IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, and SUE SAVAGE-RUMBAUGH, Ph. D.,<br><br>Defendants. | Case No. 4:10-cv-00052<br><br>BRIEF IN RESISTANCE TO ZOO ATLANTA'S APPLICATION FOR APPOINTMENT OF RECEIVER |

COMES NOW the Plaintiff, Iowa Primate Learning Sanctuary d/b/a Great Ape Trust ("Trust"), and for its Brief in Resistance to Zoo Atlanta's Application for Appointment of Receiver, respectfully states as follows:

## Table of Contents

INTRODUCTION ................................................................................................................ 2
STATEMENT OF FACTS ................................................................................................... 3
   A.   Bonobos ....................................................................................................................... 4
   B.   Matata .......................................................................................................................... 4
   C.   Maisha ......................................................................................................................... 5
   D.   Great Ape Trust .......................................................................................................... 6
   E.   Risks of moving Matata and Maisha .......................................................................... 8
   F.   AZA ........................................................................................................................... 10
   G.   Ownership of Matata and Maisha ............................................................................ 11
LEGAL ARGUMENT ......................................................................................................... 12
   I.   LEGAL STANDARD FOR APPOINTMENT OF A RECEIVER ............................. 12
   II.   THE EXTRAORDINARY REMEDY OF A RECEIVERSHIP IS NOT WARRANTED IN THIS MATTER ................................................................................................... 13
      A.   It is unlikely that Zoo Atlana is the rightful owner of Matata and Maisha………13

    B    There is no probability of fradulent conduct that would frustrate Zoo Atlanta's claim of ownership………………………………………………………………… 14
    C.   There is no imminent danger that the bonobos will be concealed, lost, or diminished in value……..………………………………………………………… 14
    D.   Adequate legal remedies exist to determine whether Zoo Atlanta owns the bonobos and may, permissibly, send them to the Milwaukee Zoo to participate in a breeding program ……………………………………………………....…16
    E.   Less drastic equitable remedies are available…………………………………16
    F.   Appointing a receiver that requires moving the bonobos from the Trust, before competion of the underlying interpleader litigation, will likely do *more harm than good*…………………………………………………………………...17

CONCLUSION.................................................................................................................. 18

## INTRODUCTION

For the past 35 years, since being caught in the wild in Zaire, now known as the Democratic Republic of the Congo ("Congo"), Matata has participated in ground breaking research financed by grants from the National Institute of Child Health and Development, ("NICHD"), a part of the National Institute of Health, and various private foundations. Throughout that time, Matata and members of her family, including Maisha, have worked with and been cared for by Dr. Sue Savage Rumbaugh, William Fields, and other scientists at various institutions, most recently the Great Ape Trust ("Trust"). At the Trust, Matata and Maisha reside in an exceptional, state of the art facility that was designed specifically for bonobos. They are with their bonobo family and the humans with whom they have lived for virtually their entire lives. Through the years, Dr. Savage Rumbaugh, the Language Research Center ("LRC") at Georgia State University, the Trust, and the NICHD have provided millions of dollars to support Matata and Maisha and other members of Matata's family. Zoo Atlanta has, since Matata was purportedly donated to it in 2000, entrusted Matata's and

Maisha's well-being to the LRC and Trust. It has provided no financial support and has indicated no interest in providing a home for them at its own facility.

Given this history, Zoo Atlanta's claim that there is imminent danger that Matata and Maisha will be diminished in value if they continue to reside at the Trust pending the resolution of this action is hardly credible. The fact that Zoo Atlanta wants Matata to participate in a particular breeding program affiliated with the American Zoos and Aquariums Association ("AZA") rather than in the Trust's research program, does not justify uprooting Matata and Maisha from their home and family; forcing them to undergo a stressful move that would be detrimental to them; and placing them with a "receiver" that is the very zoo where Zoo Atlanta wishes Matata to be bred unless and until Zoo Atlanta is determined to be their rightful owner and entitled to remove them from the Trust.

Matata and Maisha should remain at the Trust pending the resolution of this Interpleader action.

## STATEMENT OF FACTS

The Trust initiated this Interpleader action to resolve the Defendants' competing ownership interests in two bonobos, Matata and Maisha, who have resided at the Trust since 2005. The details of the competing ownership claims, including related documentation, are set forth in the complaint and will not be repeated here. Zoo Atlanta has requested that the Milwaukee Zoo be appointed as a "receiver" for Matata and Maisha and that they be moved there pending the resolution of this matter. An understanding of bonobos and the impact that relocation has on them; the history of Matata and Maisha; the Trust; and the Trust's relationship with Zoo Atlanta and the AZA, is helpful in addressing the request for a Receiver.

