# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST, <br><br> Plaintiff, <br><br> v. <br><br> ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, and SUE SAVAGE-RUMBAUGH, Ph. D., <br><br> Defendants. | Case No. 4:10-cv-00052 |

**DECLARATION OF WILLIAM C. ZIFCHAK, ESQ.
IN SUPPORT OF DEFENDANT SUE SAVAGE-RUMBAUGH'S
<u>MOTION FOR SPECIFIC PERFORMANCE AND RELATED RELIEF</u>**

I, WILLIAM C. ZIFCHAK, declare as follows:

1. I am Special Counsel to the law firm Kaye Scholer LLP, having retired as an equity partner after 31 years on January 1, 2013. I am attorney of record to co-defendant, Sue Savage Rumbaugh ("Dr. Rumbaugh") in this matter and have served in that capacity since February 2010.

2. Dr. Rumbaugh respectfully moves this Court for specific performance of the Settlement Agreement[1] and Supplemental Agreement[2] in this matter (together, the

---

[1] This refers to the *Agreement for Settlement and Acknowledgment of Ownership*, by and between the Iowa Primate Learning Sanctuary, Zoological Foundation of Georgia, Democratic Republic of the Congo, and Dr. Rumbaugh, last to sign on February 17, 2013, attached to the Memo as Exhibit A.

[2] This refers to the *Supplemental Agreement for Settlement and Acknowledgement of Ownership*, by and between Iowa Primate Learning Sanctuary, Emily Sue Savage-Rumbaugh, and Bonobo Hope Initiative, Inc., signed on January 31, 2013, attached to the Memo as Exhibit B.

- 2 -

"Agreements") and for related relief, as described in Dr. Rumbaugh's Motion For Specific Performance And Related Relief ("Motion") and the accompanying Memorandum ("Memo").

3. Prompting this request is that beginning on June 1, 2013, in a series of emails to Declarant, Lyle Simpson, Esq., counsel for Ape Communication & Cognition Institute ("ACCI"), the purported successor entity to Plaintiff Iowa Primate Learning Sanctuary ("IPLS"), d/b/a the Great Ape Trust, renounced for the first time the Agreements, on the basis that IPLS has in fact never agreed to them despite its Director executing each of them and IPLS's counsel of record having executed and filed a Stipulation of Dismissal with this Court pursuant to them. Mr. Simpson asserted that for this reason, the Agreements are not binding on IPLS or its purported successor entity, ACCI. These Agreements are binding on ACCI, however, for the reasons described in the Motion and herein.[3]

Background

4. In February 2010, counsel to IPLS, Jaki Samuelson, Esq., retained Declarant to represent Dr. Rumbaugh as a co-defendant in this action. Outside of this litigation, Declarant began representing Dr. Rumbaugh individually and on a pro bono basis in or about December 2007, at which time she was being induced by the Great Ape Trust and Lyle Simpson, Esq., to sign a one-sided retirement agreement. More recently, Declarant was engaged in or about February 2014 by Bonobo Hope Initiative, Inc. ("BHI"), a sister non-profit to IPLS, to serve as litigation counsel in connection with a continuing dispute with IPLS and its purported successor.

---

[3] The presumed purpose of ACCI in renouncing the Agreements is to exercise sole ownership and control of these priceless bonobos and the attendant intellectual property, and more problematically to exploit the bonobos for types of scientific research and other purposes that were not contemplated by the Agreements. In doing so ACCI is purposefully excluding Dr. Rumbaugh indefinitely from meaningful access to the bonobos that she has raised and nurtured since their births and during which 40+ year period she taught most of them to communicate in English using computer keyboards.

5. I was involved with advising Dr. Rumbaugh at the time the Agreements were signed. An integral term of the Settlement Agreement was that IPLS, BHI, and Dr. Rumbaugh enter into the Supplemental Agreement which determined ownership and related rights over Kanzi, Nyota, Elikya, and Teco (the "Bonobo 4"). This was made explicit in Paragraph 7 of the Settlement Agreement, which states that Dr. Rumbaugh's consent to the Settlement Agreement was contingent on her entering into the Supplemental Agreement with IPLS. (*See* Memo, Ex. A ¶ 7.) Plainly, to the extent that ACCI is renouncing the Supplemental Agreement or contends that it is not binding on it, or was never binding on IPLS, then Dr. Rumbaugh's consent to the Settlement Agreement would also be null and void.[4]

6. Dr. Julie Gilmore signed both the Settlement Agreement and the Supplemental Agreement on behalf of both IPLS and BHI and as the "Director" of each entity. (Memo, Ex. A at 5; Memo, Ex. B at 4.)

Recent Events Compel the Need for This Court's Intervention

7. In or about November 2013, the Board of IPLS, without notice to Dr. Rumbaugh or to BHI, dismissed Dr. Rumbaugh from the Board and barred her from the premises of IPLS and from communicating with IPLS. Since that time, IPLS (and its successor, ACCI) have refused to grant Dr. Rumbaugh and the other members of the BHI Board access to the Bonobo 4, the ability to oversee their care, the ability to oversee the science in which they are involved, and other rights of a joint owner.

8. On December 18, 2013, Mr. Simpson advised Declarant that IPLS had been rendered administratively "inactive" due to the failure to file a biennial report with the

---

[4] If the Court finds that the Agreements are null and void, then to the extent that Dr. Rumbaugh and BHI have taken actions based on their understanding that both Agreements were valid and enforceable, IPLS and ACCI should be promissorily estopped from using those actions against Dr. Rumbaugh and BHI.

