**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 4:10-cv-00052<br>)  Hon. Magistrate Judge Ross Walters<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT SUE SAVAGE-RUMBAUGH'S AND INTERVENOR DEFENDANT**
**BONOBO HOPE INITIATIVE'S JOINT MEMORANDUM ADDRESSING**
**JURISDICTION AND OTHER ISSUES**

COME NOW Defendant Sue Savage-Rumbaugh, Ph.D. ("Dr. Rumbaugh") and Intervenor Defendant Bonobo Hope Initiative, Inc. ("Bonobo Hope" or "BHI"), and for their Joint Memorandum Addressing Jurisdiction And Other Issues, together state to the Court as follows:

**INTRODUCTION**

Currently before this Court is Dr. Rumbaugh's Motion For Specific Performance And Related Relief ("Motion For Specific Performance") [Dkt. 69] and supporting memorandum ("Supporting Memorandum") [Dkt. 69-1]. Bonobo Hope intervened as of right on July 31, 2014 [Dkt. 79] and joined in Dr. Rumbaugh's Motion For Specific

Performance on August 25, 2014 [Dkt. 84].    A hearing on the Motion for Specific Performance is set to begin on May 27, 2015 [Dkt. 99].

Per this Court's Order of December 23, 2014, Dr. Rumbaugh and BHI now submit this brief to "address the jurisdictional issues discussed at the status conference [held on December 18, 2014]" and to clarify "other issues" prior to the evidentiary hearing.  Order Following Status Conference Concerning Evidentiary Hearing And Other Deadlines, at 2 (Dec. 23, 2014) [Dkt. 93].  Specifically, in this brief, Dr. Rumbaugh and BHI (i) more fully explain the claims they intend to pursue at hearing, and (ii) address this Court's jurisdiction over the "Main Agreement"[1] and over the "Side Agreement,"[2] the Agreements based upon which the parties filed a Stipulation of Dismissal on February 21, 2013.  [See Dkt. 59.][3]

By any standard, this Court has the power, the discretion, and the need to adjudicate Dr. Rumbaugh's Motion For Specific Performance.[4]

## STATEMENT OF FACTS

This is an action in Interpleader to determine the lawful ownership of two bonobos, Matata and her son, Maisha, whom have been in continuous residence at the facility administered by plaintiff Iowa Primate Learning Sanctuary ("IPLS") and its purported successor entity, the Ape Cognition & Communication Institute ("ACCI"), since in or about

---

[1]    This refers to the *Agreement for Settlement and Acknowledgment of Ownership*, by and between the Iowa Primate Learning Sanctuary, Zoological Foundation of Georgia, Democratic Republic of the Congo, and Dr. Rumbaugh, last to sign on February 17, 2013, attached hereto as Exhibit A.

[2]    This refers to the *Side Agreement for Settlement and Acknowledgement of Ownership*, by and between Iowa Primate Learning Sanctuary, Emily Sue Savage-Rumbaugh, and Bonobo Hope Initiative, Inc., signed on January 31, 2013, attached hereto as Exhibit B.

[3]    In the Stipulation of Dismissal, the parties "agree[d] and consent[ed] to the continued jurisdiction of the court to oversee compliance with the settlement agreement, for a period of twelve (12) months from signature." [Dkt. 59.]

[4]    The Court is aware of Matata's sudden and mysterious death on June 22, 2014, while in the sole custody of plaintiff Ape Cognition & Communication Institute and while Dr. Rumbaugh was banned from the lab.  Matata was the sole property of Defendant Democratic Republic of Congo ("DRC").  We are authorized by counsel of record for Defendant DRC, William Graham, to state that DRC fully joins in the request that the Court assert its jurisdiction over both Agreements and grant the relief requested in the Motion For Specific Performance.

US.55758197.01

2004.  On December 29, 2011, the Court referred the case to U.S. Magistrate Judge Ross Walters to oversee settlement discussions.  [Dkt. 42.]

