## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:10-cv-00052 Hon. Magistrate Judge Ross Walters |
| ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### JOINT PRE-HEARING BRIEF OF DEFENDANT SUE SAVAGE-RUMBAUGH AND INTERVENOR DEFENDANT BONOBO HOPE INITIATIVE

Defendant Sue Savage-Rumbaugh ("Dr. Rumbaugh") and Intervenor Defendant Bonobo Hope Initiative, Inc. ("BHI") hereby file this Joint Pre-Hearing Brief in support of Dr. Rumbaugh's Motion for Specific Performance and Related Relief ("Motion") (Dkt. 69) and supporting Memorandum ("Memorandum") (Dkt. 69-1).

## I.    INTRODUCTION

Dr. Rumbaugh[1] and BHI had two simple goals in mind when they previously settled this litigation: (i) to ensure that Dr. Rumbaugh's groundbreaking, multi-generational research involving a family of world-famous bonobos continued beyond her tenure; and (ii) to ensure the continued health and safety of the bonobos.  Dr. Rumbaugh and BHI

---

[1] Dr. Rumbaugh has been a member of the BHI board of directors since BHI was founded in 2011.

achieved these goals on paper through the settlement agreements in this case, which include the Main Agreement[2] and the Side Agreement[3] (collectively, the "Settlement Agreements"), and through strategic corporate structuring.   Today, however, these goals are being threatened and undermined due to breaches of the Settlement Agreements by the current operators of the bonobo facility, acting in concert apparently with Yerkes National Primate Research Center in Georgia, long an opponent of Dr. Rumbaugh's research. Dr. Rumbaugh's research has not only been halted; it is intentionally being reversed, and BHI's oversight role has been eviscerated.   Moreover, the wellbeing and welfare of the bonobos that took decades to develop is now being jeopardized by the current regime.

The organization that was bound by the Settlement Agreements to support and foster Dr. Rumbaugh's research – Plaintiff Iowa Primate Learning Sanctuary ("IPLS") – instead staged a "coup."   The IPLS board dislodged Dr. Rumbaugh from its leadership, barred Dr. Rumbaugh from its facility and underhandedly changed the direction of Dr. Rumbaugh's research, contrary to the Settlement Agreements.

All of this is occurring against a backdrop of environmental hazards to the bonobos and staff owing to the fact that the IPLS facility is situated in a flood plain.   The IPLS facility has endured 2 floods since 2005, rendering the water table toxic and arguably contributing to the deaths of two bonobos, Panbanisha and Matata.

---

[2] This refers to the ***Agreement for Settlement and Acknowledgment of Ownership***, by and between the Iowa Primate Learning Sanctuary, Zoological Foundation of Georgia, Democratic Republic of the Congo, and Dr. Rumbaugh, last to sign on February 17, 2013 (Dkt. 69-2).

[3] This refers to the ***Supplemental Agreement for Settlement and Acknowledgement of Ownership***, by and between Iowa Primate Learning Sanctuary, Emily Sue Savage-Rumbaugh, and Bonobo Hope Initiative, Inc., signed on January 31, 2013 (Dkt. 69-3).

US.56739810.01

Additionally, even though IPLS by now has ceased to exist, IPLS (and its legal successor, Plaintiff Ape Cognition & Communication Institute ("ACCI")) have denied Dr. Rumbaugh and BHI the right to determine the relocation of the bonobo colony, as required by the Settlement Agreements.  Instead of allowing Dr. Rumbaugh and BHI to determine relocation, IPLS's corporate counsel, Lyle Simpson ("Simpson") formed a new entity – ACCI – and transferred all of IPLS's assets to it, including the bonobos.  ACCI continues to bar Dr. Rumbaugh from its facility and continues to deny Dr. Rumbaugh and BHI any involvement in its scientific research.

