IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., <br><br> Defendants. | Case No. 4:10-cv-00052-RAW <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESISTANCE TO DEFENDANT SUE SAVAGE-RUMBAUGH'S MOTION FOR SPECIFIC PERFORMANCE AND RELATED RELIEF** |

COME NOW Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust ("IPLS") and Ape Cognition and Communication Institute ("ACCI"), and for their Supplemental Brief in Resistance to Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief ("Motion"), and argue as follows:

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 2
II. BACKGROUND ................................................................................................... 3
    A.  The Lawsuit and Settlement Agreements ................................................... 3
    B.  Administrative Dissolution ......................................................................... 5
    C.  Dr. Rumbaugh Cedes Control of Science to Dr. Taglialatela and Dr. Hopkins .......... 6
    D.  The Motion for Specific Performance ........................................................ 7
III. LEGAL STANDARDS ......................................................................................... 9
IV. ARGUMENT ........................................................................................................ 9
    A.  Because IPLS Exists as a Matter of Law, the Court Should Not Allow

1

        BHI or Dr. Rumbaugh to Attempt to Transfer the Bonobos ...................................... 10

    B.    ACCI has Complied with the Agreement Relating to Its Joint Ownership of
the Bonobos with BHI ................................................................................................. 12

        (1)    Dr. Rumbaugh's access was not contemplated in the agreements and
poses serious health and safety risks to the bonobos and staff ........................ 12

        (2)    Dr. Rumbaugh should be equitably estopped from imposing authority
or control over the bonobos ........................................................................ 13

    C.    ACCI has Complied with the Agreements to Involve the Bonobos in Research ...... 14

    D.    ACCI has Complied with the Agreements to Use Its Best Efforts to
Provide Complete and Competent Care of the Bonobos and to
Take all Reasonable Precautions to Ensure their Complete Safety ........................... 15

V.    CONCLUSION ................................................................................................................ 16

## I. INTRODUCTION

The crux of this matter, and the real rub between the parties giving rise to Dr. Rumbaugh's motion for specific performance, is whether ACCI's joint ownership of the bonobos requires it to grant Dr. Rumbaugh access to ACCI's facilities and to the bonobos. All other arguments, and Dr. Rumbaugh's shotgun style assertion of claims,[1] are a mere pretext for granting her this desired access. Dr. Rumbaugh's requested relief is unacceptable for a number of reasons. Namely, there is substantial evidence that Dr. Rumbaugh poses significant health and safety risks to the bonobos and to others that justify her exclusion from ACCI's facilities and from the bonobos. Indeed, she has conceded as much in the past.

It also appears Dr. Rumbaugh has manufactured the circumstances from which she now hopes to benefit. It is anticipated that her principal argument will be that IPLS ceased to exist and, as a result, she should be allowed "to determine the destiny of Maisha and the Bonobo 4." But there's more to the story. In 2012, while the underlying action related to the bonobos was well underway, a change of agent form was filed with the Iowa Secretary of State designating

---

[1] Recall, for example, that one of Dr. Rumbaugh's alternative requests for relief was to reopen the underlying interpleader action to allow her to assert certain wage-related and personal injury claims against IPLS and ACCI <u>and</u> their respective officers and attorneys.

2

Dr. Rumbaugh herself as IPLS's agent. As a condition of signing the settlement agreements at issue, she insisted on entering a side agreement that would provide her with contingent rights to the bonobos should IPLS cease to exist. She then conveniently failed to respond to notices to file IPLS's biennial report. As a result, IPLS was administratively dissolved. Dr. Rumbaugh cannot be allowed to benefit from precipitating IPLS's administrative dissolution.

For the foregoing reasons, and for the reasons outlined below to be more fully explored in the evidentiary hearing in the matter, Dr. Rumbaugh's Motion should be denied in its entirety.

## II. BACKGROUND

### A. The Lawsuit and Settlement Agreements

On February 9, 2010, IPLS filed a complaint with this Court interpleading the bonobos known as Maisha and Matata[2] in an attempt to resolve competing claims to their ownership and control. (Dkt. No. 2).

