IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - -X
IOWA PRIMATE LEARNING SANCTUARY  :
d/b/a GREAT APE TRUST AND         :
APE COGNITION AND COMMUNICATION   :
INSTITUTE,                        :
                                  :
        Plaintiffs,   :    Case No. 4:10-cv-00052
                                  :
    vs.                          :
                                  :
ZOOLOGICAL FOUNDATION OF          :
GEORGIA, INC. d/b/a ZOO ATLANTA,  :
DEMOCRATIC REPUBLIC OF CONGO,     :
JAPAN MONKEY CENTRE INSTITUTE     :
AND MUSEUM OF PRIMATOLOGY, and    :
SUE SAVAGE-RUMBAUGH, Ph.D.,       :
                                  :
       Defendants,    :    TRANSCRIPT OF HEARING
                                  :         VOLUME I
and                               :
                                  :
BONOBO HOPE INITIATIVE, INC.,     :
                                  :
     Intervenor-Defendant.  :
- - - - - - - - - - - - - - - - -X


               Fourth Floor, South Courtroom
               United States Courthouse
               123 East Walnut Street
               Des Moines, Iowa  50309
               Wednesday, May 27, 2015
               9:26 a.m.



BEFORE:  THE HONORABLE ROSS A. WALTERS, Magistrate Judge.




           Terri L. Martin, CSR, RPR, CRR
          United States Court Reporter
          Room 189, U.S. Courthouse
           123 East Walnut Street
          Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiffs:          WILLIAM J. MILLER, ESQ.
                             BRIAN A. MELHUS, ESQ.
                             Dorsey & Whitney
                             801 Grand Avenue, Suite 4100
                             Des Moines, Iowa  50309-2790

For the Defendants:          TODD P. LANGEL, ESQ.
                             Faegre Baker Daniels
                             801 Grand Avenue, 33rd Floor
                             Des Moines, Iowa  50309-8011

                             WILLIAM C. ZIFCHAK, ESQ.
                             Kaye Scholer
                             250 West 55th Street
                             New York,  New York  10019-9710

                             JOSHUA STAMBAUGH, ESQ.
                             Kaye Scholer
                             1999 Avenue of the Stars
                             Suite 1600
                             Los Angeles, California  90067

                             ROSS NEIHAUS, ESQ.
                             Kaye Scholer
                             Three First National Plaza
                             70 West Madison Street
                             Suite 4200
                             Chicago, Illinois  60602-4231

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defendants: | | | | |
| Sue Savage-Rumbaugh | 20 | 81 | 138 | 145 |
| | | | 149 | |
| Laurent Dubreuil | 151 | 199 | | |
| Lyle Simpson | 218 | | | |

# E X H I B I T S

| PLAINTIFFS' EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1004 - Change of registered agent | 109 | 109 |
| 1005 - 10/26/13 Rumbaugh e-mail | 129 | 129 |
| 1006 - ACCI active research protocols | 215 | 215 |

| DEFENDANTS' EXHIBIT NUMBERS: | | |
|---|---|---|
| 23 - 12/4/12 plan of action | 183 | 183 |
| 25 - 2/4/13 Simpson letter to Grassley | 223 | 223 |
| 91 - Flooding report | 149 | 150 |

1          P R O C E E D I N G S

2              (In open court.)

3          THE COURT:  Please be seated, everybody.

4          Good morning to you all.  Of course, I had seen the

5      lawyers, but good morning to the rest of you.  This, of course,

6      is the Iowa Primate Learning Sanctuary, doing business as Great

7      Ape Trust, and Ape Cognitive and Communication Institute versus

8      Dr. Sue Savage-Rumbaugh and -- I will probably mispronounce this

9      because around here we've said "boenobo" and "baunobo."

10          How is it correctly pronounced or is there a consensus

11     on that point?

12          MR. STAMBAUGH:  It's "boenobo," Your Honor.

13          THE COURT:  It's bonobo.  Thank you.

14          MR. ZIFCHAK:  We all agree.

15          THE COURT:  Well, good.  Take a lesson from that.  The

16     Bonobo Hope Initiative, which, of course, is an intervenor.

17     We're here today for evidentiary hearing on Savage-Rumbaugh's

18     motion for specific performance and related relief to which the

19     Bonobo Hope Initiative has joined.  Of course, the matter as we

20     know, concerns the enforcement of the settlement agreement and a

21     side agreement, the latter of which -- with respect to the

22     latter which the court has raised a jurisdictional issue.  But

23     as I said in my final pretrial order, we're going to go ahead

24     and make the record here today because there's similarity in the

25     issues involved in both of those things.

1           I think we're ready now for opening statements, and

2   under the pretrial order those are limited to 15 minutes.  And I

3   think that -- Mr. Zifchak, you've risen.  Does that mean you're

4   going to do it?

5           MR. ZIFCHAK:  Yes, Your Honor.

6           THE COURT:  If you would, please.

7           MR. ZIFCHAK:  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           MR. ZIFCHAK:  May it please the court.  My name is

10  William Zifchak.  I'm special counsel to the law firm Kaye

11  Scholer in the New York office.  I retired in 2012 as a partner

12  after 30 years.  I believe Your Honor has met the other members

13  of my trial team, and I'll get on with my opening.

14          Here today is a determined group of lawyers pitched

15  for conflict on a courtroom battle field not over money, indeed

16  all counsel here are serving pro bono; but as at the battle of

17  Gettysburg over an idea.  Here the idea being fought over is not

18  the morality of human bondage or even ape bondage.  I note that

19  this morning the Court of Appeals of my home state is hearing

20  argument on the issue of habeas corpus for chimpanzees in that

21  state; but we're not here for that issue today.

22          There can be no dispute that the primate research

23  trajectory that Dr. Sue Savage-Rumbaugh initiated four decades

24  ago in Georgia established that certain of the bonobos now in

25  residence here in Des Moines have the capacity to communicate

1  with humans in human language about their environment and their

2  feelings.

3         A recent flier for the plaintiff, Ape Cognitive and

4  Communication Institute, has a picture of Kanzi on it, and it

5  says, I know 3,000 words. For this reason, these bonobos are

6  unique in the history of mankind.

7         Let me briefly illustrate the research with a

8  three-minute excerpt from one of the videos at Exhibit 98 in

9  this case, a video prepared at Dr. Rumbaugh's direction at the

10  Language Research Center at Georgia State University.

11         Todd.

12         (Video excerpt from Exhibit 98 was played.)

13         MR. ZIFCHAK:  Your Honor, the idea we're battling over

14  here today is whether this research should be continued with the

15  hope that it will unlock even greater discoveries about the

16  origins of man or whether that research trajectory should be

17  short-circuited by the current custodians of the bonobos who

18  were entrusted with their care and in so doing maligning and

19  persecuting the protagonist of that research,

20  Dr. Savage-Rumbaugh, and banning her from all access to the

21  bonobos that she nurtured.

22         These conditions have been interposed without any

23  regard for the mental health and welfare of the bonobos.  The

24  current custodians have drawn a shroud of secrecy over the

25  bonobos and the facility and denied all but token access to the

1  co-owners of the bonobos, Bonobo Hope Initiative.  They have

2  driven out Sue; her sister, Liz Pugh, who was featured briefly

3  in the excerpt and who worked with the bonobos since Atlanta;

4  and most recently Sue's niece, Heather, who as an infant had her

5  diaper changed by the bonobo you saw in the video, Panbanisha.

6         More to the point, the current custodians are doing

7  all of this we contend in violation of the two settlement

8  agreements which are before the court.  These agreements, among

9  other things, impose Dr. Savage-Rumbaugh's research trajectory

10 on the current custodians, and the supplemental agreement

11 strongly implies that Bonobo Hope as co-owners has an equal say

12 in the, quote, residence, breeding, activities, and use of the

13 four bonobos subject to that side agreement.

14         Now, Your Honor, lest you think I am a crazed animal

15 rights activist from the upper west side of Manhattan, I am not.

16 None of my team are.  Eight years ago I did not even know what a

17 bonobo was.  I was introduced to this matter initially as an

18 employment dispute because by trade I'm an employment lawyer;

19 but what I've learned these past eight years is this.  Sue, a

20 primatologist, had worked with her then husband, Duane Rumbaugh,

21 for 25 years at the Ape Language Research Center in Georgia

22 studying chimps and then bonobos.

23         While Duane first created the touch screen board

24 system for chimps and his own history is memorialized in a very

25 recent book called "With Apes in Mind," Sue discovered that the

1  bonobos, specifically Kanzi and his half-sister, Panbanisha, had

2  far more aptitude for language and went on to learn thousands of

3  words.  They also played the piano, lit fires with matches and

4  lighters, made tools and knots, opened padlocks with keys and

5  were potty trained on a regular toilet.

6        Sue owned several of the Georgia bonobos, one of which

7  was a gift from the people of Japan.  Sue, who by this time

8  already had an honorary Ph.D. from the University of Chicago, in

9  addition to her own Ph.D., gave up her tenured professorship at

10  Georgia State and in 2004 donated her ownership interest to the

11  Great Ape Trust, in exchange for a promise from Ted Townsend of

12  a job for life and to care for the bonobos for life.  Sue asked

13  for no money for these priceless creatures.

14        With proper approvals Sue drove the bonobos to Iowa in

15  a school bus in 2005.  Ted Townsend spent 20 million dollars

16  building a facility on donated city land that he acknowledged

17  was in a floodplain.  Jealous rivals forced Sue out after two

18  years.  This was the start of a pattern.  Sue was reinstated

19  full time in May 2008 but supervised by a non Ph.D. named

20  William Fields.  A major flood in June 2008, in Townsend's own

21  words, was the, quote, death nail for his master plan for

22  expansion at the trust.  After the financial crash, he made

23  plans to pull out and relocate the bonobos.

24        The U.S. Army Corps of Engineers has banned further

25  construction at the facility and the groundwater may well be

toxic to the apes and to humans.  Four bonobos, the one that was a gift from Japan, named P-Suke, Nathen, Panbanisha, and Matata, the original bonobo from Africa, have died in Iowa.  Infant Teco was born in 2010 with chronic health conditions.

In August 2011 Sue was selected as one of Time Magazine's 100 most influential people in the world.  To my knowledge, she is the only Iowa resident ever so honored, and yet in October 2011 she was locked out by Fields in the face of allegations by disgruntled workers that she, herself, was a danger to these bonobos.  These allegations were discredited and a new leadership team replaced Townsend who left the trust saddled with debt.

Lyle Simpson, Professor Ken Schweller, and many distinguished scholars wrote letters of support to the bonobo research and for Sue to the Governor of the State of Iowa, its senators, and its university presidents.  These identical allegations from 2011 were served up as new to Ken Schweller when he became the new board chair, and he used them as an excuse to place Sue again on administrative leave and then work to relocate the bonobos.  Sue was cleared once again after a comprehensive investigation and things moved along until May 2013 when she suffered a fall and concussion at the lab.  In the interim, George Caudill, at Lyle Simpson's urging, was elected the chair of IPLS.

In May 2013, the Caudill and Simpson led board,

1  including Tom Watson who is the CEO of Hy-Vee, resolved to grant

2  Sue, quote, unfettered permanent access to the bonobos.  And

3  I've displayed the resolution on the screen.  It's Exhibit 27 in

4  the exhibit binder.

5          The current custodians have been in breach of this

6  pledge since November of 2013 when on Sunday, November 9, Sue

7  was suddenly banned from the lab by George Caudill.  She has

8  been denied access since that time.  There is no dispute that

9  Sue and her husband, Duane, were banned at the insistence of

10 Yerkes Primate Research Center, a private lab that specializes

11 in invasive research on chimps and which is disserved by the

12 implications of the research trajectory.

13         Now, to bring things back to the instant motion, this

14 action was brought in interpleader, as Your Honor knows, to

15 resolve ownership claims to Matata and her son, Maisha.  Sue was

16 invited to participate in this action because she had owned

17 Maisha and she asked me to represent her in the litigation.  The

18 lawsuit was settled on the basis where ownership of the other

19 five bonobos, including the late Panbanisha, would be shared

20 50/50 with Bonobo Hope Initiative.  The supplemental agreement

21 was the quid pro quo for Sue signing the main settlement

22 agreement.  A provision common to both agreements we will show

23 mandates that whether Sue was actively involved or not, Sue's

24 research trajectory with the bonobos based on interspecies

25 immersion in a symbolic culture, which cultivates language and

1 other forms of communications in the bonobos, be continued as a

2 condition of leaving the bonobos in the care of the Iowa Primate

3 Learning Sanctuary.

4       Paragraph 5 of the supplemental agreement, at the same

5 time that that agreement awarded Bonobo Hope co-ownership,

6 identifies the trappings of ownership that Sue was releasing and

7 that we contend Bonobo Hope acquired as follows:

8       Quote, Savage-Rumbaugh acknowledges and agrees that

9 relinquishing her claim to ownership includes, but is not

10 limited to relinquishing any and all rights to determine the

11 residence, breeding, activities, or use of the Bonobo 4.

12       Bonobo Hope released no claims on to that side

13 agreement, Your Honor.  It was awarded co-ownership as part of

14 the overall settlement.  By implication, this clause fleshes out

15 the rights inherent in Bonobo Hope's co-ownership of the

16 bonobos.

17       The settlements require an express written

18 understanding between the parties in order to be modified.

19 There is no such amendment.  The settlements also award

20 relocation rights to Bonobo Hope working in conjunction with

21 Dr. Savage-Rumbaugh should IPLS cease to exist.

22       Now, Jared Taglialatela and William Hopkins were

23 installed as Sue's successors allegedly by a vote of the Bonobo

24 Hope Board with Sue and Duane's endorsement and at Lyle

25 Simpson's urging.  The successor to IPLS, the plaintiff ACCI,

1  contends that by that vote Bonobo Hope somehow put itself out of

2  business.  However, neither Sue nor Bonobo Hope was aware when

3  it voted on that resolution that Sue allegedly had been

4  dismissed from her position on the IPLS Board of Directors or

5  that Jared, a former student of Sue's in Georgia, had done an

6  about-face on his decade long support of Sue's research

7  trajectory.

8         Sue was not permitted by Lyle to discuss with Bonobo

9  Hope her banishment from the lab by George Caudill on

10 November 9th before the vote.  Lyle did not volunteer to Bonobo

11 Hope, which happened to be his client, that Yerkes had imposed a

12 ban on Sue's access as a condition of doing business with IPLS.

13 Lyle did not volunteer that ACCI had been created to stand in

14 the shoes of IPLS because it had been rendered inactive by the

15 Secretary of State of Iowa.

16        Since November 2013, ACCI has refused to volunteer any

17 information about the conditions of the bonobos or detail on any

18 research initiative.  Rather it has made clear that it disavows

19 and has discontinued Sue's research trajectory, including the

20 regular language immersion with the bonobos.

21        I have put on the screen, and I'll just display it

22 here, Your Honor, the single piece of paper that we've received

23 from ACCI since November 2013 that describes the research that

24 purportedly is going on at the lab.  We've asked for detail.

25 They've refused to give it to us.  We would like to know -- and

1  that's one purpose of the hearing -- exactly what the research

2  is that the bonobos are and are not being subjected to.

3        This is not only a breach of the settlement agreements

4  and the resolutions preceding it, it is inhumane.  It is the

5  equivalent of cutting out the tongue of a human being.  ACCI has

6  ignored concerns that the lab and the campus are environmentally

7  dangerous to the bonobos.  We intend to prove, therefore, that

8  the settlements mandate continuation of the interspecies

9  immersion research trajectory, that IPLS and ACCI have breached

10 this mandate, that Bonobo Hope's express and inherent rights of

11 ownership have been abrogated, that IPLS has ceased to exist

12 within the meaning of the settlements and breached them when it

13 failed to notify this court of that fact, and the bonobos,

14 therefore, should be relocated in accordance with the relocation

15 clause.  We also intend to show that Bonobo Hope has a viable

16 relocation site in neighboring Missouri.

17        Your Honor, in closing, let me say this.  In the

18 course of this hearing, you will hear two perhaps diametrically

19 opposed interpretation of events whose occurrence for the most

20 part is undisputed.  The court may find the interpretation of

21 the motives of various well meaning professionals almost

22 impossible.  I suggest to you that such an exercise is not

23 necessary.  The focus of the inquiry, with all due respect, is

24 whether the research trajectory should be sustained because that

25 was invariably the intention of the parties and, if not, whether

1  Bonobo Hope nevertheless because of its undisputed ownership

2  interests has an equal say in the destiny of these precious

3  creatures.

4          We hope that the court will rule in favor of Sue and

5  Bonobo Hope on both counts.

6          Thank you for your courtesy, Your Honor.

7          THE COURT:  Thank you, Mr. Zifchak.

8          Opening statement on behalf of the plaintiffs.

9          MR. MILLER:  Good morning, Your Honor.

10          I'm Bill Miller here on behalf of IPLS and ACCI.  I'm

11  here with my colleague, Brian Melhus, who will be trying the

12  case and this hearing with me, and Jared Taglialatela, Dr. Jared

13  Taglialatela, who is the director of research at ACCI and is

14  serving as our corporate representative.

15          May it please the court.  Your Honor, this is a case

16  about boundaries is what it comes down to.  It's the boundaries

17  of the ability of humans and the ability of humans to respect

18  those boundaries.  Now, in the background are some very

19  fascinating issues about the boundaries of the human mind, and

20  Dr. Sue -- and I refer to her with that respectfully,

21  Dr. Rumbaugh -- there may be a reference to her husband, so I'll

22  just say Dr. Sue just so we're clear.  Dr. Sue has done some

23  innovative work in the past with these bonobos.  The court

24  shouldn't be distracted by those issues, however, because the

25  focus here, the real boundaries to be concerned with are more

1  mundane, and they're focused on the settlements and the side

2  agreement and focused on subsequent activity by Bonobo Hope, by

3  Dr. Rumbaugh and by others that bring us to this point of

4  conflict that we're discussing in the courtroom.

5          Now, Dr. Sue has been asked time and time again to

6  live within boundaries, and those boundaries have been directed

7  by legal proceedings, by colleagues, by circumstances, and the

8  fact of the matter is she refuses.  And as this court knows,

9  just by example, this case started out as an interpleader action

10  and it's morphed into something different.

11          One of the issues that you'll be deciding -- and I'll

12  mention it here and not again, I don't think -- is the

13  jurisdictional issue with respect to what claims are at issue

14  here.  We have two jurisdictional issues.  We have the

15  supplemental agreement, and I think there's an agreement that

16  that will be addressed by the court, or at least the parties are

17  in agreement; but we have other claims about personal injury and

18  the like.  I didn't hear mention of them this morning.  They

19  shouldn't be discussed.

20          The focus is on the main and side agreements that

21  settled that interpleader action and the conduct subsequent to

22  them.  Those agreements define a plan going forward for the

23  operation of the Great Ape Trust, a facility that ACCI is now

24  operating.  Dr. Sue agreed it was time for her to step aside,

25  and she handpicked the next generation that would take over that

1  operation.  Then, for whatever reason, she decided to reassert

2  herself and in doing so created havoc.  She jeopardized the very

3  plan that she helped to implement.  She was then called on that.

4  It was brought to her attention.  She withdrew, and then since

5  then she's concentrated on this litigation.

6          Meanwhile, ACCI and IPLS have continued the work of

7  Great Ape Trust.  They've restored order to the organization.

8  They've put protocols in place and continued the research.

9  They've raised funds for the facility and to support the

10  research that they were doing, and they set boundaries for a

11  sustainable path going forward.  I think it will be clear and

12  evident as you hear testimony in this matter that Dr. Sue

13  doesn't like those boundaries.  She thinks they interfere with

14  her own plans and her work, Bonobo Hope agrees; but she gave up

15  control, she wants it back.

16          You do have a legal issue in front of you with respect

17  to this question of whether IPLS ceases to exist.  The fact of

18  the matter is no; the same operation from IPLS to ACCI.  In

19  fact, ACCI has improved what IPLS has been doing.  The prior

20  entity was administratively dissolved.  You'll hear testimony

21  from Mr. Simpson regarding that, from Dr. Rumbaugh and from

22  others.  That entity can be reinstated if necessary, continues

23  to exist, and ACCI continues at work.  We've briefed those

24  issues, and the evidence that you'll hear in the next couple of

25  days will support that IPLS does not cease to exist.

1          The real crux is how ACCI continues this operation

2   going forward while recognizing the co-ownership of BHI.  ACCI

3   has worked with BHI.  It's briefed them on events.  It hosted

4   members and meetings to discuss what's occurring at the

5   facility.  It's occurred in a context, however, in which Bonobo

6   Hope had previously stated that Dr. Taglialatela and Dr. Hopkins

7   would be in charge of the plan going forward.

8          Now, BHI has now cast its lot with Dr. Rumbaugh for

9   reasons that I don't know why exactly, but that's what they've

10  done.  But the fact of the matter is that there's no agreement

11  that guarantees Dr. Sue access to the facility, and any

12  indication that might happen in the future evaporated when she

13  refused to withdraw like she had promised.  Furthermore, she's

14  admitted over time that she's not capable of overseeing things

15  including the operation and safe health of the bonobos, and she

16  shouldn't be permitted to come back in now.

17         In sum, Your Honor, ACCI has continued to work the

18  Great Ape Trust here in Des Moines.  It's caring for the

19  bonobos, carrying on research consistent with prior agreements

20  between the parties.  It's not doing biomedical research.  The

21  bonobos aren't at risk from flooding.  These are all contrived

22  excuses.

23         The parties tried to erect boundaries that permitted

24  the continuation of Great Ape Trust.  We're here because ACCI

25  can respect those boundaries that Dr. Sue and BHI cannot.  At

1  the end of this matter, we're going to ask you to restore order

2  by confirming that ACCI may continue its work without

3  interference and demanded access by Dr. Sue.

4          Thank you.

5          THE COURT:  Thank you, Mr. Miller.

6          Mr. Stambaugh, you may call your first witness.

7          MR. STAMBAUGH:  Thank you, Your Honor.

8          The claimants first call Dr. Sue Savage-Rumbaugh.

9          THE COURT:  Ma'am, if you would come forward, please.

10         THE CLERK:  Please raise your right hand.

11       SUE SAVAGE-RUMBAUGH, DEFENDANTS' WITNESS, SWORN

12         THE COURT:  You can take a seat right there.

13         You might want to adjust the microphone so you can

14  speak into it conveniently.

15         THE WITNESS:  Okay.

16         MR. STAMBAUGH:  May I proceed, Your Honor?

17         THE WITNESS:  Can you hear me just fine?

18         MR. STAMBAUGH:  Yes.  May I proceed?

19         THE COURT:  Yes.

20

21

22

23

24

25

DIRECT EXAMINATION

BY MR. STAMBAUGH:

Q.  Dr. Savage-Rumbaugh, we've heard some of the counsel talk
about the reasons for this proceeding.  Can you explain to the
court in your own words briefly why you're here today?

A.  Yes.  I'm here because a settlement agreement, in my view,
has been breached and access to the bonobos from both the
scientists and myself has been precluded.  I established the
Bonobo Hope Board and the scientists on that board to look after
the future of the bonobos, and I would like to see that
continue.

Q.  What do you want specifically for the lives of these bonobos
going forward?

A.  I want the research trajectory to go forward with
responsible scientists looking after that trajectory, and I want
the Pan/Homo culture and the rearing environment to continue.
This includes not only art, music, apes, it includes the family
that goes along with the bonobos, the human family as well as
the bonobo family, because that's produced the results of the
research.

Q.  Dr. Savage-Rumbaugh, we've already heard the phrase
"research trajectory."  Can you explain to the court what is the
nature of your research?

A.  The research trajectory, in my view, is something that a
scientist establishes when they have a question, a long-term

1 question and they spend their life looking at it from many

2 different ways.  Some scientists bounce around and look at

3 different topics.  I have taken the topic, the origin of the

4 human mind.  As a young child, my father used to always ask why

5 are all my seven children so different.  And I guess I started

6 to wonder, how did we get different and how did we get to be the

7 way we are.

8           So when I had a chance to for the first time in my

9 life meet apes, I was very fortunate.  I met them at the

10 University of Oklahoma where apes were raised in radically

11 different conditions.  Some were raised in human homes from the

12 date of birth.  Some were raised in peer groups from the date of

13 birth.  Some were raised by their mothers from the date of

14 birth.  Some were wild caught.  And I could immediately see,

15 having had a background in psychology, that these apes were

16 radically different, and apes are our closest living relatives,

17 and I saw then that what happens in one's lifetime and the

18 cultures that one is in makes a huge difference, and it makes a

19 difference even prior to birth and it certainly makes a

20 difference in the period of time after birth.

21           So I wanted to study that for my career, and I had

22 been on my way to Harvard University to work with B.F. Skinner.

23 I was very impressed with his book "Walden Two" in which he

24 shows how a full understanding of behavior and reward and

25 reinforcement and learning theory could shape a better world,

1  and I had been admitted to Harvard.  When I saw these apes, I

2  realized that learning theory was not the answer.  It couldn't

3  explain what I saw.  Rearing was explaining what I saw, but that

4  rearing went far beyond any reinforcement techniques and any

5  classical conditioning techniques, something else was going on.

6         So I vowed to work with apes the rest of my life.  At

7  that point many people told me, you won't get a job, it will be

8  difficult, you won't be accepted, nobody is doing that.  The

9  evidence in front of my eyes was overpowering, and I decided to

10  do it.  So I finished my Ph.D. at the University of Oklahoma,

11  and then I went to Yerkes under the direction of Dr. Duane

12  Rumbaugh, whom I later married, although I hardly knew him at

13  the time, and we've had and continue to have a wonderful

14  relationship since.  He's 20 years my senior, so he's residing

15  with a daughter in Jersey and would love to be here but is not

16  able to do so at this point in time because of his age.

17         But I have continued and he has urged me to continue,

18  and we had a very, very interesting research trajectory at the

19  Yerkes Primate Center.  When I first arrived, I was shown around

20  the center.  I looked up and down the wing where there were 130

21  or 150 chimpanzees, each two to a cage.  I walked up and down

22  that wing, and those chimps were crazy.  They were crazy.  They

23  were throwing shit, they were screaming, they were banging their

24  heads on the walls, they were poking their eyes, they were

25  pulling their hair out.  And I cried, and I said, as a

1  scientist, this is wrong.  I have to do something about this,

2  but I can't do anything about it as an animal rights activist.

3  All I can do is help people understand that these apes are more

4  intelligent than we have learned before.

5          And as I said, I had seen apes reared in human homes,

6  and I knew that they could go for rides in cars with me, they

7  could go to A & W with me and sit right there and order a

8  hamburger.  That was done at the University of Oklahoma.  It was

9  my training as a graduate student.

10         So I decided to do research that would help understand

11 the intelligence of these apes.

12 Q.  Thank you.

13         For the sake of our kind madam court reporter, Yerkes

14 is Y-E-R-K-E-S.

15         Can you explain to us what Yerkes is?

16 A.  Yerkes is one of a number of facilities operated by the

17 Federal Government that keeps primates mostly for the purpose of

18 biomedical research and certain kinds of restricted behavioral

19 research.

20 Q.  Dr. Savage-Rumbaugh, when did you first start working with

21 bonobos?

22 A.  I first started working with bonobos in 1975 when Matata,

23 the matriarch of this group, was imported from the Congo under a

24 loan-lease agreement to determine whether bonobos were actually

25 a different species than chimpanzees.  That was in 1975 and that

1    was the same time I arrived at the Yerkes Primate Center.

2              The other people there were doing biomedical assays

3    and I was to do the behavioral assay, comparing the behavior of

4    bonobos and chimpanzees to determine if they were or were not

5    different species.

6    Q.   Assay is A-S-S-A-Y, is that correct?

7    A.   Yes.

8    Q.   After Yerkes where did your research take you next?

9    A.   My research took me to Georgia State University, and there

10   we began with Kanzi in 1980 when he was just six months old.  He

11   was assigned to us and brought to us from the Yerkes Primate

12   Center, along with his mother, because I refused to separate him

13   from his mother or cause him any trauma by so doing.  And the

14   previous work I had done at the Yerkes Center had been -- tried

15   to determine whether or not apes could learn language, use

16   symbols, comprehend symbols, but it had all been based on

17   learning principles and conditioning principles.  And while the

18   work had been very successful, what I realized was that as long

19   as we could tell the world that we had trained these apes, we

20   weren't in the same ballpark with human beings.

21             So the real question was, could an ape pick up

22   language if it were in a situation in which a human child could

23   pick up language.  As long as we were assuming it had to be

24   trained, we couldn't really answer that question.

25             So I designed an environment for Kanzi, not to make

1  him a human because I knew that would be wrong.  Even if Kanzi

2  could become human, his body wasn't going to be human even if

3  his mind were.  He needed to live with bonobos and understand

4  bonobo language and culture.  So I kept him with his mother, and

5  I designed an environment in 50 acres of forest that Georgia

6  State provided, and Kanzi's day was spent wandering around that

7  forest finding food, foraging much as he would do if he were in

8  the wild.  But each place where there was food, it had a name,

9  and we could talk about where we were going to go and we could

10  talk about what we were going to do.  And in that environment,

11  without any training, Kanzi acquired knowledge of that forest

12  faster than the humans, he could lead people who were lost, and

13  he learned how to use the symbols, and he learned the human

14  language, the spoken language.  Even though he couldn't speak it

15  clearly, he tried to emulate it.

16        So he learned a written language and a spoken

17  language.  By the time he was two, two-and-a-half years of age,

18  he began to be competent.  And by the time he was three or four,

19  it became clear that he didn't need any kind of training

20  whatsoever.  He was on -- he was a bit delayed, but he was on

21  the same trajectory that a human child would be on if he were in

22  a loving, caring environment where he has respect and dignity

23  every moment and has the opportunity to do what he wants and say

24  what he wants.  That was the opportunity that was available to

25  Kanzi.

1  Q.  Doctor, in order to conduct this type of research

2  trajectory, what sort of contact with the bonobos is required?

3  A.  The same as you would have if you raised a child in a

4  loving, caring home.  You have free contact.  The child goes

5  places with you.  The child does things with you.  You explain

6  to the child what you're going to do in advance.  You tell the

7  child when there are ways to be polite and ways to be kind and

8  the proper words to say.  There has to be a moral attachment and

9  a bond that's established.  It's through that bond of love that

10  a young bonobo will want to emulate certain things; but it would

11  be wrong to do that with all humans around, as I said, so you

12  need bonobos and humans and the attachment needs to be both

13  ways.

14  Q.  After GSU, Georgia State University, where did you go next?

15  A.  After Georgia State University, at the request of Ted

16  Townsend, I came to Iowa, Des Moines, Iowa.

17  Q.  At the time you came to Iowa, Dr. Savage-Rumbaugh, what sort

18  of notoriety did Kanzi have?

19  A.  Well, Kanzi had gained worldwide recognition very rapidly

20  because he was the first nonhuman ever to be acquire language

21  without being trained and to understand spoken sentences, even

22  novel sentences that he had never heard before, even narrations

23  and stories that he had never heard before.  His comprehension

24  was deep and it grew deeper; but the accolades were -- I think

25  he was widely talked about in the New York Times.  He appeared

1    in newspapers around the world, he appeared in video clips

2    around the world, and he was on the first satellite that was

3    sent beyond the solar system, which had the treasures of

4    information we would share with the rest of the solar system if

5    they were to find that information, description of the work with

6    Kanzi was included there.

7    Q.  I want to take a step back before we talk about the Great

8    Ape Trust, Dr. Savage-Rumbaugh.

9           Have you received any awards or accolades for this

10   groundbreaking work that you were doing?

11   A.  Yes.  I've received an honorary doctorate at the University

12   of Chicago; an honorary doctorate at my alma mater, Southwest

13   Missouri State University; and I've received a Sigma Xi

14   lectureship; and I was nominated by Time Magazine as one of the

15   100 most influential people in the world.

16   Q.  What is a Sigma Xi lectureship?

17   A.  Sigma Xi is an honorary society for scientists, and they

18   select some scientists to travel around the United States and

19   tell students and colleges about the particular work they are

20   doing.

21   Q.  And have you been nominated for any other awards?

22   A.  I think that's the sum total.

23   Q.  Have you ever heard of the Templeton award?

24   A.  Oh, I've been nominated, but I don't know that I've received

25   other awards.  I was told that I was nominated for a Nobel, but

1  you never really know.  I don't know how many things I've been

2  nominated for.

3  Q.  How did you come about to be named one of Time Magazine's

4  100 most influential people?

5  A.  I don't know.

6  Q.  What year was that?

7  A.  I think that was 2010 or 2011 -- 2010.

8  Q.  Let's go ahead and talk about how the bonobos came to Iowa.

9  How did that come about?

10  A.  Ted Townsend heard about the bonobos through a book called

11  "Monkey Wars."  He was interested in building the Iowa Child

12  facility as I understand people here in Iowa know, and he read

13  in the book "Monkey Wars" about chimpanzees and bonobos in

14  Iowa -- I mean in Missouri that had language, and that research

15  happened to be done by an Iowan.  My husband, Duane Rumbaugh,

16  was born in Iowa, so because he was an Iowan -- I guess you do

17  this in Iowa -- he called up my husband and asked to come and

18  visit and see what our lab was really like.

