IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - - -X
IOWA PRIMATE LEARNING SANCTUARY   :
d/b/a GREAT APE TRUST AND         :
APE COGNITION AND COMMUNICATION   :
INSTITUTE,                        :
                                  :
       Plaintiffs,           :    Case No. 4:10-cv-00052
                                  :
   vs.                         :
                                  :
ZOOLOGICAL FOUNDATION OF          :
GEORGIA, INC. d/b/a ZOO ATLANTA,  :
DEMOCRATIC REPUBLIC OF CONGO,     :
JAPAN MONKEY CENTRE INSTITUTE     :
AND MUSEUM OF PRIMATOLOGY, and    :
SUE SAVAGE-RUMBAUGH, Ph.D.,       :
                                  :
      Defendants,          :    TRANSCRIPT OF HEARING
                                  :         VOLUME II
and                               :
                                  :
BONOBO HOPE INITIATIVE, INC.,     :
                                  :
     Intervenor-Defendant.   :
- - - - - - - - - - - - - - - - - -X


                  Fourth Floor, South Courtroom
                  United States Courthouse
                  123 East Walnut Street
                  Des Moines, Iowa  50309
                  Thursday, May 28, 2015
                  9:00 a.m.


BEFORE:  THE HONORABLE ROSS A. WALTERS, Magistrate Judge.



              Terri L. Martin, CSR, RPR, CRR
            United States Court Reporter
           Room 189, U.S. Courthouse
            123 East Walnut Street
           Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiffs:        WILLIAM J. MILLER, ESQ.
                           BRIAN A. MELHUS, ESQ.
                           Dorsey & Whitney
                           801 Grand Avenue, Suite 4100
                           Des Moines, Iowa  50309-2790

For the Defendants:        TODD P. LANGEL, ESQ.
                           Faegre Baker Daniels
                           801 Grand Avenue, 33rd Floor
                           Des Moines, Iowa  50309-8011

                           WILLIAM C. ZIFCHAK, ESQ.
                           Kaye Scholer
                           250 West 55th Street
                           New York,  New York  10019-9710

                           JOSHUA STAMBAUGH, ESQ.
                           Kaye Scholer
                           1999 Avenue of the Stars
                           Suite 1600
                           Los Angeles, California  90067

                           ROSS NEIHAUS, ESQ.
                           Kaye Scholer
                           Three First National Plaza
                           70 West Madison Street
                           Suite 4200

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **For the Defendants:** | | | | |
| Lyle Simpson (Resumed) | 230 | 292 | 299 | 302 |
| Derek Wildman | 303 | 333 | 350 | |
| Ryan Sheldon | 351 | 372 | | |
| **For the Plaintiffs:** | | | | |
| Julie Gilmore | 390 | 422 | 438 | 445 |
| Jared Taglialatela | 454 | | | |

E X H I B I T S

| PLAINTIFFS' EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 23 - Simpson 12/4/12 memorandum | 236 | 236 |
| 26 - 4/25/13 Mate e-mail | 238 | 239 |
| 30 - Simpson e-mail | 247 | 247 |
| 35 - 8/30/13 Caudill and Simpson e-mails | 242 | 242 |
| 36 - 9/24/13 Simpson e-mail to IPLS board | 249 | 250 |
| 37 - 9/27/13 Simpson e-mail | 254 | 254 |
| 38 - Yerkes request for guarantee | 286 | 287 |
| 51 - 12/12/13 Simpson e-mail | 289 | 298 |

| DEFENDANTS' EXHIBIT NUMBERS: | | |
|---|---|---|
| 94 - Sheldon letter of credit | 371 | 372 |

P R O C E E D I N G S

1
2      (In open court, with defendant present.)

3      THE COURT:  Please be seated, everybody.

4      And you can continue your examination.

5      MR. NEIHAUS:  Yes, Your Honor.

6      MR. FISHER:  Your Honor --

7      THE COURT:  Yes.

8      MR. FISHER:  -- permission to address the court?

9      THE COURT:  Sure.

10      MR. FISHER:  My name is Gary Fisher.  I practice law

11 with Lyle Simpson, and he's asked me to be here with him and

12 represent him today for purposes for his testimony.  I don't

13 intend on saying much more than I have right now, but I would

14 ask permission that I be heard if I need to make an objection.

15      THE COURT:  Well, you can certainly be present.  I

16 think when we talk about objections, any objection to the

17 evidentiary admissibility really ought to be made by counsel for

18 the plaintiffs.  If you feel for some reason that it goes into

19 an area that may relate to badgering the witness or something

20 like that, which I imagine you might be concerned with --

21      MR. FISHER:  And matters potentially of privilege.

22      THE COURT:  And the matter of privilege, you can

23 assert an issue of privilege.  If there's a badgering issue, I

24 think you need to discuss that with counsel first and let him

25 make it.  So I'm not going to give you carte blanche to make

1  objections, but objections that involve the personal rights of

2  the witness, of course, I would hear those based on that.

3          MR. FISHER:  Thank you.

4          THE COURT:  And you may continue.

5          MR. NEIHAUS:  Thank you, Your Honor.

6                    LYLE LEE SIMPSON,

7  resumed his testimony as follows:

8               DIRECT EXAMINATION (Continued)

9  BY MR. NEIHAUS:

10  Q.  Good morning, Mr. Simpson.

11  A.  Good morning.

12  Q.  Can you hear me okay?

13  A.  Yes, now.

14  Q.  Mr. Simpson, I would like to talk about the structural

15  changes of the BHI and IPLS boards in 2012 and 2013.  In your

16  role as counsel, you were responsible for merging the two boards

17  together, is that right?

18  A.  It was my recommendation to do that and the boards voted on

19  doing that.

20  Q.  And that merger happened in February 2012, is that right?

21  A.  I believe that's correct.

22  Q.  And once you merged the boards, BHI and IPLS in effect

23  became one entity, is that right?

24  A.  That's true.

25  Q.  And that entity went by different names, including BHI,

1  IPLS, Great Ape Trust or GAT, is that right?

2  A.  Yes.

3  Q.  In December 2012, however, you determined that the combined

4  board structure was not effectively working, right?

5          MR. MILLER:  Your Honor, I would like to object.

6  Counsel has called this witness as part of their direct case,

7  their case in chief.  He's called as a witness for them for

8  direct purposes, and he's being cross-examined.  I think the

9  testimony is -- you know, I wanted to give him some leeway

10 yesterday, we were just getting started, but I think we should

11 proceed in a question-and-answer fashion rather than a

12 cross-examination.

13         MR. STAMBAUGH:  Your Honor, may I be heard on that?

14         THE COURT:  Sure.

15         MR. STAMBAUGH:  Mr. Simpson has been called in our

16 case in chief.  Pursuant to Rule 611(c), when an adverse witness

17 is called, counsel is allowed to ask leading questions on direct

18 examination.  Mr. Neihaus has already established that

19 Mr. Simpson was counsel for IPLS and ACCI during the relevant

20 events, clearly making him an adverse witness under Rule 611

21 and, therefore, he should be allowed to ask leading questions.

22         THE COURT:  Anything further?

23         MR. MILLER:  Well, Your Honor, he's also -- there's

24 testimony that he's counsel for BHI, Dr. Rumbaugh as well.

25 Again, they've called him.

1     THE COURT:  Is he still counsel for BHI and

2  Dr. Rumbaugh?

3     MR. STAMBAUGH:  He is not, Your Honor.

4     THE COURT:  I'll let you lead, though do bear in mind

5  leading questions are oftentimes not the best way to get

6  information out of someone; but I'll let you lead if you think

7  you need to.

8     MR. NEIHAUS:  Thank you, Your Honor.

9  BY MR. NEIHAUS:

10  Q.  So my question, Mr. Simpson, in December 2012, you

11  determined that the combined board structure was not effectively

12  working, is that right?

13  A.  Not totally.

14  Q.  I'm sorry, can you explain your answer?  You determined that

15  the board structure was not totally working; is that what you're

16  saying?

17  A.  The reason for merging the two entities, Bonobo Hope really

18  was not a functioning board at the time of the merger, but it

19  had money in it that had been raised by the people who were

20  participating in the Bonobo Hope activity.

21     IPLS from January 1, 2012 on was operating on a --

22  without a source of income essentially, and it was operating

23  essentially because of contributions.  We were having trouble

24  paying the utility bills, let alone -- I say "we," the client

25  was having trouble paying the utility bills and paying salaries.

1          There was money in Bonobo Hope.  The easy way of --

2    and Bonobo Hope had been given this money without having tax

3    exempt status, so the people that had given the money would have

4    trouble taking income tax deductions for the money that they had

5    contributed.  In order to get it qualified with the Internal

6    Revenue Service so that they could get a tax deduction, the

7    easiest way to do that is to show that this is a supporting

8    organization for another 501(c)(3) tax exempt organization.

9    There's three different levels of foundations, and this is by

10   far the simplest and the least expensive.

11         By merging the two entities together, that made it

12   very easy to qualify so that the people that made contributions

13   could deduct them.  It also made it very easy then to transfer

14   the money from Bonobo Hope into IPLS so they could pay their

15   immediate bills, and that was the reason it was created.

16         Once that was done, there was really -- it wasn't

17   necessary to keep them together.  The problem with Bonobo Hope

18   is that it had people on the board all over the world, most of

19   whom I never met, even as of today.  It was very difficult to

20   get that organization to do anything.  In fact, they wouldn't do

21   anything unless Sue specifically told them to do it.  And the

22   net result was it was totally dysfunctional, and so --

23   Q.  You're talking about the combined board right now?

24   A.  No.  I'm talking about why we separated them.  In order to

25   manage the facility, you know, somebody in Barcelona or in

1  Israel, I don't even know that they had ever been to the

2  facility, let alone could make decisions for managing it.  It

3  was just totally ineffective.

4         My recommendation to them was that they get local

5  people on the IPLS board who had hands on ability to manage and

6  that people on the Bonobo Hope board, most of whom were

7  scientists and were there because they were interested in the

8  program itself, could continue to function; but they could do it

9  better as separate boards than to expect somebody in Barcelona

10 or Haifa, Israel to make local decisions.  So that's the reason

11 we separated.

12 Q.  So then you separated them into two different boards; a

13 board composed of scientists, which was BHI, and a board

14 composed of local business people, which was IPLS, is that

15 right?

16 A.  That's true.

17 Q.  And you recommended -- you were the one who made the

18 recommendation that the board be split in two in this way?

19 A.  That's true.  They were -- there wasn't any leadership

20 effectively and they weren't making decisions, and they needed

21 some guidance, and so I was -- I had to make recommendations

22 because nobody else was doing it.  In the meantime, they're

23 going broke.

24 Q.  And what you recommended was that going forward the purpose

25 of Bonobo Hope should be the management and protection of the

1  bonobo colony and the direction and development of the science

2  that can be produced through the proper utilization?

3  A.  That was my recommendation, yes.

4  Q.  You also recommended that control and maintenance of the

5  bonobos and the science be administered only by Bonobo Hope, is

6  that right?

7  A.  That was my recommendation.

8  Q.  And you described your recommendation in a memo to the

9  Bonobo Hope board, right?

10  A.  Yes.

11  Q.  I would like to show you what's been marked as Exhibit 23,

12  which is a memorandum authored by Mr. Simpson dated December 4,

13  2012, and which was distributed to the joint IPLS and BHI

14  boards.

15        Mr. Simpson, could you please turn to your --

16  A.  I have nothing on my desk.

17        MR. NEIHAUS:  I'm sorry.  It's by the side of the

18  witness stand.

19        Judge, may I approach?

20        THE COURT:  You may.

21  BY MR. NEIHAUS:

22  Q.  Mr. Simpson, are you looking at what's been marked as

23  Exhibit 23?

24  A.  Yes.

25  Q.  Is this the memorandum that you wrote?

1   A.  Yes.

2           MR. NEIHAUS:  At this time I would like to offer

3   Exhibit 23 into evidence.

4                           (Defendants' Exhibit 23 was

5                            offered in evidence.)

6           MR. MILLER:  No objection, Your Honor.

7           THE COURT:  23 is received.

8           MR. NEIHAUS:  Thank you.

9                           (Defendants' Exhibit 23 was

10                           received in evidence.)

11  BY MR. NEIHAUS:

12  Q.  Mr. Simpson, you called this memorandum your plan of action,

13  is that right?

14  A.  It was my recommendation for a plan of action.

15  Q.  And the combined BHI-IPLS board accepted your

16  recommendation, isn't that right?

17  A.  Yes.

18  Q.  And that happened through two sets of resolutions; one in

19  December 2012 and one in April 2013, is that right?

20  A.  I don't -- tell me again what you just said.

21  Q.  The board accepted your recommendation --

22  A.  Yes.

23  Q.  -- and implemented it through two sets of resolutions, is

24  that right?

25  A.  I don't know about the two sets of resolutions.  Are you --

1  Q.  If I could ask you to turn towards the back of Exhibit 23,

2  three pages from the back, there's a sheet that starts minutes

3  for December 12, 2012.

4              Are you there?

5  A.  Yes.

6  Q.  All right.  Mr. Simpson, do you recognize these minutes?

7  A.  Actually I don't, but it doesn't mean that I might not have

8  seen them before, but I -- I'm just amazed somebody created

9  minutes.

10  Q.  If you can move down about three-quarters of the way down

11  the page, you say -- you see there's a small letter a, and it

12  starts, "Resolved, that the board's current officers," and if

13  you can just read paragraph a to yourself, you authored that

14  paragraph, isn't that right?

15  A.  Well, it's language that I certainly would have used.

16  Q.  And if you could look at the following letters --

17  A.  Yes, I did write that.

18  Q.  And if you could look through the following letters b

19  through f, you also wrote those parts of the document, isn't

20  that right?

21  A.  Yes, that was my recommendation.

22              MR. NEIHAUS:  If I may have just one moment, Your

23  Honor.

24              (Pause.)

25  BY MR. NEIHAUS:

1  Q.  At this time I would like to identify Exhibit 26 for the

2  record, which is an e-mail from Ursala Goodenough, but is

3  forwarding another e-mail from Carmen Mate on April 25, 2013.

4         MR. NEIHAUS:  Your Honor, permission to publish to the

5  court?

6         THE COURT:  Has 26 been received?

7         MR. NEIHAUS:  It has not, Your Honor.  At this time I

8  would like to -- I'm sorry.

9  BY MR. NEIHAUS:

10  Q.  Mr. Simpson, could you please turn to Exhibit 26.

11  A.  Yes.

12  Q.  And do you see the e-mail sent by Carmen Mate on the first

13  page?

14  A.  Yes.

15  Q.  Now, if you go to the line beginning "To:  Bonobo Hope

16  Initiative, Inc. Board Members," from that point on you actually

17  authored the text, isn't that right?

18  A.  Yes.

19  Q.  And you can confirm this by your signature block at the end

20  of the document, is that right?

21  A.  Yes.

22         MR. NEIHAUS:  At this point I would offer to move

23  Exhibit 26 into evidence.

24                        (Defendants' Exhibit 26 was

25                         offered in evidence.)

1      MR. MILLER:  Your Honor, we're going to object on the

2 basis of hearsay asserted in the pretrial listing.  Furthermore,

3 I think the subsequent testimony from Exhibit 23 establishes

4 that was hearsay, but I acknowledge I didn't state that

5 objection previously, that's the perceived admission of that

6 evidence.

7      THE COURT:  I'll receive Exhibit 26, subject to the

8 objection.

9                          (Defendants' Exhibit 26 was

10                          received in evidence.)

11     MR. NEIHAUS:  We would also ask permission to publish

12 to the court?

13     THE COURT:  Certainly.

14 BY MR. NEIHAUS:

15 Q.  Mr. Simpson, in this e-mail you asked -- you proposed

16 certain resolutions to the combined BHI-IPLS board, isn't that

17 right?  In the e-mail that you offered in Exhibit 26, you

18 proposed certain resolutions to the combined BHI-IPLS board?

19 A.  I did, yes.

20 Q.  Including the resolution that the members of the BHI board

21 resign from the joint board, isn't that right?

22 A.  Yes.

23 Q.  And that was how you effectuated the split; all the BHI

24 members who were on the joint board simply resigned from the

25 IPLS board?

1  A.  That's true.

2  Q.  I would like to ask you now about some resolutions that IPLS

3  passed a month after this e-mail, approximately a month, in May

4  of 2013.  IPLS approved a resolution to grant Dr. Sue

5  Savage-Rumbaugh unfettered access to the bonobo colony, is that

6  right?

7  A.  Yes.

8  Q.  And that resolution was never rescinded, correct?

9  A.  That I can't say.  IPLS made subsequent decisions that could

10  have had the effect of rescinding that.  My intent of putting

11  that in there was to be consistent with the original plan.  When

12  ACCI was formed, it was, in essence, parallel with IPLS.  I hope

13  you get into that a little later.  It made different decisions

14  at that point in time that could have had that effect; but my

15  intent at the time when all of this was created was that that be

16  established policy.

17  Q.  IPLS never passed a resolution rescinding this May 2013

18  resolution, did it?

19  A.  It wouldn't have to.  If it came up with another decision

20  that was conflicting with it, the later decision would apply.

21  Q.  I appreciate the answer, but, Mr. Simpson, my question is

22  simply, did ACCI ever pass another resolution rescinding this

23  May 2013 resolution?

24  A.  They passed another resolution that might have had the

25  effect of rescinding it.  It didn't specifically address that

1  resolution.

2  Q.  And what resolution are you referring to?

3  A.  In their December 18, 2013 minutes, ACCI made a lot of

4  decisions establishing the trajectory that it would be operating

5  under, and some of those decisions would modify prior decisions.

6  Q.  In fact, in one of their set of minutes, ACCI determined --

7  I would like to strike the question and start over.

8         In IPLS's minutes from December 18, 2013, they passed

9  a resolution acknowledging that Dr. Savage-Rumbaugh had been

10  dismissed from the board in July of 2013, isn't that right?

11  A.  Yes, I believe that's right.

12  Q.  Yet even after July of 2013 when, as you suggest or as the

13  IPLS board minutes reflect, Dr. Savage-Rumbaugh had allegedly --

14  supposedly been dismissed from the IPLS board, IPLS was still

15  telling Dr. Rumbaugh with certainty that she will always be able

16  to rejoin her bonobo family, isn't that right?

17         MR. MILLER:  Objection; hearsay.

18         THE COURT:  I'll receive it, subject to the objection.

19  A.  I don't know what you're referring to.

20  BY MR. NEIHAUS:

21  Q.  I would like to identify for the court Exhibit 35, which is

22  an e-mail authored by IPLS Chair George Caudill, sent to

23  Dr. Savage-Rumbaugh in which Mr. Simpson was cc'd.  Mr. Simpson,

24  if you could please turn to Exhibit 35.

25         Mr. Simpson, you received this e-mail, is that right?

1    A.   I believe so.

2            MR. NEIHAUS:  At this time I would like to offer

3    Exhibit 35 into evidence.

4                                (Defendants' Exhibit 35 was

5                                offered in evidence.)

6            MR. MILLER:  Well, with the same objection with

7    respect to hearsay, Your Honor; also lacks foundation, I

8    believe, but --

9            MR. NEIHAUS:  Your Honor, I'll point out that this was

10   an Exhibit B document on the final pretrial order, which meant

11   there was no objection to foundation and there was no objection

12   to hearsay on that document.  In addition, this document is not

13   being brought for the truth of the matter asserted but the

14   effect on the listener.  And we call it a party opponent

15   admission anyway because it's by the president of IPLS.

16           THE COURT:  I'll receive it, subject to the objection.

17                                (Defendants' Exhibit 35 was

18                                received in evidence.)

19   BY MR. NEIHAUS:

20   Q.   Mr. Simpson, if you could look at the third paragraph down,

21   the final line that's written in bold, do you see where

22   Mr. Caudill on August 30 of 2013 told Mr. Savage-Rumbaugh, "I

23   can say with certainty that you will always be able to rejoin

24   your bonobo family."

25           Do you see where that's written?

1  A.  Yes.

2  Q.  Was that your understanding as well?

3  A.  At that point in time, I certainly -- that was everybody's

4  hope.

5  Q.  And if you could please turn to the next page of the

6  document, at the very top of the page, the second line down

7  about halfway through, the sentence beginning, "You can do all,"

8  George Caudill also told Dr. Savage-Rumbaugh on August 30 of

9  2013, "You can do all of this with complete confidence that you

10  will always be welcome to rejoin the bonobos."

11          Was that also your understanding at the time?

12  A.  Yes.

13  Q.  Mr. Caudill continues that Dr. Savage-Rumbaugh will be able

14  to continue her research as she sees fit.

15          Was that your understanding at the time as well?

16  A.  Yes.  Everybody was concerned with the fact that nothing was

17  happening and they certainly wanted Sue back.

18  Q.  Sooner rather than later, is that right?

19  A.  Yes.

20  Q.  Mr. Simpson, after the settlement agreements in this case

21  were entered into, you recommended that IPLS undergo a

22  transitional period, is that right?

23  A.  After --

24  Q.  After February of 2013 when the settlement agreements in

25  this case were entered into, you recommended that IPLS undergo a

1  transitional period, is that right?

2  A.  You're talking about the position of the Director of

3  Science?

4  Q.  That's right.

5  A.  All right.  I don't want to get into Sue's personal health

6  issues, but it does affect this.  Late April, early May,

7  sometime in that point in time, in 2013 -- Sue has issues

8  dealing with depression -- I was called up and told that she was

9  having those problems, and it didn't surprise me because Sue had

10 contributed money to the Community Foundation of Greater

11 Des Moines in order to support the activity of IPLS during her

12 administration as the director, and we were running out of money

13 and there was no source of funding.

14        I found out sometime later that she also apparently

15 had fallen and hurt herself.  Anyway, she left the facility.

16 She was there one day and gone the next, and attempts to contact

17 her and attempts -- something is wrong -- and attempts to get

18 her direction because she was running the facility stopped.

19        MR. NEIHAUS:  Can I ask the court, I think the

20 microphones are out.

21        THE COURT:  The microphones are off.  Mr. Simpson, the

22 best we can do is just speak up.  The microphones aren't working

23 very well.

24 A.  Okay.  Anyway -- oh, there it comes -- she needed help.  She

25 was, in essence, a one-person band.  She was tending to the

1  care -- we had no money to pay people.  She was tending to the

2  care of the bonobos.  She was I assume attempting to continue

3  her science, and at the same time she was paying the bills and

4  running the facility, and it was pretty obvious to anybody

5  looking on that the science was waning because of all of the

6  other activity demanding her attention.

7          So what I was seeking then was an assistant for her.

8  I made that proposal to Bonobo Hope that they find a Director of

9  Science and that we elevate Sue to Director of Science Emeritus

10  was my recommendation, but nothing happened.  I didn't get a

11  response from anybody on the bonobo board and just literally

12  nothing happened.  So -- do you want me to continue?

13  Q.  I'll go ahead and ask another question.

14          And after that episode, that was when you agreed, as

15  we discussed previously, that IPLS wanted Sue back and that she

16  would always be welcome to rejoin the bonobos, is that right?

17  A.  Yes.

18  Q.  And that her science would continue, right?

19  A.  Yes.

20  Q.  You never intended for her to be put out to pasture, right?

21  A.  I had no thought of that.

22  Q.  You needed Sue because she needed to continue to have a

23  vital role in the success of IPLS, right?

24  A.  We had one of the most valuable science treasures in the

25  world right here in Des Moines and there was no activity.  We

1  had a third-generation bonobo, Teco, born who was I think at

2  that point in time, what, three.  I think that Teco is five now

3  or will be.  There was a tremendous amount of science being lost

4  because we didn't have a scientist.

5  Q.  And at this time you communicated to the IPLS board, the BHI

6  board, as well as to Dr. Jared Taglialatela, that you needed an

7  assistant for Sue, is that right?

8  A.  I'm not sure how Jared got involved in that description,

9  but -- I didn't even know Jared.  He was on the Bonobo Hope

10  board, but he was one of those people that I had never met.  We

11  asked -- in fact, I went through Dr. Duane Rumbaugh and asked

12  that he and Sue help us find a scientist to, in essence, assist

13  Sue.  That would have been I think in August because I couldn't

14  get any help out of anybody else on the Bonobo Hope board, and

15  then he and Sue did recommend Jared, and that was probably in

16  September.

17  Q.  At this point I would like to identify for the record

18  Exhibit 30, which is an e-mail authored by Lyle Simpson to the

19  BHI and IPLS boards, which includes Dr. Jared Taglialatela,

20  dated July 1, 2013.

21           Mr. Simpson, if you could please turn to Exhibit 30 in

22  your exhibit book.

23  A.  Yes.

24  Q.  You authored this e-mail, is that right?

25  A.  Yes.

1      MR. NEIHAUS:  I would like to offer Exhibit 30 into

2  evidence.

3                          (Defendants' Exhibit 30 was

4                          offered in evidence.)

5      MR. MILLER:  Well, we again object on the basis of

6  hearsay, Your Honor.

7      THE COURT:  I'll receive it, subject to the objection.

8                          (Defendants' Exhibit 30 was

9                          received in evidence.)

10     MR. NEIHAUS:  We also ask permission to publish?

11     THE COURT:  Yes.

12 BY MR. NEIHAUS:

13 Q.  Mr. Simpson, in this e-mail that you sent, one of the

14 recipients was Dr. Jared Taglialatela, is that right?

15 A.  He was a member of the Bonobo Hope board.

16 Q.  And in this e-mail you told the board that this transition

17 was not intended to have Sue just stop working and have another

18 person take over, right?

19 A.  That's right.

20 Q.  So you told Dr. Jared Taglialatela in July of 2013 that this

21 transition was not intended to have Dr. Savage-Rumbaugh just

22 stop working and have another person take over, is that right?

23 A.  That's true.

24 Q.  Isn't it true that when you envisioned the transition in

25 July of 2013, you believed that the trust needed for Sue to

1  continue to have a vital role?

2  A.  I had all expectation that she would.

3  Q.  And you told Dr. Taglialatela in July of 2013 that the trust

4  needed Dr. Savage-Rumbaugh to continue to have a vital role, is

5  that right?

6  A.  Yes.

7  Q.  I'm sorry?

8  A.  Yes.

9  Q.  You believed that neither the bonobos nor IPLS could afford

10 to have Dr. Savage-Rumbaugh simply step away, right?

11 A.  We had one of the most valuable research tools in the world

12 right here in Des Moines, and she had been involved in it from

13 day one.  I would have had no expectation of anything else.

14 Q.  And you told Dr. Taglialatela in July 2013 that neither the

15 bonobos or IPLS could afford to have Dr. Savage-Rumbaugh simply

16 step away, is that right?

17 A.  Yes.

18 Q.  This transition was not intended to occur quickly, but

19 during a period of overlap, perhaps many years, is that right?

20 A.  I don't know that I would have used those terms, but that

21 would have been my expectation.

22 Q.  I would like to identify for the court Exhibit 36, which

23 purports to be an e-mail from Mr. Simpson to Dr. Duane Rumbaugh

24 and other members of the IPLS board.

25      Mr. Simpson, are you on Exhibit 36?

1   A.   Yes.

2   Q.   Do you recognize this document?

3   A.   Yes.

4   Q.   What is it?

5   A.   It's an e-mail from me.

6   Q.   And it's sent to the IPLS board, is that right?

7   A.   Yes.

8   Q.   And in that e-mail you discuss this transition period?

9   A.   It was sent to a limited number of people, but it was sent

10  with the idea that Carmen would distribute it to the IPLS board.

11  Q.   And the date of this document is September 24, 2013, is that

12  right?

13  A.   Yes.

14          MR. NEIHAUS:   I would offer Exhibit 36 into evidence.

15                          (Defendants' Exhibit 36 was

16                          offered in evidence.)

17          MR. MILLER:   Your Honor, may I voir dire the witness

18  for purposes of an objection?

19          THE COURT:   You may.

20                      VOIR DIRE EXAMINATION

21  BY MR. MILLER:

22  Q.   Mr. Simpson, you're reviewing Exhibit 36 in front of you

23  right now, correct?

24  A.   Yes.

25  Q.   Do you see the second paragraph of the e-mail and then on

1 the second page two paragraphs are in what appear to be in bold

2 type?

3 A.  Yes.

4 Q.  Is that bold type you applied to this document?

5 A.  Yes.

6           MR. MILLER:  Thank you.

7           Your Honor, I object to hearsay, no other objection.

8           THE COURT:  I'll receive it, subject to the objection.

9           I would note that the probative value of documents of

10 this kind are not as to the truth of any matters contained

11 therein, but as to the intent and plan and reasons why the

12 witness did what he did, which in my judgment would not be

13 hearsay.  But that said, I will receive it, subject to your

14 objection.

15           MR. MILLER:  Thank you, Your Honor.

16                               (Defendants' Exhibit 36 was

17                                received in evidence.)

18           MR. NEIHAUS:  Also ask permission to publish?

19           THE COURT:  Yes.

20                     DIRECT EXAMINATION (Continued)

21 BY MR. NEIHAUS:

22 Q.  Mr. Simpson, if you could look at the second paragraph you

23 bolded, you say, "This certainly is not intended to mean that we

24 are contemplating the transition to occur in the near future,

25 but we should have a period of overlap, perhaps many years,

1  where they might work together"...

2          And that was your expectation at the time, is that

3  right?

4  A.  Yes.

5  Q.  And the purpose of this transition was to make sure that

6  Dr. Savage-Rumbaugh's life work continues forever, right?

7  A.  The purpose for this documentation was we needed to get an

8  additional scientist involved because nothing was happening.

9  Nobody really wanted to push Sue out of the facility, but she

10  really wasn't there.  She was in New Jersey at this time.

11  Certainly no one wanted to dishonor the work she had done.  I

12  mean, she's world famous.  But we had to have somebody there.

13  We couldn't pay the utility bills at that point in time.  We had

14  no source of income.  What that would have meant is that once

15  IPLS went bankrupt, the Department of Agriculture would have

16  taken charge of those bonobos and they would have put them in a

17  sanctuary somewhere and they would no longer be available for

18  research because you can't do that kind of research in a

19  sanctuary.

20          We were scared to death that we were going to lose the

21  bonobo community for the citizens of Iowa.  We had to have

22  science in order to sustain the facility.  Nobody wanted to

23  offend or insult Sue in any way, still don't; but she wasn't

24  functioning.

25  Q.  So you wanted to bring in an assistant --

1  A.  We needed -- we had to bring in somebody.

2  Q.  To make sure that her life work continued forever, is that

3  right?

4  A.  That was my intent, yes.

5  Q.  And you told Dr. Jared Taglialatela that the purpose of this

6  transition was to make sure that Dr. Savage-Rumbaugh's life work

7  continues forever, is that right?

8  A.  I told Carmen that my recommendation was that we proceed on

9  this plan.  She circulated it to the board, I assume, and I'm

10  not directing the facility.  All I'm trying to do is advise

11  them.  I'm saying this is a plan that I think would work.

12  Q.  So you were counsel for IPLS at the time?

13  A.  Yes.

14  Q.  And you advised -- and this was your advice to them, right?

15  A.  Yes.

16  Q.  And if I could direct you back to Exhibit 30.  If you could

17  please turn to page 2, the last full paragraph in the e-mail

18  that you authored, starting at the second sentence, you said,

19  "We want a strong team to make sure that her" -- that is,

20  Dr. Savage-Rumbaugh -- "life work continues forever."

21          Is that right?

22  A.  Yes.

23  Q.  And that's what you told to Dr. Taglialatela who was a

24  recipient of that e-mail, right?

25  A.  Assuming he read it, yes.

1  Q.  And even later in September of 2013 when Dr. Taglialatela

2  was considering the nomination to be the Director of Science at

3  IPLS, you told him that you were trying to ensure that

4  Dr. Savage-Rumbaugh's world class work continues, right?

5  A.  I don't recall telling him that, but I certainly would have.

6  Q.  I would like to identify Exhibit 37 for the record, which is

7  an e-mail authored by Mr. Simpson on September 27, 2013 to

8  Dr. Taglialatela.

9          Mr. Simpson, are you at Exhibit 37?

10 A.  Yes.

11         MR. MILLER:  Your Honor --

12 BY MR. NEIHAUS:

13 Q.  And you wrote this e-mail, is that right?

14         MR. MILLER:  Excuse me, Counsel.  Point of order.  I

15 apologize.

16         I don't believe we received Exhibit 37 from you folks,

17 so if I could just see a copy, if we could take a moment.

18         THE COURT:  Certainly.

19         (Pause.)

20         MR. NEIHAUS:  And just to correct the record, we

21 believe that we did provide counsel with Exhibit 37.  And,

22 Counsel, after our discussion, I don't know if you want to

23 acknowledge that you did at some point receive that exhibit.

24         MR. MILLER:  Mr. Neihaus is saying we made some

25 objections to it in the pretrial order, so if we did, we

1  received it.  I don't have a copy of it here, but that's fine.

2  BY MR. NEIHAUS:

3  Q.  Mr. Simpson, you wrote this e-mail, is that right?

4  A.  Yes.

5         MR. NEIHAUS:  At this time I would like to offer

6  Exhibit 37 into evidence.

7                        (Defendants' Exhibit 37 was

8                         offered in evidence.)

9         MR. MILLER:  Your Honor, I'll reassert the objection

10  that's in the pretrial order.

11         THE COURT:  37 is received, subject to the objections

12  in the pretrial order.

13                        (Defendants' Exhibit 37 was

14                         received in evidence.)

15         MR. NEIHAUS:  Also ask permission to publish?

16         THE COURT:  You may.

17  BY MR. NEIHAUS:

18  Q.  Mr. Simpson, if you could please look in the first

19  paragraph, the fourth line from the bottom, halfway through

20  there's a sentence beginning "Sue and Duane."

21         Are you with me at that point?

22  A.  Are you talking about my message or are you talking about

23  page 2?

24  Q.  Page 1.

25  A.  Page 1.

1  Q.  The first paragraph in your e-mail, about halfway through

2  there's a sentence beginning "Sue and Duane."

3        Do you see that?

4  A.  Yes.

5  Q.  You told Dr. Taglialatela on September 27, 2013, that Sue

6  and Duane, together with many other scientists from around the

7  world, including yourself, have contributed so much to the

8  science of today, we want to make sure that this world class

9  work continues.

10       That's what you told Dr. Taglialatela, is that right?

11  A.  Yes.

12       THE COURT:  I do note that the exhibit has certain

13  comments about the content.  They're numbered 13, 14 and 15.  I

14  think in fairness to the witness we ought to indicate whether or

15  not those are his words or who wrote those things there.

16  BY MR. NEIHAUS:

17  Q.  Mr. Simpson, if you look on page 1 you see at the top in

18  bold, starts 13 and then says September 27, 2013 with a

19  description.

20       That's not your writing, is it?

21  A.  No.

22  Q.  And then if you look on the next page, the other numbered

23  paragraphs, those were not in your writing either?

24  A.  The bold language, no.

25       THE COURT:  I think so the record is clear where

1  somebody has editorialized, I think it's fair that I'm not going

2  to consider the numbered comments in the exhibit.

3          MR. NEIHAUS:  Thank you, Your Honor.

4  BY MR. NEIHAUS:

5  Q.  Mr. Simpson, I would like to ask you some questions about

6  being a registered agent in Iowa.  What is the purpose of a

7  registered agent in the state of Iowa?

