IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - - -X
IOWA PRIMATE LEARNING SANCTUARY   :
d/b/a GREAT APE TRUST AND         :
APE COGNITION AND COMMUNICATION   :
INSTITUTE,                        :
                                  :
        Plaintiffs,               :      Case No. 4:10-cv-00052
                                  :
    vs.                           :
                                  :
ZOOLOGICAL FOUNDATION OF          :
GEORGIA, INC. d/b/a ZOO ATLANTA,  :
DEMOCRATIC REPUBLIC OF CONGO,     :
JAPAN MONKEY CENTRE INSTITUTE     :
AND MUSEUM OF PRIMATOLOGY, and    :
SUE SAVAGE-RUMBAUGH, Ph.D.,       :
                                  :
        Defendants,               :      TRANSCRIPT OF HEARING
                                  :            VOLUME III
and                               :
                                  :
BONOBO HOPE INITIATIVE, INC.,     :
                                  :
        Intervenor-Defendant.     :
- - - - - - - - - - - - - - - - - -X


                        Fourth Floor, South Courtroom
                        United States Courthouse
                        123 East Walnut Street
                        Des Moines, Iowa  50309
                        Friday, May 29, 2015
                        8:57 a.m.



BEFORE:  THE HONORABLE ROSS A. WALTERS, Magistrate Judge.



                    Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                    Room 189, U.S. Courthouse
                    123 East Walnut Street
                    Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiffs:          WILLIAM J. MILLER, ESQ.
                             BRIAN A. MELHUS, ESQ.
                             Dorsey & Whitney
                             801 Grand Avenue, Suite 4100
                             Des Moines, Iowa  50309-2790

For the Defendants:          TODD P. LANGEL, ESQ.
                             Faegre Baker Daniels
                             801 Grand Avenue, 33rd Floor
                             Des Moines, Iowa  50309-8011

                             WILLIAM C. ZIFCHAK, ESQ.
                             Kaye Scholer
                             250 West 55th Street
                             New York,  New York  10019-9710

                             JOSHUA STAMBAUGH, ESQ.
                             Kaye Scholer
                             1999 Avenue of the Stars
                             Suite 1600
                             Los Angeles, California  90067

                             ROSS NEIHAUS, ESQ.
                             Kaye Scholer
                             Three First National Plaza
                             70 West Madison Street
                             Suite 4200
                             Chicago, Illinois  60602-4231

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiffs: | | | | |
| Jared Taglialatela (Resumed) | 473 | 528 | 597 | 601 |
| William Hopkins | 638 | 652 | 663 | |
| For the Defendants: | | | | |
| Russell Howard Tuttle | 602 | 629 | | |

E X H I B I T S

| PLAINTIFFS' EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1000 - Simpson & D. Rumbaugh e-mail string | 672 | 672 |
| 1007 - Taglialatela CV | 472 | 472 |
| 1008 - Hopkins CV | 640 | 640 |

| DEFENDANTS' EXHIBIT NUMBERS: | | |
|---|---|---|
| 43 - 11/9/13 e-mail from Caudill | 668 | 671 |
| 48 - 11/20/13 e-mail string from D. Rumbaugh | 668 | 671 |
| 69 - 3/18/14 e-mail string from Simpson | 668 | 671 |
| 71 - 3/18/14 e-mail string from Taglialatela | 668 | 671 |
| 74 - 4/22/14 Knoploh-Odole e-mail string | 668 | 671 |
| 76 - 4/28/14 Simpson e-mail string | 668 | 671 |
| 95 - Dubreuil CV | 668 | 670 |
| 97 - Tuttle CV | 555 | 555 |
| 98 - SSR video compilation of bonobos | 668 | 670 |
| 103 - 11/19/13 Caudill e-mail to Simpson | 668 | 671 |
| 105 - Taglialatela e-mail | 509 | 509 |

```
1                      P R O C E E D I N G S

2              (In open court.)

3              THE COURT:  Please be seated.

4              And good morning to you all.

5              Let's see, were we going to make a record about that

6    exhibit first?

7              MR. STAMBAUGH:  We are, Your Honor.  We have conferred

8    with opposing counsel, and I believe all of the objections have

9    been withdrawn as to Exhibit 107 as testified to by Dr. Gilmore

10   yesterday.  So we would like to move Exhibit 107 into evidence.

11                                 (Defendants' Exhibit 107 was

12                                 offered in evidence.)

13             MR. MELHUS:  That is correct, Your Honor, on behalf of

14   plaintiffs.

15             THE COURT:  Thank you.

16             107 is received.

17             MR. STAMBAUGH:  Thank you, Your Honor.

18                                 (Defendants' Exhibit 107 was

19                                 received in evidence.)

20             THE COURT:  Now, are we going to continue with the

21   witness we had yesterday or do you have somebody here that was

22   presenting at some point today?

23             MR. STAMBAUGH:  I believe we're going to continue with

24   Dr. Taglialatela and then go to Dr. Tuttle.

25             THE COURT:  Okay.  Sir, would you come forward and
```

TAGLIALATELA - DIRECT

1  retake the stand, please.

2                    JARED TAGLIALATELA,

3  resumed his testimony as follows:

4           MR. MILLER:  I'm sorry, madam court attendant, it

5  looks like we're losing our screen.  Are we still on the other

6  screens?

7           THE CLERK:  Oh.

8           THE COURT:  Literally we're losing that one.

9           THE CLERK:  We're on the other screens.

10          MR. MILLER:  I will get it to come back up, I hope.

11          Hmmm.  Well, I'll try resetting it, let it go all the

12 way down.

13          MR. MILLER:  Okay.

14                    DIRECT EXAMINATION (Continued)

15 BY MR. MILLER:

16 Q.  Good morning, Doctor.  I will go ahead and ask you a little

17 bit about security at the facility at Des Moines.  We just lost

18 on the big screen the photo, but you have it in front of you.

19 That's a picture of the compound or the facility, correct?

20 A.  Yes.

21 Q.  Okay.  Can you explain, around the facility is there any

22 security procedures or devices in place?

23 A.  Sure.  Around the building itself or the general property,

24 or both?

25 Q.  Both -- well, let's start with the building itself.

PROSHA/KATHKA - DIRECT

474

1    A.   Okay.  So the building itself is actually secured with key

2    card access.  There are actually three entry points for --

3    actually I take that back.  There's four entry points to the

4    physical structure of the building itself, all of which are key

5    card access, and in order to gain access, once you gain access

6    to the public space of the building, you also need a second

7    level key card to get into the -- actually any of the places

8    where the ape enclosures are.  Of course, the ape enclosures

9    themselves are all locked with manual locks.

10   Q.   And then how about security within the grounds?

11   A.   So, as I mentioned yesterday, the property is 230 acres.

12   Out of that 230 acres, I think approximately 125 are fenced in

13   with barbed wire at the top.  There's two entry points for that,

14   the main gate and a back gate.  The back gate is locked and

15   chained and requires a manual key lock.  It's not really used,

16   except for I go through there and walk the property every once

17   in a while because it's a very nice area along the Des Moines

18   River; but the main gate is secured again with, as I mentioned

19   yesterday, a key pad access.

20   Q.   At some point in time, did you become a member of a

21   governing body for this facility?

22   A.   Yes.

23   Q.   Okay.  When did that first happen?

24   A.   So initially, to the best of my recollection, it was in the

25   fall of 2012.  I was approached by Dr. Savage-Rumbaugh by e-mail

PROBLEATHER - DIRECT

1  and telephone, if I'm not mistaken, and was asked to join a

2  board that was my understanding was basically the organization

3  that was overseeing the operation at the, quote/unquote, Great

4  Ape Trust.  The name of that organization was not very clear to

5  me.  Some referred to it as the Great Ape Trust, some referred

6  to it as IPLS, and some referred to it as the Bonobo Hope

7  Initiative.  The idea was they were all basically the same

8  thing, at least that was my understanding.

9         I vaguely recall asking specific questions of Ken

10  Schweller, who was the chair of the board of that organization,

11  and I believe that's the way he explained that answer to me.

12  Q.  Do you know if you were ever a board member of the entity

13  called IPLS?

14  A.  My understanding now is that I was never a board member of

15  the entity called IPLS.

16  Q.  Do you recall discussing with Dr. Rumbaugh, Dr. Sue

17  Savage-Rumbaugh, her intention to transition away from the

18  operation at some point in time?

19  A.  I do, but that didn't happen until the fall of 2013.

20  Q.  And what do you recall about that discussion?

21  A.  Well, I was initially written an e-mail by Dr. Duane

22  Rumbaugh, and he had asked me if I would consider being involved

23  with the facility in Iowa.  I don't remember the specific

24  contents, but if I had it in front of me, I certainly could

25  relay them.  His -- he basically was requesting, for lack of a

1  better way, sort of what I assume oversight of the scientific

2  program there in his e-mail.  And I remember being a bit stunned

3  by that just because I hadn't heard from him in awhile, though

4  we are close and usually had been corresponding fairly

5  regularly, but it had been a little bit of time since we had

6  last spoke.

7  Q.  Had you previously discussed with Dr. Duane or Dr. Sue

8  involvement in any sort of leadership position at the facility?

9  A.  Again, just to sort of get the time line correct, joined

10  this Bonobo Hope Initiative board in the fall of 2012 upon

11  Dr. Savage-Rumbaugh's request.  Following -- basically the

12  reason or my understanding of the reason Dr. Savage-Rumbaugh

13  contacted me at that time was because there was some concern

14  that the bonobos were going to be relocated.  The board or the

15  executive committee, some subset of the board were concerned

16  that they wouldn't be able to provide support for the apes and

17  there was discussions about them being relocated.

18         Initially, having not visited the facility or not

19  really -- just sort of only participating by e-mail and by

20  phone, I was concerned that they were correct and was helping to

21  try and figure out a way to find a place for the bonobos where

22  they would be able to be cared for properly.

23         Through the course of those discussions, which were

24  basically e-mail discussions between board members, to be quite

25  frank, my position somewhat changed on that because it became

1  clear to me that no one would actually probably take the bonobos

2  and, in all likelihood, we would need involvement from another

3  organization to help support them in situ, if you will.

4  Q.  And when you say "in situ," what do you mean?

5  A.  I mean at the facility for Des Moines.  Dr. Savage-Rumbaugh

6  and I, for lack of a better word, argued quite publicly about

7  this or at least among the board members.  The minute after she

8  invited me and I started voicing my opinions, she pretty much

9  attacked me both to the board as a group and also in individual

10 e-mails that were written just to me.

11 Q.  Were these e-mails among the group, did that include members

12 of the entity known as BHI that we've heard from some members of

13 that group here in testimony?

14 A.  To the best of my recollection, it does.

15 Q.  And other than the ongoing discussion about relocation, what

16 other involvement did you have from that point in time in 2012

17 up to the point when Dr. Duane contacted you in 2013?

18 A.  Well, it appears that that discussion while quite heated for

19 three or four weeks, and probably hundreds of e-mails were

20 exchanged if not in the thousands, after that time there was

21 some influx of financial support, which I really don't know

22 where it came from, and it sort of put a temporary hiatus, if

23 you will, on the discussion.

24         It was a pretty ineffective board.  It wasn't very

25 communicative.  In fact, I was probably writing -- having just

 1  joined, I was writing, you know, probably 75 percent of the

 2  e-mails in this discussion.  It was basically

 3  Dr. Savage-Rumbaugh and me and Dr. Schweller, with other people

 4  chiming in very small bits there.

 5         Once that financial -- immediate financial crisis was

 6  resolved, communications basically stopped, and to the best of

 7  my recollection, I didn't receive another communication about

 8  that organization or related to that organization until

 9  approximately May of 2013.

10  Q.  And when were you contacted by Dr. Duane?

11  A.  To the best of my recollection, that was in September of

12  2013.

13  Q.  Okay.  And after he contacted you, did you have any

14  discussions with Dr. Sue Savage-Rumbaugh?

15  A.  Yes.  Dr. Rumbaugh, Duane Rumbaugh, and I spoke, and the

16  first thing I told him was that I would absolutely need to visit

17  the facility and take a look at the apes.  I mean, my primary

18  concern, based on his e-mail, was for the apes' welfare and

19  continues to be so.  So I wrote to him.  He put me in contact --

20  I don't know exactly how this worked, but he put me in contact

21  with leadership at the organization.  We arranged a visit, and I

22  traveled there.  To the best of my recollection, shortly after

23  my return, Dr. Savage-Rumbaugh called me and we spoke on the

24  phone and then spoke numerous times after that.

25  Q.  What did Dr. Savage-Rumbaugh tell you during that first

1   conversation?

2              MR. STAMBAUGH:  Objection; calls for hearsay.  This is

3   a witness who testified in this proceeding.

4              THE COURT:  Well, yes, but it's also a party opponent.

5   I'll receive it, subject to the objection.

6   A.   To the best of my recollection, we talked a little bit about

7   the history.  She gave me her version, if you will, of the

8   history since about 2011 onward.  We spoke -- she, quite

9   frankly, told me that she was living in New Jersey, she felt she

10  couldn't be of assistance to the bonobos anymore, she felt that,

11  you know -- she, I guess, was being complimentary with regards

12  to what she thought was my -- what role I could offer or what

13  support I could offer for the bonobos, and she told me she was

14  doing some other academic activities, some things with Rutgers

15  University, just attending lectures and that sort of thing.  I

16  could go into more detail on it, but --

17  BY MR. MILLER:

18  Q.   Well, what did you tell her during that discussion?

19             MR. STAMBAUGH:  Same objection.

20             THE COURT:  Same ruling.

21  A.   Again, to the best of my recollection, it was after my

22  initial visit, shortly after my initial visit -- and, again,

23  just to the best of my recollection, that was the timing.  I

24  can't be absolutely certain.  But we -- I told her, you know,

25  that it was something that I would certainly consider, that I

1   visited the facility.  I also remember distinctly telling her

2   that I was working on a rather large grant application and the

3   due date was early December and so I was sort of postponing any

4   formal commitments until after that point since my time was

5   consumed with that application.  I don't remember a whole lot

6   more than that.

7   BY MR. MILLER:

8   Q.  Did you have any further discussions with her or was that

9   answer to describe all of your discussions?

10  A.  I think probably I'm -- I did have additional phone

11  conversations with her.  I think I'm blending -- I don't know if

12  all of those took place on the same -- on that initial

13  conversation.

14  Q.  What was the next step you took after this phone call?

15  A.  At that time I was seriously considering -- you know, as has

16  been testified by others, Bill Hopkins and I came to the

17  facility sometime in October, to the best of my recollection.

18  We spent a full day there.  We had breakfast meetings with the

19  board members, visited the facility, visited the grounds.  We

20  didn't -- I think we were there by 9:00 in the morning, and we

21  didn't leave until 4:00 or 5:00 in the afternoon.  It was a fall

22  day.  Looking at the facility, looking at the condition of the

23  apes, trying to understand as much as I could about how the

24  facility ran, that was one day.  I mean, this was barely

25  anything.

1          We spent time from that visit onward -- or I should

2     say I spent time from that visit onward thinking very seriously

3     about the position, if you will, of actually assuming some sort

4     of leadership role at that facility.  I spoke with many, many

5     colleagues.  I spoke with friends, to be quite frank.  I spoke

6     with people I used to work with that were not necessarily

7     colleagues but former technicians, people who knew

8     Dr. Savage-Rumbaugh, all of it just to sort of evaluate whether

9     or not it would be reasonable for me to even take on this

10    responsibility.

11    Q.  And did you ask questions about Dr. Savage-Rumbaugh's

12    ongoing involvement?

13    A.  I did.  I spoke with Dr. Savage-Rumbaugh specifically about

14    that, and, again, she had told me that she didn't -- initially,

15    I should qualify this, initially she told me she was in New

16    Jersey, didn't feel like she could do anything positive, that

17    the Bonobo 12 had, you know, sort of left a scar, if you will,

18    and was doing things in New Jersey with other folks there.  Her

19    involvement was, you know, in basically her words not an issue.

20          Actually can I add one thing?  Because I also spoke to

21    her specifically about how I felt my research interests had

22    diversified to some extent and that I had a research program

23    involving lots of different facets, some were aspects of

24    experimental ecology, some aspects in psychology, some of them

25    were aspects of maybe what you'd just call the origins of human

1  language, human intelligence and that those were diverse.  And

2  she assured me, you know, that, oh, yeah, I think there would be

3  lots of great opportunities for that type of work there.

4  Q.  Did she assure you that she was no longer planning to be

5  involved with the Des Moines facility?

6  A.  Yes, she did.

7  Q.  Did you then eventually decide to take on a leadership role

8  there?

9  A.  I did eventually.  Now, I want to be clear about this.  When

10  I arrived to visit the facility, in I think what is October, to

11  the best of my recollection, of 2013, I'll be quite frank, the

12  existing board members and counsel, Mr. Simpson, were fairly,

13  for lack of a better word, pushy about my involvement, to which

14  I asked them, of course, to hold on, but their -- I expressed

15  concerns on day one, if you will, that it would be something I

16  would need to have autonomy with and that I would not have

17  Dr. Savage-Rumbaugh in any oversight role or in any role in

18  which she would be basically overseeing any aspect of our

19  research program.  And by we, I mean Dr. Hopkins and myself.

20  Q.  From your discussions with Dr. Savage-Rumbaugh, did you

21  satisfy yourself that those conditions were going to be met?

22  A.  I satisfied myself at the time, but clearly I was not right.

23  Q.  And, similarly, from any other discussions that you had with

24  board members, did you also satisfy yourself that that was going

25  to be the case?

1  A.  I did.  I spoke with a number of them.  They indicated to

2  me -- I know it's been testified -- I believe I've heard it's

3  been testified since May, but according to the folks I spoke

4  with, it was since March of 2013, so we were going on six or

5  seven months that Dr. Savage-Rumbaugh had been absent from the

6  facility and was actually no longer living in Des Moines.  And

7  Lyle Simpson told me that -- he used the word that she was

8  cocooned, that she was not going to be involved moving forward.

9  And I was satisfied, I guess, that that was going to be the case

10  based on Dr. Rumbaugh, Dr. Savage-Rumbaugh, board members and

11  Mr. Simpson's, you know, words to me.

12  Q.  Would you have taken on the role of Director of Research for

13  ACCI if Dr. Sue had not told you she was no longer going to be

14  involved?

15  A.  Absolutely not.

16  Q.  Can you explain for the court -- well, first off, can you

17  identify Dr. Hopkins?

18  A.  Sure.  Dr. Bill Hopkins is a professor at Georgia State

19  University.  He's also the science director at the Ape Cognition

20  and Communication Institute.

21  Q.  And what's your understanding of how Dr. Hopkins got

22  involved?

23  A.  After receiving that initial e-mail from Dr. Duane Rumbaugh

24  in, again, the fall of 2013, I contacted Dr. Hopkins and invited

25  him to come visit with me.

1  Q.  And did he eventually agree to get involved as well with

2  ACCI?

3  A.  Yes, he did.  In fact, after our initial visit, I was much

4  more reticent I would say than he was.  He was excited about the

5  prospect of being able to -- we both wanted to do something

6  positive for the apes obviously.  He felt that we could make it

7  a reality, whereas I was perhaps a bit more cautious.

8  Q.  And what was his role that he took on when he first started?

9  A.  He took on the role of science director.

10 Q.  Did you eventually become a member of the Board of Directors

11 of ACCI?

12 A.  Yes.  When ACCI was formed on December 18, 2013, I became a

13 member of the Board of Directors.

14 Q.  At that time, who were the other members of the Board of

15 Directors?

16 A.  At that time George Caudill, Tom Watson, Meg Schneider-Fitz,

17 Steve Boers, Julie Gilmore, Dr. Bill Hopkins, and myself.

18 Q.  And has that membership of the board changed over time?

19 A.  Yes.

20 Q.  Are -- who are its current members?

21 A.  The official current members include the list I just gave,

22 with the exception of Mr. Steve Boers who resigned from the

23 board in September of 2014.

24 Q.  And are there new members to the board since that time?

25 A.  There are new members that have agreed we will officially

1  appoint them.  Although some of them are already acting in that

2  capacity, we'll officially appoint them at our next face-to-face

3  board meeting, but they include Al Setka, they include Jill

4  Pruetz, P-R-U-E-T-Z, and Steve Clark, Steven Clark.

5  Q.  Does ACCI have employees?

6  A.  Yes.

7  Q.  And can you give the judge a brief overview of who the

8  employees are?

9  A.  Sure.  With specific individual names or --

10  Q.  Sure.

11  A.  Okay.  So we currently employ basically two full-time and

12  one half-time, what we call animal care technicians; but there's

13  a bit of a transition in the works right now, so I'll just try

14  to describe that.  Heather Housh and -- oh, my, gosh, sorry,

15  blanking on their names -- and Elizabeth Cleveland are two

16  full-time animal care technicians.  We have a half-time animal

17  care technician, Gaila, G-A-I-L-A, Conklin.  Heather Housh

18  resigned two weeks ago.  She's going back to school.  And

19  basically we have just made an offer to another individual who

20  has provisionally accepted.

21         In addition to those animal care staff, we have a

22  research coordinator, and we also have two additional graduate

23  research assistants.  So that concludes the paid individuals --

24  I'm sorry, and Dr. Gilmore is paid a very small monthly sort of

25  retainer, if you will, as our attending veterinarian.

1  Q.  What are the job duties of the animal care employees?

2  A.  Basically their job entails taking care of animals.  A

3  typical day would involve preparing food, shifting the apes from

4  their sleeping -- where they slept to an outdoor yard if it's

5  nice weather or another yard.  We usually do foraging activities

6  for the apes so they will be dispersing food in different

7  locations.  They're also responsible for sort of setting up

8  enrichment devices or giving the apes other forms of enrichment.

9  They do a lot of husbandry training, and by that it's very

10  important to, obviously, be able to monitor the health and well

11  being of the apes.  And so the way we do that is we like to use

12  anesthesia as infrequently as possible, and you can very

13  readily, especially with our bonobos, train them or teach them,

14  if you will, to participate in presentation of their body parts.

15  And so they're able to -- the animal care staff help us with

16  that as well.  They also on occasion would be hopefully able to

17  help with research, but we haven't had that much yet.

18  Q.  What does the research coordinator do?

19  A.  The research coordinator is basically -- as I mentioned

20  yesterday, I'm there about six days a month.  The research

21  coordinator is basically my eyes and ears while I'm not there,

22  so she or he helps me to coordinate activities at the facility

23  on a daily basis.  We are in basically constant contact with one

24  another, and so it's a main sort of sounding board for me to

25  understand what's going on at the facility and to communicate

1  what I would like to see happen.

2  Q.  And is there a contingent of volunteers that works with ACCI

3  as well?

4  A.  There are a contingent of volunteers.  Volunteers are

5  absolutely vital to what we've got going on, and we are very

6  grateful to have the support.  They do lots of different things;

7  assist us with cleaning, food preparation, picking up our food

8  donations, doing other shopping types of things, basically, with

9  the exception of feeding the apes and shifting the apes, help us

10 with just about anything.  We've had volunteers help us with

11 taking care of the grounds and building climbing structures and

12 designing educational material for school groups that come

13 through, sometimes even leading those school groups, so --

14 Q.  Okay.  And how does ACCI fund its operation?

15 A.  So we have a number of different avenues for that.  We have

16 existing grants that fund those operations, and when I say

17 "grants," I'm referring to research grants that either come from

18 public or private foundations or agencies that fund scientific

19 research.

20        The second way we have that is that we've formed a

21 consortium, which I'm not an attorney, but as far as I

22 understand, it's just a legal entity agreement.  The members of

23 that consortium as of now are ACCI, Kennesaw State University,

24 Georgia State University and Drake University, and what --

25 effectively what happens with the consortium is that consortium

1   members pay an annual fee and in exchange for the annual fee

2   faculty and students would have access to the facility.

3   Q.  Has ACCI secured in kind or reduced cost support from the

4   community?

5   A.  Yes.  So -- I should have also finished with the funding

6   sources.  So, in addition to that -- so I would call that maybe

7   institutional support -- we also have received private

8   donations.  Individuals both on our board and in the community

9   donate cash.  So, I mean, for example, board member -- financial

10  donations from board members for 2015 my best guess right now is

11  somewhere in the order of $28,000 just from board members.

12  Going outside of that, I don't have the number for individuals.

13  We also recently lost a corporate sponsorship program, and we've

14  done actually -- I'm actually thrilled with how well we've done

15  with that.

16          In addition to that, yes, we receive in kind type

17  donations or reduced cost services from -- for example, three

18  Hy-Vee grocery stores in the Des Moines area donate food, as

19  does Anderson-Erickson Dairy.  So we do buy some of our food,

20  but they buy a large portion of it.  In addition to that, we

21  have a marketing group that works with us for free, we have

22  attorneys, and I think that's just about it.

23          I would like to mention, by the way, that the

24  donations that we receive, whether they be in kind or cash

25  donations, are used to fund the care and welfare of the apes.

1  They don't fund science.  We use scientific grants to fund

2  science.

3          The final source is collaborations with other PIs

4  basically at other institutions, so they'll come in, they want

5  to collect some data.  They submit an IACUC protocol.  It gets

6  reviewed by our IACUC.  Sometimes there's a little back and

7  forth where they have to revise and resubmit.  Once they do and

8  that protocol gets approved, they'll come to me and we'll work

9  out some way, schedule a visit.  They'll come and collect data

10  and basically, for lack of a better way of describing it, we

11  charge them for the opportunity to collect data at the facility.

12  Q.  Let's shift slightly to discuss one item that was discussed

13  with Dr. Gilmore briefly yesterday, but I want to give a little

14  context.  Are you familiar with the Species Survival Plan that

15  she mentioned in her testimony?

16  A.  Yes, I am.

17  Q.  Is that Species Survival Plan tied to an entity of any sort?

18  A.  I believe it is an organization that stands alone.  It is

19  housed or hosted by -- hosted I think is a better word by the

20  Milwaukee County Zoo, but it is an entity, and my understanding

21  is that it's a distinct entity of its own.

22  Q.  And do you recall if participation in the Species Survival

23  Plan was something that had been discussed during the joint

24  meeting that you had with Bonobo Hope and ACCI last year?

25  A.  It was most definitely discussed during that meeting.

1  Q.  Is ACCI regulated by any governmental or other entity?

2  A.  Yes.

3  Q.  What entity or entities?

4  A.  The USDA, United States Department of Agriculture.

5  Q.  Can you briefly describe for the court what that regulatory

6  relationship is?

7  A.  Sure.  So given the nature of our facility, we actually have

8  two licenses from the USDA, an exhibitor's license and a

9  research license.  We are primarily a research facility, so the

10  USDA inspects us regularly, and those are often -- or I should

11  say are most often surprise visits, if you will, unannounced,

12  and they will basically review protocols for animal care, animal

13  husbandry and research activities, but include also things like

14  security, disaster planning, all that kind of things.

15          So that is -- we have a USDA inspector.  I believe it

16  would be a regional -- an individual handler for the region.

17  Fortunately, ours has primate experience.  On a date that she

18  does an inspection -- I've been fortunate enough to be there for

19  one of them -- she'll come in, she will tour the facility,

20  inspect our food prep areas, inspect all of our logs to which

21  there are very many, as they say in this sort of business if you

22  don't write it down, you didn't do it, so we have logs for just

23  about everything.  She also meticulously looks through all of

24  our protocols and standard operating procedures.

25  Q.  If there's some concern by the USDA, do they write you up or

1  put a report in?

2  A.  Yeah.  There would be a way to issue, I guess it would be --

3  I'm looking for the term, I want to say citation, but that's not

4  correct; a violation.

5  Q.  Has ACCI had any violations within the time that you've been

6  involved?

7  A.  No, they have not.  No, we have not.

8  Q.  Yesterday we briefly discussed the Yerkes facility.

9         Do you recall that testimony?

10 A.  Yes.

11 Q.  Okay.  I don't know if I asked you, what is the Yerkes --

12 what is Yerkes?  Can you briefly describe that?

13 A.  The Yerkes, Y-E-R-K-E-S, National Primate Research Center.

14 Q.  And what does that national primate center do?

15 A.  There's a number of national primate research centers.  I

16 don't know the number off the top of my head.  There's one in

17 Wisconsin.  There's a couple -- basically they're part of a

18 national primate research center system which house primates,

19 but in the case of Yerkes also lots of other animals and

20 basically work for different aspects of really scientific

21 research.

22 Q.  Is ACCI regulated by Yerkes?

23 A.  No.

24 Q.  Does ACCI have any written agreements with Yerkes?

25 A.  Not at the moment.

1  Q.  Does ACCI have any oral agreements with Yerkes?

2  A.  No.

3  Q.  Has it made any promises or commitments to Yerkes?

4  A.  Commitments, no, or promises actually.

5  Q.  Has Yerkes made any promises or commitments to ACCI?

6  A.  Not at this point.

7  Q.  Does ACCI have procedures or protocols in place with respect

8  to its operations?  You heard Dr. Gilmore talk about a few of

9  those?

10  A.  Yes.

11  Q.  Is there a procedure or protocol in place for emergencies?

12  A.  Yes.

13  Q.  Or natural disasters?

14  A.  That is actually a relatively new USDA requirement that you

15  need to have a disaster plan.

16  Q.  And ACCI does have a disaster plan in place?

17  A.  ACCI does have a disaster plan.

18  Q.  And that disaster plan would have been reviewed presumably

19  by the USDA in one of these visits?

20  A.  Absolutely.

21  Q.  Does ACCI have committees that assist the board in operating

22  the facility?

23  A.  Yes.

24  Q.  And what are they?

25  A.  Well, we have a scientific advisory panel.  That body is

1  probably the main for providing, for lack of a better way of

2  saying it, external peer review of what we're doing.  And I mean

3  that with regards to both the health and welfare of the apes,

4  management policies, but also security issues, emergency

5  preparedness, things like that.

6  Q.  And who are -- who sits on that committee?

7  A.  So --

8  Q.  If you can describe generally for the court?

9  A.  Okay.  So not individual names?

10  Q.  Yes.

11  A.  They include individuals that have extensive experience in

12  great ape care, management and, you know, working with apes in

13  behavioral research contexts.

14  Q.  There's also an IACUC committee, is that correct?

15  A.  That is true.

16  Q.  You sit on the IACUC committee?

17  A.  I do.

18  Q.  Has the IACUC committee that you sit on received any

19  proposals for research from a member of Bonobo Hope?

20  A.  No.

21  Q.  And I mean the current BHI board.

22  A.  No, although I believe that Dr. -- not doctor, that Mr. Itai

23  Roffman is preparing one.  I could be wrong about that, but we

24  had e-mail exchanges and I sent him the application for the

25  protocol form.

1   Q.  I would like to talk to you a little bit about the bonobos

2   in residence.

