IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, | ) ) ) ) ) Case No. 4:10-cv-00052-RAW |
| Plaintiffs, | ) ) **PLAINTIFFS' POST-HEARING BRIEF IN** |
| | ) **RESISTANCE TO DEFENDANT SUE** |
| | ) **SAVAGE-RUMBAUGH'S MOTION FOR** |
| v. | ) **SPECIFIC PERFORMANCE AND** |
| | ) **RELATED RELIEF** |
| ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

COME NOW Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust

("IPLS") and Ape Cognition and Communication Institute ("ACCI"), and for their Post-Hearing

Brief in Resistance to Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and

Related Relief ("Motion"), argue as follows:

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 2

II.     BACKGROUND .................................................................................................. 4

        A.    Dr. Rumbaugh's Turbulent History with the Bonobos in Iowa ................................. 4

        B.    The Lawsuit and Settlement Agreements .................................................. 5

        C.    Administrative Dissolution ............................................................................. 8

        D.    Dr. Rumbaugh Cedes Control of Science to Dr. Taglialatela and Dr. Hopkins .......... 8

        E.    The Motion for Specific Performance ...................................................... 11

III.    LEGAL STANDARDS .................................................................................... 13

IV.     ARGUMENT ...................................................................................................... 13

A.  Because IPLS Exists as a Matter of Law, the Court Should Not Allow BHI or Dr. Rumbaugh to Attempt to Transfer the Bonobos ........................................................ 14

B.  ACCI has Complied with the Agreement Relating to Its Joint Ownership of the Bonobos with BHI .................................................................................................... 16

    (1)  Dr. Rumbaugh's unrestricted access was not contemplated in the agreements and poses serious health and safety risks to the bonobos and staff ................ 18

    (2)  Dr. Rumbaugh should be equitably estopped from imposing authority or control over the bonobos ................................................................................ 19

C.  ACCI has Complied with the Agreements to Involve the Bonobos in Research ...... 20

D.  ACCI has Complied with the Agreements to Use Its Best Efforts to Provide Complete and Competent Care of the Bonobos and to Take all Reasonable Precautions to Ensure their Complete Safety .......................................................... 22

V.  CONCLUSION ................................................................................................................ 23

## I.   INTRODUCTION

As forecast in ACCI's pre-hearing briefing, the epicenter of this dispute is whether the settlement agreements at issue require ACCI to grant Dr. Sue Savage-Rumbaugh ("Dr. Rumbaugh") unrestricted access to the bonobos.  Such unrestricted access poses significant health and safety concerns to the bonobos and staff.  The other issues encompassed by Dr. Rumbaugh's shotgun-style assertion of claims appear to have been contrived as a pretext for granting her unrestricted access to the bonobos.  Indeed, after three days of testimony, it is now clear that Dr. Rumbaugh and BHI manufactured the circumstances from which they hope to benefit.

First, Dr. Rumbaugh precipitated the administrative dissolution of IPLS.  Specifically, Dr. Rumbaugh, acting as the executive director of IPLS, installed herself as its registered agent and then failed to file its biennial report.  This caused IPLS to be administratively dissolved.  Rather than addressing this issue head on, Dr. Rumbaugh claims ignorance of what the law requires of a registered agent.  She and BHI now take the position that IPLS's dissolution triggered their contingent rights under the settlement agreements to relocate the bonobos away

from ACCI's facility.  Not only does this argument fall flat because IPLS continues to exist as a matter of law but Dr. Rumbaugh and BHI cannot be allowed to benefit from precipitating IPLS's administrative dissolution.

Second, Dr. Rumbaugh drafted the very broad provisions in the settlement agreements relating to research to be conducted with the bonobos.[1]  Although the research provisions clearly encompass the research being conducted by ACCI, Dr. Rumbaugh and BHI now ask the Court to construe this language to exclude ACCI's research and to read in requirements for so-called behind-the-glass interactions with the bonobos where no such language appears in the settlement agreements.  The Court should not give effect to these self-serving interpretations.

Third, notwithstanding Dr. Rumbaugh's prior support of moving the bonobos to the ACCI facility in Des Moines and her prior opposition of moving them from that facility,[2] Dr. Rumbaugh and BHI now take the entirely unsupported position that the ground water at the facility is toxic—which Dr. Rumbaugh alleges caused cancer in both humans and bonobos—and that the bonobos are in imminent danger from flooding.  They claim that these conditions warrant moving the bonobos from Iowa.  This convenient, fair-weather position is without any basis in fact or reality.

While Dr. Rumbaugh and BHI attempt to manufacture circumstances that trigger their contingent rights under the settlement agreements, they have not lived up to their end of the bargain.  BHI claims the benefits of joint ownership rights but has not contributed a single dollar to ACCI's efforts to care for the bonobos and has not even attempted to obtain a single grant to

---

[1] (Affidavit of William J. Miller, sworn July 2, 2015 ("Miller Aff."), Ex. B. at 58:17-25 – 59:1-15, 60:4-7) (App. at 13-15).

[2] In 2012, Dr. Kenneth Schweller, then executive of IPLS, proposed to a plan to relocate the bonobos to Mississippi.  (*See id.* at 142:19-25) (App. at 25).  Dr. Rumbaugh opposed the relocation at that time because she "<u>would not have been allowed to be in with the bonobos</u>." (*Id.* at 143:1-8) (App. at 26)) (emphasis added).

support research with the bonobos.[3]  Rather, Dr. Rumbaugh and BHI have focused their efforts

toward a pie-in-the-sky plan to move the bonobos to a glorified Morton Building[4] in Missouri

with no functional utilities backed by a wood-burning furnace.[5]

    For the foregoing reasons, for the reasons discussed at the evidentiary hearing, and for

those reasons more fully explored below, Dr. Rumbaugh's and BHI's Motion should be denied

in its entirety.

