IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., <br><br> Defendants. | Case No. 4:10-cv-00052-RAW <br><br><br> **PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR POST-HEARING BRIEF IN RESISTANCE TO DEFENDANT SUE SAVAGE-RUMBAUGH'S MOTION FOR SPECIFIC PERFORMANCE AND RELATED RELIEF** |

COME NOW Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust ("IPLS") and Ape Cognition and Communication Institute ("ACCI"), and offer the following Appendix in Support of Their Post-Hearing Brief in Resistance to Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief:

**Table of Contents**

Affidavit of William J. Miller in Support of Post-Hearing Brief in Resistance to
Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief...........1

    **Exhibit A** – Opening Statement of W. Zifchak,  Hearing Transcript, Vol. 1,
    May 27, 2015 ......................................................................................................................4

    **Exhibit B** – Testimony of Sue Savage-Rumbaugh, Hearing Transcript, Vol. 1,
    May 27, 2015 ......................................................................................................................7

i

**Exhibit C** – Testimony of Laurent Dubreuil, Hearing Transcript, Vol. 1,
May 27, 2015 ........................................................................................................27

**Exhibit D** – Testimony of Lyle Simpson, Hearing Transcript, Vol. 2,
May 28, 2015 ........................................................................................................30

**Exhibit E** – Testimony of Derek Wildman, Hearing Transcript, Vol. 2,
May 28, 2015 ........................................................................................................34

**Exhibit F** – Testimony of Ryan Sheldon, Hearing Transcript, Vol. 2,
May 28, 2015 ........................................................................................................38

**Exhibit G** – Testimony of Julie Gilmore, Hearing Transcript, Vol. 2,
May 28, 2015 ........................................................................................................43

**Exhibit H** – Testimony of Jared Taglialatela, Hearing Transcript, Vol. 3,
May 29, 2015 ........................................................................................................55

**Exhibit I** – Testimony of William Hopkins, Hearing Transcript, Vol. 3,
May 29, 2015 ........................................................................................................65

**Exhibit J** – Plaintiffs' Timeline of Relevant Events ........................................73

**Exhibit 1** – Agreement for Settlement and Acknowledgement of Ownership ................78

**Exhibit 2** – Final Supplemental Agreement for Settlement and Acknowledgement
of Ownership........................................................................................................84

**Exhibit 34** – Certificate of Administrative Dissolution ....................................90

**Exhibit 1000** – Email Correspondence between Lyle Simpson and Duane
Rumbaug ..............................................................................................................92

**Exhibit 1004** – Statement of Change of Registered Office and/or Registered
Agent....................................................................................................................100

**Exhibit 1005** – Email Correspondence from Sue Rumbaugh to George Caudill,
Lyle Simpson, Board Members, Staff, Volunteers, Jared Taglialatela, and Bill.............104

**Exhibit 1006** – ACCI Active Research Protocols .........................................112

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, | ) ) ) ) ) Case No. 4:10-cv-00052-RAW |
| Plaintiffs, | ) ) **WILLIAM J. MILLER'S AFFIDAVIT IN** |
| | ) **SUPPORT OF PLAINTIFFS' POST-** |
| v. | ) **HEARING BRIEF IN RESISTANCE TO** ) **DEFENDANT SUE SAVAGE-** |
| ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., | ) **RUMBAUGH'S MOTION FOR SPECIFIC** ) **PERFORMANCE AND RELATED** ) **RELIEF** ) ) ) ) ) ) ) |
| Defendants. | ) ) |

STATE OF IOWA       )
                    ) SS:
COUNTY OF POLK    )

William J. Miller, being duly sworn and under oath, deposes and states as follows:

1.     I am an attorney for Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape

Trust ("IPLS") and Ape Cognition and Communication Institute ("ACCI") in the above

captioned matter.

2.     Attached as Exhibit A is a true and correct copy of excerpts from the opening

statement of W. Zifchak taken from the hearing transcript, volume 1, dated May 27, 2015.

3.     Attached as Exhibit B is a true and correct copy of excerpts from the testimony of

Dr. Sue Savage-Rumbaugh taken from the hearing transcript, volume 1, dated May 27, 2015.

4.     Attached as Exhibit C is a true and correct copy of excerpts from the testimony of

**App. 001**

Laurent Dubreuil taken from the hearing transcript, volume 1, dated May 27, 2015.

5.      Attached as Exhibit D is a true and correct copy of excerpts from the testimony of Lyle Simpson taken from the hearing transcript, volumes 1 and 2, dated May 27 and 28, 2015.

6.      Attached as Exhibit E is a true and correct copy of excerpts from the testimony of Derek Wildman taken from the hearing transcript, volume 2, dated May 28, 2015.

7.      Attached as Exhibit F is a true and correct copy of excerpts from the testimony of Ryan Sheldon taken from the hearing transcript, volume 2, dated May 28, 2015.

8.      Attached as Exhibit G is a true and correct copy of excerpts from the testimony of Julie Gilmore taken from the hearing transcript, volume 2, dated May 28, 2015.

9.      Attached as Exhibit H is a true and correct copy of excerpts from the testimony of Jared Taglialatela taken from the hearing transcript, volumes 2 and 3, dated May 28 and 29, 2015.

10.      Attached as Exhibit I is a true and correct copy of excerpts from the testimony of William Hopkins taken from the hearing transcript, volume 3, dated May 29, 2015.

11.      Attached as Exhibit J is Plaintiff's Timeline of Relevant Events.

12.      Attached as Exhibit 1 is a true and correct copy of the Agreement for Settlement and Acknowledgement of Ownership offered at the hearing by Defendants.

13.      Attached as Exhibit 2 is a true and correct copy of Final Supplemental Agreement for Settlement and Acknowledgement of Ownership offered at the hearing by Defendants.

14.      Attached as Exhibit 34 is a true and correct copy of Certificate of Administrative Dissolution offered at the hearing by Defendants.

15.      Attached as Exhibit 1000 is a true and correct copy of email correspondence between Lyle Simpson and Duane Rumbaugh offered at the hearing by the Plaintiffs.

**App. 002**

16.    Attached as Exhibit 1004 is a true and correct copy of Statement of Change of Registered Office and/or Registered Agent offered at the hearing by the Plaintiffs.

17.    Attached as Exhibit 1005 is a true and correct copy of email correspondence from Sue Rumbaugh to George Caudill, Lyle Simpson, Board Members, Staff, Volunteers, Jared Taglialatela, and Bill offered at the hearing by Plaintiffs.

18.    Attached as Exhibit 1006 is a true and correct copy of ACCI Active Research Protocols offered at the hearing by Plaintiffs.


Further affiant sayeth not.

_____
William J. Miller

Subscribed and sworn to before me on this 2nd day of July, 2015.

```
MANUEL ADOLFO CORNELL
Commission Number 781700
My Commission Expires
December 6, 2016
```

_____
Notary Public in and for the State of Iowa
My Commission expires: 12/6/2016

3

**App. 003**

# EXHIBIT A

1    bonobos, specifically Kanzi and his half-sister, Panbanisha, had

2    far more aptitude for language and went on to learn thousands of

3    words.  They also played the piano, lit fires with matches and

4    lighters, made tools and knots, opened padlocks with keys and

5    were potty trained on a regular toilet.

6            Sue owned several of the Georgia bonobos, one of which

7    was a gift from the people of Japan.  Sue, who by this time

8    already had an honorary Ph.D. from the University of Chicago, in

9    addition to her own Ph.D., gave up her tenured professorship at

10   Georgia State and in 2004 donated her ownership interest to the

11   Great Ape Trust, in exchange for a promise from Ted Townsend of

12   a job for life and to care for the bonobos for life.  Sue asked

13   for no money for these priceless creatures.

14           With proper approvals Sue drove the bonobos to Iowa in

15   a school bus in 2005.  Ted Townsend spent 20 million dollars

16   building a facility on donated city land that he acknowledged

17   was in a floodplain.  Jealous rivals forced Sue out after two

18   years.  This was the start of a pattern.  Sue was reinstated

19   full time in May 2008 but supervised by a non Ph.D. named

20   William Fields.  A major flood in June 2008, in Townsend's own

21   words, was the, quote, death nail for his master plan for

22   expansion at the trust.  After the financial crash, he made

23   plans to pull out and relocate the bonobos.

24           The U.S. Army Corps of Engineers has banned further

25   construction at the facility and the groundwater may well be

10

1  toxic to the apes and to humans.  Four bonobos, the one that was

2  a gift from Japan, named P-Suke, Nathen, Panbanisha, and Matata,

3  the original bonobo from Africa, have died in Iowa.  Infant Teco

4  was born in 2010 with chronic health conditions.

5       In August 2011 Sue was selected as one of Time

6  Magazine's 100 most influential people in the world.  To my

7  knowledge, she is the only Iowa resident ever so honored, and

8  yet in October 2011 she was locked out by Fields in the face of

9  allegations by disgruntled workers that she, herself, was a

10  danger to these bonobos.  These allegations were discredited and

11  a new leadership team replaced Townsend who left the trust

12  saddled with debt.

13       Lyle Simpson, Professor Ken Schweller, and many

14  distinguished scholars wrote letters of support to the bonobo

15  research and for Sue to the Governor of the State of Iowa, its

16  senators, and its university presidents.  These identical

17  allegations from 2011 were served up as new to Ken Schweller

18  when he became the new board chair, and he used them as an

19  excuse to place Sue again on administrative leave and then work

20  to relocate the bonobos.  Sue was cleared once again after a

21  comprehensive investigation and things moved along until May

22  2013 when she suffered a fall and concussion at the lab.  In the

23  interim, George Caudill, at Lyle Simpson's urging, was elected

24  the chair of IPLS.

25       In May 2013, the Caudill and Simpson led board,

# EXHIBIT B

40

1  supposed to be a pie-eating contest judge at the local state

2  fair.  I found this rather demeaning for Kanzi.  In the recent

3  pictures and things of Kanzi and Nyota and the others that have

4  published they look quite stressed, and I'm sure this was very

5  stressful for Kanzi.

6  Q.  This was not a picture of your work while you were at the

7  trust?

8  A.  No.  This was how they hoped to raise funds.

9  Q.  Let's go ahead and take the pictures down.

10          Dr. Savage-Rumbaugh, we've heard about the plans for

11  the trust and about your work at the trust.  Did Mr. Townsend

12  follow through on his lifetime commitment of funding?

13  A.  Mr. Townsend withdrew his funding at the end of 2011 and we

14  were sort of left in the lurch.

15  Q.  What happened after that?

16  A.  I was appointed an interim director, and we began to try to

17  go forward and raise funds.  Lyle Simpson became the legal

18  counsel, and he wrote to many people throughout the state,

19  including the Governor and including senators and including his

20  clientele, to describe the research.  He was very, very positive

21  about the research and he wanted to help us raise funds, and so

22  from that point forward Dr. Schweller and I listened to his

23  guidance.

24  Q.  Let me take a step back in time.

25          What led to Mr. Townsend withdrawing his funding?

41

1         MR. MILLER:  Objection; hearsay.

2         THE COURT:  I'll receive it, subject to the objection.

3         MR. STAMBAUGH:  You may answer.

4   A.  It is my understanding that it was the flood and his

5   inability to raise enough money and the reverse in the stock

6   market that happened in 2008.

7   BY MR. STAMBAUGH:

8   Q.  When was the flood?

9   A.  I mean, the flood was in 2008.

10  Q.  What was the impact of that flood on the trust?

11  A.  The impact was hard.  The flood -- we were told even up

12  until the minute water was coming in the building, the Corps of

13  Engineers said, the building will not flood, the building will

14  not flood, stay there, stay there.  So the waters came really

15  fast, they came really high, they were really cold, they were

16  really toxic.  And you could look through the glass doors and

17  see fish all around, like you were in an aquarium.  And many of

18  the staff, of course, did not want to risk those waters.  My

19  sister and I risked those waters day and night to take care of

20  the bonobos and allow them to survive through the flood.  They

21  had to stay up high in the tunnels, and we had to bring food to

22  them, and it took about two weeks I guess for the water to fully

23  recede.  We had to, with assistance, clean out the entire

24  building.  There were problems in the drain system, of course,

25  and during that period of time, we had no electricity.  We had

42

1   to bring the food in by boat.  We had to go back and forth daily

2   by boat.  We had to wear waders up to here (indicating) the

3   entire time.  Oftentimes you would slip and fall and water would

4   get in your waders so you were exposed to toxic water.  We had

5   to ask the bonobos, please, don't go in the water because we had

6   no way to prevent them.  There was only one bonobo that really

7   liked the water.  He kept playing in it, and he soon got cancer.

8   And my sister who slipped repeatedly in her waders got cancer.

9   Q.  Did you stay in the building the whole time?

10  A.  I stayed in the building the whole time.  I mean, I might

11  have gone out for food or things like that, but I stayed there.

12  I slept on the table so I wasn't -- you couldn't sleep on the

13  floor or you would be in the water.

14  Q.  What was the subsequent impact of that flood on the bonobos,

15  other than the cancer that you already mentioned?

16  A.  Well, I thought that the grounds were toxic, but there was

17  no test of that to be sure.  So I don't know for sure what the

18  biological effects of the flood were; but the bonobos and myself

19  certainly respected the power of the Des Moines River, as I

20  guess anyone in Iowa does, and prior to that time they did go

21  down and put their toes in the water, but they were much more

22  hesitant to do that after the flood.  And if we spoke about

23  flood, they clearly remembered it and were -- you know, paid

24  attention to the flood reports, shall we say.

25  Q.  And what was the impact of that flood?  What is your

46

1   at some point in time, and at that point I was to keep the lab

2   running and to raise the money and to establish an IACUC.

3   Q.  Were you asked to sign any forms on behalf of the company as

4   the executive director?

5   A.  I was asked to sign a form.  I was not told that I was

6   signing it particularly as the executive director, but it does

7   say that I believe on the bottom of the form.  I was asked to do

8   that by Susan McKee.  I don't recall any particular explanation

9   of that form.  I was having to sign a lot of forms that were new

10  to me at that time, insurance forms, employee forms, all kinds

11  of forms.  And before she resigned as the accountant and

12  administrative assistant, she had worked with Jim Aipperspach,

13  and she was transitioning through Heidi Lyn, who was there for

14  awhile, and then me, and I certainly trusted her and I signed

15  whatever she asked me to sign.

16  Q.  Let's take a step back.  Who is Susan McKee?

17  A.  Susan McKee was the administrative assistant and accountant

18  to Jim Aipperspach for Great Ape Trust.

19  Q.  What was the form that she asked you to sign, if you can

20  recall?

21  A.  I understand now it was a registered agent form.  I didn't

22  know what a registered agent form was at that time, but I knew

23  it was something to do with IPLS and it needed my signature.

24  Q.  Did you know what that change of agent form required of you

25  at the time?

1    A.   No.   I was not told what was required of me.

2    Q.   Were you aware at the time that you signed this that you had

3    to file any documentation on behalf of the entity?

4    A.   No.

5    Q.   Dr. Rumbaugh, were you aware of any liens against IPLS at

6    the time you signed this change of agent form?

7    A.   No.   Nothing was described to me of that sort.

8    Q.   I want to return and talk about what was going on at the

9    Great Ape Trust in early 2012, which is where we left off.   What

10    was your responsibility at the trust in early 2012?

11    A.   My responsibility in early 2012 was to pull the trust out of

12    the chaos that it was in, take the research trajectory forward

13    and get funding.

14    Q.   In addition to administrative tasks, what else were you

15    tasked with at the trust at that time?

16    A.   I was tasked with all of the operational, the daily

17    operations of running the lab, training the staff, food, care.

18    I was there 24 hours, and I was making the facility operate.

19    Everybody else came and went.

20    Q.   Was that different from your responsibilities a year prior?

21    A.   Yes.   Prior to that time there were security people there

22    watching over it at night.   There were people that prepared the

23    food.   There were people to do the cleaning.   There were people

24    to handle the accounting.   There were people to handle the PR.

25    There were people to handle the administration.   All of those

SAVAGE-RUMBAUGH - DIRECT

1          THE COURT:  And I will receive it, subject to the

2   objection.  The question calls simply for her understanding, not

3   a legal understanding.

4          MR. STAMBAUGH:  Thank you, Your Honor.  Yes, it does.

5   A.  My understanding was that the ownership of the bonobos was

6   to be split between the IPLS board and the BHI board.  I was

7   concerned about that and I discussed that with Lyle, and that's

8   when he suggested that perhaps guardianship would be a solution.

9   I think Mr. Zifchak didn't feel that that was really the

10  appropriate solution.

11         Then the resolution was passed that after the board

12  was split, the IPLS board would transfer its ownership to the

13  BHI board, so I -- the science and the work that I had done

14  could go forward under the guidance of that board, and

15  Dr. Taglialatela was a member of that board.

16  BY MR. STAMBAUGH:

17  Q.  Did you have any involvement in the drafting of any

18  provisions in the settlement agreements?

19  A.  At one point in time when the settlement agreements were

20  still being drafted by Jaki Samuelson and Ted Townsend was in

21  charge, Bill Fields brought a paragraph to me that he wanted to

22  insert into the document to protect the research trajectory.

23         We had been very aware that we were in a very unusual

24  position.  We wouldn't own the bonobos the way you could own a

25  dog or a pet.  We couldn't have any guardianship the way you

SAVAGE-RUMBAUGH - DIRECT

59

1  have over a child.  We were in sort of no man's land and whoever

2  owned the bonobos determined the future.  So he felt the only

3  protection to keep the bonobos in the kind of life they had had

4  and to see that the research could actually go forward was to

5  insert a paragraph about the research trajectory itself.  So he

6  wrote that paragraph and he brought it to me and I added

7  portions to that paragraph.

8          MR. STAMBAUGH:  Your Honor, at this time I would like

9  to publish what's been marked as Exhibit 1.  Pursuant to the

10 pretrial order, it's been deemed admitted as a category A.

