**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:10-cv-00052 Hon. Magistrate Judge Ross Walters |
| ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**JOINT POST-HEARING BRIEF OF DEFENDANT SUE SAVAGE-RUMBAUGH**
**<u>AND INTERVENOR DEFENDANT BONOBO HOPE INITIATIVE</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND AND STATEMENT OF FACTS ................................................... 3

ARGUMENT ................................................................................................... 16

I.     IPLS AND ACCI HAVE VIOLATED, AND CONTINUE TO VIOLATE, THE SETTLEMENT AGREEMENTS ........................................................................ 16

     A.     Applicable Principles of Contract Interpretation ............................ 16

     B.     IPLS Has "Ceased To Exist," For Purposes Of The Settlement Agreements, Thus Conferring Upon BHI And Dr. Savage-Rumbaugh Sole Discretion To Determine The Placement Of The Bonobos. ................... 18

     C.     ACCI Has Violated The Settlement Agreements By Failing To Continue Dr. Savage-Rumbaugh's Research Trajectory. ................................ 23

          1.     The Settlement Agreements Require That Dr. Savage-Rumbaugh's Research Trajectory Continue. ................................ 23

          2.     When Dr. Savage-Rumbaugh Recommended Dr. Taglialatela To Fill The Role Of Director Of Science, It Was Understood That She Would Continue To Have Access To The Bonobos And That Dr. Taglialatela Would Continue Her Research Trajectory, Consistent With The Settlement Agreements. ............................ 24

          3.     ACCI Has Refused To Continue, and Has Renounced, Dr. Savage-Rumbaugh's Research Trajectory. ............................ 27

               a.     ACCI Banned Dr. Savage-Rumbaugh From The Facility Under Suspect Pretextual Circumstances. ................... 27

               b.     By Its Own Admission, ACCI Has Failed To Continue Dr. Savage-Rumbaugh's Research Trajectory In Her Absence And Interposed Protocols As To Animal Care That Render That Research Impossible. ........................... 31

     D.     IPLS And ACCI Have Violated BHI's Rights As Joint Owners Of The Bonobos. ....................................................................... 34

          1.     The Settlement Agreements Establish BHI And IPLS As Joint Owners Of The Bonobos. ........................................ 34

2.     The Circumstances Surrounding The Execution Of The Agreements Make Clear That BHI's Particular Rights As Joint Owners Included The Right To Direct The Science In Which The Bonobo 4 Were To Continue To Be Involved. ....................................................................... 34

3.     IPLS And ACCI Have Denied BHI Its Rights As Joint Owners Of The Bonobo 4 Under The Side Agreement ................................................ 36

     a.     ACCI Now Exerts Complete Control Over The Bonobo 4 And The Science In Which They Are Involved And In Doing So Has Erected A Wall Of Secrecy Around The Lab ........ 36

     b.     ACCI Has Stonewalled Members Of The BHI Board From Having More Than Token Access To The Bonobos. ................... 37

     c.     IPLS Failed To Inform BHI About The Formation Of ACCI. ..... 38

     d.     ACCI Has Made Only A Token Release Of Information To BHI About The Bonobos And The Science In Which They Are Involved. ................................................................ 39

     e.     IPLS And ACCI Have Banned Dr. Savage-Rumbaugh, President Of BHI, From The Des Moines Facility. ...................... 41

     f.     IPLS Purported To Dismiss Dr. Savage-Rumbaugh From The IPLS Board. ................................................................. 42

     g.     IPLS Failed To Inform BHI About Sue Being Banned From The Facility And Removed From The IPLS Board. ..................... 43

E.     ACCI Is In Breach Of Its Obligation To Adequately Care For The Bonobos. ....................................................................................... 44

1.     The Bonobos Are Not Safe At The Current Facility ................................ 44

2.     The Bonobos' Psychological Well-Being Is Suffering Irreparable Harm In The Custody Of ACCI ................................................. 45

3.     BHI Is Nearing Completion Of A New, State-Of-The-Art Great Ape Facility To Which The Bonobos Can Be Relocated ................................ 47

CONCLUSION ........................................................................................... 48

Appendix ............................................................................................. A1-A3

Defendant Sue Savage-Rumbaugh ("Dr. Savage-Rumbaugh") and Intervenor Defendant Bonobo Hope Initiative, Inc. ("BHI") file this Joint Post-Hearing Brief in further support of Dr. Savage-Rumbaugh's Motion for Specific Performance and Related Relief ("Motion") (Dkt. 69) and supporting Memorandum ("Memorandum") (Dkt. 69-1).

## **INTRODUCTION**

Dr. Savage-Rumbaugh[1] and BHI had two simple goals in mind when they previously settled this litigation: (i) to ensure that Dr. Savage-Rumbaugh's groundbreaking, multi-generational research involving a family of "highly intelligent" bonobos – several of whom "comprehend [] spoken English"[2] – continued beyond her tenure; and (ii) to ensure the continued health and safety of the bonobos. Dr. Savage-Rumbaugh and BHI achieved these goals through the settlement agreements in this case, which include the Main Agreement[3] and the Side Agreement[4] (collectively, the "Settlement Agreements"), and through strategic corporate structuring. Today, however, these goals are being undermined due to breaches of the Settlement Agreements by the current operators of the bonobo facility, using the demands of the Yerkes National Primate Research Center in Georgia, long an opponent of Dr. Savage-Rumbaugh's research, as a pretext to ban Dr. Savage-Rumbaugh from access to the bonobos. Dr. Savage-Rumbaugh's research not only has been halted; it has been

---

[1] Dr. Savage-Rumbaugh has been a member of the BHI board of directors since BHI was founded in 2011 and currently serves as its President.

[2] Tr. at 521:17-19.

[3] This refers to the ***Agreement for Settlement and Acknowledgment of Ownership***, by and between the Iowa Primate Learning Sanctuary, Zoological Foundation of Georgia, Democratic Republic of the Congo, and Dr. Savage-Rumbaugh, last to sign on February 17, 2013 (Dkt. 69-2).

[4] This refers to the ***Supplemental Agreement for Settlement and Acknowledgement of Ownership***, by and between Iowa Primate Learning Sanctuary, Emily Sue Savage-Rumbaugh, and Bonobo Hope Initiative, Inc., signed on January 31, 2013 (Dkt. 69-3).

intentionally dismantled, and BHI's oversight role has been eviscerated. Moreover, the wellbeing and welfare of the bonobos that took several decades to develop is now being jeopardized by the current regime.

The organization that was bound by the Settlement Agreements to support and sustain Dr. Savage-Rumbaugh's research – Plaintiff Iowa Primate Learning Sanctuary ("IPLS") – in the person of Jared Taglialatela and William Hopkins – instead staged a "coup." The IPLS board dislodged Dr. Savage-Rumbaugh from its leadership, barred Dr. Savage-Rumbaugh from its facility and underhandedly changed the direction of Dr. Savage-Rumbaugh's research, contrary to the Settlement Agreements. It did this, moreover, at a time when IPLS had been dissolved by the Secretary of State and evaded a $99,000 tax lien by purporting to transfer its assets in secret to a new entity, ACCI.[5]

All of this is occurring against a backdrop of environmental hazards to the bonobos and staff owing to the fact that the IPLS facility is situated in a flood plain. The IPLS facility has endured 2 floods since 2005, and very nearly a third this past week, likely rendering the water table toxic and arguably contributing to the premature deaths of three bonobos, Nathan (2009), Panbanisha (2012) and Matata (2014).

Additionally, even though IPLS has ceased to exist, this court was not given notice and neither IPLS (nor its legal successor, Plaintiff Ape Cognition & Communication Institute ("ACCI")) have allowed Dr. Savage-Rumbaugh and BHI the right to determine the relocation of the bonobo colony, as required by the Settlement Agreements. Instead of allowing Dr. Savage-Rumbaugh and BHI to determine relocation, IPLS's corporate counsel, Lyle Simpson ("Simpson") formed a new entity – ACCI – and transferred all of IPLS's

---

[5] As of January 15, 2015, that state tax lien was in the amount of $98,673.

2

assets to it, including the bonobos, without BHI's knowledge. ACCI continues to bar Dr. Savage-Rumbaugh from its facility and continues to deny Dr. Savage-Rumbaugh and BHI any involvement in its scientific research.

Dr. Savage-Rumbaugh and BHI now request relief from this Court in the form of specific performance of the Settlement Agreements, as well as remedies for breaches of the those agreements. Specifically, Dr. Savage-Rumbaugh and BHI respectfully request that, pursuant to the Motion, this Court: (i) grant Dr. Savage-Rumbaugh and BHI their right to relocate Maisha and the Bonobo 4;[6] or, alternatively, (ii) order that BHI be allowed to make all decisions regarding the research in which the Bonobo 4 are involved including allowing Dr. Savage-Rumbaugh to participate in this research, as well as having regular access to and information concerning the bonobos and having at least an equal say in decisions affecting the bonobos, including residence, breeding, activities and use; and (iii) grant any other relief this Court deems just and equitable.

## BACKGROUND AND STATEMENT OF FACTS[7]

Dr. Savage-Rumbaugh is one of the world's leading primatologists. For over 40 years, she has been raising a colony of bonobos,[8] which is now in its third generation, and researching their linguistic and cognitive capabilities. Her work involves rearing bonobos in a loving, caring environment similar to that in which human children are reared in order to immerse them in the same culture of language that human children experience. (Transcript of Hearing 30:22-25, 175:17-20, May 27-29, 2015 [hereinafter " Tr."].) In order to create such an environment, there

---

[6] This refers to the four bonobos housed at the IPLS facility in addition to Maisha, which include Nyota, Elikya, Kanzi, and Teco.

[7] The Court requested that a timeline be included in the post-trial submission. That timeline is attached as an appendix to this brief.

[8] Bonobos are a species of great ape and, along with chimpanzees, are the closest extant relative to humans.

must be direct contact between the bonobos and the members of their human family. Direct contact allows the bonobos to establish a bond through which they will seek to emulate the aspects of human culture that they experience. (*Id.* at 26:1-13.)

Dr. Savage-Rumbaugh is most widely renowned for her work with Kanzi, a 34-year old male bonobo whom she reared from birth. Dr. Savage-Rumbaugh taught Kanzi and the other bonobos to communicate using symbols (called "lexigrams") and paper or computer keyboards. As Professor Russ Tuttle testified: "Sue was the enrichment for Kanzi … the things she brought to him, not just her presence, but the way she interacted …" (*Id.* at 626:15-18)[9] For her groundbreaking work, Dr. Savage-Rumbaugh was named one of TIME Magazine's "100 Most Influential People in the World" in 2011. (Tr. at 27:7-15) She also received a Sigma Xi lectureship and has been awarded honorary degrees from the University of Chicago and Missouri State University. (*Id.* at 27:7-20.)

For 23 years of her career, Dr. Savage-Rumbaugh worked at the Georgia State University Language Research Center. In 2005, Dr. Savage-Rumbaugh accepted the invitation of Ted Townsend, a wealthy Iowa businessman, to move the bonobo colony to a new facility in Des Moines – the Iowa Primate Learning Sanctuary, d/b/a Great Ape Trust of Iowa. Townsend promised Dr. Savage-Rumbaugh that he would personally fund IPLS in perpetuity and that he would pay her salary for life. In exchange, Dr. Savage-Rumbaugh donated her ownership interests in the bonobos to IPLS. (Ex. G to Interpleader Complaint (Dkt. 1-1).)

---

[9] Lest the court be distracted by ACCI's suggestion that Dr. Savage-Rumbaugh's work with the bonobos was little more than child rearing, we refer the court to pages 556-65 of Professor Tuttle's 2014 treatise, Apes and Human Evolution (Harvard University Press) wherein he recapitulates the scientific rigor with which Dr. Savage-Rumbaugh studied language proficiency in the bonobos as well as chimpanzee, and set forth her findings, moreover, "undeterred by skeptics and critics." (*Id.* at 563.) Dr. Tuttle cites thirty monographs authored or co-authored by Dr. Savage-Rumbaugh in his list of References (*Id.* at 929-31).

In 2008, the Des Moines facility flooded, causing tremendous damage and severely endangering the bonobos. (Tr. at 41:8-42:24.) After the flood, it became clear that the Army Corps of Engineers had never issued a permit to build on the site and would not be providing any new permits for future construction. (*Id*. at 43:14-16; Ex. 91.) This news rendered Townsend's plans to expand the facility obsolete. (Tr. at 42:25-44:3.) Townsend eventually announced that he would be withdrawing his support for IPLS. (*Id*. at 44:4-10.)

When Townsend withdrew his support, IPLS was required to begin its own fundraising efforts. Since that time, IPLS has struggled to garner the financial support necessary to sustain itself.