A.  <u>Bonobos</u>

Matata and Maisha are bonobos (pan paniscus). Bonobos, who have sometimes been described as pygmy or dwarf chimpanzees, are an endangered species. They are found, in the wild, only in Democratic Republic of the Congo ("Congo"). Bonobos reside in matriarchal communities. (Ex. G ¶ 4). While young females often leave colonies before they reach adulthood, it is unusual for older, dominant, females to leave the colony in which they have prominent social status. Bonds between mothers and sons are particularly strong and last into males' adulthood. (Ex. D ¶ 10). Bonobos can generally live approximately 50 years in captivity. (Ex. D ¶ 4).

B.  <u>Matata</u>

Matata is the matriarch of the seven member bonobo colony residing at the Trust. (Ex. B ¶ 18; Ex. G ¶ 6.) The other bonobos in the colony include her daughters Panbanisha and Elikya, son Maisha, adopted son Kanzi, and grandchildren Nyota and Teco (born on June 3, 2010). Matata was born in the Congo (then known as Zaire) in or around 1970 and resided in the wild until 1974 when she came to the Yerkes National Regional Primate Center ("Yerkes") in Atlanta, Georgia pursuant to a loan agreement between the Congo and Yerkes Center for Primatological Research of Emory University in Atlanta, Georgia, acting in cooperation with the United States National Academy of Sciences. (Complaint Exs. A, M; Ex. A ¶ 5). She was sent from the Congo to the United States to participate in a research program sponsored by the NICHD and has continuously, since that time, participated in research funded by NICHD and various private foundations. (Ex. A ¶ 5; Ex. B ¶ 4; Ex. E ¶ 5).

Matata has, in her lifetime, resided at Yerkes (1975-1980); the Language Research Center at Georgia State University in Atlanta, Georgia ("LRC") (1980-2005); and the Great

Ape Trust in Des Moines, Iowa (2005-present). (Ex. E ¶ 11). Continuously since 1978, Matata has been under the care and direction of Dr. Sue Savage Rumbaugh and/or William Fields, who is the current Executive Director, Director of Scientific Research and Program Director at Great Ape Trust. (Ex. B ¶ 3; Ex. E ¶ 5). She has never lived at a zoo.

At the approximate age of 40, Matata is an older bonobo. (Ex. B ¶ 4). While she is in good health, she has few teeth. (Ex. D ¶ 9).The Trust does not intend to breed Matata since pregnancy, at her age, would place her health and well being at risk. (Ex. B ¶ 15). Birth control at the Trust is currently handled by the rhythm method rather than by exogenous hormone methods, as the safety and long term consequences of administration of exogenous hormones to female bonobos and other bonobos who reside in their colonies and are exposed to their urine, has not been established. (Ex. B ¶ 21). Zoo Atlanta makes much of the accidental impregnation of Matata by a member of her family in 2006. There have been no subsequent accidents and strict preventive measures are enforced at the Trust to avoid such situations. (Ex. B ¶ 22). The accident involving Matata is similar to an accident that occurred at the Milwaukee Zoo involving Neema, an ape that was mistakenly allowed to breed with her half brother. It is the understanding of William Fields that such an accident with Neema occurred not just once, but twice. (Ex. B ¶ 23).

    C. <u>Maisha</u>

Maisha was born in 2000. (Ex. B ¶ 19; Ex. E ¶ 7). His mother is Matata and his father was P Suke. (Ex. E ¶ 7). Maisha resided at the LRC in Atlanta from 2000-2005 and has since lived at the Great Ape Trust. He has been under the care and direction of Dr. Savage Rumbaugh and/or William Fields his entire life. (Ex. B ¶¶ 3, 15; Ex. E ¶¶ 3, 7). He has also been a continuous participant in the research programs funded by NICHD and various private

5

foundations. (Ex. B ¶ 4). Matata is in excellent health and an active participant in the bonobo colony at the Trust. (Ex. B ¶ 8). He has never resided in a zoo.