- 3 -

Secretary of State of Iowa and that he could not reinstate it without IPLS paying off a $75,000 unemployment insurance tax lien imposed on IPLS. (*See* Memo, Ex. D.) Even though he was corporate counsel to IPLS, curiously Mr. Simpson attributed the filing oversight to Dr. Rumbaugh (even though Dr. Rumbaugh was on extended leave of absence due to a head injury suffered while working at IPLS). (*Id.*)

9. Mr. Simpson also advised Declarant in the same December 18, 2013 communication that he would be creating a successor non-profit entity to IPLS, and that the new entity, which we subsequently learned was ACCI, would be assuming IPLS's obligations under the Agreements, among other obligations.[5] (*Id.*) Mr. Simpson asked me to review the transfer documents prior to signing.

10. At that time, I agreed to review the transfer documents before signing and asked Mr. Simpson to send them to me, but Mr. Simpson never sent them. I continued to ask for the documents illustrating the successor entity's commitment to take on IPLS's obligations on more than one occasion thereafter. Mr. Simpson declined to provide this documentation for more than 5 months.

11. In his correspondence of December 18, 2013, Mr. Simpson also asked whether I thought that this Court's approval would be necessary to effectuate this transfer. (*Id.*) Although I did not respond to Mr. Simpson directly on this point, I did communicate to Paul Burns, counsel of record herein for IPLS, that I believed this Court's approval was necessary.

12. On February 10, 2014, when I still had not received the transfer documents or an update on the status of IPLS, I sent Mr. Simpson two letters. (Memo, Exs. H & I.) In

---

[5] I was advised on June 3, 2013, by Julie Flaherty, Esq., an attorney admitted to the bar in Minnesota and an outside advisor to BHI, that Mr. Simpson told her in or about July 2012 that he was intending to transfer IPLS's assets to a new entity in order to evade the tax lien of $75,000. This was well before Dr. Rumbaugh allegedly allowed IPLS's active status to lapse.

- 5 -

those letters, I formally requested, among other things, that Mr. Simpson update me on the status of IPLS, including about the planned disposition of its assets, the bonobos.

13. Because at that time I believed there was still much uncertainty surrounding the continued viability of IPLS as an entity and the control and ownership of the bonobos, the parties agreed, at Declarant's request, to extend this Court's jurisdiction over the Agreements, which was set to expire on or around February 17, 2014. The Court extended its jurisdiction until June 17, 2014. [Dkt. 66.]

14. Neither Mr. Simpson nor anyone else from IPLS or ACCI ever disclosed the existence of ACCI to me or to this Court. I did not learn of its creation until local counsel, Todd Langel, discovered it and shared it with me on February 20, 2014.

15. On February 27, 2014, Mr. Simpson sent me an email purportedly on behalf of IPLS. (Memo, Ex. J.) In his original email, Mr. Simpson repeatedly referred to IPLS as if it was an entity that continued to operate, and he did not at any point mention that ACCI had been formed and was the legal successor to IPLS. I replied to Mr. Simpson, revealed that I had learned about ACCI's formation, and asked why Mr. Simpson had not disclosed this development to either myself or to counsel for Defendant Democratic Republic of the Congo. (*Id.*) In his response email, Mr. Simpson acknowledged the existence of ACCI, and he was explicit that ACCI was accepting "all responsibility for all actions of IPLS since...2011." (*Id.*) Simpson and other ACCI members affirmed on multiple occasions thereafter that ACCI was succeeding IPLS and was accepting its obligations.

16. On June 2, 2014, Mr. Simpson suddenly reversed course and advised me by email that ACCI in fact had not and would not accept the obligations under the Agreements. (*See* Memo, Ex. L at 2-3.)

17. On June 4, 2014, at the outset of a joint meeting of the boards of ACCI and BHI, Mr. Simpson handed to me a "Bill of Sale" dated December 18, 2013, from IPLS to ACCI. Curiously, it is signed by the same two officers, Meg Fitz and Bill Hopkins, for both entities. (*See* Memo, Ex. M.) Upon information and belief, at the time of the sale (December 18, 2013), IPLS was an inactive corporation under the laws of the State of Iowa and, if so, lacked any power to sell its assets, much less to do so in order to evade a state tax lien. At the conclusion of that June 4, 2014 meeting, Mr. Simpson advised that he had been authorized by the ACCI Board to propose that if the federal lawsuit were "ended" – by which I understood him to mean the instant action – ACCI would acknowledge and abide by the Agreements.

18. On June 10, 2014, Declarant circulated a proposed Memorandum of Understanding to ACCI's outside counsel, William Miller, Esq. of Dorsey & Whitney LLP. Despite this effort, discussions broke off on June 13, 2014.

19. In light of Mr. Simpson's and ACCI's failure to negotiate a resolution to this dispute, their insistence on keeping Dr. Rumbaugh apart from the bonobos that she raised and studied and with which she has gained world renown for communicating with in "English," Mr. Simpson's and ACCI's questionable legal maneuvering, and the imminent June 17 deadline, we seek the Court's intervention to define, declare and enforce each parties' legal rights and obligations under the Settlement Agreement and Supplemental Agreement and in particular specifically enforce IPLS's and ACCI's obligation to grant BHI co-ownership of the bonobos and to grant BHI and Dr. Rumbaugh related rights over Maisha and the Bonobo 4, on which premises Dr. Rumbaugh executed the Settlement Agreement, to declare that the Democratic Republic of the Congo is the sole owner of Matata, and to resolve issues relating to the governance and administration of ACCI and BHI flowing from the Agreements.

## CONCLUSION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 13, 2014
At New York, New York


By:   /s/ William C. Zifchak
      William C. Zifchak