1.    Main Agreement – Acknowledgement of Ownership

As a consequence of those discussions, the parties entered into a settlement agreement (the Main Agreement), which determined the ownership rights to Matata and Maisha.  Under the Main Agreement, the parties agreed and acknowledged that Defendant Democratic Republic of the Congo ("DRC") was the sole owner of Matata, and IPLS was the owner of Maisha.  (Main Agreement, Ex. A ¶¶ 1 & 3.)  BHI signed the Main Agreement in acknowledgement of certain, specified paragraphs affecting its rights.  (Main Agreement, Ex. A at 5.)

2.    Incorporating by Reference of Side Agreement – Acknowledgement of Ownership

As an express requisite to her signing the Main Agreement, Dr. Rumbaugh required that IPLS, BHI, and she simultaneously enter into a Side Agreement.  (*See* Main Agreement, Ex. A ¶ 7.)  The Side Agreement determined ownership rights to four bonobos that are not the subjects of the interpleader actions per se.  Those bonobos are Kanzi, Elikya, Nyota, and Teco (the "Bonobo 4").  Under the Side Agreement, BHI and IPLS "jointly are the owners" of the Bonobo 4.  (Side Agreement, Ex. B ¶ 1.)[5]

Notably, whereas Dr. Rumbaugh relinquished "any and all rights to determine the residence, breeding, activities or use of the Bonobo 4" (Side Agreement, Ex. B ¶ 5), Bonobo Hope did not relinquish these rights.  The clear implication is that the parties recognized -- at a bare minimum -- that co-ownership granted to Bonobo Hope an equal voice in the

---

[5]    Until her untimely death in November 2012, while Dr. Rumbaugh was winding up a forced administrative leave from the Great Ape Trust, there is no dispute that the parties intended to acknowledge that a fifth bonobo, Panbanisha, was similarly to be co-owned by IPLS and Bonobo Hope as part of the Side Agreement.

US.55758197.01

"residence, breeding, activities and use" of the Bonobo 4.  ACCI, since November 2013, has attempted to abrogate these rights.  The threshold question now is whether this Court should exert jurisdiction to resolve this injustice.

Virtually all of the operative provisions of the Main Agreement that are at issue in this litigation are identical or substantially similar to provisions in the Side Agreement. Both Agreements are titled "Acknowledgement of Ownership" and make repeated reference to Bonobo Hope.  Both Agreements state that if IPLS should "cease to exist," BHI and Dr. Rumbaugh together have the right to determine the destiny of Maisha (under the Main Agreement) and the Bonobo 4 (under the Side Agreement).[6]  (Main Agreement, Ex. A ¶ 6 & Side Agreement, Ex. B ¶ 4.)  Both Agreements require that IPLS "use its best efforts to provide complete and competent care" of the bonobos and state that IPLS "shall take all reasonable precautions to ensure their complete safety."  (Main Agreement, Ex. A ¶ 5 & Side Agreement, Ex. B ¶ 3.)  Both Agreements call for signatures on behalf of IPLS, Dr. Rumbaugh and BHI.  Both Agreements require that the resident bonobos in question be studied in furtherance of the specific research trajectory set out therein.  Specifically, the Agreements state that all bonobos

> "shall continue to reside at [IPLS] for at least so long as [the bonobos] continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimi[c]s, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices)..."

(Main Agreement, Ex. A ¶¶ 2, 4 & Side Agreement, Ex. B ¶ 2 (emphasis added).)

---

[6]    The Main Agreement also states that should IPLS shall "cease to exist," then DRC shall have sole discretion regarding the future placement of Matata.  (Main Agreement, Ex. A ¶ 6.)

Lastly, both Agreements make reference, in sum or substance, to each other and can be treated as an integrated whole: notably, Paragraph 8 of the Main Agreement states that Zoo Atlanta relinquishes "any claims of ownership to Panbanisha, Nyota, Elikya, Kanzi and Teco," who are the subjects of the Side Agreement, not merely to Matata and Maisha. Plaintiffs IPLS and ACCI have acknowledged that the Main Agreement and Side Agreement "cross-referenced each other." Plaintiffs' Brief In Support Of Resistance, at 3 [Dkt. 83-1].