Dr. Rumbaugh and BHI now request relief from this Court in the form of specific performance of the Settlement Agreements, as well as remedies for breaches of the those agreements.  Specifically, Dr. Rumbaugh and BHI respectfully request that, pursuant to the Motion, this Court: (i) grant Dr. Rumbaugh and BHI their right to relocate Maisha and the Bonobo 4;[4, 5] or, alternatively, (ii) order that BHI be allowed to make all decisions regarding the research in which the Bonobo 4 are involved and that Dr. Rumbaugh be allowed to participate in this research, including having regular access to the bonobos and having at least an equal say in other decisions affecting the bonobos, and (iii) grant any other relief this Court deems just and equitable.

---

[4] This refers to the four bonobos housed at the IPLS facility in addition to Maisha, which include Nyota, Elikya, Kanzi, and Teco.

[5] At hearing, Dr. Rumbaugh and BHI will present the Court with a viable alternative location to which the bonobos can be relocated.  Dr. Rumbaugh and BHI will present testimony from Ryan Sheldon, a successful entrepreneur and long-time supporter and confidant of Dr. Rumbaugh.  Mr. Sheldon has committed to, and largely has completed, constructing a facility in Missouri to which the bonobos could be comfortably and appropriately relocated. Mr. Sheldon also has committed to financing the upkeep of the facility and the bonobos going forward.

II.   <u>BACKGROUND AND STATEMENT OF FACTS</u>

Dr. Rumbaugh is one of the world's leading primatologists.  For over 40 years, Dr. Rumbaugh has been raising a colony of bonobos,[6] now in its third generation, and researching their linguistic and cognitive capabilities.  Dr. Rumbaugh is most widely renowned for her work with Kanzi, a 34-year-old male bonobo that she raised from birth. Dr. Rumbaugh taught Kanzi and the other bonobos to communicate using symbols (called "lexigrams") and computer keyboards.  For her groundbreaking research, Dr. Rumbaugh was named one of TIME magazine's 100 Most Influential People in the World in 2011.  She also has been awarded honorary degrees from the University of Chicago and Missouri State University.

Dr. Rumbaugh spent the first 23 years of her career at Georgia State University's Language Research Center.  In 2005, Dr. Rumbaugh accepted the invitation of a prominent Des Moines businessman, Ted Townsend, to give up her tenure and move herself and her colony of bonobos to a brand new facility in Des Moines – the Iowa Primate Learning Sanctuary, d/b/a Great Ape Trust of Iowa.  Townsend promised Dr. Rumbaugh that he personally would fund IPLS in perpetuity and that he would pay Dr. Rumbaugh's salary for life.  In exchange, Dr. Rumbaugh donated her ownership interests in the bonobos to IPLS. Unfortunately, Townsend later withdrew his support, in part because of the Great Recession and in part because the 2008 flood of the IPLS facility rendered his plans to expand the facility "obsolete."  IPLS, thus, was required to begin its own fundraising efforts.  Since that time, IPLS has struggled to garner the necessary financial support.

---

[6] Bonobos are a species of great ape and, along with chimpanzees, are the closest extant relative to humans.

IPLS Files Federal Interpleader Action to Determine Ownership of Bonobos

In addition to the financial and environmental struggles it was facing, IPLS found itself in a legal battle over the ownership of the bonobos.  Defendant Democratic Republic of Congo ("DRC") was claiming complete ownership rights to Matata.  (*See* Complaint for Interpleader ¶ 25 (Dkt. 1).)   Defendant Zoological Foundation of Georgia, Inc. ("Zoo Atlanta") was claiming contingent ownership rights to Matata and Maisha.  (*Id*. ¶ 26.) Dr. Rumbaugh had an ownership interest in Maisha.  (*Id*. ¶ 27.)  IPLS understood that Defendant Japan Money Centre Institute and Museum of Primatology potentially had an ownership claim to Maisha.  (*Id*. ¶ 28.)   Additionally, IPLS and Dr. Rumbaugh had competing ownership claims over five other bonobos: Nyota, Elikya, Kanzi, Panbanisha (Kanzi's half-sister who died suddenly in 2012), and Teco.

In an effort to resolve the ownership issues over Maisha and Matata, IPLS filed this interpleader action on February 5, 2010.  (*Id*.)