On or about January 31, 2013, in an attempt to resolve the issues, the parties entered into a settlement agreement (the "Main Agreement")[3] relating to the control of Maisha and Matata. The Main Agreement provided, in relevant part, as follows:

> 3. All parties stipulate and agree that the Trust is the owner of Maisha.
>
> 4. Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing

---

[2] As the Court may recall, Matata unfortunately died of natural causes. Although Matata is discussed in the agreements and in the underlying impleader, the parties' rights relative to Matata will not be discussed herein.

[3] The Main Agreement refers to the Agreement for Settlement and Acknowledgment of Ownership, by and between the Iowa Primate Learning Sanctuary, Zoological Foundation of Georgia, Democratic Republic of Congo, and Dr. Rumbaugh, last to sign on February 17, 2013, attached hereto as Exhibit 1.

3

practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Maisha's residence.

5. The Trust shall use its best efforts to provide complete and competent care of Matata and Maisha; and shall take all reasonable precautions to ensure their complete safety.

6. Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for Matata and/or Maisha, the Trust shall provide the DRC, in the case of Matata, and Bonobo Hope Initiative, Inc., an Iowa nonprofit corporation ("Bonobo Hope"), in the case of Maisha, sixty days written notice prior to the date upon which the Trust will no longer be available as a residence for Matata or Maisha. The Trust in either case shall also provide sixty (60) days written notice to the court in the Interpleader Action. The notice will include any information in the Trust's possession concerning the status of the research in which the bonobos are participating, and any options, of which the Trust is aware, for new residences for the bonobos. DRC shall have sole discretion regarding placement of Matata under such circumstances. Bonobo Hope in unison with Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such circumstances. Should either DRC or Bonobo Hope fail to exercise its discretion regarding placement of Matata or Maisha, as the case may be, including making appropriate arrangements to transport the bonobo to a new residence, the Trust will use its best efforts to place the bonobo in a new location, preferably a private sanctuary, with preference given to placement together with other members of the bonobo colony with whom the bonobo resided at the Trust

7. Savage-Rumbaugh's willingness to execute this Agreement is contingent upon her entering simultaneously into a side agreement with the Trust.

As suggested by paragraph 7 of the Main Agreement, IPLS, Dr. Rumbaugh, and Defendant Bonobo Hope Initiative, Inc. ("BHI"), entered into a supplemental settlement agreement (the "Side Agreement")[4] regarding the control and ownership of the bonobos known as Kanzi, Nyota, Elikya, and Teco (the "Bonobo 4"). The Side Agreement provided, in relevant part, as follows:

---

[4] The Side Agreement refers to the Side Agreement for Settlement and Acknowledgement of Ownership, by and between IPLS, Dr. Rumbaugh, and BHI, signed on January 31, 2013, attached hereto as Exhibit 2.

1. All parties stipulate and agree that the Trust and Bonobo Hope jointly are the owners of the bonobos Kanzi, Nyota, Elikya and Teco, now residing at the Trust (the "Bonobo 4").

2. The Bonobo 4 shall continue to reside at the Trust for at least so long as they continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices.)

3. The Trust shall use its best efforts to provide complete and competent care of the Bonobo 4; and shall take all reasonable precautions to ensure their complete safety.

4. Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for the Bonobo 4, the Trust shall provide Savage-Rumbaugh (or her legal representative) and Bonobo Hope (or its legal representative or successor, if any) sixty (60) days -written notice prior to the date upon which the Trust will no longer be available as a residence for the Bonobo 4 or the date as of which the Trust proposes to place the Bonobo 4 in a new residence, whichever date is earlier. The notice will include any information in the Trust's possession concerning the status of the research in which the Bonobo 4 are participating, and any options, of which the Trust is aware, for new residences for the Bonobo 4. Savage-Rumbaugh or her legal representative and Bonobo Hope acting in unison shall have sole discretion regarding placement of the Bonobo 4 under such circumstances and the Trust or its legal representative shall cooperate fully in that endeavor, at no cost to Savage-Rumbaugh or Bonobo Hope. Should Savage-Rumbaugh or Bonobo Hope fail to exercise such discretion regarding placement of the Bonobo 4, including making appropriate arrangements to transport the Bonobo 4 to a new residence, the Trust (or its legal successor, if any) will use its best efforts to place the Bonobo 4 in a new residence, preferably a private sanctuary, with preference given to placement in a new residence together with the bonobos Matata and Maisha, at no cost to Savage-Rumbaugh or Bonobo Hope.