19          Ted described having his father interest him in

20  Africa, and he traveled there many times, and he had seen all

21  the African animals.  He had them mounted at the Townsend

22  facility, and he had read about chimpanzees, and I don't think

23  he knew anything about bonobos; but he was interested in the

24  origins of humans and the whole evolutionary story.

25          So he came to our lab to see if it was for real, and

 1  we showed him around, and he wanted to include us in the Iowa

 2  Child project because he wanted children in Iowa to have the

 3  experience of seeing apes with these capabilities.  He thought

 4  it would inspire them to strive for greater heights themselves.

 5  Q.  What was the plan for the bonobos when they first came to

 6  Iowa?

 7  A.  The plan was to build the ideal facility in which the

 8  research trajectory could expand and continue in perpetuity.

 9  Q.  Did your research trajectory continue after the bonobos

10  moved to the Great Ape Trust in Iowa?

11  A.  The research trajectory continued in many ways and it had

12  difficulties in other ways.  We were brought to Iowa, along with

13  a group from the Smithsonian Zoo, and they had an orangutan

14  named Azy, which it's interesting that his name Azy was sort of

15  like Kanzi.  And in terms of PR there was a desire to present

16  Azy and Kanzi in a similar manner, that they had similar skills.

17  They both used the keyboard.  Azy was not reared in an

18  environment like Kanzi, and Azy could not understand spoken

19  English and Azy could not understand narratives and Azy could

20  not understand novel sentences.  In fact, all Azy could do was

21  if you held -- if I held up my glasses, he could say glasses.

22  If I held up Kleenex, he could say Kleenex.  He could do that

23  for seven items.  Beyond that -- that's called paired associate

24  in psychology.  It means event X happens, you say A; event Y

25  happens, you say B.  So all you have to learn is to pair two

1  things.

2          Language is very different.  Language is symbolic.  So

3  if I say M&M and I hit a symbol, you usually do that if you're

4  an ape because you want an M&M; but Kanzi can understand no M&M.

5  He can understand M&M's for Matata, M&M's yesterday, M&M's

6  tomorrow.  When a symbol becomes freed from that paired

7  association, you can go backward and forward in time.  It can be

8  put in a sentence in all different ways, and words can modify it

9  in all different ways.  Then you have language.

10          Azy didn't have language; but the PR department -- Rob

11 was young, Rob was hoping to the future, and they wanted to

12 equate Sue with Rob --

13 Q.  And I'm sorry, I'm going to stop you there.  When you say

14 "Rob," who you referring to?

15 A.  Rob Shumaker.

16 Q.  Can you spell that?

17 A.  S-H-U-M-A-K-E-R.

18 Q.  Thank you.

19          Please continue.

20 A.  And I had hoped to work with Rob.  Ted told me that his goal

21 was that Rob would learn from me and be willing to work with me.

22 The only way you can learn is if you actually rear an ape

23 yourself and put it in the kinds of rearing environments that

24 the child has, and it needs to be a by-species rearing

25 environment as I mentioned.  You have to as a scientist do what

1 others have done to follow in their footsteps.

2       Rob wasn't really willing to do that with orangs, and

3 it caused him great consternation and the PR department some

4 consternation when Kanzi made fires, when Kanzi drew, when Kanzi

5 made music, when Kanzi did the things that culturally we do.

6 When Kanzi went on long walks out in the woods with Panbanisha,

7 it caused consternation because Rob couldn't do that with Azy.

8       So there was some conflict between myself and

9 Dr. Shumaker.  I welcomed Dr. Shumaker to the lab.  I hoped that

10 Ted's original idea that he would be able to learn and take the

11 science forward would be helpful.  At that time Rob had no

12 publications in his field, and there were probably 400 in the

13 other fields.

14       But in many other ways the trajectory went positively

15 forward.  The bonobos grew in abilities immensely, possibly as a

16 result of actually relocating so they got to see that the world

17 was a bigger place.  It was a very, very different environment

18 here in Iowa.  The weather was different.  We had the caves

19 outside.  We had a really big river.  We had a flood that almost

20 drowned us.  We had some of the things that happen in life, and

21 from all of those, the bonobos learned a great deal.

22       And in particular the bonobo Panbanisha, who passed

23 away very recently, became fascinated with all of the

24 documentaries on television that compared humans and apes and

25 talked about how intelligent apes were relative to humans.  She

1   wanted to study all of those and watch them over and over and

2   began to be very reflective.  Kanzi also increased in his

3   ability to be reflective.

4           And they were very aware that there were people in

5   Iowa who were very scared of apes and if they got out of the

6   facility would shoot them.  We had to explain this to them.  So

7   they were very cautious.  They were very respectful of everyone.

8   They were very careful.  In a sense they grew up here.  They

9   became adults.  Morality that I didn't think could show up began

10  to show up here, and this was one of -- it really changed here,

11  even though the research trajectory as I had originally imagined

12  it wasn't perfectly positive, because they are such intelligent

13  beings, they continued in their own minds, they continued the

14  trajectory.  And this was one of the things that I had very much

15  hoped to convey to Dr. Taglialatela had I had the chance.

16  Q.  You mentioned just a minute ago about the development of

17  Kanzi at the time he arrived in Iowa.  Dr. Savage-Rumbaugh,

18  after three decades of pursuing your research, can you explain

19  to the court in more detail what Kanzi was able to do at the

20  time you arrived at the Great Ape Trust?

21  A.  Kanzi learned on his own how to comprehend human language.

22  He could understand a sentence that he had never heard before.

23  There were sentences such as, can you give the doggie a shot?

24  Kanzi had never been asked to give a dog a shot, but in a test

25  situation, he could pick up a syringe and a toy dog and give

1  that dog a shot when there were many other multiple objects

2  there.  Kanzi could understand sentences like, let's not do it

3  now, let's do it later where the "it" is referenced by the

4  context.  So Kanzi understood referential words, he understood

5  symbolic words, he understood abstract sentences and abstract

6  syntax.  Kanzi could follow a narrative.  Kanzi could watch a

7  videotape and, at the level of at least an eight-

8  or ten-year-old, understand what was going on in a video.  Kanzi

9  on his own -- his favorite movie was "Quest for Fire."  And each

10  bonobo has always had a favorite movie, and it determines their

11  character.  Kanzi's was "Quest for Fire," and he began to make

12  fire, and by the time he got here he was an accomplished fire

13  maker.  You have to be sure that you don't burn yourself and

14  that you gather the sticks right and that you put them right and

15  that you add sticks at the right time.  Not all the other

16  bonobos wanted to do that, but Kanzi did.

17          Kanzi also became an accomplished stone tool napper

18  before he came here, and no other bonobos has ever made stone

19  tools, no other bonobo has ever made fire, no other bonobo has

20  ever understood language at that level.  And Kanzi had played

21  and demonstrated ability to have rhythm and synchrony with Peter

22  Gabriel, and many other things, but those are the ones that are

23  best documented.

24  Q.  Their favorite movie was not "Planet of the Apes"?

25  A.  They feel the "Planet of the Apes" -- well, they've watched

1  all the different versions, and they don't like the intermediary

2  versions where the apes were so aggressive.  They did like the

3  Charleston Heston version, but they had focused on -- each one

4  is different.  Kanzi focused on "Quest for Fire" because humans

5  were very ape-like in that movie and they were trying to become

6  more human-like in that movie, which I guess is what Kanzi was

7  trying to do; but Kanzi would watch that movie over and over and

8  over and, at certain points it was very scary, and at the scary

9  points he would turn -- there was a reflection in the lexigram.

10 When the video would shine on the lexigram, Kanzi would turn and

11 look the other way at the scary part, so he wasn't actually

12 watching the video.

13         Panbanisha's favorite movie was "Harry and the

14 Hendersons," which is about a bigfoot that is struck by a family

15 car and is carried home in the station wagon and the family is

16 trying to protect this ape in their house and nobody else

17 understands the plight of the ape, and that really became

18 Panbanisha's preoccupation.

19         And I could explain the others, but it is like a

20 child.  They have their own personality and they develop in

21 their own way.

22 Q.  Dr. Savage-Rumbaugh, how much time were you spending with

23 the bonobos at the trust at this time?

24 A.  I had somebody with the bonobos 24 hours a day.  It wasn't

25 always me.  When Panbanisha and Kanzi were little, I did stay

1  with them 24 hours a day, three days a week, and somebody else

2  stayed with them the rest of the time.  I tried to as much as I

3  could do writing and presentations and keep the trust running

4  and to work -- I didn't work an eight-hour day schedule.  I

5  worked at the project all the time but not always at the lab.  I

6  had my sister, Liz Pugh, and others if I weren't there who could

7  continue the proper environment.

8  Q.  Dr. Savage-Rumbaugh, did you take any photographs of the

9  activities that you were conducting with the bonobos at the

10 trust at this time?

11 A.  Yes.  Yes, I did.

12 Q.  Did you bring them here today?

13 A.  Yes, I did.

14 Q.  Do you think it would assist in your testimony to talk about

15 those pictures?

16 A.  I would just like to show a few pictures.

17       MR. STAMBAUGH:  Your Honor, at this time I would ask

18 to publish these pictures for purely demonstrative purposes, and

19 I've already shown them to opposing counsel.

20       THE COURT:  You may do so.

21       MR. STAMBAUGH:  Thank you.

22       With the court's permission, I'll be using the

23 document camera.

24       Just one moment, Your Honor.  I apologize.  I stand

25 corrected.  We will be using the screen.

1        Thank you.

2    BY MR. STAMBAUGH:

3    Q.  Dr. Savage-Rumbaugh, as we put up these pictures, I'm just

4    going to ask you to describe briefly for the court what is the

5    picture of?

6    A.  This is a picture of Kanzi.  He's just asked to see the

7    picture that we've just shown him on the screen.  We had a

8    photographer come who was going to take pictures of Kanzi for a

9    newspaper, I believe in England, and Kanzi -- prior to the shot

10   Kanzi asked if he could pose in front of the icicles which were

11   coming into his tunnel, and he posed in front of those and then

12   he asked to see what he looked like in the picture.

13   Q.  How did he ask to pose under the icicles?

14   A.  He has picture on his keyboard.  He can say picture and

15   gesture to the icicles and point to the photographer that is

16   already taking his picture and then go sit there.

17   Q.  Are those the lexigram keyboards that we've heard about?

18   A.  Yes.

19   Q.  Can you describe those briefly to the court?

20   A.  Yes.  There are over 450 symbols on the lexigram keyboard,

21   and some of them were -- Kanzi learned six when he was very,

22   very young.  At the time we thought he had to be trained, and we

23   found out he learned them, and then we slowly added them in

24   Kanzi's life.  We may see a picture, if we go ahead, we'll see a

25   picture of what a keyboard looks like; but they're geometric

1   symbols or in some cases printed words because Kanzi does try to

2   speak, and Kanzi will try to say things.  For a word like

3   peanut, he will try to say (sound by witness) and for banana

4   he'll try to say (sound by witness).  And, in fact, that was

5   some of Dr. Taglialatela's earliest work, it was fantastic work,

6   and I really hoped he would continue it.

7          But because it's very hard for us to understand

8   English, Kanzi would also point to a symbol, and this work has

9   been extended to children with retardation that have similar

10  problems.  If you can't understand them, they need a symbol.  So

11  that's what the symbol board does.  The symbol board itself is

12  not the language.  It's a means of expressing when you're --

13  when you're blocked in other ways, like I am right now.  I'm

14  going to have a drink of water.

15  Q.  Please, please do.

16          And for the record, Dr. Rumbaugh's impression of

17  peanut was two high speaking symbols and banana was three high

18  speaking symbols, although I don't speak bonobo so that's my

19  best interpretation.

20          Please have a drink of water.

21          Let's go to the next picture.

22          Dr. Rumbaugh, this looks like one of the bonobos

23  looking at a small, perhaps compact mirror?  What is this

24  photograph?

25  A.  Yes.  Kanzi is grooming his eye.  He's using the mirror to

1   groom his eye, and the mirror is very special because it shows

2   that Kanzi has self-recognition.  Self-recognition matters

3   because if you know who you are and you can reflect upon who you

4   are, it is out of that capacity you can develop a moral system,

5   the kind of system that's much more highly involved that we're

6   using here today.  And apes are the only creatures that have

7   actually demonstrated this ability.  Many others can use mirrors

8   to find dots on themselves or use mirrors to look behind, but

9   they don't know who it is in the mirror.  Kanzi does.

10  Q.  Let's go to the next picture.

11  A.  This is Kanzi making a painting with me, and you can see,

12  unlike Azy who was given a brush and had to paint outside the

13  cage with whatever color they gave him and wiggle it through the

14  wire, Kanzi can actually create pictures.  He can create

15  representational art.  He chooses his own color.  He paints as

16  he wishes.  This is just to show the process.

17  Q.  Are you aware of any other ape in the world who can do that?

18  A.  Yes.  Koko and Michael can do that.  They're gorillas that

19  Penny Patterson has raised, and they can create representational

20  art, and she raised them almost the same way that I raised Kanzi

21  and Panbanisha.

22  Q.  Following a similar research trajectory?

23  A.  Yes.

24  Q.  So Kanzi is one of three who is able to do these things on

25  the planet?

1  A.  Well, Panbanisha can do it, Nyota can do it, and Matata was

2  starting to do it, and Teco can do it.

3  Q.  All of those were raised by you, right?

4  A.  Yes.

5  Q.  Let's go to the next picture.

6  A.  This is Kanzi using the keyboard, and Panbanisha is getting

7  ready to turn around and look at him.  They can communicate at a

8  very complex level vocally; but if they want to be quiet, they

9  can also use the keyboard to communicate with each other.

10  Q.  Let's go to the next picture, please.

11  A.  This is Kanzi and Sue communicating both vocally and with a

12  keyboard to some people outside the cage where, as you saw in

13  the little videos, the vocalizations are constant and they're

14  interdigitated as though the bonobos were talking to you.  They

15  are talking to you because they can understand you or me, but we

16  can't understand them.  So they're interspersing their sounds in

17  an appropriate way at a more rapid pace than any human could do.

18  Dr. Taglialatela has demonstrated that in very fine work and,

19  again, it was what I was hoping that I would be able to foster

20  in the proper direction.

21        So here Kanzi and I are talking with vocal talk

22  (sounds by witness), and we're talking on the keyboard at the

23  same time to people outside the caged area.

24  Q.  Let's look at one more picture.

25  A.  Well, this was an attempt by ACCI to raise money.  Kanzi was

1  supposed to be a pie-eating contest judge at the local state

2  fair.  I found this rather demeaning for Kanzi.  In the recent

3  pictures and things of Kanzi and Nyota and the others that have

4  published they look quite stressed, and I'm sure this was very

5  stressful for Kanzi.

6  Q.  This was not a picture of your work while you were at the

7  trust?

8  A.  No.  This was how they hoped to raise funds.

9  Q.  Let's go ahead and take the pictures down.

10         Dr. Savage-Rumbaugh, we've heard about the plans for

11  the trust and about your work at the trust.  Did Mr. Townsend

12  follow through on his lifetime commitment of funding?

13  A.  Mr. Townsend withdrew his funding at the end of 2011 and we

14  were sort of left in the lurch.

15  Q.  What happened after that?

16  A.  I was appointed an interim director, and we began to try to

17  go forward and raise funds.  Lyle Simpson became the legal

18  counsel, and he wrote to many people throughout the state,

19  including the Governor and including senators and including his

20  clientele, to describe the research.  He was very, very positive

21  about the research and he wanted to help us raise funds, and so

22  from that point forward Dr. Schweller and I listened to his

23  guidance.

24  Q.  Let me take a step back in time.

25         What led to Mr. Townsend withdrawing his funding?

1    MR. MILLER:  Objection; hearsay.

2    THE COURT:  I'll receive it, subject to the objection.

3    MR. STAMBAUGH:  You may answer.

4  A.  It is my understanding that it was the flood and his

5  inability to raise enough money and the reverse in the stock

6  market that happened in 2008.

7  BY MR. STAMBAUGH:

8  Q.  When was the flood?

9  A.  I mean, the flood was in 2008.

10 Q.  What was the impact of that flood on the trust?

11 A.  The impact was hard.  The flood -- we were told even up

12 until the minute water was coming in the building, the Corps of

13 Engineers said, the building will not flood, the building will

14 not flood, stay there, stay there.  So the waters came really

15 fast, they came really high, they were really cold, they were

16 really toxic.  And you could look through the glass doors and

17 see fish all around, like you were in an aquarium.  And many of

18 the staff, of course, did not want to risk those waters.  My

19 sister and I risked those waters day and night to take care of

20 the bonobos and allow them to survive through the flood.  They

21 had to stay up high in the tunnels, and we had to bring food to

22 them, and it took about two weeks I guess for the water to fully

23 recede.  We had to, with assistance, clean out the entire

24 building.  There were problems in the drain system, of course,

25 and during that period of time, we had no electricity.  We had

1  to bring the food in by boat.  We had to go back and forth daily

2  by boat.  We had to wear waders up to here (indicating) the

3  entire time.  Oftentimes you would slip and fall and water would

4  get in your waders so you were exposed to toxic water.  We had

5  to ask the bonobos, please, don't go in the water because we had

6  no way to prevent them.  There was only one bonobo that really

7  liked the water.  He kept playing in it, and he soon got cancer.

8  And my sister who slipped repeatedly in her waders got cancer.

9  Q.  Did you stay in the building the whole time?

10  A.  I stayed in the building the whole time.  I mean, I might

11  have gone out for food or things like that, but I stayed there.

12  I slept on the table so I wasn't -- you couldn't sleep on the

13  floor or you would be in the water.

14  Q.  What was the subsequent impact of that flood on the bonobos,

15  other than the cancer that you already mentioned?

16  A.  Well, I thought that the grounds were toxic, but there was

17  no test of that to be sure.  So I don't know for sure what the

18  biological effects of the flood were; but the bonobos and myself

19  certainly respected the power of the Des Moines River, as I

20  guess anyone in Iowa does, and prior to that time they did go

21  down and put their toes in the water, but they were much more

22  hesitant to do that after the flood.  And if we spoke about

23  flood, they clearly remembered it and were -- you know, paid

24  attention to the flood reports, shall we say.

25  Q.  And what was the impact of that flood?  What is your

1 understanding of the impact of that flood on Mr. Townsend's

2 funding of the Great Ape Trust?

3 A.  Well, I can tell you that Mr. Townsend put a lot of money

4 and a lot of hope into that building.  I know that he wanted to

5 expand it.  I know that he wanted to add at least four other

6 buildings.  We had had repeated architectural meetings about

7 adding other buildings from the start, even before that building

8 was built, and they continued.  I know Ted was really looking

9 for funding from outside to expand and to have gorillas and

10 chimpanzees there, which we didn't have at that time, and to

11 have a visitor center.

12          And with the flood Ted knew that those plans could not

13 continue.  I don't know how much Ted knew before that time, but

14 it became clear that the Army Corps of Engineers had never given

15 a building permit to the site and it would certainly not give

16 any new building permits to the site.  That became very clear.

17 So Ted's plans had to be abandoned for the site, and I can

18 remember him staying away during the early days of the flood and

19 everybody wondering where's Ted, where's Ted, where's Ted.  And

20 then I saw him, and he came and stood way, way back, and he

21 looked and he put his hands like that (indicating) and he looked

22 all around, and I felt very sorry for him.  He was very --

23 Q.  The witness was putting her hands on her waist.

24          I'm sorry.  Go ahead.

25 A.  Yeah, I think his dream was lost.  I think his hopes were

1  lost.  I think he thought we really didn't -- couldn't pull out.

2  But those are my subjective impressions of watching the

3  expression on Ted's face.

4         So we had to -- not too long after that he had a

5  meeting where he indicated he was going to drop his funding by

6  one million a year until it was down to zero and we needed to

7  make other plans.

8  Q.  When did he indicate that?

9  A.  It was some months after the flood, after the cleanup and

10 after the flood.

11 Q.  When was the funding eventually pulled completely?

12 A.  It was pulled completely at the end of 2011, so between

13 2008 - 2011, we had three years.

14 Q.  Dr. Savage-Rumbaugh, what was your role in the lab at the

15 end of 2011 when Mr. Townsend pulled his funding?

16 A.  My role was to keep the lab going.  I had to pay all the

17 bills.  Not only find the money to pay the bills, I had to raise

18 the money to pay the bills.  I had to actually pay the bills.  I

19 had to do all of the administrative work.  I had to check into

20 all the insurance and administrative issues.  I had to set up a

21 new IACUC because the IACUC resigned.  I had to find a new vet

22 because the Iowa State vet resigned.  I had full care,

23 24-hour-a-day care of Teco without very much relief at all at

24 that point.  I had to bring in new volunteers and train them.  I

25 had to do the majority of the feeding and cleaning.  I had to

1   pull us through.

2   Q.  You mentioned that you had to set up a new IACUC.  That's

3   I-A-C-U-C in all caps.

4           What is an IACUC, Dr. Savage-Rumbaugh?

5   A.  An IACUC is an Interinstitutional Animal Care and Use

6   Committee.  It's a committee that governs the use and research

7   and the standard operating procedures of any animal facility in

8   the United States.

9   Q.  You mentioned that you had new administrative duties at the

10  end of 2011, early 2012.  Was one of those administrative duties

11  to serve as executive director?

12  A.  Yes.  I was the interim executive director.  I wasn't

13  clearly informed of that at the time, but Dr. Schweller later

14  informed me that was his view of my position.  Dr. Schweller had

15  gone to the previous IACUC and told them that we had a million

16  to a million-and-a-half dollars to operate.  Then in a few weeks

17  he stated in the paper that we really didn't have that money.  I

18  believe he thought Ted would provide that money.  I'm not sure

19  where Dr. Schweller thought the money would come from; but he

20  then made it clear that we didn't have it and that IACUC

21  resigned.  It had voted to continue the project based on

22  Dr. Schweller's report.

23          Dr. Schweller then turned to me and informed me that

24  it was my job to raise money and that I should contact Peter

25  Gabriel, who had made the musical video that I think you'll see

1  at some point in time, and at that point I was to keep the lab

2  running and to raise the money and to establish an IACUC.

3  Q.  Were you asked to sign any forms on behalf of the company as

4  the executive director?

5  A.  I was asked to sign a form.  I was not told that I was

6  signing it particularly as the executive director, but it does

7  say that I believe on the bottom of the form.  I was asked to do

8  that by Susan McKee.  I don't recall any particular explanation

9  of that form.  I was having to sign a lot of forms that were new

10 to me at that time, insurance forms, employee forms, all kinds

11 of forms.  And before she resigned as the accountant and

12 administrative assistant, she had worked with Jim Aipperspach,

13 and she was transitioning through Heidi Lyn, who was there for

14 awhile, and then me, and I certainly trusted her and I signed

15 whatever she asked me to sign.

16 Q.  Let's take a step back.  Who is Susan McKee?

17 A.  Susan McKee was the administrative assistant and accountant

18 to Jim Aipperspach for Great Ape Trust.

19 Q.  What was the form that she asked you to sign, if you can

20 recall?

21 A.  I understand now it was a registered agent form.  I didn't

22 know what a registered agent form was at that time, but I knew

23 it was something to do with IPLS and it needed my signature.

24 Q.  Did you know what that change of agent form required of you

25 at the time?

1  A.  No.  I was not told what was required of me.

2  Q.  Were you aware at the time that you signed this that you had

3  to file any documentation on behalf of the entity?

4  A.  No.

5  Q.  Dr. Rumbaugh, were you aware of any liens against IPLS at

6  the time you signed this change of agent form?

7  A.  No.  Nothing was described to me of that sort.

8  Q.  I want to return and talk about what was going on at the

9  Great Ape Trust in early 2012, which is where we left off.  What

10  was your responsibility at the trust in early 2012?

11  A.  My responsibility in early 2012 was to pull the trust out of

12  the chaos that it was in, take the research trajectory forward

13  and get funding.

14  Q.  In addition to administrative tasks, what else were you

15  tasked with at the trust at that time?

16  A.  I was tasked with all of the operational, the daily

17  operations of running the lab, training the staff, food, care.

18  I was there 24 hours, and I was making the facility operate.

19  Everybody else came and went.

20  Q.  Was that different from your responsibilities a year prior?

21  A.  Yes.  Prior to that time there were security people there

22  watching over it at night.  There were people that prepared the

23  food.  There were people to do the cleaning.  There were people

24  to handle the accounting.  There were people to handle the PR.

25  There were people to handle the administration.  All of those

1  people left.

2  Q.  How did that affect you in early 2012?

3  A.  It was tiring and I felt that I needed some additional

4  assistance.

5  Q.  Did you explain to folks that it was tiring and you needed

6  additional assistance?

7  A.  Yes.  I explained to the board.  I explained to the board

8  that we were going to have to hire a new vet, we were going to

9  have to have a new IACUC, we had many issues that needed to be

10 resolved, and I sought Dr. Schweller's assistance.

11 Q.  Were you able to accomplish what you wanted to accomplish

12 with the bonobos at this time when you were overworked,

13 overtired?

14 A.  Yes.  I was able to pull them through, make sure that the

15 lab was clean, passed all of the USDA inspections, get the bills

16 paid in the interim, and continued Teco's daily life making it

17 as much like Kanzi's as possible and kept Teco integrated in

18 with the bonobo group in the same way that Kanzi had been

19 integrated with the bonobo group when he was a baby.

20 Q.  You mentioned taking care of Teco earlier.  Please tell the

21 court, who is Teco?

22 A.  Teco was the son of Elikya.  He was born at Ted Townsend's

23 request.  Ted Townsend wanted to have an Iowa bonobo.  His

24 mother, Elikya, was the daughter of Matata, the matriarch who

25 came from the Congo, so Teco was a third generation captive born

1    bonobo.  He was also a third generation bonobo in this language

2    group, which was really different both in terms of its genetic

3    history and cultural history.

4            When Teco was born, his delivery was difficult.  It

5    took -- probably two days Elikya was in labor.  She would go

6    into labor, and when some staff would arrive, she would often

7    get nervous and go out of labor because she didn't trust --

8    there were staff members she didn't trust.  I stayed with her

9    around the clock, and the delivery, as is often the case,

10   because bonobos don't like to deliver when there are many people

11   around, the delivery occurred very early in the morning.  Teco

12   was not really able to move.  I thought that he was not a live

13   born baby.  We had had three babies already born that were not

14   live born in the lab.  We never had this happen in Georgia.  It

15   was a big problem in Iowa.

16           I stayed with Teco, and after maybe 15 or 20 minutes,

17   I saw his tongue barely move, and I realized that he was alive.

18   Prior to that time I did not think he was alive.  After three

19   hours he finally vocalized and began to move.

20           Teco was very, very unusual for a bonobo in that he

21   came with the reflexes of a human baby, and by that I mean that

22   he clung with his hands but he didn't cling with his feet.  Baby

23   bonobos and chimpanzees have a reflex, so if you're holding them

24   and you start to move, they immediately grab with their feet and

25   their hands, and they cling on to the hair of their mother or

1    they can cling onto your clothes.  So if you're climbing a tree

2    or you're out in the wild and you're an ape mother, you don't

3    need to keep that baby with you.  That baby will stay with you.

4    When it's very young, you might support it a little bit; but by

5    the time it's three or four months of age, it clings.

6           Teco didn't have that reflex, so when Elikya tried to

7    move around the cage, he would hold with his hands but his feet

8    would hang down, and instead of his feet being gripped on her,

9    they kicked.  A human baby kicks with its feet.  So what we got

10   in Teco's case is we got a change in the software of the

11   neurological system in this baby by the third generation.  He

12   had the neurological software that a human baby comes with, and

13   it made it difficult for Elikya to climb around the higher areas

14   of the cage.  So she began to leave Teco with Kanzi, with

15   Matata, with Panbanisha while she climbed up around the higher

16   areas of the cage, and Teco began to try to nurse from Kanzi and

17   the others and became very, very weak.  So Elikya finally

18   brought Teco out to me and asked for me to help take care of

19   him, and I did.

20   Q.  How old was Teco during this very difficult time in early

21   2012?

22   A.  That was the first two months of his life.

23   Q.  So during all of the experiences that you were just

24   describing?

25   A.  What I just described were the first two months of his life,

1    yes.

2    Q.  Dr. Savage-Rumbaugh, after this period in early 2012, what

3    happened at the trust after that?

4    A.  Well, in May of 2013, I fell and had a concussion.  Prior to

5    that concussion, we had tried to work out a way for me to have

6    some assistance and the project to go forward.  And Lyle Simpson

7    had suggested that the best way would be for us to establish a

8    business board and a science board.  We had one board that was

9    composed of scientists.  While the trust had been operating, I

10   felt that many of the people on the board of the Great Ape Trust

11   who were business people had difficulty understanding the

12   conflict of being people who came from the zoo and people who

13   came from the field of science.  So I wanted a board that was

14   composed of scientists so the scientific research trajectory

15   could continue.  That was my premise coming here.

16          So we started out with the IPLS board after

17   Mr. Townsend left, and the board was composed of scientists.

18   Mr. Simpson's view was that business people did not want to be

19   on the same board with scientists, and he sat me down and he

20   said, Sue, you really need to have two boards, one with business

21   people and one with scientists.  And what the business people

22   will do, they won't bother you, they won't cause any trouble,

23   they won't do anything; they'll just bring in the money, and

24   myself and others will work with them, and we'll fund your work,

25   we'll see that the trajectory goes forward.  He even suggested

1  that maybe he would help me obtain guardianship for the bonobos

2  because he knew I was concerned.

3          So he was very supportive and he offered to establish

4  two boards, and we passed resolutions to that effect in the end

5  of 2012, and from that -- and then in May, we effected those

6  resolutions by actually establishing two boards.  The resolution

7  set out how the boards would act, and in May we established

8  those two boards.

9  Q.  Let's pick it up in late 2012 then.

10          First of all, for the court's benefit who is Lyle

11  Simpson?

12  A.  Lyle Simpson was the legal counsel for Bonobo Hope and for

13  IPLS.  He took up Jaki Samuelson's role.

14  Q.  And you mentioned that there was a proposal made for

15  splitting the two boards, is that right?

16  A.  Yes.

17  Q.  What was the purpose of the IPLS board?

18  A.  The first board, which was the IPLS board, that was the

19  board of scientists, and its purpose was to carry the research

20  trajectory forward.  Lyle proposed splitting that board into two

21  boards.

22  Q.  What were those two boards going to look like?

23  A.  One was going to be composed entirely of business people,

24  hopefully most of them local in Des Moines that Lyle knew.

25  Q.  What was the name of that business board?

1  A.  That business board was going to carry forth the Iowa

2  Primate Learning Sanctuary name at that time.

3  Q.  And what was the purpose of the second board?

4  A.  The second board was to be composed of scientists.  They

5  were to have oversight over the science.  They were to operate

6  the facility, which was to be leased to them for a nominal

7  amount, and they were to be responsible for the health and

8  welfare of the bonobos and full ownership was to be transferred

9  to the board of scientists.

10 Q.  What is the name of that board of scientists?

11 A.  Bonobo Hope Initiative.

12 Q.  Is that sometimes referred to as BHI?

13 A.  Yes.

14 Q.  Was there any discussion among the board members regarding

15 the purpose for these two separate boards?

16 A.  There was a lot of discussion after Lyle made the proposal.

17 There was a great deal of discussion between myself and Lyle

18 prior to the proposal.  Many board members worried, as did I,

19 that the business board might take charge, that at some point I

20 might be removed from the bonobos.  There were lots of e-mails

21 back and forth about that.  Lyle reassured us that that could

22 never happen, I could never be removed from the facility, that

23 the business board would not take over, that I would be a member

24 of the business board, that the chair of BHI, Carmen, would be a

25 member of the business board, and that its sole function would

1  be to raise funds for the science and the operation of the

2  facility and otherwise it would be hands off.

3  Q.  Who is Carmen?

4  A.  Carmen is the chairperson of Bonobo Hope Initiative.

5  Q.  Carmen Mate?

6  A.  Yes.

7  Q.  M-A-T-E?

8  A.  It's "Matae".

9  Q.  Excuse me; Mate.

10         How did Mr. Simpson accomplish this division of the

11  two boards; one into business, one into scientists?

12  A.  He sent around a lengthy e-mail to the board explaining his

13  desire, and he answered questions from the board, and then he

14  invited the board to vote on resolutions in December of 2012

15  that stated that at some point in the future time, this action

16  would take place, and the board so voted and passed the

17  resolutions that I just described.

18  Q.  How did those two boards operate after they were divided?

19  A.  They weren't divided in 2012.  What happened initially was

20  that Mr. Simpson set up what he called a pro board or pre board

21  or something like that.  He brought George Caudill on board and

22  a few other people, and they had meetings even though they

23  weren't yet the IPLS board.

24         And then in May he asked the scientists to all resign

25  from the IPLS board and nominate and place George Caudill and

1  Tom Watson and the other people that he wanted to have on the

2  board at that time, and that the scientists would then go on

3  what he termed the science board.

4  Q.  After they were split in 2013, did BHI, in fact, oversee the

5  science?