8  A.  In the first place, it's a source of contact to the public.

9  So if you want to access that company, you serve the registered

10  agent.  The Iowa Secretary of State's office also maintains a

11  register for all corporations licensed to do business in the

12  state of Iowa, and they require a registered agent so that not

13  only they have a contact source, but so that they can look to

14  that contact source to keep the reports current so that the

15  corporation continues to exist.

16          In our office we go beyond that, we serve as

17  registered agent for 2,000 companies and many doing business in

18  Iowa from outside the state, and so our objective is to preserve

19  their existence.  For our own clients I probably have -- I've

20  created several thousand corporations, but we maintain the

21  minute books for about 400 corporations and 200 limited

22  liability companies that we go further than that and try and

23  maintain their minutes to the best that they'll allow us to do

24  it.

25  Q.  So you're very familiar with the Secretary of State's

1  requirements for filings of corporations, is that right?

2  A.  Yes.

3  Q.  At one point you asked Dr. Savage-Rumbaugh to be the

4  registered agent for --

5  A.  No.

6  Q.  -- IPLS, is that right?

7  A.  No.

8  Q.  You never --

9  A.  I wouldn't have done that.  I don't know how that decision

10  was made.  We have a lot of clients that we represent where

11  we're not the registered agent.  That's the client's choice.  We

12  offer the opportunity for our firm to do that.

13  Q.  You provided Dr. Savage-Rumbaugh with the form to become a

14  registered agent, is that right?

15  A.  No.

16  Q.  You frequently had Dr. Savage-Rumbaugh sign forms on behalf

17  of IPLS, right?

18  A.  Yes, because she was the director.

19  Q.  And so forms such as a registered agent form, if you would

20  have brought it to her, you would have expected her to sign?

21  A.  I wouldn't have done that because that's not our policy.  We

22  attempt to serve as registered agents for our clients if they'll

23  allow us to do it, and probably half of them do.

24  Q.  So you keep track of who the registered agents are for your

25  companies?

1  A.  No.

2  Q.  You do not keep track of who the registered agents are for

3  your companies?

4  A.  No.  That's a decision for the company to make.  I keep

5  track of the clients that we're the registered agent of.

6  Q.  You offer your clients to serve as their registered agents,

7  right?

8  A.  Given the opportunity I do that, yes.

9  Q.  You spoke with Dr. Savage-Rumbaugh many times in 2011 and

10  2012, is that right?

11  A.  Certainly, but not about that subject.

12  Q.  You never brought that up to her, did you?

13  A.  I probably wouldn't.  I mean, that's --

14  Q.  Even though IPLS was your client?

15  A.  That's true.  I represent a lot of clients.

16  Q.  As IPLS's counsel, didn't you have a responsibility to make

17  sure that IPLS filed its biennial reports?

18  A.  Only if I'm registered agent.

19  Q.  Well, Mr. Simpson, a few moments ago I asked you the

20  responsibilities of a registered agent, and you did not list

21  filing a biennial report among them?

22  A.  No; I did.  I talked in terms of the Secretary of State's

23  requirement that those documents be handled -- you know, filed

24  by the registered agent.  I didn't use those words, but that's

25  exactly what I meant.

1    Q.  Have you ever filed a biennial report?

2    A.  Have I ever filed an annual report for a corporation?

3    Q.  Yes.

4    A.  We file many of them every year.  There are a lot of clients

5    that don't want to pay us to do their annual reports.

6    Q.  Mr. Simpson, you agree that IPLS was administratively

7    dissolved in August of 2013, correct?

8    A.  Sorry, but I'm getting a beep in my ear.  I can't hear

9    anything.

10             THE COURT:  The microphone is off.

11             THE CLERK:  The battery should have been okay, but

12   here is another set.  You may need to adjust the volume.

13   BY MR. NEIHAUS:

14   Q.  Mr. Simpson, can you hear me now?

15   A.  Yes.

16   Q.  Do you agree that IPLS was administratively dissolved in

17   August 2013, right?

18   A.  I now know that to have happened, yes.

19   Q.  You did not tell Dr. Savage-Rumbaugh, however, that IPLS had

20   been administratively dissolved, is that right?

21   A.  I'm not -- this went off again.

22             I'm not too sure she didn't tell me.  The procedure is

23   this:  The registered -- do I have sound?

24             THE COURT:  You don't have sound either.  Sometimes if

25   you hold -- if you jostle it a little, the thing at the bottom,

1  it will work.

2         MR. STAMBAUGH:  I think we've lost all the mics.

3         THE CLERK:  The system is down.

4         THE WITNESS:  Can you hear me now?

5         THE CLERK:  I've let IT know.

6         THE COURT:  Okay.  We'll forge ahead.  We'll do it the

7  old fashion way.  Everybody speak up and go slow.

8         THE WITNESS:  Okay.

9  A.   (Continuing)  Sometime in January the Secretary of State

10 sends a postcard to the registered agent for all corporations

11 that has a code on it that allows them to access the Secretary

12 of State records so that they can file an annual report.  It's a

13 simple process.  It doesn't take long.  I think there's a small

14 filing fee.

15        If that isn't done by March 31st, at that point in

16 time, the Secretary of State starts preparing a report of all

17 those corporations that haven't filed, and they forward that to

18 the Iowa Attorney General's office.  The 1st of August of that

19 year the Attorney General then administratively dissolves

20 corporations that haven't filed because they assume they've gone

21 out of business.

22        The Secretary of State then sends a letter sometime in

23 mid August saying that this has happened to your corporation,

24 it's a second reminder, so that if you didn't intend for that to

25 happen or you missed the mailing -- it looks like bulk mail and

1 many clients simply throw it away, which is one of the reasons

2 we offer that service for clients because we know what we're

3 looking at and a client could easily miss it.

4          If that happens, when you get that letter from the

5 Secretary of State saying you've been administratively

6 dissolved, you then have a chance to do something about it.

7          My first notice that IPLS and Bonobo Hope had neither

8 one filed their annual report was when Sue showed me a copy of

9 those letters.  I think it was Sue.  Somebody did in the

10 organization; but I was pretty sure it was Sue.  At that time

11 our procedure is to go back, determine what wasn't filed,

12 prepare that document, prepare an application, send it with the

13 fees to the Secretary of State and have it reinstated, in which

14 case it's reinstated retroactively back to the time that it was

15 administratively dissolved as if nothing had gone wrong.

16          I had Sue sign those documents.  I think at that point

17 in time I also had her sign something changing the registered

18 agent to what we call Iowa Registered Agents, Inc., which is the

19 corporation that's owned by my law firm that handles all of

20 those registrations for at least 2,000 clients.

21          The problem then -- I prepared the documentation and I

22 filed it with the Secretary of State.  Bonobo Hope got

23 reestablished.  IPLS didn't because part of the process the

24 Secretary of State goes through before they'll reform a

25 corporation is they go to the Department of Revenue and

1    determine are there any liens against this corporation because

2    they require those payments to be made before they'll

3    reestablish the corporation.

4            Ted Townsend, when he was -- when his board was

5    running IPLS, there's a quirk in nonprofit corporation law that

6    allows them to opt out of paying unemployment taxes on the

7    payroll of their employees.  I think that was created by

8    churches.  I have no clue why on earth there should be an

9    exemption.  So no unemployment taxes were ever paid on the IPLS

10   employees up through December 31, 2011.  When Ted Townsend quit

11   paying for all of those employees, they were let go, and many

12   filed for unemployment.

13           What happens then is it made IPLS the self-insurer of

14   those unemployment payments, and so Work Force Development in

15   the State of Iowa, they paid them, but they filed a lien, and

16   that lien at that time I think was approximately $60,000.  Well,

17   at this point in time, we didn't have the money to pay the

18   utility bill, let alone to pay $60,000 to get the corporation

19   reestablished.  So we weren't able to do it.

20           The problem that that caused that I could see is that

21   we no longer had a corporate shield around the Board of

22   Directors and yet we've got a facility that we're trying to open

23   to the public, and that made them personally liable for the risk

24   of operating the Great Ape Trust.  And so my recommendation to

25   them at that time is that we need to create a new entity so you

1  have a corporate shield and we need to have the facility owned

2  by that entity so that you don't have a big liability, either

3  that or you've got to come up with the money to pay off this

4  lien so we can get your corporation reestablished.

5  BY MR. NEIHAUS:

6  Q.  Mr. Simpson, one question about the lien.  When did you

7  first learn about that tax lien?

8  A.  Tell me what?

9  Q.  When did you first learn about that tax lien?

10 A.  When I was shown the letter that came from the Secretary of

11 State in August that said the corporation had been dissolved.

12 Q.  Didn't you write a letter to Ted Townsend in March of 2012

13 asking for funds to pay the tax lien?

14 A.  I asked -- I knew what was going on because every time they

15 make a payment, they send a statement and it was going to the

16 corporation, and so I knew that the unemployment taxes for those

17 employees was an obligation of IPLS.  I was worried about the

18 liability of IPLS.  It had nothing to do with the annual report.

19 Q.  So you knew at least by March 2012 that IPLS had this

20 outstanding tax obligation, is that right?

21 A.  Yes.

22 Q.  And you said you knew that from the corporate statements

23 that you received, is that right?

24 A.  I knew it had a tax liability.  I didn't know for sure that

25 they had filed a lien, and once I tried to get IPLS

1　reestablished, I found out that the lien was there, and it

2　didn't surprise me; but it did say to me we either pay the lien

3　or we've got to create a new entity or you've got public

4　liability for everybody you allow on the premises, including the

5　people who are there maintaining the bonobos.

6　Q.　You said you knew about the tax liability again before you

7　knew about the lien.　You knew about the liability --

8　A.　I knew about the unemployment lien -- or not lien, but the

9　unemployment obligation to Work Force Development.

10　Q.　How did you know about that obligation?

11　A.　Because they send out a piece of paper every time they make

12　payments on a monthly basis to employees who have filed for

13　unemployment.

14　Q.　Who sends out a monthly statement?

15　A.　Work Force Development.

16　Q.　And that's an entity of the State of Iowa?

17　A.　It's the state agency that pays the unemployment.

18　Q.　How did you come to receive those statements?

19　A.　They would be mailed to -- they probably were mailed to the

20　trust.

21　Q.　How did you then receive those statements from the trust?

22　A.　Somebody would have asked me what's this about, I'm sure, at

23　least that would be my guess.　I have no memory of it.

24　Q.　I would like to ask you about an event that occurred in

25　October of 2013.　At that time the BHI board approved -- I'm

1  sorry.

2       In October of 2013, you're familiar that

3  Dr. Savage-Rumbaugh recommended that the IPLS board appoint

4  Drs. Jared Taglialatela and Bill Hopkins to positions with the

5  facility?

6  A.  They had recommended Jared.  When Jared came to visit, he

7  brought Bill Hopkins with him, and they decided they would split

8  up the responsibilities between the two of them if they were to

9  accept.  And if my memory serves me, we went back either to Sue

10 or to Duane and indicated that this is what they wanted to do.

11 And they thought that was great, and so they, in essence,

12 nominated both of them.

13 Q.  And in November of 2013, the BHI board approved

14 Dr. Savage-Rumbaugh's recommendations to appoint

15 Drs. Taglialatela and Hopkins, is that right?

16 A.  Both boards approved it.

17 Q.  You never told the BHI board before that vote that

18 Dr. Savage-Rumbaugh had previously been kicked off the IPLS

19 board, is that right?

20 A.  I don't recall that; but I don't know why it would have been

21 my responsibility to do that.

22 Q.  And you never told the BHI board before November of 2013

23 that Dr. Savage-Rumbaugh had been banned from the IPLS facility

24 by George Caudill, is that right?

25 A.  I thought that was a very temporary situation.  Dr. Rumbaugh

1  had not been there since April.  All of a sudden she showed up

2  at the facility because young Teco apparently was ill, and she,

3  in essence, took charge.  And the result of that was I get a

4  call from George Caudill saying, the director of the facility

5  and the veterinarian are both quitting.  What do we do?

6          And I said, tell me what's going on.

7          And he said that Sue had come in there and was

8  undermining -- she took charge.  She was undermining their

9  authority, and both of them were upset.  I have a home down in

10 Lake of the Ozarks and I was down there.  There wasn't anything

11 that I could do.  But he was concerned, and he knows that at

12 least I can talk with Sue and hopefully she would listen, and

13 what he wanted was that she back off because the tidal wave that

14 was being created by her simply showing up and taking charge was

15 more than he could manage at that point.  I think this was over

16 a weekend.

17         I explained to Sue three different ways that her

18 behavior was causing problems and that we needed to modulate

19 what she was trying to do.  Nobody was trying to kick her out.

20 Q.  When did you explain this to Sue?

21 A.  Oh, heavens, I probably spent 20, 30 hours that weekend back

22 and forth in conversations with a lot of people.  I tried to --

23 the best analogy that I can give to the situation at that point,

24 we were operating with volunteers, and these are people that are

25 there because they loved the bonobos and they're willing to work

1  for them for nothing.  We -- my best analogy I used -- I have 30

2  years in the military, and I used the military context which

3  hopefully makes sense out of what I was trying to say.

4  Everybody there would have known who Sue Rumbaugh was.  She's a

5  world famous name.  I characterized her as if she were a general

6  and she's come down to a company level organization where we've

7  got a captain that's in charge and we've got all of these

8  workers, and she was doing things directly with the workers that

9  were in contradiction to the instructions that they had had from

10  their captain.

11  Q.  This captain that you're referring to is George Caudill, is

12  that right?

13  A.  No.  It was Julie Gilmore and Steve Boers.

14  Q.  Wasn't George the president of IPLS at the time?

15  A.  Yes, but he's not running the facility and --

16  Q.  Wasn't George the individual who made the decision to ban

17  Sue from the lab on November 9th?

18  A.  You're way ahead of me in the story.

19  Q.  Sir, I would just like you to answer this question.

20  A.  He's the one that acted.  With the corporation, you have the

21  member group that owns it.  With IPLS, the members and the board

22  are identical.  You have the board that makes the policy

23  decisions, and then you have the officers that carry out the

24  work of the company.  The work of the company would be by the

25  directors, and the directors in this case were -- Julie is the

1  veterinarian.  At that time she probably was director of the

2  facility -- no.  Steve Boers was still director of the facility,

3  but --

4  Q.  But, Mr. Simpson, my question is George Caudill, the chair

5  of IPLS at the time, is the one who made the decision to ban Sue

6  from the laboratory, isn't that right?

7  A.  That was the only solution that he could come up with that

8  solved the problem that he was dealing with that would keep

9  Julie Gilmore and Steve Boers working in the facility.

10 Q.  And you thought he was overreacting, right?

11 A.  I didn't know.  I knew that there was havoc going on.  I

12 wasted a whole weekend on the phone talking to people.

13 Q.  But you felt George Caudill was overacting by banning Sue

14 from the lab and you told him that, right?

15 A.  Probably.

16 Q.  Do you doubt whether you told him that?

17 A.  I can't remember, but I --

18 Q.  Mr. Simpson, please --

19 A.  That to me is kind of a final solution.  It was temporary.

20 All he was trying to do is not lose his people.

21 Q.  Mr. Simpson, if I could please direct your attention to the

22 transcript of your deposition, which I will get from the side

23 for you.

24      At this time I would like to direct your attention to

25 page 122, starting at line 21.

1      Mr. Simpson, isn't it true in your deposition you were

2  asked the following question and gave the following answer:

3      "Q.  Was it your understanding that as of the

4      afternoon of Sunday, November 10, that Sue had been

5      banned from the lab and had been dismissed from her

6      position as director of science by George?

7      "A.  I don't know when that occurred.  He told me that

8      he did it.  I think he felt that that was the only emergent

9      thing that he could do at that time to get order again and

10     not lose his key people.  But whether he overreacted, which

11     is kind of what I told him -- I says 'You've got to have a

12     better solution.'  But, you know, I wasn't there."

13     Did I read that transcript correctly?

14  A.  It would sound like something I would have said under those

15  circumstances.

16  Q.  Mr. Simpson, did I read -- could you please just answer --

17  A.  It is what I said, yes.

18  Q.  Mr. Caudill, who made the decision to ban Sue from the lab,

19  is the same one, is the same individual who previously told Sue

20  that with complete confidence she will always be welcome to

21  rejoin the bonobos and continue her research as she sees fit,

22  isn't that right?

23  A.  No one had ever seen this form of behavior from Sue before.

24  Q.  You testified that Sue returned to take care of the bonobos,

25  right, to take care of Teco because she felt he was sick?

1 A. Nobody had seen Sue for six months. When she showed up, she

2 acted like she was still in charge of the facility, and that was

3 more than the people that were in charge of the facility could

4 deal with. That was never contemplated. It's not saying that

5 from her perspective she was wrong. I'm not sure what

6 information she had that she was acting on.

7 Q. So Dr. Savage-Rumbaugh was kicked out of the lab on

8 November 9, 2013, and after that time, later in that same month,

9 the BHI board accepted Sue's recommendation to appoint

10 Drs. Jared Taglialatela and Bill Hopkins in a vote, isn't that

11 right?

12 A. Yes.

13 Q. And before that vote occurred, you never told the members of

14 the BHI board that Dr. Savage-Rumbaugh had been banned, isn't

15 that right?

16 A. That wasn't my obligation to tattle on Sue. My guess is --

17 Q. And you didn't tell the BHI board members that she had been

18 banned?

19 A. I had no responsibility to tell them that.

20 Q. So you didn't do that?

21 A. Of course not. I'm not trying to air dirty laundry for Sue

22 publicly.

23 Q. And you never told the BHI board --

24 A. That wasn't a permanent ban, by the way. It was to get her

25 out of the facility that weekend.

1  Q.  So you expected that she would be back?

2  A.  Of course.

3  Q.  And before that vote which appointed Drs. Jared Taglialatela

4  and Bill Hopkins, you never told the BHI members that

5  Dr. Savage-Rumbaugh had been kicked off of the IPLS board, isn't

6  that right?

7  A.  That I don't remember because, keep in mind, I don't attend

8  their meetings.  I heard from George at some point in time, and

9  I cannot now remember when, that -- we had a provision in the

10  bylaws that if you missed three meetings without an accepted

11  excuse, that you, in effect, had resigned.  We also had a

12  provision in the bylaws that the majority of the board could

13  remove another director if necessary.  For some reason or

14  another in the middle of the summer, they got tired of

15  attempting to keep Sue informed because she was never responding

16  to anything.  They sent Julie Gilmore over to her house, and she

17  wouldn't let her in even.  I talked to several people, Liz and

18  Shawn, I think, relatives of Sue.  I understood that Sue was

19  dealing with depression.  I've seen Sue before when she deals

20  with depression.  She gets catatonic.  And there was no way to

21  contact her, and so they got tired of trying, and they simply

22  agreed that, okay, we won't consider her a board member.

23  Q.  And that was in the summer?

24  A.  Somewhere in the summer, and I can't tell you when, but I --

25  Q.  So when the vote came in November of 2013 to appoint

1 Drs. Taglialatela and Bill Hopkins, before that you never told

2 the BHI board members that Dr. Savage-Rumbaugh had been kicked

3 off the IPLS board, right?

4 A.  I had no obligation to do that.

5 Q.  So you didn't do it?

6 A.  Of course not.  That's not -- I'm not trying to defame Sue

7 in any way.  She could tell anybody she wanted to.

8 Q.  Sue's being banned from the facility and kicked off the

9 board, that ruined your weekend, right?

10 A.  We didn't think she -- I wouldn't use the term she was

11 kicked off the board.  I think she simply ceased to participate.

12 Q.  When Sue was banned from the lab, that ruined your weekend,

13 right?

14 A.  Tell me again?

15 Q.  When Sue was banned from the lab on November 9, 2013, that

16 ruined your weekend, right?

17 A.  Yes.

18 Q.  You were on the phone with everybody you said?

19 A.  I would say that --

20 Q.  You were on the phone with people frequently discussing the

21 situation, right?

22 A.  I'm trying to figure out how we not lose all of the people

23 that were working there.

24 Q.  George you felt was overreacting?

25 A.  That would be my guess, yes.

1  Q.  And only a few days later when BHI held its vote to appoint

2  Drs. Taglialatela and Bill Hopkins, you did not think it was

3  important to tell the BHI board members what had happened?

4  A.  No.  I don't think that's my responsibility.  Sue was on the

5  BHI board.  She could tell them anything that she wanted to.

6  But why would I make her look bad to her own board?

7  Q.  Now, moving to December 18th of 2013, IPLS passed a

8  resolution acknowledging that Dr. Savage-Rumbaugh had been

9  kicked off the board in July of 2013, right?

10  A.  They claimed that that had happened.  I've never seen

11  anything documenting that.  To me that's an important issue.  So

12  I advised the board that that's something that they needed to

13  record if that, in fact, happened.

14  Q.  But you never told Dr. Savage-Rumbaugh in July of 2013 or in

15  December of 2013 -- strike that.

16          But you didn't tell Dr. Savage-Rumbaugh in December of

17  2013 that IPLS had passed that resolution, did you?

18  A.  I don't recall.

19  Q.  Mr. Simpson, I would now like to ask you some questions

20  about events that occurred on December 18, 2013 regarding the

21  establishment of Ape Cognition and Communication Institute,

22  ACCI.

23          On December 18, 2013, you sent an e-mail to

24  Mr. Zifchak, who was counsel for Dr. Savage-Rumbaugh at the

25  time, isn't that right?

1  A.  Yes.

2  Q.  You sent this e-mail at 6:23 p.m., on December 18th of 2013,

3  right?

4  A.  Right.

5  Q.  And in that e-mail you told Mr. Zifchak that you were

6  considering forming a new entity to assume ownership of the

7  bonobos, right?

8  A.  I'm not sure that I said -- I'm not sure what I said in it,

9  but I was informing him -- in the first place, I had been trying

10  to talk Bill Zifchak, as well as Julie Flattery, into becoming

11  counsel for Bonobo Hope.  I had been looking for somebody to

12  replace -- I would love to have somebody replace me with both

13  organizations.  I've got over $300,000 worth of my time invested

14  pro bono, and I can't afford to keep this up; but I've never

15  been able to find anybody who would accept the responsibility.

16  And the problem that you've got in what I do is you just can't

17  walk away, but --

18  Q.  But this e-mail that you wrote to Mr. Zifchak --

19  A.  So I think I told him -- I can't remember, but I had a

20  conversation with him on the telephone, and he was reluctant to

21  get involved.  And I don't think he felt he was involved at that

22  point in time.  In fact, I think he was thinking of retiring.

23  Q.  When was this conversation on the telephone?

24  A.  Earlier in December 2013.  I would have to go back to my

25  time record to determine that, but -- so I was simply putting

1  him on notice that we had filed -- in fact, I probably wrote

2  that message before they made the decision and we went ahead and

3  filed it because I didn't know what the name was going to be

4  until they were in the middle of this meeting, and I wanted to

5  put him on notice that because IPLS, we were not able to get it

6  reconstituted, we had to create a new organization, because I

7  didn't want him to be surprised about that, and what I really

8  needed to know was on the basis of the lawsuit, is that

9  something we needed court approval.

10  Q.  So let me make sure I'm understanding your testimony

11  correctly.  We have this e-mail here of December 18, 2013 that

12  you have acknowledged sending to Mr. Zifchak.  Your testimony is

13  earlier in the month you had actually called Mr. Zifchak --

14  A.  Yes.

15  Q.  -- and had a discussion about IPLS and BHI?

16  A.  Yes.

17  Q.  You sure of that?

18  A.  That's my memory.

19  Q.  Mr. Simpson, I would now like to direct your attention to

20  Exhibit 59, which pursuant to the pretrial order is a category A

21  and has been admitted into evidence.

22          Mr. Simpson, are you on Exhibit 59?

23  A.  Yes.

24  Q.  Is this the e-mail that you wrote to Mr. Zifchak on

25  December 18, 2013?

1  A.  Yes.

2  Q.  And you start the e-mail, "Bill, a voice out of your past"?

3  A.  Yes.  He and I had been --

4  Q.  You were contacting Mr. Zifchak after not having been in

5  contact for a long period of time?  That is why you are the

6  voice out of the past?

7  A.  Well, he and I have had a lot of conversations ever since I

8  first got involved.

9  Q.  But if you had spoken to him a week prior, you wouldn't have

10 written "a voice out of your past"?

11 A.  That's probably true.  I can't tell you when I talked to him

12 before.

13 Q.  I'm sorry?

14 A.  I can't tell you exactly when I talked to him before.  I was

15 more than frustrated when I found out we didn't have a

16 corporation.

17 Q.  So you did not actually speak to him on the phone in the

18 weeks before sending this e-mail?

19 A.  My memory tells me that at some point in time after I found

20 out I had a problem with IPLS and needed to form another

21 organization, that I needed to talk to Bill.

22 Q.  And then the second sentence of the e-mail says, "I have a

23 very novel question to ask you."

24 A.  Yes.

25 Q.  Do you see that?

1  A.  Yes.

2  Q.  So this is the first time you're bringing the issue to him?

3  A.  This is the first time I what?

4  Q.  This is the first time you're bringing the issues mentioned

5  in the e-mail to him?  That's why it's novel?

6  A.  That's probably right, yes.

7  Q.  And in this e-mail you told Mr. Zifchak that you were

8  considering forming a new entity, isn't that right?

9  A.  Yes.

10  Q.  And that new entity was to assume ownership of the bonobos,

11  isn't that right?

12  A.  Yes.

13  Q.  You said that IPLS at that time was subject to a $75,000 tax

14  lien from the State of Iowa that it could not pay, right?

15  A.  It had gone up with interest, yes.

16  Q.  And that the entity had been administratively dissolved and

17  you could not reinstate it, is that right?

18  A.  Yes.

19  Q.  You said that this new entity would assume IPLS's

20  responsibility for all of IPLS's assets, including the bonobos,

21  but not responsibility for the tax lien, right?

22  A.  There's other debts that Ted Townsend had left with IPLS.

23  And what I was trying to do was walk the line of fulfilling the

24  obligation to the bonobos without bringing all of the history of

25  Ted Townsend's organization with it.

1  Q.  So the new entity would assume all the assets of IPLS but

2  not the debts?

3  A.  That's the point.  Then it had a different board, and that

4  was protection from creditors.

5  Q.  Well, it had the same board, right?

6  A.  Well --

7  Q.  All of the members of the ACCI board were the members of the

8  IPLS board?

9  A.  Yes, most of them.

10  Q.  And in this e-mail you asked Mr. Zifchak if he thought that

11  you required federal court approval to do this transaction,

12  right?

13  A.  That was my question.  I wasn't part of the lawsuit, so I

14  really didn't know the content of what the issues were.

15  Q.  So you were asking Mr. Zifchak if this transaction required

16  the court's approval?

17  A.  Yes.

18  Q.  Mr. Simpson, you really did not want to know whether you

19  needed this court's approval, did you?

20  A.  That was my reason for the question.

21  Q.  Isn't it true that by the time you wrote this e-mail first

22  informing Mr. Zifchak that you were considering forming a new

23  entity, that new entity, ACCI, in fact, already had been formed?

24  A.  I had written this message before.  I didn't send it until

25  afterward.

1  Q.  Isn't it true that by the time you sent this e-mail, the new

2  entity discussed --

3  A.  It had been formed about three hours ahead of this message

4  going out.

5  Q.  So ACCI, in fact, already was formed by the time you sent

6  this e-mail?

7  A.  Yeah.  I didn't go back and correct that language.  That

8  wasn't -- to me that wasn't relevant.

9  Q.  More than that, by the time you sent this e-mail to

10  Mr. Zifchak, IPLS, in fact, already had transferred the bonobos

11  to ACCI, isn't that right?

12  A.  It had agreed to do it.

13  Q.  It had signed the bill of sale agreeing to transfer the

14  bonobos, right?

15  A.  The bill of sale memorialized the decision they made in that

16  board meeting.

17  Q.  The board meeting --

18  A.  On December 18th.

19  Q.  So you're telling me there was a board meeting --

20  A.  There was a physical board meeting in my office, I attended

21  probably 10 percent of it, in order to get the administrative

22  functions decided.  They met there all day.  December is not a

23  month that I would give up pro bono to anybody because we do

24  twice the volume in December as we do in any other month of the

25  year, and we have fewer days to do it in because of holidays.

1    And so I said if you need to have me present for part of your

2    meeting, then you're welcome to meet in our office if you would

3    like to do that.  I need to have some specific questions

4    answered, and that was one of them.

5    Q.  So that was 9:00 a.m., on December 18th of 2013, right?

6    A.  Where do you get the 9:00 a.m.?  Is that on the minutes?

7    Q.  I'm asking you from your memory.  The meeting occurred at

8    9:00 a.m.?

9    A.  It probably would have started at that point in time.  It

10   went all day.  I spent an hour of that time with them probably

11   at best.

12   Q.  And in that meeting ACCI accepted -- strike that.

13           And in that meeting ACCI passed a resolution agreeing

14   to receive the bonobos from IPLS, right?

15   A.  Yes.

16   Q.  And it memorialized that in a bill of sale, correct?

17   A.  Yes.

18   Q.  That all occurred before you sent your e-mail?

19   A.  Yeah, that's probably right.  Because I sent the e-mail only

20   after the meeting was over.  I didn't want to send the e-mail

21   until I knew the decisions had been made.  I wasn't trying to

22   make the decisions for them, but I --

23   Q.  You did not seek this court's approval before doing the

24   transaction, isn't that right?

25   A.  No.  But then I didn't look at myself as even being a part

1  of this court's action.  IPLS was represented by Paul Burns.  I

2  hadn't even talked to him.

3  Q.  So before this transaction occurred, you did not ask

4  Mr. Zifchak his opinion about whether court approval was

5  required?

6  A.  Well, I didn't know.  I didn't ask him that question until I

7  knew they made the decision to do it.  My concern, what I was

8  doing at that time was protecting the liability of these board

9  members from the public, and I had to have a corporate shield.

10  Now, in a business you make decisions collectively in board

11  meetings.  You document all of those things typically sometimes

12  quite a ways afterwards.  Sometimes you never document it until

13  all of a sudden you're forced to.

14  Q.  Clearly you had the idea in your head that this transaction

15  might require court approval, right?

16  A.  I didn't know.  It was a question that was raised in my mind

17  and I was worried about it.

18  Q.  And you were counsel to IPLS and ACCI when it was

19  established at the time?

20  A.  Yes.

21  Q.  What if the transaction did require court approval?

22  A.  Then I needed to get somebody who was going to submit it to

23  the court so it could get approved.

24  Q.  And you never looked into that before the transaction

25  occurred?

1  A.  No.  It was not on my mind until all of a sudden I'm trying

2  to put all the pieces together and I'm saying this is one that I

3  don't know the answer to.

4  Q.  Mr. Simpson, didn't you testify that you drafted the e-mail

5  to Mr. Zifchak several days before you actually sent it?

6  A.  I did this -- I'm not sure in terms of timing --

7  Q.  You said you drafted it at one point and then sent it in at

8  a later point?

9  A.  That's right.

10 Q.  Is it fair to say there was at least a day in between those

11 two then?

12 A.  That was --

13 Q.  You wrote the e-mail at least a day before you sent it?

14 A.  That was pro bono time.  I've got a whole bunch of clients

15 backed up wanting things done by December 31st for tax reasons.

16 I fit things in pro bono when I can.  I typically work 7:00 to

17 7:00, half days, but at that point in time I was working until

18 9 o'clock at night, and at my age it's getting hard to do.

19 Q.  And I would like to ask you some questions about the Yerkes

20 Regional Primate Research Center.  Are you familiar with that

21 entity?

22 A.  Other than the fact I've heard the name and I know that

23 Duane Rumbaugh had something to do with setting it up, and I

24 know it's in Georgia; but beyond that, I have very little

25 knowledge about it.

1  Q.  Isn't it true that in order for ACCI to acquire bonobos from

2  the Yerkes Regional Primate Center at this point or anytime

3  after it was formed, Dr. Savage-Rumbaugh and Dr. Duane Rumbaugh

4  cannot be associated with ACCI in any way?

5  A.  I was told -- and probably by one of the Rumbaughs -- that

6  they had had problems when they were exiting Georgia to bring

7  the bonobos to Iowa, and Yerkes was mentioned at that point, I

8  think probably by Duane because most of my conversation about

9  that was with him.  So I knew that there was some issues.

10       What was happening, because of the research that Sue

11  has done with these bonobos, she has shown that the difference

12  between the bonobo and the humans is very narrow.  Genetically

13  it's a percent-and-a-half.  She showed that these bonobos have

14  feelings and aspirations that are close to human.  That caused

15  people that were using apes to do medical research to have a

16  real hiccup because now all of a sudden you're doing bad things

17  to people -- you know, to animals that have the same kind of

18  feelings that we do.

19       And so as a result of that, the Director of the

20  National Institute of Health, being sympathetic to Sue's view,

21  determined that no longer can we do biomedical research with

22  apes.  The problem that that causes is that they owned, I don't

23  know, close to 500, I assume, chimpanzees around the world that

24  were being used for medical research that they no longer had a

25  need for.  Yerkes has quite a few chimpanzees.  There is a bill

1  that passed Congress that said that the NIH chimpanzees could be

2  furloughed, and there was a -- if my memory serves me, something

3  like $15,000 a year retirement fund for chimpanzees to cause

4  people to be willing to take them.  That's never really been

5  funded, but that was the first half of the legislation.

6          Yerkes owned a bunch of these chimpanzees.  They

7  simply wanted to get rid of them, and they were willing to pay

8  money up front instead of the $15,000 a year for somebody to

9  take them.  We've got a facility at the Great Ape Trust that's

10  not being used that was originally used for the gorillas, but

11  when Ted quit funding them, the gorillas were moved.  So it's an

12  empty building and it could house I've been told about 20

13  chimpanzees.  If we got the Yerkes money up front, we would have

14  money then that we could pay the utility bills out over the

15  course of the winter, which is what everybody was worried about,

16  and continue paying some of the salaries for key people.

17          Jared and Bill Hopkins have access and a relationship

18  with Yerkes and were a source of the potential of bringing these

19  bonobos to Des Moines and we were hoping right now.  Because of

20  Sue's prior history, my understanding at that point was that

21  they wanted assurance that this was not a facility Sue was still

22  running.  And so, consequently -- and I can't remember in terms

23  of exact timing, but I told Sue this was a pending problem.  And

24  she offered to go down there and clean up her relationship with

25  the folks in Georgia.  I suggested that she not do that at that

1  point in time because I didn't think anybody should get between

2  Jared and Bill if they were capable of bringing them here and,

3  you know, cause problems because I was -- my concern at that

4  point in time for the organization, looking at it from the

5  outside, was that if they don't have the source of funding to

6  pay the heating bill, this organization is not going to be here.

7  And so that was the imminent problem at that time, and Sue was a

8  component of it because I had understood that they at least

9  wanted assurance that she wasn't running the facility or they

10 weren't going to give the chimpanzees to them.  That was my

11 knowledge at that point.

12 Q.  If I could please, I would like to identify for the court

13 Exhibit 38.

14         Mr. Simpson, if you could please turn to Exhibit 38.

15 A.  Yes.

16 Q.  Do you recognize this document?

17 A.  Yes.

18 Q.  What is this document?

19 A.  This is -- once this lawsuit was going forward, I said to

20 George Caudill, tell me what it is that Yerkes actually said.

21 What's causing the problem?  Why are we dealing with this issue

22 with Sue?