3   A.  Uh-huh.

4   Q.  Who are the bonobos in residence at the colony currently?

5   A.  So we have Kanzi, Elikya -- I don't know if you want me to

6   say something about them or --

7   Q.  Just name them off.

8   A.  Kanzi, Elikya, Maisha, Teco, Nyota.

9   Q.  How long have you worked with the colony or members of the

10  colony?

11  A.  I first began working with Kanzi in 1998.  I was working

12  with him when he was at the Georgia State University Language

13  Research Center, and I worked with him from 1998, roughly May of

14  1998 until October of 2004 on a near daily basis; the same goes

15  for Elikya and the same goes for Nyota, and, I'm sorry, the same

16  goes for Maisha, but Maisha wasn't born in 1998, so I was there

17  actually when he was born.

18          I returned again, as I mentioned earlier, for an

19  initial visit in October.  I believe my next visit after that

20  was December, and I worked with them on a daily basis when I'm

21  in Des Moines, save the last two-and-a-half days.

22          MR. MILLER:  Your Honor, at this time I would like to

23  publish a photograph as a demonstrative exhibit that I've

24  previously shared with counsel.

25          THE COURT:  Please.

1  BY MR. MILLER:

2  Q.  Dr. Taglialatela, we've put a photograph -- it's actually

3  three photographs side by side.  Who is depicted in that

4  photograph?

5  A.  That's Kanzi.

6  Q.  And when you're here in Des Moines since your time with

7  ACCI, you've worked with the bonobos yourself directly?

8  A.  Yes, absolutely.  I work with the bonobos, you know,

9  depending on what the day -- as you can probably imagine, I'm

10  fairly busy on the days that I'm here; but as often as I can,

11  I'm working with the bonobos.  And to be quite frank, that has

12  included things such as collecting data for colleagues or for

13  graduate students or my own projects.  It's also included

14  cleaning the cages and moving the apes and training our new

15  staff because we have new animal care staff and research staff

16  that work with the apes.  So I've been doing a lot of that hands

17  on when I'm here as well.

18  Q.  Did you know a bonobo by the name of Matata?

19  A.  Yes.

20  Q.  And did Matata pass away since you began working with ACCI?

21  A.  Yes.  To the best of my recollection, Matata passed away in

22  June of 2014.

23  Q.  Were you surprised when that occurred?

24  A.  I was surprised when that occurred.  I was also sad when

25  that occurred.  Matata was the second oldest bonobo in captivity

1  when she passed away.  She was wild caught, so her age is a

2  little unknown, but we guesstimated 45.  As a colleague of mine

3  commented to me, she was old when I met her; but she also was by

4  all outward appearances healthy, and the main -- I've seen video

5  of her the day before, and she was foraging in her yards and

6  acting otherwise normal during the course of that day.  In fact,

7  the USDA inspected us I think a couple of days later and was

8  shown the same video that I was shown because I was not in town

9  when it occurred and came to the same conclusion that I came to.

10 Q.  You're not a veterinarian, correct?

11 A.  No.

12 Q.  And Matata was under the care of Dr. Gilmore at that time?

13 A.  Yes, she was.

14 Q.  Do you have any concerns about the care that was provided

15 Matata?

16 A.  No, no.  I mean, Dr. Gilmore was in close contact with me

17 about -- is always in close contact with me about their care.

18 So if I have a concern, I would voice it to her directly.

19 Q.  Is ACCI providing for the emotional health of the bonobos?

20 A.  Absolutely.

21 Q.  And how is it doing that?

22 A.  Well, I mean, we do that in a number of ways.  You know, I'm

23 not sure if it's appropriate, but I mean, I've heard a lot of

24 testimony from people that, I mean -- you know, I've worked with

25 apes for going on nearly 20 years now, and I see these apes or

1    apes at other facilities, which I think is probably one of the

2    important things to remember, a lot.  I've worked with bonobos

3    at Milwaukee County Zoo.  I've worked with bonobos at

4    Jacksonville Zoo.  I've worked with obviously the bonobos that

5    are now in residence at ACCI.  I've worked with chimpanzees,

6    literally hundreds of chimpanzees at research facilities, at

7    zoos and even in sanctuaries.

8            There's a number of ways that you can both provide and

9    then not only just provide and say we're doing something, but

10   assess whether or not you're effective at doing what you say

11   you're doing.  Apes are extremely intelligent.  The way apes got

12   to be extremely intelligent is because they live in very

13   complex, dynamic environment that is both socially rich and

14   geographically or what we would call ecologically rich; in other

15   words, it's a complex environment.

16           If you're a bonobo living in the wild or, for that

17   matter, a chimpanzee living in the wild, your biggest challenge,

18   right, is finding food.  It's hard to find food, and you need

19   help from other individuals.  So the way we provide for the

20   emotional well being of the apes in captivity is to provide them

21   under the rich environment in which they basically need to --

22   you know, are stimulated emotionally and socially and

23   intellectually, and we do that in very specific ways; by giving

24   them extractive or challenging foraging tasks that challenge

25   them.

1           So, for example, we're doing things where we would
2    maybe provide, you know, simulated termite fishing devices,
3    where you would put some food and whatnot in a tube and allow
4    the apes to use a stick to kind of extract food.  We do a lot of
5    different foraging activities outside, take advantage of those
6    human spaces, provide food.  They're foraging in the wild.  The
7    apes actually love that, right.  Kanzi likes to sit at a
8    computer and work all day, he does that in front of us, but he
9    also likes foraging, and he's out there doing that all day long.
10          The environment itself also provides some degree of
11   enrichment.  You know, we have wildlife that the bonobos enjoy
12   chasing off, geese mainly and the unfortunate bunny once in a
13   while, and so we do all of these things to provide.  And then
14   what we do is we assess that.  We assess, hey, are we doing a
15   good job at what we think we're doing a good job of.
16   Q.  Okay.  Since you're getting excited in the explanation, I
17   would just ask you to slow down a little bit for the benefit of
18   the court reporter.
19   A.  Oh, I'm sorry.
20   Q.  How do you assess the emotional state or what you've just
21   described?
22   A.  Well, so, for -- in a number of ways.  The people that take
23   care of the apes on a daily basis discuss how the -- you know,
24   discuss our impressions, subjective impressions of how the apes
25   are feeling that day, their activity level.  We record

1   meticulously how much food they're eating.  Now that it's summer

2   and we have a couple of interns starting, we're also initiating,

3   although it hasn't started yet, basically a study looking at the

4   social interactions of the apes, so where they're spending their

5   time and with who.  We also look at their physical appearance.

6   So if you look at the pictures up here, I mean, for example --

7   Q.  Hold on one second.

8   A.  Sure.

9        MR. MILLER:  Madam court reporter, did you -- excuse

10   me; madam court attendant, did you say there's a device that we

11   could have him point with?

12        THE CLERK:  Yes.

13        THE WITNESS:  Yeah, the screen is really dark.

14        MR. MILLER:  Let me approach here.

15        THE WITNESS:  I can use the screen.

16        MR. MILLER:  Well, I just want you to be able to

17   illustrate for the court --

18        THE CLERK:  May I?

19        MR. MILLER:  Hold on one second, Doctor.

20        (Clerk confering with witness.)

21   BY MR. MILLER:

22   Q.  Dr. Taglialatela, using the demonstrative exhibit and the

23   gesturing tool that the court attendant just showed you, could

24   you explain for the court what you're just about to describe

25   with respect to physical condition?

1   A.   Yeah.   So this is a picture of Kanzi.   Kanzi will be 35 in

2   October, and these are pictures basically from 2011, the one --

3   the picture from 2011 was taken as a still shot from some video.

4   There's a picture from 2013.   And, by the way, I think this is

5   May of 2011.   I don't know about 2013, and this is May of 2015.

6          Okay.   So just a couple of things that I want to

7   highlight with regard to how we assess physical condition of the

8   apes.   You can see Kanzi in this picture, and probably the most

9   obvious thing to anyone who looks at this would notice that

10   Kanzi's physical appearance is largest in the middle picture, in

11   2013.   In 2011 he does seem thinner, but it's not necessarily a

12   good thing.   He's missing hair you can see quite readily over

13   here (indicating), all along his arms, and in addition to

14   missing hair, he's quite ashy, which is an indication that the

15   skin is dry.   Now if this were February, I think it could have

16   been explained, well, maybe it was a particularly bad winter in

17   2011, dry skin.   In my opinion, that's a reflection of diet

18   that's led to that dry skin.   He does also appear to be

19   strangely enough -- this isn't visible in the other pictures, so

20   I can't say a whole lot of it, some redness on his genitals, so

21   I'm not really sure about any of that.

22          But one other thing to notice is that there's very

23   little muscle tone.   I mean, these are apes.   They're strong,

24   powerful animals, and there's very little muscle tone.

25          Now, if you look at the picture -- I'm going to clear

1   this.  If you look at the picture of 2013, okay, Kanzi's skin, I

2   mean, at least from the quality of this picture, seems better.

3   It seems like his hair is coming in a bit more, but he's also,

4   for lack of a better word, enormous.  I mean, an adult male

5   bonobo should weigh approximately 145 pounds.  Kanzi in this

6   picture I would guess is at least 210, morbidly obese by all

7   definitions.  Okay.  The No. 1 cause is heart disease or what --

8   I don't know the technical term for it in captive bonobos.

9   Clearly, this condition is extremely dangerous for Kanzi.

10          Now, if you look at 2015 -- and, again, we just took

11  this picture the other day; I didn't take it, but someone else

12  took it the other day -- couple of things:  Hair and skin are in

13  great condition.  Also what you can see -- and I don't know if

14  it's very clear.  Yeah, I think it's actually clear.  You can

15  see actual muscle tone, and this comes from activity.  I

16  mentioned yesterday we enhanced the facility by building

17  climbing structures indoors and out, by having them do, in

18  addition to all their cognitive and behavioral testing,

19  extractive foraging tasks, tasks that get them moving around in

20  their environment, all right.  That's the kind of things that

21  contribute to the health.

22          And one final thing and, again, maybe this -- I'll

23  admit maybe it may not be a fair comparison given the picture

24  that's up there.  Look at Kanzi's eyes.  They're bright, right,

25  the skin across his face is looking taunt, is looking alive, if

1  you will, and that's one of the measures that you use.

2          MR. STAMBAUGH:  I'll object to the witness's testimony

3  to the extent it calls for a medical opinion.  He's already

4  testified he's not a veterinarian.

5          THE COURT:  Received, subject to the objection.  The

6  answer is in.

7  BY MR. MILLER:

8  Q.  Did you make any observations of the physical health of the

9  other bonobos when you made your return visit in the fall of

10 2013 to the Des Moines facility?

11         MR. STAMBAUGH:  Same objection.

12         THE COURT:  Same ruling.

13 A.  I will say that overall, including Kanzi -- you know, I have

14 the benefit of hindsight when I look at this picture now.  My

15 initial impression in the fall of 2013, especially considering

16 what I was expecting to see, was that the apes were -- you know,

17 they were still there, and that was pretty good, and none of

18 them were exhibiting any obvious signs of physical distress.

19 BY MR. MILLER:

20 Q.  Has their physical condition from your observations changed

21 over time?

22         MR. STAMBAUGH:  Same objection.

23         THE COURT:  Overruled.

24 A.  Yes.

25 BY MR. MILLER:

1  Q.  And how so?

2  A.  I think we can look at the photo of Kanzi, and there are

3  similar ones to be had for the other apes.  When I began,

4  Elikya's skin was not very good at all, and she basically had

5  literally not much hair except for the top of her head.  I don't

6  have it with me, but for those of you who follow us on Facebook

7  would have seen a picture of Elikya just a couple of days before

8  where she's basically unrecognizable from that earlier photo;

9  bright eyes, great looking skins, shiny coats.

10          I've had a number of colleagues visit the facility,

11  these are people that have worked with apes in captive settings

12  for years, decades, not just a visit five days here and only see

13  these bonobos.  I'm talking about individuals that have

14  dedicated their lives, and they have commented.  The one comment

15  we get most often is I cannot believe how good the apes look.

16  Q.  The court record of prior testimony will reflect what it

17  does; but if there's been any claim with respect to the apes not

18  doing well, do you agree with that?

19  A.  No.

20  Q.  Why is that?

21  A.  Well, I guess for the reasons I just gave you.  I mean --

22  Q.  You were in the courtroom yesterday when Mr. Sheldon

23  explained the plan for the Missouri facility, correct?

24  A.  Yes.

25  Q.  Based on your experience and training, what do you think

1  about that plan?

2  A.   I'm sorry, what did I think of the facility?

3  Q.   Yes, based on -- yes, based on your experience and training,

4  what do you think of that plan and facility?

5  A.   I mean, I think that -- before I say anything, I think that,

6  you know, Mr. Sheldon should be commended for the generosity to

7  say the least on what he is willing to put forth.  I think

8  that's really commendable.

9          To be quite frank -- and I also would like to say that

10  I appreciate the perspective of simplifying the building

11  structure as much as possible.  That lowers maintenance costs

12  and also increases probably reliability, right.  It's probably

13  easier to take care of a Toyota than it is a Lamborghini.

14          With that said, in this day and age, the facility is

15  primitive and is not really appropriate for apes.

16  Q.   And why do you say that?

17  A.   You know, I heard talk of large outdoor spaces and outdoor

18  play yards, but we didn't see any -- I haven't seen any pictures

19  of those, and to contain the apes in effectively cages inside of

20  what looks like, you know, a Morton building is, in my mind, not

21  what anyone should be moving towards.  You know, I've spent 11

22  years working at the Yerkes Primate Center, which includes the

23  main center in which the apes are in indoor/outdoor runs that

24  are concrete floors and metal caging, and it's not acceptable.

25  And as far as I can tell from that facility, they don't even

1  have the outdoor part built.

2  Q.  I would like to switch subjects with you --

3  A.  Sure.

4  Q.  -- and talk with you a little bit about research.

5         There's a binder next to you in the --

6         MR. MILLER:  May I approach, Your Honor?

7         THE COURT:  You may.

8         MR. MILLER:  Thank you.

9  BY MR. MILLER:

10  Q.  Dr. Taglialatela, I put in front of you what was previously

11  admitted as Exhibit 1006.

12         Do you see that there?

13  A.  Yes.  ACCI Active Research Protocols?

14  Q.  Correct.  And in preparing for this proceeding, did you

15  alert me that that document was actually out of date?

16  A.  Yes, it is.

17         MR. MILLER:  Your Honor, I have a demonstrative

18  exhibit that I would like to put up on the board that is an

19  update to that exhibit.  I've shown counsel.  Would that be

20  permissible?  I would like to publish that.

21         THE COURT:  You may.

22         MR. MILLER:  Thank you.

23  BY MR. MILLER:

24  Q.  So Exhibit 1006 is list of active research protocols, at

25  least through the date of when that document was produced, with

1   Bonobo Hope and Dr. Savage-Rumbaugh?

2   A.   Yes.

3   Q.   And then if you refer to the board, does the demonstrative

4   exhibit that's been placed on the board there reflect additional

5   research protocols that have been approved since that time?

6   A.   Yes.  It looks like it includes the addition of three

7   protocols, three additional protocols.

8   Q.   Is there additional information that supports each of these

9   proposals?

10  A.   Yes.  These are just a list of names of the PIs, principal

11  investigators, as well as the title of the proposal, I think

12  also, I guess, their animal use protocol number, which is what

13  AUP number stands for, their approval date and their end date.

14  Q.   Generally speaking briefly, what kind of information would

15  back or be behind these protocols?

16  A.   Okay.  The Institutional Animal Care and Use Committee is in

17  place to review research protocols.  So the protocol itself

18  contains everything an individual would need to evaluate both

19  what's going to be done and whether it's important for that

20  research to be done and any potential harm or discomfort to the

21  animals.  So it includes all of the details that a layperson

22  would need to evaluate them.

23  Q.   So that information would have been approved -- or reviewed

24  and approved by the IACUC committee?

25  A.   That is correct.

1  Q.  The IACUC?

2  A.  That's correct.

3  Q.  Did the ACCI agree to voluntarily produce the list in 1006

4  to Bonobo Hope previously?

5  A.  This exhibit?

6  Q.  Not that exhibit, but 1006 which is the one that we actually

7  marked Exhibit 1006.

8  A.  Oh, I'm sorry, I apologize.  I believe so, yes.

9          MR. STAMBAUGH:  I just want to note for the record

10  that counsel is talking about a document -- counsel is showing a

11  document that was not given to counsel for BHI until yesterday,

12  so I believe the witness's testimony that the previous document

13  that we're not looking at on the screen was given to us.  Is

14  that right?

15          MR. MILLER:  That was my understanding.

16  BY MR. MILLER:

17  Q.  Dr. Taglialatela --

18  A.  I'm not sure I followed all of that.

19  Q.  Yes.  Let me make sure it's clear for the court.

20          Exhibit 1006 had been previously produced to Bonobo

21  Hope, correct?

22  A.  That is my understanding, yes.

23          MR. STAMBAUGH:  Correct.  Which is not the document

24  being shown on the screen right now?

25          THE WITNESS:  Yes.

1        MR. MILLER:  So stipulated.

2  BY MR. MILLER:

3  Q.  Have any publications resulted from the research reflected

4  in 1006 or on the update that's on the screen?

5  A.  To my knowledge at this point, no publications.

6  Q.  Why not?

7  A.  Well, if you look at the dates of approval, we -- you know,

8  those are -- the earliest one is the end of April of last year.

9  I mean, research projects take time to collect data, analyze the

10  data, write up the data, submit the paper, and in most cases get

11  the paper back.  So, I mean, it's just that it takes time.  It's

12  too soon.

13  Q.  Are you able to predict when there may be publications?

14  A.  I think we're far enough along on -- and, again, you'll have

15  to bear with me without going into too much detail.  Depending

16  on the journal you submit the paper to, some of them will turn a

17  paper around to you in ten days, and some of them will take four

18  months, so that would be a thing.  But I think we may have

19  something in press, which means it's been accepted but hasn't

20  been released, by the end of the calendar year.

21  Q.  And those would be peer-reviewed publications?

22  A.  Of course.

23  Q.  I think you told the court briefly previously that with

24  respect to your CV that you publish research yourself,

25  Dr. Taglialatela?

1   A.  Yes.

2   Q.  Have you published with Dr. Savage-Rumbaugh in the past?

3   A.  I have.

4   Q.  Do you know when the last article you published with her

5   would have been?  And if you want to refer to your CV, it's

6   Exhibit 1007.  And, Doctor, it should be in the binder right in

7   front of you.

8   A.  The one that's in here?

9   Q.  Yes.

10          MR. MILLER:  Your Honor, while he's looking for that,

11  I would move Exhibit 1007 into evidence.

12                              (Plaintiffs' Exhibit 1007 was

13                               offered in evidence.)

14          THE COURT:  Is there objection to 1007?

15          MR. STAMBAUGH:  Only the objections listed on the

16  pretrial order.  I'll reassert those.

17          THE COURT:  Exhibit 1007 is received, subject to those

18  objections.

19                              (Plaintiffs' Exhibit 1007 was

20                               received in evidence.)

21  A.  Okay.  So I divide my CV because it's standard to do this.

22  Publications are divided into what we would call research

23  papers, which are mostly going to be reporting primary research

24  that I or colleagues have done.  That research would then be

25  peer-reviewed by colleagues, appointed by an editor of a

1  journal, and then published.  This would be what we would call

2  primary data.

3           So that section appears the last paper I coauthored

4  with Dr. Savage-Rumbaugh was published in 2004.

5           I also have a number of book chapters.  Some of those

6  are peer-reviewed, some of them are not.  They're usually more

7  review type -- not really theoretical, but review where you're

8  sort of considering a corpus of data or previously published --

9  actually I don't think this is a complete copy of my CV.  It

10 stops at page 8, and I think it should be like 17 pages.

11          So book chapterwise, it looks like it was 2004, but

12 they're chronological from start to finish, so it could be

13 later.  I don't have it in front of me.

14          MR. MILLER:  Your Honor, may I approach?

15          The copy I have in this notebook has additional pages.

16 I don't know if that was simply an administrative error that we

17 didn't get the full copy in the notebook.

18          THE COURT:  You can show that to him to refresh his

19 recollection.

20 BY MR. MILLER:

21 Q.  I mainly just want to make this available to you.

22 A.  It says 8 of 16.  There's no 9.

23 Q.  Dr. Taglialatela, why have you not published with Dr.

24 Rumbaugh since 2004?

25 A.  We stopped working together in 2004.

1    Q.  Yesterday there was some testimony regarding minimally

2    invasive or invasive research.  I think it's also been referred

3    to as biomedical research at some point in time.  Does that term

4    have meaning to you in your experience?

5    A.  I mean, those terms are very nebulous in my experience, and

6    I think biomedical and invasive should not be the same.

7    Q.  Okay.  Do you have an understanding of invasive research

8    based on your training and expertise?

9    A.  My definition of invasive research would be research that

10   does something to sort of alter the animal, if you will.  So

11   once upon a time -- this hasn't been done in a long time as far

12   as I understand now -- chimpanzees were used for hepatitis B

13   research.  I'm not talking about bonobos.  I'm talking about pan

14   troglodytes.  As part of those procedures, they would take

15   biopsies of their spleens, for example.  That would clearly be

16   defined as a surgery.  It's clearly defined as invasive.

17            I think an argument could be made that withdrawing

18   blood has some degree of invasivity, right, I mean the word

19   coming from invading the body at some level.  I restrict -- I

20   try to avoid the use of the term because it doesn't have a

21   clearly accepted definition; but I would say permanently

22   altering the animal is my definition of invasive.

23   Q.  Do you have -- similarly, do you have an understanding from

24   your experience of what biomedical research has -- or what

25   meaning that has?

1   A.   Yes.  And I will sort of give my definition acknowledging

2   that the common use of the term has a negative connotation that

3   I don't agree with.  In my mind, biomedical research is research

4   that can benefit human health.  That's the biomedical part,

5   okay.  That's not the way it's used conventionally.

6   Q.   And does ACCI have any protocol in place involving invasive

7   research?

8   A.   Invasive research the way I've described it, no.

9   Q.   Does ACCI have any plans to do invasive research?

10  A.   Absolutely not.  In point of fact -- oh, sorry.

11  Q.   Go ahead, please.

12  A.   I think it is -- I'm fairly certain it is illegal to do

13  invasive research on bonobos as dictated by the Endangered

14  Species Act.

15  Q.   Has ACCI taken the lexigram keyboards away from the bonobos?

16  A.   No.

17  Q.   Do you have any understanding where this notion arises?

18  A.   I have no understanding.  That is positively ridiculous.  In

19  fact, we're constantly thinking of new ways to invent, to keep

20  the lexigram keyboard used, you know, as we're thinking of new

21  ways to do it.  If I may, we last summer built a climbing

22  structure, I think I mentioned yesterday, beautiful outdoor play

23  yards.  Bonobos are arboreal, which means they spend time in

24  trees.  They like to be up high, they like to climb, and they

25  like to hang out up high.  There were no climbing structures in

1  these beautiful yards, so we built a climbing structure to see

2  if it would be used.  Well, Kanzi was very excited to see -- or

3  very interested, I should say, to see the Director of Science,

4  the Director of Research, one of our staff member's husbands and

5  a graduate student of mine, you know, with power tools building

6  a climbing structure in his yard.  And when he was inside

7  wanting to be let out, he said a number of things and then said

8  tree house.

9          Now, the tree house was a location that

10  Dr. Savage-Rumbaugh had built in the facility in Atlanta, and it

11  was a place that they would visit, because one of the things

12  that I think probably was consistent with what

13  Dr. Savage-Rumbaugh and I initially had talked about

14  researchwise back when I was in graduate school, you know, 15 or

15  so years ago, was that what I just said, moving around to

16  different spots, looking for food, thinking about whether that

17  food was there the day before or will it be there today or

18  tomorrow.  Dr. Savage-Rumbaugh built basically a mockup of that

19  in Atlanta.  Kanzi had a place called tree house.  Tree house

20  was associated with a food.  If my memory serves, it was

21  bananas.  That's what you find at the tree house.

22          So Kanzi saw us building this structure.  He used his

23  keyboard calling it tree house.  Staff were talking to me that

24  night because we were talking about it, and they told me that

25  story, and I was, like, that's awesome.  I was floored.  And not

1   to mention, we then decided, well, we need to call this thing

2   something, let's call it tree house, and the next morning we

3   painted the lexigram on it for tree house, and it's the tree

4   house and everyone calls it the tree house.

5   Q.  Has anybody from the Bonobo Hope, the BHI board ever asked

6   you if the keyboard had been taken away?

7   A.  No.

8   Q.  Have you banned any form of communication with the bonobos?

9   A.  No, absolutely not.

10  Q.  Do you require the use of face masks and gloves?

11  A.  Absolutely do.

12  Q.  Why?

13  A.  Because the apes are susceptible to respiratory diseases.

14  Dr. Gilmore testified yesterday that Panbanisha died of acute

15  respiratory distress.  I've seen her necropsy report, and I'm

16  not a veterinarian, but I've asked other veterinarians to look

17  at it, and the only thing of concern was her morbid obesity.

18  I'm concerned about the effect that a respiratory illness will

19  have on our colony.

20          Teco before we instituted this policy became gravely

21  ill last May with a respiratory infection.  If it weren't for

22  the heroic efforts of Dr. Gilmore, as well as a pediatric, human

23  pediatric pulmonary specialist, who not only brought his

24  equipment but medicine, quite frankly, I'm not sure Teco would

25  still be here.  Dr. Gilmore saved him based on her heroic

1  efforts, and I've worked with many veterinarians through the

2  course of my career, and what Dr. Gilmore has done was above and

3  beyond what you normally see because of her relationship with

4  the apes.  I don't ever want to repeat that.

5         All of the staff, you know, don't like wearing face

6  masks, but they all understand why we do it.  In fact, probably

7  the biggest person who doesn't like it the most is Dr. Hopkins,

8  but we all do it because it's what's in the best interests of

9  the apes.

10         Now, I will add, with that said, if it's necessary and

11  someone can justify it in their IACUC protocol, we have a

12  provision that allows that it's not be used for certain IACUC

13  protocols, but no one has tried to justify not using face masks,

14  but the IACUC would certainly review it and entertain it.

15  Q.  Have you been in any other forms of interaction with the

16  bonobos?

17  A.  Could you be more specific?  I don't know what --

18  Q.  Are you preventing them from interacting in any way with

19  humans that are working with them?

20  A.  No.

21  Q.  Has ACCI continued to bar Dr. Savage-Rumbaugh from access in

22  the facilities since you've become involved?

23  A.  Yes.

24  Q.  Why?

25  A.  I believe that Dr. Rumbaugh poses a safety risk to the

1  bonobos and to the people that she works with.

2  Q.  What's the basis for that conclusion?

3  A.  The basis for that is my past experiences working with her.

4  Q.  Can you describe briefly for the court what you mean by

5  that?

6  A.  I personally -- and, again, we're going back now to the time

7  that I was in graduate school, between the periods of 1998 and

8  2004 -- have witnessed unsafe practices.  By that I mean locks

9  off of cages, diets not being followed, allowing apes to get out

10 of her control and do, you know, things that either put them in

11 harm or put humans in harm.  I can be specific if you want.

12        And I probably should add that some of that is also

13 based on information that I've directly or indirectly gained

14 subsequent to me accepting this position in December of 2013,

15 and by that I mean documents that refer to protocols being

16 reversed or specific complaints that I've come upon as part of

17 my presence at the facility.

18 Q.  Is there any restriction on BHI members accessing the

19 facility?

20 A.  No.

21 Q.  You've been here in court and heard complaints about

22 accessibility by the board members, is that correct?

23 A.  I have heard that.

24 Q.  Have you ever purposely avoided Bonobo Hope members having

25 access?

1  A.  Absolutely not, and the only meeting, to my recollection,

2  that I postponed was Dr. Laurent Dubreuil's, and it was because

3  I was meeting with you to prepare for this hearing.

4  Q.  Did you meet with Dr. Wildman during his recent visit that

5  he testified about?

6  A.  I did for the entire length of his visit.  I invited him to

7  lunch, but he wanted to get on the road.

8  Q.  Did you put any restrictions on his access to the facility

9  or documents?

10  A.  I did not, and I believe he testified to that.

11  Q.  Did you tell him you would e-mail him something afterwards?

12  A.  Yes.

13  Q.  Did you do that?

14  A.  No, I did not.

15  Q.  Why not?

16  A.  Quite frankly, there were two issues.  One -- and, again,

17  this is not an excuse; it's an explanation.  I have 432 e-mails

18  in my inbox as of this morning.  I simply did not get to that

19  item on my to do list.  He wanted a list of abstracts for grants

20  we've submitted.  It would take some time to pull that all

21  together, and since the time I met with Dr. Wildman, my

22  academic semester ended, so I had to get grades in and grade

23  papers, I submitted a very large grant, and I had to get

24  research graduate students up here and set up for research

25  projects this summer.

1          So I've just -- quite frankly, it hasn't gotten -- I

2   haven't gotten to it yet, and I regret -- you know, I apologize

3   for that.  I said I would do it and I haven't.

4          The other thing he asked for was full IACUC protocols.

5   After reviewing that, it's come to my attention that there's

6   some gray area, but that actually IACUC protocols are

7   confidential and shouldn't be shared with members that are

8   outside of the IACUC.  It's a gray area.  I offered them to him,

9   but I wasn't comfortable at this point e-mailing them to him,

10  and I needed to e-mail him to clarify that, and I haven't had a

11  chance to e-mail him to clarify that.

12  Q.  Do you think Dr. Wildman's testimony accurately described

13  your discussion with him?

14  A.  I'm sorry.  Could you --

15  Q.  Sure.  Do you believe his testimony accurately described

16  your discussion with him?

17          MR. STAMBAUGH:  Objection; inadmissible character

18  evidence.  That's the province of the court to weigh a witness's

19  credibility.

20          THE COURT:  I'll receive it, subject to the objection.

21  A.  To be honest with you, I'm trying to recall.  Maybe if you

22  would ask me specifics.

23  BY MR. MILLER:

24  Q.  He testified that you provided some sort of statement with

25  respect to assurances that you were being required to give.

1          Do you recall that testimony?

2          MR. STAMBAUGH:   Objection, misstates the record.

3  BY MR. MILLER:

4  Q.   If you don't recall, we'll just move on.

5  A.   Assurances with regards to?

6  Q.   Your institutions.  I believe he said -- he made some point

7  with respect to institutions multiple.

8  A.   No, I don't recall that, and I think he was -- you know,

9  assuming that somehow Kennesaw or the Yerkes Primate Center --

10  so the Yerkes Primate Center is not funding ACCI at all at this

11  point in time.  They have literally given us absolutely not a

12  single dollar.  So Kennesaw State University, my university, has

13  given us money both in forms of pilot grants to me and bridging

14  funds and monies from this consortium agreement which I

15  described earlier.