## II.    BACKGROUND

To assist the Court in establishing a working background, IPLS and ACCI have attached a

timeline of events relevant to the determination of the issues in this matter.  (*See* Affidavit of

William J. Miller, sworn July 2, 2015 ("Miller Aff."), Ex. J) (App. at 74-77).  In addition, IPLS

and ACCI offer the following background facts.

### A.    Dr. Rumbaugh's Turbulent History with the Bonobos in Iowa

It is undisputed that Dr. Rumbaugh's early work with the bonobos was transformative in

the sense that it changed the way the scientific community viewed the capacity and capabilities

of nonhuman primates.  (Miller Aff., Ex. E at 313:19-23) (App. at 35).  In recent years, however,

"many people in the community questioned Dr. Rumbaugh's scientific credibility."  (*Id.* at

340:23 – 341:1) (App. at 36-37).

In 2005, Dr. Rumbaugh drove the bonobos in a school bus from Georgia to the Iowa

Primate Learning Sanctuary's twenty million dollar facility in Des Moines built specifically to

house the bonobos.  (*See* Miller Aff., Ex. A at 9:14-20) (App. at 5).  The state-of-the-art facility

was donated by a prominent Iowa businessman who purportedly offered a lifetime commitment

---

[3] (Miller Aff., Ex. C. at 211:4-10, 212:13-17) (App. at 28-29).
[4] *See* Morton Buildings – Pole Barns, Horse Barns, Metal Buildings, www.mortonbuildings.com (last visited June 25, 2015).
[5] (Miller Aff., Ex. F at 381:14 – 384:23) (App. at 39-42).

of funding to support the bonobos.  (*See* Miller Aff., Ex. B at 40:10-14) (App. at 8).

However, questions soon arose about Dr. Rumbaugh's ability to care for the bonobos.[6]  In particular, in approximately 2007—within two years of relocating the bonobos to Iowa—Dr. Rumbaugh was removed from the facility allegedly by "jealous rivals."  (Miller Aff., Ex. A at 9:14-20) (App. at 5).   Dr. Rumbaugh was then reinstated at the facility in 2008 under the direction of William Fields.  (*Id.* at 9:18-20) (App. at 5).

In 2011, Dr. Rumbaugh was again removed from the facility "by Fields in the face of allegations . . . that she, herself, was a danger to these bonobos."  (*Id.* at 10:8-10) (App. at 6).  That same year, the prominent Iowa businessman who had purportedly committed to support the bonobos for a lifetime withdrew his funding.  (Miller Aff., Ex. B at 40:10-14) (App. at 8).

In 2012, Dr. Rumbaugh was appointed as the executive director of IPLS.  Later that year, and again under allegations that she posed a physical danger to the bonobos and others, Dr. Rumbaugh was placed on administrative leave from the facility.  (Miller Aff., Ex. A at 10:15-20) (App. at 6).

## B.       The Lawsuit and Settlement Agreements

 On February 9, 2010, IPLS filed a complaint with this Court interpleading the bonobos known as Maisha and Matata[7] in an attempt to resolve competing claims to their ownership and control.  (Dkt. No. 2).

---

[6] Indeed, even Dr. Rumbaugh's and BHI's opening statement to the Court promised to demonstrate a pattern of Dr. Rumbaugh being removed from interacting with the bonobos over the past ten years.

[7] As the Court may recall, Matata unfortunately died of natural causes.  Although Matata is discussed in the agreements and in the underlying impleader, the parties' rights relative to Matata will not be discussed herein.

On or about January 31, 2013, the parties entered into a settlement agreement (the "Main Agreement")[8] relating to the control of Maisha and Matata.  The Main Agreement provided, in relevant part, as follows:

3. All parties stipulate and agree that the Trust is the owner of Maisha.

4. Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Maisha's residence.

5. The Trust shall use its best efforts to provide complete and competent care of Matata and Maisha; and shall take all reasonable precautions to ensure their complete safety.

6. Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for Matata and/or Maisha, the Trust shall provide the DRC, in the case of Matata, and Bonobo Hope Initiative, Inc., an Iowa nonprofit corporation ("Bonobo Hope"), in the case of Maisha, sixty days written notice prior to the date upon which the Trust will no longer be available as a residence for Matata or Maisha. The Trust in either case shall also provide sixty (60) days written notice to the court in the Interpleader Action. The notice will include any information in the Trust's possession concerning the status of the research in which the bonobos are participating, and any options, of which the Trust is aware, for new residences for the bonobos. DRC shall have sole discretion regarding placement of Matata under such circumstances. Bonobo Hope in unison with Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such circumstances. Should either DRC or Bonobo Hope fail to exercise its discretion regarding placement of Matata or Maisha, as the case may be, including making appropriate arrangements to transport the bonobo to a new residence, the Trust will use its best efforts to place the bonobo in a new location, preferably a private sanctuary, with preference given to placement together with other members of the bonobo colony with whom the bonobo resided at the Trust

7. Savage-Rumbaugh's willingness to execute this Agreement is contingent upon her entering simultaneously into a side agreement with the Trust.

---

[8] (Miller Aff., Ex 1) (App. at 79-83).

As suggested by paragraph 7 of the Main Agreement, IPLS, Dr. Rumbaugh, and Defendant Bonobo Hope Initiative, Inc. ("BHI"), entered into a supplemental settlement agreement (the "Side Agreement")[9] regarding the control and ownership of the bonobos known as Kanzi, Nyota, Elikya, and Teco (the "Bonobo 4").  The Side Agreement provided, in relevant part, as follows:

1.      All parties stipulate and agree that the Trust and Bonobo Hope jointly are the owners of the bonobos Kanzi, Nyota, Elikya and Teco, now residing at the Trust (the "Bonobo 4").