11         THE COURT:  You may.  But before we do that, who was

12 it that brought this paragraph to you?

13         THE WITNESS:  William Fields.  He was the director of

14 the bonobo research project at that time.

15         THE COURT:  Thank you.

16 BY MR. STAMBAUGH:

17 Q.  Dr. Savage-Rumbaugh, we've published now for the court and

18 counsel what's been marked as Exhibit 1.  Is this what has been

19 termed the main settlement agreement?

20 A.  Yes.

21 Q.  And I would like to draw your attention down to paragraph 4,

22 which I believe is on page 2.  If you would go ahead and take a

23 moment to read that paragraph 4 to yourself.

24         (Pause.)

25 A.  Yes, I'm familiar with it.

SAVAGE-RUMBAUGH - DIRECT

60

1  Q.  Is this the research trajectory paragraph that you were just

2  referring to?

3  A.  Yes, it is.

4  Q.  Did you add or edit language in this paragraph?

5  A.  Yes.  I added where it says, "including but not limited to"

6  and then all of the things underneath down to the end of the

7  parentheses.

8  Q.  Explain to us what that language means in this paragraph.

9  A.  Well, I would like to start by explaining the language prior

10  to it because it's just an extension of that.  So it says to

11  continue to be involved in research of the fields of

12  experimental psychology, use of language and tools, and ape

13  intelligence and human cultural modes.  This is actually a

14  description of the trajectory of the research, which started out

15  in experimental psychology and finally led into the field of

16  cultural anthropology.  And within the field of cultural

17  anthropology where Kanzi is showing he could learn without the

18  kind of training he would have in an experimental paradigm, I

19  was trying to list all of the things that typically are

20  considered uniquely human that had set us apart in time, that

21  apes might be able to do if we continue the research trajectory

22  and that these things might fall out of language.  We had

23  already seen that we got for free music, we got for free tool

24  use, we were getting for free art, and we needed to follow up

25  and see how much further they could go.

66

1   Q.  If you take a look at this paragraph, does it appear to be

2   the same as the one we just saw on the main agreement?

3   A.  Yes, it's the same.

4   Q.  And as a co-drafter of this provision, what was the purpose

5   of this research trajectory provision?

6   A.  To continue --

7           MR. MILLER:  Objection; relevance.

8           THE COURT:  It's --

9   A.  To continue the research --

10          THE COURT:  Just a minute.  When he says that, I have

11  to say something.

12          THE WITNESS:  Oh, I'm sorry.

13          THE COURT:  Which is, it is received, subject to the

14  objection.

15          THE WITNESS:  I'm sorry.

16          THE COURT:  You may proceed.

17  A.  Yes, it's the same.

18  BY MR. STAMBAUGH:

19  Q.  Dr. Savage-Rumbaugh, what was the interplay between the

20  proposal to split the boards and these two settlement agreements

21  that we've just looked at?

22  A.  They were presented to me together by Lyle Simpson, and they

23  were my assurance that the concerns I had expressed to

24  Mr. Simpson would be fully resolved and that no one could remove

25  me from this facility or remove the bonobos from the facility

SAVAGE-RUMBAUGH - DIRECT

68

1   coming up after and saying, we finally understand your research.

2   The research is something that oftentimes women can understand

3   because women play a great role in rearing in our culture, and

4   under the leadership of Ted Townsend, Rob was really the main

5   one describing to Des Moines about the research, and I really

6   never had had an opportunity until the Prairie Club to really

7   present my research in detail.  And about five or six women came

8   up to me afterward and they said, we really finally understand

9   and we want you to stay here in Des Moines, and we realize that

10  since you're doing this cross generational research, you need

11  help.  Where are you going to get help?

12          BHI had already told me I needed help.  I already knew

13  I needed help.  So there was no opposition to having other

14  people come and assist me or the transition.  When the boards

15  were -- when the boards officially split in May, shortly after

16  that I fell and had a concussion, and at that point in time,

17  Julie Gilmore and my sister wanted me to come back and continue

18  working, and I really felt that I was unable to do it.

19          So I continued to keep contact with the laboratory.  I

20  continued to write e-mails and work through Liz and through

21  Gaila.  But I also at Lyle Simpson's request began to look for

22  somebody to follow through, and one of the things we had hoped

23  to do was to move ahead with the Federal Sanctuary System.  The

24  chimp pack had just passed at that time, and all of the

25  chimpanzees in biomedical research were going to move to

SAVAGE-RUMBAUGH - DIRECT

1  sanctuaries, come out of biomedical research.  And you will

2  remember that I many, many years earlier had stood on the wing

3  at Yerkes and saw the pain and the distress, and I had wanted to

4  help those chimps.

5        So I thought if we could bring chimpanzees into a

6  sanctuary out of the federal system and there would absolutely

7  be a good situation for them, we could learn how to rehabilitate

8  them.

9  Q.  What was your understanding of what your role would be

10  during this transition period?

11  A.  My role would be to help it come about in any way that it

12  could and to use my knowledge of chimpanzees and to try to build

13  a better environment for them while continuing the research

14  trajectory and working with additional colleagues.

15  Q.  You mentioned that you believed that additional help might

16  be needed, is that correct?

17  A.  Yes.  I knew if we were -- certainly I needed additional

18  help, but taking on -- they were asking for 30 or 40 additional

19  chimpanzees.  The requests that the administration was making at

20  that time were basically -- they computed how many dollars they

21  could get from the Federal Government, and from the number of

22  dollars they computed the number of chimpanzees.  I indicated

23  that I thought that was a lot of chimpanzees to start with; but

24  my role would have been to take that -- to help take that

25  forward.

SAVAGE-RUMBAUGH - DIRECT

1   Q.   Did you talk to --

2   A.   I should have been on that board and at that meeting.

3   Q.   Did you talk with other BHI members about how you

4   anticipated that this would be the case, that you would have

5   access, continued access to the colony?

6   A.   Lyle had written them indicating that I had had some

7   difficulties and he wanted me to look for a successor and that I

8   would have continued access to the colony and I would co-direct

9   with whoever was selected for three to four years.  He had

10  written that with them.  So he didn't discuss if it would

11  happen.  We assumed that if Lyle said it, it would happen.

12  Q.   You mentioned just a minute ago that you made a

13  recommendation for someone to assist you during this transition

14  period, is that right?

15  A.   Yes, I did.

16  Q.   Who did you recommend?

17  A.   I recommended Dr. Taglialatela.

18  Q.   Why did you recommend Dr. Taglialatela?

19  A.   He had been a student of mine in the past and he had helped

20  supervise the staff.  He was interested in the social behavior

21  and the linguistic behavior of the bonobos.  I wanted to select

22  someone who could potentially work with the Federal Sanctuary

23  System, and I wanted to select someone who had a history of

24  direct interaction and contact with the bonobos and that I

25  believed understood and supported the research and who had

SAVAGE-RUMBAUGH - CROSS

82

1  build the building out of the floodplain.  I was assured that

2  the building would never ever flood.  Even as the water was at

3  the door, I was assured the building would never flood.

4  Q.  And it flooded in 2008?

5  A.  Yes.

6  Q.  And you experienced that, I know you've told the court.

7       At that time there was no contingency plan for

8  flooding, for moving the animals at that time, right?

9  A.  We were assured that the building would not flood.  We

10  worked on a few contingency plans, but the director was an

11  engineer and was in close contact at every moment with the Corps

12  of Engineers, said we did not have to execute.  We did have some

13  emergency plans, but they were said to be not needed.

14  Q.  And you weathered the storm, so to say, and the apes stayed

15  there after 2008, correct?

16  A.  I don't think we actually would have weathered the storm if

17  Liz and I hadn't been there to tell you the truth.

18  Q.  Well, that's actually not my question.

19       The apes stayed there after the flood, correct?

20  A.  They stayed there after the flood, yes.

21  Q.  They stayed there in 2009?

22  A.  Yes.

23  Q.  2010?

24  A.  Yes.

25  Q.  2011?

83

1   A.   Yes.

2   Q.   They're still there today, correct?

3   A.   Yes.  It's flooded twice more since then, but not gone into

4   the building, but blocked the access to the building.

5   Q.   In 2012 there was a discussion about relocating the apes to

6   a new site, correct?

7   A.   Correct.

8   Q.   You objected to that quite vociferously, correct?

9   A.   Yes, I did.

10  Q.   And --

11  A.   Because it wouldn't have allowed me to continue the research

12  trajectory.

13  Q.   Okay.  2013 you applied for a grant from Prairie Meadows to

14  continue to support the operation, is that right?

15  A.   Yes, I did.

16  Q.   And that grant was premised on creating an artist colony at

17  the facility, right?

18  A.   It wasn't premised on creating a complete artist colony, but

19  that was part of the grant, yes.

20  Q.   Okay.  And, in fact, your brother would have been an artist

21  in residence to work with the bonobos?

22  A.   He wouldn't have stayed there, no.  He has a studio in

23  Springfield, Missouri, and he has several other grants.  He

24  would have assisted us but, no, there was no plan for my brother

25  to stay as an artist in residence.

85

1  correct?

2  A.  We had repeated reports to the staff in the building that we

3  had to be very, very careful, we shouldn't touch the water, we

4  shouldn't be in it, we should have our waders, the water was

5  toxic, we had to keep the bonobos out of the water.

6  Q.  And from 2008 through the time you were at the facility, you

7  never had any testing done on that water to substantiate that

8  alleged claim?

9  A.  I wasn't in a position to direct such testing.

10 Q.  And you did not have the testing done, correct?

11 A.  It wasn't up to me to have any testing done.  That would

12 have been up to Dr. Gilmore.

13 Q.  Okay.

14 A.  I did discuss the problem several times, and when I was

15 initially director, I had the water in the building tested

16 because I was concerned that it was toxic, and the Water Works

17 changed how the water in the building was directed because it

18 was -- it did turn out to be toxic and they had to make major

19 changes because of that.

20 Q.  Well, you certainly don't have any proof that the water

21 caused illness to any animal or to your sister, correct?

22 A.  I haven't sought to obtain any proof.

23 Q.  Now, you did, however, have a report put together ostensibly

24 for this proceeding about flooding at the facility, is that

25 right?

App. 022

116

1   A.  No, I didn't fire Lyle.  Duane's advice was to work with

2   Lyle, Lyle is our friend and to try and work with Lyle, and Lyle

3   had been a friend and that the best thing to do was to try to

4   talk with him.

5   Q.  And I think you testified Lyle was Bonobo Hope's lawyer?

6   A.  Lyle was the lawyer for Bonobo Hope.

7   Q.  And did Bonobo Hope fire him?

8   A.  I was given explicit instructions by George and Lyle not to

9   tell anyone on Bonobo Hope what had happened.  It was indicated

10  to me that Lyle and George were lawyers and I wasn't and I could

11  be put in jail, many bad things could happen to me.  And Duane

12  and I were both very frightened, and Lyle had been a longtime

13  friend and we tried to work it out with him until such time as I

14  was told to get out of his office and get a lawyer.

15  Q.  By working it out, did that mean continuing to write e-mails

16  to Lyle for the next several months?

17  A.  It meant talking with Lyle and explaining to him that I had

18  not violated any particular rule or regulation that he or George

19  had laid down because I wrote an e-mail to Jared, I should be

20  able to write an e-mail to Jared and to discuss whether

21  chimpanzees were coming to the lab or not.  I see absolutely

22  nothing illegal or wrong with that.  And I was told I could no

23  longer communicate with Jared, with Bill, with George, with the

24  board, with anyone or with anyone in the lab, no one on the

25  staff, not my sister, not my niece, not my family, I had to sit

117

1   there and be quiet and the best thing to do was to get out of

2   town.

3   Q.  Now, at that time you were -- actually you were out of town,

4   right?

5   A.  No.  I'm in Des Moines.  I've just been kicked out of the

6   lab and Teco was ill and I'm very concerned about him, and I was

7   writing a few members of the board, against Lyle's objection,

8   explaining to them that we had a little bit of a problem, but I

9   thought I would resolve it with Lyle.

10  Q.  Okay.  So you're writing e-mails even though you supposedly

11  were told not to?

12  A.  I didn't write e-mails and explain everything that was going

13  on, but I did indicate that we had some kind of issue as regards

14  Teco.

15  Q.  If you have a problem, you never stopped from e-mailing

16  somebody relating to one of these issues, correct?

17  A.  I stopped sending e-mails in March when George took over and

18  told me that any e-mail I sent to the Bonobo Hope board needed

19  to be reviewed by him.  I thought that was wrong.  I sent far,

20  far fewer e-mails to the board from that point on until I was

21  asked to step out of Lyle's office.  I was in a legal gray area.

22  I was working with two lawyers.  They were in charge of the

23  facility and I did not understand what was happening.

24  Q.  Now, you have these concerns apparently with Mr. Simpson.

25  You would have reviewed documents that he gave you and asked to

142

1  believe.

2  Q.  Almost two years --

3  A.  2014.

4  Q.  Almost a year ago?

5  A.  Yes.

6  Q.  Has anyone other than Derek Wildman been allowed in the last

7  year to visit the lab under Jared's direction, to your

8  knowledge?

9  A.  Laurent was allowed to visit the lab maybe nine months ago.

10  I don't know exactly how long ago.

11  Q.  Dr. Savage-Rumbaugh, Mr. Miller asked you some questions

12  about the flooding and relocation efforts.

13  A.  Yes.

14  Q.  Do you recall that discussion?

15  A.  Yes.

16  Q.  At some point you were presented with a relocation plan, is

17  that right?

18  A.  Pardon?

19  Q.  At some point there was a suggestion that the bonobos be

20  relocated, is that right?

21  A.  Yes, yes.

22  Q.  And you opposed that relocation, is that correct?

23  A.  You're talking about the relocation that Dr. Schweller

24  proposed?

25  Q.  Correct.

SAVAGE-RUMBAUGH - REDIRECT

143

1  A.   Yes.  I opposed that, yes.

2  Q.   And at the time that you opposed it, was there a viable

3  alternative option for the bonobos to be relocated consistent

4  with your research trajectory?

5  A.   No.  They would have had to have been sent to a zoo in

6  either Alabama or Mississippi.  It wasn't even an accredited

7  ACCI zoo, and I would not have been allowed to be in with the

8  bonobos.

9  Q.   Is there a viable alternative relocation plan for the

10  bonobos today to be taken out of the floodplain?

11  A.   Yes.

12           MR. MILLER:  Objection.  Your Honor, objection.  This

13  exceeds the scope of the direct testimony.  We're into new

14  issues.

15           THE COURT:  It probably does.  If we were in a jury

16  trial, I would probably sustain that objection, but I want to

17  hear from everybody.  So it's received, subject to the

18  objection.

19           MR. STAMBAUGH:  Thank you, Your Honor.

20           THE COURT:  Go ahead.

21           MR. MILLER:  Your Honor, if I may then reserve the

22  right to cross-examine Dr. Rumbaugh if we're going to get into a

23  new issue?

24           THE COURT:  Of course.

25           MR. STAMBAUGH:  And that would be my only question on

# EXHIBIT C

**App. 027**

1          So the answer is we didn't try to have grants for

2   research that could not be conducted because we were de facto

3   excluded from that.

4   Q.  You didn't obtain any grants and you didn't try to obtain

5   any grants; is that what you're saying?

6   A.  You can only have grants for research that is likely.  If

7   you believe the research is not likely because you don't --

8   you're not allowed to enter the premises, then why would you ask

9   for any grant?  That would be lying to a federal agency.  So the

10  answer is no; but I qualified the answer.

11  Q.  All right.  Thank you.

12          And let's go a little bit simpler.  How much money has

13  BHI contributed to the care and support of the bonobos in

14  Des Moines since December 2013?

15  A.  We have contributed in different ways.  So there was money

16  especially coming from Bill Greaves who committed to several

17  thousand of dollars in the summer of -- oh, I'm sorry, I'm mixed

18  up with the time line.  So you are asking after December 2013

19  again, I think.  So after 2013, we have tried to come up with

20  solutions on the long term believing that the solution in

21  Des Moines was not a long-term solution for many reasons.  So we

22  did not try to have much donations at that level.

23  Q.  Can you qualify not much donations at that level?  Is it

24  zero or --

25  A.  I could, but I could not -- I mean, I don't know.  I don't

1   know the answer to that.  You are asking since December?  You

2   are asking since we have been unable to access the bonobos, so I

3   don't know exactly what the answer is.  Unless we include the

4   promise coming from Ryan Sheldon and the new facility in

5   Missouri, which is, of course, what we did.

6           So we were looking for donations, not for the

7   Des Moines facility, but we have been raising funds for another

8   facility where we hope to transfer the bonobos.  So we paid for

9   a few, for their veterinary care I believe, but I cannot be more

10  specific on this.  I'm not the treasurer of the board.

11  Q.  Fair enough.  And I'm not meaning to interrupt you, and if I

12  am, I'm sorry.

13          If I'm to understand your testimony, since December

14  2013, you haven't -- BHI has not contributed any money to the

15  care and support of the bonobos.  But has put forth effort to

16  relocate the bonobos somewhere else, is that correct?

17  A.  Yes.  You also need to take into consideration that the

18  whole system based on volunteers who would be trained to work

19  with the apes was coming from before December 2013.  So the main

20  reason, you also have to understand that when Jim Benson and

21  Bill Greaves sent their undergraduate students as interns for

22  the summer, they were members of Bonobo Hope or of the science

23  board, as far as we could tell.

24          So we have been helping through the formal training of

25  the volunteers, through the work of Liz and Heather who have

# EXHIBIT D

258

1   A.  No.

2   Q.  You do not keep track of who the registered agents are for

3   your companies?

4   A.  No.  That's a decision for the company to make.  I keep

5   track of the clients that we're the registered agent of.

6   Q.  You offer your clients to serve as their registered agents,

7   right?