<u>IPLS Files Federal Interpleader Action to Determine Ownership of the Bonobos – February 2010</u>

In addition to the financial and environmental challenges it was facing, IPLS found itself in a legal battle over the ownership of the bonobos. Defendant Democratic Republic of Congo ("DRC") was claiming complete ownership rights over the bonobo named Matata. (*See* Complaint for Interpleader at ¶ 25 (Dkt. 1).) Defendant Zoological Foundation of Georgia, Inc. ("Zoo Atlanta") was claiming contingent ownership rights to Matata and Maisha. (*See id*. at ¶ 26.) Dr. Savage-Rumbaugh had an ownership interest in Maisha. (*See id*. at ¶ 27.) IPLS understood that Defendant Japan Monkey Centre Institute and Museum of Primatology also had a potential ownership interest to Maisha. (*Id*. ¶ 28.) Additionally, IPLS and Dr. Savage-Rumbaugh had competing ownership claims over five other bonobos: Nyota, Elikya, Kanzi, Panbanisha (Kanzi's half-sister who died suddenly in 2012), and Teco.

On February 5, 2010, IPLS filed an interpleader action in order to resolve the ownership issues related to Maisha and Matata (*Id*.)

BHI is Formed and Its Members are Voted Onto the IPLS Board – 2011-12

In September 2011, while the interpleader action was pending, Dr. Savage-Rumbaugh helped to form a new organization comprised of scientists and academics – BHI – in order to provide further support for the bonobos. (Tr. at 55:14-25.) In February 2012, on advice of IPLS's and BHI's corporate counsel, Lyle Simpson, IPLS voted all of the members of the BHI board onto the IPLS board, thus forming a joint IPLS-BHI board which, practically speaking, acted as a singular unit referred to as "Bonobo Hope Great Ape Trust." (*Id*. at 230:14-231:2.)

Simpson's Plan of Action and December 2012 Resolutions Give BHI Control Over the Bonobos and Over the Science in Which They are Involved

In December 2012, Simpson determined that having a joint IPLS-BHI board was not an effective way of operating. (*Id*. at 233:16-234:23.) On December 4, 2012, Simpson circulated to the joint IPLS-BHI board a "Plan of Action," in which he recommended that the boards of IPLS and BHI separate and that each board focus on its strengths. (*See* Ex. 23.) The IPLS board, which was composed of local businessmen and lay-leaders, was to focus on the administration of the facility and on fundraising. (Ex. 23 at 2.) The BHI board, which was composed of scientists and academics, would be solely responsible for directing and developing the science as well as managing and protecting the bonobo colony. (*See* Ex. 23; Tr. at 234:24-235:3.) "The concept," Simpson explained, "is for the bonobos to be under the exclusive control of the Bonobo Hope board. This includes their daily care, where they are to be located, and the direction of the science." (Ex. 23 at 2.) Simpson proposed this arrangement because he recognized that "it is the best use of the academic leadership [*i.e.*, BHI] for them to focus on the science and not have to manage the daily activity." (*Id.* at 1.) Conversely, according to Simpson, it would be improper for the members of the IPLS

board to be concerned with BHI's scientific program and related efforts, as the IPLS board "would have neither the talent nor the ability to deal with those issues." (*Id.* at 4.) Notably, Dr. Savage-Rumbaugh was to remain on both boards. (*Id.* at 2.)

On December 12, 2012, the joint IPLS-BHI board unanimously adopted a series of resolutions based on Simpson's Plan of Action. (*See Id.* at 7-9.) Those resolutions specified, among other things, that: (i) BHI was to "oversee and to develop the science program of [IPLS] and be solely responsible for the protection of the bonobo colony"; and (ii) IPLS was to "own, manage and develop the [IPLS] site." (*Id.* at 8.)

The Parties Enter into the Settlement Agreements – January 2013

In January 2013, after receiving Simpson's Plan of Action and adopting it through the December 2012 resolutions, the parties to the interpleader action entered into the Settlement Agreements. (*See* Ex. 1; Ex. 2.) The Main Agreement, which determined rights to Maisha and Matata, was entered into between IPLS, Dr. Savage-Rumbaugh, DRC, and Zoo Atlanta. (*See* Ex. 1.) The Side Agreement, which determined rights to the Bonobo 4, was entered into between IPLS, Dr. Savage-Rumbaugh, and BHI.[10] (*See* Ex. 2.) Under the Main Agreement, DRC was the owner of Matata and IPLS was the owner of Maisha. (Ex. 1 at ¶¶ 1 & 3.) Under the Side Agreement, BHI and IPLS "jointly are the owners" of the Bonobo 4.[11] (Ex. 2 at ¶ 1.)

In addition to determining the ownership of the bonobos, the Settlement Agreements provided Dr. Savage-Rumbaugh and BHI with certain rights to ensure that Dr. Savage-Rumbaugh's research trajectory would be continued and to otherwise ensure the protection

[10] As discussed in Dr. Savage-Rumbaugh's and BHI's Joint Memorandum Addressing Jurisdiction And Other Issues (Dkt. 102), the Main Agreement and Side Agreement cross-referenced each other, and the signing of the Side Agreement was a condition precedent to Dr. Savage-Rumbaugh signing the Main Agreement.

[11] Until her sudden death in November 2012, Panbanisha made this group the "Bonobo 5."

and well-being of the bonobos. First, the Settlement Agreements expressly require that IPLS continue Dr. Savage-Rumbaugh's research trajectory when they state that Maisha, Matata, and the Bonobo 4:

> shall continue to reside at [IPLS] for at least so long as [the bonobos] continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimi[c]s, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices)... (Ex. 1 at ¶¶ 2, 4; Ex. 2 at ¶ 2.)

Dr. Savage-Rumbaugh was one of the principal authors of this provision. (Tr. at 60:4-7.) The purpose of including this provision in the Settlement Agreements was to ensure that Dr. Savage-Rumbaugh's research trajectory would continue for generations. (*Id.* at 62:16-19.)

Second, the Settlement Agreements provide that if IPLS "cease[s] to exist," then BHI and Dr. Savage-Rumbaugh together have the right to determine the relocation of Maisha and the Bonobo 4. (Ex. 1 at ¶ 6; Ex. 2 at ¶ 4.)

Third, the Settlement Agreements require that the parties "use [their] best efforts to provide complete and competent care" of the bonobos and "take all reasonable precautions to ensure their complete safety." (Ex. 1 at ¶ 5; Ex. 2 at ¶ 3.)

## The IPLS and BHI Boards Separate, and BHI Retains Control over the Bonobos and over the Research

On April 25, 2013, BHI Chairperson Carmen Mate circulated a series of resolutions, authored by Simpson, to officially separate the IPLS and BHI boards from each other, consistent with the strategy laid out in Simpson's Plan of Action. (*See* Ex. 26; Tr. at 239:15-240:1.) According to Simpson, once the boards were separated, the members of the BHI board would "collectively retain the science and research oversight." (Ex. 26 at 1.) As

outlined in the Plan of Action, Dr. Savage-Rumbaugh remained on both the IPLS and BHI boards. (*Id*. at 2.)

<u>Dr. Savage-Rumbaugh Nominates a Successor</u>

After Townsend pulled his funding, Dr. Savage-Rumbaugh assumed a considerable amount of responsibility over the day-to-day operations of the Des Moines facility. (Tr. at 44:14-45:1, 244:24-245:6.) Because Dr. Savage-Rumbaugh was required to devote time to administering the facility, she had less time to devote to her research. (*Id.* at 245:2-6.) In May of 2013, Dr. Savage-Rumbaugh suffered a concussion while working at the facility. (*Id*. at 51:4.) As a result, she had to step away for a period of time. (*Id.* at 107:1-5.) During her absence, Dr. Savage-Rumbaugh remained in close contact with the people who were working at the facility. (*Id.* at 105:24-106:1.)

During this period, Simpson and others began discussing ways to provide Dr. Savage-Rumbaugh with some assistance. (*Id.* at 246:10-13.) Following a conversation with George Caudill, Chairman of the IPLS board, Dr. Savage-Rumbaugh traveled to New Jersey to discuss with her husband, Dr. Duane Rumbaugh, the possibility of choosing a successor to carry-on her research. (*Id.* at 106:1-8.)

Simpson came forward with a plan whereby Dr. Savage-Rumbaugh would be elevated to the position of Director Emeritus of Science, and BHI would find someone to assume the title of Director of Science. (*Id.* at 245:7-10.) On May 22, 2013, in accordance with Simpson's plan, the IPLS board passed a resolution electing Dr. Savage-Rumbaugh Director Emeritus of Science of IPLS "<u>with unfettered permanent access to the bonobo colony.</u>" (Ex. 27 at 1.) (emphasis added) On July 1, 2013, Simpson sent an email to the BHI board ensuring them that he did not intend for Dr. Savage-Rumbaugh to "simply step away." (*See* Ex. 30 at 1.) Instead, he envisioned a gradual transition of responsibilities

from Dr. Savage-Rumbaugh to her scientific successor. (*Id.* at 2.) Simpson sent a similar email to the members of the IPLS board on September 24, 2013, in which he suggested "a period of overlap, perhaps many years." (Ex. 36 at 1.)

During this same period, on August 30, 2013, Caudill emailed Dr. Savage-Rumbaugh in New Jersey to let her know that she was welcome to return to Des Moines and continue her research at any time. (*See* Ex. 35 at 1-2.) Caudill assured Dr. Savage-Rumbaugh that she "can do all of this with complete confidence that [she] will always be welcome to rejoin the bonobos and to continue [her] research as [she] see[s] fit." (*Id.* at 2.)

Although Dr. Savage-Rumbaugh intended to return to her research at the IPLS facility, she recognized the propriety of appointing a successor. (Tr. at 68:12-14.) She reached out to one of her former students, Dr. Jared Taglialatela, and asked Dr. Taglialatela to succeed her in her research. (*Id.* at 71:16-17.) Dr. Savage-Rumbaugh chose Dr. Taglialatela because she believed that he supported her research trajectory and would seek to carry it forward. (*Id.* at 71:18-72:2.) She also believed, based on assurances from Simpson, Caudill, and Taglialatela, among others, that she would continue to play a role in the research and continue to have access to the bonobos. (*Id.* at 72:11-17.) After a series of emails and visits to the IPLS facility, Dr. Taglialatela accepted the offer. (*See id.* at 141:1-9, 265:6-9.) In October 2013, Dr. Savage-Rumbaugh recommended to the IPLS and BHI boards that Dr. Taglialatela be offered the position of Director of Research. (*Id.* at 72:3-5.)

**Dr. Savage-Rumbaugh Is Improperly Dismissed from the IPLS Board and Is Banned from the IPLS Facility**

In or about November 2013, Dr. Savage-Rumbaugh learned that the IPLS board had purportedly dismissed her at some earlier point in 2013 for alleged nonparticipation. Two sets of IPLS board meetings minutes from December 18, 2013 provide conflicting accounts

of the circumstances under which this purported dismissal took place. (*See* Ex. 54; Ex. 55.) Aside from the fact that IPLS may have been legally inactive at the time (discussed below), if in fact the IPLS board took such action, they did so without providing necessary notice to Dr. Savage-Rumbaugh. (*See* Tr. at 75:25-76:10.)

Also in November 2013, when Dr. Savage-Rumbaugh returned to Des Moines from New Jersey, Caudill and Simpson, acting on behalf of IPLS, banned Dr. Savage-Rumbaugh from the facility. Caudill took away her key to the facility and, since that time, has barred Dr. Rumbaugh from having any access to, or observation or interaction with, any of the bonobos, including those co-owned by BHI, of which she is an officer and director. (*See* Ex. 42.)[12] That same month, both BHI and IPLS, as joint owners, voted to approve Dr. Taglialatela as Director of Research and Dr. William Hopkins as Director of Science.[13] (Tr. at 265:13-16.) No one on the BHI board knew that Dr. Savage-Rumbaugh had been purportedly dismissed from the IPLS board or banned from the facility. (*See id.* at 191:14-192:16, 387:11-389:6.) Since that time, IPLS (and its legal successor, ACCI) has refused to grant Dr. Savage-Rumbaugh or any other member of BHI regular unimpeded access to the Bonobo 4 or pertinent research protocols, control over their care, control over the science in which they are involved, or other rights to which BHI are entitled under the Side Agreement as joint owners.

---

[12] Caudill also issued, on or about November 20, 2013, a lengthy memorandum to "staff and volunteers at IPLS" in which he demeaned and defamed Dr. Savage-Rumbaugh, stating that "Sue will no longer be affiliated with IPLS … and will no longer be involved in or have any input into the operations of IPLS. (Ex. 48 at 3.) Caudill obviously did this to satisfy Yerkes.

[13] As a condition of his appointment, Dr. Taglialatela on his own enlisted Dr. Hopkins as Director of Science.

In August 2013, both IPLS and BHI were administratively dissolved by the Iowa Secretary of State after failing to file biennial statements.  (*Id*. at 261:7-9; Ex. 34.)  Both organizations sought reinstatement.  (*Id*. at 261:10-23; 291:16-19.)  BHI's application was granted.  (*Id*. at 261:22-23.)  IPLS's application was denied due to a $60,000 tax lien resulting from unpaid employment taxes.[14]  (*Id*. at 261:23-262:16.)  IPLS has not paid off the lien and has not been reinstated.  (*Id*. at 291:20-23.)  Additionally, IPLS has made no efforts to pay off the lien, nor does it have plans to do so in the future.  (*Id*. at 291:24-292:23.)