    D. Great Ape Trust

The Great Ape Trust is a scientific research facility founded by Ted Townsend in 2002. The $13 million facility provides an extraordinary environment for Matata, Maisha and the other apes who reside there. The bonobos reside in a 13,000 square foot facility, with access to large spaces, indoors and out. The facility is surrounded by 200 acres of water, trees, and grass. The configuration of the facility allows Matata and Maisha to socialize with the other bonobos in large or small groups or stay in a private place if they choose. The facility was specifically designed to accommodate the bonobos' needs and to provide them a healthy environment. The air within the building is completely exchanged seven times per day. The building has natural lighting. The floors are heated. Fresh food is prepared for the bonobos by Trust staff members according to diets that are customly designed by their veterinarians to meet their individual needs. (Ex. B ¶¶ 6, 7).

In addition to having the opportunity for social interaction with their bonobo family at the Trust, Matata and Maisha have regular contact with the human friends with whom they have had regular interaction throughout their lives. Dr. Savage Rumbaugh works at the Trust as a Scientist with Special Standing. Dr. Savage Rumbaugh's sister, Elizabeth (Liz) Pugh, who began working with the bonobos in Georgia, now works with them at the Trust, as does William Fields who began working with the bonobos in Georgia in 1997. (Ex. B ¶¶ 1, 3, 14-16).

As a facility that conducts research funded by the NICHD, the Trust is overseen by, and must comply with, the rigorous requirements of the Office of Laboratory Animal Welfare ("OLAW"), a division of the National Institute of Health. (Ex. C ¶ 9). Pursuant to OLAW requirements, the Trust has an Institutional Animal Care and Use Committee ("IACUC") that conducts inspections every 6 months to ensure that the Trust's facilities, standard practices, and ape health and well-being, are compliant with OLAW requirements. (Ex. C ¶ 10). The protocols for all research conducted at the Trust must be approved by the IACUC. (Ex. B ¶ 11). In addition to IACUC inspections, the quality of the Trust environment and welfare of the apes is ensured by yearly inspections by the U.S. Department of Agriculture, that is also responsible for inspecting zoos, (Ex. B ¶ 12; Ex. C ¶ 10-11; Ex. E ¶ 16); and periodic inspections by a team from OLAW. The Trust's inspections have consistently recognized the superior quality of the facility. USDA inspections of the bonobo building have identified no deficiencies whatsoever. (Ex. B ¶ 12; Ex. C ¶ 10-11; Ex. E ¶ 16). An OLAW inspection in the fall of 2009 lauded the "...spirit and dedication of the staff,...well managed animal facilities,...effectiveness of the institutional practices,...program of veterinary care,...excellent behavior and scientific research program,...state of the art facility operations; [and]...in depth involvement and excellent professional leadership...." at the Trust. (Ex. B ¶ 13; Ex. C ¶ 11).

The research in which the bonobos participate involves non invasive interdisciplinary studies of their cognitive and communicative capabilities and is conducted by world renowned scientists. (Ex. A ¶ 2; Ex. E ¶ 14). Some of the bonobos have the capability of using lexigrams to communicate with humans. The research in which Matata and Maisha participate has generated over 439 scientific publications (See Exh. 1 to Ex. B).

      E.  <u>Risks of moving Matata and Maisha</u>

Moving is a stressful experience for bonobos and presents numerous health risks. It is common knowledge in the zoological community that movement of apes be minimized. (Ex. F ¶ 1-6). It would be contrary to best husbandry practice for an ape to be moved from a good facility to another while awaiting a decision to make a second move. (Ex. F ¶ 7).

One risk arises from the necessity of sedating the bonobos to facilitate a move. As with humans, sedation of bonobos has inherent risks. There is no dose of tranquilizer that is necessarily safe. Older bonobos, such as Matata, who may have underlying, unknown medical conditions such as cardiac disease, are particularly susceptible to such risks. (Ex. D ¶ 16).

The inevitable exposure of Matata and Maisha to microbiological agents to which they have not been previously been exposed presents a second risk. Both Matata and Maisha have lived in a stable, closed, group of bonobos. To transfer them to a new group in a different location, regardless of the cleanliness of the facility, would potentially expose them to a variety of micro flora that they have not previously encountered. The stress of moving would weaken their immune system and heighten the risk that they would become ill as a result of exposure to new micro flora. (Ex. D ¶ 13).