At the time the Main Agreement and Side Agreement were signed (in January-February 2013), Dr. Rumbaugh was a member of the IPLS Board of Directors, a member of the BHI Board of Directors, and the Director of Science of what was publicly advertised as the "Bonobo Hope Great Ape Trust Sanctuary." (*See* Brochure entitled Bonobo Hope Great Ape Trust Sanctuary, attached hereto as Exhibit C.) Counsel of record to IPLS was Paul Burns, and Kaye Scholer was counsel of record to Dr. Rumbaugh. Bonobo Hope technically was not a party to the litigation at that time. However, notably, at that time, Lyle Simpson, Esq. was serving simultaneously as corporate counsel to both IPLS and BHI, and the record will reflect that Mr. Simpson was purveying legal and business advice to both organizations and Dr. Rumbaugh interchangeably, and had been doing so for at least twelve months, often without any pretense of attorney-client privilege. The record will reflect that Mr. Simpson billed Bonobo Hope regularly for his time.[7]

In or about the first quarter of 2012, IPLS was faced with an unemployment insurance tax liability to the State of Iowa in excess of $60,000. (*See* Letter from Lyle Simpson to Ted Townsend, at 2 (March 1, 2012), attached hereto at Exhibit D.) On August 9, 2013, IPLS was administratively dissolved by the Iowa Secretary of State for failing to deliver its 2013 Biennial Report. (Certificate of Administrative Dissolution,

---

[7]     Bonobo Hope and Dr. Rumbaugh are waiving whatever privilege attaches to Mr. Simpson's advice, if any.

attached hereto as Exhibit E.)  Upon information and belief, Mr. Simpson allowed IPLS to be administratively dissolved and eventually formed a new entity, ACCI, in December 2013, in order to evade the tax assessment rather than force IPLS into bankruptcy.

3.    IPLS Evades Side Agreement and Asserts 100% Ownership Over the Bonobos

In or about November 2013, Dr. Rumbaugh learned that the IPLS Board of Directors had purportedly dismissed her at some earlier point in 2013 for alleged nonparticipation. Aside from the fact that there is no contemporaneous record of such a dismissal vote, and that IPLS may have been legally inactive at the time, the IPLS Board of Directors purportedly took such action without providing notice to Dr. Rumbaugh, as required. (Declaration of William C. Zifchak, Esq. In Support Of Defendant Sue Savage-Rumbaugh's Motion For Specific Performance And Related Relief ("Zifchak Aff.") [Dkt. 69-4] ¶ 7, attached as Exhibit C to Memorandum In Support Of Defendant Sue Savage-Rumbaugh's Motion For Specific Performance And Related Relief [Dkt. 69-1].)  Dr. Rumbaugh also was barred by Mr. Simpson, acting in the name of IPLS, from entering onto the IPLS grounds and from having any access to, or observation or interaction with, any of the bonobos, including those co-owned by BHI, even while, it is undisputed, Mr. Simpson remained BHI's corporate counsel.  (*Id.*)

4.    IPLS Has "Ceased to Exist."

In or around December 2013, upon information and belief, IPLS ceased its operations, purported to form a successor entity (ACCI), and purported to transfer its interest in Maisha and the Bonobo 4 to ACCI.

As described in the Supporting Memorandum, IPLS and ACCI failed to disclose to Dr. Rumbaugh and BHI the fact that Mr. Simpson purported to form a successor entity and

Case 4:10-cv-00052-RAW   Document 102   Filed 02/16/15   Page 7 of 16


purported to transfer 100% ownership of Maisha and the Bonobo 4 to that entity for one dollar on December 18, 2013. (*See* Supporting Memorandum ¶¶ 11-16 & 22-23.) It was not until February 2014 that Dr. Rumbaugh and BHI learned (through their counsels' own diligence) about the formation of ACCI and the purported transfer to ACCI of 100% ownership of the bonobos. (*Id.* ¶ 16.) IPLS and ACCI also to date, despite due demand, have refused to grant Dr. Rumbaugh, or any other member of BHI (i) regular access to the Bonobo 4, (ii) control, an equal hand in, or any meaningful input over the care and welfare of the Bonobo 4, including emotional well-being, (iii) control, an equal hand in, or access to information concerning the research, activities, or usage in which the Bonobo 4 are involved, or (iv) other rights to which BHI is entitled as joint owners of the Bonobo 4. ACCI has distorted and effectively eviscerated IPLS's obligations under both Agreements.