BHI is Formed and Voted Onto IPLS Board

In 2011, while the litigation was pending, Dr. Rumbaugh helped to form a new organization comprised of scientists and academics, BHI, in order to provide further support for the bonobos.  Upon advice of IPLS's and BHI's corporate counsel, Lyle Simpson, IPLS voted all the members of the BHI board onto the IPLS board, thus forming a joint IPLS-BHI board which, practically speaking, acted as a singular unit referred to as "Bonobo Hope Great Ape Trust."

Simpson's Plan of Action and December 2012 Resolutions Give BHI Control Over the Bonobos and Over the Science

In December 2012, Simpson determined that that structure (having a joint IPLS-BHI board) was not an effective way of operating.  Instead, he circulated to the joint IPLS-BHI

5

board a "Plan of Action,"[7] in which he recommended that the boards of IPLS and BHI separate and that each board focus on its strengths.   Because BHI was composed of scientists and academics, Simpson proposed that BHI oversee the science and the care of the bonobos.   IPLS, which was composed of local businessmen and lay-leaders, was to focus on the administration of the IPLS facility and on fundraising.   "The concept," Simpson explained, "is for the bonobos to be under the exclusive control of the Bonobo Hope board. This includes their daily care, where they are to be located, and the direction of the science." Simpson created this arrangement because he recognized that "it is the best use of the academic leadership [*i.e.*, BHI] for them to focus on the science and not have to manage the daily activity."   According to Simpson, it would be improper for the members of the IPLS board to be concerned with BHI's scientific program and related efforts.   As Simpson explained, "The [IPLS] board would have neither the talent nor the ability to deal with those issues."

Based upon Simpson's Plan of Action, the joint IPLS-BHI board unanimously adopted a series of resolutions in December 2012.[8]   Those resolutions specified, among other things, that: (i) BHI was to "oversee and to develop the science program of [IPLS] and be solely responsible for the protection of the bonobo colony"; and (ii) IPLS was to "own, manage and develop the [IPLS] site."

The Parties Enter into the Settlement Agreements

After receiving Simpson's Plan of Action and adopting the December 2012 resolutions, the parties entered into the Settlement Agreements. The Main Agreement,

---

[7] Dr. Rumbaugh and BHI will present Simpson's Plan of Action as an exhibit at hearing.

[8] Dr. Rumbaugh and BHI will present the December 2012 Resolutions as an exhibit at hearing.

which determined rights to Maisha and Matata, was entered into between IPLS, Dr. Rumbaugh, DRC, and Zoo Atlanta.[9]   (*See* Dkt. 69-2.)   The Side Agreement, which determined rights to the Bonobo 4, was entered into between IPLS, Dr. Rumbaugh, and BHI.[10]   (*See* Dkt. 69-3.)   Under the Main Agreement, DRC was the owner of Matata and IPLS was the owner of Maisha.   (Main Agreement ¶¶ 1 & 3 (Dkt. 69-2).)   Under the Side Agreement, BHI and IPLS "jointly are the owners" of the Bonobo 4.[11]   (Side Agreement ¶ 1 (Dkt. 69-3).)

In addition to determining the ownership of the bonobos, the Settlement Agreements provided Dr. Rumbaugh and BHI with certain rights to ensure that Dr. Rumbaugh's research trajectory would be continued and to otherwise ensure the protection and well-being of the bonobos. First, the Settlement Agreements expressly require that IPLS continue Dr. Rumbaugh's research trajectory when they state that Maisha, Matata, and the Bonobo 4:

> "shall continue to reside at [IPLS] for at least so long as [the bonobos] continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimi[c]s, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices)..."

(Main Agreement ¶¶ 2, 4 (Dkt. 69-2) & Side Agreement ¶ 2 (Dkt. 69-3).)   This provision was drafted to ensure that Dr. Rumbaugh's research trajectory would continue.

---

[9] BHI was not a party to the Main Agreement, but it signed the agreement in acknowledgement of certain, specified paragraphs affecting its rights.

[10] As discussed in Dr. Rumbaugh's and BHI's Joint Memorandum Addressing Jurisdiction And Other Issues [Dkt. 102], the Main Agreement and Side Agreement cross-referenced each other, and the signing of the Side Agreement was a condition precedent to Dr. Rumbaugh signing the Main Agreement.