**B.    Administrative Dissolution**

On January 19, 2012, while the fight for control of the bonobos continued, Dr. Rumbaugh, acting as the Executive Director of IPLS, executed a Statement of Change of Registered Office and/or Registered Agent ("Change of Registered Agent")[5] with the Iowa

---

[5] A copy of the Change of Registered Agent is attached hereto as Exhibit 3.

Secretary of State's Office. Dr. Rumbaugh listed herself as the new Registered Agent for IPLS. "In or about the first quarter of 2012, IPLS was faced with an unemployment insurance tax liability to the State of Iowa in excess of $60,000." (Dr. Rumbaugh's and BHI's Joint Memorandum Addressing Jurisdiction and Other Issues, Dkt. No. 102, p. 5). On August 14, 2013, the Iowa Secretary of State administratively dissolved IPLS for failure to file its 2013 Biennial Report as required by Iowa Code section 504.1613. Dr. Rumbaugh was still acting as the registered agent for IPLS at the time IPLS was administratively dissolved.

### C. Dr. Rumbaugh Cedes Control of Science to Dr. Taglialatela and Dr. Hopkins

On October 26, 2013, Dr. Rumbaugh wrote to members of IPLS and BHI to recommend that Dr. Jared Taglialatela and Dr. Bill Hopkins take over the directorship of IPLS and direct the research related to the bonobos. Dr. Rumbaugh urged that Dr. Taglialatela and Dr. Hopkins "must be able to control all aspects of their program." Moreover, she conceded that "the best thing I could do to improve the chances for IPLS funding and to decrease the level - of objections going to the USDA about IPLS - would be to absent myself from the lab." Dr. Rumbaugh outlined her reasoning as follows:

> Dear George, Lyle, Board Members, Staff, Volunteers, Jared, and Bill
>
> I am writing to each of you to strongly support and to enthusiastically endorse, Jared Taglialatela and Bill Hopkins. It is my hope that they will find a means of working with the bonobos and of facilitating the transition from the current operational status to one that is sustainable for the long term, along with the necessary structural transitions.
>
> It would be very helpful to IPLS if Jared were able to assume the directorship in the near future and if Bill were able to assist him in whatever way they both deemed satisfactory. . . .
>
> . . .
>
> . . . Similarly, they must be able to control all aspects of their program; for the lives of the bonobos cannot be separated from the success of the research. Separating this authority was a disastrous mistake made by past administrations at

the Trust and it should not be carried forward in any guise. It eliminated any chance the program had of succeeding.

. . .

I remain deeply indebted to all who firmly supported me during the investigations required by the accusations of the bonobo 12. I am even further indebted to all who worked so diligently to evaluate the accusations and enabled my name to be cleared. However, not only did the bonobo 12 continue their blog, they usurped the former web domain, continued to send false information to the USDA and to influence the opinions of local donors. It became increasingly clear that the best thing I could do to improve the chances for IPLS funding and to decrease the level - of objections going to the USDA about IPLS - would be to absent myself from the lab.

. . .

The actions of the bonobo 12 were personally directed at me and the research I conducted. There is no reason to suspect that they will attack Jared or Bill. With Jared's directorship in place, these problems should rapidly diminish. While Jared and Bill are familiar with language work, their focus is on investigating the effects of language acquisition as well as comparing and contrasting bonobos and chimpanzees. This is appropriate and the direction that should now be taken.

It is my hope that the coming essential transition will proceed smoothly and rapidly. I also hope that, as appropriate, and under Jared's direction, I will continue to do some research with the bonobos, once the needed structural changes and funding are firmly in place. I will to do nothing to disrupt this critical and necessary next step. The leadership role must transition to and remain within, the hands of others. IPLS is most fortunate that Jared and Bill are visiting and willing to consider what they might do.

. . .

Acting in reliance on Dr. Rumbaugh's representations as to their roles and her absence from the lab, Dr. Taglialatela and Dr. Hopkins accepted positions as directors of ACCI and undertook the significant responsibility of caring for the bonobos, conducting or overseeing research related to the bonobos, and obtaining funding to support the bonobos and the facility.