6  A.  Yes.  BHI moved to oversee the science.  At the time, even

7  before they were split, George Caudill asked me not to

8  communicate directly with the science board, that I needed to go

9  through him before I communicated with the science board.  Lyle

10  advised George that the science board suggested that he, George,

11  decide it.  So there was definitely an indication that the

12  science board was not operating in quite the way that we had

13  envisioned it would operate.

14  Q.  When was BHI actually formed?

15  A.  BHI was formed when we learned that Ted Townsend was going

16  to stop funding.  And I formed that with another party who

17  advised me to do it over the computer, and I -- Lyle asked me to

18  meet with him and indicated that he could be of some assistance

19  to me, and he asked me what I was doing given that Ted was

20  resigning, and I explained that I was establishing my own

21  nonprofit and I would try to raise money.  Lyle said that he

22  would offer assistance and he would offer help and he would

23  offer guidance, and I gave him the paperwork that I had, and he

24  said he would take charge and he would help me from that point

25  on with BHI.

1  Q.  So to be clear, Dr. Savage-Rumbaugh, during that period of

2  separating the two boards, what was your understanding of the

3  purpose of the BHI board?

4  A.  The purpose of the BHI board was to carry on what the IPLS

5  board had left off, was to look after the trajectory of the

6  science, the welfare of the bonobos, and it was to operate the

7  facility.  I think everybody was in agreement that we would at

8  some point bring in some assistance and that there would be a

9  transfer of my senior role to a different role and that I would

10 go forward.  Lyle always indicated that that would be a

11 co-direction of the facility for three to four years and at a

12 proper time and whoever came forward would take more

13 responsibility.

14 Q.  Before we talk about that transition period, was there also

15 a dispute over the ownership of the bonobos around this time?

16 A.  At that time this case was already in the interpleader

17 court.  So as we were coming to change over from the Townsend

18 administration to what was the Schweller administration, Lyle

19 was very, very anxious that the lawsuit be resolved.  Lyle

20 indicated to me that the judge would be very angry if I didn't

21 resolve it, that I needed to resolve it as soon as possible,

22 that it would be impossible to raise funds if I didn't resolve

23 that, and I needed to do that and that we could go forward from

24 that point.

25 Q.  How many settlement agreements were there?

1  A.  There were two settlement agreements.

2  Q.  Were you a party to both of those settlement agreements?

3  A.  Yes.

4  Q.  Who represented the parties during the negotiations of those

5  settlements?

6  A.  Paul Burns represented IPLS and the board, the IPLS board,

7  of which Ken Schweller was the chair at that point in time.

8  Bill Zifchak represented me, and there were other lawyers

9  representing I guess Atlanta and other places.

10  Q.  As a party to both agreements, what was your understanding

11  of the purpose of the main settlement agreement?

12  A.  The purpose of the main settlement agreement --

13          THE COURT:  Just a second.

14          MR. MILLER:  Your Honor, objection; relevance.

15          THE COURT:  I'll receive it, subject to objection.

16          MR. STAMBAUGH:  Thank you, Your Honor.

17          You can continue.

18  A.  The purpose was to resolve the ownership that had been

19  brought before the court and to do it in a way that everybody

20  agreed and could go forward.

21  BY MR. STAMBAUGH:

22  Q.  As a party to the supplemental settlement agreement, what

23  was your understanding as to the purpose of that agreement?

24          MR. MILLER:  Objection; relevance.  Objection to the

25  extent it calls for a legal conclusion.

1    THE COURT:  And I will receive it, subject to the

2  objection.  The question calls simply for her understanding, not

3  a legal understanding.

4    MR. STAMBAUGH:  Thank you, Your Honor.  Yes, it does.

5  A.  My understanding was that the ownership of the bonobos was

6  to be split between the IPLS board and the BHI board.  I was

7  concerned about that and I discussed that with Lyle, and that's

8  when he suggested that perhaps guardianship would be a solution.

9  I think Mr. Zifchak didn't feel that that was really the

10  appropriate solution.

11    Then the resolution was passed that after the board

12  was split, the IPLS board would transfer its ownership to the

13  BHI board, so I -- the science and the work that I had done

14  could go forward under the guidance of that board, and

15  Dr. Taglialatela was a member of that board.

16  BY MR. STAMBAUGH:

17  Q.  Did you have any involvement in the drafting of any

18  provisions in the settlement agreements?

19  A.  At one point in time when the settlement agreements were

20  still being drafted by Jaki Samuelson and Ted Townsend was in

21  charge, Bill Fields brought a paragraph to me that he wanted to

22  insert into the document to protect the research trajectory.

23    We had been very aware that we were in a very unusual

24  position.  We wouldn't own the bonobos the way you could own a

25  dog or a pet.  We couldn't have any guardianship the way you

1   have over a child.  We were in sort of no man's land and whoever

2   owned the bonobos determined the future.  So he felt the only

3   protection to keep the bonobos in the kind of life they had had

4   and to see that the research could actually go forward was to

5   insert a paragraph about the research trajectory itself.  So he

6   wrote that paragraph and he brought it to me and I added

7   portions to that paragraph.

8         MR. STAMBAUGH:  Your Honor, at this time I would like

9   to publish what's been marked as Exhibit 1.  Pursuant to the

10   pretrial order, it's been deemed admitted as a category A.

11         THE COURT:  You may.  But before we do that, who was

12   it that brought this paragraph to you?

13         THE WITNESS:  William Fields.  He was the director of

14   the bonobo research project at that time.

15         THE COURT:  Thank you.

16   BY MR. STAMBAUGH:

17   Q.  Dr. Savage-Rumbaugh, we've published now for the court and

18   counsel what's been marked as Exhibit 1.  Is this what has been

19   termed the main settlement agreement?

20   A.  Yes.

21   Q.  And I would like to draw your attention down to paragraph 4,

22   which I believe is on page 2.  If you would go ahead and take a

23   moment to read that paragraph 4 to yourself.

24         (Pause.)

25   A.  Yes, I'm familiar with it.

1 Q. Is this the research trajectory paragraph that you were just

2 referring to?

3 A. Yes, it is.

4 Q. Did you add or edit language in this paragraph?

5 A. Yes. I added where it says, "including but not limited to"

6 and then all of the things underneath down to the end of the

7 parentheses.

8 Q. Explain to us what that language means in this paragraph.

9 A. Well, I would like to start by explaining the language prior

10 to it because it's just an extension of that. So it says to

11 continue to be involved in research of the fields of

12 experimental psychology, use of language and tools, and ape

13 intelligence and human cultural modes. This is actually a

14 description of the trajectory of the research, which started out

15 in experimental psychology and finally led into the field of

16 cultural anthropology. And within the field of cultural

17 anthropology where Kanzi is showing he could learn without the

18 kind of training he would have in an experimental paradigm, I

19 was trying to list all of the things that typically are

20 considered uniquely human that had set us apart in time, that

21 apes might be able to do if we continue the research trajectory

22 and that these things might fall out of language. We had

23 already seen that we got for free music, we got for free tool

24 use, we were getting for free art, and we needed to follow up

25 and see how much further they could go.

1          So I included art, music, tools, agriculture, fire,

2     animal domestication, habitat construction, use of water for

3     swimming, and things of that sort, fishing, hunting.  Mimics

4     means being able to mimic something, so if you -- if you want a

5     cup of coffee, I can show you like this, would you like a cup of

6     coffee (indicating), and I don't have to speak to do that.

7     Kanzi and many others began to be able to use gestures in that

8     complex kind of way.  So we wanted to see how far they could

9     take that.

10          Sociological role construction, we were very -- it

11     became very clear that it was no longer a matter of the dominant

12     ape.  Each ape had a different role, and that role as in human

13     society it can change.  In one case -- excuse me.  In one case

14     you might be a judge, in another case you might be a father, in

15     another case you might be an uncle, in another case you might be

16     a brother, and you behave differently in all of those roles.  It

17     was clear that the bonobos were doing that and they were doing

18     that in a way that linked into our linguistic concepts of those

19     roles.  We used language to define those roles in society.

20          Normative child rearing practices, I think this is

21     probably the most important one.  One of the things that you

22     find when you begin to allow humans to rear apes is that humans

23     get one shot at rearing children, and they don't really study

24     about how to do it and they don't really go to school about how

25     to do it for the most part unless they're psychologists.  They

1  do it the way their parents did it.  And when you have people

2  working in your lab trying to help you rear your children, you

3  realize that they come with very different backgrounds and they

4  rear children in very different ways and they have very

5  different concepts and practices.  And you begin to suddenly see

6  that this rearing that we really haven't studied in detail in

7  human society is causing -- it can cause lots and lots of good

8  things and it can cause many difficulties.  So I wanted to look

9  at the practices in rearing that produced the very best kind of

10  environment, the most competent kind of apes, the most moral

11  apes, the least aggressive apes, the most loving apes.

12  Q.  Dr. Savage-Rumbaugh, and I'm sorry, I'm going to interrupt

13  you for just a second.  As the co-drafter of this provision,

14  what is your understanding of the purpose for including it in

15  this settlement agreement?

16  A.  To see that the research trajectory continued for many

17  generations beyond me.

18  Q.  And you're referring to your research trajectory?

19  A.  Yes.

20  Q.  What would happen -- strike that.

21         What is your understanding of what would happen if the

22  trust no longer exists or wasn't able to care for the apes and

23  follow that research trajectory?

24         MR. MILLER:  Objection; relevance.

25         THE COURT:  I'll receive it, subject to the objection.

1        MR. STAMBAUGH:  You may answer.

2   A.  Would you state that question again?

3   BY MR. STAMBAUGH:

4   Q.  Sure.  We just described that the purpose of that

5   paragraph -- you just testified that the purpose is to continue

6   your trajectory at the trust, is that correct?

7   A.  Well, the purpose was to continue the trajectory as long as

8   they resided at the trust.  The purpose was to continue the

9   trajectory for a long time.

10  Q.  And so my question to you is, what is your understanding

11  under the settlement if they no longer resided at the trust

12  vis-a-vis your research trajectory?

13        MR. MILLER:  Objection; relevance.

14        THE COURT:  Same ruling.  Received, subject to the

15  objection.

16  A.  The paragraph was put in there to see that the research

17  trajectory continued wherever they were located.  Is that the

18  question?

19  BY MR. STAMBAUGH:

20  Q.  That's the answer to my question.

21  A.  Okay.

22  Q.  Thank you.

23        Dr. Savage-Rumbaugh, does BHI exist today?

24  A.  Yes.

25  Q.  Are you a board member of BHI?

1  A.  Yes.

2  Q.  I want to draw your attention to paragraph 6 that is now on

3  the screen.  This is a paragraph that begins, should the trust

4  cease to exist or otherwise.

5        Do you see where that's written?

6  A.  Right at the top.

7  Q.  Correct.  And it goes on to talk about what might happen

8  should the trust cease to exist or otherwise.

9        Did you have an understanding at the time that you

10  signed this main agreement that Bonobo Hope Initiative would

11  have relocation rights to Maisha should the trust cease to

12  exist?

13  A.  Yes.

14  Q.  What was the purpose of giving BHI relocation rights?

15  A.  BHI owned Maisha and it should make the decisions regarding

16  Maisha.

17  Q.  What sort of research trajectory does BHI follow?

18  A.  The one I just described.

19        MR. STAMBAUGH:  Your Honor, at this point I would ask

20  to publish Exhibit 2, which is also a category A, and pursuant

21  to the pretrial order has been deemed admitted.

22        THE COURT:  You may do so.  And with regard to any

23  category A exhibit, they're already considered received in

24  evidence, and you don't have to ask permission to publish them.

25        MR. STAMBAUGH:  Thank you, Your Honor.

1    BY MR. STAMBAUGH:

2    Q.  Dr. Savage-Rumbaugh, you mentioned earlier that there were

3    two settlement agreements, correct?

4    A.  Yes.

5    Q.  There was a main agreement and a supplemental agreement, is

6    that correct?

7    A.  Yes.

8    Q.  Was what the purpose of the supplemental agreement?

9    A.  The purpose of the supplemental agreement was the ownership

10   was going to be split and we were going to go forward.

11   Q.  Which bonobos does the supplemental agreement relate to?

12   A.  It relates to the bonobos that were transferred to BHI.

13   Q.  Can you name them for us?

14   A.  I believe it's every bonobo except Maisha.

15   Q.  So that's Kanzi, Nyota --

16   A.  -- Panbanisha, Elikya, Teco.

17   Q.  Okay.  Let me draw your attention to paragraph 2 in this

18   supplemental agreement.  I'm going to ask you to take a quick

19   look at paragraph 2.  And my question to you will be, is this

20   the same research trajectory paragraph that we just saw in the

21   main settlement agreement?

22   A.  Yes.

23   Q.  Did you have a role in drafting this provision?

24   A.  I drafted the other paragraph and I assumed that it was put

25   in the supplemental agreement.

1  Q.  If you take a look at this paragraph, does it appear to be

2  the same as the one we just saw on the main agreement?

3  A.  Yes, it's the same.

4  Q.  And as a co-drafter of this provision, what was the purpose

5  of this research trajectory provision?

6  A.  To continue --

7          MR. MILLER:  Objection; relevance.

8          THE COURT:  It's --

9  A.  To continue the research --

10         THE COURT:  Just a minute.  When he says that, I have

11 to say something.

12         THE WITNESS:  Oh, I'm sorry.

13         THE COURT:  Which is, it is received, subject to the

14 objection.

15         THE WITNESS:  I'm sorry.

16         THE COURT:  You may proceed.

17 A.  Yes, it's the same.

18 BY MR. STAMBAUGH:

19 Q.  Dr. Savage-Rumbaugh, what was the interplay between the

20 proposal to split the boards and these two settlement agreements

21 that we've just looked at?

22 A.  They were presented to me together by Lyle Simpson, and they

23 were my assurance that the concerns I had expressed to

24 Mr. Simpson would be fully resolved and that no one could remove

25 me from this facility or remove the bonobos from the facility

1  without the approval of BHI.

2  Q.  So returning to the supplemental agreement, what would

3  happen if the Bonobo 4 -- these other bonobos -- no longer

4  resided at the trust?  What is your understanding of what would

5  happen?

6  A.  That BHI would determine where they were located.

7  Q.  And which research trajectory would be used for the Bonobo

8  4?

9  A.  The one that's in that paragraph.

10  Q.  That was drafted by you?

11  A.  Yes.

12  Q.  And that's consistent with your research trajectory?

13  A.  Yes.

14          MR. STAMBAUGH:  Thank you.

15          You can take the exhibit down.

16  BY MR. STAMBAUGH:

17  Q.  Dr. Savage-Rumbaugh, at some point was there a transition,

18  we'll call it, of your role at the Great Ape Trust in 2013?

19  A.  Yes.

20  Q.  What was that transition?  What was your understanding of

21  the transition?

22  A.  The transition began when BHI advised Lyle that I needed

23  more assistance, and Lyle was working to help fundraise because,

24  as Lyle wrote, I was pretty much a one-person band.  And I

25  remember lecturing to the Prairie Club and many of the women

1  coming up after and saying, we finally understand your research.

2  The research is something that oftentimes women can understand

3  because women play a great role in rearing in our culture, and

4  under the leadership of Ted Townsend, Rob was really the main

5  one describing to Des Moines about the research, and I really

6  never had had an opportunity until the Prairie Club to really

7  present my research in detail.  And about five or six women came

8  up to me afterward and they said, we really finally understand

9  and we want you to stay here in Des Moines, and we realize that

10  since you're doing this cross generational research, you need

11  help.  Where are you going to get help?

12        BHI had already told me I needed help.  I already knew

13  I needed help.  So there was no opposition to having other

14  people come and assist me or the transition.  When the boards

15  were -- when the boards officially split in May, shortly after

16  that I fell and had a concussion, and at that point in time,

17  Julie Gilmore and my sister wanted me to come back and continue

18  working, and I really felt that I was unable to do it.

19        So I continued to keep contact with the laboratory.  I

20  continued to write e-mails and work through Liz and through

21  Gaila.  But I also at Lyle Simpson's request began to look for

22  somebody to follow through, and one of the things we had hoped

23  to do was to move ahead with the Federal Sanctuary System.  The

24  chimp pack had just passed at that time, and all of the

25  chimpanzees in biomedical research were going to move to

1  sanctuaries, come out of biomedical research.  And you will

2  remember that I many, many years earlier had stood on the wing

3  at Yerkes and saw the pain and the distress, and I had wanted to

4  help those chimps.

5        So I thought if we could bring chimpanzees into a

6  sanctuary out of the federal system and there would absolutely

7  be a good situation for them, we could learn how to rehabilitate

8  them.

9  Q.  What was your understanding of what your role would be

10  during this transition period?

11  A.  My role would be to help it come about in any way that it

12  could and to use my knowledge of chimpanzees and to try to build

13  a better environment for them while continuing the research

14  trajectory and working with additional colleagues.

15  Q.  You mentioned that you believed that additional help might

16  be needed, is that correct?

17  A.  Yes.  I knew if we were -- certainly I needed additional

18  help, but taking on -- they were asking for 30 or 40 additional

19  chimpanzees.  The requests that the administration was making at

20  that time were basically -- they computed how many dollars they

21  could get from the Federal Government, and from the number of

22  dollars they computed the number of chimpanzees.  I indicated

23  that I thought that was a lot of chimpanzees to start with; but

24  my role would have been to take that -- to help take that

25  forward.

1  Q.  Did you understand that you would continue to have access to

2  the bonobos during this transition period?

3  A.  Definitely.

4  Q.  I would like to go ahead and publish for court and counsel

5  Exhibit 27.

6          Dr. Savage-Rumbaugh, if you could please go ahead and

7  take a look at what has been marked as Exhibit 27.  This is the

8  board minutes of the IPLS on May 22, 2013.  I want to draw your

9  attention to the bottom of this first page.  There's a

10  resolution, and it reads, "Resolved, that Dr. Sue

11  Savage-Rumbaugh be elected director emeritus of scientific

12  research of the Iowa Primate Learning Sanctuary with unfettered

13  permanent access to the bonobo colony."

14          Dr. Rumbaugh, when is the first time that you learned

15  of this resolution?

16  A.  Yesterday.

17  Q.  Was it your understanding that during this transition you

18  would have unfettered permanent access to the bonobo colony?

19  A.  Yes.  But I was not at that board meeting because I had a

20  concussion and I did not receive any invitations to that board

21  meeting.  And I had been assured in a number of e-mails and

22  conversations with Lyle that this was the case.  I went forward

23  throughout the summer assuming this was the case.  I went

24  forward looking for a successor assuming that this was the case.

25  I didn't know it was an official resolution until yesterday.

1  Q.  Did you talk to --

2  A.  I should have been on that board and at that meeting.

3  Q.  Did you talk with other BHI members about how you

4  anticipated that this would be the case, that you would have

5  access, continued access to the colony?

6  A.  Lyle had written them indicating that I had had some

7  difficulties and he wanted me to look for a successor and that I

8  would have continued access to the colony and I would co-direct

9  with whoever was selected for three to four years.  He had

10  written that with them.  So he didn't discuss if it would

11  happen.  We assumed that if Lyle said it, it would happen.

12  Q.  You mentioned just a minute ago that you made a

13  recommendation for someone to assist you during this transition

14  period, is that right?

15  A.  Yes, I did.

16  Q.  Who did you recommend?

17  A.  I recommended Dr. Taglialatela.

18  Q.  Why did you recommend Dr. Taglialatela?

19  A.  He had been a student of mine in the past and he had helped

20  supervise the staff.  He was interested in the social behavior

21  and the linguistic behavior of the bonobos.  I wanted to select

22  someone who could potentially work with the Federal Sanctuary

23  System, and I wanted to select someone who had a history of

24  direct interaction and contact with the bonobos and that I

25  believed understood and supported the research and who had

1  coauthored the work with me and that believed in the research

2  trajectory and would take it forward.

3  Q.  Did you write a letter to both boards with your

4  recommendation of Dr. Taglialatela?

5  A.  Yes, I did.

6  Q.  What was your understanding of your role in the research

7  going forward when you wrote that letter of recommendation?

8  A.  My understanding was that I would co-direct the facility for

9  the next three or four years and I would have unfettered access

10 with the bonobos beyond that time.

11 Q.  What was that understanding based on at the time that you

12 wrote the letter?

13 A.  It was based on Lyle Simpson's letters to me and Lyle

14 Simpson's phone calls with Duane and his phone calls with me,

15 and it was based on the comments that I had heard, both e-mail

16 and over the phone from George Caudill and Julie Gilmore, and it

17 was based on my phone conversations with Dr. Taglialatela.

18 Q.  When did you write that letter of recommendation?

19 A.  I'd have to look at the date.  I think it was October 26th.

20 Q.  It was in the fall of 2013?

21 A.  Yes.

22 Q.  Dr. Savage-Rumbaugh, when you wrote that letter of

23 recommendation, what was your understanding of the research

24 trajectory -- easy for me to say -- that Dr. Taglialatela would

25 continue with?

1  A.  The one that was in the settlement agreement.

2  Q.  That had been signed earlier that year?

3  A.  Yes, when he was a member of the board.

4       MR. STAMBAUGH:  Your Honor, if I may just have one

5  moment, please.

6       (Pause.)

7       MR. STAMBAUGH:  Thank you, Your Honor.

8       I would like now to publish what has been marked as

9  Exhibit 42.

10 BY MR. STAMBAUGH:

11 Q.  Dr. Savage-Rumbaugh, you just testified that in October of

12 2013 you recommended Dr. Taglialatela, you had sent that letter

13 of recommendation with an understanding based upon the

14 settlements and your discussions.  And I have just published for

15 the court and counsel Exhibit 42, which is an e-mail on

16 November 10, 2013 from George Caudill, and it reads:

17      "Sue, in the next few minutes, when you depart, please

18      leave your access card and any keys with whomever is on

19      duty right now.

20      "Thank you.

21      "George."

22      What happened between October and November 10, 2013?

23 A.  I can only speculate and offer some documentation to that

24 speculation.  I later on was to learn that Yerkes had placed

25 some constraints on my being at the facility, but I did nothing

1  between that time except come back to help take care of Teco who

2  had become ill.

3  Q.  And after you had made this recommendation for

4  Dr. Taglialatela to assist you, what happened to your role in

5  the lab?

6  A.  I was asked to leave the lab and I was told that unless I

7  left Des Moines and said nothing, I would never be allowed to

8  see the bonobos again in my life.  I was told basically to shut

9  up and get out of town.

10 Q.  You said you were banned from the lab?

11 A.  Yes.

12 Q.  By whom?

13 A.  By Dr. Caudill, on authority of Lyle Simpson.

14 Q.  Was that your understanding of what would happen after you

15 wrote a letter of recommendation?

16 A.  No, it definitely was not.

17 Q.  Would you have written that letter if someone had told you

18 that you were going to be banned from the lab?

19 A.  I certainly would not.

20 Q.  Would you have written that letter if someone had told you

21 that Yerkes was demanding that you be removed from the lab?

22 A.  No.

23 Q.  Were you actually kicked off the premises on November 10th?

24 A.  Yes.

25 Q.  How did that happen?

1   A.  I got an e-mail from George Caudill asking me to leave.  I

2   indicated that someone needed to come and take care of Teco

3   because he was still ill, and they had trouble finding anybody

4   to come and take care of Teco.  It took some time before finally

5   my sister had rested up enough, she had been taking care of him

6   five days and nights until I got there to help her, and when she

7   rested up enough, she came to take care of Teco and I left the

8   lab.

9   Q.  Was this consistent with the transition as it had been

10  explained to you in mid October of 2013?

11  A.  It was the strangest thing that had ever happened to me in

12  my life.  It was completely inconsistent.

13  Q.  Was this consistent with the settlement agreements that you

14  had helped draft and sign earlier that year?

15  A.  No.  It was not consistent with anything on paper or

16  anything in my experience in my entire history of interaction

17  with Lyle Simpson.  I didn't know George Caudill very well.  He

18  had just came onto the scene.

19  Q.  Dr. Savage-Rumbaugh, were you ever told that you were

20  removed from the IPLS board prior to December 2013?

21  A.  No.  I was -- every indication I had from George and Lyle

22  was that I was on the board.

23  Q.  Did you ever quit the board?

24  A.  No.

25  Q.  Did you ever indicate in any manner that you wanted to be

1  removed?

2  A.  I would not have done so.  I knew that being on both boards

3  was critical, and I had talked with Lyle about that many times.

4  Q.  Did you ever agree, as suggested by Mr. Miller in his

5  opening, that it was time for you to step aside completely?

6  A.  No, I did not.

7  Q.  Did you as a BHI board member have any notice of this, being

8  removed, prior to voting Dr. Taglialatela or Dr. Hopkins on to

9  the board?

10  A.  No.  I assumed that I was a member of the IPLS board.

11  Q.  Do you know when Dr. Taglialatela and Dr. Hopkins were voted

12  on to the IPLS board?

13  A.  They were voted on as we were transiting the request of

14  Dr. Schweller to move the bonobos to Mississippi when he thought

15  we were low on funding.  At that point in time I believe was

16  when Dr. Taglialatela came on the board.  I would have to check

17  the notes for the exact date, but it was certainly prior to the

18  other events we're discussing.

19  Q.  Were you made aware of that vote?

20  A.  Oh, you mean on the IPLS board?

21  Q.  On the IPLS board, correct?

22  A.  No.  I don't know when he came on the IPLS board.  I thought

23  you meant the BHI -- well, the IPLS -- he first came on the IPLS

24  board before it was split into two boards; but then when it was

25  split into two boards and there was the business board, he was

1 not on it at that time.  So he had to be added to it because all

2 of the scientists resigned from it.

3          So when he was added back to it by Lyle and George and

4 others on the board, I was not made aware of that and I don't

5 know when it occurred -- I didn't know at that time when it

6 occurred.

7 Q.  Do you know if any other BHI members, to your knowledge,

8 were aware of the fact that you were allegedly kicked off the

9 board prior to voting Dr. Taglialatela and Dr. Hopkins on to the

10 board?

11 A.  I was told that I would not be allowed to tell them that or

12 to talk to them or to write any e-mails to them and the only way

13 I would be allowed to see the bonobos again was if I followed

14 those orders.

15 Q.  Was that surprising to you --

16 A.  Yes.

17 Q.  -- after the settlement agreements and the resolutions that

18 we've talked about?

19 A.  Yes.

20 Q.  Dr. Savage-Rumbaugh, we talked earlier a little bit about

21 the research trajectory that you've accomplished over four

22 decades of your life.  I want to ask you a few follow-up

23 questions about that.

24          Is wearing masks and gloves around the bonobos

25 consistent with that research trajectory?

1  A.  If a person were ill, they would probably wear masks or

2  gloves if they were a person that wasn't very, very close to the

3  bonobos the whole time, but otherwise we would not have masks

4  and gloves.

5  Q.  Is having indirect contact with the bonobos consistent with

6  your research trajectory?

7  A.  I'm not really sure what you are implying by indirect

8  contact.

9  Q.  Let me ask a better question.

10        Does your research trajectory require that you have

11  direct contact with the bonobos?

12  A.  Yes.

13  Q.  What sort of direct contact?

14  A.  The same kind of contact you would have in a family

15  situation.  It doesn't require that everyone working with the

16  bonobos have that kind of contact.  It does require that some

17  individuals have that level of contact.

18  Q.  I want to return briefly to when you were kicked out of the

19  lab, Dr. Savage-Rumbaugh.  Did you agree to, quote, give up

20  control as Mr. Miller suggested in his opening?

21  A.  No, I did not.  I resisted it even at the moment I was

22  kicked out, and I told them that it was wrong.

23  Q.  Have you agreed to live within the boundaries of the

24  settlement agreements and the resolutions as they were explained

25  to you?

1  A.  Yes, I have.

2         MR. STAMBAUGH:  Your Honor, may I have one moment?

3         THE COURT:  Please.

4         (Pause.)

5         MR. STAMBAUGH:  I appreciate the court's indulgence.

6  I have just a few more questions.

7  BY MR. STAMBAUGH:

8  Q.  Dr. Savage-Rumbaugh, has BHI been satisfied with

9  Dr. Taglialatela's performance to date?

10  A.  It's given Dr. Taglialatela every benefit of the doubt and

11  every opportunity to communicate and every opportunity to help

12  him, and it has been dissatisfied with his response.

13  Q.  Has BHI taken any measures to show that dissatisfaction with

14  Dr. Taglialatela?

15  A.  Yes, it has.

16  Q.  What has it done?

17  A.  It's removed him from his position.

18  Q.  Was that pursuant to a formal vote?

19  A.  Yes.

20  Q.  When did that vote take place?

21  A.  I would have to look at the document to give you the exact

22  date.

23  Q.  Was it sometime in 2015?

24  A.  Oh, yes.

25  Q.  Was it sometime in the last few months?

1  A.  Yes.

2         MR. STAMBAUGH:  Your Honor, I have no further

3  questions, subject, of course, to redirect.

4         THE COURT:  Thank you.

5         We're just before the noon hour, Counsel.  I think

6  we'll take our noon recess at this time.  We'll be in recess

7  until 1 o'clock this afternoon.

8         Thank you.

9         MR. STAMBAUGH:  Thank you, Your Honor.

10         (Recess at 11:53 a.m., until 1:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      AFTERNOON SESSION  1:05 p.m.

2           (In open court.)

3           THE COURT:  Please be seated, everybody.

4                    SUE SAVAGE-RUMBAUGH,

5  resumed her testimony as follows:

6           THE COURT:  And, Mr. Miller, you may cross-examine or

7  your colleague may, whoever is going to do it.

8           MR. MILLER:  Thank you, Your Honor.  I will go ahead

9  and proceed.

10          Thank you.

11                    CROSS-EXAMINATION

12  BY MR. MILLER:

13  Q.  Dr. Rumbaugh, can you hear me okay?

14  A.  Yes, I can.

15  Q.  I don't believe that I'm going to be referring to your

16  husband, Duane Rumbaugh, today; but I may refer to calling you

17  Dr. Sue.  I mean no offense by that, okay?

18  A.  Yes.

19  Q.  Okay.  Thank you.

20          Dr. Sue, I first want to talk to you a little bit

21  about flooding, and you testified about some concerns about

22  flooding at the site.  You've known that flooding could happen

23  at the site of the facility since before you moved here with the

24  colony, right?

25  A.  I knew that they were concerned enough that they had to

1  build the building out of the floodplain.  I was assured that

2  the building would never ever flood.  Even as the water was at

3  the door, I was assured the building would never flood.

4  Q.  And it flooded in 2008?

5  A.  Yes.

6  Q.  And you experienced that, I know you've told the court.

7       At that time there was no contingency plan for

8  flooding, for moving the animals at that time, right?

9  A.  We were assured that the building would not flood.  We

10  worked on a few contingency plans, but the director was an

11  engineer and was in close contact at every moment with the Corps

12  of Engineers, said we did not have to execute.  We did have some

13  emergency plans, but they were said to be not needed.

14  Q.  And you weathered the storm, so to say, and the apes stayed

15  there after 2008, correct?

16  A.  I don't think we actually would have weathered the storm if

17  Liz and I hadn't been there to tell you the truth.

18  Q.  Well, that's actually not my question.

19       The apes stayed there after the flood, correct?

20  A.  They stayed there after the flood, yes.

21  Q.  They stayed there in 2009?

22  A.  Yes.

23  Q.  2010?

24  A.  Yes.

25  Q.  2011?

1  A.  Yes.

2  Q.  They're still there today, correct?

3  A.  Yes.  It's flooded twice more since then, but not gone into

4  the building, but blocked the access to the building.

5  Q.  In 2012 there was a discussion about relocating the apes to

6  a new site, correct?

7  A.  Correct.

8  Q.  You objected to that quite vociferously, correct?

9  A.  Yes, I did.

10  Q.  And --

11  A.  Because it wouldn't have allowed me to continue the research

12  trajectory.

13  Q.  Okay.  2013 you applied for a grant from Prairie Meadows to

14  continue to support the operation, is that right?

15  A.  Yes, I did.

16  Q.  And that grant was premised on creating an artist colony at

17  the facility, right?

18  A.  It wasn't premised on creating a complete artist colony, but

19  that was part of the grant, yes.

20  Q.  Okay.  And, in fact, your brother would have been an artist

21  in residence to work with the bonobos?

22  A.  He wouldn't have stayed there, no.  He has a studio in

23  Springfield, Missouri, and he has several other grants.  He

24  would have assisted us but, no, there was no plan for my brother

25  to stay as an artist in residence.

1  Q.  And around this same time frame, you were out talking to the

2  public about the facility and about the work of Great Ape Trust,

3  correct?

4  A.  I was very rarely out talking with the public because I was

5  basically taking care of Teco and the other apes and cleaning

6  and feeding and doing other duties.

7  Q.  Do you remember appearing on Iowa Public Radio for an

8  interview?

9  A.  I've appeared on a number of Iowa Public Radio shows,

10 including one last week.

11 Q.  All right.  And do you recall at this time that you were

12 interviewed by Charity Nebbe in 2012?