23         And this was sent to me in an e-mail from George.  He

24 said the first question in the application that IPLS or now ACCI

25 would have to submit to Yerkes to get these chimpanzees, this

1  was the first question that they asked and --

2  Q.  And the question -- I'm sorry, continue.

3  A.  Tell me what?

4  Q.  I'm sorry, I didn't want to cut you off.

5  A.  No.  I was just saying that this was far more descriptive

6  than anything that I had understood before then and, frankly, I

7  didn't know that it was intended to include Duane; but,

8  obviously, he lives in New Jersey and so that's not really an

9  issue, but --

10  Q.  And these questions that were on the questionnaire, the

11  first one is, "Are either of the Rumbaughs associated with your

12  sanctuary in any way at this time," right?

13  A.  That's the first question.  And then the second part of that

14  question is, "Can you guarantee they will have no more

15  involvement?"  And that's what apparently Jared and Bill Hopkins

16  were faced with.

17              MR. NEIHAUS:  At this time I would offer Exhibit 38

18  into evidence.

19                          (Defendants' Exhibit 38 was

20                           offered in evidence.)

21              MR. MILLER:  Objection, Your Honor.  Keeping in mind

22  your prior statements with respect to hearsay, I do think this

23  has a different quality.  It is hearsay and I would reassert

24  that objection.

25              THE COURT:  I will receive it, subject to the

1  objection again.  I don't think it has any probative value for

2  the truth of the matter asserted, merely evidence of a question

3  that was asked; but it's received, subject to the objection.

4                              (Defendants' Exhibit 38 was

5                              received in evidence.)

6          THE COURT:  I think what we'll do since we're paused

7  here is we'll take our mid-morning recess.  We're in recess for

8  15 minutes.

9          (Recess at 10:35 a.m., until 10:55 a.m.)

10         THE COURT:  Please be seated.

11         Counsel.

12 BY MR. NEIHAUS:

13 Q.  Mr. Simpson, before the break we were discussing the Yerkes

14 Regional Primate Research Center and the restrictions it put on

15 Dr. Sue Savage-Rumbaugh having an association with ACCI or

16 formerly IPLS.  If it wants bonobos from Yerkes, then ACCI or

17 formally IPLS could not even say that Dr. Savage-Rumbaugh had

18 taken a leave of absence, right?  It had to say that she has

19 retired?

20 A.  I don't really know what they would have to say for Yerkes

21 to accept.  All I know is that this is the statement that was

22 shown to me in the last few months.  I've never seen the

23 application.

24 Q.  You are aware of the Yerkes restrictions prior to the last

25 few months, right?

1   A.   I was aware of the fact that they were concerned about Sue

2   for some period of time.

3   Q.   I would like to identify for the record Exhibit 51, which is

4   an e-mail from Lyle Simpson to Dr. Savage-Rumbaugh dated

5   December 12, 2013.

6          Mr. Simpson, are you looking at that exhibit?

7   A.   Yes.

8   Q.   This is the e-mail that you wrote?

9   A.   Yes, uh-huh.

10  Q.   And in the second paragraph of the e-mail you say, "The only

11  real problem that I have with what you have outlined is that we

12  must say that you have 'retired' from IPLS in order to be able

13  to answer the Yerkes questionnaire honestly."

14  A.   That was my understanding.  That's what was told to me.

15  Q.   You continue, "We cannot say that you have taken 'a leave of

16  absence' if we want to acquire Yerkes' chimpanzees which Jared

17  and Bill wish to bring to Des Moines."

18          That was your understanding at the time, right?

19  A.   That's what I was told.  I'd never seen the reason for it.

20  Q.   And then you continue, "That does provide immediate capital

21  so it is an avenue the IPLS board must pursue."

22          That was your understanding at the time, right?

23  A.   Yes.

24  Q.   IPLS's only option was to procure chimpanzees from Yerkes so

25  it could get funding, isn't that right?

1  A.  That was the immediate source of funding that was apparent

2  to the board at that time.  It's obviously not happened yet.

3  Q.  And you felt that was the only option IPLS had?

4  A.  We were moving into winter.  There's no money to pay the

5  utility bills.  We didn't see any other source of funding at

6  that time.

7  Q.  And IPLS did have another option, right?

8  A.  Which was move the bonobos?

9  Q.  Under the settlement agreements, if IPLS could not procure

10  the funding it needed to sustain itself, then Dr. Sue

11  Savage-Rumbaugh and BHI had the right to relocate the bonobos,

12  right?

13  A.  And then the people of Iowa lost one of the most valuable

14  research tools in the world today.

15  Q.  But that was an option that was available, right?

16  A.  It's an unacceptable option.

17  Q.  Dr. Sue Savage-Rumbaugh would be able to continue her life

18  work that way?

19  A.  I don't know that.

20          MR. NEIHAUS:  I would like to offer Exhibit 51 into

21  evidence.

22                          (Defendants' Exhibit 51 was

23                           offered in evidence.)

24          MR. MILLER:  I again object on the basis of hearsay,

25  Your Honor, noting I understand your prior ruling on that.

1      THE COURT:  51 is received, subject to the objection.

2                              (Defendants' Exhibit 51 was

3                              received in evidence.)

4      MR. NEIHAUS:  Excuse me for one moment, Your Honor.

5      (Pause.)

6  BY MR. NEIHAUS:

7  Q.  Mr. Simpson, what measures, if any, has ACCI taken to date

8  to deal with the threat of flooding at the lab?

9  A.  I can't answer that question.

10  Q.  Do you know of any measures that ACCI has taken to deal with

11  the threat of flooding at the lab?

12  A.  I know that this is an issue that they've addressed.  I do

13  not know what decisions have been made.

14  Q.  What measures, if any, has ACCI taken to test the toxicity

15  of the groundwater at the lab?

16  A.  I have no way of knowing that.

17  Q.  Has IPLS been reinstated to date?

18  A.  It's a de jure corporation today.  I mean, simply because

19  you lose your charter with the state so you're no longer a

20  de facto corporation, which means that a lot of the laws that

21  protect corporations apply, doesn't mean the organization itself

22  ceases to exist.  It just changes character, and it's running --

23  it's still -- there are aspects of IPLS that you would have to

24  say still are in existence today.

25  Q.  You agree --

1  A.  It's not an operating company.

2  Q.  IPLS today is not an operating company?

3  A.  Not in the sense that it's -- it's running parallel.  It has

4  the same board that ACCI has, and so when one board meets,

5  technically both boards are meeting; the same kind of issue we

6  had when Bonobo Hope and IPLS were joined together.  But IPLS

7  itself is a fictitious name now, as far as the state is

8  concerned, of ACCI, and so it's still a functional organization

9  under the guise of ACCI.

10  Q.  You agree that the Iowa Secretary of State administratively

11  dissolved IPLS in August of 2013, isn't that right?

12  A.  That's right.

13  Q.  And you --

14  A.  That the Attorney General dissolved, administratively

15  dissolved.

16  Q.  And you helped IPLS apply for reinstatement, right?

17  A.  Yes.

18  Q.  And that request was denied, right?

19  A.  Yes, until the lien has been paid.

20  Q.  Has the lien been paid?

21  A.  No.

22  Q.  Has IPLS been reinstated?

23  A.  Not in that sense, no.

24  Q.  Let's talk about that tax lien for a moment, Mr. Simpson.

25  What plans does IPLS currently have to lift the tax lien?

1  A.  I don't have any knowledge of that.

2  Q.  Do you know of any plans that IPLS has currently to lift the

3  tax lien?

4  A.  I know of none.

5  Q.  How does IPLS intend to pay that tax lien?

6  A.  I don't know.

7  Q.  What fund-raising effort has IPLS taken since it was

8  administratively dissolved to pay that tax lien?

9  A.  I don't have any knowledge of that.

10  Q.  Do you have knowledge of any fund-raising efforts that IPLS

11  has taken since it was administratively dissolved in order to

12  pay off the tax lien?

13  A.  I know that IPLS is continually seeking funding.  I have no

14  idea what their budget or plans would be related to that.

15  That's not my area of concern.

16  Q.  Who's seeking funding on behalf of IPLS?

17  A.  Jared and Bill Hopkins.

18  Q.  So is that funding distinct from their funding for ACCI?

19  A.  No.

20  Q.  Do you know of any efforts that have been made since IPLS

21  was administratively dissolved to raise funds specifically for

22  IPLS?

23  A.  No.

24           MR. NEIHAUS:  One more moment.

25           (Pause.)

1          MR. NEIHAUS:  At this time I have no more questions,

2    subject to redirect.

3          THE COURT:  Cross-examination, Mr. Miller.  As we

4    mentioned yesterday, you can combine your cross-examination with

5    your direct examination if you care to.

6          MR. MILLER:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. MILLER:

9    Q.  Good afternoon, Mr. Simpson.

10         Can you hear me okay?

11   A.  Yes, I can.

12   Q.  Actually good morning.  I'm sorry.

13         You've been a Des Moines, Iowa lawyer, based lawyer

14   for about 50 years, is that correct?

15   A.  Fifty-two January 15th -- June 15th I mean.

16   Q.  And do you have an area of specialty or expertise?

17   A.  I take people from a point of an idea through hopefully what

18   makes them successful, the transition planning to maximize the

19   value they've created in their lifetime and the estate planning

20   to make the best statement they can make about their life.  My

21   practice is limited to those areas.

22   Q.  Does that include a practice in corporate law?

23   A.  Yes, corporate law, limited liability company law.  I

24   chaired the limited liability company session for the Iowa Bar.

25   It's an area that I work in.

1  Q.  This may seem a silly question, but I want to make sure we

2  get it in the record.  Have you ever taken an action that has

3  not been authorized by a client of yours?

4  A.  Not to my knowledge.

5  Q.  Are you a member of the Board of Directors of IPLS?

6  A.  No.

7  Q.  Are you a member of the Board of Directors of ACCI?

8  A.  No.

9  Q.  Are you a member of the Board of Directors of BHI?

10 A.  No.

11 Q.  Have you ever been a member of any of those boards?

12 A.  No.

13 Q.  I think earlier you were starting to explain, and I want to

14 make sure I give you an opportunity to do so.  To your

15 knowledge, are the lexigram keyboards at the facility being

16 used?

17 A.  I have no knowledge of that.  I haven't been there since.

18 Q.  And you've known Dr. Rumbaugh for several years, is that

19 right?

20 A.  Yes.

21 Q.  Dr. Sue Rumbaugh, right?

22 A.  Uh-huh.

23 Q.  And you worked with her over the years for various purposes?

24 A.  Yes.

25 Q.  She at one point in time discussed a change in her name to

1  match that of the colonies, is that correct?

2  A.  Apparently she has given a surname of Wamba to the bonobo

3  community that we have here in Des Moines, and she did ask about

4  the possibility of changing her last name to that.

5  Q.  Have there been points in time when you've dealt with

6  Dr. Rumbaugh in which she was unavailable to you for a period of

7  time?

8  A.  Yes.

9  Q.  And was that due to illness or what caused it that you

10  understood?

11  A.  Essentially I guess I would have to say it's because of

12  illness.

13  Q.  And was this a matter of days or matter of weeks that you

14  would go without contact?

15  A.  Well, more like months.

16  Q.  Did you learn in April of 2012 that Dr. Sue was not able to

17  care for the bonobos and to assure the safety of people and the

18  bonobos?

19  A.  Yes.

20  Q.  And I'm going to refer you to an exhibit --

21          MR. MILLER:  Your Honor, may I approach to help?

22          THE COURT:  You may.

23          MR. MILLER:  And, Counsel, Your Honor, I'm going to

24  refer the witness to Exhibit 1000 of the plaintiffs' exhibits.

25  BY MR. MILLER:

1  Q.  Mr. Simpson, do you see Exhibit 1000 front of you there?

2  A.  Yes.

3  Q.  I refer you to the first page -- first off can you identify

4  for me what Exhibit 1000 is?  Is that an e-mail string that

5  you --

6  A.  Yes.

7  Q.  At least the most recent e-mail was to you.  You sent an

8  e-mail to Dr. Duane Rumbaugh on April 3rd of 2012?

9  A.  Yes, it is.

10 Q.  And if you follow through the rest of that exhibit, is that,

11 again, an e-mail string that begins at the very tail end with an

12 e-mail from Dr. Sue on April 1st of 2012?

13 A.  Yes.

14 Q.  Okay.  In that e-mail do you see there that Dr. Sue is

15 e-mailing Dr. Ken Schweller?  Do you see that?

16 A.  Yes.

17 Q.  And who is Ken Schweller -- or what was his role as of

18 April 1, 2012?

19 A.  He would have been -- I think he was still chairman of the

20 board of IPLS.

21 Q.  And she reports, "Ken, I have been not able to care for the

22 bonobos and to assure the safety of people or the bonobos,"

23 correct?

24 A.  Yes.

25 Q.  And that e-mail continues on.  Would you agree that there's

1  further discussion resulting from that e-mail from Dr. Sue?

2  A.  Yes.

3  Q.  Do you recall -- you learned about this e-mail on April 1,

4  2012?  You received it, correct, at least in a forward?

5  A.  I received it in a string of e-mails.

6  Q.  And what action did this e-mail prompt from you?

7  A.  I think it started a conversation between myself and Duane

8  Rumbaugh.

9  Q.  Was this e-mail concerning to you and Mr. Schweller?

10  A.  Oh, my, yes.

11  Q.  Why is that?

12  A.  Well, Sue was running the facility, and as I said earlier,

13  she was somewhat of a one-person band.  It would take three or

14  four people to fill her shoes.

15  Q.  And did Mr. Schweller talk with Sue and yourself about this

16  situation?

17  A.  Yes, he did.

18  Q.  If you would look at the bottom of page 5 of the exhibit,

19  bottom right corner --

20  A.  Uh-huh.

21  Q.  -- do you see there the subject matter "Attn:  LYLE Sue in

22  trouble"?

23  A.  That was really a shock.

24  Q.  And that's Dr. Schweller reporting to you what his

25  discussion with Dr. Rumbaugh entailed, is that right?

1   A.  Yes.

2   Q.  Was this issue with respect to Dr. Sue in April resolved

3   immediately?

4   A.  No.

5   Q.  What occurred subsequent to this e-mail?

6   A.  Well, I was seeking -- because I had the most direct

7   contact, Duane Rumbaugh has been a personal friend for a long

8   time.  We lived on the same floor in the Park Fleur, and I was

9   seeking help from him because whenever Sue has had this

10  problem in the past that I was aware of, he was her source of

11  support.

12  Q.  And is this e-mail reflective of similar circumstances as

13  those you described earlier where Dr. Sue would have some issue

14  with respect to the bonobos and the facility and would not be in

15  the picture?

16  A.  Yes, many years earlier.

17  Q.  And were the events discussed and described here in the

18  April e-mail, they precede the next year or maybe more

19  discussion and development that you've testified to with respect

20  to where the boards would head?

21  A.  I'm not quite following the question.

22  Q.  Right.  Sorry about that.  I'm going to move on,

23  Mr. Simpson.

24          Mr. Simpson, do you have any personal knowledge from

25  direct contact with somebody at Yerkes with respect to whatever

1  Yerkes may intend relating to Dr. Rumbaugh?

2  A.  No.

3  Q.  And I mean either Dr. Sue Rumbaugh or Dr. Duane Rumbaugh.

4  A.  No, other than what I've heard from them.

5  Q.  When you say other than what you've heard, you're referring

6  to from Mr. Caudill?

7  A.  From Dr. Rumbaugh or Sue.

8  Q.  Okay.  So you've never spoken to anybody at Yerkes who has

9  told you we're not going to do anything with ACCI unless Dr. Sue

10  is out of the picture?

11  A.  No.

12  Q.  And do you profess in any way to understand what chimpanzees

13  or what information or what location those chimpanzees at Yerkes

14  may come from?

15  A.  No.

16  Q.  You don't have any personal knowledge with respect to that?

17  A.  No.

18          MR. MILLER:  That's all my questions, Your Honor.

19          Thank you.

20          THE COURT:  Redirect?

21          MR. NEIHAUS:  One moment, Your Honor, please.

22          (Pause.)

23                    REDIRECT EXAMINATION

24  BY MR. NEIHAUS:

25  Q.  Just a few questions, Mr. Simpson.

1          You agree, though, that generally Sue was around,

2   right?

3   A.  Yes.

4   Q.  And she did take care of the bonobos?

5   A.  Yes.

6   Q.  And you mentioned that the few times that she was absent

7   were years apart, right?

8   A.  The two times where I've known that there was depression

9   issues, yes.

10  Q.  And as you saw in the exhibit that was placed before you,

11  when she's in a position where she does not feel she can assure

12  the safety of the people or the bonobos around her, she can

13  identify it, right?

14  A.  She did in this case, yes.

15  Q.  And that situation got resolved?

16  A.  Yes.

17  Q.  Assuming that Dr. Savage-Rumbaugh was unable for any reason

18  to reenter the lab, does that in any way negate BHI's rights

19  under the settlement agreement?

20  A.  Not that I can see.

21  Q.  And just one other topic, Mr. Simpson.

22          How many board meetings has ACCI had since July of

23  2012?

24  A.  I really have no way of knowing that.

25  Q.  Do you know if ACCI has had any board meetings since July of

1    2012?

2    A.   I know they have.  If they provide me minutes of their

3    meeting, then I record those in the minute book, and that's

4    really the only information that I would have.

5    Q.  Do you have any minutes of ACCI board meetings since July of

6    2012?

7    A.   Off the top of my head, I can't respond to that.  Whatever

8    we did have that I had in the minute book was provided to you.

9    Q.   I'm sorry, I believe I said 2012.  I meant since July of

10   2014.

11   A.   I honestly -- I'm typically not in the loop of their

12   meetings.  I know there's issues that they've had to deal with,

13   so I'm assuming they've had meetings.

14   Q.   You don't have records of any meetings?

15   A.   Since 20' --

16   Q.   Since July of 2014.

17   A.   I get an e-mail exchange from time to time.  I don't put

18   those in the minute book.  I don't recall that I've had physical

19   minutes of a meeting since then that has gone through the minute

20   book.

21            MR. NEIHAUS:  No further questions.

22            THE WITNESS:  Okay.

23            MR. MILLER:  Just a couple of follow-ups, Your Honor.

24

25

1                    RECROSS-EXAMINATION

2   BY MR. MILLER:

3   Q.  Mr. Simpson, have you ever at any point in time intended to

4   deceive Dr. Rumbaugh with respect to any of these events that

5   you've described?

6   A.  Heavens no, nor would I.

7   Q.  Have you intended to deceive BHI with respect to these

8   issues?

9   A.  No, not at all.

10  Q.  Same question for IPLS?

11  A.  No.

12  Q.  Or ACCI?

13  A.  No.  My duty is to be a conveyor of information to my client

14  and that's -- I do that daily.

15          MR. MILLER:  Nothing further.

16          Thank you.

17          THE COURT:  Anything further?

18          MR. NEIHAUS:  Nothing further, Your Honor.

19          THE COURT:  You may step down, sir.

20          Thank you.

21          This witness is under subpoena.  May he be excused?

22          MR. STAMBAUGH:  Yes, Your Honor, he may.

23          MR. MILLER:  Yes.

24          THE COURT:  You're excused.

25          Thank you.

1                              (Witness excused.)

2          MR. STAMBAUGH:  May we call our next witness?

3          THE COURT:  Please.

4          MR. STAMBAUGH:  Claimants call Derek Wildman.  May we

5  inquire?

6          THE COURT:  Would you come forward, sir.

7          THE CLERK:  Please stop right there and raise your

8  right hand.

9          DEREK WILDMAN, DEFENDANTS' WITNESS, SWORN

10         MR. STAMBAUGH:  Mr. Zifchak will be doing the

11  examination, Your Honor.

12         THE COURT:  All right.

13                      DIRECT EXAMINATION

14  BY MR. ZIFCHAK:

15  Q.  Good morning, Professor.

16  A.  Yes.

17  Q.  Could you please state your name and business address for

18  the record.

19  A.  Yes.  My name is Derek Wildman.  My business address is the

20  Institute for Genomic Biology at the University of Illinois at

21  Urbana-Champaign.

22  Q.  Who is your current employer, please?

23  A.  The University of Illinois.

24  Q.  And is it correct that you're currently a member of the

25  board of Bonobo Hope Initiative?

1   A.   Yes.

2   Q.   How long have you been a professor at the University of

3   Illinois?

4   A.   About ten months.

5   Q.   Prior to that where were you employed?

6   A.   Wayne State University in Detroit, Michigan.

7   Q.   For how long?

8   A.   Fourteen years.

9   Q.   At Illinois you are a professor of what subject or subjects?

10  A.   I am a professor of molecular and integrative physiology and

11  I am a faculty member at the Institute for Genomic Biology.

12  Q.   And same question with respect to Wayne State?

13  A.   At Wayne State I began as a post-doctoral associate in the

14  year 2000, and I was promoted to the faculty as an assistant

15  professor in 2005.  I received tenure and promotion to associate

16  professor in 2009 and was promoted to full professor in August

17  2014.  And I'm currently still an adjunct professor there at the

18  Center for Molecular Medicine and Genetics at the Wayne State

19  University School of Medicine.

20  Q.   Professor Wildman, what do you teach currently at the

21  University of Illinois, what subjects?

22  A.   The subjects I teach are human medical genomics.

23  Q.   Is it correct that you drove six hours from Champaign,

24  Illinois, last night to come here and give testimony?

25  A.   Yes, it is correct.

1  Q.  Will you tell the court, please, a little bit about your

2  educational background.

3  A.  Sure.  I became -- I received my undergraduate training at

4  the University of Colorado in Boulder, where I became interested

5  in human evolutionary studies, and my degree was in

6  anthropology, after which I enrolled in the Ph.D. program at the

7  University of Arizona in Tucson.  I obtained a master's degree

8  from that university, and I switched and went to New York

9  University, to the New York Consortium in Evolutionary

10  Primatology and obtained by Ph.D. from New York University in

11  the year 2000.

12  Q.  Who were the educational institutions that are members of

13  the consortium that you just identified?

14  A.  That's New York University, the City University of New York,

15  and Columbia University.

16  Q.  What did you get your doctorate in?

17  A.  My doctorate was on the genetics of baboons, specifically

18  baboons from the Arabian Peninsula, Saudi Arabia, and Yemen.  I

19  did field work in Ethiopia and in Yemen to obtain that degree

20  and collected samples and worked with baboons.

21  Q.  So your doctorate is in anthropology?

22  A.  It is in anthropology, uh-huh.

23  Q.  I know we have not had a chance to introduce your CV into

24  the record.  Could you comment just briefly on whether you have

25  published in these fields?

1    A.  Sure.  I've published approximately 100 peer-reviewed

2    articles.  Additionally, I'm Editor in Chief of the Journal of

3    Molecular Phylogenetics and Evolution, which is a scholarly

4    journal devoted to understanding the evolutionary relationships

5    among species of organisms.

6    Q.  How did you get interested in that latter subject?

7    A.  Well, initially I became interested in phylogeny and

8    evolution as an early graduate student, and my Ph.D. was

9    involved in the baboons as I mentioned.  What was -- what I was

10   trying to find out was when did the baboons leave Africa

11   because, as we all know, humans as part of their migration left

12   Africa around a couple -- a hundred thousand years ago, and I

13   wanted to see if other species left at times coincident.

14          The way you can do that is by understanding genetic

15   relatedness and tabulating the number of DNA mutations that have

16   occurred over time as a molecular clock, and so that was my

17   initial interest.  I then became interested in more general

18   primate and mammalian phylogeny, and I've done quite extensive

19   work in that area.

20   Q.  Very briefly can you define phylogeny?

21   A.  Yes.  Phylogeny is the genealogy of species.

22   Q.  Could you also summarize what your principal interests are

23   at this time as a scholar?

24   A.  As a scholar I'm interested in what defines humans, what

25   makes us humans, how did we evolve, and I'm interested in that

1 from the perspective of genetics, genomics, and epigenetics.

2 Q. Is it fair to say that you are a scientist?

3 A. I would say so, yeah.

4 Q. Okay.  Did there come a point in time when you learned of

5 the work of Dr. Sue Savage-Rumbaugh?

6 A. So I had heard of Dr. Rumbaugh's work.  Since the 1990s I

7 was aware of it.  She's one of the luminaries in the field of

8 comparative ethology and the evolution of language.

9    So as part of any anthropological training, any

10 anthropology degree would -- degree granting institution would

11 likely expose their students to the work of Dr. Rumbaugh.

12 Q. And were you exposed to the work?

13 A. Yes, uh-huh.

14 Q. And did that lead you at a point in time to make contact

15 with Dr. Savage-Rumbaugh?

16 A. Well, so one of the things that I have done as part of my

17 career is understand the relations of humans to other apes from

18 a genetic perspective, and with my colleague and mentor, Morris

19 Goodman, who's now deceased, we published work about the genetic

20 evolution of humans, chimpanzees, gorillas, other apes, and we

21 came to the conclusion that humans and chimpanzees are more

22 closely related, including bonobos, are more closely related to

23 each other than either of those species is to gorillas or other

24 apes and that their similarities were so apparent they deserved

25 to be classified in the same genus of mammals, and that genus is

1   homo.  And so we proposed that humans and chimpanzees should be

2   classified this way, in a way similar to the way donkeys and

3   horses are classified in the same genus Equus.  And so that

4   perspective about shared similarities is something that made the

5   work of Dr. Rumbaugh attractive to both Morris and myself

6   because we're interested in the features that unite us, not the

7   features that separate us, and I think that Dr. Rumbaugh has in

8   some ways similar perspectives.

9   Q.  When did you first make contact with Dr. Savage-Rumbaugh?

10  A.  This would have been in 2008, late 2008, early 2009.

11  Q.  What was the nature of the contact?  What prompted it?

12  A.  So Sue had contacted Professor Goodman, and we came out here

13  and visited the facility in Des Moines and met with Sue for a

14  couple of days and discussed a project that we were interested

15  in on working on together, and that project initially was the

16  sequencing of the genome of Kanzi, and that was a large scale

17  project that is still ongoing.

18  Q.  Briefly, could you explain what you mean by, in lay terms,

19  sequencing the genome of Kanzi?

20  A.  Sure.  So our cells contain nuclei within which resides DNA.

21  This DNA genome is packaged in chromosomes of which we have 23

22  pairs.  Kanzi and bonobos have 24 pairs.  Total number of DNA

23  nucleotype bases or letters, if you want to think of it as an

24  analogy, stretch out to be about three billion letters of DNA

25  sequence in the genome of a human or a bonobo.

1          So we undertook a project to sequence every single one

2    of those three billion letters in Kanzi's genome, and we did

3    that ad nauseam I would say.  We sequenced each base about a

4    hundred times.

5    Q.   Okay.  You say that you spent a couple of days in Des Moines

6    with Dr. Rumbaugh.

7    A.   Uh-huh.

8    Q.   What did that entail?

9    A.   That entailed visiting the facility.  That entailed many

10   intense discussions about research and potential research in the

11   future, potential collaborations.  What was most interesting for

12   me was observing Sue with the bonobos.

13   Q.   And what did you observe?

14   A.   I observed a family.  I observed Sue interacting with

15   Panbanisha, with Kanzi, with Nyota, with the other bonobos, and

16   I saw relationships that were clearly long-term relationships

17   that were meaningful.

18   Q.   Did these observations have any particular relationship to

19   the purpose of your visit or were these just incidental to the

20   visit?

21   A.   Well, so what the purpose of our visit was was to begin to

22   explore a study from the genetic and epigenetic perspective on

23   the evolution of language.  Something that we in this room all

24   share is language.  It is very difficult to study the origins of

25   human language because it has already happened, possibly as long

1    ago as several hundred thousand years.  In the case of the

2    homo-pan culture that Sue has developed over the decades working

3    with Kanzi and the others, what we have is the possibility of

4    language emerging de novo in another species.  We don't have --

5    language doesn't fossilize.  We don't have fossil words, so

6    we -- if we want to study that, we can study that from the

7    perspective of genetics and from the perspective of epigenetics.

8    Q.  You mentioned that Dr. Rumbaugh contacted Professor Goodman.

9    A.  Uh-huh.

10   Q.  Do you know why it was that she contacted him?

11   A.  Well, Professor Goodman in the early 1960s made a profound

12   discovery.  This discovery was that using immunological data --

13   Professor Goodman was trained as an immunologist -- was that

14   humans, chimpanzees and gorillas were more similar to one

15   another immunologically than either of those three creatures

16   were to something like orangutans.  Professor Goodman was very

17   excited about this at that time, and actually he went to a

18   conference in Austria that had many of the top geneticists of

19   the field at the time.  And he was excited to present his

20   results, and he's written about this, so it's a matter of public

21   record.  But what he found was a lot of resistance to the idea

22   that humans were similar to apes and not distinct from all apes.

23   The sort of working hypothesis was that humans were profoundly

24   genetically distinct from everything else.

25            Dr. Goodman's finding has been supported by subsequent

1    studies from him and many other groups at the level of proteins

2    and amino acid sequences, DNA sequences, insertion of

3    transposable elements.  Many different types of data have

4    supported that hypothesis, and it's been refined to say that

5    humans and chimpanzees are, including bonobos are the sister

6    group to the human species and that we share a recent common

7    ancestor, a most recent common ancestor about six million years

8    ago.

9    Q.   Why then did Dr. Rumbaugh contact Dr. Goodman?

10   A.   Well, so because Dr. Goodman was able to see the

11   similarities that humans shared with other species, and

12   Dr. Goodman was able to look at human evolution from an unbiased

13   perspective.  That was his greatest genius, and his genius was

14   recognized.  He was elected to the National Academy of Sciences.

15   Dr. Goodman was able to look at the DNA sequence without any

16   packaging of human behaviors or human accomplishments and just

17   look at that and make what he considered to be rational

18   decisions that were based solely on the amount of genetic

19   similarity and genetic difference in a species-by-species

20   comparison.

21          And he and I worked very closely on a number of

22   grants, a number of research projects for a period of ten years,

23   and so when he told me that he had the opportunity to come talk

24   to Sue, I was, you know, gangbusters, we must do this, we must

25   go and talk to her.  It's a great opportunity.

1  Q.  In your travels as a scientist, have you visited primate

2  colonies other than the one here in Des Moines?

3  A.  Sure, sure.

4  Q.  Based on your observations in, I think you said 2008, how

5  would you contrast the Des Moines bonobo colony with the typical

6  primate colony you have visited elsewhere?

7  A.  The Des Moines colony was not a facility like any other

8  primate colony I've seen.  Most primate colonies are -- the

9  animals are in cages.  They are restricted in terms of what they

10  can do, and to be honest, they are not happy, those primates.

11  The bonobos in Des Moines and the interactions with humans is

12  unique in the world in terms of a captive primate situation.

13          I think we lost the mic.

14  Q.  Did we lose the mic?

15  A.  Yes.

16          THE CLERK:  There's nothing I can do.

17          MR. ZIFCHAK:  Derek, can you speak up?

18          THE COURT:  Can you speak up?

19          THE WITNESS:  Yes, I will do my best.  I can talk

20  loud.  I'm a professor.

21          THE COURT:  I thought so.

22  A.  (Continuing)  Okay.  So primates are typically kept in

23  facilities for biomedical research, and in that instance they

24  are treated as subjects no different than you would see, you

25  know, dogs in a kennel.  At the Iowa facility what you saw was

1  multi species family of humans and bonobos interacting with one

2  another.  So that's a totally different thing.

3  BY MR. ZIFCHAK:

4  Q.  Did you come to an understanding, either at the time of that

5  visit or before or after, as to the nature of

6  Dr. Savage-Rumbaugh's research trajectory; and, if so, what was

7  that understanding?

8  A.  Yeah.  So I had -- well, before meeting Dr. Rumbaugh, I knew

9  her work and I knew she was interested in studying language

10 acquisition in nonhuman primates, but I didn't really appreciate

11 the multigenerational trajectory that she was aiming towards,

12 and that I learned by getting to know her.  And what I learned

13 was that that she was interested in a long-term project, not a

14 project of a few years.  A typical grant cycle is four or five

15 years.  She was interested in a lifetime of work and work that

16 would go on after she was gone.

17 Q.  As a scientist, do you consider her body of work to date

18 incremental or original?

19 A.  The word I would use to describe Dr. Savage-Rumbaugh's work

20 is transformative, and by transformative I mean she's changed

21 the way many scientists and many people think about nonhuman

22 species, and she has demonstrated that nonhuman species have

23 abilities that we did not think they had.  And it's in the area

24 of language that this work has been most focused on by

25 Dr. Rumbaugh.  But I will point out that other workers have

1  exposed human biases in many other fields.  For example, Dr.

2  Jane Goodall discovered that chimpanzees made and used tools.

3  Before Dr. Goodall's works in Africa, it was considered that

4  humans were the only species that made and used tools, and now

5  we know that chimpanzees in Senegal, for example, use spears to

6  hunt bush babies, which are a small little primate.  So that's

7  one example.  And many of the so-called human specific traits it

8  has been determined were not human specific.

9         Another example is fossil tools older than the human

10  genus were discovered and published just last month, 3.3 million

11  year old tools.

12  Q.  This is, I guess, a naive question.  Are the bonobos in

13  Des Moines or any of them capable of making tools?

14  A.  Yes, yes, absolutely, absolutely.  Kanzi is an expert

15  flintknapper, much better than you or I would be, yeah.

16  Q.  What were your first principal interests as far as studying

17  the bonobos here in Des Moines?

18  A.  Well, so I'm interested in how new features emerge in

19  evolution, and one new feature that emerged in our evolution was

20  language, and what were the biological consequences of the

21  emergence of language.  We know that DNA sequences can mutate,

22  but it's unlikely that there was a DNA mutation that all of a

23  sudden gave some human long, long ago the ability to speak and

24  that human taught everybody else how to do that.  What we in the

25  field have come to appreciate in the past several decades is

1 that in addition to DNA mutation, sequence mutation, DNA can be

2 chemically modified in various ways, and that chemical

3 modification doesn't change the actual underlying DNA sequence,

4 but it changes the activity of genes.  So genes get turned on

5 and turned off based on these chemical modifications.  We are

6 interested in whether those chemical modifications can be passed

7 from generation to generation, and that can be -- we can

8 hypothesize that that could be a mechanism for how biologically

9 the requirements for language emerged.

10 Q.  Thank you.

11          Professor Wildman, when were you first elected to one

12 of the boards governing the Great Ape Trust?

13 A.  That would have been 2010, 2011.

14 Q.  And at whose invitation were you elected to the board?

15 A.  The invitation initially came from Dr. Rumbaugh and

16 Dr. Fields.

17 Q.  And you accepted the invitation?

18 A.  I did.

19 Q.  Why?

20 A.  Because I found the research that was being done at that

21 facility to be fascinating and important, and I wanted to help

22 support that in any way that I could.

23 Q.  Do you recall being on the board at the time that a

24 resolution was considered that would split the board in two?

25 A.  I do.

1    Q.   Do you recall that?

2    A.   Uh-huh.

3    Q.   What was the proposition at that point in time?

4    A.   Well, the idea was that the board would be better and more

5    efficient if it was divided in the following way:  That there

6    were people who had expertise in finance and fund-raising, and

7    those folks would be in charge of raising the money and that

8    type of thing for the facility, and then there would be a

9    separate board which we called in the vernacular the science

10   board, and the science board was involved in the management of

11   scientific activities that involved the bonobos.