16          So the suggestion that the Yerkes Primate Center is

17  now contributing financially to ACCI at this point in time is

18  absolutely false.

19  Q.   Are there plans for one or more BHI members to visit the

20  Des Moines facility tomorrow?

21  A.   Yes.  I had to postpone Laurent Dubreuil's visit which I

22  think was originally scheduled for the 26th.  I asked him to

23  come tomorrow.  Dr. Coxe contacted me about -- Dr. Sally Coxe

24  contacted me about visiting.  I asked her to come tomorrow when

25  the hearing was concluded.  She has agreed.  I don't know if

1  we've decided on a final time, but we can work that out, and she

2  will come and visit tomorrow.  I extended that same invitation

3  to Dr. Dubreuil.  He has not at this point in time responded to

4  me yet.  Dr. Roffman similarly, and I know he would have had to

5  extend his visit, but I have extended that invitation to him,

6  but I haven't heard confirmation that he will be here.

7  Q.  And did a Dr. Tuttle also make a visit to the facility?

8  A.  Yes, he did.  He's not a member of BHI, but he did make a

9  visit yesterday.

10  Q.  When the BHI members presumably visit, will they have an

11  opportunity to review the active research protocols during that

12  visit?

13  A.  Uh-huh.

14  Q.  Is that a "yes"?

15  A.  Yes, of course.  I'm sorry.

16  Q.  You've been in the courtroom when you've heard various

17  witnesses explain their concerns with respect to Dr. Rumbaugh's

18  research trajectory being respected, is that correct?

19  A.  Yes.

20  Q.  Do you agree with that?

21  A.  Do I agree with that?

22          MR. STAMBAUGH:  Objection; vague and ambiguous.  Agree

23  with what?

24  BY MR. MILLER:

25  Q.  Sure.  Do you agree that ACCI has jettisoned, rejected,

1  destroyed Dr. Savage-Rumbaugh's research trajectory?

2  A.  Absolutely not.

3  Q.  Do you disagree with Dr. Rumbaugh's past research?

4  A.  No.

5  Q.  Do you disagree with the aspects of her past relations with

6  the bonobos?

7  A.  Yes.

8  Q.  Why is that?

9  A.  You know, let's look at what I would consider to be the sort

10  of most recent peer-reviewed publications that

11  Dr. Savage-Rumbaugh has produced.  It probably takes us back to

12  1993, which was a monograph that was produced on Kanzi's English

13  comprehension.  There may be a couple of things after that, but

14  I'm just focusing possibly on the main largest corpus of her

15  work.  This is absolutely groundbreaking work, okay.  Through

16  meticulous data collection, controls, they -- Sue and

17  colleagues -- I'm sorry, excuse me; Dr. Savage-Rumbaugh and

18  colleagues discovered that a nonhuman animal, a nonhuman ape was

19  capable of comprehending spoken English.  Yes, Kanzi uses

20  lexigrams.  He probably uses lexigram to a greater extent than

21  previous apes that have been looked at, but he understands

22  spoken English and not just simple word identification but novel

23  sentences.

24          So if you ask Kanzi a question, can you put the keys

25  in the refrigerator, right, something theoretically Kanzi would

1   never hear before or never heard before, he can do that, right;

2   absolutely groundbreaking work.  It was published in a

3   peer-reviewed publication in 1993, I think the Monograph Society

4   for Child Development if I have that correct.

5         So I don't disagree with the profound findings.

6   Actually before that, in the mid 1980s, Dr. Savage-Rumbaugh

7   published a paper that I believe appeared in the Journal of

8   Science documenting the abilities of two chimpanzees, Sherman

9   and Austin, to exchange lexigrams, to identify items, perhaps --

10  you know, it's a subjective impression which one was the more

11  profound finding.  Both of them are quite amazing, okay.

12        What I -- there's a famous scientist by the name of

13  Harry Harlow.  Many of you have probably heard about him.  For

14  those of you who did, I'll be very brief.  Harry Harlow took

15  monkeys and separated infants separated from their moms, put

16  them on a wire rack with a nipple that gave milk and looked at

17  the effects that that had on the developing individual neonate

18  monkey, okay.  Now, everyone is probably thinking, well, that

19  sounds cruel.  At the time no one really knew what would happen

20  when you did that.  There was a debate ranging in this company

21  about whether nature or nurture was more important.  Well, Harry

22  Harlow did that, and we found out it is devastating to the

23  emotional and neurological development of an organism when you

24  do that type of thing.

25        Now, are we going to get -- I mean, that was his work,

1   and it was really important that we all learned that; but if a

2   person came to you and said, hey, could we do this again, you

3   would probably say no, right?

4           I disagree with the idea of taking a bonobo even for

5   part of the day, rearing it with humans, for any reason, because

6   I think that the detriment to the individual animal, all right,

7   is not justified by the benefit you get from the science to

8   either our understanding of our place in the universe or for

9   biomedical or public health relevance.

10  Q.  I'm going to ask you a few questions.  If you need to refer

11  to Exhibit 1006 or the demonstrative that's in front of you, I

12  ask that you do that.

13  A.  Okay.

14  Q.  Do the bonobos at the facility in Des Moines continue to be

15  involved in research in the field of experimental psychology?

16  A.  Yes.

17  Q.  What active research protocols involve experimental

18  psychology?

19  A.  Experimental psychology is a pretty broad stroke, but I

20  would say specifically these three that are on the bottom part

21  of this table here, so these three here would certainly fit into

22  that context.

23  Q.  Can you give us the title of those?

24  A.  Oh, I'm sorry.  "Using Virtual Reality to Investigate the

25  Spacial Cognitive Abilities of Bonobos" would certainly fall

1   into experimental psychology.

2   Q.   You need to slow down.

3   A.   I'm sorry, I forgot.

4   Q.   Go ahead.  And the second one?

5   A.   "Using Virtual Reality to Investigate the Spacial Cognitive

6   Abilities of Bonobos."

7   Q.   I'm sorry, I wanted to refer you to the second one.

8   A.   Okay.  "Do Bonobos Make Inductive Inferences About

9   Nonvisible Properties of Object Categories."

10  Q.   And the third is nonhuman primate SNARC effect?

11  A.   Yeah.  That would be SNARC effect.

12  Q.   What is the SNARC effect?

13  A.   I was afraid you would ask me this.

14  Q.   Well, I --

15  A.   For the record, I'm not an experimental psychologist.

16          It's basically the priming effect you would get.  If I

17  were to order numbers for you on a page and I had 1, 2, 3, 4,

18  you would have this expectancy given that we read English from

19  left to right that 1 would be on the left and 10 would be on the

20  right, for example.  So it's basically a computer-based testing

21  to sort of see if the apes have a sort of similar bias, if you

22  will.

23  Q.   Other than IACUC approval, is there anything barring

24  research in the area of experimental psychology at the facility?

25  A.   No.

1  Q.  Do the bonobos at the facility continue to be involved in

2  research in the field of use of language and tools?

3  A.  Absolutely.

4  Q.  What active research protocols involve those areas?

5  A.  You said language and tools?

6  Q.  Correct.

7  A.  So the first six in the actual exhibit.

8  Q.  On Exhibit 1006?

9  A.  Uh-huh.

10 Q.  And other than IACUC approval, is there anything barring

11 research in the field of use of language and tools at the

12 facility?

13 A.  No.  In fact, I've had a scientist recently contact me about

14 the recent discovery that Dr. Wildman mentioned that they found

15 stone tools that were three-and-a-half million years old.  We're

16 working to develop protocol for them because they want to come

17 and bring some of those exact core stones and see if we can do

18 some of that stone tool work here to see what the apes can

19 produce.

20 Q.  Do the bonobos at the facility continue to be involved in

21 research in the field of ape intelligence and human cultural

22 modes?

23 A.  Yes.

24 Q.  What active research protocols involve those areas?

25 A.  So human cultural modes is a really big topic.  I would say

1   without a doubt rhythmic entrainment in bonobo apes at ACCI

2   would certainly be a cultural move because rhythmic entrainment

3   is basically -- I mean, it's drumming.

4           What was the first part of that?  I'm sorry.

5   Q.  We're looking at --

6   A.  Something in cultural modes?

7   Q.  Use of language -- or excuse me, field of ape intelligence

8   and human cultural modes.

9   A.  The one entitled "Theory of Mind in Language Competent

10  Bonobos," for those of you that don't know, the theory of mind

11  is basically the idea that you have knowledge states that you

12  know are different from other individuals, and that's the theory

13  of mind, and so we're looking at that as well.

14          And "The Large-Scale Comparison of Cognition and

15  Communication in the Animal Kingdom" as well.  And I guess, to

16  some extent, "New Insights into Human Origins through the Study

17  of Linguistically Competent Bonobos."

18  Q.  You mentioned a moment ago moment rhythmic entrainment in

19  bonobo apes, et cetera?

20  A.  Yes.

21  Q.  Is that a continuation of a study that the PI, Patricia

22  Gray, had begun with Dr. Savage-Rumbaugh?

23  A.  It is my understanding it is.  She's also worked I think at

24  the Jacksonville Zoo with bonobos there.

25  Q.  Other than IACUC approval, is there anything barring

1  research in the field of ape intelligence and human cultural

2  modes at the ACCI facility?

3  A.  No.

4  Q.  Would you welcome a proposal to the IACUC for research in

5  these areas from a member of BHI?

6  A.  Yes.

7  Q.  And you've told this to the BHI board in the past?

8  A.  I believe that I wrote an e-mail that it may not have

9  included all members of BHI, but it at least included Carmen

10  Mate, the chair, and Itai Roffman that, to the best of my

11  recollection, indicated that -- that gave them the protocol form

12  and indicated what would be required.

13  Q.  And Dr. Roffman mentioned he may be preparing this

14  submission to the IACUC?

15  A.  My understanding, he is.  It's not a trivial form, so it

16  would take some time.  So the fact that I haven't heard back

17  from him after I sent it to him is not surprising at all.

18  Q.  Any other proposals to the IACUC committee been made by the

19  BHI board?

20  A.  No, they have not.

21        MR. MILLER:  That's all my questions.

22        I'll pass the witness.

23        THE COURT:  I think we'll take our mid-morning recess

24  at this time.  We'll be in recess for 15 minutes.

25        (Recess at 10:21 a.m., until 10:38 a.m.)

1        THE COURT:  Be seated, please.

2        Cross-examination.

3        MR. STAMBAUGH:  Thank you, Your Honor.

4                     CROSS-EXAMINATION

5   BY MR. STAMBAUGH:

6   Q.  If you'll indulge me, Dr. Taglialatela, I know your counsel

7   was sitting down; but from where I come from, we stand up when

8   we examine witnesses.

9   A.  That's fine; cultural differences.

10  Q.  I understand your students call you Dr. Tag?

11  A.  Yes.

12  Q.  Do you have any problem if I call you Dr. Tag?

13  A.  No; only if you consider yourself my student.  No, I'm just

14  kidding.  That's fine.

15  Q.  I would be happy to some day.  That would be my pleasure.

16       Dr. Tag, during your direct examination you gave the

17  court a nice visual depiction of the facility here in

18  Des Moines, is that right?

19  A.  Yes.

20  Q.  It is a big space?

21  A.  Yes.

22  Q.  It is a nice space?

23  A.  Yes.

24  Q.  You didn't build it?

25  A.  No, not at all.

1  Q.  You didn't design it?

2  A.  No, not at all.

3  Q.  In fact, you were just appointed as the Director of Science

4  of an organization that co-operates it, correct?

5  A.  Director of Research and I think we -- well, I wouldn't say

6  we co-operate it.  ACCI operates the facility, yes; but no, I

7  didn't build it.

8  Q.  The only reason you are the Director of Research at ACCI is

9  because Dr. Sue Savage-Rumbaugh recommended that you be

10 appointed to that position, correct?

11 A.  That is not correct.

12 Q.  Why isn't that correct?

13 A.  Well, for starters, I don't think that's the only reason.

14 That may be part of the initial introduction, and to be quite

15 frank, if Dr. Savage-Rumbaugh had written me an e-mail to come

16 visit the facility, I wouldn't have.  I visited because

17 Dr. Duane Rumbaugh asked me to come visit the facility, and

18 that's why I did.

19         There's about two-and-a-half months between me

20 visiting that facility and taking on an official role at that

21 organization.  So I guess that's why my answer is what it is.

22 Q.  And you understand Dr. Sue Savage-Rumbaugh wrote a letter

23 recommending you for that position, is that right?

24 A.  I do, yes.

25 Q.  Did you receive a copy of that letter?

1  A.  I did.

2  Q.  You don't want Dr. Rumbaugh in the lab anymore, though, do

3  you?

4  A.  Dr. Savage-Rumbaugh?

5  Q.  Dr. Sue Savage-Rumbaugh.

6  A.  No.

7  Q.  That would hurt your career, wouldn't it, Dr. Tag?

8  A.  Not at all.

9  Q.  It's your testimony here today that having

10  Dr. Savage-Rumbaugh in the lab would not hurt your career?

11  A.  Would hurt my career?

12  Q.  Correct.

13  A.  I don't know how to evaluate the statement of whether or not

14  it would hurt my career.

15  Q.  I thought a second ago you testified that it would not.  So

16  let's make sure the record is clear.

17  A.  Okay.  I'll stand by that.  I'm explaining myself.  It would

18  not --

19  Q.  Dr. Taglialatela --

20  A.  -- not hurt my career.  I don't know how it would hurt my

21  career.

22  Q.  Let's get this straight.  It would not hurt your career?

23  A.  No.

24  Q.  But you don't know how it would hurt your career?

25  A.  Let me restate --

1   Q.  Let me ask you a better question, Dr. Tag.

2   A.  Yes.

3   Q.  You have a professional financial investment in the outcome

4   of this case, isn't that correct?

5   A.  Can you restate that?

6   Q.  Sure.  And it's a simple question.  I'm just wondering if

7   you can explain to the court whether or not you have a direct

8   professional investment in the outcome of this case.  If these

9   bonobos are relocated, Dr. Tag, would that hurt your career?

10  A.  Quite frankly, if these bonobos are relocated, no, it

11  doesn't hurt my career.

12  Q.  So you would have no objection to them being relocated?

13  A.  No.  I would have an objection to them being relocated.  Do

14  you want me to explain why?

15          I have an objection to having these bonobos being

16  relocated because if these bonobos are relocated, in all

17  likelihood, I would fear for the grave outcomes it would have on

18  their welfare, okay.  I'm not paid, I haven't been paid, I don't

19  get money from summer support for grants to support this.  In

20  point of fact, I've spent about $2,500 of my discretionary

21  account which I get from the university as part of indirects

22  that are given back to me from the university to fly back and

23  forth.  I've spent, you know, 90-something days or more away

24  from my family.  I got involved in this endeavor for one reason,

25  with regards to those bonobos, which is for their welfare.  And

1   to be quite frank, no one else would do it, and the reason no

2   one else would do it is because of this situation we're in right

3   now.  Everyone I spoke to and sought counsel on advised me,

4   she's never going to stop, just give up.  You're crazy to do

5   this.  And I looked at the bonobos and thought I might have a

6   real chance because she told me she wasn't -- "she" being

7   Dr. Savage-Rumbaugh, told me she wasn't involved, told me she

8   was done.  Duane Rumbaugh corroborated that, and that's why I

9   agreed, perhaps foolishly, to get involved in the beginning.

10          So no, if the bonobos are relocated, it doesn't hurt

11   my career.

12   Q.  And we'll take a little bit of a closer look at what

13   Dr. Savage-Rumbaugh actually said to you regarding her

14   involvement.

15   A.  Okay.

16   Q.  I want to go back to my earlier question.  You mentioned

17   that Dr. Savage-Rumbaugh's involvement with these bonobos

18   currently wouldn't necessarily hurt your career, is that right?

19   A.  Yes.

20   Q.  So you have no objection to Dr. Savage-Rumbaugh being

21   involved in the research at ACCI's facility?

22   A.  I do have an objection to Dr. Savage-Rumbaugh being involved

23   in the research.

24   Q.  So, Dr. Tag, it's your testimony for the court here today

25   that despite you thinking it may have been a poor decision, you

1  were the only one on the planet who was capable and ready to

2  take care of these bonobos, is that right?

3  A.  I would not argue capable.  I would say that I was the only

4  one who was willing and ready to do it.

5  Q.  And as we sit here today on May 29, 2015, it's your

6  testimony for the court that you are the only one who is ready

7  and willing to take care of these bonobos, is that right?

8  A.  I have a co-director, Dr. Hopkins, so I would --

9  Q.  So there's two people in the country who are ready and

10  willing to take care of these bonobos.  Thankfully it's Dr. Tag

11  and Dr. Hopkins?

12  A.  Let me say it this way.  There are two people in the country

13  that have the expertise and the resources necessary to take care

14  of these bonobos that are also willing to do it.

15  Q.  And that's you and Dr. Hopkins?

16  A.  That's my testimony.

17  Q.  Nobody else at any other research institutions?

18  A.  I mean, I haven't polled everyone.  I would be welcome to

19  polling people, but -- sometimes I feel like I want to poll

20  people.

21  Q.  What about Dr. Savage-Rumbaugh, does she have the

22  qualifications?

23  A.  No.

24  Q.  She doesn't have the qualifications to care for these

25  bonobos; that's your testimony?

1  A.  That is my testimony.

2  Q.  Now, Dr. Tag, I'm sure the court is wondering and the

3  question in my mind is, you're the first and only witness who's

4  made that statement here during this proceeding, and you've been

5  sitting here listening to the testimony.

6         Does that surprise you that you are the only person

7  currently in control of these bonobos who has that opinion that

8  Dr. Sue Savage-Rumbaugh is unable to care for these bonobos?

9  A.  I don't recall you asking anyone else; but with that said,

10 you know, there's a reason -- the folks that were -- there

11 weren't anyone who would be qualified to make that statement

12 that you brought into the witness box -- I'm sorry, whatever

13 this place is called, except for Dr. Gilmore.

14 Q.  So you and Dr. Gilmore are the only ones qualified?

15 A.  To make a determination of whether or not

16 Dr. Savage-Rumbaugh is qualified to take care of the bonobos?

17 Q.  Correct.

18 A.  Out of all of the people that have been in this seat that I

19 am in right now, yes.

20 Q.  Okay.  Do you know who Dr. Russ Tuttle is?

21 A.  I do.

22 Q.  And you would agree with me that Dr. Russ Tuttle is one of

23 the foremost primatologists in the world, is that correct?

24 A.  He's certainly -- I don't know if one of the foremost, but

25 he's certainly a very well known primatologist.

1  Q.  You believe that Dr. Russ Tuttle's opinions with respect to

2  primatology should be respected?

3  A.  I do.

4  Q.  And that those opinions should be listened to?

5  A.  Yes.

6  Q.  Now, you testified about this facility and the beautiful

7  outdoor grounds, is that right?

8  A.  Uh-huh.

9  Q.  The play yard?

10 A.  Yes.

11 Q.  You told the court that it was important for these bonobos

12 to be in trees to forage and they are -- let me get it straight.

13 I'm not a scientist?

14 A.  I don't think I said that.  I don't think I said trees.

15 Q.  Arboreal?

16 A.  Yes.

17 Q.  Is that the word?

18 A.  I said they are arboreal.  They like to climb and be up

19 high, yes.

20 Q.  Okay.  Do they actually go into the forest, though, in the

21 facility?

22 A.  They do not.  They have their -- I guess depending upon your

23 definition of the forest, my definition of the forest does not

24 accurately describe those two bonobo yards.

25 Q.  Your definition of the forest doesn't include trees?

1  A.  No.  The bonobo yards are not forest.  A forest includes

2  trees.

3  Q.  You said it was important for them to go in the trees,

4  though?

5  A.  No, I didn't say that.  I said they are arboreal in the

6  wild.  It's important for them to climb and go up high.

7  Q.  Okay.  But not necessarily --

8  A.  I think the record will reflect that's what I said.

9  Q.  Not necessarily in trees?

10 A.  No, not necessarily in trees.

11 Q.  So you described this wonderful facility with lots of acres.

12 They don't go in the forest, is that right?

13 A.  They do not go in the forest.  I will add that the

14 chimpanzees that we hope to bring there have a yard that's

15 eight-and-a-half acres that could be described as a forest given

16 that it has hardwood trees on it.  In fact, I think we call it

17 the chimpanzee forested yard.

18 Q.  You mentioned an infirmary, is that right?

19 A.  I did not mention an infirmary.

20 Q.  During your testimony yesterday?

21 A.  I may have.

22 Q.  Okay.

23 A.  Yeah, it was one of the improvements that we're planning for

24 the building.  I don't actually remember me mentioning it, but --

25 Q.  It's not actually functional right now, is it?

1  A.  It is.  We are at the point now where we are trying to fund

2  its construction.  Given the space, we don't actually have a

3  whole lot to do.  It's a lot of outfitting it with equipment.

4  The modifications required to actually -- there's no major

5  structural modifications that need to be done.  We need to

6  acquire additional equipment and have it installed.

7  Q.  And, Dr. Tag, it will help us be more efficient here today

8  if you just answer the question that I'm asking.

9  A.  Okay.

10  Q.  And my specific question was, it's true that the infirmary

11  is not functional today, isn't that right?

12  A.  That is correct.

13  Q.  Okay.  It's true that one of the lexigram keyboards is not

14  fully functional today, isn't that right?

15  A.  I don't -- no, that's not correct.  One of the lexigram

16  keyboards?  The majority of the lexigram keyboards are pieces of

17  paper.  As far as I know, pieces of paper don't have any lack of

18  functionality, unless they're no longer available or destroyed,

19  so --

20  Q.  With respect to the electronic ones, is it your testimony

21  that they're all fully functional?

22  A.  There are two electronic ones, and to the best of my

23  knowledge, both are fully functional.

24  Q.  Dr. Tag, earlier in your direct testimony, you specifically

25  said that you didn't believe that you were voted on to the IPLS

1  board, is that correct?

2  A.  To the best of my knowledge, I've never been a member of

3  that board.

4  Q.  Okay.  I am going to go ahead and identify for you Exhibit

5  54 and take a look at that large notebook.

6  A.  I don't know if I can lift it.

7  Q.  Go ahead and turn to Exhibit 54.

8         Do you have Exhibit 54 in front of you?

9  A.  I'm not there yet.

10        Okay.  Yes, I'm there.

11  Q.  Exhibit 54 appears to be minutes of a board meeting for the

12  Iowa Primary Learning Sanctuary, and you understand that to be

13  IPLS, correct?

14  A.  Yes.

15  Q.  And on the first page of these minutes, it says, the

16  following officers were elected, and it includes Jared

17  Taglialatela as vice president.

18        Do you see that?

19  A.  I do see that.

20  Q.  Would you go ahead and flip to Exhibit 55.

21        Do you see Exhibit 55?

22  A.  Yes, I'm here.

23  Q.  And these are, again, minutes by unanimous consent of

24  December 18, 2013 reorganizational meeting of IPLS, correct?

25  A.  That's what is stated at the top.

1  Q.  And then on the second page, it says that you, Jared

2  Taglialatela, shall be appointed to scientific program manager,

3  is that right?

4  A.  That's what it says, yes.

5  Q.  And that's of IPLS, is that correct?

6  A.  It looks like it, yeah.

7  Q.  So that's something that you were mistaken about in your

8  direct?

9  A.  I said to the best of my knowledge.  I mean, the first

10 document is not signed; but, you know, I said to the best of my

11 knowledge, I was never elected to IPLS.

12 Q.  And, Dr. Tag, that testimony was mistaken, correct?

13 A.  To the best of my knowledge, I was never a member of IPLS.

14 Q.  Okay.  As we see here in these exhibits, that testimony was

15 mistaken, is that right?

16 A.  Well, to be quite honest, I don't know that that testimony

17 is not correct because still, to the best of my knowledge, I

18 would have to consult with someone who could verify -- I've

19 never -- to the best of my knowledge, I've never seen this

20 document before, and so --

21 Q.  Let's talk about some other documents that you may not have

22 seen.

23 A.  Okay.

24 Q.  Prior to being appointed to the Director of Research --

25 A.  Yes.

1  Q.  -- for ACCI --

2  A.  Yes.

3  Q.  -- had you ever seen the settlement agreements that were

4  approved by this court?

5  A.  I don't believe that I have -- that I had clearly seen them,

6  no.

7  Q.  And you hadn't read the research provisions that were

8  included in those settlement agreements prior to accepting your

9  position as Director of Research at ACCI, correct?

10 A.  To be quite frank, I don't recall when I first saw the

11 settlement agreements.  If I didn't see them before, I clearly

12 didn't read the research provision.

13 Q.  So you clearly didn't rely on them when you assumed this

14 role?

15 A.  Again, if I didn't see them before, I didn't -- I haven't

16 read them, I wouldn't have relied on them.

17 Q.  So if you didn't see them, you wouldn't have read them, and

18 if you hadn't read them, you wouldn't have relied on them?

19 A.  Yes.

20 Q.  Correct?

21 A.  Yes.

22 Q.  You wouldn't have incorporated any of the information in the

23 settlement agreements into your understanding of what your role

24 was, correct?

25 A.  My understanding at the time, to the best of my

1  recollection, of what my role is, what Dr. Savage-Rumbaugh and I

2  talked about over the phone, what was written in e-mails to me

3  and what my discussions with the then board was, were, and that

4  was to take the research in the directions that we saw fit.

5  Q.  I appreciate that.  That's interesting.

6           Dr. Tag, you had a chance to say that when you spoke

7  with Mr. Miller.  My question is, you didn't incorporate any of

8  the information from the settlement agreements approved by this

9  court into your understanding of your role as Director of

10 Research of ACCI, isn't that correct?

11 A.  Yes.

12 Q.  You don't know what the research agreements -- excuse me,

13 what the settlement agreements said about co-ownership, correct,

14 prior to assuming this position?

15 A.  Again, to the best of my recollection, it's possible I did

16 see the settlement agreements before December 18, 2013.  To the

17 best of my recollection, the answer is no.

18 Q.  And you've made that very clear and we understand.  All I

19 can ask for is the best of your recollection.

20 A.  Okay.

21 Q.  You didn't know what the settlement agreements said about

22 co-ownership prior to accepting that position, correct?

23 A.  That is to the best of my recollection, yes.

24 Q.  You didn't know what the settlement agreements said about

25 the emotional welfare, the physical welfare of these bonobos

1  prior to accepting your position, isn't that correct?

2  A.  Again, yes.

3  Q.  You don't know what the settlement agreement says about the

4  research trajectory -- no reason to roll your eyes.

5  A.  I'm sorry.

6  Q.  I want to make sure that we have a clear record here.

7  A.  I apologize.

8  Q.  You don't know what the settlement agreement said about

9  research trajectory before accepting your position?

10  A.  I didn't know what the settlement agreement said about

11  anything if I hadn't seen it before December 18, 2013.

12  Q.  Your counsel, Mr. Miller, talked about boundaries in his

13  opening statement.

14          Do you remember that?

15  A.  I do.

16  Q.  Dr. Tag, do you think that you're bound by these settlement

17  agreements in your current position at ACCI?

18  A.  I've been advised that I am.

19  Q.  That's your understanding?

20  A.  Yes.

21  Q.  And you can testify to the court you believe you're bound by

22  these settlement agreements?

23  A.  Again, that's what I've been advised, yes.

24  Q.  But you don't know what was in them prior to accepting this

25  role at ACCI?

1    A.   Right.

2    Q.   Now, Dr. Tag, we talked about -- Mr. Miller talked with you

3    about the Yerkes Research Center?

4    A.   Yerkes National Primate Research Center.

5    Q.   Yerkes National Primate Research Center?

6    A.   That's right.

7    Q.   Do they use an acronym or has it always just been Yerkes?

8    A.   Just Yerkes.

9    Q.   You told Mr. Miller yesterday, I believe, that you don't

10   believe there's been any assurances by ACCI that they have

11   promised Yerkes that the Rumbaughs wouldn't be involved, isn't

12   that right?

13   A.   I told them that there was a caveat to that because the

14   initial statement -- the initial questionnaire was distributed,

15   was asked to be completed.  I wasn't charged with that answer

16   because we divided it up, and I think the first question, if I'm

17   not mistaken, was do Dr. Sue Savage-Rumbaugh or Dr. Duane

18   Rumbaugh have any involvement, and then there was some second

19   clause which I thought was in Lyle Simpson's, Mr. Simpson's

20   testimony.  And, to be quite frank, I can't remember the

21   wording, but it said something to the effect of any future

22   involvement of those two individuals.

23        I don't recall the answer that was given, but given

24   that context of that document -- and I hope I'm still answering

25   your question -- Dr. Savage-Rumbaugh was not at the facility,

1   was not involved.  So we simply -- I'm guessing what we simply

2   would have answered or what I would have advised at the time was

3   that Dr. Savage-Rumbaugh is not involved.  So just say she's not

4   involved.  She's living in New Jersey.  That's what we all knew

5   to be the truth.

6   Q.  Okay.  And I don't think you answered my question, and I'll

7   ask respectfully again, because we're under time constraints, if

8   you could focus on the question I asked.

9   A.  I'm doing my best.

10  Q.  Yesterday you testified that you didn't fill out that

11  questionnaire, is that right?

12  A.  I didn't fill out that answer.

13  Q.  Today, just 30 seconds ago, we heard a little bit of

14  discussion about what you think they might have answered if you

15  advised at the time.  I want to be very clear.  Did you fill out

16  the questionnaire?

17  A.  I filled out part of the questionnaire.

18  Q.  Did you fill out that question regarding the Rumbaughs?

19  A.  To the best of my recollection, no.

20  Q.  Do you know what the answer was given then by ACCI?

21  A.  To the best of my recollection is the details I just gave

22  you, which I think you're now telling me not to give you.

23  Q.  Dr. Tag, do you know who responded to that question in the

24  questionnaire?

25  A.  I don't off the top of my head.  In all likelihood -- would

1  you like me to speculate?

2  Q.  I don't need you to speculate.  Can you tell us here today

3  who filled it out?

4  A.  I don't know.

5  Q.  Did you ever see the answer to that question after it was

6  completed?

7  A.  I probably did, and I don't know -- I don't recall it at the

8  time.

9  Q.  So you can't tell us here today what ACCI's response was to

10  that question by Yerkes regarding the Rumbaughs' involvement in

11  the research, correct?

12  A.  With certainty I cannot.

13  Q.  Well, you can't tell us with any reasonable indication of

14  what it might be; you don't know one way or the other?

15  A.  Well --

16  Q.  Correct?

17  A.  I'm not trying to be difficult.  No, that's not correct.  I

18  asked you earlier, you said the best thing you can ask me for is

19  my best recollection.  I have a vague recollection of some

20  discussion of that answer.  I wasn't the one who was responsible

21  for preparing it.