2.      The Bonobo 4 shall continue to reside at the Trust for at least so long as they continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices.)

3.      The Trust shall use its best efforts to provide complete and competent care of the Bonobo 4; and shall take all reasonable precautions to ensure their complete safety.

4.      Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for the Bonobo 4, the Trust shall provide Savage-Rumbaugh (or her legal representative) and Bonobo Hope (or its legal representative or successor, if any) sixty (60) days -written notice prior to the date upon which the Trust will no longer be available as a residence for the Bonobo 4 or the date as of which the Trust proposes to place the Bonobo 4 in a new residence, whichever date is earlier. The notice will include any information in the Trust's possession concerning the status of the research in which the Bonobo 4 are participating, and any options, of which the Trust is aware, for new residences for the Bonobo 4. Savage-Rumbaugh or her legal representative and Bonobo Hope acting in unison shall have sole discretion regarding placement of the Bonobo 4 under such circumstances and the Trust or its legal representative shall cooperate fully in that endeavor, at no cost to Savage-Rumbaugh or Bonobo Hope. Should Savage-Rumbaugh or Bonobo Hope fail to exercise such discretion regarding placement of the Bonobo 4, including making appropriate arrangements to transport the Bonobo 4 to a new residence, the Trust (or its legal successor, if any) will use its best efforts to place the Bonobo 4 in a

---

[9] (Miller Aff., Ex. 2) (App. at 85-89).

new residence, preferably a private sanctuary, with preference given to placement in a new residence together with the bonobos Matata and Maisha, at no cost to Savage-Rumbaugh or Bonobo Hope.

Dr. Rumbaugh played a key role in drafting the provisions of the Agreements related to research to be conducted with the bonobos.  (Miller Aff., Ex. B at 58:17 – 59:1, 60:4-7) (App. at 13-15).  In particular, Dr. Rumbaugh added the language in paragraph 4 of the Main agreement and paragraph 2 of the Side Agreement "where it says, 'including but not limited to' and then all the things underneath down to the end of the parentheses." (*Id.* at 60:4-7) (App. at 15).

### C.      Administrative Dissolution

On January 19, 2012, while the fight for control of the bonobos continued, Dr. Rumbaugh, acting as the Executive Director of IPLS, executed a Statement of Change of Registered Office and/or Registered Agent ("Change of Registered Agent") with the Iowa Secretary of State's Office.  (Miller Aff., Ex. 1004) (App. at 101-103).  Dr. Rumbaugh listed herself as the new Registered Agent for IPLS.  (*Id.*)  On August 14, 2013, the Iowa Secretary of State administratively dissolved IPLS for failure to file its 2013 Biennial Report as required by Iowa Code section 504.1613.  (Miller Aff., Ex. 34) (App. at 91).

### D.      Dr. Rumbaugh Cedes Control of Science to Dr. Taglialatela and Dr. Hopkins

On October 26, 2013, Dr. Rumbaugh wrote to members of IPLS and BHI to recommend that Dr. Jared Taglialatela and Dr. Bill Hopkins take over the directorship of IPLS and direct the research related to the bonobos.  (Miller Aff., Ex. 1005) (App. at 105-107).  Dr. Rumbaugh urged that Dr. Taglialatela and Dr. Hopkins "must be able to control all aspects of their program." (*Id.*) (App. at 106).  Moreover, she conceded that "the best thing I could do to improve the chances for IPLS funding and to decrease the level - of objections going to the USDA about IPLS - would be to absent myself from the lab." (*Id.*)  Dr. Rumbaugh outlined her reasoning as follows:

Dear George, Lyle, Board Members, Staff, Volunteers, Jared, and Bill

I am writing to each of you to strongly support and to enthusiastically endorse, Jared Taglialatela and Bill Hopkins. It is my hope that they will find a means of working with the bonobos and of facilitating the transition from the current operational status to one that is sustainable for the long term, along with the necessary structural transitions.

It would be very helpful to IPLS if Jared were able to assume the directorship in the near future and if Bill were able to assist him in whatever way they both deemed satisfactory. . . .

. . .

. . . Similarly, they must be able to control all aspects of their program; for the lives of the bonobos cannot be separated from the success of the research. Separating this authority was a disastrous mistake made by past administrations at the Trust and it should not be carried forward in any guise. It eliminated any chance the program had of succeeding.

. . .

I remain deeply indebted to all who firmly supported me during the investigations required by the accusations of the bonobo 12. I am even further indebted to all who worked so diligently to evaluate the accusations and enabled my name to be cleared. However, not only did the bonobo 12 continue their blog, they usurped the former web domain, continued to send false information to the USDA and to influence the opinions of local donors. It became increasingly clear that the best thing I could do to improve the chances for IPLS funding and to decrease the level - of objections going to the USDA about IPLS - would be to be absent myself from the lab.

. . .

The actions of the bonobo 12 were personally directed at me and the research I conducted. There is no reason to suspect that they will attack Jared or Bill. With Jared's directorship in place, these problems should rapidly diminish. While Jared and Bill are familiar with language work, their focus is on investigating the effects of language acquisition as well as comparing and contrasting bonobos and chimpanzees. This is appropriate and the direction that should now be taken.

It is my hope that the coming essential transition will proceed smoothly and rapidly. I also hope that, as appropriate, and under Jared's direction, I will continue to do some research with the bonobos, once the needed structural changes and funding are firmly in place. I will to do nothing to disrupt this critical and necessary next step. The leadership role must transition to and remain within,

the hands of others. IPLS is most fortunate that Jared and Bill are visiting and willing to consider what they might do.

. . .