8   A.  Given the opportunity I do that, yes.

9   Q.  You spoke with Dr. Savage-Rumbaugh many times in 2011 and

10  2012, is that right?

11  A.  Certainly, but not about that subject.

12  Q.  You never brought that up to her, did you?

13  A.  I probably wouldn't.  I mean, that's --

14  Q.  Even though IPLS was your client?

15  A.  That's true.  I represent a lot of clients.

16  Q.  As IPLS's counsel, didn't you have a responsibility to make

17  sure that IPLS filed its biennial reports?

18  A.  Only if I'm registered agent.

19  Q.  Well, Mr. Simpson, a few moments ago I asked you the

20  responsibilities of a registered agent, and you did not list

21  filing a biennial report among them?

22  A.  No; I did.  I talked in terms of the Secretary of State's

23  requirement that those documents be handled -- you know, filed

24  by the registered agent.  I didn't use those words, but that's

25  exactly what I meant.

263

1  have a corporate shield and we need to have the facility owned

2  by that entity so that you don't have a big liability, either

3  that or you've got to come up with the money to pay off this

4  lien so we can get your corporation reestablished.

5  BY MR. NEIHAUS:

6  Q.  Mr. Simpson, one question about the lien.  When did you

7  first learn about that tax lien?

8  A.  Tell me what?

9  Q.  When did you first learn about that tax lien?

10  A.  When I was shown the letter that came from the Secretary of

11  State in August that said the corporation had been dissolved.

12  Q.  Didn't you write a letter to Ted Townsend in March of 2012

13  asking for funds to pay the tax lien?

14  A.  I asked -- I knew what was going on because every time they

15  make a payment, they send a statement and it was going to the

16  corporation, and so I knew that the unemployment taxes for those

17  employees was an obligation of IPLS.  I was worried about the

18  liability of IPLS.  It had nothing to do with the annual report.

19  Q.  So you knew at least by March 2012 that IPLS had this

20  outstanding tax obligation, is that right?

21  A.  Yes.

22  Q.  And you said you knew that from the corporate statements

23  that you received, is that right?

24  A.  I knew it had a tax liability.  I didn't know for sure that

25  they had filed a lien, and once I tried to get IPLS

1  Q.  And only a few days later when BHI held its vote to appoint

2  Drs. Taglialatela and Bill Hopkins, you did not think it was

3  important to tell the BHI board members what had happened?

4  A.  No.  I don't think that's my responsibility.  Sue was on the

5  BHI board.  She could tell them anything that she wanted to.

6  But why would I make her look bad to her own board?

7  Q.  Now, moving to December 18th of 2013, IPLS passed a

8  resolution acknowledging that Dr. Savage-Rumbaugh had been

9  kicked off the board in July of 2013, right?

10  A.  They claimed that that had happened.  I've never seen

11  anything documenting that.  To me that's an important issue.  So

12  I advised the board that that's something that they needed to

13  record if that, in fact, happened.

14  Q.  But you never told Dr. Savage-Rumbaugh in July of 2013 or in

15  December of 2013 -- strike that.

16       But you didn't tell Dr. Savage-Rumbaugh in December of

17  2013 that IPLS had passed that resolution, did you?

18  A.  I don't recall.

19  Q.  Mr. Simpson, I would now like to ask you some questions

20  about events that occurred on December 18, 2013 regarding the

21  establishment of Ape Cognition and Communication Institute,

22  ACCI.

23       On December 18, 2013, you sent an e-mail to

24  Mr. Zifchak, who was counsel for Dr. Savage-Rumbaugh at the

25  time, isn't that right?

# EXHIBIT E

App. 034

313

1   multi species family of humans and bonobos interacting with one

2   another.  So that's a totally different thing.

3   BY MR. ZIFCHAK:

4   Q.  Did you come to an understanding, either at the time of that

5   visit or before or after, as to the nature of

6   Dr. Savage-Rumbaugh's research trajectory; and, if so, what was

7   that understanding?

8   A.  Yeah.  So I had -- well, before meeting Dr. Rumbaugh, I knew

9   her work and I knew she was interested in studying language

10  acquisition in nonhuman primates, but I didn't really appreciate

11  the multigenerational trajectory that she was aiming towards,

12  and that I learned by getting to know her.  And what I learned

13  was that that she was interested in a long-term project, not a

14  project of a few years.  A typical grant cycle is four or five

15  years.  She was interested in a lifetime of work and work that

16  would go on after she was gone.

17  Q.  As a scientist, do you consider her body of work to date

18  incremental or original?

19  A.  The word I would use to describe Dr. Savage-Rumbaugh's work

20  is transformative, and by transformative I mean she's changed

21  the way many scientists and many people think about nonhuman

22  species, and she has demonstrated that nonhuman species have

23  abilities that we did not think they had.  And it's in the area

24  of language that this work has been most focused on by

25  Dr. Rumbaugh.  But I will point out that other workers have

340

1          THE COURT:  The answer is in.  I'll receive it.

2  BY MR. MILLER:

3  Q.  He offered to let you look at the research protocols while

4  you were visiting, correct?

5  A.  He may have.  I can't recall.

6  Q.  Well, I think you testified that you asked him -- or you

7  said, well, I don't want to spend time looking at those today,

8  you can e-mail them to me later?

9  A.  Yes, that is true.

10  Q.  Okay.  And you --

11  A.  I don't recall them being on his lap.

12  Q.  Okay.  They were in his office, they were offered to you,

13  correct?

14  A.  They were pointed at, yeah, or binders were pointed at, yes,

15  that's true.  I didn't see the contents of those binders.

16  Q.  You understood that they were the IACUC research protocols?

17  A.  No.

18  Q.  Okay.  All right.  You've spoken to Dr. Taglialatela on the

19  phone several times --

20  A.  Sure.

21  Q.  -- in the past couple of years, correct?

22  A.  Correct.

23  Q.  In the fall of 2012, you told him that you didn't think that

24  Dr. Rumbaugh had any scientific credibility, correct?

25  A.  I told him that many people in the community questioned

1  Dr. Rumbaugh's scientific credibility.

2  Q.  You told him during this meeting a few weeks ago that you

3  were going to do a paternity test on Teco because it was at

4  least questionable if Kanzi was the father, right?

5  A.  No.  What I told him was that I had the capability to do a

6  paternity test on Teco if that was something that he desired to

7  have done.

8  Q.  You didn't tell him you were going to go back to your

9  office, do it and e-mail the results?

10  A.  I said we could talk about it, but I certainly promised

11  nothing.

12  Q.  Did you discuss with him the use of lexigram keyboards while

13  you were there?

14  A.  Not so much.

15  Q.  Right.  Because when you were there, you saw that they were

16  being used, correct?

17  A.  No.  I wasn't paying -- I said I saw -- what I saw there was

18  the big screen in the main room and it was on, and mostly we

19  went in the back where the -- when we interacted with the

20  bonobos, we were not interacting with lexigrams, and then there

21  was a high school tour going on.

22  Q.  And you weren't paying attention to lexigrams during your

23  visit?

24  A.  That was not the purpose of my visit.

25  Q.  Earlier you told us an analogy about a tree and some

# EXHIBIT F

App. 038

381

1   Q.   To make an analogy, Mr. Townsend owned a very successful

2   company here in Des Moines.  Are you aware of that?

3   A.   Yes.

4   Q.   And he felt, based on the success of his company, that he

5   could sustain the bonobos in perpetuity for a lifetime --

6   A.   In --

7          MR. NEIHAUS:   Objection; assumes facts not in

8   evidence.

9          THE COURT:   Well, I get the point that you're making,

10   but I think we're getting rather far afield.

11          MR. MELHUS:   Sure.  I'll move on, Your Honor.

12          Thank you.

13   BY MR. MELHUS:

14   Q.   Okay.  Let's talk a minute about the proposed facility.

15          As it stands today, do you have any electricity in the

16   building?

17   A.   The building has temporary power running to it for the

18   purposes of running construction equipment.

19   Q.   So when you testified earlier that you had a long list of

20   utilities --

21   A.   Yes.  No, these are all utilities that are planned for this

22   facility.  These are -- let me correct that.

23   Q.   Sure.

24   A.   These were planned utilities for this facility.  Our

25   intention is to meet the USDA requirements and then work through

SHELDON - CROSS

382

1   these.  These are requirements that we believe we need in order

2   to sustain it long term.  So our -- our objection -- or our

3   primary goal is to meet the USDA requirements first.

4   Q.  Okay.  Fair enough.

5         As it stands today, if we were to try to send bonobos

6   to the facility today --

7   A.  Right.

8   Q.  -- would there be any electricity?

9   A.  No.  It wouldn't be possible to send them today, which is

10  why I'm proposing to donate $2,000 a week to ACCI to sustain

11  them until we can get the facility inspected.

12  Q.  Okay.  And just to confirm, there's no plumbing at the

13  facility --

14  A.  We have --

15  Q.  -- that's operational?

16  A.  Actually we do have quite a bit of plumbing that is

17  operational right now.  That is one of the first parts that

18  we're doing.  It isn't all hooked up yet, but we do have the

19  complete septic system put in, all the drainage is nearly

20  complete.

21  Q.  Are there any windows?

22  A.  Not at this time.  We haven't planned the windows yet.

23  Q.  The HVAC system that you talked about earlier, is that in

24  place?

25  A.  It's not in place yet, but those will be in place before we

SHELDON - CROSS

383

1   can get an inspection for USDA approval.

2   Q.   And the fire detection system that you talked about --

3   A.   Right.

4   Q.   -- is that in place yet?

5   A.   That is not in place yet either, no.

6   Q.   And what about the security system, is that --

7   A.   Those things are not in place yet, they are not in place.

8   Q.   I am interested -- and I think just because it's not

9   something I've seen in too many facilities before.   I'm

10  interested in the wood-burning furnace.   Could you tell me a

11  little bit more about how that would work?

12  A.   Right, right.   The wood-burning furnace is a furnace that

13  sits away from the facility, and it is used for emergencies

14  only.   It is used to generate heat in a jacket of water, and

15  it's usually a very small building.   It looks like kind of a

16  small utility garage shed, and you would load wood into that

17  wood burner, and it circulates water throughout the jacket, and

18  that's what runs the radiant floor heating system into the

19  building, which is all water circulation.

20  Q.   Okay.   I understand that process, but what I don't

21  understand is how logistically -- do you have to feed this

22  machine, this wood-burning furnace every day or --

23  A.   Yes.   It needs to be fed once every two days, so --

24  Q.   And how close would it be burning -- when it's burning, how

25  close would it be to the bonobos?

384

1   A.   It would not be anywhere near the bonobos.

2   Q.   I guess I -- and the exhibit or the demonstrative that you

3   showed earlier, it appeared that it was fairly close?

4   A.   Yeah.   That's a proposed location.

5   Q.   So that hasn't been constructed yet?

6   A.   No.   Again, we will meet USDA guidelines on that, on that

7   location, so -- wood burners are a very common heat source in

8   our area.

9   Q.   How common are they in facilities that house great apes?

10  A.   Like I said before, this is an emergency heat source.   This

11  isn't necessarily required.   Our primary is propane.   Propane is

12  the primary heat source that we will be using for the radiant

13  floor heating, and then we can deal with the wood burner as an

14  emergency.

15  Q.   Do you know if wood-burning furnaces are common in

16  facilities that house great apes?

17  A.   I don't know if that's common or not.

18  Q.   Did you consult with the USDA when making the decision to

19  install a wood-burning furnace?

20  A.   We haven't installed the wood-burning furnace.

21  Q.   Have you consulted with the USDA in any form in the

22  construction of this facility?

23  A.   Not at this time, no.   We have followed the USDA guidelines.

24  Q.   Do you have any USDA permits to transport the bonobos from

25  Des Moines to Missouri?

App. 042

# EXHIBIT G

App. 043

1  its best efforts to provide complete and competent care of

2  Matata and Maisha; and shall take all reasonable precautions to

3  ensure their complete safety."

4          Do you see that?

5  A.   Yes.

6  Q.   And you read that at the time that you signed the agreement?

7  A.   Yes.

8  Q.   And since then have you endeavored to comply with providing

9  complete and competent care to the bonobos?

10         MR. LANGEL:  Objection.

11         THE COURT:  I'll receive it, subject to the objection,

12  whatever it was.

13         MR. MELHUS:  Go ahead and answer, if you can.

14  A.   Yes, absolutely, I believe that we provide complete and

15  competent care, and our ability to do that continues to actually

16  expand over time.

17  BY MR. MELHUS:

18  Q.   Okay.  Can you talk about how you endeavored to provide care

19  for the bonobos and how that's changed over time?

20  A.   Since the formation of ACCI, we've put a lot of very helpful

21  protocols in place that were not in place previously.  Some of

22  the things that have been very helpful is actually adopting and

23  incorporating the use of personal protective equipment.  The

24  best way in my experience to treat animals is to keep them from

25  getting sick in the first place, and personal protective

GILMORE - DIRECT

416

1   She called and I received -- or she had called me on that date

2   inquiring about Teco.  She also had sent an e-mail at that time.

3   I did talk to her on the phone and, you know, talked about Teco,

4   you know, how he was doing and things like that and just had,

5   not long conversation about that, but just kind of passed that

6   along and tried to answer questions that she had, and it was

7   mostly just about that.

8   Q.   Okay.  And after that conversation on October 30th, did

9   Dr. Savage-Rumbaugh actually physically return to the lab?

10  A.   She did, yep.

11  Q.   And can you describe the effect that that had on the lab and

12  its operations?

13  A.   She was planning on returning as part of a scheduled visit

14  later in the month, but made a decision to kind of drop

15  everything and fly out there, and she just kind of immersed

16  herself in the lab.  She took over care of Teco.  She just

17  without permission basically spent the night at the lab and

18  started just sort of picking up, in my opinion, as if she had

19  never left the lab to begin with, as far as their day-to-day

20  care and, you know, talking to staff about what should be done

21  when and where, and she started e-mailing lots of different

22  people about lots of different things, including, you know,

23  Teco.

24          I know at that time she started to send Jared and

25  Bill, who were just still in their very beginning stages of

**App. 045**

GILMORE - DIRECT

417

1   involvement with us, lots and lots of e-mails, and the board was

2   very concerned about that behavior and also very concerned that

3   those actions may not -- or may drive Dr. Taglialatela and

4   Dr. Hopkins away.  They had been very clear that they wanted

5   autonomy over the science there and, you know, they were

6   accepting with the understanding that Sue was effectively

7   retiring from research there.

8   Q.  And did Dr. Savage-Rumbaugh's involvement in the lab at that

9   time, was that consistent with the e-mail that she sent on

10  October 26, 2013?

11  A.  No.

12  Q.  In what way, based on your understanding of the e-mail and

13  her role going forward, was her subsequent involvement

14  inconsistent?

15  A.  There was just no discussion about it.  It just happened.

16  She just came back and basically re-embedded herself in the

17  facility without appropriate discussions with people like George

18  or Steve Boers was the executive director at the time or things

19  like that about what her visit should look like, what role she

20  should play there, what contacts she should have with the

21  animals.  You know, she had -- that was the first time, in my

22  recollection, that she had seen them since she left in May, and

23  it was just kind of picking up like a day had not passed.

24  Q.  And did the board at that time, the IPLS board, take any

25  action to push back on her involvement consistent with her prior

GILMORE - DIRECT

418

1  representations in that October 26 e-mail?

2  A.  Yes, I know George and Lyle had phone conversations and

3  e-mail conversations with her asking her to, you know, please

4  take a step back, go back to New Jersey, you know, honor this

5  initial statement that she had sent out on October 26th and, you

6  know, at the time they were saying, you know, come back at

7  Thanksgiving, that's how it started out when you had initially

8  planned, and we can have kind of a formal discussion about

9  things like that.  And she essentially refused to leave, and the

10  communications between them -- I didn't have communication with

11  her about this at that time; but the communications between them

12  got more and more adversarial until the end as she continued to

13  e-mail.  In spite of Lyle saying, please don't e-mail anyone

14  else about the research, you know, you need to stop, please

15  don't call Bill and Jared, this is inappropriate, she continued

16  to send those e-mails.  And, finally, George just said she

17  needed to leave the facility immediately.

18  Q.  And did you or anybody else on the IPLS board then take

19  action to enforce her prior representations?

20  A.  George asked that I go out there.  He asked her to leave,

21  and he asked me to go out and make sure that -- to the facility

22  and make sure that she had left the premises.  What I arrived

23  there, she hadn't left.  And so I entered the building, we had a

24  conversation about her needing to leave and comply with George's

25  request and Lyle's request that she return, you know, return

419

1  back -- well, we didn't -- where she goes is not important, but

2  that she leaves the facility.

3  Q.  Okay.  And did she eventually leave the facility?

4  A.  She did.

5  Q.  Did you have any conversations with her as she was leaving

6  the facility about why she was being asked to leave?

7  A.  Yeah.  We did have a conversation where I said, the board --

8  I shared the board's concern that the e-mailing and kind of

9  excessive e-mailing to Bill and Jared was going to cause a

10  problem with them wanting to come out and be a part of the

11  program just because it was so contradictory to what she had

12  initially said, you know, she would do.  And so it was -- there

13  was definitely concern about that, and I shared that with her.

14  Q.  Okay.  Sometime later in November of 2013, did you become

15  aware of a lien against IPLS as an entity, a tax lien?

16  A.  When Lyle told us about it, yeah, we --

17  Q.  Okay.  Did Lyle explain what was going on at that time and

18  his plan to take the organization forward?

19  A.  Right.  So are you talking about the tax ID?  I don't know

20  what -- I don't understand exactly what you're asking.

21  Q.  Right.  Mr. Lyle Simpson was the attorney for IPLS at the

22  time, right?

23  A.  Uh-huh.

24  Q.  And did he have any conversations with you about the effect

25  of a tax lien or an unpaid debt to the state and how that would

GILMORE - CROSS

422

 1  providing complete and competent care for all of the bonobos at

 2  ACCI's facility?

 3  A.  Yes.  I think it's better than ever and that we want to

 4  continue to make it even better than it is today.