## Simpson Forms ACCI and Transfers All of IPLS's Assets to ACCI Without Informing BHI

In December of 2013, Simpson and certain members of the IPLS board initiated a scheme to side-step the tax lien and deprive BHI of its rights as joint owners of the Bonobo 4.  On Dec. 18, 2013, IPLS formed a new corporation called the Ape Cognition and Communication Institute – ACCI.  (*Id*. at 262:24-263:4; Ex. 57.)  IPLS then executed a Bill of Sale transferring to ACCI, for the value of $1.00, its interests in the bonobos, as well as "all assets, inventory, equipment and property currently owned by Iowa Primate Learning Sanctuary which is now located on the premises." (Ex. 56 at 1.)

Later that day, Simpson sent an email to Bill Zifchak, counsel for Dr. Savage-Rumbaugh and BHI, revealing for the first time that IPLS had been administratively dissolved and could not be reinstated due to what was, by that point, a $75,000 tax lien.  (*See* Ex. 59.)  Simpson explained his plan to form a new corporation and asked Zifchak whether IPLS would need this Court's approval to go forward with it.  (*Id*. at 1.)  He also

---

[14] That amount had risen to $75,000 by December 2013 (*see* Ex. 59 at 1) and currently is almost $99,000.

asked Zifchak if he would be willing to review the transfer documents in order to make sure that "the rights of everyone remain exactly as they are today." (*Id.*) Simpson did not reveal that ACCI had already been formed or that IPLS had already transferred all of its assets to ACCI. (*See* Tr. at 278:21-279:8.) Zifchak responded shortly thereafter explaining that he would get back to Simpson about court approval and confirming that he would be willing to review the transfer documents. (*See* Ex. 60 at 1.) Simpson never responded. Zifchak followed up with two letters to Simpson on February 10, 2014. (*See* Ex. 65; Ex. 66.) Once again, Simpson did not respond.

On March 14, 2014, Dr. Taglialatela sent an email to the members of the ACCI and BHI boards in order to provide "an update regarding the Iowa Bonobo family." (*See* Ex. 105.) This was the first time that Dr. Taglialatela had communicated with many of the members of BHI since ACCI had been formed four months previously. (*See* Tr. at 322:16-25, 556:18-557:1.) In the email, Dr. Taglialatela informed the members of the BHI board about the formation of ACCI. (*See* Ex. 105 at 1.) He also explained that, "ACCI basically assumes all of the responsibilities of IPLS. Moving forward, <u>IPLS will no longer exist</u>." (*Id.*) (emphasis added)

Since the time Dr. Savage-Rumbaugh and BHI discovered this scheme, ACCI has acknowledged that it is IPLS's legal successor and that it is bound by the Settlement Agreements (a point on which it initially demurred but then conceded). It also has acknowledged that, per the Side Agreement, BHI is the joint owner of the Bonobo 4. Even so, ACCI continues to prevent BHI board members from having access to the bonobos, at least an equal say in their care, activities, and use; and control over the research that is BHI's right. ACCI also continues to bar Dr. Savage-Rumbaugh from having any access to the bonobos.

<u>BHI Has Been Working With Ryan Sheldon to Build a New Facility to House the Bonobos</u>

Ryan Sheldon is the founder and CEO of National Control Devices, LLC, an electronics design and manufacturing firm. (Tr. at 352:12-15.) The company is highly profitable and very stable (*Id*. at 353:17-354:14.)

Mr. Sheldon worked with Dr. Savage-Rumbaugh at the Language Resource Center at Georgia State University for over seven years, from July 1992 to September 1999. (*Id*. at 355:12-17, 357:13-17.) The two have maintained a very close relationship ever since (*id*. at 357:18-358:2), and Mr. Sheldon holds Dr. Savage-Rumbaugh in extremely high regard, viewing her as an inspiration and a role model. (*Id*. at 368:2-6.)

Mr. Sheldon is currently in the process of building a new, state-of-the-art facility to which the bonobos can be relocated. The facility is located on a 200-acre tract that Mr. Sheldon owns in Osceola, Missouri. (*Id*. at 358:13-18.) It is modeled after the facility at the Language Research Center, where Mr. Sheldon had worked with Dr. Savage-Rumbaugh. (*Id*. at 358:5-12.) Specifically, Mr. Sheldon's facility will consist of a central building with five cages, a utility room and an infirmary, with tunnel access to the infirmary and three of the cages. (*Id*. at 359:21-360:3.) There will also be an outdoor play yard. (*Id*. at 365:21-22.) Importantly, in light of the problems that the current facility in Des Moines has encountered with flooding, Mr. Sheldon's facility will have a storm shelter that can be accessed by tunnel, and which can double as an infirmary. (*Id*. at 361:15-17.) In addition, the utilities are designed to permit the facility to continue operating in the event of a power loss. (*Id*. at 362:5-363:2.) The facility will also have a high-tech security system, owing to the connections that Mr. Sheldon and his company have in the security industry. (*Id*. at 364:25-365:18.)

Mr. Sheldon's facility will meet all of the USDA requirements (*id*. at 381:24-382:3) and will be OSHA-certified. (*Id*. at 366:12-15.) In fact, the facility has already been inspected

and will have a final USDA inspection once it is completed. (*Id*. at 366:16-20.) Going forward, the facility will receive yearly inspections to ensure that it remains OSHA compliant. (*Id*. at 369:1-3.)

Mr. Sheldon has consulted with a world-renowned energy management specialist, Dr. Amory Lovins, in order to make sure that the facility is as low-cost and self-sustaining as possible. (*Id*. at 360:18-25.) This will allow the majority of the funds that are brought in to go to things that the bonobos need for enrichment. (*Id*. at 364:22-24.)

Currently, the buildings that make up the facility are scheduled to be finished in August of this year. (*Id*. at 365:20-21.) The outdoor play yards will be finished in September or October, with plans to expand them in 2016 in order to provide the bonobos more free space. (*Id*. at 365:21-266:1.) In fact, Mr. Sheldon intends to make constant improvements to the facility in the coming years. (*Id*. at 367:4-10.)

Mr. Sheldon considers this facility to be a lifetime commitment on the part of himself and his company. (*Id*. at 368:15-16.) In terms of the financial commitment, in addition to paying the cost of building the actual facility, Mr. Sheldon has committed his company, National Control Devices, LLC, to a $104,000 annual contribution. (*Id*. at 369:12-13.) He has also arranged for a five-year bank guarantee of $520,000, which will provide five years of funding in the event that anything happens to either Mr. Sheldon or his company. (*Id*. at 369:21-370:10; Ex. 94.) Mr. Sheldon's company will also cover the cost of building and site maintenance as well as the cost of transporting the bonobos to the facility. (*Id*. at 368:18-20.) Finally, Mr. Sheldon has pledged to pay ACCI $2,000 per week to continue caring for the bonobos until the facility is finished and both this Court and the USDA have approved the plan to relocate them. (*Id*. at 369:13-20.)

As far as the services that are necessary to operate the facility, Mr. Sheldon's employees will handle all of the administrative duties for the new facility as part of their everyday responsibilities to National Control Devices, LLC. (*Id*. at 374:25-375:13, 376:24-377:3.) The company will also provide employee health screenings, tuberculosis testing and all necessary vaccinations. (*Id*. at 369:4-6.) Accounting and tax services will be provided by a large accounting firm in Springfield, Missouri, that currently works with Mr. Sheldon's company. (*Id*. at 368:21-25.)

The ultimate goal of building this facility is to provide a safe, open place for the bonobos, where they can be reunited with Dr. Savage-Rumbaugh, and where Dr. Savage-Rumbaugh's research can return to its original, intended trajectory. (*Id*. at 366:22-367:3) Mr. Sheldon has received letters of support from Dr. Amory Lovins and Dr. Jane Goodall. (*Id*. at 372:16-17.)

## ARGUMENT

## I.  IPLS AND ACCI HAVE VIOLATED, AND CONTINUE TO VIOLATE, THE SETTLEMENT AGREEMENTS

### A.  Applicable Principles of Contract Interpretation

IPLS and ACCI have violated both the letter and the spirit of the Settlement Agreements. According to Iowa law, when interpreting a contract, the intent of the party controls. *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997) ("We recognize in the construction of written contracts, the cardinal principle is that the intent of the parties must control").

Each agreement states that "the language of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties." (Ex. 1 at ¶ 15(a); Ex. 2 at ¶ 11(b).)

Iowa courts recognize that even unambiguous language in a contract was developed in a context, and courts must consider that context when interpreting the contract. As the Iowa Supreme Court has stated:

> Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract 'can almost never be plain except in a context.' Accordingly, any determination of meaning or ambiguity should only be made **in the light of relevant evidence** of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.

*Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) (internal citations and punctuation omitted; emphasis added); *see also Fausel v. JRJ Enterprises, Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) ("[T]he rule that words and other conduct are interpreted in the light of all the circumstances is not limited to cases when ambiguity in the agreement exists.").

Courts may also rely on extrinsic evidence to interpret the ambiguous language of a contract. *See Pillsbury*, 752 N.W.2d at 439 ("[W]here the language [of a contract] is ambiguous, extrinsic evidence may be used to aid in the interpretation of the contract. In doing so, the court looks to the circumstances surrounding the making of the contract and to the parties' own subsequent interpretation of the agreement." (internal citations omitted)).

Here, both the language of the Settlement Agreements and the circumstances show that IPLS and ACCI have violated the central terms of the Settlement Agreements.

B.   IPLS Has "Ceased To Exist," For Purposes Of The Settlement Agreements, Thus Conferring Upon BHI And Dr. Savage-Rumbaugh Sole Discretion To Determine The Placement Of The Bonobos.

According to both the Main Agreement and the Side Agreement, if IPLS should "cease to exist," BHI and Dr. Savage-Rumbaugh, acting in unison, shall have sole discretion to relocate Maisha (under the Main Agreement) and the Bonobo 4 (under the Side Agreement).[15]

Under Iowa law, "[a] corporation that is administratively dissolved continues its corporate existence but shall not carry on any activities except those necessary to wind up and liquidate its affairs . . . and notify its claimants."  Iowa Code § 504.1422(3).  A corporation that thereupon transfers all of its assets to another corporation "cease[s] to exist".  *See Smith v. Vill. Enters.*, 208 N.W.2d 35 (Iowa 1973) (attaching an equitable lien to assets transferred from one corporation to another because, as a result of the sale of all of its assets to the second corporation, the first corporation had "practically cease[d] to exist").

On August 9, 2013, both IPLS and BHI were administratively dissolved after failing to file biennial statements with the Iowa Secretary of State.  (Tr. at 261:7-9.)  Both corporations later applied for reinstatement.  (*Id.* at 261:10-23, 291:16-19.)  BHI's application for reinstatement was granted, effective <u>nunc</u> <u>pro</u> <u>tunc</u> as of the August 9, 2013, date of dissolution. (*Id.* at 261:22-23.)  IPLS's petition for reinstatement, however, was denied owing to a $60,000 tax lien – currently $99,000 – resulting from unpaid employment taxes.[16]  (*Id.* at 261:23-262:16.)

---

[15] *See* Ex. 1, ¶6 ("Should the Trust cease to exist . . . Bonobo Hope in unison with Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such circumstances"); Ex. 2, ¶4 ("Should the Trust cease to exist . . . Savage-Rumbaugh or her legal representative and Bonobo Hope acting in unison shall have sole discretion regarding placement of the Bonobo 4 under such circumstances").

[16] The fact that BHI was reinstated, and that the reinstatement related back to the date of dissolution, undermines any contention that Dr. Savage-Rumbaugh caused IPLS to cease to exist, and therefore, should not benefit from the provision in the Settlement Agreements that grants her and BHI relocation rights in the event that IPLS ceases to exist.  (In any case no such estoppel should be worked against BHI.)  Even assuming that Dr. Savage-Rumbaugh

As Lyle Simpson testified, at the time that it was administratively dissolved, IPLS did not have enough money to pay its bills, much less the tax lien that was preventing it from being reinstated. (*Id*. at 262:16-19. *See also* Ex. 59 at 1.) According to Dr. Gilmore, Simpson discussed with the IPLS board a variety of plans for dealing with the quandary, including filing for bankruptcy. (Tr. at 419:24-420:13.) Ultimately, Simpson decided to create a new corporation that would assume all of IPLS's assets but none of its liabilities. (*See* Ex. 59 at 1.) On December 18, 2013, a new entity, ACCI, was created with separate Articles of Incorporation and a new Board, and IPLS executed a Bill of Sale transferring to ACCI its interests in the bonobos, as well as "all assets, inventory, equipment and property currently owned by the Iowa Primate Learning Sanctuary which is now located on the premises," for the value of $1.00. (Ex. 56 at 1.) Under Iowa law, when IPLS completed this transaction, it ceased to exist.

Dr. Taglialatela openly acknowledged that IPLS "no longer exist[s]," having transferred all of its assets to ACCI. On March 14, 2014, Dr. Taglialatela sent an email to the members of the BHI board and the newly-created ACCI board in order to announce the formation of ACCI and describe its vision for the future. (*See* Ex. 105.) Dr. Taglialatela did not provide any details about the circumstances surrounding the formation of ACCI, explaining only that it was necessary to form a new entity and that "ACCI basically assumes all of the responsibilities of IPLS." (*See id*. at 1) He then stated without qualification that "[m]oving forward, IPLS will no longer exist." (*See id*.)