Impregnation of Matata, which is Zoo Atlanta's motive to place Matata at the Milwaukee Zoo, is another substantial risk. At age 40, it is questionable whether Matata is capable of a successful pregnancy. Her last live birth was in 2000. She has since had two miscarriages. At Matata's age, a pregnancy, whether or not it results in a live birth, is a health risk. (Ex. B ¶ 20; Ex. D ¶ 17).

There are also significant risks associated with removal of Matata and Maisha from the colony in which they have continuously resided and inserting them into a new social structure. If Matata, who has been the dominant female in her colony for many years, is placed in a new environment with an existing matriarch, she is likely to struggle to maintain her alpha position within the new group of bonobos.  The resulting confrontations with other bonobos create a serious risk of injury to Matata.  Matata's age and reduced number of teeth, as well as her status as an "outsider," make her particularly subject to injury.  Matata's risk of injury is also exacerbated by the unique cultural environment in which she has lived her entire life.  Her manner of communication and social interaction has undoubtedly been influenced by the research and cultural interactions with humans in which she has participated.  It is very possible that she will not be able to socially negotiate an acceptable position in a new group and will be left with no alternative but to fight for position. (Ex. B ¶ 25; Ex. D ¶ 11).

Bonobo males are fiercely protective of their mothers.  Accordingly, in the likely event that Matata will struggle in the new environment, Maisha will be placed in the position of having to fight to support and defend Maisha.  His risk of injury will, accordingly, be significant. (Ex. B ¶ 26; Ex. G ¶ 9).

Beyond the risks of physical injury, Matata and Maisha will inevitably suffer from being separated from their bonobo family and the human friends/caretakers with which they have had a long term relationship.  (Ex. B ¶ 24; Ex. D ¶ 9; Ex. E ¶¶ 5, 18;Ex. G ¶ 8). Removing bonobos from their established social groups is detrimental to their well-being and should be done only if absolutely necessary. (Ex. D ¶ 9). It takes a considerable period of time for bonobos to adapt to a new environment. (Ex. D ¶ 13).

Matata and Maisha would experience additional stress from being placed on display for the first time in their lives. Bonobos and chimpanzees are stressed by environments in which they are in regular proximity to humans. By nature, they find it difficult to ignore humans. They seek to communicate and make connections with them. This behavior places strain on the apes and can be detrimental to their well being, especially if there is continued exposure to humans over a sustained period. Since they have never lived in a zoo and, therefore, have not had an opportunity to acclimate to being on display, Matata and Maisha will experience this added stress. (Ex. B ¶ 2).

Zoo Atlanta's proposal to move Matata and Maisha would likely result in them being unnecessarily moved not just once, but twice. Each move would present a significant threat to their well being.

F. AZA

As a research facility, the Trust's mission is different than that of the members of the Association of Zoos and Aquariums ("AZA"), including Zoo Atlanta and the Milwaukee County Zoo. AZA members operate facilities that combine research and breeding of animals with public education and recreation. While the Trust had originally believed its unique educational and research programs would allow it to operate consistently with the AZA mission, it found that the demands placed upon it by AZA, including requests beginning several years ago to remove Matata from ongoing research programs and transport her to the Milwaukee Zoo for breeding purposes, were at odds with its philosophical approach and certain fundamental premises of its research. (Ex. C ¶¶ 3-7 and Ex.'s 1, 2 and 3 to Ex. C). Accordingly, after its efforts to negotiate a resolution of issues relating to Matata were

unsuccessful, the Trust, voluntarily and at its own initiative, without having been asked to do so by the AZA, chose not to renew its certification with the AZA in 2009. It did not "lose" its accreditation with the AZA as has been alleged by Zoo Atlanta. (Ex. C ¶¶ 6, 7, 8 and Ex.'s 2-3 to Ex. C).

### G. Ownership of Matata and Maisha

Zoo Atlanta's claim that it owns Matata and Maisha is strongly disputed. This dispute is the reason for this Interpleader action.

Zoo Atlanta's assertion of ownership of Matata is derived from a purported "donation" of Matata by Yerkes to Zoo Atlanta in 1996. (Complaint Exhibit C). Yerkes did not, however, own Matata at the time of the purported transfer. Matata had been loaned to Yerkes by the Congo (then Zaire). (Complaint Exh.'s A, M; Ex A, *see also*, Ex. E ¶¶ 9-11). Mwanza Ndunda, Secretary General Ministry of Education and Scientific Research of the Democratic Republic of the Congo, and Center of Research in Ecology and Forestry, advised the Trust of the Congo's continued ownership interest in Matata in March 2009 and objected to moving her from the Trust if she continued to be involved in research. (Complaint Ex. M). Minister Ndunda affirmed that Matata had been loaned to Yerkes for the purpose of participating in the research that has continued and evolved and in which she still participates at the Trust today. The Congo continues to assert its ownership interest in Matata and has expressed its desire that Matata and her offspring remain at the Trust. Minister Ndunda emphasizes that Matata was sent to the United States for the purpose of research rather than breeding. (Ex. A).