    5.    <u>Dr. Rumbaugh's and BHI's Claims At Hearing</u>

Based on these actions – and others discovered during the pendency of the Motion For Specific Performance – Dr. Rumbaugh and BHI are pursuing four distinct claims at hearing, as discussed below.

In the Motion for Specific Performance, Dr. Rumbaugh moved this Court either: (i) to declare that ACCI is the legal successor to IPLS, declare that ACCI is bound by the Main Agreement and the Side Agreement, and adjudicate rights thereunder;[8] (ii) to "[d]eclare that IPLS has ceased to exist and direct that custody and control of Maisha and the Bonobo 4 be transferred forthwith to Dr. Rumbaugh and BHI,"[9] or (iii) to "[r]eopen this

---

[8]    *See* Supporting Memorandum ¶ 1 (asking this Court to "declare that ACCI is IPLS's legal successor and is bound under the Agreements," declare that BHI is the joint owner of the Bonobo 4, "and resolve issues relating to the governance and administration of ACCI and BHI flowing from the Agreements.").
[9]    *Id.* ¶ 2(a).

US.55758197.01

litigation and, among other things, permit Dr. Rumbaugh to move to amend her answer to assert counterclaims against IPLS and ACCI and their respective officers and attorneys…"[10]

It is evident that certain of these issues have been resolved on the face of the parties' pleadings. In two Court filings, subsequent to the Motion For Specific Performance, ACCI has acknowledged that it considers itself to be IPLS's legal successor and concedes that the Main Agreement and the Side Agreement are binding upon ACCI. *See* Plaintiffs' Statement In Response To The Court's Ruling On Motion To Withdraw ¶ 9 [Dkt. 81] & Plaintiffs' Brief In Support Of Resistance at 5 [Dkt. 83-1].

In light of ACCI's acknowledgements and of the discovery to date, the issues which Dr. Rumbaugh intends to pursue at hearing have evolved. For the Court's and parties' clarity, Dr. Rumbaugh intends to pursue the following claims at hearing:[11]

    (i)    IPLS has "ceased to exist," within the letter and spirit of both the Main Agreement and the Side Agreement, thereby triggering the right of BHI and Dr. Rumbaugh to determine the destiny of Maisha and the Bonobo 4, pursuant to paragraph 6 of the Main Agreement and paragraph 4 of the Side Agreement;[12]

    (ii)    ACCI has violated paragraph 1 of the Side Agreement because, by refusing to grant to Dr. Rumbaugh or to any other member of BHI regular access to and regular information about the Bonobo 4, at least an equal hand in control over their care, and at least an equal hand in

---

[10]    *Id.* ¶ 2(b).
[11]    William Zifchak (Counsel of record for Dr. Rumbaugh and BHI) gave advance notice of Dr. Rumbaugh's intentions to pursue these claims to William Miller (counsel of record for IPLS & ACCI) during a phone call on January 7, 2014.
[12]    A private benefactor in Missouri, Ryan Sheldon, and the internationally prominent Virgin Foundation, have each separately pledged to underwrite the relocation to and maintenance of the bonobos at a suitable sanctuary.

control over the research in which they are involved, ACCI has denied

BHI its inherent rights as "joint owners" of the bonobos;

(iii)   ACCI has violated paragraph 4 of the Main Agreement and

paragraph 2 of the Side Agreement because it has abandoned and not

continued the bicultural, experimental psychology research trajectory

identified in those paragraphs in favor of invasive and dangerous

research that these bonobos have never previously been subjected to;[13]

and

(iv)   ACCI has violated paragraph 5 of the Main Agreement and

paragraph 3 of the Side Agreement because it has failed to "use its best

efforts to provide complete and competent care" of the bonobos, and

failed to "take all reasonable precautions to ensure their complete

safety," in each case including their psychological well-being.