[11] Until her death in 2012, Panbanisha made this group the "Bonobo 5."

Second, the Settlement Agreements provide that if IPLS "cease[s] to exist," then BHI and Dr. Rumbaugh together have the right to determine the relocation of Maisha and the Bonobo 4.  (Main Agreement ¶ 6 & Side Agreement ¶ 4.)

Third, the Settlement Agreements require that IPLS "use its best efforts to provide complete and competent care" of the bonobos and that IPLS "take all reasonable precautions to ensure their complete safety."  (Main Agreement ¶ 5 & Side Agreement ¶ 3.)

The IPLS and BHI Boards Separate, and BHI Retains Control over the Bonobos and over the Research

On April 25, 2013, BHI Chairperson Carmen Mate circulated a series of resolutions, authored by Simpson, to officially separate the IPLS and BHI boards from each other.[12] This was consistent with the strategy laid out in Simpson's Plan of Action.  According to Simpson, once the boards were separated, BHI would "collectively retain the science and research oversight as members of the Bonobo Hope board."  Even after the separation, Dr. Rumbaugh remained on both the IPLS and BHI boards.

Dr. Rumbaugh Nominates a Successor

In or about April 2013, Dr. Rumbaugh experienced an injury while working at the IPLS facility that necessitated a prolonged absence.  In response, Simpson and others began requesting that Dr. Rumbaugh name a successor to carry on her research.  Although Dr. Rumbaugh intended to return to her research at the IPLS facility, she recognized the propriety of appointing a successor.  Dr. Rumbaugh reached out to one of her former students, Dr. Jared Taglialatela, and asked Dr. Taglialatela to succeed her in her research. After a series of emails and visits to the IPLS facility, Dr. Taglialatela agreed.  In

---

[12] Dr. Rumbaugh and BHI will present the April 2013 Resolutions as an exhibit at hearing.

October 2013, Dr. Rumbaugh recommended to the IPLS and BHI boards that Dr. Taglialatela be offered the position of Director of Research.[13]

**Dr. Rumbaugh Is Improperly Dismissed from the IPLS Board and Is Barred from the IPLS Facility**

In or about November 2013, Dr. Rumbaugh learned that the IPLS Board of Directors had purportedly dismissed her at some earlier point in 2013 for alleged nonparticipation. Aside from the fact that IPLS may have been legally inactive at the time (discussed below), if in fact the IPLS Board of Directors took such action – and there is no contemporaneous record, quite the contrary – they did so without providing notice to Dr. Rumbaugh.

Also in November 2013, when Dr. Rumbaugh returned from her absence, IPLS Chairman George Caudill and Simpson, acting on behalf of IPLS, barred Dr. Rumbaugh from entering onto the IPLS grounds and from having any access to, or observation or interaction with, any of the bonobos, including those co-owned by BHI.  Since that time, IPLS (and its legal successor, ACCI) has refused to grant Dr. Rumbaugh or any other member of BHI regular access to the Bonobo 4, control over their care, control over the science in which they are involved, or other rights to which BHI are entitled under the Side Agreement as joint owners.

Simpson Forms ACCI and Transfers IPLS's Assets Without Informing BHI

Instead of acknowledging BHI's rights as joint owners to the Bonobo 4, in December 2013, Simpson and certain members of the IPLS board initiated a scheme to evade a state tax lien and to deprive BHI of its rights as joint owners of the Bonobo 4.  As detailed in a series of emails that Dr. Rumbaugh and BHI will present at hearing, in

---

[13] As a condition of his appointment, Dr. Taglialatela on his own enlisted his colleague, Dr. Bill Hopkins, as Director of Science.

US.56739810.01

December 2013, Simpson revealed to counsel for Dr. Rumbaugh and BHI that IPLS had been administratively dissolved in August 2013.   Additionally, IPLS could not file for reinstatement because it did not have the ability to satisfy a $75,000 state tax lien that resulted from its failure to pay unemployment taxes.