**D.     The Motion for Specific Performance**

On June 13, 2014, Dr. Rumbaugh filed her Motion. (Dkt. No. 69). The Motion sought, among other things, to (i) declare that ACCI is IPLS's legal successor and is bound under the

Agreements and (ii) to enforce the rights under the Agreements including declaring that BHI is a joint owner of the Bonobo 4, that Dr. Rumbaugh and BHI retain relocation rights over Maisha and the Bonobo 4, and to resolve issues relating to the governance and administration of ACCI and BHI. Alternatively, the motion sought to (i) declare that ACCI ceased to exist or (ii) reopen the litigation in this matter to allow Dr. Rumbaugh to assert a number of personal injury and wage claims against IPLS and ACCI and their respective officers and attorneys.

BHI filed a motion to intervene, (Dkt. No. 73), which was granted by this Court. (Dkt. No. 79). BHI then concurred with and joined in Dr. Rumbaugh's Motion.[6] (Dkt. No. 84).

On August 25, 2014, the Plaintiffs' filed their resistance to Dr. Rumbaugh's Motion asserting, among other concerns, that there did not appear to be an issue presented by the Motion that required resolution by this Court. (Dkt. No 83). Namely, ACCI asserted that it was bound by the agreements. As such, Dr. Rumbaugh's request that the Court declare that ACCI is bound by the agreements seemed unnecessary, and the alternative relief seemed inappropriate under the circumstances.

Following a hearing on the Motion, the Court allowed the parties to conduct limited discovery for the purpose of informing the issues encompassed by the Dr. Rumbaugh's Motion. After limited discovery, Plaintiffs provided notice of certain affirmative defenses to Dr. Rumbaugh's Motion filed concurrently herewith. A three-day evidentiary hearing on Dr. Rumbaugh's for Specific Performance and Related Relief is scheduled before the Court for May 27 to May 29, 2015.

Additional facts and circumstances will be fleshed out in the Argument section below and at the evidentiary hearing to inform the issues as appropriate.

---

[6] Accordingly, Plaintiffs' present briefing also responds to BHI's apparent positions herein.

## III. LEGAL STANDARDS

The cardinal rule in both contract interpretation and contract construction is to determine the parties' intentions at the time they signed the contract. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010) ("The determination of the intent of the parties at the time they entered into the contract is the cardinal rule of contract interpretation."); *Am. Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 329 (Iowa 1999) ("When we are reviewing the district court's construction of a contract, we must keep in mind the cardinal rule that the intent of the parties controls.").

In all contracts, "there is an implied term that the person for whom the work is contracted to be done will not obstruct, hinder or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him." *Kaltoff v. Nielsen*, 106 N.W.2d 597, 602 (1960). "The principle that no one is permitted to benefit from his or her own wrongful act is a part of the doctrine of conditions and bars a party to a contract from unjustifiably preventing the other party from performing and thus precipitating a breach." 17A Am. Jur. *Contracts* § 686 (2004).

"Equitable estoppel is a common-law affirmative defense 'preventing one party who has made certain representations from taking unfair advantage of another when the party making the representations changes its position to the prejudice of the party who relied upon the representations.'" *Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa 2005) (quoting *ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 606 (Iowa 2004) (citing *Ahrendsen v. Iowa Dep't of Human Servs.*, 613 N.W.2d 674, 678 (Iowa 2000)).

## IV. ARGUMENT

During the discovery process, Dr. Rumbaugh asserted that her claims and the issues she "intends to pursue at the hearing have evolved." (Dr. Rumbaugh's and BHI's Joint

Memorandum Addressing Jurisdiction and Other Issues, Dkt. No. 102, p. 8). It now appears she will argue that (A) IPLS has "ceased to exist," (B) ACCI has violated a provision of the side agreement relating to joint ownership of the bonobos, (C) ACCI has violated provisions in both agreements related to research with the bonobos, and (D) ACCI has violated provisions in both agreement related to care of the bonobos. With that understanding, ACCI will briefly respond to each issue in turn.