13 A.  Yes, I believe I was interviewed by Charity Nebbe.

14 Q.  You and Dr. Gilmore participated in that, too, correct?

15 A.  I believe Dr. Gilmore was there.  She was the veterinarian.

16 Q.  Right.  And Ms. Nebbe during that interview asked you again

17 a backup plan for moving the bonobos, is that right?

18 A.  Yes.

19 Q.  At that point in time, you said, no, that's not going to

20 happen?

21 A.  Yes, I did.  I thought it was not going to happen.  I had

22 been told that if they built the bypass, it would no longer

23 flood, and I was trusting of that.

24 Q.  And you testified earlier, if I understand you correctly,

25 that there was some concern that the water was toxic, is that

1　correct?

2　A.　We had repeated reports to the staff in the building that we

3　had to be very, very careful, we shouldn't touch the water, we

4　shouldn't be in it, we should have our waders, the water was

5　toxic, we had to keep the bonobos out of the water.

6　Q.　And from 2008 through the time you were at the facility, you

7　never had any testing done on that water to substantiate that

8　alleged claim?

9　A.　I wasn't in a position to direct such testing.

10　Q.　And you did not have the testing done, correct?

11　A.　It wasn't up to me to have any testing done.  That would

12　have been up to Dr. Gilmore.

13　Q.　Okay.

14　A.　I did discuss the problem several times, and when I was

15　initially director, I had the water in the building tested

16　because I was concerned that it was toxic, and the Water Works

17　changed how the water in the building was directed because it

18　was -- it did turn out to be toxic and they had to make major

19　changes because of that.

20　Q.　Well, you certainly don't have any proof that the water

21　caused illness to any animal or to your sister, correct?

22　A.　I haven't sought to obtain any proof.

23　Q.　Now, you did, however, have a report put together ostensibly

24　for this proceeding about flooding at the facility, is that

25　right?

1  A.  One of our board advisors offered to have an engineering

2  agency who specializes in that provide us a report.

3  Q.  Okay.  So seven years after the flooding in 2008 that you

4  have such concern about and only when you're about to have a

5  hearing in front of the judge do you get a report, is that

6  right?

7          MR. STAMBAUGH:  Objection; argumentative.

8  A.  No, that's not right.

9  BY MR. MILLER:

10  Q.  Okay.

11          THE COURT:  Let's back up.  Just a minute.  I will

12  receive it, subject to objection.

13  A.  No, that's not right.  I've been calling for such a report

14  for some time.  Basically it was my understanding that if they

15  expanded the bypass, it would not flood.  The bypass has been

16  sufficiently expanded now that one can go stand and look there

17  and see if there's enough water on the other side.  Expanding

18  the hole in the bypass is not going to make any difference.

19          In addition, my neighbors who lived around there have

20  had a lot of time to talk to me in the last two years since I'm

21  not with the bonobos, and they've all informed me that in 1993

22  the whole area was under flood, way up to the railroad tracks,

23  and there was no bypass built at all.

24          So it just seemed to me that I needed to reconsider.

25  It wasn't because I was concerned that ACCI is there.  I'm

1 concerned about the health and wellbeing of the bonobos.

2 BY MR. MILLER:

3 Q.  Right.  They told you about 1993, and that was the exact

4 same way you found the site in 2008 when you moved the bonobos

5 off, potential for flooding, correct?

6 A.  But I didn't know how high the water had gone in 1993.  I

7 was not told.  I just knew the site had a potential for

8 flooding.  In Atlanta we built the building on a site that had

9 potential for flooding.  The university told us they would build

10 the building out of the floodplain, and they did.  We had water

11 up to the building, but it didn't come in, and they built the

12 road up so that we could always have access.

13          I assumed we were in a similar situation here, they

14 would build the building as they said, completely out of the

15 floodplain, and they would build the road high enough so we

16 would have access.  That did not happen.

17 Q.  And the only time you've analyzed the situation with

18 flooding, actually had an expert look at it was a month ahead of

19 this hearing?

20 A.  I wasn't in the position to direct such a call.  I couldn't

21 tell Jared, "Jared, you really need to check out the flood."  I

22 think I have written some e-mails to other board members that

23 concern has been expressed repeatedly for a very long time in my

24 e-mails.  And I wasn't in a position when Dr. Gilmore was

25 director to direct such a question, and I wasn't in a position

1   when Dr. Fields was -- Mr. Fields was there; but certainly after

2   2008 had I been in the position to have that authority, I would

3   have done so.

4   Q.  Stepping back a moment to the Prairie Meadows grant,

5   certainly you've been out and about talking with the public

6   about the bonobos over time, correct?

7   A.  Not extensively, but I have been.  I was not the foreperson

8   for the Great Ape Trust.  They attempted to send Rob Shumaker

9   out.  As I said before, the only time I have really been able to

10  explain my research to the public was at that Prairie Club

11  meeting.

12  Q.  And at that Prairie Club meeting, did you have Teco with

13  you?

14  A.  No, I did not.

15  Q.  Okay.  You've been out and about at events where you brought

16  one of the bonobos with you to meet others?

17  A.  I had IACUC approval one time under the auspices of the

18  Great Ape Trust and the veterinarian from Iowa State to take

19  Teco to a specific public gathering, and there were people there

20  to assist me, and he was I think about six months of age.

21  Q.  Was that the visit to the church on 42nd Street?

22  A.  I believe so.

23  Q.  What about the visit to the Ray Society?

24  A.  I didn't take Teco to the Ray Society.  I know you have a

25  document that -- the Ray Society came to visit the center.  I

1  didn't take Teco any place out to the Ray Society ever.

2  Q.  You discussed earlier with the judge, with your counsel

3  about Mr. Townsend's vision for the Great Ape Trust.

4  A.  Yes.

5  Q.  And you feel you had some sense for his vision, is that

6  correct?

7  A.  Yes.

8  Q.  And one of the aspects of the vision was to share the

9  bonobos with the public?

10  A.  No.

11  Q.  To not introduce them to others through things like an

12  artist colony or through meetings with the public?

13  A.  Well, we were going to construct small domes with glass in

14  between and there would be trails that the public could go on

15  completely separate from the bonobos, and they would enter a

16  small round building with a glass wall in between, and the

17  public could do tool making on one side, the bonobos would do

18  tool making on the other side of the glass, or the public could

19  make music on one side and the bonobos would make music on the

20  other side.  It wasn't to literally introduce, to take Teco into

21  the public.  That was never his intent.

22  Q.  You also got an exhibitor's license while you were the

23  executive director, correct?

24  A.  Not while I was executive director.  Al Setka got an

25  exhibitor's license, and when we were placed in charge of the

1  facility, the USDA agent came actually while I had the Ray

2  Society there, she arrived and announced to me that that

3  exhibitor's license had been cancelled I believe by Susan McKee

4  and that I needed to reapply for the exhibitor's license if I

5  was going to have anyone in the building, such as at the bike

6  ride where you now need an exhibitor's license, I guess, and you

7  have a bike ride and you have people in the building.  To have

8  people in the building such as you've recently done, I would

9  need an exhibitor's license.

10 Q.  Right.

11 A.  And the trust had always had one.

12 Q.  Very good.  So you've moved with the bonobos on various

13 occasions, correct?

14 A.  No.  I made one move here.

15 Q.  You moved facilities, I believe, in Georgia, or did I

16 misunderstand that?

17 A.  I began the project with the bonobos in 1980 after I moved

18 to this facility.  Prior to that my work was with Sherman and

19 Austin, and I initially moved the chimpanzees, Sherman and

20 Austin as well, to the language research center.

21 Q.  Thanks for that clarification.

22         When the Iowa opportunity arose, there were some other

23 locations that you considered as well, correct?

24 A.  I was considering them.  I was not aware that Mr. Townsend

25 had already gone to the Iowa State administration and

1  contributed $450,000, which was essentially a purchase of the

2  bonobos.  There was really no consideration after he had done

3  that.

4  Q.  And you thought the Iowa proposal that he put forth was a

5  good one?

6  A.  My preference was to work with Penny Patterson and take the

7  bonobos to Hawaii.

8  Q.  But, nonetheless, you came up here to Iowa at Mr. Townsend's

9  behest apparently?

10  A.  I really didn't have any choice.  Once the university

11  administration accepted his $450,000, I could have stayed, and I

12  had a tenured position.  I could have taught, but the bonobos

13  were coming here.  They were bought and sold quite simply.

14  Q.  And I think you told me that you liked the Iowa location

15  because it was pretty similar to the Georgia location you were

16  at?

17  A.  Well, I was very worried about the size of the Des Moines

18  River.  We had the little small South River.  The Des Moines

19  River, when it runs into the Raccoon River, it's something that

20  I -- you know, it's really powerful.  And I was very worried

21  about the cold, and many, many people that wanted to fund me

22  were very, very worried about the cold, and many people,

23  including Peter Gabriel, and Steve Woodruff of the Coca-Cola

24  Foundation, and Mr. Hyashibara of Japan who would have funded me

25  had I gone either to Hawaii or Japan, pulled out because they

1  did not think the bonobos should be in Iowa.

2  Q.  Okay.  Townsend stated -- and he sunk 20 million dollars?

3  A.  He was the only one in.  He didn't stay in; one of the only

4  ones.

5  Q.  Fair enough.  But at least at the time when he moved you

6  here and then for the next several years, over time he put 20

7  million dollars in the operation?

8  A.  Yes, he did.

9  Q.  And when you moved up here, you helped design the facility,

10  is that correct?

11  A.  Yes, I did.

12  Q.  And it was state of the art?

13  A.  I designed the facility with architects who were working

14  with a zoo-based mentality, and they were really influenced by

15  Rob Shumaker and Ben Beck, and there was quite a bit of

16  competition over whether we were going to have a zoo or whether

17  we were going to have a research facility.  My original request

18  was for a small butler building.  Duane indicated to Ted over

19  and over that we needed a small butler building to get here, get

20  on the ground, show that we could continue to do research and we

21  would have access to the outdoors and the trajectory could

22  continue and to put the money into an endowment, not a building.

23  It was Ted that chose to make a 20 million dollar building and

24  Ted that wanted an edifice that would be state of the art.  I

25  would say there was an attempt to make it state of the art to my

1  research, but that attempt was compromised many, many times

2  during design sessions by Rob Shumaker and Ben Beck.

3  Q.  I don't know if -- who is Ben Beck?  I don't know that we've

4  talked about him.

5  A.  He came with Rob Shumaker.  He was the former curator at the

6  National Smithsonian.  He has worked with tools.  He's well

7  known for a book on toolmaking in nonhuman primates.  His

8  background is in anthropology, and he has worked with

9  Dr. Tuttle.

10  Q.  Now, up until the move to Des Moines, you were a research

11  associate with Yerkes, which you referred to before, is that

12  correct?

13  A.  I was a research associate with Yerkes.  At the time during

14  the five years I was with Yerkes and I was a research associate

15  for, I would have to check another three to five or six years

16  while I was at Georgia State, but Yerkes removed that research

17  associate position at some point after I was at Georgia State.

18  Q.  And I think you, when I talked to you in your deposition,

19  told me that you felt you had somehow run afoul of Yerkes and

20  they were upset with your research; is that a

21  fair approximation?

22  A.  I hadn't run afoul with Yerkes.  I had done research that as

23  it became known became problematic for Yerkes because if it's

24  understood that apes have the ability that have been

25  demonstrated for Kanzi, it would be very difficult to continue

1  to keep apes in the kind of caging and biomedical situation that

2  I described earlier.

3  Q.  And, in fact, I think you told me that your husband,

4  Dr. Duane, thought he was threatened in some way by Yerkes?

5  A.  He reported to me that at the time that NHK came and filmed

6  and was going to go worldwide on the documentary of Kanzi's

7  abilities, the director came to the center and he watched the

8  video, and he took me aside and he said, I'm going to shut your

9  research down.  He then talked to Duane.  He and Duane often

10  talked, and he told Duane that in the past if he gave orders to

11  do something, they needed to be carried out and people had, in

12  fact, not stayed around on the planet if they weren't followed.

13  Q.  Eventually your research associate position with Yerkes was

14  terminated?

15  A.  Yes.

16  Q.  And you don't have any personal knowledge about whatever

17  relationship may or may not exist between Yerkes and ACCI?

18  A.  I have the knowledge that Lyle has transmitted to me and I

19  have the knowledge from Jared's deposition.

20  Q.  Now, Lyle didn't transmit any information to you.

21  A.  He transmitted a lot of information to me.

22  Q.  Okay.  Again, you don't have any direct information

23  yourself, you have never spoken to anybody at Yerkes?

24  A.  After I transmitted to Bill Zifchak Lyle Simpson's request

25  that I could no longer talk with him and I had to contact a

1  lawyer, Bill Zifchak instructed me not to contact Yerkes or

2  anybody else but to remain silent.  So I learned from Lyle what

3  was happening, and I was astonished, and I've not been allowed

4  to try to find anything else out.  I've been asked to be quiet,

5  and I have.

6  Q.  Okay.  I think to change gears a little bit, too, you were

7  telling the court earlier about the Bonobo 12.  What is the

8  Bonobo 12?

9       MR. STAMBAUGH:  Objection; misstates earlier

10  testimony.

11      THE COURT:  Well, the question just asked what is

12  Bonobo 12.  So that's what I'm interested in if you can tell us.

13      Thank you.

14  A.  There were a group of people that claimed to be employees

15  who worked under me.  Only a very few of them actually worked

16  with me.  None of them worked under me.  During a period of

17  three years while Mr. Fields was in charge of the lab, these

18  employees worked with me.  When it came time to transition and

19  we knew there were not going to be funds from Ted, one of these

20  employees who was paid by Mr. Lauridsen and had a special

21  scholarship through Mr. Lauridsen brought Mr. Lauridsen to the

22  lab and hoped to obtain funding for the continuation of the lab.

23  I showed Mr. Lauridsen around.

24      The Bonobo 12 continued to work with him and with

25  others, and they had a desire to essentially do what

1  Mr. Taglialatela has done -- or Dr. Taglialatela, pardon me.

2  They wanted their research to go forward and have me excluded.

3  So a variety of complaints were filed against me with the IACUC,

4  and those complaints were later investigated by two special

5  panels and found to be completely false.

6  BY MR. MILLER:

7  Q.  Now, out of that process, I think, is the time frame when

8  there's a question of whether the bonobos are going to need to

9  be relocated because the funding is in jeopardy, is that

10 correct?

11 A.  It was a time of transition of power from Ted's authority to

12 whoever else would be in authority.  It turned out to be Ken

13 Schweller, and nobody knew where the funding was going to come

14 from when Ted's money ran out.

15 Q.  And at that time, we're talking late 2011, early 2012,

16 correct?

17 A.  Late 2011.

18 Q.  Okay.  And at that time there's one board called IPLS,

19 correct?

20 A.  Yes.

21 Q.  And it includes several of the individuals who are on the

22 board of the current BHI, including --

23 A.  No.

24 Q.  No.  Okay.  How am I wrong about that?

25 A.  At that time the board was Connie Wimer, Sue Coop, Suku

1   Radia, Ted, Margo Blumenthal.  Jim Aipperspach may have been an

2   auxiliary member.  I don't know if he was an official member.  I

3   guess Jim Aipperspach was an official member of the board.  I

4   think that was the board.

5   Q.  And that's the IPLS board?

6   A.  That was the IPLS board during the time that the transition

7   was underway near the end of 2011.  Is that the time you're

8   asking me about?

9   Q.  Correct.  So does Bonobo Hope, BHI exist at that time?

10  A.  I had begun to form BHI and I had asked a number of people

11  to serve on BHI, and we had had some initiating meetings which I

12  believe took place around that time.

13  Q.  Okay.  So one of the people you invited to that board was

14  Dr. Taglialatela, correct?

15  A.  No.  I didn't invite Dr. Taglialatela to that board at that

16  time, no.

17  Q.  You eventually invited him to the Bonobo Hope board?

18  A.  Much later, yes.

19  Q.  At this 2011 period was Dr. Dubreuil on that board, Bonobo

20  Hope?

21  A.  No, I don't think so.

22  Q.  Okay.  Are any members of the current Bonobo Hope at the

23  party that's involved in this lawsuit, were they members of the

24  BHI board at that point in time?

25  A.  Derek Wildman was a member, Nancy Howell was a member of the

1  board at that time.  Sally Coxe was a member and I believe Itai

2  Roffman was a member.

3  Q.  Thank you.  And I apologize for the confusion.

4        What I wanted to be clear about is those board members

5  at that time in 2011 were encouraging you to relocate the

6  bonobos, correct?

7  A.  No.  What had happened was that Ted had indicated that the

8  bonobos were going to need to be relocated, and I had met with

9  Ted and his board, Connie and Margo, several times, and my

10  position was that, Ted, if you're out of money, let's first turn

11  to your board and ask these board members to help us to try to

12  get through a difficult time, and if it goes forward the way

13  that I hope it will, then we can start to ask Peter Gabriel and

14  others for money, we can start to get grants again, because by

15  that time we had animal assurances, which themselves cost about

16  a million dollars to get, and we're required to even apply for a

17  federal grant.

18        So we had really gotten in a position where if the

19  rest of the board members, Margo and Connie and others, had

20  supported us and gone forward, we could have done fine; but Ted

21  was adamant that the bonobos move, and at board meetings, he

22  said, these bonobos are moving, you know, when I leave.  And I,

23  you know, didn't know really what was going to happen.

24  Q.  Did I understand you correctly that you would have taken

25  bonobos out to A & W in the past?

1    A.   At the University of Oklahoma before there were IACUCs, yes.

2    Q.   Well, and you would put them in the car and would take them

3    to Wendy's here in Des Moines, correct?

4    A.   No.   Unless I had approval from Dr. Gilmore, I didn't put

5    them in any place here in the car and take them anywhere.

6    Q.   You went out to a Buddhist temple or to visit a relative

7    with Teco, is that correct?

8    A.   I didn't take any bonobos anywhere unless I had the approval

9    of Dr. Gilmore to take them there.

10   Q.   Did you have any --

11   A.   But let me just say that across the years, the IACUCs became

12   in place.   When I began my work in 1975, there was not an IACUC

13   and there were no rules and regulations, and I was working as a

14   graduate student and it was part of my job, my paid job to drive

15   the bonobos to different places.   I was ordered to do that by my

16   faculty supervisor.

17         One of the things I did regularly was take a bonobo,

18   Lucy, who had been reared in a human home five or ten miles away

19   to 60 acres of land that they owned, and Lucy was allowed to go

20   on their land.   And oftentimes I wouldn't even see Lucy.   And I

21   was instructed when I was ready to go back to hit the horn and

22   Lucy would come and jump in the car, and she did.

23         I could tell many more things that happened at the

24   University of Oklahoma, but in part because of my work, IACUCs

25   and protocols came into being while I was at Yerkes, not only

1  because of my work but basically because animal rights were also

2  breaking into places.  And once those rules and regulations

3  began to try to govern how a person is able to do research, I

4  had to go through a whole series of rules and regulations to get

5  approval to do anything, and I didn't skirt those intentionally

6  ever.

7  Q.  Correct.  You understand rules and regulations are important

8  for working with bonobos?

9  A.  Yes, I do.

10  Q.  Right.  And I think you told me -- well, first off, was Lucy

11  a bonobo?

12  A.  Lucy was a chimpanzee.

13  Q.  Did Lucy come with you from Georgia?

14  A.  No.  Lucy was reared in a human home.  There's a book on

15  Lucy that was written by a clinical psychologist that describes

16  how humanized an ape can become when it's raised from the day of

17  birth in a human home.  That was part of the research project of

18  my major professor William Lemmon.

19  Q.  What happened with Lucy?  She wasn't part of your research

20  trajectory?

21  A.  I was a graduate student like Jared was a graduate student

22  working under me, and so at that time I was learning about what

23  happens if an ape is reared in a human home, what happens if an

24  ape is reared with nonspecifics, what happens if an ape is

25  reared with its mother, what happens if an ape has had traumatic

1  experiences, and I was seeing all the different apes to which I

2  was exposed.

3  Q.  Okay.  You didn't bring Lucy with you, though?

4  A.  Lucy did not come here, no.

5  Q.  What happened to Lucy?

6  A.  Her parents decided to try to reintroduce Lucy to the wild,

7  and Lucy was not a member of a chimpanzee group.  Lucy was never

8  really able to integrate into a chimpanzee group.  It was

9  because of Lucy that I made the vow to never raise a Kanzi or a

10 Teco or a Panbanisha without constant contact with other bonobos

11 and their mothers because I saw in Oklahoma what happens when

12 you do that.

13       So because Lucy was never exposed to other chimpanzees

14 growing up, she really wasn't able to integrate with other

15 chimpanzees, and when she couldn't integrate at Oklahoma, they

16 tried to introduce her to an island with other chimpanzees in

17 the wild.  She survived for a while, but she eventually passed

18 away.

19 Q.  So if I'm following you correctly, she was human reared or

20 reared with humans and taken back to the wild, so to say?

21 A.  You're not following me correctly, exactly.

22 Q.  Okay.

23 A.  She was reared without any contact with any other

24 chimpanzees by experimental design.  I have never replicated

25 that procedure.

1  Q.  Okay.  I understand.  But eventually she went back to the

2  wild, as it were, and was killed or harmed or died?

3          MR. STAMBAUGH:  Objection; relevance as to this whole

4  line of questioning.  It's irrelevant.

5          THE COURT:  Well, it's a follow-up.  I'll receive it,

6  subject to the objection.

7  A.  The problem with apes, as with humans, if you're going to be

8  in a different environment, you need family and you need a

9  tribe.  An ape put out in the wild alone, no ape is going to be

10  survived that way.  So it really wasn't her human rearing that

11  caused her failure to survive in the wild.  It was her lack of

12  exposure to other chimpanzees that caused her failure to be able

13  to integrate into a culture or another group of chimpanzees.

14  BY MR. MILLER:

15  Q.  You'd acknowledge that the use of personal protective

16  equipment -- or the lack of use of it can expose the bonobos to

17  disease, correct?

18  A.  If there's someone with a disease around them, yes.

19  Q.  Right.  So if you're going to have an individual or a human

20  in contact with an ape, there should be personal protective

21  equipment?

22  A.  It depends on whether that person is ill or not.  As I

23  explained, the rearing involves a very familial like situation.

24  If you -- I didn't wear personal protective equipment with my

25  son, Shane, who is sitting there in the back.  I didn't wear

1  personal protective equipment with Kanzi or with Nyota or with

2  Teco, and all three of them are alive and here today and well.

3  Q.  And I think you were testifying earlier that one part of

4  your research trajectory is not using masks and gloves or

5  personal protective equipment?

6  A.  Not for everyone.  In a familial situation where you're

7  sharing the same biome, the same skin biome, you're sharing

8  food, in a familial situation, there's enough sharing and

9  immunology developed that apes and human children can be quite

10  healthy.  Human children often experience problems, for example,

11  when they first start in a nursery, they might be fine, but they

12  start in public school or a nursery and they experience

13  problems.

14        One of the problems we experienced was that

15  Dr. Gilmore brought her young daughter who was just in nursery

16  school and allowed her young daughter to interact with Teco

17  without -- even when she knew that the daughter was ill and even

18  when I objected to that.  So you can have a problem, but you

19  have to be -- you have to use good common sense the way you

20  would with your own children.

21  Q.  And Governor Branstad, in fact, even interacted with Teco

22  when you were together with him when he was ill?

23  A.  With Dr. Gilmore's permission.

24  Q.  All right.

25  A.  I don't know whether Governor Branstad was ill or not, but I

1  did not make those decisions.

2  Q.  And this was during the time that you were executive

3  director?

4  A.  Whether I was executive director or not, all decisions about

5  who could interact and the health and welfare of the bonobos

6  were made by Dr. Gilmore and I would not countermand those.

7  Q.  And I think you also testified you believe as part of your

8  research trajectory that there be direct contact with the

9  bonobos, is that correct?

10  A.  Would you repeat the question?

11  Q.  It's important to your research trajectory that there be

12  direct contact between humans and the bonobos?

13  A.  With certain people; not all people, not the general public.

14  The same as you would do with your child, except when the

15  bonobos get to be three or 4, five, you can't send them to

16  public school.  You can't really improve their immunology.  So

17  you really have to be careful because they're going to have a

18  more restricted immunological profile than say your son or

19  daughter would.

20  Q.  And so you would decide who could meet or be directly in

21  contact with the bonobo and who wouldn't be?

22        MR. STAMBAUGH:  Objection; misstates the testimony.

23        THE COURT:  I'll receive it, subject to the objection.

24  A.  You always have to make that decision just as you do with

25  your children or your pets.  It's nothing unusual.

1  BY MR. MILLER:

2  Q.  Bonobos are certainly -- they're capable of inflicting harm

3  to people, to humans, correct?

4  A.  Humans are far more capable than bonobos of inflicting harm

5  on other humans and do so far more often.

6  Q.  But you would agree with me that the bonobos are capable of

7  inflicting harm on humans?

8  A.  They are capable of it.

9  Q.  And other animals?

10  A.  They are capable of it.

11  Q.  All right.  In fact, you've witnessed circumstances where

12  somebody was injured by a bonobo, correct?

13  A.  Yes.

14  Q.  Bonobos have bitten other individuals in your presence, for

15  instance?

16  A.  In bonobo society, biting is a way of disciplining just like

17  spanking is a way of disciplining sometimes in human societies.

18  In other human societies, cutting off a finger is a way of

19  disciplining.  Bonobos have a cultural pattern of biting, but

20  that can be changed.  They don't do that just because they're a

21  bonobo.  They do that because they're a cultural being.

22  Q.  In spring 2013, you got hurt, you went back to New Jersey,

23  correct?

24  A.  I didn't get hurt and go back to New Jersey.  I got hurt and

25  I stayed there quite awhile.  I had constant interchange with

1  Gaila and Liz who was working there every day.  I knew -- I was

2  asked to help find a successor, and I knew they wanted to have

3  funding from the Federal Sanctuary System, so I met with George

4  Caudill, and I told him if we were going to talk about getting

5  assistance, I needed to go back and talk with Duane because

6  Duane started the whole project.  So I went back to discuss what

7  they asked me to discuss, which was to bring a successor for the

8  future, and George -- I went with his blessing.

9  Q.  I mean, that visit with Duane, Dr. Rumbaugh, was in New

10  Jersey, correct?

11  A.  He lives in New Jersey, so I had to go there to talk with

12  him.

13  Q.  Right.  You were there for a matter of weeks or months even?

14  A.  A couple of months.  I hadn't visited him in three or 4

15  years since Teco was born.

16  Q.  And you went through periods of time when you have been here

17  in Des Moines where you're not engaged in research or in the

18  operations of the facility, correct?

19  A.  I don't think there's been any time where I haven't been

20  cognizant and concerned about the operations of the facility,

21  writing e-mails on safety procedures, asking everybody what's

22  going on, providing any assistance or help I could; but there

23  have been times where I was injured.  I had a cracked wrist, I

24  had a cracked ankle.  I worked at the facility straight through

25  those.  I've had some infections, and I've worked at the

1  facility straight through those.  I was working 24/7.  I was

2  working very long and very hard hours, and there have been times

3  where I've needed to get away from the facility where -- as when

4  I fell and hit my head, and many of those times people have

5  wanted me back at the facility.  And I'm glad they do, I'm glad

6  they felt that I was valuable; but it was very clear to me, even

7  before Teco was born and I took on the obligation of rearing him

8  because his mother was having difficulty, that I needed more

9  help.  I certainly had more help in Atlanta the whole time I was

10  rearing Kanzi or Panbanisha or Nyota.

11  Q.  So in 2012 you took over as executive director for a period

12  of time?

13  A.  I'm not really sure if Dr. Schweller gave me that title or

14  not.

15  Q.  I think that's what you testified to earlier, and the record

16  will reflect what it does; but you certainly also testified that

17  there was a period of time when you took care of all of the

18  administrative functions.  Do you recall that?

19  A.  Yes.

20  Q.  All right.  Okay.  And during that time Mr. Stambaugh asked

21  you questions about the fact that you were a registered agent

22  for IPLS.  Do you recall that?

23  A.  Yes.

24  Q.  And you --

25  A.  And I would just like to say I took over all administrative

1  functions in the lab at the time.  Dr. Schweller was taking over

2  as many as he was willing to take.  I wasn't grabbing them.

3  Q.  But you understood that you were the registered agent for

4  the organization?

5  A.  I didn't know what registered agent meant at that time.  I

6  had no idea.

7  Q.  All right.  I want to go ahead and look at Exhibit 1004.

8  Dr. Rumbaugh, if you would find it in front of you.  It's in a

9  notebook that's in front of you, plaintiffs' exhibits.  It

10  should be right in front.

11 A.  You want me to look in the book?

12 Q.  Yes.

13 A.  What number is it?

14 Q.  1004.

15 A.  Is it in this smaller one?

16 Q.  Yes, ma'am.

17 A.  Okay.  I have it.

18 Q.  And that's a statement of change of registered agent or

19 registered agent form.

20          Do you see that there?

21 A.  Yes.

22 Q.  Okay.  And is that your signature at the bottom of that

23 page?

24 A.  Yes, it is.

25 Q.  As executive director?

1  A.  That's written under my name.  I can't tell you that that

2  was on there when I signed it.

3  Q.  You did sign this document, right?

4  A.  I did sign this document, yes.

5          MR. MILLER:  All right.  Your Honor, we offer Exhibit

6  1004.

7                          (Plaintiffs' Exhibit 1004 was

8                           offered in evidence.)

9          MR. STAMBAUGH:  Your Honor, we renew our objections as

10  in the pretrial order; relevance, authentication; 1005; copy of

11  public record conditions not satisfied.

12          THE COURT:  Exhibit 1004 is received, subject to that

13  objection.

14                          (Plaintiffs' Exhibit 1004 was

15                           received in evidence.)

16          MR. MILLER:  Your Honor, may I publish 1004?

17          THE COURT:  Yes.

18          MR. MILLER:  Your Honor, just for the record and to

19  make a little record with respect to 1004, I have a copy here

20  that I offered and would give to the court attendant at the end

21  of this testimony that has an authentication or certification

22  from the Secretary of State that I think will resolve some of

23  the issues; but we don't have that copy for your file, excuse

24  me.

25          THE COURT:  Is it part of the official record?

1          MR. MILLER:  Well, I'm holding that copy here, but I

2    guess it's -- a copy is in the binder, and I would switch it out

3    if that's -- when they raised the objection, we got a certified

4    copy to try and resolve those issues.

5          THE COURT:  Well, you can switch it out; but I

6    think -- I assume that the exhibits before the witnesses are the

7    official court record --

8          MR. MILLER:  I apologize.

9          THE COURT:  -- or would be the original exhibits.  Do

10   we all understand that?  Yes?

11         MR. STAMBAUGH:  Yes.

12         MR. MILLER:  Yes.

13         THE COURT:  So if you want to change the official

14   exhibit, you can.  I don't need it, but you can do it if you

15   want to.

16         MR. MILLER:  Okay.  I appreciate that, Your Honor.  I

17   didn't have this handy when I put that up there at the desk, at

18   the witness box today, so I'm sorry.

19   BY MR. MILLER:

20   Q.  Dr. Rumbaugh, if you would again refer back to 1004, I think

21   I just would ask you if this is your signature here at the top

22   of that page, is that correct?

23   A.  Yes.

24   Q.  Okay.  And I think you testified earlier this was provided

25   to you to sign by Ms. McKee, correct?

1    A.   That's my recollection.

2    Q.   But you did review it and sign it for her?

3    A.   I don't -- I just signed it because she asked me to, to do

4    it.  I didn't really understand what the implications of it were

5    and I didn't really know why she was asking me to sign it.

6    Q.   You would have received mail for Great Ape Trust at the

7    address reflected on this 1004, correct, the 4200 Southeast

8    44th?

9    A.   Yes.

10   Q.   Okay.  So that's a correct address for the organization?

11   A.   That's a correct address.

12   Q.   And you don't deny that you never filed a biennial report?

13   I think Mr. Stambaugh asked you about that earlier.

14   A.   When Lyle Simpson took over as the legal counsel, he told me

15   he would handle all of those things for BHI and IPLS, so I never

16   had any indication from either Susan McKee or Lyle Simpson that

17   that was my responsibility, and I had not really handled a

18   nonprofit before and Lyle was handling BHI for me and he filed

19   the reports for BHI, so I had no reason to suspect that he would

20   not handle the reports for IPLS.

21   Q.   Well, did you give him this document when it came in?

22   A.   Lyle wasn't the legal counsel when this document came in.

23   Jaki Samuelson was still the legal counsel at that time.

24   Q.   I'm sorry, I misheard you.  Who was that?

25   A.   Jaki Samuelson.

1  Q.  Okay.  Did you give it to Ms. Samuelson?

2  A.  I gave it to Susan McKee.

3  Q.  Okay.

4  A.  She took it.  I don't know what she did with it.

5  Q.  You later tried to reinstate the IPLS entity, is that

6  correct?

7  A.  No.  I didn't even -- I mean, Lyle tried to; I didn't.  I'm

8  not a lawyer.  Unless a lawyer is there to explain these things

9  to me, I have no knowledge, I don't know what to do.

10  Q.  I'm going to show you Exhibit 39.  Can you find that in the

11  bigger notebook behind you?