12   Q.   Do you recall in conjunction with the proposition that the

13   board be split in two seeing either a memorandum from Lyle

14   Simpson or an actual resolution to be voted on by the board?

15   A.   Eventually there was, yeah.

16   Q.   Okay.  I'm going to ask you to identify that in just a

17   moment.

18          MR. ZIFCHAK:  It's I believe Exhibit 23.  It was

19   identified and moved into evidence in Mr. Simpson's testimony.

20   Is that correct?

21          MR. STAMBAUGH:  Yes.

22   BY MR. ZIFCHAK:

23   Q.   Derek, would you look at the exhibit?  I think it's on the

24   screen right to your left.

25   A.   Oh, this one, okay.

1  Q.  Yeah.  We can scroll it from here.

2  A.  Okay.  These words seem familiar to me.

3          Yeah, I remember this.

4  Q.  Was there a vote on those resolutions?

5  A.  There was.

6  Q.  And what was the result?

7  A.  The result was that the board was split in two.

8  Q.  Is it correct that the vote was unanimous?

9  A.  As far as recall, yeah.

10  Q.  And what was your vote?

11  A.  I voted that, yes, the board should be split.

12  Q.  At that time or around that time, were you made aware of

13  pending settlement agreements in this action?

14  A.  Not so much.  Yeah, I knew that -- I viewed my role in the

15  whole enterprise was to advise on the science side of things.

16  Q.  Uh-huh.

17  A.  And I focused my attention on those matters.

18  Q.  At a point in time, though, you were made aware of

19  settlement agreements, correct?

20  A.  Yes, absolutely.

21  Q.  And what was your understanding of the intention of those

22  agreements?

23  A.  The intention of the agreements was that the science board

24  would be in charge of the science and the bonobos' care and that

25  the other board was more of an administrative and fiduciary

1    body.

2    Q.  Can you identify George Caudill, please?

3    A.  I know who that person is, absolutely.  He was sold to the

4    board as someone who could fix whatever public relations

5    problems the facility was having at the time, and he was

6    presented to us as someone who had experience in scandal

7    management, and so he would be a very strong and powerful person

8    to help us get pointed in the right direction.

9    Q.  When did you first learn that the board was interested in

10   identifying a successor to Dr. Savage-Rumbaugh?

11   A.  Well, we had discussed that for some time.

12   Dr. Savage-Rumbaugh was interested in having a transition, a

13   slow transition that would enable eventually when she was no

14   longer capable of doing the work, that her research trajectory

15   could be continued, and so we were interested in identifying

16   folks that could possibly continue that trajectory.

17   Q.  Was Dr. Jared Taglialatela on the board at that point in

18   time?

19   A.  He may have been, yeah, uh-huh.

20   Q.  But you don't remember specifically?

21   A.  No, because you must understand that there were many votes

22   and many board members switching, and so, yeah, I can't recall,

23   but he was involved.  He became involved in, as far as I know,

24   in the last few years.

25   Q.  There came a point in time when Jared was identified as a

1  potential successor to Sue, correct?

2  A.  Yes, yes.

3  Q.  Did you participate in any discussions where the nature of

4  Sue's research trajectory was communicated to Jared?

5  A.  Well, I have discussed with Jared several times my feelings

6  about the research trajectory and that it should be continued.

7  Q.  What about back in 2013?

8  A.  In 2013, Jared was presented to us as somebody who would be

9  doing such a thing.

10 Q.  Presented to you by whom?

11 A.  By Dr. Rumbaugh and others.

12 Q.  Did Mr. Simpson express any views in that respect to the

13 board at that time?

14 A.  Yeah.  I mean, Mr. Simpson was supportive of Jared and later

15 Dr. Hopkins being involved and promoting the research trajectory

16 going forward.

17 Q.  Did there come a point in time when you voted to appoint

18 Jared and Bill Hopkins to positions at IPLS?

19 A.  Yes, there did.

20 Q.  At the time that you voted, did you have any knowledge that

21 Dr. Savage-Rumbaugh had been banned from the lab?

22 A.  I did not.

23 Q.  Or that she may have been banned at the insistence of

24 Yerkes?

25 A.  I did not.

1  Q.  Or that she had allegedly been dismissed from the IPLS board

2  without notice to her?

3  A.  I did not.

4  Q.  Did you vote with the understanding that Jared and Bill were

5  going to exclude Bonobo Hope, which you've described as the

6  science board, from any meaningful role in the science going

7  forward?

8  A.  No.  I thought that the Bonobo Hope board would be the

9  science board and, you know, serve the purpose that they were

10 created to serve.

11 Q.  Do you have any reason to believe that the other board

12 members who voted on the resolutions installing Jared and Bill

13 knew of any of these conditions that I just ticked off?

14 A.  Some of them must have, I would think, but not on the Bonobo

15 Hope side.

16 Q.  I see.  Well, had you known of these conditions at the time

17 that you voted, would you have voted the same way?

18 A.  No.

19 Q.  When did you first learn that Dr. Savage-Rumbaugh had been

20 banned from access to the bonobos?

21 A.  That would have been in 2013, late 2013, early 2014.

22 Q.  What was your reaction at the time?

23 A.  I was horrified.

24 Q.  Why?

25 A.  Because to me removal of Sue from those bonobos is akin to

1 removing a parent from a household by Social Services, and I

2 certainly didn't think that anyone outside of the science board

3 had the authority to do such a thing.

4 Q.  Did you communicate these views to Jared, Bill Hopkins, or

5 ACCI?

6 A.  I did.

7 Q.  How did you do that?

8 A.  I did it orally and via e-mails.

9 Q.  From your perspective as a scientist, what is the impact on

10 the science of removing Sue from access to the bonobo colony?

11 A.  So longitudinal studies are studies that take place over

12 time.  The two types -- the main division in experimental

13 science is cross-sectional study design versus longitudinal

14 study design.  A cross-sectional study design is simple as you

15 do an experiment, you write it up, and it's done.  A

16 longitudinal study design is a long-term study, like an

17 ecological study that goes on for decades.

18         What happened when Sue was removed was one of the main

19 variables in longitudinal study was shifted.  I can give an

20 example that might help with the lawyers and so on.  At the

21 University of Illinois, there is something called the Morrow

22 Plots, and this is an experimental agricultural field.  It

23 started in 1867.  It's a continuous experiment about soil

24 quality, fertilizer.  It's been going on for over a hundred --

25 about 150 years, and it's the longest continuous experiment in

1   the United States.

2           In 2007 the institute where my office is was built,

3   and it's right next to the Morrow Plots, and the architects made

4   their plans and everything, and it looked great, and they were

5   going to start building, and then somebody said, whoa, wait a

6   second, raised their hand, wait a second.  If we build this

7   building here, it's going to cast shade on this plot and that's

8   going to mess up the experiment that we've been working on for

9   150 years.  So the architects had to go back and reconfigure the

10  building so that it has no shade on that field and that the

11  integrity of the experiment is kept intact.

12          Removing Sue and stopping the human interaction with

13  the bonobos is the same as casting shade on the plot.

14  Q.  Did you make these views known to ACCI?

15  A.  I did.

16  Q.  From the time that the vote was taken in November of 2013

17  going forward, do you recall the first instance when you or the

18  board of Bonobo Hope received a substantive communication from

19  Jared regarding the goings on at the lab?

20  A.  So, to my recollection, we have received basically one

21  substantive thing from Jared, and that was in 2014, and that was

22  a list of what was going on at the facility in terms of

23  establishment of a new scientific advisory board and also, you

24  know, some of the titles of research grants, either submitted or

25  planned to be submitted, things like that.

1  Q.  What was your reaction to that document?

2  A.  Well, it wasn't a total surprise to me because I had been

3  asked by Jared to serve on the ACCI scientific advisory board,

4  and I thought that was a good thing because, you know, that's

5  what I'm all about and I wanted to advise the science.  What I

6  wasn't aware of was all of the things that you previously

7  mentioned and that Sue was not -- no longer involved in the

8  scientific activities at the place.

9  Q.  Do you recall the other professionals who were named to the

10  scientific advisory board?

11  A.  Yeah, I do.  Some of them were -- the majority of them were

12  working at primate facilities around the country.  There was

13  also a professor from the George Washington University, I

14  believe.

15  Q.  Did any of those folks have expertise in the area of Sue's

16  research trajectory?

17  A.  No.

18  Q.  Or did they have expertise in other areas?

19  A.  No.  They had expertise in animal husbandry and management

20  and health care of bonobos, things like that.

21  Q.  Did Bonobo Hope respond to Jared's March 2014 report?

22  A.  We did, and we ultimately held a joint meeting in June of

23  last year.

24  Q.  Were you satisfied with the outcome of the joint meeting?

25  A.  No.

1  Q.  Why not?

2  A.  Because Sue was not reinstated in the facility and the

3  research trajectory that had been going on for several decades

4  remains stopped.

5  Q.  After the March 2014 communication, have you seen any other

6  communication from ACCI regarding research at the lab?

7  A.  Well, I have been -- I've had one document shared with me,

8  which is the list of active research protocols, and I've also

9  spoken with Jared and I've met with him at the facility.

10  Q.  Have you seen any documentation, other than the list of

11  protocols that you just referred to?

12  A.  I have not.

13  Q.  Was the list of protocols particularly illuminating in your

14  judgment?

15  A.  It was not.

16  Q.  Why not?

17  A.  Because a protocol in the field is simply permission to do

18  particular research.  It doesn't mean the research is actually

19  being done.  It doesn't mean there's funding for the research.

20  It's just something that an IACUC board approves.  The titles of

21  those research protocols are sufficiently vague that I have no

22  idea whether they involve one bonobo at the facility, all of the

23  bonobos, whether they involve human interaction with the

24  bonobos, what experiments are proposed to be done.  None of that

25  is in the title.

1   Q.   Did you convey to Jared or Bill Hopkins these observations?

2   A.   Sure.  Yes, I did.  And -- yeah, I did.

3   Q.   And what was their response?

4   A.   Jared had said he would send me the abstracts of grant

5   proposals and the protocols.

6   Q.   Did he ever do that?

7   A.   He did not.

8           THE COURT:  I think we'll take our noon recess at this

9   time.  We'll be in recess until approximately 1 o'clock this

10  afternoon.

11          MR. ZIFCHAK:  Thank you, Your Honor.

12          (Recess at 12:03 p.m., until 1:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           AFTERNOON SESSION  1:08 p.m.

2               (In open court.)

3               THE COURT:  Take a seat.

4               Go ahead, Mr. Zifchak.

5                       DEREK WILDMAN,

6    resumed his testimony as follows:

7                    DIRECT EXAMINATION (Continued)

8    BY MR. ZIFCHAK:

9    Q.  Derek, have you had occasion to visit the bonobo lab since

10   November of 2013?

11   A.  Yes.  I've visited twice since then.

12   Q.  And please explain what you observed in the first visit and

13   approximately when that was.

14   A.  In June of 2014, there was a joint board meeting, after

15   which we went to the facility for a brief visit, and we remained

16   in the lobby and looked at the bonobos and had conversations

17   amongst ourselves.

18   Q.  Let's jump ahead to the second visit.  When was that?

19   A.  The second visit was about approximately one month ago, and

20   I was visiting the facility to talk with Jared and see how

21   things were going.

22   Q.  How did that visit come about?

23   A.  Well, there was a desire to get -- for the Bonobo Hope board

24   to get information about the status of the bonobos, and so a

25   call was sent to people on that board if we can go visit, when

1  they could go visit, and I volunteered to go, and then Jared and

2  I corresponded and worked out a mutually agreeable time.

3  Q.  Did you have any difficulty in doing that?

4  A.  Well, I think there -- like anything, it took some back and

5  forth; but I would point out that that didn't seem too strange

6  to me because I realized that Jared is not always in Iowa and

7  that when he is here, he's quite busy, and so there was some

8  back and forth.

9  Q.  Do you have an understanding as to how frequently or

10  infrequently Jared is in Iowa at the lab?

11  A.  What he's told me -- and I can't verify it -- is that he

12  tends to spend about five days per month at the lab.

13  Q.  What about Bill Hopkins, do you have any understanding with

14  respect to his visitation frequency?

15  A.  My sense is that his is a little bit less than Jared's.

16  Q.  In any case, can you please describe what you observed at

17  the lab in your April 2015 visit and in particular contrasted,

18  to the extent you can, with what you had observed while Sue had

19  access to the bonobos?

20  A.  Okay.  The facility when I visited it in April was clean.

21  The lights were on.  The bonobos were not in any obvious

22  distress or anything like that.  But in contrast to what I

23  observed in terms of the interactions between Sue and the

24  bonobos and others and the bonobos in the past, that wasn't so

25  much going on.  Staff were wearing masks, myself included, and

1  gloves, and some of the procedures had been updated in terms of

2  how the interactions occurred.

3  Q.  Did you observe any humans interacting with the bonobos

4  using the keyboards?

5  A.  I did not.

6  Q.  Was Jared Taglialatela present during your visit?

7  A.  Yes.

8  Q.  What did he show you in particular?

9  A.  Oh, he was very open and he showed me the facility.  He

10  showed me -- we went back beyond the glass to the mesh, and we

11  observed the bonobos.  We walked around outside and we went to

12  the kitchen.  We went to the other building.  It was a pretty

13  comprehensive walk around the facility.

14  Q.  Did he show you any space that he intended to dedicate to

15  medical procedures?

16  A.  Well, he showed me a room that is currently designed to be

17  an enclosure room, and he described that in the future they

18  would like to repurpose that so that veterinary work could be

19  done on the animals on site.

20  Q.  Did he give you access to any documents pertinent to the

21  operation of the lab or any research progress?

22  A.  We discussed that.  I felt that our time was best spent

23  talking with one another, and as I said before, I asked him to

24  send me some of those documents via e-mail.

25  Q.  Did he give you any information pertinent to what his plans

1   were for the facility going forward?

2   A.  Yeah, sure.  He described his plans for -- his goal of

3   having Pan troglodytes, chimpanzees, common chimpanzees brought

4   in, as well as additional bonobos.

5   Q.  Anything else?

6   A.  He talked about some of the research he planned to do with

7   his graduate student who was there.

8   Q.  Did he describe the research?

9   A.  Briefly.

10  Q.  And?

11  A.  And it was language acquisition tasks, experiments in which

12  objects were out of view of the bonobo, sort of standard

13  psychological experiments.

14  Q.  How does that contrast with Sue's research trajectory, in

15  your opinion?

16  A.  Those types of experiments are not my preferred type of

17  experiments, but they are standard psychological experiments

18  done with animals.

19  Q.  Is there anything notable about those experiments given the

20  talents of these particular bonobos?

21  A.  Well, the idea behind the design of those experiments is to

22  prevent what's called the Clever Hans Phenomenon in which

23  experiments were done on a horse and a horse figured out -- was

24  able to count basically, and it turned out that the handler of

25  that horse was giving signals to the horse.  And so in order to

1  prevent and control for the experiment, you know, Jared and his

2  student had, in my view, instituted those procedures to avoid

3  that.  I think that at this point that is not necessary given

4  the several decades of interaction that had already occurred

5  with, for example, Kanzi.

6  Q.  Did you discuss with Jared why Dr. Savage-Rumbaugh had been

7  banned from the lab and whether she could be reinstated?

8  A.  Yes.  I expressed concern and I requested that she be

9  brought back.  Jared did not seem to -- Jared told me that there

10  was no reason to do that scientifically, there was no scientific

11  basis for having Sue come back in the lab, that if Sue wanted to

12  come back to the facility, she was welcome, but she would have

13  to stay outside the glass.

14  Q.  Subsequent to your visit to the lab in April 2015, do you

15  recall describing the conditions you observed as, quote, a ghost

16  town?

17  A.  Yeah, yeah.

18  Q.  An ape farm?

19  A.  I did.

20  Q.  What did you mean by an ape farm?

21  A.  I meant that it was in -- my concern is that the facility is

22  becoming a breeding facility for chimpanzees and not a real

23  research facility.

24  Q.  Now, it's interesting that Jared said that Sue's research is

25  not necessary, I think that's what you testified to.

1    A.    Uh-huh.

2    Q.    Do you agree or disagree with that statement?

3    A.    I disagree.

4    Q.    Why?

5    A.    Well, because it's an ongoing study that we're actively

6    working on trying to understand over time how human, chimpanzee,

7    bonobo interactions change the biology of both species.

8    Q.    What research, in your judgment, remains to be done that's

9    consistent with Sue's research trajectory that has not yet been

10   done?

11   A.    Well, I would like to look at the epigenetics of all of the

12   members of the colony throughout the course of their lives, so

13   longitudinally sampling their DNA to test hypotheses about how

14   the environment can chemically alter that DNA and in the context

15   of human-chimpanzee interaction, so that's an essential part.

16   Q.    Do you have an understanding as to what research

17   Dr. Savage-Rumbaugh would like to undertake with the bonobos

18   should she be restored to the lab?

19   A.    Well, we've talked about the epigenetic work and we've

20   actively collaborated on that and would like to keep working on

21   that, and that would require -- what's cool is that the

22   sequencing and the experimental techniques are minimally

23   invasive and they are now relatively cost effective, and we're

24   interested in looking at the activity of genes in these

25   creatures.  So that's one aspect of future work.

1  Q.  Okay.  Are you prepared to work with Dr. Savage-Rumbaugh

2  in these various research endeavors if she is restored to the

3  lab?

4  A.  Yes, absolutely.

5  Q.  Just a couple more questions.  Is it correct that

6  Dr. Taglialatela has recently been promoted to associate

7  professor?

8  A.  That's what he told me, yes.

9  Q.  And where is he an associate professor?

10  A.  Kennesaw State College in Georgia.

11  Q.  Do you know whether this has anything to do with any of the

12  work he's been doing in Des Moines?

13  A.  I wouldn't think so because that's relatively new.  Tenured

14  decisions are based on past research accomplishments.

15  Q.  I see.  Were you or anyone on the Bonobo Hope board

16  contacted in connection with the decision to give him a

17  promotion?

18  A.  No.

19        MR. ZIFCHAK:  I have nothing further.

20        Thank you very much.

21        THE COURT:  Thank you.

22        Cross-examination.

23        MR. MILLER:  Thank you, Your Honor.

24

25

1                        CROSS-EXAMINATION

2   BY MR. MILLER:

3   Q.  Dr. Wildman, my name is Bill Miller.  I represent ACCI and

4   IPLS.  We've met before, correct?

5   A.  Correct.

6   Q.  Good to see you here today.

7   A.  Thank you.  Likewise.

8   Q.  You were just telling Mr. Zifchak about some epigenetic

9   research you want to perform?

10  A.  Uh-huh.

11  Q.  Is that correct?

12  A.  Yes.

13  Q.  Right.  And that would involve taking blood or tissue from

14  the bonobos here in Des Moines to do that research?

15  A.  Yeah.  Epigenetics can be done on any biological material,

16  including saliva, blood, hair, whatever you --

17  Q.  Right.  You just told me you would do invasive testing on

18  these bonobos?

19          MR. ZIFCHAK:  Objection to form.

20          THE COURT:  I think he did use the term "minimally

21  invasive."

22  BY MR. MILLER:

23  Q.  Okay, minimally invasive.  Minimally invasive testing,

24  correct?

25  A.  So the way that we've operated in the past in a lot of

1  nonhuman primate studies is when primates are examined by

2  veterinarians and typically blood draws occur at those

3  examinations, we take a little bit of blood.

4  Q.  Right.  And you use that blood to do your work?

5  A.  Absolutely.

6  Q.  And you're certainly not testifying today that if ACCI has

7  plans to adapt the facility to use it to give on site veterinary

8  care that there's anything wrong with that, is there?

9  A.  I think it's a great idea.  I think veterinary care is

10  important for chimpanzees and bonobos, yes, and you don't want

11  to transport them places if you don't have to, sure.

12  Q.  Right.  Now, have you prepared a proposal to the IACUC

13  committee at ACCI, IPLS, the Great Ape Trust, for the epigenetic

14  research that you've just described?

15  A.  No, sir.

16  Q.  Do you -- you don't consider yourself an expert in Great Ape

17  behavior, correct?

18  A.  No.

19  Q.  All right.  You're not an expert in Great Ape cognition?

20  A.  I have -- not only on Great Ape cognition, but human

21  cognition.  I've studied the genetics and the genomics of human

22  brain evolution.

23  Q.  And I appreciate that research.  My understanding is that

24  that would be done in your laboratory, correct?

25  A.  Sometimes.

1   Q.   Okay.

2   A.   For example, I've collaborated with Dr. Hopkins on

3   publications.  Some of the work was done in my laboratory, some

4   was done in his, some was done in Dr. Sherwood's laboratory,

5   yes, sir.

6   Q.   Right.  And that's cellular study with relation to the

7   genome or DNA?

8   A.   That is usually how I contribute, yeah.

9   Q.   And you don't consider yourself an expert in Great Ape

10  communication?

11  A.   No more than any other Ph.D. in anthropology whose trained

12  years of course work and observational studies has, yes.  My

13  research funding is not in that area.

14  Q.   And your research funding is not in the field of

15  experimental psychology?

16  A.   No, but I do have quite an extensive publication in

17  community-based psychiatric studies.

18  Q.   Right.  With bonobos?

19  A.   With humans.

20  Q.   All right.  With any great apes?

21  A.   With great apes, I've only worked on the genetics and

22  genomics of great apes.

23  Q.   And you don't consider yourself an expert in the field of

24  use of language and tools of great apes, correct?

25  A.   I consider myself a Ph.D. who's qualified to evaluate such

1  research, yeah.

2  Q.  All right.  You don't consider yourself an expert in that

3  field, though?

4  A.  No -- well, I would say I served on the National Science

5  Foundation grant panels and reviewed dozens and dozens of

6  research grants on these topics.

7  Q.  Okay.  How about the field of ape intelligence, are you an

8  expert in that area?

9  A.  I think that I would say yes in many ways.

10  Q.  Okay.  And what basis do you have for that conclusion?

11  A.  Because I've studied the molecular underpinnings of

12  intelligence for several decades.

13  Q.  In apes?

14  A.  In apes.

15  Q.  How about human cultural modes, are you an expert in human

16  cultural modes?

17  A.  What do you mean by mode?

18  Q.  I believe it's defined -- I'm looking at Exhibit 1.  It's in

19  the big binder in front of you.  I'm going to refer you to

20  paragraph 4, which is on the second page of that exhibit.

21         And do you see there there's a reference to ape

22  intelligence in human cultural modes, the fourth line down,

23  paragraph 4?

24  A.  Uh-huh.

25  Q.  And that's "yes," sir?

1  A.  Yes, I see that.

2  Q.  Right.  And Dr. Rumbaugh, I believe my understanding was her

3  testimony was human cultural modes include but are not limited

4  to art, music, tools, agriculture, fire, et cetera.

5          Do you see that there?  Is that your area of

6  expertise?

7  A.  My doctoral training covered that issue, yeah, sure.

8  Q.  Okay.  How did it cover that issue?

9  A.  Through course work.

10  Q.  What kind of course work?

11  A.  So anthropology as a discipline is divided into four

12  subfields.  These are biological anthropology, cultural

13  anthropology, linguistic anthropology, and archaeology.  I was

14  trained in the four-field tradition of anthropology, meaning I'm

15  competent in all of those areas.

16  Q.  That was your Ph.D. training?

17  A.  That was my Ph.D. training, that was my undergraduate

18  training, that was my master's training, yes.

19  Q.  And are you using that training in your current work?

20  A.  Absolutely.

21  Q.  Okay.  You testified --

22  A.  You know -- may I make an analogy?

23  Q.  Sure.

24  A.  So a cardiac surgeon knows about the anatomy of the pelvis

25  and received that as part of his medical training.  Even if the

1   doctor doesn't do pelvic surgery on a day-to-day basis, they

2   still know.

3   Q.  You testified that you visited some primate facilities?

4   A.  Uh-huh.

5   Q.  That's a "yes"?  I'm sorry, you have to answer.

6   A.  Yes.

7   Q.  I want to make sure we get it in the record.

8   A.  Sure.

9   Q.  Thanks.

10          What primate facilities have you visited with great

11  apes present?

12  A.  The Primate Foundation of Arizona and the National --

13  Southwest National Primate Research Facility in San Antonio.

14  Q.  And how much time have you spent at those facilities?

15  A.  I have spent several weeks.

16  Q.  All right.  You spent enough time to be able to compare and

17  contrast those facilities with the facility here in Des Moines,

18  correct?

19  A.  Sure.

20  Q.  Right.  You said that those facilities don't match up with

21  the Des Moines facility because they have the great apes in

22  cages, correct?

23  A.  Uh-huh.

24  Q.  Is that a "yes"?

25  A.  Yes.

1  Q.  Thank you.

2           And, furthermore, you told me they don't match up

3  because they don't have space for the great apes to roam,

4  correct?

5  A.  That is correct.

6  Q.  And what species of great apes would have been at those

7  facilities that you visited?

8  A.  Pan troglodytes.

9  Q.  Can you translate that for a lay lawyer?

10 A.  Chimpanzees.

11 Q.  Thank you.

12          So you visited a few weeks ago with Dr. Taglialatela,

13 is that correct?

14 A.  Uh-huh.

15 Q.  That's a "yes"?

16 A.  Yes.

17 Q.  Thank you.

18          And when you met with him --

19 A.  Uh-huh.

20 Q.  -- he had the binder of research protocol sitting on his

21 lap, right?

22 A.  Correct.

23          MR. ZIFCHAK:  Objection to the question; no

24 foundation.

25          THE WITNESS:  Okay.

1          THE COURT:  The answer is in.  I'll receive it.

2    BY MR. MILLER:

3    Q.  He offered to let you look at the research protocols while

4    you were visiting, correct?

5    A.  He may have.  I can't recall.

6    Q.  Well, I think you testified that you asked him -- or you

7    said, well, I don't want to spend time looking at those today,

8    you can e-mail them to me later?

9    A.  Yes, that is true.

10   Q.  Okay.  And you --

11   A.  I don't recall them being on his lap.

12   Q.  Okay.  They were in his office, they were offered to you,

13   correct?

14   A.  They were pointed at, yeah, or binders were pointed at, yes,

15   that's true.  I didn't see the contents of those binders.

16   Q.  You understood that they were the IACUC research protocols?

17   A.  No.

18   Q.  Okay.  All right.  You've spoken to Dr. Taglialatela on the

19   phone several times --

20   A.  Sure.

21   Q.  -- in the past couple of years, correct?

22   A.  Correct.

23   Q.  In the fall of 2012, you told him that you didn't think that

24   Dr. Rumbaugh had any scientific credibility, correct?

25   A.  I told him that many people in the community questioned

1  Dr. Rumbaugh's scientific credibility.

2  Q.  You told him during this meeting a few weeks ago that you

3  were going to do a paternity test on Teco because it was at

4  least questionable if Kanzi was the father, right?

5  A.  No.  What I told him was that I had the capability to do a

6  paternity test on Teco if that was something that he desired to

7  have done.

8  Q.  You didn't tell him you were going to go back to your

9  office, do it and e-mail the results?

10  A.  I said we could talk about it, but I certainly promised

11  nothing.

12  Q.  Did you discuss with him the use of lexigram keyboards while

13  you were there?

14  A.  Not so much.

15  Q.  Right.  Because when you were there, you saw that they were

16  being used, correct?

17  A.  No.  I wasn't paying -- I said I saw -- what I saw there was

18  the big screen in the main room and it was on, and mostly we

19  went in the back where the -- when we interacted with the

20  bonobos, we were not interacting with lexigrams, and then there

21  was a high school tour going on.

22  Q.  And you weren't paying attention to lexigrams during your

23  visit?

24  A.  That was not the purpose of my visit.

25  Q.  Earlier you told us an analogy about a tree and some

1   research and about how Dr. Rumbaugh had been removed from the

2   facility and removed from the situation, right?

3   A.  Uh-huh.

4   Q.  Is that correct?  Was that correct?  I mean, do you recall

5   that testimony?  I'm sorry.

6   A.  Yeah.  It was not a tree, but yeah, yeah.

7   Q.  I apologize.  Let's be clear, now, Dr. Rumbaugh removed

8   herself from the facility in the fall of 2013, isn't that right?

9   A.  I have no idea.

10  Q.  Okay.  Grab a binder up there if you would next to you with

11  the plaintiffs' exhibits.

12  A.  This one (indicating)?

13  Q.  Great.  If you would look at Exhibit 1005 for me.

14  A.  Yes.

15  Q.  I mean, you certainly knew in the fall of 2013, the plan was

16  for Dr. Rumbaugh to be leaving the facility?

17  A.  Yes, I did.

18  Q.  Right?

19  A.  I did.

20  Q.  And if you look at 1005, that's an e-mail that you received

21  from Dr. Sue, correct?

22  A.  Let me just confirm that I'm on this e-mail list.

23       I see my name on the cc, yeah.

24  Q.  Right.  If you go to the third page, top of that page, you

25  would have received this e-mail and read it, I assume?

1  A.  Yes.

2  Q.  She says, "I also hope that, as appropriate, and under

3  Jared's direction, I will continue to do some research with the

4  bonobos, once the needed structural changes and funding are

5  firmly in place.  I will do nothing to disrupt this critical and

6  necessary next step."

7          Do you see that?

8  A.  I do.

9  Q.  And on the page before, if you go to the second page, at the

10  very bottom, she tells you, "While Jared and Bill are familiar

11  with language work, their focus is on investigating the effects

12  of language acquisition as well as comparing and contrasting

13  bonobos and chimpanzees."

14          Do you see that there?

15  A.  I do.

16  Q.  In fact, she tells you and the rest of the board, "This is

17  appropriate and the direction that should now be taken," right?

18  A.  I see that, yes, uh-huh.

19          (Pause.)

20          THE WITNESS:  Is there a question?

21          THE COURT:  None pending.

22  BY MR. MILLER:

23  Q.  Again, I think you said you understood that she was leaving

24  at that point in time?

25  A.  I understood that she would not be working full time all the

1  time, yeah.  That's how I understood it.  As it says here, it is

2  my hope that I will continue to do some research with the

3  bonobos.  That's what I understood.

4  Q.  Right.  You also understood that that would be as

5  appropriate and under Jared's direction once the needed

6  structural changes and funding are in place; you understood

7  that, too, right?

8  A.  I understood Sue to be a principal investigator capable of

9  making her own scientific decisions and going through proper

10  channels to do research, yeah.

11  Q.  Right.  And principal investigator is a term of art that you

12  use for somebody that's submitted a research protocol that was

13  approved to do research at a facility, is that correct?

14  A.  Well, it doesn't have to be at a facility; just to do

15  research, yeah.

16  Q.  Okay.  And earlier you testified about all sorts of things

17  that you thought were not disclosed to you.  You didn't know

18  about Sue had been removed from the facility, right?

19  A.  Uh-huh.

20  Q.  You didn't -- that's a "yes," correct?

21  A.  Yes.

22  Q.  You didn't know that she was not apparently on the IPLS

23  board; is that what your testimony was?

24  A.  In the question that Mr. Zifchak asked me at that time, yes,

25  I stand by my testimony.

1  Q.  Sure.  You didn't know anything about Yerkes?

2  A.  No, I did not.

3  Q.  You still don't know anything about Yerkes today, right?

4  You don't have any personal knowledge about what Yerkes may or

5  may not be doing at that facility?

6  A.  You're absolutely correct.  All I know is what Jared has

7  told me about Yerkes.

8  Q.  Okay.  Did he tell you when you were visiting about chimps

9  coming that Yerkes had said Dr. Sue can't be here because Yerkes

10  is telling me they can't be here?

11  A.  No, he did not.

12  Q.  And, to your knowledge, nobody at Bonobo Hope knows anything

13  about Yerkes directly, correct?

14  A.  Well, many of us know about many things about Yerkes.

15  Q.  Let me be clear.  None of you know for a fact or have

16  personal knowledge, direct knowledge, that Yerkes has put some

17  sort of condition relating to Dr. Sue participating and whether

18  chimps can come to Des Moines?

19          MR. ZIFCHAK:  Could we have an understanding of who

20  "you" is in the question?

21          MR. MILLER:  Sure.

22  BY MR. MILLER:

23  Q.  My question is, does anybody on Bonobo Hope, has anybody

24  ever told you that, that they have that understanding or that

25  personal knowledge?

1  A.  Nobody on Bonobo Hope has told me, but Jared has told me

2  that he is -- would be unable to obtain research funds if

3  Dr. Rumbaugh was allowed access to the facility.

4  Q.  When did he tell you that?

5  A.  Most recently on my most recent visit and also on the

6  telephone.

7  Q.  Well, I just asked you if --

8  A.  No.  I'll clarify.

9  Q.  Okay.  Please do.

10  A.  I didn't say that Jared named names of individuals at

11  Yerkes.  I'm not in Jared's head.  I'm just telling you what

12  Jared said.

13  Q.  Tell me precisely what he told you.

14  A.  He said that for him to be able to get assurances from his

15  institutions, whatever that may mean, Sue should not be working

16  there.

17  Q.  And what kind of assurances?

18  A.  What do you mean?

19  Q.  Well, you --

20  A.  I'm just telling you that's what he told me.  That's the end

21  of it.

22  Q.  You don't know what he was talking about?

23  A.  I could speculate.  But why would I do that?

24  Q.  Fair.  And you don't have any knowledge about Yerkes putting

25  a condition -- you personally don't have any knowledge about

1  Yerkes putting a condition on chimpanzees coming to this

2  facility, correct?

3  A.  Correct.

4  Q.  Did you talk to Dr. Sue before the vote at the end of -- in

5  December of 2013, a vote that you say was tainted by this lack

6  of knowledge, did you ask her, Dr. Sue, are you still at the

7  facility?

8         MR. ZIFCHAK:  Objection.  How many questions is the

9  witness required to answer?

10        THE COURT:  I think it is a compound question.  Let's

11 take another shot at it.

12 BY MR. MILLER:

13 Q.  Okay.  Did you ask Dr. Sue before you voted in December of

14 2013 if she was still working at the facility?

15        MR. ZIFCHAK:  I think that question lacks foundation.

16 The vote was in November 2013.

17 BY MR. MILLER:

18 Q.  Same question with the clarification that it was November

19 2013, if I misspoke.

20 A.  I did not ask Liz, I did not ask Heather, I did not ask Sue,

21 I did not ask anyone if they had been removed access to the

22 facility because it hadn't occurred to me that that would have

23 happened.

24 Q.  And you didn't ask her, correct?

25 A.  No.  I had these kinds of e-mails from her that said things

1  like she will continue to do research.

2  Q.  Okay.  You didn't ask her about her status at IPLS at that

3  time, did you?

4  A.  No.

5  Q.  You didn't ask her anything about whether there's conditions

6  about Yerkes?

7  A.  Why would I do that?

8  Q.  Well, you're testifying -- are you testifying that these are

9  issues that were important to you when you took that vote?

10  A.  No.  I'm testifying that those issues were not raised when I

11  took that vote.

12  Q.  Okay.  They weren't raised.  Did they matter?

13  A.  You know, I also didn't ask if there was an astroid that hit

14  the facility.

15  Q.  No, I know, but if --

16  A.  It was unexpected.

17  Q.  You're here today testifying that these were issues that

18  were apparently material to you when you took that vote, is that

19  correct?