22          I'm just trying to answer your question as honestly as

23  I can.  I mean --

24  Q.  I appreciate that because we didn't hear that testimony

25  yesterday, okay.  So I want to be very clear.  Yesterday you

1   testified you didn't fill out the response to that question.

2   A.   Yes.

3   Q.   Okay.  That was your testimony again here today?

4   A.   Yes.

5   Q.   You didn't fill it out?

6   A.   Yes.

7   Q.   You don't know with certainty who did fill it out?

8   A.   Yes.

9   Q.   And you don't know if you ever saw it after it was filled

10  out?

11  A.   I'm sure I saw it after it was filled out because I'm sure

12  someone sent it to me saying, are we okay to send these?

13  Q.   So because the court didn't hear that testimony yesterday,

14  could you tell us what the response said?

15  A.   With certainty I cannot tell you what the response said.

16  Q.   Do you have any specific recollection of what this response

17  to this specific question said, Dr. Tag?

18  A.   I think I said that.  I think that it probably said that

19  Dr. Savage-Rumbaugh wasn't there, was no longer with -- or

20  wasn't with our organization and was living in New Jersey.

21  Q.   So ACCI did assure Yerkes that the Rumbaughs -- Dr.

22  Savage-Rumbaugh was not working at the Great Ape Trust?

23  A.   I don't see how that's an assurance.  That's a statement of

24  fact.

25  Q.   In fact, it's your impression that Dr. Sue Savage-Rumbaugh

1  being absent from the lab is a condition of Yerkes sending any

2  apes to the Great Ape Trust, isn't that correct?

3  A.  That is not correct.  But, if I may, I think that given that

4  we've told them that, it would be quite -- you know, it might be

5  an issue if we were to change, reverse our position on that.

6  Q.  But, Dr. Tag, it was your impression that it was necessary

7  for you to make that representation to them, isn't that correct?

8  A.  I don't believe that is correct.  It was a statement of

9  fact.

10  Q.  Dr. Tag, did you give a deposition in this case?

11  A.  Yes, I did.

12  Q.  Did you promise to tell the truth in that deposition?

13  A.  I did.

14  Q.  And you've had an opportunity to review your transcript

15  after it was finished?

16  A.  I have, yes.

17  Q.  There's a copy of your transcript on the ledge right there.

18  I'm going to draw your attention to page 119 in your deposition

19  transcript.

20  A.  Okay.

21  Q.  Are you at page 119?

22  A.  I am.

23  Q.  Now, on page 119 you were asked:

24        "Q.  Has Yerkes conditioned any proposals or contracts

25    or agreements with ACCI on Doctor Rumbaugh having no access

1    to the bonobos in Des Moines?

2         "A.  Not formally, but initial discussions --

3    initially there was a discussion between myself, Doctor

4    Hopkins, and members of Yerkes, say, executive staff or

5    whatever.  At that time Doctor Rumbaugh had no involvement.

6    We made it clear to them that that was the case.

7         "Q.  Was it necessary for you to make that clear to

8    them?

9         "A.  It was -- I was of the impression it was

10   necessary."

11        Did I read that accurately?

12   A.  You did.

13   Q.  So at the time of your deposition you had the impression

14   that it was --

15   A.  Apparently I did.

16   Q.  Well, apparently at the time of your deposition?

17   A.  That's what it says right here, it was, I was of the

18   impression it was necessary.

19   Q.  Is that true today?  Is it necessary --

20   A.  Didn't I just answer the question?

21   Q.  I'm sorry?

22   A.  I just answered that question.

23   Q.  I'm asking, is it true today that Doctor -- that it's

24   necessary that you made clear to Yerkes that Dr. Savage-Rumbaugh

25   be banned from the lab as a condition of them sending any

1  chimpanzees or working with the Great Ape Trust?

2  A.  Can you restate?

3  Q.  Sure.  Is it true that it's necessary for ACCI to explain to

4  Yerkes that Dr. Sue Savage-Rumbaugh has been banned from the lab

5  as a condition for Yerkes working with ACCI?

6  A.  I would say that if Dr. Savage-Rumbaugh were to be involved

7  at this point, I would need to explain something to Yerkes.

8  Conversations with Yerkes have evolved since this deposition was

9  taken, and so that may have changed my opinion of what my

10  impression is today, you know, sort of post hoc, if you will, I

11  guess.

12  Q.  Let's talk about that.  We didn't hear that during your

13  direct examination.  What conversations have you had with

14  Yerkes?

15  A.  So, to give some context if I may, I don't want to prolong

16  anything unnecessarily, we approached Yerkes at a time I can't

17  remember now to bring chimpanzees to the facility.  Quite

18  frankly, we did that because there's an empty building that is

19  far superior than any building Yerkes has to offer any ape, as

20  well as this large outdoor eight-and-a-half acre yard.  We

21  wanted -- these are chimpanzees I've worked with since 2004.  I

22  know them.  I know them as individuals.  I don't like where they

23  live.  I don't like a lot of other things about where Yerkes --

24  Q.  And, Dr. Tag, I apologize --

25  A.  That's okay.

1  Q.  -- I hate to interrupt.  For the purposes of moving forward,

2  my question was, you gave an answer during your deposition, you

3  just explained to the court that apparently that was your

4  impression then?

5  A.  Right.

6  Q.  You've just testified there's been conversations with Yerkes

7  between January of this year and as we sit here today.  This is

8  a very important issue.  What are those conversations that

9  you've had with Yerkes since then?

10  A.  What I was trying to get to is that we've had conversations

11  with Yerkes -- I don't know exactly how many, but there have

12  been more than two -- face-to-face meetings discussing the

13  possibility of bringing chimpanzees to our facility in

14  Des Moines and housing them in that building.

15  Q.  Is it still your impression that as a condition of them

16  doing that that it's necessary for Dr. Sue Savage-Rumbaugh to

17  not be in the lab?

18  A.  Yes.

19  Q.  Okay.  Now, let's talk about when you were voted onto the,

20  what we now know as the IPLS board.  Subsequently that became

21  the ACCI board, correct?

22  A.  I'm sorry, could you restate?  I didn't hear the first part

23  of the question.

24  Q.  Let's just talk about when you were voted onto the IPLS

25  board.  We've now seen that was the IPLS board and that

1  subsequently became the ACCI board, is that right?

2  A.  I don't know -- I didn't have any knowledge I was on that.

3  Q.  You don't even know what you were voted onto, is that

4  correct?

5  A.  I thought I was voted onto the ACCI board.

6  Q.  And that turned out to be incorrect?

7  A.  I'm not sure it turned out to be incorrect.

8  Q.  Okay.

9  A.  There may be a document just like this one that has ACCI on

10  it.

11  Q.  It is true that IPLS no longer exists, correct?

12  A.  It is true that IPLS was dissolved by the Attorney General

13  of the State of Iowa.

14  Q.  My question was slightly narrower, Dr. Tag.

15         It's correct that IPLS no longer exists, correct?

16  A.  Sure.  In a legal sense, I guess.  I don't know.  I'm not an

17  attorney.

18  Q.  Well, you've stated it.  You've said as much, IPLS no longer

19  exists, correct?

20  A.  When did I say -- I'm unsure when I may have said that.

21  Could you give me context of when I said that?

22  Q.  I would be happy to.  Let me ask you today, is it your

23  testimony that IPLS does exist?

24  A.  My understanding now, again, not being an attorney, is

25  that -- which IPLS can be retroactively restarted because once

1  this sort of lien is paid.  In fact, we've had now discussions

2  among the ACCI board and that subset of individuals as to how

3  that actually would happen when finances permitted.

4  Q.  But as we sit here today, IPLS no longer exists, correct?

5           MR. MILLER:  Your Honor, I'm going to object that he's

6  both asked and answered and calling for a legal conclusion.  The

7  witness has testified, and it's clear from the record, he's not

8  a lawyer.

9           THE COURT:  I will accept his lay opinion.

10 A.  It's been dissolved.  To me, if I no longer exist, I can't

11 be recreated.  My understanding now is that IPLS can be

12 reconstituted or whatever because -- so, I guess, that would be

13 my --

14 Q.  And I appreciate that, but neither the court nor I am

15 interested in metaphysics right now.

16          Is it correct that IPLS no longer exists?

17 A.  Yeah.  I thought I just said that.  I was using the analogy,

18 but yes.

19 Q.  Okay.  I'm going to go ahead and draw your attention to

20 Exhibit 105.

21 A.  Okay.

22 Q.  If you can look at your exhibit binder.

23 A.  The big one here?

24 Q.  Yes, it is.

25 A.  All right.  I apologize trying to get to these pages.

1             Okay.  I'm back.

2   Q.  Okay.  Exhibit 105 is an e-mail from you to the directors of

3   the board, correct?

4   A.  Yes, it is.

5   Q.  Dated March 14, 2014?

6   A.  Yes, it is.  I will note that it's an e-mail that was

7   forwarded apparently from Dr. Savage-Rumbaugh to Dr. Bill

8   Zifchak and a couple of other folks.  It's not my original

9   e-mail.

10  Q.  Correct.  And that's not something that we're interested in

11  today.

12  A.  Okay.

13  Q.  But the body of the e-mail on that first page is from you,

14  correct?

15  A.  It looks like it's from me, but since it's forwarded, I

16  can't verify the entire contents of it.

17  Q.  Let's take a look at your e-mail address --

18  A.  Yeah, that's --

19  Q.  jtaglialal@kennesaw.edu, is that your e-mail address?

20  A.  Yes, it is.

21  Q.  Do you have any reason to believe you did not write this

22  e-mail on March 14, 2014?

23  A.  To be frank, over the past year-and-a-half, there has been

24  some shady things that have occurred involving members of

25  Dr. Savage-Rumbaugh's counsel, and I'm concerned that perhaps

1    somewhere in this document something I wrote has been

2    misrepresented.  I mean, that would be my only concern.

3    Q.  You think the document has been altered?

4    A.  I'm not saying it has.  I'm just saying I would be concerned

5    it might have, if I can't verify that.  If it came from my

6    e-mail address and it was electronically out of my mailbox, I

7    would certainly be obvious to verify it.

8    Q.  Do you have any reason to believe as we sit here today that

9    it's been altered?

10   A.  I don't have any specific reason to believe that, no.

11   Q.  As you see in the top right-hand corner, this was a document

12   that was introduced during your deposition.

13            Do you remember that?

14   A.  I don't remember it specifically, but --

15   Q.  Do you see that exhibit stamp?

16   A.  Yeah.

17   Q.  In fact, it's Exhibit 1?

18   A.  Okay.

19   Q.  Do you recall raising any concerns about the document being

20   altered during your deposition?

21   A.  I mean, I would have to check my deposition testimony.  I

22   remember raising a concern about some document that was

23   forwarded as well.  I don't recall if it was this one or not,

24   for the same reason.  I'm just -- I'm not going to say anything

25   else.

1          MR. STAMBAUGH:  Your Honor, at this time I would move

2    to admit Exhibit 105 into evidence.

3                              (Defendants' Exhibit 105 was

4                              offered in evidence.)

5          MR. MILLER:  Your Honor, objection; lack of

6    foundation, also it includes hearsay.

7          THE COURT:  105 is received, subject to the objection.

8                              (Defendants' Exhibit 105 was

9                              received in evidence.)

10   BY MR. STAMBAUGH:

11   Q.  I'm going to go ahead and publish Exhibit 105, Dr. Tag.  We

12   started this discussion with the question of whether IPLS exists

13   any longer.

14   A.  Uh-huh.

15   Q.  I'm going to draw your attention to the second full

16   paragraph in your e-mail to the directors.

17   A.  Uh-huh.

18   Q.  In the second-to-the-last sentence or the last sentence of

19   that second paragraph you state, "Moving forward, IPLS will no

20   longer exist."

21          Do you see that?

22   A.  Yes.

23   Q.  And you wrote that as of March 14, 2014?

24   A.  Yes.

25   Q.  And you were truthful at the time?

1  A.  Yes.  And the reason I wrote that is because we were

2  talking -- this was not a legal document and I'm not an

3  attorney, and this was a matter of a branding issue.  Go do an

4  Internet search for Great Ape Trust or IPLS and you get all

5  sorts of things that are -- you know, we needed to move past

6  that in order to gain some scientific credibility.  That is, you

7  know, what I intended in writing this document.  I certainly had

8  no legal -- or never tried to do that.

9  Q.  Let's go ahead and talk about this document for a bit.

10  A.  Sure.

11  Q.  You wrote it to both the board members of both ACCI and BHI,

12  correct?

13  A.  That appears to be correct, yes.

14  Q.  The first sentence says, "It is with great pleasure that I

15  provide you with an update regarding the Iowa Bonobo family," is

16  that correct?

17  A.  Yes.

18  Q.  In fact, Dr. Tag, you hadn't communicated with any BHI board

19  members for approximately four months before that?

20  A.  I think that would be incorrect.  I had conversations over

21  the phone with Dr. Savage-Rumbaugh in January, if I'm not

22  mistaken.  I spoke with Mr. Zifchak over the phone I believe in

23  February or March, called me at my home.

24  Q.  Is Mr. Zifchak a member of the BHI board?

25  A.  No, but I'm -- okay.  Sorry.  Not to my knowledge, he is not

1  a member of the BHI board.

2  Q.  What are you referring to when you say "the Iowa Bonobo

3  family"?

4  A.  I'm referring to the bonobos that lived in residence at the

5  facility at the time.

6  Q.  You talk about making monthly trips to Des Moines.  What did

7  you mean by that?

8  A.  I travel to Des Moines on a monthly basis.

9  Q.  It was your testimony on direct examination that you spend

10  approximately six days a month, per month at the facility, is

11  that right?

12  A.  Since December of 2013, that's correct.

13  Q.  How many days did you spend in January of this year at the

14  facility?

15  A.  I would have to check that record.  I don't have that in

16  front of me.  Basically I use my credit card because I use

17  American Express for everything and I look at charges that are

18  in Des Moines.  I don't have specific recollection of my travel

19  dates for January of this year.

20  Q.  You don't keep a log of your research that you do at the

21  facility by date?

22  A.  I do.  That's what -- I would verify it in those ways, sure.

23  Q.  You just told me that you verify it by reference to your

24  credit card receipts?

25  A.  Well, unfortunately, there are days when I'm in Des Moines

1  that I'm not able to be at the facility, such as being in

2  federal court.

3  Q.  Well, this is the first time you've been in federal court

4  over these bonobos?

5  A.  It is the first time I've been in federal court at all, but

6  I also --

7  Q.  Now, you mentioned that you have 420 e-mails in your inbox,

8  that you spend 35 hours a week, I believe --

9  A.  That's correct.

10  Q.  -- working on these bonobos?

11  A.  Working on ACCI, yes.

12  Q.  But yet you've only had time to respond to BHI requests to

13  visit until you had to come here today and answer to the court

14  regarding the proceedings in this case?

15  A.  Can you restate the question?

16  Q.  Sure.  How many visits by BHI board members have there been

17  in the last 18 months?  I counted two.

18  A.  Yes, off the top of my head, I believe it's two as well.

19  Q.  Okay.  We heard Dr. Laurent Dubreuil's description, four to

20  five hours last fall, is that right?

21  A.  That was -- yes.

22  Q.  And Dr. Derek Wildman's visit in March of this year?

23  A.  I think he said April, I think he's right.

24  Q.  In April of this year?

25  A.  Yes.

1  Q.  Okay.  So during the 35 hours that you spend a week on these

2  animals, there wasn't time to allow any other BHI board members

3  to visit the facility, is that right?

4  A.  Well, I spend six days a month approximately, and given that

5  this is the subject of a, whatever we call this, lawsuit, I felt

6  it was important to be present when these visitations were

7  occurring.  As Dr. Wildman testified yesterday, we go back and

8  forth for scheduling per the normal discussions that any two

9  professionals would come about and settle upon a date.  Dr. Coxe

10  and I did the same thing with I think less than two e-mails.

11  Q.  That's right.  And you settled on a date with Dr. Dubreuil,

12  right?

13  A.  I did, and I changed that date.

14  Q.  And you cancelled it?

15  A.  I postponed it.

16  Q.  Right?

17  A.  I did, yes, I testified to that.

18  Q.  And now you've allowed, for instance, Mr. Roffman to visit

19  the facility after we're here in court for this proceeding, is

20  that correct?

21  A.  I've allowed him to -- no.  He hasn't requested to visit

22  before.

23  Q.  Has anyone else at BHI requested to visit before?

24  A.  Oh, and actually I want to correct something.  I just

25  remembered a third -- Dr. Sally Coxe visited last June after the

1  joint meeting.

2  Q.  And Dr. Sally Coxe has requested to visit again?

3  A.  And she will be there tomorrow.

4  Q.  Tomorrow?

5  A.  Yes.

6  Q.  After this proceeding is over?

7  A.  Yes.  In time, tomorrow is after today, so, yeah, it will be

8  after.

9  Q.  Those are the only times that were available to you given

10  your busy schedule?

11  A.  No, that's not correct.

12  Q.  Those are the only times you could agree upon given your

13  busy schedule, is that right?

14  A.  Me and Dr. Coxe?

15  Q.  She and any other BHI board member?

16  A.  No.  No, that's not true.  Dr. Wildman visited in April.

17  Q.  We've got one in April, Dr. Tag?

18  A.  Yeah.

19  Q.  We've got one last August, right?

20  A.  Yeah.

21  Q.  Pursuant to the settlement agreements, you may be aware BHI

22  co-owns these bonobos.  Do you understand that?

23  A.  I understand.

24  Q.  Do you believe that ownership means access to these bonobos?

25  A.  I believe that if ownership doesn't involve any inherent

1  risks associated with that access, then yes.

2  Q.  It's your testimony to the court that you are going to

3  determine whether there are inherent risks when BHI, the

4  co-owners of the bonobos, ask to see them whether or not they'll

5  be allowed access?

6  A.  I'm specifically referring to Dr. Savage-Rumbaugh.  Everyone

7  else is welcome to access them, is welcome to visit the facility

8  and they can -- as long as they're willing to abide by our

9  safety protocols, go wherever they want to go or as Derek

10 Wildman testified yesterday, I did not restrict his access in

11 any way.

12          But I'm telling you that I haven't had requests from

13 Dr. Roffman -- I'm sorry, from Mr. Roffman prior to whenever his

14 initial request came and we tried to settle on a date.  Dr. Coxe

15 asked me to visit last June, I guess it was, and we settled on a

16 date very quickly, and she asked to visit again most recently

17 and we settled on a date very quickly.  Dr. Wildman asked to

18 visit and we settled on a date relatively quickly.

19 Q.  There's been about three visits in about 18 months, correct?

20 A.  Correct.  And there's probably been four requests.

21 Q.  Okay.  Dr. Wildman visited in April?

22 A.  Yes.

23 Q.  He sent you a request or you talked about --

24 A.  We talked about it.

25 Q.  -- you sending him an e-mail in April.

1   A.   Yes.

2   Q.   It's been a month.  You didn't have time to respond?

3   A.   I haven't gotten back to him on it.

4   Q.   Let's go ahead and talk about your appointment to ACCI.

5   A.   Okay.

6   Q.   And I want to bring up Exhibit 1005, which I believe has

7   already been admitted.

8            You can refer to the screen as well since we're

9   publishing.

10           Do you recall testimony regarding Exhibit 1005?

11  A.   I do recall, yes.

12  Q.   This is the letter of recommendation, correct?

13  A.   Sure.

14  Q.   From Dr. Sue Savage-Rumbaugh?

15  A.   Yes, yes.

16  Q.   Okay.  And you relied on this letter?

17  A.   Relied on this letter --

18  Q.   In terms of your appointment to ACCI, you relied on the

19  statements in this letter?

20  A.   I mean, yeah, I considered the statements very carefully.

21  Q.   Okay.  Let's go to page 2, the top of the second page --

22  and perhaps it's page 3.

23           Thank you.

24           The top paragraph reads, "It is my hope that the

25  coming essential transition will proceed smoothly and rapidly.

1   I also hope that, as appropriate, and under Jared's direction, I

2   will continue to do some research with the bonobos, once the

3   needed structural changes and funding are firmly in place."

4            Did you rely on that statement, Dr. Tag?

5   A.   I did.  I relied on that statement and specifically it was

6   in conjunction with phone conversations that Dr. Savage-Rumbaugh

7   and I had.

8   Q.   Has there been any planned research that's appropriate under

9   your direction for Dr. Savage-Rumbaugh?

10  A.   Dr. Savage-Rumbaugh hasn't specifically submitted a research

11  proposal or even written me any sort of correspondence

12  requesting any research activity.

13  Q.   Did you not plan on Dr. Savage-Rumbaugh having any

14  involvement; you just didn't tell her in response to this

15  e-mail?

16  A.   I took that e-mail and what she stated in it and what she

17  told me on the phone as what she intended.

18  Q.   And do you expect today that Dr. Savage-Rumbaugh will have

19  any involvement in the research going forward?

20  A.   I think that, you know, we have grave concerns regarding

21  Dr. Savage-Rumbaugh's access to the apes because of specific

22  safety concerns.  If Dr. Savage-Rumbaugh wants to submit a

23  research protocol and we are able to have a conversation and

24  figure out what specifically she wants to do and we think we

25  could do it in a safe way and have some assurance of her safety,

1   I assume that the hurdle beyond that would be IACUC, I guess.  I

2   don't --

3   Q.  Let's go ahead and publish Exhibit 30.

4   A.  Are these in here, can I ask?  It's hard to turn.  Are

5   these --

6   Q.  They're in the large exhibit binder.

7   A.  30?

8   Q.  30, yes.  Please do refer to the hard copy if you want.

9            Go ahead and take a look at Exhibit 30 that's been

10  published.

11  A.  Okay.

12            (Discussion off the record.)

13  BY MR. STAMBAUGH:

14  Q.  Dr. Tag, do you have Exhibit 30 in front of you?

15  A.  Yes, I do.

16  Q.  This is an e-mail from Lyle Simpson copying you on July 1,

17  2013, correct?

18  A.  Yes, it appears that's correct.

19  Q.  This is during the so-called transition period in which you

20  testified Dr. Savage-Rumbaugh was cocooned, correct?

21  A.  Well, Dr. -- Mr. Simpson didn't mention that to me until

22  what would be October of 2013.

23  Q.  But this is the time period when she would have been, quote,

24  cocooned?

25  A.  I wouldn't be able to say.  What I took Mr. Simpson to be

1  saying was that, as of my arrival in approximately October of

2  2013, that she was, quote/unquote, cocooned.

3  Q.  And was this part of this transition plan on July 1, 2013?

4  A.  I don't know.  I did receive this e-mail, and to be quite

5  honest with you, I don't recall reading it very closely.

6  Q.  Well, Dr. Tag, did you read the e-mails from Mr. Simpson?

7  A.  You know, this is before -- I mean, I was a Bonobo Hope

8  board member.  If I read this e-mail, which I'm sure I may have

9  skimmed through if I got it, you know, that's a very busy

10 research time, and it's possible that I didn't read very closely

11 this e-mail, but I definitely received it.  I'm not denying

12 that.  That's my e-mail address.

13 Q.  We understand that you have been very busy.  I can

14 appreciate that.

15          How many peer-reviewed publications have been made by

16 ACCI since you took over as Director of Research?

17 A.  I believe Mr. Miller asked that.  It is zero.

18 Q.  That is none?

19 A.  That is none.

20 Q.  Okay.  Let's go back to this e-mail.

21 A.  Yeah.

22 Q.  You don't know if you read -- do you have any specific

23 recollection of reading this e-mail regarding the transition?

24 A.  To be honest, no.

25 Q.  Okay.  Let's take a look at it.

1          Mr. Simpson says in the first paragraph, "We need Sue

2   and she must continue to have a vital role in the success of the

3   Trust."

4          Did I read that correctly?

5   A.  I wasn't following along, but I'm sure you did.

6   Q.  Well, Dr. Tag, for purposes, again, of the court --

7   A.  Okay.

8   Q.  -- and people who are here today, let's go ahead and follow

9   along.

10  A.  Okay.

11  Q.  Take a look at the first paragraph.

12  A.  First paragraph.

13  Q.  Is it correct that Mr. Simpson wrote to others, including

14  you, in July of 2013 and said, "We need Sue and she must

15  continue to have a vital role in the success of the Trust."

16  A.  That is correct.

17  Q.  Okay.  Was that your understanding at the time that he wrote

18  this e-mail to you, that Sue needed to have a vital role in the

19  success --

20  A.  I don't recall anything about this e-mail.

21  Q.  So that's a no?

22  A.  So that's -- that was not my understanding, I guess.

23  Q.  Okay.  Mr. Simpson also wrote in the third paragraph, "We do

24  not want Sue simply to step away.  Neither the bonobos nor the

25  Trust can afford to have that happen."

1    Did I read that correctly?

2  A.   You did.

3  Q.   Do you remember seeing that in his e-mail when he wrote it?

4  A.   No.

5  Q.   So that was not part of your understanding at the time that

6  you assumed the role as Director of Research, correct?

7  A.   Yes.

8  Q.   Okay.  Dr. Tag, the question again that I have in my mind

9  and that I would suspect that the court has is when you

10 testified on direct that Dr. Savage-Rumbaugh would be no longer

11 involved in the facility, why weren't you paying attention to

12 the settlement agreements, the e-mail from Dr. Savage-Rumbaugh

13 herself, and the e-mails we've seen from Mr. Simpson?

14 A.   I mean, I think I can answer that very clearly.  I was

15 paying attention to the e-mail that you just showed me -- I

16 forget the exhibit name right now, but I think it was written

17 roughly late in October, or whatever that endorsement letter, as

18 you put it, was, and you said the word "facility."  Being

19 involved in the research and being involved in the facility are

20 two very different things.  I have colleagues that are involved

21 in our research that come and collect data.  They don't have

22 anything to do with the day-to-day operations of the facility.

23    In that same e-mail you showed me from

24 Dr. Savage-Rumbaugh, she mentions things about having -- it may

25 have been another e-mail -- autonomy to run the program, take

1  care of the bonobos because you can't separate the bonobos from

2  the research.  That's what we were -- that's what my impression

3  was.  Between what Dr. Simpson -- excuse me, Mr. Simpson told me

4  and Dr. Savage-Rumbaugh told me, I was under the impression that

5  we would have that autonomy.  That was then in my mind affirmed

6  by resolution by both boards.

7  Q.  I want to get this straight.  There's a difference between

8  the research and the facility, is that right?

9  A.  There's a difference between running the facility and

10  operating the facility and doing the research, yes.

11  Q.  So is it your testimony to the court today that

12  Dr. Savage-Rumbaugh can play a role in the research as long as

13  it's not in the facility?

14  A.  I think I -- well, I'll just go back to the answer I just

15  previously gave, which was about Dr. Savage-Rumbaugh, again, if

16  we can be assured that it can be done safely, it's consistent

17  with the mission, that our IACUC approves it, then, yes, a

18  research project would not be impossible I presume.

19  Q.  But you told us this morning that you banned

20  Dr. Savage-Rumbaugh from the lab?

21  A.  I don't think I said I banned her.  I think you asked me --

22  or someone asked me if she continued to have no access, and I

23  said yes, she does not have access.

24  Q.  She doesn't have access today, but you believe that she can

25  be involved in the research at some point indeterminate in the

1   future; is that your testimony here today?

2   A.   That would be.

3   Q.   If she can comply with Dr. Tag's research requirements?

4   A.   If she can comply with the research requirements and safety

5   procedures and standard operating procedures of ACCI and get our

6   IACUC to approve a research proposal and cover the cost of doing

7   such research, then yes.

8   Q.   What if that is inconsistent with the settlement agreements?

9   A.   I'm sorry?

10   Q.   What if your requirements on the research are inconsistent

11   with the settlement agreements?

12   A.   I don't understand.  I don't understand how that would be

13   the case.

14   Q.   You don't understand how you could have requirements that

15   are separate and distinct from the settlement agreements?

16   A.   We have requirements that are mandated or dictated by the

17   United States Department of Agriculture and basically the Office

18   of Laboratory Animal Welfare.  So I don't think a settlement

19   agreement or supplemental agreement could force us to break the

20   law.

21   Q.   Do you believe that you need to operate consistent with both

22   the USDA requirements and the settlement agreements approved by

23   this court?

24   A.   I believe I have to operate -- I'm a scientist, and my

25   expertise --

1  Q.  So you're not bound by the court's settlement agreements?

2  A.  I imagine I would.  I am.

3  Q.  Okay.

4  A.  I --

5          THE COURT:  You're cross-talking.  Let each other

6  finish first.

7  BY MR. STAMBAUGH:

8  Q.  Go ahead.

9  A.  I don't know a situation that would arise with those two

10  things would be in conflict with one another.

11  Q.  That's because you haven't even read the settlement

12  agreement?

13  A.  No.  I've read the settlement agreement.

14  Q.  Dr. Tag, are there any plans to anesthetize the bonobos this

15  year?

16  A.  We have a plan to give them all health surveys, like those

17  described by Dr. Gilmore.

18  Q.  Does that include anesthetizing?

19  A.  Yes, it does include anesthesia.

20  Q.  Was Steve Boers dismissed as executive director of ACCI?

21  A.  Steve Boers, to the best of my recollection, resigned.  But

22  that's --

23  Q.  I'm sorry?

24  A.  Steve Boers, to the best of my recollection, resigned.

25  Q.  Do you know why he resigned?

1   A.  Well, I think I do.  He was --

2           MR. MILLER:  Your Honor, I'm going to -- excuse me,

3   Your Honor.  I'm going to object.  May we approach for a moment,

4   Your Honor, to discuss an issue with you?

5           THE COURT:  I'm sorry, I've lost you.  What was the

6   question again?

7           MR. MILLER:  We're getting into a line of questioning

8   regarding Steve Boers and his employment relationship with the

9   entity, and I would like to explain to you perhaps off the

10  record at a side-bar why I have concerns about that, and then if

11  you think it's appropriate, we would proceed obviously.

12          THE COURT:  Well, have we heard anything previously

13  that he was an employee?

14          MR. MILLER:  Yes, he was previously an employee.

15          THE COURT:  Okay.  What do we need to ask about other

16  than the fact that he was an employee?

17          MR. STAMBAUGH:  The reasons for his resignation, Your

18  Honor, to the extent Dr. Tag knows about it.

19          THE COURT:  Oh --

20          MR. STAMBAUGH:  Your Honor, I'll move on.

21          THE COURT:  All right.

22  BY MR. STAMBAUGH:

23  Q.  So, Dr. Tag, we saw a document today that was an amendment

24  to what was previously marked as Exhibit 1006, and I want to go

25  ahead and have you take a look at Exhibit 1006.

1          And let's bring that up.

2   A.  Is that in here as well (indicating)?

3   Q.  We're going to put it up on the screen.  I believe the

4   exhibit would have the old version of 1006.