(*Id.*)

In addition to this recommendation, Dr. Rumbaugh explained that she hoped to obtain additional funding by housing furloughed chimpanzees from Yerkes at the IPLS facility by using Dr. Taglialatela and Dr. Hopkins to help make that happen.  (Miller Aff., Ex. B. at 68:19-25 – 69:1-8, 71:16-23) (App. at 17-19).  To that end, Dr. Rumbaugh assured Dr. Taglialatela that she planned to no longer be involved with the Des Moines facility.  (Miller Aff., Ex. H at 482:4-6) (App. at 56).  Likewise, Dr. Rumbaugh assured Dr. Hopkins that he and Dr. Taglialatela "would have autonomy to move the research in a direction that we thought would be most beneficial for garnering private or public sector support."  (Miller Aff., Ex. I at 641:8-19) (App. at 66).

If Dr. Rumbaugh had told Dr. Taglialatela that she planned to continue to be involved in the research and present at the lab, he would "[a]bsolutely not" have taken on the significant responsibility of caring for the bonobos, conducting or overseeing research related to the bonobos, and obtaining funding to support the bonobos and the facility.  (Miller Aff., Ex. H at 483:12-15) (App. at 57).  Likewise, Dr. Hopkins "would not have got involved," if he had known Dr. Rumbaugh planned to continue to be involved in the research and present at the lab. (Miller Aff., Ex. I at 643:3-16) (App. at 67).  Acting in reliance on Dr. Rumbaugh's representations as to their roles and her absence from the lab, Dr. Taglialatela and Dr. Hopkins accepted positions as directors of IPLS and ACCI and undertook the significant responsibility of caring for the bonobos, conducting or overseeing research related to the bonobos, and obtaining funding to support the bonobos and the facility.

However, far from absenting herself from the lab and allowing Dr. Taglialatela and Dr. Hopkins "to control all aspects of their program," Dr. Rumbaugh arrived at the IPLS facility unexpectedly in early November 2013.   (Miller Aff., Ex. G at 416:8-23) (App. at 45). Specifically, IPLS's veterinarian Dr. Julie Gilmore testified that Dr. Rumbaugh "immersed herself in the lab," "spent the night at the lab" without permission, and started contacting staff about IPLS's day-to-day operations and care for the bonobos.  (*Id.* at 416:13-23) (App. at 45).

Subsequently, IPLS requested that Dr. Rumbaugh comply with her representations that she absent herself from the lab and provide Dr. Taglialatela and Dr. Hopkins with the autonomy necessary to conduct research with the bonobos.  (*See id.* at 417:24 – 418:17) (App. at 46-47). Dr. Gilmore explained to Dr. Rumbaugh that her sudden immersion in the lab in early November 2013 was contradictory to what she, Dr. Rumbaugh, had represented to IPLS, BHI, Dr. Taglialatela, and Dr. Hopkins.  (*See id.* at 419:5-13) (App. at 48).

After being asked to comply with her representation that she would absent herself from the lab (or, in Dr. Rumbaugh's terms, being "kicked out"), Dr. Rumbaugh alleges that she was given "explicit instructions . . . not to tell anyone on Bonobo Hope what had happened. . . . [or she] could be put in jail, many bad things could happen to [her]."  (Miller Aff., Ex. B. at 116:8-14) (App. at 23).  Notwithstanding the alleged fear of complying with that order, Dr. Rumbaugh e-mailed BHI members.  (*Id.* at 117:3-14) (App. at 24).  However, she "didn't write e-mails and explain everything that was going on, [referencing being kicked out of the lab,] but [she] did indicate that we had some kind of issues as regards Teco."  (*Id.* at 117:12-14) (App. at 24).  In fact, Dr. Rumbaugh could have told BHI everything that was going on, but did not.  (*See* Miller Aff., Ex. D at 273:5-7) (App. at 33).

### E.   The Motion for Specific Performance

On June 13, 2014, Dr. Rumbaugh filed her Motion.  (Dkt. No. 69).  The Motion sought,

among other things, to (i) declare that ACCI is IPLS's legal successor and is bound under the Agreements and (ii) to enforce the rights under the Agreements including declaring that BHI is a joint owner of the Bonobo 4, that Dr. Rumbaugh and BHI retain relocation rights over Maisha and the Bonobo 4, and to resolve issues relating to the governance and administration of ACCI and BHI.  Alternatively, the motion sought to (i) declare that ACCI ceased to exist or (ii) reopen the litigation in this matter to allow Dr. Rumbaugh to assert a number of personal injury and wage claims against IPLS and ACCI and their respective officers and attorneys.

BHI filed a motion to intervene, (Dkt. No. 73), which was granted by this Court.  (Dkt. No. 79).  BHI then concurred with and joined in Dr. Rumbaugh's Motion.[10]  (Dkt. No. 84).

On August 25, 2014, the Plaintiffs' filed their resistance to Dr. Rumbaugh's Motion asserting, among other concerns, that there did not appear to be an issue presented by the Motion that required resolution by this Court.  (Dkt. No 83).  Namely, ACCI asserted that it was bound by the agreements.  As such, Dr. Rumbaugh's request that the Court declare that ACCI is bound by the agreements seemed unnecessary, and the alternative relief seemed inappropriate under the circumstances.

After limited discovery, Plaintiffs provided notice of certain affirmative defenses to Dr. Rumbaugh's Motion including that (1) Dr. Rumbaugh's and BHI's claims are barred by equitable doctrines, (2) that their own failure to perform all obligations and conditions under the settlement agreements bars recovery, and (3) that they prevented Plaintiffs' performance under the settlement agreements.  A three-day evidentiary hearing on Dr. Rumbaugh's Motion for Specific Performance and Related Relief was held before the Court on May 27 to May 29, 2015.