 5  Q.  And is ACCI doing everything -- or is it taking all

 6  reasonable precautions to ensure the bonobos' complete safety?

 7  A.  Yes.

 8          MR. MELHUS:  I have no further questions for this

 9  witness at this time, subject to redirect, Your Honor.

10          THE COURT:  Cross-examination.

11          MR. LANGEL:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. LANGEL:

14  Q.  Ms. Gilmore, my name is Todd Langel, and I'm one of the

15  attorneys for Dr. Savage-Rumbaugh.

16  A.  Okay.

17  Q.  I want to back up just a little bit to the 2012 time frame.

18  Do you recall -- you may recall back in 2012 you told Sue that

19  she had your support?

20  A.  Yes.

21  Q.  Do you remember that?  And that your support would be

22  wholehearted and unending?

23  A.  Yes.  At what point in 2012?  I don't --

24  Q.  In August of 2012.

25  A.  Okay.

436

1  scientist.  Allyson Bennett is another scientist that is part of

2  that.  And then we have a facility representative, Tami Watson,

3  who's on the IACUC, and our layperson, nonaffiliated layperson

4  is Jack Price, and he's someone from the Des Moines community.

5  Q.  Have any chimps come to the lab yet?

6  A.  No.

7  Q.  If they do come there, who will be their veterinarian?

8  A.  I expect that I will be at this point in time.

9  Q.  Before Mr. Taglialatela took over as the leader of ACCI,

10 were you required to wear masks and gloves anywhere in the lab?

11 A.  No.

12 Q.  Has IPLS been reinstated as of today?

13 A.  What do you mean; from -- I think we just discussed that,

14 like there's a tax lien out that we still owe money.  Is that

15 what you mean, the tax --

16 Q.  You're not aware of IPLS being reinstated as we sit here

17 today?

18 A.  In -- as far as the tax ID goes, the IPLS tax ID has not

19 been reinstated.  We consider it to be the same organization

20 functionally.

21 Q.  Are you aware of any plans in the near future to resolve the

22 tax lien and reinstate IPLS?

23 A.  We would like to resolve the tax lien.  A lot of that is a

24 funding issue.  As funds become available, we would like to

25 address that issue.

1   that's the primate equivalent to an autopsy in a human?

2   A.   Or the veterinary equivalent.   Yeah, we call it necropsy;

3   same as thing as an autopsy.

4   Q.   Okay.   And did anything during your course of care in that

5   necropsy report indicate that Matata had passed away as a result

6   of, for example, water from the flood of 2008?

7   A.   No.

8   Q.   Did she have access to water from that flood?

9   A.   No -- well, I don't know.   I wasn't there in 2008, so -- she

10  doesn't have access to lake water, though, now.

11  Q.   Okay.   Shortly after Matata's death, do you recall George

12  Caudill or any other member of the ACCI board sending an e-mail

13  to Carmen Mate, the chair of the ACCI board, about Matata's

14  death?

15  A.   I don't recall exactly who George shared an e-mail with, but

16  I know he prepared an e-mail and sent it and, yes, I don't -- I

17  think so.

18  Q.   Okay.   So, in any event, BHI was made aware of Matata's

19  death soon thereafter?

20  A.   Yes, to my knowledge.

21  Q.   Okay.   And counsel asked some questions about -- I'm

22  changing subjects just quickly.   Counsel asked some questions

23  about reasons why the SSP may not want to interact with

24  Dr. Savage-Rumbaugh.

25  A.   Uh-huh.

GILMORE - REDIRECT

442

1   Q.  And you gave some reasons for that.  Are there any other

2   reasons that you can think of?  For example, has

3   Dr. Savage-Rumbaugh placed any bonobos or staff in physical harm

4   that you're aware of?

5   A.  I mean, yes, there are a history of various issues.  I mean,

6   it depends on exactly where you're wanting to go with that.  But

7   as a very general rule placing them in harm from a veterinarian

8   perspective is Kanzi and Panbanisha being morbidly obese by not

9   feeding them the healthiest of diets.  So that is definitely a

10  concern when they're breeding, you know, new animals, that they

11  have a claim and they want to make sure that they're going to be

12  treated well.

13          They also were not comfortable with the protocol of

14  removing young babies from their mothers and, you know, rearing

15  them because they felt like it was a welfare issue for both the

16  infants and, you know, the mother of that infant.

17          I mean, those are two main issues.  There was also,

18  you know, various concerns about the difficulty historically

19  that veterinarians have had working at this organization or

20  working with Sue Savage-Rumbaugh.  People have not had the best

21  experience from my understanding, other veterinarians have not

22  had the best experience getting cooperation with needed

23  procedures and compliance with, you know, veterinary

24  recommendations.

25  Q.  Okay.  Are you aware of any other specific incidences with

GILMORE - REDIRECT

443

1   Dr. Savage-Rumbaugh placing the bonobos in physical harm?

2   A.   Yes.   I mean, I can think of a couple of examples of that.

3   Q.   Could you provide a couple of examples just briefly for the

4   court?

5   A.   Okay.   Well, Teco has had a few separate issues that I was

6   called to treat him on that were directly related to his care

7   while under Dr. Savage-Rumbaugh.   One time I was called out and

8   he had grabbed a bottle of Tylenol and was running around with

9   the Tylenol.   There was a concern about how much Tylenol he

10  potentially ingested.   He -- I was able to retrieve the bottle

11  from him, but he had that.   There were pills all over the floor.

12  He did ingest I think a small amount of those, but not enough

13  to, you know, cause any lasting damage; but that was a very

14  frightening incident.

15          There's another time that I was asked to x-ray him to

16  see if he potentially had eaten a battery because he was holding

17  batteries in his mouth and things like that, and then we

18  couldn't find a battery, so we were concerned about whether or

19  not he had swallowed a battery.   He hadn't swallowed a battery

20  at that time.

21          There was one incident, you know, that was an

22  accident, but I still think warrants some investigation into

23  protocol.   There was a time where Teco had a leash and collar on

24  in the anteroom, which is like the space right outside of the

25  enclosure -- outside of the ape enclosure, and one of the other

444

1   bonobos, Maisha, grabbed his leash through the wire and almost

2   strangled him, which obviously wouldn't happen in normal

3   circumstances if he wasn't wearing a leash and collar.

4        You know, obviously, we've changed a lot of protocols

5   over time, but I think in general, you know, exposing him to,

6   you know, the public or lots of visitors or things like that, or

7   any of them is not in their best interests.  We've changed

8   things dramatically there to try to keep them healthier by just

9   not exposing them to germs in the first place.

10  Q.  Were there any issues with transporting Teco or others --

11  excuse me.  Were there any issues with Dr. Savage-Rumbaugh

12  transporting Teco or other bonobos in a personal vehicle that

13  would have caused any safety concerns?

14  A.  The first --

15       THE COURT:  Mr. Melhus, if I may interject a moment.

16  Remember what I said about funnels and hourglasses?

17       MR. MELHUS:  Sure.

18       THE COURT:  We're getting to the hourglass area.

19       MR. MELHUS:  Okay.

20       THE COURT:  You started a little bit about the SSP and

21  why those people might have been reluctant to work with

22  Dr. Savage-Rumbaugh; but now we're going into a whole other area

23  of stuff that has happened, and I think we're opening new vistas

24  that probably we need not.

25       MR. MELHUS:  Fair enough, Your Honor.  I apologize and

# EXHIBIT H

1   language, human intelligence and that those were diverse.  And

2   she assured me, you know, that, oh, yeah, I think there would be

3   lots of great opportunities for that type of work there.

4   Q.  Did she assure you that she was no longer planning to be

5   involved with the Des Moines facility?

6   A.  Yes, she did.

7   Q.  Did you then eventually decide to take on a leadership role

8   there?

9   A.  I did eventually.  Now, I want to be clear about this.  When

10  I arrived to visit the facility, in I think what is October, to

11  the best of my recollection, of 2013, I'll be quite frank, the

12  existing board members and counsel, Mr. Simpson, were fairly,

13  for lack of a better word, pushy about my involvement, to which

14  I asked them, of course, to hold on, but their -- I expressed

15  concerns on day one, if you will, that it would be something I

16  would need to have autonomy with and that I would not have

17  Dr. Savage-Rumbaugh in any oversight role or in any role in

18  which she would be basically overseeing any aspect of our

19  research program.  And by we, I mean Dr. Hopkins and myself.

20  Q.  From your discussions with Dr. Savage-Rumbaugh, did you

21  satisfy yourself that those conditions were going to be met?

22  A.  I satisfied myself at the time, but clearly I was not right.

23  Q.  And, similarly, from any other discussions that you had with

24  board members, did you also satisfy yourself that that was going

25  to be the case?

483

1  A.  I did.  I spoke with a number of them.  They indicated to

2  me -- I know it's been testified -- I believe I've heard it's

3  been testified since May, but according to the folks I spoke

4  with, it was since March of 2013, so we were going on six or

5  seven months that Dr. Savage-Rumbaugh had been absent from the

6  facility and was actually no longer living in Des Moines.  And

7  Lyle Simpson told me that -- he used the word that she was

8  cocooned, that she was not going to be involved moving forward.

9  And I was satisfied, I guess, that that was going to be the case

10  based on Dr. Rumbaugh, Dr. Savage-Rumbaugh, board members and

11  Mr. Simpson's, you know, words to me.

12  Q.  Would you have taken on the role of Director of Research for

13  ACCI if Dr. Sue had not told you she was no longer going to be

14  involved?

15  A.  Absolutely not.

16  Q.  Can you explain for the court -- well, first off, can you

17  identify Dr. Hopkins?

18  A.  Sure.  Dr. Bill Hopkins is a professor at Georgia State

19  University.  He's also the science director at the Ape Cognition

20  and Communication Institute.

21  Q.  And what's your understanding of how Dr. Hopkins got

22  involved?

23  A.  After receiving that initial e-mail from Dr. Duane Rumbaugh

24  in, again, the fall of 2013, I contacted Dr. Hopkins and invited

25  him to come visit with me.

TAGLIALATELA - DIRECT

523

1   and it was really important that we all learned that; but if a

2   person came to you and said, hey, could we do this again, you

3   would probably say no, right?

4         I disagree with the idea of taking a bonobo even for

5   part of the day, rearing it with humans, for any reason, because

6   I think that the detriment to the individual animal, all right,

7   is not justified by the benefit you get from the science to

8   either our understanding of our place in the universe or for

9   biomedical or public health relevance.

10  Q.  I'm going to ask you a few questions.  If you need to refer

11  to Exhibit 1006 or the demonstrative that's in front of you, I

12  ask that you do that.

13  A.  Okay.

14  Q.  Do the bonobos at the facility in Des Moines continue to be

15  involved in research in the field of experimental psychology?

16  A.  Yes.

17  Q.  What active research protocols involve experimental

18  psychology?

19  A.  Experimental psychology is a pretty broad stroke, but I

20  would say specifically these three that are on the bottom part

21  of this table here, so these three here would certainly fit into

22  that context.

23  Q.  Can you give us the title of those?

24  A.  Oh, I'm sorry.  "Using Virtual Reality to Investigate the

25  Spacial Cognitive Abilities of Bonobos" would certainly fall

TAGLIALATELA - DIRECT

524

1   into experimental psychology.

2   Q.   You need to slow down.

3   A.   I'm sorry, I forgot.

4   Q.   Go ahead.   And the second one?

5   A.   "Using Virtual Reality to Investigate the Spacial Cognitive

6   Abilities of Bonobos."

7   Q.   I'm sorry, I wanted to refer you to the second one.

8   A.   Okay.   "Do Bonobos Make Inductive Inferences About

9   Nonvisible Properties of Object Categories."

10  Q.   And the third is nonhuman primate SNARC effect?

11  A.   Yeah.   That would be SNARC effect.

12  Q.   What is the SNARC effect?

13  A.   I was afraid you would ask me this.

14  Q.   Well, I --

15  A.   For the record, I'm not an experimental psychologist.

16          It's basically the priming effect you would get.   If I

17  were to order numbers for you on a page and I had 1, 2, 3, 4,

18  you would have this expectancy given that we read English from

19  left to right that 1 would be on the left and 10 would be on the

20  right, for example.   So it's basically a computer-based testing

21  to sort of see if the apes have a sort of similar bias, if you

22  will.

23  Q.   Other than IACUC approval, is there anything barring

24  research in the area of experimental psychology at the facility?

25  A.   No.

App. 059

1  Q.  Do the bonobos at the facility continue to be involved in

2  research in the field of use of language and tools?

3  A.  Absolutely.

4  Q.  What active research protocols involve those areas?

5  A.  You said language and tools?

6  Q.  Correct.

7  A.  So the first six in the actual exhibit.

8  Q.  On Exhibit 1006?

9  A.  Uh-huh.

10 Q.  And other than IACUC approval, is there anything barring

11 research in the field of use of language and tools at the

12 facility?

13 A.  No.  In fact, I've had a scientist recently contact me about

14 the recent discovery that Dr. Wildman mentioned that they found

15 stone tools that were three-and-a-half million years old.  We're

16 working to develop protocol for them because they want to come

17 and bring some of those exact core stones and see if we can do

18 some of that stone tool work here to see what the apes can

19 produce.

20 Q.  Do the bonobos at the facility continue to be involved in

21 research in the field of ape intelligence and human cultural

22 modes?

23 A.  Yes.

24 Q.  What active research protocols involve those areas?

25 A.  So human cultural modes is a really big topic.  I would say

**App. 060**

TAGLIALATELA - DIRECT

1   without a doubt rhythmic entrainment in bonobo apes at ACCI

2   would certainly be a cultural move because rhythmic entrainment

3   is basically -- I mean, it's drumming.

4           What was the first part of that?  I'm sorry.

5   Q.  We're looking at --

6   A.  Something in cultural modes?

7   Q.  Use of language -- or excuse me, field of ape intelligence

8   and human cultural modes.

9   A.  The one entitled "Theory of Mind in Language Competent

10  Bonobos," for those of you that don't know, the theory of mind

11  is basically the idea that you have knowledge states that you

12  know are different from other individuals, and that's the theory

13  of mind, and so we're looking at that as well.

14          And "The Large-Scale Comparison of Cognition and

15  Communication in the Animal Kingdom" as well.  And I guess, to

16  some extent, "New Insights into Human Origins through the Study

17  of Linguistically Competent Bonobos."

18  Q.  You mentioned a moment ago moment rhythmic entrainment in

19  bonobo apes, et cetera?

20  A.  Yes.

21  Q.  Is that a continuation of a study that the PI, Patricia

22  Gray, had begun with Dr. Savage-Rumbaugh?

23  A.  It is my understanding it is.  She's also worked I think at

24  the Jacksonville Zoo with bonobos there.

25  Q.  Other than IACUC approval, is there anything barring

TAGLIALATELA - DIRECT

527

1  research in the field of ape intelligence and human cultural

2  modes at the ACCI facility?

3  A.  No.

4  Q.  Would you welcome a proposal to the IACUC for research in

5  these areas from a member of BHI?

6  A.  Yes.

7  Q.  And you've told this to the BHI board in the past?

8  A.  I believe that I wrote an e-mail that it may not have

9  included all members of BHI, but it at least included Carmen

10 Mate, the chair, and Itai Roffman that, to the best of my

11 recollection, indicated that -- that gave them the protocol form

12 and indicated what would be required.

13 Q.  And Dr. Roffman mentioned he may be preparing this

14 submission to the IACUC?

15 A.  My understanding, he is.  It's not a trivial form, so it

16 would take some time.  So the fact that I haven't heard back

17 from him after I sent it to him is not surprising at all.

18 Q.  Any other proposals to the IACUC committee been made by the

19 BHI board?

20 A.  No, they have not.

21        MR. MILLER:  That's all my questions.

22        I'll pass the witness.

23        THE COURT:  I think we'll take our mid-morning recess

24 at this time.  We'll be in recess for 15 minutes.

25        (Recess at 10:21 a.m., until 10:38 a.m.)

1    I also hope that, as appropriate, and under Jared's direction, I

2    will continue to do some research with the bonobos, once the

3    needed structural changes and funding are firmly in place."

4         Did you rely on that statement, Dr. Tag?

5    A.  I did.  I relied on that statement and specifically it was

6    in conjunction with phone conversations that Dr. Savage-Rumbaugh

7    and I had.

8    Q.  Has there been any planned research that's appropriate under

9    your direction for Dr. Savage-Rumbaugh?

10   A.  Dr. Savage-Rumbaugh hasn't specifically submitted a research

11   proposal or even written me any sort of correspondence

12   requesting any research activity.

13   Q.  Did you not plan on Dr. Savage-Rumbaugh having any

14   involvement; you just didn't tell her in response to this

15   e-mail?

16   A.  I took that e-mail and what she stated in it and what she

17   told me on the phone as what she intended.

18   Q.  And do you expect today that Dr. Savage-Rumbaugh will have

19   any involvement in the research going forward?

20   A.  I think that, you know, we have grave concerns regarding

21   Dr. Savage-Rumbaugh's access to the apes because of specific

22   safety concerns.  If Dr. Savage-Rumbaugh wants to submit a

23   research protocol and we are able to have a conversation and

24   figure out what specifically she wants to do and we think we

25   could do it in a safe way and have some assurance of her safety,

568

1  care of the bonobos because you can't separate the bonobos from

2  the research.  That's what we were -- that's what my impression

3  was.  Between what Dr. Simpson -- excuse me, Mr. Simpson told me

4  and Dr. Savage-Rumbaugh told me, I was under the impression that

5  we would have that autonomy.  That was then in my mind affirmed

6  by resolution by both boards.

7  Q.  I want to get this straight.  There's a difference between

8  the research and the facility, is that right?

9  A.  There's a difference between running the facility and

10 operating the facility and doing the research, yes.