---

intentionally failed to file IPLS's biennial report <u>in order to cause</u> IPLS to be administratively dissolved – which she obviously did not – the fact that IPLS's application for reinstatement was not granted was a result of its preexisting default on payment of unemployment taxes. Moreover, as will be explained in greater detail below, IPLS did not cease to exist merely because it had been administratively dissolved, but rather because it later sold all of its assets to ACCI and stopped functioning altogether.

At the hearing, Dr. Taglialatela argued unpersuasively that this statement related to a branding issue.  (Tr. at 555:18-556:8.)  According to Dr. Taglialatela, IPLS had incurred much negative publicity, and ACCI "needed to move past that in order to gain some scientific credibility."  (*Id.* at 556:5-6.)  Rather than suggesting an alternative reading of his statement, Dr. Taglialatela's explanation lends further support to the conclusion that Plaintiffs' intention was to create a completely new entity in ACCI, and that that new entity would take over where IPLS left off.  Indeed, Dr. Taglialatela ultimately conceded that his March 14, 2014 email meant exactly what it says:  that IPLS had ceased to exist.  (*See id.* at 552:16-18.)[17]

Plaintiffs argue that IPLS has not ceased to exist because it could theoretically be reinstated at some unspecified future date.  (*See, e.g.*, *id.* at 17:16-25.)  This argument fails for several reasons.

First, as multiple witnesses testified at the hearing, ACCI has made no effort in the past 18 months to pay off the tax lien – now $99,000 – that precluded IPLS from being reinstated, nor does ACCI have any immediate plans to do so.  (*Id.* at 262:24-263:4.)  Moreover, this would be an exercise in futility, since IPLS sold all of its assets to a newly-formed entity,[18] ACCI, leaving behind a $75,000 liability (now $99,000), and would have no reason or means with which to function.  Equally important, in his March 14, 2014 email, Dr. Taglialatela explicitly acknowledged that IPLS had ceased to exist.  (*See* Ex. 105 at 1.)  It strains credulity to believe that the drafters of the Iowa Nonprofit Corporation Act intended to create a situation in which an

---

[17] Dr. Taglialatela also acknowledged under oath that as of August 2014, he told a reporter that ACCI was going to "start from scratch."  (*Id.* at 579:1-3.)

[18] ACCI has never argued that it is the alter ego of IPLS for purposes of the Settlement Agreements, and thus that IPLS is still in existence, nor can it:  the Bill of Sale was an arm's-length transaction; ACCI did not assume the $99,000 tax lien; there is no successors clause in the Settlement Agreements, and the Settlement Agreements were never amended to add ACCI as a substitute party for IPLS.  Indeed, from December 18, 2013 to March 2014, BHI was entirely unaware of ACCI's existence, and did not learn of the Bill of Sale between IPLS and ACCI until June 2014.

administratively dissolved corporation continues to exist indefinitely in limbo in a situation in which no efforts have been made to seek reinstatement and no plans exist to seek reinstatement in the future. However, Plaintiffs' argument would require the Court to find that an administratively dissolved corporation somehow continues to exist despite the fact that it has sold off all of its assets and then explicitly stated that it had ceased to exist.

Second, Plaintiffs' argument fails because it would produce an inequitable result. As outlined above, ACCI has benefitted greatly from the transaction by which it purportedly acquired all of IPLS's valuable assets, both in terms of acquiring those assets purportedly free from any liabilities that IPLS had incurred and in terms of being in a position to "rebrand" itself as something separate and distinct from IPLS. In announcing the formation of ACCI, Dr. Taglialatela explicitly stated that ACCI was taking over for IPLS, and that IPLS would no longer exist. Now that BHI and Dr. Savage-Rumbaugh are attempting to exercise the placement rights that the Settlement Agreements afford them, Plaintiffs have reversed their position and claim that IPLS never actually ceased to exist because it could, theoretically, be reinstated. In essence, Plaintiffs are trying to have it both ways.

The Iowa Supreme Court addressed a similar situation in *Smith v. Vill. Enters.*, 208 N.W.2d 35 (Iowa 1973). In that case, a group of creditors of an insolvent corporation devised a plan by which they would transfer all of the corporation's assets to a new corporation, which would then carry forth the original corporation's business and, if possible, seek to discharge its debts. *See id*. at 38-39. Two of the original corporation's other creditors, who had not approved of the plan to transfer the corporation's assets, brought suit against the new corporation seeking to recover the money that they were owed by the original corporation. *See id*. at 39. Recognizing the inequity of permitting a corporation to render itself unable to satisfy its obligations to its creditors by transferring its assets to another corporation, the court accepted the

plaintiffs' argument that the original corporation had ceased to exist and imposed an equitable lien on the assets that the original corporation had transferred to the new corporation. *See id*. at 39-40. Applying the same reasoning to the present situation, as a sheer matter of equity, Plaintiffs should not be permitted to simply transfer all of IPLS's assets to ACCI in order to obtain a new corporate shield and escape IPLS's liabilities while simultaneously asserting the purported continued existence of IPLS in order to prevent BHI and Dr. Savage-Rumbaugh from exercising their legal rights under the Settlement Agreements.

Finally, Plaintiffs' argument violates basic principles of contract interpretation. Iowa law does not explicitly provide a deadline by which a nonprofit corporation must seek to be reinstated after it is administratively dissolved. If, as Plaintiffs argue, IPLS does not cease to exist as long as it could theoretically seek reinstatement at some future date, and indeed, has not ceased to exist despite selling off all of its assets and openly acknowledging that it has ceased to exist (Dr. Taglialatela, at once an officer and director of IPLS, made that very declaration in March 2014), then it is unclear that IPLS could ever cease to exist. If IPLS cannot cease to exist, then the provisions in the Settlement Agreements that grant relocation rights to BHI and Dr. Savage-Rumbaugh in the event that IPLS ceases to exist have no legal effect and are utterly illusory. Such a result would be contrary to the basic principle that an agreement should be interpreted so as to give effect to the language of the entire agreement, and not in such a way that would render any term or provision superfluous. *See Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997).

C.  ACCI Has Violated The Settlement Agreements By Failing To Continue Dr. Savage-Rumbaugh's Research Trajectory.

1.  The Settlement Agreements Require That Dr. Savage-Rumbaugh's Research Trajectory Continue.

For over 40 years, Dr. Savage-Rumbaugh immersed herself in the study of language acquisition in non-human primates in order to determine what it means to be "human" and for humans to have "civilization." Importantly, Dr. Savage-Rumbaugh's work involves long-term, multi-generational research that is intended to continue well past the point at which Dr. Savage-Rumbaugh, herself, can no longer participate. (Tr. at 313:4-16.)

To that end, the Settlement Agreements expressly requires that the parties continue Dr. Savage-Rumbaugh's research trajectory. Specifically, the Settlement Agreements state that Maisha, Matata, and the Bonobo 4:

> shall continue to reside at the Trust for at least so long as [they] continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimi[c]s, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices) . . .

(Main Agreement at ¶¶ 2, 4; Side Agreement at ¶ 2.)

Dr. Savage-Rumbaugh was one of the primary authors of this provision. (Tr. at 60:4-7.) As she explained at the hearing, she chose the particular areas of research listed above in order to describe the research that she had been doing with the bonobos and to spell out her vision for future research. (*Id.* at 60:8-62:11.) The purpose of including this provision in the Settlement Agreements, therefore, was not to suggest broad parameters for research that could be conducted with the bonobos, but rather to ensure that the specific research trajectory that Dr. Savage-

Rumbaugh had established over 40 years *would* continue for generations. (*Id.* at 62:12-19, 615:1-3, 619:1-16.)

> 2. When Dr. Savage-Rumbaugh Recommended Dr. Taglialatela To Fill The Role Of Director Of Science, It Was Understood That She Would Continue To Have Access To The Bonobos And That Dr. Taglialatela Would Continue Her Research Trajectory, Consistent With The Settlement Agreements.

After Ted Townsend pulled his funding, Dr. Savage-Rumbaugh assumed increasing levels of responsibility for the day-to-day operations at the facility. (*Id.* at 44:14-45:1; Ex. 30 at 1.) As Simpson testified, she was acting as a "one-man band." (Tr. at 244:24-25.) Because she had to devote time to the administrative functions of the facility, Dr. Savage-Rumbaugh had less time to devote to her research. (*Id.* at 245:2-6.) In response, various people began discussing the idea of finding someone to assist Dr. Savage-Rumbaugh in her work. (*Id*. at 246:10-13.) The issue became more pressing when Dr. Savage-Rumbaugh was injured from a fall in the Lab in May. (*See id*. at 51:4.)

Simpson came forward with a plan that involved designating Dr. Savage-Rumbaugh Director Emeritus of Science and identifying someone else to assume the responsibilities of the Director of Science. (*Id*. at 245:7-10.) Simpson made it clear that his plan was not intended to put Dr. Savage-Rumbaugh out to pasture. (*See* Ex. 30 at 1.) Quite the contrary: in May 2013, the IPLS board passed a resolution officially naming Dr. Savage-Rumbaugh as the Director Emeritus of Scientific Research "with unfettered permanent access to the bonobo colony." (*See* Ex. 27 at 1.)

Thus, for example, in a July 1, 2013 email to the BHI board, Simpson explained that he "was not intending to suggest that Sue stop now and another person take over." (Ex. 30 at 2.) According to Simpson, "[n]either the bonobo[s] nor the trust can afford to have that happen." (*Id.* at 1.) Instead, Simpson envisioned a measured transition, in which the person chosen to

serve as the Director of Science would "be available to fill Sue's shoes when she is not available, and to continue her good work when she is no longer able to serve in that capacity." (*Id*. at 2.) In fact, in a September 24, 2013 email to the IPLS board, Simpson explained that he envisioned "a period of overlap, perhaps many years." (*See* Ex. 36 at 1.) Consistent with the Settlement Agreements, the goal of all of this was "to make sure that [Dr. Savage-Rumbaugh's] life work continues forever." (Ex. 30 at 2.)

Dr. Savage-Rumbaugh accepted the offer to serve as Director Emeritus of Science with the understanding that she would co-direct the facility and continue the research trajectory. (Tr. at 56:10-13, 72:6-10.) In order to do so, she would need to have continued access to the bonobos. (*Id.* at 70:1-3.) Simpson gave her repeated assurances that that would be the case. (*Id*. at 137:4-9.) Dr. Savage-Rumbaugh also had numerous conversations with Caudill, Dr. Gilmore and Dr. Taglialatela, in which it was discussed that she would continue to play a role in the research and continue to have access to the bonobos. (*Id*. at 72:11-7;. 35 at 1-2 (August 30, 2013 email from Caudill to Dr. Savage-Rumbaugh, in which he tells her to stay in New Jersey as long as she needs to, and that she should do so "with complete confidence that [she] will always be welcome to rejoin the bonobos and to continue [her] research as [she] see[s] fit."))

Dr. Savage-Rumbaugh recommended Dr. Taglialatela to fill the role of Director of Science because she believed that he supported her research trajectory and would seek to continue it, in accordance with the Settlement Agreements. (Tr. at 71:18-72:2.) As Dr. Savage-Rumbaugh explained at the hearing, Dr. Taglialatela had worked with her in the past and co-authored scientific articles with her as recently as 2010. (*Id.* at 141:1-9.) As a result, he had a history of direct interaction and contact with the bonobos and understood the research and its trajectory intimately. (*Id*. at 71:21-72:2.) In addition, during the course of their conversations about the Director of Science position, Dr. Taglialatela had told Dr. Savage-Rumbaugh that he

spoke very positively about her research in his class and was excited about continuing his working relationship with her. (*Id.* at 141:1-9.) As Dr. Savage-Rumbaugh explained at the hearing, in the field of professional science, if someone is being asked to continue a colleague's research, and they do not support the work or intend to continue it, they have an obligation to so state. (*Id.* at 141:10-13.) Dr. Taglialatela never gave any indication that he disagreed with Dr. Savage-Rumbaugh's research trajectory or any had any misgivings about carrying it forward. (*Id.* at 141:7-9.)

Similarly, the BHI board had no reason to think that Dr. Taglialatela – or Dr. Hoffman, another Rumbaugh protégé – questioned the research trajectory described in the Settlement Agreements. (*Id.* at 179:6-180:15, 192:21-193:17.) The members of the BHI board knew that Dr. Taglialatela had worked with Dr. Savage-Rumbaugh and co-authored learned articles with her. As Professor Dubreuil explained at the hearing, when a scientist co-authors an article it means that they agree with what is presented in the article. (*Id.* at 179:22-24.) If they question the work, they do not attach their name to it. (*Id.* at 179:24-180:2.) Moreover, if a scientist comes to doubt their previous work, they have an obligation to retract or critique that work. (*Id.* at 192:25-193:3.) Professor Dubreuil testified that he was aware of no such critique of Dr. Savage-Rumbaugh's work by either Dr. Taglialatela or Dr. Hopkins, either in a formal publication or email conversations. (*Id.* at 193:3-17.)