Zoo Atlanta's, the Japanese Monkey Centre's and Dr. Savage Rumbaugh's claim to Maisha (and the Great Ape Trust's claim derived from Dr. Savage Rumbaugh) are derived from agreements providing for ownership of off-spring of P Suke (Maisha's father) and Matata (Maisha's mother). (Complaint Ex.'s 16-20 and D, E, and F thereto; Ex. E ¶¶ 7, 8). The Congo may also assert an ownership interest in Maisha as the son of Matata.

It is notable that neither Matata nor Maisha have ever been in the custody of Zoo Atlanta, nor has Zoo Atlanta contributed to their support. (Ex. B ¶ 29; Ex. E ¶¶ 11, 18). In contrast, Dr. Savage Rumbaugh, NICHD, Georgia State University, and the Trust have expended millions of dollars to support Matata and Maisha and the other members of Matata's family while they have resided and participated in research at the LRC and Trust. (Ex. B ¶ 29).

## LEGAL ARGUMENT

### I. LEGAL STANDARD FOR APPOINTMENT OF A RECEIVER

Pursuant to Federal Rule of Civil Procedure 66, the federal district court can appoint a receiver in "accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66. "The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc*. 999 F.2d 314, 316 (8th Cir. 1993) (citation omitted). "A receiver is an extraordinary equitable remedy that is only justified in extreme situations." *Id*. Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment include: 1) a valid claim by a party seeking the appointment; 2) the probability that fraudulent conduct has occurred of will occur to frustrate that claim; 3) imminent danger

that property will be concealed, lost or diminished in value; 4) inadequacy of legal remedies; 5) lack of a less drastic equitable remedy; and 6) likelihood that appointing the receiver will do more good than harm. *See id*. at 999 F.2d at 316-317. (citations omitted).  Zoo Atlanta does not and cannot prove that this case presents an "extreme situation" that requires the Court to appoint a receiver.

II. THE EXTRAORDINARY REMEDY OF A RECEIVERSHIP<br>IS NOT WARRANTED IN THIS MATTER

A. <u>It is unlikely that Zoo Atlanta is the rightful owner of Matata and Maisha.</u>

The very nature of the underlying interpleader litigation is to determine whether Zoo Atlanta has a valid claim to Matata and Maisha.  Zoo Atlanta's claim that it owns Matata and Maisha is strongly disputed.  In fact, Zoo Atlanta's assertion of ownership is derived from a purported "donation" of Matata from Yerkes to Zoo Atlanta in 1996.  Yerkes did not, however, own Matata at the time of the purported donation.  Matata had been <u>loaned</u> to Yerkes by the Congo.  Mwanza Ndunda, Secretary General Ministry of Education and Scientific Research of the Democratic Republic of the Congo, and Center of Research in Ecology and Forestry has affirmed that Matata had been loaned to Yerkes for the purposes of participating in the research that has continued and evolved and in which Matata and Maisha still participate at the Trust today.  Since Yerkes did not own Matata, it could not transfer ownership of Matata to Zoo Atlanta by its "donation."  The owner of Matata, the Congo, wants Matata to remain at the Trust and continue in the research program in which she has participated for the past 35 years.

There are several potential claimants to Maisha, including Zoo Atlanta, the Japanese Monkey Centre, Dr. Savage Rumbaugh, and the Congo.  The Court's interpretation of the

Congo's ownership rights and various agreements between the other parties will be necessary to establish who owns him.