## ARGUMENT

At the December 18, 2014 status conference, this Court requested briefing to address

its jurisdiction over the Side Agreement.  (Hearing Transcript ("Transcript") at 12:7-14:20

(Dec. 18, 2014), attached hereto as Exhibit F.)   The Court requested this briefing after

noting that the Side Agreement is "a separate agreement [from the Main Agreement] which

is solely between Iowa citizens" and which "involves four bonobos who were not part of the

original interpleader." (*Id.* at 13:3-6.)

In addition, at the December 18, 2014 status conference, William Miller, Counsel for

IPLS and ACCI, raised a question about this Court's subject matter jurisdiction over this

---

[13]     Discovery to date has confirmed that the Yerkes Regional Primate Research Center in Georgia, notorious among primatologists for its invasive biomedical research on certain species of great apes, is collaborating with ACCI concerning the future of the Des Moines bonobos and utilization of the ACCI facility.

US.55758197.01

action in its entirety. (Hearing Tr. at 12:14-21.) Miller questioned whether the parties exhibited the diversity necessary to maintain this action because multiple parties were Iowa residents (*i.e.*, because the parties did not exhibit *complete* diversity). (*Id.* at 12:17-21.)

This Court clearly has jurisdiction over the Side Agreement for two reasons. <u>First</u>, the Side Agreement was incorporated by reference into the Main Agreement, and there is no issue that it was an express condition precedent to Dr. Rumbaugh's executing the Main Agreement. <u>Second</u>, this Court has supplemental jurisdiction over the Side Agreement because the Agreements are mirror images, and disputes arising under the Side Agreement are part of the same case or controversy as those arising under the Main Agreement.

Additionally, this Court may continue its subject matter jurisdiction over this case as a whole, even though multiple parties are from Iowa, because federal interpleader actions only require *minimal* diversity, which the parties to this case exhibit.

I.   **THE MAIN AGREEMENT INCORPORATES THE SIDE AGREEMENT BY REFERENCE**

This Court has jurisdiction over the Side Agreement because it was incorporated into the Main Agreement by reference.[14] "Under the doctrine of incorporation, one document becomes part of another separate document simply by reference as if the former is fully set out in the latter." *Hofmeyer v. Iowa Dist. Court*, 640 N.W.2d 225, 228 (Iowa 2001). "Where a writing refers to another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Id.* at 228-29. All that is needed to

---

[14] This Court's jurisdiction over the Main Agreement itself is well established, both because (1) the dismissal order includes an express retention of jurisdiction, and because (2) compliance with the settlement agreement is a term of the Stipulation of Dismissal entered into by the parties in this case. [*See* Dkt. 59.]; *see also Myers v. Richland Cnty.*, 429 F.3d 740, 747 (8th Cir. 2005) (finding that a federal court has jurisdiction over a settlement agreement were the court "incorporated the agreement into its final order [dismissing the lawsuit] or reserved jurisdiction to enforce the agreement") (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994)).

US.55758197.01

incorporate a document into another by reference is a "clear and specific reference" to that document. *Id.* at 228.

The argument for incorporation is particularly strong where, as here, the execution of one document is a condition precedent for the execution of another document. *See AGR-Keast, L.L.P. v. Steen*, 798 N.W.2d 349, at *4 (Iowa Ct. App. 2011) (exercising jurisdiction where one document "expressly incorporates [another document] as a condition precedent of its taking effect"). When the execution of one document is a condition precedent to the execution of another document, those documents must be considered together because the first document is subject to the second. *See id.* (finding that "the former [document] is expressly subject to the latter [document]").

Paragraph 7 of the Main Agreement explicitly references the Side Agreement, which is enough to deem it incorporated under *Hofmeyer*. (*See* Main Agreement ¶ 7 (discussing a "side agreement with [IPLS]).)[15]   More than that, however, Dr. Rumbaugh made the execution of the Side Agreement a *condition precedent* to her entering into the Main Agreement. As the Main Agreement states: "[Dr. Rumbaugh'] willingness to execute this Agreement is *contingent upon* her entering simultaneously into a side agreement with [IPLS]." (Main Agreement, Ex. A ¶ 7 (emphasis added); *see also* Zifchak Aff. ¶ 5 (stating that the execution of the Side Agreement was an "integral term" of the Main Agreement and that this was expressed in paragraph 7 of the Main Agreement).)   Therefore, the Main Agreement is "expressly subject to" the Side Agreement.