Instead of working to satisfy the tax lien and reinstate IPLS, Simpson formed a new entity (ACCI) with the exact same board composition as IPLS.   Simpson then transferred all of IPLS's assets to ACCI (including the bonobos).   Simpson did not reveal the formation of ACCI to Dr. Rumbaugh or BHI at any time.   Instead, Dr. Rumbaugh and BHI learned of ACCI's existence at a later point and as a result of their own counsel's diligence.

Since the time Dr. Rumbaugh and BHI discovered this scheme, ACCI has acknowledged that it is IPLS's legal successor and that it is bound by the Settlement Agreements (a point which it initially wavered on but then conceded).   It also has acknowledged that, per the Side Agreement, BHI is the joint owner of the Bonobo 4.   Even so, ACCI continues to bar BHI from having regular access to the bonobos, at least an equal say in their care, and the control over the research that is BHI's right.   ACCI also continues to bar Dr. Rumbaugh from having any access to the bonobos.

**III.     IPLS AND ACCI HAVE VIOLATED THE SETTLEMENT AGREEMENTS**

IPLS and ACCI have violated both the letter and the spirit of the Settlement Agreements.   According to Iowa law, when interpreting a contract, the intent of the party controls.   *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997) ("We recognize in the construction of written contracts, the cardinal principle is that the intent of the parties must control").

US.56739810.01

Iowa courts recognize that even unambiguous language in a contract was developed in a context, and courts must consider that context when interpreting the contract.  As the Iowa Supreme Court has stated:

> Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract 'can almost never be plain except in a context.' Accordingly, any determination of meaning or ambiguity should only be made *in the light of relevant evidence* of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.

*Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) (internal citations and punctuation omitted; emphasis added); *see also Fausel v. JRJ Enterprises, Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) ("[T]he rule that words and other conduct are interpreted in the light of all the circumstances is not limited to cases when ambiguity in the agreement exists.")

Of course, courts may also rely on extrinsic evidence to interpret the ambiguous language of a contract.  *See Pillsbury*, 752 N.W.2d at 439 ("[W]here the language [of a contract] is ambiguous, extrinsic evidence may be used to aid in the interpretation of the contract.  In doing so, the court looks to the circumstances surrounding the making of the contract and to the parties' own subsequent interpretation of the agreement." (internal citations omitted)).

Here, both the language of the Settlement Agreements and the circumstances show that IPLS and ACCI have violated the central terms of the Settlement Agreements.

US.56739810.01

A.      IPLS Has "Ceased to Exist," and Therefore Dr. Rumbaugh and BHI Are Entitled
        to Determine Relocation of the Bonobos.

As the evidence at the hearing will show, it is undisputed that IPLS has ceased to

exist.  As a result, under the Settlement Agreements, Dr. Rumbaugh and BHI have the right

to determine the relocation of Maisha and the Bonobo 4.

According to both the Main Agreement and the Side Agreement, should IPLS "cease

to exist," Dr. Rumbaugh and BHI, acting in unison, have sole discretion to relocate Maisha

(under the Main Agreement) and the Bonobo 4 (under the Side Agreement).[14]

Under Iowa law, there are two possible points at which a not-for-profit corporation

(such as IPLS) could be said to have "ceased to exist."  The first is at dissolution.  In Iowa,

once a not-for-profit corporation is administratively dissolved, it may no longer carry on its

regular business activities.  Instead, it many only carry out activities for the purposes of

winding up and liquidating its affairs.  *See* Iowa Code § 504.1422(3) (stating that "[a]

corporation that is administratively dissolved continues its corporate existence but shall not

carry on any activities except that necessary to wind up and liquidate its affairs…and notify

its claimants…").  A corporation's operations, then, "cease to exist" upon dissolution.

The second point at which an Iowa corporation can be said to have "ceased to exist"

is when the corporation has finished winding up and liquidating its affairs.  *See Smith v. Vill.*

*Enterprises, Inc.*, 208 N.W.2d 35, 39 (Iowa 1973) (stating that "[w]here one corporation

---

[14] *See* Main Agreement, Dkt. No. 69-2, pg. 3, ¶ 6 ("Should the Trust cease to exist…. Bonobo Hope in unison with
Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such
circumstances") & Side Agreement, Dkt. No. 69-3, pp. 2-3, ¶ 4 ("Should the Trust cease to exist….  Savage-
Rumbaugh or her legal representative and Bonobo Hope acting in unison shall have sole discretion regarding
placement of the Bonobo 4 under such circumstances").