### A. Because IPLS Exists as a Matter of Law, the Court Should Not Allow BHI or Dr. Rumbaugh to Attempt to Transfer the Bonobos

Based on the limited discovery conducted in this matter, it seems likely that Dr. Rumbaugh or BHI will argue that IPLS has ceased to exist which triggers certain contingent rights in the Main Agreement and Side Agreement.

At issue is paragraph 6 of the Main Agreement and paragraph 4 of the Side Agreement. Paragraph 6 of the Main Agreement provides that "[s]hould the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for . . . Maisha,"[7] certain rights are afforded to BHI and Dr. Rumbaugh, including the option to elect to make appropriate arrangements for the transfer of Maisha to another facility. Similarly, paragraph 4 of the Side Agreement provides that, "[s]hould the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for the Bonobo 4" certain rights are afforded to BHI and Dr. Rumbaugh, including the option to elect to make appropriate arrangements for the transfer of the Bonobo 4 to another facility.

It is anticipated that Dr. Rumbaugh and/or BHI will point to the administrative dissolution of IPLS as evidence that it no longer exists. However, notwithstanding its administrative dissolution, IPLS continues to exist as a matter of law. The Iowa Business

---

[7] To be clear, neither IPLS nor ACCI have determined that they are unable to care for the bonobos. Any argument to the contrary is entirely unfounded.

Corporations Act addresses the effect of the administrative dissolution of a corporation. Iowa Code § 490.1421. It provides that "[a] corporation administratively dissolved continues its corporate existence." *Id.* An administratively dissolved corporation may seek reinstatement. *Id.* at § 490.1422. "When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution as if the administrative dissolution had never occurred." *Id.* at § 490.1422(3). As a result, and notwithstanding its administrative dissolution, IPLS continues to exist.

To the extent the Court is willing to entertain the argument that IPLS has ceased to exist, the Court should not allow Dr. Rumbaugh to benefit from her own wrongful acts by precipitating such a condition. *Nielsen*, 106 N.W.2d at 602 (1960); 17A Am. Jur. *Contracts* § 686. In 2012, during the dispute about the ownership of the bonobos, Dr. Rumbaugh appointed herself as the acting agent on behalf of IPLS. At that time, or by the first quarter of 2012 at the latest, Dr. Rumbaugh knew about the allegations that IPLS owed over $60,000 to the State of Iowa. Dr. Rumbaugh then conditioned the much needed resolution of the underlying interpleader in this matter on the signing of the Side Agreement which would allow her "to control the destiny" of the bonobos should IPLS "cease to exist." Conveniently, and at the first opportunity, Dr. Rumbaugh failed to respond to requests for IPLS's biennial statement. IPLS was then administratively dissolved subject to a lien that substantially encumbered IPLS's resources and threatened the corporate shield protecting IPLS and its board of directors. Dr. Rumbaugh cannot be allowed to benefit from her wrongful acts by invoking her contingent rights under the "cease to exist" clause nor should those benefits flow to BHI. 17A Am. Jur. *Contracts* § 686.

### B. ACCI has Complied with the Agreement Relating to Its Joint Ownership of the Bonobos with BHI

At issue is Dr. Rumbaugh's claim that "ACCI has violated paragraph 1 of the Side Agreement." (Dr. Rumbaugh's and BHI's Joint Memorandum in Addressing Jurisdiction and Other Issues, Dkt. No. 102., p. 8). Paragraph 1 of the Side Agreement provides that "[a]ll parties stipulate and agree that the Trust and Bonobo Hope jointly are the owners of the bonobos Kanzi, Nyota, Elikya and Teco, now residing at the Trust (the 'Bonobo 4')." As will be established at the evidentiary hearing, ACCI is and always has been willing to work with BHI, including providing BHI access to information about the bonobos, the health of the bonobos, and the research being conducted with the bonobos.

ACCI submits that the crux of the issue is whether joint ownership requires ACCI to allow Dr. Rumbaugh to have access to ACCI's facilities and control over the research being conducted. ACCI feels strongly that the joint ownership provision does not, and should not, grant Dr. Rumbaugh access to the bonobos and control over the bonobo research for two independent reasons.