12  A.  39?

13  Q.  Or you can look right behind you actually.

14  A.  Oh, okay.

15  Q.  That's a document -- do you see that at the top --

16  application for reinstatement?

17  A.  Yes.

18  Q.  And it says the name of the business entity, the date of

19  administrative dissolution of the Iowa Primate Learning

20  Sanctuary.  Do you see that there?

21  A.  Yes.

22  Q.  And that's your signature at the bottom on November 6, 2013,

23  correct?

24  A.  I don't recall signing that document on November 6, 2013.

25  That would have been right before I came -- or I guess as I came

1 back to take care of Teco.

2 Q. Right. You don't deny you signed this on that date?

3 A. If Lyle asked me to sign the document, I probably would have

4 done what Lyle asked because I really believed he was operating

5 in my best interests until I had a source to conclude otherwise.

6 Q. Okay. Let's talk about Lyle. Lyle is not a board member of

7 IPLS, correct?

8 A. No, sir.

9 Q. Or BHI?

10 A. No, sir.

11 Q. To your knowledge, of ACCI?

12 A. No, sir.

13 Q. Of any organization?

14 A. I've invited him to be a board member of those

15 organizations, but he's turned me down.

16 Q. Politely declined I assume?

17 A. Yes.

18 Q. Now, I think you just said, if I understand you correctly,

19 at some point in time, you became concerned about the advice you

20 received; is that accurate?

21 A. After I was removed from the building and told to leave town

22 and that I would never see the bonobos again, I did become

23 concerned; but Duane encouraged me not to cause a problem, to

24 follow Lyle's advice, to not explain any of this to the BHI

25 board and to work with Lyle, that somehow, some way if we worked

1  with Lyle we would work these things out.  So I continued to

2  work with Lyle to try to do that until such point as Lyle told

3  me to leave his office and contact a lawyer.  And right before I

4  was told that, I finally concluded that what was happening was

5  simply wrong, and I turned to him and I said, Lyle, you have

6  tricked the Bonobo Hope science board, and I don't appreciate

7  it.  And Lyle asked me to leave his office and get a lawyer.

8  Q.  Okay.  So you said you came to this conclusion and concern

9  when you were removed in November 2013, correct?

10 A.  Correct.

11 Q.  You kept talking to Lyle after that?

12 A.  Yes, I did to try and resolve it.  I thought Lyle didn't

13 understand the situation because George Caudill told me that I

14 was removed because I wrote an e-mail to Jared, and in that

15 e-mail I asked Jared if chimpanzees were coming soon to the

16 facility because Jared and I had discussed the chimpanzees from

17 Yerkes might come; but Jared had indicated that there were big

18 hurdles to those chimpanzees coming.  At that time Jared didn't

19 tell me that the hurdle was me and I had no idea that the hurdle

20 was me.  I thought six to seven chimpanzees were coming, and I

21 thought it would be some time before they arrived.  I was told

22 that they were arriving very soon, there could be as many as 30

23 and that I needed --

24 Q.  I don't want to interrupt you, I apologize, but I think

25 we're getting a little off course.

1        What I would like to understand is November of 2013

2   you say I'm distrustful of Lyle; is that what you're saying?

3        MR. STAMBAUGH:  I'm going to object as argumentative

4   and request that the court allow the witness to finish her

5   answer.

6        THE COURT:  Oh, I think it was time for another

7   question, and your objection to the current question is -- I'll

8   receive it, subject to the objection.

9        Do you recall the question?

10       Why don't we get a fresh start.

11  BY MR. MILLER:

12  Q.  Okay.  When you're removed, when you're asked to leave in

13  2013, November of 2013, your testimony is you became concerned

14  about Lyle's advice?

15  A.  Lyle was concerned that I had written an e-mail to my

16  potential successor, and he threw me out because I wrote an

17  e-mail to my potential successor.  That's what I was told why I

18  was being thrown out.  I was concerned, and I went to discuss

19  that with him.

20  Q.  Right.  Several months later you went to discuss that with

21  him?

22  A.  No, no.  I went and discussed it with him immediately.

23  Q.  Okay.  Did you fire him?

24  A.  Fire Lyle?

25  Q.  Right.

1  A.  No, I didn't fire Lyle.  Duane's advice was to work with

2  Lyle, Lyle is our friend and to try and work with Lyle, and Lyle

3  had been a friend and that the best thing to do was to try to

4  talk with him.

5  Q.  And I think you testified Lyle was Bonobo Hope's lawyer?

6  A.  Lyle was the lawyer for Bonobo Hope.

7  Q.  And did Bonobo Hope fire him?

8  A.  I was given explicit instructions by George and Lyle not to

9  tell anyone on Bonobo Hope what had happened.  It was indicated

10  to me that Lyle and George were lawyers and I wasn't and I could

11  be put in jail, many bad things could happen to me.  And Duane

12  and I were both very frightened, and Lyle had been a longtime

13  friend and we tried to work it out with him until such time as I

14  was told to get out of his office and get a lawyer.

15  Q.  By working it out, did that mean continuing to write e-mails

16  to Lyle for the next several months?

17  A.  It meant talking with Lyle and explaining to him that I had

18  not violated any particular rule or regulation that he or George

19  had laid down because I wrote an e-mail to Jared, I should be

20  able to write an e-mail to Jared and to discuss whether

21  chimpanzees were coming to the lab or not.  I see absolutely

22  nothing illegal or wrong with that.  And I was told I could no

23  longer communicate with Jared, with Bill, with George, with the

24  board, with anyone or with anyone in the lab, no one on the

25  staff, not my sister, not my niece, not my family, I had to sit

1  there and be quiet and the best thing to do was to get out of

2  town.

3  Q.  Now, at that time you were -- actually you were out of town,

4  right?

5  A.  No.  I'm in Des Moines.  I've just been kicked out of the

6  lab and Teco was ill and I'm very concerned about him, and I was

7  writing a few members of the board, against Lyle's objection,

8  explaining to them that we had a little bit of a problem, but I

9  thought I would resolve it with Lyle.

10  Q.  Okay.  So you're writing e-mails even though you supposedly

11  were told not to?

12  A.  I didn't write e-mails and explain everything that was going

13  on, but I did indicate that we had some kind of issue as regards

14  Teco.

15  Q.  If you have a problem, you never stopped from e-mailing

16  somebody relating to one of these issues, correct?

17  A.  I stopped sending e-mails in March when George took over and

18  told me that any e-mail I sent to the Bonobo Hope board needed

19  to be reviewed by him.  I thought that was wrong.  I sent far,

20  far fewer e-mails to the board from that point on until I was

21  asked to step out of Lyle's office.  I was in a legal gray area.

22  I was working with two lawyers.  They were in charge of the

23  facility and I did not understand what was happening.

24  Q.  Now, you have these concerns apparently with Mr. Simpson.

25  You would have reviewed documents that he gave you and asked to

1  sign before you signed them, correct?

2  A.  Would you rephrase that?

3  Q.  Sure.  Notwithstanding your concerns with Mr. Simpson or

4  perhaps because of those concerns, if he gave you a document and

5  said, I need you to review and sign this, you would have done

6  that?  You would have reviewed that document before you would

7  have signed it, correct?

8  A.  I believe I arrived in Iowa to take care of Teco on the 5th

9  of November or the 4th of November, and I believe that I was

10  thrown out on the 10th of November.  And I did meet with Lyle,

11  had dinner with Lyle.  He took me to the Wakonda Country Club,

12  and at that point he told everyone at the country club the most

13  wonderful things he could tell them about me, probably around

14  November 6th or around that time.  I had no idea Lyle would kick

15  me out of the facility.  He couldn't say good enough things

16  about me when he was buying my meal.  He had been my longtime

17  friend, and he had written to everyone about the research.  I

18  had no reason not to trust Lyle.

19  Q.  But what I'm asking is, if you had a document that Lyle

20  asked you to review and sign, you would have reviewed it before

21  you signed it, correct?

22  A.  I wouldn't have reviewed it with the idea that Lyle might be

23  asking me to do something that I should not do.  I mean, if he

24  tells me, we need this signed for IPLS, yes, I would have signed

25  it for Lyle at that time.  I wouldn't have reviewed it and said,

1  what about this, what about this, are you going to stick with

2  the settlement agreements, are you going to throw me out.  I

3  would have never even thought to do that.

4  Q.  About that dinner at the Wakonda Club, you were actually

5  back and had Thanksgiving dinner with them, correct?

6  A.  No.  Thanksgiving dinner was later.  I was back to take care

7  of Teco, and Lyle asked me to take an evening off, and I got my

8  sister to come in and take care of Teco, and I went to dinner

9  with Lyle at the Wakonda Country Club.

10  Q.  What I'm asking, if I understand your testimony, so

11  November 6th, or thereabouts, you have dinner with Lyle at

12  Wakonda, correct?

13  A.  It could have been the 7th.  I don't --

14  Q.  Okay.  And then you're asked to leave, and you leave on the

15  9th, is that correct?

16  A.  I wasn't asked to leave by Lyle at the dinner.  I was asked

17  to leave on the 9th or 10th by George.

18  Q.  Yeah, I appreciate that, Dr. Sue.  I understand you

19  weren't -- but on November 9th or 10th is when you were asked to

20  leave and you leave, correct?

21  A.  Correct.

22          MR. STAMBAUGH:  Objection; argumentative.

23          THE COURT:  Overruled.

24  BY MR. MILLER:

25  Q.  And then, despite this betrayal and this deception that

1  you've been talking about, you come back a couple of weeks later

2  and you have Thanksgiving dinner with Lyle and George, correct?

3      MR. STAMBAUGH:  Same objection.

4  A.  George --

5      THE COURT:  Overruled.

6  A.  George wrote me and talked to me and said, Sue, this is

7  going to be the last time you're ever going to see the bonobos

8  in your life, and I feel that I need to do something in order to

9  allow you to say good-bye.  If I allow you to come to the

10  facility, will you leave, you know, at the appropriate time, and

11  do you understand that this is the last time you'll ever see the

12  bonobos?  I didn't agree that it was the last time I would ever

13  see the bonobos, and I said, I don't agree to that; but yes, I

14  will come to the facility and I will spend Thanksgiving dinner

15  with the bonobos and thank you very much for giving me that

16  opportunity, George.

17  Q.  Right.  Again, that's a couple of weeks after this supposed

18  event, the betrayal and all of that?

19  A.  But I had been talking with George and Lyle every single day

20  from the point I was out complaining about the problem at every

21  point they would allow me to discuss it.

22  Q.  When you came in to deal with Teco there in November, you

23  came in unannounced?

24  A.  No.  That's not true.  I wrote to people.  I wrote to Julie

25  Gilmore, and Heather knew I was coming and one other person knew

1    I was coming.

2    Q.  You came in and you had called meetings with staff and

3    volunteers?

4    A.  I did not.

5    Q.  Okay.

6    A.  At one point George Caudill asked to see me, and I asked,

7    will any of the volunteers be able to take Teco or will Heather

8    or Liz be able to take Teco, and I asked the people to get

9    together so that I could make sure that Teco's coverage was --

10   somebody was there to take care of Teco while I went to see

11   George, and that was called as me getting the volunteers

12   together and trying to organize them and gather them.  That was

13   not it at all.  Because I was asked to meet George, I had to be

14   responsible and find somebody to take care of Teco, who was ill,

15   until I could come back.

16          And when George asked me to meet with him, which was

17   on a Saturday morning, he had me go to the Caribou coffee shop

18   and stay there the entire day waiting for him and then he still

19   didn't show up, and then he said he would meet with me the next

20   morning and I had to get somebody else to cover, and he didn't

21   meet with me then either.

22   Q.  And, again, this is when you come back to take care of Teco?

23   A.  Yes.

24   Q.  And by this point in time, you had gone back to New Jersey?

25   A.  I'm not sure what point in time you're referencing.

1    Q.  I apologize.  Where were you there in -- where did you come

2    from to take care of Teco?

3    A.  I came from New Jersey where I had gone to talk to Duane.

4    Duane and I had talked to Jared over the phone, and we had

5    written the letters at Lyle's request and we were doing

6    everything we could to facilitate the transfer the way Lyle had

7    laid it out, which was a three- to 4-year transition with Sue

8    and Jared co-directing the center and unfettered access to the

9    bonobos thereafter.

10   Q.  Okay.  And after this scenario where you come in and take

11   care of Teco, it was actually Dr. Gilmore talked to you and

12   said, Sue, we need you to leave, correct?

13   A.  No.  Dr. -- Mr. Caudill wrote me the letter, the document

14   that you showed up there.

15   Q.  And that was followed by a meeting with Dr. Gilmore where

16   she asked, you need to go, and you said, I'm going to go?

17   A.  There were many other e-mails from Caudill.  I don't know if

18   you've seen them or not.  There were other e-mails from Lyle.

19   There were phone calls from Lyle.  I kept implying that no one

20   had come forward to take care of Teco and, in fact, until Liz

21   was rested up, she really was not able to come forward and take

22   care of Teco.

23        At one point George or someone sent Julie Gilmore in

24   to ask me to leave.  I was already -- I had already agreed to

25   leave because I had been ordered out of the facility by the

1 legal counsel and the chair of the board, and I was -- it was

2 intimated that, you know, the authorities would come and remove

3 me from the facility.  I wasn't trying to grandstand.

4         And Dr. Gilmore came, and I was preparing things,

5 getting my stuff together so that I could leave.  And my sister,

6 Liz, went over and started to talk to Dr. Gilmore and asked

7 about why I was being forced to leave, and Dr. Gilmore turned to

8 my sister and said, Liz, this isn't about anything other than

9 money.  This isn't about Sue and Teco or their relationship.

10 This is only about money.

11         And at that point Teco got very upset and threw

12 himself on the floor and started having a temper tantrum and

13 slapping himself all over, and my sister felt he went into a

14 very traumatic event; but I left as I was ordered to do by Lyle,

15 Steve Boers, Julie Gilmore, and George Caudill.

16 Q.  Okay.  So apparently Julie said something about it being the

17 money; is that what you said?

18 A.  That's what I was told.

19 Q.  Okay.  And you, obviously, brought that up with Caudill and

20 Simpson when you came back for that Thanksgiving dinner?

21 A.  They weren't there when I went to the Thanksgiving dinner.

22 The Thanksgiving dinner was to be had with the bonobos in the

23 lab.  It was a private family affair.  People from my family

24 could go, Duane could go, Heather could go, Liz could go.  The

25 pan/homo people could go.  No one outside the pan/home group was

1   allowed.  It was the Thanksgiving dinner that we would have had

2   with George.  We had it with the bonobo family instead.  And I

3   had not left -- between the time I was kicked out on the 10th

4   and the 15th, I had not left Iowa.

5   Q.  Sitting here today, you have no direct evidence yourself of

6   ACCI's current operations, correct?

7   A.  I have not been allowed in the facility.

8   Q.  Anything that you believe is occurring there, you've heard

9   from others?

10  A.  I've seen videos.

11  Q.  Okay.  What videos have you seen?

12  A.  I've seen videos on television and I saw a video taken by

13  Sheila a couple of weeks ago at the bike event.

14  Q.  Okay.  And Sheila is your counsel?

15  A.  Yes.

16  Q.  Okay.  And what were the other videos, I'm sorry, you saw on

17  television?

18  A.  I saw videos on television not long after Matata died that

19  were made by ACCI.

20  Q.  Okay.  You followed and watched documentaries of the like?

21  A.  Pardon?

22  Q.  You've been watching documentaries or videos or something

23  like that; is that -- I'm just trying to understand what you're

24  referring to.

25  A.  I do watch documentaries, but it's not because I watch

1  documentaries or follow videos that I saw the video of Nyota on

2  television.  It was a newscast.

3  Q.  Okay.  And that was after Matata died?

4  A.  Right after Matata died, and I've seen some video that Liz

5  has taken.

6  Q.  What video did Liz take?

7  A.  I don't know how to answer that question.

8  Q.  Why?  Why can't you answer that?

9  A.  What do you mean "what video"?  I don't understand the

10 syntax of your question.

11 Q.  Okay.  You've watched a video that your sister, Liz, a

12 volunteer at ACCI, took, correct?

13 A.  Yes, I have.

14 Q.  What was the video that you viewed?

15 A.  There are several videos.  I recall one video of Nyota that

16 she took.  I have one short video of Teco that she took.  I

17 don't think I've seen any videos with Kanzi.

18 Q.  When did she take these videos?

19 A.  I don't know.

20 Q.  Did she tell anybody she was taking those videos?

21 A.  Probably not.

22 Q.  Did she tell the bonobos she was taking the videos?

23 A.  Oh, I'm sure she would.

24 Q.  And what about this video that Sheila took, what was that

25 video?

1  A.  I don't understand when you say "what was that video."  Do

2  you want to know what's on the video?

3  Q.  Yeah.

4  A.  Is that what you're asking me?

5  Q.  Yes.  Please describe for me what video your counsel took by

6  coming to this bike event.

7  A.  She was on a bike event, and she took a video of whatever

8  she saw.

9  Q.  And what does the video depict?

10  A.  It depicts bonobos.  It depicts outdoor cages.  It depicts

11  indoor cages.  It depicts people walking past with masks and

12  gloves and pushing food carts.

13  Q.  It depicts the facility as it currently is?

14  A.  Yes, some parts of it.  I mean, I can't say that it depicts

15  the entirety of the facility as it entirely is.  It exhibits

16  what's on the video.

17  Q.  You asked her to go to this event, which I take it was the

18  Biking for Bonobos event about a week ago, is that right?

19  A.  Yes.

20  Q.  You asked her to go there and take video?

21  A.  Yes.

22  Q.  Why?

23  A.  Because I wanted to know if the bonobos were okay.

24  Q.  Now, members of Bonobo Hope have been at the facility and

25  seen the bonobos?

1    A.    They had a terrible time getting into the facility.

2    Q.    They've been at the facility and seen the bonobos within the

3    past couple of months, correct?

4          MR. STAMBAUGH:    Objection; compound and misstates the

5    evidence.

6          THE COURT:    I'll receive it, subject to the objection.

7    A.    Members of the Bonobo Hope board have asked and asked and

8    asked and been turned down, turned down and turned down.    Derek

9    Wildman was able to spend -- the only BHI member that's been

10   allowed to go is the one that's on ACCI's board as well as the

11   BHI board, and he was allowed to go to the facility.

12   BY MR. MILLER:

13   Q.    Okay.    He's a Bonobo Hope member, he was there at the

14   facility, he observed the bonobos, correct?

15   A.    Yes.

16   Q.    And that was within the past couple of months?

17   A.    Yes.

18   Q.    Still you thought, boy, I've got to have my lawyer go out

19   and take video of these people?

20          MR. STAMBAUGH:    Objection; argumentative,

21   inappropriate.

22          THE COURT:    That is argumentative.

23          MR. MILLER:    I withdraw the question.

24   BY MR. MILLER:

25   Q.    You suggested bringing chimps into the facility as part of

1  the operation of the Great Ape Trust in the past, correct?

2  A.  Would you state the question again?

3  Q.  Sure.  You, yourself, Dr. Rumbaugh, suggested or supported

4  bringing chimps to the facility, correct?

5  A.  Yes, I did, and so did the BHI board.  We voted on that.

6  Q.  And you have no objection to chimps coming at this time?

7  A.  At that time I did not have the flood report.

8  Q.  Now, because of this flood report that you've got, you say

9  no, no chimps?

10 A.  I think unless there's a way to move apes really easily and

11 quickly because the water rises so fast, it's just not possible

12 to do because the access to the building can be shut off very,

13 very rapidly.  I think you would need a tunnel going from that

14 low area over to the high area on the other side.  You would

15 have to buy some land on the other side, and if you could do

16 that and they had a way to move quickly, I wouldn't object to

17 it; but under the current circumstances, I think that their

18 lives would be in jeopardy at some point.

19 Q.  I skipped over one thing, Dr. Sue, I want to go back over

20 with you.  In front of you in the small binder there's an

21 Exhibit 1005.  Can you find that for me?

22 A.  Yes.

23 Q.  Do you have that there in front of you?

24 A.  Yes, I do.

25 Q.  Do you agree with me that that's an e-mail that you wrote

1  Mr. Caudill with a cc to several individuals, including

2  Dr. Taglialatela, Mr. Roffman, your sister, Dr. Wildman,

3  Dr. Dubreuil, correct?

4  A.  That's correct.

5  Q.  In fact, there are others listed there, correct?

6  A.  Yes.

7  Q.  And that's an e-mail you wrote on October 26, 2013?

8  A.  Yes.

9  Q.  Re:  Iowa Primate Learning Sanctuary, correct?

10  A.  Yes.

11  Q.  And this e-mail you're sending to the board members of IPLS

12  and Bonobo Hope, correct?

13  A.  Yes.

14          MR. MILLER:  Offer Exhibit 1005, Your Honor.

15                          (Plaintiffs' Exhibit 1005 was

16                          offered in evidence.)

17          MR. STAMBAUGH:  Just renew our objections in the

18  pretrial order; foundation and hearsay, Your Honor.

19          THE COURT:  The Exhibit 1005 is received, subject to

20  the objection.

21                          (Plaintiffs' Exhibit 1005 was

22                          received in evidence.)

23  BY MR. MILLER:

24  Q.  If you would bear with me one second.  I have a lot of paper

25  in front of me.

1  A.  Sure.

2          MR. MILLER:  Your Honor, may we publish Exhibit 1005?

3          THE COURT:  You may.  But as I'm looking at it, it is

4  an e-mail string, isn't it?

5          MR. MILLER:  An e-mail string, Your Honor.

6  BY MR. MILLER:

7  Q.  In fact, just to be clear, Dr. Sue, if you go through it, in

8  the bottom right-hand corner of that document there's page

9  numbers.

10          Do you see that?

11 A.  Yes.

12 Q.  If you look at page 4, that's a response from Mr. Roffman,

13 Ph.D. student, correct?

14 A.  Yes.

15 Q.  "I fully support Sue letter."

16 A.  Yes.

17 Q.  Do you see that?

18          And from page 5 is from Dr. Dubreuil?

19 A.  Yes.

20 Q.  "I want to express my very strong support."

21          Do you see that?

22 A.  Yes.

23 Q.  And then page 6, "I fully support the transition that Sue

24 recommends."

25          Do you see that there?

1   A.  Yes.

2   Q.  Again, from Bonobo Hope board members, is that correct?

3   A.  Yes.

4   Q.  Okay.  Let's go back to page 1.  Why don't you read along

5   with me because this first e-mail, the first line says, "I am

6   writing to each of you to strongly support and to

7   enthusiastically endorse Jared Taglialatela and Bill Hopkins."

8           Do you see that there?

9   A.  Yes.

10  Q.  And this is an e-mail that you wrote, correct?

11  A.  Yes, yes, sir.

12  Q.  "It is my hope that they will find a means of working with

13  the bonobos and of facilitating the transition from the current

14  operational status to one that is sustainable for the long term,

15  along with the necessary structural transitions," correct?

16  A.  Yes.

17  Q.  All right.  And you meant that when you wrote that e-mail,

18  correct?

19  A.  I had no idea that they would dissolve the BHI board,

20  appoint their own advisory board that has no voting power and

21  remove me from the lab.

22  Q.  Okay.

23  A.  I would have never supported them under those circumstances.

24  Q.  Okay.  You say further on there in the fourth paragraph,

25  "They," Dr. Taglialatela and Dr. Hopkins, "can be of far more

1  benefit to the center and can do far more than I can do in many

2  fields," is that correct?

3  A.  That's correct.

4  Q.  And you believed that then?

5  A.  I have not changed that.  They have expertise that I don't

6  have, but I have expertise that they really need.

7  Q.  Okay.  Well, in fact, you go on to say in the next

8  paragraph, "They," Taglialatela and Hopkins, "can do hands on

9  research, observational research, computer based tasks,

10  neurological research, social and communicative comparisons,

11  etc."

12          Do you see that there?

13  A.  Yes.

14  Q.  Okay.  So you understood that's what they would be doing

15  when they came in?

16  A.  No.  I mean, I assumed they would be doing hands on

17  interaction with the bonobos, but they have declined to do that.

18  At least at the meeting in June, they declined to do it and to

19  do it without any assistance and without any continuation of the

20  pan/homo family is not a continuation of the research

21  trajectory.

22  Q.  Right.  That's the research trajectory that you described in

23  that paragraph that you drafted in the supplemental and

24  settlement agreement that you discussed earlier, correct?

25  A.  That's correct.

1  Q.  If you look at the second page of this exhibit, the fourth

2  paragraph down, the last sentence, "It became increasingly clear

3  that the best thing I could do to improve the chances for IPLS

4  funding and to decrease the level of objections going to the

5  USDA about IPLS would be to absent myself from the lab," correct?

6  A.  Fourth paragraph down?

7  Q.  Right.

8  A.  The fourth paragraph starts with, "I supervised both for a

9  time" --

10  Q.  No.  I'm sorry, I may have lost you there.  I'm looking at

11  the second page of that exhibit, the last sentence of the fourth

12  paragraph.

13  A.  Yes, okay.

14  Q.  And it did become increasingly clear to you that the best

15  thing for you to do would be to absent yourself from the lab,

16  correct?

17  A.  Well, I had discussed with Jared absenting myself from the

18  lab for about two months while they -- I simply would be there

19  full time for two months and come in and sort of take charge,

20  and then I would give them the opportunity for the publicity and

21  that I would work in the background and be helpful to them.  I

22  knew Jared couldn't be there very much.  He had told me that.

23        So we had had numerous discussions on the phone about

24  what my assumptions were, and they were not at all what happened

25  once Jared and Bill were voted on the board.

1  Q.  Yes.  Let's talk about that whole prospect of them and the

2  amount of time they would spend there.  In this e-mail you say

3  you fully acknowledge that the center is equipped with computer

4  connections and cameras that can enable them to monitor all

5  aspects of the operation and to communicate with anyone at any

6  time should they need to do so, correct?

7  A.  Yes.  If Jared wasn't going to be there, I would hope he

8  would be able to monitor with cameras at all times, but that

9  doesn't mean that he can do something about Teco if he's ill.

10 He can call me if I don't know and I can come in and help him.

11 If a bonobo has escaped, if we need to have the bonobos going

12 out on walks or doing things in the caves or making fire or

13 things that would continue the research trajectory, he could

14 monitor those over the video, but that doesn't mean you can do

15 them over the video.

16 Q.  Well, that may be, but certainly you would have staff or

17 volunteers that you could have to do that type of work, right?

18 A.  No, that wasn't the case.

19 Q.  Okay.

20 A.  It takes people many years to learn how to do that, to

21 establish that long term kind of relationship that can go in and

22 do that, sometimes 4, five, six years.

23 Q.  Many years like Heather, correct?

24 A.  Heather was born into the group.

25 Q.  Right.  And Heather is still working at the facility at this

1  time, correct?

2  A.  At the time we wrote this letter, Heather was at the

3  facility and Liz was at the facility and I was planning to be

4  returned to the facility.

5  Q.  You were going to leave the operation in the hands of Jared

6  and Bill and you knew that Liz and Heather were at the facility?

7  A.  That wasn't my intent, no.

8          MR. STAMBAUGH:  Objection to this testimony and --

9          THE WITNESS:  That was never my intent.

10          THE COURT:  Just a moment.  Now the record is all

11  messed up.  Ask your question again.

12  BY MR. MILLER:

13  Q.  When you wrote this e-mail, you knew Heather and Liz

14  continued to work at the facility, correct?

15  A.  Yes, they did.

16  Q.  And if you continue on that second page, at the very bottom

17  paragraph, you acknowledge -- and this is an e-mail again you're

18  sending the Bonobo Hope board -- "While Jared and Bill are

19  familiar with language work, their focus is on investigating the

20  effects of language acquisition as well as comparing and

21  contrasting bonobos and chimpanzees."

22          Do you see that sentence?

23  A.  Which page?

24  Q.  Bottom of the second page, Exhibit 1005.

25  A.  Yes.

1  Q.  You see that there?

2  A.  Yes.

3  Q.  And, in fact, you say, "This is appropriate and the

4  direction that should now be taken"?

5  A.  Yes, within the research trajectory, within the oversight of

6  the Bonobo Hope board was to make sure that across time no drift

7  occurred.  The Bonobo Hope board wasn't to be dissolved even if

8  I had dropped dead at that moment.

9  Q.  Okay.  I mean, you even say in this e-mail to Bonobo Hope,

10  "They," Taglialatela and Hopkins, "must be able to control all

11  aspects of their program, for the lives of bonobos cannot be

12  separated from the success of the research."

13        Do you see that there or do you recall writing that?

14  A.  I definitely recall writing that, and I would like to

15  explain why.

16  Q.  Sure.

17  A.  Because I had lost control of the research program once it

18  came here to a board of business people.  The money determined

19  what could be done.  And I told Jared on the phone that you

20  don't want to have happen to you with a business board what

21  happened to me and that's why I've set the facility the way I

22  have and that's why the science board is going to be the guiding

23  hand in the future.  Jared took that to mean, oh, well, we'll

24  just kick Sue out and the science board out, and we'll take over

25  the business board and Jared and Bill will vote and we'll

1  determine the future.  That wasn't my intent.  I guess -- I

2  mean, I didn't think he understood it that way, but I guess he

3  did.

4  Q.  Okay.  Let's talk about your intent, okay?  Because I think

5  earlier you said you believed you were going to have unfettered

6  access going forward.

7  A.  I was repeatedly reassured by Lyle and George that that was

8  going to be the case.  Before I ever even spoke with Jared on

9  the phone, we had that assurance.

10  Q.  Okay.  Page 3 of Exhibit 1005, can you look at that for me,

11  the top of that page?

12  A.  Page 3 of 1005?

13  Q.  Yes.

14  A.  Okay.  Yes.

15  Q.  Are you there, Dr. Sue?

16  A.  Yes.

17  Q.  You write to the Bonobo Hope board and IPLS board, "It is my

18  hope that the coming essential transition will proceed smoothly

19  and rapidly.  I also hope that, as appropriate, and under

20  Jared's direction, I will continue to do some research with the

21  bonobos" --

22          Now "under Jared's direction," right, you wrote that

23  there?

24  A.  Yes, I did.

25  Q.  -- "once the needed structural changes and funding are

1  firmly in place."

2          Do you see that?

3  A.  Yes, I do.

4  Q.  Then you finish off there, "I will do nothing to disrupt

5  this critical and necessary next step."

6  A.  Yes, I do.  I clearly didn't interpret the next step the way

7  that Jared did, and I did not know about the issue of Yerkes

8  placing a constraint on my presence in the lab.  I assumed that

9  I would be on the IPLS board and that this kind of thing could

10  not happen because Lyle had assured me that it could not happen

11  under any stretch of the imagination.

12          MR. MILLER:  No further questions, Your Honor.

13          THE COURT:  Redirect?

14          MR. STAMBAUGH:  Thank you, Your Honor.  Just a few

15  questions.

16                    REDIRECT EXAMINATION

17  BY MR. STAMBAUGH:

18  Q.  Dr. Savage-Rumbaugh, I want to talk about that same exhibit

19  we were just looking at, Exhibit 1005.

20  A.  Can I look at it again?

21  Q.  Please.  We'll also have it published.

22  A.  Okay.

23  Q.  Now, the last paragraph that we were just looking at, at the

24  top of this page 3 in which you made very clear that you hoped

25  to do further research with the bonobos, is that correct?

1  A.  That's correct.

2  Q.  Have you been able to do any further research with the

3  bonobos under Jared's direction?

4  A.  No.

5  Q.  To your knowledge, has anybody at Bonobo Hope Initiative

6  been able to do further research under Jared's direction with

7  the bonobos?

8  A.  No.

9  Q.  Mr. Miller pointed out that there are some responses to your

10  letter further on in this exhibit from an Itai Roffman?

11  A.  Yes.

12  Q.  And from Laurent Dubreuil?

13  A.  Yes.

14  Q.  To your knowledge, was Mr. Roffman aware that Yerkes had

15  made a mandate of not having you at the lab before writing their

16  response?

17  A.  No.  No one on the BHI board was aware of that.

18  Q.  Is that the same for Professor Dubreuil?

19  A.  That's the same.

20  Q.  And to your knowledge, were they aware that you had been

21  banned from the lab?

22  A.  No, they were not.

23  Q.  Neither Mr. Roffman nor Professor Dubreuil?

24  A.  That's correct.  I was told by Lyle Simpson that if I

25  proceeded with this vote and it went well that I could discuss

1   this before the meeting had ended and let them know what the

2   situation was.  So I agreed to that, thinking that once we

3   talked with the BHI board, perhaps we could talk about

4   rescinding the vote or putting some qualifications on it; but

5   Lyle went against his word and he did not allow me to have that

6   discussion.  He cut it off with e-mails to Carmen cutting that

7   discussion off.

8   Q.  This paragraph that we were just looking at at the top of

9   page 3, you wrote this to Dr. Taglialatela, correct?

10  A.  That's correct.

11  Q.  That you had an expectation to do further research?

12  A.  Yes.

13  Q.  Was it your expectation that he would read your e-mail?

14  A.  Yes.

15  Q.  All of the e-mail, including the expectation to do further

16  research?