20  A.  Correct.

21  Q.  And you did not ask Dr. Rumbaugh about any of those issues,

22  correct?

23  A.  Correct.

24  Q.  Were you asleep at the switch?

25  A.  There's a switch?

1      MR. ZIFCHAK:  Objection.

2      THE COURT:  It's argumentative.

3  BY MR. MILLER:

4  Q.  Have you, Dr. Wildman, provided any fund-raising support or

5  funding to the Great Ape Trust or to the ACCI -- sorry; to Great

6  Ape Trust?

7  A.  Have I -- I've donated a little bit of money to the Great

8  Ape Trust, sure.

9  Q.  When did you do that?

10  A.  A couple of years ago.

11  Q.  Okay.  You haven't donated to the current ACCI, correct?

12  A.  No, I have not, I don't think so.

13  Q.  To your knowledge, have any of your colleagues on the Bonobo

14  Hope board donated any money to the operation?

15  A.  I have no knowledge of what my colleagues have done.

16  Q.  But you've sought funding for a facility in Missouri, is

17  that correct?

18  A.  I personally have not, but I'm aware that that's going on.

19      MR. MILLER:  Thank you, Doctor.  I appreciate your

20  time.

21      I'll pass the witness.

22      THE COURT:  Redirect?

23      MR. ZIFCHAK:  Thank you.  Just a couple of quick

24  questions and then we'll let Mr. Professor Wildman get back on

25  the road to Champaign, Illinois.

1                    REDIRECT EXAMINATION

2    BY MR. ZIFCHAK:

3    Q.  First of all, in addition to Kennesaw, do you know of any

4    other institution with which Dr. Taglialatela is currently

5    affiliated?

6    A.  Yerkes.

7    Q.  So that when he told you that his institutions required

8    certain assurances before they would let chimps arrive at the

9    Des Moines lab, he was referring to Kennesaw and Yerkes,

10   correct?

11   A.  That was my assumption.

12            MR. ZIFCHAK:  Nothing further.

13            Thank you.

14            THE COURT:  Anything further?

15            MR. MILLER:  No.

16            THE COURT:  You may step down, sir.

17            Thank you.

18            THE WITNESS:  Thank you.

19                                  (Witness excused.)

20            MR. STAMBAUGH:  May we call our next witness, Your

21   Honor?

22            THE COURT:  Please.

23            MR. STAMBAUGH:  The claimants call Mr. Ryan Sheldon,

24   and Mr. Neihaus will be doing the examination.

25            May I inquire and get Mr. Sheldon?

1            THE COURT:  Yes.

2            Would you come forward, please.

3            THE CLERK:  Please raise your right hand.

4        RYAN DOUGLAS SHELDON, DEFENDANTS' WITNESS, SWORN

5            THE COURT:  Be seated right there, sir.

6                        DIRECT EXAMINATION

7    BY MR. NEIHAUS:

8    Q.  Good afternoon, Mr. Sheldon.

9    A.  Thank you.

10   Q.  Would you please state your full name for the record.

11   A.  Ryan Douglas Sheldon.

12   Q.  Why are you here today, Mr. Sheldon?

13   A.  Your Honor, my history with this bonobo colony spans 23

14   years, and the knowledge I have gained from this bonobo colony

15   has allowed my business to grow to sell millions of dollars

16   worth of product.  And I'm here today because I built a facility

17   in Missouri because I would like to relocate them on 200 acres

18   of land near my home.

19            I'm here today to provide a lifelong funding solution

20   for the bonobo colony, and it is my belief that it is my moral

21   and ethical obligation to these bonobos to support them for the

22   rest of their life, and I'm here to ask you if you will make it

23   my legal obligation.

24   Q.  Thank you, Mr. Sheldon.

25            If I could just ask you to speak a little bit louder

1    and into the microphone in front of you.

2    A.  Okay.

3              MR. NEIHAUS:  Your Honor, Mr. Sheldon has prepared a

4    PowerPoint presentation that we would like to use purely for

5    demonstrative purposes.  We have shared it with opposing

6    counsel, who has indicated they have no objections to our

7    publishing it to the court solely for demonstrative purposes,

8    and so with the court's permission, we would like to publish.

9              THE COURT:  That's fine.

10   BY MR. NEIHAUS:

11   Q.  Mr. Sheldon, what do you do for a living?

12   A.  I am CEO and founder of National Control Devices, which is

13   ControlAnything.com and ControlEverything.com.

14   Q.  And what kind of company is that?

15   A.  We're an electronics design and manufacturing firm, and we

16   do all our electronics design work in our facility in Osceola,

17   Missouri, and we also do our manufacturing at that facility.

18   Q.  When did you found the company?

19   A.  I believe it was October of 1995.

20   Q.  Where is your company located?

21   A.  We are located at 430 Market Street, Osceola, Missouri.

22   Q.  And what type of products does National Control Devices

23   make?

24   A.  We specialize in making computer-controlled switching

25   products.  We turn things on and off for a living.  We

1  specialize in iPad control, Android control.  We can control

2  pumps, valves, motors, solenoids, gates, all of those kinds of

3  things, from a computer anywhere in the world.

4  Q.  And if you can tell a little bit more about what the

5  technology that your company develops allows people to do.

6  A.  Yeah.  The technology that we work with, we work

7  specifically to customize our product for many customers.  We've

8  customized our product for computer-controlled switching

9  companies all over the United States and actually all over the

10  world.

11  Q.  Does the company have any plans for expansion in the coming

12  year?

13  A.  Yes, we do.  In 2016 we're introducing -- or we're retasking

14  ControlEverything.com to be a social networking web site that

15  introduces 600 new products to the market that also hits 12 new

16  targets.

17  Q.  Is the company profitable?

18  A.  It's very highly profitable.

19  Q.  Can you tell me a little bit about the company and its

20  statistics?

21  A.  Yes.  We have 14 full-time employees.  We have now 20 years

22  in the business.  We have shipped over 52,000 orders.  We have

23  over 4,000 products in our product line.  We're currently

24  shipping about 3.4 million dollars worth of product to our

25  customers each year, and we've seen a very steady increase of

1  about 27 percent per year.

2  Q.  And what's your percentage of repeat customers?

3  A.  We have a very high percentage of repeat customers.  It

4  is sometimes -- we believe the latest numbers might be as high

5  as 90 percent, so --

6  Q.  You mentioned your clients before.  Who are your clients?

7  A.  Our clients are companies like Google, Apple, Microsoft,

8  Intel, Lockheed Martin, McDonnell Douglas, Boeing and customers

9  like that.

10  Q.  Do you have any governmental clients?

11  A.  Yes.  We have a huge number of government clients.  We work

12  with NASA very frequently.  We work with the FBI.  We work with

13  the U.S. Army and the U.S. Navy, as well as many other

14  government organizations.

15  Q.  And any local clients here in Des Moines?

16  A.  In Des Moines, yes, we have many.  We've worked with Hach is

17  one of our clients.  Northern Iowa Shrimp is another one of our

18  clients.  We've worked with the University of Iowa, Iowa State

19  University, and I believe we've got Rockwell Collins is another

20  one of our big clients in Iowa.

21  Q.  I would like to ask you now, when did you first meet and

22  become involved with Dr. Sue Savage-Rumbaugh and the bonobo

23  colony?

24  A.  I was introduced to the work of Dr. Sue Savage-Rumbaugh on

25  my 20th birthday, which was December 24th of 1991, and it was

1  one of the greatest birthday gifts a person could ever have.

2  Q.  What happened on that day?

3  A.  I went to visit a man named Russ Rupert on a job interview,

4  and Russ and Pam wanted to hire me to write a video game

5  software for test applications for chimpanzees.

6  Q.  And did they hire you?

7  A.  Yes, they hired me, and I continued to work there for seven

8  months.

9  Q.  What was the name of that company?

10  A.  The name of the company was called Public Sphere.

11  Q.  And where did you go after Public Sphere?

12  A.  In July of that year of 1992 -- I worked with Russ for seven

13  months, and in July of 1992 I moved to Atlanta to work with Sue

14  directly.

15  Q.  And where did you work with her?

16  A.  At the Language Research Center at Georgia State University,

17  the Language Research Center in Decatur, Georgia.

18  Q.  Can you tell me a little bit about the Language Research

19  Center?

20  A.  Yeah.  The Language Research Center was a phenomenal place.

21  Basically it was a USDA type facility.  It had extra offices in

22  the front for administrative tasks and things of that nature.

23  It had a large acreage.  We had a really great interaction with

24  the bonobos.  We spent a lot of time walking with them outside.

25  We were encouraged to use the keyboard.  We were encouraged to

1  spend a lot of time with them, treat them as though they were

2  people, treat them as our friends because they became our

3  friends in that time.  It was a really, really incredible place.

4  It was very well isolated, and it was very focused on the

5  research and it was very focused on the well being of the

6  bonobos.

7  Q.  And how did you develop your technology to serve the

8  research needs of Dr. Savage-Rumbaugh and the bonobos?

9  A.  Dr. Sue Savage-Rumbaugh asked me to develop a keyboard -- or

10  a relay controller, which was basically used to dispense food to

11  chimpanzees whenever they got a task right.  And I developed

12  that relay controller for Dr. Sue Savage-Rumbaugh, and that was

13  the basis upon which I formed my company.

14  Q.  I see on the slide here --

15  A.  Yeah.

16  Q.  -- talking about the merging of the technology.  There's a

17  picture.

18  A.  Yeah.

19  Q.  Can you tell me a little bit about that picture?

20  A.  Yes.  Panbanisha was a great friend of mine.  I spent a

21  great deal of time with her in the woods.  Most of the time we

22  didn't have cameras near us.  Most of the time Panbanisha and I

23  just hung out a lot.  We played, we used the keyboard a lot.

24  And she really showed me that she is a person inside.

25  Q.  So is this you then in the picture?

1  A.   This is me and Panbanisha together.

2  Q.   And what are you doing in the picture?

3  A.   Well, right now we're sitting and we're about to use the

4  keyboard because Sue is ready to do some work for her research.

5  So we have to kind of calm her down a little bit and get her to

6  focus.

7  Q.   And that's the keyboard in front of you?

8  A.   Yeah.  The keyboard is to the right on the bottom corner.

9        At that time Sue really taught me the importance of

10  merging technology with research, and technology and research is

11  very symbiotic.  They rely on each other, and without one the

12  other is not as good.

13  Q.   How long were you at the Language Research Center?

14  A.   For seven years.  I left in September 15th of 1999.

15  Q.   And why did you leave?

16  A.   Sue was getting ready to go to Iowa, she was making plans

17  for that, and I was making plans to grow my company further.

18  Q.   Did you maintain a relationship with Dr. Savage-Rumbaugh

19  after leaving?

20  A.   Yes, I did.

21  Q.   Can you tell me about that relationship?

22  A.   Well, Sue and I have always been close.  Sue and I have --

23  she stopped by to visit my office many times throughout the

24  years.  She's kind of seen us grow, and she has -- she's always

25  kind of kept me up to date on how the bonobos are and those

1  kinds of things, and we just had a really great, really great

2  working relationship.

3  Q.  Mr. Sheldon, what is it that you have proposed to house the

4  bonobos going forward?

5  A.  What I'm proposing to do is to create a facility that is

6  based more like what we had at the Learning Research Center.  It

7  was more of a basic USDA facility.  It was designed for low cost

8  of operation.  It was designed for -- basically to have all of

9  the things that we had at the LRC, which were to have the

10  freedom, the ability to do what we did then that made the

11  research very successful.  And so that is the path that I am

12  really trying to follow now is to go back to the LRC standards.

13  Q.  And where is this facility located?

14  A.  This facility is located in Osceola, Missouri.  It is

15  located near my home.  I have a 200-acre farm, which is next to

16  the bluffs of where I live, in Osceola.  I also have a guest

17  house in town, and Sue has come to stay in the guest house

18  numerous times as we've made plans for this facility.

19  Q.  I see on the slide there's a picture with some arrows on it.

20  Can you please tell us what those are.

21  A.  Yes.  The red arrow is the farm.  It's the approximate

22  location of the facility.  The blue area is where my home is,

23  and the yellow area is where my guest house is.

24  Q.  Where is your office?

25  A.  My office is -- the town is bigger than that photo shows.

1  My office is a little bit -- it would be below the yellow arrow

2  so --

3  Q.  And what are we looking at in these pictures?

4  A.  In that photo -- and this kind of shows a reference point of

5  the area of where we're building.  It's about three-quarters of

6  a mile off the bluff, and it is divided -- the bluff area is

7  divided with a road.  It is very deep and very heavily forested,

8  but also in an open field area.  So we have a mix of forest and

9  open area, pasture areas.

10  Q.  So if I understand you correctly, the river that we see

11  there (indicating)?

12  A.  Uh-huh.

13  Q.  It's the river, and then the red arrow is pointing to a very

14  small structure far off?

15  A.  Right, that's right, exactly.  That arrow is very accurately

16  positioned.  At the bottom of that arrow is where the facility

17  would be located.

18  Q.  And about how far is that?

19  A.  It's about three-quarters of a mile from the edge of the

20  bluff.

21  Q.  What are the facilities that have been planned?

22  A.  The facilities are -- we have modeled them on the USDA

23  facilities.  We've planned a 40 x 80 building.  If I might read

24  through some of these, there's a lot of details, and I don't

25  want to leave these out.  We've planned for five 18 x 11 cages.

1    We've planned for a 25 x 17 utility room, a 15 x 15 infirmary.

2    We have tunnel access to the infirmary, as well as three tunnels

3    to cages 1, 3 and 5 -- my screen went blank.  The screen is out.

4    Q.  Sure.  You can look at the one right behind you if that's

5    all right.

6    A.  Yes.  Dr. Amory Lovins has consulted with me and he has

7    recommended the insulation --

8            MR. MELHUS:  Objection.  Excuse me.  Objection to the

9    extent that he's testifying to hearsay, anything that Dr. Lovins

10   has told him in the past, for the truth of the matter asserted

11   here.

12           THE COURT:  I'll receive it, subject to the objection

13   and only for the purpose of explaining the reason for the

14   design.

15           THE WITNESS:  I'm sorry?

16           THE COURT:  You may continue.

17           THE WITNESS:  Okay.  Thank you.

18   A.  (Continuing)  Dr. Amory Lovins has had numerous

19   conversations with me because he is an energy management

20   specialist.  He focuses -- he is world renowned at the Rocky

21   Mountain Institute as an energy management.  He flies all over

22   the world for this particular type of thing, and he has

23   consulted with me because we want to make this facility be very

24   low cost and self-sustaining as much as we possibly can.  So

25   that is the purpose why we have consulted with him about this.

1  BY MR. NEIHAUS:

2  Q.  Was there anything more you wanted to say about the

3  facility?

4  A.  We have -- again, we have really focused this in on being a

5  USDA type facility.  We have modeled it around the colony room

6  that we had at the Language Research Center.  It is kind of a

7  combination of the colony room and the P-Suke Building that we

8  had at the Language Research Center.

9  Q.  Can you tell me about the floor plan?

10  A.  Yeah.  The floor plan is -- Sue and I worked on drawing the

11  floor plan in coordination with our builder and our plumber.

12  It's got a very intricate plumbing system.  We've positioned all

13  of the utilities to the left side of the facility so that

14  maintenance can be done without any interaction into the ape

15  areas.  The right side of the facility serves as a storm shelter

16  with tunnel access, and also it would double, could be used for

17  double purpose as an infirmary.

18  Q.  What are the important utilities at the facility?

19  A.  I'm sorry, I have to read some of this.  I'm having trouble

20  keeping up with this.  We have a dual 120-gallon --

21       MR. NEIHAUS:  Mr. Sheldon, I'll just ask you to wait

22  one minute.

23       THE CLERK:  I believe the screen just got turned off.

24       MR. NEIHAUS:  Okay.

25       (Pause.)

1    MR. STAMBAUGH:  Your Honor, we have a paper copy.  May

2  I approach?  Would that help?

3    THE WITNESS:  Yes.  Okay.  Sorry for the interruption.

4  BY MR. NEIHAUS:

5  Q.  You were taking about the utilities?

6  A.  Yeah.  The utilities, we have a dual 120-gallon pressurized

7  water tank.  That was recommended by our plumber.  We have grid

8  power with five kilowatt of two-day reserve battery backup.  We

9  have a thousand gallon propane tank with propane generator,

10  which would allow us to run the facility off of the generator if

11  we need to.  We have a 50-foot propane radiant heater.  This is

12  a very special heater that is specific for this facility.  This

13  heater operates off of -- without grid power.  It will operate

14  as an emergency heat source in the event that we were to lose

15  utilities.  We have dual HVAC conventional air-conditioning.  We

16  have a high power humidification system that is being planned

17  right now.  We have radiant floor heating, metal encapsulated

18  electrical wiring throughout the entire facility with GFI

19  protection.  We have a high pressure water sprayer system to

20  keep the facilities sanitary.  We have a propane water heater

21  with a wood burner backup.  We also have interior low power LED

22  lighting with day/night dimming.  The apes actually can control

23  the brightness of the light inside the cages with the system.

24    All utilities are accessible from the west side as I

25  mentioned earlier before, and we have a fresh air exchange

1  system for air quality to make sure the air quality stays good

2  inside the building.

3         We have many more utilities planned, but that is --

4  that's where we're at at this time.  This is what we have as our

5  must have list of utilities.

6  Q.  When did construction of the facilities start?

7  A.  We started in September of 2014 building the facility, and I

8  have photos of the facility as we go through the construction.

9  Q.  So what are we looking at this first?

10  A.  The first photo is -- the red is the radiant floor heating

11  with the infrared reflective barrier.  It also serves as

12  moisture barrier for the facility.  And they're pouring concrete

13  in this photo.  This is a special concrete.  It's cement mix

14  with fiber backup.  The reason we do fiber is to prevent

15  cracking.  We don't want cracking in USDA facilities, not

16  advisable.

17  Q.  What are we looking at in this next photo?

18  A.  This next photo kind of shows the pillars starting to form

19  for the cages in the corners, each cage.

20         And also there's a worker there.  He is working

21  setting the next group of blocks, and below him -- or I guess

22  behind him, he's got a trough which serves as the main drain

23  behind the cages for cleanup.

24  Q.  And could you tell me about these photos?

25  A.  Yeah.  These photos show a much better picture of the drain

1  system that we have planned.  The wall in the back is the

2  opening where we'll put the tunnel for the storm shelter, which

3  would also serve as an emergency storm shelter and as an

4  infirmary, and that's where the blocks are knocked out in the

5  photo.

6          And Sue came to visit the facility.  This kind of

7  gives you a general reference of size.  It's a very -- we have

8  plenty of height, far beyond the USDA recommendations in size.

9  Q.  Are there any outdoor areas near the facility?

10 A.  Yes.  We have outdoor areas planned for the facility.  Many

11 of these outdoor areas are still in the planning phase.  We're

12 focusing on the building at this time.  And in future

13 conversations with Sue and the USDA, we will plan a caging

14 system that would be exactly what is -- what we need.

15 Q.  What kind of security measures do you have in place?  I'm

16 sorry, what -- can you tell me what's in this photo?

17 A.  Oh, this is an artist rendering of the overview of the

18 facility.  It kind of shows its basic structure and size.  It's

19 a very modest facility, and Sue and I wanted to name this

20 after -- this facility after Panbanisha who was our very, very

21 close friend.

22          And so it's designed to be sustainable.  It's designed

23 to be sustainable at low cost so that we can focus more funds on

24 doing everything that the apes would need to enrich their lives.

25 Q.  Now, can you tell me about the security measures you have in

1  place?

2  A.  Yes.  Our company has a special connection to the security

3  industry.  We work with a lot of security companies, and so we

4  have planned an 8-zone fire detection system, a 20 zone push

5  notification system.  This will allow us to have buttons

6  throughout the facility that would immediately send a text

7  message to everybody who's connected to the network.  No matter

8  where you happen to be, you will get a text message from the

9  facility.  We will have 10 zones of indoor/outdoor ultrasonic

10  motion detection system.  This system cannot be penetrated.  It

11  cannot be bypassed.  There is no known way to get around an

12  ultrasonic motion detection system.  We have 20 zones of low

13  power LED exterior flood lighting.  We have 8 zones of security

14  cameras system with remote access to all the cameras.  We have

15  an RFID card swipe system that will be in place hopefully later

16  this year that would give access/control to the cages so you

17  would have to swipe the card to get into the cages, and it would

18  not allow you to leave doors open that would allow for an escape.

19  Q.  When is the projected opening of the facility?

20  A.  We're hoping to open late August for a lot of the actual

21  facilities themselves.  We also hope to be getting the outdoor

22  play yards finished in September or October.  In 2016 I would

23  like to expand the play yard area to a much larger size, but the

24  original size that we planned is more to meet the USDA

25  requirements.  The second size is to give them a lot more free

1 space.

2 Q. You mentioned the USDA requirements?

3 A. Right.

4 Q. What are those guidelines?

5 A. We read a number of guidelines as we were designing the

6 facility, and Sue and I read those together, and we determined

7 that a lot of the guidelines were specific more to cage size and

8 transport and some of the basic requirements for ape care. We

9 have made sure that we have followed all of these guidelines to

10 the best of our ability, but it's been awhile since I've read

11 it, so I don't have all of the guidelines in memory right now.

12 We've also been working with a company called Swmo

13 Safety. They do OSHA safety certification for our company, and

14 we're going to employ them to do OSHA safety certification for

15 this facility as well.

16 Q. Has your building been inspected?

17 A. Yes. The building has been inspected by Matt Bishop. This

18 inspection was to guide us to any corrections, any minor issues

19 that we needed to address, and it's been very helpful. We will

20 have a final inspection prior to a USDA inspection, so --

21 Q. What is the purpose of relocating these bonobos to Missouri?

22 A. My primary purpose for bringing them to Missouri is to give

23 them a safe, open place where they can go back to the kind of

24 work that we used to do at the LRC. That is my first and

25 foremost concern is that we have the best kind of facility at

1   that time for the type of language research that Sue was doing.

2   I would like to return to that trajectory as much as we can so

3   that the research can continue.

4           I would like to provide never-ending improvements to

5   the bonobo environment.  The bonobo environment never stops

6   changing.  When you get into a facility like this, you realize

7   that you always need to make adjustments and improvements in the

8   bonobo environment, and this is one of my hugest commitments to

9   this project is to always be improving on and expanding their

10  environment so that they have an incredible place to play.

11          I would also like to develop hardware and software

12  technologies.  With Sue and I working together, we can propel

13  the research many, many years ahead.  Sue and I have the ability

14  to work very synergistically together, and we know exactly how

15  to plan the research with the technology.  We have learned that

16  many years ago, and we are not afraid of returning to that

17  model.

18          I would also like to provide Dr. Sue Savage-Rumbaugh

19  with lifetime access to the bonobo colony.  That is, in my

20  opinion, critical.  These bonobos form relationships with

21  people, and they hurt when people are missing from their life as

22  we would hurt when people are missing from our lives.  I have

23  experienced this, and I cannot explain it to anyone who has not

24  experienced it; but I can tell you these bonobos are like people

25  inside and they love us as much as we love them.

1    Q.   What -- I'm sorry.

2    A.   My other objectives that I really want to mention is that I

3    would -- Dr. Sue Savage-Rumbaugh, in my mind, has been a huge

4    role model in my career.  She has been a wonderful inspiration.

5    She has been a pillar.  She has been someone who I feel has been

6    sent to guide me through life, and I would like to honor her

7    with archiving all of her work on our web site.  All of the

8    history I can put together, I want to put it on our web site,

9    and I would like to enrich humanity by sharing all of the work

10   and all of the technology and make it available to anyone who

11   wants to do whatever they need to do, and we want to share it at

12   Apes.ControlEverything.com.

13   Q.   What are you and your company prepared to commit to this

14   bonobo colony and to Dr. Savage-Rumbaugh in terms of services?

15   A.   I consider this to be a lifetime commitment.  This is huge

16   for me, and I don't make many lifetime commitments in my life.

17   Q.   So what kind of services would you provide?

18   A.   The building and site maintenance is going to be provided by

19   my company.  We're also going to be covering the costs of

20   transport of the bonobo colony.

21        We will provide accounting and tax services with RMMC

22   in Springfield, which is a very large accounting firm that we

23   work with.  We will also be providing administrative services

24   for this facility.  We will be contributing technology to

25   perpetuate Sue's work, whatever that may be.

1          We will also work with Swmo Safety for bi-annual OSHA

2     safety certifications to make sure our facility stays OSHA

3     compliant and safe.

4          We will also be providing employee health screening,

5     TB testing, and all necessary vaccinations for everyone who has

6     contact with the bonobos.

7     Q.  And what kind of commitment are you and your company

8     prepared to make in terms of financial support?

9     A.  My company is ready to commit to a 40 x 80 pre-engineered

10    building.  That's not the end.  It's the beginning.  I'm willing

11    to commit 203 acres of land which this resides on, this property

12    resides on, an irrevocable $104,000 annual contribution from

13    National Control Devices, LLC.  I would also like to commit

14    $2,000 a week to be paid to ACCI.  I have a good friend,

15    Dr. Jared Taglialatela, and I would like to see ACCI have the

16    funds that they need to take care of the bonobos while they're

17    in Iowa.

18    Q.  And that commitment is until --

19    A.  That is until the relocation, until the USDA-approved and

20    court-approved relocation.

21          I would like to -- I'm also offering a renewable

22    five-year bank guarantee of $520,000.  This will be renewed

23    annually.  So if anything should happen to me or my business,

24    there would be at least five years of funding that would be

25    guaranteed to make sure that everything goes well.

1 Q.  And have you received any assurances or approvals from a

2 bank?

3 A.  Yes.  My very close friend, Scott Buerge from Metz Banking

4 Company, he is the president of Metz Banking Company, he has

5 also been the person who has helped me start my business from

6 the very beginning to where it is today, and we've had many long

7 conversations about this, and he has offered this $520,000 line

8 of credit to be used in the event that I cannot fund it with

9 cash, but I do intend to fund this with cash every single year,

10 so --

11 Q.  At this time I would like to identify for the record Exhibit

12 94.  Mr. Sheldon, in that big notebook to your left that's

13 sitting on the ledge, there's a book of exhibits.

14 A.  Okay.

15 Q.  It's even further to your left.

16 A.  Okay.

17 Q.  There you go.  If you could please turn to Exhibit 94.

18        MR. MELHUS:  Your Honor, I would like to assert an

19 objection to Exhibit 94 at this time.  We believe that this is

20 hearsay and lacks foundation.  This letter is being offered to

21 prove that this money is going to be available, so it's offered

22 for the truth of the matter asserted, and I don't think that BHI

23 or Dr. Sue Savage-Rumbaugh intend to offer the author of this

24 letter as a witness in this case.

25        THE COURT:  I don't know that it's been offered yet.

1    Has the exhibit been offered?

2              MR. NEIHAUS:  It has not been offered yet.  We do

3    intend to offer it.  Can I lay foundation first?

4    A.  Yes, that is the letter of credit.

5    BY MR. NEIHAUS:

6    Q.  Can you tell me, how did you receive this letter?

7    A.  Scott Buerge signed it for me on Sunday evening.  We were

8    both pressed for time, and we met and he signed this and brought

9    it to me.

10   Q.  Did you request this letter?

11   A.  Yes, I did.

12   Q.  For what purpose?

13   A.  For securing the future of these bonobos.

14   Q.  And, to your understanding, what does this letter give

15   assurance of?

16   A.  This letter gives assurance that if anything should happen

17   to me or my company that the bonobos will continue to be funded.

18             MR. NEIHAUS:  At this time we would offer Exhibit 94

19   into evidence.

20                              (Defendants' Exhibit 94 was

21                               offered in evidence.)

22             MR. MELHUS:  We assert the same objections as we did

23   earlier, Your Honor.

24             THE COURT:  Thank you.

25             94 will be received, subject to the objection.

1                    (Defendants' Exhibit 94 was

2                    received in evidence.)

3          THE WITNESS:  He's willing to accept a phone call if

4    anyone is interested.

5    BY MR. NEIHAUS:

6    Q.  And were there any other financial commitments?

7    A.  Yes.  I believe I have about a hundred thousand dollars left

8    to finish this building, and this figure is a little bit out of

9    date.  I've now committed a total of 1.25, one-and-a-quarter,

10   million dollars in resources to this project in land,

11   facilities, trust fund, and cash.

12   Q.  Have you received any support in your endeavors to build the

13   facility?

14   A.  Yes, I have.  I have received --

15   Q.  And to move this bonobo colony?

16   A.  Yes.  I received letters of support from Dr. Amory Lovins

17   and Dr. Jane Goodall.

18          MR. NEIHAUS:  Thank you, Mr. Sheldon.

19          I have no further questions, subject to rebuttal.

20          THE COURT:  Cross-examination?

21          MR. MELHUS:  Just briefly, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. MELHUS:

24   Q.  Mr. Sheldon, when did you begin construction of this

25   facility in Osage (sic), Missouri?

1  A.  I believe I had that marked in September, so I can look back

2  at the slides to see.  It has a better document.

3  Q.  Okay.  And in September of 2014 I think your earlier

4  testimony reflects, what was the purpose or purposes for that

5  facility?

6  A.  The purpose is for these bonobos.

7  Q.  Was there any other purpose?

8  A.  It's for these bonobos.

9  Q.  That's the sole purpose for this facility and there's no

10  other purpose?

11  A.  That is the purpose of this facility is for these bonobos.

12  We have discussed the potential that if we cannot get the

13  bonobos there that we may consider chimpanzees for other

14  applications; but the purpose and the reason why it was

15  constructed was for these bonobos.

16  Q.  So the primary purpose would then be for the bonobos, the

17  secondary backup purpose --

18  A.  A secondary backup purpose actually would be determined by

19  BHI.  BHI will then decide what happens to the facility if we do

20  not get the bonobos relocated.

21  Q.  And what purposes other than chimpanzees were contemplated?

22  A.  That was the only purposes that have been contemplated as of

23  now.

24  Q.  And these chimpanzees, where would they come from?

25  A.  That hasn't been decided.  That's well outside my area,

1   so --

2   Q.  Have you had any conversations about where these chimpanzees

3   might come from?

4   A.  No, not any that I can think of.

5   Q.  You've made what you've described as a lifetime

6   commitment --

7   A.  Yes.

8   Q.  -- to the bonobos for as long as they reside at the Missouri

9   facility, right?

10  A.  Yes.

11  Q.  And that lifetime commitment, I'm just trying to unbundle

12  that a little bit, that includes money.  How much money do you

13  expect it to cost to fund the facility each year?

14  A.  I expect it to cost around 80 to 90 thousand dollars to fund

15  the facility each year, but those are projected costs based on

16  our area and based on the information that we have been able to

17  gather.

18  Q.  Do you have any experience in running a facility that houses

19  great apes that would allow you to make such projection?

20  A.  Well, what I did was I looked into the NIH standards, and

21  NIH typically funds chimpanzees for 15 and as high as 17

22  thousand dollars I've seen references to.  So basically they've

23  decided that NIH is willing to fund 15 to 17 thousand dollars

24  from what I've been able to determine per chimpanzee.

25  Q.  Okay.  And what about administrative services?

1  A.  I'm providing that.  That's not part of the money that I'm

2  contributing.  My company is providing all of the administrative

3  services as I outlined in my PowerPoint presentation.

4  Q.  Do you have any idea of what those administrative services

5  might cost your company?

6  A.  I haven't -- I don't think that they're going to cost that

7  much because we have a really good administration in place for

8  my company, and we can -- they are all willing to volunteer

9  their time to work on this, so --

10  Q.  So the administrative services would be volunteered --

11  A.  Right.

12  Q.  -- by people from your company?

13  A.  Right.

14  Q.  What about the tax services that you discussed, how much

15  will that cost?

16  A.  That will cost -- typically tax services for my company cost

17  about seven or eight thousand dollars a year.

18  Q.  And so a similar amount could be expected here?

19  A.  I doubt that it would be that high given the nature of this.

20  Tami from RMMC has been very low cost so far.

21  Q.  What about staffing, how are you going to take care of these

22  bonobos on a day-to-day basis?

23  A.  I don't plan to take care of the bonobos on a day-to-day

24  basis.  What I would like to do is provide the funding and

25  provide the facilities.  I intend to have BHI make the

1  determination as to how staffing is handled.

2  Q.  How much would staffing cost in this type of facility?

3  A.  The general staffing for our facility could be -- I would

4  say in our area we're probably looking at about 20,000 a year as

5  a pretty average annual income for a lot of people.  There are

6  some people who make more obviously and then there are some

7  people who make less, but we're actually in a low to very low

8  income area in terms of Missouri is -- this area of Missouri is

9  a very low income area in Missouri.

10 Q.  So that would mean that labor costs less down there; is that

11 what you're trying to say?

12 A.  That's exactly right.  Labor typically costs less in our

13 area.

14 Q.  And against -- excuse me.  What about food costs, have you

15 determined how much food is going to cost?

16 A.  Yeah, I've discussed that with Sue.  I have discussed that

17 with Sue, and it is very typical of many of these types of

18 organizations to have food donated.  However, we have discussed

19 having a budget for food, and I am certainly willing to increase

20 my budget as necessary to cover those kinds of things.

21 Q.  So you intend to have staff on a volunteer basis?

22 A.  No, I wouldn't say on a volunteer.  We're looking at a paid

23 staff.

24 Q.  Okay.  Administrative staff would be on a volunteer basis?

25 A.  The administrative staff are actually paid at my company.

1  They have extra time at work, and they're willing to do it

2  voluntarily at work; but they will be paid through my company,

3  so --

4  Q.  And the food, you're hoping that that's going to be donated?

5  A.  From what I've been able to determine, food is typically

6  always donated to many of these kind of facilities.  It was

7  donated at the LRC.  Sue has indicated to me that it's been

8  donated at ACCI, and I have no reason to believe that we can't

9  get food donated to this facility as well.

10  Q.  What about the commitment to provide never-ending

11  improvements to technology?

12  A.  Right.

13  Q.  How much is that going to cost?

14  A.  That could cost tens of thousands of dollars to do that.

15  Q.  Okay.  Against whose lifetime is this commitment going to be

16  measured; against your lifetime?

17  A.  That's a good -- that's a very, very excellent question.  It

18  is my hopes that it would go against the lifetime of me and any

19  business that I own.  So as my business currently stands, if I

20  were to die, my business would continue on.  I have employees

21  who can carry it forward without me.  And however it serves the

22  interests of this court, I would like for it to always be a

23  lifetime commitment for me, for any business that I own.

24  Q.  Have you taken any steps to ensure that that commitment is

25  going to be carried forward?

1  A.  I'm sorry, I don't understand the question.

2  Q.  Other than offering your word of a lifetime commitment, have

3  you taken any steps to ensure that this money will be provided

4  for your lifetime?

5  A.  Well, I've provided a bank letter of credit.

6  Q.  Have you set up a trust, for example?

7  A.  We will set up a trust.  I believe Mr. Zifchak has been

8  working on setting up the trust.

9  Q.  But you haven't done that to date?

10 A.  No, it's not set up yet.  We don't want to set up the trust

11 until we get a decision.

12 Q.  Okay.  Are you aware that Mr. Ted Townsend -- do you know

13 Mr. Ted Townsend?

14 A.  Yes.  I have met Ted Townsend two, maybe three times.  I

15 have a very high regard for Mr. Ted Townsend.