5   A.  All right.

6   Q.  Dr. Tag, are you aware that the revised version was given to

7   us three days ago?

8   A.  I'm not aware.

9   Q.  Are you aware that it was given to us literally the night

10  before this proceeding?

11  A.  This document here, I'm not aware of that.

12  Q.  Okay.

13  A.  But you stated that earlier.

14  Q.  I'm actually going to have you take a look at Exhibit 1006

15  in the binder, which will be the last exhibit, the big binder --

16  A.  The last exhibit?

17  Q.  -- the one that we've been looking at, correct.

18  A.  I'm sorry.  The numbers go from 1 to 100 in here.  That's

19  why I ask.

20  Q.  Oh, I apologize.  It will be in the smaller binder, the 1000

21  exhibits?

22  A.  Okay.  I'm there.

23  Q.  Okay.  Go ahead and take a look at what was previously

24  provided to us as 1006 and compare it to this new document on

25  the screen.

1   A.   Okay.

2   Q.   Do you know what the differences is?

3   A.   Yeah.   There were three additional protocols listed on the

4   new document.

5   Q.   And those were added three days ago, correct?

6   A.   No.   They were added whatever the date of approval would be.

7   Q.   So that would be March 1, 2015 for two of them and then

8   April 23 of 2015?

9   A.   Apparently.

10  Q.   Why wasn't that provided to BHI prior to three days ago?

11          MR. MILLER:   Your Honor, objection.   I'm going to

12  object on the basis of relevance.   I'm going to further object

13  because this counsel is aware or should be aware this court

14  previously entered an order whereby the parties agreed there

15  would be no written discovery in this case, and we agreed

16  between us that we would share documents.   We have done so.   Now

17  he's cross-examining my witness based on an allegation that he

18  failed to fulfill a voluntary agreement to exchange documents.

19  I think that's highly inappropriate.

20          MR. STAMBAUGH:   Your Honor, may I be heard briefly?

21          THE COURT:   Certainly.

22          MR. STAMBAUGH:   As Your Honor knows, a main theme in

23  this case is the information that was given to BHI.   Dr. Tag

24  testified to that on direct examination, and I believe his

25  testimony was that he was willing to give any information at any

1   time to BHI board members.  My question goes directly to that

2   issue.

3           THE COURT:  I'm going to receive it, subject to the

4   objection.

5   BY MR. STAMBAUGH:

6   Q.  Dr. Tag, why didn't you give these three protocols to

7   anybody at BHI prior to three days ago?

8   A.  Well, I didn't give them to BHI three days ago.  I guess

9   you're asking me why, when this table was updated, wasn't an

10  update sent to BHI.  I guess to be quite honest, you know, that

11  would have come up in one of our periodic reviews of what we're

12  doing, who is doing what; but as I said, this has been a

13  particularly busy time and I guess we just didn't get around to

14  it.

15  Q.  Dr. Tag, to be fair --

16  A.  Yeah.

17  Q.  -- the court has now heard you mention on a number of

18  occasions, we understand that you're very busy at the lab, that

19  you're too busy to respond to Dr. Wildman's e-mail, you're too

20  busy to have actually gone through the scheduled appointment

21  with Dr. Dubreuil, and you're too busy to simply send another

22  piece of paper to BHI prior to your counsel providing it three

23  days ago?

24  A.  If I may, I am that busy because I have two full-time jobs,

25  one of them I don't get paid for, which is this job; but leave

1  that all aside, so, I mean, I'll put my schedule up against

2  anyone's in this room to be quite frank.  With that said --

3  Q.  You might get taken up on that offer.

4  A.  With that said, with that said, you're bringing up three

5  instances.  I postponed Dr. Dubreuil's appointment because I was

6  meeting with my attorney to prepare for this hearing.  I did not

7  respond to an e-mail from Dr. Wildman.  I didn't send him

8  something that we spoke about, and perhaps that was not a

9  reasonable amount of time, perhaps it was.  He told me he was

10  going to do a paternity test on Kanzi.  I didn't have that -- he

11  hasn't gotten back to me on that either.  So, you know, I didn't

12  send an update.  It's only been a couple -- it hasn't even been

13  three months.  If an update had been requested, I would have

14  sent one.

15  Q.  This is the research, though, Dr. Tag, correct?

16  A.  Yes.

17  Q.  This is what BHI is interested in, correct?

18  A.  I have no idea what BHI is interested in.

19  Q.  I agree with that statement.  And despite their requests,

20  this is the first time, literally the night before this hearing

21  began, that we saw these research proposals.  Can you explain

22  that to the court?

23  A.  That's a misrepresentation.  I'm sorry, Counsel.

24  Q.  The first time that anyone was aware of these three

25  protocols --

1   A.   They've only been approved since March.

2   Q.   Correct.

3   A.   And a document was provided with the other research

4   proposals.

5   Q.   Three days ago.

6   A.   No.  I'm sorry, I thought this document (indicating) --

7   Q.   Oh, the previous proposal.

8   A.   Yeah, yeah, yeah.

9   Q.   Correct, correct, that one page was given.

10          You can't explain why these weren't given to BHI?

11          MR. MILLER:  Your Honor, objection.  This has been

12   asked and answered.  He's badgering.

13          THE COURT:  We'll ask one more question on this

14   subject.

15   BY MR. STAMBAUGH:

16   Q.   Dr. Tag, can you explain why BHI board members were not

17   given any details on these three protocols until three days ago,

18   despite it starting in March?

19   A.   I guess we've been too busy to send an update.  If an update

20   had been requested, it would have been sent.

21   Q.   Okay.  Let me ask a few questions about this update version.

22   I'll make the representation that I have compared them, and it

23   appears that the only change, other than the addition of these

24   three protocols, is the addition of a particular research

25   assistant, is that right?

1    A.  I'm sorry, that's correct, yes, that's a change.

2    Q.  Is that Sara Skiba?

3    A.  Yes.

4    Q.  Who is Sara Skiba?

5    A.  She's our research coordinator.

6    Q.  For ACCI?

7    A.  Yes.

8    Q.  Does she work with you?

9    A.  She does.

10   Q.  Does she work with you in Georgia?

11   A.  She will actually.  She was recently, I think -- my

12   recollection now is February -- was hired as a research

13   coordinator.  I believed I described the details of that

14   position earlier.  She graduated from the University of

15   Wisconsin, Madison, did an internship at the Lincoln Park Zoo in

16   Chicago, moved here on or around mid to end of February of 2015,

17   began working as research coordinator for us and will begin

18   graduate school at Kennesaw State under my direction in -- I

19   guess in August.

20   Q.  So apparently she is an undergraduate student?

21   A.  No.  She's a postgraduate student would be the technical

22   term.

23   Q.  Is she a Ph.D. candidate?

24   A.  She is not a Ph.D. candidate.

25   Q.  She's not yet in graduate school?

1   A.   That's correct.

2   Q.   Dr. Tag, do you ever recall telling a reporter that you were

3   going to start from scratch at ACCI?

4   A.   I don't recall that; but that sounds like something I might

5   have said.

6   Q.   Why would you have said that you were going to start from

7   scratch?

8   A.   Well, from a branding perspective -- I've had a lot of

9   opportunity to talk to people in this community about the

10  facility, educators, people that could give us money,

11  philanthropists, and they are extremely sour, for lack of a

12  better word, on the organization, the facility, just the

13  prospect of all aspects of the bonobos being in Iowa.  And that

14  I guess is sort of my, although I'm not an expert in branding is

15  my sort of way of saying no, no, no, we're going to do things --

16  we're taking a fresh start maybe is a better way to say it.

17  Q.   Fresh start from Dr. Savage-Rumbaugh's research?

18  A.   No.  I don't remember the context that I told this reporter,

19  but it would not be that.  It would be more of an operational

20  standpoint.

21  Q.   Would it refresh your recollection if I showed you a copy?

22  A.   Sure.  That would be great.

23          MR. STAMBAUGH:  Your Honor, may I approach?

24          THE COURT:  You may.

25  BY MR. STAMBAUGH:

1  Q.  Is it true that you told a reporter in August 2014 that you

2  were going to start from scratch?

3  A.  Again, it looks like I did.

4  Q.  Dr. Tag, do you know what a Form 990 is, an IRS Form 990 is?

5  A.  Not off the top of my head, sorry.

6  Q.  Do you know if ACCI has filed a Form 990 for the years 2013

7  or 2014?

8  A.  I do not know.  That's beyond my pay grade.

9           MR. STAMBAUGH:  Your Honor, one moment, please.

10          (Pause.)

11  BY MR. STAMBAUGH:

12  Q.  Dr. Tag, have you ever read the December 2012 resolutions

13  regarding the role of BHI and the oversight of the science?

14  A.  I don't specifically recall them, but maybe looking at them

15  might --

16  Q.  You don't recall as you sit here today --

17  A.  No.

18  Q.  -- reading about the role of BHI when that board was

19  created?

20  A.  I don't.

21  Q.  What sort of data do you collect in the lab today?

22  A.  Are you referring specifically to ACCI or my research

23  program in general?

24  Q.  Correct, ACCI.  You mentioned you're there about six days a

25  month?

1   A.   Yes.

2   Q.   You said you collected data?

3   A.   On occasion.

4   Q.   I'm sorry?

5   A.   I said on occasion because I'm also doing other

6   administrative things, but yes.

7   Q.   All right.  You mentioned, in fact, that you were so busy as

8   we've heard to respond to e-mails, to schedule appointments,

9   that you clean the cages; that was your testimony?

10  A.   That I was so busy that I cleaned the cages?  I was cleaning

11  the cages because we needed help in that area.  So, yes, I do

12  that.

13  Q.   Despite having the busiest schedule of anyone in this room?

14  A.   Well, to be quite frank, you cannot answer an e-mail, but

15  you cannot clean a cage, so I'm triage.

16  Q.   How often do you clean the cages?

17  A.   It doesn't happen very often.

18  Q.   So let's go back to my original question.  What sort of data

19  have you been collecting the last 18 months?

20  A.   So the data that we've collected is we take two forms.  It's

21  all behavioral data.  It's either observational behavioral data

22  or experimental behavioral data, okay.  Observational behavioral

23  data usually involves setting up some sort of scenario, okay.

24  For example, we're doing a study looking at social grouping and

25  communication as it relates to sort of a feeding patch size.  So

1  we would distribute, let's say, some food and then we would let

2  the apes into the area, in their outdoor yards, for example, and

3  we videotape it and take real-time pen and paper data.  So I

4  would describe it as an observational study.

5        Experimental behavioral data is collected.  You

6  present the ape with a scenario and they have to make a

7  selection.  So, for example -- we don't do this, but just to

8  give you a very simple example, you have three, you know, cups

9  or something and one of them is labeled each with a lexigram,

10  and you would, say, hide a food under one and you ask the ape to

11  find it or something like that.  They're often videotaped, and

12  we often take real-time pen and paper data as well.

13        The final data we collect are computer-based data, so

14  the ape is usually given a computer game, for lack of a better

15  way to explain it, and they do that and actually the computer

16  logs the data of those times.

17  Q.  Where do you keep all of this data?

18  A.  So the behavioral data, the observational study data is

19  stored on videotape, obviously, and then it's scored back in my

20  lab in Kennesaw.  There's also pen and paper data, which is kept

21  in notebooks, and then it's transferred to digital -- some

22  individual cataloging.  Sometimes it's Excel.  Sometimes it's a

23  software program called Bentel.  It's like a -- I can't think of

24  the term -- a database program, and then the computer data logs

25  itself, and we, again, keep that on hard drives.

1  Q.  How many in-person meetings has ACCI had since July of last

2  year?

3  A.  In person?

4  Q.  Correct.

5  A.  One in October, we had one in December, and I can't

6  remember -- we have had at least two conference calls, but I

7  don't remember off the top of my head an in-person one, but

8  I'm -- so at least two in-person meetings.

9  Q.  I'm sorry, you said just a second ago at least two

10  conference calls.

11  A.  No, no.  I'm sorry.  At least two in-person meetings; one

12  in, to the best of my recollection, October and one in December,

13  and then at least two additional, sorry, conference calls.

14  Q.  So you think there's been two in-person meetings over the

15  last nine months of ACCI?

16  A.  That is my recollection as of this moment in time.

17  Q.  You mentioned earlier something about, was it a scientific

18  advisory board?

19  A.  Scientific advisory panel, yes.

20  Q.  Panel.  How many times have they met in the last year?

21  A.  We have not met as a group.  Individuals have come and

22  visited, but we haven't met as a group.

23  Q.  You have never met together?

24  A.  That is my recollection, we've never met as a group

25  together.

1  Q.  But you consider it a panel?

2  A.  I consider it a panel.

3  Q.  Do you have any minutes of any proposed meetings or --

4  A.  No, we do not.

5  Q.  -- or strategic plans?

6  A.  We have a strategic plan to bring, again, you know -- if you

7  will, 30 seconds of indulgence -- when we came on board, they

8  were literally, you know, tens of thousands of dollars in the

9  hole.  The lights were going to be shut off.  We've done

10  considerable efforts to reverse that course.  We have a plan, a

11  strategic plan hopefully as soon as the end of the summer to

12  bring those individuals here for a face-to-face sort of

13  conference.

14  Q.  Have you produced this written strategic plan?

15  A.  There may be a file on my computer somewhere with some

16  notes.  I've discussed it with members of the panel.  In

17  particular certain individuals have visited.

18  Q.  So there's not actually a formal written plan?

19  A.  No.  There is no formal written plan, that is correct.

20  Q.  And the scientific advisory panel has never actually met?

21  A.  The scientific advisory panel has never actually met in

22  person all as a group.

23  Q.  Let's talk about funding and trying to keep the lights on.

24  You spoke with Mr. Miller about numerous grants that you were

25  looking forward to?

1   A.  Yes, sure.

2   Q.  How much money has come into ACCI from those grants for the

3   last 12 months?

4   A.  I don't have that number off the top of my head.

5   Q.  You can just give an approximation.

6   A.  Considering we've been paying staff off of those grants

7   since last fall, I'm going to guess that portion would be

8   somewhere around 100, 150 thousand.  We've gotten at least --

9   I'm sorry, I wasn't prepared for this question -- perhaps

10  another 35 to 45 in collaborator per diems, which I described

11  earlier.  I, myself, have gotten some pilot grants and bridging

12  funds that are probably in the neighborhood of 30, and then

13  we've had private donations, which I've not had the opportunity

14  to add up; but I would still say it's probably under $30,000, in

15  the neighborhood, and then corporate sponsorships which are

16  probably in the neighborhood of around 10 to 20 thousand right

17  now.

18  Q.  Funding is important, correct, Dr. Tag?

19  A.  Funding is very important.

20  Q.  But you can't tell us exactly how much ACCI has received?

21  A.  No, I can't tell you that.

22  Q.  And the research is important, correct, Dr. Taglialatela?

23  A.  Yes.

24  Q.  But there haven't been any peer-reviewed publications since

25  you've been in charge?

1  A.  Well, there haven't been any peer-reviewed publications.

2  Q.  Correct.

3  A.  There have not.

4  Q.  The scientific advisory panel you believe is important,

5  correct?

6  A.  I think it's important.

7  Q.  But they've never met?

8  A.  No, but individuals have been in contact with us and

9  visited.  They haven't met as a group.

10 Q.  I want to talk a little bit about Matata's death.

11 A.  Yes.

12 Q.  Is it true that Liz Pugh was not permitted access to the lab

13 24 hours before Matata died?

14 A.  That is not my recollection, no.

15 Q.  You testified that -- did you testify that you were there

16 the day before Matata died?

17 A.  No, I was not there the day before Matata died.

18 Q.  Were you at the lab the day that she died?

19 A.  I was not.

20 Q.  Do you know if Matata was playing outside the day before she

21 died?

22 A.  My understanding she was and I saw a video to that effect.

23 Q.  Is it possible that Matata died because of something she ate

24 outdoors?

25 A.  I'm not a veterinarian.  I have no idea.

1  Q.  Do you know if it's possible?

2  A.  I do not know if it's possible.  I would imagine it's not

3  possible.

4  Q.  Even though you're not a veterinarian?

5  A.  Even though I'm not a veterinarian.  You asked me my

6  opinion.

7  Q.  You testified about the bonobos foraging all day?

8  A.  No, not all day, but they do forage during the course of the

9  day.

10  Q.  And that's important?

11  A.  I think that's very important.

12  Q.  Have you had the water toxicity evaluated since you were

13  appointed Director of Research?

14  A.  I don't understand what you mean by the water.  What water?

15  Q.  The water that's outside, the groundwater.

16  A.  The groundwater.  In the pond?

17  Q.  In the pond, in the area.  Have you seen it rain in

18  Des Moines?

19  A.  You mean when there's puddles, have I tested the water

20  that's in the puddles?

21  Q.  Have you tested the groundwater?

22  A.  I don't know what the term "groundwater" means, and I'm a

23  Ph.D. with no biology behavior.  I don't know what groundwater

24  is.

25  Q.  Do you understand that there's water under the ground?

1  A.  I understand that there is water under the ground.  I have

2  not tested the water under the ground.

3  Q.  Wonderful.  Have you tested the pond water?

4  A.  I have not tested the pond water.  The apes have no access

5  to the water under the ground nor the pond.  The apes drink

6  water as it comes out of the tap that I just drank a couple of

7  cupsful.

8  Q.  Dr. Tag, do you know who Heather Housh is?

9  A.  I do.

10 Q.  Is it correct that Heather has worked and cared for the

11 bonobos for a long time?

12 A.  It's my understanding she's been there for at least a year,

13 but I think more.

14 Q.  Are you aware that she resigned?

15 A.  Yes, of course, I'm aware she resigned.

16 Q.  Are you aware that she resigned because she was fed up with

17 you?

18 A.  I am not aware of that, and I have e-mails from her and

19 personal conversations that directly contradict that.

20 Q.  Dr. Tag, we've heard about these research protocols that you

21 have on the screen here.  Can you give us any further written

22 details about this underlying list of protocols?

23 A.  At this moment?

24 Q.  As we sit here today, trying to determine --

25 A.  Sure.

1    Q.  -- the appropriate location for these bonobos and the

2    research trajectory, correct.

3    A.  Do you want me to go through and explain what each one is?

4    Q.  That isn't my question.

5    A.  I'm sorry; I misunderstood.

6    Q.  My question is, can you provide us or the court with any

7    written details regarding these research protocols?

8    A.  Okay.  I just want to be clear.  Can I provide this court

9    with written details, meaning I would type it out, or provide

10   you with a document that details what's in the protocol?

11   Q.  Dr. Tag, this is not a complicated question.  We have a

12   page-and-a-half of written protocols.

13   A.  Yes.

14   Q.  And I'm not a scientist.  I know His Honor is not a

15   scientist.  Do you have any other written materials as we sit

16   here today?

17   A.  We have the full written protocols that these all refer to.

18   Q.  What does that mean; full written protocols?

19   A.  There's something called an animal use protocol.  It's

20   basically an application.  I think I described this earlier.  It

21   describes to a layperson so that they may evaluate the science,

22   evaluate the need to do the science, evaluate the value of what

23   is the data that are collected and their implications for

24   science, whether it be for human health or otherwise.  A

25   layperson needs to be able to understand those so that the IACUC

1  committee can evaluate that.

2  Q.  Why haven't those been provided to BHI?

3  A.  It's my impression, based on my reading of the rules, that

4  those are confidential documents.

5  Q.  Is BHI on the ACCI IACUC?

6  A.  No.  There's no member of the Bonobo Hope Initiative board

7  on the ACCI IACUC.

8  Q.  You testified that you're willing to give BHI any

9  information regarding the research, correct?

10 A.  Okay.  I would have to check more closely, but I don't think

11 that I could give them IACUC protocols because I believe them to

12 be -- again, not -- I believe them to be confidential.

13 Q.  Have you given any written description of these protocols

14 other than the IACUC protocol?

15 A.  I think I gave a presentation about some of them during that

16 joint meeting, which would only qualify to some of them because

17 it would have been ones that would have been by June, when we

18 met.

19 Q.  Dr. Tag, you've heard testimony that BHI has rescinded the

20 resolution appointing you to the board, correct?

21 A.  I didn't hear that testimony.

22 Q.  You didn't hear the testimony regarding rescinding of the

23 resolution appointing you to the board?

24 A.  I thought I heard --

25 Q.  By Dr. Savage-Rumbaugh?

1   A.  Appointing me to the BHI board?

2   Q.  There seems to be some confusion about which board you were

3   appointed to.  Did you hear any testimony that BHI appointed you

4   to the ACCI board?

5   A.  I don't see how BHI could have appointed me to the ACCI

6   board.

7   Q.  So it's your testimony here today that BHI votes were not

8   necessary to appoint you to the combined board which became,

9   according to you, ACCI?

10  A.  I'm -- no, I'm sorry.  I don't -- I think that there's facts

11  out of whack there.

12  Q.  Let me ask a better question.

13          Do you believe that BHI appointed you Director of

14  Research of ACCI, the BHI board members?

15  A.  No, I don't believe that.  I believe they passed a

16  resolution that gave me the autonomy to lead the research

17  program.

18  Q.  And was that part of your appointment as Director of

19  Research?

20  A.  I don't know.

21  Q.  And you know that that resolution has been rescinded?  Did

22  you hear testimony to that effect?

23  A.  You know, I heard --

24          MR. MILLER:  Objection.  It misstates the record.

25          THE COURT:  He asked if he's heard testimony to that

1  effect.

2  A.  To be quite frank, I didn't understand what the testimony

3  was.  You are now making it very clear to me what -- I

4  understand that now.  I didn't -- I heard Dr. Savage-Rumbaugh

5  say rescind to that effect.  I didn't understand what it meant.

6  I am now clear as to what it means.

7  Q.  Okay.  I'll make that representation to you --

8  A.  Okay.

9  Q.  -- that BHI has rescinded that resolution.  So do you have

10  any plans for vacating the lab?

11  A.  No.

12  Q.  Didn't Mr. George Caudill tell Dr. Savage-Rumbaugh when he

13  banned her that she no longer had any connection to IPLS?

14  A.  I have no knowledge of what George told -- George Caudill

15  told Dr. Savage-Rumbaugh.  In fact, I didn't know anything about

16  that entire ordeal, or whatever, until long after it had been

17  over.

18  Q.  Did you understand that the BHI board members have any role

19  in appointing you as Director of Research, putting the

20  resolution aside?

21  A.  Can you restate it one more time?

22  Q.  Absolutely.  Did you believe that BHI was required, that

23  their votes were required to appoint you as Director of Research

24  of this entity?

25  A.  Did I believe that BHI needed to vote on my appointment as

1  Director of Research?

2  Q.  Correct; taking over the lab.

3  A.  I -- it's a separate board, in my understanding, so it seems

4  like one board can't vote members onto another board.  That

5  would be my understanding.  It probably was my understanding at

6  the time.

7  Q.  Do you know what the settlements say about who owns the

8  bonobos?

9  A.  I know what's been advised to me by counsel of what the

10  settlement agreement says.

11  Q.  And you don't know what the resolutions say in December of

12  2012 regarding the role of BHI and the oversight of the science?

13  A.  In December of 2012, I'm fairly certain that those

14  resolutions -- there's this whole discussion that's gone on

15  about everyone on BHI resigning and then joining another board.

16  You'll note that I was never a part of those individuals because

17  the e-mails were sent to an e-mail address that I no longer use.

18  So I was never a part of that discussion, which is probably why

19  I didn't see those fall, December 2012 ones anyway.

20  Q.  Dr. Tag, I have to ask then, do you know what you're a part

21  of?  This is an important issue in the case.  You don't believe

22  that one board can vote a board member onto another board.

23          Who voted you as Director of Research?

24  A.  The ACCI board.

25  Q.  The ACCI board wasn't in existence, correct?

1   A.  My understanding -- and, again, this is -- you know,

2   Mr. Simpson is counsel and advised us that ACCI was created on

3   December 18, 2013, and when that was created, I was given the

4   position of whatever, Director of Research, or however it's

5   stated in our minutes.

6   Q.  So your understanding was not based upon the settlements,

7   correct?

8   A.  Yes, that's my understanding.

9   Q.  Your understanding was not based upon the May 2013

10  resolution giving Dr. Savage-Rumbaugh unfettered access,

11  correct?

12  A.  I didn't even know that.

13  Q.  Your understanding was not based upon the December 2012

14  resolutions describing the role of BHI, is that correct?

15  A.  Yes.

16  Q.  Dr. Tag, can you tell us what happened on November 9th,

17  November 10th when Dr. Savage-Rumbaugh was kicked out of the

18  lab?

19  A.  I have no idea.

20  Q.  It was her testimony that you heard it was based on an

21  e-mail sent to you?

22  A.  Again, that's all -- I have no idea.  Wasn't there, never

23  discussed.

24  Q.  You didn't read the e-mail?

25  A.  Wait.  Oh, no, I'm sorry.

1  Q.  Do you know what she's referring to?

2  A.  I'm sorry.  I thought you were saying -- she testified that

3  it was an e-mail that I sent?

4  Q.  She testified that after she sent that e-mail, she was asked

5  to leave by Mr. Caudill, sent an e-mail to you.

6  A.  I don't recall that.

7  Q.  Do you recall reading that e-mail?

8  A.  That she sent an e-mail to me?

9  Q.  Yes.

10  A.  No, I don't recall reading that.

11  Q.  You don't recall reading that e-mail?

12  A.  Well, I don't know what e-mail you're even talking about.

13  Q.  This is --

14  A.  At this minute I have 420 e-mails in my inbox.

15          THE COURT:  Just a minute.

16  BY MR. STAMBAUGH:

17  Q.  This was at the time that you were appointed to the board.

18  We've heard about your inbox.

19  A.  I wasn't appointed to the board until December 18, 2013.  So

20  November is not the time I was appointed to the board.  Show me

21  the e-mail.

22  Q.  Would you agree that it's around the time that you were

23  appointed to the board?

24  A.  Sure.  Can you show me the e-mail?

25  Q.  I want to make sure that we understand that the court

1  understands what actually happened in November 2013.  We've

2  heard a number of things that you didn't read or don't remember

3  reading.  And my question is, do you recall the e-mail that

4  Dr. Savage-Rumbaugh has testified about which led to her being

5  banned from the campus?

6  A.  I don't recall that specific e-mail.

7  Q.  Dr. Tag, you don't want Dr. Savage-Rumbaugh in the lab

8  screwing up your research, do you?

9  A.  I don't want Dr. -- I don't want Dr. Savage-Rumbaugh in the

10  lab because I think she poses a danger to the humans and the

11  apes that work with her or are around her.

12  Q.  It's fair to say you don't want her screwing up your

13  research?

14  A.  That is false -- that is a half truth.

15  Q.  And you don't want her to take away from your professional

16  development at this point, correct?

17  A.  I don't understand what you mean by take away from my

18  professional development.

19  Q.  Well, this is the way we started our discussion.  You have a

20  professional interest in this case.  We've established that,

21  correct?

22  A.  Is that what I testified, that I did?  I mean, I've been up

23  here for a long time, and I feel like at times I've been kind

24  of -- I just want to make sure.

25  Q.  I'm asking you, do you have a professional interest?

1   A.  I have an interest in this case or --

2   Q.  And you don't want Dr. Savage-Rumbaugh to screw that up,

3   isn't that right?

4   A.  I don't want Dr. Savage-Rumbaugh to pose a physical threat

5   to any of the people or the bonobos that work there.

6   Q.  Or a professional threat to your career?

7          MR. MILLER:  Your Honor, objection.  It's been asked

8   and answered repeatedly.

9          THE COURT:  It has, yes.

10  BY MR. STAMBAUGH:

11  Q.  Dr. Tag, I've been authorized by BHI to advise you that you

12  have been relieved of your duties and that they would forbid you

13  from research of any kind with the bonobos.  They intend to

14  report this to Kennesaw and Yerkes at the conclusion of this

15  hearing.

16         My final question would be, do you care to comment on

17  that?

18  A.  No.

19         MR. MILLER:  Your Honor -- hold on for a second.

20         MR. STAMBAUGH:  I have no further questions.

21         MR. MILLER:  -- objection.  Objection, Your Honor.

22         THE COURT:  That last question and answer, that last

23  exchange is stricken from the record.  You can give him official

24  notification in other more appropriate ways.

25         MR. STAMBAUGH:  Thank you, Your Honor.

```
 1              No further questions at this time.

 2              THE COURT:  Anything further?

 3              MR. MILLER:  Yes, Your Honor.  Thank you.

 4                     REDIRECT EXAMINATION

 5  BY MR. MILLER:

 6  Q.  Dr. Taglialatela, based on recent discussions with Yerkes,

 7  have they sent chimpanzees to the facility?

 8  A.  No.

 9  Q.  Do they have immediate plans to send chimpanzees to the

10  facility?

11  A.  No, they don't.

12  Q.  Was your testimony that you received direct questions, four

13  requests for visits from BHI board members to the facility?

14  A.  I'm sorry, could you restate?

15  Q.  How many requests do you recall receiving from BHI board

16  members to visit the facility?

17  A.  Specific requests for individuals to visit the facility?

18  Q.  Yes.

19  A.  I -- the most fresh in my memory are the four that I

20  described earlier.

21  Q.  And other than requests that you received since January 1,

22  2015 with this hearing imminent, how many requests have you

23  received?

24  A.  Laurent Dubreuil had a request.  I think he visited in

25  August of 2014.  I don't remember any others off the top of my
```

1   head -- oh, and I'm sorry, Dr. Coxe visited in June of 2014

2   after our joint meeting.

3   Q.  And other than visits, you've had phone calls with at least

4   Dr. Wildman, is that correct?

5   A.  Yes.  I also had one early on with Dr. Dubreuil, but I can't

6   remember the exact date.

7   Q.  You were asked some questions about Exhibit 1006 and the

8   demonstrative we used earlier.  Were the backup information to

9   those protocols in the binder that you offered to Dr. Wildman

10  when he visited in April?

11  A.  Yes.  All the protocols are kept for regulations in binders

12  at the facility on site.  I offered them to Dr. Wildman.

13  Q.  Can you explain why Dr. Wildman didn't take time to look at

14  the details of those exhibits, other than he was too busy?

15  A.  I think he was --

16          MR. STAMBAUGH:  Objection; foundation, totally

17  irrelevant.

18          THE COURT:  You can ask him what Dr. Wildman said

19  about that.

20          MR. MILLER:  Okay.  Thank you.

21          THE COURT:  There's a lot of speculation in this

22  record about what other people are thinking and what they're

23  doing on both sides.  Focus.