Additional facts and circumstances will be developed in the Argument section below as

---

[10]  Accordingly, Plaintiffs' present briefing also responds to BHI's apparent positions herein.

appropriate.

## III.   LEGAL STANDARDS

The cardinal rule in both contract interpretation and contract construction is to determine the parties' intentions at the time they signed the contract. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010) ("The determination of the intent of the parties at the time they entered into the contract is the cardinal rule of contract interpretation."); *Am. Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 329 (Iowa 1999) ("When we are reviewing the district court's construction of a contract, we must keep in mind the cardinal rule that the intent of the parties controls.").

In all contracts, "there is an implied term that the person for whom the work is contracted to be done will not obstruct, hinder or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him." *Kaltoff v. Nielsen*, 106 N.W.2d 597, 602 (1960). "The principle that no one is permitted to benefit from his or her own wrongful act is a part of the doctrine of conditions and bars a party to a contract from unjustifiably preventing the other party from performing and thus precipitating a breach." 17A Am. Jur. *Contracts* § 686 (2004).

"Equitable estoppel is a common-law affirmative defense 'preventing one party who has made certain representations from taking unfair advantage of another when the party making the representations changes its position to the prejudice of the party who relied upon the representations.'" *Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa 2005) (quoting *ABC Disposal Sys., Inc. v. Dep't of Natural Res.,* 681 N.W.2d 596, 606 (Iowa 2004) (citing *Ahrendsen v. Iowa Dep't of Human Servs.,* 613 N.W.2d 674, 678 (Iowa 2000)).

## IV.   ARGUMENT

During the discovery process, Dr. Rumbaugh asserted that her claims and the issues she

"intends to pursue at the hearing have evolved."   (Dr. Rumbaugh's and BHI's Joint Memorandum Addressing Jurisdiction and Other Issues, Dkt. No. 102, p. 8).  As confirmed by the pre-hearing briefing in this matter, it now appears Dr. Rumbaugh and BHI argue that (A) IPLS has "ceased to exist," (B) ACCI has violated a provision of the side agreement relating to joint ownership of the bonobos, (C) ACCI has violated provisions in both agreements related to research with the bonobos, and (D) ACCI has violated provisions in both agreements related to care of the bonobos.  ACCI will briefly respond to each issue in turn.

### A. Because IPLS Exists as a Matter of Law, the Court Should Not Allow BHI or Dr. Rumbaugh to Attempt to Transfer the Bonobos

At issue is paragraph 6 of the Main Agreement and paragraph 4 of the Side Agreement. Paragraph 6 of the Main Agreement provides that "[s]hould the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for . . . Maisha,"[11] certain rights are afforded to BHI and Dr. Rumbaugh, including the option to elect to make appropriate arrangements for the transfer of Maisha to another facility.  Similarly, paragraph 4 of the Side Agreement provides that, "[s]hould the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for the Bonobo 4" certain rights are afforded to BHI and Dr. Rumbaugh, including the option to elect to make appropriate arrangements for the transfer of the Bonobo 4 to another facility.

Notwithstanding IPLS's administrative dissolution, IPLS continues to exist as a matter of law.  The Iowa Business Corporations Act addresses the effect of the administrative dissolution of a corporation.  Iowa Code § 490.1421.  It provides that "[a] corporation administratively dissolved continues its corporate existence."  *Id.*  An administratively dissolved corporation may

---

[11] To be clear, neither IPLS nor ACCI have determined that they are unable to care for the bonobos.  Any argument to the contrary is entirely unfounded and directly refuted by the evidence developed in the evidentiary hearing that IPLS/ACCI is the only identified entity able to care for the bonobos.

seek reinstatement.  *Id.* at § 490.1422.  Indeed, IPLS plans to seek reinstatement as funds become available to pay off a tax lien.  (Miller Aff., Ex. G at 436:21-25) (App. at 50).  "When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution as if the administrative dissolution had never occurred."  Iowa Code § 490.1422(3).  As a result, and notwithstanding its administrative dissolution, IPLS continues to exist.

To the extent the Court is willing to entertain the argument that IPLS has ceased to exist, the Court should not allow Dr. Rumbaugh to benefit from her own wrongful acts by precipitating such a condition.  *Nielsen*, 106 N.W.2d at 602 (1960); 17A Am. Jur. *Contracts* § 686.  It is the registered agent's responsibility to make sure that a corporation files its biennial report.  (Miller Aff., Ex. D at 258:19-25) (App. at 31).  In 2012, during the dispute about the ownership of the bonobos, Dr. Rumbaugh appointed herself as the acting agent on behalf of IPLS.  (Miller Aff., Ex. 1004) (App. at 101-102).  At that time, or by March 2012 at the latest, Dr. Rumbaugh, as executive director of IPLS and its registered agent, had to have known about and received letters from Iowa Work Force Development asserting that IPLS owed money to the State of Iowa.  (*See* Miller Aff., Ex. D at 263:6-21) (App. at 32).

After designating herself with the responsibilities as IPLS's registered agent, Dr. Rumbaugh conditioned the much needed resolution of the underlying interpleader in this matter on the signing of the Side Agreement that would allow her to relocate the bonobos should IPLS "cease to exist."  Conveniently, and at the first opportunity, Dr. Rumbaugh failed to respond to requests for IPLS's biennial statement.  IPLS was then administratively dissolved subject to a lien that substantially encumbered IPLS's resources and threatened the corporate shield protecting IPLS and its board of directors.  Dr. Rumbaugh cannot be allowed to benefit from her

wrongful acts by invoking her contingent rights under the "cease to exist" clause, nor should those benefits flow to BHI.  17A Am. Jur. *Contracts* § 686.