11 Q.  So is it your testimony to the court today that

12 Dr. Savage-Rumbaugh can play a role in the research as long as

13 it's not in the facility?

14 A.  I think I -- well, I'll just go back to the answer I just

15 previously gave, which was about Dr. Savage-Rumbaugh, again, if

16 we can be assured that it can be done safely, it's consistent

17 with the mission, that our IACUC approves it, then, yes, a

18 research project would not be impossible I presume.

19 Q.  But you told us this morning that you banned

20 Dr. Savage-Rumbaugh from the lab?

21 A.  I don't think I said I banned her.  I think you asked me --

22 or someone asked me if she continued to have no access, and I

23 said yes, she does not have access.

24 Q.  She doesn't have access today, but you believe that she can

25 be involved in the research at some point indeterminate in the

# EXHIBIT I

**App. 065**

641

1   of the organization, and Jared approached me and asked me if I

2   would be willing to help.  So I said yes, I'm certainly willing

3   to consider that, given the history that I had also had with

4   those particular bonobos, and we came to visit in the fall of

5   2013 and decided -- I decided at that point that I would work

6   with Jared toward, you know, resurrecting the facility and the

7   organization.

8   Q.  Okay.  Prior to making that decision, did you have any

9   conversations with Dr. Sue Savage-Rumbaugh?

10  A.  We did.  We talked by phone, and we had a number of e-mail

11  exchanges that I was copied on, including the correspondence

12  with Jared, and we were assured that we would have autonomy to

13  move the research in the direction that we thought would be most

14  beneficial for garnering private or public sector support for

15  the work and to try and, you know, essentially, you know,

16  reactivate, you know, start the program of research again and

17  try to improve the visibility of the institution both nationally

18  and internationally, which I think it was suffering at that

19  time.

20  Q.  Okay.  And I think you mentioned some e-mail communications

21  with Dr. Savage-Rumbaugh, is that correct?

22  A.  That's correct.

23  Q.  Could you please direct your attention to what's been marked

24  as Plaintiffs' Exhibit 1005.

25  A.  I'm sorry, I don't -- 1005?  There doesn't seem to be

HOPKINS - DIRECT

643

1   our appointments to the IPLS and to the management of the

2   operation.

3   Q.  And based on that e-mail and some of the conversations you

4   described earlier, what was your understanding of your role at

5   the Iowa Primate Learning Sanctuary and the research it was

6   conducting moving forward?

7   A.  My understanding was that essentially the organization was

8   being handed to Jared and I and that we were being asked, and I

9   would even go so far to say as we were being, you know, begged

10  to take over the management and the care of the animals, and

11  that's what was my understanding.  It was my understanding we

12  had complete authority to do that, to take the research in the

13  direction it needed to go, and we had the complete authority to

14  make decisions about the welfare of the animals, and that was my

15  understanding of the agreement.  And, quite frankly, I would not

16  have got involved without that stipulation.

17  Q.  Okay.  And you understand that prior to those conversations

18  and that e-mail that's marked as an exhibit, Plaintiffs' Exhibit

19  1005, that Dr. Savage-Rumbaugh had a more active role in IPLS?

20  A.  No.

21  Q.  Excuse me.  Prior to the conversations and e-mail

22  communications prior to you joining IPLS, did

23  Dr. Savage-Rumbaugh have a more active role at any point

24  historically?

25  A.  At IPLS, yes, she did.  Prior to our involvement, yes.  The

**App. 067**

644

1    plan was not for her to be involved going forward.

2    Q.   Okay.  I would like to talk about some of the research

3    that's being conducted at ACCI currently.  Could you please

4    direct your attention and I'm going to ask you to flip to the

5    exhibit book in front of you again.  It's Plaintiffs Exhibit

6    1006.

7    A.   Okay.

8    Q.   And could you describe that document just briefly?

9    A.   It looks like a brief description of the active IACUC or

10   research protocols that have been approved at ACCI.

11   Q.   Okay.  And would you be able to describe some of those --

12   some of that research that's reflected in this document for the

13   benefit of the court, starting with, for example, what's

14   described as AUP No. 140423-01?  It's the very first protocol on

15   the list.

16   A.   Well, the first project is Dr. Taglialatela's proposal.  In

17   that particular IACUC, the goal is to go back and to

18   characterize the speech comprehension abilities of all of the

19   bonobos at ACCI.  We know that Kanzi's abilities are well

20   documented, but the rest we know much less about, although

21   clearly we interact with them, we have a sense they understand

22   many, many words, but we don't really have a sense of that.

23        For me, I guess, this complements the work from the

24   past in important ways in that we're establishing, you know,

25   what other individuals are capable of doing this.  And then the

645

1   larger goal of that project is to incorporate experimental

2   psychological methods into assessing what are the underlying

3   mechanisms that allow for these bonobos to comprehend spoken

4   English.  It's really a remarkable ability that they have, but

5   we really, really don't understand beyond their capacity to do

6   that much about how they're capable of doing that.  And if you

7   look in the literature and you look for theories for an

8   explanation of that, there's very few of them, and it's really

9   difficult to reconcile what they're capable of doing with what's

10  out there theoretically.

11          So to me this is a very important project and

12  certainly one that complements the work from the past.

13  Q.  When you describe the work from the past, could you kind of

14  explain what you mean?

15  A.  Well, I'm talking about the work that's been started at the

16  Language Research Center in the early 1970s, and that is the use

17  of symbols, the ability -- there's documentation of the

18  linguistic capacities of chimpanzees and bonobos.  So that's

19  essentially what I mean by the past.

20  Q.  Okay.  And would it be fair to characterize that type of

21  research as experimental psychology?

22  A.  Absolutely.

23  Q.  Would it be fair to characterize that type of research as

24  the use of language?

25  A.  Yes.

HOPKINS - DIRECT

646

1   Q.   Would it be fair to characterize that type of research as

2   involving ape intelligence?

3   A.   Absolutely, sure.  I mean, again, as, you know, their

4   capacity to acquiring and use the symbols and their capacity to

5   particularly comprehend the speech certainly reflects something

6   about their intelligence.  So it certainly captures, you know,

7   that theme as a research theme as a whole, sure.

8   Q.   Okay.  And I think the court may be curious, and there's

9   certainly some questions about some of the other research that's

10  going on at ACCI, so I'll ask you just to describe one more

11  research protocol.

12         Let's move to the third on the list, which is marked

13  as AUP No. 140611-02.  Could you describe that protocol and the

14  research that's being conducted under it?

15  A.   So this is Dr. Lyn's protocol, so she's really interested in

16  examining the role that social linguistic experiences have on

17  the developmental cognition.  And so in this particular set of

18  studies, she's developed or is employing something called a

19  primate cognition test battery.  So it's sort of a standardized

20  intelligence test, for lack of a better term, that's used to

21  measure sort of social and physical intelligence in apes

22  specifically.

23         So her goal in that project is to explore, you know,

24  whether acquiring the use of a symbol system, you know, in some

25  way alters or it selectively picks certain forms of intelligence

App. 070

647

1   over others, so that's a pretty significant part of that

2   project.

3           The other part of that project is trying to get at an

4   old question that's been around a long time in the literature,

5   and that is, what is the motivation behind ape communication.

6   So starting back in the seventies, it was sort of argued that

7   apes only sign or use chips or use symbols for instrumental

8   things, so they only produce keyboard utterances for the

9   purposes of asking for something, I want this, I want that, I

10  want that.   They never engage in communication just for the

11  purposes of communication.   So, you know, look, there's an

12  airplane up in the sky, which is -- you know, so this has been

13  an argument that's been around starting with Paris, but more

14  recently it was argued in the literature, not just in the

15  context of simple use, but also in the context of just normal

16  forms of gestural and vocal communication in apes.

17          So there's an element of that proposal as well that

18  aims to look at, you know, whether or not particularly apes that

19  have been raised in these sort of rich sociolinguistic

20  environments are more prone to engage in more declarative form

21  of communication, which are these forms where you talk about

22  something other than asking for something.

23  Q.   Okay.   Thank you for that description.

24          I think we talked earlier about how you would

25  characterize that type of research.   Are you familiar with

1  Dr. Savage-Rumbaugh's research historically?

2  A.  Yes, I am.

3  Q.  Would you characterize that type of research as continuing

4  on the same type of research trajectory?

5  A.  I would.  In fact, I would argue that this work is all, you

6  know, being framed in a way that complements that work very

7  well.

8  Q.  Since you've been involved at ACCI, have there been any

9  changes to policies or protocols that are designed to benefit

10  the bonobos' care and well being?

11  A.  Yes.  So we have done a number of things in terms of

12  sanitation.  So we've removed some -- at least early on, some of

13  the greenhouse areas had a bark in them instead of the natural

14  floors, and so we removed some of those substrates just because

15  we had some mold building in there and that was we thought a

16  health problem, so we removed some of that.

17        We've instituted some policies around how the care

18  staff and also the volunteers interact with the animals in terms

19  of, you know, certain levels of sophistication and what they're

20  allowed in terms of contact policy with the animals.  So we have

21  instituted some of those policies as well, and we've also

22  adopted the policies of having both the volunteers and the care

23  staff to wear masks and gloves when working with the apes.

24  Q.  And what would be the benefit of having the volunteers and

25  caretakers wear masks and gloves when interacting with the

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 4:10-cv-00052-RAW<br><br><br>**PLAINTIFFS' TIMELINE OF RELEVANT EVENTS** |

COME NOW Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust ("IPLS") and Ape Cognition and Communication Institute ("ACCI"), and for their Timeline of Relevant Events provide as follows:

## <u>Introduction</u>

While the historical interactions of the parties to this matter are very involved—for example, both parties testified to the exchange of thousands of emails—a timeline of the relevant events need not be. To that end, Plaintiffs have endeavored to identify events relevant to resolving the narrow issues before the Court. Plaintiffs will supplement this timeline, as necessary, to respond to events and arguments raised by Defendant Dr. Sue Savage-Rumbaugh ("Dr. Rumbaugh") and Bonobo Hope Initiative, Inc. ("BHI").

**App. 074**

## Timeline of Relevant Events

### 2001

**October 31, 2001:** the Iowa Primate Learning Sanctuary ("IPLS") was formed.

### 2005

In approximately 2005, Dr. Sue Savage-Rumbaugh drove the bonobos in a school bus from Georgia to the IPLS's twenty million dollar facility in Des Moines.[1]

### 2010

**February 9, 2010:** IPLS filed a complaint with this Court interpleading the bonobos known as Maisha and Matata in an attempt to resolve competing claims to their ownership and control.[2]

### 2011

**September 8, 2011:** BHI was formed.

### 2012

**January 19, 2012:** Dr. Rumbaugh, acting as the Executive Director of IPLS, executed a Statement of Change of Registered Office and/or Registered Agent with the Iowa Secretary of State's Office.[3]  Dr. Rumbaugh listed herself as the new Registered Agent for IPLS.[4]

### 2013

**January 31, 2013:** At or around this time, the parties entered into a settlement agreement[5] relating to the control of Maisha and Matata.  At or around the same time, the parties entered into a supplemental settlement[6] agreement relating to the control of the remaining bonobos.

---

[1]  *See* Opening Statement of W. Zifchak, Hearing Transcript, Vol. I, May 27, 2015, 9:14-20.
[2]  Dkt. No. 2.
[3]  Exhibit 1004.
[4]  *Id.*
[5]  Exhibit 1.

**App. 075**

**August 9, 2013:** The Iowa Secretary of State administratively dissolved IPLS for failure to file its 2013 Biennial Report as required by Iowa Code section 504.1613.[7]  At that time, Dr. Rumbaugh was the registered agent for IPLS.

**October 26, 2013:** Dr. Rumbaugh wrote an email to members of IPLS and BHI recommending that Dr. Jared Taglialatela and Dr. Bill Hopkins take over the directorship of IPLS and direct the research related to the bonobos.[8]  Dr. Rumbaugh urged that Dr. Taglialatela and Dr. Hopkins "must be able to control all aspects of their program."[9]  Moreover, she asserted that "the best thing I could do to improve the chances for IPLS funding and to decrease the level - of objections going to the USDA about IPLS - would be to be absent myself from the lab."[10]

**Early November 2013:** Dr. Rumbaugh arrived at the IPLS facility unexpectedly.[11] Subsequently, IPLS requested that Dr. Rumbaugh comply with her representations that she absent herself from the lab and provide Dr. Taglialatela and Dr. Hopkins with the autonomy necessary to conduct research with the bonobos.[12]  Dr. Gilmore explained to Dr. Rumbaugh that her sudden immersion in the lab in early November 2013 was contradictory to what she, Dr. Rumbaugh, had represented to IPLS, BHI, Dr. Taglialatela, and Dr. Hopkins.[13]  After she left the lab, Dr. Rumbaugh wrote emails to the BHI board indicating that "we had some kind of issues as regards Teco" but "didn't write e-mails and explain everything that was going on, [referencing being asked to leave the lab.]"[14]

---

[6]  Exhibit 2.
[7]  Exhibit 34.
[8]  Exhibit 1005.
[9]  *Id.*
[10]  *Id.*
[11]  Testimony of Dr. Gilmore, Hearing Transcript, Vol. II, May 28, 2015, 416:8-23.
[12]  *See id.* at 417:24-45 – 418:1-17.
[13]  *See id.* at 419:5-13.
[14]  Testimony of Dr. Rumbaugh, Hearing Transcript, Vol. I, May 27, 2015, 272:5-7.  **App. 076**

**November 12, 2013:** BHI held a board meeting via email.  During that meeting, BHI passed a resolution appointing Dr. Taglialatela Scientific Program Manager of IPLS with the responsibility of "oversee[ing] the day to day science program."[15]  During the same meeting, BHI appointed Dr. Hopkins the Science Director of IPLS with the responsibility of "oversee[ing] all science done at IPLS."[16]  Similarly, the IPLS board voted unanimously in favor of Dr. Taglialatela and Dr. Hopkins overseeing the science at IPLS.

**December 18, 2013:** Ape Cognition and Communication Institute ("ACCI") was formed. That same day, IPLS held a board meeting.  IPLS transferred the bonobos and real estate held by IPLS to ACCI.

**2014**

**June 4, 2014:** ACCI and BHI held a joint board meeting in West Des Moines with Dr. Rumbaugh present.  During that meeting, Dr. Taglialatela and Dr. Hopkins provided an update to ACCI and BHI regarding the research with the bonobos, care of the bonobos, and pending grants.  Following the meeting, several BHI board members and counsel for BHI visited the ACCI facility.

**June 13, 2014:** Dr. Rumbaugh filed a motion for specific performance of the settlement agreements asserting or threatening a number of claims against ACCI, IPLS, and their officers, directors, and attorneys.[17]

---

[15]  Exhibit 46.
[16]  *Id.*
[17]  Dkt. No. 69.

**App. 077**

# EXHIBIT 1

**App. 078**

## AGREEMENT FOR SETTLEMENT AND ACKNOWLEDGMENT
## OF OWNERSHIP

This Agreement for Settlement and Acknowledgment of Ownership ("Agreement") is entered into on the dates set forth below, by and between the Iowa Primate Learning Sanctuary d/b/a Great Ape Trust of Iowa ("Trust"); Zoological Foundation of Georgia d/b/a Zoo Atlanta ("Zoo"); Democratic Republic of the Congo ("DRC"); and Emily Sue Savage-Rumbaugh ("Savage-Rumbaugh") according to the terms set forth below:

**WHEREAS,** there has been a dispute concerning the ownership of two bonobos (Pan paniscus) who reside at the Trust, including specifically: Matata, a forty (40) year old female born in the Democratic Republic of the Congo, and Maisha born May 28, 2000 at the Language Research Center at Georgia State University;

**WHEREAS,** each of the parties to this Agreement asserts a potential ownership interest in one or more of the bonobos;

**WHEREAS,** on or about February 9, 2010, the Trust filed a Complaint for Interpleader in the United States District Court for the Southern District of Iowa, captioned Iowa Primate Learning Sanctuary d/b/a Great Ape Trust v. Zoological Foundation of Georgia, Inc. d/b/a Zoo Atlanta, Democratic Republic of Congo, Japan Monkey Centre Institute and Museum of Primatology ("JMC"), and Sue Savage-Rumbaugh, Ph.D., Case No. 10-52, for the purpose of resolving the competing ownership claims to Matata and Maisha ("Interpleader.")  A copy of the Interpleader is attached as Exhibit A;

**WHEREAS,** JMC has not appeared in the Interpleader and is in default; and

**WHEREAS,** the parties wish to resolve their respective claims to ownership of Matata and Maisha, and dismiss the Interpleader;

**NOW, THEREFORE,** in consideration of the foregoing and the mutual promises, and other good and valuable consideration as set forth herein, the parties do now agree as follows:

1.    All parties stipulate and agree that DRC is the sole owner of Matata.

2.    Subject to DRC's absolute rights to at any time take possession and/or control of Matata or to otherwise unilaterally change the arrangements respecting possession, custody and/or care of Matata, which rights are hereby acknowledged by all parties, Matata shall continue to reside at the Trust for at least so long as she and/or the other members of the colony for which she is the Matriarch continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural

61012885_9.DOC

modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Matata's residence.

3.     All parties stipulate and agree that the Trust is the owner of Maisha.

4.     Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Maisha's residence.

5.     The Trust shall use its best efforts to provide complete and competent care of Matata and Maisha; and shall take all reasonable precautions to ensure their complete safety.