When the BHI board later voted to appoint Dr. Taglialatela and Dr. Hopkins to the positions of Director of Research and Director of Science, respectively, they too were operating under the assumption that Dr. Savage-Rumbaugh would have "unfettered access" to the bonobos. (*Id.* at 191:16-18.) They were not aware that Dr. Savage-Rumbaugh had been banned from the facility in the period of time since she had initially recommended Dr. Taglialatela for the Director of Science through the time of the BHI vote. (*Id.* at 191:14-18, 387:11-389:6.) They

also were not aware of Yerkes' involvement in having Dr. Savage-Rumbaugh banned. (*Id.* at 191:19-23.) Moreover, the members of the BHI board were not aware that Dr. Savage-Rumbaugh had been purportedly removed from the IPLS board or that IPLS had been administratively dissolved and was unable to be reinstated. (*Id*. at 191:24-192:2.) Had they known this information, the members of the BHI board would not have voted to approve Dr. Taglialatela or Dr. Hopkins. (*Id*. at 198:24-199:3, 320:16-18.)[19]

      3.      ACCI Has Refused To Continue, and Has Renounced, Dr. Savage-Rumbaugh's Research Trajectory.

          a.      ACCI Banned Dr. Savage-Rumbaugh From The Facility Under Suspect Pretextual Circumstances.

In November 2013, Dr. Savage-Rumbaugh returned to the facility in Des Moines to care for Teco, who was ill, and whom Sue had raised virtually from his birth in May 2010. (*Id*. at .73:22-74:2.) As Dr. Savage-Rumbaugh testified, the facility is equipped with computer connections and cameras that allow Dr. Taglialatela to monitor the facility at all times, but there are certain things that cannot be done from a distance, such as taking care of a sick bonobo. (*Id*. at 134:1-5.) There are volunteers at the facility who assist in the day-to-day operations, of the facility, but they are not trained to interact with the bonobos. (*Id.* at 134:16-22.) This was not an unannounced visit; Dr. Savage-Rumbaugh told Dr. Gilmore and Heather Pugh Houghs, one of the senior volunteers at the facility, that she would be returning. (*Id.* at 120:22-121:1.) More importantly, Dr. Savage-Rumbaugh's visit was entirely consistent with the repeated assurances that she would have "unfettered access" to the bonobos.

Nevertheless, George Caudill, the chairman of the IPLS board, asked Dr. Savage-Rumbaugh to leave the facility and hand over her access card and keys. (Ex. 42.) Caudill also

---

[19] In fact, the BHI board recently voted to rescind the resolutions appointing Dr. Taglialatela and Dr. Hopkins to the positions of Director of Research and Director of Science, respectively. (*Id.* at 79:13-19.)

stated in a follow-up email: "You are, as of today, prohibited from entering the property. You may not contact anybody directly or indirectly related to IPLS or Bonobo Hope. . . ." (Ex. 103 at 2.) According to Dr. Gilmore, Caudill was concerned about the effect that Dr. Savage-Rumbaugh's return would have on Dr. Taglialatela's and Dr. Hopkins' willingness to accept their new positions as Director of Research and Director of Science, respectively. (Tr. at 419:5-13.) In addition, Caudill felt that it was inappropriate for Dr. Savage-Rumbaugh to keep in regular contact with Drs. Taglialatela and Hopkins (*Id.* at 418:13-16), despite the fact that they were being asked to fill positions in which they would assist Dr. Savage-Rumbaugh in that research and, ultimately, continue the research trajectory for the foreseeable future.

As Simpson testified, he felt Caudill was overreacting when Caudill banned Dr. Savage-Rumbaugh from the facility (*Id.* at 268:13-269:17.) Indeed, Dr. Taglialatela testified that he does not even remember the emails that Dr. Savage-Rumbaugh had sent him that caused Caudill so much concern.[20] (*Id.* at 593:16-595:6.) Simpson, however, agreed to ask Dr. Savage-Rumbaugh to leave the facility temporarily. He told Dr. Savage-Rumbaugh that she needed to "modulate what she was trying to do," but made clear that "[n]obody was trying to kick her out." (*Id.* at 266:17-19.) Since that time, however, Dr. Savage-Rumbaugh's ban to access has become permanent. (*Id.* at 515:21-23.)

Put simply, banning Dr. Savage-Rumbaugh discontinues and corrupts the research trajectory. The goal of Dr. Savage-Rumbaugh's research is to find out what transpires when non-human primates are immersed in the culture of language. (*Id.* at 197:21-24.) Removing Dr. Savage-Rumbaugh from the facility completely dismantles the decade-long experiment and

---

[20] It should also be noted that, at this point in time, IPLS had been administratively dissolved, and was therefore, prohibited from carrying on activities "except those necessary to wind up and liquidate its affairs . . . and notify its claimants." *See* Iowa Code § 504.1422(3).

is detrimental to the bonobos' emotional well-being. (*Id*. at 197:24-198:1.)[21] Moreover, as Professor Wildman testified, Dr. Savage-Rumbaugh's experiment is a long-term, longitudinal study. (*Id*. at 313:4-16, 321:9-17.) Removing Dr. Savage-Rumbaugh from the facility removes one of the principal variables in the experiment. (*Id*. at 321:18-322:13.) Because it discontinues the research trajectory, banning Dr. Savage-Rumbaugh from the facility violates the Settlement Agreements.

Plaintiffs make the specious argument that Dr. Savage-Rumbaugh has been banned from the facility due to safety concerns. (*Id*. at 515:21-516:1.) Putting aside the fact that this was not the explanation that was given by Simpson and Caudill for removing Dr. Savage-Rumbaugh from the facility, as well as the fact that her removal was intended to be temporary, there are numerous flaws in Plaintiffs' argument.

First, the evidence that Dr. Savage-Rumbaugh's presence at the facility creates a safety concern for the bonobos or the other people working at the facility had been rejected by IPLS on two separate occasions.[22] In the Fall of 2011, a group known as the "Bonobo 12" raised concerns about the safety of Dr. Savage-Rumbaugh's work. As Dr. Gilmore explained, these allegations were leveled by people who had not spent much time at the facility or with the bonobo colony, and they were largely based on thirdhand knowledge. (*Id*. at 448:10-20.) For that reason, Dr. Gilmore testified that she believed the allegations were unfair to Dr. Savage-Rumbaugh. (*Id*. at 397:8-14, 448:10-20.) As part of the investigation into the Bonobo 12's allegations, Dr. Gilmore filled out a questionnaire about the welfare of the bonobos. In that

---

[21] Professor Dubreuil argued that removing Dr. Savage-Rumbaugh from the facility is wrong from a professional, as well as a scientific, standpoint. The first stage of the experiment involved rearing the bonobos. That stage was designed and carried out by Dr. Savage-Rumbaugh. To remove and bar her from the experiment now is to essentially steal her work; work which took decades to perform. (*Id*. at 198:2-13.)

[22] No witness on behalf of BHI expressed the slightest concern for the safety of the bonobos while in Sue's presence.

questionnaire, Dr. Gilmore stated that she was satisfied with the bonobos' diet and feeding program, that the injuries to Teco and Kanzi that formed the basis for some of the allegations were not the result of negligence or mistreatment,[23] and that Dr. Savage-Rumbaugh has a good relationship with the bonobos and clearly cares about their wellbeing:

> "I have only ever seen Sue be kind and attentive to the bonobos. She is clearly accepted as a matriarch figure by the group and walks among all of them (not just the language group) with ease. Sue has a unique ability to communicate with the bonobos, a fact that is undisputable and has been observed by countless others . . . I believe [her] ability to walk among the bonobos has been a source of jealousy . . . My observation is that Sue and Liz [Sue's sister] both are very concerned about safety . . . Many of the 'safety incidents' of which Sue is accused occurred when Sue wasn't even in the building."

(Ex. 107. *See also* Tr. at 446:12-448:20.)  Two special panels determined that the Bonobo 12's allegations were completely false.  (*See* Tr. at 96:4-5, 396:13-6.)

Second, it has come to light through the course of these proceedings that the decision to ban Dr. Savage-Rumbaugh from the facility is driven on a desire to obtain chimpanzees from Yerkes National Primate Research Center, and the alleged concern over safety is a pretext.  As Simpson testified, the facility in Des Moines has a vacant building that was originally used for gorillas, but which could be used to house chimpanzees.  (*Id*. at 284:9-13.)  Yerkes is willing to compensate ACCI to take some of its chimpanzees.  (Id at 284:6-9.)  However, Yerkes has sought assurances from ACCI that Dr. Savage-Rumbaugh is no longer associated with the facility (*See* Ex. 38; Ex. 51 at 1), and has explicitly conditioned its willingness to work with ACCI on Dr. Savage-Rumbaugh's non-involvement.  (Tr. at 284:17-22, 657:7-658:13.)

---

[23] Indeed, Dr. Gilmore testified that some of the incidents had occurred while Dr. Savage-Rumbaugh was not even at the lab.  (*Id*. at 448:10-14.)

Yerkes has long been opposed to Dr. Savage-Rumbaugh's research. Dr. Savage-Rumbaugh has shown to a certainty that non-human primates are sentient beings with feelings and emotions; moreover, it has been established that they are extremely close genetically to humans. (*Id*. at 283:10-12.) These discoveries have created serious problems for organizations, like Yerkes, that perform medical research on apes. (*Id*. at 93:18-94:15, 283:10-18.) Yerkes' causing the decision to ban Dr. Savage-Rumbaugh from the facility therefore not only undermines Plaintiffs' claim that her banishment was due solely to concerns about safety, but also casts additional doubt as to ACCI's intentions for continuing Dr. Savage-Rumbaugh's research trajectory now that she has been removed from the facility.

Third, all of the information upon which Plaintiffs rely in support of the argument that Dr. Savage-Rumbaugh's presence at the facility creates safety concerns for the bonobos and the people at the facility was known at the time the Settlement Agreements were executed and the May 2013 resolution granting her unfettered recess were passed. As a result, it informed the parties' understanding of the circumstances surrounding the execution of those legal instruments. If there were genuine concerns about the safety of Dr. Savage-Rumbaugh's research trajectory, they should have been raised at the time. Instead, as described above, the Settlement Agreements require that Dr. Savage-Rumbaugh's research trajectory continue.

b.      By Its Own Admission, ACCI Has Failed To Continue Dr. Savage-Rumbaugh's Research Trajectory In Her Absence And Interposed Protocols As To Animal Care That Render That Research Impossible.

Dr. Taglialatela makes no secret of the fact that he has implemented a sea change in the research being conducted at the facility since assuming his position as Director of Research. Dr. Taglialatela testified that he acknowledges the significance of Dr. Savage-Rumbaugh's past research but does not agree with her methodologies. (*Id*. at 521:3-7.) The two, however, cannot

be so neatly separated. For example, Dr. Taglialatela testified that he would not rear a bonobo with humans "even for part of a day." (*Id.* at 523:4-9.) As explained above, however, Dr. Savage-Rumbaugh's rearing techniques are critical to her research. It is only by establishing a close bond between humans and bonobos that the bonobos will seek to emulate the aspects of human culture that they encounter. By discontinuing Dr. Savage-Rumbaugh's rearing techniques, ACCI has discontinued her research trajectory.

ACCI also has discontinued the culture of language at the Des Moines facility. Although Dr. Tagliatela attempted to establish that the current research regimen is fully consistent with Dr. Savage-Rumbaugh's research trajectory, the examples he put forth in his testimony were unpersuasive: "chasing . . . geese" (*id.* at 498:11-13), "rhythmic entrainment" (*id.* at 525:24-526:3), "feeding patch size" (*id.* at 580:24-25). The witnesses for ACCI gave no indication whatsoever that <u>any</u> scientist – or even research assistant – is engaging in <u>any</u> systematic interaction with the bonobos with English language or on an intellectual plane. They clearly are dumbing-down the bonobos and have turned the Lab into a form of penal colony for bonobos. In August 2014, Professor Dubreuil visited the facility on behalf of the BHI board in order to check up on the bonobos and the status of the research. He saw no paper keyboards, except in one of the enclosures that was not being used, and that particular keyboard was missing a panel. (*Id*. at 173:19-21, 174:7-11.) The computer keyboard was still in the facility, but it was not turned on. (*Id.* at 173:21-22.) During the time that he was at the facility, Professor Dubreuil observed volunteers conducting physical examinations of the bonobos, but they were not using language to facilitate the examination. (*Id*. at 174:12-18.) For some reason, the volunteers were also no longer wearing t-shirts with lexigrams on them, which at one time, all of the volunteers and caretakers had worn in order to engage in conversation with the bonobos when the keyboards were not available. (*Id*. at 173:22-174:6.) Professor Wildman similarly testified that he did not

observe any humans interacting with the bonobos using the keyboards when he visited the facility in April of 2015. (*Id*. at 328:3-5.) As explained above, the constant and systematic immersion of the bonobos in the culture of language was another critical component of Dr. Savage-Rumbaugh's research. According to Professors Dubreuil and Tuttle, that component of the research appears to have been shut down. (*Id*. at 175:15-176:2, 616:16-20.) By discontinuing the culture of language at the facility, ACCI has discontinued Dr. Savage-Rumbaugh's research trajectory.