      B.    <u>There is no probability of fraudulent conduct that would frustrate Zoo Atlanta's claim of ownership.</u>

Although proof of fraud is not required to support a district court's discretionary decision to appoint a receiver...," Aviation Supply Corp., 999 F.2d at 317, Zoo Atlanta attempts to characterize the Trust's decision not to place Matata into an AZA breeding program and Matata's accidental pregnancy four years ago as "fraudulent" conduct. Plainly, the breeding issues of concern to Zoo Atlanta do not involve misrepresentations or underhanded conduct of any kind. Matata and Maisha continue to reside exactly where Zoo Atlanta placed them pursuant to a loan agreement in 2000. They are safe, well cared for, and happy. When Zoo Atlanta terminated the purported loan agreement, and asked that Matata and Maisha move to the Milwaukee Zoo, the Trust openly and appropriately filed the instant interpleader action to resolve the competing ownership claims to both bonobos before carrying out a move to which the Trust, Dr. Savage Rumbaugh, and the Congo object.

      C.    <u>There is no imminent danger that the bonobos will be concealed, lost, or diminished in value.</u>

As indicated above, there is no reason to believe that Matata and Maisha will be concealed. Furthermore, their value will not be diminished if they remain at the Trust pending the resolution of this matter. They are at an exceptional facility that has been specifically designed to meet the needs of bonobos. They receive regular clinical checks by a qualified veterinarian. The Trust is subject to oversight by OLAW, the USDA, and a local IACUC, each of which inspects the facility and the welfare of the bonobos at regular intervals. Inspection reports have consistently been excellent and without deficiencies. The recent

OLAW inspection, conducted in the fall of 2009, complimented the Trust for the ". . . spirit and dedication of the staff, . . . well managed animal facilities, . . . effectiveness of the institutional practices, . . . program of veterinary care, . . . excellent behavioral and scientific research program,  . . . state of the art facility operations; [and] . . . in depth involvement and excellent professional leadership . . ." at the Trust.  (Ex. C ¶ 11 and Ex. 5 to Ex. C).

Zoo Atlanta's suggestion that Matata is in imminent danger of breeding with a family member is overblown and misplaced.  The Trust enforces the rhythm method of birth control rather than using exogenous hormones, as bonobos residing at the Trust experienced side effects from hormonal birth control, and the safety and long term consequences of hormone birth control on the bonobos to whom it is administered, as well as the other bonobos who reside in their colonies, have not been established.  While, Matata experienced an accidental impregnation by a family member in 2006, the Milwaukee Zoo has experienced similar accidents, including the impregnation of Matata's daughter, Neema, by her step brother on at least one, and possibly two occasions.  There has been no accidental pregnancy at the Trust since 2006 and the Trust is vigilant in its efforts to avoid such accidents.  Further, the Trust does not intend to breed Matata since pregnancy, at her age, would place her health at risk.  She has had two miscarriages since her last successful delivery in 2000.

The Trust is a safe and healthy environment for each of the bonobos in Matata's colony.  There is no danger that Matata's or Maisha's value will be diminished by remaining there.

      D.    <u>Adequate legal remedies exist to determine whether Zoo Atlanta owns the bonobos and may, permissibly, send them to the Milwaukee Zoo to participate in a breeding program.</u>

The Interpleader filed by the Trust is a proper legal remedy to resolve the competing ownership interests of Zoo Atlanta and the other parties. It will ultimately be up to the owners of the two bonobos to determine whether they should continue to participate in the research program of which they are an integral part or in the breeding program advocated by Zoo Atlanta. It is premature and unjustified to send them to the Milwaukee Zoo prior to the resolution of the ownership interests.[1]

      E.    <u>Less drastic equitable remedies are available.</u>

If oversight is deemed to be needed for the "preservation and protection" of Matata and Maisha, which the Trust vigorously denies, a receiver could be appointed to monitor their welfare at the Trust. A qualified receiver could be selected from one of the educational institutions proximate to the Trust who could conveniently visit the Trust as needed to evaluate Matata's and Maisha well-being. Appointment of such a receiver would not require moving the bonobos to a new facility with the attendant stress and risk as described in Section F, below.

If it is determined that there is an immediate need to perpetuate Matata's bloodlines, which, again, the Trust vigorously denies, Matata could be impregnated by artificial insemination. Additionally, her offspring, ncluding her daughter who resides at the Milwaukee Zoo, are available for breeding by artificial or natural means, depending on their location.

---

[1] Should the bonobos suffer physical injury or a decline in health during a temporary stay at the Milwaukee Zoo under receivership, or should Matata be bred while she is there, additional litigation regarding damage to the apes or ownership of Matata's offspring would be likely. (Ex. E ¶ 5).