Because the Main Agreement references the Side Agreement, and because the Main Agreement makes the Side Agreement a condition precedent to the Main Agreement, the

---

[15]      There is no dispute that the "side agreement" referred to in the Main Agreement is, in fact, the Side Agreement at issue in this litigation. (*See* Plaintiffs' Brief In Support Of Resistance at 3 (in which IPLS and ACCI acknowledge that the Main Agreement and Side Agreement "cross-referenced each other" [Dkt. 83-1].)

- 11 -

Side Agreement has been incorporated into the Main Agreement.   Therefore, the Side Agreement must now be treated as if it is "fully set out in the [Main Agreement]" and must be "interpreted as part of the [Main Agreement]."  *See Hofmeyer*, 640 N.W.2d at 228; *see also AGR-Keast*, 798 N.W.2d 349, at *4.

Additionally, it is reasonable to conclude that in consenting to continued jurisdiction of this Court over the Main Agreement, the parties contemplated that disputes under the Side Agreement would also be addressed by this same Court.

## II.   THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER THE SIDE AGREEMENT UNDER 28 U.S.C. §1367

A second, distinct reason this Court has jurisdiction over the Side Agreement is because the Side Agreement falls within this Court's supplemental jurisdiction. Supplemental jurisdiction applies to any claims "that are so related to claims in the action within the original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367.   Courts applying § 1367 look to whether the claims (1) "derive from a common nucleus of operative fact" (2) such that the movants "would ordinarily be expected to try them all in one judicial proceeding."  *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 963 (8th Cir. 2011).   "Once original jurisdiction exists, supplemental jurisdiction over all related claims is mandatory, absent certain statutory exceptions."  *Id.*

Clearly the claims arising under the Side Agreement derive from a "common nucleus of operative facts" as to claims arising under the Main Agreement.   Indeed, the very claims being prosecuted at this time under both Agreements are <u>identical</u>.   As the Court will recall from the early history of this litigation, although Matata and Maisha were the two bonobos subject to the interpleader action filed by IPLS in or about February 2010, their fate was inextricably linked to the fate of the other bonobos with whom they have resided at the

- 12 -

Great Ape Trust.  In 2010, IPLS and Dr. Rumbaugh collaborated to successfully repel a motion by defendant Zoo Atlanta to appoint Milwaukee Zoo as a temporary receiver, in large part because of the risks to the bonobos and the corruption of Dr. Rumbaugh's decades-long interspecies research that was posed by separating Matata and Maisha, on the one hand, from the rest of their family, on the other.  [Dkt. 11.][16]

Similarly, in the present dispute, most of Dr. Rumbaugh's and BHI's claims pertain to the bonobo colony as a whole and cannot be divided between the bonobos individually. The question of whether IPLS has "ceased to exist" is a legal determination, the outcome of which will affect Maisha and the Bonobo 4 in the exact same way (*i.e.*, by determining whether Dr. Rumbaugh's and BHI's rights to decide the future destiny of the bonobos has been triggered).  Additionally, questions about (i) whether ACCI is pursuing the research trajectory intended by the settlement agreements, and (ii) whether ACCI is properly attending to the care and welfare of the bonobos, will require the Court to determine facts regarding the treatment of the bonobo colony *as a whole* (not about the bonobos individually).

Consideration of judicial economy also compels the conclusion that Dr. Rumbaugh and BHI not be thrown into state court to enforce one settlement agreement while the federal court oversees enforcement and interpretation of mirror image terms in the sister settlement agreement.

Because the claims under the Side Agreement are so closely intertwined with those under the Main Agreement, they effectively "form part of the same case or controversy." Therefore, this Court should assert supplemental jurisdiction over them.