12

transfers all its assets to another corporation,… [it] practically ceases to exist…" (*quoting Luedecke v. Des Moines Cabinet Co.*, 140 Iowa, 223, 225 (1908)).

Under either definition, IPLS has "ceased to exist."  IPLS was administratively dissolved on August 9, 2013.  (Dkt. 69-6.)  At that point, IPLS was supposed to have halted its operations, except for those necessary to wind up and liquidate its affairs.  Under the first definition, then, IPLS can be said to have "ceased to exist" when it was administratively dissolved on August 9, 2013.

Alternatively, under the second definition, IPLS could be said to have "ceased to exist" on December 18, 2013, when it transferred away *all* of its assets, including Maisha and the Bonobo 4, to ACCI.  (Dkt. 69-14.)  At that point, IPLS completed the winding up and liquidation of its affairs.

Even IPLS's legal successor, ACCI, acknowledges that IPLS no longer exists and that ACCI as an entity is distinct from IPLS.  ACCI indicated as much in an email sent by Dr. Taglialatela (ACCI's Director of Research) on March 14, 2014 to the boards of ACCI and BHI.  (Dkt. 69-12, pg. 2.)  The purpose of the email was to introduce ACCI and to provide a "vision of the path for the future."  *Id*.  As part of that "path for the future," Dr. Taglialatela explained that he and others had "form[ed] a new entity," by which he meant ACCI.  *Id*.  As for the old entity, Dr. Taglialatela explained plainly and simply that "[m]oving forward, ***IPLS will no longer exist***…"  *Id*.  (emphasis added).

13

Because IPLS has "ceased to exist," Dr. Rumbaugh and BHI must now be granted the right to relocate the Maisha and the Bonobo 4 in their sole discretion.[15]

B.     BHI Should Be Entitled to Make All Decisions Affecting the Research in Which the Bonobo 4 Are Involved.

IPLS and ACCI have further violated the Settlement Agreements by failing to allow BHI to exercise its rights of ownership in the bonobos as set forth in the Settlement Agreements.  Specifically, BHI should be granted the right to make all decisions affecting the scientific research in which the Bonobo 4 are involved.  According to the Side Agreement, BHI and IPLS "jointly are the owners" of the Bonobo 4.  (Side Agreement ¶ 1.) Although the Side Agreement does not describe each entity's precise rights as joint owners, those rights are clear from the surrounding circumstances under which the Side Agreement was signed, and the negotiations thereon.

The Side Agreement was signed at a time when IPLS and BHI were in process of establishing a new corporate structure.  Under that new corporate structure: (i) BHI was charged with overseeing the science in which the Bonobo 4 were involved; and (ii) IPLS was charged with carrying the administrative and management functions of the organization, including fundraising.

This division of responsibilities was explicitly set out in Simpson's Plan of Action, which was distributed on December 4, 2012.  It was then adopted by both the IPLS and BHI boards in the December 2012 Resolutions.

---

[15] IPLS also failed to abide by the requirement in the Settlement Agreements that it give the parties and this Court sixty (60) days' written notice before its dissolution.  *See* Main Agreement, Dkt. No. 69-2, pg. 3 ¶ 6; Side Agreement, Dkt. No. 69-3, pp. 2-3, ¶ 4.

14

Case 4:10-cv-00052-RAW   Document 113   Filed 05/13/15   Page 15 of 20

Less than two months later (on January 31, 2013), IPLS, BHI, and Dr. Rumbaugh signed the Side Agreement.  (*See* Dkt. No. 69-3.)  Shortly thereafter, IPLS's and BHI's corporate counsel (Simpson) again confirmed the aforementioned division of responsibilities between the organizations in the April 2013 Resolutions.  The evidence presented at the hearing will show that, based on these circumstances, Dr. Rumbaugh and members of BHI understood that, at the time they signed the Side Agreement, BHI's right's as joint owners included having complete control over the science in which the Bonobo 4 were involved. This is the only reasonable interpretation of the Settlement Agreements in light of the relevant evidence of the preliminary negotiations and the circumstances surrounding the execution of those agreements.