#### (1) Dr. Rumbaugh's access was not contemplated in the agreements and poses serious health and safety risks to the bonobos and staff

"The determination of the intent of the parties at the time they entered into the contract is the cardinal rule of contract interpretation." *NevadaCare*, 783 N.W.2d at 466. Iowa courts discern the intent of the parties by "giv[ing] effect to the language of the entire agreement in accordance with its commonly accepted and ordinary meaning." *See Lewis Cent. Educ. Ass'n v. Lewis Cent. Cmty. Sch. Dist.*, 559 N.W.2d 19, 22 (Iowa 1997). Nowhere in paragraph 1 of the Side Agreement does it appear that parties intended Dr. Rumbaugh to have access to the Bonobos. Indeed, it would strain logic and common sense to read a term into a contract where

the result poses significant danger of personal injury. And there is substantial evidence here that Dr. Rumbaugh's access poses a direct threat to the health and safety of the bonobos and others.

For instance, Dr. Taglialatela's deposition is replete with specific examples outlining the basis for his testimony that Dr. Rumbaugh poses a health and safety threat to the bonobos and others. *See* Dep. of J. Taglialatela, 67:18-20 – 73:7-12.[8] Prior to the parties signing the agreements, even Dr. Rumbaugh asserted that, "I have been not able to care for the bonobos and to assure the safety of people or the bonobos." Apr. 1, 2012 Email from S. Rumbaugh to K. Schweller. Accordingly, the Court should not read a right to access for Dr. Rumbaugh's into the contract.

### (2) Dr. Rumbaugh should be equitably estopped from imposing authority or control over the bonobos

To establish equitable estoppel, a party must show that the following elements: "(1) a false representation or concealment of material facts; (2) lack of knowledge of the true facts on the part of the actor; (3) the intention that it be acted upon; and (4) reliance thereon by the party to whom made, to his prejudice and injury." *Markey*, 705 N.W.2d at 21.

Here, on October 26, 2013, Dr. Rumbaugh wrote to Dr. Taglialatela, Dr. Hopkins, and members of IPLS and BHI to recommend that Dr. Taglialatela and Dr. Hopkins take over the directorship of IPLS and direct the research of the bonobos. Dr. Rumbaugh's pitch to Dr. Taglialatela and Dr. Hopkins specifically asserted that respective roles would allow them to "control all aspects of their program" and that she would "absent [her]self from the lab." She made this pitch in the hope that Dr. Taglialatela and Dr. Hopkins would be able to save IPLS and the bonobos from their financial straits.

---

[8] A copy of Dep. of J. Taglialatela, 67:18-20 – 73:7-12 is attached here to as Exhibit 4.

13

Dr. Taglialatela and Dr. Hopkins will testify that they relied on Sue's pitch and that they absolutely would not have accepted their positions with IPLS had they had known what Sue concealed—that she did not plan to allow Dr. Taglialatela and Dr. Hopkins complete control over the research of the bonobos and that she intended to continue to be present at the lab. As a result of Dr. Rumbaugh's prior misrepresentations, she should be equitably estopped from arguing that she should now have access to the lab, or that she or BHI retained control over the bonobo research. *See Markey*, 705 N.W.2d at 21.

### C. ACCI has Complied with the Agreements to Involve the Bonobos in Research

At issue are paragraph 4 of the Main Agreement and paragraph 2 of the Side Agreement. Paragraph 4 of the Main Agreement provides that "Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes . . . ." Paragraph 2 of the Side Agreement provides that "[t]he Bonobo 4 shall continue to reside at the Trust at least so long as they continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes . . . ."

It's clear that ACCI has complied with the provisions relating to research. ACCI's active research protocols include: New Insights Into Human Origins through the Study of Linguistically Competent Bonobos; The Role of Language in Categorization; A Large-Scale Comparison of Cognition and Communication in the Animal Kingdom; A Socio-Ecological Comparison of Captive *Pan troglaodytes*, *Pan paniscus* and *Gorilla gorilla*; An Interdisciplinary Approach to the Evolutionary Origin of Language: Comparing Chimpanzee and Bonobo Communication and Neurobiology; Theory of Mind in Language Competent Bonobos; Rhythmic Entrainment in

14

Bonobo Apes at the Ape Cognition & Communication Institute (ACCI).  *See* ACCI00043.  As should be readily apparent from the face of these approved research protocols, the bonobos continue to be actively engaged in research relating to the "use of language" as required by the Main Agreement and Side Agreement.  In addition, Dr. Taglialatela, Dr. Hopkins, and others will testify about the nature of the research being conducted.