17  A.  Yes.

18  Q.  Why did you have that expectation?

19  A.  I was of the opinion that I was sort of handing over the

20  mantle of 40 years of research to a successor and Jared had

21  brought on the second successor, Bill Hopkins, who was a student

22  of mine, and I had suggested to Jared that we also need to

23  include very much Itai Roffman who has focused more than any of

24  the others on the cultural relationships of the work and also

25  Heidi because we do need other females in the work and I didn't

1　want it to become exclusively male.  I thought Jared had

2　basically agreed to that, and Jared had worked with me closely

3　and well as a student, and we had continued to publish together

4　beyond that, even up to 2010, and Jared had said to me that he

5　spoke about my research in his classes, he spoke about it very

6　positively.  He was very positive about continuing the working

7　relationship with me in every conversation I had with him.  He

8　never indicated anything else and he never wrote me an e-mail

9　otherwise.

10　　　　　And in the field of professional scientists, if you're

11　handing the mantle over to another colleague and they don't like

12　your work and they don't intend to do it, they should at the

13　very least so inform you.

14　Q.  Dr. Savage-Rumbaugh, do you know, is Liz working at the lab

15　currently?

16　A.  Liz has volunteer status.  I don't know whether she's able

17　to be admitted to the lab currently or not.

18　Q.  Is Heather working at the lab currently?

19　A.  I believe Heather has resigned.

20　Q.  Do you know why?

21　A.  No, I don't.

22　Q.  Do you know of any BHI member other than Derek Wildman who

23　has been allowed access to the lab?

24　A.  With Mr. Zifchak I was briefly allowed access to the lab,

25　and Sally Coxe was briefly allowed access in June of 2013, I

1  believe.

2  Q.  Almost two years --

3  A.  2014.

4  Q.  Almost a year ago?

5  A.  Yes.

6  Q.  Has anyone other than Derek Wildman been allowed in the last

7  year to visit the lab under Jared's direction, to your

8  knowledge?

9  A.  Laurent was allowed to visit the lab maybe nine months ago.

10  I don't know exactly how long ago.

11  Q.  Dr. Savage-Rumbaugh, Mr. Miller asked you some questions

12  about the flooding and relocation efforts.

13  A.  Yes.

14  Q.  Do you recall that discussion?

15  A.  Yes.

16  Q.  At some point you were presented with a relocation plan, is

17  that right?

18  A.  Pardon?

19  Q.  At some point there was a suggestion that the bonobos be

20  relocated, is that right?

21  A.  Yes, yes.

22  Q.  And you opposed that relocation, is that correct?

23  A.  You're talking about the relocation that Dr. Schweller

24  proposed?

25  Q.  Correct.

1  A.  Yes.  I opposed that, yes.

2  Q.  And at the time that you opposed it, was there a viable

3  alternative option for the bonobos to be relocated consistent

4  with your research trajectory?

5  A.  No.  They would have had to have been sent to a zoo in

6  either Alabama or Mississippi.  It wasn't even an accredited

7  ACCI zoo, and I would not have been allowed to be in with the

8  bonobos.

9  Q.  Is there a viable alternative relocation plan for the

10  bonobos today to be taken out of the floodplain?

11  A.  Yes.

12        MR. MILLER:  Objection.  Your Honor, objection.  This

13  exceeds the scope of the direct testimony.  We're into new

14  issues.

15        THE COURT:  It probably does.  If we were in a jury

16  trial, I would probably sustain that objection, but I want to

17  hear from everybody.  So it's received, subject to the

18  objection.

19        MR. STAMBAUGH:  Thank you, Your Honor.

20        THE COURT:  Go ahead.

21        MR. MILLER:  Your Honor, if I may then reserve the

22  right to cross-examine Dr. Rumbaugh if we're going to get into a

23  new issue?

24        THE COURT:  Of course.

25        MR. STAMBAUGH:  And that would be my only question on

1  that topic, Your Honor.  I do want to follow up on the flooding.

2  BY MR. STAMBAUGH:

3  Q.  Dr. Savage-Rumbaugh, at the time that you opposed the

4  relocation of the bonobos from Dr. Schweller, did you know about

5  the inability to build the bypass to the facility?

6  A.  There's an ability to build the bypass.  Whether or not the

7  bypass will solve the problem is the question.

8  Q.  Did you know whether the bypass would solve the problem at

9  that point?

10 A.  I had been informed that it would, that it would solve the

11 flooding problem.

12 Q.  Has that understanding changed?

13 A.  Yes, my understanding has changed.

14 Q.  What is the understanding today?

15 A.  That the bypass does not solve the problem and that flooding

16 is -- we're not even out of the 100-year floodplain, much less

17 out of the 500-year floodplain, and with climate change, it's

18 highly unpredictable.  Even within the 100-year floodplain,

19 we've had three floods since we've moved here, three floods

20 since 2008.  So I think that the bonobos are in jeopardy at that

21 site.

22 Q.  After working with these animals for 40 years, do you feel

23 that they are safe staying in that floodplain today?

24 A.  They are not.

25             MR. STAMBAUGH:  No further questions at this time,

1  Your Honor, subject to any redirect.

2         THE COURT:  Recross?

3         MR. MILLER:  Thank you, Your Honor.

4                      RECROSS-EXAMINATION

5  BY MR. MILLER:

6  Q.  Dr. Rumbaugh, your testimony just now with respect to the

7  100-year, 500-year floodplain issue --

8  A.  Yes.

9  Q.  -- that's based on this report that you had prepared,

10 correct?

11 A.  Yes, it is.

12 Q.  This is based on an individual who's not here testifying

13 about that?

14 A.  Well, on the -- it's a web site about flooding that's put

15 out by the state, I believe.  You can look it up and you can

16 just add six inches of water at a time.  You don't really need

17 that flood report.  You can look on your computer and the state

18 shows you what will happen.  It's very clear that there's a

19 problem.

20 Q.  You're not an expert in flooding?

21 A.  No.  That's why I -- that's why I was asking if anyone could

22 get a report.

23 Q.  Right.  And that same type of research you're describing

24 would show you that this building is susceptible to flooding in

25 the 100-year floodplain?

1  A.  I would have to look on the map and ask that.  I don't think

2  my report would necessarily say that.  I would have to ask the

3  engineers.

4  Q.  Yeah.

5  A.  The way the water is directed through Des Moines, it can be

6  rather tricky, so I -- I don't think because of my report you

7  could say that this building would also flood.  I don't think

8  that follows.

9  Q.  Yeah.  But when you say your report, let's be abundantly

10  clear, this is a report that you had prepared in the past month

11  by some outside expert who is opining about the risk of flooding

12  at the site and the facility?

13  A.  Well, I think they did a lot of research.  They've worked on

14  it for quite some time and this is their job.

15  Q.  No doubt that that's --

16  A.  I mean, you could have another expert look and counter the

17  data, I don't know.  I think that there is a real risk of

18  flooding.

19  Q.  It is not your report?

20  A.  I didn't put the report together, no.

21  Q.  And on October 26, 2013 when you wrote this e-mail, there

22  was no being banned from the facility, correct?

23  A.  On October --

24  Q.  Right.  Exhibit 1005 was written on October 26, 2013,

25  correct?

1  A.  You're asking if I was banned from the facility?

2  Q.  Right.

3  A.  At this time?

4  Q.  Right.

5  A.  Jared had not been nominated yet.

6  Q.  You just told Mr. Stambaugh that somehow some issue relating

7  to you being banned was not recorded in this e-mail that you

8  wrote or was not of general knowledge; but you agree with me

9  there's no banning as of this date, correct?

10  A.  There couldn't be because BHI was still in charge of the

11  facility.  I think that the banning happened when George Caudill

12  decided that I was to be removed.  I was -- I had letters

13  telling me I was welcome to come back, please come back anytime.

14  The facility doesn't function without you.  We need you, Sue.

15  Sue, please, please come from Lyle and George and everybody.  I

16  had no idea that I would not be welcome in the facility if

17  that's your question.

18  Q.  Right.  Not until you came back and decided to reassert

19  yourself?

20  A.  I came back to take care of Teco.  I wasn't trying to

21  reinsert myself.  It was always assumed that I would come back

22  and that I would continue in some capacity, and that's all I

23  did.

24  Q.  Well, what you assumed, what you wrote was, I also hope that

25  as appropriate and under Jared's direction I will continue to do

1    some research with the bonobos, once the needed structural

2    changes and funding are firmly in place, correct?

3    A.  That was if the board and everyone voted on his proposal.

4    At that time on October 26th, we hadn't done that yet.  So

5    coming back before any of that is voted, I had still been

6    invited back and asked to come back.

7    Q.  Right.  And they went ahead and voted for him, correct?

8    Bonobo Hope did, right?

9    A.  Yes, because I was not allowed to explain that I was not

10   being allowed in the facility.

11   Q.  And, again, this is simply because you say you were told

12   that you couldn't e-mail anybody?

13   A.  I was told that I could not e-mail the board and tell them

14   this or I would never see the bonobos again.  I was ordered to

15   leave Des Moines.  I was told that if I knew what was good for

16   me, I needed to get out of Des Moines, and that if I didn't, I

17   would end up in a situation like this and my reputation would be

18   trashed.

19   Q.  And you were told that on November 9th?

20   A.  I was told that after November 9th.

21   Q.  Was that Thanksgiving dinner?

22   A.  George was not in the lab at Thanksgiving dinner.  Only the

23   bonobos and their human family were there.

24           MR. MILLER:  No further questions, Your Honor.

25           THE COURT:  Anything further?

1          MR. STAMBAUGH:  Just a few questions, Your Honor.

2          Thank you.

3                    FURTHER REDIRECT EXAMINATION

4     BY MR. STAMBAUGH:

5     Q.  Dr. Savage-Rumbaugh, Mr. Miller started a minute ago talking

6     about this report of flooding.  Do you have that report in mind?

7     A.  Yes, I do.  I'm sure it's in the court documents.

8     Q.  Yes, it is.  It's been marked as Exhibit 91.

9          When you sent that report to ACCI, did they respond in

10    any way?

11    A.  I've had no response to the flooding report from ACCI.

12    Q.  To your knowledge, have they tried to address the concerns

13    in the report in any way?

14    A.  If they have, they haven't conveyed that to the Bonobo Hope

15    board.

16          MR. STAMBAUGH:  Your Honor, at this time I would like

17    to move Exhibit 91 into evidence.

18                              (Defendants' Exhibit 91 was

19                              offered in evidence.)

20          MR. MILLER:  Your Honor, we object.  This is an expert

21    report that we got a month ago on a subject that's not relevant.

22    You know, this witness lacks personal knowledge.  It's replete

23    with hearsay.

24          THE COURT:  Why don't we -- you're going to have

25    somebody else testify about the report; yes?

1          MR. STAMBAUGH:  Your Honor, we may have --

2          THE COURT:  Do you have the person that prepared it

3    here to testify?

4          MR. STAMBAUGH:  I don't know if we'll have the person

5    that prepared it.  We would submit it under the official records

6    or public records exception of the hearsay rule; but also

7    consistent with Your Honor's advice, we would all ask that it be

8    received, subject to ACCI's objections at this time.  This is a

9    report that opposing counsel spoke about at length.  It's

10   clearly relevant to the issues in this case, including whether

11   or not the current facility is safe for the bonobos.

12         THE COURT:  Well, I'll receive it, subject to the

13   objection.  My only hesitation is as we go on, the examination

14   of this witness is becoming an hourglass rather than a funnel as

15   we go back and forth.  So this is a detailed new subject area;

16   but I'll receive it, subject to the objection.

17                              (Defendants' Exhibit 91 was

18                               received in evidence.)

19         MR. STAMBAUGH:  Thank you, Your Honor.

20         And with that, I have no further questions subject to

21   further questions or rebuttal.

22         THE COURT:  Mr. Miller, any questions?

23         MR. MILLER:  No, Your Honor.

24         THE COURT:  All right.  Thank you.

25         You may step down.

1                        (Witness excused.)

2              MR. STAMBAUGH:  May we call our next witness, Your

3    Honor?

4              THE COURT:  Yes.  We'll be taking our afternoon recess

5    in about 20 minutes.

6              MR. STAMBAUGH:  Thank you, Your Honor.

7              The claimants call Dr. Laurent Dubreuil, and

8    Mr. Zifchak will be doing the examination.

9              THE CLERK:  Please raise your right hand.

10             LAURENT DUBREUIL, DEFENDANTS' WITNESS, SWORN

11             THE COURT:  Please be seated right there.

12             Mr. Zifchak.

13             MR. ZIFCHAK:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15   BY MR. ZIFCHAK:

16   Q.  Good afternoon, Professor Dubreuil.

17             Would you please state your full name and business

18   address for the record.

19   A.  My name is Laurent Dubreuil.  My professional address is 314

20   Morrill Hall, Cornell University, Ithaca, New York.

21             THE COURT:  Would you spell your name for us, please?

22             THE WITNESS:  Yes, I will do that, and I will do my

23   best with my French accent.  So my last name is D-U-B-R-E-U-I-L.

24             THE COURT:  Thank you.

25   BY MR. ZIFCHAK:

1  Q.  Professor, may I call you Laurent?

2  A.  You may.

3  Q.  I have a suggestion.  If you sit back a little from the

4  mic --

5  A.  Okay.

6  Q.  -- I think we can pick up the accent just fine.

7          Is it correct that you are a professor, a tenured

8  professor at Cornell University in New York State?

9  A.  It is correct.

10  Q.  And is it correct that you are currently a member of the

11  board and the secretary of Bonobo Hope Initiative?

12  A.  It is correct.

13  Q.  You gave a deposition in this matter as the representative

14  of Bonobo Hope, correct?

15  A.  Yes.

16  Q.  Would you kindly summarize for the court your professional

17  background.

18  A.  So I hold two doctorates from France where I studied, one is

19  in literature and the other one is in philosophy, and at Cornell

20  University I am currently a professor of romance studies, of

21  comparative literature and of cognitive science.

22  Q.  Have you provided your curriculum vitae for purposes of this

23  hearing?

24  A.  Yes.

25          MR. ZIFCHAK:  That is Exhibit 95 in the record, Your

1  Honor.  I would merely ask the witness to identify it.

2  BY MR. ZIFCHAK:

3  Q.  Laurent, when did you last prepare a CV?

4  A.  This CV is pretty recent, so I guess in March or April.

5  Q.  Exhibit 95.

6  A.  Yes, I have it all the time.  I assume the date of the

7  revision is at the bottom, the last page of my vitae.

8  Q.  Let's move on.  We can find out.

9  A.  Yes.

10  Q.  What courses did you teach this past semester that you deem

11  relevant to this hearing?

12  A.  So this past semester I taught a graduate seminar, a

13  research seminar that was entitled "Poetry and Mind," and it was

14  a graduate seminar presenting one of my current and new research

15  projects, combining literary theory and primitive science,

16  including experimental psychology, in order to get a better

17  appreciation of the mental experience of poetry as announced and

18  of poetry as the case for creation in general, intellectual

19  creation.

20  Q.  What other responsibilities do you have in conjunction with

21  your professorship at Cornell?

22  A.  So beyond the classes I teach, I am supervising

23  undergraduate students, but mostly graduate students, for their

24  Ph.D. dissertations, and I am the current editor of Diacritics,

25  Diacritics being one of the leading journals in the world in

1  literary theory and what we call continental philosophy, which

2  is my background --

3  Q.  How long --

4  A.  -- initially.

5  Q.  I'm sorry.  Go ahead.

6  A.  My background initially.

7  Q.  How long have you been the Editor in Chief?

8  A.  Five years now, I believe.

9  Q.  Is it correct that you have been recently appointed to what

10  is called the graduate field of cognitive science?

11  A.  A few years ago, yes, I have been appointed to the graduate

12  field, maybe 4 years ago.

13  Q.  Have we submitted the letter of appointment as an exhibit in

14  this matter?

15  A.  Yes, you did.

16       MR. ZIFCHAK:  I believe that's Exhibit 10, Your Honor.

17  BY MR. ZIFCHAK:

18  Q.  Who was it that appointed you to that position?

19  A.  The director, Morton Christiansen, who's a colleague of

20  mine, who's a professor of experimental psychology at Cornell,

21  who is the co-director of the Cognitive Science Program in the

22  graduate field.

23  Q.  What is the significance of your work in the graduate field

24  of cognitive science as it pertains to this hearing?

25  A.  So when you are a member of a graduate field at Cornell,

1    that means that you are entrusted by the field since your

2    appointment is based on nomination first and election second by

3    other members of the field, in this case election based on the

4    research proposal that you do.  So once you have been appointed

5    to that field, you have the ability to be the examiner for

6    graduate students and that's also in the field of study, which

7    means that you can, I can as a member of the graduate field in

8    cognitive science fail a student or admit a student at each of

9    the different steps of his or her career in graduate studies.

10   Q.  Now, I stayed as far away as I could from science when I was

11   in college.  Can you explain for us what cognitive science is?

12   A.  So cognitive science is an interdisciplinary endeavor,

13   scholarly endeavor that mainly began in the 1960s.  And the idea

14   on the outset was to go beyond the paradigm of behavior that was

15   the paradigm ruling psychology at the time.  The idea was that

16   by combining knowledge of experimental psychology, philosophy,

17   linguistics as it had been recently redesigned especially, and

18   computer science, you could consider the mind, you could

19   certainly inquire about what is going on within a mind, and the

20   attached idea to that is that the mind could be the mind of a

21   human, of course, but also the mind of an animal, plus it could

22   be robotic or electronic, digital computerized mind.

23          So that field of endeavor began in the 1960s, and in

24   the 1980s there were many changes in it; but let's say that it's

25   now one of the most rapidly growing interdisciplinary fields in

1 the sciences in the U.S. but beyond as well.

2 Q.   How is it that you came to know Dr. Savage-Rumbaugh?

3 A.   So I came to know parts of her work when I was still a

4 graduate student, mainly because of my interest in language as a

5 theoretician of literature and as a philosopher.  And then in

6 2009, I got a major award given by the Mellon Foundation, the

7 award being called a New Directions Fellowship.  That's allowed

8 me to be free from teaching and other responsibilities to study

9 in more depth the intersections between the theory of language

10 and the theory of mind I had and the current shape and current

11 field of science.

12         At that point on I immersed myself with a very

13 different kinds of research and objects, and since one of my

14 hypotheses was that language as we know it, human verbal

15 language is not only a window or a means of expression but that

16 language is also changing the way you think, the way you invent,

17 then, of course, I came to be extremely interested in any

18 experiment that would revolve about providing language to young

19 human agents.

20         So quite clearly Sue Savage-Rumbaugh's work, body of

21 work was quoted everywhere and is still quoted everywhere in all

22 of those discussions, and I became more familiar with it through

23 the review of some of the literature.  And at that point since I

24 was relieved of teaching duties, I visited several labs.  I met

25 with several scientists both in France and in the U.S., and

1  that's when I got in touch with Sue Savage-Rumbaugh and asked

2  her if she would work with me for a few days at the facility

3  where she was working.

4  Q.  Approximately when was that, Laurent?

5  A.  I guess I got in touch with Sue Savage-Rumbaugh in March or

6  April of 2010.

7  Q.  Could you summarize your understanding of the research or

8  what's been called the research trajectory of Dr. Savage-Rumbaugh

9  at that time?

10  A.  So at that time my understanding was based on my study of

11  all of the books that she authored and co-authored, was based on

12  the study of many articles, not all the articles because she

13  co-authored hundreds of them, but many articles about the apes,

14  and I had been able to review most of the documentary movies and

15  short clips that you could find on You Tube documenting the

16  abilities of the apes.

17         I wasn't of the impression that especially when she

18  published that monograph about Kanzi's linguistic competence and

19  afterwards, that she had clearly demonstrated that there was

20  command of language that was going on with at least Kanzi and

21  then the other apes, and I wanted both to meet with

22  Dr. Savage-Rumbaugh in the same way I had met with people who

23  are doing neuroscience, for instance, to discuss with her and

24  benefit from discussions, in depth discussions about the topics

25  we were sharing; but I was also much elated by the kind of --

1   there was a small lack of perception on my part when I was

2   reviewing the evidence of about the linguistic abilities of the

3   apes, mainly because of the ways scientific research is being

4   communicated.  So I wasn't completely clear about the place of

5   language for the apes.  So to put it in spacial terms, I didn't

6   know if for these bonobos language was out there (indicating)

7   far away from them or inside of them or in between.  So I wanted

8   to have kind of a subjective experience, because I believe also

9   in subjective experience.  I'm a humanist as well as a

10  scientist, so I believe in the subjective experience of being

11  immersed within a conversation to determine myself what kind of

12  space as I mentioned language would be, in what kind of space

13  dimension language would appear for those bonobos in

14  interactions with humans.

15  Q.  Did there come an occasion when you did just that?

16  A.  Oh, yes, yes.

17  Q.  When was the first occasion?

18  A.  The first occasion was certainly during my first stay.  So

19  my first stay was a week, a bit less than a week in September

20  2010.  During this first stay I was not staying all of my

21  daytime with the bonobos.  It was half and half I would say.  I

22  first, for instance, gave a lecture in an anthropology class

23  that Bill Fields, who was in charge of the trust at that point,

24  was teaching at Simpson College, and I was invited to social

25  events as well; but when I began spending a bit more time beyond

1 that arena, at that point I believe the first interaction I had

2 was involving lexigrams or words and with just one ape in front

3 of me and nobody around us, was when I was playing with Nyota,

4 who was at that point of a very energetic nature, always jumping

5 and wanting to play chase with Teco.  So we were doing this, we

6 were racing each other from outside of the glass, that we were

7 separated by a barrier of glass, and at one point when we were

8 together and looking at each other and Nyota had two pieces of

9 paper, a paper keyboard, not the real computer with the computer

10 on, and he signed to mask.  So far when he wanted to have me

11 playing with him, he was looking at me straight in the eye and

12 then point to chase or sometimes to Teco, but names of games I

13 would say.  But my interaction at that point had been limited to

14 names of games.

15        Then he was playing -- he was deciding to play a new

16 game with me, so he was hiding his face and then covering,

17 uncovering his face with a piece of cloth that he had with him

18 and at the same time saying mask, which I understood to be an

19 invitation on my end to do the same, so I did the same.  So we

20 were doing this kind of thing.  That was the very first

21 interaction maybe the third day of my stay in September of 2010.

22 Q.  Can you give us examples of other interactions you had

23 during that first visit and what preliminary conclusions, if

24 any, you drew from your experience?

25 A.  So during my first visit Sue was also introducing to members

1   of the community Teco, who was very young, very young, sleeping

2   all the time.  And so from that arena, I participated in this

3   introduction to some people of the local community, and for the

4   first time I saw the bonobos using their keyboard with the

5   computer on.  I remember, for instance, that they were asking to

6   go outdoors and that there was the discussion about the flood.

7   So we were in 2010; flood being performed as big water because

8   they don't have floods on their keyboard.  So I remember that.

9        I remember as well that I spent a half day with Sue

10  inside of the enclosure with Kanzi and Kanzi showing me some

11  knowledge that he had of the words.  So Sue was doing kind of

12  language tasks showing either pictures or pictures of the

13  lexigram and then he had to correlate those.  He did something,

14  kind of a construction game that I saw.

15       And then the very last day of my visit, half day

16  because I was leaving on a Saturday afternoon, on Saturday

17  morning I came back, and Sue at the end of the half day told the

18  bonobos that I was about to leave.  And they all turned their

19  back to me and at least two of them began to urinate, which is

20  usually a sign, anxiety sign to separation that you find also in

21  the wild, after which point Sue said, maybe you should say hello

22  in a nicer way -- good-bye in a nicer way, and they moved toward

23  me and began screaming or squeaking or yelling, if you want,

24  depending on the term that you want to pretend that you heard

25  Panbanisha doing those sounds in the video clips.

1 Q. Just so we're clear, during this first visit to the lab in

2 Des Moines, did you have direct contact with the bonobos? And

3 if you want to find define contact yourself, please do.

4 A. In the sense of touching them?

5 Q. Yes.

6 A. No, no, and I didn't wish to be --

7 Q. What was the form of barrier between you and the bonobos

8 other than glass?

9 A. Most of the time it was glass because I was not -- I was

10 allowed to go beyond certain limits rather late in my stay, and

11 in the last two-and-a-half days, I believe, then it was the mesh

12 that you have. Of course, you cannot be close to the mesh. So

13 you need to be as far away from the mesh as you can be. All of

14 those things were being initiated with Liz mainly who was

15 telling me what I should do. I mean, the tricky part is when

16 Kanzi, for instance, which happened to me, is giving you

17 something through the mesh, so you need to accept it, but you

18 cannot take it because it wouldn't be safe. So I was being told

19 those things at that point.

20 Q. The second part of my question was, what preliminary

21 observations or conclusions did you draw from the visit as an

22 academic?

23 A. So I need to make clear also that I was doing something that

24 would be called kind of observational and anthropology kind of

25 things you would do with humans. When you approach members of

1 another culture and you are with them, you interact with them;

2 but at the same time, of course, if you are a scholar, you are

3 thinking about what they would do and what you do; but it would

4 interrupt the flow of the information, if you were, taking your

5 notebook out of your pocket and noting everything. So I was

6 taking notes of everything I saw each night, so I have a

7 relatively complete description on which I can rely of what

8 happened to me on those days in my first visit and second visit.

9 I wanted to have the subjective experience of meaning making or

10 meaning sharing, I would say, and I got it. I came back with

11 the idea that the apes had a very strong relationship to human

12 verbal language in their own symbolic language, but also that,

13 contrary to most of us, they were not so much using language to

14 break the ice, I mean, when you don't know someone and you begin

15 speaking with someone, the more they know you nonverbally and

16 the more they speak to you, which is exactly what happened to me

17 during the course of my first stay and the course of my second

18 stay, and I remember having said to Savage-Rumbaugh at the end

19 of my stay that to me the point was no longer do they have

20 language, because I was intellectually convinced -- objectively

21 convinced before with doubts. I was subjectively convinced that

22 they had some language, certainly not the kind of command of the

23 language that I have, no doubt. That's not the point. And I

24 told Sue now the real problem is what they -- I mean the real

25 thing is what they do with that language, how they think through

1    that language, are they describing their world with that kind of

2    language, are they expressing thoughts, emotions with that

3    language.

4            THE COURT:  Why don't we take our mid afternoon recess

5    at this time.

6            MR. ZIFCHAK:  Thank you, Your Honor.

7            THE COURT:  We'll be in recess for 15 minutes.

8            (Recess at 3:00 p.m., until 3:14 p.m.)

9            THE COURT:  Please be seated.

10           Mr. Zifchak.

11   BY MR. ZIFCHAK:

12   Q.  Laurent, before we describe your second visit to the lab, I

13   just wanted to ask you a couple of questions about your earlier

14   visit.  Were you in the courtroom this morning during my opening

15   statement?

16   A.  I was, yes.

17   Q.  Did you see the short video we showed of one of the bonobos?

18   A.  I did.

19   Q.  Who was that bonobo?

20   A.  Oh, it was Panbanisha.

21   Q.  Did you have any interaction with Panbanisha during your

22   September visit to the lab?

23   A.  2010?

24   Q.  Yes, 2010.

25   A.  Yes.

1  Q.  Just describe it.

2  A.  So I had the collective interactions I described in the

3  presentation to the people and then at the end the good-bye, but

4  I spent a few hours with her watching video of her in the past,

5  so she was not -- it wasn't direct interaction with her, of

6  course, but she was -- the TV screen was on my side, so she was

7  directing me and she was indicating the kind of video clips that

8  she wanted to see.  And so most of the videos that she preferred

9  were pertaining to this mythical character that Sue

10  Savage-Rumbaugh had invented that was called Bunny.  Some of you

11  may have seen that when Anderson Cooper visited the facility,

12  Panbanisha asked him to dress like Bunny because there was a

13  bunny suit.  So I can testify that Panbanisha was really into

14  her sweet memories about Bunny.  And the time when she was

15  raised at the beginning of her life with Panzee, sometimes

16  called Panpanzee, who was a chimpanzee.

17          So that's what we did mainly.  We also had tea

18  together.  One of the things that she liked to do was to not

19  only share food but decide who will get what kind of food.  So

20  this is something that she would do from her side with the

21  computer, and people may perhaps leave or perhaps another

22  caretaker -- there were lots of caretakers in my first visit --

23  would give me the M&M that she had selected or the tea that she

24  had selected for me.  So we spent that time together.

25  Q.  I gather that you had a second visit to the lab in

1  Des Moines, correct?

2  A.  Yes.

3  Q.  What was the purpose of that visit?

4  A.  At the end of my first visit, as I have said, I came back

5  with the idea that my subjective curiosity was piqued and was

6  satisfied to a large extent.  From that point on, for several

7  months I began working on the edition of the special volume for

8  an interdisciplinary journal in France, in French as well, that

9  is called "L'eloquence" that is somewhere in my vitae, page 4,

10  item [iiv] in Roman numerals, "L'eloquence des singes," which

11  means the eloquence of the apes, to provide an additional

12  dissertation.  So that was a special issue devoted to ape

13  language research in general.  We published one French version

14  of an article by Sue Savage-Rumbaugh and William Fields, but

15  there were other contributors as well.  There was one article

16  that I wrote mainly incorporating my observations of the first

17  visit, and so that's a collective issue that I edited with a

18  reflection on the long-term history of ape language research.

19         The actual practice of ape language research begins in

20  the early 20th Century, the 1910s, mainly in the United States,

21  by the way, not only, but late in 19th Century if you include

22  other attempts.  But the idea that apes would have the ability

23  like deaf children to be taught some form of human language is

24  to be found already formulated in some theoretical work in the

25  17th and the 18th Century especially, especially for the 18th

1   Century since this is the moment when you have several new

2   methods to teach sign language to deaf children who were

3   repeatedly not able to speak or to understand language before

4   they were being taught that way.

5           So that work on that special issue gave me a new depth

6   about the historical time line that is much deeper than what

7   most scientists would believe because usually when you study the

8   sciences, you don't study the history of your own discipline.

9           So when I'm coming back in October 2011, I believe it

10  was October, when I'm coming back in 2011, I'm coming back with

11  this deeper knowledge not only of the ape language research in

12  the last few decades but of the whole trajectory behind the

13  research trajectory of Sue Savage-Rumbaugh herself, and I'm

14  coming with the idea that now that I know them more, I will have

15  more interactions possibly with them using language and that

16  these other things that I mentioned before that I said I had

17  told Savage-Rumbaugh that I thought that there was something

18  beyond language now that should really be of immediate concern

19  to us.  I thought that maybe this something more could be seen.

20  I mean, I was not coming with the idea of collecting data in the

21  crude sense of the term.  I was coming back with the idea of

22  going deeper into the research work I had done before.

23  Q.  By the way, did you eventually publish in any form

24  reflections on the second visit to the Des Moines lab?

25  A.  So when I got the Mellon Award for my work in primitive

1    science, the idea was that I would be able to publish a book at

2    some point.  We as scholars take time to publish books, but the

3    book has been out that is based on that particular line of

4    research.  My concerns about language and the mind are under the

5    title of "The Intellective Space."  The subtitle is "Thinking

6    Beyond Cognition."  That's my most recent book published in

7    March of last year, and it's the item No. II in Roman capitals

8    on page 3 of my vitae.

9           In this book that is really a broad theoretical book

10   in constant dialogue with the sciences and especially the

11   primitive sciences.  In this book you will find some references

12   to Sue Savage-Rumbaugh's work as such and some references to

13   personal observations that were gathered during my two stays, my

14   two visits, and one was in 2010, the other 2011.

15   Q.  Looking back over your first two visits to the lab, did you

16   consider that the manner of the research was inherently

17   dangerous to humans?

18   A.  No.  No, I did not.

19   Q.  Did you consider it to be inherently inhumane to the animals

20   themselves?

21   A.  No, certainly not.  What is inhumane is that -- is depriving

22   the apes from their own additional language that the research

23   has given them.

24   Q.  Why do you say that?

25   A.  Because it's -- so it's not that through the use of the

 1  keyboard certainly the apes could just translate what is going

 2  on inside of them.  It's more than that.  It's that by the

 3  addition of something else, that is, the language keyboard, the

 4  symbolic language in general, they are not only able to express

 5  what they think, but what they say is also changing how they

 6  think profoundly and more superficially.  I could explain that

 7  more deeply, but I'm not sure you're here for a lecture.

 8          Because of that, the apes who have been inserted into

 9  the strong cultural and symbolic world through a constant

10  immersion, through that experience the apes are changing in

11  their mind.  They are evolving.  That's how you could have

12  through the injection of language certainly new symbolic

13  competence appearing such as playing music or drawing or

14  painting.

15          So if you take all of this back, since they cannot

16  speak really, even though Kanzi certainly tries to utter words

17  but very few people are able to understand them, the only way

18  they can express themselves in progress I would say actually is

19  through the constant use of keyboard and constant interactions

20  because language, as I was saying at the beginning, language to

21  them is maybe not completely -- it's not completely within them.