16 Q.  Are you aware he made a similar lifetime commitment to care

17 for the bonobos?

18 A.  Right.

19 Q.  Are you aware that he invested approximately 20 million

20 dollars into the bonobos here --

21 A.  I'm not aware of really anything that he had done in terms

22 of how much or any of those kinds of things.

23 Q.  Would it surprise you to learn that he's invested 20 million

24 dollars?

25 A.  It wouldn't surprise me.  It's a beautiful facility, so --

1  Q.  And are you aware that the 20 million dollars that he's

2  invested -- and I'll represent that that's an approximate figure

3  to you.  Are you aware that that 20 million dollars,

4  approximately, was not enough to fund the facility here and to

5  care for the bonobos?

6  A.  I am aware that facilities such as Chimp Haven operate off

7  of budgets similar to mine.

8  Q.  But the bonobos that we're discussing here and the budget

9  that IPLS had --

10  A.  Yes.

11  Q.  -- with Ted Townsend --

12  A.  Yes.  I can't really speak to those kinds of things.  I'm

13  not aware of much of what has happened in terms of budgeting and

14  planning at ACCI or IPLS, so --

15  Q.  So when you're making your projections about how much it

16  would cost to run your facility in Missouri --

17  A.  Right.

18  Q.  -- you didn't compare the facility here in Des Moines?

19  A.  No, absolutely not.  The facility in Des Moines is not what

20  I would call a USDA sustainable type of facility.  The facility

21  we're building is a USDA sustainable facility.

22  Q.  I'll interrupt for just a second.

23          MR. NEIHAUS:  Objection, Your Honor.  The witness was

24  answering the question.

25          THE COURT:  Oh, I'll entertain another question.  I'm

1    not sure what he hadn't finished as far as the question.

2              Go ahead.

3    BY MR. MELHUS:

4    Q.  Did you make any comparisons between the facility you're

5    proposing in Osage (sic), Missouri, to the facility here in

6    Des Moines during your design process?

7    A.  No, I haven't made any comparisons between the two.  I don't

8    have any basis for the comparison.

9    Q.  Then you have no basis for your conclusion or your testimony

10   that a facility here in Des Moines was not a USDA sustainable

11   facility?

12   A.  I have no basis for comparison on the grounds that the

13   facility in Des Moines is very different than the LRC that we

14   had.  I'm making my basis of comparison for the LRC that we used

15   to work out of.

16   Q.  So what happens, Mr. Sheldon, when, heaven forbid, something

17   bad happens to your company, the economy goes down or some other

18   unforeseen circumstance prevents the profitable operating of

19   your company as it stands today?

20   A.  I've -- failure is a very long way from our company.  We

21   have started and we have built, and we have built slowly and

22   steadily for many, many years.  We are very deeply connected to

23   industries throughout the United States and throughout the

24   world.  Many companies that we work with depend on our parts,

25   which cannot be copied and have not been copied in 20 years.

1  Q.  To make an analogy, Mr. Townsend owned a very successful

2  company here in Des Moines.  Are you aware of that?

3  A.  Yes.

4  Q.  And he felt, based on the success of his company, that he

5  could sustain the bonobos in perpetuity for a lifetime --

6  A.  In --

7           MR. NEIHAUS:  Objection; assumes facts not in

8  evidence.

9           THE COURT:  Well, I get the point that you're making,

10  but I think we're getting rather far afield.

11           MR. MELHUS:  Sure.  I'll move on, Your Honor.

12           Thank you.

13  BY MR. MELHUS:

14  Q.  Okay.  Let's talk a minute about the proposed facility.

15           As it stands today, do you have any electricity in the

16  building?

17  A.  The building has temporary power running to it for the

18  purposes of running construction equipment.

19  Q.  So when you testified earlier that you had a long list of

20  utilities --

21  A.  Yes.  No, these are all utilities that are planned for this

22  facility.  These are -- let me correct that.

23  Q.  Sure.

24  A.  These were planned utilities for this facility.  Our

25  intention is to meet the USDA requirements and then work through

1   these.  These are requirements that we believe we need in order

2   to sustain it long term.  So our -- our objection -- or our

3   primary goal is to meet the USDA requirements first.

4   Q.  Okay.  Fair enough.

5           As it stands today, if we were to try to send bonobos

6   to the facility today --

7   A.  Right.

8   Q.  -- would there be any electricity?

9   A.  No.  It wouldn't be possible to send them today, which is

10  why I'm proposing to donate $2,000 a week to ACCI to sustain

11  them until we can get the facility inspected.

12  Q.  Okay.  And just to confirm, there's no plumbing at the

13  facility --

14  A.  We have --

15  Q.  -- that's operational?

16  A.  Actually we do have quite a bit of plumbing that is

17  operational right now.  That is one of the first parts that

18  we're doing.  It isn't all hooked up yet, but we do have the

19  complete septic system put in, all the drainage is nearly

20  complete.

21  Q.  Are there any windows?

22  A.  Not at this time.  We haven't planned the windows yet.

23  Q.  The HVAC system that you talked about earlier, is that in

24  place?

25  A.  It's not in place yet, but those will be in place before we

1  can get an inspection for USDA approval.

2  Q.  And the fire detection system that you talked about --

3  A.  Right.

4  Q.  -- is that in place yet?

5  A.  That is not in place yet either, no.

6  Q.  And what about the security system, is that --

7  A.  Those things are not in place yet, they are not in place.

8  Q.  I am interested -- and I think just because it's not

9  something I've seen in too many facilities before.  I'm

10  interested in the wood-burning furnace.  Could you tell me a

11  little bit more about how that would work?

12  A.  Right, right.  The wood-burning furnace is a furnace that

13  sits away from the facility, and it is used for emergencies

14  only.  It is used to generate heat in a jacket of water, and

15  it's usually a very small building.  It looks like kind of a

16  small utility garage shed, and you would load wood into that

17  wood burner, and it circulates water throughout the jacket, and

18  that's what runs the radiant floor heating system into the

19  building, which is all water circulation.

20  Q.  Okay.  I understand that process, but what I don't

21  understand is how logistically -- do you have to feed this

22  machine, this wood-burning furnace every day or --

23  A.  Yes.  It needs to be fed once every two days, so --

24  Q.  And how close would it be burning -- when it's burning, how

25  close would it be to the bonobos?

1  A.  It would not be anywhere near the bonobos.

2  Q.  I guess I -- and the exhibit or the demonstrative that you

3  showed earlier, it appeared that it was fairly close?

4  A.  Yeah.  That's a proposed location.

5  Q.  So that hasn't been constructed yet?

6  A.  No.  Again, we will meet USDA guidelines on that, on that

7  location, so -- wood burners are a very common heat source in

8  our area.

9  Q.  How common are they in facilities that house great apes?

10  A.  Like I said before, this is an emergency heat source.  This

11  isn't necessarily required.  Our primary is propane.  Propane is

12  the primary heat source that we will be using for the radiant

13  floor heating, and then we can deal with the wood burner as an

14  emergency.

15  Q.  Do you know if wood-burning furnaces are common in

16  facilities that house great apes?

17  A.  I don't know if that's common or not.

18  Q.  Did you consult with the USDA when making the decision to

19  install a wood-burning furnace?

20  A.  We haven't installed the wood-burning furnace.

21  Q.  Have you consulted with the USDA in any form in the

22  construction of this facility?

23  A.  Not at this time, no.  We have followed the USDA guidelines.

24  Q.  Do you have any USDA permits to transport the bonobos from

25  Des Moines to Missouri?

1  A.  We can't get permits for that until we have a relocation

2  agreement.

3  Q.  Have you contacted the USDA about transporting the bonobos

4  from Des Moines to Missouri and what that would entail?

5  A.  We wouldn't contact the USDA at this stage.

6  Q.  So you wouldn't consult to see if it was even possible or

7  how long that might take?

8  A.  USDA does animal transport very frequently.  It is in the

9  Blue Book, and there are guidelines for that.  What you do is

10 you hire an animal transport company that is USDA certified.

11 You get your permits, and then you do the transport.  We are not

12 in the process of getting our permits yet because we don't have

13 a relocation agreement in place.

14 Q.  Okay.  And you haven't consulted with any USDA transport

15 companies to see how much that will cost?

16 A.  Actually we did consult with one USDA transport company.  We

17 found that it would be about a thousand dollars per chimpanzee,

18 and that was going from Omaha, Nebraska, to Springfield,

19 Missouri, which is a comparable distance to Des Moines, Iowa, to

20 Osceola, Missouri.

21 Q.  And those are for chimpanzees?

22 A.  Those are for chimpanzees, yes.

23 Q.  And these aren't chimpanzees that are proposed to go to the

24 Missouri facility, are they?

25 A.  It is my understanding that they are a breed of chimpanzee,

1   yes.

2   Q.  I think I wasn't clear on the question, but I'll go ahead

3   and move on.

4         I suppose worst case scenario this will be my final

5   question.  I appreciate your patience with me as I kind of work

6   through this.  This is my first time I've had an opportunity to

7   question you about this facility.

8         Worst case scenario, the funding falls through for the

9   Missouri facility.  What is the backup plan?  Is there another

10  plan in place, for example, to move the bonobos again to another

11  facility in Iowa, Africa, or elsewhere?

12  A.  Well, that plan is not in place.  However, I will say that

13  relocating the bonobos is not obviously an easy task.  If

14  something were to happen to me or my business, there would still

15  be five years of funding that are guaranteed, no matter what,

16  and that funding could be used to relocate the bonobos.  The

17  bonobos could be relocated by BHI at their discretion at any

18  time.  I intend to do all that I can to make sure that they have

19  their funding and that they have a plan for five years in the

20  event of my death.  However, I do believe my company is a

21  strong, successful company, and I do believe my company can

22  sustain them.

23         MR. MELHUS:  All right.  I appreciate your time.  I

24  promised that would be my last question and, subject to any

25  recross, it will be.

1          Thank you.

2          THE COURT:  Redirect?

3          MR. NEIHAUS:  No further questions, Your Honor.

4          THE COURT:  Thank you.

5          You may step down, sir.  Thank you.

6          THE WITNESS:  Thank you.

7                                    (Witness excused.)

8          MR. STAMBAUGH:  Your Honor, if I may just be heard for

9  a few minutes, I would appreciate the court's indulgence.

10          THE COURT:  Sure.

11          MR. STAMBAUGH:  We have taken the court's advisements

12  regarding scheduling and timing to heart.

13          As you can see, we've had a very large showing of

14  support both here in Iowa and across the United States and

15  throughout the world.  We have a few witnesses who we had

16  planned to call who have come as far as Israel and Africa.

17  That's Itai Roffman, I-T-A-I R-O-F-F-M-A-N, and Sally Coxe,

18  C-O-X-E.  Because this is a bench trial, as an offer of proof, I

19  will represent to the court these are additional BHI board

20  members who would testify that when they voted Dr. Taglialatela

21  on to the IPLS board in November 2013, they were not aware that

22  Dr. Savage-Rumbaugh had been kicked off the IPLS board or banned

23  from the lab.

24          Again, taking the court's instructions to heart and in

25  an effort to avoid any cumulative or duplicative testimony, we

1　will forego those witnesses.

2　　　　　Now, there is one witness, Your Honor, Dr. Russ

3　Tuttle, who is a professor at the University of Chicago, who has

4　traveled here yesterday to testify.  We have already worked out

5　with the other side an availability for Dr. Tuttle which is

6　limited to tomorrow morning.

7　　　　　So with the exception of and subject to the testimony

8　of Dr. Tuttle, the claimants are prepared to rest their case,

9　Your Honor.

10　　　　　THE COURT:  All right.  Thank you.

11　　　　　Now, just so the record is clear, these two additional

12　persons, and we've heard what they would testify to if they were

13　called, is there any objection to the court simply considering

14　that that's what they would say if they were called?

15　　　　　MR. MILLER:  Your Honor, I think we would be entitled

16　to an opportunity to cross-examine them with respect to what

17　they would say.  Yes, we object to counsel's representation of

18　that.  I understand the circumstances we're under.  The sole

19　representation is that they would say we didn't know these --

20　　　　　MR. STAMBAUGH:  As consistent with the other BHI board

21　member testimony that they were unaware at the vote in November

22　of 2013 of Dr. Taglialatela and Hopkins on to the IPLS board,

23　that they were unaware that Dr. Sue Savage-Rumbaugh had been

24　banned from the lab and dismissed from the IPLS board.  We could

25　limit it to those two offers of proof.

1          THE COURT:  Do you have any serious doubt that that's
2    what they would testify to?
3          MR. MILLER:  Your Honor, if you would note my
4    objection, no, I think that that's -- I don't, I don't have --
5    that's fine.
6          THE COURT:  Well, I'll go ahead and accept that then.
7          MR. STAMBAUGH:  We appreciate that, Your Honor.  So,
8    again, Your Honor, subject to the testimony of Dr. Tuttle
9    tomorrow morning, claimants rest their case.
10          THE COURT:  Thank you.
11          Are you ready to go forward now?  We could take a
12    minute and recess a little early if you want.
13          MR. MILLER:  We'll go ahead and recess if you don't
14    mind, Your Honor.
15          THE COURT:  We'll take our mid afternoon recess and be
16    in recess for 15 minutes.
17          (Recess at 2:42 p.m., until 2:57 p.m.)
18          THE COURT:  Please be seated.
19          Plaintiffs, you can call your first witness.
20          MR. MELHUS:  Plaintiffs call Dr. Julie Gilmore to the
21    stand.
22          THE COURT:  Please come forward, please.
23          THE CLERK:  If you could wait right there and I'll
24    swear you in.
25          THE WITNESS:  Okay.

1        THE CLERK:  Raise your right hand.

2           JULIE GILMORE, PLAINTIFFS' WITNESS, SWORN

3        THE COURT:  Right there.

4                    DIRECT EXAMINATION

5    BY MR. MELHUS:

6    Q.  Good afternoon.

7           Could you please state and spell your name for the

8    record.

9    A.  Julie Gilmore, J-U-L-I-E G-I-L-M-O-R-E.

10   Q.  And could you please describe your educational background

11   for the court.

12   A.  I have an undergraduate degree in business management.  I

13   attended undergraduate work at Colorado State University.  I

14   also did some work at the University of Phoenix and Iowa State

15   University is where I did most of my vet school prerequisites,

16   and then I have a degree in veterinary medicine from Iowa State

17   University, College of Veterinary Medicine.

18   Q.  And are you currently a member of ACCI?

19   A.  Yes.

20   Q.  That's a member of the Board of Directors just to be clear?

21   A.  Yes.

22   Q.  Are you licensed to practice medicine, veterinary medicine

23   in Iowa?

24   A.  I am.

25   Q.  Is there a special license in Iowa to practice veterinary

1  medicine with great apes?

2  A.  There is not.

3  Q.  Is there a special license to practice veterinary medicine

4  with bonobos?

5  A.  No.  There's no primate specialty in veterinary medicine.

6  Q.  How do you gain experience or expertise in treating or

7  caring for bonobos or great apes as a veterinarian?

8  A.  There's a couple of different avenues that that occurs with.

9  There are some specialty routes that incorporate some training

10  in great ape species such as, you know, a specialty in zoo

11  animal medicine or in laboratory animal medicine.  Both of those

12  specialties obviously provide training in a wide variety of

13  species that are used in research or, you know, that you would

14  find in a typical zoo collection.

15           Lots of experience in veterinary medicine in general

16  comes from mentorship opportunities and things like that,

17  working with other individuals who gained experience in an

18  apprenticeship almost type of situation.  Lots of veterinarians

19  are -- well, in general, veterinarians are trained to treat

20  multiple species, and so that's just part of the education.  I

21  think early on we learn that there are a lot of similarities

22  between a lot of different types of mammals and reptiles and

23  things like that, and you learn what the pertinent questions are

24  to ask and what the important species differences are to know.

25           So it's very common for veterinarians to treat many

1  different species.

2  Q.  And as a veterinarian have you gained experience working

3  with bonobos in particular?

4  A.  I now have about three years of experience working with

5  these animals, yes.

6  Q.  Is that type of experience very common in Iowa?

7  A.  No.  There are actually no other great apes in Iowa, even

8  the Blank Park Zoo does not have a collection of great apes, and

9  there are -- there's really -- yeah, there are not veterinarians

10  licensed in Iowa who have a wealth of great ape experience.

11  Q.  Okay.  And have you served as the veterinarian for ACCI?

12  A.  Yes.

13  Q.  And in that capacity have you taken care of bonobos under

14  their control?

15  A.  Yeah.  Absolutely, yes.

16  Q.  How did that first come to be?  How did you first get

17  involved with what was then the Iowa Primate Learning Sanctuary?

18  A.  So, at the time I was working at a small animal practice,

19  urgent care hours, and I had a colleague -- well, actually there

20  was a couple of different routes.  I had a colleague who was

21  contacted by an affiliate of the organization at that time

22  asking if she or some of the other vets in our practice would be

23  willing to help out because their veterinarian was leaving at

24  the time, they didn't have anybody to treat the animals and, you

25  know, asked if we would come out and meet with them.

1          The facility that I worked at was very close in

2  proximity to what was then the Great Ape Trust, and so it was

3  literally less than five minutes up the road and so we were a

4  logical choice.  So that was one route.

5          I also happened to know the former veterinarian who

6  provided care for those animals, Dr. Robert King, you know, when

7  he was leaving and had a conversation with him, you know, about

8  potentially doing that and he thought it would be, you know, a

9  good opportunity and something that would be a good fit for me,

10 so --

11 Q.  Okay.  All right.  Did you have any conversations with

12 Dr. Sue Savage-Rumbaugh about your involvement at the Iowa

13 Primate Learning Sanctuary which I'll refer to as IPLS?

14 A.  Yes, in the very beginning.  Can you clarify exactly what

15 you're asking with that?

16 Q.  Did you discuss what your role would be at IPLS with

17 Dr. Savage-Rumbaugh?

18 A.  Yes.  I mean, they were definitely looking for a

19 veterinarian or veterinarians plural to help care for the

20 animals there.

21 Q.  And at the time did she know about your experience with

22 great apes?

23 A.  Yes.  I think we were very clear that the veterinarians --

24 none of the veterinarians at the practice had extensive

25 experience with species like great apes, and, again, you know,

1  that is -- all veterinarians in Iowa are pretty much in that

2  same boat.  We were very clear that, you know, we're willing to

3  learn and we're willing, you know, to engage other resources,

4  but we didn't have direct species with it -- or direct

5  experience with the species prior to that.

6  Q.  Did you finally agree to become formally involved with IPLS?

7  A.  I did, yes.

8  Q.  When was that?

9  A.  That was probably -- the first time we met and agreed to

10  move forward with them I believe was in March of 2012.  And at

11  the time there was another veterinarian in particular who was

12  going to help with that endeavor who later decided that she

13  didn't want to be involved, but there were two of us initially

14  that were involved in that from Avondale.

15  Q.  All right.  And how did your role at IPLS change, if at all,

16  from March of 2012 through September of 2012?

17  A.  So, I gradually became more and more involved.  One of the

18  things that I initially started out just in a veterinarian

19  capacity, would make pretty regular trips out there to see the

20  animals, get to know the animals, attend to, you know, requests

21  for veterinary care.  I did get involved in the capacity of

22  helping them through the process of applying for an exhibitor's

23  license from the USDA.  So that was something that is kind of a

24  long process that requires lots of inspections and, you know,

25  following a set of certain rules that makes the facility safe

1  for visitors to visit and things like that.  And so I was very

2  much involved in that capacity, as well as being a veterinarian.

3  Q.  Okay.  Did IPLS have an exhibitor's license before you got

4  involved?

5  A.  No.  They had a research license but not an exhibitor's

6  license, and the exhibitor's license was something that they

7  needed to have the public out at the facility.  The USDA agent

8  had told them that they need that to, you know, host

9  fund-raising events or have tours, educational type tours or

10  things like that.

11  Q.  Okay.  And in September 2012, did your role evolve at all at

12  IPLS?

13  A.  Yes.

14  Q.  And how did it change?

15  A.  Well, about that time there were some allegations that

16  surfaced against Dr. Savage-Rumbaugh by mostly a group of former

17  people who had worked there.  The board chair at the time, Ken

18  Schweller, when those surfaced called me kind of in a panic at

19  that time saying that they needed to, you know, pending an

20  investigation, definitely remove Dr. Savage-Rumbaugh from the

21  director type situation and basically told me that I -- you

22  know, he asked, you know, you're the only person in Iowa that's

23  there to do this, will you step in and basically in a

24  supervisory type role and, you know, monitor the animals and

25  also Dr. Savage-Rumbaugh while in the lab until she -- while we

1  can conduct an investigation.

2  Q.  Okay.  Do you have any idea what the investigation was

3  about?

4  A.  It was just general welfare concerns that they had about the

5  safety of the animals and the safety of -- well being of the

6  animals and safety of the staff.  There were numerous

7  allegations made in a letter that, you know, was distributed

8  widely around the -- not only to the Board of Directors but to

9  lots of media outlets and things like that.

10          There were claims that cages were, you know, not being

11  locked and, you know, that there was some mental instability as

12  well on her part.

13  Q.  Okay.  And I understand that Dr. Savage-Rumbaugh was

14  eventually cleared of those allegations as a result of that

15  investigation?

16  A.  That's correct.

17  Q.  And did they consult with you or did the investigators

18  consult with you during that process?

19  A.  Not in a formal -- I never had a formal interview as part of

20  that process, so no.

21  Q.  Okay.

22  A.  I did have conversations, you know, independently with some

23  of those investigators, you know, about my involvement there,

24  but I didn't -- you know, the other people that were

25  investigated as part of that -- or I mean who were interviewed

1  as part of that investigation had a filmed interview with all

2  three members of the investigation committee, and I did not.

3  Q.  Okay.  Did you agree with the results of that investigation?

4  A.  I -- you know, I -- yes and no.  I would say that I did not

5  actually -- I was not privy to the results of that investigation

6  for a long time because I wasn't a member of the board so I

7  didn't initially even have an opportunity to, you know, see the

8  investigation report.  I was -- I agreed with the fact that

9  there were definitely -- it's not fair to make accusations

10  against someone that are, you know, based on hearsay and not

11  direct knowledge of certain incidents or things like that.  And

12  so, yes, I agreed that anything like that should be -- you know,

13  should not be used against somebody when somebody doesn't have

14  firsthand knowledge of a specific incident.

15  Q.  All right.  Okay.  Let's move forward in time a bit.  Around

16  November of 2012, I understand that several of the bonobos and

17  Panbanisha in particular fell ill, is that correct?

18  A.  Yes.  All of the bonobos actually fell ill at that time,

19  starting with Teco.  I think it was about October 29th he

20  started showing signs of respiratory illness, 28th, 29th, around

21  there, and then on the 30th he got quite ill.

22  Q.  Could you explain kind of the circumstances leading up to

23  that illness?

24  A.  You mean the circumstances of the bonobos being sick at that

25  time or -- yeah.  So he was the first one to be ill.  He started

1 showing typical upper respiratory symptoms, you know, runny

2 nose, low grade fever, a little bit of coughing intermittently,

3 you know, loss of appetite, lethargy, things like that.  He --

4 yeah, so it started with him, and then it kind of spread.

5 Actually quickly all of the bonobos were affected by that.  We

6 did not have an effective quarantine protocol in place at that

7 time and they all were sick at different stages.  Some of them

8 were more affected than others.  Panbanisha was actually one of

9 the last ones to get -- to show symptoms through that round of

10 illness, and she -- you know, she started showing symptoms on or

11 around probably November 4th or 5th.

12 Q.  Could you describe your course of treatment for the bonobos

13 throughout that time?

14 A.  Okay.  Initially it started with, you know, obviously

15 treating the ones that, you know, were symptomatic, so it

16 started with Teco before others started showing symptoms.  He --

17 you know, we started out with putting him on antibiotics

18 initially because he had a low grade fever and even though

19 definitely there was a suspicion that there was a viral

20 pathogen, but that was to protect against secondary bacterial

21 invaders, which is kind of a common route of treatment with a

22 respiratory disease.  As he got more ill, we started adding in

23 other measures such as a nebulization with Albuterol to open

24 airways, oxygen therapy as needed as he was having trouble

25 breathing, obviously trying to encourage good supportive care

1  with nutritional support, you know, things like that, to keep

2  him healthy.  And he had a lot of those treatments around the

3  clock and did pull through and did make a complete recovery from

4  that.

5  Q.  And that's Teco that made the full --

6  A.  Yeah, Teco, the youngest bonobo.

7  Q.  I understand one of the bonobos, Panbanisha, did not make a

8  full recovery, is that right?

9  A.  That's correct.

10  Q.  What happened to Panbanisha?

11  A.  Panbanisha was, again, one of the last ones to show

12  symptoms, and, again, some of them were affected more than

13  others.  My recollection is that Elikya and Maisha were the

14  least affected of the group, and Kanzi, Nyota, Panbanisha and

15  Teco were all quite ill, and Matata actually had some very bad

16  days during that period as well.  So they were all affected to

17  one degree or another, but Elikya and Maisha were the least

18  affected.

19        Panbanisha was one of the last to show symptoms, but

20  her symptoms were very severe and acute in nature.  She

21  started -- you know, she started showing symptoms around the 4th

22  or the 5th; same runny nose with a little bit of yellow tinge,

23  you know, discharge from her nose, lethargy.  They were not able

24  to obtain a rectal temperature for me, so I'm not sure what

25  their rectal temperature was at the time.  But we, you know,

1  started the same type of treatment with her, and we used a broad

2  spectrum injectable antibiotic.  We used oxygen therapy

3  treatment with Albuterol nebulization to help her breathe,

4  things like that, and she progressed into something called acute

5  respiratory distress syndrome, which is not uncommon in cases of

6  respiratory illness.  I think that upper respiratory became more

7  of a pneumonia type situation, and once she progressed into this

8  acute upper respiratory distress syndrome, it was very difficult

9  to get her through that, and she did succumb to it, which is

10 quite common, unfortunately, with all species who are affected

11 by acute upper -- acute respiratory distress syndrome or ARDS is

12 the acronym for that.

13 Q.  Were other people helping in the care and treatment of

14 Panbanisha and the other bonobos throughout that time?

15 A.  Staff or veterinarians or what specifically?

16 Q.  Both.

17 A.  Yes.  Many of the staff members definitely were helping

18 provide treatments to all seven of those.  I was there pretty

19 much around the clock.  I was still working -- my entire

20 involvement out there I also worked full time as a veterinarian

21 in practice, and so there were hours that I was not able to be

22 there, but when I could be there I was actually spending the

23 night there for about a three-week period of time to provide

24 care for them around the clock.  Staff members were also

25 involved in administering medications, nebulization treatments,

1   oxygen therapy, things like that.

2          I did involve other veterinarians in the course of

3   treatment there, so I consulted with Dr. King who was their

4   former veterinarian, who was actually a cardiovascular and

5   respiratory specialist up at Iowa State University, so a good

6   person to ask about respiratory disease.

7          I had also previous to that reached out and made a

8   contact with Dr. Vickie Clyde, who's a veterinarian in Milwaukee

9   County and is responsible for overseeing the bonobo colony in

10  Milwaukee County, which is quite large.  She has extensive

11  experience with bonobos.  We talked about the treatment plan,

12  challenges of managing illnesses like respiratory disease in

13  captive apes, which, unfortunately, it's the second leading

14  cause of death in this species, so it's not uncommon at all to

15  lose them to respiratory disease, and the frustrations

16  associated with trying to treat a species like a bonobo that,

17  you know, you can't ventilate for three weeks under anesthesia

18  or things like that.  So she was involved in the treatment plan

19  as well.

20         I also consulted with another veterinarian that had

21  been, you know, involved with the IACUC and things like that out

22  at the facility, Dr. Doug Pernikoff, who has a lot of captive

23  great ape experience as well and some field experience as well.

24         And then, finally, I also discussed the findings

25  with -- or the treatment plan with our USDA veterinarian,

1  Dr. Heather Cole, who is not only now and continues to be our

2  USDA representative, but prior to becoming a USDA representative

3  had extensive -- or some great ape experience in captivity as

4  well.

5           And I had -- everybody agreed that the treatment plan

6  was appropriate.  There were no additional recommendations made

7  of other things that we could do.  I think it was agreed that we

8  were making a very valiant effort, and I think that if we had

9  not made those efforts, we probably would have lost more than

10  Panbanisha in my professional opinion.

11  Q.  Okay.  And after those valiant efforts to save the bonobos

12  in 2012, in November specifically, did your role at IPLS evolve

13  again?

14  A.  Yeah.  So Panbanisha died I believe on November 6th.

15  Towards the middle or end of November, you know,

16  Dr. Savage-Rumbaugh had been cleared from that investigation,

17  but the board was clear that they did not want her in an

18  administrative role any longer and they were looking for

19  somebody to fill the role as the director.  And I had numerous

20  conversations with Dr. Savage-Rumbaugh about that, also with Ken

21  Schweller, and I agreed to put my name forward for nomination to

22  that role, and the board voted me in as the executive director.

23  Q.  Okay.

24  A.  At that time.

25  Q.  That was in November of 2012?

1   A.   Uh-huh.

2   Q.   So shortly after that, in January of 2013, were you

3   approached by anyone with a settlement agreement to resolve some

4   underlying concerns about ownership of the bonobos?

5   A.   Yes.  I -- Lyle Simpson sent me an e-mail, so I didn't have

6   a direct conversation with anyone about that.  He forwarded an

7   e-mail from Paul Burns that said, please have Julie Gilmore sign

8   this and return it to me.  Lyle sent me an e-mail that said,

9   please sign this and return it to me.  You know, the parties

10  have agreed on this issue, and it's a done deal.  So it was a

11  legal directive that I followed when I signed that document.

12  Q.   Okay.  And that was -- to be clear, there was a settlement

13  agreement that you signed?

14  A.   Yes.

15  Q.   January of 2013?

16  A.   Yes.

17  Q.   If you would flip to Exhibit 1 of the large binder to your

18  left.

19  A.   Yes.  All the way to the beginning?

20  Q.   Yes, No. 1.

21        Okay.  And does that look like the settlement

22  agreement that you signed, referring to Exhibit 1?

23  A.   Yeah, yes.

24  Q.   Okay.  Could you turn to page 2 of that exhibit, referring

25  to paragraph 5.  Do you see where it says, "The Trust shall use

1  its best efforts to provide complete and competent care of

2  Matata and Maisha; and shall take all reasonable precautions to

3  ensure their complete safety."

4          Do you see that?

5  A.  Yes.

6  Q.  And you read that at the time that you signed the agreement?

7  A.  Yes.

8  Q.  And since then have you endeavored to comply with providing

9  complete and competent care to the bonobos?

10         MR. LANGEL:  Objection.

11         THE COURT:  I'll receive it, subject to the objection,

12  whatever it was.

13         MR. MELHUS:  Go ahead and answer, if you can.

14  A.  Yes, absolutely, I believe that we provide complete and

15  competent care, and our ability to do that continues to actually

16  expand over time.

17  BY MR. MELHUS:

18  Q.  Okay.  Can you talk about how you endeavored to provide care

19  for the bonobos and how that's changed over time?

20  A.  Since the formation of ACCI, we've put a lot of very helpful

21  protocols in place that were not in place previously.  Some of

22  the things that have been very helpful is actually adopting and

23  incorporating the use of personal protective equipment.  The

24  best way in my experience to treat animals is to keep them from

25  getting sick in the first place, and personal protective

1  equipment is designed to do that.

2         So what that entails is, you know, strict policies

3  about hand sanitization, wearing gloves and masks when

4  appropriate; wearing gloves and masks when preparing food and,

5  you know, definitely while cleaning, things like that; strict

6  isolation protocols about how to protect other animals in the

7  group if some get sick and others don't, and those are policies

8  that, you know, volunteers and staff alike are very compliant

9  with.  We've had a dramatic reduction in the number of

10 respiratory illnesses since we've adopted those protocols.

11        The first eight months I was there I think I treated

12 Teco for four separate incidences like this where he's had

13 respiratory illness.  And knock on wood, we have not had any

14 respiratory illness since we have adopted that protocol very

15 stringently in and around April of, I guess it would have been

16 2014.

17 Q.  So just to -- sorry.  I think my question was maybe unclear

18 as to time.

19 A.  Okay.

20 Q.  So you're testifying to actions that were taken after the

21 formation of ACCI in December of 2013, is that correct?

22 A.  Yes.

23 Q.  Okay.  And the standard operating procedure and the policy

24 that you discussed as being adopted in April 2014, that was an

25 ACCI policy?

1  A.  Yes.

2  Q.  Okay.

3  A.  Ah -- go ahead.

4  Q.  And I think we'll return to some of the standard operating

5  procedures or policies a bit later, but I kind of want to keep

6  on this time line here.

7  A.  Okay.  Do you want me to -- I mean, there were other things

8  that we had done to increase their care.  I don't know if you

9  want me to talk about that or not.

10  Q.  Sure.  Let's talk about that now.

11  A.  Okay.  So things like strict control of their diet is I

12  think hugely important.  Their diet was not well regulated

13  previously, and we have adopted not only, you know, making sure

14  that they're receiving healthy meals all the time with, you

15  know, acceptable foods for them to eat, but that we're logging

16  those calories.  We've had some significant weight loss in Kanzi

17  since that period of time, which I think is very important from

18  a veterinarian's perspective.  We've also started a lot of

19  husbandry protocols to make it easier to examine a species like

20  this.  So they all participate almost daily in body part exams,

21  presenting different body parts, presenting for different

22  procedures that we need to do.  They present for -- we're in the

23  process of training them to accept injections, which is a far

24  better, superior method of delivering injectable medications

25  than darting, for instance, things like that when that is

1   better.

2          So I would say we continue to grow our supply of

3   veterinary equipment and, you know, we've had, you know, funds

4   coming in to make cage modifications to allow us to collect

5   blood safely and, you know, with like a blood sleeve with them

6   awake, things like that.

7          So we have a lot of things in place and plans to

8   continue to grow that program down the road.

9   Q.  Okay.  And just to be clear again, those are policies and

10  changes that were implemented after the formation of ACCI?

11  A.  Yes.

12  Q.  And that didn't exist before the formation of -- well, it

13  didn't exist under the tenure as you saw it during 2012 when you

14  first got involved with IPLS?

15  A.  Correct.  Very early on I did, you know, talk a lot about

16  diet that first summer that I was involved out there, but I

17  would say that compliance with that was not consistent and that

18  neither was logging of that.  We did not have consistency.  So

19  the diet has been something that we tried to work on for quite

20  awhile, but I feel like we are leaps and bounds ahead of that

21  now since the formation of ACCI than we were when I first was

22  involved with the organization.

23  Q.  Okay.  Just changing topics a little bit and moving forward

24  in time to May 2013, I understand that there was an incident or

25  an accident at the facility in Des Moines and that

1  Dr. Savage-Rumbaugh was taken to the hospital as a result of

2  that incident, is that correct?

3  A.  Yes.

4  Q.  Could you describe the circumstances surrounding that

5  incident and what occurred immediately after?