24          MR. MILLER:  Thank you, Your Honor.

25  A.  Dr. Wildman drove down for the day.  He visited.  I invited

1   him to stay as long as he did.  He testified that he wanted

2   to -- he felt this time would be spent talking to me, so I

3   assumed I'm taking him on his word and that he didn't want to go

4   through the details at the time and waste the opportunity to

5   speak with me.  That would be what I would guess.

6   BY MR. MILLER:

7   Q.  Are you guilty of occasionally not responding to an e-mail

8   while you were working to keep the lights on at the facility?

9   A.  Yes.

10  Q.  Have you received financial contributions from the purported

11  co-owners of the bonobos?

12  A.  No -- oh, I'm sorry.  We did receive, I think -- to the best

13  of my recollection, it was a thousand dollars.  It may have been

14  1,500 or on or around a thousand dollars.  I believe the timing

15  was last summer, and it was for medical, to go towards some

16  medical expenses.

17          I wrote Dr. Savage-Rumbaugh explaining that we would

18  use that money for that purpose, but I also indicated that we

19  are planning for an anesthetic survey, a full comprehensive

20  survey like that described by Dr. Wildman.  She wrote me back

21  indicating that she had some -- I got the impression from that

22  message, her response that she wasn't completely happy with

23  that.  I offered to return the money to her, and I did not hear

24  another word on that subject.

25  Q.  And on cross-examination you were asked about a number of

1  events in December 2012, in May of 2013, July of 2013, and you

2  readily admitted you didn't rely on those events in your

3  decision to become part of the leadership at ACCI, is that

4  correct?

5  A.  Yes.  In fact, there was some e-mail I vaguely remember in

6  May of 2013 where Steve Boers wrote me an e-mail asking me to

7  take up the directorship then, and I told him it wasn't a

8  possibility.

9  Q.  What did you rely on when you decided to become that

10  director?

11       MR. STAMBAUGH:  Objection; asked and answered and

12  extremely cumulative at this point.

13       THE COURT:  Well, I agree, but I'm going to allow it

14  one more time as to what he relied on in taking his position.

15       THE WITNESS:  I may answer?

16       THE COURT:  You may, briefly.

17  A.  Okay.  I relied on the phone conversations I had with

18  Dr. Duane Rumbaugh, I relied on e-mails written by

19  Dr. Savage-Rumbaugh, as well as phone conversations, and I

20  relied on the advice of board members, as well as board counsel

21  at that time, Lyle Simpson.

22       MR. MILLER:  That's all I have, Your Honor.

23       Thank you.

24       THE COURT:  Anything further?

25       MR. STAMBAUGH:  Your Honor, I have two questions that

1   I inadvertently left out, very specific questions, during my

2   cross-examination.

3                          RECROSS-EXAMINATION

4   BY MR. STAMBAUGH:

5   Q.  Dr. Tag, is it your opinion -- or is it correct that when a

6   bonobo spits water, it is an indication of its stress level or

7   displeasure with something?

8   A.  I think there are probably very limited contexts where that

9   would not be the case.

10  Q.  And my final question is, do you have a professional opinion

11  as to whether Kanzi is any worse off for not having interacted

12  with Dr. Sue Savage-Rumbaugh?

13  A.  I do have a professional opinion about that.

14  Q.  What is that opinion?

15  A.  My professional opinion is that Kanzi is not worse off.

16              MR. STAMBAUGH:  Thank you.

17              Nothing further, Your Honor.

18              THE COURT:  Anything further?

19              MR. MILLER:  No, Your Honor.

20              THE COURT:  You may step down, sir.

21              Thank you.

22                                      (Witness excused.)

23              THE COURT:  We'll take our noon recess at this time.

24  We'll be in recess until 1 o'clock.

25              (Recess at 12:02 p.m., until 1:00 p.m.)

```
 1                    AFTERNOON SESSION  1:04 p.m.

 2              (In open court.)

 3              THE COURT:  Please be seated.

 4              We're going to hear from Dr. Tuttle now?

 5              MR. STAMBAUGH:  Yes, Your Honor.  We call Dr. Russ

 6   Tuttle to the stand.

 7              THE COURT:  Please come forward.

 8              THE CLERK:  Raise your right hand.

 9        RUSSELL HOWARD TUTTLE, DEFENDANTS' WITNESS, SWORN

10                    DIRECT EXAMINATION

11   BY MR. STAMBAUGH:

12   Q.  Good afternoon, Dr. Tuttle.

13   A.  Hello.

14   Q.  Can you please tell the court who you are and why you're

15   here.

16   A.  I'm Russell Howard Tuttle.  I'm Professor of Anthropology,

17   Evolutionary Biology, the Morris Fishbein Center for the study

18   of the history and biology of medicine, social sciences, and

19   biological sciences, Collegiate Division of the University of

20   Chicago, the director of the anthropology program, the

21   undergraduate program, and director of the Paris Center.  We

22   have a Paris Center, the University of Chicago program on

23   primates and human evolution, and I'm the innovator of that.

24   Q.  Thank you, Dr. Tuttle.

25              Because we have a court reporter taking down
```

1   everything you say, if you could just try to slow down a little

2   bit, we'd appreciate it.  Thank you so much.

3           How long have you been a professor at the University

4   of Chicago?

5   A.  Fifty-one years.

6   Q.  Doctor, what is primatology?

7   A.  It's the study of primates.  It's living humans, nonhuman

8   and human, from lemurs, lorises, bushbabies, monkeys of various

9   sorts, apes, and us.

10  Q.  How long have you been studying primatology?

11  A.  Fifty-one years.

12  Q.  How long have you been studying apes?

13  A.  Fifty-one years.

14  Q.  How many publications have you had, peer-reviewed

15  publications regarding apes and/or primatology?

16  A.  I don't know.

17  Q.  Is it --

18  A.  I haven't counted them.  I have a 60-page CV, and a lot of

19  that is publications, government appearances, whatever, you

20  know.

21  Q.  Has it been hundreds of articles?

22  A.  No, I don't think so.  More than a hundred, yeah.

23  Q.  Let's go ahead and identify your CV, which is Exhibit No.

24  97.  There is a notebook, a large notebook right in front of you

25  that has the exhibit numbers.

1   A.   Uh-huh.

2   Q.   If you could turn to Exhibit 97.  I think it may be the

3   larger one underneath there.

4   A.   I've got it, I think.  Well, I can't really open this.

5            MR. STAMBAUGH:  May I approach, Your Honor, to assist

6   the witness?

7            THE COURT:  Sure.

8            THE WITNESS:  I'm sorry, I had surgery on this

9   shoulder.

10           MR. STAMBAUGH:  That's okay.  We've run into this

11  problem before.

12  BY MR. STAMBAUGH:

13  Q.   Dr. Tuttle, referring to what's been marked as Exhibit 97, I

14  would like you to take a look at it.  My question would be, does

15  that appear to be a true and correct copy of your CV?

16  A.   It's dated May 6, yes, that's close enough.

17  Q.   Does it appear to be accurate in terms of reflecting your

18  qualifications and credentials?

19  A.   I think so, yes.

20           MR. STAMBAUGH:  At this time I move 97 into evidence.

21                        (Defendants' Exhibit 97 was

22                        offered in evidence.)

23           MR. MILLER:  No objection.

24           THE COURT:  97 is received.

25

1                        (Defendants' Exhibit 97 was

2                        received in evidence.)

3    BY MR. STAMBAUGH:

4    Q.   Dr. Tuttle, are you being paid for your time here today?

5    A.   No.

6    Q.   What awards have you received in the field of primatology?

7    A.   Okay.  I was recently given the Charles R. Darwin Lifetime

8    Achievement Award by the American Association of Physical

9    Anthropologists, and I was Distinguished Anthropologist of the

10   Midwest Primate Interest Group a couple of years back.  I would

11   have to look for the date here.  And I've received a national

12   teaching award in anthropology from the American Anthropological

13   Association of Students, and also there's an award on campus

14   that is also a highest teaching honor you can get for teaching

15   on my campus.

16   Q.   Who awards the Darwin Award?

17   A.   The American Association of Physical Anthropologists.

18   Q.   Is that awarded every year?

19   A.   No, no.

20   Q.   How often is it awarded?

21   A.   I have no idea.  But I was the first -- it's been a couple

22   of years before I got it, and then last year a former teacher of

23   mine got it, so it's hit and miss.  It's when somebody feels,

24   takes the time -- and it takes quite a bit of time to nominate

25   these things, the supporting documents and whatever.

1    Q.  Any other awards or accolades you haven't mentioned already?

2    A.  I'm a Fellow of the American Association for the Advancement

3    of Science.  I guess that's considered an honor.  That will be

4    enough, I think.

5    Q.  Dr. Tuttle, have you authored any books regarding the

6    subject of great apes and/or primatology?

7    A.  Yes.

8    Q.  How many?

9    A.  Well, I've authored two, truly authored and written them

10   entire cover to cover two, and I have edited many, many books,

11   some under my name, but then as the editor of a book series on

12   all of primatology, and also I edited the International Journal

13   of Primatology for 20 years, which --

14   Q.  What was the most recent book that you wrote?

15   A.  "Apes and Human Evolution," 2014, Harvard University Press.

16   Q.  I'm holding a copy of Apes and Human Evolution.  By the size

17   of it, does that appear this publication?

18   A.  Yes.

19   Q.  Dr. Tuttle, what courses are you currently teaching?

20   A.  I'm teaching the course Apes and Human Evolution.  I teach

21   it in Paris in the autumn and also on campus at the University

22   of Chicago in the spring.  I should be there doing that right

23   now.  Also in the winter I taught a course on hominoid

24   evolution.  That is the evolution of apes to humans.  We have a

25   huge cap collection of tracing 35 million years of evolution

1  through fossils, fossil primates and whatever, and it's a hands

2  on course where students can really dig in.

3  Q.  Do you utilize your publication "Apes and Human Evolution"

4  in your --

5  A.  Of course, it's an outgrowth of that course.

6  Q.  And that's a text that's actually used in the curriculum?

7  A.  Yes.

8  Q.  Dr. Tuttle, now I want to talk about your relationship with

9  Dr. Sue Savage-Rumbaugh and Dr. Duane Rumbaugh.  When did you

10  first meet Dr. Savage-Rumbaugh?

11  A.  In 1976, perhaps.

12  Q.  Have you worked with her during the time from 1976, did you

13  say?

14  A.  Yeah, I've interacted with her.  I haven't actually worked

15  on a project with her.  I knew Duane before, incidentally.

16  Q.  Let me ask you this first, Dr. Tuttle.  What experience do

17  you have with bonobos?

18  A.  Well, I've watched the project involving the bonobos from

19  the time Kanzi was a tiny kid.  I was bitten by him once in the

20  love handle.  He ran back behind me.  We lived in the woods

21  where they had the bonobos where they could be walked, and he

22  was allowed to run freely in the woods, and he would come and

23  peek in the window of the trailer where my family and I were

24  staying.  And then as he grew up, I've also visited and seen

25  him; but I haven't actually worked directly with him.

1  Q.  Tell the court what you do know about Dr. Sue

2  Savage-Rumbaugh's work with these bonobos.

3  A.  It's more than groundbreaking.  It's -- well, it's

4  incredible.  She has shown that -- there's a field called

5  symbiotics, which is the study of symbols and science, and so

6  forth, and she has managed to create an environment in which

7  Kanzi spontaneously learned about this and also to understand

8  spoken English to a pretty good level.  And it was almost by not

9  manipulating him, but letting him experience what was being done

10  with Matata, his foster mother, that he was just running around

11  the room and somehow he absorbed a lot.  We learn this from

12  children.  Children learn a lot about language before they can

13  barely babble and whatever.  So he picked that up, and it's been

14  carried forward then to others who are fortunately not deceased.

15  Q.  How long have you followed this groundbreaking work of

16  Dr. Savage-Rumbaugh?

17  A.  From the outset.  I go way back to Atlanta, which is where

18  Yerkes was invented by Duane Rumbaugh, to see about whether they

19  could command symbols, and that lexigram was made up of Yerkes

20  symbols and many more, Atlanta manipulated.  It went through the

21  study of Sherman Austin.  I was on the site visit as to whether

22  the Sherman Austin study should be continued, and it was.  And

23  then I was on the grant review committee three times, three

24  reviews more recently of Sue's project.  Unfortunately, it

25  didn't do so well with the committee because it had been -- the

1   principal investigator was not a qualified academic.  He was

2   uncredentialed entirely, and it's very difficult to support that

3   when you have Sue doing the work, when it's her study.

4   Q.  Are you aware if Dr. Savage-Rumbaugh received an honorary

5   degree from the University of Chicago?

6   A.  I think so.  I promoted it and nominated her.  It was the --

7   we were inaugurating a new president, Hugo Sonnenschein, and

8   there was a call for the college to have some representative.

9   It's tricky for the college because they have four collegiate --

10  five collegiate divisions in our college.  So it would have to

11  pass muster with physical sciences, biological sciences, social

12  sciences -- well, I won't mention the fifth one, and the

13  humanities, and it got high marks from all of those when I first

14  presented it.  There was a linguist on the nominating committee

15  with me and someone else I can't remember, historian or

16  something.  And this goes through many, many filters.  It then

17  goes to the council of the senate.  The senate by university is

18  of the entire faculty, but then it comes to the council who are

19  representatives of the faculty, and then it goes to the

20  committee of the council and the honorary degree committee, and

21  on and on.  And it came through with flying colors I must say.

22  Q.  Can you -- I'm sorry, were you finished?

23  A.  Yes.

24  Q.  Can you explain to the court the significance of receiving

25  an honorary degree from the University of Chicago?

1   A.  Yes, we're one of the few -- first of all, the stature of

2   the university, you know, that should be clear, the University

3   of Chicago, we're on a par internationally with Oxford and

4   Cambridge and Harvard and many other universities.  The

5   differences with us is that we do not give honorary degrees to

6   anyone other than people of scientific, high level scientific

7   accomplishments, innovative and high level scientific

8   accomplishments.

9           Bill Clinton nibbled around, didn't get it.  Elizabeth

10  the II, her minions tried.  We just do not give it to

11  celebrities and just anyone.  It has to be based on one's

12  research programming success.

13  Q.  Dr. Tuttle, explain to the court what you know about the

14  history of Dr. Savage-Rumbaugh's work with the bonobos here in

15  Des Moines, starting with the Ted Townsend era as it's been

16  called.

17  A.  Well, I was -- I saw the plans in Atlanta, Georgia, when

18  Duane was retiring.  There was a faction organized by David

19  Washburn, I believe, and after one of the dinners, we were

20  presented by a representative of Ted's to present this plan and

21  talk about it.  It sounded wonderful, and I remember looking at

22  the plans, and I asked two questions because it looked like it

23  was near a river.  I asked, does the river flood?  I was told

24  no.  And I asked if they had tested the soil because it had been

25  some sort of Army or Navy place where they exercised, and so

1  forth, and you can imagine there might be elements, heavy

2  elements in the water, and that I don't think has ever been

3  done.

4         Well, Sue came, and then within a year, 2007, I

5  received an invitation to come to be on a scientific advisory

6  board, and I was surprised to find orangutans there, that there

7  was another project.  The building was much smaller than I

8  remembered from the plans.  I mean, they cut back quite a bit, I

9  think to accommodate building the orangutan building, and Sue

10  was nowhere to be seen initially.

11         So we had a meeting the first day, and one wondered

12  why the people, the scientists weren't called in for us to talk

13  to.  The second day Ted came in and sat down and opened with he

14  hadn't fired many people in his career, but he wanted to fire

15  Sue.  And I must say tears started.

16  Q.  Whose tears?

17  A.  Mine.

18  Q.  What was your reaction?

19  A.  That's never happened ever, in court or in a meeting.

20  Q.  What hasn't happened?

21  A.  That I would become just instantly -- it was horrible.  I

22  mean, you could just see everything going poof (indicating).

23  Q.  Dr. Tuttle, you mentioned the river that's next to the

24  facility.  Are you aware of the possibility for flooding in this

25  facility?

1   A.  Well, it's happened twice, once in 1993, which I didn't know

2   about in 2007, and then more disastrously I think in 2008 or '9.

3   I can't remember.

4   Q.  Have you had a concern about the flooding of this facility?

5   A.  Yes.  Today, in fact, you know, what's going on in Houston

6   and elsewhere, the climate is changing.

7   Q.  Have you recently read any reports regarding the possibility

8   for flooding in this facility?

9   A.  I was sent one, yeah.

10  Q.  What report was that?

11  A.  As I remember, it was about various cycles of predictability

12  of damage to the area where the center is, you know, 11 -- or

13  predicting if it happened in 11 years, the 10 years, that kind

14  of stuff.  And, of course, that's all --

15          MR. MILLER:  Your Honor, I'm sorry, I don't mean to

16  interrupt the witness, but I think the question was if he had

17  reviewed a report.  He's now describing what the report was.

18  It's hearsay.

19          THE WITNESS:  Well, I wasn't asked as an expert to

20  review it, no.

21          THE COURT:  Dr. Tuttle, he'll ask another question.

22          THE WITNESS:  Okay.

23          MR. STAMBAUGH:  And, Your Honor, I will say that

24  Dr. Tuttle has the stature of an expert in this proceeding, and

25  I would ask that he be allowed to rely on hearsay documents.

TUTTLE - DIRECT

613

1    THE COURT:  Well, my ruling has consistently been I'll

2    receive it, subject to the objection, and it is in.

3    MR. STAMBAUGH:  Thank you, Your Honor.

4    BY MR. STAMBAUGH:

5    Q.  Dr. Tuttle, you were describing this flood report you had

6    read.

7    A.  Uh-huh.

8    Q.  Please continue.

9    A.  Well, I think I have said what I have to say about it.  I

10   don't know what basis they premise this on.  It must be

11   meteorological long-term satellite stuff; but supposedly you

12   should be able to predict -- we don't have the technology I

13   think to do it yet -- when a flood is likely to occur or not in

14   a particular area.  And, of course, you can miss, and if you

15   miss, then you lose.  You lose your home, you lose valuable

16   research.

17   Q.  In your opinion after reading this flood report, do you

18   think that this facility is a safe place for the bonobos?

19   A.  No.

20   Q.  Why not?

21   A.  Well, it can flood.  The last time I understand the water

22   was way up, you couldn't even get to the bonobos for a while.

23   They had to wade through high water just to get there finally,

24   and, fortunately, they were up near the top of the exhibit or

25   page.

1  Q.  Dr. Tuttle, as someone with your standing in the field and

2  knowledge of Dr. Savage-Rumbaugh's work, in your opinion, what

3  is the significance of Dr. Savage-Rumbaugh's work both for the

4  field and humanity?

5  A.  Well, as an anthropologist, I will say that, first of all,

6  she broke one barrier, the language thing.  Language is thought

7  to underpin human culture, and the linguists at my university --

8  anthropological linguists teach courses called Language in

9  Culture.  What is the role of language in mediating culture?  I

10 do not want to get into what culture is, but we know -- social

11 sciences across the board will agree that symbols and symbolic

12 mediation of beliefs and ideals and behavior and social codes

13 and morality codes and all are symbolically mediated.  That's

14 what culture is.  It's the output of this symbolic mediation.

15         Language is one of those, but Sue has crossed one

16 barrier.  She has the bonobos and -- actually the chimpanzees

17 first, Sherman Austin, let's stay with that; but she has that

18 capacity, they have that capacity.  It's like having a computer

19 with a new capacity.  Now, can we go forward and get them to

20 use -- can that be used and cap this cognitive aspect of their

21 machinery, if you will, to start having using that and becoming,

22 I hate to say it, moral social beings.  I mean, socially

23 mediated and social beings with the sense of feelings where you

24 can tell us whether their altruistic behavior is based on

25 feelings or whether it's just a mechanism, you know, to get by.

1  Q.  Do you have an opinion as to whether that research should

2  continue?

3  A.  Of course, it should.

4  Q.  Dr. Tuttle, have you recently visited the Great Ape Trust?

5  A.  Yes.  I was out there yesterday for about 45 minutes.

6  Q.  Please tell us about that visit.

7  A.  Well, it's showing the wear and tear.  That's my opener.  Of

8  course, what can you tell in 45 minutes?  I did see all five of

9  the bonobos.  Some were more active than others.  Kanzi was not

10 terribly interactive until he was asked if he wanted a surprise,

11 and then he became very animated; but before that he was just

12 sitting with his back -- he knew we were there.  We were in

13 masks and gloves.  I don't know if that had any effect --

14 fiddling through some vegetation.  And it was like, I don't know

15 just -- I'm not in -- I don't know about stereotypings and

16 stuff, but it didn't look like -- but it could have been the

17 rain.  I don't know.

18          The others, most of the others -- initially two were

19 covered by blankets.  They wanted to be outside it seemed rather

20 than inside, which was interesting, and I got spit on.

21 Q.  Who spit on you?

22 A.  Nyota.

23 Q.  I'm sorry?

24 A.  Nyota.

25 Q.  How did Nyota look?

1  A.  He was more animated, but he was displaying for my benefit I

2  think.

3  Q.  Did that have any significance to you that Nyota spit on

4  you?

5  A.  I didn't like it, obviously.  Yeah, well, he was sick, too.

6  He was hacking, you know, very wet hacking cough and stuff, so

7  I'm trying to get over the flu.  I think I might have a new

8  kind, but it wasn't too helpful.  I don't know what the mask was

9  doing, whether that -- I think it's just something that he's

10 taken up.

11 Q.  Were the bonobos active in communicating and running around?

12 A.  When surprise was said, then -- when Kanzi started to

13 vocalize, then Nyota who was standing above him started to

14 vocalize, and the ones across the way also joined in in also

15 vocalizing.

16 Q.  Was the communication that you saw yesterday consistent with

17 the research trajectory of Dr. Savage-Rumbaugh as you understand

18 it?

19 A.  It was bonobo communication.  It wasn't through symbols or

20 whatever.

21 Q.  Did you see lexigram keyboards?

22 A.  I saw it a short distance away, yeah, the one outside where

23 the surprise was asked and --

24 Q.  To your knowledge, were all of the lexigram keyboards

25 functioning?

1   A.  I saw nothing lit on that keyboard.  It could have been

2   scratched up.  I don't know.  Inside there's another keyboard

3   that seemed to be working with -- I think it was on a big yellow

4   dot.  It looked to me like what had been used on the orangutan

5   project, but I don't know.  I didn't ask.

6   Q.  Who was with you on this visit?

7   A.  Shane, Sue's son.  I think his last name is Rumbaugh.  I

8   can't remember.  He grew up, and he was communicating with

9   Kanzi.

10  Q.  Who visited you and welcomed you to the center?

11  A.  Bill Hopkins.

12  Q.  Do you know Bill Hopkins?

13  A.  Yes.  I've known him his entire career.

14  Q.  And how do you know him professionally?  What do you know

15  about him professionally?

16  A.  I just have him in high regard as a professional.  He's an

17  expert on laterality.  We have two hemispheres of our brains and

18  other mammals do, going way back to fish for certain.  Certain

19  behaviors are lodged in one or the other.  The theory is that

20  the neural activity -- if you had to have both engage, it would

21  slow down the neural activity, your ability to respond, and so

22  forth.

23  Q.  Did Kanzi recognize Shane when you went in?

24  A.  I'm not sure, I'm not sure, because we were masked, and

25  there was certainly no immediate response.  As I say, he had his

1   back to us and sort of, you know, looked around and back and

2   finally he came and got in the tunnel near the keyboard.

3   Q.  You mentioned you had to wear masks and gloves.  Did the

4   bonobos, were they able to go into the forest?

5   A.  There is a woods there, but I did ask about that.  No, they

6   can be in the grassy area before that I think.  I don't know how

7   far out, but --

8   Q.  Were you taking -- I'm sorry.  Were you taken to an

9   infirmary?

10  A.  I asked if there was an infirmary.  There's one that is

11  going to be developed, but the room was empty.

12  Q.  Was there an infirmary there yesterday?

13  A.  No.

14  Q.  What was it?

15  A.  It was an empty room.

16  Q.  Dr. Tuttle, in your opinion, did it appear to be a

17  functional research center?

18  A.  There were two people there.  Bill was there and another

19  person, Sara, and I don't know what they were doing before, but

20  there was no other activity going that I could see; but we could

21  have distracted them from whatever they were doing research

22  wise.

23  Q.  Dr. Tuttle, are you familiar with the settlement agreements

24  entered into in this case?

25  A.  I've seen them, yes.

1  Q.  Have you read the research trajectory provisions in those

2  settlement agreements?

3  A.  Yes.

4  Q.  Do you know what that research trajectory is?

5  A.  Well, I know what it is to Sue, and as I read it, that is

6  what it is to Sue.

7  Q.  Do you have a personal opinion as to what that research

8  trajectory looks like?

9  A.  Yes.  I think it carries forward from the linguistic

10 capabilities to instantiated in culture to test out now whether

11 we can move ahead and see if you have symbolically deviated

12 culture, if that can be achieved in bonobos, and even further

13 than that if you can, can you start really finding out what

14 they're thinking.  We know they think, but can we really get at

15 thinking, and do they have any kind of goals, do they have

16 belief systems, do they have ideals even.

17 Q.  You mentioned that you are familiar with Dr. Bill Hopkins,

18 is that right?

19 A.  Yes.

20 Q.  Do you know who Dr. Jared Taglialatela is?

21 A.  Yes, of course.

22 Q.  Are you familiar with his work?

23 A.  Yes.  I've even helped it I think at times as an editor of a

24 journal and whatever throughout his career.

25          MR. STAMBAUGH:  Your Honor, at this time I would like

1  to publish the amended version of Exhibit 1006 that has already

2  been admitted in evidence.

3            THE COURT:  Okay.

4            THE WITNESS:  I have it.  No, I have --

5  BY MR. STAMBAUGH:

6  Q.  And, Dr. Tuttle, you can also look at the screen right in

7  front of you if that would help.

8  A.  Oh, thanks.

9  Q.  And there's a screen to your left behind you.

10 A.  Okay.  I'm looking.

11 Q.  I'm going to ask you to go ahead and take a look at what's

12 been marked as Exhibit 1006.

13            If you want to go ahead and scroll down.

14 A.  It says out of range.

15 Q.  Oh, your screen is not working.  It's not the first time.

16 It's nothing against you personally, Dr. Tuttle.

17            Have you seen this document before?

18 A.  What is it?  I have a paper copy here of something called

19 ACCI Active Research Protocols.  Is that what we're talking

20 about?

21 Q.  Correct.  Why don't you go ahead and take a look at that

22 paper copy first.  And why don't we take just a second to see if

23 we can fix your screen.

24 A.  This is old, I think.  It has eight.  I've seen one that has

25 11.

1          Now, you'll have to -- how do I scroll?

2          THE CLERK:  You don't.  They do.

3          MR. STAMBAUGH:  Your Honor, may I approach?

4          THE COURT:  You may.

5     BY MR. STAMBAUGH:

6     Q.  Dr. Tuttle, I've handed you what is the amended version of

7     Exhibit 1006.

8     A.  Thank you.

9     Q.  So you can refer to that.  Have you seen this document

10    before?

11    A.  Yes.

12    Q.  Have you reviewed it?

13    A.  Well, as best I can.  I would like to see the substance -- I

14    see titles and dates, but I would like to see the substance of

15    what is being planned, over what time period, how many subjects,

16    you know.

17    Q.  But you've read these protocols, the titles of the

18    protocols?

19    A.  Yes, yes.

20    Q.  Dr. Tuttle, in your opinion, do you think that these

21    research protocols can accomplish the research trajectory that's

22    set forth in the settlement agreements?

23    A.  No.

24          MR. MILLER:  I'm sorry, Your Honor.  Objection; lack

25    of foundation.  Objection; relevance.

1          THE COURT:  I'll receive it, subject to the objection.

2          MR. STAMBAUGH:  You can answer.

3   A.  Oh, okay.  Well, I have been, as I said, on site -- not

4   exactly a site -- well, one site, not others.  I do know how to

5   read a title and tell perhaps what they might want to do.  What

6   I can't do here is to tell exactly how they're going to

7   accomplish all of this.  In fact, you have five subjects, five

8   bonobos to work with, and 11 projects.  It just doesn't seem

9   feasible to me that you're going to be able to do this in a

10  reasonable amount of time.  It should be pruned down to a couple

11  of really central things to look at and justify that.

12  BY MR. STAMBAUGH:

13  Q.  You mentioned the amount of time it might take.  Is someone

14  who is present at the lab approximately six days a month able to

15  accomplish the research necessary to continue

16  Dr. Savage-Rumbaugh's research trajectory?

17          MR. MILLER:  Objection; lack of foundation.

18  Objection; relevance.

19          Thank you.

20          THE COURT:  I'll receive it, subject to the objection.

21  A.  They couldn't do it themselves certainly if you have

22  obligations elsewhere, and so forth, and that means you would

23  have to get assistants and students and whatever to be doing the

24  actual work, and that can have its pitfalls.

25  BY MR. STAMBAUGH:

1  Q.  You mentioned that you know Dr. Bill Hopkins, correct?

2  A.  Yes.

3  Q.  And you know of Dr. Jared Taglialatela?

4  A.  Yes.

5  Q.  In your professional opinion, Dr. Tuttle, do you think that

6  Dr. Hopkins and Dr. Taglialatela are well situated to continue

7  the research trajectory of Dr. Savage-Rumbaugh?

8  A.  I think, in fact, it's quite the opposite.

9  Q.  Why is that?

10  A.  Because we have the language thing, now we want to move it

11  forward into areas that aren't really represented here.  It's

12  more comparative psychology than it's something that would be --

13  I'm sure my colleagues in social anthropology wouldn't accept

14  this.  It's more anthropological.  You're really getting at what

15  it is to be a human being, a culture, a culture bearing

16  symbolically deviated being.  And she's the only one who has the

17  faith in this to carry it forward, and she had started it even,

18  but because of that grant -- the grant had all of that in it;

19  but when you have an unqualified person to be the project

20  director, as long as she's willing to do it herself, I think we

21  can make some progress.

22  Q.  Dr. Tuttle, have you seen any recent videos in addition to

23  your site visit yesterday showing what's going on at the Great

24  Ape Trust today?

25  A.  Well, I saw Jared talking to some news people about biking

1  for bonobos and stuff, but I don't recall there being any

2  footage in there about bonobos.  The preceding one from March, I

3  think, done by Cedar Rapids was -- again, it was more, you know,

4  an entertainment piece almost.  I mean, it was trying to make

5  the point that they're all happy and everything is going fine.

6  There was one statement about the research that's going on, but

7  actually what Sara said was that she's there to get things

8  started so that they can get -- have some data, in essence.  I'm

9  paraphrasing.

10 Q.  And just for the record, you're talking about an earlier

11 video?