Further, Dr. Rumbaugh cannot now claim that she did not know what was required of her as IPLS's registered agent.  *Clark v. Iowa Dep't of Revenue & Fin.*, 644 N.W.2d 310, 319 (Iowa 2002) ("It is a well-established principle that ignorance of the law is no excuse.").  At the hearing, it seemed clear that Dr. Rumbaugh's failure to file IPLS's biennial report was at the forefront of her mind.  In particular, when Dr. Rumbaugh was asked on direct examination if she was "asked to sign <u>any</u> forms on behalf of [IPLS] as executive director," she immediately, and without further prompting as to any particular form, asserted as follows:

> I was asked to sign a form.  I was not told that I was signing it particularly as the executive director, but it does say that I believe on the bottom of the form.  I was asked to do that by Susan McKee.  I don't recall any particular explanation of that form.  I was having to sign a lot of forms that were new to me at that time, insurance forms, employee forms, all kinds of forms.

(Miller Aff., Ex. B at 46:3-11) (App. at 11) (emphasis added).  Although she apparently signed "all kinds of forms" as executive director for IPLS, Dr. Rumbaugh was quick to identify the Change of Registered Agent form without any specific question pending as to that form in particular and was even quicker to assert that she did not know what that form required of her at the time she signed it.  (*See id.* 46:19 – 47:4) (App. at 11-12).  It is well-established, however, that Iowa courts afford no relief for real or feigned ignorance of the law and what it requires.  *Clark*, 644 N.W.2d at 319.

**B.      ACCI has Complied with the Agreement Relating to Its Joint Ownership of the Bonobos with BHI**

At issue is Dr. Rumbaugh's claim that "ACCI has violated paragraph 1 of the Side Agreement."  (Dr. Rumbaugh's and BHI's Joint Memorandum in Addressing Jurisdiction and Other Issues, Dkt. No. 102., p. 8).  Paragraph 1 of the Side Agreement provides that "[a]ll parties

stipulate and agree that the Trust and Bonobo Hope jointly are the owners of the bonobos Kanzi, Nyota, Elikya and Teco, now residing at the Trust (the 'Bonobo 4')."

As was established at the evidentiary hearing, ACCI is and always has been willing to work with BHI.  These efforts include but are not limited to providing BHI with access to information about the bonobos during a joint ACCI-BHI board meeting in June 2014; facilitating visits to ACCI's facilities by BHI board members Sally Coxe, Derek Wildman, and Laurent Dubreuil; facilitating visits to ACCI's facilities by Dr. Rumbaugh's and BHI's attorney William Zifchak; facilitating visits to ACCI's facilities by Dr. Rumbaugh's and BHI's expert witness Dr. Russ Tuttle accompanied by Dr. Rumbaugh's son Shane Rumbaugh; providing Derek Wildman access to all of ACCI's research protocols and supporting documents during his visit to the facility; and arranging for any BHI member to visit the facility on May 30, 2015—after enduring a three-day hearing in this matter.  ACCI has even expressed a willingness to allow any BHI member, including Dr. Rumbaugh, to play a role in research to the extent it can be done safely, is consistent with the organization's mission, and is approved by the Institutional Animal Care and Use Committee.  (Miller Aff., Ex. H at 568:12-18) (App. at 64).

While BHI claims to enjoy the benefits of joint ownership, it has not contributed a single dollar to ACCI's efforts to care for the bonobos and has not even attempted to obtain a single grant to support research with the bonobos.  (Miller Aff., Ex. C at 211:4-10, 212:13-17) (App. at 28-29).  Rather, Dr. Rumbaugh and BHI have focused their efforts toward a pie-in-the-sky plan to move the bonobos to a glorified Morton Building in Missouri with no functional utilities backed by a wood-burning furnace.  (Miller Aff., Ex. F. at 381:14 – 384:23) (App. at 39-42).

ACCI submits that the crux of the issue continues to be whether joint ownership requires ACCI to allow Dr. Rumbaugh to have unrestricted access to ACCI's facilities and control over

the research being conducted.  ACCI firmly believes that the joint ownership provision does not, and should not, grant Dr. Rumbaugh unrestricted access to the bonobos and control over the bonobo research for two independent reasons.

> **(1)    Dr. Rumbaugh's unrestricted access was not contemplated in the agreements and poses serious health and safety risks to the bonobos and staff**

"The determination of the intent of the parties at the time they entered into the contract is the cardinal rule of contract interpretation." *NevadaCare*, 783 N.W.2d at 466.  Under Iowa law, courts discern the intent of the parties by "giv[ing] effect to the language of the entire agreement in accordance with its commonly accepted and ordinary meaning." *See Lewis Cent. Educ. Ass'n v. Lewis Cent. Cmty. Sch. Dist.*, 559 N.W.2d 19, 22 (Iowa 1997).  Pursuant to Iowa law, courts refuse to "supply terms that the parties for whatever reason chose not to include." *See Kern v. Palmer Coll. Of Chiropractic*, 757 N.W.2d 651, 669 (Iowa 2008) (Appel, J., specially concurring); *see Smith v. Stowell*, 125 N.W.2d 795, 799 (Iowa 1964) (holding that a "court may not rewrite the contract" to "make for the parties a contract which they did not make for themselves, or make for them a better contract than they chose . . . to make for themselves . . . , or remake a contract . . . in order to meet special circumstances or contingencies against which the parties have not protected themselves").  Nowhere in paragraph 1 of the Side Agreement does it appear that the parties intended Dr. Rumbaugh to have unrestricted access to the bonobos. As such, Dr. Rumbaugh's and BHI's request that the Court read a right of unrestricted access into the settlement agreements cannot hold water and the Court should not supply such a term here. *See Kern v. Palmer Coll. Of Chiropractic*, 757 N.W.2d at 669; *Smith*, 125 N.W.2d at 799.