6.     Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for Matata and/or Maisha, the Trust shall provide the DRC, in the case of Matata, and Bonobo Hope Initiative, Inc., an Iowa nonprofit corporation ("Bonobo Hope"), in the case of Maisha, sixty days written notice prior to the date upon which the Trust will no longer be available as a residence for Matata or Maisha. The Trust in either case shall also provide sixty (60) days written notice to the court in the Interpleader Action. The notice will include any information in the Trust's possession concerning the status of the research in which the bonobos are participating, and any options, of which the Trust is aware, for new residences for the bonobos. DRC shall have sole discretion regarding placement of Matata under such circumstances. Bonobo Hope in unison with Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such circumstances. Should either DRC or Bonobo Hope fail to exercise its discretion regarding placement of Matata or Maisha, as the case may be, including making appropriate arrangements to transport the bonobo to a new residence, the Trust will use its best efforts to place the bonobo in a new location, preferably a private sanctuary, with preference given to placement together with other members of the bonobo colony with whom the bonobo resided at the Trust.

7.     Savage-Rumbaugh's willingness to execute this Agreement is contingent upon her entering simultaneously into a side agreement with the Trust.

BHI0003008

8.  Zoo, Savage-Rumbaugh and, respecting Matata only, the Trust, in consideration of the terms and promises set forth herein, including but not limited to the stipulation of all parties to the dismissal of the Interpleader and the mutual releases of claims by all parties, hereby agree to relinquish all claims of ownership that they may have or claim to have, based on contract, statute or regulation, common law, or on any other basis, to Matata or Maisha; and in the case of Zoo only, any claims of ownership to Panbanisha, Nyota, Elikya, Kanzi and Teco.

Zoo, and Savage-Rumbaugh acknowledge and agree that relinquishing their claim to ownership of Matata and Maisha includes, but is not limited to relinquishing any and all rights to determine the residence, breeding, activities, or use of Matata and Maisha, subject to the contingent rights of Bonobo Hope in paragraph 6 above.

9.  The Trust shall indemnify and hold Zoo and Savage-Rumbaugh harmless against and from any and all claims or demands of every kind or character that may be asserted against the Trust as a result of or related to any actions by any of the bonobos now residing at the Trust.

10. The parties agree that they have executed this Agreement of their own free will, and with full understanding of its content and the impact of this Agreement on their legal rights, and that it they have had an opportunity to discuss and evaluate the terms of this Agreement with their attorneys as they deem appropriate.

11. Each party agrees that it will stipulate to the dismissal of the Interpleader pursuant to the form attached hereto as Exhibit B, which stipulation provides for continued supervision by the court for twelve (12) months.

12. Each party agrees to release each other party of the Action, including the other parties' respective corporate affiliates, current and former officers, directors, employees, agents, representatives, and attorneys, from any and all actions, causes of action, suits, claims, expenses, costs (including court costs), claims for attorneys fees, or demands of any kind whatsoever arising prior to the date of the dismissal with prejudice of the Interpleader and relating in any way to: the ownership of Matata and Maisha, assertion of any claim to ownership of Matata and Maisha, the Interpleader, the agreements attached as Exhibits to the Interpleader, only insofar as they relate or may relate to the ownership of Matata and Maisha, and any other action taken by any other party as it relates to the ownership, care, custody, or possession of Matata and Maisha.

13. The parties each represent and warrant that the signatories below are authorized to enter into this Agreement and bind the parties with respect to the matters addressed herein.

61012885_9.DOC

BHI0003009

14. Any notices required by this Agreement shall be forwarded both by email and by the regular mail service of the country from which they originate to the parties at the following addresses:

Iowa Primate Learning Sanctuary d/b/a Great Ape Trust of Iowa
4200 Southeast 44th Avenue  Des Moines, IA 50320

Zoological Foundation of Georgia,
Inc. d/b/a Zoo Atlanta
800 Cherokee Avenue SE
Atlanta, GA  30315

Dr. Sue Savage-Rumbaugh
3950 Evergreen Avenue
Des Moines, IA  50320

Democratic Republic of Congo
c/o Mwanza Ndunda, Ph.D.
Ministere de l'Enseignement Superieur, Universitaire, et
Recherché Scientifique
Avenue de Haut Commandement
Kinshasa/Gombe,
Republique Democratique du Congo

Bonobo Hope Initiative, Inc.
c/o Sue Savage-Rumbaugh, Director of Science

15. Administrative Provisions

a) The Agreement shall be governed by the laws of the state of Iowa; and any action to enforce it must be brought in the State or Federal Courts located in Des Moines, Iowa, provided that the Trust remains a going concern in Polk County, Iowa and those courts can acquire personal jurisdiction over the Trust or its representatives.

b) The language of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

c) The foregoing constitutes the entire agreement among the parties, and there exists no other Agreement, oral or written, among the parties to this Agreement related to the matters covered by this Agreement. This Agreement may be executed by facsimile signature and in counterparts, and each signed counterpart shall be treated as an original for all purposes.

d) This Agreement shall not be modified except by an express written understanding between parties.

61012885_9.DOC

BHI0003010

**IN WITNESS WHEREOF,** the parties to this Agreement do now execute this Agreement on the date set forth below.

IOWA PRIMATE LEARNING SANCTUARY
D/B/A GREAT APE TRUST

By: *Julie Gilmore, DVM*
    Julie Gilmore, DVM
    Director
    Iowa Primate Learning Sanctuary d/b/a
    Great Ape Trust of Iowa

Date: 1/31/13

ZOOLOGICAL FOUNDATION OF
GEORGIA D/B/A ZOO ATLANTA

By: _____

Date: _____

DR. EMILY SUE SAVAGE-RUMBAUGH

By: _____

Title: *Science Director*

Date: 1/31/13

DEMOCRATIC REPUBLIC OF
CONGO

By: _____
    Nicolas Mwanza Ndunda, Ph.D.

Title: _____

Date: _____

As to paragraphs 3, 6 and 8 only:
BONOBO HOPE INITIATIVE, INC.

BY: *Julie Gilmore, DVM*
    Sue Savage-Rumbaugh,
    Director of Science
    Julie Gilmore,
    Director

51012885_9.DOC

**App. 083**

BHI0003011

# EXHIBIT 2

**App. 084**

### Final
## SUPPLEMENTAL AGREEMENT FOR SETTLEMENT AND ACKNOWLEDGMENT OF OWNERSHIP

This Agreement for Settlement and Acknowledgment of Ownership ("Agreement") is entered into on the dates set forth below, by and between the Iowa Primate Learning Sanctuary d/b/a Great Ape Trust of Iowa ("Trust"); Emily Sue Savage-Rumbaugh ("Savage-Rumbaugh"); and Bonobo Hope Initiative, Inc. ("Bonobo Hope") an Iowa non-profit corporation according to the terms set forth below:

**WHEREAS**, all parties to that certain Interpleader Action filed in the Iowa District Court for the Southern District of Iowa on or about February 9, 2010, with the exception of the Japanese Monkey Centre Institute and Museum of Primatology ("JMC") which is in default, have resolved their respective claims to ownership of certain of the bonobos (pan paniscus), Matata and Maisha who reside at the Trust;

**WHEREAS**, the Trust and Savage-Rumbaugh wish to resolve their respective remaining claims to ownership of the remaining bonobos at the Trust and to provide for their care and safety going forward;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises, and other good and valuable consideration as set forth herein, the parties do now agree as follows:

1. All parties stipulate and agree that the Trust and Bonobo Hope jointly are the owners of the bonobos Kanzi, Nyota, Elikya and Teco, now residing at the Trust (the "Bonobo 4").

2. The Bonobo 4 shall continue to reside at the Trust for at least so long as they continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices.)

3. The Trust shall use its best efforts to provide complete and competent care of the Bonobo 4; and shall take all reasonable precautions to ensure their complete safety.

4. Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for the Bonobo 4, the Trust shall provide Savage-Rumbaugh (or her legal representative) and Bonobo Hope (or its legal representative or successor, if any) sixty (60) days written notice prior to the date upon which the Trust will no longer be available as a residence for the Bonobo 4 or the date as of which the Trust proposes to place the Bonobo 4 in a new residence, whichever date is earlier.  The notice will include any information in the Trust's possession concerning the status of the research in which the Bonobo 4 are

participating, and any options, of which the Trust is aware, for new residences for the Bonobo 4. Savage- Rumbaugh or her legal representative and Bonobo Hope acting in unison shall have sole discretion regarding placement of the Bonobo 4 under such circumstances and the Trust or its legal representative shall cooperate fully in that endeavor, at no cost to Savage-Rumbaugh or Bonobo Hope. Should Savage-Rumbaugh or Bonobo Hope fail to exercise such discretion regarding placement of the Bonobo 4, including making appropriate arrangements to transport the Bonobo 4 to a new residence, the Trust (or its legal successor, if any) will use its best efforts to place the Bonobo 4 in a new residence, preferably a private sanctuary, with preference given to placement in a new residence together with the bonobos Matata and Maisha, at no cost to Savage-Rumbaugh or Bonobo Hope.

5.     Savage-Rumbaugh, in consideration of the terms and premises set forth herein, hereby agrees to relinquish all claims of ownership that she may have or claim to have, based on contract, statute or regulation, common law, or on any other basis, to the Bonobo 4 or any of them.

Savage-Rumbaugh acknowledges and agrees that relinquishing her claim to ownership includes, but is not limited to relinquishing any and all rights to determine the residence, breeding, activities, or use of the Bonobo 4, subject to her contingent rights and those of Bonobo Hope in paragraph 4 above, which contingent rights are absolute and unqualified; and without prejudice to her rights, responsibilities or professional judgments, as a member of the boards of the Trust and Bonobo Hope and as Director of Science of Bonobo Hope or any other officer position of either entity to which she may be appointed, elected or hired.

6.     The Trust shall indemnify and hold Savage-Rumbaugh and Bonobo Hope harmless against and from any and all claims or demands of every kind or character that may be asserted against the Trust, Savage-Rumbaugh or Bonobo Hope as a result of or related to any actions by any of the bonobos now residing at the Trust. This indemnity shall extend to all costs, expenses and attorney's fees which may be incurred by Savage-Rumbaugh or Bonobo Hope in connection with any such claim or demand.

7.     The parties agree that they have executed this Agreement of their own free will, and with full understanding of its content and the impact of this Agreement on their legal rights, and that they have had an opportunity to discuss and evaluate the terms of this Agreement with their attorneys as they deem appropriate.

8.     Each party to this Agreement agrees to release each other party to the Agreement, including the other parties' respective corporate affiliates, current and former officers, directors, employees, agents, representatives, and attorneys (collectively "Released Parties"), from any and all actions, causes of action, suits, claims, expenses, costs (including court costs), claims for attorneys fees, or demands of any kind whatsoever arising prior to the date hereof and relating in any way to: the ownership of the Bonobo 4 (or the deceased bonobo, Panbanisha), assertion of any claim to ownership of the Bonobo 4 (or Panbanisha ["Panbanisha"]), and any other action taken by any

BHI0003003

other of the Released Parties as it relates to the ownership, care, custody, or possession of the Bonobo 4 (or Panbanisha), provided that this release shall not preclude Savage-Rumbaugh from asserting counter-claims or cross-claims, as the case may be, against any of the Released Parties, who makes a claim against Savage-Rumbaugh relating to the ownership, care, custody or possession of the Bonobo 4 (or Panbanisha) or any of them.

9.  The parties each represent and warrant that the signatories below are authorized to enter into this Agreement and bind the parties with respect to the matters addressed herein.

10. Any notices required by this Agreement shall be forwarded both by email and by the regular mail service of the country from which they originate to the parties at the following addresses:

> Iowa Primate Learning Sanctuary d/b/a Great Ape Trust of Iowa
> 4200 Southeast 44th Avenue, Des Moines IA 50320
> Email: CarmenMaté@bcnecologia.net
>
> Dr. Sue Savage-Rumbaugh
> 3950 Evergreen Avenue
> Des Moines, IA  50320
> cc: William C. Zifchak
> Kaye Scholer, LLP
> 425 Park Avenue
> New York, NY  10022
>
> Bonobo Hope Initiative, Inc.
> c/o Dr. Sue Savage-Rumbaugh, Director of Science
> 4200 Southeast 44th Avenue
> Des Moines, IA  50320

11. Administrative Provisions

a) The Agreement shall be governed by the laws of the state of Iowa; and any action to enforce it must be brought in the State or Federal Courts located in Des Moines, Iowa, provided that the Trust remains a going concern in Polk County, Iowa and those courts can acquire personal jurisdiction over the Trust or its representatives.

b) The language of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

c) The foregoing constitutes the entire agreement among the parties concerning the subject matter of this Agreement, and there exists no other Agreement, oral or written, among or between the parties related to the matters covered by this Agreement, with the exception of the "Agreement for Settlement and Acknowledgment of Ownership"

BHI0003004

dated *January 31*, 2013. This Agreement may be executed by facsimile signature and in counterparts, and each signed counterpart shall be treated as an original.

d)  This Agreement shall not be modified except by an express written understanding between parties.

**IN WITNESS WHEREOF,** the parties to this Agreement do now execute this Agreement on the date set forth below.

IOWA PRIMATE LEARNING SANCTUARY
D/B/A GREAT APE TRUST

By _____ , DVM
    Julie Gilmore, DVM
    Director
    Iowa Primate Learning Sanctuary d/b/a
    Great Ape Trust of Iowa

Date: 1/31/13

DR. EMILY SUE SAVAGE-RUMBAUGH

_____

Date: 1/31/13


BONOBO HOPE INITIATIVE, INC.

By _____ , DVM

    Julie Gilmore, DVM

Title: Director

Date: 1/31/13

By: _____

Dr. Eve Savage-Rumbaugh

Title: Science Director

Date: 1/31/13

App. 089

BHI0003006

# EXHIBIT 34

**App. 090**

MATT SCHULTZ
IOWA SECRETARY OF STATE



LUCAS BUILDING, FIRST FLOOR
DES MOINES, IOWA  50319

No: W00857177
504RDN-258465

THE IOWA PRIMATE LEARNING SANCTUARY
SUE SAVAGE-RUMBAUGH
4200 SE 44TH AVE
DES MOINES, IA  50320

Date: August 14, 2013

## CERTIFICATE OF ADMINISTRATIVE DISSOLUTION

The corporation named above is hereby administratively dissolved pursuant to Iowa
Code sections 504.1421(1) and 504.1422 effective August 9, 2013 for failure to
deliver the 2013 Biennial Report as required by Iowa Code section 504.1613.

_____
MATT SCHULTZ  SECRETARY OF STATE



TEL (515) 281-5204   FAX (515) 242-5953   www.sos.iowa.gov   sos@sos.iowa.gov

**App. 091**

BHI0001820

# EXHIBIT 1000

**App. 092**



**Lyle Simpson**

| | |
|---|---|
| **From:** | Lyle Simpson |
| **Sent:** | Tuesday, April 03, 2012 5:18 PM |
| **To:** | 'drumbaug' |
| **Subject:** | RE: attn: LYLE  sue in trouble |

Duane

Good information.  Thank you.

Sue really should have Bill Z sue Bill Fields for her to collect the money that he owes her.

I am sending you a picture that Jan took this morning in a separate e-mail.

Lyle


Lyle L. Simpson
Simpson, Jensen, Abels, Fischer and Bouslog, PC
Attorneys and Counselors at Law
604 Locust Street
Suite 222, Equitable Building
Des Moines, Iowa 50309-3723
Office (515) 288-5000
Fax    (515) 288-7718
Cell    (515) 202-7777

CONFIDENTIALITY NOTICE: This e-mail and any attached documents, is covered by the Electronic Communications Privacy Act, 18
USC 2510-2521, and contains information from the law firm of Simpson, Jensen, Abels, Fischer and Bouslog, PC which may be
confidential and/or legally privileged.  These materials are intended only for the personal and confidential use of the addressee
identified above.  If you are not the intended recipient or an agent responsible for delivering these materials to the intended
recipient, you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance on the
contents of this transmitted information is strictly prohibited.  If you have received this e-mail in error, please immediately notify the
sender, and then please, delete the message.  Thank you.
IRS CIRCULAR 230 DISCLOSURE: Although this written communication (including attachments) may address certain tax issues, it is
not intended to constitute a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to
avoid any tax penalties.

**From:** drumbaug [mailto:drumbaug@aol.com]
**Sent:** Monday, April 02, 2012 8:46 PM
**To:** Lyle Simpson
**Subject:** Re: attn: LYLE sue in trouble

She needs assurance and social support -- and some time, not time
off but time with some success and support that will sustain her
work and the bonobos.


I think that she will rise to the occasion.  But if she doesn't, Heidi is
substantive option.  She has worked a great deal with bonobos and

Simpson000407        **App. 093**

**EXHIBIT 1000**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 1 OF 7**

has published widely.  She has a winning smile and inviting eyes.  Might be good to have her there along with Sue?  Ken mentioned a possible substantial donor.  If that became real, it would do miracles for every one -- possibly even me!

Incidentally, I have a beautiful bronze bust of Sue.  It's professional work.  If there were a way to gift that and display it in a manner that would not be embarrassing to Sue, it'd be wonderful.  I have it here in NJ.

If possible, I hope that you can shield the 100k that I suspect she pledged to Bonobo Hope.  She really can't afford that.  Too, it's time for BF to compensate Sue for funds owed and otherwise "borrowed."

I hope that Jan is doing well.  And, how is your dog?


Duane


-----Original Message-----
From: Lyle Simpson <lsimpson@iowafirm.com>
To: 'drumbaug' <drumbaug@aol.com>
Sent: Mon, Apr 2, 2012 6:38 pm
Subject: RE: attn: LYLE sue in trouble

Thanks Duane. Wish this had delayed a month or two, but I am not surprised it happened.  I had warned her early on, but she was then sure that she could handle anything.  Sue has been carrying the full load herself.

Let me know if you hear anything where I can help her.