Finally, ACCI has implemented a protocol that requires anyone who interacts with the bonobos to wear personal protective devices, including facemasks and gloves. (*Id*. at 514:10-11.) As explained above, Dr. Savage-Rumbaugh's research requires the type of direct contact between humans and bonobos that would exist in a family situation. (*Id*. at 78:9-17.) Wearing masks and gloves is, therefore, inconsistent with Dr. Savage-Rumbaugh's research trajectory. (*Id*. at 77:24-78:4.)

Plaintiffs argue that a lack of protective equipment can expose the bonobos to illness, and therefore, the equipment is necessary for the bonobos' safety. (*Id*. at 514:10-19.) As Dr. Savage-Rumbaugh explained at the hearing, however, her research involves the creation of a familial environment. (*Id*. at 102:22-23.) In such a situation, there is enough sharing between members of the family to develop an immunological profile that will prevent the spread of illnesses. (*Id*. at 103:6-10.) Human parents, for example, do not wear masks and gloves in order to keep their own children from getting sick. (*Id*. at 102:22-25.) Problems only arise when members of the family are exposed to people outside the family, such as when Dr. Gilmore brought her daughter to the facility and allowed her to interact with Teco. (*Id*. at 103:14-20, 424:16-425:18.) As Dr. Savage-Rumbaugh explained at the hearing, her research trajectory only involves direct contact between the bonobos and certain individuals, not the general public.

(*Id.* at 104:11-13.) ACCI's protocol that requires all individuals who interact with the bonobos to wear masks and gloves unnecessarily interferes with that trajectory.

Because ACCI has failed to continue Dr. Savage-Rumbaugh's research trajectory, ACCI has violated the Settlement Agreements.

### D. IPLS And ACCI Have Violated BHI's Rights As Joint Owners Of The Bonobos.

#### 1. The Settlement Agreements Establish BHI And IPLS As Joint Owners Of The Bonobos.

Paragraph 1 of Side Agreement states that BHI and IPLS "jointly are owners" of the Bonobo 4. (Ex. 2 at ¶ 1.) This paragraph encapsulates a principal purpose of the Side Agreement, which was to establish shared ownership of the Bonobo 4 by BHI and IPLS. (Tr. at 58:5-6, 65:8-10.) While paragraph 1 does not, itself, describe each party's specific rights as joint owners, those rights of ownership can be read-out from paragraph 5. Paragraph 5 refers to the "claims of ownership" that Dr. Savage-Rumbaugh was relinquishing in the Side Agreement. It defines those rights of ownership as including "all rights to determine the residence, breeding, activities, or use of the Bonobo 4." (Ex. 2 at ¶ 5.) Reading the Side Agreement "as a whole" then, when BHI acquired rights as joint owners of the Bonobo 4, it acquired "all rights to determine the residence, breeding, activities and use" of the Bonobo 4.

#### 2. The Circumstances Surrounding The Execution Of The Agreements Make Clear That BHI's Particular Rights As Joint Owners Included The Right To Direct The Science In Which The Bonobo 4 Were To Continue To Be Involved.

At the time the Side Agreement was executed, BHI and IPLS were in the process of establishing a new corporate structure. The two organizations previously had been merged together to form a single entity with a common board of directors. (Tr. at 230:15-231:2.) Inefficiencies arose, however, due to the fact that the board included both business people (who were located in Iowa) and scientists (who were located throughout the world). (*Id.* at 51:9-21,

233:17-234:3.) Simpson, therefore, as counsel to IPLS and BHI, recommended splitting the board into two separate boards with distinct responsibilities: a business board and a science board. (*Id*. at 234:4-19.)

Under Simpson's plan, IPLS was to be the "business board" and would be composed largely of local business people. (*Id*. at 52:22-53:2, 234:12-16.) Its responsibilities would consist of fundraising and managing the facility. (Ex. 23 at 2.) BHI, on the other hand, would be the "science board." (Tr. at 53:3-11, 234:12-16.) It would be composed primarily of scientists and would be solely responsible for managing and protecting the bonobo colony as well as developing and directing the science. (*Id*. at 234:24-235:1.)

During the discussions about Simpson's plan, Dr. Savage-Rumbaugh and others expressed concern that the "business board" might take over and remove Dr. Savage-Rumbaugh from the bonobos. (*Id*. at 53:18-20.) Simpson reassured them that the business board could never take over, that its sole function would be to raise funds for the facility, that it would never cause any trouble, and that Dr. Savage-Rumbaugh could not be removed from the facility. (*Id*. at 51:18-25, 53:21-54:2.) However, to further alleviate Dr. Savage-Rumbaugh's concerns about IPLS taking over, he proposed to retain her on the IPLS board. (*Id*. at 53:21-54:2.)

Simpson formally laid out his recommendations for the division of responsibility between BHI and IPLS, including Dr. Savage-Rumbaugh's inclusion on the IPLS board, in a "Plan of Action," which was distributed to the combined BHI-IPLS board on December 4, 2012. (*See* Ex. 23.) Shortly thereafter, the board unanimously passed a resolution accepting Simpson's recommendations. (*See id*.; Tr. at 54:10-17, 236:15-22.)

Less than 2 months later, on January 31, 2013, BHI, IPLS and Dr. Savage-Rumbaugh executed the Side Agreement. During the period of time in which the joint BHI-IPLS board was considering Simpson's Plan of Action, Simpson was circulating drafts of the Settlement

Agreements. (Tr. at 185:2-6.) In May 2013, the joint BHI-IPLS board passed another set of resolutions effectuating the split of BHI from IPLS that Simpson had recommended. (*See* Ex. 26; Tr. at 52:3-8, 239:15-240:1.) Clearly, the Side Agreement did not alter what the parties understood to constitute the division of responsibility that had been legislated as between BHI and IPLS. To the contrary – it incorporated that understanding.

In light of the circumstances surrounding the execution of the Side Agreement, BHI's rights as joint owners of the Bonobo 4 include the right to direct the science in which the Bonobo 4 are involved, as outlined in Simpson's Plan of Action, along with otherwise having an equal voice in the "residence, breeding, activities, and use" of the bonobos.

        3.      IPLS And ACCI Have Denied BHI Its Rights As Joint Owners Of The Bonobo 4 Under The Side Agreement.

IPLS and its legal successor, ACCI, have taken numerous actions that violate BHI's rights as joint owners of the Bonobo 4 under the Side Agreement, particularly its right to direct the science with which the Bonobo 4 are involved.

        a.      ACCI Now Exerts Complete Control Over The Bonobo 4 And The Science In Which They Are Involved And In Doing So Has Erected A Wall Of Secrecy Around The Lab.

On March 14, 2014, Dr. Taglialatela sent an email to the members of the ACCI and BHI boards outlining ACCI's new vision for the research to be conducted at the Des Moines facility. (*See* Ex. 105.) In it, he explained that ACCI had formed a new Institutional Animal Care and Use Committee ("IACUC") as well as a scientific advisory panel (*Id.* at 1.) (which is not currently functioning). (Tr. at 582:17-583:22.) As described above, ACCI also has implemented protocols that discontinue Dr. Savage-Rumbaugh's research trajectory, including limiting direct interaction between humans and bonobos and requiring that anyone who has contact with the bonobos wear a mask and gloves. Clearly ACCI presumes that it has complete autonomy over

36

the Bonobo 4 and the science in which they are involved. As a result, ACCI has violated BHI's rights as joint owners under the Side Agreement.

<blockquote>
b. ACCI Has Stonewalled Members Of The BHI Board From Having More Than Token Access To The Bonobos.
</blockquote>

Putting aside the propriety of ACCI's decision to ban Dr. Savage-Rumbaugh from the Des Moines facility, Dr. Savage-Rumbaugh's inability to enter the facility in no way negates BHI's rights under the Settlement Agreements. (*Id*. at 300:17-20.) In fact, Dr. Savage-Rumbaugh's inability to enter the facility makes it all the more important that other members of the BHI board have regular, open access to the facility in order to exercise BHI's right as joint owners to direct the science in which the Bonobo 4 are involved, and otherwise weigh in on their residence, breeding, activities, and use.

Between November 2013 and May 2015, however, members of the BHI board have been permitted to enter the facility just twice. (*Id*. at 558:16-18.) This has not been for lack of trying. For example, Professor Dubreil testified that he communicated several times with Dr. Taglialatela over the past few months in an effort to schedule a visit, but was repeatedly told that the dates that he proposed would not work. (*Id*. at 176:17-177:4.) The two men finally agreed upon May 26th. (*Id*. at 177:4-6.) However, a week before the visit was scheduled to occur, Dr. Taglialatela cancelled the visit. (*Id*. at 177:6-9.)

Dr. Taglialatela testified about potential plans for *future* visits by BHI board members that were to take place after the instant hearing, and offers that he has now extended to BHI board members who have been requesting visits for some time. (*Id*. at 519:19-520:6.) In light of Professor Dubreuil's experience, there are no guarantees that those visits will actually take place. Indeed, Dr. Taglialatela testified that he feels that he must be present at the facility when any

BHI board members visit. (*Id*. at 559:1-7.) Yet, even by his own calculations, he is only present at the facility an average of six calendar days per month. (*Id*. at 460:11-16.)

By preventing BHI board members from having regular, open access to the bonobos, ACCI circumscribes their ability to monitor and direct the science in which the Bonobo 4 are involved. For example, as Professor Dubreuil pointed out on cross-examination, he cannot attest to the fact that the culture of language that is critical to continuing Dr. Savage-Rumbaugh's research trajectory still exists at the facility outside of the four hours that he was at the facility in August of 2014 because he has not been permitted any subsequent visits. (*Id*. at 205:10-16.) Equally important, if the BHI board members do not believe that they will be permitted to have access to the facility, they cannot apply for grants to conduct research with the bonobos. (*Id*. at 210:10-211:3.) Because ACCI has prevented the members of the BHI board from having meaningful access to the Bonobo 4, and has prevented them from exercising their right to direct the science in which the Bonobo 4 are involved, ACCI has violated the Side Agreement.

### c. IPLS Failed To Inform BHI About The Formation Of ACCI.

On December 18, 2013, counsel for IPLS, Lyle Simpson, emailed counsel for Dr. Savage-Rumbaugh, Bill Zifchak, seeking advice about the possible formation of a new non-profit corporation. That non-profit corporation, Simpson suggested, would assume all of IPLS's responsibilities, except for the debt that it owed to the State of Iowa. (Ex. 59 at 1.) Simpson asked Zifchak if he would review the transfer documents he intended to use. (*Id*.) Simpson did not disclose that the organization to which he was referring – ACCI – had already been formed at the time of the email and that IPLS's assets already had been transferred to it. (Tr. at 278:21-279:8.)

Zifchak responded to Simpson the same day asking for the draft transfer documents that Simpson had asked him to review. (*See* Ex. 60.) Simpson never responded. Simpson also never

notified this Court about his intention to form a new entity and to transfer all of IPLS's assets to it – even though he thought the Court's approval necessary. (*See* Tr. at 278:10-17.) Zifchak followed up with letters to Simpson on February 10, 2014 (*See* Ex. 65; Ex. 66), but again, he received no response from Simpson. Zifchak only found out about the existence of ACCI through the diligence of his co-litigation counsel, Todd Langel. (Memorandum at ¶ 16.)

Although it initially claimed otherwise, ACCI now concedes that it is IPLS's legal successor and bound by the terms of the Side Agreement. By failing to disclose the formation of ACCI and the transfer of the assets, including the bonobos, IPLS violated BHI's rights as joint owners of the Bonobo 4 under the Side Agreement.

> d. ACCI Has Made Only A Token Release Of Information To BHI About The Bonobos And The Science In Which They Are Involved.

Dr. Taglialatela's March 14, 2014 email to the members of the ACCI and BHI boards was one of the first times that Dr. Taglialatela had communicated officially with most members of the BHI board in the four months after ACCI was formed. (Tr. at 322:16-25, 556:18-557:1.) The email itself provided only vague notions about the type of research that was being done at the facility. (*Id*. at 194:7-8.) It provided no descriptions of the research that the members of the BHI board could assess in any way. (*Id*. at 194:9.) It also provided no information about the health of the bonobos, which was a glaring omission given the fact that Matata passed away under questionable circumstances subsequent to this single communication from Dr. Taglialatela. (*Id*. at 194:9-13.) The BHI board members were, of course, glad to have finally received *something* from ACCI, but they needed more in order to carry out their responsibility directing the science, and they conveyed that fact to Dr. Taglialatela. (*Id*. at 194:22-195:10.)