    F.    <u>Appointing a receiver that requires moving the bonobos from the Trust, before completion of the underlying interpleader litigation, will likely do more harm than good.</u>

Transfer of Matata and Maisha to the Milwaukee Zoo is laden with very real and very significant risks. First, transferring the bonobos requires sedation and the attendant dangers. Older bonobos, such as Matata, are particularly susceptible to such risks. Matata and Maisha would also risk illness from exposure to microbiological agents to which they have not been previously exposed. Additionally, impregnation of Matata, who is forty years old and has experienced miscarriages in her last two pregnancies, is another substantial risk of appointing the Milwaukee Zoo as a receiver.

Furthermore, moving Matata, the matriarch of the bonobo colony at the Trust, and placing her into a new environment would subject her to major stress and possible physical danger as she would to struggle for position in the new colony. Maisha would also risk physical injury due to his inevitable involvement in fights with other male bonobos in order to support and defend Matata. Moving Matata and Maisha to the Milwaukee Zoo would also create extreme stress resulting from their separation from their colony of family members as well as from the humans who have cared for and worked with them their entire lives. Placement of Matata and Maisha in a zoo, which is a substantially different and more stressful environment than the research environment to which they are accustomed, would also cause detrimental stress. Adapting to a new environment would take a long time, particularly for Matata. Recognizing the stress inherent in moving apes, the AZA, recommends that movement of apes be minimized. Contrary to that guiding principal, Zoo Atlanta's Application could very well result in <u>two</u> moves, exposing Matata and Maisha to stress and risk not just one, but two times.

In addition to the harm that will be suffered by Matata and Maisha if they are unnecessarily moved not just once, but possibly two times, the research in which they participate at the Trust will be irreparably harmed. (Ex. E ¶¶ 21, 22).

The substantial detriment to Matata and Maisha that is inherent in the proposed move to the Milwaukee Zoo far outweighs any harm that could possibly be associated with their continued residence at the Trust pending the resolution of this Interpleader action.

## CONCLUSION

"Where [as here] there is no fraud or imminent danger of the property being lost, injured, diminished in value, or squandered and where legal remedies do not appear to be inadequate the appointment of a receiver should not be granted." *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 826 (3d Cir. 1959) (citing 45 Am. Jur. §§ 26, 30).  Given that Zoo Atlanta's claim of ownership is far from certain; there is no fraud; Matata and Maisha's value will not diminish if they remain in an excellent and regularly inspected environment at the Trust; the legal remedy sought in this Itnerpleader is adequate for determining the ownership of the bonobos before a change in residence is warranted; there are less drastic ways of addressing any concerns that may be raised by Zoo Atlanta; and, most importantly, Matata and Maisha would necessarily suffer substantial stress and risk of harm if they are moved, not just once, but twice, Zoo Atlanta's Application for a Receiver should be denied.

                WHITFIELD & EDDY, P.L.C.
317 Sixth Avenue, Suite 1200
Des Moines, IA 50309-4195
Phone: 515-288-6041
Fax: 515-246-1474

By: /s/
    Jaki K. Samuelson    AT0006940
    samuelson@whitfieldlaw.com

By /s/
    B. MacPaul Stanfield    AT0007422
    stanfield@whitfieldlaw.com

ATTORNEYS FOR PLAINTIFFS, GREAT APE TRUST

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on July 30, 2010.

By:  ☐ U. S. Mail    ☐ FAX
      ☐ Hand Delivered  ☐ Overnight Courier
      ☐ Certified Mail  X Other: E-filing

Signature: /s/ Julie R. McCain

Electronically filed.

Service List:

Gregory M. Lederer
Kimberly K. Hardeman
LEDERER WESTON CRAIG, PLC
118 Third Avenue SE, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927

ATTORNEYS FOR ZOOLOGICAL FOUNDATION OF GEORGIA, INC., D/B/A ZOO ATLANTA

Sue Savage Rumbaugh
c/o William C. Zifchak
KAYE SCHOLER
425 Park Avenue
New York, NY 10022-3598

Democratic Republic of Congo
Ministry of Foreign Affairs
P.O. Box 7100
Foreign Minister for DRC, Kinshasa

Nicolas Mwanza Ndunda, PhD
Secretary General, Centre de Recherché en Ecologie et Foresterie
DRC Ministry of Education and Scientific Research
Kinshasa, Democratic Republic of Congo

Japan Monkey Centre Institute and
Museum of Primatology
26 Kanrin, Inuyama, Aichi
484-0081, Japan