---

[16]    Moreover, but for the settlement agreements, Dr. Rumbaugh would retain a contingent ownership claim to Maisha, Nyota, Elikya, and Teco, that is, all but two of the surviving bonobos; and the DRC as contingent claims to Maisha, Kanzi, and Teco.

US.55758197.01

III.   **"MINIMAL DIVERSITY" IS SUFFICIENT FOR THIS COURT TO RETAIN SUBJECT MATTER JURISDICTION**

The Court continues to have subject matter jurisdiction over this case, even though multiple defendants are Iowa residents, because the parties exhibit *minimal diversity*.  In contrast to the complete diversity that is required to establish federal diversity jurisdiction under 28 U.S.C. § 1332, in federal interpleader actions brought under 28 U.S.C. § 1335 (such as this), "[d]iversity of citizenship may be *minimal*."  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 184 (1997) (internal quotes omitted; emphasis added).  Minimal diversity exists so long as "[t]wo or more adverse claimants [are] of diverse citizenship…]. 28 U.S.C. § 1335(a)(1); *see also Buckeye State Mut. Ins. Co. v. Moens*, 944 F. Supp. 2d 678, 688 (N.D. Iowa 2013) ("[I]n contrast to the requirement of 'complete' diversity under 28 U.S.C. § 1332, § 1335 requires only 'minimal' diversity, that is, diversity between two or more adverse parties.").

In addition to the parties in this action who are Iowa residents,[17] there are two party defendants of diverse citizenship.  Defendant Zoological Foundation of Georgia, Inc. is based in Atlanta, Georgia.  If the settlements are abrogated by the Court, Zoo Atlanta's release of ownership claims to all of the bonobos would be rescinded.  Defendant Democratic Republic of Congo is a foreign nation on the African continent, and, as noted, would have a putative claim to the offspring of Matata, including Maisha, were the settlement agreements to be set aside.  Because these two parties are not Iowa citizens, this case exhibits the minimal diversity necessary for this Court to continue to exercise its jurisdiction in this case.

---

[17]    IPLS, ACCI, BHI, and Dr. Rumbaugh are Iowa residents.

## **CONCLUSION**

For the reasons stated herein, this Court ought to assert jurisdiction over the Side Agreement and maintain its jurisdiction over the case as a whole.


Respectfully submitted,

DATED:  February 16, 2015                    FAEGRE BAKER DANIELS LLP

                                             /s/ Todd P. Langel
                                             Todd P. Langel
                                             801 Grand Avenue, 33rd Floor
                                             Des Moines, IA 50309-8011
                                             Telephone:  515-248-9000
                                             Facsimile:  515-248-9010
                                             todd.langel@faegrebd.com

                                             KAYE SCHOLER LLP

                                             William C. Zifchak*
                                             425 Park Avenue
                                             New York, NY 10022
                                             Tel:   212-836-8743
                                             Fax:  212-836-6743
                                             Cell: 347-525-5143
                                             wzifchak@kayescholer.com
                                             *admitted pro hac vice

                                             Ross Neihaus*
                                             Three First National Plaza
                                             70 West Madison Street, Suite 4200
                                             Chicago, Illinois  60602
                                             Tel:  312-583-2458
                                             Fax: 312-583-2558
                                             ross.neihaus@kayescholer.com
                                             *admitted pro hac vice

                                             ATTORNEYS FOR DR. SUE SAVAGE-
                                             RUMBAUGH, PH.D. and BONOBO
                                             HOPE INITIATIVE, INC.

US.55758197.01

## Certificate of Service

The undersigned hereby certifies that a true copy of **Defendants Dr. Sue Savage-Rumbaugh's and Bonobo Hope Initiative, Inc.'s Joint Memorandum Addressing Jurisdiction and Other Issues** was served upon the following parties through the Court's CM/ECF electronic filing system on the 16th day of February, 2015.

Paul D. Burns
Bradley & Riley PC
Tower Place
One South Gilbert
Iowa City, IA 52240-3914

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third Avenue SE, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309

William J. Miller
Dorsey & Whitney
801 Grand Avenue, Suite 4100
Des Moines, IA  50309

/s/ Todd Langel

- 16 -

US.55758197.01