Despite BHI's right to control the research in which the Bonobo 4 are involved, IPLS and now ACCI are completely denying BHI that right.  ACCI presently exerts complete control over the Bonobo 4, makes all decisions concerning the research in which they are involved, continuously denies any member of BHI regular, open access to the Bonobo 4, has completely barred Dr. Rumbaugh (a BHI board member) from the IPLS/ACCI facility, and has implemented a research protocol that is contrary to, and indeed undermines, BHI's desired research protocol.  This is completely contrary to BHI's rights as joint owners under the Settlement Agreements.

C.     ACCI Has Failed to Continue Dr. Rumbaugh's Research Trajectory.

Although he never disclosed his true colors to BHI in the Fall of 2013, Dr. Taglialatela now makes no secret of the fact that he is trying to undo Dr. Rumbaugh's research.  By doing so, he is violating the research trajectory required by the Settlement Agreements.

15

The Settlement Agreements expressly require that IPLS continue Dr. Rumbaugh's research trajectory. Specifically, the Settlement Agreements state that Maisha, Matata, and the Bonobo 4:

> "shall continue to reside at [IPLS] for at least so long as [the bonobos] continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimi[c]s, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices)..."

(Main Agreement ¶¶ 2, 4 & Side Agreement ¶ 2.) The evidence presented at the hearing will show that this provision was drafted to ensure that Dr. Rumbaugh's research trajectory would continue. Dr. Rumbaugh devoted her career to studying what it means to be "human" and what it means for humans to have "civilization." She did this by rearing bonobos in ways that seemed more "human-like," including teaching them to communicate.

After IPLS kicked Dr. Rumbaugh off of its board and banned Dr. Rumbaugh from its premises, Dr. Taglialatela overhauled Dr. Rumbaugh's research program. Apparently offended by Dr. Rumbaugh's use of human-like rearing techniques, Dr. Taglialatela set out to undo Dr. Rumbaugh's groundbreaking research. The most shocking reversal Dr. Taglialatela has made is that he has halted interactive all language research. As the evidence will show, Dr. Taglialatela has circumscribed the bonobos' access to their lexigram keyboards and touch screens. Dr. Taglialatela refuses to go "behind the glass" and interact with the bonobos, an integral component of Dr. Rumbaugh's research, even though he regularly did so while being mentored by Dr. Rumbaugh in Georgia. Dr. Taglialatela requires that anyone who does go "behind the glass" wear a facemask, which makes it impossible for the bonobos to see their lips moving (helpful for language comprehension),

and to wear gloves.  Dr. Rumbaugh and BHI are seriously concerned that the bonobos are losing their language skills, which were gained over multiple generations, have provided novel scientific insights, and have made the bonobos unique and world famous.

In addition, Dr. Taglialatela refuses to adopt or carry on any of Dr. Rumbaugh's rearing techniques, which are the central component of Dr. Rumbaugh's research.

Finally, Dr. Taglialatela has indicated he and Dr. Hopkins intend to perform invasive research on the bonobos.  That includes anesthetizing the bonobos until they are unconscious so that he can take x-rays and scans of their brains.  While x-rays and scans could be acceptable tests under some circumstances, it is dangerous – and outside the bounds of the research trajectory required by the Settlement Agreements – for the bonobos to be unconscious while doing so.

By failing to carry on Dr. Rumbaugh's research – and by intentionally undermining it – ACCI is violating the Settlement Agreements.  ACCI also is causing incalculable harm to the bonobos and to Dr. Rumbaugh's remarkable scientific breakthroughs.

        D.      __ACCI Has Failed to Properly Care for the Bonobos.__

Under both Settlement Agreements, IPLS and ACCI are required to "use [their] best efforts to provide complete and competent care" of Maisha and the Bonobo 4 and to "take all reasonable precautions to ensure their complete safety."  (Main Agreement ¶ 5; Side Agreement ¶ 3.)  The evidence at the hearing will conclusively demonstrate that IPLS and ACCI have failed to properly care for Matata, Maisha, and the Bonobo 4, and that they have failed to take the necessary precautions to ensure the bonobos' complete safety.