Dr. Rumbaugh and BHI have also made the puzzling and entirely unfounded allegation that ACCI is conducting invasive and dangerous biomedical research with the bonobos.  In short, this allegation is ridiculous.  Dr. Taglialatela, Dr. Hopkins, and others will testify that this allegation has no basis in fact or reality.  Indeed, they have repeatedly conveyed that information to Dr. Rumbaugh and BHI.

> D. **ACCI has Complied with the Agreements to Use Its Best Efforts to Provide Complete and Competent Care of the Bonobos and to Take all Reasonable Precautions to Ensure their Complete Safety**

At issue are paragraph 5 of the Main Agreement and Paragraph 3 of the Side Agreement which together provide that "[t]he Trust shall use its best efforts to provide complete and competent care of [Maisha and the Bonobo 4]; and shall take all reasonable precautions to ensure their complete safety."

ACCI's veterinarian Dr. Julie Gilmore, individually and assisted by others, has by all accounts provided complete and competent care for the bonobos.  She will testify about her qualifications and the care provided to the bonobos.  Even Dr. Rumbaugh has, in the past, praised Dr. Gilmore's efforts and care for the bonobos.

Dr. Rumbaugh and BHI seem determined to make an issue about ACCI's location relative to flooding—although it is unclear whether they will hold on to that position through the evidentiary hearing.  This is another example of Dr. Rumbaugh manufacturing a concern where is there none.  She was well aware of the flooding concerns when she moved the bonobos to their

15

current location almost ten years ago. Testimony will show that she even fought to keep the bonobos in their current location when BHI considered moving them elsewhere. She cannot now credibly assert claims that the bonobos are in imminent danger of a slow moving natural disaster for which ACCI maintains contingency plans.

## V. CONCLUSION

In sum, Dr. Rumbaugh appears to have largely manufactured the circumstances from which she now hopes to benefit. In addition, there is substantial evidence that Dr. Rumbaugh poses significant health and safety risks to the bonobos and to others that justify what appears to be her underlying complaint—her exclusion from ACCI's facilities and from the bonobos. For the foregoing reasons, and for the reasons outlined above to be more fully explored in the evidentiary hearing in the matter, Dr. Rumbaugh's Motion should be denied in its entirety.

WHEREFORE Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust and Ape Cognition and Communication Institute respectfully request that this Court deny Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief in its entirety and grant and further or additional relief the Court deems just and proper under the circumstances.

Date: May 13, 2015

/s/ William J. Miller
William J. Miller (AT0005414)
Brian A. Melhus (AT0011421)
Dorsey & Whitney LLP
801 Grand Avenue, Suite 4100
Des Moines, Iowa 50309-2790
Tel: (515) 283-1000
Fax: (515) 283-1060
E-mail: miller.william@dorsey.com
melhus.brian@dorsey.com
**ATTORNEYS FOR PLAINTIFFS**

Original filed. Copy to:
Todd P. Langel
Faegre Baker Daniels LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309

William C. Zifchak
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Ross Neihaus
Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602

Joshua S. Stambaugh
Kaye Scholer LLP
1999 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067

ATTORNEYS FOR DEFENDANTS
DR. SUE SAVAGE-RUMBAUGH,
PH.D. and BONOBO HOPE
INITIATIVE, INC.

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third A venue Se, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927
ATTORNEYS FOR DEFENDANT
JAPAN MONKEY CENTRE
INSTITUTE AND MUSEUM OF
PRIMATOLOGY

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309
ATTORNEYS FOR DEFENDANT
DEMOCRATIC REPUBLIC OF
CONGO

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 13, 2015, the foregoing instrument was served upon all parties to the above case and/or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings:

**By:** Electronic Filing and/or
\_\_\_\_ U.S. Mail         \_\_\_\_ FAX
\_\_\_\_ Hand Delivered    \_\_\_\_ Overnight Courier
  X  E-mail              \_\_\_\_ Other _____

/s/ Brian A. Melhus