22  Maybe it's a bit in front of them.  So if you -- they need to be

23  in situations where they will regularly commonly be led to use

24  that language.  And in the same way you have in the late 18th

25  Century and early 19th Century in this country and other

1  countries reflections about how should you do with prisoners,

2  maybe a penitentiary where there would be no language, where

3  there would be very limited contact with people, where people

4  would wear masks all the time to repent about what they had

5  done.  I mean, that was something that was being experimented in

6  the sense in the U.S.  You have several penitentiaries that are

7  very important in the history of the U.S.  What we know is that

8  this isolation was not coming with a good progress for the

9  prisoners.  It was often leading people to forms of mental

10 disabilities or madness.

11       For those very same reasons -- and I could digress on

12 that; but for those very same reasons, the apes who have always

13 been in a world where they could change, not only receive

14 orders, not only receive commands, but could change.  By the way

15 of the changing, changing the world they are in, if they are

16 being deprived of that, they would strongly be impacted both

17 intellectually and emotionally.

18 Q.  As an academic, based on your studies of the ape language

19 thus far, what is it that you would like to research further in

20 the future with these bonobos or what would you like to see

21 researched by scientists if it's not someone like you?  And

22 please be brief.

23 A.  Okay.  I would certainly welcome more work on the

24 verbalizations; that is, both the signals, the screams and

25 signals that they use as bonobos, but also all the added and new

1  verbalizations that they have that seem to imitate or reproduce,

2  to some extent, words.  I would be extremely interested because

3  I believe that there is a link between language, mine, if we can

4  speak of language, mine, my language, and then some new use of

5  language and then creativity in general.  I would be interested

6  in seeing them be more associated with the arts, with the idea

7  of creation that could involve many different forms.

8        I would certainly welcome my philosophical side, which

9  I would be very interested in going a bit further in terms of

10  morality.  They have good and bad, for instance, on their

11  keyboard, and some articles have been published on this, but I

12  would like to see exactly what is going on there.

13  Q.  Thank you.

14        I would like to jump out of sequence.

15  A.  Okay.

16  Q.  Because I think it would sharpen the contrast to it now.

17        Is it correct that you have visited the lab in

18  Des Moines a third time; that is, after October of 2011?

19  A.  It is correct.

20  Q.  And when was that?

21  A.  It was in August of last year.  It was a brief visit of

22  maybe 4 or five hours.

23  Q.  And what initiated the visit?

24  A.  Members of the BHI, including me, would like to see the

25  bonobos.  When Julie Gilmore was in charge, I believe in 2013, I

1  asked her if I could visit either in June or August of 2013, and

2  she said yes; but then that led me nowhere because I wanted to

3  have a new stay -- I mean, following my own trajectory of

4  interaction with those bonobos and deepening things.  So I had

5  tried to make -- to have that when Judy Gilmore was in charge,

6  and that led me nowhere.

7          I tried again last year and this year actually with

8  Jared, and with the intervention of lawyers, both Bill Miller

9  and you, Bill Zifchak, I was allowed not to stay for a few days

10 and to observe the bonobos, but I was allowed to stay a few

11 hours in the facility in August.

12         So because of that, the purpose of the visit was more

13 about checking how things were rather than going into any kind

14 of deep interaction with the people there.

15 Q.  With respect to the bonobos, what did you observe during

16 that visit?

17 A.  That was a very disturbing visit to me, to be honest.  With

18 respect to the bonobos, what I perceived was a tremendous and

19 extremely sharp contrast between the behavior of Teco, Nyota and

20 Kanzi, Panbanisha having passed away since the last time I had

21 visited the lab, and what I had seen in both 2010 and 2011.

22         So Nyota who was this extremely energetic teenager,

23 jumping and walking everywhere, hopping everywhere was extremely

24 despondent, exhibiting all signs pertaining to depression and

25 was also exhibiting what is usually called in primatology,

1  exhibiting stereotypies.  So stereotypies are --

2          MR. MELHUS:  Objection, Your Honor.  I think we lack

3  foundation for this particular witness to testify about sort of

4  primatology-related issues.

5          THE COURT:  I'm going to receive it, subject to the

6  objection.  I think he's giving his own observations of what he

7  saw and the impressions that he had based solely on his

8  observations.

9          Is that correct, Mr. Zifchak?

10          MR. ZIFCHAK:  Correct, Your Honor.

11          THE COURT:  And he may proceed to answer.

12  A.  So I will rephrase that.  Nyota was exhibiting behaviors

13  with no meaning at all, such as head shaking repeatedly

14  (indicating).  I know that is not in the transcript, but it's

15  something like this, when you shake your head for maybe 30

16  seconds in a row with no real reason to do that.

17          In the same way, Teco, who was also playful -- I mean,

18  Teco is very young, so he is playful in many respects.  When he

19  was alone in his own enclosure from the regular area, I could

20  see that he was licking and biting the mesh, two behaviors that

21  I had never seen before.

22          The change -- the strong change for Nyota was really

23  that he would have difficulties walking and that he would be

24  very slow in his movements, which is absolutely, absolutely not

25  the case before, and it's not the question of age because he

1  didn't move magically from the age of 15 to the age of 200.  So

2  it's something else.

3        Kanzi was -- I asked Kanzi in English if he remembered

4  me, at which point he -- and I was showing him a few pictures,

5  and he nodded with his head, but he was relatively aloof I would

6  say.  When Steve Boers, who was the Director of Operations -- I

7  don't know exactly what his title was -- left the lobby, Kanzi

8  checked his surroundings and seen that Steve Boers was no longer

9  there, he was on the other area of the glass, he waved his hands

10  at me.

11  BY MR. ZIFCHAK:

12  Q.  Kanzi waved his hand?

13  A.  Yes, Kanzi waved his hand to me so I would be closer to him

14  and so that I would be able to at least speak in English to him

15  through the glass.

16        What I can say, which was certainly the most

17  striking -- and observed also Maisha and Elykia, but I could not

18  have -- I could not see Elykia in the eyes.  I couldn't see her

19  face.  What I can say is that in none of the enclosures I saw,

20  which is most of the enclosures, a keyboard was there.  So there

21  was no longer any kind of paper keyboard.  The computer keyboard

22  was off.  Back in the time both in 2010 and 2011 all of the

23  volunteers and the caretakers were wearing all of the time

24  T-shirts with the lexigrams printed on the T-shirts which

25  helps -- which means if you don't have the keyboard on, the

1　computer keyboard on, or if you don't carry with you a keyboard,

2　then you still have the T-shirt and the apes are able to point

3　at the lexigrams on your own body, I guess.  Even though the

4　T-shirts with the lexigrams were on sale in the lobby, none of

5　the volunteers and the employees I saw were wearing those

6　T-shirts.

7　　　　So language was no longer there.  The similar culture

8　was no longer there in none of the enclosures I could see,

9　except one where you had a paper keyboard with one panel

10　missing, and that enclosure in the 4 hours that I was there was

11　not used with the apes or by the apes.

12　　　　I can also say that the volunteers had to go through

13　kind of a routine with the apes in case they would be examined

14　physically and that during this routine the volunteers and

15　employees had apparently been instructed to show -- to ask the

16　apes to show their body parts but not through the use of

17　language but just by pointing at a shoulder or pointing at the

18　arm.

19　　　　And the last very sharp contrast was this very heavy

20　silence within the facility.  You have seen -- we have seen the

21　videos, but it's even more than that for real.  I mean, the apes

22　are screaming all the time, they are speaking or responding all

23　the time.  I stayed for 4 hours, maybe almost five, but

24　certainly 4 within the bonobo building, and there was just

25　silence.  The only moments when the bonobos expressed vocally

1  anything was when I was at the gate leaving the facility, at the

2  outdoor gate, and Steve Boers coming back in his car, and that's

3  when I heard them very clearly screaming, which tells you

4  something.  I'm not sure everybody is familiar with the

5  geography there, but the gate is relatively far away from the

6  facility, and if you can hear them screaming from the gate, it's

7  really that they scream very loud, which is one of the physical

8  difficulties when you stay for long with them.  But during my

9  stay with them, that was pure silence.  It is usually considered

10 that bonobos are silent in the wild, according to observations

11 that I have not done myself; that when bonobos are silent, it is

12 because they are -- they believe they are under threat.  That's

13 why they don't vocalize so that they would not be attacked.  So

14 I saw a sign of distress according to the literature.

15 Q.  Did you draw any conclusions during that 4- or five-hour

16 visit as to whether any research effort was being conducted?

17 A.  My insight would be twofold.  On the one hand, since this

18 whole research is based on the immersion within symbolic culture

19 and language, I can say that this side of the research was no

20 longer in place.  That I can say extremely clearly with no doubt

21 because you cannot, you cannot say, okay, let's use language

22 from 9:00 to 5:00 -- no; not from 9:00 to 5:00, but from 9:00 to

23 10:00 or 9:00 to 12:00, and then let's go back to something else.

24          So the fact that for 4 hours in a row language was not

25 used and could not be used in any way by the apes was a sign

1 that at least half, if not more than half, of the very

2 foundations of the research was being shut down. Then I have

3 been told that Kanzi and Nyota were foraging from time to time

4 and that -- I believe that was Jared's graduate student who put

5 food into containers with the lexigram on the container, but I

6 saw the empty containers. I didn't see the experiment, and I'm

7 not sure it's exactly the most relevant experiment I have. So

8 that's what I could say.

9            So in my view the main impetus of the research was

10 already being at least diminished, possibly shut down.

11 Q.  In August of 2014, were you a member of the BHI Board of

12 Directors?

13 A.  Yes, I was.

14 Q.  And you have remained a board member until today, is that

15 correct?

16 A.  Yes, it is correct.

17 Q.  Since August of 2014, have you made any other efforts to

18 visit the bonobos in Des Moines?

19 A.  Yes.

20 Q.  Please describe them.

21 A.  So I sent messages to Jared asking him to allow me to see

22 the bonobos in the way that I had seen them in August; that is,

23 just for kind of a checkup, and also I asked to be at the

24 facility for a longer period of time. So I had those

25 interactions back and forth, usually -- not recently, but I

1   would say until the last few weeks Jared was responding in a

2   polite way, telling me that I could come and, of course, each

3   time I was suggesting a date, the date didn't work.  So I tried

4   that several times.  The most striking example of that is that

5   on March 30th we agreed on a visit that would have taken place

6   yesterday.  So we agreed on that on March 30th.  I had suggested

7   any date from May 18th to the beginning of the trial, and Jared

8   said May 26th, but he informed me on Sunday or Monday, last

9   Sunday or last Monday that this visit would be cancelled.

10  Q.   Laurent, who was it that invited you to join the board of at

11  the time I believe it was called Bonobo Hope Great Ape Trust?

12  A.   My understanding was that it was the Great Ape Trust, IPLS

13  when I had been invited by Sue Savage-Rumbaugh.

14  Q.   And when was that?

15  A.   So that was in November 2012.

16  Q.   And do you recall any particular issues that the board was

17  confronting at that point in time?

18  A.   That was a critical moment because of the recent death of

19  Panbanisha.  And that's, by the way, how I wrote back to Sue

20  when I learned about the death of Panbanisha in the press.  We

21  had been in touch here and there but not constantly in touch.

22  The pressing issue beyond that -- but that was kind of a strong

23  issue.  The pressing issue beyond that was relocation because I

24  understood that there was -- from Savage-Rumbaugh and then I

25  understood more completely with the records that there was a

1  discussion about relocating the apes to facilities where the

2  research trajectory would not be maintained at all since we were

3  speaking about zoos.  And as a kind of counter project, Sue

4  Savage-Rumbaugh was suggesting that some of the ways of moving

5  forward would be to expand on the artistic side of things for

6  the bonobos, playing music, maybe doing some narration or at

7  least subjecting them to that, doing more art.  And since I

8  had -- I was familiar with the bonobos, I was very familiar with

9  the history of ape language research and I was one of those rare

10 people who with the training both in the humanities and

11 especially in literature and in the community of science, Sue

12 Savage-Rumbaugh approached me as someone who would present these

13 kind of expanded interests, and I accepted precisely because of

14 that idea.

15 Q.  Was Dr. Taglialatela a member of the board at that time as

16 well?

17 A.  He was.

18 Q.  As of November 2012, had you had occasion to read any of his

19 published works?

20 A.  Yes.  At that point in time, yes, mainly in the moment

21 after -- just after or before my first visit in 2010.  I knew he

22 was a former graduate student of Sue Savage-Rumbaugh.  I knew

23 that.  I had seen the paper where he was a co-author on

24 language, speech, tools and writing, I believe it was an early,

25 early paper, certainly 2001.  And I had read and I had copies of

1  those in my hard drive, my computer.  I had read his first --

2  what I believe to be the first article that he published as a

3  first author on verbalizations, of Kanzi's verbalizations, the

4  way that you will have kind of semantic connection between

5  verbalizations and words.

6  Q.  Based on whatever it is you had read to that point in time

7  of his published works, did you have any impression that his

8  approach to ape language research was in conflict with that of

9  Dr. Savage-Rumbaugh?

10 A.  No, certainly not.  He was building on the foundation of the

11 work because those organizations would never have appeared

12 without the method of Savage-Rumbaugh, and then those

13 organizations were present as one of the next frontiers that

14 when we had established that some language through the keyboard

15 could be used across humans and apes, then maybe Kanzi would

16 begin trying to speak.  So that was really the kind of next

17 step.  That's how I saw it at that point.

18 Q.  When academics publish papers, they sometimes publish works

19 with co-authors, correct?

20 A.  Yes, especially in the sciences.

21 Q.  And what is the protocol as far as the order of the names?

22 A.  So when you are the co-author, that means that you agree

23 with what is in the article, and that doesn't depend on if

24 you're the first author or second author or third author.  If

25 you disagree with the article, then you're not an author.

1 There's no way you could be in disagreement with the content of

2 an article and be a co-author.

3        Then the order of priority is usually -- you have

4 different situations, but usually the first author will do most

5 of the work in an article.  Sometimes in the sciences you have

6 notes of who wrote what.  When you don't have that, it is

7 usually assumed that the first author is the main author.  In

8 the case of Jared Taglialatela co-signing with Duane Rumbaugh

9 and Sue Savage-Rumbaugh who are -- I mean, Savage-Rumbaugh is

10 the committee chair, it is understood that this research is

11 being done because the graduate student had access to the lab

12 and to the experiment that the advisor had designed, but that

13 most of the article, if not all of the article, is being written

14 by the first author.  We don't have the same practice in the

15 humanities.

16 Q.  All right.  Well, we'll accept that.

17 A.  Yes.

18 Q.  Going back to November 2012, did there come a point in time

19 when the, I'll refer to it as the Great Ape Trust board voted on

20 a resolution concerning the division of the board into two

21 boards?

22 A.  Could you tell me the date again?

23 Q.  December 2012.

24 A.  Yes.  In December 2012 -- I need to say -- I'm answering

25 your question, but I need to say that one of the very first

1  communications I got when I was appointed to the board, I was

2  appointed to the board in the midst of a meeting in November of

3  2012.  One of the first communications was coming from Lyle

4  Simpson explaining many things, but explaining the legal issues

5  with the settlement agreement and documents of that kind, I was

6  not aware of that honestly before signing, and his strong desire

7  to create two boards.

8          So since the very beginning, I believe he sent first

9  message maybe November 26th or 27th, you had this person who was

10 presented to me as the counsel of the board who was arguing in

11 favor of splitting the current board into two boards, and then

12 what he was saying as well, which was -- it's a complicated

13 matter, but that Bonobo Hope existed independently at one point

14 and then had been merged and the board of Bonobo Hope had been

15 merged with the board of Great Ape Trust or IPLS, and he was

16 suggesting that we could in the operation consisting in

17 splitting the current board into two, a science board on one

18 hand and a business board on the other hand, we could say that

19 the business board was the IPLS board and the Bonobo Hope board

20 would absorb the scientists, who were the majority of the

21 people, if not all of the people, currently at that point on the

22 Great Ape Trust, IPLS board.

23 Q.  Was that board meeting conducted on the telephone or by

24 e-mail or by a combination of the two?

25 A.  By at least dozens, maybe more, maybe 100, 200 e-mails.

1  Q.  And thereafter as you served on the board, was that

2  typically the way the board would conduct its meetings?

3  A.  Yes.  We -- yes.  In the last year, I mean approximately,

4  the Bonobo Hope board decided to still retain this way of

5  communicating over e-mail while also having -- taking advantage

6  of Webinar or Skype facilities so that we would be live at the

7  same time for a period of time.  But for the -- that was the

8  common practice for IPLS, yes.

9         MR. ZIFCHAK:  Your Honor, I just want to confer with

10 Mr. Stambaugh for a split second.

11         THE COURT:  All right.

12         (Pause.)

13         MR. ZIFCHAK:  Your Honor, I would like to put on the

14 screen page 7 of Exhibit 27, which I'm advised is --

15         MR. STAMBAUGH:  It's already admitted.

16         MR. ZIFCHAK:  -- admitted into evidence.

17         MR. LANGEL:  Exhibit 23, Bill.

18         MR. ZIFCHAK:  Oh, it's 23?  No.  That's the one.

19         MR. LANGEL:  All right.  What's published is page 7 of

20 Exhibit 23.

21         MR. ZIFCHAK:  Okay.  All right.

22 BY MR. ZIFCHAK:

23 Q.  Laurent --

24 A.  Yes.

25 Q.  -- I'm showing you what --

1          MR. MELHUS:  Your Honor, before we get into this

2    exhibit, I just wanted to renew our objections based on the

3    pretrial order to hearsay on Exhibit 23.

4          THE COURT:  I thought somebody just indicated it's a

5    category A exhibit.  It's not?

6          MR. STAMBAUGH:  That's our mistake, Your Honor.  This

7    is Exhibit 23, which has not yet been admitted.

8                                  (Defendants' Exhibit 23 was

9                                   offered in evidence.)

10         THE COURT:  Well, I'll receive it, subject to the

11   objection, hearsay objection.  It's a little hard to tell

12   whether or not it's being offered for the truth of the matter

13   asserted or something that was simply to record something that

14   was said or communicated --

15         MR. ZIFCHAK:  It's a recording of a vote on a

16   resolution.

17         THE COURT:  Well, depending upon what the recording

18   is, it could be hearsay, it might not be hearsay; but I'll

19   receive it, subject to your objection.

20         MR. ZIFCHAK:  Thank you, Your Honor.

21         MR. STAMBAUGH:  Thank you, Your Honor.

22                                 (Defendants' Exhibit 23 was

23                                  received in evidence.)

24   BY MR. ZIFCHAK:

25   Q.  Laurent, have you seen that document before?  And you can --

1  we can show you that.  If you would scroll.

2  A.  I'm not completely sure I saw this in December, I'm not

3  completely sure, but we received messages by Lyle Simpson before

4  December explaining the content of those -- of the memorandum,

5  and then I saw the resolutions when we voted upon them later on.

6  Q.  When did you vote on the resolutions?

7  A.  I believe we voted in April of 2013, yes.

8  Q.  Do you recall a vote --

9  A.  Maybe May.  I know that the resolutions had been introduced

10  in late April, so I don't know when the vote took place exactly.

11  Q.  Do you recall a vote on any resolution on the date of

12  Exhibit 27 (sic), page 7?

13  A.  I don't -- I might be wrong.  I don't recall a formal vote

14  on the immediate transcription of this into action I would say.

15  Q.  Okay.  Fair enough.

16       But it is your recollection that at a point in time

17  the Great Ape Trust board voted to split in two?

18  A.  Oh, yes, yes.  And it is my recollection that we discussed

19  that resolution.  I don't really recall if we voted upon that at

20  that point, but --

21  Q.  Okay.  Fair enough.

22       Did Lyle Simpson circulate anything else to the board

23  at the time of the first meeting that you participated in?

24  A.  I know from the records that there was memorandum that he

25  drafted.

1  Q.  Right.  Anything else?

2  A.  We had -- at the same time, I mean, in this late November

3  message when he was explaining the need for the split of the two

4  boards, he also sent as attachments, but that was different, the

5  draft for the settlement agreements, the two -- the drafts for

6  the two side agreements if I'm --

7  Q.  Okay.  What is your understanding of what the settlements

8  that were executed in this matter, the two settlements were

9  intended to accomplish?

10  A.  So the idea was to, as far as I can tell, was to determine

11  ownership and all the -- ownership of the bonobos and all that

12  comes with ownership.  And in this description of ownership, you

13  have several items, and the point was to make clear that Sue

14  Savage-Rumbaugh was relinquishing her rights and that those

15  rights were being transferred to the science board, to what was

16  to become the science board; that is, Bonobo Hope.  The Bonobo

17  Hope board already existed.  The research trajectory was playing

18  a huge role in the definition of what was being owned since we

19  can only own apes, and so that was also put into the draft that

20  we saw in late November of 2012.

21  Q.  Did there come a point in time in the spring of 2013 when it

22  was brought to your attention that the Great Ape Trust was

23  seeking someone to succeed Dr. Savage-Rumbaugh?

24  A.  Yes.  We all received a message, possibly early June or late

25  May of that year, from Lyle Simpson, again, the counsel of the

1  two boards since at that point in time in May - June, we had the

2  split -- I mean, the split was complete between the two boards.

3  So in that message Lyle Simpson was mentioning that the trust

4  had met and had decided to grant to Sue Savage-Rumbaugh the

5  title of Director Emeritus of Science and that she could still

6  do research as she wishes, I believe that's the exact term, as

7  long as she would be able to do it, I believe was almost the

8  exact term.

9           In that very same message explaining that Sue

10 Savage-Rumbaugh will be here at the trust, even though he could

11 have said -- I mean, Lyle could have said since he wrote the

12 trust at that point, that the trust had acknowledged her

13 tremendous role in the facility and wanted to grant her

14 permanent access.  At the same time, there was also the mention

15 that Sue so far had been a one-person band -- that's another

16 quote, one-person band -- and that certainly we needed more, we

17 needed people to step forward and continue the research, with

18 her being granted those permanent rights to access and to do

19 research, but someone else, preferably younger.  There was a

20 discussion about those criteria.  The goal was for finding a

21 Director of Science.

22 Q.  Were you approached about becoming the Director of Science

23 at the Great Ape Trust?

24 A.  Yes, I was.

25 Q.  Who approached you?

1  A.  Bill Greaves and Jim Benson invited me to --

2  Q.  Thanks.

3      Would you identify them for the court, please?

4  A.  So Jim Benson and William Greaves or Bill Greaves were two

5  members of the Bonobo Hope board, and they were members of the

6  board I joined and they -- one passed away very recently.  They

7  have done tremendous work with their undergraduate students at

8  their home institutions, at their college, tremendous work of

9  indexing in depth the whole content of how -- I mean, hundreds

10 of hours of videotaping of interactions between humans and

11 bonobos and between bonobos.

12     And I had the ability to visit them in nearby Toronto

13 in April of that same year, and we had a very good conversation

14 there.  I met with the students.  I saw the research they had

15 done.  We were in touch before.  I was in touch with them even

16 before I came in 2010 to the lab or maybe the same week, but we

17 had not seen each other.  And so we had a chance, I knew some of

18 their work, I knew that they had co-written articles with Jared,

19 for instance and Sue, and so I knew some of their work on

20 language and in a linguistic framework that I'm not going to

21 explain.  And they told me, maybe you should say that you would

22 be okay with being the Director of Science.

23 Q.  Was that concept discussed with Lyle Simpson or Julie

24 Gilmore?

25 A.  Yes.  I sent a message to both Lyle Simpson and Julie

1    Gilmore -- I'm sure it was sent to Lyle Simpson; I'm almost sure

2    it was sent to Julie Gilmore as well -- telling them that I had

3    been approached by others, and I said -- we were in June, so I

4    was not teaching until August.  So I said, if you need someone

5    who would do interim work for the summer who could certainly

6    lend some credentials to the facility, help with getting grants,

7    I would be glad to intervene to do that; but the problem is I

8    cannot take the responsibility of becoming the Director of

9    Science because I have a full-time job and I cannot see how you

10   could be the Director of Science if I were just doing my regular

11   job, which is heavy job, plus this.  I could not see myself

12   going a few days a month to the facility.  I could not imagine

13   that.  So I said maybe another title if you want my credentials,

14   if you want me and the imprint of Cornell, maybe another title

15   would be more appropriate such as Director of Research.  And

16   Lyle wrote back to me that what he needed was a firm offer and

17   that they should pursue that.

18          That's where we were, and then in that very same

19   summer, the discussion shifted to questions of money, so the

20   discussion of about finding a new Director of Science was in a

21   sense suspended by the emergency situation about the money.

22   Q.  Did you receive later that fall, in about October of 2013,

23   an e-mail from Dr. Savage-Rumbaugh nominating Jared Taglialatela

24   and Bill Hopkins to positions at the Great Ape Trust?

25   A.  Yes, yes.

1  Q.  And what was your reaction?

2  A.  When we got the first message in June, I believe one of the

3  implications was that one of the members of the Bonobo Hope

4  board would volunteer.  At that point Itai would have been a

5  very strong candidate, Itai Roffman, whose name I mentioned in

6  my letter to Lyle Simpson; but he had to complete his Ph.D.

7  first, so he was not the ideal candidate for now or for that

8  time.  Jared Taglialatela had been discussed as well I know, and

9  there were discussions about other people from outside of the

10 Bonobo Hope board, but that didn't lead us very far because we

11 had been in some sense a bit sidetracked by the summer

12 discussion about keeping the lights on.  Lots of messages were

13 being exchanged on that topic.

14         When in October we got the message that Jared was

15 interested and then that Jared would come with William Hopkins,

16 I thought that finally we had identified people who would be

17 able to really do the work as I thought they would do it; that

18 is, by being there more than a few days a month, by really

19 conducting new research projects.  But I need to remember that

20 when we were being asked in June what kind of Director of

21 Research we could contemplate, we were also being asked at the

22 same time -- we are also being told at the same time that Sue

23 Savage-Rumbaugh had this new title of Director Emeritus of

24 Science with the ability to do research as she wishes and so

25 long as she wanted to.

1    That was precisely when we discussed -- in the summer

2  we discussed the possibility of having Jill "Prutz" or

3  "Prootz" -- I'm sorry about the pronunciation -- P-R-E-U-T-Z, as

4  the possible Director of Science because she works nearby.  Ken

5  Schweller nominated her.  It was clear that had she resigned

6  from the former board, so that wasn't obviously the main point

7  and she was not exactly in line with the idea of having Sue

8  Savage-Rumbaugh as -- I mean, she's more advanced than Jared is,

9  for instance, so having a new mentor at the stage of her life

10  was more difficult.

11  Q.  Did there come a point in time when the Bonobo Hope board

12  voted on a resolution to appoint Jared and Bill Hopkins to the

13  positions of Director of Research and Director of Science,

14  respectively?

15  A.  Yes.  We didn't go into that, but there is also the question

16  of determining if we were actually the Bonobo Hope board, but I

17  would say that the people who thought they were the Bonobo Hope

18  board --

19  Q.  I stand corrected.

20  A.  -- voted at that point, and I thought I was a member of the

21  Bonobo Hope board at that time, and they voted and supported the

22  nomination of Hopkins and Jared Taglialatela.

23  Q.  Was there any either telephonic or e-mail or -- well, was

24  there any exchange of ideas or comments about those resolutions,

25  whether in person, by e-mail or on the telephone that you

1  recall?

2  A.  At that point in time, no, not that I recall.

3  Q.  And did you vote on the resolution?

4  A.  I did.

5  Q.  At that time were you aware of the IPLS resolution in May of

6  2013 that granted Dr. Savage-Rumbaugh unfettered permanent

7  access to the bonobos?

8  A.  I had the quotes in Lyle Simpson's message from June saying

9  something relatively similar, but not speaking -- not giving us

10  the wording of that resolution.

11  Q.  All right.  And at the time of the vote on the resolution,

12  which was November 13, 2013, is that correct?

13  A.  I believe it was, yes.

14  Q.  Were you aware that Dr. Savage-Rumbaugh had been banned from

15  further access to the laboratory?

16  A.  Oh, no, certainly not.  I was operating within the previous

17  parameters telling me that she would have access as long as she

18  wishes.

19  Q.  And at the time that you voted on the resolution, did you

20  have any inkling that Yerkes, which I believe has been

21  previously identified today, had any hand in the banning of Sue

22  from the lab?

23  A.  Absolutely not.

24  Q.  And at the time that you voted, Laurent, did you have any

25  inkling that Dr. Savage-Rumbaugh had purportedly been dismissed

1  as a director on the board of IPLS?

2  A.  No, not at all.

3  Q.  When did you learn these things?

4  A.  I would say I learned some of those things, I mean, the

5  banishment in December of 2013 and generally 2014.  For the

6  actual resolution put forward by the trust granting her limited

7  access -- or unfettered access to Sue Savage-Rumbaugh, I believe

8  I saw the document very recently, certainly yesterday when we

9  were preparing together, and for the mention of Yerkes, that

10 became completely clear to me in the last few months.

11 Q.  Do you have any evidence that any of the other purported

12 Bonobo Hope members who voted on the resolution were aware of

13 any of these things when they voted?

14 A.  I guess that -- I guess none was aware.  Maybe there was an

15 exception for Jared.  Maybe he was aware of that, but certainly

16 we were not.

17 Q.  As of the time of the vote on the resolution appointing

18 Jared and Bill Hopkins, had anyone disclosed to you that IPLS

19 had been dissolved by the State of Iowa?

20 A.  Oh, no, no, no.  We didn't know that.

21 Q.  And, lastly, at the time that you voted, did you have any

22 reason to doubt that either Jared or Bill Hopkins did not

23 support Sue's research trajectory?

24 A.  No, I had no reason to -- I had absolutely no reason,

25 because when you -- in the arena of science or getting into

1  research in general, if you suddenly believe that what you were

2  stating or explaining before is not true, you have -- it is your

3  duty to retract or your duty to critique the work.  I had -- I

4  was aware of no critique, no such critique of Savage-Rumbaugh's

5  work that would have been done by Taglialatela or Hopkins.  I

6  was not aware of any e-mail communication that would be critical

7  about that, and so I had absolutely no reason to believe that

8  there would be a problem there or that there would be any kind

9  of critical comment about Sue Savage-Rumbaugh's research

10 trajectory, especially based on my knowledge at the time of the

11 work of vocalization, since Bill Hopkins did his dissertation,

12 his Ph.D. on vocalization before getting tenure as well, not

13 only on this, but -- so, I mean, the common point that they

14 had -- and I was not extremely familiar with Hopkins' work when

15 I voted I have to say.  The common point that they had was their

16 work with Savage-Rumbaugh, their work with Kanzi and their work

17 on verbalization, which could be seen as one of the next steps.

18 Q.  After the November 13, 2013 vote, when was the first time

19 that Bonobo Hope was given any substantive information regarding

20 the goings on at the Great Ape Trust?

21 A.  Depends on what you call substantive information.  I would

22 say that I never received any substantive information, but we

23 received some amount of substantive information in March of

24 2014.  I believe it's March.  In the spring, that's for sure.

25 Q.  Could you summarize what that communication was?

1  A.   That was kind of intent about the research that was very

2  vague.  I had a phone conversation before that with Jared who

3  spoke to me over the phone for maybe -- I believe it was in

4  February of that same year, 2014, who explained to me several

5  things that we could discuss if need be, and he was basically

6  saying that he was doing his best.

7          So in this message that we received in March, we had

8  some vague notions about research being done, but just vague.

9  Certainly no description that you could assess in any way, and

10  information about the fact that the bonobos were in good health,

11  which was only true when I saw them if we just take the physical

12  aspect of the notice, but we need to remember that Matata passed

13  away in between.  So we had a few information at that time about

14  the new scientific advisory board that they had constituted,

15  which was also a surprise to some of us, most of us, that there

16  would be a new science board the first thing.  But the second

17  thing was that the new science board would just have an advisory

18  role, which means a non-role at least from our academic criteria

19  or viewpoint.

20  Q.   Did Bonobo Hope respond to the communication from Jared that

21  you just described in March of 2014?

22  A.   Yes.  I mean, we were glad to finally have some

23  communication on a one-on-one basis, but we wanted to have more

24  information about the research being conducted there.

25  Q.   Did you have a hand in drafting a response?

1  A.  Yes.

2  Q.  And was that response ultimately sent to Dr. Taglialatela?

3  A.  Ah --

4  Q.  If you recall?

5  A.  We may have sent it.  I hope we sent it.  We certainly

6  conveyed through multiple messages, multiple messages we

7  conveyed our opinion in an individual way.  After Jared sends

8  the message, we had a kind of heated discussion over e-mail

9  about many subjects, but not a discussion over the content of

10  science, for instance.

11         MR. ZIFCHAK:  Your Honor, I would like to display one

12  of ACCI's exhibits, Exhibit 6 (sic).

13         THE COURT:  All right.

14  BY MR. ZIFCHAK:

15  Q.  Laurent, I'm showing you ACCI Exhibit 6.  Have you seen this

16  before?

17  A.  Yes.

18  Q.  When was the first time you saw it, approximately?

19  A.  Recently, recently, a few months ago.

20  Q.  Between the March 2014 communication from Dr. Taglialatela

21  and this document, did Bonobo Hope receive any written

22  information from ACCI?