6  A.  Yeah.  I wasn't there at the facility when the accident

7  actually occurred, but I was at another appointment.  I did get

8  a call from Steve Boers who said she had fallen at the facility

9  and was not feeling well and she was taken to the hospital by

10 ambulance.  I attended -- I went to the hospital as soon as I

11 finished that other appointment and met with her there, and she

12 had fallen and hit the back of her head.  You know, she was -- I

13 sat with her for a while and got some clothing and stuff like

14 that for her.  She was discharged from the hospital that same

15 day and, you know, her -- you know, she returned to not the

16 facility but to the house she rents right next to the facility,

17 and I didn't see her for quite awhile after that.

18 Q.  Okay.  Did you meet her at the hospital after that accident

19 or --

20 A.  Yeah.  I did go to the hospital, like a visitor in the

21 hospital right after that occurred.  She wasn't there overnight.

22 She was just there for treatment before she was discharged.  At

23 the time -- I don't know what followed that, but at the time I

24 was there when she was discharged by her doctor or the

25 caretaking staff at the hospital, and they said she could go

1  home and that they didn't think she would have long-standing

2  injury from the fall at the time.

3  Q.  Okay.  Did they give any other -- did the doctors or nurses

4  give any other indication as to her sort of medical diagnosis?

5  A.  No; just that she had fallen and hit her head.  I don't know

6  the details of, you know, her medical exam associated with that.

7  I was just there when she was discharged, and they said, oh,

8  you're going to be fine, just go take it easy today.

9  Q.  Okay.  And you mentioned that since that time you hadn't

10 heard much from her since the accident in May 2013.

11 A.  Uh-huh.

12 Q.  Could you describe your efforts to reach her?

13 A.  A couple of different times I sent text messages, you know,

14 to her asking if she's okay, you know, just checking in and did

15 not get a response to that.  I also visited her house a couple

16 of times and knocked on the door and didn't get an answer.

17 Q.  And how long did this unresponsiveness last?

18 A.  Well, with me, I guess the first response that I got from

19 Sue was in July.  We were filming a BBC -- or the BBC was coming

20 out and we had started those agreements with them before she was

21 gone, and they were expecting on having some time to interview

22 with her and things like that.  So we had let them know we don't

23 know what's going on with her, she's not available.  So because

24 of that I did try to reach out to her and said, hey, they're

25 here, they really want to interview with you.  You know, is that

1  something that you would be interested in coming down even for a

2  little bit of time or things like that, and she just responded

3  no.

4  Q.  In July of 2013, at the same time you tried to contact

5  Dr. Savage-Rumbaugh about the BBC interview, did IPLS hold a

6  Board of Directors meeting?

7  A.  Yeah, July or August.  I can't remember the exact date.

8  Q.  And did you invite Dr. Savage-Rumbaugh to that meeting?

9  A.  Yes.  It was at -- it was an e-mail invitation that went out

10 to all of the Board of Directors.  It was at Tom Watson's Hy-Vee

11 organization out at Westown Parkway, and there was a call-in

12 number provided for people who couldn't attend in person.

13 Q.  Do you recall specifically if that invite, that e-mail was

14 sent to Dr. Savage-Rumbaugh?

15 A.  Yes.  We made certain it was sent to Dr. Savage-Rumbaugh.

16 Q.  And did she attend that meeting?

17 A.  Not to my knowledge.  No, I don't know if she called in or

18 not, but we weren't aware that she called in if she did.

19 Q.  Around that same time or perhaps at that same meeting, did

20 your role as director of IPLS change?

21 A.  Yes.  I resigned as the director at that time.  As I said, I

22 had continued to work full time in practice.  When I initially

23 accepted that directorship, I saw myself in that position on an

24 interim basis until we could find someone ideally suited to be a

25 leader of a nonprofit such as ACCI, and I just felt like it was

1  something that I couldn't continue to be involved in at that

2  level, and so I did resign.

3  Q.  Okay.

4  A.  Not from the board or as the veterinarian, but just as the

5  director.

6  Q.  Okay.  Thank you.

7          So with Dr. Savage-Rumbaugh unresponsive to attempts

8  to reach her and with you stepping down as the director of IPLS,

9  was there any talk amongst the board about who might carry this

10  work forward?

11          MR. LANGEL:  Object to foundation based on -- I think

12  it mischaracterizes the prior testimony, and there's no

13  foundation as to the allegation that Sue was not responsive.

14          THE COURT:  Well, I'll receive it, subject to the

15  objection.  I think the question was simply whether or not there

16  was talk about the subject.

17          MR. MELHUS:  Answer if you can, please.

18  A.  Can you ask me again, please?  I'm sorry.

19  BY MR. MELHUS:

20  Q.  Sure.  Was there talk about who might carry IPLS's work

21  forward in July or August of 2012, at about that time?

22  A.  There was not a specific person, and I do know that there

23  had been some e-mails that had gone around.  I didn't have

24  direct communication with Sue.  George may or may not have.  I'm

25  not privy to that, to a lot of those e-mails; but I think that

1  the consensus was she had, if any involvement -- in any

2  involvement with the board, very limited involvement at that

3  point in time. She -- there was a feeling that she was just not

4  going to return. We didn't have -- things weren't very

5  responsive when we were attempting to communicate with her. We

6  felt like we needed to make a plan for the facility. You know,

7  we either -- do we move the animals, do we find a new

8  researcher? We didn't name specific names, but the subject did

9  come up of what are we going to do next, you know, it doesn't

10 look like Sue is coming back, or it didn't feel like she was

11 coming back at that time anyway, and we just talked, you know,

12 about that in general.

13 Q. Did you finally hear from Dr. Savage-Rumbaugh in October of

14 2013?

15 A. I did, yes. And, again, I mean, she I think had some

16 communication potentially with George or things like that before

17 that; but the first time I spoke with her after the text about

18 the BBC interview was in October about -- she reached out to me

19 with concerns about Teco.

20 Q. Okay. Do you recall receiving an e-mail from

21 Dr. Savage-Rumbaugh on or about or on October 26, 2013?

22 A. Oh, about Teco, you mean, that same incident? I'm trying

23 to --

24 Q. Why don't you direct your attention, please, to Plaintiffs'

25 Exhibit -- the smaller binder in front of you, Plaintiffs'

1  Exhibit 1005.

2  A.  Oh, yes.  I didn't remember the date of this e-mail.  Yes, I

3  do remember the e-mail.

4  Q.  Could you describe the e-mail just generally for us.

5  A.  Yes.  So, yes, it's an e-mail from Sue where she is writing

6  to us saying that she is basically wanting to endorse Jared

7  Taglialatela and Bill Hopkins as basically the future leaders of

8  the facility.  She talks about feeling like they would be good

9  people to transition the program to and that she was planning on

10  stepping down and stepping back from, you know, her role there.

11  I know there was -- yeah, so, you know, she was -- definitely it

12  was a very wholehearted endorsement of them, as I read it, and

13  her plans to no longer be involved at the facility in the

14  capacity that she had been.

15  Q.  Just so we're clear here, when you're referring to Jared and

16  Bill, that's Jared Taglialatela?

17  A.  Yes.

18  Q.  And Dr. William Hopkins?

19  A.  Yes.

20  Q.  And was there any representation by Sue in that October 26th

21  e-mail about how much control that Jared and Bill would have

22  over the research conducted at IPLS?

23          MR. LANGEL:  Objection.  The exhibit speaks for

24  itself.  There isn't enough foundation as to contents other

25  than -- she doesn't have the separate knowledge about the

1  document other than reading it.

2        THE COURT:  Restate your question, please, and then

3  I'll consider it.

4  BY MR. MELHUS:

5  Q.  Was there any representation by Sue in that October 26th

6  e-mail about the amount of control Jared and Bill would have

7  over the research being conducted at IPLS as you understood it?

8  A.  I understood --

9        MR. LANGEL:  Same objection.

10        THE COURT:  I'll receive it, subject to the objection.

11        Go ahead.

12  A.  I understood it that Bill and Jared would have complete

13  control over the science.

14  BY MR. MELHUS:

15  Q.  Okay.  In that same e-mail, did Dr. Savage-Rumbaugh make any

16  representation about whether or not she would be present in the

17  lab?

18        MR. LANGEL:  Same objection.

19        THE COURT:  Same ruling.

20        MR. MELHUS:  Go ahead and answer.

21  A.  No.  I mean, there is a statement in there that, you know,

22  under Jared's direction in the future, as appropriate she may

23  continue to do some research, but it sounded like it was

24  completely up to Jared when and where and what that would look

25  like.

1   BY MR. MELHUS:

2   Q.   Okay.  And after Dr. Savage-Rumbaugh sent you this e-mail,

3   did Dr. Hopkins and Dr. Taglialatela accept Sue's offer to come

4   to Des Moines?

5   A.   Yes, they did.

6   Q.   And about what time did that occur?

7   A.   I don't recall the exact date, but it was very close after

8   that we -- you know, George reached out to them and welcomed

9   them, and those proceedings got started very quickly after that.

10  Q.   Okay.  And I understand that there was an incident at the

11  lab that occurred about that time or very close in time to Sue,

12  Dr. Savage-Rumbaugh, sending that e-mail involving young Teco.

13  Could you describe that incident to the court?

14  A.   Right.  So after -- after this was sent, I guess, I don't

15  recall the exact date, but it was around the same time frame in

16  the fall, Teco had an injury and he was lame on one of his legs,

17  and so he had -- I believe it was his left, but I don't remember

18  that for sure.  He had basically a very tender ankle, and he

19  was -- we did x-ray him at that time.  We saw no fractures.  We

20  were treating it as a soft tissue injury, and he did fully

21  recover in not a long period of time at all.

22  Q.   Okay.  And did Dr. Savage-Rumbaugh return to the lab at any

23  point in time after that apparent injury to Teco?

24  A.   She did.  So we had a conversation I think on October 30th

25  or -- or on October 30th we had a conversation via the phone.

1  She called and I received -- or she had called me on that date

2  inquiring about Teco.  She also had sent an e-mail at that time.

3  I did talk to her on the phone and, you know, talked about Teco,

4  you know, how he was doing and things like that and just had,

5  not long conversation about that, but just kind of passed that

6  along and tried to answer questions that she had, and it was

7  mostly just about that.

8  Q.  Okay.  And after that conversation on October 30th, did

9  Dr. Savage-Rumbaugh actually physically return to the lab?

10 A.  She did, yep.

11 Q.  And can you describe the effect that that had on the lab and

12 its operations?

13 A.  She was planning on returning as part of a scheduled visit

14 later in the month, but made a decision to kind of drop

15 everything and fly out there, and she just kind of immersed

16 herself in the lab.  She took over care of Teco.  She just

17 without permission basically spent the night at the lab and

18 started just sort of picking up, in my opinion, as if she had

19 never left the lab to begin with, as far as their day-to-day

20 care and, you know, talking to staff about what should be done

21 when and where, and she started e-mailing lots of different

22 people about lots of different things, including, you know,

23 Teco.

24         I know at that time she started to send Jared and

25 Bill, who were just still in their very beginning stages of

1   involvement with us, lots and lots of e-mails, and the board was

2   very concerned about that behavior and also very concerned that

3   those actions may not -- or may drive Dr. Taglialatela and

4   Dr. Hopkins away.  They had been very clear that they wanted

5   autonomy over the science there and, you know, they were

6   accepting with the understanding that Sue was effectively

7   retiring from research there.

8   Q.  And did Dr. Savage-Rumbaugh's involvement in the lab at that

9   time, was that consistent with the e-mail that she sent on

10  October 26, 2013?

11  A.  No.

12  Q.  In what way, based on your understanding of the e-mail and

13  her role going forward, was her subsequent involvement

14  inconsistent?

15  A.  There was just no discussion about it.  It just happened.

16  She just came back and basically re-embedded herself in the

17  facility without appropriate discussions with people like George

18  or Steve Boers was the executive director at the time or things

19  like that about what her visit should look like, what role she

20  should play there, what contacts she should have with the

21  animals.  You know, she had -- that was the first time, in my

22  recollection, that she had seen them since she left in May, and

23  it was just kind of picking up like a day had not passed.

24  Q.  And did the board at that time, the IPLS board, take any

25  action to push back on her involvement consistent with her prior

1  representations in that October 26 e-mail?

2  A.  Yes, I know George and Lyle had phone conversations and

3  e-mail conversations with her asking her to, you know, please

4  take a step back, go back to New Jersey, you know, honor this

5  initial statement that she had sent out on October 26th and, you

6  know, at the time they were saying, you know, come back at

7  Thanksgiving, that's how it started out when you had initially

8  planned, and we can have kind of a formal discussion about

9  things like that.  And she essentially refused to leave, and the

10 communications between them -- I didn't have communication with

11 her about this at that time; but the communications between them

12 got more and more adversarial until the end as she continued to

13 e-mail.  In spite of Lyle saying, please don't e-mail anyone

14 else about the research, you know, you need to stop, please

15 don't call Bill and Jared, this is inappropriate, she continued

16 to send those e-mails.  And, finally, George just said she

17 needed to leave the facility immediately.

18 Q.  And did you or anybody else on the IPLS board then take

19 action to enforce her prior representations?

20 A.  George asked that I go out there.  He asked her to leave,

21 and he asked me to go out and make sure that -- to the facility

22 and make sure that she had left the premises.  What I arrived

23 there, she hadn't left.  And so I entered the building, we had a

24 conversation about her needing to leave and comply with George's

25 request and Lyle's request that she return, you know, return

1 back -- well, we didn't -- where she goes is not important, but

2 that she leaves the facility.

3 Q.  Okay.  And did she eventually leave the facility?

4 A.  She did.

5 Q.  Did you have any conversations with her as she was leaving

6 the facility about why she was being asked to leave?

7 A.  Yeah.  We did have a conversation where I said, the board --

8 I shared the board's concern that the e-mailing and kind of

9 excessive e-mailing to Bill and Jared was going to cause a

10 problem with them wanting to come out and be a part of the

11 program just because it was so contradictory to what she had

12 initially said, you know, she would do.  And so it was -- there

13 was definitely concern about that, and I shared that with her.

14 Q.  Okay.  Sometime later in November of 2013, did you become

15 aware of a lien against IPLS as an entity, a tax lien?

16 A.  When Lyle told us about it, yeah, we --

17 Q.  Okay.  Did Lyle explain what was going on at that time and

18 his plan to take the organization forward?

19 A.  Right.  So are you talking about the tax ID?  I don't know

20 what -- I don't understand exactly what you're asking.

21 Q.  Right.  Mr. Lyle Simpson was the attorney for IPLS at the

22 time, right?

23 A.  Uh-huh.

24 Q.  And did he have any conversations with you about the effect

25 of a tax lien or an unpaid debt to the state and how that would

1  affect the organization in general and the plan for moving

2  forward?

3  A.  Yes.  There were lots of different conversations about that.

4  There was definitely -- we had conversations.  Lyle many times,

5  you know, talked about, you know, the fact that under prior

6  administration this debt had accumulated, and he talked about

7  different strategies that we could use to try to carry on the

8  organization, you know.  And so one of those was, you know -- I

9  mean, down the line he talked about potentially -- not initially

10 but potentially considering bankruptcy for that organization

11 and, you know, effectively starting another one; but there

12 were -- yeah, he was aware of that and talked about it on a

13 number of different occasions.

14 Q.  Okay.  And at some point did IPLS form a new organization to

15 carry that name and continue the work forward?

16 A.  Yes.  And we were sort of forced to do that.  So Lyle

17 informed us that -- so he -- you know, he had talked about the

18 tax lien or the lien initially; but he at some point around that

19 same time frame, later on in the fall, early winter, became

20 aware that the registration for the Iowa Primary Learning

21 Sanctuary had expired, had not been renewed.  And so in order to

22 renew that, we needed to pay off that tax lien, which was quite

23 expensive.  We didn't have anything near the funds to do that.

24 It wasn't practical for us to be able to do that.

25         So he formed -- and that's the only reason why we

1  didn't renew that was because we had, you know, that outstanding

2  debt making it literally impossible to do that, and we -- at the

3  time anyway.  So he created ACCI so we would have, you know, a

4  working tax ID.

5  Q.  Okay.  And I suppose if ACCI generates enough income and

6  funding, would it be possible to reinstate IPLS as you

7  understand it?

8  A.  Yes.  That's how he described it to us.

9  Q.  Okay.

10 A.  But it was very clear that we needed to -- to operate we

11 needed to have something then, you know, a tax ID right at the

12 moment.  So he described it as this has expired, we need to fix

13 this immediately, and clearly we didn't have the funds to do

14 that.

15 Q.  So going forward with ACCI in December, or there about, in

16 2013, did you continue on in your role as a veterinarian for

17 ACCI?

18 A.  I did.

19 Q.  And you talked earlier, you testified earlier about some of

20 the protocols that were in place --

21 A.  Uh-huh.

22 Q.  -- to protect the health and safety of the bonobos, is that

23 correct?

24 A.  Yes.

25 Q.  As it stands today, is it your medical opinion that you're

1  providing complete and competent care for all of the bonobos at

2  ACCI's facility?

3  A.  Yes.  I think it's better than ever and that we want to

4  continue to make it even better than it is today.

5  Q.  And is ACCI doing everything -- or is it taking all

6  reasonable precautions to ensure the bonobos' complete safety?

7  A.  Yes.

8        MR. MELHUS:  I have no further questions for this

9  witness at this time, subject to redirect, Your Honor.

10        THE COURT:  Cross-examination.

11        MR. LANGEL:  Thank you, Your Honor.

12              CROSS-EXAMINATION

13  BY MR. LANGEL:

14  Q.  Ms. Gilmore, my name is Todd Langel, and I'm one of the

15  attorneys for Dr. Savage-Rumbaugh.

16  A.  Okay.

17  Q.  I want to back up just a little bit to the 2012 time frame.

18  Do you recall -- you may recall back in 2012 you told Sue that

19  she had your support?

20  A.  Yes.

21  Q.  Do you remember that?  And that your support would be

22  wholehearted and unending?

23  A.  Yes.  At what point in 2012?  I don't --

24  Q.  In August of 2012.

25  A.  Okay.

1  Q.  Do you recall writing her an e-mail to that effect?

2  A.  I was very supportive of Sue when I was first involved with

3  the organization, yes.

4  Q.  Okay.  And do you recall writing her an e-mail to that

5  effect that she had your --

6  A.  I don't recall a specific e-mail, but we have sent thousands

7  of e-mails as you know.

8  Q.  So you don't recall a specific e-mail in which you indicated

9  you were supportive of Sue?

10  A.  I was supportive of Sue when I got started, but I don't -- I

11  mean, again, we literally have exchanged thousands of e-mails,

12  so it's hard to recall a specific one from three years ago.

13  Q.  If I showed you a copy of a document, might it refresh your

14  recollection about that conversation?

15  A.  Sure.

16        MR. LANGEL:  May I approach, Your Honor?

17        THE COURT:  Yes.

18  BY MR. LANGEL:

19  Q.  Ms. Gilmore, do you recognize the e-mail that I've handed

20  you?

21  A.  Yes.  I mean, I recognize it.  I wrote it, but I need to

22  re-read it to remember exactly what I said in it.

23  Q.  Take your time.

24        (Pause.)

25  A.  I believe that this is in response to the executive board

 1  making a recommendation to move the bonobos to a facility in --

 2  with Heidi Lyn in Mississippi, and so I think that was what I

 3  was referencing there, saying I'm supportive of her because at

 4  the time Sue was willing to, you know, make a contribution to

 5  help cover the care.  And it seemed fair to me that the board

 6  did not want to accept her donation, and it seemed fair that if

 7  she wanted to do that that they should take those funds.

 8  Q.  And the board did take those funds?

 9  A.  They did.  I wasn't on the board at that time, but yes,

10  that's my understanding.

11  Q.  And it was $140,000?

12  A.  That's my understanding.

13  Q.  Did the board know that you sent this e-mail?

14  A.  I don't know, but I sent it to Sue.  I didn't send it to

15  anybody else.  But I don't think that was a surprise that I was

16  not saying anything contrary to other board members at the time.

17  Q.  I want to move forward a little bit to when -- there was a

18  discussion about Teco and when he got sick.  Isn't it true that

19  prior to when Teco became ill, you brought your daughter for a

20  visit to the facility?

21  A.  My daughter initially came many times with me to the

22  facility.  That's just how it was.  I was a single mother, and I

23  provided lots of care for those animals, you know, at odd hours

24  and things like that, so there were times that she would come

25  with me to the facility quite frequently.

1  Q.  And at least in one of those instances, your daughter was

2  ill when she came to the facility with you?

3  A.  I don't recall intentionally ever bringing her ill to the

4  facility and exposing her to Teco, no.  I was trying to be very

5  careful about that.  If she was showing signs of illness, I

6  tried to keep her away from the facility.

7  Q.  Are you denying that you ever brought her to the facility

8  while she was ill?

9  A.  Intentionally, yeah, I didn't bring her to the facility ill.

10  Q.  Did you ever require your daughter to wear a mask when she

11  came to the facility?

12  A.  No.  That's been a protocol that we've adopted in 2014.

13  Q.  But you would agree with me that shortly before Teco became

14  ill you did indeed bring your daughter to the facility?

15  A.  Well, he was ill many times when I was coming out there and

16  had been, so yes, she was with me many times at the facility.

17  So I'm sure there were times she was there before he was ill.  I

18  think -- well, I'll let you continue.

19  Q.  When your daughter visited, is it true that you allowed your

20  daughter to share food with Teco?

21  A.  I would say that I was not in a position to set policy at

22  the time when I first started coming out there, and that was

23  very standard for Sue to encourage Teco to share food with

24  almost everybody who visited, and it was quite common for him

25  to -- you know, that's just how it was.  Teco was out.  He

1  greeted every visitor.  It wasn't a unique situation with my

2  daughter.  It was everybody who visited the facility met Teco.

3  Everybody who came there often shared food with Teco.

4  Q.  And that included the sharing of food with a potentially ill

5  child?

6  A.  Not intentionally, absolutely not.

7  Q.  But it may have occurred?

8  A.  It may have occurred.  And, again, it wasn't my decision to

9  have Teco out with my daughter.  It was Dr. Savage-Rumbaugh's.

10 Q.  There was a discussion about when Sue was asked to leave in

11 November of 2013, and you testified that you spoke with her as

12 she was gathering her belongings?

13 A.  Yes.

14 Q.  When she was leaving, you told her at that point that she

15 was being asked to leave the decision about her being asked to

16 leave was all about the money, isn't that true?

17 A.  No.  I described it as involvement of the future scientists,

18 so not the money, but the scientists, Bill and Jared's

19 involvement.

20 Q.  But you indicated to her that her involvement in the lab had

21 to cease because of the funding sources?

22 A.  I -- I wanted -- no; the scientific involvement, which

23 brings in funding.  I mean, we had -- so, you know, very

24 indirectly, I guess; but I was very concerned that that would

25 affect the transition to new leadership which she herself said

1   she had wanted.

2   Q.  But Jared and Bill, they needed money for their plan to

3   bring -- they needed to bring chimpanzees in in order to fund

4   their future plans at the facility, isn't that correct?

5   A.  Yeah.  They've been very successful bringing funds into the

6   facility.

7   Q.  But you understood that Sue could not have a material role

8   in the day-to-day operation of the lab were those efforts to

9   continue, isn't that correct?

10  A.  I had an understanding that she had said that she was

11  stepping down as, you know, playing an active role in the

12  science there and turning things over to Bill and Jared.  We had

13  moved forward on her own recommendation to bring them into the

14  fold, so to speak, and to try and put them in a leadership role,

15  and it was very frustrating to see that be seemingly sabotaged

16  by Sue herself even though it was her idea.

17  Q.  You mentioned that Jared and Bill have been successful in

18  bringing funds in.  What do you mean by that?  What funds?

19  A.  I mean that they have -- their respective universities have

20  been very supportive of their involvement here, and they, you

21  know, have continued to get small grants that have, you know,

22  put us in a not -- you know, in much better financial shape than

23  we were.

24  Q.  And what specifically have they reported to you or to the

25  board as to what they brought in?

1  A.  I mean, I don't recall the exact breakdown of grants, but

2  it's been a substantial amount of money, somewhere between two

3  and three hundred thousand dollars from what I recall in

4  different grants and different sources of funding; but that

5  would probably be a better question for Jared or Bill.

6  Q.  Has Jared or Bill reported on the fund-raising in writing to

7  the board or to you?

8  A.  Yeah.  I mean, we had that joint board meeting between BHI

9  and ACCI, you know, and there was a detailed explanation I think

10  at that time of funds that came in that they shared with both

11  boards.  And then, yeah, we continue to as we meet talk about

12  the funds that continue to come in, so they continue to bring

13  funds into the organization.

14  Q.  That joint meeting that you described took place in July

15  2014?

16  A.  Yeah.

17  Q.  June or July of 2014?

18  A.  Uh-huh.

19  Q.  Have there been any reports by Bill or Jared in writing to

20  you or to the board since that time about fund-raising?

21  A.  The ACCI board?

22  Q.  Right.

23  A.  I don't recall.  It's very possible.  I would have to look

24  at my e-mail.  We talk continuously and send many, many e-mails

25  back and forth, so I -- it's possible, but I don't recall that

1  specifically.

2  Q.  So nothing specific, but it's your testimony that they've

3  been successful?

4  A.  Yes.

5  Q.  But you don't have any specifics?

6  A.  I can get specifics; but right at the moment up here on the

7  witness stand, I don't have specific dates or funding, you know,

8  funding sources.

9  Q.  You can send those to Bonobo Hope.

10         How many meetings has the ACCI board had since July

11  2014?

12  A.  I don't recall specifically how many meetings that we have

13  had.  We are in frequent communication; but, again, we could get

14  that information for you.

15  Q.  Have you had any in-person meetings at all since July 2014?

16  A.  Probably, yes.  Yes, we have had some board meetings

17  specifically.  I'm trying to recall the exact dates of meetings

18  that we've had, so --

19  Q.  And when I ask questions, I expect that you not look at the

20  gallery or look at counsel table --

21  A.  Okay.

22  Q.  -- and you communicate with me.

23  A.  Okay.

24  Q.  So you have had in-person meetings?

25  A.  Yes, we have.  I don't recall exact dates, but --

1   Q.  How many?

2   A.  I don't recall the exact number of meetings.  I mean --

3   Q.  Do you know if minutes were indeed generated at those

4   meetings?

5   A.  I'm not the secretary, so I don't know.

6   Q.  How many of the bonobos have died while the colony has been

7   under your care?

8   A.  Two.

9   Q.  Panbanisha in November of 2012?

10  A.  Yes.

11  Q.  And then Matata?

12  A.  Yes.

13  Q.  Okay.  And when did Matata die?

14  A.  I believe June 22nd, or on or about there, in 2014.

15  Q.  In either of those cases, was Sue allowed in the lab or had

16  she been allowed in the lab?

17  A.  No.  You mean at the time of death or --

18  Q.  Yeah.

19  A.  No.

20  Q.  How did Matata die?

21  A.  Matata had -- so the day before she died, we were notified

22  by staff that she was having -- you know, seemed a little

23  shakier than normal, just seemed a little off, and it was hard

24  for them to pinpoint specific symptoms.  They said that she was

25  shakier than normal, she was still eating and drinking, she took

1  her food and climbed up into the tunnel and, you know, had made

2  a nest, and this is kind of afternoon that I was notified about

3  this.  But there definitely was a concern, you know, just with

4  that type of report.

5          And so I did reach out to June Olds, a Blank Park Zoo

6  veterinarian who I've formed a relationship with and has been

7  helpful at other times with these animals, and they have been

8  very helpful and willing to share their equipment and, you know,

9  facilities with us.  And so we talked about -- she indicated

10  that she would be willing to assist me with an anesthetized exam

11  on Matata if necessary.  It takes a little bit of timing.  They

12  need to -- you know, she would bring her portable anesthesia

13  machine and things like that out there, and so we were making

14  plans to do that, and she died in her nest overnight.

15  Q.  So who was in the lab at the time leading up to Matata's

16  death?

17  A.  There -- oh, I don't remember, but I believe possibly

18  Heather Housh was in the lab before that.  I think Tami Watson

19  also potentially was in the lab that day.  I can't remember who

20  was there or not.  We had one of Jared's graduate research

21  assistants, Scott Milne, I think that's how you say it, was

22  there that night as well.  And I can't -- there may have been

23  other people there, but I can't recall that detail.

24  Q.  Was there anybody from Yerkes there?

25  A.  No -- well, I don't think so.  There wasn't -- no, not that

1  I know of.  I mean, as far as working with Matata, it was

2  general care staff.

3  Q.  Is it correct that Liz Pugh had been banned from the lab --

4  A.  No.

5  Q.  -- for about 24 hours before Matata died?

6  A.  No.

7  Q.  Was she there?

8  A.  I don't think so, no.  She was there the following morning,

9  but I don't think she was there the night of.

10  Q.  And do you know why counsel for Dr. Rumbaugh or counsel for

11  the Congo was not advised that Matata had died?

12  A.  Well, we issued a press release.  It wasn't -- we didn't --

13  it was definitely not something that we tried to keep a secret.

14  Q.  Are you aware of any plans of Jared or anybody at ACCI to

15  loan any of the bonobos out for breeding?

16  A.  No.  Well, we do want to rejoin the SSP.  We think that's a

17  very important part of conservation, and the SSP is the Species

18  Survival Plan that is in affiliation with the zoos in North

19  America.  So the problem with SSP is that they don't have any

20  space for bonobos, and so in talks that we have had about

21  rejoining them, they have talked about bringing bonobos to us

22  for breeding.  So we would like to breed them in the future in

23  conjunction with the Species Survival Plan.

24  Q.  And what's the reason that hasn't happened yet?

25  A.  Well, we're in the process of applying for that.

1    Interestingly, I guess, one of the things that they're very

2    concerned with is this ownership issue.  The SSP has been quite

3    clear that they don't want any involvement with

4    Dr. Savage-Rumbaugh at all, so --

5    Q.  And who at SSP has conveyed that to you?

6    A.  Gay Reinartz and Vickie Clyde have said that at different

7    times.

8    Q.  Do you know why?

9    A.  I feel like they have a tenuous relationship and they don't

10   feel that the bonobos have received the best care under

11   Dr. Savage-Rumbaugh.

12   Q.  When was the last time you spoke with them about that topic?

13   A.  One of the conversations that I had with Vickie Clyde about

14   this topic was -- I mean, specifically about Sue was probably

15   when she came out when they were all sick with respiratory

16   illness actually in 2012, she agreed to come out, but only if I

17   could promise that she didn't have to have a conversation with

18   Dr. Savage-Rumbaugh or ideally ever be in the same room with

19   her.  And Dr. Savage-Rumbaugh was aware of that I do know.

20              THE COURT:  What does SSP stand for again?

21              THE WITNESS:  I'm sorry; Species Survival Plan.  It's

22   all endangered species that are captively housed in North

23   American zoos are part of a Species Survival Plan, and what that

24   does is try and create -- it's a breeding program basically that

25   involves the input of geneticists and veterinarians and things

1  like that to breed animals that would preserve as much genetic

2  diversity as possible out of the present captive population.  So

3  it's a -- and it also is a very good veterinary resource.

4  Incidentally, when you're part of the SSP, veterinarians who

5  have participating animals have regular meetings and share a lot

6  of data about health of different animals, about illnesses,

7  about injuries.  They have a report that comes out very

8  regularly, and so it can be a very helpful veterinary -- you

9  know veterinary tool.

10          THE COURT:  Thank you.

11  BY MR. LANGEL:

12  Q.  Does ACCI have plans to inform BHI of its proposed breeding

13  activities before breeding occurs?

14  A.  I'm sure that -- I think that we've discussed actually

15  wanting to join the SSP.  I don't recall exactly if we talked

16  about that back in that joint board meeting, but I think that we

17  did.

18  Q.  So you don't know right -- as you sit here today, you don't

19  know if there are plans for that?

20  A.  I mean, it's not a secret.  We would -- you know, the

21  members of the SSP are, you know, easily identifiable.

22  Q.  Are there any current plans to anesthetize any of the

23  bonobos?

24  A.  There are not current plans as far as like a set date.  We

25  do -- we think it's routine and responsible veterinary care to

1  provide, you know, periodic anesthetized exams that allow us to

2  collect, you know, full blood work and take chest x-rays and,

3  you know, do a lot of the things available.  That's a very

4  standard practice in captive management of exotic species like

5  apes or anything you would find in a zoo.

6  Q.  So do you have any currently planned?

7  A.  We don't have any currently planned, but we -- as far as

8  like a set date, but we are taking steps to ensure that that

9  does happen in the near future because we think it's part of

10 responsible veterinary care.

11 Q.  Do you have plans to inform BHI of those activities?

12 A.  We haven't discuss that yet, but I would see no reason why

13 we wouldn't.

14 Q.  So you haven't -- as of today, you haven't made any plans to

15 inform BHI of any --

16 A.  No, not concrete plans, but we definitely haven't made plans

17 to not inform them.

18 Q.  Have any of the bonobos been anesthetized in the last 18

19 months?

20 A.  No.

21 Q.  Who are the members of the ACCI IACUC?  And what does IACUC

22 stand for?

23 A.  IACUC is Institutional Animal Care and Use Committee.  I am

24 a member of the IACUC as a veterinarian.  I am also the current

25 IACUC chair.  Dr. Taglialatela is also on the IACUC as a

1  scientist.  Allyson Bennett is another scientist that is part of

2  that.  And then we have a facility representative, Tami Watson,

3  who's on the IACUC, and our layperson, nonaffiliated layperson

4  is Jack Price, and he's someone from the Des Moines community.

5  Q.  Have any chimps come to the lab yet?

6  A.  No.

7  Q.  If they do come there, who will be their veterinarian?

8  A.  I expect that I will be at this point in time.

9  Q.  Before Mr. Taglialatela took over as the leader of ACCI,

10 were you required to wear masks and gloves anywhere in the lab?

11 A.  No.

12 Q.  Has IPLS been reinstated as of today?

13 A.  What do you mean; from -- I think we just discussed that,

14 like there's a tax lien out that we still owe money.  Is that

15 what you mean, the tax --

16 Q.  You're not aware of IPLS being reinstated as we sit here

17 today?

18 A.  In -- as far as the tax ID goes, the IPLS tax ID has not

19 been reinstated.  We consider it to be the same organization

20 functionally.

21 Q.  Are you aware of any plans in the near future to resolve the

22 tax lien and reinstate IPLS?

23 A.  We would like to resolve the tax lien.  A lot of that is a

24 funding issue.  As funds become available, we would like to

25 address that issue.

1  Q.  But as you sit here today, there aren't immediate plans to

2  do that?

3  A.  There's not immediate funds to do that.

4  Q.  Have any representatives of Yerkes been to the lab while you

5  have been there?

6  A.  Yes.

7  Q.  Who?

8  A.  Veterinarians from Yerkes have visited the lab, Joyce Cohen

9  is the head veterinarian out there, and I can't recall the names

10  of the other two veterinarians, but I visited with them

11  recently.

12  Q.  How often have they been there?

13  A.  I was only there with them once.  I don't remember if

14  they've been there other times or not, but I was only there with

15  them once.  I think that's the only time they visited.

16  Q.  And when was that?

17  A.  I don't recall.  It wasn't horribly long ago, but I mean it

18  was within the last year.

19  Q.  Do you recall what time of year it was?

20  A.  It was warm out.  We were outside.  Yeah, I can look.  I am

21  guessing that would have been last fall then.