12 A.  March, I think, March.

13 Q.  Of the bonobos at the Great Ape Trust?

14 A.  Yeah, yeah.

15 Q.  What did that indicate?

16 A.  It had Teco in it and Nyota, and there was one very silly

17 thing.  Nyota was sitting with his mouth pressed to the glass

18 and a girl runs by and kisses him, kisses the glass and runs on,

19 and he wiped his mouth off on his arm, which was humorous; but I

20 don't know why that's going on.  It's not good health for people

21 to be kissing the glass, I wouldn't think.

22 Q.  What do the videos indicate to you, in your opinion,

23 regarding the actual research that was happening at the lab?

24 A.  There was no research apparent.  There was a promise of

25 things to come, but there was no research apparent.  And one of

1 the chimpanzees had a slash on his back, too, a deep open wound,

2 which was not there when we saw it, so apparently it had been

3 treated.

4 Q.  Dr. Tuttle, you mentioned Sara few minutes ago.  Who is

5 Sara?

6 A.  Her name is Sara Skiba.  She said on the phone that she's

7 the coordinator of the research.

8 Q.  I'm going to ask you to take a look at Exhibit 1006 to see

9 if you recognize the Sara you're talking about?

10 A.  Yes.  She's on the first one, the second one, the third one,

11 the fourth one, the fifth one, the sixth one, the seventh,

12 eighth and ninth.  She's not on one or two of them, as a

13 research assistant.

14 Q.  Sara Skiba is listed as a research assistant on the majority

15 of these protocols?

16 A.  Yes.

17 Q.  Do you know who Sara Skiba is?

18 A.  I met her.

19 Q.  When did you meet her?

20 A.  Yesterday, apart from seeing her on the video, but yes, I

21 met her yesterday.  She seemed to be very bright, eager.  I

22 think she's a master's student at Jared's school.

23 Q.  Dr. Tuttle, just a few final questions for you.  I'll

24 represent to you that Dr. Taglialatela testified here in court

25 that, in his opinion, Kanzi is not any worse off for not having

1    interacted with Dr. Sue Savage-Rumbaugh.  What is your

2    professional opinion of that statement having just seen Kanzi

3    yesterday?

4              MR. MILLER:  Objection; lack of foundation.

5    Objection; relevance.

6              THE COURT:  I'll receive it, subject to the objection.

7              THE WITNESS:  And can I answer or not?

8              MR. STAMBAUGH:  You can answer it.

9    A.   Yeah.  Let me sort of answer this in a somewhat different

10   way.  We talk about enrichment of captive animals.  There are

11   two zoos in Chicago that I take our students to, and I won't

12   tell you the project, but it's on this kind of thing.  They have

13   done everything you can imagine almost to enrich the environment

14   of the gorillas, chimpanzees, et cetera, in their zoos; but it

15   can't compare with what Sue was doing.  Sue was the enrichment

16   for Kanzi.  He grew up with her, et cetera.  She was his

17   enrichment.  I mean, the things she brought to him, not just her

18   presence, but the way she interacted, the things she introduced

19   him to, the things she exposed him to that he learned on his

20   own, you know, by just being around, et cetera.  That was the

21   enrichment.

22             None of that was going on when I went Thursday.  He's

23   sitting out in the grass, fiddling with the grass, but that's 45

24   minutes.  But I don't think you can match that.  I don't think

25   you can take someone, some being that's had that kind of thing

1  and then just stop it.

2  BY MR. STAMBAUGH:

3  Q.  Dr. Taglialatela also testified for us that in his 20 years

4  experience he thought that the emotional health of these bonobos

5  was good.  In your professional opinion, what do you think the

6  emotional health of these bonobos will be going forward without

7  Dr. Sue Savage-Rumbaugh?

8           MR. MILLER:  Objection; lack of foundation.

9  Objection; relevance.  Objection; also calls for speculation.

10          THE COURT:  I'll receive it, subject to the question.

11 A.  Would you --

12 BY MR. STAMBAUGH:

13 Q.  With your fifty years of experience?

14 A.  Rephrase it.  I mean without the 50 years.  Tell me what

15 you're asking again.

16 Q.  Yes, absolutely.  Dr. Tuttle, in your opinion, what do you

17 think will happen to the emotional health of these bonobos if

18 Dr. Sue Savage-Rumbaugh is absent from their lives forever?

19 A.  I can't -- it's too broad a question in a sense.  I mean,

20 they're going to continue to live on.  I mean, people live on

21 after all kinds of awful things happen to them, and they can be

22 re -- what is it; reconstituted, if you will, to some extent,

23 but it doesn't -- the question would have to be, if you want me

24 to speculate, would he be a happier, more productive for

25 humankind bonobo if he had stayed with Sue, yes, absolutely, and

1    the others as well.  We would be well along in knowing yes or no

2    about, again, what I've spoke of of the cultural part of

3    language and culture.

4    Q.  And, finally, Dr. Tuttle, you've seen Mr. Ryan Sheldon's

5    PowerPoint presentation?

6    A.  Yes.

7    Q.  Have you?

8    A.  Yes.

9    Q.  And what was your opinion of his PowerPoint presentation in

10   terms of a viable alternative location for these bonobos?

11   A.  I would move them immediately if it were ready or as soon as

12   they are and without -- we've talked about many things.  I think

13   the flooding threat is the big thing and the toxicity of the

14   soil.  I just don't understand why the soil isn't tested and

15   whatever.  They shouldn't be there until the place is ready to

16   serve them well.  And this is not faulting Jared and Bill, Bill

17   Hopkins and Jared Taglialatela; but the place I think has

18   become -- it can't help but become more toxic.  They have been

19   dying.  I mean, what kind of -- what more do you want?  I don't

20   know if it's directly related, but something is going on there

21   that they die.  If they're subject to respiratory stuff and it's

22   going through the colony and the fourth one dies, Panbanisha,

23   then why aren't remedial things taken, why don't you look at the

24   whole context of things.  Is that an enriched environment?

25   Q.  In your professional opinion, it's not an enriched

1   environment?

2   A.   No.   It isn't for people and it wouldn't be for apes.

3            MR. STAMBAUGH:   Your Honor, I have no further

4   questions at this time and pass the witness.

5            THE COURT:   Cross-examination.

6                          CROSS-EXAMINATION

7   BY MR. MILLER:

8   Q.   Good afternoon, Dr. Tuttle.   My name is Bill Miller.   We met

9   in the hall briefly.

10           You were just discussing you're aware that four

11  bonobos died through Panbanisha, is that right?

12  A.   No.   I said there were four ill.   The report that I read,

13  the obituary -- not obituary; the autopsy Panbanisha stated that

14  four had been ill.

15  Q.   Okay.   At the time that Panbanisha died four were ill?

16  A.   They had been.

17  Q.   Okay.

18  A.   It was as if the virus was going from A to B to C to D,

19  which is common with people.   It takes them awhile for a virus,

20  if you get it, to start showing symptoms.

21  Q.   Okay.   And you're concerned there was no followup on that

22  issue at that time?

23  A.   From when the first one got sick, obviously.

24  Q.   Right.   And you understand at that time Dr. Taglialatela and

25  Dr. Hopkins were not on the scene?

1   A.  I just said that, that I didn't hold them responsible for

2   that.

3   Q.  Right.  Dr. Rumbaugh was the scientist in residence,

4   correct?

5   A.  I have no idea.  I just don't remember any mention of Bill

6   or -- I don't know if they were in charge of the center at the

7   time.  I don't know who was in charge of the center at the time.

8   Q.  You have very impressive credentials, and I will establish

9   that; but you have no credentials with respect to flooding or

10  expertise with regard to flooding, correct?

11  A.  No.

12  Q.  And same thing with toxicity of water or soil; is that

13  accurate?

14  A.  I know if it's there, it should be eradicated.  My point is

15  it should be tested and, to my knowledge, it has not been.  Even

16  today I don't know.

17  Q.  Right.  And you came to that conclusion when you first

18  visited the center in 2008 or before?

19  A.  No.  I had asked the question when I saw the plans, has it

20  been tested?  I was told -- I wasn't really answered, but it

21  wasn't my business to start asking them to test the soil.

22  People heard it.  I assumed it would proceed.

23  Q.  Okay.  And that was made in --

24  A.  A year later I was invited to be on the scientific advisory

25  board, and I'm sure if I would have stayed on it without Ted

1   saying he would fire Sue, I would have demanded it.

2   Q.  Did you tell either Dr. Duane Rumbaugh or

3   Dr. Savage-Rumbaugh, you can't leave Georgia until somebody

4   shows you a test or a report about flooding?

5   A.  No.  I hadn't seen the plans yet.

6   Q.  The same thing, you didn't say to them, you cannot leave

7   Georgia until you are satisfied that there's no toxic soil here?

8   A.  No.

9   Q.  And Dr. Duane and Dr. Sue are close friends of yours for

10  decades; fair?

11  A.  Yes, I would say that.  You would have to ask them.

12  Q.  Sure.

13  A.  But I know where my heart is.

14  Q.  Now their son drove you around yesterday for your visit here

15  in town?

16  A.  Yes.  It was nice to see him again.  And I told him he

17  probably would have to wait outside.

18  Q.  Right.  But he was welcomed into the center?

19  A.  He grew up with Bill.

20  Q.  Why did Dr. -- or excuse me, why did Mr. Townsend want to

21  fire Dr. Savage-Rumbaugh?

22  A.  You don't ask Ted why.  He just does what he wants.

23  Q.  Well, did he tell you why?

24  A.  No.  And, in fact, if you -- if I can talk at length, I

25  did -- I wrote to him when I got home and told him, you can take

1   me off the board, too.  In fact, while I was there, he asked me

2   if I would chair the board -- this is the first day -- and also

3   would I be willing to come and be the director of the center,

4   this new center.

5   Q.  Ted was asking you to replace Dr. Savage-Rumbaugh?

6   A.  No.  I don't know that Sue was meant to be the director.

7   She was the researcher, lead researcher.

8   Q.  During your visit yesterday, did you ask Dr. Hopkins to

9   review the IACUC protocols or any and all documents backing

10  Exhibit 1006 that you looked at?

11  A.  No.  You mean the actual texts of them?

12  Q.  Right.

13  A.  No.  No, I did not.

14  Q.  But you told the court those are important, you wanted to

15  see them?

16  A.  No.  I would like to see them I said before I would judge

17  it, but it looks too busy to me -- regardless what's in them, it

18  looks like a very busy agenda, especially if you're not set up.

19  Q.  Okay.  But you testified you wanted to review them and you

20  didn't ask to review them while you were there?

21  A.  No.  I wasn't there for that.  I was to see the condition of

22  the animals and the facility, et cetera.

23  Q.  Did you ask to review any documents while you're visiting?

24  A.  No.

25  Q.  Is another common reaction for an ape in captive environment

1  to spit on a person they don't know?

2  A.  Well, he knew -- no, he wouldn't know Shane either.  I don't

3  know.  How would he know me, if he did know me, with a mask on?

4  Q.  Okay.  But that reaction, spitting on you, may have been a

5  reaction to the fact that he did not know you, correct?

6  A.  That's speculation.

7  Q.  It's one possibility, correct?

8  A.  If you want to make it so, yes.  I don't know.

9  Q.  And you were wearing a mask because you had just recovered

10  from the flu and you had been asked to --

11  A.  No, no.  It's the rule, you have to.  If you go in certain

12  areas of the ape places, you're supposed to wear a mask and

13  rubber gloves.

14  Q.  You had a question about Dr. Savage-Rumbaugh's research

15  trajectory.  Have you reviewed Bonobo Hope's research

16  trajectory?

17  A.  Yes, not in this, but I've seen it.

18  Q.  Okay.  What did you review?

19  A.  I think I was asked to be on that board, too, at some point.

20  I don't remember.  It would have been sometime when it was

21  forming, but I don't remember.

22  Q.  What is the research trajectory?

23  A.  The research trajectory is -- it's in a paragraph in a

24  couple of things where you go from things that have already been

25  done into art and agriculture, and I forget what all.  I would

1  have to have it in front of me.

2  Q.  I appreciate that.  I think you're referring to the research

3  trajectory you read and you testified to about the settlement

4  agreements.  I'm saying, what did you review that Bonobo Hope

5  gave you with the research trajectory?

6  A.  I don't know that Bonobo Hope gave me anything.

7  Q.  And you haven't reviewed their research trajectory?

8  A.  No, no.

9  Q.  Do they have a research trajectory that they've shared with

10  you?

11  A.  I assume it's the same as was in those documents, the

12  settlement agreements.

13  Q.  And you would not move the bonobos to Missouri until -- you

14  said at least until the facility is finished, is that right?

15  A.  Well, of course.

16  Q.  You were okay with the proposal with respect to caging of

17  the bonobos?

18  A.  I don't understand.

19  Q.  You had an opportunity to review Mr. Sheldon's proposal,

20  correct?

21  A.  Yes.  I've seen the presentation of it.  It looks wonderful,

22  but I would certainly not start moving them immediately.  It's

23  too bad we can't do that.  It's not finished.

24  Q.  And you're comfortable with that proposal, even though there

25  are cages for the bonobos?

1   A.  There will have to be.

2   Q.  And you're comfortable moving them, even though it will

3   require anesthetizing them before you move them down to

4   Missouri?

5   A.  I'm not sure it would require anesthetization before moving

6   them.  In fact, I think you could probably get around that,

7   unless there's a law about it or something, you know.

8   Q.  So if it's a USDA requirement, you would agree that that

9   would be necessary?

10  A.  It wouldn't be my place to agree or disagree.  I would have

11  nothing, no reason to be commenting on it really.

12          MR. MILLER:  Dr. Tuttle, thank you for your time.

13          Have a safe trip back.

14          THE COURT:  Doctor, I do have a question for you.  I

15  didn't pick it up.  You might have mentioned it.  When was it

16  that Mr. Townsend told you that he wanted to fire

17  Dr. Savage-Rumbaugh?

18          THE WITNESS:  It was at the first meeting of the

19  scientific advisory -- what was it -- council anyway -- well, an

20  advisory council, the first meeting.  It was in 2007.  There's a

21  copy of the invitation somewhere in the records.  I have -- no,

22  it's not.  But I have the invitation to do it, yeah.

23          THE COURT:  Thank you, Doctor.

24          THE WITNESS:  Thank you.

25          THE COURT:  Anything further?

1          MR. STAMBAUGH:  Nothing further, Your Honor.

2          Thank you.

3          THE COURT:  You may step down, sir.  Thank you.

4          May this witness be excused?

5          MR. MILLER:  Yes.

6          MR. STAMBAUGH:  Yes.

7          THE COURT:  You're excused.

8          THE WITNESS:  What's the short way out?

9          THE COURT:  Directly to the door.

10                                    (Witness excused.)

11         MR. STAMBAUGH:  Your Honor, with the conclusion of

12   Dr. Tuttle's testimony, again, Your Honor, defendants do rest

13   their case.  There's one very small housekeeping issue with

14   documents that I've spoken to opposing counsel about.  I think

15   we can deal with that at the end if necessary so we can move

16   along.

17         So for present purposes, reserving those rights,

18   defendants rest.

19         THE COURT:  Ready to call your next witness,

20   Mr. Miller?

21         MR. MILLER:  We are, Your Honor.  And just to

22   confirm -- and I apologize -- my understanding, I believe

23   counsels' understanding as well, is the court intends to defer

24   any motion, oral motion that we might make to the briefing that

25   we're contemplating for after the hearing?

```
1            THE COURT:  You can join such a motion if you want
2   with your briefing, yes.  I will accept that.  Nobody needs to
3   make -- you're talking about a motion for judgment as a matter
4   of law?
5            MR. MILLER:  For instance, Your Honor, I was not
6   intending to do that.  I just didn't know if you were expecting
7   we could do that.  I think both of our understanding was we were
8   going to be briefing these issues, but we didn't want to
9   surprise the court if we didn't address that I guess.
10           THE COURT:  It wouldn't surprise me.  I always hope
11  people tell me.
12           So we're clear, can it be stipulated and agreed that
13  all rule 50 type motions which might be made at the conclusion
14  of one party's record or the other party's record, all of those
15  things may be reserved until the posttrial briefing and may be
16  included therein as a part of the briefing?  Is that
17  satisfactory?
18           MR. STAMBAUGH:  So stipulated, Your Honor.
19           MR. MILLER:  Same, Your Honor.
20           Thank you.
21           MR. MELHUS:  Plaintiffs call Dr. William Hopkins to
22  the stand.
23           THE COURT:  Dr. Hopkins, if you would come forward,
24  please, and face the clerk, she'll administer the oath to you.
25           THE CLERK:  If you would stop right there.  Raise your
```

1   right hand.

2           WILLIAM HOPKINS, PLAINTIFF'S WITNESS, SWORN

3                   DIRECT EXAMINATION

4   BY MR. MELHUS:

5   Q.  Good afternoon, Dr. Hopkins.

6           Could you please state your name and spell your last

7   name for the record, please.

8   A.  William Hopkins, H-O-P-K-I-N-S.

9   Q.  And could you please describe your educational background

10  for the court?

11  A.  I have a bachelor's degree in psychology from the University

12  of Wisconsin, a master's and Ph.D. from Georgia State

13  University.  That's my academic background.

14          I have held three faculty appointments.  I worked from

15  1994 to 2005 at Berry College in Rome, Georgia.  In 2005 I moved

16  to Agnes Scott College, an all women's liberal arts college in

17  Atlanta, from 2006 to 2011.  And then in 2012 I went to the

18  Neuroscience Institute at George State University, which is

19  where I am now.  I've also held an appointment as research

20  associate scientist of Yerkes National Primate Research Center

21  since 1990, and I continue with that appointment today.

22  Q.  And you're currently a member of the ACCI Board of

23  Directors, is that correct?

24  A.  That's correct -- I'm sorry, I'm president of ACCI.

25  Q.  Okay.  And could you please direct your attention to what's

1  been marked as Plaintiffs' Exhibit 1008.  It's in the small

2  binder in front of you.

3  A.  Okay.

4  Q.  And could you just describe that document generally for the

5  court?

6  A.  I just want to make sure -- could you say the document

7  again; I'm sorry?

8  Q.  I'm sorry.  It's Plaintiffs' Exhibit 1008.

9          THE COURT:  It should be in the small notebook.

10          THE WITNESS:  Right there?

11          THE COURT:  No, not that.

12          MR. MELHUS:  May I approach, Your Honor?

13          THE COURT:  You may.

14          THE WITNESS:  Sorry.  I want to make sure I'm looking

15  at the -- oh, 1008.  I'm sorry.  Oh, I'm sorry, it's my CV.

16  Okay.  It's an exhibit now.

17  BY MR. MELHUS:

18  Q.  I think I may have missed it, but you said that was your CV?

19  A.  That's correct.

20  Q.  Okay.  And just in the general sense, are CVs created in the

21  normal course of business as a Professor of Neuroscience at

22  Georgia State University?

23  A.  A CV would be an academic's, essentially their resume, and

24  they're continually updated with changes in appointments or

25  publications, grants, any other academic responsibilities you

1   might have such as serving to the college or community.

2   Q.  And did you prepare that CV?

3   A.  I did.

4   Q.  And did you prepare it in the normal course of business as

5   you just described?

6   A.  That's correct.

7   Q.  Is it a complete and accurate representation of your

8   accomplishments to date?

9   A.  Pretty close.

10  Q.  Okay.  Did you make each of the entries on the CV or update

11  them at or about the time that the accomplishments occurred?

12  A.  Yes.

13          MR. MELHUS:  Plaintiffs offer Exhibit 1008 into

14  evidence at this time.

15                              (Plaintiffs' Exhibit 1008 was

16                              offered in evidence.)

17          MR. STAMBAUGH:  No objection, Your Honor.

18          THE COURT:  1008 is received.

19                              (Plaintiffs' Exhibit 1008 was

20                              received in evidence.)

21  BY MR. MELHUS:

22  Q.  Could you please describe for the court how you became

23  involved with the bonobos at ACCI?

24  A.  Okay.  In the fall of 2013, Dr. Taglialatela was approached

25  by Bonobo Hope and Sue and Duane Rumbaugh to assume leadership

1    of the organization, and Jared approached me and asked me if I

2    would be willing to help.  So I said yes, I'm certainly willing

3    to consider that, given the history that I had also had with

4    those particular bonobos, and we came to visit in the fall of

5    2013 and decided -- I decided at that point that I would work

6    with Jared toward, you know, resurrecting the facility and the

7    organization.

8    Q.  Okay.  Prior to making that decision, did you have any

9    conversations with Dr. Sue Savage-Rumbaugh?

10   A.  We did.  We talked by phone, and we had a number of e-mail

11   exchanges that I was copied on, including the correspondence

12   with Jared, and we were assured that we would have autonomy to

13   move the research in the direction that we thought would be most

14   beneficial for garnering private or public sector support for

15   the work and to try and, you know, essentially, you know,

16   reactivate, you know, start the program of research again and

17   try to improve the visibility of the institution both nationally

18   and internationally, which I think it was suffering at that

19   time.

20   Q.  Okay.  And I think you mentioned some e-mail communications

21   with Dr. Savage-Rumbaugh, is that correct?

22   A.  That's correct.

23   Q.  Could you please direct your attention to what's been marked

24   as Plaintiffs' Exhibit 1005.

25   A.  I'm sorry, I don't -- 1005?  There doesn't seem to be

1   anything in the 1005, unless I'm missing something.

2              THE COURT:  Why don't you help him out.

3              MR. MELHUS:  May I approach the witness, Your Honor?

4              THE COURT:  You may.

5              THE WITNESS:  I'm sorry, I can't read a folder.

6              MR. MELHUS:  That's okay.

7              THE WITNESS:  1005?

8              MR. MELHUS:  One moment, Your Honor.

9              (Pause.)

10             THE COURT:  I have my copy here if that would help

11   speed things up.

12             MR. MELHUS:  Well, I think we have another copy here.

13             May I approach, Your Honor?

14             THE COURT:  You may.

15             THE WITNESS:  Okay.

16   BY MR. MELHUS:

17   Q.  Could you please briefly describe that document for the

18   court?

19   A.  This document is a series of correspondence principally

20   between Sue and the board members of IPLS encouraging them to

21   endorse and support Jared and my control over essentially IPLS.

22   And, you know, the rest of the document just describes her

23   support for us, our credentials to manage the facility and to

24   take care of the apes.  And the rest of the document is the

25   support that we received from the Bonobo Hope board endorsing

1  our appointments to the IPLS and to the management of the

2  operation.

3  Q.  And based on that e-mail and some of the conversations you

4  described earlier, what was your understanding of your role at

5  the Iowa Primate Learning Sanctuary and the research it was

6  conducting moving forward?

7  A.  My understanding was that essentially the organization was

8  being handed to Jared and I and that we were being asked, and I

9  would even go so far to say as we were being, you know, begged

10  to take over the management and the care of the animals, and

11  that's what was my understanding.  It was my understanding we

12  had complete authority to do that, to take the research in the

13  direction it needed to go, and we had the complete authority to

14  make decisions about the welfare of the animals, and that was my

15  understanding of the agreement.  And, quite frankly, I would not

16  have got involved without that stipulation.

17  Q.  Okay.  And you understand that prior to those conversations

18  and that e-mail that's marked as an exhibit, Plaintiffs' Exhibit

19  1005, that Dr. Savage-Rumbaugh had a more active role in IPLS?

20  A.  No.

21  Q.  Excuse me.  Prior to the conversations and e-mail

22  communications prior to you joining IPLS, did

23  Dr. Savage-Rumbaugh have a more active role at any point

24  historically?

25  A.  At IPLS, yes, she did.  Prior to our involvement, yes.  The

1  plan was not for her to be involved going forward.

2  Q.  Okay.  I would like to talk about some of the research

3  that's being conducted at ACCI currently.  Could you please

4  direct your attention and I'm going to ask you to flip to the

5  exhibit book in front of you again.  It's Plaintiffs Exhibit

6  1006.

7  A.  Okay.

8  Q.  And could you describe that document just briefly?

9  A.  It looks like a brief description of the active IACUC or

10  research protocols that have been approved at ACCI.

11  Q.  Okay.  And would you be able to describe some of those --

12  some of that research that's reflected in this document for the

13  benefit of the court, starting with, for example, what's

14  described as AUP No. 140423-01?  It's the very first protocol on

15  the list.

16  A.  Well, the first project is Dr. Taglialatela's proposal.  In

17  that particular IACUC, the goal is to go back and to

18  characterize the speech comprehension abilities of all of the

19  bonobos at ACCI.  We know that Kanzi's abilities are well

20  documented, but the rest we know much less about, although

21  clearly we interact with them, we have a sense they understand

22  many, many words, but we don't really have a sense of that.

23        For me, I guess, this complements the work from the

24  past in important ways in that we're establishing, you know,

25  what other individuals are capable of doing this.  And then the

1  larger goal of that project is to incorporate experimental

2  psychological methods into assessing what are the underlying

3  mechanisms that allow for these bonobos to comprehend spoken

4  English.  It's really a remarkable ability that they have, but

5  we really, really don't understand beyond their capacity to do

6  that much about how they're capable of doing that.  And if you

7  look in the literature and you look for theories for an

8  explanation of that, there's very few of them, and it's really

9  difficult to reconcile what they're capable of doing with what's

10  out there theoretically.

11        So to me this is a very important project and

12  certainly one that complements the work from the past.

13  Q.  When you describe the work from the past, could you kind of

14  explain what you mean?

15  A.  Well, I'm talking about the work that's been started at the

16  Language Research Center in the early 1970s, and that is the use

17  of symbols, the ability -- there's documentation of the

18  linguistic capacities of chimpanzees and bonobos.  So that's

19  essentially what I mean by the past.

20  Q.  Okay.  And would it be fair to characterize that type of

21  research as experimental psychology?

22  A.  Absolutely.

23  Q.  Would it be fair to characterize that type of research as

24  the use of language?

25  A.  Yes.

1   Q.  Would it be fair to characterize that type of research as

2   involving ape intelligence?

3   A.  Absolutely, sure.  I mean, again, as, you know, their

4   capacity to acquiring and use the symbols and their capacity to

5   particularly comprehend the speech certainly reflects something

6   about their intelligence.  So it certainly captures, you know,

7   that theme as a research theme as a whole, sure.

8   Q.  Okay.  And I think the court may be curious, and there's

9   certainly some questions about some of the other research that's

10  going on at ACCI, so I'll ask you just to describe one more

11  research protocol.

12        Let's move to the third on the list, which is marked

13  as AUP No. 140611-02.  Could you describe that protocol and the

14  research that's being conducted under it?

15  A.  So this is Dr. Lyn's protocol, so she's really interested in

16  examining the role that social linguistic experiences have on

17  the developmental cognition.  And so in this particular set of

18  studies, she's developed or is employing something called a

19  primate cognition test battery.  So it's sort of a standardized

20  intelligence test, for lack of a better term, that's used to

21  measure sort of social and physical intelligence in apes

22  specifically.

23        So her goal in that project is to explore, you know,

24  whether acquiring the use of a symbol system, you know, in some

25  way alters or it selectively picks certain forms of intelligence

1  over others, so that's a pretty significant part of that

2  project.

3         The other part of that project is trying to get at an

4  old question that's been around a long time in the literature,

5  and that is, what is the motivation behind ape communication.

6  So starting back in the seventies, it was sort of argued that

7  apes only sign or use chips or use symbols for instrumental

8  things, so they only produce keyboard utterances for the

9  purposes of asking for something, I want this, I want that, I

10  want that.  They never engage in communication just for the

11  purposes of communication.  So, you know, look, there's an

12  airplane up in the sky, which is -- you know, so this has been

13  an argument that's been around starting with Paris, but more

14  recently it was argued in the literature, not just in the

15  context of simple use, but also in the context of just normal

16  forms of gestural and vocal communication in apes.

17         So there's an element of that proposal as well that

18  aims to look at, you know, whether or not particularly apes that

19  have been raised in these sort of rich sociolinguistic

20  environments are more prone to engage in more declarative form

21  of communication, which are these forms where you talk about

22  something other than asking for something.

23  Q.  Okay.  Thank you for that description.

24         I think we talked earlier about how you would

25  characterize that type of research.  Are you familiar with

1  Dr. Savage-Rumbaugh's research historically?

2  A.  Yes, I am.

3  Q.  Would you characterize that type of research as continuing

4  on the same type of research trajectory?

5  A.  I would.  In fact, I would argue that this work is all, you

6  know, being framed in a way that complements that work very

7  well.

8  Q.  Since you've been involved at ACCI, have there been any

9  changes to policies or protocols that are designed to benefit

10  the bonobos' care and well being?

11  A.  Yes.  So we have done a number of things in terms of

12  sanitation.  So we've removed some -- at least early on, some of

13  the greenhouse areas had a bark in them instead of the natural

14  floors, and so we removed some of those substrates just because

15  we had some mold building in there and that was we thought a

16  health problem, so we removed some of that.

17        We've instituted some policies around how the care

18  staff and also the volunteers interact with the animals in terms

19  of, you know, certain levels of sophistication and what they're

20  allowed in terms of contact policy with the animals.  So we have

21  instituted some of those policies as well, and we've also

22  adopted the policies of having both the volunteers and the care

23  staff to wear masks and gloves when working with the apes.

24  Q.  And what would be the benefit of having the volunteers and

25  caretakers wear masks and gloves when interacting with the

1  bonobos?

2  A.  So it's principally for the health of the apes, so we worry

3  about human pathogen transmission to the apes, all right.  The

4  apes are in the facility.  They're confined.  We're not worried

5  so about the contact, what they encounter with each other.  What

6  we worry about is the volunteers and the staff go home every day

7  and socialize with other people and other people, and so each

8  time they do that, you know, they're putting themselves at risk,

9  you know, of picking up some type of pathogen that could then be

10  brought back and transmitted to the chimps and the bonobos.  So

11  we just were worried about that.  And what prompted that was the

12  fact that Teco had been ill when we first came on board, and we

13  were -- it was a respiratory infection.  They only get them from

14  us, no other way.  This was on the heels of Panbanisha passing

15  away from a respiratory infection essentially.  So we just

16  didn't want to put the apes at any more risk, so we instituted

17  this policy, and it's a policy that's used in many institutions

18  that house great apes.

19  Q.  Are there exceptions to the policy to allow for research

20  interaction with the bonobos?

21  A.  Certainly.

22  Q.  Could you describe that?

23  A.  Yeah.  If there's a research justification for not wearing

24  the masks or the gloves, that can be placed in the IACUC, it can

25  be presented and evaluated, and a decision can be made.  So it's

1    a cost benefit or it's a risk benefit analysis.  Does the

2    benefit of doing whatever research you want to do with them

3    without wearing a mask or gloves, is that greater than the risk

4    that it presents to the apes, right.  So if it's deemed to be

5    the case, then that can move forward, and we're not opposed to

6    that as long as it's scientifically justified.

7    Q.   Okay.  So it's not the case that you're trying to block

8    interaction with the apes by requiring people to wear masks and

9    gloves?