Further, Dr. Rumbaugh's unrestricted access has been shown to pose significant safety concerns.  Indeed, Dr. Rumbaugh has repeatedly been removed from interaction with the

bonobos because of these safety concerns.  (*See e.g.*, (Miller Aff., Ex. A at 9:14 – 10:8-10) (App. at 5-6) (describing pattern of being removed from the bonobos because of safety and other concerns); (Miller Aff., Ex. H at 563:18-22) ("[W]e have grave concerns regarding Dr. Savage-Rumbaugh's access to the apes because of specific safety concerns.") (App. at 63); (Miller Aff. Ex. G at 441:21 – 444:9) (App. at 51-54) (describing specific safety concerns involving Dr. Rumbaugh's interactions with the bonobos)).  Indeed, Dr. Rumbaugh's history of allowing staff members and members of the public to have direct physical contact with the bonobos has placed the bonobos at risk for contracting serious, possibly life-threating disease and illness.  Likewise, this type of direct physical contact with the bonobos has exposed staff members and bonobos to the type of physical safety concerns expressed by ACCI throughout the hearing.  Prior to the parties signing the settlement agreements, even Dr. Rumbaugh asserted that, "I have been not able to care for the bonobos and to assure the safety of people or the bonobos."  (Miller Aff., Ex. 1000) (App. at 99).  It would strain logic and common sense to read a term into a contract where, as here, the result poses significant danger of personal injury.  Accordingly, the Court should not read into the contract a right for Dr. Rumbaugh to have unrestricted access to the bonobos.

### (2)    Dr. Rumbaugh should be equitably estopped from imposing authority or control over the bonobos

To establish equitable estoppel, a party must show that the following elements: "(1) a false representation or concealment of material facts; (2) lack of knowledge of the true facts on the part of the actor; (3) the intention that it be acted upon; and (4) reliance thereon by the party to whom made, to his prejudice and injury."  *Markey*, 705 N.W.2d at 21.

Here, on October 26, 2013, Dr. Rumbaugh wrote to Dr. Taglialatela, Dr. Hopkins, and members of IPLS and BHI to recommend that Dr. Taglialatela and Dr. Hopkins take over the directorship of IPLS and direct the research of the bonobos.  (Miller Aff., Ex. 1005) (App. at

105-107).   Dr. Rumbaugh's pitch to Dr. Taglialatela and Dr. Hopkins specifically asserted that respective roles would allow them to "control all aspects of their program" and that she would "absent [her]self from the lab."   (*Id.*) (App. at 106).   She made this pitch in the hope that Dr. Taglialatela and Dr. Hopkins would rely on it and come to Des Moines to save IPLS and the bonobos from their financial straits.   (Miller Aff., Ex. B at 68:19 – 69:8, 71:16-23) (App. at 17-19) (describing Dr. Rumbaugh's desire to use Dr. Taglialatela and Dr. Hopkins to obtain funding from furloughed chimpanzees from Yerkes National Primate Center).

Dr. Taglialatela and Dr. Hopkins testified that they relied on Sue's pitch outlined in her October 26, 2013 e-mail to their substantial prejudice and that they absolutely would not have accepted their positions with IPLS had they had known what Dr. Rumbaugh concealed—that she did not plan to allow Dr. Taglialatela and Dr. Hopkins complete control over the research of the bonobos and that she intended to continue to be present at the lab.   (Miller Aff., Ex. H at 483:12-15) (App. at 57) (testifying that he would "[a]bsolutely not" have taken on the significant responsibility of caring for the bonobos, conducting or overseeing research related to the bonobos, and obtaining funding to support the bonobos had he known Dr. Rumbaugh planned to continue to be involved); (Miller Aff., Ex. I at 643:3-16) (App. at 67) (testifying to substantially the same).   As a result of Dr. Rumbaugh's prior representations, she should be equitably estopped from arguing that she should now have access to the lab, or that she or BHI retained control over the bonobo research.   *See Markey*, 705 N.W.2d at 21.

## C.     ACCI has Complied with the Agreements to Involve the Bonobos in Research

At issue is paragraph 4 of the Main Agreement and paragraph 2 of the Side Agreement. Paragraph 4 of the Main Agreement provides that "Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue

to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes . . . ."   Paragraph 2 of the Side Agreement provides that "[t]he Bonobo 4 shall continue to reside at the Trust at least so long as they continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes . . . ."   Both paragraphs then list a number of activities following a very broad "including, but not limited to" clause.

It is clear that ACCI has complied with the provisions relating to research.  ACCI's active research protocols include: New Insights Into Human Origins through the Study of Linguistically Competent Bonobos; The Role of Language in Categorization; A Large-Scale Comparison of Cognition and Communication in the Animal Kingdom; A Socio-Ecological Comparison of Captive *Pan troglaodytes*, *Pan paniscus* and *Gorilla gorilla*; An Interdisciplinary Approach to the Evolutionary Origin of Language: Comparing Chimpanzee and Bonobo Communication and Neurobiology; Theory of Mind in Language Competent Bonobos; Rhythmic Entrainment in Bonobo Apes at the Ape Cognition & Communication Institute (ACCI).  (Miller Aff., Ex. 1006) (App. at 113).  As should be readily apparent from the face of these approved research protocols, the bonobos continue to be actively engaged in research relating to the "use of language" as required by the Main Agreement and Side Agreement.  Dr. Hopkins' testimony at the hearing detailed the nature of the research as consistent with the descriptions set forth in the Main Agreement and Side Agreement.   (Miller Aff., Ex. I. at 644:2 – 648:7) (App. at 68-72).[12] Likewise, Dr. Taglialatela testified about the research being conducted at the facility in a manner

---

[12]  It appears that Dr. Rumbaugh and BHI have dropped the puzzling and entirely unfounded allegation that ACCI is conducting invasive and dangerous biomedical research with the bonobos.  As such, biomedical research will not be discussed herein.

that was consistent with the research described in the settlement agreements.  (Miller Aff., Ex. H at 523:10 – 527:20) (App. at 58-62).