Lyle

Lyle L. Simpson
Simpson, Jensen, Abels, Fischer and Bouslog, PC
Attorneys and Counselors at Law
604 Locust Street
Suite 222, Equitable Building
Des Moines, Iowa 50309-3723
Office (515) 288-5000
Fax    (515) 288-7718
Cell   (515) 202-7777

CONFIDENTIALITY NOTICE: This e-mail and any attached documents, is covered by the Electronic Communications Privacy Act, 18 USC 2510-2521, and contains information from the law firm of Simpson, Jensen, Abels, Fischer and Bouslog, PC which may be confidential and/or legally privileged. These materials are intended only for the personal and confidential use of the addressee identified above. If you are not the intended recipient or an agent responsible for delivering these materials to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmitted information is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender, and then please, delete the message. Thank you.
IRS CIRCULAR 230 DISCLOSURE: Although this written communication (including attachments) may address certain tax issues, it is not intended to constitute a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to avoid any tax penalties.

From: drumbaug [mailto:drumbaug@aol.com]
Sent: Monday, April 02, 2012 2:48 PM
To: Lyle Simpson
Subject: Re: attn: LYLE sue in trouble

Lyle,

Her condition likely is temporary. Heidi's and Liz's perceptions of it will be valuable.

Heidi would do a good job in presenting the bonobos, what they have done, what they might do, what might be learned from them and so on. I'd go with Heidi rather than no one if Sue is not back on line. If Sue is not back on line and if Heidi is not available because of her job, then you and Ken and Paul must present it as a resource with its management being not strong enough to field significant experimental work at present. The apes and the lab are priceless. As a resource, it should not be lost to the State of Iowa. Ken can talk eloquently about the computers, the apes, and so on. Liz can be a winner and should be talked with about going if neither Sue nor Heidi can go. My guess is that one or the other will go!

I'm not telling my colleagues about the situation with Sue. It's important that Sue not get entirely "off line." She can have a respite and needs it badly for her 24/7 dedication to the apes, which now will lessen with Teco being worked into the colony at night.

Other questions?

My warm appreciation for your highly effective leadership!

Duane


-----Original Message-----
From: Lyle Simpson <lsimpson@iowafirm.com>
To: 'drumbaug' <drumbaug@aol.com>; 'SCHWELLER@bvu.edu' <SCHWELLER@bvu.edu>
Sent: Mon, Apr 2, 2012 2:17 pm
Subject: RE: attn: LYLE sue in trouble

Thanks Duane

What I need most is your assessment of Sue's condition from your experience.  Is this temporary or do we have a far more serious problem.

We are scheduled to visit the President of Iowa State on the 23rd to offer him the Trust.  Since Sue is a critical piece do we proceed?  We cannot really afford to put it off as that will possibly mean moving the bonobos.  We could go without her, but it will certainly not be as effective.  What is your recommendation.

I prefer that Sue's issue not be known publicly.  This is like lighting a brush fire.  Obviously, it could consume the trust.

Thanks for your help.

Lyle

Lyle L. Simpson
Simpson, Jensen, Abels, Fischer and Bouslog, PC
Attorneys and Counselors at Law
604 Locust Street
Suite 222, Equitable Building
Des Moines, Iowa 50309-3723
Office (515) 288-5000
Fax    (515) 288-7718
Cell    (515) 202-7777

CONFIDENTIALITY NOTICE: This e-mail and any attached documents, is covered by the Electronic Communications Privacy Act, 18 USC 2510-2521, and contains information from the law firm of Simpson, Jensen, Abels, Fischer and Bouslog, PC which may be confidential and/or legally privileged.  These materials are intended only for the personal and confidential use of the addressee identified above.  If you are not the intended recipient or an agent responsible for delivering these materials to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmitted information is strictly prohibited.  If you have received this e-mail in error, please immediately notify the sender, and then please, delete the message.  Thank you.
IRS CIRCULAR 230 DISCLOSURE: Although this written communication (including attachments) may address certain tax issues, it is not intended to constitute a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to avoid any tax penalties.

From: drumbaug [mailto:drumbaug@aol.com]
Sent: Monday, April 02, 2012 7:26 AM
To: Lyle Simpson; SCHWELLER@bvu.edu
Cc: drumbaug@aol.com
Subject: Re: attn: LYLE sue in trouble

Lyle,

I've received your email and am up ready to talk/work from here. My cell phone is 678-898-4660. Either or both of you may call at any time.

I need to talk with Liz and Sam. I also want to talk with Heidi Lyn (who probably is not available to return to Des Moines, but perhaps ---?)

Sue's son, Shane Savage-Rumbaugh, is teaching now but might(?) be able to go and to help.

Priority #1 is safety of the people. To have people who the apes know and trust will be the best bet. I'll help to find and get them there. *What is unsafe? -- cages breaking?, doors insecure? Displays of the apes against people.* Does Susannah view the situation as unsafe?

Priority #2 is safety of the apes. Cleaning can wait if necessary. Feeding and watering should not wait. The apes that are angry perhaps miss the attention they get when Sue is feeling well.

Priority #3 is, in my view, moving them to another facility. Gay's good help will be vital as will Heidi's.

I'll try to stay in touch with you. I'll make no financial commitment but will try to get cost estimates of help.

Give me call about how I may proceed. I'd propose that I call you as I progress. In the meanwhile, I'll start as per above.

If you contact Sue, tell her that I'll do what I can from New Jersey.


Duane


-----Original Message-----
From: Lyle Simpson <lsimpson@iowafirm.com>
To: Drumbaug <Drumbaug@aol.com>
Sent: Mon, Apr 2, 2012 12:12 am
Subject: Fwd: attn: LYLE sue in trouble


DUANE

WE NEED YOUR IMMEDIATE HELP

LYLE

Sent from my Samsung Epic™ 4G Touch


-------- Original message --------
Subject: attn: LYLE sue in trouble
From: Kenneth Schweller <schweller@bvu.edu>
To: Bradshaw <bradshaw@kerulos.org>,Olisar <olisar@sbcglobal.net>,Steklis <steklis@email.arizona.edu>,Lasley <plasley@iastate.edu>,Goodenough <ursula@biology2.wustl.edu>,Lyle Simpson <lsimpson@iowafirm.com>
CC:


Had a long talk with Sue by phone tonight.
1) flat affect, depressed, guilty, "has let people down", scared, no energy
2) is worried about making mistakes that might affect the safety of the bonobos and staff
3) Elikya and Matata are angry at her, she fears they might hurt her seriously if they have a chance
4) said "you need to find another director" and get more staff with ape experience, it is more than she can handle
5) she sees "no future", no money, no real hope for her and Liz
6) Susannah has a staph infection on her foot, possibly from the boots, Sue fears USDA might hear about things like that

Simpson000411

App. 097

EXHIBIT 1000
CASE NO. 4:10-CV-00052
PAGE NO. 5 OF 7

and they might increase in frequency
7) doesn't think ISU or other plans will work out
8) can't live from month to month with the anxiety
9) says she needs help know, just cant do it
Etc etc

I plan to go down to the Trust on Tuesday, stay Tuesday night, to try to reassure Sue.
Now, here's the hard part.  Sue has informed me, the Trust Chair, that she regards the working situation as unsafe.  I MUST take this seriously.  It is imperative we find experienced primate helpers, and that probably means hiring them short term, to step in.  I cannot in good conscience after having been told by a person with Sue's experience that the working conditions are dangerous and not take immediate ameliorative action.  If we have to burn our funds to do it, then we still have to do it.  An injury to a staff member or bonobo is not something we can just trust will not happen having been warned.  Please help me.  Who can we call on to step in and give sue some relief... I appreciate that Joanne is spending more hours, but Sue said that isn't helping with the real problem.  I don't want to be an alarmist here, but as Board Chair I am officially dubbing this a crisis requiring intervention.  I need help and advice.

I am closing down my machine for tonight, getting a class of wine, hitting the hottub and going to bed and tackle this all tomorrow with a clearer head.

Thanks as always,
Ken

------Original Message-----
From: Ursula Goodenough [mailto:ursula@biology2.wustl.edu]
Sent: Sunday, April 01, 2012 7:58 PM
To: G.A. Bradshaw; Kenneth Schweller
Cc: lsimpson@iowafirm.com; Olisar
Subject: Re: sue still down

Just got this from Sam Pugh, Liz's husband, whom Duane suggested I contact.

Dear Ursula,

Thank you so much.  We are keeping a close watch on Sue.  We also have a friend in Dr. Addy, retired M.D. who comes out almost daily and has Sue's best interests and health in constant "vigilant mode" as it were.

You are in the loop and I will keep you abreast of the situation.
I will try to set up a holiday for Liz and Sue ASAP.

Thanks again, Sam
515-745-9714

On 4/1/12 4:38 PM, "G.A. Bradshaw" <bradshaw@kerulos.org> wrote:

> Thank you Ken
>
> Is there someone else who can care for the Bonobos? Is Liz handling
> that now? I suggest that we should pay for someone who can come in to
> care for the bonobos in this emergency.
>
> I plan on continuing to find out the next step per the animal
> organization sanctuary and will report on any progress or immediate funds.
>
> Gay
>
>
> On 4/1/12 6:19 AM, Kenneth Schweller wrote:
>> Got this 8:00 this morning, replied, will try to call.
>> Sent her this good news to try to cheer her up.
>> 1.        David reports our fundraising just topped $20,000  and he is
>> confidant of reaching $50,00 by May 15

**Simpson000412**

**App. 098**

**EXHIBIT 1000**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 6 OF 7**

>> 2.        We have a possible BIG donor, Laney Thornton, from foundation
>> of the same name who will be contacting us
>> 3.        I talked with David about getting you some help, Joanne is now
>> planning to come in much more often to assist you in any admin stuff
>>
>> -Ken
>>
>> From: Sue Rumbaugh [mailto:suerumbaugh@gmail.com]
>> Sent: Sunday, April 01, 2012 7:59 AM
>> To: Kenneth Schweller
>> Subject: bonobos
>>
>> Ken,
>>   I have been not able to care for the bonobos and to assure the
>> safety of people or the bonobos.
>> Sue

Simpson000413          **App. 099**

**EXHIBIT 1000**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 7 OF 7**

# EXHIBIT 1004

Jan. 24. 2012 8:25AM   Iowa Secretary of State                    No. 1273  P. 1



258465



**MATT SCHULTZ**
Secretary of State
State of Iowa

**STATEMENT OF CHANGE
OF REGISTERED OFFICE
AND/OR
REGISTERED AGENT**

Pursuant to Iowa law, the undersigned submits this Statement to change the business entity's registered office and/or registered agent in Iowa. Read the instructions on the back of this form before completing the information and signing below.

1. The name of the business entity is: The Iowa Primate Learning Sanctuary dba Great Ape Trust

2. The address of the CURRENT registered OFFICE, as indicated on the Secretary of State's records is:

4200 SE 44th Ave   Des Moines   IA   50320
*Street Address*          *City*          *State*          *Zip*

3. The address of the NEW registered OFFICE is:

4200 SE 44th Ave   Des Moines   IA   50320
*Street Address*          *City*          *State*          *Zip*

4. The name of the CURRENT registered AGENT as indicated on the Secretary of State's records is:

Susan A. McKee
*(If more than one AGENT is registered, indicate which one is being replaced.)*

5. The name and email address of the NEW registered AGENT is:

Sue Savage-Rumbaugh
*Name*                              *Email Address*

6. If the REGISTERED AGENT has changed, the NEW Registered Agent must sign here, consenting to their appointment, or attach their written consent to this form.

_____
Signature of NEW Registered Agent                    See Attached Form for Signature

Complete ONLY if the Registered Agent changes.

7. If the REGISTERED AGENT changes the street address of their business office on this form, the Registered Agent must sign here indicating that NOTICE of the change has been given to the business entity.

_____
Signature of Registered Agent

Complete ONLY if the Registered Agent changes the street address of their business office.

8. After any/all change(s) are made, the street address of the registered office and the street address of the business office of the registered agent will be identical.

See Attached Form for Signature

9. Signature by authorized* representative: _____  Date: 1/19/2012
                                         *See Instruction #9 on back*

PRINT Name and Title: Sue Savage-Rumbaugh   ( ) 515-537-3000   **App. 101**
                      *Name and Title*              *Telephone Number*
                      Executive Director

(2)



**MATT SCHULTZ**
*Secretary of State*
*State of Iowa*

**STATEMENT OF CHANGE
OF REGISTERED OFFICE
AND/OR
REGISTERED AGENT**

Pursuant to Iowa law, the undersigned submits this Statement to change the business entity's registered office and/or registered agent in Iowa. Read the instructions on the back of this form before completing the information and signing below.

1. The name of the business entity is: The Iowa Primate Learning Sanctuary dba Great Ape Trust

2. The address of the CURRENT registered OFFICE, as indicated on the Secretary of State's records is:

4200 SE 44th Ave Des Moines IA 50320
Street Address        City        State        Zip

3. The address of the NEW registered OFFICE is:

4200 SE 44th Ave Des Moines IA 50320
Street Address        City        State        Zip

4. The name of the CURRENT registered AGENT as indicated on the Secretary of State's records is:

Susan D McKaye
*(if more than one AGENT is registered, indicate which one is being replaced)*

5. The name and email address of the NEW registered AGENT is:

Sue Savage-Rumbaugh
Name                                    Email Address

6. If the REGISTERED AGENT has changed, the NEW Registered Agent must sign here, consenting to their appointment, or attach their written consent to this form

_____
Signature of NEW Registered Agent

Complete ONLY if the Registered Agent changes.

7. If the REGISTERED AGENT changes the street address of their business office on this form, must sign here indicating that NOTICE of the change has been given to the business entity.

_____
Signature of Registered Agent

Complete ONLY if the Registered Agent changes the street address of their business office.

FILED
IOWA
SECRETARY OF STATE
1-24-12
8:25AM
W772060

8. After any/all change(s) are made, the street address of the registered office and the street address of the business office of the registered agent will be identical.

B. Signature by authorized* representative: _____   Date: 1/19/12
*See instruction #9 on back*

PRINT Name and Title: Sue Savage-Rumbaugh   (515) 537-3000
Name and Title        Executive Director        Telephone Number

**App. 102**



**STATE OF IOWA**
Secretary of State Office

C # 562

I hereby certify that this is a true and complete document(s) to which the seal is affixed as filed in this office beginning January 24, 2012

Dated May 15, 2015

Secretary Of State

By

# EXHIBIT 1005

App. 104



| | |
|---|---|
| **From:** | Sue Rumbaugh |
| **To:** | George Caudill |
| **Cc:** | Jared Taglialatela; sboers@mchsi.com; Lyle Simpson; drumbaugh@aol.com Rumbaugh; Tom Watson; Julie Gilmore; Nancy Howell; Carmen Mate; Ital Roffman; Bill Greaves; Jim Benson; Ken Schweller; liz rubert pugh; Sally Coxe; Sally Coxe; Ursula Goodenough; horst steklis; Derek Wildman; Laurent Dubreuil; Galia Conklin; rosa crooks; Heather Pugh; whopkins4@gsu.edu; Amory Lovins; Peter Gabriel; Annie Parsons |
| **Subject:** | Re: Iowa Primate Learning Sanctuary |
| **Date:** | Saturday, October 26, 2013 4:22:36 PM |

Dear George, Lyle, Board Members, Staff, Volunteers, Jared, and Bill

I am writing to each of you to strongly support and to enthusiastically endorse, Jared Taglialatela and Bill Hopkins. It is my hope that they will find a means of working with the bonobos and of facilitating the transition from the current operational status to one that is sustainable for the long term, along with the necessary structural transitions.

It would be very helpful to IPLS if Jared were able to assume the directorship in the near future and if Bill were able to assist him in whatever way they both deemed satisfactory. Both can assuredly assist with academic connections with the University of Iowa as well as with their own current institutions and both will be able to conduct research efforts at IPLS. They can assist with local fund raising and with negotiations with the park board. The center is equipped with computer connections and cameras that can enable them to monitor all aspects of the operation and to communicate with anyone at any time, should they need to do so.

While it was necessary to turn these off and take down many aspects of the system in order to stop others from illegally monitoring IPLS activities and communications, Jared and Bill have the knowledge and expertise to determine how best to secure the center and their access to it from other locations. This could enable them to monitor the bonobos, the research and the care from wherever they might be located. This can be safely done and with their input it can also be economically achieved.

I supervised both for a time while they were graduate students at GSU. I have followed their careers since then. They are, without doubt, the professionals best able to move IPLS forward. at this time. They can be of far more benefit to the center and can do far more than I can do in many fields. Both of them know our bonobos personally and helped raise them. They also know many other chimpanzees and bonobos.

They can do hands on research, observational research, computer based tasks, neurological research, social and communicative comparisons, etc. They are outstanding and well recognized in their fields. They are of the highest professional standards and honesty. They will be able to help with the NIH contacts and contracts needed to bring chimpanzees to IPLS. They will be far more effective than I in this regard. They both know how to manage all administrative and all scientific aspects of such a program. They have, in their own institutions, proved themselves. They have every needed skill accomplish research, to operate the center professionally and to gain the respect of the entire world as the center deserves. They know Liz and Heather and they understand their importance to the bonobos and the assistance they give with research efforts. They understand the stress Liz and Heather are now under and must be done.

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 1 OF 7**

They are highly accomplished grant writers and have funded their own careers with NIH grants. They have checked with the highest levels of NIH as regards the funding ban on chimpanzee research. They report that this ban does not apply to bonobos. This is good news for IPLS. If IPLS moves quickly to solidify the positions/options/opportunities which Jared and Bill feel they will need, there will be no barrier to bringing in research dollars.

This, of course, will require that they either maintain their current academic positions or be offered new ones with the Un. of Iowa or Iowa State. NIH dollars are best sought from the basis of a solid academic base. One or the other is essential. An academic position was something that I was never able to achieve under the Great Ape Trust or the IPLS leadership, and this error must be avoided in their case. Similarly, they must be able to control all aspects of their program, for the lives of the bonobos cannot be separated from the success of the research. Separating this authority was a disastrous mistake made by past administrations at the Trust and it should not be carried forward in any guise. It eliminated any chance the program had of succeeding.