A few months prior to the hearing, ACCI provided BHI with a one-page list of ACCI's active research protocols. (*See* Ex. 1006.) Despite the BHI board members' requests, this was

the first document that ACCI has provided to the BHI board about the research being conducted at the facility since Dr. Taglialatela's March 14, 2014 email.[24]  (Tr. at 195:20-23, 324:5-12.)  Unfortunately, this one-page list suffers from the same deficiencies as that email.  First, it is simply a list of protocols.  As Professor Wildman explained at the hearing, "a protocol in the field is simply permission to do particular research.  It doesn't mean the research is actually being done.  It doesn't mean there's funding for the research." (*Id*. at 324:17-19.)  Second, the titles of the protocols are so vague that it is impossible to make any judgment about what the research protocols entail.  (*Id*. at 195:24-196:13, 324:20-25 (explaining that the titles are "sufficiently vague" that he has "no idea whether they involve one bonobo at the facility, all of the bonobos, whether they involve human interaction with the bonobos, what experiments are proposed to be done.  None of that is in the title.")  By comparison, grant applications are approximately one hundred pages long.  (*Id*. at 196:13-22.)

Dr. Taglialatela testified at the hearing that there is additional material related to these protocols in binders located at the Des Moines facility, and suggested that he made that information available to Professor Wildman when he visited.  (*Id*. at 506:8-22, 598:7-12.)  Dr. Taglialatela also testified, however, that he has come to believe that the information contained in those binders is confidential and should not be shared with anyone outside of the IACUC.  (*Id*. at 518:4-8.)  As a result, he decided against emailing the information to Professor Wildman, as the two had agreed.  (*Id*. at 518:8-11.)  In fact, no members of the BHI board are included on the ACCI IACUC (*id*. at 589:4-7), so based on Dr. Taglialatela's understanding of the rules pertaining to the IACUC, no BHI board members will be permitted to review the information pertaining to ACCI's list of active protocols.

---

[24] Dr. Taglialatela justified his failure to respond timely to BHI requests for access and information with the explanation that he was "too busy."  (Tr. at 574:6-14, 576:16-20.)

At the hearing, ACCI also presented an updated list of active research protocols. The three new protocols listed on the document are dated March of this year. ACCI has provided no explanation for why the updated list of protocols was not provided to BHI at that time; one can reasonably assume that disclosure was delayed to avoid providing to BHI the names of potential hearing witnesses.

Because ACCI has failed to provide BHI with anything except token information about the Bonobo 4 and the science in which they are involved, ACCI has violated the Side Agreement.[25]

e.      IPLS And ACCI Have Banned Dr. Savage-Rumbaugh, President Of BHI, From The Des Moines Facility.

As explained above, the decision by both IPLS and ACCI to ban Dr. Savage-Rumbaugh from the facility has discontinued her research trajectory. Despite the fact that the Side Agreement affords BHI the right to direct the science in which the Bonobo 4 are involved, or at the very least, affords BHI an equal voice in the "use" of the Bonobo 4, neither IPLS nor ACCI sought input from the members of the BHI board about this decision. (*Id*. at 320:19-21 (Professor Wildman first learned about the banishment in late-2013, early-2014); *Id*. at 192:3-5 (Professor Dubreuil first learned about the banishment in December of 2013 and generally 2014).) In fact, Professor Wildman testified that, once he found out that Dr. Savage-Rumbaugh had been banned, he informed Dr. Taglialatela that he did not support the decision and did not believe that anyone outside of BHI had the authority to impose such a ban. (*Id*. at 321:4-8.)

---

[25] Although the Court had not directed document discovery in connection with the May hearing, counsel for ACCI and BHI agreed to an informal exchange of documents pertinent to depositions. Whereas BHI produced many hundreds of pages of documents to ACCI in accordance with this agreement, ACCI produced a grand total of 80 pages, half of which were payroll records, the single sheet listing ambiguous research protocols, no minutes of ACCI board meetings after July 2014, and no correspondence with Yerkes, which is plainly relevant. ACCI's refusal to disclose most relevant documents is in bad faith and emblematic of its imperious attitude toward BHI and Dr. Savage-Rumbaugh.

Nevertheless, Dr. Savage-Rumbaugh's banishment has persisted. (*Id*. at 515:21-23.) Because IPLS and ACCI have banished Dr. Savage-Rumbaugh from the facility without input from BHI, IPLS and ACCI have violated BHI's rights under the Side Agreement as joint owners of the Bonobo 4.

In fact, not only was BHI excluded from the decision to ban Dr. Savage-Rumbaugh, BHI is vehemently opposed to the banishment. Professor Wildman testified that he was "horrified" when he found out that Dr. Savage-Rumbaugh had been banned. (*Id*. at 320:22-23.) Professor Dubreuil testified that the banishment is "wrong from almost all of the angles I can envision." (*Id*. at 197:2-5.) The decision by IPLS and ACCI to ban Dr. Savage-Rumbaugh from the Des Moines facility, therefore, not only circumvents BHI's right to direct the science, it contravenes the decisions that BHI has made in exercising that right. Accordingly, IPLS and ACCI have violated BHI's rights as joint owners of the Bonobo 4 under the Side Agreement.

<blockquote>f.      IPLS Purported To Dismiss Dr. Savage-Rumbaugh From The IPLS Board.</blockquote>

On December 18, 2013, IPLS passed a resolution purportedly dismissing Dr. Savage-Rumbaugh from the IPLS board. (*See* Ex. 55.) There is considerable uncertainty regarding the circumstances of her dismissal or the legal effect thereof. For example, two sets of minutes from that day present conflicting stories. One set of minutes state that Dr. Savage-Rumbaugh "quit because she failed to attend three meetings of the Board without accepted excuse." (Ex. 55.) Another set of minutes, however, states that "a vote had been taken in July of 2013 to dismiss her from the IPLS board." (Ex. 54.) In addition, despite the reference in the second set of minutes to a vote in July of 2013, there is no record of such a vote having taken place. (*Id*. at 273:7-11.) Indeed, Simpson testified that he advised the IPLS board that, "that's something that they needed to record *if that, in fact, happened*." (*Id*. at 273:12-13 (emphasis added).) Moreover, no notice

of such a vote was provided to Dr. Savage-Rumbaugh.  Finally, because it had been administratively dissolved, IPLS was prohibited from carrying on "any activities except those necessary to wind up and liquidate its affairs . . . and notify its claimants."  Iowa Code § 504.1422(3).

As explained above, Dr. Savage-Rumbaugh was placed on the IPLS board in order to prevent the IPLS board from taking over and disrupting the division of responsibilities between BHI and IPLS outlined in Simpson's Plan of Action.  (*Id*. at 53:21-54:2.)  Removing Dr. Savage-Rumbaugh from the IPLS board, therefore, violates BHI's rights as joint owner of the Bonobo 4 under the Side Agreement.

> g.     IPLS Failed To Inform BHI About Sue Being Banned From The Facility And Removed From The IPLS Board.

In November of 2013, when Caudill and Simpson decided to remove Dr. Savage-Rumbaugh from the Des Moines facility, they instructed her not to say anything to the BHI board.  (*Id*. at 74:3-9; Ex. 103 at 2 ("You may not contact ANYBODY directly or indirectly related to IPLS or Bonobo Hope without first clearing those communications with Lyle and I—and no matter how much you ask others to keep your communications confidential, word will always filter back to us").)  As a result, the BHI board members did not know that Dr. Savage-Rumbaugh had been banned from the facility or dismissed from the IPLS board when they voted to approve Dr. Taglialatela and Dr. Hopkins to their current positions.  (*See id.* at 191:14-192:16, 387:11-389:6.)  By keeping the BHI board members in the dark about such critical events related to the research being conducted at the facility, IPLS prevented BHI from properly exercising its right to direct the science with which the Bonobo 4 are involved.  Indeed, all of the members of the BHI board testified that they would not have voted to approve Dr. Taglialatela or

Dr. Hopkins to their current positions if they had had that information.[26] (*Id.* at 198:24-199:3, 320: 16-18.)  By failing to inform the BHI board about Dr. Savage-Rumbaugh's banishment from the Des Moines facility and her removal from the IPLS board, IPLS has violated BHI's rights under the Side Agreement.

       E.       <u>ACCI Is In Breach Of Its Obligation To Adequately Care For The Bonobos.</u>

Under the Settlement Agreements, IPLS and ACCI are required to "use [their] best efforts to provide complete and competent care" of Maisha and the Bonobo 4 and to "take all reasonable precautions to ensure their complete safety."  (Ex. 1 at ¶ 5; Ex. 2 at ¶ 3.)[27]  By any reasonable interpretation, and taking the settlements as a whole, this includes providing for both the physical and the emotional well-being of the bonobos.

       1.       The Bonobos Are Not Safe At The Current Facility

The Des Moines facility has previously experienced disastrous flood conditions, which severely endangered the bonobos and may have caused the death of bonobo Nathan.  In 2008, for example, the water came in very quickly and rose very high.  (Tr. at 41:14-15.)  The Court may take judicial notice that: on June 13, 2008, the Des Moines River below the Raccoon River at Des Moines reached its record stage level of 35.55 feet above mean level; "Flood Stage" is 24 feet; and that on June 26, 2015, the level at 6 p.m. was 28.68 feet, or almost 5 feet above Flood Stage.[28]  Problems arose with the facility's drainage system, and it took two weeks for the water to fully recede, during which time the there was no electricity, and the bonobos' food had to be brought in by boat.  (Tr. at 41:21-42:2.)  The bonobos were forced to stay high up in the tunnels

---

[26] In fact, BHI has now rescinded the resolution appointing Dr. Taglialatela and Dr. Hopkins to those positions.  (*Id.* at 79:13-19.)

[27] These obligations derive from the Transfer Agreements by which Dr. Savage-Rumbaugh and Georgia State donated the bonobos to IPLS. (*See* Exs. G and H to Interpleader Complaint (Dkt. 1-1).)

[28] *See* Rivergages.mvr.usace.army.mil/WaterControl.

for the entire two-week period in order to avoid the water, which was very cold and very toxic. (*Id.* at 41:14-22.)  According to Professor Tuttle, the facility was built on land that had been previously used by the military.  (*Id*. at 610:21-611:3.)  One of the bonobos, Nathan, who liked to play in the water, and Dr. Savage-Rumbaugh's sister, Liz Pugh, who risked the waters with her in order to take care of the bonobos, later developed cancer.  (*Id.* at 42:4-8.)  Remarkably, no toxicity tests have been performed on the water or soil around the facility.  (*Id*. at 586:12-587:7, 628:12-16.)

The facility has experienced three other floods since 2008 (*id*. at 144:18-20), it exceeded flood stage recently on June 26, 2015, and it is inevitable that it will face more floods in the future.  (*See* Ex. 91.)  In fact, Des Moines is currently experiencing flood conditions.  In order to avoid a repeat of the conditions that were experienced in 2008, significant improvements need to be made to the Des Moines facility.  (*See*, e.g., Tr. at 128:8-18 (explaining that the facility needs a tunnel that would allow the apes to be moved quickly because the water rises very fast).)  However, at a point in time after the 2008 flood, it was discovered that the Army Corps of Engineers had never given permission to build the facility on the land it currently occupies and has prohibited further construction. (*Id*. at 43:13-16; Ex. 91.)  As long as the bonobos remain at the Des Moines facility, therefore, their physical safety will remain at risk from flooding and collateral damage.

2.     The Bonobos' Psychological Well-Being Is Suffering Irreparable Harm In The Custody Of ACCI

As explained above, ACCI's research program involves suspending the culture of language at the Des Moines facility and severely limiting the bonobos' interaction with humans, especially Dr. Savage-Rumbaugh, who has been banned from the facility in 2004, and requiring use of masks and gloves.  As Dr. Tuttle testified he observed only "bonobo communication.  It

wasn't through symbols." (Tr. At 616:19.) "There was no research apparent." (*Id*. at 624:24) This "research" program threatens the bonobos' psychological well-being.[29]

At the hearing, Professor Dubreuil, a Professor of Language at Cornell University, testified that it is "inhumane" to deprive the bonobos of the language that Dr. Savage-Rumbaugh's research has given them. (*Id*. at 167:21-23.) Through the use of the lexigram keyboards, for example, the bonobos not only express what is on their minds but also change how they think and change the world around them. (*Id*. at 167:24-168:6.) According to Professor Dubreuil, depriving the bonobos of their ability to evolve in that way will have a strong impact on them, both intellectually and emotionally. (*Id*. at 168:24-169:17 (drawing on the example of prisons in which it was discovered that depriving the inmates of direct contact with other persons and the use of language often led to mental disabilities or madness).)

Professor Dubreuil also testified that banning Dr. Savage-Rumbaugh from the Des Moines facility is ethically wrong and detrimental to the bonobos' psychological welfare due to the "extremely, extremely powerful" emotional bond that bonobos form with the individuals who raised them. (*Id*. at 197:2-20.) Professor Tuttle explained that Dr. Savage-Rumbaugh is the bonobos' "enrichment," and therefore, banning her from the facility deprives them of their enrichment. (*Id*. at 626:9-627:1.) Professor Wildman stated simply that he was "horrified" when he found out that Dr. Savage-Rumbaugh had been banned from the facility, comparing it to Social Services removing a parent from a family. (*Id*. at 320:22-321:3.)