The evidence and testimony at the hearing will show that since the time Dr. Taglialatela implemented his research program (which includes suspending the bonobos' development of

their language skills and severely limiting the bonobos' interactions with humans), the bonobos have become disoriented.

Additionally, ACCI puts the bonobos at great risk by continuing to allow them to reside at the current facility. The current facility was constructed despite the absence of necessary permits in a floodplain. The facility has previously experienced disaster flood conditions, which severely endangered the bonobos, and it is likely that it will flood again. The flooding likely permanently contaminated the ground water. The U.S. Army Corps of Engineers has prohibited further expansion on the site.

During the time ACCI has overseen the care of the bonobos, the matriarch Matata died (in June 2014). ACCI has yet to explain any cause of death that seems reasonable in light of the fact that Matata died prematurely, was not known to have any illnesses or debilitating medical conditions, and appeared to be in sound health the day before her death.

Because IPLS and ACCI have not used their best efforts to care for the bonobos or to take all necessary precautions to ensure their complete safety, they further violated the Settlement Agreements.

## IV.   <u>CONCLUSION</u>

Dr. Rumbaugh and BHI will present evidence at hearing that IPLS and ACCI have repeatedly and blatantly violated the Settlement Agreements. At the conclusion of the hearing, Dr. Rumbaugh and BHI will respectfully request that this Court remedy IPLS and ACCI's breaches by: (i) granting Dr. Rumbaugh and BHI their right to relocate Maisha and the Bonobo 4; or, alternatively (ii) ordering that BHI be allowed to make all decisions regarding the research in which the Bonobo 4 are involved and that Dr. Rumbaugh be allowed to participate in this research, including having regular access to the bonobos and having at least an equal say in

US.56739810.01

other decisions affecting the bonobos; and (iii) granting any other relief this Court deems just and equitable.

DATED:  May 13, 2015                           FAEGRE BAKER DANIELS LLP

                                               /s/ Todd Langel

                                               Todd P. Langel
                                               801 Grand Avenue, 33rd Floor
                                               Des Moines, IA 50309-8011
                                               Tel:  515-248-9000
                                               Fax: 515-248-9010
                                               todd.langel@faegrebd.com

                                               KAYE SCHOLER LLP

                                               William C. Zifchak*
                                               250 West 55th Street
                                               New York, NY 10019-9710
                                               Tel:  212-836-8743
                                               Fax:  212-836-6743
                                               Cell: 347-525-5143
                                               wzifchak@kayescholer.com

                                               Joshua Stambaugh*
                                               1999 Avenue of the Stars, Suite 1600
                                               Los Angeles, California 90067
                                               Tel:  310-788-1244
                                               Fax: 310-229-1844
                                               Joshua.Stambaugh@kayescholer.com

                                               Ross Neihaus*
                                               Three First National Plaza
                                               70 West Madison Street, Suite 4200
                                               Chicago, Illinois  60602
                                               Tel:  312-583-2458
                                               Fax: 312-583-2558
                                               ross.neihaus@kayescholer.com
                                               *admitted pro hac vice

                                               ATTORNEYS FOR DR. SUE SAVAGE-
                                               RUMBAUGH, PH.D. and BONOBO
                                               HOPE INITIATIVE, INC.

19

<u>Certificate of Service</u>

The undersigned hereby certifies that a true copy of the Joint Pre-Hearing Brief of Defendant Sue Savage-Rumbaugh and Intervenor Defendant Bonobo Hope Initiative was served upon the following parties by through the ECF filing system on the 13th day of May, 2015.

Paul D. Burns
Bradley & Riley PC
Tower Place
One South Gilbert
Iowa City, IA 52240-3914

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309

Jack Pennington
Simpson, Jensen, Abels, Fischer & Bouslog, P.C.
604 Locust Street, Ste. 222
Des Moines, Iowa 50309

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third Avenue SE, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927

William J. Miller
Dorsey & Whitney
801 Grand Avenue, Suite 4100
Des Moines, IA  50309

/s/ Todd Langel

20