23  A.  Pertaining to research, no, certainly not.

24  Q.  What was your reaction when you first saw this document?

25  A.  As you can see, it's a list with a few titles.  Most, not

1  all of them, but most of the titles are so vague that it would

2  be difficult -- I mean, that you could do everything with

3  bonobos.  Let's take the first one, for instance, "New Insights

4  into Human Origins through the Study of Linguistically Competent

5  Bonobos."  I mean, it's difficult to be more vague than that.  I

6  mean, I don't know what it means.

7          So basically we have a list of possible research

8  protocols that appear to be active, and though I don't know

9  exactly what it means, some of them very clearly will not do

10 many things with bonobos, such as "A Socio-Ecological Comparison

11 of Captive Pan troglodytes, Pan paniscus and Gorilla gorilla."

12 You will have some interaction with the bonobos but not much.

13 Others are just completely vague.  And we certainly -- I mean,

14 nobody could get away with it.  I mean, when I am, as I will be

15 in two days, when I am a member of the selection committee for

16 grants, which I am in two days, most of the grants being the

17 sciences, the other half English humanities, and me judging all

18 of those grants, for each grant I have up to 100 pages of

19 description.  So let's say that 100 pages might be a bit on the

20 long side here, but certainly more than one vague title would be

21 welcomed to have any kind of possible scientific and scholarly

22 judgment about what is going on.

23 Q.  Is it your understanding that at least since last June, June

24 2014, that ACCI has denied Dr. Savage-Rumbaugh access to the lab

25 and access to the bonobos?

1    A.   It is my understanding, yes.

2    Q.   And as a member of the board of Bonobo Hope and as an

3    academician, what is your view on that continued banishment?

4    A.   I believe it's wrong from almost all of the angles I can

5    envision.   It's certainly wrong for the welfare of the bonobos

6    because all animals, all mammals, let's say, have a strong

7    emotional bond with the other mammals that raised them, but

8    certainly in the case of primates, in the case of great apes,

9    especially in the case of bonobos, this emotional bond is

10    extremely, extremely powerful.

11         So you had experiments in the 1960s where you had

12    small monkeys, not apes, but small monkeys being raised in

13    isolation, and you had after that the psychotic mother and the

14    female monkeys that were isolated with no human contact would

15    then become like a mother cheating their offspring, and all of

16    this is very well regimented for lesser, if I may use the term

17    "lesser," for lesser animals than bonobos.

18         So it's wrong to prevent those bonobos from at least

19    seeing, being in contact with the people who raised them.

20    That's the ethical part of it.

21         Then it's completely wrong scientifically because the

22    whole point of the experiment was symbolic, constant symbolic

23    immersion on a systematic basis and this happening through

24    bondage, through emotional bonding, precisely.   So you are

25    basically dismantling the experiment, the whole decade long

1   experiment by preventing Sue Savage-Rumbaugh from having access.

2   It's wrong professionally.  I mean, I cannot say how much it is

3   wrong, I mean, how wrong it is, excuse my French, in the sense

4   that in science, in research in general, you have the phase of

5   preparation, so you prepare the experiment.  Then you will

6   collect data and then you will interpret them.  But the first

7   stage of preparation is the rearing in the case that we are

8   considering, and this is a phase that has been not only done by

9   Savage-Rumbaugh but designed by her in an extremely theoretical

10  and reflective way.  So it's almost close to stealing the

11  intellectual property, not the property research, but the

12  intellectual property of the work by abandoning animals,

13  experimental animals that haven't been prepared.

14          And then I would add the last point where it is wrong,

15  as I have said before, your own ethics as a scholar and a

16  scientist is to say in the public through publications, through

17  peer review publications why you disagree with someone, why you

18  disagree with something.  So you cannot appropriate the bonobos

19  and say, oh, I disagree, but I'm not going to say why, I'm not

20  going to publish why.  Because in one year and a half how many

21  articles did we see coming from Bill Hopkins and Jared

22  Taglialatela that was based on their supposed research, supposed

23  active research in the lab?  None.

24  Q.  Just one last question, Professor Dubreuil, and I'll put the

25  question as it's been put to Jeb Bush recently.  Knowing what

1  you know now, would you have voted to install Jared and Bill

2  Hopkins?

3  A.  No.

4           MR. ZIFCHAK:  Thank you.

5           I pass the witness.

6           THE COURT:  Cross-examination?

7           MR. MELHUS:  Just briefly, Your Honor.

8                       CROSS-EXAMINATION

9  BY MR. MELHUS:

10 Q.  Mr. Dubreuil, you testified earlier that in September of

11 2010, you had several extended interactions with the bonobos, is

12 that correct?

13 A.  I had several interactions with the bonobos, yes.

14 Q.  And at night you would go home and take very careful notes

15 about your interactions?

16 A.  Each night.  I'm not doing them back home because I was

17 living in Des Moines and Des Moines is not my home; but every

18 night, yes, I was and sometimes for lunch when I had a break I

19 would write down observations, yes.

20 Q.  Okay.  And then at some time later you had a second visit,

21 an extended visit?

22 A.  Yes.

23 Q.  And you also had interactions with the bonobos at that time?

24 A.  Yes.

25 Q.  And during those interactions in that second visit, I think

1  you described it in your testimony as ape language research, is

2  that right?

3  A.  Could you rephrase the question?

4  Q.  Sure.  You described your interactions the second -- during

5  the second visit as targeted towards ape language research.

6          Is that an accurate description?

7  A.  No, that's not.  I said that in between my two visits, I had

8  edited a special issue that was devoted to ape language research

9  and the theories of thought foundations of ape language

10  research.  So when I came for the second visit, I had a deeper

11  knowledge of the long-term history of ape language research.

12  Q.  Okay.  That's what I said.

13  A.  I believe.

14  Q.  And were you conducting any type of research during either

15  of those two visits?

16  A.  I conduct research almost every day of my life.  I'm writing

17  a lot.  So, yes, I conduct research.  I was involved in one of

18  my research projects, the one that led to the publication of the

19  2015 book I already referenced, "The Intellective Space."

20          So that was one of the research projects I was

21  involved in at that point when I visited for the second time in

22  2011.

23  Q.  Okay.  And during that second visit, you conducted some

24  observations and you included those in your publication, is that

25  right?

1  A.  I did -- I observed things.  I didn't set up a research

2  procedure with control -- you know, in a controlled setting if

3  you want.  I mean, you have different ways of conducting

4  research.  So I observed what I saw.  I simply reflected on this

5  and some of my personal observations, interlaced with my general

6  understanding of the problems that we discussed, appear, do

7  appear in my 2015 book.

8  Q.  Okay.  Did you collect any data during either of those

9  visits?

10  A.  It depends on what you call data.  I believe it's in the

11  discussion there, so we can discuss that if you want.

12  Q.  Sure.  What is your understanding of what the term "data"

13  is?

14  A.  I would say it's mainly a term that you have in the

15  experimental sciences.  So in nonexperimental sciences, such as

16  math or theoretical physics or theoretical chemistry, you don't

17  call it data because you just theorize about things.  So if you

18  seek -- chose the definition of data in the experimental

19  sciences, meaning that you set up a protocol with controlled

20  procedures and then you collect data, I didn't do that in none

21  of my stay.

22         Now, the term "data" is coming from Latin.  It's the

23  pure form of datum which means given, something that is given to

24  you.  So you consider that when you are a historian and you do a

25  type of work, for instance, you collect data because you collect

1  items that are a part relatively speaking with the experimental

2  sciences.  I am not a scholar doing experimental research, so I

3  don't collect data more than a theoretical person would, as a

4  scientist working in physics would collect data; but as someone

5  who theorizes on things, I'm extremely interested in the data

6  and the experiments that other scientists and scholars could

7  have.

8  Q.  Did you conduct any research with the bonobos during either

9  of those visits?

10  A.  My answer would be yes, because research is not collecting

11  data.  It's not reduced to collecting data.

12  Q.  Are you aware of the requirements to obtain IACUC -- that's

13  I-A-C-U-C -- approval before conducting research with primates?

14  A.  Before collecting data, yes, I'm aware of that.

15  Q.  Before conducting any research, are you aware of any

16  requirements about obtaining IACUC approval before conducting

17  research of primates?

18  A.  I was observing primates, so I didn't intervene in their

19  life space.  In that sense I believe the jury is out, if I may

20  use such an expression here.  Maybe that's not -- but according

21  to the rules of the IACUC, I was not asked by the Director of

22  Operations, who was Bill Fields at that point, I was not asked

23  by him to submit a research proposal that would go through an

24  IACUC.

25  Q.  So you did not obtain IACUC approval before conducting

1  research of the bonobos?

2  A.  I did not collect data.  I believe that my work was

3  observational and I was not being asked to go through the IACUC

4  procedure since I was with Jared Taglialatela.

5  Q.  Did you obtain IACUC approval before conducting research on

6  the bonobos?

7          MR. ZIFCHAK:  Objection; asked and answered.

8          MR. MELHUS:  Your Honor, I don't think he answered the

9  question that was posed, so I'll just restate it again.

10         THE COURT:  I'll let you restate it.

11         Go ahead and answer.

12 A.  I did not receive IACUC approval for any collection of data.

13 BY MR. MELHUS:

14 Q.  So that's a slightly different answer than the question that

15 I had asked about.  Did you obtain any IACUC approval before

16 conducting research with the bonobos?

17 A.  I believe we are here in a discussion about the identity of

18 terms which we use, so could you tell me what you call

19 conducting research?  And then I will be very glad to answer.

20 Q.  I'm using research in the same sense that you used it when

21 you testified that you conducted research of bonobos.

22         MR. ZIFCHAK:  I think that mischaracterizes the

23 testimony, but I'll allow the witness to answer.

24 A.  As I said, I did not -- I was not being asked to submit a

25 research protocol, so I did not receive a research protocol -- a

1 research authorization.  I believe I have been clear about that.

2 BY MR. MELHUS:

3 Q.  All right.  Thank you.

4        Now, there was a third visit you testified about in

5 August of 2014, is that correct?

6 A.  That is correct.

7 Q.  And that visit lasted approximately 4 to five hours, is that

8 right?

9 A.  4 to five, yes.

10 Q.  And during that time, you made some observations about the

11 bonobos and how they behaved and the research that was being

12 conducted at the facility, is that correct?

13 A.  I made an observation about the behavior of the bonobos.  I

14 made observations about their enclosures.  I could not make

15 direct observation about research since there was no research

16 going on as far as I could tell.

17 Q.  So you didn't see any research going on during that August

18 2014 --

19 A.  No, not of any kind.  I had been told that the cannisters

20 that were somewhere on the floor with things around them were

21 being used for some kind of simple recognition cognition task.

22 That's what I have been told, but I had no direct experience of

23 that.  And I can say that the research defined as involving

24 preparation through the constant and systematic immersion within

25 the cultural symbolic used here, that this research was not

1  taking place since the lexigrams were nowhere to be found in the

2  enclosures with the apes.

3  Q.  So other than your observation in October -- or excuse me,

4  August 2014 for the 4 to five hours, you have no way of knowing

5  whether or not lexigrams are in use outside of that time period,

6  is that correct?

7  A.  If lexigrams are being used, I have no reason to believe

8  that the lexigrams would have been removed before my visit and

9  then reinjected after my visit.

10 Q.  But you have no way of knowing for sure whether or not there

11 is any lexigrams in use before or after your visit, is that

12 correct?

13 A.  I have ways of drawing conclusions, but I have no way of

14 being constantly checking where things are since I'm not being

15 allowed to visit the lab when I suggest different dates and

16 different years, so no.

17 Q.  And your observations during that August 2014 visit, they

18 weren't based on any formal research in primatology, were they?

19 A.  Could you rephrase the question?

20 Q.  You testified earlier to some observations that you made of

21 the bonobos during your August 2014 visit, correct?

22 A.  I testified, yeah.  I went there, yes; but I don't get the

23 second part of your question.

24 Q.  So the conclusions that you drew from those observations --

25 A.  Yes.

1    Q.  -- during that August 2014 visit, they weren't based on any

2    formal training in primatology or ape behavior, were they?

3    A.  They were trained -- I'm a member of a cognitive science

4    project and communication program.  Cognition, which is the way

5    the mind works through feelings, emotions, cognition is at the

6    core of my training, at the core of what I do in cognitive

7    science.  Ape cognition is a part of that.

8             Behavior and behaviorism is one way of looking at

9    things that has been -- behaviorism as a paradigm has been

10   largely distributed in the past.  Cognition is another way.  So

11   I have extensive knowledge of the scientific literature, if we

12   can use that term, about ape cognition, yes, I have that.

13   Q.  You have training in ape cognition?

14   A.  I have an extensive knowledge of the recent and published

15   literature about ape cognition.

16   Q.  And that's just sort of based on your own understanding and

17   research in that area?

18   A.  Okay.  So when you study carefully, the question of

19   cognition, the very theory of cognition is that cognition

20   appears and happens independently from the site, that you can

21   have an understanding of cognition understood as a unit of the

22   way your mind works, that you can have that understanding and

23   that this understanding does not depend on the animal or the

24   organism that is using it.

25             So when you work in cognitive studies, you don't work

1    with apes, you don't work with grass.  You can, but you don't

2    have to.  When you work in cognitive studies or cognitive

3    science, you are interested in the way that the mind works.  In

4    order to understand how the mind works, you need to cross

5    boundaries.  You need to cross disciplinary boundaries.  You

6    need to go from biology to philosophy to computer science to

7    artificial intelligence to experimental psychology, and you need

8    to do that.  Some people are more on the experimental side of

9    things; some people are more on the theoretical side of things.

10   I am more on the theoretical side of things, so I have the

11   theoretical knowledge of cognition as it also pertains to apes.

12             That is why I have been elected by my peers as a

13   member of the Cognitive Science Program, and I am the only

14   humanist beyond three philosophers being a member of that

15   program.  All the other ones are in engineering science, in

16   biology, in neurobiology, experimental psychology.

17             So I might believe that I have been elected for good

18   reasons and precisely because I provide a theoretical light and

19   a theoretical angle specifically grounded and explained to me

20   that people working on experiments cannot competently bring.

21   Q.  So in that capacity that you just described at some length,

22   how many papers have you published, for example, on ape

23   cognition and behavior?

24   A.  On ape cognition and behavior?

25   Q.  Right.

1  A.  So I don't work so much on behavior, so I don't publish on

2  behavior.  Behavior is for me just a consequence of cognition,

3  emotional and intellectual cognition.  Then if you -- what I

4  need to explain is that if you narrow down things, then you are

5  missing the whole point of cognition.

6           So to go back to your question, I edited the journal

7  issue about ape cognition and language, the one I referred to

8  earlier on.  I was invited to respond to Sue Savage-Rumbaugh's

9  essay on the web site in 2011 or 2012 -- yeah, early 2011, I

10 believe.

11          I have published observations and reflective

12 observations in the article that was in the collection I have

13 already mentioned.

14          I have published some pages within "The Intellective

15 Space," maybe 10 percent of "The Intellective Space."  I

16 don't -- it's hard to quantify my 2015 book that pertains to ape

17 cognition.

18          And I am working right now on a book co-authored with

19 Sue Savage-Rumbaugh about -- that we entitled "Dialogues on the

20 Human Ape," which is a co-authored book that is certainly at

21 that stage it's at least 250 pages long, and it's a theoretical

22 book and based on the dialogue between people coming from

23 different disciplines and trying to understand the states and

24 the possibilities of becoming a human ape.

25          I also gave a key note lecture at a conference at

1 Cornell on post humanities where I mainly spoke about ape

2 cognition.

3          Are you -- do you want more?

4 Q.  No.  Let's move on.  But thank you for that response.

5 A.  Okay.

6 Q.  Let's just change topics for a second.

7 A.  Yes.

8 Q.  Since December 2013, has BHI obtained any grants to support

9 or care for the bonobos in Des Moines?

10 A.  Your question is, since December 2013, did we get any grants

11 to support the bonobos in Des Moines?  That's your question?

12 Q.  Correct, that's my question.

13 A.  I wanted to be sure about the time line since, as you know,

14 we have multiple time lines and multiple instances as well.

15          So since December of 2013, basically we as members of

16 the Bonobo Hope have been unable to conduct any research with

17 the bonobos.  So that's the first part of my answer.  So we did

18 not try to bring so much money to the facility for research that

19 we could not conduct.  But we decided that we would move forward

20 and that we would try to come up with a new facility, and we

21 have been in discussion with different facility directors and

22 especially Ryan Sheldon, who has very generously decided to go

23 ahead and build a new facility either for the bonobos if we are

24 able to have them, which we hope, or for chimpanzees who would

25 need rehabilitation.  So this is a place that is being built in

1  Missouri, and there is funding attached to that.

2  Q.  I appreciate that response, and I think we got a little bit

3  off topic again.  Let's focus specifically on how many grants

4  BHI has gained for the care and support of the bonobos in

5  Des Moines.

6  A.  Since December 2013?

7  Q.  Correct.

8  A.  And you're speaking about grants or you're speaking about

9  donations?

10 Q.  Let's start with grants.

11 A.  With grants, since -- how can I put that?  If I believe that

12 I am not allowed to have access to the bonobos, why would I try

13 to have the grant to work with the bonobos if I cannot work with

14 the bonobos?  I believe that question is certainly in my mind,

15 in the mind of several of us.  And so when you propose -- when

16 you do a research proposal for a grant, you -- there is an

17 engagement, a commitment from your part, so you're saying this

18 is a research that I would like to do and I know I will be able

19 to conduct that research if I get that grant.  Now, if you

20 believe, as I believe, that I would not be able to conduct that

21 research, that BHI would not be able to conduct that research,

22 et cetera, then I'm not going to write a paper and submit it to

23 a federal institution or to a private foundation asking for

24 money, asking for money for a project that I know or I believe I

25 cannot conduct in any way.

1          So the answer is we didn't try to have grants for

2    research that could not be conducted because we were de facto

3    excluded from that.

4    Q.  You didn't obtain any grants and you didn't try to obtain

5    any grants; is that what you're saying?

6    A.  You can only have grants for research that is likely.  If

7    you believe the research is not likely because you don't --

8    you're not allowed to enter the premises, then why would you ask

9    for any grant?  That would be lying to a federal agency.  So the

10   answer is no; but I qualified the answer.

11   Q.  All right.  Thank you.

12          And let's go a little bit simpler.  How much money has

13   BHI contributed to the care and support of the bonobos in

14   Des Moines since December 2013?

15   A.  We have contributed in different ways.  So there was money

16   especially coming from Bill Greaves who committed to several

17   thousand of dollars in the summer of -- oh, I'm sorry, I'm mixed

18   up with the time line.  So you are asking after December 2013

19   again, I think.  So after 2013, we have tried to come up with

20   solutions on the long term believing that the solution in

21   Des Moines was not a long-term solution for many reasons.  So we

22   did not try to have much donations at that level.

23   Q.  Can you qualify not much donations at that level?  Is it

24   zero or --

25   A.  I could, but I could not -- I mean, I don't know.  I don't

1  know the answer to that.  You are asking since December?  You

2  are asking since we have been unable to access the bonobos, so I

3  don't know exactly what the answer is.  Unless we include the

4  promise coming from Ryan Sheldon and the new facility in

5  Missouri, which is, of course, what we did.

6           So we were looking for donations, not for the

7  Des Moines facility, but we have been raising funds for another

8  facility where we hope to transfer the bonobos.  So we paid for

9  a few, for their veterinary care I believe, but I cannot be more

10 specific on this.  I'm not the treasurer of the board.

11 Q.  Fair enough.  And I'm not meaning to interrupt you, and if I

12 am, I'm sorry.

13          If I'm to understand your testimony, since December

14 2013, you haven't -- BHI has not contributed any money to the

15 care and support of the bonobos.  But has put forth effort to

16 relocate the bonobos somewhere else, is that correct?

17 A.  Yes.  You also need to take into consideration that the

18 whole system based on volunteers who would be trained to work

19 with the apes was coming from before December 2013.  So the main

20 reason, you also have to understand that when Jim Benson and

21 Bill Greaves sent their undergraduate students as interns for

22 the summer, they were members of Bonobo Hope or of the science

23 board, as far as we could tell.

24          So we have been helping through the formal training of

25 the volunteers, through the work of Liz and Heather who have

 1  been working in their own life with Dr. Savage-Rumbaugh, and

 2  through the unpaid work of interns that were coming from

 3  college, and they're graduate students of both Benson and

 4  Greaves, who were members of the science board.

 5  Q.  You mentioned Liz and Heather.  Could you identify those two

 6  individuals for the record?

 7  A.  So Liz -- I mean, we spoke of her.  I mean, she's here, and

 8  she has been -- she's Sue's sister, one of Sue's sisters, and

 9  she has been in charge of working with the bonobos for decades.

10  And I have to say that I didn't really know since Liz didn't

11  publish so much.  Before coming to the trust, I had no knowledge

12  of the tremendous experience that she had with the apes.  I

13  certainly spent more time with her during my two visits than I

14  spent with -- in 2010 and 2011, than the time I spent with

15  Savage-Rumbaugh, and she is really incredible in her own

16  connection with the apes, but also in her ability to precisely

17  inscribe this research trajectory into very concrete aspects of

18  daily life.

19          Heather is her daughter, and I don't know her

20  personally and I never observed her working with the bonobos.  I

21  have heard positive reports of what she has done, but I have no

22  personal knowledge of what she has done and what she does with

23  the bonobos.

24  Q.  Is Liz contributing her time and efforts as a member of BHI?

25  A.  As you know, the membership of BHI is a complicated matter,

1  so Liz is not right now a member of the BHI, even though I

2  believe that she has been or she may have been.  She is

3  certainly the embodiment of the research trajectory that BHI is

4  heading toward.

5  Q.  Was Heather contributing efforts to support and care for the

6  bonobo as a member of BHI or in some other capacity?

7  A.  She is not a member of BHI.  As I told you before, I never

8  met her, but I believe that her training came at least partially

9  from the time that she spent working with Sue Savage-Rumbaugh

10  and Liz and the time she spent as a member of the family group

11  as has been defined before.

12          MR. MELHUS:  Just one minute, Your Honor.

13          (Pause.)

14          MR. MELHUS:  That's all the questions I have for this

15  witness at this time, Your Honor.

16          THE COURT:  Redirect?

17          MR. ZIFCHAK:  Your Honor, because I can't get the

18  image of an hourglass out of my mind, I have no more questions.

19          THE COURT:  Thank you.

20          You may step down, sir.

21                              (Witness excused.)

22          MR. STAMBAUGH:  Your Honor, just a few housekeeping

23  matters.  I don't know if the court is prepared to let us call

24  our next witness.  I do want to move into evidence Exhibit 1006,

25  which while not a category A was proposed by ACCI, so I assume

1  there's no objection.

2                          (Plaintiffs' Exhibit 1006 was

3                          offered in evidence.)

4       MR. MILLER:  No objection.

5       THE COURT:  1006 is received.

6                          (Plaintiffs' Exhibit 1006 was

7                          received in evidence.)

8       MR. STAMBAUGH:  Thank you, Your Honor.

9       One moment.

10      (Pause.)

11      MR. STAMBAUGH:  Your Honor, the other issue is that

12  our next witness is one of two that have been called by

13  subpoena.  I don't know if the court has any concern that if we

14  don't call him this evening that he's not subject to the court's

15  jurisdiction, we may run into problems, or if you would like to

16  call this witness and have him subject to the court's

17  jurisdiction, we would be happy to do that and then we can

18  finish for this evening.

19      THE COURT:  Well, is he here?

20      MR. STAMBAUGH:  He is, Your Honor.  May I inquire?

21      THE COURT:  Why don't you talk to the witness and tell

22  the witness it looks like he's going to have to come back.  He?

23      MR. STAMBAUGH:  Yes.

24      THE COURT:  He would just have to come back tomorrow.

25      MR. LANGEL:  And I have just had that conversation

1  with the witness, Your Honor, and he has committed to being back

2  tomorrow.

3          THE COURT:  Okay.

4          MR. STAMBAUGH:  My witness is Mr. Lyle Simpson, Your

5  Honor.

6          THE COURT:  Oh, well, why don't we get a running start

7  on Mr. Simpson, and we'll adjourn at 5:00.

8          MR. STAMBAUGH:  May I inquire?

9          THE COURT:  Yes.  By the way, I have -- somebody has

10 given me a deposition of Mr. Simpson up here.

11         MR. NEIHAUS:  Yes, Your Honor.

12         THE COURT:  Is this going to be offered in evidence?

13         MR. NEIHAUS:  No.  It's just for the court to follow

14 if it's used for impeachment.

15         THE COURT:  All right.

16         MR. NEIHAUS:  I also have a copy for the witness which

17 I will now put up on the stand with the court's permission.

18         THE COURT:  Let's start with Mr. Simpson, and we'll

19 adjourn at 5:00.  Please tell him that.

20         (Pause.)

21         THE COURT:  Mr. Simpson, would you come forward,

22 please, right up here and face the clerk.

23         THE CLERK:  Please raise your right hand.

24         LYLE LEE SIMPSON, DEFENDANTS' WITNESS, SWORN

25         THE COURT:  Please be seated right there.

1          THE WITNESS:  Thank you.

2          THE COURT:  We're going to get a running start on your

3    testimony here this afternoon, Mr. Simpson; but I believe as

4    you've been told, you'll probably have to come back tomorrow.

5    Understood?

6          THE WITNESS:  That's fine, Your Honor.  I'm totally

7    deaf on this side (indicating).

8          THE COURT:  All right.

9          THE WITNESS:  So I need to watch you and make sure I

10   know what you're saying.

11         THE COURT:  All right.  Fair enough.

12         Counsel, you both identified Mr. Simpson as a witness.

13   I assume since we're in a bench trial, we can get his testimony

14   in the record and everybody can ask all the questions they want

15   to ask of him so that he only has to come to court once.  Would

16   that be all right?

17         MR. MILLER:  I appreciate that stipulation, Your

18   Honor, yes.

19         MR. STAMBAUGH:  Absolutely, Your Honor.

20         THE COURT:  So everybody will ask the questions they

21   have of Mr. Simpson, and then when he's done, we can excuse him.

22         You can proceed.

23         MR. NEIHAUS:  Thank you, Your Honor.

24

25

1        DIRECT EXAMINATION

2   BY MR. NEIHAUS:

3   Q.  Good afternoon, Mr. Simpson.

4   A.  Good afternoon.

5   Q.  Could you please state your full name for the record.

6   A.  Lyle Lee Simpson.

7   Q.  And you're an attorney here in Des Moines, is that right?

8   A.  Yes, sir.

9   Q.  You were counsel for IPLS; that is, plaintiff Iowa Primate

10  Learning Sanctuary in 2012 and 2013, is that right?

11  A.  Yes, sir.

12  Q.  And you have also been counsel for plaintiff Ape Cognitive

13  and Communication Institute or ACCI since its founding in

14  December of 2013, is that right?

15  A.  Yes, sir.

16  Q.  And you also formerly were counsel for defendant Bonobo Hope

17  Initiative, BHI, is that correct?

18  A.  Yes, sir.

19  Q.  You're appearing here today pursuant to a subpoena, is that

20  right?

21  A.  That's right.

22  Q.  And there's a document request attached to that subpoena, is

23  that correct?

24  A.  Yes, sir.

25  Q.  Did you bring any documents here with you today pursuant to

1    that subpoena?

2    A.  All documents that have been requested of me that I have

3    have already been provided.  I do not have the documents that

4    were on the -- listed on the subpoena today, to the best of my

5    knowledge.

6    Q.  Thank you.

7                Mr. Simpson, you believe that the bonobos that are at

8    issue in this case are treasures, don't you?

9    A.  Are what?

10   Q.  Are treasures.

11   A.  Well, yes.

12   Q.  And you believe that the bonobos would not have reached

13   their current level and Iowa would not have these treasures if

14   Dr. Sue Savage-Rumbaugh had not been involved, is that right?

15   A.  Both Sue and her former husband, Duane Rumbaugh.

16   Q.  Isn't it true that the bonobos are so unique because they've

17   grown up sharing a culture and sharing a language with humans?

18   A.  Yes.  In fact, this is the only place on earth where humans

19   can actually conduct an intelligent conversation in the English

20   language with another species of life.

21   Q.  Isn't it also true that the head of the human part of that

22   group was Dr. Savage-Rumbaugh?

23   A.  She spent a lot of time with the bonobos.

24   Q.  You believe that if the bonobos were denied the ability to

25   communicate, say if they were denied the ability to use their

1　keyboards, that that would be a travesty, isn't that right?

2　A.　I don't know that I'm qualified to answer that question, but

3　I do know that they use them.

4　Q.　But you believe if they were denied access, that that would

5　be a travesty, is that correct?

6　A.　My opinion is only a lay opinion.

7　Q.　I understand that.　And what is your lay opinion, sir?

8　A.　One of the unique features of these bonobos is the fact that

9　they do understand human language when it's spoken to them and,

10　you know, I suppose some people say that their horse or their

11　dog can understand also; but the level of understanding seems to

12　be superior among these bonobos.

13　Q.　Mr. Simpson, you gave a deposition in this case, isn't that

14　right?

15　A.　Tell me what you said.

16　Q.　You gave a deposition in this case?

17　A.　Yes.

18　Q.　And in that deposition you told the truth, is that right?

19　A.　I believe so.

20　Q.　Mr. Simpson, I've placed a copy of your deposition

21　transcript in the white binder just ahead of you.　If you could

22　please go ahead and open the deposition to page 57.

23　　　　　And starting at line 3, are you there, Mr. Simpson?

24　Have you found line 3, Mr. Simpson?

25　　　　　I'll withdraw the question.

1          Mr. Simpson, isn't it true that at your deposition you

2     were asked this question and gave the following answer:

3          "Q.  Let me ask the question another way.  If the

4          bonobos -- and this is a hypothetical question -- were

5          denied access to the keyboards with which they've become

6          accustomed, would that detract from the continued research

7          into their ability to communicate in English?"

8          At which point counsel objected.  And after the

9     objection you answered:

10         "A.  I think that would be a travesty."

11    A.   In my opinion --

12    Q.   My question is, did I read the transcript of your deposition

13    correctly?

14         MR. MILLER:  Your Honor, I object.  There's lack of

15    foundation and also reassert the objection stated in the

16    deposition with regard to the fact that this is calling for

17    expert testimony.

18         THE COURT:  I will receive it, subject to the

19    objection.

20    BY MR. NEIHAUS:

21    Q.   Did I read your deposition transcript accurately?

22    A.   From what I've observed, to me that would be -- a travesty

23    is probably a good word for it.

24    Q.   You at times have written letters of support on behalf of

25    Dr. Savage-Rumbaugh's research in order to raise funds, isn't

1  that correct?

2  A.  For many reasons.  If you're referring to the letters that

3  I've written the Governor and the Senators --

4  Q.  Are those some letters that you have written in support of

5  Dr. Savage-Rumbaugh's research in order to raise funds?

6  A.  The letters to the Governor were to influence the University

7  of Iowa and Iowa State University to take title to the facility

8  so that we had a stable economic base.  One problem in operating

9  the facility is that you can get grants to do research, but it

10  doesn't cover the base cost of electricity and staff.  And what

11  we were trying to do because we were in desperate economic

12  condition at that time was to get somebody to help us support

13  the facility, and that was the purpose for the letter to the

14  Governor.

15  Q.  And in your letter -- in your letters to the Governor, you

16  praised Dr. Savage-Rumbaugh's research, isn't that correct?

17  A.  Yes.

18  Q.  And you also wrote a letter to a state -- I'm sorry, to

19  Senator Grassley praising Dr. Savage-Rumbaugh's research, isn't

20  that correct?

21  A.  Yes.

22  Q.  If I could ask you to now turn in the other binder that is

23  in front of you, the largest one, to Exhibit 25.

24          THE COURT:  Counsel, when we're finished with this

25  exhibit, we'll take our evening recess at that time.

1          MR. NEIHAUS:  Thank you, Your Honor.

2     BY MR. NEIHAUS:

3     Q.  I would like to identify for the record Exhibit 25, which is

4     a letter from Lyle Simpson to Senator Charles Grassley written

5     on February 4, 2013.

6          Mr. Simpson, this is a letter that you wrote to

7     Senator Grassley in which you praise Dr. Savage-Rumbaugh's

8     research, isn't that correct?

9     A.  Yes.

10          MR. NEIHAUS:  At this time I would like to offer

11     Exhibit 25 into evidence.

12                              (Defendants' Exhibit 25 was

13                               offered in evidence.)

14          THE COURT:  Is there any objection?

15          MR. MILLER:  Well, Your Honor, we'll object to

16     relevance and hearsay; but we understand your prior order with

17     respect to accepting the evidence.

18          THE COURT:  Exhibit 25 is received, subject to the

19     objection.

20                              (Defendants' Exhibit 25 was

21                               received in evidence.)

22          THE COURT:  With that, why don't we take our evening

23     recess, shall we?  9 o'clock, 9 o'clock tomorrow morning.

24          9 o'clock in the morning, Mr. Simpson.

25          THE WITNESS:  All right.

1    THE COURT:  We'll see you all then.  Have a pleasant

2 evening.

3    MR. STAMBAUGH:  Thank you, Your Honor.

4    (Recess at 5:04 p.m., until 9:00 a.m., Thursday,

5 May 28, 2015.)