22          MR. LANGEL:  That's all the questions I have.

23          Thank you.

24          THE COURT:  Redirect?

25          MR. MELHUS:  Just briefly, Your Honor.

1                      REDIRECT EXAMINATION

2    BY MR. MELHUS:

3    Q.  Dr. Gilmore, let's talk a little bit about the course of

4    care that you provided for Matata.  Could you briefly describe

5    the care that you provided to Matata?

6    A.  Yes.  Well, Matata actually had been a remarkably healthy

7    ape for her age.  She was very -- many apes her age -- as far as

8    we know or to our knowledge, she was the second oldest ape in

9    captivity -- or second oldest bonobo in captivity, I'm sorry.

10   She, compared to many others, was doing very well.  She was not

11   horribly arthritic.  She was still very active.  Her hair coat

12   looks good.  She did not have obvious terrible cataracts or

13   anything like that impeding her vision.  So she actually had

14   been fairly healthy.

15            I had been concerned in the year prior to her death

16   about potential renal disease, which is common in aging animals.

17   I noticed that she was polyuric, drinking more and urinating

18   more than what I would consider to be normal.  We did not

19   anesthetize her to get blood work to confirm that there was an

20   elevation of renal values, but I did collect urine on her many

21   times and saw what -- I saw protein in her urine, and I saw that

22   she was isosthenuric, which means that her urine wasn't

23   concentrated or diluted, and that is a sign that her kidneys

24   aren't working well to concentrate urine, and that can be normal

25   in a well hydrated animal; but it's a flag, especially

1  consistently, and the protein in the urine was concerning.  We

2  also -- animals -- I watched her urine pretty closely because

3  animals that do have potential kidney issues are more prone to

4  urinary tract infections and things like that, and we did treat

5  her for multiple urinary tract infections over the year before

6  she died.

7          So we really weren't given, you know, a lot of warning

8  that there was something awry with her.  She -- it was

9  literally -- it wasn't even a full 24 hours that she had

10 symptoms.  It was maybe even more like 12 hours that she had

11 symptoms and then passed away.

12 Q.  Were you consulting with any other individuals about the

13 care for Matata either before or right after?

14 A.  Yes.  I mean, as I mentioned, June Olds is the Blank Park

15 Zoo veterinarian.  I was in discussion with her about the

16 symptoms that were concerning that were described by the staff,

17 and she agreed, again, to come out and help with an anesthetized

18 exam if needed, bring the equipment from the zoo to help us and

19 things like that to get that done.  So we were going to meet the

20 following morning.  And she died in her sleep overnight, so we

21 didn't have very much time to respond to a health crisis with

22 her.  Again, she was eating, she made a nest, she climbed up to

23 her nest.  She died in her sleep in her nest.

24 Q.  Were you able to validate your course of care for Matata as

25 a result of those consultations?

1  A.  Can you say that one more time?  I didn't hear you.

2  Q.  Sure.  Were you able to validate your course of care for

3  Matata during the consultations you just discussed?

4  A.  Yes, absolutely.  I mean, nobody -- obviously, just as I

5  mentioned, as a general rule, veterinarians like Vickie Clyde or

6  USDA Agent Heather Cole, things like that, agree that it's a

7  good idea to periodically anesthetize animals and obtain survey

8  data on them, you know, check blood work, take x-rays, you know,

9  image them and things like that as appropriate, you know, to

10  make sure -- we, again, are not at the place where we could

11  routinely do that at that time, but it's something that we're

12  working towards.

13        But given the circumstances, no, nobody provided any

14  other insight or any other suggestions for what could be done

15  for her.  In fact, this is -- I know we did share the necropsy

16  report with Vickie Clyde and things like that.  Her thought was

17  that given the very sudden acute onset and kind of the -- you

18  know, there were definitely renal changes identified on that

19  necropsy report, but they weren't the obvious cause of death.  I

20  mean, you can't totally exclude that; but one thought was that

21  it was probably -- or Vickie's opinion, Dr. Clyde's opinion was

22  that it was very likely an arrythmia caused by some myocardial

23  fibrosis in her heart.  And that, incidentally, is the leading

24  cause of death in great apes, in bonobos.

25  Q.  Okay.  You mentioned a necropsy report.  As I understand it,

1  that's the primate equivalent to an autopsy in a human?

2  A.  Or the veterinary equivalent.  Yeah, we call it necropsy;

3  same as thing as an autopsy.

4  Q.  Okay.  And did anything during your course of care in that

5  necropsy report indicate that Matata had passed away as a result

6  of, for example, water from the flood of 2008?

7  A.  No.

8  Q.  Did she have access to water from that flood?

9  A.  No -- well, I don't know.  I wasn't there in 2008, so -- she

10  doesn't have access to lake water, though, now.

11  Q.  Okay.  Shortly after Matata's death, do you recall George

12  Caudill or any other member of the ACCI board sending an e-mail

13  to Carmen Mate, the chair of the ACCI board, about Matata's

14  death?

15  A.  I don't recall exactly who George shared an e-mail with, but

16  I know he prepared an e-mail and sent it and, yes, I don't -- I

17  think so.

18  Q.  Okay.  So, in any event, BHI was made aware of Matata's

19  death soon thereafter?

20  A.  Yes, to my knowledge.

21  Q.  Okay.  And counsel asked some questions about -- I'm

22  changing subjects just quickly.  Counsel asked some questions

23  about reasons why the SSP may not want to interact with

24  Dr. Savage-Rumbaugh.

25  A.  Uh-huh.

1  Q.  And you gave some reasons for that.  Are there any other

2  reasons that you can think of?  For example, has

3  Dr. Savage-Rumbaugh placed any bonobos or staff in physical harm

4  that you're aware of?

5  A.  I mean, yes, there are a history of various issues.  I mean,

6  it depends on exactly where you're wanting to go with that.  But

7  as a very general rule placing them in harm from a veterinarian

8  perspective is Kanzi and Panbanisha being morbidly obese by not

9  feeding them the healthiest of diets.  So that is definitely a

10  concern when they're breeding, you know, new animals, that they

11  have a claim and they want to make sure that they're going to be

12  treated well.

13        They also were not comfortable with the protocol of

14  removing young babies from their mothers and, you know, rearing

15  them because they felt like it was a welfare issue for both the

16  infants and, you know, the mother of that infant.

17        I mean, those are two main issues.  There was also,

18  you know, various concerns about the difficulty historically

19  that veterinarians have had working at this organization or

20  working with Sue Savage-Rumbaugh.  People have not had the best

21  experience from my understanding, other veterinarians have not

22  had the best experience getting cooperation with needed

23  procedures and compliance with, you know, veterinary

24  recommendations.

25  Q.  Okay.  Are you aware of any other specific incidences with

1  Dr. Savage-Rumbaugh placing the bonobos in physical harm?

2  A.  Yes.  I mean, I can think of a couple of examples of that.

3  Q.  Could you provide a couple of examples just briefly for the

4  court?

5  A.  Okay.  Well, Teco has had a few separate issues that I was

6  called to treat him on that were directly related to his care

7  while under Dr. Savage-Rumbaugh.  One time I was called out and

8  he had grabbed a bottle of Tylenol and was running around with

9  the Tylenol.  There was a concern about how much Tylenol he

10  potentially ingested.  He -- I was able to retrieve the bottle

11  from him, but he had that.  There were pills all over the floor.

12  He did ingest I think a small amount of those, but not enough

13  to, you know, cause any lasting damage; but that was a very

14  frightening incident.

15         There's another time that I was asked to x-ray him to

16  see if he potentially had eaten a battery because he was holding

17  batteries in his mouth and things like that, and then we

18  couldn't find a battery, so we were concerned about whether or

19  not he had swallowed a battery.  He hadn't swallowed a battery

20  at that time.

21         There was one incident, you know, that was an

22  accident, but I still think warrants some investigation into

23  protocol.  There was a time where Teco had a leash and collar on

24  in the anteroom, which is like the space right outside of the

25  enclosure -- outside of the ape enclosure, and one of the other

1  bonobos, Maisha, grabbed his leash through the wire and almost

2  strangled him, which obviously wouldn't happen in normal

3  circumstances if he wasn't wearing a leash and collar.

4          You know, obviously, we've changed a lot of protocols

5  over time, but I think in general, you know, exposing him to,

6  you know, the public or lots of visitors or things like that, or

7  any of them is not in their best interests.  We've changed

8  things dramatically there to try to keep them healthier by just

9  not exposing them to germs in the first place.

10  Q.  Were there any issues with transporting Teco or others --

11  excuse me.  Were there any issues with Dr. Savage-Rumbaugh

12  transporting Teco or other bonobos in a personal vehicle that

13  would have caused any safety concerns?

14  A.  The first --

15          THE COURT:  Mr. Melhus, if I may interject a moment.

16  Remember what I said about funnels and hourglasses?

17          MR. MELHUS:  Sure.

18          THE COURT:  We're getting to the hourglass area.

19          MR. MELHUS:  Okay.

20          THE COURT:  You started a little bit about the SSP and

21  why those people might have been reluctant to work with

22  Dr. Savage-Rumbaugh; but now we're going into a whole other area

23  of stuff that has happened, and I think we're opening new vistas

24  that probably we need not.

25          MR. MELHUS:  Fair enough, Your Honor.  I apologize and

1  I'll move on.

2  BY MR. MELHUS:

3  Q. My final question for you would be, has ACCI adopted any

4  protocols to address some of the concerns that you just

5  testified to?

6  A. Yes. There are a lot of protocols in place to make our

7  environment as safe as possible. You know, I directly attribute

8  that to Bill and -- to Dr. Taglialatela and Dr. Hopkins' efforts

9  at the lab. We've taken considerable steps to provide, you

10  know, actual structured safety training for staff and teaching

11  staff members how to move apes, you know, safely and how to

12  interact with the apes safely. We have strict diet protocols in

13  place, including a protocol for how they're rewarded for the

14  research that they participate in. Again, husbandry is, you

15  know, exponentially better and, you know, more organized than it

16  ever has been.

17        MR. MELHUS: Thank you, Dr. Gilmore.

18        And, Your Honor, that's all the questions I have for

19  this witness.

20        THE COURT: Mr. Langel, recross.

21               RECROSS-EXAMINATION

22  BY MR. LANGEL:

23  Q. Dr. Gilmore, I just have a few questions.

24        Did you at some point fill out a questionnaire that

25  was prepared by Nancy Howell during the investigation of Sue in

1  November of 2012?

2  A.  Yes, I think so.

3  Q.  Okay.  And do you recall what you said in that -- in your

4  responses to the questions in that questionnaire?

5  A.  I don't have that questionnaire in front of me, but I'm sure

6  you can give it to me.

7  Q.  Would it help if I put it in front of you?

8  A.  Yeah, sure.

9          MR. LANGEL:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. LANGEL:

12  Q.  Ms. Gilmore, is the document I've handed you a copy of the

13  questionnaire that you completed in response to questions from

14  Nancy Howell?

15  A.  Yes, it looks like it.

16  Q.  Okay.  With respect to your response as to diet and feeding

17  of the apes, can you summarize your response?

18  A.  Give me just a second to find it again.

19          (Pause.)

20          Yeah, and I would say that, as I mentioned earlier, in

21  June we had done some work trying to bring a nutritionist out to

22  start an active -- you know, an active nutrition plan for them,

23  and so this was, you know, we were --

24  Q.  You indicated that you were satisfied with the diet and

25  feeding program.  In fact, that's what you said verbatim, is

1  that correct?

2  A.  Yes.  I am satisfied that we had put that in place and I

3  think that we were making efforts to comply with that on some

4  level.  I think we're better at it now, but I think that there

5  were efforts to comply with those initial recommendations,

6  especially during this investigation period.

7  Q.  And you were also asked to evaluate the injuries to Kanzi

8  and Teco, isn't that correct?

9  A.  Uh-huh.

10  Q.  And you concluded in your remarks that you didn't have any

11  reason to believe that the injuries occurred as a result of

12  negligence or maltreatment, isn't that correct?

13  A.  Oh, no, I didn't think that.  Dr. Savage-Rumbaugh had

14  indicated that somebody had cut him with a weed whacker and I --

15  Q.  Let me move back.  As to the injury as to -- just describe

16  your summary and your testimony there as to --

17  A.  I did not think that that was maliciously inflicted on them,

18  no.

19  Q.  Okay.

20  A.  I think it was just an injury.

21  Q.  Okay.  It was your view that it was not maliciously

22  inflicted, but you --

23  A.  No, I don't think so.

24  Q.  -- understood that Dr. Rumbaugh --

25  A.  I did not think that Dr. Rumbaugh cut Kanzi, no.

1  Q.  The third category of the inquiry involved Dr. Rumbaugh's

2  interactions with the bonobos?

3  A.  Uh-huh.

4  Q.  And can you describe for me your response to the inquiry in

5  that regard?

6  A.  I think that she has a good relationship with the bonobos

7  and I think that she definitely has walked among them as I

8  indicated there.  So she -- I believe that she cares about them

9  and she definitely has spent many years with them.

10 Q.  You concluded -- with respect to some of the concerns that

11 were being raised about safety, is it fair to say that some of

12 the incidents that Sue was accused of occurred when Sue wasn't

13 even in the building; is that fair to say?

14 A.  Yes.  And I have always maintained, and I still will say

15 this, that a lot of those Bonobo 12 allegations as I mentioned

16 at the very beginning of my testimony, I had a problem with the

17 way that -- I didn't think that was fair to Sue, because a lot

18 of those were thirdhand and by people who hadn't spent very much

19 time there, and I did not like the way that that was presented

20 to the public.

21       MR. LANGEL:  Your Honor, this document is not marked

22 as an exhibit yet, but we would like to mark it and would like

23 to move it into evidence at this time as Exhibit 107.

24       MR. MELHUS:  Your Honor, could we see the exhibit

25 before it's --

1             THE COURT:  Certainly.  I didn't pick up the date.

2             What was the date of your responsive questionnaire?

3             THE WITNESS:  I don't know.  It's not on here.  I

4    can't remember.

5             MR. MELHUS:  May I approach the witness, Your Honor?

6             THE COURT:  Yes, please.

7             MR. LANGEL:  I have it in -- if I can publish my

8    screen, I could also share it with the court; but this is the

9    only paper copy that I have.

10            THE COURT:  I would be happy to take a look at it.

11            THE CLERK:  Do you want me to publish it then on the

12   screen?

13            THE COURT:  Oh, yes.  Go ahead and put it up.

14            (Pause.)

15            MR. MELHUS:  Your Honor, recognizing that this is the

16   first time that we've been provided with this particular

17   document, we do have concerns about when it was created and

18   whether or not this is a complete and accurate copy of

19   Dr. Gilmore's prior statements, and I would ask that the

20   court --

21            THE COURT:  You can voir dire the witness, if you care

22   to, for the purposes of an objection if that's your concern.

23            MR. MELHUS:  Sure.

24

25

1                    VOIR DIRE EXAMINATION

2   BY MR. MELHUS:

3   Q.  Dr. Gilmore, do you recall answering this questionnaire?

4   A.  Yes.  It was three years ago, so it's hard to remember, you

5   know, the verbatim details of that that were made that long ago.

6   Q.  Would you be able to make -- or would you be able to testify

7   today about whether or not this is a complete and accurate copy

8   of your prior statements?

9   A.  I would probably have to review it.

10           MR. MELHUS:  Your Honor, we would object to foundation

11  at this time, and we recognize the court's earlier ruling taking

12  exhibits subject to those objections, so we have no further

13  objections about this exhibit.

14           THE COURT:  Mr. Langel, do you care to lay a little

15  more foundation about the exhibit?

16           MR. LANGEL:  Just a few questions, Your Honor.

17              RECROSS-EXAMINATION (Continued)

18  BY MR. LANGEL:

19  Q.  Ms. Gilmore -- and could I hand you the document again?

20           MR. STAMBAUGH:  May I approach, Your Honor?

21           THE COURT:  Please.

22  BY MR. LANGEL:

23  Q.  You testified that you indeed prepared a summary of

24  responses in response for Nancy Howell, correct?

25  A.  Yes.

1  Q.  And you've had a chance to review Exhibit 107 briefly.  And

2  take all the time that you need, but my question to you is, is

3  Exhibit 107 a true and correct copy of your responses to

4  Ms. Howell's questionnaire?

5  A.  Oh, this here (indicating)?  What's Exhibit 107; what I'm

6  holding?

7  Q.  Yes.

8  A.  Okay.  Yes.  I mean -- do you want me to read it right now?

9  Q.  I want you to become familiar with it and tell me if there's

10  any reason for you not to believe that it isn't -- or for you to

11  disagree with me that it is a true and correct copy of your

12  responses.

13        MR. MELHUS:  Your Honor, in the interests of not

14  having Dr. Gilmore have to review this entire document, if we

15  could possibly leave the record open with respect to this

16  particular exhibit and have Dr. Gilmore review it and would make

17  an offer tomorrow morning regarding its admissibility.

18        THE COURT:  That would be fine.  I only have a little

19  bit of it here on the screen.  Is it a lengthy document?

20        MR. MELHUS:  It's about seven pages.

21        MR. LANGEL:  Seven pages.

22        THE COURT:  I think that's a reasonable request.  Is

23  she going to be back tomorrow?  Is that what you're proposing,

24  or can she do it yet tonight?

25        MR. MELHUS:  If our objections still stand tomorrow

1    morning, we can make her available tomorrow.

2            THE COURT:  I would suggest an alternative, if you

3    have a few minutes when we're done here today, maybe you could

4    talk to her, both of you, both sides about it and satisfy

5    yourselves as to its authenticity and completeness.

6            MR. MELHUS:  I will do that, Your Honor.

7            THE WITNESS:  All right.

8            THE COURT:  Let me ask especially for context because

9    I'm a little bit outside of the bubble on it, but it's my

10   understanding that this questionnaire is in response to concerns

11   that were raised by the Bonobo 12?

12           THE WITNESS:  Yes.

13           THE COURT:  Some of the complaints that they made; is

14   that true?  Yes.

15           THE WITNESS:  Yes.

16           THE COURT:  And in about what time frame again?

17           THE WITNESS:  It would have been September of 2012

18   maybe, August or September.

19           THE COURT:  Thank you.

20           I had assumed that.  I just wanted to make sure I had

21   it right.

22           THE WITNESS:  All right.

23           THE COURT:  Why don't we -- who's questioning?

24   Mr. Langel, I think you've got the floor.  Do you have any more

25   questions for this witness?

1          MR. LANGEL:  Just the famous last phrase, one final

2    last question.

3    BY MR. LANGEL:

4    Q.  Did you have any conversations with Mr. Taglialatela about

5    your testimony?

6    A.  No.

7    Q.  Or with anyone about what any prior witnesses have said in

8    this case?

9    A.  No.

10          MR. LANGEL:  Thank you.

11          No further questions.

12          THE COURT:  Anything further of this witness at this

13   time?

14          MR. MELHUS:  Nothing further, Your Honor.

15          Thank you.

16          THE COURT:  Ma'am, you may step down.  If you don't

17   mind, would you stay awhile, and we're going to do a little bit

18   more here, and then they would like to talk to you about that

19   today.

20          And then if you're able to stipulate that it's

21   complete -- you've made other objections, but that it's complete

22   and accurate and hers, maybe she won't have to come back

23   tomorrow.

24          MR. MELHUS:  That would be my hope, Your Honor.

25          MR. STAMBAUGH:  That would be our preferred approach,

1    Your Honor.

2         THE COURT:  Do you have another witness we could get

3    started on today?

4         MR. MILLER:  We do, Your Honor.  Plaintiffs call

5    Dr. Taglialatela, Jared Taglialatela.

6         THE COURT:  Sir, would you come forward, please, and

7    be sworn.

8         Cheryl?

9         THE CLERK:  Oh, I'm sorry.

10        Please raise your right hand.

11   JARED TAGLIALATELA, PLAINTIFFS' WITNESS, SWORN

12                    DIRECT EXAMINATION

13   BY MR. MILLER:

14   Q.  Would you state your name and spell your last name, please.

15   A.  Sure.  My name is Jared Taglialatela.  It's

16   T-A-G-L-I-A-L-A-T-E-L-A.

17   Q.  Are you, as has been alleged and discussed in this trial, a

18   research associate with Yerkes National Primate Research Center?

19   A.  Yes, I am.

20   Q.  What is a Yerkes research associate?

21   A.  That's a good question.  It's basically a blanket term for

22   any individual who would have already received a doctoral degree

23   but would still have privileges to enter the facility and

24   presumably collect data from any of the animals that are housed

25   there.

1  Q.  And you're Director of Science for ACCI, is that correct?

2  A.  No.  I'm the Director of Research.

3  Q.  Oh, excuse me, I'm sorry; Director of Research.  Thank you

4  for that correction.

5          You're also a board member of ACCI?

6  A.  That is correct.

7  Q.  Does Yerkes have any involvement with ACCI's operations?

8          MR. STAMBAUGH:  Objection; lacks foundation.

9          THE COURT:  I'll receive it, subject to the objection.

10  A.  The Yerkes National Primate Research Center has no

11  involvement with ACCI's operations.

12  BY MR. MILLER:

13  Q.  Have you met or discussed ACCI with Yerkes in the past?

14  A.  Yes, I have.

15  Q.  For what purpose?

16  A.  For the purpose of attempting to have the Yerkes National

17  Primate Research Center transfer a number of their chimpanzees

18  within their overall colony to ACCI here in Des Moines.

19  Q.  Has Yerkes transferred those chimpanzees?

20  A.  No, they have not.

21  Q.  Has Yerkes ever told you that a condition on their

22  involvement with ACCI to transfer these chimpanzees would be

23  that Dr. Sue or Dr. Duane Rumbaugh has no involvement with ACCI?

24  A.  No, they have not.

25  Q.  Have you provided an assurance or a statement to ACCI that

1  they would have no involvement?

2  A.  There was an initial questionnaire that was given to ACCI

3  when we first inquired with the Yerkes National Primate Research

4  Center about -- if they were interested in divesting their

5  chimpanzees.  I don't have it in front of me, so I don't really

6  know.  I believe one of their questions, I think this was

7  Lyle's, Mr. Simpson's earlier testimony, indicated this was at

8  least mentioned.  There was a question, I believe, in which that

9  came up.  I was not the person charged with writing the response.

10  I don't off the top of my head remember what that response was.

11  Q.  Has anyone from BHI ever asked you if Yerkes ever made this

12  condition relating to chimpanzees?

13          MR. STAMBAUGH:  Objection; lacks foundation.

14          THE COURT:  I'll receive it, subject to the objection.

15  A.  Not to my recollection.

16  BY MR. MILLER:

17  Q.  And you've never provided -- am I understanding you

18  correctly you, Dr. Taglialatela, you have never provided such

19  assurances to Yerkes?

20  A.  No, I have not.

21  Q.  And, to your knowledge, has anybody at ACCI provided that?

22          MR. STAMBAUGH:  Objection; lacks foundation.  The

23  witness just testified he didn't fill out the questionnaire.

24          THE COURT:  Overruled.  I'll receive it, subject to

25  the objection.

1  A.  I'm sorry, could you restate that one again?

2  BY MR. MILLER:

3  Q.  To your knowledge, has any assurance about their involvement

4  been provided to Yerkes?

5        MR. STAMBAUGH:  Same objection.

6        THE COURT:  Same ruling.

7  A.  Not specifically, based on my previous response.

8  BY MR. MILLER:

9  Q.  Where do you live, sir?

10 A.  I live in Atlanta, Georgia.

11 Q.  And how old are you?

12 A.  I'm 40.

13 Q.  You have in front of you in one of the notebooks an Exhibit

14 1007.  Could you take a look at that?

15 A.  Yeah.

16 Q.  Do you have that there?

17 A.  Yeah.

18 Q.  Can you identify that for the record, what that exhibit is?

19 A.  It looks like a copy of my CV, curriculum vitae.

20 Q.  Is that current?

21 A.  It looks like it's probably missing a couple of recent

22 peer-reviewed publications.

23 Q.  Do you know approximately when that CV would have been

24 prepared?

25 A.  The peer-reviewed publications stop in this CV in 2012.

1   There will be a few more in the intervening years.

2   Q.   Can you provide the court a brief description of your

3   educational background?

4   A.   Sure.  I'll use my CV to remind myself.  I received my

5   bachelor's degree in biology from the University of Virginia in

6   1997.  I received my Ph.D. in neurobiology and behavior from

7   Georgia State University in 2004.  I then did postdoctoral

8   training, which was partially funded by the National Institutes

9   of Health by individual postdoctoral fellowship, and I completed

10  that work in 2008.

11  Q.   And do you have a particular area of expertise?

12  A.   I would consider my area of expertise is in great ape

13  behavior, with a focus on great ape communication, as well as

14  neuroanatomy.

15  Q.   Where are you employed?

16  A.   I'm employed at Kennesaw State University in Kennesaw,

17  Georgia.

18  Q.   Do you have a job title there?

19  A.   I'm assistant professor of biology.

20  Q.   And what does that position entail?

21  A.   It entails teaching courses, mentoring both undergraduate

22  and master's level graduate students, and it involves conducting

23  research and publishing those findings, as well as seeking grant

24  funding for funding network.

25  Q.   What does your position as Director of Research at ACCI

1  entail?

2  A.   That's a pretty comprehensive position at this point given

3  the size of the organization.  Mainly sort of my job

4  description, if you will, is kind of overseeing the research

5  that gets conducted at the facility in sort of a most pragmatic

6  way.  So, in other words, what I mean by that is being able to

7  make sure that the apes are being cared for in such a way that

8  we can conduct the research that we need to conduct, by

9  interfacing with other researchers, whether those be PIs or

10  graduate students or postdoctoral fellows, either from within

11  the organization or from other institutions, making sure they

12  have time to work with the animals.  I also help other PIs

13  develop and we'll use protocols and talk about basically the

14  pragmatics of what we can and cannot do at the facility.

15  Q.   And I think we established earlier, PI is --

16  A.   I'm sorry; principal --

17  Q.   -- principal -- go ahead.  What it is?

18  A.   Principal investigator.

19  Q.   Can you define what that entails?

20  A.   That term is a little nebulous, depending on where you go;

21  but basically it refers to an individual who would be completing

22  animal use protocols and conducting their own line of research.

23  So, obviously, if there's individuals that don't do animal work,

24  it wouldn't necessarily involve animal work.

25  Q.   Are you paid for your position at ACCI?

1  A.  No, I am not.

2  Q.  Are you fulfilling that position alongside full-time work

3  that you're doing at Kennesaw?

4  A.  Um --

5  Q.  Your day job, as it were?

6  A.  Right.  This is -- yes, I have another day job.  That's what

7  pays the bills.

8  Q.  And that's the professorship you just described a moment

9  ago?

10  A.  Yes.

11  Q.  Okay.  Approximately how much time a month do you spend in

12  Des Moines for ACCI work?

13  A.  I've calculated that since the -- I believe it was since --

14  now my memory is gone; but I think it was since December of

15  2013, I would say on or about sometime in December of 2013, and

16  I have spent approximately six days in Des Moines, although this

17  May it turned out to be approximately 21 days, so I think I had

18  not calculated that.  It was anticipating how many days I would

19  be in Des Moines.

20  Q.  And those other months, you didn't have a lawyer asking you

21  about it.

22          So it's six days a month?

23  A.  Yes, I'm sorry, six days a month.

24  Q.  And outside those six days a month physically in Des Moines,

25  are you able to quantify or explain for the court other time you

1    spend on ACCI business?

2    A.   I would have to give my best guess estimate, and I have been

3    working on that for a number of reasons, and right now I'm

4    thinking somewhere in the area of 35 hours.

5    Q.   Thirty-five hours per --

6    A.   Per week; I'm sorry.

7          MR. MILLER:  Your Honor, I have a demonstrative

8    exhibit that I shared a copy with counsel.  I would just like to

9    show it to Dr. Taglialatela to assist in his testimony if that's

10   okay?

11         THE COURT:  That's fine.

12   BY MR. MILLER:

13   Q.   Actually, Doctor, before we have you start looking at the

14   document as it gets up there, there's been no testimony about

15   this facility in Des Moines.  Can you describe for the court

16   where in Des Moines it's located?

17   A.   Sure.  So it's on the southeast side of town on Evergreen

18   Avenue or what's known as Southeast 44th Street.  It's

19   approximately 200 -- approximately 230 acres is basically the

20   grounds of the facility.  The building, which is now depicted in

21   the picture here, is basically a large, what would probably be

22   best referred to as poured concrete building.  So it's

23   foam-filled concrete slabs that are basically poured on site and

24   then assembled together.

25         It's an expansive building and it's basically a mirror

1   image of each other, so you have sort of an east side and west

2   side that are basically identical.  In the images, you can see

3   there's a central area there that would be glass windows called

4   the greenhouse.

5        Next to that there are two towers, again an east tower

6   and a west tower, and then there's halls in the areas that go

7   out from the sides of that.  Those indoor -- those facilities

8   house ape -- the majority of that space is ape accessible space,

9   so that's where the bonobos spend their days.

10        In addition to that ape accessible space inside, there

11  are two play yards attached to those towers as well as to some

12  bedroom areas on the inside.  And then it's a little bit hard to

13  make out in this photograph -- and I don't have a pointer, but

14  you can basically see there's approximately three-and-a-half

15  acres of outdoor yards that are surrounded by electrical

16  fencing.

17        So these are open area yards open to the top, a total

18  of three-and-a-half areas, and the west one is about

19  one-and-a-half, maybe a little bit shy of that and the east one

20  is about two-and-a-half, and those are all bonobo accessible

21  weather permitting.

22  Q.  And are there additional buildings on the grounds?

23  A.  There is another building that used to house orangutans.

24  It's not nearly as aesthetically interesting as this one, but it

25  basically is a big three-story rectangle, and it has an outdoor

1 play yard that is a similar three-story rectangle with what we

2 call welded wire, which is sort of square metal mesh attached to

3 it.  It's also three stories.  That entire building is attached

4 by a chute, if you will, so a tunnel that's fully enclosed.

5 That tunnel leads out to a yard that is surrounded by a

6 triple-layered electrical fence.  The final layer has about 56

7 strands of electrical wiring on it, and it surrounds about

8 eight-and-a-half acres of hardwood forest.

9 Q.  And if you can help me put the court at the front door, the

10 front door to the facility on this demonstrative exhibit is

11 opposite the greenhouse, is that correct?

12 A.  That is correct, yes.

13 Q.  Okay.  And walk us through the door and tell the court what

14 you would see.

15 A.  Sure.  So we walk into the lobby building, and, again, like

16 I just initially described, the building has an east and west

17 side that are effectively mirror images.  There's some

18 exceptions.  The first thing you would see is a rounded glass

19 room -- I should say two rounded glass rooms that are each a

20 quarter of a pie piece if you could imagine.

21        So you walk straight in, there is a beautiful mural

22 that was painted of the surrounding grounds, and then on the

23 right side there's a quarter inch pie piece which is surrounded

24 in the area facing the lobby with glass.  The east side has a

25 very similar one.  Inside of that pie piece is what we call the

1    demo room.  It's outfitted with a touch screen computer so that

2    you can project the bonobos' lexigram keyboard.  Also you can

3    use that touch screen for cognitive testing and various things.

4             Those rooms open into an east and west component of

5    this greenhouse that you see here again, which is ape accessible

6    space, and those east and west greenhouses lead through a series

7    of what we basically call the ramps into those large towers that

8    you see.

9             Beyond those large towers are what we call bedrooms

10   and, they're sort of similar, more traditional, quote/unquote,

11   caging, although they're quite nicer than most of the caging you

12   would see other places.  All of the towers and those bedrooms

13   connect to both an enclosed play yard, which would have mesh of

14   some kind all around it, natural substrate on the ground,

15   surrounded by wall on one side, the rest of it is mesh, and then

16   there's also a tunnel that leads out to these large play yards

17   that I was describing that is surrounded by electrical fence.

18   Q.  When you describe the towers and the bedrooms, those are for

19   the bonobos?

20   A.  They are for the bonobos, yes.

21   Q.  Do you agree you became involved in ACCI in December of 2013

22   as has been described here in the proceedings?

23   A.  Yes.

24   Q.  After you became involved with ACCI, have you been involved

25   with the board making any improvements to this facility?

1   A.  Yes.  We've made a number of -- we haven't made any major

2   improvements -- well, I guess it depends on who you're asking.

3   We've made some improvements to the facility.  Most recently

4   we've installed different access mechanisms for the front gate,

5   which we think are more secure and more reliable performance

6   wise because there was at least in my time experiencing some

7   historical troubles with the gate following bad weather, for

8   example.  I've worked at a lot of primate facilities and know a

9   lot of people who have gates, and apparently gates are always an

10  issue.  We've installed some new access panels that allow the

11  gate to be accessed in a way to keep the facility more secure.

12          In addition to that, we've done general improvements

13  to the facility.  The radiant flooring system has been improved.

14  It still needs to be improved further, but we've improved the

15  radiant flooring, as well as some, what I would call badly

16  needed maintenance and cleanup that needed to be done when I

17  first -- from the time that I officially started at the end of

18  December of 2013.

19  Q.  And have you also made any changes to the play areas for the

20  bonobos?

21  A.  We have, yes.  We've built some of the large outdoor yards

22  I've described.  Approximately three-and-a-half to four total

23  acres were really lovely opening spaces, but were without any

24  climbing structures.  We've added climbing structures to that

25  space.  Incidentally, we've also added climbing structures to

1  the indoor spaces as well.  We've added climbing structures to

2  the outdoor spaces, and in point of fact I think in the next

3  week or so, we have an Eagle Scout coming out to build us more.

4  Q.  And during your tenure, has electricity stayed on, the heat

5  been on?

6  A.  Yes.

7  Q.  And how do you know that?  How do you -- do you monitor the

8  heat and electricity, for instance?

9  A.  Oh, well, I talk with staff at the facility daily.  In

10  addition, during the winter months we keep -- actually we keep

11  it all year long, but we check them regularly in the winter

12  months obviously when it gets cold.  We have sensors that sense

13  the temperature where the bonobos are sleeping, and they're

14  actually programmed to send out text messages to a number of us

15  in the event that the temperatures fall below a set point.

16         One of the advantages of the building itself is that

17  the entire building is heated with radiant floor heat and, as I

18  mentioned, poured foam-filled concrete, and so the building

19  retains its heat even in the really cold Iowa winters.  As an

20  example, we lost our radiant floor heating for a period of 24

21  hours while I was here in February, and nobody noticed until

22  noon the following day, and that was when we took our routine

23  floor heat readings and they were one degree off what they had

24  been, what we normally would expect to see.  And so as a matter

25  of precaution, we then started feeling the floor, and we have a

1 contract, which is sort of an informal kind of in kind contract,

2 with a local contractor servicing company.  We put a call into

3 them, and they indeed verified that it had gone out and we

4 hadn't even noticed it.  We had a less than one degree change in

5 temperature in 24 hours, and that was on a very critical winter

6 day.

7         THE COURT:  Mr. Miller, why don't we take our evening

8 recess at this time.

9         MR. MILLER:  Thank you, Your Honor.

10         THE COURT:  We'll be in recess until 9 o'clock,

11 9 o'clock tomorrow morning.

12         (Recess at 5:00 p.m., until 9:00 a.m., Friday,

13 May 29, 2015.)

14

15

16

17

18

19

20

21

22

23

24

25