10   A.   No, absolutely not.  That is not the motive whatsoever.

11   Q.   Are you trying to erase Dr. Savage-Rumbaugh's research

12   trajectory by requiring the use of masks and gloves?

13   A.   Absolutely not.  We're simply trying to keep the animals

14   healthy.

15   Q.   Are you trying to eliminate Dr. Savage-Rumbaugh's research

16   trajectory in any way at ACCI?

17   A.   No, absolutely not.

18   Q.   Do you have a secret agreement or any other type of

19   agreement with Yerkes to block Dr. Savage-Rumbaugh's access to

20   the laboratory?

21   A.   No, absolutely not.

22   Q.   Is there any type of invasive biomedical research going on

23   at the facility?

24   A.   No.

25   Q.   Going forward, what would you like to see happen with these

1  bonobos in Des Moines?

2  A.   I would -- going forward, I would like the original

3  agreement that we thought we had signed on to to be enforced,

4  and that is we would like to be given the autonomy and control

5  over both the scientific direction and the health and management

6  of the five bonobos here and the research program forward.

7  Q.   Why is that so important?

8  A.   Because I think the program has suffered in the past and it

9  hasn't been terribly productive, and it's been muddled in

10  controversies with the Bonobo 12 and other kinds of groups

11  constantly -- there's just been constant, sort of a circus

12  atmosphere around its management and operation.  You know, these

13  apes deserve more than that.  They're an incredibly valuable

14  research population, and we have an opportunity and we have an

15  obligation I think to continue investigating what they're

16  capable of doing.  And I think if they were to leave and go

17  anywhere else, that wouldn't be possible.

18        When we first came on board, I mean there was some

19  discussion about moving some of the bonobos to zoos, and I

20  remember thinking that would just be a tragedy.  This is the

21  worst thing that could happen, because we wouldn't be able to

22  continue to work with them, and they probably wouldn't be in as

23  good of an environment than they are now.

24        So that's why I really feel like they should stay here

25  and they should stay and continue to be under our control.

1          MR. MELHUS:  No further questions for this witness,

2  subject to any redirect, Your Honor.

3          Thank you, Dr. Hopkins.

4          THE COURT:  Cross-examination?

5          MR. STAMBAUGH:  Very briefly, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. STAMBAUGH:

8  Q.  Good afternoon, Dr. Hopkins.

9  A.  Hello.

10  Q.  Do you know who Dr. Russ Tuttle is?

11  A.  I do.

12  Q.  Is Dr. Russ Tuttle one of the most widely acclaimed and

13  respected primatologists in the world?

14  A.  He's well known.

15  Q.  Do you respect his opinion?

16  A.  I think it would depend on the topic.

17  Q.  Do you respect his opinion with respect to the topic of

18  primatology?

19  A.  Primatology globally, maybe, yeah.

20  Q.  And you would agree with me that Dr. Tuttle is more familiar

21  with the research trajectory of Dr. Sue Savage-Rumbaugh than you

22  are, correct, sir?

23  A.  No.

24  Q.  How long have you worked with Dr. Sue Savage-Rumbaugh?

25  A.  I've known Dr. Savage-Rumbaugh for 30 years now.

1  Q.  And it's your opinion that you know the nature of her

2  research trajectory better than Dr. Russ Tuttle at the

3  University of Chicago?

4  A.  I do.

5  Q.  But you believe his opinions should be respected?

6  A.  I do.

7  Q.  Dr. Hopkins, you mentioned on direct examination that

8  there's no secret agreement between ACCI and Yerkes?

9  A.  That's correct.

10  Q.  But is it your understanding that it's a necessary condition

11  of any funding from Yerkes that Dr. Sue be absent from the lab?

12  A.  Yes, but that's not secret.  That's not a secret.

13  Q.  Dr. Hopkins, you attended a board meeting of ACCI on

14  July 29, 2014, is that correct?

15  A.  I'm sorry, what was the date?

16  Q.  July 29, 2014.

17  A.  Yes.

18  Q.  Do you recall a discussion about individuals from Yerkes

19  being sent to ACCI during that board meeting?

20  A.  I don't recall that, but that might have come up.

21  Q.  Would it refresh your recollection if I showed you a copy of

22  the board minutes?

23  A.  Sure.

24        MR. STAMBAUGH:  May I approach, Your Honor?

25        THE COURT:  You may.

HOPKINS - CROSS

654

```
 1              THE WITNESS:  Okay.

 2   BY MR. STAMBAUGH:

 3   Q.  So do you recall the discussion of people from Yerkes coming

 4   to ACCI during that board meeting?

 5   A.  Yes.

 6   Q.  And what I've just showed you mentions sending a vet, is

 7   that correct?

 8   A.  That's correct.

 9   Q.  A PR person?

10   A.  That's correct.

11   Q.  That means public relations?

12   A.  Yes.

13   Q.  And their colony manager?

14   A.  That's correct.

15   Q.  Why was a vet being sent from Yerkes?

16   A.  Because if we were ever going to bring chimpanzees to the

17   facility, they would want to see the layout of the structures to

18   see whether it would allow for isolation of apes if they were

19   sick or ill, or things like that.

20   Q.  Did the Yerkes' vet actually come?

21   A.  Sure.  Two of them came.

22   Q.  Two vets?

23   A.  Two came.

24   Q.  On what date?

25   A.  On those dates in this --
```

1   Q.   July 30th and July 31st, 2014?

2   A.   That's correct.

3   Q.   Did they stay for those two days?

4   A.   I would say it was a day-and-a-half.

5   Q.   Did you speak with them?

6   A.   Sure.

7   Q.   Did Dr. Taglialatela speak with them?

8   A.   Yes.

9   Q.   Did a PR person come from Yerkes on those dates as well?

10  A.   She did.

11  Q.   Did you talk with her?

12  A.   Yes.

13  Q.   Did Dr. Taglialatela talk with her?

14  A.   Yes.

15  Q.   What did you talk about?

16  A.   In terms of public relations or --

17  Q.   Yes.

18  A.   -- what did we talk about on the whole?  We talked about the

19  prospects here.

20  Q.   Why was she there from Yerkes?

21  A.   Why was the public relations individual there?  I think from

22  the standpoint of the Yerkes Primate Center, they would want to

23  know something about where they were sending their apes in the

24  event that they did produce a press release to announce that.

25  Q.   Did you talk about Sue Savage-Rumbaugh with the vet?

1  A.  On that occasion, I don't recall talking about Sue during

2  that time.

3  Q.  Did you talk about Sue Savage-Rumbaugh with a vet from

4  Yerkes on any other occasion?

5  A.  We have had conversations about Dr. Savage-Rumbaugh with,

6  yes, veterinarians from the Yerkes Primate Learning Center, not

7  necessarily on the date of that meeting, but perhaps another

8  meeting.

9  Q.  Subsequent to July 2014?

10 A.  I don't think subsequent to that, no.

11 Q.  Did you talk about Sue Savage-Rumbaugh with the PR person

12 from Yerkes?

13 A.  Yes.

14 Q.  What did you talk about?

15 A.  I don't remember really everything about that conversation.

16 I think principally it centered around Sue and Duane's

17 involvement in ACCI and the institution itself going forward.

18 Q.  Was that conversation the basis for your understanding that

19 it was a necessary condition of funding from Yerkes that Sue and

20 Duane be banned from the lab?

21 A.  Well, not essentially with the PR person.  That was from

22 e-mail exchanges that we had with the then director and also

23 some of the other folks from the Yerkes center that would be

24 involved in any decision to bring chimps here.  The person who

25 was given the task of spearheading, you know, that discussion

1  was the PR person.

2  Q.  Did you speak with the colony manager?

3  A.  He was here, and we did talk, yes.

4  Q.  Did you talk about Dr. Sue Savage-Rumbaugh?

5  A.  Honestly, I don't remember talking with him about Sue

6  Savage-Rumbaugh.

7  Q.  So there was no secret agreement, Dr. Hopkins, but as a

8  result of your conversations and e-mails with these individuals

9  from Yerkes, you knew that it was a condition that Sue and Duane

10  be banned from the lab if they brought chimpanzees there,

11  correct?

12  A.  I'm not exactly sure I understand the question.

13  Q.  You testified on direct that there was no secret agreement?

14  A.  Right.

15  Q.  But there had been conversations about Dr. Savage-Rumbaugh?

16  A.  Uh-huh.

17  Q.  There had been e-mails about --

18  A.  Yes, Sue and Duane knew that.

19  Q.  Let me finish my question.

20  A.  Okay.

21  Q.  There had been e-mails about Dr. Sue Savage-Rumbaugh, okay,

22  and you now have an understanding, based upon conversations and

23  e-mails, that if Yerkes brings chimpanzees, Sue and Duane will

24  be banned, correct?

25  A.  No.  We don't have an agreement with Yerkes at this point.

1  Q.  That wasn't my question.

2  A.  Okay.

3  Q.  My question was, you now have an understanding, based upon

4  the e-mails, the conversations with individuals from Yerkes,

5  that Sue and Duane will be banned, correct?

6  A.  No.  I disagree with that.  I would not say that's a fair

7  statement.

8  Q.  Your impression is --

9  A.  I would say that, you know, I think that if we want to

10 pursue the opportunity to bring chimpanzees from the Yerkes

11 Center to ACCI, all right, I believe that the Yerkes Center

12 would put the kibosh on that if Sue and Duane were involved, and

13 I think Sue and Duane also would agree with that statement.

14 Q.  Does ACCI have immediate plans to bring chimpanzees from

15 Yerkes?

16 A.  We would -- not necessarily Yerkes.  We have a vacant

17 building.  We would very much like to put some chimpanzees in

18 it.  If Yerkes isn't interested or doesn't want to or chooses,

19 for whatever reason it decides, not to work with us toward that

20 endeavor, then we will look for another organization to work

21 with.

22 Q.  I appreciate that, Dr. Hopkins, and I don't want to mince

23 words; but can you tell the court, have there been any immediate

24 plans with Yerkes, whether or not they come to fruition?

25 A.  We have had discussions with Yerkes about bringing

1   chimpanzees to ACCI, yes.

2   Q.   And it's a true statement that as a condition of doing that,

3   Sue and Duane will be banned from the lab, correct, sir?

4   A.   No, that's not correct.

5   Q.   It's your understanding that Yerkes would ban Sue and Duane

6   from the lab should they bring chimpanzees, correct?

7   A.   My thoughts on that are that Yerkes will never agree to send

8   the apes here, all right, if Sue and Duane are involved.  I'm

9   not sure --

10  Q.   Okay.  So let's go at it from that angle.  If Sue and Duane

11  are involved, you understand from your conversations and e-mails

12  with Yerkes that they will never send chimpanzees here, correct?

13  A.   That's correct, yeah.

14  Q.   Okay.  Would you consider that a condition of Yerkes sending

15  chimpanzees here?

16  A.   Yeah, I would.

17  Q.   Okay.  Dr. Hopkins, you have enormous respect for Dr. Sue

18  and Dr. Duane Rumbaugh's contributions to science, correct?

19  A.   I do.

20  Q.   Why was it necessary to ban Sue from the lab, in fact, to

21  deny her access in order for you and Dr. Taglialatela to pursue

22  a scientific course for ACCI?

23  A.   I didn't ban Sue from the lab.

24  Q.   So you would have no objection to Dr. Savage-Rumbaugh

25  becoming part of the research at the lab today, is that correct?

HOPKINS - CROSS

660

1  A.  No.  I would oppose that.

2  Q.  And why is that?

3  A.  Because I don't think it would be successful.

4  Q.  If Dr. Tuttle opined that it would be successful if Dr. Sue

5  Savage-Rumbaugh was involved, would you disagree with him?

6  A.  I would.

7          MR. STAMBAUGH:  One moment, Your Honor.

8          (Pause.)

9  BY MR. STAMBAUGH:

10  Q.  Dr. Hopkins, a couple of final questions.

11         You mentioned in your direct testimony that you needed

12  autonomy in your research; is that accurate?

13  A.  Yes.

14  Q.  Why does that necessitate banning Sue to have autonomy?

15  A.  I think that's the definition of autonomy is working alone

16  and independently.

17  Q.  You have other individuals assisting you and

18  Dr. Taglialatela, correct?

19  A.  We do, yeah.

20  Q.  So why is it so important that you completely deny access to

21  the woman who has reared these bonobos over the last four

22  decades?

23  A.  Again, I think it's because if Sue is involved in the

24  organization, I believe we will not be successful, and I think

25  if you look at the last ten years and the opportunity that's

1  been squandered to this point, I would say that's the basis for

2  that argument.

3  Q.  Well, ACCI hasn't produced any peer-reviewed research since

4  you've been in charge, correct?

5  A.  That's not correct.

6  Q.  Have there been publications from ACCI, peer-reviewed

7  publications --

8  A.  Yes.

9  Q.  -- since you were in charge?

10 A.  Even before now, we've had papers that I've published with

11 Sue in the past.

12 Q.  I've talking about research done at ACCI since you became --

13 and forgive me, I've forgotten your title; Director of Science?

14 A.  Yes.

15 Q.  Okay.  There's been no peer-reviewed publications from ACCI

16 regarding the bonobos?

17 A.  I'm not exactly sure about that, so I would have to look

18 exactly to determine if any of the papers that we published say,

19 for example, in 2015 have an ACCI affiliation.  I would say -- I

20 think the answer to that is no.  So if the definition of

21 productivity is, does it have an ACCI title or recognition of

22 the institution, at this point I would say no; but that doesn't

23 mean that isn't the case.  At professional conferences certainly

24 work that's been done at ACCI has been presented at professional

25 meetings.

1  Q.  You would agree with Dr. Taglialatela's opinion as to

2  whether there have been peer-reviewed publications from ACCI

3  since you've been in charge?

4  A.  I'm sorry?

5  Q.  You would agree with Dr. Taglialatela's opinion on the issue

6  as to whether there has been peer-reviewed publications from

7  ACCI since you've been in charge?

8          MR. MELHUS:  Objection.

9  A.  I don't know what his opinion is.

10          MR. MELHUS:  Before you answer, objection to lack of

11  foundation.  I don't think that the basis for that question has

12  been established with this witness, Your Honor.

13          THE COURT:  Well, he's answered it, and I'll receive

14  it, subject to the objection.  He said he didn't know what Dr.

15  Taglialatela's opinion was.

16  BY MR. STAMBAUGH:

17  Q.  In other words, would you defer to Dr. Taglialatela's

18  opinion as to whether there have been peer-reviewed publications

19  from ACCI?

20  A.  Sure.

21          MR. STAMBAUGH:  Okay.  No further questions, Your

22  Honor.

23          THE COURT:  Redirect?

24          MR. MELHUS:  Just briefly, Your Honor.

25

REDIRECT EXAMINATION

BY MR. MELHUS:

Q.  Dr. Hopkins, you've testified that Yerkes does not want
Dr. Savage-Rumbaugh to be involved with any chimpanzees that may
be transported to the facility at ACCI.  Do you have any idea
why that might be?

A.  Yes.

        MR. STAMBAUGH:  Objection; lacks foundation.

        THE COURT:  You may answer --

A.  Yes.

        THE COURT:  -- subject to the objection.  Go ahead.
I'm sorry.

A.  I mean, again, I think -- there was a PR person who came to
visit, and I think there's a reason because I think if you type
into any Internet search engine, you can find a lot of negative
publicity, negative press, negative things that took place at
GAT and IPLS, and I think the Yerkes Center and anyone
interested in bringing chimps, probably not just Yerkes, would
be quite concerned about what might happen if Sue were involved
with the organization and they brought chimpanzees there, would
people be put at risk.  I think, you know, given what's been put
out there for public discussion, the answer to that is they
would have -- the answer is yes, they would have a concern about
that.

        Honestly, the Language Research Center started at the

1   Yerkes Primate Center in the 1970s, and for many, many years the

2   Language Research Center, where Sue and Duane did a lot of their

3   important work, was part of the Yerkes Primate Center, and they

4   had a long history with Sue and Duane, and that relationship

5   ended, and I don't think that relationship ended on the best of

6   terms, and I think there were some concerns by the center at the

7   time about some safety issues and things like that, with the

8   operation, even when it was at George State, even before it came

9   to Iowa.

10          So it's not as if that anyone from the Yerkes Primate

11  Center had never heard of Sue or Duane or had no background or

12  experience working with them.  Many people did.  I think the

13  players in the discussions have changed over the years, all

14  right; but, you know, there's still some legacy there, if you

15  will, in terms of, you know, the actions or some of the

16  unfortunate events that happened at the language center when the

17  Yerkes Center was still involved in it.

18  BY MR. MELHUS:

19  Q.  And are there other organizations that share or validate

20  Yerkes' concern about working with Dr. Sue Savage-Rumbaugh

21  moving forward?

22          MR. STAMBAUGH:  Objection; lacks foundation.

23          THE COURT:  I'll receive it, subject to the objection;

24  but I must say, although the witness has some ideas as to why

25  and impressions about Yerkes' reasons that they may or may not

1   have for the position that they may or may not have taken with

2   regard to Dr. Savage-Rumbaugh and her husband being involved,

3   but I think -- well, I want you to know that this is of little

4   probative value to me because the witness has opinions and --

5   but I think they're far enough removed that they're not

6   particularly helpful on that subject.

7            MR. MELHUS:  Okay.  I apologize if I'm getting too far

8   off course.  I just wanted to establish the record with respect

9   to dispelling any conspiracy theory that might be out there as

10  far as ACCI and Yerkes is concerned.  And with that

11  understanding, Your Honor, I'll move along.

12           THE COURT:  I know this is difficult for you to sit in

13  the stands, but move along and ask another question.

14  BY MR. MELHUS:

15  Q.  Are there any other reasons, sitting Yerkes aside, that you

16  would not want to work with Dr. Savage-Rumbaugh moving forward

17  that would explain why she has been denied access to the

18  laboratory?

19           MR. STAMBAUGH:  Objection; lacks foundation,

20  cumulative, improper credibility testimony -- character

21  testimony, excuse me.

22           THE COURT:  I'll receive it, subject to the

23  objections.

24           MR. MELHUS:  Answer if you can.

25  A.  Okay.  Can you -- I'm sorry.  Can you ask it again?

1  BY MR. MELHUS:

2  Q.  Sure.  Sitting aside the concerns that Yerkes may or may not

3  have with Dr. Savage-Rumbaugh, are there any reasons that would

4  justify or explain why she has been not allowed access to the

5  lab up until this point?

6          MR. STAMBAUGH:  Same objections.

7          THE COURT:  Same ruling.

8  A.  Okay.  I think on the whole the belief is that the animals

9  are at risk, to some extent, as are the people that work with

10  the animals.  I think this is a concern that would be a concern

11  for me going forward, and that's largely a big motivating factor

12  for why it is I feel like we must work independent from

13  Dr. Savage-Rumbaugh in order to be successful.

14          MR. MELHUS:  Dr. Hopkins, thank you for your time.  I

15  have no further questions, subject to any recross -- or

16  redirect.

17          MR. STAMBAUGH:  No further questions, Your Honor.

18          THE COURT:  You may step down, sir.

19          Thank you.

20                              (Witness excused.)

21          MR. MILLER:  Your Honor, at this point in time, I know

22  counsel have a couple of issues with respect to some documents

23  or exhibits we want to discuss.  I believe we are done with the

24  presentation of our evidence, although I would like to briefly

25  huddle with my co-counsel and our representative, and I

1   respectfully ask if we could perhaps take an early break to

2   address these items, and we may be done.

3          THE COURT:  That is perfectly fine.  Will you need --

4   is 15 minutes going to be enough time?

5          MR. MILLER:  Yeah.  I was going to say, I think we

6   need to review some exhibits, so we may need a little bit

7   longer.

8          THE COURT:  Okay.  We'll play it by ear.  We'll be in

9   recess for 15 minutes, maybe a little longer.

10         MR. STAMBAUGH:  Thank you, Your Honor.

11         (Recess at 2:34 p.m., until 3:13 p.m.)

12         THE COURT:  Be seated, please.

13         There was some record you wanted to make about some

14  exhibits I think?

15         MR. STAMBAUGH:  Yes.  Thank you, Your Honor.

16         Counsel has conferred and worked out some agreements.

17  For claimant's purposes, we would like to enter the following

18  exhibits into evidence:  No. 95, which was the CV of Dr. Laurent

19  Dubreuil that was discussed by Dr. Dubreuil but not moved into

20  evidence, and also Exhibit No. 98, Your Honor, which is a

21  collection of videos.  Your Honor has it on a disk in the

22  exhibit binder.  These are videos that show the relationship and

23  interplay between Dr. Savage-Rumbaugh and the bonobos and would

24  be used essentially in lieu of any rebuttal testimony regarding

25  her relationship with these bonobos, whether or not that was a

1    safe relationship.

2           With respect to -- and, again, I confess that I'm not

3    as familiar with the local procedure.  We have a number of

4    exhibits, Your Honor, they were e-mails authored by George

5    Caudill.  That was an individual that was on the guaranteed to

6    appear witness list by the plaintiffs in this case in the

7    pretrial order.  I can represent to the court that we would have

8    introduced these exhibits through Mr. Caudill because they were

9    authored by him.  We believe that they are party opponent

10   admissions in any event; but the reason that we did not use them

11   during the proceeding is because Mr. Caudill was not here, even

12   though his presence was guaranteed.

13          Those exhibit numbers, the e-mails offered by

14   Mr. George Caudill, are Nos. 43, 48, 69, 71, 74, 76 and 103.  So

15   we would -- claimants would move all of those exhibit numbers

16   into evidence as well.

17                              (Defendants' Exhibits 43, 48, 69,

18                              71, 74, 76, 95, 98 and 103 were

19                              offered in evidence.)

20          THE COURT:  Any objection, Mr. Miller, to those

21   exhibits?

22          MR. MILLER:  Your Honor, I would restate the

23   objections in the pretrial order.  Further, we do think the

24   offer here of these exhibits is inappropriate.  We did note

25   Mr. Caudill as a witness, guaranteed presence here.  We notified

1   counsel beforehand he had personal issues that arose that

2   prevented him from being here.  We think this is somewhat

3   punitive, but, Your Honor, we understand the circumstances.  So

4   we would restate -- or we would state that objection and restate

5   our objections in the pretrial order.

6        Then I would also ask with respect to the videos, are

7   we able to stipulate to a time frame of those videos?  I don't

8   think that that's identified in that.

9        MR. ZIFCHAK:  I believe the videos predate Iowa.

10        MR. MILLER:  Okay.  And can we so stipulate?

11        MR. ZIFCHAK:  We can so stipulate to that.

12        MR. STAMBAUGH:  So the videos would reflect the

13   interplay between Dr. Savage-Rumbaugh and the bonobos before

14   coming to Iowa.

15        MR. MILLER:  Right, as I understand it.

16        And the only other thing, we would restate the

17   objection asserted to Dr. Dubreuil's CV in the pretrial order.

18        Thank you.

19        THE COURT:  Mr. Stambaugh, did you want to make a

20   record that it was a business record like Mr. Melhus did with

21   one of the CVs?

22        MR. STAMBAUGH:  I was impressed, Your Honor.  Well

23   done.

24        THE COURT:  95 and 98 are received, subject to

25   objection.

1            (Defendants' Exhibits 95 and 98

2            were received in evidence.)

3        THE COURT:  Now, with regard to what I'll call the

4   Caudill e-mails, is there any issue about the authenticity of

5   these e-mails and were they written by Mr. Caudill or at the

6   time he was -- was he -- I'm not quite sure, chair of the board

7   of the IPLS?

8        MR. ZIFCHAK:  Yes, Your Honor.

9        THE COURT:  Is all of that true?

10       MR. MILLER:  He was chair.  He wrote e-mails, Your

11  Honor.

12       THE COURT:  Did he write these?

13       MR. MILLER:  What's that?

14       THE COURT:  Did he write these?

15       MR. MILLER:  Well, to be honest, I mean, I have looked

16  through the stack.  You know, if I didn't say it before, I think

17  several of these could have been admitted through others.  That

18  being said, for instance, 43, you know, we've had this, not a

19  pattern but occasional e-mail, where it seems like something was

20  copied and pasted over another document.  That's what it appears

21  to be with 43 as well as 103, Your Honor.

22       So I don't have a reason to believe these aren't what

23  are being represented by counsel, but, you know, I don't know

24  either.  So I guess -- I think from the appearance of the

25  document, you can draw whatever weight or conclusion you may

1  from that.  I don't have any reason to object beyond that.  I

2  have no knowledge.

3          THE COURT:  All right.  I'll receive the Caudill

4  e-mails, 43, 48, 69, 71, 74 and 76 and 103, subject to the

5  objections made.  Are they hearsay objections?

6          MR. MILLER:  Hearsay.  Also there would be relevance

7  objections.  We've stated objections in the pretrial order, and

8  I would rely on those; but hearsay, I'm certain there would be

9  some hearsay objections.  I can go through document objections

10  if you prefer.

11          THE COURT:  You don't need to.  My main concern was

12  that these are statements by Dr. Caudill, who's chair of IPLS,

13  and I assume is writing these things in his capacity as such.

14          MR. MILLER:  That appears to be the case, Your Honor,

15  and I think you'll see they're e-mail trails or strings with

16  other people involved as well.

17          THE COURT:  Well, I'll receive them subject to those

18  objections then.

19                                  (Defendants' Exhibits 43, 48, 69,

20                                  71, 74, 76 and 103 were received

21                                  in evidence.)

22          THE COURT:  Is there anything else evidentiary wise

23  before we close the record?

24          MR. MILLER:  Yes.  Thank you, Your Honor.

25          We had one exhibit that we discussed with Mr. Simpson,

1   No. 1000, which had I been on top of things would have moved to

2   admit and would do so now.

3                           (Plaintiffs' Exhibit 1000 was

4                           offered in evidence.)

5           MR. STAMBAUGH:  Your Honor, we have no objections.

6           THE COURT:  1000 is received.

7                           (Plaintiffs' Exhibit 1000 was

8                           received in evidence.)

9           MR. MILLER:  Oh, and one other matter of housekeeping.

10  We do have this exhibit that has the certification for Secretary

11  of State that we would like to three-hole punch and switch out.

12          THE COURT:  You can do that and put it in the official

13  court record, which the official court record exhibits are the

14  ones up here.

15          THE CLERK:  And they will be taking those, Judge.

16          Do you need a copy with that stamp on it for your own

17  records?

18          THE COURT:  No, I don't.

19          THE CLERK:  Do you want the official to be used to

20  consider or do you want to use the ones they provided to you?

21          THE COURT:  We'll keep the official ones they provide.

22          THE CLERK:  Then I won't prepare the receipts because

23  the practice is to give counsel the official exhibits back now,

24  so I will.

25          THE COURT:  I will keep the official.

1          THE CLERK:  That's fine, but that's what I was

2   preparing, so I won't do that.

3          THE COURT:  Anything else on the exhibits?  Any

4   other --

5          MR. STAMBAUGH:  That's it for evidentiary issues, Your

6   Honor.

7          MR. MILLER:  I agree, Your Honor.

8          THE COURT:  Now, we've talked about written argument,

9   and in my last order I proposed maybe 21 days, but I'm flexible

10  as your schedules may dictate.  I think the efficient way to do

11  it would be to have you both file them simultaneously and you

12  can both reply to the other's.  So I'll give you a brief period

13  of time for that.  Now, when do you think you can have that

14  done?

15         MR. STAMBAUGH:  I'm going to defer to Mr. Zifchak.

16         MR. ZIFCHAK:  Your Honor, would you expect us to have

17  the transcripts before we prepare the briefs?

18         THE COURT:  Are you going to be ordering transcripts?

19         MR. ZIFCHAK:  Yes.

20         THE COURT:  All right.  Well, yes, though I don't --

21  why don't we move it out by another week, and if for some reason

22  the transcript is not ready -- should we make it 28 days?  I

23  really don't know how long the transcripts will take.  I'm

24  resisting the temptation to fluff up the court reporter after

25  all I know about her high skills and prompt service, but she has

1 other things to do as well.

2           MR. ZIFCHAK:  Friday, June 26th?

3           THE COURT:  Let's make it June the 26th.  Now, they're

4 due at the same time, so if somebody can't get it done, talk,

5 and if I need to grant an extension, I want to do it mutually so

6 that you both have them at the same time.

7           And shall we allow, oh, say, ten days after that for

8 reply, which would be -- is that sufficient?

9           MR. MILLER:  Your Honor, normally ten days would be

10 sufficient.  I note the July 4th holiday would be in there.

11 Maybe we could go with 14 just to avoid that holiday.

12          THE COURT:  All right.  What day would that be?

13          MR. MILLER:  I'm showing July 10th then.

14          THE COURT:  Okay.  Replies due by the 10th, and it

15 will be submitted at that time.

16          Now, as you work on these, one thing that will really

17 help the court, you know, different witnesses remembered things

18 happening at slightly different times and sometimes the record

19 was a little boggy as to what was going on when.  So if you

20 could include a time line of significant events with your

21 arguments, that would be helpful to me in keeping that straight,

22 the chronology.  So if you would do that for me, I would

23 appreciate that.  You don't have to -- just a description of

24 what happened, but your argument by the dates.  I just want to

25 be able to track the chronology as accurately as I can.  I know

1  the exhibits will help with that, but if you would do that for

2  me, I would appreciate that.

3          Anything else we need to talk about?

4          MR. STAMBAUGH:  Your Honor, as a personal matter, and

5  I know that I speak for all of us out-of-towners, we very much

6  appreciate the court's patience and courtesy in this proceeding.

7  I just wanted to say that.

8          THE COURT:  Well, you're quite welcome.  It's a

9  pleasure to have you all here.  You know, as pro bono

10 presentations go, this has been ranked very high in the pantheon

11 of such presentations I've seen.  You've all done an excellent

12 job, and it's apparent to me that all of you share the passion

13 of your respective clients for the subjects as to the inquiry of

14 the animals concerned, and I think that reflects the quality of

15 the presentation.

16         I'll look forward to your posttrial submissions and,

17 of course, I'll rule as quickly as I am able to.

18         Good day to you all.  Safe travels.

19         (Proceedings concluded at 3:25 p.m.)

20

21

22

23

24

25

676

```
1                    C E R T I F I C A T E

2              I, the undersigned, a Certified Shorthand Reporter of

3   the State of Iowa, do hereby certify that I acted as the

4   official court reporter at the hearing in the above-entitled

5   matter at the time and place indicated.

6              That I took in shorthand all of the proceedings had at

7   the said time and place and that said shorthand notes were

8   reduced to computer transcription under my direction and

9   supervision, and that the foregoing computer transcription pages

10  are a full and complete transcript of the shorthand notes so

11  taken.

12             Dated at Des Moines, Iowa, this 15th day of June,

13  2015.

14

15

16

17                            /s/ Terri L. Martin
                              CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25
```