Because Dr. Rumbaugh and BHI drafted the research paragraphs at issue, any ambiguity as to what type of research is required under the settlement agreements should be construed against against them.  Iowa courts generally construe ambiguous contract language against the drafter.  *See Peak v. Adams*, 799 N.W.2d 535, 548 (Iowa 2011).  Here, Dr. Rumbaugh testified that she drafted the provisions of the Agreements related to research to be conducted with the bonobos.  (Miller Aff., Ex. B at 58:17 – 59:7) (App. at 13-15).  In particular, Dr. Rumbaugh added the language in paragraph 4 of the Main agreement and paragraph 2 of the Side Agreement "where it says, 'including but not limited to' and then all the things underneath down to the end of the parentheses."  (*Id.* at 60:4-7) (App. at 15).  To the extent there is any ambiguity as to whether this non-exhaustive "including but not limited to" language encompasses the research being conducted at ACCI, the Court should construe the language in favor of ACCI.

Accordingly, the Court should find that research is being conducted at ACCI consistent with the Main and Side Agreements.

D.     **ACCI has Complied with the Agreements to Use Its Best Efforts to Provide Complete and Competent Care of the Bonobos and to Take all Reasonable Precautions to Ensure their Complete Safety**

At issue are paragraph 5 of the Main Agreement and Paragraph 3 of the Side Agreement which together provide that "[t]he Trust shall use its best efforts to provide complete and competent care of [Maisha and the Bonobo 4]; and shall take all reasonable precautions to ensure their complete safety."  With respect to providing complete and competent care, ACCI's veterinarian Dr. Julie Gilmore, individually and assisted by others, has by all accounts used her best efforts to provide complete and competent care of the bonobos.  (Miller Aff., Ex. G. at 404:8-16) (App. at 44).

22

With respect to the clause in the settlement requiring ACCI to take all reasonable precautions to ensure the bonobos' complete safety, ACCI has done just that. However, Dr. Rumbaugh and BHI persist in attempt to make an issue about ACCI's location relative to flooding. In 2008, the IPLS facility experienced flooding at the facility in Des Moines. (Miller Aff., Ex. B. at 41:8-9) (App. at 9). Dr. Rumbaugh believes the flood water was toxic and caused her sister and at least one bonobo to get cancer.[13] (*Id.* at 42:2-15) (App. at 10) ("There was only one bonobo that really liked the water. He kept playing in it, and he soon got cancer. And my sister who slipped repeatedly in her waders got cancer.") Notwithstanding her concerns about the allegedly toxic water, Dr. Rumbaugh made no effort to move the bonobos from the facility.[14] (*Id.* at 82:19 – 83:3, 85:6-9) (App. at 20-22). In fact, she affirmatively resisted subsequent efforts to move them from the facility when such a move would not allow her to continue research with the bonobos. (*Id.* at 83:5-9) (App. at 21). She continued to allow the bonobos to reside in the facility while she was the executive director of IPLS. There simply remains no credible, and no admissible, evidence that ACCI has failed to take all reasonable precautions to ensure the bonobo's complete safety.

## V.    CONCLUSION

In sum, Dr. Rumbaugh appears to have largely manufactured the circumstances from which she now hopes to benefit. In addition, there is substantial evidence that Dr. Rumbaugh poses significant health and safety risks to the bonobos and to others that justify what appears to be her underlying complaint—her exclusion from ACCI's facilities and from the bonobos. For the foregoing reasons, and for the reasons explored in the evidentiary hearing in this matter, Dr.

---

[13] Dr. Rumbaugh readily concedes, however, that she does not "know for sure what the biological effects of the flood were." (*Id.* at 42:16-18) (App. at 10).

[14] Although Dr. Rumbaugh served as executive director of IPLS in 2012, she testified that she supposedly was not "in a position to direct such testing" of the ground water to dispel her suspicions. (*Id.* at 85:6-9) (App. at 22).

Rumbaugh's Motion should be denied in its entirety.

WHEREFORE Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust and Ape Cognition and Communication Institute respectfully request that this Court deny Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief in its entirety and grant and further or additional relief the Court deems just and proper under the circumstances.


Date:  July 2, 2015

/s/ William J. Miller
William J. Miller (AT0005414)
Brian A. Melhus (AT0011421)
Dorsey & Whitney LLP
801 Grand Avenue, Suite 4100
Des Moines, Iowa 50309-2790
Tel:  (515) 283-1000
Fax:  (515) 283-1060
E-mail:  miller.william@dorsey.com
            melhus.brian@dorsey.com
**ATTORNEYS FOR PLAINTIFFS**


Original filed.  Copy to:

Todd P. Langel
Faegre Baker Daniels LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309

William C. Zifchak
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Ross Neihaus
Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
ATTORNEYS FOR DEFENDANTS
DR. SUE SAVAGE-RUMBAUGH,
PH.D. and BONOBO HOPE
INITIATIVE, INC.

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 2, 2015, the foregoing instrument was served upon all parties to the above case and/or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings:

**By:**   Electronic Filing and/or
_____ U.S. Mail          _____ FAX
_____ Hand                       Overnight
_____ Delivered                 Courier
  X    E-mail               _____ Other _____

/s/ Brian A. Melhus

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third A venue Se, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927
ATTORNEYS FOR DEFENDANT
ZOOLOGICAL FOUNDATION OF
GEORGIA, INC. d/b/a ZOO
ATLANTA

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309
ATTORNEYS FOR DEFENDANT
DEMOCRATIC REPUBLIC OF
CONGO