Academic positions are also must for any scientific professional attempting to obtain government funds. While the Un. of Iowa previously expressed hesitancy in working with IPLS, it is quite possible that the removal of chimpanzees from the federal granting system, the real possibility of bringing chimpanzees to IPLS, as well as the interest in bringing Jared and Bill to IPLS -- will open up a completely new working relationship with the University.

I remain deeply indebted to all who firmly supported me during the investigations required by the accusations of the bonobo 12. I am even further indebted to all who worked so diligently to evaluate the accusations and enabled my name to be cleared. However, not only did the bonobo 12 continue their blog, they usurped the former web domain, continued to send false information to the USDA and to influence the opinions of local donors. It became increasingly clear that the best thing I could do to improve the chances for IPLS funding and to decrease the level of objections going to the USDA about IPLS - would be to absent myself from the lab.

Fortunately, Liz and Heather have been able to step forward, with Gala's help and fill in the gaps in care that then occurred. Additionally the volunteers have been amazing. Had I been present in the lab when the recent incidents occurred - even though they had nothing to do with me; it is certain that there would have been an international response that would have been extremely harmful to all IPLS and especially to the bonobos. It could have very easily closed the lab. In the extreme - I could have been slapped with criminal charges. I probably would have had them dropped, but I did not wish to take that chance. As it was, these events were handled easily and things moved forward just as they should have, with all learning more and being more careful. This is what should happen.

The actions of the bonobo 12 were personally directed at me and the research I conducted. There is no reason to suspect that they will attack Jared or Bill. With Jared's directorship in place, these problems should rapidly diminish. While Jared and Bill are familiar with language work, their focus is on investigating the effects of language acquisition as well as comparing and contrasting bonobos and chimpanzees. This is appropriate and the direction that should now be taken.

ACCI00002

**App. 106**

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 2 OF 7**

It is my hope that the coming essential transition will proceed smoothly and rapidly. I also hope that, as appropriate, and under Jared's direction, I will continue to do some research with the bonobos, once the needed structural changes and funding are firmly in place.  I will to do nothing to disrupt this critical and necessary next step. The leadership role must transition to and remain within, the hands of others. IPLS is most fortunate that Jared and Bill are visiting and willing to consider what they might do.

Duane and I plan to visit over the Thanksgiving Holiday and for those of you who have not yet met Duane you have a real treat in store.

There is no means by which I can sufficiently express my deepest gratitude for what each and every one of you have done.

On Tue, Oct 1, 2013 at 7:53 PM, George Caudill <caudill@mac.com> wrote:
Hello Jarad,

I serve as chairman of the board of the Iowa Primate Learning Sanctuary, and Lyle asked that I respond to your recent email on behalf of the board.

First, we're very excited about the prospect of having you join us. The bonobos here at the sanctuary have shown incredible communication skills and the potential for more research is boundless.

To answer your questions about the goals of both boards, the IPLS board was created primarily to support the day to day operations of IPLS through fundraising and general oversight. More than anything else, this board promotes the sanctuary within the community. The Bonobo Hope Board is our scientific board whose job it is to provide guidance and support for the scientific and research endeavors at IPLS. Your interaction with these boards would generally be minimal. We all feel a deep devotion to the bonobos, and you'll find that board members will contribute as much or as little input as you would like. All of the IPLS board hails from Des Moines, while the Bonobo Hope board is scattered from the U.S. to Canada to Spain...

As for your role, we would look to you to determine how you can best conduct research with the bonobos, it would be entirely up to you. You would be free to establish the research programs, in consultation with the scientific board; as you would see fit. It would be our hope that you would see research with the bonobos as a full time endeavor, and you can use the facility for whatever research you wish, subject only to IACUC approval. The boards would, of course, need to be able to respond to others who may wish to do research in the facility. We also have a strong desire to establish educational programs for younger members of our community, place this sort of outreach as one of our highest priorities.

All that being said, we would very much like to have you pay us a visit in the very near future. We will be happy to host you at a time that is most convenient for you; so please let us know when you'd like to visit IPLS, you're always more than welcome to spend as much time as you like here in Des Moines as you try to make a decision.

So, please, if you have any questions, we'd be more than happy to get back to

CONFIDENTIAL

ACCI00003

**App. 107**

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 3 OF 7**

| From: | Itai Roffman |
|---|---|
| To: | Sue Rumbaugh |
| Cc: | George Caudill; Jared Taglialatela; sboers@mchsi.com; Lyle Simpson; drumbaugh@aol.com Rumbaugh; Tom Watson; Julie Gilmore; Nancy Howell; Carmen Mate; Bill Greaves; Jim Benson; Ken Schweller; liz rubert pugh; Sally Coxe; Sally Coxe; Ursula Goodenough; horst steklis; Derek Wildman; Laurent Dubreuil; Gaila Conklin; rosa crooks; Heather Pugh; whopkins4@gsu.edu; Amory Lovins; Peter Gabriel; Annie Parsons |
| Subject: | Re: Iowa Primate Learning Sanctuary |
| Date: | Saturday, October 26, 2013 5:10:56 PM |

I fully support Sue letter.
itai


Itai Roffman, Ph.D. student,
Adams Fellow, The Israel National Academy of Sciences
*Pan-Homo* Sister-Species Evolution Research Program
Graduate Studies Authority, The International Graduate Center of Evolution,
Haifa University, Israel


On Sat, Oct 26, 2013 at 4:22 PM, Sue Rumbaugh <suerumbaugh@gmail.com>
wrote:
Dear George, Lyle, Board Members, Staff, Volunteers, Jared, and Bill

I am writing to each of you to strongly support and to enthusiastically endorse, Jared Taglialatela and Bill Hopkins. It is my hope that they will find a means of working with the bonobos and of facilitating the transition from the current operational status to one that is sustainable for the long term, along with the necessary structural transitions.

It would be very helpful to IPLS if Jared were able to assume the directorship in the near future and if Bill were able to assist him in whatever way they both deemed satisfactory. Both can assuredly assist with academic connections with the University of Iowa as well as with their own current institutions and both will be able to conduct research efforts at IPLS. They can assist with local fund raising and with negotiations with the park board. The center is equipped with computer connections and cameras that can enable them to monitor all aspects of the operation and to communicate with anyone at any time, should they need to do so.

While it was necessary to turn these off and take down many aspects of the system in order to stop others from illegally monitoring IPLS activities and communications, Jared and Bill have the knowledge and expertise to determine how best to secure the center and their access to it from other locations. This could enable them to monitor the bonobos, the research and the care from wherever they might be located. This can be safely done and with their input it can also be economically achieved.

I supervised both for a time while they were graduate students at GSU. I have followed their careers since then. They are, without doubt, the professionals best able to move IPLS forward. at this time. They can be of far more benefit to the center and can do far more than I can do in many fields. Both of them know our bonobos personally and helped raise them. They also know many other

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 4 OF 7**

| From: | Laurent Dubreuil |
|---|---|
| To: | Sue Rumbaugh |
| Cc: | George Caudill; Jared Taglialatela; sboers@mchsi.com; Lyle Simpson; drumbaugh@aol.com Rumbaugh; Tom Watson; Julie Gilmore; Nancy Howell; Carmen Mate; Ital Roffman; Bill Greaves; Jim Benson; Ken Schweller; liz rubert pugh; Sally Coxe; Sally Coxe; Ursula Goodenough; horst steklis; Derek Wildman; Gaila Conklin; rosa crooks; Heather Pugh; whopkins4@gsu.edu; Amory Lovins; Peter Gabriel; Annie Parsons |
| Subject: | Re: Iowa Primate Learning Sanctuary |
| Date: | Saturday, October 26, 2013 8:54:12 PM |

Dear all,

I just learned about this new situation through Sue's message. As a member of the Scientific Board, I want to express my very strong support for Jared's candidacy: Jared has all the credentials to do an absolutely outstanding job. I also want to thank him for stepping in. And I'd be glad to help the transition as much as I can.

Best,
--
Laurent Dubreuil
Professor of Romance Studies, Comparative Literature & Cognitive Science
Editor, diacritics
Cornell University, USA
314 Morrill Hall, 14830-4701 Ithaca, NY

On Oct 26, 2013, at 5:22 PM, "Sue Rumbaugh" <suerumbaugh@gmail.com> wrote:

Dear George, Lyle, Board Members, Staff, Volunteers, Jared, and Bill

I am writing to each of you to strongly support and to enthusiastically endorse, Jared Taglialatela and Bill Hopkins. It is my hope that they will find a means of working with the bonobos and of facilitating the transition from the current operational status to one that is sustainable for the long term, along with the necessary structural transitions.

It would be very helpful to IPLS if Jared were able to assume the directorship in the near future and if Bill were able to assist him in whatever way they both deemed satisfactory. Both can assuredly assist with academic connections with the University of Iowa as well as with their own current institutions and both will be able to conduct research efforts at IPLS. They can assist with local fund raising and with negotiations with the park board. The center is equipped with computer connections and cameras that can enable them to monitor all aspects of the operation and to communicate with anyone at any time, should they need to do so.

While it was necessary to turn these off and take down many aspects of the system in order to stop others from illegally monitoring IPLS activities and communications, Jared and Bill have the knowledge and expertise to determine how best to secure the center and their access to it from other locations. This could enable them to monitor the bonobos, the research and the care from wherever they might be located. This can be safely done and with their input it can also be economically achieved.

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 5 OF 7**

| | |
|---|---|
| **From:** | Ursula Goodenough |
| **To:** | Sally Coxe; Sue Rumbaugh |
| **Cc:** | George Caudill; Jared Taglialatela; sboers@mchsi.com; Lyle Simpson; drumbaug@aol.com Rumbaugh; Tom Watson; Julie Gilmore; Nancy Howell; Carmen Mate; Itai Roffman; Bill Greaves; Jim Benson; Ken Schweller; liz rubert pugh; horst steklis; Derek Wildman; Laurent Dubreuil; Gaila Conklin; rosa crooks; Heather Pugh; whopkins4@gsu.edu; Amory Lovins; Peter Gabriel; Annie Parsons |
| **Subject:** | Re: Iowa Primate Learning Sanctuary |
| **Date:** | Sunday, October 27, 2013 12:50:24 PM |

Ditto!!!

**From:** Sally Coxe <scoxe@bonobo.org>
**Date:** Sunday, October 27, 2013 12:12 PM
**To:** Sue Savage-Rumbaugh <suerumbaugh@gmail.com>
**Cc:** George Caudill <caudill@mac.com>, Jared Taglialatela <jtaglial@kennesaw.edu>, Steve Boers <sboers@mchsi.com>, Lyle Simpson <lsimpson@iowafirm.com>, Duane Rumbaugh <drumbaug@aol.com>, Tom Watson <TomWatson@hy-vee.com>, Julie Gilmore <jgilmoredvm@gmail.com>, Nancy Howell <howellnr@spst.edu>, Carmen Mate <CarmenMate@bcnecologia.net>, Itai Roffman <IROFFMAN@gmail.com>, Bill Greaves <greaves@glendon.yorku.ca>, Jim Benson <jbenson.jim@gmail.com>, Kenneth Schweller <schweller@bvu.edu>, Liz Rubert-Pugh <rubertpugh@live.com>, Ursula Goodenough <ursula@biology2.wustl.edu>, Dieter Steklis <steklis@email.arizona.edu>, Derek Wildman <al0825@wayne.edu>, Laurent Dubreuil <ld79@cornell.edu>, Gaila Conklin <gmconklin@yahoo.com>, rosa crooks <rowslx@hotmail.com>, Heather Pugh <beachbabay22@aol.com>, "whopkins4@gsu.edu" <whopkins4@gsu.edu>, Amory Lovins <amory@rmi.org>, Peter Gabriel <Peter.Gabriel@realworld.co.uk>, Annie Parsons <Annie.Parsons@petergabriel.com>
**Subject:** Re: Iowa Primate Learning Sanctuary

Dear Sue and all,

I am grateful to read about these very positive developments.  I fully support the transition that Sue recommends, with confidence in the leadership that Jared and Bill will bring.

Thank you,
Sally

***************************************
Sally Jewell Coxe
President
Bonobo Conservation Initiative
2701 Connecticut Ave., NW #702
Washington, DC 20008
USA
Tel: 202-332-1014
Fax: 202-234-3066
Cell: 202-441-1599
DRC: (+243) 81-164-9316
     (+243) 99-813-1715
SKYPE: sallyc333
www.bonobo.org

CONFIDENTIAL                    ACCI00013          **App. 110**

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 6 OF 7**

**From:**    Carmen Mate
**To:**       Ursula Goodenough
**Cc:**       Sally Coxe; Sue Rumbaugh; George Caudill; Jared Taglialatela; sboers@mchsi.com; Lyle Simpson;
              drumbaug@aol.com Rumbaugh; Tom Watson; Julie Gilmore; Nancy Howell; Carmen Mate; Itai Roffman; Bill
              Greaves; Jim Benson; Ken Schweller; liz rubert pugh; horst steklis; Derek Wildman; Laurent Dubreuil; Gaila
              Conklin; rosa crooks; Heather Pugh; whopkins4@gsu.edu; Amory Lovins; Peter Gabriel; Annie Parsons
**Subject:**  Re: Iowa Primate Learning Sanctuary
**Date:**     Sunday, October 27, 2013 1:36:57 PM

Dear Alls
Congratulations jared, Bill & Sue . I,m sure that this "team" is perfect to promote
the research and the link with the university.
carmen

El domingo, 27 de octubre de 2013, Ursula Goodenough escribió:
  Ditto!!!

  **From:** Sally Coxe <scoxe@bonobo.org>
  **Date:** Sunday, October 27, 2013 12:12 PM
  **To:** Sue Savage-Rumbaugh <suerumbaugh@gmail.com>
  **Cc:** George Caudill <caudill@mac.com>, Jared Taglialatela <jtaglial@kennesaw.edu>, Steve Boers
  <sboers@mchsi.com>, Lyle Simpson <lsimpson@iowafirm.com>, Duane Rumbaugh
  <drumbaug@aol.com>, Tom Watson <TomWatson@hy-vee.com>, Julie Gilmore
  <jgilmoredvm@gmail.com>, Nancy Howell <howellnr@spst.edu>, Carmen Mate
  <CarmenMate@bcnecologia.net>, Itai Roffman <IROFFMAN@gmail.com>, Bill Greaves
  <greaves@glendon.yorku.ca>, Jim Benson <jbenson.jim@gmail.com>, Kenneth Schweller
  <schweller@bvu.edu>, Liz Rubert-Pugh <rubertpugh@live.com>, Ursula Goodenough
  <ursula@biology2.wustl.edu>, Dieter Stecklis <steklis@email.arizona.edu>, Derek Wildman
  <ai0825@wayne.edu>, Laurent Dubreuil <ld79@cornell.edu>, Gaila Conklin
  <gmconklin@yahoo.com>, rosa crooks <rowsix@hotmail.com>, Heather Pugh
  <beachbabay22@aol.com>, "whopkins4@gsu.edu" <whopkins4@gsu.edu>, Amory Lovins
  <amory@rmi.org>, Peter Gabriel <Peter.Gabriel@realworld.co.uk>, Annie Parsons
  <Annie.Parsons@petergabriel.com>
  **Subject:** Re: Iowa Primate Learning Sanctuary

  Dear Sue and all,

  I am grateful to read about these very positive developments.  I fully support the transition that Sue
  recommends, with confidence in the leadership that Jared and Bill will bring.

  Thank you,
  Sally

  ******************************************
  Sally Jewell Coxe
  President
  Bonobo Conservation Initiative
  2701 Connecticut Ave., NW #702
  Washington, DC 20008
  USA

**EXHIBIT 1005**
**CASE NO. 4:10-CV-00052**
**PAGE NO. 7 OF 7**

# EXHIBIT 1006

**App. 112**



APE COGNITION
& CONSERVATION
INITIATIVE

# ACCI Active Research Protocols

| AUP Number | Title | Investigators | Approval Date | End Date | Annual Review Date |
|---|---|---|---|---|---|
| 140423-01 | New Insights Into Human Origins through the Study of Linguistically Competent Bonobos | PI: Jared Taglialatela<br>Co-I: Bill Hopkins<br>Tami Watson, Volunteer | 04-23-14 | 04-22-17 | |
| 140611-01 | The Role of Language in Categorization | PI: Heidi Lyn<br>Co-I: Jared Taglialatela<br>Co-I: Bill Hopkins<br>Co-I: Gary Lupyan<br>Mystera Samuelson, student<br>Stephanie Jett, student | 06-11-14 | 06-10-17 | |
| 140611-02 | A Large-Scale Comparison of Cognition and Communication in the Animal Kingdom | PI: Heidi Lyn<br>Co-I: Jared Taglialatela<br>Co-I: Bill Hopkins<br>Mystera Samuelson, student<br>Stephanie Jett, student | 06-11-14 | 06-10-17 | |
| 140611-03 | A Socio-Ecological Comparison of Captive *Pan troglodytes*, *Pan paniscus* and *Gorilla gorilla* | PI: Jared Taglialatela<br>Co-I: Scott Milne | 06-11-14 | 06-10-17 | |
| 140611-04 | An Interdisciplinary Approach to the Evolutionary Origin of Language: Comparing Chimpanzee and Bonobo Communication and Neurobiology | PI: Jared Taglialatela<br>Co-I: Bill Hopkins<br>Scott Milne, GRA | 06-11-14 | 06-10-17 | |
| 140827-01 | Theory of Mind in Language Competent Bonobos | PI: Carla Krachun<br>Co-I: Bill Hopkins<br>Co-I: Robert Lurz<br>McLennon Wilson, student | 08-27-14 | 08-26-17 | |
| 141110-01 | Rhythmic Entrainment in Bonobo Apes at the Ape Cognition & Communication Institute (ACCI) | PI: Patricia Gray<br>Co-I: Edward Large<br>ACCI PI: Jared Taglialatela | 11-10-14 | 11-09-17 | |

**App. 113**

EXHIBIT 00068
CASE NO. 4:10-CV-00052
PAGE NO. 1 OF 1