It is not surprising, therefore, that Professor Dubreuil described what he saw during his August 2014 visit to the Des Moines facility 9 months after the ban on Dr. Savage-Rumbaugh

---

[29] Dr. Taglialatela seemed to boast when he testified that the emotional needs of the bonobos were being attended to by giving them "foraging tasks" (*id*. at 497:24), "chasing … geese … and the unfortunate bunny" (*id*. at 498:12) and having access to a "beautiful outdoor play yard [ ]" (*id*. at 512:22-23).

had been imposed -- as "disturbing." (*Id.* at 171:15-17.) According to Professor Dubreuil, there was an "extremely sharp contrast" between the way the bonobos were behaving during that visit and the way they had behaved when he saw visited the facility in 2010 and 2011. (*Id.* at 171:17-21.) First, he witnessed changes in the bonobos' behavior. For example, during the August 2014 visit, Nyota was exhibiting signs of depression and was engaging in behavior without meaning. (*Id.* at 171:22-172:14.) Nyota also had difficulty moving and was slow in his movements, which was surprising given that he was only a teenager and had been extremely energetic and active during previous visits. (*Id.* at 172:22-173:2.) Kanzi acted aloof, and Professor Dubreuil also saw Teco licking and biting the mesh surrounding his enclosure, two behaviors that Professor Dubreuil had not previously witnessed in extended visits. (*Id.* at 172:17-21, 173:3-6.) Second, Professor Dubreil described a "very heavy silence" in the facility, which was quite striking for bonobos. (*Id.* at 174:19-25.) According to Professor Dubreuil, the literature indicates that silence indicates distress. (*Id.* at 175:9-14.) Professor Wildman visited the facility more recently, in April 2015, and described it as a "ghost town." (*Id*. at 330:14-17.) He also expressed concern that the facility was being turned into an "ape farm," meaning "a breeding facility for chimpanzees and not a real research facility." (*Id*. at 18-23.)

3. BHI Is Nearing Completion Of A New, State-Of-The-Art Great Ape Facility To Which The Bonobos Can Be Relocated

The Court heard testimony from Ryan Sheldon, a highly successful entrepreneur and long-time supporter of Dr. Savage-Rumbaugh's work. Mr. Sheldon is building a facility for the bonobos on a 200 acre farm in Osceola, Missouri, and construction is nearing completion. (*Id.* at 358:3-18.) As Mr. Sheldon testified, the facility will meet all of the USDA requirements (*id.* at 381:24-382:3) and will be low-cost and self-sustaining. (*Id.* at 360:18-25.) In terms of the bonobos' physical safety and well-being, Mr. Sheldon is committed to making (and has the

ability to make) continuous improvements to the facility. (*Id.* at 367:4-10.) He also posted a Letter of Credit in the amount of $502,000 to ensure the ongoing provision of the bonobos. (Ex. 94.)

## **CONCLUSION**

For all of the reasons outlined above, IPLS and ACCI have repeatedly and brazenly violated the Settlement Agreements. Accordingly, Dr. Savage-Rumbaugh and BHI respectfully request that this Court remedy IPLS and ACCI's breaches by: (i) granting Dr. Savage-Rumbaugh and BHI their right to relocate Maisha and the Bonobo 4; or, alternatively (ii) ordering that BHI be allowed to make all decisions regarding the research in which the Bonobo 4 are involved and that Dr. Savage-Rumbaugh be allowed to participate in this research, including having regular access to the bonobos and having at least an equal say in other decisions affecting the bonobos; and (iii) granting any other relief this Court deems just and equitable.

DATED: July 2, 2015     FAEGRE BAKER DANIELS LLP

           /s/ Todd Langel

           Todd P. Langel
           801 Grand Avenue, 33rd Floor
           Des Moines, IA 50309-8011
           Tel: 515-248-9000
           Fax: 515-248-9010
           todd.langel@faegrebd.com

           KAYE SCHOLER LLP

           William C. Zifchak*
           250 West 55th Street
           New York, NY 10019-9710
           Tel: 212-836-8743
           Fax: 212-836-6743
           Cell: 347-525-5143
           wzifchak@kayescholer.com
           *admitted pro hac vice*

Ross Neihaus*
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois  60602
Tel:  312-583-2458
Fax:  312-583-2558
ross.neihaus@kayescholer.com
*admitted pro hac vice

Joshua Holt
901 15th Street, NW
Washington, DC 20005
Tel:  202-682-3543
Fax:  202-414-0316
joshua.holt@kayescholer.com
on the memorandum

ATTORNEYS FOR DR. SUE SAVAGE-
RUMBAUGH, PH.D. and BONOBO HOPE
INITIATIVE, INC.

# APPENDIX -- TIMELINE

- <u>1976</u> – Dr. Savage-Rumbaugh begins conducting language research with the bonobos at Yerkes National Primate Learning Center in Atlanta, Georgia.

- <u>1980</u> – Dr. Savage-Rumbaugh and Dr. Duane Rumbaugh relocate together with the bonobos to the Language Research Center at Georgia State University.

- <u>July 11, 1993</u> – Saylorville Lake peaks at 56 feet above normal during state-wide flooding.

- <u>June 1997</u> – Dr. Savage-Rumbaugh receives Honorary Ph.D. of Science from the University of Chicago.

- <u>1999</u> – The Japanese Monkey Centre gifts to Dr. Savage-Rumbaugh two male bonobos, P-Suke and Nyota.  (*See* Dkt. No. 1, Ex. E and Dkt. No. 16.)

- <u>2002</u> – Iowa Primate Learning Sanctuary d/b/a the Great Ape Trust of Iowa, Inc., is incorporated by Iowan entrepreneur Ted Townsend.

- <u>February 2004</u> – At a time that Dr. Savage-Rumbaugh solely owns the bonobos P-Suke, Nyota, Elykia, Maisha and Nathan, she enters into a "Transfer Agreement" with Ted Townsend by which she donates these ownership interests to the Great Ape Trust so long as the Trust cares for the bonobos for life.  (Dkt. No. 1, Ex. 6.)

- <u>2004</u> – Townsend is gifted 200 acres of land by the City of Des Moines and builds a $20 million research facility for great apes in an acknowledged flood plain.

- <u>2005</u> – Dr. Savage-Rumbaugh and Dr. Duane Rumbaugh together with the bonobos relocate to Des Moines, where she becomes Director of Science and he becomes a research scientist at IPLS.

- <u>August 2007</u> – Iowa experiences flood conditions state-wide.  The U.S. Army Corps of Engineers predicts that Saylorville Lake will peak at 37 feet above normal on August 31.

- <u>December 2007</u> – Townsend forces out Dr. Savage-Rumbaugh as Director of Science.

- <u>May 2008</u> – Dr. Savage-Rumbaugh returns to the Trust as a consultant.

- <u>June 2008</u> – The IPLS facility floods after the Des Moines River overflows its banks. $5 million in damage is caused.  Des Moines River below Raccoon River peaks at a record 35.55 feet on June 13, 2008, or 11.55 feet <u>above</u> "flood stage."

- <u>February 2010</u> – IPLS files the interpleader complaint in this action to resolve conflicting ownership claims to the bonobos Matata and Maisha, naming as co-defendants Dr. Savage-Rumbaugh, Zoological Society of Georgia, Democratic Republic of the Congo and the Japanese Monkey Centre.  (Dkt. No. 1.)

- <u>May 2010</u> –Elykia gives birth to Teco.

- <u>2010</u> – Dr. Jared Taglialatela co-authors with Dr. Savage-Rumbaugh and Dr. Duane Rumbaugh the chapter "The Foundation of Primate Intelligence and Language Skills," in Broadfield et al, editors, <u>The Human Brain Evolving: Paleoneurological Studies in Honor of Holloway R.L.</u> 283-92 Stone Age Institute Press.

- <u>August 2011</u> – Dr. Savage-Rumbaugh named one of <u>Time Magazine's</u> "100 Most Influential People in the World"

- <u>November 2011</u> – Dr. Savage-Rumbaugh creates a separate not-for-profit, Bonobo Hope Initiative, to foster the bonobo colony, in case IPLS fails and the bonobos have to be relocated.

- <u>February 2012</u> – At the suggestion of shared legal counsel, Lyle Simpson, the BHI and IPLS boards merge. This merger is effectuated by the IPLS board members voting all of the members of the BHI board onto the IPLS board.

- <u>November 2012</u> – Panbanisha dies before Dr. Savage-Rumbaugh is returned from administrative leave.

- <u>December 4, 2012</u> – Lyle Simpson circulates to the unitary BHI-IPLS board a memorandum entitled "Plan of Action," in which memorandum, Mr. Simpson recommends that the BHI and IPLS boards split once again into two boards. (Ex. 23.)

  - Under Mr. Simpson's plan, the BHI board was to "oversee and to develop the science program of [the Great Ape Trust] and be solely responsible for the protection of the bonobo colony," while IPLS was to serve as the business board to fundraise and to administer the facility.

- <u>December 12, 2012</u> – The unitary BHI-IPLS board passes the resolution recommended by Mr. Simpson, which begins implementation of his Plan of Action. (Ex. 23.)

- <u>January-February 2013</u> – Main settlement and supplemental settlement agreements executed, and Stipulation of Dismissal calling for continued Court oversight executed and filed by counsel of record. (Dkt. No. 59.)

- <u>March 2013</u> – Mr. George Caudill named Chair of IPLS.

- <u>April 2013</u> – The unitary BHI-IPLS board passes additional resolutions to implement Mr. Simpson's plan to split the board in two.

- <u>May 2013</u> – Dr. Savage-Rumbaugh is injured in the Lab requiring her extended absence.

- <u>May 2013</u> – The IPLS board passes a resolution granting to Dr. Savage Rumbaugh "unfettered permanent access to the bonobos." (Ex. 27.)

- <u>June-October 2013</u> –Lyle Simpson suggests that BHI propose a transition plan. (*See* Ex. 30; Ex. 36.)

A2

- <u>August 9, 2013</u> –IPLS is administratively dissolved by the Iowa Secretary of State for failure to deliver its 2013 Biennial Report.  To date it remains dissolved because of an unemployment insurance tax lien in excess of $90,000.

- <u>October 2013</u> – Per the suggestion of the IPLS board and Lyle Simpson, Dr. Savage-Rumbaugh recommends Dr. Jared Taglialatela (and he in turn nominates Dr. Williams Hopkins) to carry on her multi-generational research.

- <u>October 2013</u> – Yerkes inquires whether IPLS can "guarantee" that Dr. Savage-Rumbaugh will have no role at the Lab, in anticipation of sending its chimpanzees to IPLS.  (Ex. 38.)

- <u>November 5, 2013</u> –Dr. Savage-Rumbaugh returns to the Lab to care for Teco, who had taken ill on November 1.

- <u>November 9, 2013</u> - Claiming that her presence at the facility is causing a disturbance, Mr. Caudill bans Dr. Savage-Rumbaugh from the facility.

- <u>November 12, 2013</u> – At the request of the IPLS board and Lyle Simpson, BHI circulates a resolution proposing that BHI elect Drs. Jared Taglialatela and William Hopkins to carry on Dr. Savage-Rumbaugh's multi-generational research.

- <u>November 13, 2013</u> – At the suggestion of the IPLS board and Lyle Simpson, the BHI board holds a vote by email and appoints Drs. Jared Taglialatela and William Hopkins as Director of Research and Director of Science, respectively.

- <u>November 21, 2013</u> – George Caudill emails all IPLS staff announcing that Dr. Savage-Rumbaugh is retiring permanently.  (Ex. 48.)

- <u>December 18, 2013</u> – Without knowledge of BHI, Ape Cognition & Communication Institute is formed.  IPLS purports to transfer the bonobos and certain real estate to ACCI for $1.

- <u>February 14, 2014</u> – Parties stipulate to continue federal court jurisdiction over settlement agreements for 120 days.  (Dkt. Nos. 65-66.)

- <u>February 20, 2014</u> – Counsel for Dr. Savage-Rumbaugh and BHI discover, through their own diligence, the formation in December 2013 of ACCI.

- <u>March 14, 2014</u> – Dr. Taglialatela emails the members of the ACCI and BHI boards to introduce ACCI and describe the proposed research, mission, etc.  In the email, Dr. Taglialatela states that IPLS will "cease to exist."  (*See* Ex. 105.)

- <u>June 22, 2014</u> – Matata, the matriarch of the bonobo colony, dies.

- <u>June 22, 2014</u> – George Caudill sends an email to the BHI community announcing Matata's death.  This is Mr. Caudill's last correspondence with BHI.  (Ex 79.)

- <u>June 2015</u> – Des Moines again experiences major flooding.  Des Moines River below Raccoon River reaches within five feet of its record historical peak, and six feet <u>above</u> "flood stage."

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the **JOINT POST-HEARING BRIEF OF DEFENDANT SUE SAVAGE-RUMBAUGH AND INTERVENOR DEFENDANT BONOBO HOPE INITIATIVE** was served upon the following parties through the CM/ECF system of the United States District Court for the Southern District of Iowa, Central Division, on July 2, 2015.

/s/ Ross Neihaus
Ross Neihaus

## SERVICE LIST

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third Avenue SE, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927

Jack Pennington
Simpson, Jensen, Abels, Fischer & Bouslog, P.C.
604 Locust Street, Suite 222
Des Moines, Iowa 50309

William J. Miller
Brian Melhus
Dorsey & Whitney
801 Grand Avenue, Suite 4100
Des Moines, IA 50309