**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | | |
|---|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:10-cv-00052 Hon. Magistrate Judge Ross Walters |
| ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANT SUE SAVAGE-RUMBAUGH'S AND INTERVENOR DEFENDANT BONOBO HOPE INITIATIVE'S REPLY TO PLAINTIFFS' POST-HEARING BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.      PLAINTIFFS' ARGUMENT THAT IPLS CONTINUES TO EXIST AS A
MATTER OF LAW IS DEEPLY FLAWED .................................................... 2

          A.    Plaintiffs' Argument that Dr. Savage-Rumbaugh is Trying to Benefit
from Her Own Wrongdoing is Patently Absurd ................................................. 3

II.     PLAINTIFFS FAIL TO REFUTE THE CLAIM THAT THEY HAVE VIOLATED
BHI'S RIGHTS AS JOINT OWNERS OF THE BONOBOS ......................... 7

          A.    Plaintiffs' Argument About BHI's Own Fundraising Efforts
Misconstrues the Division of Responsibilities Between BHI and IPLS
and Is Factually Incorrect ................................................................ 10

          B.    Plaintiffs' Argument That Joint Ownership Does Not Grant Dr. Savage-
Rumbaugh Unrestricted Access to the Bonobos or Control Over the
Bonobo Research is a Straw Man .................................................... 12

III.    PLAINTIFFS FAIL TO REFUTE THE CLAIM THAT THEY HAVE VIOLATED
THE SETTLEMENT AGREEMENTS BY DISCONTINUING DR. SAVAGE-
RUMBAUGH'S RESEARCH TRAJECTORY ............................................. 17

IV.    PLAINTIFFS FAIL TO REFUTE THE CLAIM THAT ACCI IS IN BREACH OF
ITS OBLIGATION TO PROVIDE ADEQUATE CARE FOR THE BONOBOS .......... 19

CONCLUSION ..................................................................................................... 21

Defendant Sue Savage-Rumbaugh ("Dr. Savage-Rumbaugh") and Intervenor Defendant Bonobo Hope Initiative, Inc. ("BHI") (collectively, the "Movants") file this Reply to Plaintiffs' Post-Hearing Brief (Dkt. 133) in further support of Dr. Savage-Rumbaugh's Motion for Specific Performance and Related Relief ("Motion") (Dkt. 69).

## INTRODUCTION

After three days of testimony, Plaintiffs Iowa Primate Learning Sanctuary d/b/a Great Ape Trust ("IPLS") and Ape Cognition and Communication Institute ("ACCI") remain unable to refute any of Movants' claims. In their Post-Hearing Brief, Plaintiffs mostly plow the same ground as in their pre-trial submissions and attempt to shoehorn the testimony to those contentions. When that does not work, Plaintiffs throw up a variety of smokescreens in order to confuse the issues and divert attention away from the sheer lack of evidence supporting their positions. Moreover, Plaintiffs completely evade the reality that Yerkes National Primate Research Center – to mix metaphors – is the 600-pound gorilla in the room that, by their own admission, precipitated IPLS's and ACCI's breaches of the Main Agreement[1] and the Side Agreement[2] (collectively, the "Settlement Agreements").

---

[1] This refers to the ***Agreement for Settlement and Acknowledgment of Ownership***, by and between the Iowa Primate Learning Sanctuary, Zoological Foundation of Georgia, Democratic Republic of the Congo, and Dr. Savage-Rumbaugh, last to sign on February 17, 2013 (Dkt. 69-2).

[2] This refers to the ***Supplemental Agreement for Settlement and Acknowledgement of Ownership***, by and between Iowa Primate Learning Sanctuary, Emily Sue Savage-Rumbaugh, and Bonobo Hope Initiative, Inc., signed on January 31, 2013 (Dkt. 69-3).

1

## ARGUMENT

## I.   PLAINTIFFS' ARGUMENT THAT IPLS CONTINUES TO EXIST AS A MATTER OF LAW IS DEEPLY FLAWED

Plaintiffs argue that IPLS has not ceased to exist as a matter of law because it could, at some unspecified future time, seek reinstatement.  (Plaintiffs' Brief ["Pls.' Br."] at 14-15.)  As explained in Movants' Post-Hearing Brief, Plaintiffs' argument fails for several reasons.

First, Plaintiffs' argument ignores the actions that IPLS took after it was administratively dissolved.  In support of their argument, Plaintiffs cite a sentence fragment from Iowa Code § 504.1422(3):  "[a] corporation that is administratively dissolved continues its corporate existence . . . ."  Plaintiffs omit the rest of that sentence, which reads, "but shall not carry on any activities except those necessary to wind up and liquidate its affairs pursuant to section 504.1405 and notify its claimants pursuant to sections 504.1406 and 504.1407."  (Iowa Code § 504.1422(3).)  The clear implication of this language is that an administratively dissolved corporation continues its existence solely for purposes of winding up its affairs.  Once the corporation has completed that process, such as by selling off all of its assets, it ceases to exist.  *See Smith v. Vill. Enters.*, 208 N.W.2d 35 (Iowa 1973) (finding that, because it sold all of its assets, a corporation had "practically cease[d] to exist").  That is precisely what happened here.  After it was administratively dissolved, IPLS sold all of its assets to ACCI.  (*See* Ex. 59 at 1.)  At that point, IPLS ceased to exist.  In fact, Dr. Taglialatela admitted as much.  (*See* Ex. 105 at 1 ("Moving forward, IPLS will no longer exist.").) [3]

---

[3] The suggestion that ACCI or IPLS intends to pay off the tax lien at some indeterminate point in the future also is patently false.  The entire rationale behind forming ACCI was to obtain a new corporate shield without having to pay off the tax lien.  (*See* Transcript of Hearing at 262:24-263:4 (explaining that IPLS could form a new corporation or pay off the lien).)

Second, Plaintiffs' argument violates basic principles of contract interpretation. If, as Plaintiffs argue, IPLS has not ceased to exist, despite selling off all of its assets and openly acknowledging that it has ceased to exist, then it is unclear that IPLS could ever "cease to exist." As a result, the provisions in the Settlement Agreements providing relocation rights to Dr. Savage-Rumbaugh and BHI in the event that IPLS "ceases to exist" have no legal effect. Such a result would be contrary to the basic principle that an agreement should be interpreted so as to give effect to the language of the entire agreement, and not in such a way that would render any term or provision superfluous. *See Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997).

Third, Plaintiffs' argument would produce an inequitable result. As explained in Movants' Post-Hearing Brief, ACCI has benefitted substantially from the transaction by which it acquired all of IPLS's assets. (*See* Movants' Brief [hereinafter "Mvts.' Br."] at 19-20.) Now that BHI and Dr. Savage-Rumbaugh seek to exercise the relocation rights that the Settlement Agreements afford them, Plaintiffs turn around and point to the continued existence of IPLS for the sole purpose of denying those rights. Plaintiffs' argument that they are free to obstruct Movants' relocation rights forever must be rejected as a matter of sheer equity.

A.   Plaintiffs' Argument that Dr. Savage-Rumbaugh is Trying to Benefit from Her Own Wrongdoing is Patently Absurd

As a fallback position, Plaintiffs argue that the Court should find that IPLS has not ceased to exist because Dr. Savage-Rumbaugh "precipitated the administrative dissolution of IPLS" and should not be able to benefit from her own "wrongful acts." (Pls.' Br. at 15.) In support of this argument, Plaintiffs present a theory by which Dr. Savage-Rumbaugh appointed herself the registered agent for IPLS, fully understanding the responsibilities of that position, conditioned the execution of the Settlement Agreements on the inclusion of a provision providing herself and

3

BHI with relocation rights over the bonobos in the event that IPLS should cease to exist, then, "[c]onveniently, and at the first opportunity," intentionally failed to file IPLS's biennial report with the Secretary of State, knowing about IPLS's tax liability and the fact that it would prevent IPLS from being reinstated, thus triggering the relocation rights for herself and BHI.  (*See id*.)

On its face, Plaintiffs' theory strains credulity.  If Dr. Savage-Rumbaugh's goal was to gain complete control over the bonobos, as Plaintiffs allege, it makes no sense that she would try to do so by employing the Rube Goldberg-like mechanism that Plaintiffs describe.  Plaintiffs' theory is based on the premise that Dr. Savage-Rumbaugh created a back-door mechanism in the Settlement Agreements in order to attain control over the bonobos (i.e., that if IPLS "ceased to exist," she and BHI would get relocation rights).  Plaintiffs, however, ignore the fact that in signing the Settlement Agreements, Dr. Savage-Rumbaugh relinquished her ownership rights to the Bonobo 4.  (*See* Ex. 2 at ¶ 5.)  It makes no sense that Dr. Savage-Rumbaugh would sign an agreement relinquishing her rights to the Bonobo 4 when her real purpose was to gain control over them.  If that was Dr. Savage-Rumbaugh's goal, she simply would not have signed the Settlement Agreements.

Further, if her goal was to gain complete control over the bonobos, it makes no sense that Dr. Savage-Rumbaugh would have stepped back from her role as Director of Science and arranged for Drs. Taglialatela and Hopkins to assume complete control over the bonobos and the science in which they are involved, as Plaintiffs assert.

Beyond its patent ridiculousness, Plaintiffs' theory is simply not substantiated by the facts.  It would belabor the point to try and describe every way in which this theory fails on the facts, so Movants will endeavor to outline only the more glaring examples.

First, Dr. Savage-Rumbaugh did not "appoint herself" as the registered agent for IPLS, as Plaintiffs contend.  At the end of 2011, Ted Townsend pulled his funding for the facility.

(Transcript of Hearing [hereinafter "Tr."] at 40:13-14.) [4]  Without money to pay the employees'

salaries, Dr. Savage-Rumbaugh had to assume a wide range of new responsibilities just to keep

the facility running.  (*See id*. at 44:14-45:1.)  At one point, she was given a form to sign by Susan

McKee, the administrative assistant and accountant to Jim Aipperspach for the Great Ape Trust

(and for Ted Townsend), without any explanation, and she signed it, along with several other

forms that were presented to her at the time, none of which she had ever seen before.  (*Id*. at

46:5-15.)

Second, contrary to Plaintiffs' assertions, Dr. Savage-Rumbaugh did not know what was

required of her as registered agent.  Dr. Savage-Rumbaugh explicitly stated as much in her

testimony.  (*Id*. at 46:24-47:4.)  While Plaintiffs point out that ignorance of the law is no excuse

(Pls.' Br. At 16.), it requires a Herculean leap of logic to go from the position that Dr. Savage-

Rumbaugh cannot rely on her lack of knowledge about the responsibilities of a registered agent

in order to avoid those responsibilities, to Plaintiffs' theory that Dr. Savage-Rumbaugh

intentionally installed herself as registered agent in order to bring about the end of IPLS.  To the

contrary, Dr. Savage-Rumbaugh's obvious lack of knowledge about the role of a registered agent

negates any such inference.

Third, Plaintiffs' assertion that Dr. Savage-Rumbaugh "had to have known about and

received letters from Iowa Workforce Development asserting that IPLS owed money to the State

of Iowa" is completely unsupported.  Plaintiffs cite only to Simpson's testimony in which he

explains that he – a trained lawyer with decades of experience – knew about IPLS's outstanding

tax obligation because he saw copies of statements from Iowa Workforce Development showing

---

[4] For the Court's convenience, Movants are attaching all three volumes of the transcript to this Reply Brief.  *See* Transcript of Hearing, Volume I, attached hereto as Exhibit A; Transcript of Hearing, Volume II, attached hereto as Exhibit B; Transcript of Hearing, Volume III, attached hereto as Exhibit C.

that they had made unemployment payments on behalf of IPLS.  (Pls' Br. at 15 (citing Tr. at 263:6-21).)  Plaintiffs offer no evidence that Dr. Savage-Rumbaugh knew that IPLS owed money to the State of Iowa.  In fact, she explicitly testified that she did not.  (Tr. at 47:5-7.)  Even assuming that Dr. Savage-Rumbaugh was aware that IPLS owed a debt to the State of Iowa, Plaintiffs fail to provide any evidence that she understood the legal implications of failing to pay that debt such that she could use it as the basis for the scheme that Plaintiffs envision.  In fact, even Simpson testified that, although he knew about IPLS's outstanding tax obligation as early as March 2012, he did not know that the State of Iowa had imposed a lien on IPLS until he received notice that IPLS had been administratively dissolved and unsuccessfully tried to get the corporation reinstated.  (*Id.* at 263:24-264:2.)

Fourth, Plaintiffs overlook the fact that both IPLS and BHI were administratively dissolved.  (*See id.* at 261:7-9.)  As pointed out in Movant's Post-Hearing Brief, this fact alone undermines any argument that Dr. Savage-Rumbaugh intentionally orchestrated IPLS's administrative dissolution.  (*See* Mvts.' Br. at 18 n.6.)  The only logical inference is that Dr. Savage-Rumbaugh simply failed to file biennial reports for both corporations because, as explained above, she was not aware that she had been appointed registered agent for either one or that her responsibilities included filing biennial reports.  In fact, Simpson conceded that it was Dr. Savage-Rumbaugh who brought the administrative dissolutions to his attention so that he could rectify the situation.  (Tr. at 261:7-10.)  The reason IPLS was not reinstated – and has not been reinstated to date – was that the State of Iowa had imposed a lien on IPLS as a result of unpaid unemployment taxes.  (*Id.* at 261:23-262:16.)  IPLS's failure to pay unemployment taxes was solely the responsibility of Ted Townsend (*id.* at 262:4-16), and the resulting lien had nothing to do with Dr. Savage-Rumbaugh's failure to file a biennial report (*id.* at 263:18).

6

Fifth, it was Simpson, not Dr. Savage-Rumbaugh, who advised IPLS to sell all of its assets to ACCI.  (*Id*. at 262:24-263:4.)  IPLS ceased to exist not solely because it had been administratively dissolved but because it subsequently sold off all of its assets.  Dr. Savage-Rumbaugh played no role in that decision and had no knowledge of it until months later,[5] thus severing any causal connection between any action that she took on behalf of IPLS and the fact that IPLS has ceased to exist.

Putting aside the numerous gaps and errors in Plaintiffs' theory as to Dr. Savage-Rumbaugh's culpability, Plaintiffs make zero allegations that BHI was involved in any way in the events that led to IPLS's administrative dissolution or the fact that it has ceased to exist.  Plaintiffs try to shoehorn BHI into the argument at the end, arguing that "Dr. Rumbaugh cannot be allowed to benefit from her wrongful acts by invoking her contingent rights under the 'cease to exist' clause, nor should those benefits flow to BHI."  (Pls.' Br. at 15-16 (emphasis added).)  However, Plaintiffs provide no explanation as to why Dr. Savage-Rumbaugh's actions should be imputed to BHI.  BHI is a separate party to these proceedings with its own interests, and in fact, BHI intervened in these proceedings specifically to protect those interests.  (*See* Dkt. 73.)

## II.   PLAINTIFFS FAIL TO REFUTE THE CLAIM THAT THEY HAVE VIOLATED BHI'S RIGHTS AS JOINT OWNERS OF THE BONOBOS

Plaintiffs pretend that ACCI has complied with its obligations relating to its joint ownership of the bonobos with BHI because it has stated that it is "willing to work with BHI."  (Pls. Br. at 17.)  Plaintiffs drastically misconstrue the nature of BHI's rights as joint owners under the Side Agreement.

---

[5] Indeed, according to the Plaintiffs, Dr. Savage-Rumbaugh was no longer a member of the IPLS board at the time, and therefore, did not vote on the proposal to sell all of IPLS's assets to ACCI.  (*See* Ex. 54 at 2; Ex. 55 at 2.)

As explained in Movants' Post-Hearing Brief, at the time the Side Agreement was executed, BHI and IPLS were in the process of splitting into two separate boards with distinct responsibilities.  Under Simpson's "Plan of Action," IPLS was to become the "business board," responsible for fundraising and managing the facility, and BHI would become the "science board," with sole responsibility for managing and protecting the bonobo colony and developing and directing the science.  (*See* Ex. 23 at 2; Tr. at 234:12-235:2.)  The joint BHI-IPLS board unanimously adopted the "Plan of Action" in December of 2012.  (*See* Ex. 23 at 7-9.)  On January 31, 2013, BHI, IPLS and Dr. Savage-Rumbaugh executed the Side Agreement.  In May of 2013, the joint BHI-IPLS board passed another set of resolutions effectuating the split of BHI from IPLS that Simpson had recommended.  (*See* Ex. 26; Tr. at 239:15-240:1.)  Read in this context, it is clear that BHI's rights as joint owners of the bonobo include the right to direct the science in which the bonobos are involved.  *See Fausel v. JRJ Enters.*, 603 N.W.2d 612, 618 (Iowa 1999) ("any determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." (quoting Restatement (Second) of Contracts § 212 cmt. b (1979)).  At the very least, the Side Agreement affords BHI an equal voice in determining "the residence, breeding, activities and use" of the bonobos.  (*See* Ex. 2 at ¶ 5 (describing at least some of the "claims of ownership" contemplated by the Settlement Agreements).)

In support of the argument that they have complied with their obligations to BHI as joint owners of the bonobos, Plaintiffs offer examples of ACCI's sporadic efforts to "work with BHI." (Pls.' Br. at 17.)  The examples cited are underwhelming and essentially demonstrate no more effort than ACCI would make for any member of the scientific community who wished to conduct research involving the bonobos.  For example, Plaintiffs point to the fact that they

provided BHI with information about the bonobos at a joint board meeting in June 2014.  (*Id.*)

No subsequent meeting has ever been scheduled.  Next, Plaintiffs point to the fact that ACCI has

"facilitated" visits to the Des Moines facility by certain members of the BHI board.  (*Id.*)

However, Plaintiffs cite only a handful of instances, many of which occurred around the time of

the hearing.  Plaintiffs also give lip service to having provided Professor Wildman with access to

all of ACCI's research protocols and supporting documents when he visited the facility.  (*Id.*)

Professor Wildman testified that those papers were voluminous and that he did not have an

opportunity to review them.  (Tr. at 328:22-24; 340:12-17.)  Further, Dr. Taglialatela testified at

the hearing that, while he had offered to email the documents to Professor Wildman, he now

believes that the information related to ACCI's research protocols is confidential, implying that

the information will not actually be made available to any members of the BHI board.[6]  (*Id.* at

518:4-8.)  Finally, Plaintiffs point to the fact that ACCI has "expressed a willingness" to allow

BHI board members to "play a role" in the research, "to the extent that it can be done safely, is

consistent with the organization's mission and is approved by the Institutional Animal Care and

Use Committee."  (Pls.' Br. at 17.)  ACCI's willingness to allow BHI board members to merely

"play a role" in the research not only falls far short of recognizing BHI's right to direct the

science in which the bonobos are involved, but is an open repudiation of the research trajectory

required by the Settlement Agreements.  Even if the Settlement Agreements only afford BHI the

right to have an equal voice in determining the "residence, breeding, activities and use" of the

bonobos, the fact that ACCI has unilaterally set the terms under which BHI can "play a role" in

---

[6] Notably, Plaintiffs make no reference to the single-page list of active protocols that it provided to BHI.  (*See* Ex. 1006.)  As Professors Dubreuil and Wildman testified, that list is insufficient to provide BHI with any understanding of the research being conducted at the facility.  (Tr. at 195:24-196:2, 324:13-25.)

the research clearly violates BHI's rights as joint owners to have an equal say in "use," i.e., research.

Furthermore, as explained in Movants' Post-Hearing Brief, Plaintiffs have taken actions that directly violate BHI's rights as joint owners of the bonobos.  Those actions include forming a new Institutional Animal Care and Use Committee and a scientific advisory committee, banning Dr. Savage-Rumbaugh from the Des Moines facility in direct contravention of BHI's expressed preferences regarding the direction of the research, purporting to dismiss Dr. Savage-Rumbaugh from the IPLS board, failing to inform BHI that Dr. Savage-Rumbaugh had been banned from the facility or dismissed from the IPLS board, failing to inform BHI about the formation of ACCI and its role as the legal successor to IPLS, and implementing protocols that reverse Dr. Savage-Rumbaugh's research trajectory.  (*See* Mvts.' Br. at 36-44.)  Plaintiffs' assertion that ACCI is "willing to work with BHI" (in addition to being untrue) does not negate the fact that each of these actions or omissions constitutes a violation of BHI's rights as joint owners of the bonobos, for which this Court must fashion a remedy.

A.    Plaintiffs' Argument About BHI's Own Fundraising Efforts Misconstrues the Division of Responsibilities Between BHI and IPLS and Is Factually Incorrect

To raise doubts about BHI's willingness to live up to its own obligations as joint owners of the bonobos, Plaintiffs argue that BHI "has not contributed a single dollar to ACCI's efforts to care for the bonobos and has not even attempted to obtain a single grant to support research with the bonobos."  (Pls.' Br. at 17.)  This argument is misplaced for several reasons.

First, BHI is not primarily responsible for fundraising.  As explained above, under Simpson's plan to split the joint BHI/IPLS board into two separate boards, IPLS (and later ACCI) was to be the "business board" and would be responsible for fundraising and managing the facility.  (*See* Tr. at 52:22-53:2; Ex. 23 at 2.)  BHI, on the other hand, was to be the "science

board" and would be solely responsible for managing and protecting the bonobo colony as well as developing and directing the science.  (Tr. at 234:24-235:1.  *See also* Ex. 23 at 1 (explaining that "it is the best use of the academic leadership [*i.e.*, BHI] for them to focus on the science and not have to manage the daily activity").)

Second, Plaintiffs' assertion that BHI has "not contributed a single dollar to ACCI's efforts to care for the bonobos" is simply not true.[7]  Dr. Savage-Rumbaugh contributed $140,000 of her own money for the care of the bonobos while she was an officer of BHI (Tr. at 423:25-424:12), and Professor Dubreuil testified about a contribution that Bill Greaves, a BHI board member, made in the amount of $40,000 (*id.* at 211:15-17).  Additionally, in response to a direct question from Plaintiffs' counsel about "financial contributions from the purported co-owners of the bonobos," Dr. Taglialatela testified that BHI contributed between $1,000 and $1,500 in 2014 to pay for the bonobos' medical expenses.  (*Id.* at 599:10-16.)[8]  As far as obtaining grants since ACCI was formed, Professor Dubreuil explained at the hearing that the members of the BHI board have been unable to apply for grants to support research with the bonobos specifically because ACCI has largely excluded them from conducting research with the bonobos.  (Tr. at 210:10-211:3.)  Indeed, it would be difficult for BHI board members to participate in fundraising of any kind, given that ACCI has made only a token release of information about the research that is being performed at the Des Moines facility.

Furthermore, Plaintiffs acknowledge that, since 2013, BHI has focused much of its time and attention on assisting Ryan Sheldon with the establishment of a new facility for the bonobos

---

[7] Further, as discussed *infra*, IPLS/ACCI is responsible for the "complete and competent care" and "safety" of the bonobos under the Settlement Agreements.  (*See* Ex. 1 at ¶ 5, Ex. 2 at ¶ 3.)

[8] Professor Dubreuil also pointed out that BHI has also contributed to the care of the bonobos in ways that do not involve a direct exchange of money, such as by sending graduate students to serve as interns at the facility.  (Tr. at 212:17-23.)

in Missouri, believing that the bonobos' long-term interests are not served by keeping them in

Des Moines.  (*See id*. at 211:19-21.)  Plaintiffs' description of the facility, however, is

misleading, and their characterization of the plan to relocate the bonobos to the facility as "pie-

in-the-sky" is completely unfounded.  For example, Plaintiffs assert that the facility has "no

functional utilities."  (Pls.' Br. at 17.)  The reason why the utilities are not yet functional, as Mr.

Sheldon clearly explained to Plaintiffs' counsel at the hearing, is that the facility is not yet

complete.  (Tr. at 381:19-382:11.)  No one is proposing to move the bonobos to Missouri before

the facility has been completed or the utilities turned on.  In fact, Mr. Sheldon has graciously

offered to fund the bonobos' upkeep at the Des Moines facility until they can be safely moved to

Missouri.  (*Id*. at 382:9-11.)  Plaintiffs also warn that the Missouri facility will be "backed by a

wood-burning furnace."  (Pls.' Br. at 17.)  Again, as Mr. Sheldon carefully explained to

Plaintiffs' counsel, the wood-burning furnace is only intended to be used in emergencies, when

the regular propane furnace is not operational.  (Tr. at 284:10-14.)  Far from being a "glorified

Morton building," the Missouri facility will be fully USDA-compliant and is based on the

facility at which the bonobos were housed at Georgia State University.  (*Id*. at 358:5-12, 381:24-

382:3.)

> B.    Plaintiffs' Argument That Joint Ownership Does Not Grant Dr. Savage-
>       Rumbaugh Unrestricted Access to the Bonobos or Control Over the Bonobo
>       Research is a Straw Man

Plaintiffs submit that "the crux of the issue continues to be whether joint ownership

requires ACCI to allow Dr. Rumbaugh to have unrestricted access to ACCI's facilities and

control over the research being conducted."  (Pls.' Br. at 17-18.)  That is decidedly not the case.

The question is, and has always been, whether Plaintiffs have violated the Settlement

Agreements, which includes, among other things, whether they have violated BHI's rights as

joint owners of the bonobos.  Plaintiffs' attempt to narrow the scope of the issue to be decided in

these proceedings is nothing more than an attempt to set up a straw man, and should be disregarded as such.  Nevertheless, there are several problems with the factual underpinnings of Plaintiffs arguments:

First, Plaintiffs argument that the Settlement Agreements do not contemplate unrestricted access for Dr. Savage-Rumbaugh is based on an incomplete and overly narrow reading of the Agreements.  Plaintiffs correctly point out that, under Iowa law, the primary focus in interpreting a contract is the parties' intent at the time the contract was executed, and courts discern the intent of the parties by looking at the entire agreement.  *See NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010); *Lewis Cent. Educ. Ass'n v. Lewis Cent. Cmty. Sch. Dist.*, 559 N.W.2d 19, 22 (Iowa 1997).  Having laid out that standard, Plaintiffs proceed to focus their entire argument on paragraph 1 of the Side Agreement, which states only that BHI and IPLS "jointly are owners" of the Bonobo 4.  (*See* Pls.' Br. at 18.)  Plaintiffs completely ignore paragraph 4 of the Main Agreement and paragraph 2 of the Side Agreement, which outline the research trajectory that must be followed.  (*See* Ex. 1 at ¶ 4; Ex. 2 at ¶ 2.)  Plaintiffs acknowledge that Dr. Savage-Rumbaugh was a primary author of the language in those paragraphs, and as she testified, her intention was to describe her specific research trajectory and to ensure that that trajectory would continue for generations.  (Tr. at 62:12-19.)  As explained in detail in Movants' Post-Hearing Brief, Dr. Savage-Rumbaugh's research trajectory cannot continue and will be compromised if she is entirely denied access to the bonobos in the near term.  (*See* Mvts.' Br. at 28-29 (citing Tr. at 197:24-198:1, 321:18-322:13).)

Plaintiffs also ignore paragraph 1 of the Side Agreement, which establishes BHI as a joint owner of the bonobos.  (*See* Ex 2. at ¶ 1.)  As was made clear at the hearing, the members of the BHI board have denounced Plaintiffs' ban on Dr. Savage-Rumbaugh's access to the Des Moines facility and dispute the claim that the research trajectory can continue without her involvement.

(*See, e.g.*, Tr. at 197:2-198:23, 320:19-322:13, 626:9-627:1.)  Thus, even if the Settlement

Agreements do not explicitly guarantee a right of unrestricted access for Dr. Savage-Rumbaugh,[9]

neither do they permit ACCI to unilaterally ban her from the facility.

      <u>Second</u>, Plaintiffs argue that Dr. Savage-Rumbaugh's unrestricted access poses safety

concerns.  (Pls.' Br. at 18-19.)  In support of this assertion, Plaintiffs cite a portion of Movants'

counsel's opening statement, which Plaintiffs claim describes a pattern of Dr. Savage-Rumbaugh

being removed from the bonobos because of safety concerns.  (*Id.* at 19.)  In fact, an honest

reading of the opening statement reveals that the pattern that counsel was describing was one in

which allegations are leveled against Dr. Savage-Rumbaugh by jealous rivals and other

individuals with hidden agendas, investigated and <u>found to be completely baseless</u>.[10]  (*See* Tr. at

9:14-10:22.)  Dr. Gilmore – an ACCI and, formerly, IPLS board member – confirmed this

assessment, explaining that many of the allegations leveled against Dr. Savage-Rumbaugh over

the years have been "unfair."[11]  (Tr. at 397:3-14, 448:10-20.)    Importantly, all of the allegations

were known in May of 2013, when the IPLS board passed a resolution granting Dr. Savage-

Rumbaugh "unfettered permanent access to the bonobo colony."  (*See* Ex. 27 at 1.)

      In fact, Plaintiffs' assertion that Dr. Savage-Rumbaugh has been banned from the Des

Moines facility due to safety concerns is a mere pretext to camouflage the crucial role that

---

[9] Paragraph 5 of the Side Agreement emphasizes that Dr. Savage-Rumbaugh's release of her ownership claims is
"<u>without prejudice to her rights</u>, responsibilities or professional judgments, as a member of the boards of the Trust
and Bonobo Hope and as <u>Director</u> of <u>Science</u> of Bonobo Hope . . . ."  (Ex. 2 at ¶ 5 (emphasis added).)  Plainly, the
parties contemplated a continued substantial role at the Lab for Dr. Savage-Rumbaugh.

[10] Any objective observer of the videos introduced into evidence showing Dr. Savage-Rumbaugh's intensive
interaction with the bonobos (*see* Ex. 98), as well as her demeanor on the witness stand, would be hard pressed to
conclude that she poses any physical risk to the bonobos.  Movants challenge ACCI to permit the court to interview
the bonobos and ask them themselves.

[11] Dr. Gilmore also testified that she filled out a questionnaire as part of the investigation into some of these
allegations, in which she stated that she was satisfied with the bonobos' diet and feeding program, that the injuries to
Teco and Kanzi that formed the basis for some of the allegations were not the result of negligence or mistreatment,
and that Dr. Savage-Rumbaugh has a good relationship with the bonobos and clearly cares about their wellbeing.
(*Id*. at 446:12-448:20; Ex. 107.)

Yerkes National Primate Research Center ("Yerkes") has played in that decision.  As multiple witnesses testified, Yerkes is willing to pay ACCI to house some of its chimpanzees in the Des Moines facility, but has conditioned its funding on Dr. Savage-Rumbaugh no longer being involved with the facility.  (*See, e.g.,* Tr. at 546:25-550:18, 653:7-12, 659:10-16.  *See also* Ex. 51 at 1 (Simpson email to Dr. Savage-Rumbaugh explaining that they need to tell Yerkes that she has retired).)  Yerkes' condition has nothing to do with safety, and everything to do with the fact that Dr. Savage-Rumbaugh's research showing that bonobos are self-reflective beings capable of thought and true symbolic/syntactic human language is creating serious problems for organizations, like Yerkes, that perform medical research on apes.  (*See* Tr. at 93:18-94:15, 283:10-18.)

     Finally, Plaintiffs fall back on the position that Dr. Savage-Rumbaugh should be equitably estopped from imposing authority or control over the bonobos.  (Pls. Br. at 19.)  In support of their argument, Plaintiffs rely exclusively on a single email that Dr. Savage-Rumbaugh wrote to the members of the BHI and IPLS boards on October 26, 2013 recommending Dr. Taglialatela for the position of Director of Research and Dr. Hopkins for the position of Director of Science.  (*Id*. at 19-20.)  Plaintiffs' interpretation of that email as ceding complete control over the research to Drs. Taglialatela and Hopkins is based on a highly selective and self-serving reading.  For example, Plaintiffs highlight the language in the email in which Dr. Savage-Rumbaugh said that Drs. Taglialatela and Hopkins should "control all aspects of their program."  (*Id*. at 20.)  As Dr. Savage-Rumbaugh testified, that statement was directed at the members of the "business board," i.e., IPLS, in order to prevent a recurrence of the situation in which she lost control of the research program because the business people took over and allowed money to dictate what could be done.  (Tr. at 136:17-23.)  Dr. Savage-Rumbaugh did not intend to suggest that Drs. Taglialatela and Hopkins should be completely free to set the

direction of the research as they saw fit without her involvement, and certainly not without

oversight from BHI, which had been charged with sole responsibility for directing the science,

per the Settlement Agreements and the resolutions implementing Simpson's "Plan of Action."

(*See id.* at 136:23-137:3.)  Plaintiffs also highlight Dr. Savage-Rumbaugh's statement that she

would "absent [her]self from the lab."  (Pls.' Br. at 20.)  As Dr. Savage-Rumbaugh testified, she

did not intend this statement to mean that she would never return at any point or that she would

play absolutely no role in the research going forward.  (Tr. at 133:17-25 (describing a

conversation with Dr. Taglialatela in which she discussed the possibility of absenting herself

from the lab for a period of about two months, during which time she would work in the

background).)  Indeed, later in the same email, Dr. Savage-Rumbaugh explicitly stated that she

hoped to continue doing research with the bonobos.  (*See* Ex. 1005 at 3.)

Furthermore, Plaintiffs' interpretation of Dr. Savage-Rumbaugh's October 26, 2013

email is contradicted by the overwhelming weight of the evidence.  For example, Simpson

explicitly told both the BHI and IPLS boards that he did not intend for Dr. Savage-Rumbaugh to

simply step away, and that she "must continue to have a vital role in the success of the Trust."

(*See* Ex. 30; Ex. 36.)  In addition, when the IPLS board passed a resolution appointing Dr.

Savage-Rumbaugh to the position of Director Emeritus of Scientific Research, it granted her

"unfettered permanent access to the bonobo colony."  (*See* Ex. 27 at 1.)  The reason Dr.

Taglialatela did not incorporate any of these documents or communications into his

understanding of the positions that he and Dr. Hopkins (whom he chose to serve as Director of

Science) were accepting was not because they were "concealed" from him, as Plaintiffs claim,

but rather because he simply did not read them.  (*See* Tr. at 539:24-542:11 (testifying that he had

not seen the Settlement Agreements before accepting his position as Director of Science),

564:14-567:7 (testifying that he had no recollection of reading Simpson's July 1, 2013 email to

the BHI board), 593:9-12 (testifying that he did not know about the IPLS board's resolution granting Dr. Savage-Rumbaugh "unfettered permanent access").)  Because they did not avail themselves of readily accessible information that would have affected their understanding, Drs. Taglialatela and Hopkins cannot assert a claim of estoppel. (*See Shellhorn v. Williams*, 244 Iowa 908, 918-919 (Iowa 1953); 28 Am. Jur. 2d *Estoppel and Waiver* § 79 (2015) ("A party asserting estoppel cannot disregard obvious facts, or neglect to seek information that is easily accessible, and then charge his or her ignorance to others.").)

Clearing away all of Plaintiffs' misleading arguments, the fact remains that Plaintiffs' evidence of ACCI's willingness to "work with BHI" is woefully insufficient to demonstrate that ACCI has complied with its obligations relating to its joint ownership of the bonobos with BHI. Furthermore, Plaintiffs offer no justification for the numerous acts or omissions that constitute direct violations of BHI's rights as joint owners of the bonobos.

### III.   PLAINTIFFS FAIL TO REFUTE THE CLAIM THAT THEY HAVE VIOLATED THE SETTLEMENT AGREEMENTS BY DISCONTINUING DR. SAVAGE-RUMBAUGH'S RESEARCH TRAJECTORY

Plaintiffs argue that they have complied with the requirement in the Settlement Agreements to involve the bonobos in research.  (Pls.' Br. at 20.)  However, Plaintiffs' argument is based on an incomplete and overly broad reading of the provisions of the Settlement Agreements outlining the areas of research in which the bonobos are to be involved.

To demonstrate compliance, Plaintiffs cite the language in paragraph 4 of the Main Agreement and paragraph 2 of the Side Agreement, which provides that the bonobos shall continue to reside at the Trust at least so long as they "continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes. . . ."  (*See id*. at 20-21.)  Plaintiffs then list the <u>titles</u> of some of ACCI's active research protocols and cite testimony from Drs. Taglialatela and Hopkins explaining that those

17

protocols fall within those three categories.  (*See id*. at 21-22.)  However, Plaintiffs conveniently

omit the second half of each of the relevant paragraphs, which lists the specific types of activities

that qualify for inclusion in those three categories.[12]  Plaintiffs concede that Dr. Savage-

Rumbaugh was the author of that language.  As she testified at the hearing, her intention was to

describe her specific research trajectory, not to suggest broad parameters for research that could

be conducted with the bonobos.  (*See* Tr. at 62:12-19.)

Plaintiffs only acknowledge the role that Dr. Savage-Rumbaugh played in drafting

paragraph 4 of the Main Agreement and paragraph 2 of the Side Agreement in support of the

argument that, because of the role that she and BHI played in the drafting process, any ambiguity

in those paragraphs should be interpreted against them.[13]  In other words, having previously

explained that the "cardinal rule of contract interpretation" is to determine the parties' intent at

the time the contract was executed, Plaintiffs about-face and argue that the Court should interpret

the Settlement Agreements contrary to the stated intent.[14]  Importantly, Plaintiffs provide no

evidence that the language that Dr. Savage-Rumbaugh drafted is ambiguous; they simply ignore

it.  Plaintiffs offer the testimony of Drs. Taglialatela and Hopkins, in which they state their belief

that ACCI's research is consistent with the first half of paragraph 4 of the Main Agreement and

paragraph 2 of the Side Agreement, but that conclusion is not the result of any ambiguity in the

language of those paragraphs.  It is, instead, a post hoc rationalization of their decision to alter

---

[12] The activities listed are "art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimi[c]s, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices."  (Ex. 1 at ¶¶ 2, 4; Ex. 2 at ¶ 2.)

[13] In fact, there is no evidence that BHI was involved in drafting the paragraphs in question.  Once again, Plaintiffs are attempting to shoehorn BHI into an argument about Dr. Savage-Rumbaugh.

[14] It bears noting that paragraph 15(b) of the Main Agreement and 11(b) of the Side Agreement admonish that the language shall "not [be] strictly construed for or against any of the parties."  (Ex. 1 at ¶ 15(b); Ex. 2 at ¶ 11(b).)  Further, BHI was not a party to the litigation at the time the Settlement Agreements were executed and as such had no independent counsel involved in their negotiation.

the trajectory of the research.  As Dr. Taglialatela testified, he had not even seen the Settlement Agreements when he accepted his position as Director of Science, and his belief at the time was that he and Dr. Hopkins were free to "take the research in the direction that we saw fit." (*See* Tr. at 539:24-541:4.)

To the extent that they can discern the nature of the research that ACCI is conducting from just the titles of ACCI's active research protocols, Dr. Savage-Rumbaugh and the members of the BHI board have asserted that ACCI's research does not fall within the specific confines of Dr. Savage-Rumbaugh's research trajectory.  (*See id.* at 196:7-13, 324:20-25.  *See also id.* at 621:20-23.)  Moreover, as explained in detail in Movants' Post-Hearing Brief, Plaintiffs have taken other actions that have had the effect of discontinuing Dr. Savage-Rumbaugh's research trajectory, including banning Dr. Savage-Rumbaugh from the Des Moines facility, refusing to carry on the rearing techniques that are crucial to her research trajectory, discontinuing the culture of language at the facility, banning direct human interaction with the bonobos, and implementing a protocol that requires anyone who interacts with the bonobos to wear facemasks and gloves.  (*See* Mvts'. Br. at 27-34.)  Plaintiffs do not dispute any of those allegations.  (*See, e.g.*, Tr. at 404:20-405:1, 523:4-9.)  Accordingly, Plaintiffs have failed to refute the claim that they have violated the Settlement Agreements by discontinuing Dr. Savage-Rumbaugh's research trajectory.

## IV. PLAINTIFFS FAIL TO REFUTE THE CLAIM THAT ACCI IS IN BREACH OF ITS OBLIGATION TO PROVIDE ADEQUATE CARE FOR THE BONOBOS

While Plaintiffs assert that ACCI has taken all reasonable precautions to ensure the bonobos' complete safety (*see* Pls.' Br. at 23), they offer absolutely no support for this assertion.

At the hearing, multiple witnesses raised concerns about the bonobos' safety in light of the flooding that has occurred at the Des Moines facility, and which will continue to occur in the

future.  (*See, e.g.,* Tr. at 41:10-42:24, 144:15-24, 612:4-613:25.  *See also* Ex. 91.)  Plaintiffs offer

no response to these concerns.  Instead, Plaintiffs meekly assert that Dr. Savage-Rumbaugh

"made no effort to move the bonobos from the facility," and "affirmatively resisted subsequent

efforts to move them from the facility when such a move would not allow her to continue

research with the bonobos."  (Pls.' Br. at 23.)  Once again, Plaintiffs seek to divert attention

away from the issue at hand.   Furthermore, Plaintiffs mischaracterize the facts.  As Dr. Savage-

Rumbaugh testified, she has been concerned about the safety of the bonobos for quite some time,

and has repeatedly voiced those concerns, but she has not been in a position to order any formal

analysis to assess the flooding situation.  (Tr. at 87:17-88:3.)  Furthermore, she had received

assurances that expanding the flow-rate through the opening in the bypass, which serves to

partially inhibit the speed of the natural flow of water during flooding, would solve the problem,

thus negating the need to relocate the bonobos.  (*Id*. at 84:21-23, 144:3-11.)  She only recently

learned that it will not have the desired effect.  (*Id*. at 144:12-14.)  Moreover, until now, there

was no viable relocation option.  (*Id.* at 143:2-5.)  In 2012, for example, when the idea of

relocating the bonobos was raised, the only option would have been to move them to a non-

accredited zoo.  (*Id.* at 143:5-7.)  As Plaintiffs concede, moving the bonobos to a zoo would have

prevented Dr. Savage-Rumbaugh from continuing her work with them.  (*Id.* at 143:7-8.)

Plaintiffs' own witness, Dr. Hopkins, testified that moving the bonobos to a zoo would have been

a "tragedy."  (*Id.* at 651:18-23.)

        Plaintiffs similarly offer no response to any of the other concerns that were raised by

Movants' witnesses about the effects that Plaintiffs' decision to ban Dr. Savage-Rumbaugh from

the Des Moines facility or their efforts to reverse her research trajectory will have on the

bonobos' psychological and physical wellbeing.  The expertise and credibility of these witnesses

is undisputed.  For example, Professor Dubreuil testified that it is "inhumane" to deprive the

bonobos of the language that Dr. Savage-Rumbaugh's research has given them.  (*Id.* at 167:21-169:17.)  He also expressed concern about the effect that Dr. Savage-Rumbaugh's banishment would have on the bonobos due to the very strong emotional bond that bonobos form with the individuals who raise them.  (*Id.* at 197:2-20.)  Professor Tuttle testified that removing Dr. Savage-Rumbaugh from the facility deprives the bonobos of their enrichment (*id.* at 626:9-627:1), and Professor Wildman compared it to removing a parent from a human family (*id.* at 320:22-321:3).  Not surprisingly, Professors Dubreuil and Wildman each testified that they encountered an alarming scene when they visited the Des Moines facility.  Professor Dubreuil testified about the bonobos engaging in uncharacteristic behaviors and described a "heavy silence" that hung over the facility (*id.* at 171:15-175:14), and Professor Wildman described the facility as a "ghost town" (*id.* at 330:4-16).  Plaintiffs have failed to address any of these allegations.  Accordingly, Plaintiffs have failed to refute Movants' showing that ACCI is in breach of its obligation to adequately care for the bonobos, or to demonstrate this to a certainty.[15]

## CONCLUSION

For all of the reasons outlined above, Plaintiffs have failed to refute the claims that they repeatedly and knowingly violated the Settlement Agreements.  Accordingly, Dr. Savage-Rumbaugh and BHI respectfully request that this Court remedy IPLS and ACCI's breaches by: (i) granting Dr. Savage-Rumbaugh and BHI their right to relocate Maisha and the Bonobo 4; or, alternatively (ii) ordering that BHI be allowed to make all decisions regarding the research in which the bonobos are involved, including having regular access to the bonobos and having at least an equal say in other decisions affecting the bonobos, and that Dr. Savage-Rumbaugh be

---

[15] Obviously, BHI having had its access to the Lab severely circumscribed, and Dr. Savage-Rumbaugh eliminated altogether, it is impossible to proffer proof to a certainty regarding the poor health of the bonobos.  That is not the point.  BHI has the right to a proactive role at the Lab, and need not rely on the conclusory assertions of persons it has grown to distrust.  Neither should this Court.

allowed to participate in this research; and (iii) granting any other relief this Court deems just and equitable.

DATED:  July 24, 2015     FAEGRE BAKER DANIELS LLP

          /s/ Todd Langel

          Todd P. Langel
          801 Grand Avenue, 33rd Floor
          Des Moines, IA 50309-8011
          Tel:  515-248-9000
          Fax:  515-248-9010
          todd.langel@faegrebd.com

          KAYE SCHOLER LLP

          William C. Zifchak*
          250 West 55th Street
          New York, NY 10019-9710
          Tel:  212-836-8743
          Fax:  212-836-6743
          Cell:  347-525-5143
          wzifchak@kayescholer.com
          *admitted pro hac vice

          Ross Neihaus*
          Three First National Plaza
          70 West Madison Street, Suite 4200
          Chicago, Illinois  60602
          Tel:  312-583-2458
          Fax:  312-583-2558
          ross.neihaus@kayescholer.com
          *admitted pro hac vice

          Joshua Holt
          901 15th Street, NW
          Washington, DC 20005
          Tel:  202-682-3543
          Fax:  202-414-0316
          joshua.holt@kayescholer.com
          on the memorandum

          ATTORNEYS FOR DR. SUE SAVAGE-
          RUMBAUGH, PH.D. and BONOBO HOPE
          INITIATIVE, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the **DEFENDANT SUE SAVAGE-RUMBAUGH'S AND INTERVENOR DEFENDANT BONOBO HOPE INITIATIVE'S REPLY TO PLAINTIFFS' POST-HEARING BRIEF** was served upon the following parties through the CM/ECF system of the United States District Court for the Southern District of Iowa, Central Division, on July 24, 2015.


/s/ Ross Neihaus
Ross Neihaus


## SERVICE LIST

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third Avenue SE, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927

Jack Pennington
Simpson, Jensen, Abels, Fischer & Bouslog, P.C.
604 Locust Street, Suite 222
Des Moines, Iowa 50309

William J. Miller
Brian Melhus
Dorsey & Whitney
801 Grand Avenue, Suite 4100
Des Moines, IA 50309

EXHIBIT A

1

```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF IOWA
                          CENTRAL DIVISION

- - - - - - - - - - - - - - - - - -X
IOWA PRIMATE LEARNING SANCTUARY   :
d/b/a GREAT APE TRUST AND         :
APE COGNITION AND COMMUNICATION   :
INSTITUTE,                        :
                                  :
         Plaintiffs,              :    Case No. 4:10-cv-00052
                                  :
     vs.                          :
                                  :
ZOOLOGICAL FOUNDATION OF          :
GEORGIA, INC. d/b/a ZOO ATLANTA,  :
DEMOCRATIC REPUBLIC OF CONGO,     :
JAPAN MONKEY CENTRE INSTITUTE     :
AND MUSEUM OF PRIMATOLOGY, and    :
SUE SAVAGE-RUMBAUGH, Ph.D.,       :
                                  :
         Defendants,              :    TRANSCRIPT OF HEARING
                                  :           VOLUME I
and                               :
                                  :
BONOBO HOPE INITIATIVE, INC.,     :
                                  :
         Intervenor-Defendant.    :
- - - - - - - - - - - - - - - - - -X
```

                         Fourth Floor, South Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Wednesday, May 27, 2015
                         9:26 a.m.


BEFORE:  THE HONORABLE ROSS A. WALTERS, Magistrate Judge.



                    Terri L. Martin, CSR, RPR, CRR
                     United States Court Reporter
                      Room 189, U.S. Courthouse
                       123 East Walnut Street
                      Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiffs:          WILLIAM J. MILLER, ESQ.
                             BRIAN A. MELHUS, ESQ.
                             Dorsey & Whitney
                             801 Grand Avenue, Suite 4100
                             Des Moines, Iowa  50309-2790

For the Defendants:          TODD P. LANGEL, ESQ.
                             Faegre Baker Daniels
                             801 Grand Avenue, 33rd Floor
                             Des Moines, Iowa  50309-8011

                             WILLIAM C. ZIFCHAK, ESQ.
                             Kaye Scholer
                             250 West 55th Street
                             New York,  New York  10019-9710

                             JOSHUA STAMBAUGH, ESQ.
                             Kaye Scholer
                             1999 Avenue of the Stars
                             Suite 1600
                             Los Angeles, California  90067

                             ROSS NEIHAUS, ESQ.
                             Kaye Scholer
                             Three First National Plaza
                             70 West Madison Street
                             Suite 4200
                             Chicago, Illinois  60602-4231

3

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|------------|--------|-------|----------|---------|
| For the Defendants: | | | | |
| Sue Savage-Rumbaugh | 20 | 81 | 138<br>149 | 145 |
| Laurent Dubreuil | 151 | 199 | | |
| Lyle Simpson | 218 | | | |

4

E X H I B I T S

| PLAINTIFFS' EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1004 - Change of registered agent | 109 | 109 |
| 1005 - 10/26/13 Rumbaugh e-mail | 129 | 129 |
| 1006 - ACCI active research protocols | 215 | 215 |

| DEFENDANTS' EXHIBIT NUMBERS: | | |
|---|---|---|
| 23 - 12/4/12 plan of action | 183 | 183 |
| 25 - 2/4/13 Simpson letter to Grassley | 223 | 223 |
| 91 - Flooding report | 149 | 150 |

P R O C E E D I N G S

1

2          (In open court.)

3          THE COURT:  Please be seated, everybody.

4          Good morning to you all.  Of course, I had seen the

5   lawyers, but good morning to the rest of you.  This, of course,

6   is the Iowa Primate Learning Sanctuary, doing business as Great

7   Ape Trust, and Ape Cognitive and Communication Institute versus

8   Dr. Sue Savage-Rumbaugh and -- I will probably mispronounce this

9   because around here we've said "boenobo" and "baunobo."

10          How is it correctly pronounced or is there a consensus

11  on that point?

12          MR. STAMBAUGH:  It's "boenobo," Your Honor.

13          THE COURT:  It's bonobo.  Thank you.

14          MR. ZIFCHAK:  We all agree.

15          THE COURT:  Well, good.  Take a lesson from that.  The

16  Bonobo Hope Initiative, which, of course, is an intervenor.

17  We're here today for evidentiary hearing on Savage-Rumbaugh's

18  motion for specific performance and related relief to which the

19  Bonobo Hope Initiative has joined.  Of course, the matter as we

20  know, concerns the enforcement of the settlement agreement and a

21  side agreement, the latter of which -- with respect to the

22  latter which the court has raised a jurisdictional issue.  But

23  as I said in my final pretrial order, we're going to go ahead

24  and make the record here today because there's similarity in the

25  issues involved in both of those things.

6

1             I think we're ready now for opening statements, and

2   under the pretrial order those are limited to 15 minutes.  And I

3   think that -- Mr. Zifchak, you've risen.  Does that mean you're

4   going to do it?

5             MR. ZIFCHAK:  Yes, Your Honor.

6             THE COURT:  If you would, please.

7             MR. ZIFCHAK:  Good morning, Your Honor.

8             THE COURT:  Good morning.

9             MR. ZIFCHAK:  May it please the court.  My name is

10  William Zifchak.  I'm special counsel to the law firm Kaye

11  Scholer in the New York office.  I retired in 2012 as a partner

12  after 30 years.  I believe Your Honor has met the other members

13  of my trial team, and I'll get on with my opening.

14            Here today is a determined group of lawyers pitched

15  for conflict on a courtroom battle field not over money, indeed

16  all counsel here are serving pro bono; but as at the battle of

17  Gettysburg over an idea.  Here the idea being fought over is not

18  the morality of human bondage or even ape bondage.  I note that

19  this morning the Court of Appeals of my home state is hearing

20  argument on the issue of habeas corpus for chimpanzees in that

21  state; but we're not here for that issue today.

22            There can be no dispute that the primate research

23  trajectory that Dr. Sue Savage-Rumbaugh initiated four decades

24  ago in Georgia established that certain of the bonobos now in

25  residence here in Des Moines have the capacity to communicate

1  with humans in human language about their environment and their

2  feelings.

3          A recent flier for the plaintiff, Ape Cognitive and

4  Communication Institute, has a picture of Kanzi on it, and it

5  says, I know 3,000 words.  For this reason, these bonobos are

6  unique in the history of mankind.

7          Let me briefly illustrate the research with a

8  three-minute excerpt from one of the videos at Exhibit 98 in

9  this case, a video prepared at Dr. Rumbaugh's direction at the

10 Language Research Center at Georgia State University.

11          Todd.

12          (Video excerpt from Exhibit 98 was played.)

13          MR. ZIFCHAK:  Your Honor, the idea we're battling over

14 here today is whether this research should be continued with the

15 hope that it will unlock even greater discoveries about the

16 origins of man or whether that research trajectory should be

17 short-circuited by the current custodians of the bonobos who

18 were entrusted with their care and in so doing maligning and

19 persecuting the protagonist of that research,

20 Dr. Savage-Rumbaugh, and banning her from all access to the

21 bonobos that she nurtured.

22          These conditions have been interposed without any

23 regard for the mental health and welfare of the bonobos.  The

24 current custodians have drawn a shroud of secrecy over the

25 bonobos and the facility and denied all but token access to the

1   co-owners of the bonobos, Bonobo Hope Initiative.  They have

2   driven out Sue; her sister, Liz Pugh, who was featured briefly

3   in the excerpt and who worked with the bonobos since Atlanta;

4   and most recently Sue's niece, Heather, who as an infant had her

5   diaper changed by the bonobo you saw in the video, Panbanisha.

6          More to the point, the current custodians are doing

7   all of this we contend in violation of the two settlement

8   agreements which are before the court.  These agreements, among

9   other things, impose Dr. Savage-Rumbaugh's research trajectory

10  on the current custodians, and the supplemental agreement

11  strongly implies that Bonobo Hope as co-owners has an equal say

12  in the, quote, residence, breeding, activities, and use of the

13  four bonobos subject to that side agreement.

14         Now, Your Honor, lest you think I am a crazed animal

15  rights activist from the upper west side of Manhattan, I am not.

16  None of my team are.  Eight years ago I did not even know what a

17  bonobo was.  I was introduced to this matter initially as an

18  employment dispute because by trade I'm an employment lawyer;

19  but what I've learned these past eight years is this.  Sue, a

20  primatologist, had worked with her then husband, Duane Rumbaugh,

21  for 25 years at the Ape Language Research Center in Georgia

22  studying chimps and then bonobos.

23         While Duane first created the touch screen board

24  system for chimps and his own history is memorialized in a very

25  recent book called "With Apes in Mind," Sue discovered that the

1  bonobos, specifically Kanzi and his half-sister, Panbanisha, had

2  far more aptitude for language and went on to learn thousands of

3  words.  They also played the piano, lit fires with matches and

4  lighters, made tools and knots, opened padlocks with keys and

5  were potty trained on a regular toilet.

6          Sue owned several of the Georgia bonobos, one of which

7  was a gift from the people of Japan.  Sue, who by this time

8  already had an honorary Ph.D. from the University of Chicago, in

9  addition to her own Ph.D., gave up her tenured professorship at

10 Georgia State and in 2004 donated her ownership interest to the

11 Great Ape Trust, in exchange for a promise from Ted Townsend of

12 a job for life and to care for the bonobos for life.  Sue asked

13 for no money for these priceless creatures.

14         With proper approvals Sue drove the bonobos to Iowa in

15 a school bus in 2005.  Ted Townsend spent 20 million dollars

16 building a facility on donated city land that he acknowledged

17 was in a floodplain.  Jealous rivals forced Sue out after two

18 years.  This was the start of a pattern.  Sue was reinstated

19 full time in May 2008 but supervised by a non Ph.D. named

20 William Fields.  A major flood in June 2008, in Townsend's own

21 words, was the, quote, death nail for his master plan for

22 expansion at the trust.  After the financial crash, he made

23 plans to pull out and relocate the bonobos.

24         The U.S. Army Corps of Engineers has banned further

25 construction at the facility and the groundwater may well be

1  toxic to the apes and to humans.  Four bonobos, the one that was

2  a gift from Japan, named P-Suke, Nathen, Panbanisha, and Matata,

3  the original bonobo from Africa, have died in Iowa.  Infant Teco

4  was born in 2010 with chronic health conditions.

5          In August 2011 Sue was selected as one of Time

6  Magazine's 100 most influential people in the world.  To my

7  knowledge, she is the only Iowa resident ever so honored, and

8  yet in October 2011 she was locked out by Fields in the face of

9  allegations by disgruntled workers that she, herself, was a

10  danger to these bonobos.  These allegations were discredited and

11  a new leadership team replaced Townsend who left the trust

12  saddled with debt.

13          Lyle Simpson, Professor Ken Schweller, and many

14  distinguished scholars wrote letters of support to the bonobo

15  research and for Sue to the Governor of the State of Iowa, its

16  senators, and its university presidents.  These identical

17  allegations from 2011 were served up as new to Ken Schweller

18  when he became the new board chair, and he used them as an

19  excuse to place Sue again on administrative leave and then work

20  to relocate the bonobos.  Sue was cleared once again after a

21  comprehensive investigation and things moved along until May

22  2013 when she suffered a fall and concussion at the lab.  In the

23  interim, George Caudill, at Lyle Simpson's urging, was elected

24  the chair of IPLS.

25          In May 2013, the Caudill and Simpson led board,

1  including Tom Watson who is the CEO of Hy-Vee, resolved to grant

2  Sue, quote, unfettered permanent access to the bonobos.  And

3  I've displayed the resolution on the screen.  It's Exhibit 27 in

4  the exhibit binder.

5        The current custodians have been in breach of this

6  pledge since November of 2013 when on Sunday, November 9, Sue

7  was suddenly banned from the lab by George Caudill.  She has

8  been denied access since that time.  There is no dispute that

9  Sue and her husband, Duane, were banned at the insistence of

10 Yerkes Primate Research Center, a private lab that specializes

11 in invasive research on chimps and which is disserved by the

12 implications of the research trajectory.

13        Now, to bring things back to the instant motion, this

14 action was brought in interpleader, as Your Honor knows, to

15 resolve ownership claims to Matata and her son, Maisha.  Sue was

16 invited to participate in this action because she had owned

17 Maisha and she asked me to represent her in the litigation.  The

18 lawsuit was settled on the basis where ownership of the other

19 five bonobos, including the late Panbanisha, would be shared

20 50/50 with Bonobo Hope Initiative.  The supplemental agreement

21 was the quid pro quo for Sue signing the main settlement

22 agreement.  A provision common to both agreements we will show

23 mandates that whether Sue was actively involved or not, Sue's

24 research trajectory with the bonobos based on interspecies

25 immersion in a symbolic culture, which cultivates language and

1  other forms of communications in the bonobos, be continued as a

2  condition of leaving the bonobos in the care of the Iowa Primate

3  Learning Sanctuary.

4        Paragraph 5 of the supplemental agreement, at the same

5  time that that agreement awarded Bonobo Hope co-ownership,

6  identifies the trappings of ownership that Sue was releasing and

7  that we contend Bonobo Hope acquired as follows:

8        Quote, Savage-Rumbaugh acknowledges and agrees that

9  relinquishing her claim to ownership includes, but is not

10  limited to relinquishing any and all rights to determine the

11  residence, breeding, activities, or use of the Bonobo 4.

12        Bonobo Hope released no claims on to that side

13  agreement, Your Honor.  It was awarded co-ownership as part of

14  the overall settlement.  By implication, this clause fleshes out

15  the rights inherent in Bonobo Hope's co-ownership of the

16  bonobos.

17        The settlements require an express written

18  understanding between the parties in order to be modified.

19  There is no such amendment.  The settlements also award

20  relocation rights to Bonobo Hope working in conjunction with

21  Dr. Savage-Rumbaugh should IPLS cease to exist.

22        Now, Jared Taglialatela and William Hopkins were

23  installed as Sue's successors allegedly by a vote of the Bonobo

24  Hope Board with Sue and Duane's endorsement and at Lyle

25  Simpson's urging.  The successor to IPLS, the plaintiff ACCI,

1   contends that by that vote Bonobo Hope somehow put itself out of

2   business.  However, neither Sue nor Bonobo Hope was aware when

3   it voted on that resolution that Sue allegedly had been

4   dismissed from her position on the IPLS Board of Directors or

5   that Jared, a former student of Sue's in Georgia, had done an

6   about-face on his decade long support of Sue's research

7   trajectory.

8           Sue was not permitted by Lyle to discuss with Bonobo

9   Hope her banishment from the lab by George Caudill on

10  November 9th before the vote.  Lyle did not volunteer to Bonobo

11  Hope, which happened to be his client, that Yerkes had imposed a

12  ban on Sue's access as a condition of doing business with IPLS.

13  Lyle did not volunteer that ACCI had been created to stand in

14  the shoes of IPLS because it had been rendered inactive by the

15  Secretary of State of Iowa.

16          Since November 2013, ACCI has refused to volunteer any

17  information about the conditions of the bonobos or detail on any

18  research initiative.  Rather it has made clear that it disavows

19  and has discontinued Sue's research trajectory, including the

20  regular language immersion with the bonobos.

21          I have put on the screen, and I'll just display it

22  here, Your Honor, the single piece of paper that we've received

23  from ACCI since November 2013 that describes the research that

24  purportedly is going on at the lab.  We've asked for detail.

25  They've refused to give it to us.  We would like to know -- and

1  that's one purpose of the hearing -- exactly what the research

2  is that the bonobos are and are not being subjected to.

3         This is not only a breach of the settlement agreements

4  and the resolutions preceding it, it is inhumane.  It is the

5  equivalent of cutting out the tongue of a human being.  ACCI has

6  ignored concerns that the lab and the campus are environmentally

7  dangerous to the bonobos.  We intend to prove, therefore, that

8  the settlements mandate continuation of the interspecies

9  immersion research trajectory, that IPLS and ACCI have breached

10  this mandate, that Bonobo Hope's express and inherent rights of

11  ownership have been abrogated, that IPLS has ceased to exist

12  within the meaning of the settlements and breached them when it

13  failed to notify this court of that fact, and the bonobos,

14  therefore, should be relocated in accordance with the relocation

15  clause.  We also intend to show that Bonobo Hope has a viable

16  relocation site in neighboring Missouri.

17         Your Honor, in closing, let me say this.  In the

18  course of this hearing, you will hear two perhaps diametrically

19  opposed interpretation of events whose occurrence for the most

20  part is undisputed.  The court may find the interpretation of

21  the motives of various well meaning professionals almost

22  impossible.  I suggest to you that such an exercise is not

23  necessary.  The focus of the inquiry, with all due respect, is

24  whether the research trajectory should be sustained because that

25  was invariably the intention of the parties and, if not, whether

1    Bonobo Hope nevertheless because of its undisputed ownership

2    interests has an equal say in the destiny of these precious

3    creatures.

4            We hope that the court will rule in favor of Sue and

5    Bonobo Hope on both counts.

6            Thank you for your courtesy, Your Honor.

7            THE COURT:  Thank you, Mr. Zifchak.

8            Opening statement on behalf of the plaintiffs.

9            MR. MILLER:  Good morning, Your Honor.

10           I'm Bill Miller here on behalf of IPLS and ACCI.  I'm

11   here with my colleague, Brian Melhus, who will be trying the

12   case and this hearing with me, and Jared Taglialatela, Dr. Jared

13   Taglialatela, who is the director of research at ACCI and is

14   serving as our corporate representative.

15           May it please the court.  Your Honor, this is a case

16   about boundaries is what it comes down to.  It's the boundaries

17   of the ability of humans and the ability of humans to respect

18   those boundaries.  Now, in the background are some very

19   fascinating issues about the boundaries of the human mind, and

20   Dr. Sue -- and I refer to her with that respectfully,

21   Dr. Rumbaugh -- there may be a reference to her husband, so I'll

22   just say Dr. Sue just so we're clear.  Dr. Sue has done some

23   innovative work in the past with these bonobos.  The court

24   shouldn't be distracted by those issues, however, because the

25   focus here, the real boundaries to be concerned with are more

1  mundane, and they're focused on the settlements and the side

2  agreement and focused on subsequent activity by Bonobo Hope, by

3  Dr. Rumbaugh and by others that bring us to this point of

4  conflict that we're discussing in the courtroom.

5          Now, Dr. Sue has been asked time and time again to

6  live within boundaries, and those boundaries have been directed

7  by legal proceedings, by colleagues, by circumstances, and the

8  fact of the matter is she refuses.  And as this court knows,

9  just by example, this case started out as an interpleader action

10  and it's morphed into something different.

11          One of the issues that you'll be deciding -- and I'll

12  mention it here and not again, I don't think -- is the

13  jurisdictional issue with respect to what claims are at issue

14  here.  We have two jurisdictional issues.  We have the

15  supplemental agreement, and I think there's an agreement that

16  that will be addressed by the court, or at least the parties are

17  in agreement; but we have other claims about personal injury and

18  the like.  I didn't hear mention of them this morning.  They

19  shouldn't be discussed.

20          The focus is on the main and side agreements that

21  settled that interpleader action and the conduct subsequent to

22  them.  Those agreements define a plan going forward for the

23  operation of the Great Ape Trust, a facility that ACCI is now

24  operating.  Dr. Sue agreed it was time for her to step aside,

25  and she handpicked the next generation that would take over that

1   operation.  Then, for whatever reason, she decided to reassert

2   herself and in doing so created havoc.  She jeopardized the very

3   plan that she helped to implement.  She was then called on that.

4   It was brought to her attention.  She withdrew, and then since

5   then she's concentrated on this litigation.

6        Meanwhile, ACCI and IPLS have continued the work of

7   Great Ape Trust.  They've restored order to the organization.

8   They've put protocols in place and continued the research.

9   They've raised funds for the facility and to support the

10  research that they were doing, and they set boundaries for a

11  sustainable path going forward.  I think it will be clear and

12  evident as you hear testimony in this matter that Dr. Sue

13  doesn't like those boundaries.  She thinks they interfere with

14  her own plans and her work, Bonobo Hope agrees; but she gave up

15  control, she wants it back.

16       You do have a legal issue in front of you with respect

17  to this question of whether IPLS ceases to exist.  The fact of

18  the matter is no; the same operation from IPLS to ACCI.  In

19  fact, ACCI has improved what IPLS has been doing.  The prior

20  entity was administratively dissolved.  You'll hear testimony

21  from Mr. Simpson regarding that, from Dr. Rumbaugh and from

22  others.  That entity can be reinstated if necessary, continues

23  to exist, and ACCI continues at work.  We've briefed those

24  issues, and the evidence that you'll hear in the next couple of

25  days will support that IPLS does not cease to exist.

1          The real crux is how ACCI continues this operation

2    going forward while recognizing the co-ownership of BHI.  ACCI

3    has worked with BHI.  It's briefed them on events.  It hosted

4    members and meetings to discuss what's occurring at the

5    facility.  It's occurred in a context, however, in which Bonobo

6    Hope had previously stated that Dr. Taglialatela and Dr. Hopkins

7    would be in charge of the plan going forward.

8          Now, BHI has now cast its lot with Dr. Rumbaugh for

9    reasons that I don't know why exactly, but that's what they've

10   done.  But the fact of the matter is that there's no agreement

11   that guarantees Dr. Sue access to the facility, and any

12   indication that might happen in the future evaporated when she

13   refused to withdraw like she had promised.  Furthermore, she's

14   admitted over time that she's not capable of overseeing things

15   including the operation and safe health of the bonobos, and she

16   shouldn't be permitted to come back in now.

17         In sum, Your Honor, ACCI has continued to work the

18   Great Ape Trust here in Des Moines.  It's caring for the

19   bonobos, carrying on research consistent with prior agreements

20   between the parties.  It's not doing biomedical research.  The

21   bonobos aren't at risk from flooding.  These are all contrived

22   excuses.

23         The parties tried to erect boundaries that permitted

24   the continuation of Great Ape Trust.  We're here because ACCI

25   can respect those boundaries that Dr. Sue and BHI cannot.  At

1  the end of this matter, we're going to ask you to restore order

2  by confirming that ACCI may continue its work without

3  interference and demanded access by Dr. Sue.

4           Thank you.

5           THE COURT:  Thank you, Mr. Miller.

6           Mr. Stambaugh, you may call your first witness.

7           MR. STAMBAUGH:  Thank you, Your Honor.

8           The claimants first call Dr. Sue Savage-Rumbaugh.

9           THE COURT:  Ma'am, if you would come forward, please.

10          THE CLERK:  Please raise your right hand.

11      SUE SAVAGE-RUMBAUGH, DEFENDANTS' WITNESS, SWORN

12          THE COURT:  You can take a seat right there.

13          You might want to adjust the microphone so you can

14  speak into it conveniently.

15          THE WITNESS:  Okay.

16          MR. STAMBAUGH:  May I proceed, Your Honor?

17          THE WITNESS:  Can you hear me just fine?

18          MR. STAMBAUGH:  Yes.  May I proceed?

19          THE COURT:  Yes.

20

21

22

23

24

25

1                    DIRECT EXAMINATION

2   BY MR. STAMBAUGH:

3   Q.  Dr. Savage-Rumbaugh, we've heard some of the counsel talk

4   about the reasons for this proceeding.  Can you explain to the

5   court in your own words briefly why you're here today?

6   A.  Yes.  I'm here because a settlement agreement, in my view,

7   has been breached and access to the bonobos from both the

8   scientists and myself has been precluded.  I established the

9   Bonobo Hope Board and the scientists on that board to look after

10  the future of the bonobos, and I would like to see that

11  continue.

12  Q.  What do you want specifically for the lives of these bonobos

13  going forward?

14  A.  I want the research trajectory to go forward with

15  responsible scientists looking after that trajectory, and I want

16  the Pan/Homo culture and the rearing environment to continue.

17  This includes not only art, music, apes, it includes the family

18  that goes along with the bonobos, the human family as well as

19  the bonobo family, because that's produced the results of the

20  research.

21  Q.  Dr. Savage-Rumbaugh, we've already heard the phrase

22  "research trajectory."  Can you explain to the court what is the

23  nature of your research?

24  A.  The research trajectory, in my view, is something that a

25  scientist establishes when they have a question, a long-term

1   question and they spend their life looking at it from many

2   different ways.  Some scientists bounce around and look at

3   different topics.  I have taken the topic, the origin of the

4   human mind.  As a young child, my father used to always ask why

5   are all my seven children so different.  And I guess I started

6   to wonder, how did we get different and how did we get to be the

7   way we are.

8          So when I had a chance to for the first time in my

9   life meet apes, I was very fortunate.  I met them at the

10  University of Oklahoma where apes were raised in radically

11  different conditions.  Some were raised in human homes from the

12  date of birth.  Some were raised in peer groups from the date of

13  birth.  Some were raised by their mothers from the date of

14  birth.  Some were wild caught.  And I could immediately see,

15  having had a background in psychology, that these apes were

16  radically different, and apes are our closest living relatives,

17  and I saw then that what happens in one's lifetime and the

18  cultures that one is in makes a huge difference, and it makes a

19  difference even prior to birth and it certainly makes a

20  difference in the period of time after birth.

21         So I wanted to study that for my career, and I had

22  been on my way to Harvard University to work with B.F. Skinner.

23  I was very impressed with his book "Walden Two" in which he

24  shows how a full understanding of behavior and reward and

25  reinforcement and learning theory could shape a better world,

1   and I had been admitted to Harvard.  When I saw these apes, I

2   realized that learning theory was not the answer.  It couldn't

3   explain what I saw.  Rearing was explaining what I saw, but that

4   rearing went far beyond any reinforcement techniques and any

5   classical conditioning techniques, something else was going on.

6           So I vowed to work with apes the rest of my life.  At

7   that point many people told me, you won't get a job, it will be

8   difficult, you won't be accepted, nobody is doing that.  The

9   evidence in front of my eyes was overpowering, and I decided to

10  do it.  So I finished my Ph.D. at the University of Oklahoma,

11  and then I went to Yerkes under the direction of Dr. Duane

12  Rumbaugh, whom I later married, although I hardly knew him at

13  the time, and we've had and continue to have a wonderful

14  relationship since.  He's 20 years my senior, so he's residing

15  with a daughter in Jersey and would love to be here but is not

16  able to do so at this point in time because of his age.

17          But I have continued and he has urged me to continue,

18  and we had a very, very interesting research trajectory at the

19  Yerkes Primate Center.  When I first arrived, I was shown around

20  the center.  I looked up and down the wing where there were 130

21  or 150 chimpanzees, each two to a cage.  I walked up and down

22  that wing, and those chimps were crazy.  They were crazy.  They

23  were throwing shit, they were screaming, they were banging their

24  heads on the walls, they were poking their eyes, they were

25  pulling their hair out.  And I cried, and I said, as a

1   scientist, this is wrong.  I have to do something about this,

2   but I can't do anything about it as an animal rights activist.

3   All I can do is help people understand that these apes are more

4   intelligent than we have learned before.

5            And as I said, I had seen apes reared in human homes,

6   and I knew that they could go for rides in cars with me, they

7   could go to A & W with me and sit right there and order a

8   hamburger.  That was done at the University of Oklahoma.  It was

9   my training as a graduate student.

10           So I decided to do research that would help understand

11  the intelligence of these apes.

12  Q.  Thank you.

13           For the sake of our kind madam court reporter, Yerkes

14  is Y-E-R-K-E-S.

15           Can you explain to us what Yerkes is?

16  A.  Yerkes is one of a number of facilities operated by the

17  Federal Government that keeps primates mostly for the purpose of

18  biomedical research and certain kinds of restricted behavioral

19  research.

20  Q.  Dr. Savage-Rumbaugh, when did you first start working with

21  bonobos?

22  A.  I first started working with bonobos in 1975 when Matata,

23  the matriarch of this group, was imported from the Congo under a

24  loan-lease agreement to determine whether bonobos were actually

25  a different species than chimpanzees.  That was in 1975 and that

1  was the same time I arrived at the Yerkes Primate Center.

2         The other people there were doing biomedical assays

3  and I was to do the behavioral assay, comparing the behavior of

4  bonobos and chimpanzees to determine if they were or were not

5  different species.

6  Q.  Assay is A-S-S-A-Y, is that correct?

7  A.  Yes.

8  Q.  After Yerkes where did your research take you next?

9  A.  My research took me to Georgia State University, and there

10  we began with Kanzi in 1980 when he was just six months old.  He

11  was assigned to us and brought to us from the Yerkes Primate

12  Center, along with his mother, because I refused to separate him

13  from his mother or cause him any trauma by so doing.  And the

14  previous work I had done at the Yerkes Center had been -- tried

15  to determine whether or not apes could learn language, use

16  symbols, comprehend symbols, but it had all been based on

17  learning principles and conditioning principles.  And while the

18  work had been very successful, what I realized was that as long

19  as we could tell the world that we had trained these apes, we

20  weren't in the same ballpark with human beings.

21         So the real question was, could an ape pick up

22  language if it were in a situation in which a human child could

23  pick up language.  As long as we were assuming it had to be

24  trained, we couldn't really answer that question.

25         So I designed an environment for Kanzi, not to make

1   him a human because I knew that would be wrong.  Even if Kanzi

2   could become human, his body wasn't going to be human even if

3   his mind were.  He needed to live with bonobos and understand

4   bonobo language and culture.  So I kept him with his mother, and

5   I designed an environment in 50 acres of forest that Georgia

6   State provided, and Kanzi's day was spent wandering around that

7   forest finding food, foraging much as he would do if he were in

8   the wild.  But each place where there was food, it had a name,

9   and we could talk about where we were going to go and we could

10  talk about what we were going to do.  And in that environment,

11  without any training, Kanzi acquired knowledge of that forest

12  faster than the humans, he could lead people who were lost, and

13  he learned how to use the symbols, and he learned the human

14  language, the spoken language.  Even though he couldn't speak it

15  clearly, he tried to emulate it.

16          So he learned a written language and a spoken

17  language.  By the time he was two, two-and-a-half years of age,

18  he began to be competent.  And by the time he was three or four,

19  it became clear that he didn't need any kind of training

20  whatsoever.  He was on -- he was a bit delayed, but he was on

21  the same trajectory that a human child would be on if he were in

22  a loving, caring environment where he has respect and dignity

23  every moment and has the opportunity to do what he wants and say

24  what he wants.  That was the opportunity that was available to

25  Kanzi.

1  Q.  Doctor, in order to conduct this type of research

2  trajectory, what sort of contact with the bonobos is required?

3  A.  The same as you would have if you raised a child in a

4  loving, caring home.  You have free contact.  The child goes

5  places with you.  The child does things with you.  You explain

6  to the child what you're going to do in advance.  You tell the

7  child when there are ways to be polite and ways to be kind and

8  the proper words to say.  There has to be a moral attachment and

9  a bond that's established.  It's through that bond of love that

10  a young bonobo will want to emulate certain things; but it would

11  be wrong to do that with all humans around, as I said, so you

12  need bonobos and humans and the attachment needs to be both

13  ways.

14  Q.  After GSU, Georgia State University, where did you go next?

15  A.  After Georgia State University, at the request of Ted

16  Townsend, I came to Iowa, Des Moines, Iowa.

17  Q.  At the time you came to Iowa, Dr. Savage-Rumbaugh, what sort

18  of notoriety did Kanzi have?

19  A.  Well, Kanzi had gained worldwide recognition very rapidly

20  because he was the first nonhuman ever to be acquire language

21  without being trained and to understand spoken sentences, even

22  novel sentences that he had never heard before, even narrations

23  and stories that he had never heard before.  His comprehension

24  was deep and it grew deeper; but the accolades were -- I think

25  he was widely talked about in the New York Times.  He appeared

1    in newspapers around the world, he appeared in video clips

2    around the world, and he was on the first satellite that was

3    sent beyond the solar system, which had the treasures of

4    information we would share with the rest of the solar system if

5    they were to find that information, description of the work with

6    Kanzi was included there.

7    Q.   I want to take a step back before we talk about the Great

8    Ape Trust, Dr. Savage-Rumbaugh.

9          Have you received any awards or accolades for this

10   groundbreaking work that you were doing?

11   A.   Yes.  I've received an honorary doctorate at the University

12   of Chicago; an honorary doctorate at my alma mater, Southwest

13   Missouri State University; and I've received a Sigma Xi

14   lectureship; and I was nominated by Time Magazine as one of the

15   100 most influential people in the world.

16   Q.   What is a Sigma Xi lectureship?

17   A.   Sigma Xi is an honorary society for scientists, and they

18   select some scientists to travel around the United States and

19   tell students and colleges about the particular work they are

20   doing.

21   Q.   And have you been nominated for any other awards?

22   A.   I think that's the sum total.

23   Q.   Have you ever heard of the Templeton award?

24   A.   Oh, I've been nominated, but I don't know that I've received

25   other awards.  I was told that I was nominated for a Nobel, but

1  you never really know.  I don't know how many things I've been

2  nominated for.

3  Q.  How did you come about to be named one of Time Magazine's

4  100 most influential people?

5  A.  I don't know.

6  Q.  What year was that?

7  A.  I think that was 2010 or 2011 -- 2010.

8  Q.  Let's go ahead and talk about how the bonobos came to Iowa.

9  How did that come about?

10  A.  Ted Townsend heard about the bonobos through a book called

11  "Monkey Wars."  He was interested in building the Iowa Child

12  facility as I understand people here in Iowa know, and he read

13  in the book "Monkey Wars" about chimpanzees and bonobos in

14  Iowa -- I mean in Missouri that had language, and that research

15  happened to be done by an Iowan.  My husband, Duane Rumbaugh,

16  was born in Iowa, so because he was an Iowan -- I guess you do

17  this in Iowa -- he called up my husband and asked to come and

18  visit and see what our lab was really like.

19        Ted described having his father interest him in

20  Africa, and he traveled there many times, and he had seen all

21  the African animals.  He had them mounted at the Townsend

22  facility, and he had read about chimpanzees, and I don't think

23  he knew anything about bonobos; but he was interested in the

24  origins of humans and the whole evolutionary story.

25        So he came to our lab to see if it was for real, and

1  we showed him around, and he wanted to include us in the Iowa

2  Child project because he wanted children in Iowa to have the

3  experience of seeing apes with these capabilities.  He thought

4  it would inspire them to strive for greater heights themselves.

5  Q.  What was the plan for the bonobos when they first came to

6  Iowa?

7  A.  The plan was to build the ideal facility in which the

8  research trajectory could expand and continue in perpetuity.

9  Q.  Did your research trajectory continue after the bonobos

10 moved to the Great Ape Trust in Iowa?

11 A.  The research trajectory continued in many ways and it had

12 difficulties in other ways.  We were brought to Iowa, along with

13 a group from the Smithsonian Zoo, and they had an orangutan

14 named Azy, which it's interesting that his name Azy was sort of

15 like Kanzi.  And in terms of PR there was a desire to present

16 Azy and Kanzi in a similar manner, that they had similar skills.

17 They both used the keyboard.  Azy was not reared in an

18 environment like Kanzi, and Azy could not understand spoken

19 English and Azy could not understand narratives and Azy could

20 not understand novel sentences.  In fact, all Azy could do was

21 if you held -- if I held up my glasses, he could say glasses.

22 If I held up Kleenex, he could say Kleenex.  He could do that

23 for seven items.  Beyond that -- that's called paired associate

24 in psychology.  It means event X happens, you say A; event Y

25 happens, you say B.  So all you have to learn is to pair two

1   things.

2        Language is very different.  Language is symbolic.  So

3   if I say M&M and I hit a symbol, you usually do that if you're

4   an ape because you want an M&M; but Kanzi can understand no M&M.

5   He can understand M&M's for Matata, M&M's yesterday, M&M's

6   tomorrow.  When a symbol becomes freed from that paired

7   association, you can go backward and forward in time.  It can be

8   put in a sentence in all different ways, and words can modify it

9   in all different ways.  Then you have language.

10       Azy didn't have language; but the PR department -- Rob

11  was young, Rob was hoping to the future, and they wanted to

12  equate Sue with Rob --

13  Q.  And I'm sorry, I'm going to stop you there.  When you say

14  "Rob," who you referring to?

15  A.  Rob Shumaker.

16  Q.  Can you spell that?

17  A.  S-H-U-M-A-K-E-R.

18  Q.  Thank you.

19       Please continue.

20  A.  And I had hoped to work with Rob.  Ted told me that his goal

21  was that Rob would learn from me and be willing to work with me.

22  The only way you can learn is if you actually rear an ape

23  yourself and put it in the kinds of rearing environments that

24  the child has, and it needs to be a by-species rearing

25  environment as I mentioned.  You have to as a scientist do what

1    others have done to follow in their footsteps.

2         Rob wasn't really willing to do that with orangs, and

3    it caused him great consternation and the PR department some

4    consternation when Kanzi made fires, when Kanzi drew, when Kanzi

5    made music, when Kanzi did the things that culturally we do.

6    When Kanzi went on long walks out in the woods with Panbanisha,

7    it caused consternation because Rob couldn't do that with Azy.

8         So there was some conflict between myself and

9    Dr. Shumaker.  I welcomed Dr. Shumaker to the lab.  I hoped that

10   Ted's original idea that he would be able to learn and take the

11   science forward would be helpful.  At that time Rob had no

12   publications in his field, and there were probably 400 in the

13   other fields.

14        But in many other ways the trajectory went positively

15   forward.  The bonobos grew in abilities immensely, possibly as a

16   result of actually relocating so they got to see that the world

17   was a bigger place.  It was a very, very different environment

18   here in Iowa.  The weather was different.  We had the caves

19   outside.  We had a really big river.  We had a flood that almost

20   drowned us.  We had some of the things that happen in life, and

21   from all of those, the bonobos learned a great deal.

22        And in particular the bonobo Panbanisha, who passed

23   away very recently, became fascinated with all of the

24   documentaries on television that compared humans and apes and

25   talked about how intelligent apes were relative to humans.  She

1   wanted to study all of those and watch them over and over and

2   began to be very reflective.  Kanzi also increased in his

3   ability to be reflective.

4          And they were very aware that there were people in

5   Iowa who were very scared of apes and if they got out of the

6   facility would shoot them.  We had to explain this to them.  So

7   they were very cautious.  They were very respectful of everyone.

8   They were very careful.  In a sense they grew up here.  They

9   became adults.  Morality that I didn't think could show up began

10  to show up here, and this was one of -- it really changed here,

11  even though the research trajectory as I had originally imagined

12  it wasn't perfectly positive, because they are such intelligent

13  beings, they continued in their own minds, they continued the

14  trajectory.  And this was one of the things that I had very much

15  hoped to convey to Dr. Taglialatela had I had the chance.

16  Q.  You mentioned just a minute ago about the development of

17  Kanzi at the time he arrived in Iowa.  Dr. Savage-Rumbaugh,

18  after three decades of pursuing your research, can you explain

19  to the court in more detail what Kanzi was able to do at the

20  time you arrived at the Great Ape Trust?

21  A.  Kanzi learned on his own how to comprehend human language.

22  He could understand a sentence that he had never heard before.

23  There were sentences such as, can you give the doggie a shot?

24  Kanzi had never been asked to give a dog a shot, but in a test

25  situation, he could pick up a syringe and a toy dog and give

1    that dog a shot when there were many other multiple objects

2    there.  Kanzi could understand sentences like, let's not do it

3    now, let's do it later where the "it" is referenced by the

4    context.  So Kanzi understood referential words, he understood

5    symbolic words, he understood abstract sentences and abstract

6    syntax.  Kanzi could follow a narrative.  Kanzi could watch a

7    videotape and, at the level of at least an eight-

8    or ten-year-old, understand what was going on in a video.  Kanzi

9    on his own -- his favorite movie was "Quest for Fire."  And each

10   bonobo has always had a favorite movie, and it determines their

11   character.  Kanzi's was "Quest for Fire," and he began to make

12   fire, and by the time he got here he was an accomplished fire

13   maker.  You have to be sure that you don't burn yourself and

14   that you gather the sticks right and that you put them right and

15   that you add sticks at the right time.  Not all the other

16   bonobos wanted to do that, but Kanzi did.

17          Kanzi also became an accomplished stone tool napper

18   before he came here, and no other bonobos has ever made stone

19   tools, no other bonobo has ever made fire, no other bonobo has

20   ever understood language at that level.  And Kanzi had played

21   and demonstrated ability to have rhythm and synchrony with Peter

22   Gabriel, and many other things, but those are the ones that are

23   best documented.

24   Q.  Their favorite movie was not "Planet of the Apes"?

25   A.  They feel the "Planet of the Apes" -- well, they've watched

1   all the different versions, and they don't like the intermediary

2   versions where the apes were so aggressive.  They did like the

3   Charleston Heston version, but they had focused on -- each one

4   is different.  Kanzi focused on "Quest for Fire" because humans

5   were very ape-like in that movie and they were trying to become

6   more human-like in that movie, which I guess is what Kanzi was

7   trying to do; but Kanzi would watch that movie over and over and

8   over and, at certain points it was very scary, and at the scary

9   points he would turn -- there was a reflection in the lexigram.

10  When the video would shine on the lexigram, Kanzi would turn and

11  look the other way at the scary part, so he wasn't actually

12  watching the video.

13          Panbanisha's favorite movie was "Harry and the

14  Hendersons," which is about a bigfoot that is struck by a family

15  car and is carried home in the station wagon and the family is

16  trying to protect this ape in their house and nobody else

17  understands the plight of the ape, and that really became

18  Panbanisha's preoccupation.

19          And I could explain the others, but it is like a

20  child.  They have their own personality and they develop in

21  their own way.

22  Q.  Dr. Savage-Rumbaugh, how much time were you spending with

23  the bonobos at the trust at this time?

24  A.  I had somebody with the bonobos 24 hours a day.  It wasn't

25  always me.  When Panbanisha and Kanzi were little, I did stay

1   with them 24 hours a day, three days a week, and somebody else

2   stayed with them the rest of the time.  I tried to as much as I

3   could do writing and presentations and keep the trust running

4   and to work -- I didn't work an eight-hour day schedule.  I

5   worked at the project all the time but not always at the lab.  I

6   had my sister, Liz Pugh, and others if I weren't there who could

7   continue the proper environment.

8   Q.  Dr. Savage-Rumbaugh, did you take any photographs of the

9   activities that you were conducting with the bonobos at the

10  trust at this time?

11  A.  Yes.  Yes, I did.

12  Q.  Did you bring them here today?

13  A.  Yes, I did.

14  Q.  Do you think it would assist in your testimony to talk about

15  those pictures?

16  A.  I would just like to show a few pictures.

17          MR. STAMBAUGH:  Your Honor, at this time I would ask

18  to publish these pictures for purely demonstrative purposes, and

19  I've already shown them to opposing counsel.

20          THE COURT:  You may do so.

21          MR. STAMBAUGH:  Thank you.

22          With the court's permission, I'll be using the

23  document camera.

24          Just one moment, Your Honor.  I apologize.  I stand

25  corrected.  We will be using the screen.

1          Thank you.

2    BY MR. STAMBAUGH:

3    Q.  Dr. Savage-Rumbaugh, as we put up these pictures, I'm just

4    going to ask you to describe briefly for the court what is the

5    picture of?

6    A.  This is a picture of Kanzi.  He's just asked to see the

7    picture that we've just shown him on the screen.  We had a

8    photographer come who was going to take pictures of Kanzi for a

9    newspaper, I believe in England, and Kanzi -- prior to the shot

10   Kanzi asked if he could pose in front of the icicles which were

11   coming into his tunnel, and he posed in front of those and then

12   he asked to see what he looked like in the picture.

13   Q.  How did he ask to pose under the icicles?

14   A.  He has picture on his keyboard.  He can say picture and

15   gesture to the icicles and point to the photographer that is

16   already taking his picture and then go sit there.

17   Q.  Are those the lexigram keyboards that we've heard about?

18   A.  Yes.

19   Q.  Can you describe those briefly to the court?

20   A.  Yes.  There are over 450 symbols on the lexigram keyboard,

21   and some of them were -- Kanzi learned six when he was very,

22   very young.  At the time we thought he had to be trained, and we

23   found out he learned them, and then we slowly added them in

24   Kanzi's life.  We may see a picture, if we go ahead, we'll see a

25   picture of what a keyboard looks like; but they're geometric

1   symbols or in some cases printed words because Kanzi does try to

2   speak, and Kanzi will try to say things.  For a word like

3   peanut, he will try to say (sound by witness) and for banana

4   he'll try to say (sound by witness).  And, in fact, that was

5   some of Dr. Taglialatela's earliest work, it was fantastic work,

6   and I really hoped he would continue it.

7           But because it's very hard for us to understand

8   English, Kanzi would also point to a symbol, and this work has

9   been extended to children with retardation that have similar

10  problems.  If you can't understand them, they need a symbol.  So

11  that's what the symbol board does.  The symbol board itself is

12  not the language.  It's a means of expressing when you're --

13  when you're blocked in other ways, like I am right now.  I'm

14  going to have a drink of water.

15  Q.  Please, please do.

16          And for the record, Dr. Rumbaugh's impression of

17  peanut was two high speaking symbols and banana was three high

18  speaking symbols, although I don't speak bonobo so that's my

19  best interpretation.

20          Please have a drink of water.

21          Let's go to the next picture.

22          Dr. Rumbaugh, this looks like one of the bonobos

23  looking at a small, perhaps compact mirror?  What is this

24  photograph?

25  A.  Yes.  Kanzi is grooming his eye.  He's using the mirror to

1   groom his eye, and the mirror is very special because it shows

2   that Kanzi has self-recognition.  Self-recognition matters

3   because if you know who you are and you can reflect upon who you

4   are, it is out of that capacity you can develop a moral system,

5   the kind of system that's much more highly involved that we're

6   using here today.  And apes are the only creatures that have

7   actually demonstrated this ability.  Many others can use mirrors

8   to find dots on themselves or use mirrors to look behind, but

9   they don't know who it is in the mirror.  Kanzi does.

10  Q.  Let's go to the next picture.

11  A.  This is Kanzi making a painting with me, and you can see,

12  unlike Azy who was given a brush and had to paint outside the

13  cage with whatever color they gave him and wiggle it through the

14  wire, Kanzi can actually create pictures.  He can create

15  representational art.  He chooses his own color.  He paints as

16  he wishes.  This is just to show the process.

17  Q.  Are you aware of any other ape in the world who can do that?

18  A.  Yes.  Koko and Michael can do that.  They're gorillas that

19  Penny Patterson has raised, and they can create representational

20  art, and she raised them almost the same way that I raised Kanzi

21  and Panbanisha.

22  Q.  Following a similar research trajectory?

23  A.  Yes.

24  Q.  So Kanzi is one of three who is able to do these things on

25  the planet?

1  A.  Well, Panbanisha can do it, Nyota can do it, and Matata was

2  starting to do it, and Teco can do it.

3  Q.  All of those were raised by you, right?

4  A.  Yes.

5  Q.  Let's go to the next picture.

6  A.  This is Kanzi using the keyboard, and Panbanisha is getting

7  ready to turn around and look at him.  They can communicate at a

8  very complex level vocally; but if they want to be quiet, they

9  can also use the keyboard to communicate with each other.

10  Q.  Let's go to the next picture, please.

11  A.  This is Kanzi and Sue communicating both vocally and with a

12  keyboard to some people outside the cage where, as you saw in

13  the little videos, the vocalizations are constant and they're

14  interdigitated as though the bonobos were talking to you.  They

15  are talking to you because they can understand you or me, but we

16  can't understand them.  So they're interspersing their sounds in

17  an appropriate way at a more rapid pace than any human could do.

18  Dr. Taglialatela has demonstrated that in very fine work and,

19  again, it was what I was hoping that I would be able to foster

20  in the proper direction.

21        So here Kanzi and I are talking with vocal talk

22  (sounds by witness), and we're talking on the keyboard at the

23  same time to people outside the caged area.

24  Q.  Let's look at one more picture.

25  A.  Well, this was an attempt by ACCI to raise money.  Kanzi was

1  supposed to be a pie-eating contest judge at the local state

2  fair.  I found this rather demeaning for Kanzi.  In the recent

3  pictures and things of Kanzi and Nyota and the others that have

4  published they look quite stressed, and I'm sure this was very

5  stressful for Kanzi.

6  Q.  This was not a picture of your work while you were at the

7  trust?

8  A.  No.  This was how they hoped to raise funds.

9  Q.  Let's go ahead and take the pictures down.

10       Dr. Savage-Rumbaugh, we've heard about the plans for

11  the trust and about your work at the trust.  Did Mr. Townsend

12  follow through on his lifetime commitment of funding?

13  A.  Mr. Townsend withdrew his funding at the end of 2011 and we

14  were sort of left in the lurch.

15  Q.  What happened after that?

16  A.  I was appointed an interim director, and we began to try to

17  go forward and raise funds.  Lyle Simpson became the legal

18  counsel, and he wrote to many people throughout the state,

19  including the Governor and including senators and including his

20  clientele, to describe the research.  He was very, very positive

21  about the research and he wanted to help us raise funds, and so

22  from that point forward Dr. Schweller and I listened to his

23  guidance.

24  Q.  Let me take a step back in time.

25       What led to Mr. Townsend withdrawing his funding?

1          MR. MILLER:  Objection; hearsay.

2          THE COURT:  I'll receive it, subject to the objection.

3          MR. STAMBAUGH:  You may answer.

4   A.  It is my understanding that it was the flood and his

5   inability to raise enough money and the reverse in the stock

6   market that happened in 2008.

7   BY MR. STAMBAUGH:

8   Q.  When was the flood?

9   A.  I mean, the flood was in 2008.

10  Q.  What was the impact of that flood on the trust?

11  A.  The impact was hard.  The flood -- we were told even up

12  until the minute water was coming in the building, the Corps of

13  Engineers said, the building will not flood, the building will

14  not flood, stay there, stay there.  So the waters came really

15  fast, they came really high, they were really cold, they were

16  really toxic.  And you could look through the glass doors and

17  see fish all around, like you were in an aquarium.  And many of

18  the staff, of course, did not want to risk those waters.  My

19  sister and I risked those waters day and night to take care of

20  the bonobos and allow them to survive through the flood.  They

21  had to stay up high in the tunnels, and we had to bring food to

22  them, and it took about two weeks I guess for the water to fully

23  recede.  We had to, with assistance, clean out the entire

24  building.  There were problems in the drain system, of course,

25  and during that period of time, we had no electricity.  We had

1    to bring the food in by boat.  We had to go back and forth daily

2    by boat.  We had to wear waders up to here (indicating) the

3    entire time.  Oftentimes you would slip and fall and water would

4    get in your waders so you were exposed to toxic water.  We had

5    to ask the bonobos, please, don't go in the water because we had

6    no way to prevent them.  There was only one bonobo that really

7    liked the water.  He kept playing in it, and he soon got cancer.

8    And my sister who slipped repeatedly in her waders got cancer.

9    Q.  Did you stay in the building the whole time?

10   A.  I stayed in the building the whole time.  I mean, I might

11   have gone out for food or things like that, but I stayed there.

12   I slept on the table so I wasn't -- you couldn't sleep on the

13   floor or you would be in the water.

14   Q.  What was the subsequent impact of that flood on the bonobos,

15   other than the cancer that you already mentioned?

16   A.  Well, I thought that the grounds were toxic, but there was

17   no test of that to be sure.  So I don't know for sure what the

18   biological effects of the flood were; but the bonobos and myself

19   certainly respected the power of the Des Moines River, as I

20   guess anyone in Iowa does, and prior to that time they did go

21   down and put their toes in the water, but they were much more

22   hesitant to do that after the flood.  And if we spoke about

23   flood, they clearly remembered it and were -- you know, paid

24   attention to the flood reports, shall we say.

25   Q.  And what was the impact of that flood?  What is your

1  understanding of the impact of that flood on Mr. Townsend's

2  funding of the Great Ape Trust?

3  A.  Well, I can tell you that Mr. Townsend put a lot of money

4  and a lot of hope into that building.  I know that he wanted to

5  expand it.  I know that he wanted to add at least four other

6  buildings.  We had had repeated architectural meetings about

7  adding other buildings from the start, even before that building

8  was built, and they continued.  I know Ted was really looking

9  for funding from outside to expand and to have gorillas and

10  chimpanzees there, which we didn't have at that time, and to

11  have a visitor center.

12      And with the flood Ted knew that those plans could not

13  continue.  I don't know how much Ted knew before that time, but

14  it became clear that the Army Corps of Engineers had never given

15  a building permit to the site and it would certainly not give

16  any new building permits to the site.  That became very clear.

17  So Ted's plans had to be abandoned for the site, and I can

18  remember him staying away during the early days of the flood and

19  everybody wondering where's Ted, where's Ted, where's Ted.  And

20  then I saw him, and he came and stood way, way back, and he

21  looked and he put his hands like that (indicating) and he looked

22  all around, and I felt very sorry for him.  He was very --

23  Q.  The witness was putting her hands on her waist.

24      I'm sorry.  Go ahead.

25  A.  Yeah, I think his dream was lost.  I think his hopes were

1  lost.  I think he thought we really didn't -- couldn't pull out.

2  But those are my subjective impressions of watching the

3  expression on Ted's face.

4          So we had to -- not too long after that he had a

5  meeting where he indicated he was going to drop his funding by

6  one million a year until it was down to zero and we needed to

7  make other plans.

8  Q.  When did he indicate that?

9  A.  It was some months after the flood, after the cleanup and

10 after the flood.

11 Q.  When was the funding eventually pulled completely?

12 A.  It was pulled completely at the end of 2011, so between

13 2008 - 2011, we had three years.

14 Q.  Dr. Savage-Rumbaugh, what was your role in the lab at the

15 end of 2011 when Mr. Townsend pulled his funding?

16 A.  My role was to keep the lab going.  I had to pay all the

17 bills.  Not only find the money to pay the bills, I had to raise

18 the money to pay the bills.  I had to actually pay the bills.  I

19 had to do all of the administrative work.  I had to check into

20 all the insurance and administrative issues.  I had to set up a

21 new IACUC because the IACUC resigned.  I had to find a new vet

22 because the Iowa State vet resigned.  I had full care,

23 24-hour-a-day care of Teco without very much relief at all at

24 that point.  I had to bring in new volunteers and train them.  I

25 had to do the majority of the feeding and cleaning.  I had to

1  pull us through.

2  Q.  You mentioned that you had to set up a new IACUC.  That's

3  I-A-C-U-C in all caps.

4           What is an IACUC, Dr. Savage-Rumbaugh?

5  A.  An IACUC is an Interinstitutional Animal Care and Use

6  Committee.  It's a committee that governs the use and research

7  and the standard operating procedures of any animal facility in

8  the United States.

9  Q.  You mentioned that you had new administrative duties at the

10 end of 2011, early 2012.  Was one of those administrative duties

11 to serve as executive director?

12 A.  Yes.  I was the interim executive director.  I wasn't

13 clearly informed of that at the time, but Dr. Schweller later

14 informed me that was his view of my position.  Dr. Schweller had

15 gone to the previous IACUC and told them that we had a million

16 to a million-and-a-half dollars to operate.  Then in a few weeks

17 he stated in the paper that we really didn't have that money.  I

18 believe he thought Ted would provide that money.  I'm not sure

19 where Dr. Schweller thought the money would come from; but he

20 then made it clear that we didn't have it and that IACUC

21 resigned.  It had voted to continue the project based on

22 Dr. Schweller's report.

23           Dr. Schweller then turned to me and informed me that

24 it was my job to raise money and that I should contact Peter

25 Gabriel, who had made the musical video that I think you'll see

1  at some point in time, and at that point I was to keep the lab

2  running and to raise the money and to establish an IACUC.

3  Q.  Were you asked to sign any forms on behalf of the company as

4  the executive director?

5  A.  I was asked to sign a form.  I was not told that I was

6  signing it particularly as the executive director, but it does

7  say that I believe on the bottom of the form.  I was asked to do

8  that by Susan McKee.  I don't recall any particular explanation

9  of that form.  I was having to sign a lot of forms that were new

10 to me at that time, insurance forms, employee forms, all kinds

11 of forms.  And before she resigned as the accountant and

12 administrative assistant, she had worked with Jim Aipperspach,

13 and she was transitioning through Heidi Lyn, who was there for

14 awhile, and then me, and I certainly trusted her and I signed

15 whatever she asked me to sign.

16 Q.  Let's take a step back.  Who is Susan McKee?

17 A.  Susan McKee was the administrative assistant and accountant

18 to Jim Aipperspach for Great Ape Trust.

19 Q.  What was the form that she asked you to sign, if you can

20 recall?

21 A.  I understand now it was a registered agent form.  I didn't

22 know what a registered agent form was at that time, but I knew

23 it was something to do with IPLS and it needed my signature.

24 Q.  Did you know what that change of agent form required of you

25 at the time?

1  A.  No.  I was not told what was required of me.

2  Q.  Were you aware at the time that you signed this that you had

3  to file any documentation on behalf of the entity?

4  A.  No.

5  Q.  Dr. Rumbaugh, were you aware of any liens against IPLS at

6  the time you signed this change of agent form?

7  A.  No.  Nothing was described to me of that sort.

8  Q.  I want to return and talk about what was going on at the

9  Great Ape Trust in early 2012, which is where we left off.  What

10  was your responsibility at the trust in early 2012?

11  A.  My responsibility in early 2012 was to pull the trust out of

12  the chaos that it was in, take the research trajectory forward

13  and get funding.

14  Q.  In addition to administrative tasks, what else were you

15  tasked with at the trust at that time?

16  A.  I was tasked with all of the operational, the daily

17  operations of running the lab, training the staff, food, care.

18  I was there 24 hours, and I was making the facility operate.

19  Everybody else came and went.

20  Q.  Was that different from your responsibilities a year prior?

21  A.  Yes.  Prior to that time there were security people there

22  watching over it at night.  There were people that prepared the

23  food.  There were people to do the cleaning.  There were people

24  to handle the accounting.  There were people to handle the PR.

25  There were people to handle the administration.  All of those

1  people left.

2  Q.  How did that affect you in early 2012?

3  A.  It was tiring and I felt that I needed some additional

4  assistance.

5  Q.  Did you explain to folks that it was tiring and you needed

6  additional assistance?

7  A.  Yes.  I explained to the board.  I explained to the board

8  that we were going to have to hire a new vet, we were going to

9  have to have a new IACUC, we had many issues that needed to be

10  resolved, and I sought Dr. Schweller's assistance.

11  Q.  Were you able to accomplish what you wanted to accomplish

12  with the bonobos at this time when you were overworked,

13  overtired?

14  A.  Yes.  I was able to pull them through, make sure that the

15  lab was clean, passed all of the USDA inspections, get the bills

16  paid in the interim, and continued Teco's daily life making it

17  as much like Kanzi's as possible and kept Teco integrated in

18  with the bonobo group in the same way that Kanzi had been

19  integrated with the bonobo group when he was a baby.

20  Q.  You mentioned taking care of Teco earlier.  Please tell the

21  court, who is Teco?

22  A.  Teco was the son of Elikya.  He was born at Ted Townsend's

23  request.  Ted Townsend wanted to have an Iowa bonobo.  His

24  mother, Elikya, was the daughter of Matata, the matriarch who

25  came from the Congo, so Teco was a third generation captive born

1   bonobo.  He was also a third generation bonobo in this language

2   group, which was really different both in terms of its genetic

3   history and cultural history.

4        When Teco was born, his delivery was difficult.  It

5   took -- probably two days Elikya was in labor.  She would go

6   into labor, and when some staff would arrive, she would often

7   get nervous and go out of labor because she didn't trust --

8   there were staff members she didn't trust.  I stayed with her

9   around the clock, and the delivery, as is often the case,

10  because bonobos don't like to deliver when there are many people

11  around, the delivery occurred very early in the morning.  Teco

12  was not really able to move.  I thought that he was not a live

13  born baby.  We had had three babies already born that were not

14  live born in the lab.  We never had this happen in Georgia.  It

15  was a big problem in Iowa.

16       I stayed with Teco, and after maybe 15 or 20 minutes,

17  I saw his tongue barely move, and I realized that he was alive.

18  Prior to that time I did not think he was alive.  After three

19  hours he finally vocalized and began to move.

20       Teco was very, very unusual for a bonobo in that he

21  came with the reflexes of a human baby, and by that I mean that

22  he clung with his hands but he didn't cling with his feet.  Baby

23  bonobos and chimpanzees have a reflex, so if you're holding them

24  and you start to move, they immediately grab with their feet and

25  their hands, and they cling on to the hair of their mother or

1  they can cling onto your clothes.  So if you're climbing a tree

2  or you're out in the wild and you're an ape mother, you don't

3  need to keep that baby with you.  That baby will stay with you.

4  When it's very young, you might support it a little bit; but by

5  the time it's three or four months of age, it clings.

6         Teco didn't have that reflex, so when Elikya tried to

7  move around the cage, he would hold with his hands but his feet

8  would hang down, and instead of his feet being gripped on her,

9  they kicked.  A human baby kicks with its feet.  So what we got

10 in Teco's case is we got a change in the software of the

11 neurological system in this baby by third generation.  He

12 had the neurological software that a human baby comes with, and

13 it made it difficult for Elikya to climb around the higher areas

14 of the cage.  So she began to leave Teco with Kanzi, with

15 Matata, with Panbanisha while she climbed up around the higher

16 areas of the cage, and Teco began to try to nurse from Kanzi and

17 the others and became very, very weak.  So Elikya finally

18 brought Teco out to me and asked for me to help take care of

19 him, and I did.

20 Q.  How old was Teco during this very difficult time in early

21 2012?

22 A.  That was the first two months of his life.

23 Q.  So during all of the experiences that you were just

24 describing?

25 A.  What I just described were the first two months of his life,

1   yes.

2   Q.  Dr. Savage-Rumbaugh, after this period in early 2012, what

3   happened at the trust after that?

4   A.  Well, in May of 2013, I fell and had a concussion.  Prior to

5   that concussion, we had tried to work out a way for me to have

6   some assistance and the project to go forward.  And Lyle Simpson

7   had suggested that the best way would be for us to establish a

8   business board and a science board.  We had one board that was

9   composed of scientists.  While the trust had been operating, I

10  felt that many of the people on the board of the Great Ape Trust

11  who were business people had difficulty understanding the

12  conflict of being people who came from the zoo and people who

13  came from the field of science.  So I wanted a board that was

14  composed of scientists so the scientific research trajectory

15  could continue.  That was my premise coming here.

16          So we started out with the IPLS board after

17  Mr. Townsend left, and the board was composed of scientists.

18  Mr. Simpson's view was that business people did not want to be

19  on the same board with scientists, and he sat me down and he

20  said, Sue, you really need to have two boards, one with business

21  people and one with scientists.  And what the business people

22  will do, they won't bother you, they won't cause any trouble,

23  they won't do anything; they'll just bring in the money, and

24  myself and others will work with them, and we'll fund your work,

25  we'll see that the trajectory goes forward.  He even suggested

1  that maybe he would help me obtain guardianship for the bonobos

2  because he knew I was concerned.

3       So he was very supportive and he offered to establish

4  two boards, and we passed resolutions to that effect in the end

5  of 2012, and from that -- and then in May, we effected those

6  resolutions by actually establishing two boards.  The resolution

7  set out how the boards would act, and in May we established

8  those two boards.

9  Q.  Let's pick it up in late 2012 then.

10      First of all, for the court's benefit who is Lyle

11  Simpson?

12  A.  Lyle Simpson was the legal counsel for Bonobo Hope and for

13  IPLS.  He took up Jaki Samuelson's role.

14  Q.  And you mentioned that there was a proposal made for

15  splitting the two boards, is that right?

16  A.  Yes.

17  Q.  What was the purpose of the IPLS board?

18  A.  The first board, which was the IPLS board, that was the

19  board of scientists, and its purpose was to carry the research

20  trajectory forward.  Lyle proposed splitting that board into two

21  boards.

22  Q.  What were those two boards going to look like?

23  A.  One was going to be composed entirely of business people,

24  hopefully most of them local in Des Moines that Lyle knew.

25  Q.  What was the name of that business board?

1   A.   That business board was going to carry forth the Iowa

2   Primate Learning Sanctuary name at that time.

3   Q.   And what was the purpose of the second board?

4   A.   The second board was to be composed of scientists.  They

5   were to have oversight over the science.  They were to operate

6   the facility, which was to be leased to them for a nominal

7   amount, and they were to be responsible for the health and

8   welfare of the bonobos and full ownership was to be transferred

9   to the board of scientists.

10  Q.   What is the name of that board of scientists?

11  A.   Bonobo Hope Initiative.

12  Q.   Is that sometimes referred to as BHI?

13  A.   Yes.

14  Q.   Was there any discussion among the board members regarding

15  the purpose for these two separate boards?

16  A.   There was a lot of discussion after Lyle made the proposal.

17  There was a great deal of discussion between myself and Lyle

18  prior to the proposal.  Many board members worried, as did I,

19  that the business board might take charge, that at some point I

20  might be removed from the bonobos.  There were lots of e-mails

21  back and forth about that.  Lyle reassured us that that could

22  never happen, I could never be removed from the facility, that

23  the business board would not take over, that I would be a member

24  of the business board, that the chair of BHI, Carmen, would be a

25  member of the business board, and that its sole function would

SAVAGE-RUMBAUGH - DIRECT

54

1  be to raise funds for the science and the operation of the

2  facility and otherwise it would be hands off.

3  Q.  Who is Carmen?

4  A.  Carmen is the chairperson of Bonobo Hope Initiative.

5  Q.  Carmen Mate?

6  A.  Yes.

7  Q.  M-A-T-E?

8  A.  It's "Matae".

9  Q.  Excuse me; Mate.

10        How did Mr. Simpson accomplish this division of the

11  two boards; one into business, one into scientists?

12  A.  He sent around a lengthy e-mail to the board explaining his

13  desire, and he answered questions from the board, and then he

14  invited the board to vote on resolutions in December of 2012

15  that stated that at some point in the future time, this action

16  would take place, and the board so voted and passed the

17  resolutions that I just described.

18  Q.  How did those two boards operate after they were divided?

19  A.  They weren't divided in 2012.  What happened initially was

20  that Mr. Simpson set up what he called a pro board or pre board

21  or something like that.  He brought George Caudill on board and

22  a few other people, and they had meetings even though they

23  weren't yet the IPLS board.

24        And then in May he asked the scientists to all resign

25  from the IPLS board and nominate and place George Caudill and

1    Tom Watson and the other people that he wanted to have on the

2    board at that time, and that the scientists would then go on

3    what he termed the science board.

4    Q.   After they were split in 2013, did BHI, in fact, oversee the

5    science?

6    A.   Yes.  BHI moved to oversee the science.  At the time, even

7    before they were split, George Caudill asked me not to

8    communicate directly with the science board, that I needed to go

9    through him before I communicated with the science board.  Lyle

10   advised George that the science board suggested that he, George,

11   decide it.  So there was definitely an indication that the

12   science board was not operating in quite the way that we had

13   envisioned it would operate.

14   Q.   When was BHI actually formed?

15   A.   BHI was formed when we learned that Ted Townsend was going

16   to stop funding.  And I formed that with another party who

17   advised me to do it over the computer, and I -- Lyle asked me to

18   meet with him and indicated that he could be of some assistance

19   to me, and he asked me what I was doing given that Ted was

20   resigning, and I explained that I was establishing my own

21   nonprofit and I would try to raise money.  Lyle said that he

22   would offer assistance and he would offer help and he would

23   offer guidance, and I gave him the paperwork that I had, and he

24   said he would take charge and he would help me from that point

25   on with BHI.

1  Q.  So to be clear, Dr. Savage-Rumbaugh, during that period of

2  separating the two boards, what was your understanding of the

3  purpose of the BHI board?

4  A.  The purpose of the BHI board was to carry on what the IPLS

5  board had left off, was to look after the trajectory of the

6  science, the welfare of the bonobos, and it was to operate the

7  facility.  I think everybody was in agreement that we would at

8  some point bring in some assistance and that there would be a

9  transfer of my senior role to a different role and that I would

10  go forward.  Lyle always indicated that that would be a

11  co-direction of the facility for three to four years and at a

12  proper time and whoever came forward would take more

13  responsibility.

14  Q.  Before we talk about that transition period, was there also

15  a dispute over the ownership of the bonobos around this time?

16  A.  At that time this case was already in the interpleader

17  court.  So as we were coming to change over from the Townsend

18  administration to what was the Schweller administration, Lyle

19  was very, very anxious that the lawsuit be resolved.  Lyle

20  indicated to me that the judge would be very angry if I didn't

21  resolve it, that I needed to resolve it as soon as possible,

22  that it would be impossible to raise funds if I didn't resolve

23  that, and I needed to do that and that we could go forward from

24  that point.

25  Q.  How many settlement agreements were there?

1    A.   There were two settlement agreements.

2    Q.   Were you a party to both of those settlement agreements?

3    A.   Yes.

4    Q.   Who represented the parties during the negotiations of those

5    settlements?

6    A.   Paul Burns represented IPLS and the board, the IPLS board,

7    of which Ken Schweller was the chair at that point in time.

8    Bill Zifchak represented me, and there were other lawyers

9    representing I guess Atlanta and other places.

10   Q.   As a party to both agreements, what was your understanding

11   of the purpose of the main settlement agreement?

12   A.   The purpose of the main settlement agreement --

13            THE COURT:   Just a second.

14            MR. MILLER:   Your Honor, objection; relevance.

15            THE COURT:   I'll receive it, subject to objection.

16            MR. STAMBAUGH:   Thank you, Your Honor.

17            You can continue.

18   A.   The purpose was to resolve the ownership that had been

19   brought before the court and to do it in a way that everybody

20   agreed and could go forward.

21   BY MR. STAMBAUGH:

22   Q.   As a party to the supplemental settlement agreement, what

23   was your understanding as to the purpose of that agreement?

24            MR. MILLER:   Objection; relevance.  Objection to the

25   extent it calls for a legal conclusion.

1          THE COURT:  And I will receive it, subject to the

2   objection.  The question calls simply for her understanding, not

3   a legal understanding.

4          MR. STAMBAUGH:  Thank you, Your Honor.  Yes, it does.

5   A.  My understanding was that the ownership of the bonobos was

6   to be split between the IPLS board and the BHI board.  I was

7   concerned about that and I discussed that with Lyle, and that's

8   when he suggested that perhaps guardianship would be a solution.

9   I think Mr. Zifchak didn't feel that that was really the

10  appropriate solution.

11         Then the resolution was passed that after the board

12  was split, the IPLS board would transfer its ownership to the

13  BHI board, so I -- the science and the work that I had done

14  could go forward under the guidance of that board, and

15  Dr. Taglialatela was a member of that board.

16  BY MR. STAMBAUGH:

17  Q.  Did you have any involvement in the drafting of any

18  provisions in the settlement agreements?

19  A.  At one point in time when the settlement agreements were

20  still being drafted by Jaki Samuelson and Ted Townsend was in

21  charge, Bill Fields brought a paragraph to me that he wanted to

22  insert into the document to protect the research trajectory.

23         We had been very aware that we were in a very unusual

24  position.  We wouldn't own the bonobos the way you could own a

25  dog or a pet.  We couldn't have any guardianship the way you

1 have over a child.  We were in sort of no man's land and whoever

2 owned the bonobos determined the future.  So he felt the only

3 protection to keep the bonobos in the kind of life they had had

4 and to see that the research could actually go forward was to

5 insert a paragraph about the research trajectory itself.  So he

6 wrote that paragraph and he brought it to me and I added

7 portions to that paragraph.

8          MR. STAMBAUGH:  Your Honor, at this time I would like

9 to publish what's been marked as Exhibit 1.  Pursuant to the

10 pretrial order, it's been deemed admitted as a category A.

11          THE COURT:  You may.  But before we do that, who was

12 it that brought this paragraph to you?

13          THE WITNESS:  William Fields.  He was the director of

14 the bonobo research project at that time.

15          THE COURT:  Thank you.

16 BY MR. STAMBAUGH:

17 Q.  Dr. Savage-Rumbaugh, we've published now for the court and

18 counsel what's been marked as Exhibit 1.  Is this what has been

19 termed the main settlement agreement?

20 A.  Yes.

21 Q.  And I would like to draw your attention down to paragraph 4,

22 which I believe is on page 2.  If you would go ahead and take a

23 moment to read that paragraph 4 to yourself.

24          (Pause.)

25 A.  Yes, I'm familiar with it.

1   Q.  Is this the research trajectory paragraph that you were just

2   referring to?

3   A.  Yes, it is.

4   Q.  Did you add or edit language in this paragraph?

5   A.  Yes.  I added where it says, "including but not limited to"

6   and then all of the things underneath down to the end of the

7   parentheses.

8   Q.  Explain to us what that language means in this paragraph.

9   A.  Well, I would like to start by explaining the language prior

10  to it because it's just an extension of that.  So it says to

11  continue to be involved in research of the fields of

12  experimental psychology, use of language and tools, and ape

13  intelligence and human cultural modes.  This is actually a

14  description of the trajectory of the research, which started out

15  in experimental psychology and finally led into the field of

16  cultural anthropology.  And within the field of cultural

17  anthropology where Kanzi is showing he could learn without the

18  kind of training he would have in an experimental paradigm, I

19  was trying to list all of the things that typically are

20  considered uniquely human that had set us apart in time, that

21  apes might be able to do if we continue the research trajectory

22  and that these things might fall out of language.  We had

23  already seen that we got for free music, we got for free tool

24  use, we were getting for free art, and we needed to follow up

25  and see how much further they could go.

1      So I included art, music, tools, agriculture, fire,

2  animal domestication, habitat construction, use of water for

3  swimming, and things of that sort, fishing, hunting.  Mimics

4  means being able to mimic something, so if you -- if you want a

5  cup of coffee, I can show you like this, would you like a cup of

6  coffee (indicating), and I don't have to speak to do that.

7  Kanzi and many others began to be able to use gestures in that

8  complex kind of way.  So we wanted to see how far they could

9  take that.

10     Sociological role construction, we were very -- it

11 became very clear that it was no longer a matter of the dominant

12 ape.  Each ape had a different role, and that role as in human

13 society it can change.  In one case -- excuse me.  In one case

14 you might be a judge, in another case you might be a father, in

15 another case you might be an uncle, in another case you might be

16 a brother, and you behave differently in all of those roles.  It

17 was clear that the bonobos were doing that and they were doing

18 that in a way that linked into our linguistic concepts of those

19 roles.  We used language to define those roles in society.

20     Normative child rearing practices, I think this is

21 probably the most important one.  One of the things that you

22 find when you begin to allow humans to rear apes is that humans

23 get one shot at rearing children, and they don't really study

24 about how to do it and they don't really go to school about how

25 to do it for the most part unless they're psychologists.  They

1   do it the way their parents did it.  And when you have people

2   working in your lab trying to help you rear your children, you

3   realize that they come with very different backgrounds and they

4   rear children in very different ways and they have very

5   different concepts and practices.  And you begin to suddenly see

6   that this rearing that we really haven't studied in detail in

7   human society is causing -- it can cause lots and lots of good

8   things and it can cause many difficulties.  So I wanted to look

9   at the practices in rearing that produced the very best kind of

10  environment, the most competent kind of apes, the most moral

11  apes, the least aggressive apes, the most loving apes.

12  Q.  Dr. Savage-Rumbaugh, and I'm sorry, I'm going to interrupt

13  you for just a second.  As the co-drafter of this provision,

14  what is your understanding of the purpose for including it in

15  this settlement agreement?

16  A.  To see that the research trajectory continued for many

17  generations beyond me.

18  Q.  And you're referring to your research trajectory?

19  A.  Yes.

20  Q.  What would happen -- strike that.

21          What is your understanding of what would happen if the

22  trust no longer exists or wasn't able to care for the apes and

23  follow that research trajectory?

24          MR. MILLER:  Objection; relevance.

25          THE COURT:  I'll receive it, subject to the objection.

1          MR. STAMBAUGH:  You may answer.

2  A.  Would you state that question again?

3  BY MR. STAMBAUGH:

4  Q.  Sure.  We just described that the purpose of that

5  paragraph -- you just testified that the purpose is to continue

6  your trajectory at the trust, is that correct?

7  A.  Well, the purpose was to continue the trajectory as long as

8  they resided at the trust.  The purpose was to continue the

9  trajectory for a long time.

10  Q.  And so my question to you is, what is your understanding

11  under the settlement if they no longer resided at the trust

12  vis-a-vis your research trajectory?

13          MR. MILLER:  Objection; relevance.

14          THE COURT:  Same ruling.  Received, subject to the

15  objection.

16  A.  The paragraph was put in there to see that the research

17  trajectory continued wherever they were located.  Is that the

18  question?

19  BY MR. STAMBAUGH:

20  Q.  That's the answer to my question.

21  A.  Okay.

22  Q.  Thank you.

23          Dr. Savage-Rumbaugh, does BHI exist today?

24  A.  Yes.

25  Q.  Are you a board member of BHI?

1   A.  Yes.

2   Q.  I want to draw your attention to paragraph 6 that is now on

3   the screen.  This is a paragraph that begins, should the trust

4   cease to exist or otherwise.

5          Do you see where that's written?

6   A.  Right at the top.

7   Q.  Correct.  And it goes on to talk about what might happen

8   should the trust cease to exist or otherwise.

9          Did you have an understanding at the time that you

10  signed this main agreement that Bonobo Hope Initiative would

11  have relocation rights to Maisha should the trust cease to

12  exist?

13  A.  Yes.

14  Q.  What was the purpose of giving BHI relocation rights?

15  A.  BHI owned Maisha and it should make the decisions regarding

16  Maisha.

17  Q.  What sort of research trajectory does BHI follow?

18  A.  The one I just described.

19          MR. STAMBAUGH:  Your Honor, at this point I would ask

20  to publish Exhibit 2, which is also a category A, and pursuant

21  to the pretrial order has been deemed admitted.

22          THE COURT:  You may do so.  And with regard to any

23  category A exhibit, they're already considered received in

24  evidence, and you don't have to ask permission to publish them.

25          MR. STAMBAUGH:  Thank you, Your Honor.

1  BY MR. STAMBAUGH:

2  Q.  Dr. Savage-Rumbaugh, you mentioned earlier that there were

3  two settlement agreements, correct?

4  A.  Yes.

5  Q.  There was a main agreement and a supplemental agreement, is

6  that correct?

7  A.  Yes.

8  Q.  Was what the purpose of the supplemental agreement?

9  A.  The purpose of the supplemental agreement was the ownership

10  was going to be split and we were going to go forward.

11  Q.  Which bonobos does the supplemental agreement relate to?

12  A.  It relates to the bonobos that were transferred to BHI.

13  Q.  Can you name them for us?

14  A.  I believe it's every bonobo except Maisha.

15  Q.  So that's Kanzi, Nyota --

16  A.  -- Panbanisha, Elikya, Teco.

17  Q.  Okay.  Let me draw your attention to paragraph 2 in this

18  supplemental agreement.  I'm going to ask you to take a quick

19  look at paragraph 2.  And my question to you will be, is this

20  the same research trajectory paragraph that we just saw in the

21  main settlement agreement?

22  A.  Yes.

23  Q.  Did you have a role in drafting this provision?

24  A.  I drafted the other paragraph and I assumed that it was put

25  in the supplemental agreement.

1   Q.  If you take a look at this paragraph, does it appear to be

2   the same as the one we just saw on the main agreement?

3   A.  Yes, it's the same.

4   Q.  And as a co-drafter of this provision, what was the purpose

5   of this research trajectory provision?

6   A.  To continue --

7           MR. MILLER:  Objection; relevance.

8           THE COURT:  It's --

9   A.  To continue the research --

10          THE COURT:  Just a minute.  When he says that, I have

11  to say something.

12          THE WITNESS:  Oh, I'm sorry.

13          THE COURT:  Which is, it is received, subject to the

14  objection.

15          THE WITNESS:  I'm sorry.

16          THE COURT:  You may proceed.

17  A.  Yes, it's the same.

18  BY MR. STAMBAUGH:

19  Q.  Dr. Savage-Rumbaugh, what was the interplay between the

20  proposal to split the boards and these two settlement agreements

21  that we've just looked at?

22  A.  They were presented to me together by Lyle Simpson, and they

23  were my assurance that the concerns I had expressed to

24  Mr. Simpson would be fully resolved and that no one could remove

25  me from this facility or remove the bonobos from the facility

1   without the approval of BHI.

2   Q.  So returning to the supplemental agreement, what would

3   happen if the Bonobo 4 -- these other bonobos -- no longer

4   resided at the trust?  What is your understanding of what would

5   happen?

6   A.  That BHI would determine where they were located.

7   Q.  And which research trajectory would be used for the Bonobo

8   4?

9   A.  The one that's in that paragraph.

10  Q.  That was drafted by you?

11  A.  Yes.

12  Q.  And that's consistent with your research trajectory?

13  A.  Yes.

14          MR. STAMBAUGH:  Thank you.

15          You can take the exhibit down.

16  BY MR. STAMBAUGH:

17  Q.  Dr. Savage-Rumbaugh, at some point was there a transition,

18  we'll call it, of your role at the Great Ape Trust in 2013?

19  A.  Yes.

20  Q.  What was that transition?  What was your understanding of

21  the transition?

22  A.  The transition began when BHI advised Lyle that I needed

23  more assistance, and Lyle was working to help fundraise because,

24  as Lyle wrote, I was pretty much a one-person band.  And I

25  remember lecturing to the Prairie Club and many of the women

1  coming up after and saying, we finally understand your research.

2  The research is something that oftentimes women can understand

3  because women play a great role in rearing in our culture, and

4  under the leadership of Ted Townsend, Rob was really the main

5  one describing to Des Moines about the research, and I really

6  never had had an opportunity until the Prairie Club to really

7  present my research in detail.  And about five or six women came

8  up to me afterward and they said, we really finally understand

9  and we want you to stay here in Des Moines, and we realize that

10 since you're doing this cross generational research, you need

11 help.  Where are you going to get help?

12          BHI had already told me I needed help.  I already knew

13 I needed help.  So there was no opposition to having other

14 people come and assist me or the transition.  When the boards

15 were -- when the boards officially split in May, shortly after

16 that I fell and had a concussion, and at that point in time,

17 Julie Gilmore and my sister wanted me to come back and continue

18 working, and I really felt that I was unable to do it.

19          So I continued to keep contact with the laboratory.  I

20 continued to write e-mails and work through Liz and through

21 Gaila.  But I also at Lyle Simpson's request began to look for

22 somebody to follow through, and one of the things we had hoped

23 to do was to move ahead with the Federal Sanctuary System.  The

24 chimp pack had just passed at that time, and all of the

25 chimpanzees in biomedical research were going to move to

1   sanctuaries, come out of biomedical research.  And you will

2   remember that I many, many years earlier had stood on the wing

3   at Yerkes and saw the pain and the distress, and I had wanted to

4   help those chimps.

5          So I thought if we could bring chimpanzees into a

6   sanctuary out of the federal system and there would absolutely

7   be a good situation for them, we could learn how to rehabilitate

8   them.

9   Q.  What was your understanding of what your role would be

10  during this transition period?

11  A.  My role would be to help it come about in any way that it

12  could and to use my knowledge of chimpanzees and to try to build

13  a better environment for them while continuing the research

14  trajectory and working with additional colleagues.

15  Q.  You mentioned that you believed that additional help might

16  be needed, is that correct?

17  A.  Yes.  I knew if we were -- certainly I needed additional

18  help, but taking on -- they were asking for 30 or 40 additional

19  chimpanzees.  The requests that the administration was making at

20  that time were basically -- they computed how many dollars they

21  could get from the Federal Government, and from the number of

22  dollars they computed the number of chimpanzees.  I indicated

23  that I thought that was a lot of chimpanzees to start with; but

24  my role would have been to take that -- to help take that

25  forward.

1   Q.  Did you understand that you would continue to have access to

2   the bonobos during this transition period?

3   A.  Definitely.

4   Q.  I would like to go ahead and publish for court and counsel

5   Exhibit 27.

6           Dr. Savage-Rumbaugh, if you could please go ahead and

7   take a look at what has been marked as Exhibit 27.  This is the

8   board minutes of the IPLS on May 22, 2013.  I want to draw your

9   attention to the bottom of this first page.  There's a

10  resolution, and it reads, "Resolved, that Dr. Sue

11  Savage-Rumbaugh be elected director emeritus of scientific

12  research of the Iowa Primate Learning Sanctuary with unfettered

13  permanent access to the bonobo colony."

14          Dr. Rumbaugh, when is the first time that you learned

15  of this resolution?

16  A.  Yesterday.

17  Q.  Was it your understanding that during this transition you

18  would have unfettered permanent access to the bonobo colony?

19  A.  Yes.  But I was not at that board meeting because I had a

20  concussion and I did not receive any invitations to that board

21  meeting.  And I had been assured in a number of e-mails and

22  conversations with Lyle that this was the case.  I went forward

23  throughout the summer assuming this was the case.  I went

24  forward looking for a successor assuming that this was the case.

25  I didn't know it was an official resolution until yesterday.

1   Q.  Did you talk to --

2   A.  I should have been on that board and at that meeting.

3   Q.  Did you talk with other BHI members about how you

4   anticipated that this would be the case, that you would have

5   access, continued access to the colony?

6   A.  Lyle had written them indicating that I had had some

7   difficulties and he wanted me to look for a successor and that I

8   would have continued access to the colony and I would co-direct

9   with whoever was selected for three to four years.  He had

10  written that with them.  So he didn't discuss if it would

11  happen.  We assumed that if Lyle said it, it would happen.

12  Q.  You mentioned just a minute ago that you made a

13  recommendation for someone to assist you during this transition

14  period, is that right?

15  A.  Yes, I did.

16  Q.  Who did you recommend?

17  A.  I recommended Dr. Taglialatela.

18  Q.  Why did you recommend Dr. Taglialatela?

19  A.  He had been a student of mine in the past and he had helped

20  supervise the staff.  He was interested in the social behavior

21  and the linguistic behavior of the bonobos.  I wanted to select

22  someone who could potentially work with the Federal Sanctuary

23  System, and I wanted to select someone who had a history of

24  direct interaction and contact with the bonobos and that I

25  believed understood and supported the research and who had

1  coauthored the work with me and that believed in the research

2  trajectory and would take it forward.

3  Q.  Did you write a letter to both boards with your

4  recommendation of Dr. Taglialatela?

5  A.  Yes, I did.

6  Q.  What was your understanding of your role in the research

7  going forward when you wrote that letter of recommendation?

8  A.  My understanding was that I would co-direct the facility for

9  the next three or four years and I would have unfettered access

10  with the bonobos beyond that time.

11  Q.  What was that understanding based on at the time that you

12  wrote the letter?

13  A.  It was based on Lyle Simpson's letters to me and Lyle

14  Simpson's phone calls with Duane and his phone calls with me,

15  and it was based on the comments that I had heard, both e-mail

16  and over the phone from George Caudill and Julie Gilmore, and it

17  was based on my phone conversations with Dr. Taglialatela.

18  Q.  When did you write that letter of recommendation?

19  A.  I'd have to look at the date.  I think it was October 26th.

20  Q.  It was in the fall of 2013?

21  A.  Yes.

22  Q.  Dr. Savage-Rumbaugh, when you wrote that letter of

23  recommendation, what was your understanding of the research

24  trajectory -- easy for me to say -- that Dr. Taglialatela would

25  continue with?

 1  A.  The one that was in the settlement agreement.

 2  Q.  That had been signed earlier that year?

 3  A.  Yes, when he was a member of the board.

 4          MR. STAMBAUGH:  Your Honor, if I may just have one

 5  moment, please.

 6          (Pause.)

 7          MR. STAMBAUGH:  Thank you, Your Honor.

 8          I would like now to publish what has been marked as

 9  Exhibit 42.

10  BY MR. STAMBAUGH:

11  Q.  Dr. Savage-Rumbaugh, you just testified that in October of

12  2013 you recommended Dr. Taglialatela, you had sent that letter

13  of recommendation with an understanding based upon the

14  settlements and your discussions.  And I have just published for

15  the court and counsel Exhibit 42, which is an e-mail on

16  November 10, 2013 from George Caudill, and it reads:

17          "Sue, in the next few minutes, when you depart, please

18      leave your access card and any keys with whomever is on

19      duty right now.

20          "Thank you.

21          "George."

22          What happened between October and November 10, 2013?

23  A.  I can only speculate and offer some documentation to that

24  speculation.  I later on was to learn that Yerkes had placed

25  some constraints on my being at the facility, but I did nothing

1  between that time except come back to help take care of Teco who

2  had become ill.

3  Q.  And after you had made this recommendation for

4  Dr. Taglialatela to assist you, what happened to your role in

5  the lab?

6  A.  I was asked to leave the lab and I was told that unless I

7  left Des Moines and said nothing, I would never be allowed to

8  see the bonobos again in my life.  I was told basically to shut

9  up and get out of town.

10  Q.  You said you were banned from the lab?

11  A.  Yes.

12  Q.  By whom?

13  A.  By Dr. Caudill, on authority of Lyle Simpson.

14  Q.  Was that your understanding of what would happen after you

15  wrote a letter of recommendation?

16  A.  No, it definitely was not.

17  Q.  Would you have written that letter if someone had told you

18  that you were going to be banned from the lab?

19  A.  I certainly would not.

20  Q.  Would you have written that letter if someone had told you

21  that Yerkes was demanding that you be removed from the lab?

22  A.  No.

23  Q.  Were you actually kicked off the premises on November 10th?

24  A.  Yes.

25  Q.  How did that happen?

1  A.  I got an e-mail from George Caudill asking me to leave.  I

2  indicated that someone needed to come and take care of Teco

3  because he was still ill, and they had trouble finding anybody

4  to come and take care of Teco.  It took some time before finally

5  my sister had rested up enough, she had been taking care of him

6  five days and nights until I got there to help her, and when she

7  rested up enough, she came to take care of Teco and I left the

8  lab.

9  Q.  Was this consistent with the transition as it had been

10  explained to you in mid October of 2013?

11  A.  It was the strangest thing that had ever happened to me in

12  my life.  It was completely inconsistent.

13  Q.  Was this consistent with the settlement agreements that you

14  had helped draft and sign earlier that year?

15  A.  No.  It was not consistent with anything on paper or

16  anything in my experience in my entire history of interaction

17  with Lyle Simpson.  I didn't know George Caudill very well.  He

18  had just came onto the scene.

19  Q.  Dr. Savage-Rumbaugh, were you ever told that you were

20  removed from the IPLS board prior to December 2013?

21  A.  No.  I was -- every indication I had from George and Lyle

22  was that I was on the board.

23  Q.  Did you ever quit the board?

24  A.  No.

25  Q.  Did you ever indicate in any manner that you wanted to be

1  removed?

2  A.  I would not have done so.  I knew that being on both boards

3  was critical, and I had talked with Lyle about that many times.

4  Q.  Did you ever agree, as suggested by Mr. Miller in his

5  opening, that it was time for you to step aside completely?

6  A.  No, I did not.

7  Q.  Did you as a BHI board member have any notice of this, being

8  removed, prior to voting Dr. Taglialatela or Dr. Hopkins on to

9  the board?

10 A.  No.  I assumed that I was a member of the IPLS board.

11 Q.  Do you know when Dr. Taglialatela and Dr. Hopkins were voted

12 on to the IPLS board?

13 A.  They were voted on as we were transiting the request of

14 Dr. Schweller to move the bonobos to Mississippi when he thought

15 we were low on funding.  At that point in time I believe was

16 when Dr. Taglialatela came on the board.  I would have to check

17 the notes for the exact date, but it was certainly prior to the

18 other events we're discussing.

19 Q.  Were you made aware of that vote?

20 A.  Oh, you mean on the IPLS board?

21 Q.  On the IPLS board, correct?

22 A.  No.  I don't know when he came on the IPLS board.  I thought

23 you meant the BHI -- well, the IPLS -- he first came on the IPLS

24 board before it was split into two boards; but then when it was

25 split into two boards and there was the business board, he was

1  not on it at that time.  So he had to be added to it because all

2  of the scientists resigned from it.

3          So when he was added back to it by Lyle and George and

4  others on the board, I was not made aware of that and I don't

5  know when it occurred -- I didn't know at that time when it

6  occurred.

7  Q.  Do you know if any other BHI members, to your knowledge,

8  were aware of the fact that you were allegedly kicked off the

9  board prior to voting Dr. Taglialatela and Dr. Hopkins on to the

10 board?

11 A.  I was told that I would not be allowed to tell them that or

12 to talk to them or to write any e-mails to them and the only way

13 I would be allowed to see the bonobos again was if I followed

14 those orders.

15 Q.  Was that surprising to you --

16 A.  Yes.

17 Q.  -- after the settlement agreements and the resolutions that

18 we've talked about?

19 A.  Yes.

20 Q.  Dr. Savage-Rumbaugh, we talked earlier a little bit about

21 the research trajectory that you've accomplished over four

22 decades of your life.  I want to ask you a few follow-up

23 questions about that.

24          Is wearing masks and gloves around the bonobos

25 consistent with that research trajectory?

1   A.  If a person were ill, they would probably wear masks or

2   gloves if they were a person that wasn't very, very close to the

3   bonobos the whole time, but otherwise we would not have masks

4   and gloves.

5   Q.  Is having indirect contact with the bonobos consistent with

6   your research trajectory?

7   A.  I'm not really sure what you are implying by indirect

8   contact.

9   Q.  Let me ask a better question.

10          Does your research trajectory require that you have

11  direct contact with the bonobos?

12  A.  Yes.

13  Q.  What sort of direct contact?

14  A.  The same kind of contact you would have in a family

15  situation.  It doesn't require that everyone working with the

16  bonobos have that kind of contact.  It does require that some

17  individuals have that level of contact.

18  Q.  I want to return briefly to when you were kicked out of the

19  lab, Dr. Savage-Rumbaugh.  Did you agree to, quote, give up

20  control as Mr. Miller suggested in his opening?

21  A.  No, I did not.  I resisted it even at the moment I was

22  kicked out, and I told them that it was wrong.

23  Q.  Have you agreed to live within the boundaries of the

24  settlement agreements and the resolutions as they were explained

25  to you?

1   A.  Yes, I have.

2           MR. STAMBAUGH:  Your Honor, may I have one moment?

3           THE COURT:  Please.

4           (Pause.)

5           MR. STAMBAUGH:  I appreciate the court's indulgence.

6   I have just a few more questions.

7   BY MR. STAMBAUGH:

8   Q.  Dr. Savage-Rumbaugh, has BHI been satisfied with

9   Dr. Taglialatela's performance to date?

10  A.  It's given Dr. Taglialatela every benefit of the doubt and

11  every opportunity to communicate and every opportunity to help

12  him, and it has been dissatisfied with his response.

13  Q.  Has BHI taken any measures to show that dissatisfaction with

14  Dr. Taglialatela?

15  A.  Yes, it has.

16  Q.  What has it done?

17  A.  It's removed him from his position.

18  Q.  Was that pursuant to a formal vote?

19  A.  Yes.

20  Q.  When did that vote take place?

21  A.  I would have to look at the document to give you the exact

22  date.

23  Q.  Was it sometime in 2015?

24  A.  Oh, yes.

25  Q.  Was it sometime in the last few months?

1  A.  Yes.

2          MR. STAMBAUGH:  Your Honor, I have no further

3  questions, subject, of course, to redirect.

4          THE COURT:  Thank you.

5          We're just before the noon hour, Counsel.  I think

6  we'll take our noon recess at this time.  We'll be in recess

7  until 1 o'clock this afternoon.

8          Thank you.

9          MR. STAMBAUGH:  Thank you, Your Honor.

10          (Recess at 11:53 a.m., until 1:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION  1:05 p.m.

2              (In open court.)

3              THE COURT:  Please be seated, everybody.

4                         SUE SAVAGE-RUMBAUGH,

5     resumed her testimony as follows:

6              THE COURT:  And, Mr. Miller, you may cross-examine or

7     your colleague may, whoever is going to do it.

8              MR. MILLER:  Thank you, Your Honor.  I will go ahead

9     and proceed.

10             Thank you.

11                         CROSS-EXAMINATION

12    BY MR. MILLER:

13    Q.  Dr. Rumbaugh, can you hear me okay?

14    A.  Yes, I can.

15    Q.  I don't believe that I'm going to be referring to your

16    husband, Duane Rumbaugh, today; but I may refer to calling you

17    Dr. Sue.  I mean no offense by that, okay?

18    A.  Yes.

19    Q.  Okay.  Thank you.

20             Dr. Sue, I first want to talk to you a little bit

21    about flooding, and you testified about some concerns about

22    flooding at the site.  You've known that flooding could happen

23    at the site of the facility since before you moved here with the

24    colony, right?

25    A.  I knew that they were concerned enough that they had to

1   build the building out of the floodplain.  I was assured that

2   the building would never ever flood.  Even as the water was at

3   the door, I was assured the building would never flood.

4   Q.  And it flooded in 2008?

5   A.  Yes.

6   Q.  And you experienced that, I know you've told the court.

7          At that time there was no contingency plan for

8   flooding, for moving the animals at that time, right?

9   A.  We were assured that the building would not flood.  We

10  worked on a few contingency plans, but the director was an

11  engineer and was in close contact at every moment with the Corps

12  of Engineers, said we did not have to execute.  We did have some

13  emergency plans, but they were said to be not needed.

14  Q.  And you weathered the storm, so to say, and the apes stayed

15  there after 2008, correct?

16  A.  I don't think we actually would have weathered the storm if

17  Liz and I hadn't been there to tell you the truth.

18  Q.  Well, that's actually not my question.

19         The apes stayed there after the flood, correct?

20  A.  They stayed there after the flood, yes.

21  Q.  They stayed there in 2009?

22  A.  Yes.

23  Q.  2010?

24  A.  Yes.

25  Q.  2011?

1   A.   Yes.

2   Q.   They're still there today, correct?

3   A.   Yes.  It's flooded twice more since then, but not gone into

4   the building, but blocked the access to the building.

5   Q.   In 2012 there was a discussion about relocating the apes to

6   a new site, correct?

7   A.   Correct.

8   Q.   You objected to that quite vociferously, correct?

9   A.   Yes, I did.

10   Q.   And --

11   A.   Because it wouldn't have allowed me to continue the research

12   trajectory.

13   Q.   Okay.  2013 you applied for a grant from Prairie Meadows to

14   continue to support the operation, is that right?

15   A.   Yes, I did.

16   Q.   And that grant was premised on creating an artist colony at

17   the facility, right?

18   A.   It wasn't premised on creating a complete artist colony, but

19   that was part of the grant, yes.

20   Q.   Okay.  And, in fact, your brother would have been an artist

21   in residence to work with the bonobos?

22   A.   He wouldn't have stayed there, no.  He has a studio in

23   Springfield, Missouri, and he has several other grants.  He

24   would have assisted us but, no, there was no plan for my brother

25   to stay as an artist in residence.

1    Q.   And around this same time frame, you were out talking to the

2    public about the facility and about the work of Great Ape Trust,

3    correct?

4    A.   I was very rarely out talking with the public because I was

5    basically taking care of Teco and the other apes and cleaning

6    and feeding and doing other duties.

7    Q.   Do you remember appearing on Iowa Public Radio for an

8    interview?

9    A.   I've appeared on a number of Iowa Public Radio shows,

10   including one last week.

11   Q.   All right.  And do you recall at this time that you were

12   interviewed by Charity Nebbe in 2012?

13   A.   Yes, I believe I was interviewed by Charity Nebbe.

14   Q.   You and Dr. Gilmore participated in that, too, correct?

15   A.   I believe Dr. Gilmore was there.  She was the veterinarian.

16   Q.   Right.  And Ms. Nebbe during that interview asked you again

17   a backup plan for moving the bonobos, is that right?

18   A.   Yes.

19   Q.   At that point in time, you said, no, that's not going to

20   happen?

21   A.   Yes, I did.  I thought it was not going to happen.  I had

22   been told that if they built the bypass, it would no longer

23   flood, and I was trusting of that.

24   Q.   And you testified earlier, if I understand you correctly,

25   that there was some concern that the water was toxic, is that

1  correct?

2  A.  We had repeated reports to the staff in the building that we

3  had to be very, very careful, we shouldn't touch the water, we

4  shouldn't be in it, we should have our waders, the water was

5  toxic, we had to keep the bonobos out of the water.

6  Q.  And from 2008 through the time you were at the facility, you

7  never had any testing done on that water to substantiate that

8  alleged claim?

9  A.  I wasn't in a position to direct such testing.

10  Q.  And you did not have the testing done, correct?

11  A.  It wasn't up to me to have any testing done.  That would

12  have been up to Dr. Gilmore.

13  Q.  Okay.

14  A.  I did discuss the problem several times, and when I was

15  initially director, I had the water in the building tested

16  because I was concerned that it was toxic, and the Water Works

17  changed how the water in the building was directed because it

18  was -- it did turn out to be toxic and they had to make major

19  changes because of that.

20  Q.  Well, you certainly don't have any proof that the water

21  caused illness to any animal or to your sister, correct?

22  A.  I haven't sought to obtain any proof.

23  Q.  Now, you did, however, have a report put together ostensibly

24  for this proceeding about flooding at the facility, is that

25  right?

1  A.  One of our board advisors offered to have an engineering

2  agency who specializes in that provide us a report.

3  Q.  Okay.  So seven years after the flooding in 2008 that you

4  have such concern about and only when you're about to have a

5  hearing in front of the judge do you get a report, is that

6  right?

7        MR. STAMBAUGH:  Objection; argumentative.

8  A.  No, that's not right.

9  BY MR. MILLER:

10  Q.  Okay.

11        THE COURT:  Let's back up.  Just a minute.  I will

12  receive it, subject to objection.

13  A.  No, that's not right.  I've been calling for such a report

14  for some time.  Basically it was my understanding that if they

15  expanded the bypass, it would not flood.  The bypass has been

16  sufficiently expanded now that one can go stand and look there

17  and see if there's enough water on the other side.  Expanding

18  the hole in the bypass is not going to make any difference.

19        In addition, my neighbors who lived around there have

20  had a lot of time to talk to me in the last two years since I'm

21  not with the bonobos, and they've all informed me that in 1993

22  the whole area was under flood, way up to the railroad tracks,

23  and there was no bypass built at all.

24        So it just seemed to me that I needed to reconsider.

25  It wasn't because I was concerned that ACCI is there.  I'm

1  concerned about the health and wellbeing of the bonobos.

2  BY MR. MILLER:

3  Q.  Right.  They told about 1993, and that was the exact

4  same way you found the site in 2008 when you moved the bonobos

5  off, potential for flooding, correct?

6  A.  But I didn't know how high the water had gone in 1993.  I

7  was not told.  I just knew the site had a potential for

8  flooding.  In Atlanta we built the building on a site that had

9  potential for flooding.  The university told us they would build

10  the building out of the floodplain, and they did.  We had water

11  up to the building, but it didn't come in, and they built the

12  road up so that we could always have access.

13       I assumed we were in a similar situation here, they

14  would build the building as they said, completely out of the

15  floodplain, and they would build the road high enough so we

16  would have access.  That did not happen.

17  Q.  And the only time you've analyzed the situation with

18  flooding, actually had an expert look at it was a month ahead of

19  this hearing?

20  A.  I wasn't in the position to direct such a call.  I couldn't

21  tell Jared, "Jared, you really need to check out the flood."  I

22  think I have written some e-mails to other board members that

23  concern has been expressed repeatedly for a very long time in my

24  e-mails.  And I wasn't in a position when Dr. Gilmore was

25  director to direct such a question, and I wasn't in a position

1  when Dr. Fields was -- Mr. Fields was there; but certainly after

2  2008 had I been in the position to have that authority, I would

3  have done so.

4  Q.  Stepping back a moment to the Prairie Meadows grant,

5  certainly you've been out and about talking with the public

6  about the bonobos over time, correct?

7  A.  Not extensively, but I have been.  I was not the foreperson

8  for the Great Ape Trust.  They attempted to send Rob Shumaker

9  out.  As I said before, the only time I have really been able to

10  explain my research to the public was at that Prairie Club

11  meeting.

12  Q.  And at that Prairie Club meeting, did you have Teco with

13  you?

14  A.  No, I did not.

15  Q.  Okay.  You've been out and about at events where you brought

16  one of the bonobos with you to meet others?

17  A.  I had IACUC approval one time under the auspices of the

18  Great Ape Trust and the veterinarian from Iowa State to take

19  Teco to a specific public gathering, and there were people there

20  to assist me, and he was I think about six months of age.

21  Q.  Was that the visit to the church on 42nd Street?

22  A.  I believe so.

23  Q.  What about the visit to the Ray Society?

24  A.  I didn't take Teco to the Ray Society.  I know you have a

25  document that -- the Ray Society came to visit the center.  I

1   didn't take Teco any place out to the Ray Society ever.

2   Q.   You discussed earlier with the judge, with your counsel

3   about Mr. Townsend's vision for the Great Ape Trust.

4   A.   Yes.

5   Q.   And you feel you had some sense for his vision, is that

6   correct?

7   A.   Yes.

8   Q.   And one of the aspects of the vision was to share the

9   bonobos with the public?

10  A.   No.

11  Q.   To not introduce them to others through things like an

12  artist colony or through meetings with the public?

13  A.   Well, we were going to construct small domes with glass in

14  between and there would be trails that the public could go on

15  completely separate from the bonobos, and they would enter a

16  small round building with a glass wall in between, and the

17  public could do tool making on one side, the bonobos would do

18  tool making on the other side of the glass, or the public could

19  make music on one side and the bonobos would make music on the

20  other side.  It wasn't to literally introduce, to take Teco into

21  the public.  That was never his intent.

22  Q.   You also got an exhibitor's license while you were the

23  executive director, correct?

24  A.   Not while I was executive director.  Al Setka got an

25  exhibitor's license, and when we were placed in charge of the

1   facility, the USDA agent came actually while I had the Ray

2   Society there, she arrived and announced to me that that

3   exhibitor's license had been cancelled I believe by Susan McKee

4   and that I needed to reapply for the exhibitor's license if I

5   was going to have anyone in the building, such as at the bike

6   ride where you now need an exhibitor's license, I guess, and you

7   have a bike ride and you have people in the building.  To have

8   people in the building such as you've recently done, I would

9   need an exhibitor's license.

10  Q.  Right.

11  A.  And the trust had always had one.

12  Q.  Very good.  So you've moved with the bonobos on various

13  occasions, correct?

14  A.  No.  I made one move here.

15  Q.  You moved facilities, I believe, in Georgia, or did I

16  misunderstand that?

17  A.  I began the project with the bonobos in 1980 after I moved

18  to this facility.  Prior to that my work was with Sherman and

19  Austin, and I initially moved the chimpanzees, Sherman and

20  Austin as well, to the language research center.

21  Q.  Thanks for that clarification.

22          When the Iowa opportunity arose, there were some other

23  locations that you considered as well, correct?

24  A.  I was considering them.  I was not aware that Mr. Townsend

25  had already gone to the Iowa State administration and

1   contributed $450,000, which was essentially a purchase of the

2   bonobos.  There was really no consideration after he had done

3   that.

4   Q.  And you thought the Iowa proposal that he put forth was a

5   good one?

6   A.  My preference was to work with Penny Patterson and take the

7   bonobos to Hawaii.

8   Q.  But, nonetheless, you came up here to Iowa at Mr. Townsend's

9   behest apparently?

10  A.  I really didn't have any choice.  Once the university

11  administration accepted his $450,000, I could have stayed, and I

12  had a tenured position.  I could have taught, but the bonobos

13  were coming here.  They were bought and sold quite simply.

14  Q.  And I think you told me that you liked the Iowa location

15  because it was pretty similar to the Georgia location you were

16  at?

17  A.  Well, I was very worried about the size of the Des Moines

18  River.  We had the little small South River.  The Des Moines

19  River, when it runs into the Raccoon River, it's something that

20  I -- you know, it's really powerful.  And I was very worried

21  about the cold, and many, many people that wanted to fund me

22  were very, very worried about the cold, and many people,

23  including Peter Gabriel, and Steve Woodruff of the Coca-Cola

24  Foundation, and Mr. Hyashibara of Japan who would have funded me

25  had I gone either to Hawaii or Japan, pulled out because they

1  did not think the bonobos should be in Iowa.

2  Q.  Okay.  Townsend stated -- and he sunk 20 million dollars?

3  A.  He was the only one in.  He didn't stay in; one of the only

4  ones.

5  Q.  Fair enough.  But at least at the time when he moved you

6  here and then for the next several years, over time he put 20

7  million dollars in the operation?

8  A.  Yes, he did.

9  Q.  And when you moved up here, you helped design the facility,

10  is that correct?

11  A.  Yes, I did.

12  Q.  And it was state of the art?

13  A.  I designed the facility with architects who were working

14  with a zoo-based mentality, and they were really influenced by

15  Rob Shumaker and Ben Beck, and there was quite a bit of

16  competition over whether we were going to have a zoo or whether

17  we were going to have a research facility.  My original request

18  was for a small butler building.  Duane indicated to Ted over

19  and over that we needed a small butler building to get here, get

20  on the ground, show that we could continue to do research and we

21  would have access to the outdoors and the trajectory could

22  continue and to put the money into an endowment, not a building.

23  It was Ted that chose to make a 20 million dollar building and

24  Ted that wanted an edifice that would be state of the art.  I

25  would say there was an attempt to make it state of the art to my

1   research, but that attempt was compromised many, many times

2   during design sessions by Rob Shumaker and Ben Beck.

3   Q.  I don't know if -- who is Ben Beck?  I don't know that we've

4   talked about him.

5   A.  He came with Rob Shumaker.  He was the former curator at the

6   National Smithsonian.  He has worked with tools.  He's well

7   known for a book on toolmaking in nonhuman primates.  His

8   background is in anthropology, and he has worked with

9   Dr. Tuttle.

10  Q.  Now, up until the move to Des Moines, you were a research

11  associate with Yerkes, which you referred to before, is that

12  correct?

13  A.  I was a research associate with Yerkes.  At the time during

14  the five years I was with Yerkes and I was a research associate

15  for, I would have to check another three to five or six years

16  while I was at Georgia State, but Yerkes removed that research

17  associate position at some point after I was at Georgia State.

18  Q.  And I think you, when I talked to you in your deposition,

19  told me that you felt you had somehow run afoul of Yerkes and

20  they were upset with your research; is that a

21  fair approximation?

22  A.  I hadn't run afoul with Yerkes.  I had done research that as

23  it became known became problematic for Yerkes because if it's

24  understood that apes have the ability that have been

25  demonstrated for Kanzi, it would be very difficult to continue

1  to keep apes in the kind of caging and biomedical situation that

2  I described earlier.

3  Q.  And, in fact, I think you told me that your husband,

4  Dr. Duane, thought he was threatened in some way by Yerkes?

5  A.  He reported to me that at the time that NHK came and filmed

6  and was going to go worldwide on the documentary of Kanzi's

7  abilities, the director came to the center and he watched the

8  video, and he took me aside and he said, I'm going to shut your

9  research down.  He then talked to Duane.  He and Duane often

10  talked, and he told Duane that in the past if he gave orders to

11  do something, they needed to be carried out and people had, in

12  fact, not stayed around on the planet if they weren't followed.

13  Q.  Eventually your research associate position with Yerkes was

14  terminated?

15  A.  Yes.

16  Q.  And you don't have any personal knowledge about whatever

17  relationship may or may not exist between Yerkes and ACCI?

18  A.  I have the knowledge that Lyle has transmitted to me and I

19  have the knowledge from Jared's deposition.

20  Q.  Now, Lyle didn't transmit any information to you.

21  A.  He transmitted a lot of information to me.

22  Q.  Okay.  Again, you don't have any direct information

23  yourself, you have never spoken to anybody at Yerkes?

24  A.  After I transmitted to Bill Zifchak Lyle Simpson's request

25  that I could no longer talk with him and I had to contact a

1  lawyer, Bill Zifchak instructed me not to contact Yerkes or

2  anybody else but to remain silent.  So I learned from Lyle what

3  was happening, and I was astonished, and I've not been allowed

4  to try to find anything else out.  I've been asked to be quiet,

5  and I have.

6  Q.  Okay.  I think to change gears a little bit, too, you were

7  telling the court earlier about the Bonobo 12.  What is the

8  Bonobo 12?

9         MR. STAMBAUGH:  Objection; misstates earlier

10  testimony.

11         THE COURT:  Well, the question just asked what is

12  Bonobo 12.  So that's what I'm interested in if you can tell us.

13         Thank you.

14  A.  There were a group of people that claimed to be employees

15  who worked under me.  Only a very few of them actually worked

16  with me.  None of them worked under me.  During a period of

17  three years while Mr. Fields was in charge of the lab, these

18  employees worked with me.  When it came time to transition and

19  we knew there were not going to be funds from Ted, one of these

20  employees who was paid by Mr. Lauridsen and had a special

21  scholarship through Mr. Lauridsen brought Mr. Lauridsen to the

22  lab and hoped to obtain funding for the continuation of the lab.

23  I showed Mr. Lauridsen around.

24         The Bonobo 12 continued to work with him and with

25  others, and they had a desire to essentially do what

1  Mr. Taglialatela has done -- or Dr. Taglialatela, pardon me.

2  They wanted their research to go forward and have me excluded.

3  So a variety of complaints were filed against me with the IACUC,

4  and those complaints were later investigated by two special

5  panels and found to be completely false.

6  BY MR. MILLER:

7  Q.  Now, out of that process, I think, is the time frame when

8  there's a question of whether the bonobos are going to need to

9  be relocated because the funding is in jeopardy, is that

10  correct?

11  A.  It was a time of transition of power from Ted's authority to

12  whoever else would be in authority.  It turned out to be Ken

13  Schweller, and nobody knew where the funding was going to come

14  from when Ted's money ran out.

15  Q.  And at that time, we're talking late 2011, early 2012,

16  correct?

17  A.  Late 2011.

18  Q.  Okay.  And at that time there's one board called IPLS,

19  correct?

20  A.  Yes.

21  Q.  And it includes several of the individuals who are on the

22  board of the current BHI, including --

23  A.  No.

24  Q.  No.  Okay.  How am I wrong about that?

25  A.  At that time the board was Connie Wimer, Sue Coop, Suku

1  Radia, Ted, Margo Blumenthal.  Jim Aipperspach may have been an

2  auxiliary member.  I don't know if he was an official member.  I

3  guess Jim Aipperspach was an official member of the board.  I

4  think that was the board.

5  Q.  And that's the IPLS board?

6  A.  That was the IPLS board during the time that the transition

7  was underway near the end of 2011.  Is that the time you're

8  asking me about?

9  Q.  Correct.  So does Bonobo Hope, BHI exist at that time?

10  A.  I had begun to form BHI and I had asked a number of people

11  to serve on BHI, and we had had some initiating meetings which I

12  believe took place around that time.

13  Q.  Okay.  So one of the people you invited to that board was

14  Dr. Taglialatela, correct?

15  A.  No.  I didn't invite Dr. Taglialatela to that board at that

16  time, no.

17  Q.  You eventually invited him to the Bonobo Hope board?

18  A.  Much later, yes.

19  Q.  At this 2011 period was Dr. Dubreuil on that board, Bonobo

20  Hope?

21  A.  No, I don't think so.

22  Q.  Okay.  Are any members of the current Bonobo Hope at the

23  party that's involved in this lawsuit, were they members of the

24  BHI board at that point in time?

25  A.  Derek Wildman was a member, Nancy Howell was a member of the

1   board at that time.  Sally Coxe was a member and I believe Itai

2   Roffman was a member.

3   Q.  Thank you.  And I apologize for the confusion.

4        What I wanted to be clear about is those board members

5   at that time in 2011 were encouraging you to relocate the

6   bonobos, correct?

7   A.  No.  What had happened was that Ted had indicated that the

8   bonobos were going to need to be relocated, and I had met with

9   Ted and his board, Connie and Margo, several times, and my

10  position was that, Ted, if you're out of money, let's first turn

11  to your board and ask these board members to help us to try to

12  get through a difficult time, and if it goes forward the way

13  that I hope it will, then we can start to ask Peter Gabriel and

14  others for money, we can start to get grants again, because by

15  that time we had animal assurances, which themselves cost about

16  a million dollars to get, and we're required to even apply for a

17  federal grant.

18        So we had really gotten in a position where if the

19  rest of the board members, Margo and Connie and others, had

20  supported us and gone forward, we could have done fine; but Ted

21  was adamant that the bonobos move, and at board meetings, he

22  said, these bonobos are moving, you know, when I leave.  And I,

23  you know, didn't know really what was going to happen.

24  Q.  Did I understand you correctly that you would have taken

25  bonobos out to A & W in the past?

1  A.  At the University of Oklahoma before there were IACUCs, yes.

2  Q.  Well, and you would put them in the car and would take them

3  to Wendy's here in Des Moines, correct?

4  A.  No.  Unless I had approval from Dr. Gilmore, I didn't put

5  them in any place here in the car and take them anywhere.

6  Q.  You went out to a Buddhist temple or to visit a relative

7  with Teco, is that correct?

8  A.  I didn't take any bonobos anywhere unless I had the approval

9  of Dr. Gilmore to take them there.

10  Q.  Did you have any --

11  A.  But let me just say that across the years, the IACUCs became

12  in place.  When I began my work in 1975, there was not an IACUC

13  and there were no rules and regulations, and I was working as a

14  graduate student and it was part of my job, my paid job to drive

15  the bonobos to different places.  I was ordered to do that by my

16  faculty supervisor.

17       One of the things I did regularly was take a bonobo,

18  Lucy, who had been reared in a human home five or ten miles away

19  to 60 acres of land that they owned, and Lucy was allowed to go

20  on their land.  And oftentimes I wouldn't even see Lucy.  And I

21  was instructed when I was ready to go back to hit the horn and

22  Lucy would come and jump in the car, and she did.

23       I could tell many more things that happened at the

24  University of Oklahoma, but in part because of my work, IACUCs

25  and protocols came into being while I was at Yerkes, not only

1  because of my work but basically because animal rights were also

2  breaking into places.  And once those rules and regulations

3  began to try to govern how a person is able to do research, I

4  had to go through a whole series of rules and regulations to get

5  approval to do anything, and I didn't skirt those intentionally

6  ever.

7  Q.  Correct.  You understand rules and regulations are important

8  for working with bonobos?

9  A.  Yes, I do.

10  Q.  Right.  And I think you told me -- well, first off, was Lucy

11  a bonobo?

12  A.  Lucy was a chimpanzee.

13  Q.  Did Lucy come with you from Georgia?

14  A.  No.  Lucy was reared in a human home.  There's a book on

15  Lucy that was written by a clinical psychologist that describes

16  how humanized an ape can become when it's raised from the day of

17  birth in a human home.  That was part of the research project of

18  my major professor William Lemmon.

19  Q.  What happened with Lucy?  She wasn't part of your research

20  trajectory?

21  A.  I was a graduate student like Jared was a graduate student

22  working under me, and so at that time I was learning about what

23  happens if an ape is reared in a human home, what happens if an

24  ape is reared with nonspecifics, what happens if an ape is

25  reared with its mother, what happens if an ape has had traumatic

1   experiences, and I was seeing all the different apes to which I

2   was exposed.

3   Q.   Okay.  You didn't bring Lucy with you, though?

4   A.   Lucy did not come here, no.

5   Q.   What happened to Lucy?

6   A.   Her parents decided to try to reintroduce Lucy to the wild,

7   and Lucy was not a member of a chimpanzee group.  Lucy was never

8   really able to integrate into a chimpanzee group.  It was

9   because of Lucy that I made the vow to never raise a Kanzi or a

10  Teco or a Panbanisha without constant contact with other bonobos

11  and their mothers because I saw in Oklahoma what happens when

12  you do that.

13          So because Lucy was never exposed to other chimpanzees

14  growing up, she really wasn't able to integrate with other

15  chimpanzees, and when she couldn't integrate at Oklahoma, they

16  tried to introduce her to an island with other chimpanzees in

17  the wild.  She survived for a while, but she eventually passed

18  away.

19  Q.   So if I'm following you correctly, she was human reared or

20  reared with humans and taken back to the wild, so to say?

21  A.   You're not following me correctly, exactly.

22  Q.   Okay.

23  A.   She was reared without any contact with any other

24  chimpanzees by experimental design.  I have never replicated

25  that procedure.

1   Q.  Okay.  I understand.  But eventually she went back to the

2   wild, as it were, and was killed or harmed or died?

3          MR. STAMBAUGH:  Objection; relevance as to this whole

4   line of questioning.  It's irrelevant.

5          THE COURT:  Well, it's a follow-up.  I'll receive it,

6   subject to the objection.

7   A.  The problem with apes, as with humans, if you're going to be

8   in a different environment, you need family and you need a

9   tribe.  An ape put out in the wild alone, no ape is going to be

10  survived that way.  So it really wasn't her human rearing that

11  caused her failure to survive in the wild.  It was her lack of

12  exposure to other chimpanzees that caused her failure to be able

13  to integrate into a culture or another group of chimpanzees.

14  BY MR. MILLER:

15  Q.  You'd acknowledge that the use of personal protective

16  equipment -- or the lack of use of it can expose the bonobos to

17  disease, correct?

18  A.  If there's someone with a disease around them, yes.

19  Q.  Right.  So if you're going to have an individual or a human

20  in contact with an ape, there should be personal protective

21  equipment?

22  A.  It depends on whether that person is ill or not.  As I

23  explained, the rearing involves a very familial like situation.

24  If you -- I didn't wear personal protective equipment with my

25  son, Shane, who is sitting there in the back.  I didn't wear

1   personal protective equipment with Kanzi or with Nyota or with

2   Teco, and all three of them are alive and here today and well.

3   Q.  And I think you were testifying earlier that one part of

4   your research trajectory is not using masks and gloves or

5   personal protective equipment?

6   A.  Not for everyone.  In a familial situation where you're

7   sharing the same biome, the same skin biome, you're sharing

8   food, in a familial situation, there's enough sharing and

9   immunology developed that apes and human children can be quite

10  healthy.  Human children often experience problems, for example,

11  when they first start in a nursery, they might be fine, but they

12  start in public school or a nursery and they experience

13  problems.

14          One of the problems we experienced was that

15  Dr. Gilmore brought her young daughter who was just in nursery

16  school and allowed her young daughter to interact with Teco

17  without -- even when she knew that the daughter was ill and even

18  when I objected to that.  So you can have a problem, but you

19  have to be -- you have to use good common sense the way you

20  would with your own children.

21  Q.  And Governor Branstad, in fact, even interacted with Teco

22  when you were together with him when he was ill?

23  A.  With Dr. Gilmore's permission.

24  Q.  All right.

25  A.  I don't know whether Governor Branstad was ill or not, but I

1  did not make those decisions.

2  Q.  And this was during the time that you were executive

3  director?

4  A.  Whether I was executive director or not, all decisions about

5  who could interact and the health and welfare of the bonobos

6  were made by Dr. Gilmore and I would not countermand those.

7  Q.  And I think you also testified you believe as part of your

8  research trajectory that there be direct contact with the

9  bonobos, is that correct?

10 A.  Would you repeat the question?

11 Q.  It's important to your research trajectory that there be

12 direct contact between humans and the bonobos?

13 A.  With certain people; not all people, not the general public.

14 The same as you would do with your child, except when the

15 bonobos get to be three or 4, five, you can't send them to

16 public school.  You can't really improve their immunology.  So

17 you really have to be careful because they're going to have a

18 more restricted immunological profile than say your son or

19 daughter would.

20 Q.  And so you would decide who could meet or be directly in

21 contact with the bonobo and who wouldn't be?

22         MR. STAMBAUGH:  Objection; misstates the testimony.

23         THE COURT:  I'll receive it, subject to the objection.

24 A.  You always have to make that decision just as you do with

25 your children or your pets.  It's nothing unusual.

SAVAGE-RUMBAUGH - CROSS

105

BY MR. MILLER:

Q.  Bonobos are certainly -- they're capable of inflicting harm

to people, to humans, correct?

A.  Humans are far more capable than bonobos of inflicting harm

on other humans and do so far more often.

Q.  But you would agree with me that the bonobos are capable of

inflicting harm on humans?

A.  They are capable of it.

Q.  And other animals?

A.  They are capable of it.

Q.  All right.  In fact, you've witnessed circumstances where

somebody was injured by a bonobo, correct?

A.  Yes.

Q.  Bonobos have bitten other individuals in your presence, for

instance?

A.  In bonobo society, biting is a way of disciplining just like

spanking is a way of disciplining sometimes in human societies.

In other human societies, cutting off a finger is a way of

disciplining.  Bonobos have a cultural pattern of biting, but

that can be changed.  They don't do that just because they're a

bonobo.  They do that because they're a cultural being.

Q.  In spring 2013, you got hurt, you went back to New Jersey,

correct?

A.  I didn't get hurt and go back to New Jersey.  I got hurt and

I stayed there quite awhile.  I had constant interchange with

1   Gaila and Liz who was working there every day.  I knew -- I was

2   asked to help find a successor, and I knew they wanted to have

3   funding from the Federal Sanctuary System, so I met with George

4   Caudill, and I told him if we were going to talk about getting

5   assistance, I needed to go back and talk with Duane because

6   Duane started the whole project.  So I went back to discuss what

7   they asked me to discuss, which was to bring a successor for the

8   future, and George -- I went with his blessing.

9   Q.  I mean, that visit with Duane, Dr. Rumbaugh, was in New

10  Jersey, correct?

11  A.  He lives in New Jersey, so I had to go there to talk with

12  him.

13  Q.  Right.  You were there for a matter of weeks or months even?

14  A.  A couple of months.  I hadn't visited him in three or 4

15  years since Teco was born.

16  Q.  And you went through periods of time when you have been here

17  in Des Moines where you're not engaged in research or in the

18  operations of the facility, correct?

19  A.  I don't think there's been any time where I haven't been

20  cognizant and concerned about the operations of the facility,

21  writing e-mails on safety procedures, asking everybody what's

22  going on, providing any assistance or help I could; but there

23  have been times where I was injured.  I had a cracked wrist, I

24  had a cracked ankle.  I worked at the facility straight through

25  those.  I've had some infections, and I've worked at the

1   facility straight through those.  I was working 24/7.  I was

2   working very long and very hard hours, and there have been times

3   where I've needed to get away from the facility where -- as when

4   I fell and hit my head, and many of those times people have

5   wanted me back at the facility.  And I'm glad they do, I'm glad

6   they felt that I was valuable; but it was very clear to me, even

7   before Teco was born and I took on the obligation of rearing him

8   because his mother was having difficulty, that I needed more

9   help.  I certainly had more help in Atlanta the whole time I was

10  rearing Kanzi or Panbanisha or Nyota.

11  Q.  So in 2012 you took over as executive director for a period

12  of time?

13  A.  I'm not really sure if Dr. Schweller gave me that title or

14  not.

15  Q.  I think that's what you testified to earlier, and the record

16  will reflect what it does; but you certainly also testified that

17  there was a period of time when you took care of all of the

18  administrative functions.  Do you recall that?

19  A.  Yes.

20  Q.  All right.  Okay.  And during that time Mr. Stambaugh asked

21  you questions about the fact that you were a registered agent

22  for IPLS.  Do you recall that?

23  A.  Yes.

24  Q.  And you --

25  A.  And I would just like to say I took over all administrative

1  functions in the lab at the time.  Dr. Schweller was taking over

2  as many as he was willing to take.  I wasn't grabbing them.

3  Q.  But you understood that you were the registered agent for

4  the organization?

5  A.  I didn't know what registered agent meant at that time.  I

6  had no idea.

7  Q.  All right.  I want to go ahead and look at Exhibit 1004.

8  Dr. Rumbaugh, if you would find it in front of you.  It's in a

9  notebook that's in front of you, plaintiffs' exhibits.  It

10  should be right in front.

11  A.  You want me to look in the book?

12  Q.  Yes.

13  A.  What number is it?

14  Q.  1004.

15  A.  Is it in this smaller one?

16  Q.  Yes, ma'am.

17  A.  Okay.  I have it.

18  Q.  And that's a statement of change of registered agent or

19  registered agent form.

20         Do you see that there?

21  A.  Yes.

22  Q.  Okay.  And is that your signature at the bottom of that

23  page?

24  A.  Yes, it is.

25  Q.  As executive director?

1   A.  That's written under my name.  I can't tell you that that

2   was on there when I signed it.

3   Q.  You did sign this document, right?

4   A.  I did sign this document, yes.

5           MR. MILLER:  All right.  Your Honor, we offer Exhibit

6   1004.

7                               (Plaintiffs' Exhibit 1004 was

8                               offered in evidence.)

9           MR. STAMBAUGH:  Your Honor, we renew our objections as

10  in the pretrial order; relevance, authentication; 1005; copy of

11  public record conditions not satisfied.

12          THE COURT:  Exhibit 1004 is received, subject to that

13  objection.

14                              (Plaintiffs' Exhibit 1004 was

15                              received in evidence.)

16          MR. MILLER:  Your Honor, may I publish 1004?

17          THE COURT:  Yes.

18          MR. MILLER:  Your Honor, just for the record and to

19  make a little record with respect to 1004, I have a copy here

20  that I offered and would give to the court attendant at the end

21  of this testimony that has an authentication or certification

22  from the Secretary of State that I think will resolve some of

23  the issues; but we don't have that copy for your file, excuse

24  me.

25          THE COURT:  Is it part of the official record?

1          MR. MILLER:  Well, I'm holding that copy here, but I

2    guess it's -- a copy is in the binder, and I would switch it out

3    if that's -- when they raised the objection, we got a certified

4    copy to try and resolve those issues.

5          THE COURT:  Well, you can switch it out; but I

6    think -- I assume that the exhibits before the witnesses are the

7    official court record --

8          MR. MILLER:  I apologize.

9          THE COURT:  -- or would be the original exhibits.  Do

10   we all understand that?  Yes?

11         MR. STAMBAUGH:  Yes.

12         MR. MILLER:  Yes.

13         THE COURT:  So if you want to change the official

14   exhibit, you can.  I don't need it, but you can do it if you

15   want to.

16         MR. MILLER:  Okay.  I appreciate that, Your Honor.  I

17   didn't have this handy when I put that up there at the desk, at

18   the witness box today, so I'm sorry.

19   BY MR. MILLER:

20   Q.  Dr. Rumbaugh, if you would again refer back to 1004, I think

21   I just would ask you if this is your signature here at the top

22   of that page, is that correct?

23   A.  Yes.

24   Q.  Okay.  And I think you testified earlier this was provided

25   to you to sign by Ms. McKee, correct?

1   A.   That's my recollection.

2   Q.   But you did review it and sign it for her?

3   A.   I don't -- I just signed it because she asked me to, to do

4   it.  I didn't really understand what the implications of it were

5   and I didn't really know why she was asking me to sign it.

6   Q.   You would have received mail for Great Ape Trust at the

7   address reflected on this 1004, correct, the 4200 Southeast

8   44th?

9   A.   Yes.

10   Q.   Okay.  So that's a correct address for the organization?

11   A.   That's a correct address.

12   Q.   And you don't deny that you never filed a biennial report?

13   I think Mr. Stambaugh asked you about that earlier.

14   A.   When Lyle Simpson took over as the legal counsel, he told me

15   he would handle all of those things for BHI and IPLS, so I never

16   had any indication from either Susan McKee or Lyle Simpson that

17   that was my responsibility, and I had not really handled a

18   nonprofit before and Lyle was handling BHI for me and he filed

19   the reports for BHI, so I had no reason to suspect that he would

20   not handle the reports for IPLS.

21   Q.   Well, did you give him this document when it came in?

22   A.   Lyle wasn't the legal counsel when this document came in.

23   Jaki Samuelson was still the legal counsel at that time.

24   Q.   I'm sorry, I misheard you.  Who was that?

25   A.   Jaki Samuelson.

1   Q.   Okay.   Did you give it to Ms. Samuelson?

2   A.   I gave it to Susan McKee.

3   Q.   Okay.

4   A.   She took it.   I don't know what she did with it.

5   Q.   You later tried to reinstate the IPLS entity, is that

6   correct?

7   A.   No.   I didn't even -- I mean, Lyle tried to; I didn't.   I'm

8   not a lawyer.   Unless a lawyer is there to explain these things

9   to me, I have no knowledge, I don't know what to do.

10  Q.   I'm going to show you Exhibit 39.   Can you find that in the

11  bigger notebook behind you?

12  A.   39?

13  Q.   Or you can look right behind you actually.

14  A.   Oh, okay.

15  Q.   That's a document -- do you see that at the top --

16  application for reinstatement?

17  A.   Yes.

18  Q.   And it says the name of the business entity, the date of

19  administrative dissolution of the Iowa Primate Learning

20  Sanctuary.   Do you see that there?

21  A.   Yes.

22  Q.   And that's your signature at the bottom on November 6, 2013,

23  correct?

24  A.   I don't recall signing that document on November 6, 2013.

25  That would have been right before I came -- or I guess as I came

SAVAGE-RUMBAUGH - CROSS

1  back to take care of Teco.

2  Q.  Right.  You don't deny you signed this on that date?

3  A.  If Lyle asked me to sign the document, I probably would have

4  done what Lyle asked because I really believed he was operating

5  in my best interests until I had a source to conclude otherwise.

6  Q.  Okay.  Let's talk about Lyle.  Lyle is not a board member of

7  IPLS, correct?

8  A.  No, sir.

9  Q.  Or BHI?

10  A.  No, sir.

11  Q.  To your knowledge, of ACCI?

12  A.  No, sir.

13  Q.  Of any organization?

14  A.  I've invited him to be a board member of those

15  organizations, but he's turned me down.

16  Q.  Politely declined I assume?

17  A.  Yes.

18  Q.  Now, I think you just said, if I understand you correctly,

19  at some point in time, you became concerned about the advice you

20  received; is that accurate?

21  A.  After I was removed from the building and told to leave town

22  and that I would never see the bonobos again, I did become

23  concerned; but Duane encouraged me not to cause a problem, to

24  follow Lyle's advice, to not explain any of this to the BHI

25  board and to work with Lyle, that somehow, some way if we worked

1   with Lyle we would work these things out.  So I continued to

2   work with Lyle to try to do that until such point as Lyle told

3   me to leave his office and contact a lawyer.  And right before I

4   was told that, I finally concluded that what was happening was

5   simply wrong, and I turned to him and I said, Lyle, you have

6   tricked the Bonobo Hope science board, and I don't appreciate

7   it.  And Lyle asked me to leave his office and get a lawyer.

8   Q.  Okay.  So you said you came to this conclusion and concern

9   when you were removed in November 2013, correct?

10   A.  Correct.

11   Q.  You kept talking to Lyle after that?

12   A.  Yes, I did to try and resolve it.  I thought Lyle didn't

13   understand the situation because George Caudill told me that I

14   was removed because I wrote an e-mail to Jared, and in that

15   e-mail I asked Jared if chimpanzees were coming soon to the

16   facility because Jared and I had discussed the chimpanzees from

17   Yerkes might come; but Jared had indicated that there were big

18   hurdles to those chimpanzees coming.  At that time Jared didn't

19   tell me that the hurdle was me and I had no idea that the hurdle

20   was me.  I thought six to seven chimpanzees were coming, and I

21   thought it would be some time before they arrived.  I was told

22   that they were arriving very soon, there could be as many as 30

23   and that I needed --

24   Q.  I don't want to interrupt you, I apologize, but I think

25   we're getting a little off course.

1        What I would like to understand is November of 2013

2   you say I'm distrustful of Lyle; is that what you're saying?

3        MR. STAMBAUGH:  I'm going to object as argumentative

4   and request that the court allow the witness to finish her

5   answer.

6        THE COURT:  Oh, I think it was time for another

7   question, and your objection to the current question is -- I'll

8   receive it, subject to the objection.

9        Do you recall the question?

10       Why don't we get a fresh start.

11  BY MR. MILLER:

12  Q.  Okay.  When you're removed, when you're asked to leave in

13  2013, November of 2013, your testimony is you became concerned

14  about Lyle's advice?

15  A.  Lyle was concerned that I had written an e-mail to my

16  potential successor, and he threw me out because I wrote an

17  e-mail to my potential successor.  That's what I was told why I

18  was being thrown out.  I was concerned, and I went to discuss

19  that with him.

20  Q.  Right.  Several months later you went to discuss that with

21  him?

22  A.  No, no.  I went and discussed it with him immediately.

23  Q.  Okay.  Did you fire him?

24  A.  Fire Lyle?

25  Q.  Right.

1  A.  No, I didn't fire Lyle.  Duane's advice was to work with

2  Lyle, Lyle is our friend and to try and work with Lyle, and Lyle

3  had been a friend and that the best thing to do was to try to

4  talk with him.

5  Q.  And I think you testified Lyle was Bonobo Hope's lawyer?

6  A.  Lyle was the lawyer for Bonobo Hope.

7  Q.  And did Bonobo Hope fire him?

8  A.  I was given explicit instructions by George and Lyle not to

9  tell anyone on Bonobo Hope what had happened.  It was indicated

10 to me that Lyle and George were lawyers and I wasn't and I could

11 be put in jail, many bad things could happen to me.  And Duane

12 and I were both very frightened, and Lyle had been a longtime

13 friend and we tried to work it out with him until such time as I

14 was told to get out of his office and get a lawyer.

15 Q.  By working it out, did that mean continuing to write e-mails

16 to Lyle for the next several months?

17 A.  It meant talking with Lyle and explaining to him that I had

18 not violated any particular rule or regulation that he or George

19 had laid down because I wrote an e-mail to Jared, I should be

20 able to write an e-mail to Jared and to discuss whether

21 chimpanzees were coming to the lab or not.  I see absolutely

22 nothing illegal or wrong with that.  And I was told I could no

23 longer communicate with Jared, with Bill, with George, with the

24 board, with anyone or with anyone in the lab, no one on the

25 staff, not my sister, not my niece, not my family, I had to sit

1  there and be quiet and the best thing to do was to get out of

2  town.

3  Q.  Now, at that time you were -- actually you were out of town,

4  right?

5  A.  No.  I'm in Des Moines.  I've just been kicked out of the

6  lab and Teco was ill and I'm very concerned about him, and I was

7  writing a few members of the board, against Lyle's objection,

8  explaining to them that we had a little bit of a problem, but I

9  thought I would resolve it with Lyle.

10  Q.  Okay.  So you're writing e-mails even though you supposedly

11  were told not to?

12  A.  I didn't write e-mails and explain everything that was going

13  on, but I did indicate that we had some kind of issue as regards

14  Teco.

15  Q.  If you have a problem, you never stopped from e-mailing

16  somebody relating to one of these issues, correct?

17  A.  I stopped sending e-mails in March when George took over and

18  told me that any e-mail I sent to the Bonobo Hope board needed

19  to be reviewed by him.  I thought that was wrong.  I sent far,

20  far fewer e-mails to the board from that point on until I was

21  asked to step out of Lyle's office.  I was in a legal gray area.

22  I was working with two lawyers.  They were in charge of the

23  facility and I did not understand what was happening.

24  Q.  Now, you have these concerns apparently with Mr. Simpson.

25  You would have reviewed documents that he gave you and asked to

1  sign before you signed them, correct?

2  A.  Would you rephrase that?

3  Q.  Sure.  Notwithstanding your concerns with Mr. Simpson or

4  perhaps because of those concerns, if he gave you a document and

5  said, I need you to review and sign this, you would have done

6  that?  You would have reviewed that document before you would

7  have signed it, correct?

8  A.  I believe I arrived in Iowa to take care of Teco on the 5th

9  of November or the 4th of November, and I believe that I was

10  thrown out on the 10th of November.  And I did meet with Lyle,

11  had dinner with Lyle.  He took me to the Wakonda Country Club,

12  and at that point he told everyone at the country club the most

13  wonderful things he could tell them about me, probably around

14  November 6th or around that time.  I had no idea Lyle would kick

15  me out of the facility.  He couldn't say good enough things

16  about me when he was buying my meal.  He had been my longtime

17  friend, and he had written to everyone about the research.  I

18  had no reason not to trust Lyle.

19  Q.  But what I'm asking is, if you had a document that Lyle

20  asked you to review and sign, you would have reviewed it before

21  you signed it, correct?

22  A.  I wouldn't have reviewed it with the idea that Lyle might be

23  asking me to do something that I should not do.  I mean, if he

24  tells me, we need this signed for IPLS, yes, I would have signed

25  it for Lyle at that time.  I wouldn't have reviewed it and said,

1   what about this, what about this, are you going to stick with

2   the settlement agreements, are you going to throw me out.  I

3   would have never even thought to do that.

4   Q.  About that dinner at the Wakonda Club, you were actually

5   back and had Thanksgiving dinner with them, correct?

6   A.  No.  Thanksgiving dinner was later.  I was back to take care

7   of Teco, and Lyle asked me to take an evening off, and I got my

8   sister to come in and take care of Teco, and I went to dinner

9   with Lyle at the Wakonda Country Club.

10  Q.  What I'm asking, if I understand your testimony, so

11  November 6th, or thereabouts, you have dinner with Lyle at

12  Wakonda, correct?

13  A.  It could have been the 7th.  I don't --

14  Q.  Okay.  And then you're asked to leave, and you leave on the

15  9th, is that correct?

16  A.  I wasn't asked to leave by Lyle at the dinner.  I was asked

17  to leave on the 9th or 10th by George.

18  Q.  Yeah, I appreciate that, Dr. Sue.  I understand you

19  weren't -- but on November 9th or 10th is when you were asked to

20  leave and you leave, correct?

21  A.  Correct.

22          MR. STAMBAUGH:  Objection; argumentative.

23          THE COURT:  Overruled.

24  BY MR. MILLER:

25  Q.  And then, despite this betrayal and this deception that

1  you've been talking about, you come back a couple of weeks later

2  and you have Thanksgiving dinner with Lyle and George, correct?

3          MR. STAMBAUGH:   Same objection.

4  A.  George --

5          THE COURT:   Overruled.

6  A.  George wrote me and talked to me and said, Sue, this is

7  going to be the last time you're ever going to see the bonobos

8  in your life, and I feel that I need to do something in order to

9  allow you to say good-bye.  If I allow you to come to the

10  facility, will you leave, you know, at the appropriate time, and

11  do you understand that this is the last time you'll ever see the

12  bonobos?  I didn't agree that it was the last time I would ever

13  see the bonobos, and I said, I don't agree to that; but yes, I

14  will come to the facility and I will spend Thanksgiving dinner

15  with the bonobos and thank you very much for giving me that

16  opportunity, George.

17  Q.  Right.  Again, that's a couple of weeks after this supposed

18  event, the betrayal and all of that?

19  A.  But I had been talking with George and Lyle every single day

20  from the point I was out complaining about the problem at every

21  point they would allow me to discuss it.

22  Q.  When you came in to deal with Teco there in November, you

23  came in unannounced?

24  A.  No.  That's not true.  I wrote to people.  I wrote to Julie

25  Gilmore, and Heather knew I was coming and one other person knew

1   I was coming.

2   Q.  You came in and you had called meetings with staff and

3   volunteers?

4   A.  I did not.

5   Q.  Okay.

6   A.  At one point George Caudill asked to see me, and I asked,

7   will any of the volunteers be able to take Teco or will Heather

8   or Liz be able to take Teco, and I asked the people to get

9   together so that I could make sure that Teco's coverage was --

10  somebody was there to take care of Teco while I went to see

11  George, and that was called as me getting the volunteers

12  together and trying to organize them and gather them.  That was

13  not it at all.  Because I was asked to meet George, I had to be

14  responsible and find somebody to take care of Teco, who was ill,

15  until I could come back.

16        And when George asked me to meet with him, which was

17  on a Saturday morning, he had me go to the Caribou coffee shop

18  and stay there the entire day waiting for him and then he still

19  didn't show up, and then he said he would meet with me the next

20  morning and I had to get somebody else to cover, and he didn't

21  meet with me then either.

22  Q.  And, again, this is when you come back to take care of Teco?

23  A.  Yes.

24  Q.  And by this point in time, you had gone back to New Jersey?

25  A.  I'm not sure what point in time you're referencing.

1  Q.  I apologize.  Where were you there in -- where did you come

2  from to take care of Teco?

3  A.  I came from New Jersey where I had gone to talk to Duane.

4  Duane and I had talked to Jared over the phone, and we had

5  written the letters at Lyle's request and we were doing

6  everything we could to facilitate the transfer the way Lyle had

7  laid it out, which was a three- to 4-year transition with Sue

8  and Jared co-directing the center and unfettered access to the

9  bonobos thereafter.

10  Q.  Okay.  And after this scenario where you come in and take

11  care of Teco, it was actually Dr. Gilmore talked to you and

12  said, Sue, we need you to leave, correct?

13  A.  No.  Dr. -- Mr. Caudill wrote me the letter, the document

14  that you showed up there.

15  Q.  And that was followed by a meeting with Dr. Gilmore where

16  she asked, you need to go, and you said, I'm going to go?

17  A.  There were many other e-mails from Caudill.  I don't know if

18  you've seen them or not.  There were other e-mails from Lyle.

19  There were phone calls from Lyle.  I kept implying that no one

20  had come forward to take care of Teco and, in fact, until Liz

21  was rested up, she really was not able to come forward and take

22  care of Teco.

23       At one point George or someone sent Julie Gilmore in

24  to ask me to leave.  I was already -- I had already agreed to

25  leave because I had been ordered out of the facility by the

1   legal counsel and the chair of the board, and I was -- it was

2   intimated that, you know, the authorities would come and remove

3   me from the facility.  I wasn't trying to grandstand.

4            And Dr. Gilmore came, and I was preparing things,

5   getting my stuff together so that I could leave.  And my sister,

6   Liz, went over and started to talk to Dr. Gilmore and asked

7   about why I was being forced to leave, and Dr. Gilmore turned to

8   my sister and said, Liz, this isn't about anything other than

9   money.  This isn't about Sue and Teco or their relationship.

10  This is only about money.

11           And at that point Teco got very upset and threw

12  himself on the floor and started having a temper tantrum and

13  slapping himself all over, and my sister felt he went into a

14  very traumatic event; but I left as I was ordered to do by Lyle,

15  Steve Boers, Julie Gilmore, and George Caudill.

16  Q.   Okay.  So apparently Julie said something about it being the

17  money; is that what you said?

18  A.   That's what I was told.

19  Q.   Okay.  And you, obviously, brought that up with Caudill and

20  Simpson when you came back for that Thanksgiving dinner?

21  A.   They weren't there when I went to the Thanksgiving dinner.

22  The Thanksgiving dinner was to be had with the bonobos in the

23  lab.  It was a private family affair.  People from my family

24  could go, Duane could go, Heather could go, Liz could go.  The

25  pan/homo people could go.  No one outside the pan/home group was

1   allowed.  It was the Thanksgiving dinner that we would have had

2   with George.  We had it with the bonobo family instead.  And I

3   had not left -- between the time I was kicked out on the 10th

4   and the 15th, I had not left Iowa.

5   Q.  Sitting here today, you have no direct evidence yourself of

6   ACCI's current operations, correct?

7   A.  I have not been allowed in the facility.

8   Q.  Anything that you believe is occurring there, you've heard

9   from others?

10  A.  I've seen videos.

11  Q.  Okay.  What videos have you seen?

12  A.  I've seen videos on television and I saw a video taken by

13  Sheila a couple of weeks ago at the bike event.

14  Q.  Okay.  And Sheila is your counsel?

15  A.  Yes.

16  Q.  Okay.  And what were the other videos, I'm sorry, you saw on

17  television?

18  A.  I saw videos on television not long after Matata died that

19  were made by ACCI.

20  Q.  Okay.  You followed and watched documentaries of the like?

21  A.  Pardon?

22  Q.  You've been watching documentaries or videos or something

23  like that; is that -- I'm just trying to understand what you're

24  referring to.

25  A.  I do watch documentaries, but it's not because I watch

1  documentaries or follow videos that I saw the video of Nyota on

2  television.  It was a newscast.

3  Q.  Okay.  And that was after Matata died?

4  A.  Right after Matata died, and I've seen some video that Liz

5  has taken.

6  Q.  What video did Liz take?

7  A.  I don't know how to answer that question.

8  Q.  Why?  Why can't you answer that?

9  A.  What do you mean "what video"?  I don't understand the

10 syntax of your question.

11 Q.  Okay.  You've watched a video that your sister, Liz, a

12 volunteer at ACCI, took, correct?

13 A.  Yes, I have.

14 Q.  What was the video that you viewed?

15 A.  There are several videos.  I recall one video of Nyota that

16 she took.  I have one short video of Teco that she took.  I

17 don't think I've seen any videos with Kanzi.

18 Q.  When did she take these videos?

19 A.  I don't know.

20 Q.  Did she tell anybody she was taking those videos?

21 A.  Probably not.

22 Q.  Did she tell the bonobos she was taking the videos?

23 A.  Oh, I'm sure she would.

24 Q.  And what about this video that Sheila took, what was that

25 video?

1   A.   I don't understand when you say "what was that video."  Do

2   you want to know what's on the video?

3   Q.   Yeah.

4   A.   Is that what you're asking me?

5   Q.   Yes.  Please describe for me what video your counsel took by

6   coming to this bike event.

7   A.   She was on a bike event, and she took a video of whatever

8   she saw.

9   Q.   And what does the video depict?

10  A.   It depicts bonobos.  It depicts outdoor cages.  It depicts

11  indoor cages.  It depicts people walking past with masks and

12  gloves and pushing food carts.

13  Q.   It depicts the facility as it currently is?

14  A.   Yes, some parts of it.  I mean, I can't say that it depicts

15  the entirety of the facility as it entirely is.  It exhibits

16  what's on the video.

17  Q.   You asked her to go to this event, which I take it was the

18  Biking for Bonobos event about a week ago, is that right?

19  A.   Yes.

20  Q.   You asked her to go there and take video?

21  A.   Yes.

22  Q.   Why?

23  A.   Because I wanted to know if the bonobos were okay.

24  Q.   Now, members of Bonobo Hope have been at the facility and

25  seen the bonobos?

1    A.   They had a terrible time getting into the facility.

2    Q.   They've been at the facility and seen the bonobos within the

3    past couple of months, correct?

4            MR. STAMBAUGH:   Objection; compound and misstates the

5    evidence.

6            THE COURT:   I'll receive it, subject to the objection.

7    A.   Members of the Bonobo Hope board have asked and asked and

8    asked and been turned down, turned down and turned down.  Derek

9    Wildman was able to spend -- the only BHI member that's been

10   allowed to go is the one that's on ACCI's board as well as the

11   BHI board, and he was allowed to go to the facility.

12   BY MR. MILLER:

13   Q.   Okay.  He's a Bonobo Hope member, he was there at the

14   facility, he observed the bonobos, correct?

15   A.   Yes.

16   Q.   And that was within the past couple of months?

17   A.   Yes.

18   Q.   Still you thought, boy, I've got to have my lawyer go out

19   and take video of these people?

20           MR. STAMBAUGH:   Objection; argumentative,

21   inappropriate.

22           THE COURT:   That is argumentative.

23           MR. MILLER:   I withdraw the question.

24   BY MR. MILLER:

25   Q.   You suggested bringing chimps into the facility as part of

1  the operation of the Great Ape Trust in the past, correct?

2  A.  Would you state the question again?

3  Q.  Sure.  You, yourself, Dr. Rumbaugh, suggested or supported

4  bringing chimps to the facility, correct?

5  A.  Yes, I did, and so did the BHI board.  We voted on that.

6  Q.  And you have no objection to chimps coming at this time?

7  A.  At that time I did not have the flood report.

8  Q.  Now, because of this flood report that you've got, you say

9  no, no chimps?

10  A.  I think unless there's a way to move apes really easily and

11  quickly because the water rises so fast, it's just not possible

12  to do because the access to the building can be shut off very,

13  very rapidly.  I think you would need a tunnel going from that

14  low area over to the high area on the other side.  You would

15  have to buy some land on the other side, and if you could do

16  that and they had a way to move quickly, I wouldn't object to

17  it; but under the current circumstances, I think that their

18  lives would be in jeopardy at some point.

19  Q.  I skipped over one thing, Dr. Sue, I want to go back over

20  with you.  In front of you in the small binder there's an

21  Exhibit 1005.  Can you find that for me?

22  A.  Yes.

23  Q.  Do you have that there in front of you?

24  A.  Yes, I do.

25  Q.  Do you agree with me that that's an e-mail that you wrote

1  Mr. Caudill with a cc to several individuals, including

2  Dr. Taglialatela, Mr. Roffman, your sister, Dr. Wildman,

3  Dr. Dubreuil, correct?

4  A.  That's correct.

5  Q.  In fact, there are others listed there, correct?

6  A.  Yes.

7  Q.  And that's an e-mail you wrote on October 26, 2013?

8  A.  Yes.

9  Q.  Re:  Iowa Primate Learning Sanctuary, correct?

10  A.  Yes.

11  Q.  And this e-mail you're sending to the board members of IPLS

12  and Bonobo Hope, correct?

13  A.  Yes.

14           MR. MILLER:  Offer Exhibit 1005, Your Honor.

15                          (Plaintiffs' Exhibit 1005 was

16                           offered in evidence.)

17           MR. STAMBAUGH:  Just renew our objections in the

18  pretrial order; foundation and hearsay, Your Honor.

19           THE COURT:  The Exhibit 1005 is received, subject to

20  the objection.

21                          (Plaintiffs' Exhibit 1005 was

22                           received in evidence.)

23  BY MR. MILLER:

24  Q.  If you would bear with me one second.  I have a lot of paper

25  in front of me.

1   A.  Sure.

2            MR. MILLER:  Your Honor, may we publish Exhibit 1005?

3            THE COURT:  You may.  But as I'm looking at it, it is

4   an e-mail string, isn't it?

5            MR. MILLER:  An e-mail string, Your Honor.

6   BY MR. MILLER:

7   Q.  In fact, just to be clear, Dr. Sue, if you go through it, in

8   the bottom right-hand corner of that document there's page

9   numbers.

10           Do you see that?

11  A.  Yes.

12  Q.  If you look at page 4, that's a response from Mr. Roffman,

13  Ph.D. student, correct?

14  A.  Yes.

15  Q.  "I fully support Sue letter."

16  A.  Yes.

17  Q.  Do you see that?

18           And from page 5 is from Dr. Dubreuil?

19  A.  Yes.

20  Q.  "I want to express my very strong support."

21           Do you see that?

22  A.  Yes.

23  Q.  And then page 6, "I fully support the transition that Sue

24  recommends."

25           Do you see that there?

1   A.   Yes.

2   Q.   Again, from Bonobo Hope board members, is that correct?

3   A.   Yes.

4   Q.   Okay.  Let's go back to page 1.  Why don't you read along

5   with me because this first e-mail, the first line says, "I am

6   writing to each of you to strongly support and to

7   enthusiastically endorse Jared Taglialatela and Bill Hopkins."

8            Do you see that there?

9   A.   Yes.

10  Q.   And this is an e-mail that you wrote, correct?

11  A.   Yes, yes, sir.

12  Q.   "It is my hope that they will find a means of working with

13  the bonobos and of facilitating the transition from the current

14  operational status to one that is sustainable for the long term,

15  along with the necessary structural transitions," correct?

16  A.   Yes.

17  Q.   All right.  And you meant that when you wrote that e-mail,

18  correct?

19  A.   I had no idea that they would dissolve the BHI board,

20  appoint their own advisory board that has no voting power and

21  remove me from the lab.

22  Q.   Okay.

23  A.   I would have never supported them under those circumstances.

24  Q.   Okay.  You say further on there in the fourth paragraph,

25  "They," Dr. Taglialatela and Dr. Hopkins, "can be of far more

1  benefit to the center and can do far more than I can do in many

2  fields," is that correct?

3  A.  That's correct.

4  Q.  And you believed that then?

5  A.  I have not changed that.  They have expertise that I don't

6  have, but I have expertise that they really need.

7  Q.  Okay.  Well, in fact, you go on to say in the next

8  paragraph, "They," Taglialatela and Hopkins, "can do hands on

9  research, observational research, computer based tasks,

10  neurological research, social and communicative comparisons,

11  etc."

12         Do you see that there?

13  A.  Yes.

14  Q.  Okay.  So you understood that's what they would be doing

15  when they came in?

16  A.  No.  I mean, I assumed they would be doing hands on

17  interaction with the bonobos, but they have declined to do that.

18  At least at the meeting in June, they declined to do it and to

19  do it without any assistance and without any continuation of the

20  pan/homo family is not a continuation of the research

21  trajectory.

22  Q.  Right.  That's the research trajectory that you described in

23  that paragraph that you drafted in the supplemental and

24  settlement agreement that you discussed earlier, correct?

25  A.  That's correct.

1  Q.  If you look at the second page of this exhibit, the fourth

2  paragraph down, the last sentence, "It became increasingly clear

3  that the best thing I could do to improve the chances for IPLS

4  funding and to decrease the level of objections going to the

5  USDA about IPLS would be to absent myself from the lab," correct?

6  A.  Fourth paragraph down?

7  Q.  Right.

8  A.  The fourth paragraph starts with, "I supervised both for a

9  time" --

10  Q.  No.  I'm sorry, I may have lost you there.  I'm looking at

11  the second page of that exhibit, the last sentence of the fourth

12  paragraph.

13  A.  Yes, okay.

14  Q.  And it did become increasingly clear to you that the best

15  thing for you to do would be to absent yourself from the lab,

16  correct?

17  A.  Well, I had discussed with Jared absenting myself from the

18  lab for about two months while they -- I simply would be there

19  full time for two months and come in and sort of take charge,

20  and then I would give them the opportunity for the publicity and

21  that I would work in the background and be helpful to them.  I

22  knew Jared couldn't be there very much.  He had told me that.

23       So we had had numerous discussions on the phone about

24  what my assumptions were, and they were not at all what happened

25  once Jared and Bill were voted on the board.

1  Q.  Yes.  Let's talk about that whole prospect of them and the

2  amount of time they would spend there.  In this e-mail you say

3  you fully acknowledge that the center is equipped with computer

4  connections and cameras that can enable them to monitor all

5  aspects of the operation and to communicate with anyone at any

6  time should they need to do so, correct?

7  A.  Yes.  If Jared wasn't going to be there, I would hope he

8  would be able to monitor with cameras at all times, but that

9  doesn't mean that he can do something about Teco if he's ill.

10  He can call me if I don't know and I can come in and help him.

11  If a bonobo has escaped, if we need to have the bonobos going

12  out on walks or doing things in the caves or making fire or

13  things that would continue the research trajectory, he could

14  monitor those over the video, but that doesn't mean you can do

15  them over the video.

16  Q.  Well, that may be, but certainly you would have staff or

17  volunteers that you could have to do that type of work, right?

18  A.  No, that wasn't the case.

19  Q.  Okay.

20  A.  It takes people many years to learn how to do that, to

21  establish that long term kind of relationship that can go in and

22  do that, sometimes 4, five, six years.

23  Q.  Many years like Heather, correct?

24  A.  Heather was born into the group.

25  Q.  Right.  And Heather is still working at the facility at this

1  time, correct?

2  A.  At the time we wrote this letter, Heather was at the

3  facility and Liz was at the facility and I was planning to be

4  returned to the facility.

5  Q.  You were going to leave the operation in the hands of Jared

6  and Bill and you knew that Liz and Heather were at the facility?

7  A.  That wasn't my intent, no.

8         MR. STAMBAUGH:  Objection to this testimony and --

9         THE WITNESS:  That was never my intent.

10         THE COURT:  Just a moment.  Now the record is all

11  messed up.  Ask your question again.

12  BY MR. MILLER:

13  Q.  When you wrote this e-mail, you knew Heather and Liz

14  continued to work at the facility, correct?

15  A.  Yes, they did.

16  Q.  And if you continue on that second page, at the very bottom

17  paragraph, you acknowledge -- and this is an e-mail again you're

18  sending the Bonobo Hope board -- "While Jared and Bill are

19  familiar with language work, their focus is on investigating the

20  effects of language acquisition as well as comparing and

21  contrasting bonobos and chimpanzees."

22         Do you see that sentence?

23  A.  Which page?

24  Q.  Bottom of the second page, Exhibit 1005.

25  A.  Yes.

1   Q.  You see that there?

2   A.  Yes.

3   Q.  And, in fact, you say, "This is appropriate and the

4   direction that should now be taken"?

5   A.  Yes, within the research trajectory, within the oversight of

6   the Bonobo Hope board was to make sure that across time no drift

7   occurred.  The Bonobo Hope board wasn't to be dissolved even if

8   I had dropped dead at that moment.

9   Q.  Okay.  I mean, you even say in this e-mail to Bonobo Hope,

10  "They," Taglialatela and Hopkins, "must be able to control all

11  aspects of their program, for the lives of bonobos cannot be

12  separated from the success of the research."

13          Do you see that there or do you recall writing that?

14  A.  I definitely recall writing that, and I would like to

15  explain why.

16  Q.  Sure.

17  A.  Because I had lost control of the research program once it

18  came here to a board of business people.  The money determined

19  what could be done.  And I told Jared on the phone that you

20  don't want to have happen to you with a business board what

21  happened to me and that's why I've set the facility the way I

22  have and that's why the science board is going to be the guiding

23  hand in the future.  Jared took that to mean, oh, well, we'll

24  just kick Sue out and the science board out, and we'll take over

25  the business board and Jared and Bill will vote and we'll

1  determine the future.  That wasn't my intent.  I guess -- I

2  mean, I didn't think he understood it that way, but I guess he

3  did.

4  Q.  Okay.  Let's talk about your intent, okay?  Because I think

5  earlier you said you believed you were going to have unfettered

6  access going forward.

7  A.  I was repeatedly reassured by Lyle and George that that was

8  going to be the case.  Before I ever even spoke with Jared on

9  the phone, we had that assurance.

10  Q.  Okay.  Page 3 of Exhibit 1005, can you look at that for me,

11  the top of that page?

12  A.  Page 3 of 1005?

13  Q.  Yes.

14  A.  Okay.  Yes.

15  Q.  Are you there, Dr. Sue?

16  A.  Yes.

17  Q.  You write to the Bonobo Hope board and IPLS board, "It is my

18  hope that the coming essential transition will proceed smoothly

19  and rapidly.  I also hope that, as appropriate, and under

20  Jared's direction, I will continue to do some research with the

21  bonobos" --

22          Now "under Jared's direction," right, you wrote that

23  there?

24  A.  Yes, I did.

25  Q.  -- "once the needed structural changes and funding are

1  firmly in place."

2          Do you see that?

3  A.  Yes, I do.

4  Q.  Then you finish off there, "I will do nothing to disrupt

5  this critical and necessary next step."

6  A.  Yes, I do.  I clearly didn't interpret the next step the way

7  that Jared did, and I did not know about the issue of Yerkes

8  placing a constraint on my presence in the lab.  I assumed that

9  I would be on the IPLS board and that this kind of thing could

10  not happen because Lyle had assured me that it could not happen

11  under any stretch of the imagination.

12          MR. MILLER:  No further questions, Your Honor.

13          THE COURT:  Redirect?

14          MR. STAMBAUGH:  Thank you, Your Honor.  Just a few

15  questions.

16                   REDIRECT EXAMINATION

17  BY MR. STAMBAUGH:

18  Q.  Dr. Savage-Rumbaugh, I want to talk about that same exhibit

19  we were just looking at, Exhibit 1005.

20  A.  Can I look at it again?

21  Q.  Please.  We'll also have it published.

22  A.  Okay.

23  Q.  Now, the last paragraph that we were just looking at, at the

24  top of this page 3 in which you made very clear that you hoped

25  to do further research with the bonobos, is that correct?

1   A.   That's correct.

2   Q.   Have you been able to do any further research with the

3   bonobos under Jared's direction?

4   A.   No.

5   Q.   To your knowledge, has anybody at Bonobo Hope Initiative

6   been able to do further research under Jared's direction with

7   the bonobos?

8   A.   No.

9   Q.   Mr. Miller pointed out that there are some responses to your

10  letter further on in this exhibit from an Itai Roffman?

11  A.   Yes.

12  Q.   And from Laurent Dubreuil?

13  A.   Yes.

14  Q.   To your knowledge, was Mr. Roffman aware that Yerkes had

15  made a mandate of not having you at the lab before writing their

16  response?

17  A.   No.  No one on the BHI board was aware of that.

18  Q.   Is that the same for Professor Dubreuil?

19  A.   That's the same.

20  Q.   And to your knowledge, were they aware that you had been

21  banned from the lab?

22  A.   No, they were not.

23  Q.   Neither Mr. Roffman nor Professor Dubreuil?

24  A.   That's correct.  I was told by Lyle Simpson that if I

25  proceeded with this vote and it went well that I could discuss

1  this before the meeting had ended and let them know what the

2  situation was.  So I agreed to that, thinking that once we

3  talked with the BHI board, perhaps we could talk about

4  rescinding the vote or putting some qualifications on it; but

5  Lyle went against his word and he did not allow me to have that

6  discussion.  He cut it off with e-mails to Carmen cutting that

7  discussion off.

8  Q.  This paragraph that we were just looking at at the top of

9  page 3, you wrote this to Dr. Taglialatela, correct?

10  A.  That's correct.

11  Q.  That you had an expectation to do further research?

12  A.  Yes.

13  Q.  Was it your expectation that he would read your e-mail?

14  A.  Yes.

15  Q.  All of the e-mail, including the expectation to do further

16  research?

17  A.  Yes.

18  Q.  Why did you have that expectation?

19  A.  I was of the opinion that I was sort of handing over the

20  mantle of 40 years of research to a successor and Jared had

21  brought on the second successor, Bill Hopkins, who was a student

22  of mine, and I had suggested to Jared that we also need to

23  include very much Itai Roffman who has focused more than any of

24  the others on the cultural relationships of the work and also

25  Heidi because we do need other females in the work and I didn't

1  want it to become exclusively male.  I thought Jared had

2  basically agreed to that, and Jared had worked with me closely

3  and well as a student, and we had continued to publish together

4  beyond that, even up to 2010, and Jared had said to me that he

5  spoke about my research in his classes, he spoke about it very

6  positively.  He was very positive about continuing the working

7  relationship with me in every conversation I had with him.  He

8  never indicated anything else and he never wrote me an e-mail

9  otherwise.

10          And in the field of professional scientists, if you're

11  handing the mantle over to another colleague and they don't like

12  your work and they don't intend to do it, they should at the

13  very least so inform you.

14  Q.  Dr. Savage-Rumbaugh, do you know, is Liz working at the lab

15  currently?

16  A.  Liz has volunteer status.  I don't know whether she's able

17  to be admitted to the lab currently or not.

18  Q.  Is Heather working at the lab currently?

19  A.  I believe Heather has resigned.

20  Q.  Do you know why?

21  A.  No, I don't.

22  Q.  Do you know of any BHI member other than Derek Wildman who

23  has been allowed access to the lab?

24  A.  With Mr. Zifchak I was briefly allowed access to the lab,

25  and Sally Coxe was briefly allowed access in June of 2013, I

1  believe.

2  Q.  Almost two years --

3  A.  2014.

4  Q.  Almost a year ago?

5  A.  Yes.

6  Q.  Has anyone other than Derek Wildman been allowed in the last

7  year to visit the lab under Jared's direction, to your

8  knowledge?

9  A.  Laurent was allowed to visit the lab maybe nine months ago.

10 I don't know exactly how long ago.

11 Q.  Dr. Savage-Rumbaugh, Mr. Miller asked you some questions

12 about the flooding and relocation efforts.

13 A.  Yes.

14 Q.  Do you recall that discussion?

15 A.  Yes.

16 Q.  At some point you were presented with a relocation plan, is

17 that right?

18 A.  Pardon?

19 Q.  At some point there was a suggestion that the bonobos be

20 relocated, is that right?

21 A.  Yes, yes.

22 Q.  And you opposed that relocation, is that correct?

23 A.  You're talking about the relocation that Dr. Schweller

24 proposed?

25 Q.  Correct.

1   A.  Yes.  I opposed that, yes.

2   Q.  And at the time that you opposed it, was there a viable

3   alternative option for the bonobos to be relocated consistent

4   with your research trajectory?

5   A.  No.  They would have had to have been sent to a zoo in

6   either Alabama or Mississippi.  It wasn't even an accredited

7   ACCI zoo, and I would not have been allowed to be in with the

8   bonobos.

9   Q.  Is there a viable alternative relocation plan for the

10  bonobos today to be taken out of the floodplain?

11  A.  Yes.

12          MR. MILLER:  Objection.  Your Honor, objection.  This

13  exceeds the scope of the direct testimony.  We're into new

14  issues.

15          THE COURT:  It probably does.  If we were in a jury

16  trial, I would probably sustain that objection, but I want to

17  hear from everybody.  So it's received, subject to the

18  objection.

19          MR. STAMBAUGH:  Thank you, Your Honor.

20          THE COURT:  Go ahead.

21          MR. MILLER:  Your Honor, if I may then reserve the

22  right to cross-examine Dr. Rumbaugh if we're going to get into a

23  new issue?

24          THE COURT:  Of course.

25          MR. STAMBAUGH:  And that would be my only question on

1   that topic, Your Honor.  I do want to follow up on the flooding.

2   BY MR. STAMBAUGH:

3   Q.  Dr. Savage-Rumbaugh, at the time that you opposed the

4   relocation of the bonobos from Dr. Schweller, did you know about

5   the inability to build the bypass to the facility?

6   A.  There's an ability to build the bypass.  Whether or not the

7   bypass will solve the problem is the question.

8   Q.  Did you know whether the bypass would solve the problem at

9   that point?

10  A.  I had been informed that it would, that it would solve the

11  flooding problem.

12  Q.  Has that understanding changed?

13  A.  Yes, my understanding has changed.

14  Q.  What is the understanding today?

15  A.  That the bypass does not solve the problem and that flooding

16  is -- we're not even out of the 100-year floodplain, much less

17  out of the 500-year floodplain, and with climate change, it's

18  highly unpredictable.  Even within the 100-year floodplain,

19  we've had three floods since we've moved here, three floods

20  since 2008.  So I think that the bonobos are in jeopardy at that

21  site.

22  Q.  After working with these animals for 40 years, do you feel

23  that they are safe staying in that floodplain today?

24  A.  They are not.

25              MR. STAMBAUGH:  No further questions at this time,

 1  Your Honor, subject to any redirect.

 2              THE COURT:  Recross?

 3              MR. MILLER:  Thank you, Your Honor.

 4                          RECROSS-EXAMINATION

 5  BY MR. MILLER:

 6  Q.  Dr. Rumbaugh, your testimony just now with respect to the

 7  100-year, 500-year floodplain issue --

 8  A.  Yes.

 9  Q.  -- that's based on this report that you had prepared,

10  correct?

11  A.  Yes, it is.

12  Q.  This is based on an individual who's not here testifying

13  about that?

14  A.  Well, on the -- it's a web site about flooding that's put

15  out by the state, I believe.  You can look it up and you can

16  just add six inches of water at a time.  You don't really need

17  that flood report.  You can look on your computer and the state

18  shows you what will happen.  It's very clear that there's a

19  problem.

20  Q.  You're not an expert in flooding?

21  A.  No.  That's why I -- that's why I was asking if anyone could

22  get a report.

23  Q.  Right.  And that same type of research you're describing

24  would show you that this building is susceptible to flooding in

25  the 100-year floodplain?

1  A.  I would have to look on the map and ask that.  I don't think

2  my report would necessarily say that.  I would have to ask the

3  engineers.

4  Q.  Yeah.

5  A.  The way the water is directed through Des Moines, it can be

6  rather tricky, so I -- I don't think because of my report you

7  could say that this building would also flood.  I don't think

8  that follows.

9  Q.  Yeah.  But when you say your report, let's be abundantly

10  clear, this is a report that you had prepared in the past month

11  by some outside expert who is opining about the risk of flooding

12  at the site and the facility?

13  A.  Well, I think they did a lot of research.  They've worked on

14  it for quite some time and this is their job.

15  Q.  No doubt that that's --

16  A.  I mean, you could have another expert look and counter the

17  data, I don't know.  I think that there is a real risk of

18  flooding.

19  Q.  It is not your report?

20  A.  I didn't put the report together, no.

21  Q.  And on October 26, 2013 when you wrote this e-mail, there

22  was no being banned from the facility, correct?

23  A.  On October --

24  Q.  Right.  Exhibit 1005 was written on October 26, 2013,

25  correct?

1   A.  You're asking if I was banned from the facility?

2   Q.  Right.

3   A.  At this time?

4   Q.  Right.

5   A.  Jared had not been nominated yet.

6   Q.  You just told Mr. Stambaugh that somehow some issue relating

7   to you being banned was not recorded in this e-mail that you

8   wrote or was not of general knowledge; but you agree with me

9   there's no banning as of this date, correct?

10  A.  There couldn't be because BHI was still in charge of the

11  facility.  I think that the banning happened when George Caudill

12  decided that I was to be removed.  I was -- I had letters

13  telling me I was welcome to come back, please come back anytime.

14  The facility doesn't function without you.  We need you, Sue.

15  Sue, please, please come from Lyle and George and everybody.  I

16  had no idea that I would not be welcome in the facility if

17  that's your question.

18  Q.  Right.  Not until you came back and decided to reassert

19  yourself?

20  A.  I came back to take care of Teco.  I wasn't trying to

21  reinsert myself.  It was always assumed that I would come back

22  and that I would continue in some capacity, and that's all I

23  did.

24  Q.  Well, what you assumed, what you wrote was, I also hope that

25  as appropriate and under Jared's direction I will continue to do

1  some research with the bonobos, once the needed structural

2  changes and funding are firmly in place, correct?

3  A.  That was if the board and everyone voted on his proposal.

4  At that time on October 26th, we hadn't done that yet.  So

5  coming back before any of that is voted, I had still been

6  invited back and asked to come back.

7  Q.  Right.  And they went ahead and voted for him, correct?

8  Bonobo Hope did, right?

9  A.  Yes, because I was not allowed to explain that I was not

10 being allowed in the facility.

11 Q.  And, again, this is simply because you say you were told

12 that you couldn't e-mail anybody?

13 A.  I was told that I could not e-mail the board and tell them

14 this or I would never see the bonobos again.  I was ordered to

15 leave Des Moines.  I was told that if I knew what was good for

16 me, I needed to get out of Des Moines, and that if I didn't, I

17 would end up in a situation like this and my reputation would be

18 trashed.

19 Q.  And you were told that on November 9th?

20 A.  I was told that after November 9th.

21 Q.  Was that Thanksgiving dinner?

22 A.  George was not in the lab at Thanksgiving dinner.  Only the

23 bonobos and their human family were there.

24      MR. MILLER:  No further questions, Your Honor.

25      THE COURT:  Anything further?

1        MR. STAMBAUGH:  Just a few questions, Your Honor.

2        Thank you.

3                    FURTHER REDIRECT EXAMINATION

4  BY MR. STAMBAUGH:

5  Q.  Dr. Savage-Rumbaugh, Mr. Miller started a minute ago talking

6  about this report of flooding.  Do you have that report in mind?

7  A.  Yes, I do.  I'm sure it's in the court documents.

8  Q.  Yes, it is.  It's been marked as Exhibit 91.

9        When you sent that report to ACCI, did they respond in

10 any way?

11 A.  I've had no response to the flooding report from ACCI.

12 Q.  To your knowledge, have they tried to address the concerns

13 in the report in any way?

14 A.  If they have, they haven't conveyed that to the Bonobo Hope

15 board.

16        MR. STAMBAUGH:  Your Honor, at this time I would like

17 to move Exhibit 91 into evidence.

18                              (Defendants' Exhibit 91 was

19                              offered in evidence.)

20        MR. MILLER:  Your Honor, we object.  This is an expert

21 report that we got a month ago on a subject that's not relevant.

22 You know, this witness lacks personal knowledge.  It's replete

23 with hearsay.

24        THE COURT:  Why don't we -- you're going to have

25 somebody else testify about the report; yes?

1          MR. STAMBAUGH:  Your Honor, we may have --

2          THE COURT:  Do you have the person that prepared it

3    here to testify?

4          MR. STAMBAUGH:  I don't know if we'll have the person

5    that prepared it.  We would submit it under the official records

6    or public records exception of the hearsay rule; but also

7    consistent with Your Honor's advice, we would all ask that it be

8    received, subject to ACCI's objections at this time.  This is a

9    report that opposing counsel spoke about at length.  It's

10   clearly relevant to the issues in this case, including whether

11   or not the current facility is safe for the bonobos.

12         THE COURT:  Well, I'll receive it, subject to the

13   objection.  My only hesitation is as we go on, the examination

14   of this witness is becoming an hourglass rather than a funnel as

15   we go back and forth.  So this is a detailed new subject area;

16   but I'll receive it, subject to the objection.

17                              (Defendants' Exhibit 91 was

18                               received in evidence.)

19         MR. STAMBAUGH:  Thank you, Your Honor.

20         And with that, I have no further questions subject to

21   further questions or rebuttal.

22         THE COURT:  Mr. Miller, any questions?

23         MR. MILLER:  No, Your Honor.

24         THE COURT:  All right.  Thank you.

25         You may step down.

```
 1                          (Witness excused.)

 2              MR. STAMBAUGH:  May we call our next witness, Your

 3    Honor?

 4              THE COURT:  Yes.  We'll be taking our afternoon recess

 5    in about 20 minutes.

 6              MR. STAMBAUGH:  Thank you, Your Honor.

 7              The claimants call Dr. Laurent Dubreuil, and

 8    Mr. Zifchak will be doing the examination.

 9              THE CLERK:  Please raise your right hand.

10              LAURENT DUBREUIL, DEFENDANTS' WITNESS, SWORN

11              THE COURT:  Please be seated right there.

12              Mr. Zifchak.

13              MR. ZIFCHAK:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15    BY MR. ZIFCHAK:

16    Q.  Good afternoon, Professor Dubreuil.

17              Would you please state your full name and business

18    address for the record.

19    A.  My name is Laurent Dubreuil.  My professional address is 314

20    Morrill Hall, Cornell University, Ithaca, New York.

21              THE COURT:  Would you spell your name for us, please?

22              THE WITNESS:  Yes, I will do that, and I will do my

23    best with my French accent.  So my last name is D-U-B-R-E-U-I-L.

24              THE COURT:  Thank you.

25    BY MR. ZIFCHAK:
```

1  Q.  Professor, may I call you Laurent?

2  A.  You may.

3  Q.  I have a suggestion.  If you sit back a little from the

4  mic --

5  A.  Okay.

6  Q.  -- I think we can pick up the accent just fine.

7         Is it correct that you are a professor, a tenured

8  professor at Cornell University in New York State?

9  A.  It is correct.

10 Q.  And is it correct that you are currently a member of the

11 board and the secretary of Bonobo Hope Initiative?

12 A.  It is correct.

13 Q.  You gave a deposition in this matter as the representative

14 of Bonobo Hope, correct?

15 A.  Yes.

16 Q.  Would you kindly summarize for the court your professional

17 background.

18 A.  So I hold two doctorates from France where I studied, one is

19 in literature and the other one is in philosophy, and at Cornell

20 University I am currently a professor of romance studies, of

21 comparative literature and of cognitive science.

22 Q.  Have you provided your curriculum vitae for purposes of this

23 hearing?

24 A.  Yes.

25         MR. ZIFCHAK:  That is Exhibit 95 in the record, Your

1  Honor.  I would merely ask the witness to identify it.

2  BY MR. ZIFCHAK:

3  Q.  Laurent, when did you last prepare a CV?

4  A.  This CV is pretty recent, so I guess in March or April.

5  Q.  Exhibit 95.

6  A.  Yes, I have it all the time.  I assume the date of the

7  revision is at the bottom, the last page of my vitae.

8  Q.  Let's move on.  We can find out.

9  A.  Yes.

10 Q.  What courses did you teach this past semester that you deem

11 relevant to this hearing?

12 A.  So this past semester I taught a graduate seminar, a

13 research seminar that was entitled "Poetry and Mind," and it was

14 a graduate seminar presenting one of my current and new research

15 projects, combining literary theory and primitive science,

16 including experimental psychology, in order to get a better

17 appreciation of the mental experience of poetry as announced and

18 of poetry as the case for creation in general, intellectual

19 creation.

20 Q.  What other responsibilities do you have in conjunction with

21 your professorship at Cornell?

22 A.  So beyond the classes I teach, I am supervising

23 undergraduate students, but mostly graduate students, for their

24 Ph.D. dissertations, and I am the current editor of Diacritics,

25 Diacritics being one of the leading journals in the world in

1  literary theory and what we call continental philosophy, which

2  is my background --

3  Q.  How long --

4  A.  -- initially.

5  Q.  I'm sorry.  Go ahead.

6  A.  My background initially.

7  Q.  How long have you been the Editor in Chief?

8  A.  Five years now, I believe.

9  Q.  Is it correct that you have been recently appointed to what

10  is called the graduate field of cognitive science?

11  A.  A few years ago, yes, I have been appointed to the graduate

12  field, maybe 4 years ago.

13  Q.  Have we submitted the letter of appointment as an exhibit in

14  this matter?

15  A.  Yes, you did.

16        MR. ZIFCHAK:  I believe that's Exhibit 10, Your Honor.

17  BY MR. ZIFCHAK:

18  Q.  Who was it that appointed you to that position?

19  A.  The director, Morton Christiansen, who's a colleague of

20  mine, who's a professor of experimental psychology at Cornell,

21  who is the co-director of the Cognitive Science Program in the

22  graduate field.

23  Q.  What is the significance of your work in the graduate field

24  of cognitive science as it pertains to this hearing?

25  A.  So when you are a member of a graduate field at Cornell,

1  that means that you are entrusted by the field since your

2  appointment is based on nomination first and election second by

3  other members of the field, in this case election based on the

4  research proposal that you do.  So once you have been appointed

5  to that field, you have the ability to be the examiner for

6  graduate students and that's also in the field of study, which

7  means that you can, I can as a member of the graduate field in

8  cognitive science fail a student or admit a student at each of

9  the different steps of his or her career in graduate studies.

10 Q.  Now, I stayed as far away as I could from science when I was

11 in college.  Can you explain for us what cognitive science is?

12 A.  So cognitive science is an interdisciplinary endeavor,

13 scholarly endeavor that mainly began in the 1960s.  And the idea

14 on the outset was to go beyond the paradigm of behavior that was

15 the paradigm ruling psychology at the time.  The idea was that

16 by combining knowledge of experimental psychology, philosophy,

17 linguistics as it had been recently redesigned especially, and

18 computer science, you could consider the mind, you could

19 certainly inquire about what is going on within a mind, and the

20 attached idea to that is that the mind could be the mind of a

21 human, of course, but also the mind of an animal, plus it could

22 be robotic or electronic, digital computerized mind.

23        So that field of endeavor began in the 1960s, and in

24 the 1980s there were many changes in it; but let's say that it's

25 now one of the most rapidly growing interdisciplinary fields in

156

1  the sciences in the U.S. but beyond as well.

2  Q.  How is it that you came to know Dr. Savage-Rumbaugh?

3  A.  So I came to know parts of her work when I was still a

4  graduate student, mainly because of my interest in language as a

5  theoretician of literature and as a philosopher.  And then in

6  2009, I got a major award given by the Mellon Foundation, the

7  award being called a New Directions Fellowship.  That's allowed

8  me to be free from teaching and other responsibilities to study

9  in more depth the intersections between the theory of language

10  and the theory of mind I had and the current shape and current

11  field of science.

12        At that point on I immersed myself with a very

13  different kinds of research and objects, and since one of my

14  hypotheses was that language as we know it, human verbal

15  language is not only a window or a means of expression but that

16  language is also changing the way you think, the way you invent,

17  then, of course, I came to be extremely interested in any

18  experiment that would revolve about providing language to young

19  human agents.

20        So quite clearly Sue Savage-Rumbaugh's work, body of

21  work was quoted everywhere and is still quoted everywhere in all

22  of those discussions, and I became more familiar with it through

23  the review of some of the literature.  And at that point since I

24  was relieved of teaching duties, I visited several labs.  I met

25  with several scientists both in France and in the U.S., and

1  that's when I got in touch with Sue Savage-Rumbaugh and asked

2  her if she would work with me for a few days at the facility

3  where she was working.

4  Q.  Approximately when was that, Laurent?

5  A.  I guess I got in touch with Sue Savage-Rumbaugh in March or

6  April of 2010.

7  Q.  Could you summarize your understanding of the research or

8  what's been called the research trajectory of Dr. Savage-Rumbaugh

9  at that time?

10  A.  So at that time my understanding was based on my study of

11  all of the books that she authored and co-authored, was based on

12  the study of many articles, not all the articles because she

13  co-authored hundreds of them, but many articles about the apes,

14  and I had been able to review most of the documentary movies and

15  short clips that you could find on You Tube documenting the

16  abilities of the apes.

17            I wasn't of the impression that especially when she

18  published that monograph about Kanzi's linguistic competence and

19  afterwards, that she had clearly demonstrated that there was

20  command of language that was going on with at least Kanzi and

21  then the other apes, and I wanted both to meet with

22  Dr. Savage-Rumbaugh in the same way I had met with people who

23  are doing neuroscience, for instance, to discuss with her and

24  benefit from discussions, in depth discussions about the topics

25  we were sharing; but I was also much elated by the kind of --

1   there was a small lack of perception on my part when I was

2   reviewing the evidence of about the linguistic abilities of the

3   apes, mainly because of the ways scientific research is being

4   communicated.  So I wasn't completely clear about the place of

5   language for the apes.  So to put it in spacial terms, I didn't

6   know if for these bonobos language was out there (indicating)

7   far away from them or inside of them or in between.  So I wanted

8   to have kind of a subjective experience, because I believe also

9   in subjective experience.  I'm a humanist as well as a

10  scientist, so I believe in the subjective experience of being

11  immersed within a conversation to determine myself what kind of

12  space as I mentioned language would be, in what kind of space

13  dimension language would appear for those bonobos in

14  interactions with humans.

15  Q.  Did there come an occasion when you did just that?

16  A.  Oh, yes, yes.

17  Q.  When was the first occasion?

18  A.  The first occasion was certainly during my first stay.  So

19  my first stay was a week, a bit less than a week in September

20  2010.  During this first stay I was not staying all of my

21  daytime with the bonobos.  It was half and half I would say.  I

22  first, for instance, gave a lecture in an anthropology class

23  that Bill Fields, who was in charge of the trust at that point,

24  was teaching at Simpson College, and I was invited to social

25  events as well; but when I began spending a bit more time beyond

DUBREUIL - DIRECT

159

1   that arena, at that point I believe the first interaction I had

2   was involving lexigrams or words and with just one ape in front

3   of me and nobody around us, was when I was playing with Nyota,

4   who was at that point of a very energetic nature, always jumping

5   and wanting to play chase with Teco.  So we were doing this, we

6   were racing each other from outside of the glass, that we were

7   separated by a barrier of glass, and at one point when we were

8   together and looking at each other and Nyota had two pieces of

9   paper, a paper keyboard, not the real computer with the computer

10  on, and he signed to mask.  So far when he wanted to have me

11  playing with him, he was looking at me straight in the eye and

12  then point to chase or sometimes to Teco, but names of games I

13  would say.  But my interaction at that point had been limited to

14  names of games.

15          Then he was playing -- he was deciding to play a new

16  game with me, so he was hiding his face and then covering,

17  uncovering his face with a piece of cloth that he had with him

18  and at the same time saying mask, which I understood to be an

19  invitation on my end to do the same, so I did the same.  So we

20  were doing this kind of thing.  That was the very first

21  interaction maybe the third day of my stay in September of 2010.

22  Q.  Can you give us examples of other interactions you had

23  during that first visit and what preliminary conclusions, if

24  any, you drew from your experience?

25  A.  So during my first visit Sue was also introducing to members

1  of the community Teco, who was very young, very young, sleeping

2  all the time.  And so from that arena, I participated in this

3  introduction to some people of the local community, and for the

4  first time I saw the bonobos using their keyboard with the

5  computer on.  I remember, for instance, that they were asking to

6  go outdoors and that there was the discussion about the flood.

7  So we were in 2010; flood being performed as big water because

8  they don't have floods on their keyboard.  So I remember that.

9        I remember as well that I spent a half day with Sue

10  inside of the enclosure with Kanzi and Kanzi showing me some

11  knowledge that he had of the words.  So Sue was doing kind of

12  language tasks showing either pictures or pictures of the

13  lexigram and then he had to correlate those.  He did something,

14  kind of a construction game that I saw.

15        And then the very last day of my visit, half day

16  because I was leaving on a Saturday afternoon, on Saturday

17  morning I came back, and Sue at the end of the half day told the

18  bonobos that I was about to leave.  And they all turned their

19  back to me and at least two of them began to urinate, which is

20  usually a sign, anxiety sign to separation that you find also in

21  the wild, after which point Sue said, maybe you should say hello

22  in a nicer way -- good-bye in a nicer way, and they moved toward

23  me and began screaming or squeaking or yelling, if you want,

24  depending on the term that you want to pretend that you heard

25  Panbanisha doing those sounds in the video clips.

1   Q.  Just so we're clear, during this first visit to the lab in

2   Des Moines, did you have direct contact with the bonobos?  And

3   if you want to find define contact yourself, please do.

4   A.  In the sense of touching them?

5   Q.  Yes.

6   A.  No, no, and I didn't wish to be --

7   Q.  What was the form of barrier between you and the bonobos

8   other than glass?

9   A.  Most of the time it was glass because I was not -- I was

10  allowed to go beyond certain limits rather late in my stay, and

11  in the last two-and-a-half days, I believe, then it was the mesh

12  that you have.  Of course, you cannot be close to the mesh.  So

13  you need to be as far away from the mesh as you can be.  All of

14  those things were being initiated with Liz mainly who was

15  telling me what I should do.  I mean, the tricky part is when

16  Kanzi, for instance, which happened to me, is giving you

17  something through the mesh, so you need to accept it, but you

18  cannot take it because it wouldn't be safe.  So I was being told

19  those things at that point.

20  Q.  The second part of my question was, what preliminary

21  observations or conclusions did you draw from the visit as an

22  academic?

23  A.  So I need to make clear also that I was doing something that

24  would be called kind of observational and anthropology kind of

25  things you would do with humans.  When you approach members of

1  another culture and you are with them, you interact with them;

2  but at the same time, of course, if you are a scholar, you are

3  thinking about what they would do and what you do; but it would

4  interrupt the flow of the information, if you were, taking your

5  notebook out of your pocket and noting everything.  So I was

6  taking notes of everything I saw each night, so I have a

7  relatively complete description on which I can rely of what

8  happened to me on those days in my first visit and second visit.

9  I wanted to have the subjective experience of meaning making or

10  meaning sharing, I would say, and I got it.  I came back with

11  the idea that the apes had a very strong relationship to human

12  verbal language in their own symbolic language, but also that,

13  contrary to most of us, they were not so much using language to

14  break the ice, I mean, when you don't know someone and you begin

15  speaking with someone, the more they know you nonverbally and

16  the more they speak to you, which is exactly what happened to me

17  during the course of my first stay and the course of my second

18  stay, and I remember having said to Savage-Rumbaugh at the end

19  of my stay that to me the point was no longer do they have

20  language, because I was intellectually convinced -- objectively

21  convinced before with doubts.  I was subjectively convinced that

22  they had some language, certainly not the kind of command of the

23  language that I have, no doubt.  That's not the point.  And I

24  told Sue now the real problem is what they -- I mean the real

25  thing is what they do with that language, how they think through

1  that language, are they describing their world with that kind of

2  language, are they expressing thoughts, emotions with that

3  language.

4         THE COURT:  Why don't we take our mid afternoon recess

5  at this time.

6         MR. ZIFCHAK:  Thank you, Your Honor.

7         THE COURT:  We'll be in recess for 15 minutes.

8         (Recess at 3:00 p.m., until 3:14 p.m.)

9         THE COURT:  Please be seated.

10        Mr. Zifchak.

11 BY MR. ZIFCHAK:

12 Q.  Laurent, before we describe your second visit to the lab, I

13 just wanted to ask you a couple of questions about your earlier

14 visit.  Were you in the courtroom this morning during my opening

15 statement?

16 A.  I was, yes.

17 Q.  Did you see the short video we showed of one of the bonobos?

18 A.  I did.

19 Q.  Who was that bonobo?

20 A.  Oh, it was Panbanisha.

21 Q.  Did you have any interaction with Panbanisha during your

22 September visit to the lab?

23 A.  2010?

24 Q.  Yes, 2010.

25 A.  Yes.

DUBREUIL - DIRECT

1  Q.  Just describe it.

2  A.  So I had the collective interactions I described in the

3  presentation to the people and then at the end the good-bye, but

4  I spent a few hours with her watching video of her in the past,

5  so she was not -- it wasn't direct interaction with her, of

6  course, but she was -- the TV screen was on my side, so she was

7  directing me and she was indicating the kind of video clips that

8  she wanted to see.  And so most of the videos that she preferred

9  were pertaining to this mythical character that Sue

10  Savage-Rumbaugh had invented that was called Bunny.  Some of you

11  may have seen that when Anderson Cooper visited the facility,

12  Panbanisha asked him to dress like Bunny because there was a

13  bunny suit.  So I can testify that Panbanisha was really into

14  her sweet memories about Bunny.  And the time when she was

15  raised at the beginning of her life with Panzee, sometimes

16  called Panpanzee, who was a chimpanzee.

17         So that's what we did mainly.  We also had tea

18  together.  One of the things that she liked to do was to not

19  only share food but decide who will get what kind of food.  So

20  this is something that she would do from her side with the

21  computer, and people may perhaps leave or perhaps another

22  caretaker -- there were lots of caretakers in my first visit --

23  would give me the M&M that she had selected or the tea that she

24  had selected for me.  So we spent that time together.

25  Q.  I gather that you had a second visit to the lab in

1  Des Moines, correct?

2  A.   Yes.

3  Q.   What was the purpose of that visit?

4  A.   At the end of my first visit, as I have said, I came back

5  with the idea that my subjective curiosity was piqued and was

6  satisfied to a large extent.  From that point on, for several

7  months I began working on the edition of the special volume for

8  an interdisciplinary journal in France, in French as well, that

9  is called "L'eloquence" that is somewhere in my vitae, page 4,

10  item [iiv] in Roman numerals, "L'eloquence des singes," which

11  means the eloquence of the apes, to provide an additional

12  dissertation.  So that was a special issue devoted to ape

13  language research in general.  We published one French version

14  of an article by Sue Savage-Rumbaugh and William Fields, but

15  there were other contributors as well.  There was one article

16  that I wrote mainly incorporating my observations of the first

17  visit, and so that's a collective issue that I edited with a

18  reflection on the long-term history of ape language research.

19          The actual practice of ape language research begins in

20  the early 20th Century, the 1910s, mainly in the United States,

21  by the way, not only, but late in 19th Century if you include

22  other attempts.  But the idea that apes would have the ability

23  like deaf children to be taught some form of human language is

24  to be found already formulated in some theoretical work in the

25  17th and the 18th Century especially, especially for the 18th

1   Century since this is the moment when you have several new

2   methods to teach sign language to deaf children who were

3   repeatedly not able to speak or to understand language before

4   they were being taught that way.

5           So that work on that special issue gave me a new depth

6   about the historical time line that is much deeper than what

7   most scientists would believe because usually when you study the

8   sciences, you don't study the history of your own discipline.

9           So when I'm coming back in October 2011, I believe it

10  was October, when I'm coming back in 2011, I'm coming back with

11  this deeper knowledge not only of the ape language research in

12  the last few decades but of the whole trajectory behind the

13  research trajectory of Sue Savage-Rumbaugh herself, and I'm

14  coming with the idea that now that I know them more, I will have

15  more interactions possibly with them using language and that

16  these other things that I mentioned before that I said I had

17  told Savage-Rumbaugh that I thought that there was something

18  beyond language now that should really be of immediate concern

19  to us.  I thought that maybe this something more could be seen.

20  I mean, I was not coming with the idea of collecting data in the

21  crude sense of the term.  I was coming back with the idea of

22  going deeper into the research work I had done before.

23  Q.  By the way, did you eventually publish in any form

24  reflections on the second visit to the Des Moines lab?

25  A.  So when I got the Mellon Award for my work in primitive

1    science, the idea was that I would be able to publish a book at

2    some point.  We as scholars take time to publish books, but the

3    book has been out that is based on that particular line of

4    research.  My concerns about language and the mind are under the

5    title of "The Intellective Space."  The subtitle is "Thinking

6    Beyond Cognition."  That's my most recent book published in

7    March of last year, and it's the item No. II in Roman capitals

8    on page 3 of my vitae.

9              In this book that is really a broad theoretical book

10   in constant dialogue with the sciences and especially the

11   primitive sciences.  In this book you will find some references

12   to Sue Savage-Rumbaugh's work as such and some references to

13   personal observations that were gathered during my two stays, my

14   two visits, and one was in 2010, the other 2011.

15   Q.  Looking back over your first two visits to the lab, did you

16   consider that the manner of the research was inherently

17   dangerous to humans?

18   A.  No.  No, I did not.

19   Q.  Did you consider it to be inherently inhumane to the animals

20   themselves?

21   A.  No, certainly not.  What is inhumane is that -- is depriving

22   the apes from their own additional language that the research

23   has given them.

24   Q.  Why do you say that?

25   A.  Because it's -- so it's not that through the use of the

1 keyboard certainly the apes could just translate what is going

2 on inside of them.  It's more than that.  It's that by the

3 addition of something else, that is, the language keyboard, the

4 symbolic language in general, they are not only able to express

5 what they think, but what they say is also changing how they

6 think profoundly and more superficially.  I could explain that

7 more deeply, but I'm not sure you're here for a lecture.

8         Because of that, the apes who have been inserted into

9 the strong cultural and symbolic world through a constant

10 immersion, through that experience the apes are changing in

11 their mind.  They are evolving.  That's how you could have

12 through the injection of language certainly new symbolic

13 competence appearing such as playing music or drawing or

14 painting.

15         So if you take all of this back, since they cannot

16 speak really, even though Kanzi certainly tries to utter words

17 but very few people are able to understand them, the only way

18 they can express themselves in progress I would say actually is

19 through the constant use of keyboard and constant interactions

20 because language, as I was saying at the beginning, language to

21 them is maybe not completely -- it's not completely within them.

22 Maybe it's a bit in front of them.  So if you -- they need to be

23 in situations where they will regularly commonly be led to use

24 that language.  And in the same way you have in the late 18th

25 Century and early 19th Century in this country and other

1 countries reflections about how should you do with prisoners,

2 maybe a penitentiary where there would be no language, where

3 there would be very limited contact with people, where people

4 would wear masks all the time to repent about what they had

5 done.  I mean, that was something that was being experimented in

6 the sense in the U.S.  You have several penitentiaries that are

7 very important in the history of the U.S.  What we know is that

8 this isolation was not coming with a good progress for the

9 prisoners.  It was often leading people to forms of mental

10 disabilities or madness.

11         For those very same reasons -- and I could digress on

12 that; but for those very same reasons, the apes who have always

13 been in a world where they could change, not only receive

14 orders, not only receive commands, but could change.  By the way

15 of the changing, changing the world they are in, if they are

16 being deprived of that, they would strongly be impacted both

17 intellectually and emotionally.

18 Q.  As an academic, based on your studies of the ape language

19 thus far, what is it that you would like to research further in

20 the future with these bonobos or what would you like to see

21 researched by scientists if it's not someone like you?  And

22 please be brief.

23 A.  Okay.  I would certainly welcome more work on the

24 verbalizations; that is, both the signals, the screams and

25 signals that they use as bonobos, but also all the added and new

1  verbalizations that they have that seem to imitate or reproduce,

2  to some extent, words.  I would be extremely interested because

3  I believe that there is a link between language, mine, if we can

4  speak of language, mine, my language, and then some new use of

5  language and then creativity in general.  I would be interested

6  in seeing them be more associated with the arts, with the idea

7  of creation that could involve many different forms.

8           I would certainly welcome my philosophical side, which

9  I would be very interested in going a bit further in terms of

10 morality.  They have good and bad, for instance, on their

11 keyboard, and some articles have been published on this, but I

12 would like to see exactly what is going on there.

13 Q.  Thank you.

14          I would like to jump out of sequence.

15 A.  Okay.

16 Q.  Because I think it would sharpen the contrast to it now.

17          Is it correct that you have visited the lab in

18 Des Moines a third time; that is, after October of 2011?

19 A.  It is correct.

20 Q.  And when was that?

21 A.  It was in August of last year.  It was a brief visit of

22 maybe 4 or five hours.

23 Q.  And what initiated the visit?

24 A.  Members of the BHI, including me, would like to see the

25 bonobos.  When Julie Gilmore was in charge, I believe in 2013, I

1  asked her if I could visit either in June or August of 2013, and

2  she said yes; but then that led me nowhere because I wanted to

3  have a new stay -- I mean, following my own trajectory of

4  interaction with those bonobos and deepening things.  So I had

5  tried to make -- to have that when Judy Gilmore was in charge,

6  and that led me nowhere.

7          I tried again last year and this year actually with

8  Jared, and with the intervention of lawyers, both Bill Miller

9  and you, Bill Zifchak, I was allowed not to stay for a few days

10 and to observe the bonobos, but I was allowed to stay a few

11 hours in the facility in August.

12         So because of that, the purpose of the visit was more

13 about checking how things were rather than going into any kind

14 of deep interaction with the people there.

15 Q.  With respect to the bonobos, what did you observe during

16 that visit?

17 A.  That was a very disturbing visit to me, to be honest.  With

18 respect to the bonobos, what I perceived was a tremendous and

19 extremely sharp contrast between the behavior of Teco, Nyota and

20 Kanzi, Panbanisha having passed away since the last time I had

21 visited the lab, and what I had seen in both 2010 and 2011.

22         So Nyota who was this extremely energetic teenager,

23 jumping and walking everywhere, hopping everywhere was extremely

24 despondent, exhibiting all signs pertaining to depression and

25 was also exhibiting what is usually called in primatology,

1  exhibiting stereotypies.  So stereotypies are --

2          MR. MELHUS:  Objection, Your Honor.  I think we lack

3  foundation for this particular witness to testify about sort of

4  primatology-related issues.

5          THE COURT:  I'm going to receive it, subject to the

6  objection.  I think he's giving his own observations of what he

7  saw and the impressions that he had based solely on his

8  observations.

9          Is that correct, Mr. Zifchak?

10         MR. ZIFCHAK:  Correct, Your Honor.

11         THE COURT:  And he may proceed to answer.

12 A.  So I will rephrase that.  Nyota was exhibiting behaviors

13 with no meaning at all, such as head shaking repeatedly

14 (indicating).  I know that is not in the transcript, but it's

15 something like this, when you shake your head for maybe 30

16 seconds in a row with no real reason to do that.

17         In the same way, Teco, who was also playful -- I mean,

18 Teco is very young, so he is playful in many respects.  When he

19 was alone in his own enclosure from the regular area, I could

20 see that he was licking and biting the mesh, two behaviors that

21 I had never seen before.

22         The change -- the strong change for Nyota was really

23 that he would have difficulties walking and that he would be

24 very slow in his movements, which is absolutely, absolutely not

25 the case before, and it's not the question of age because he

1  didn't move magically from the age of 15 to the age of 200.  So

2  it's something else.

3        Kanzi was -- I asked Kanzi in English if he remembered

4  me, at which point he -- and I was showing him a few pictures,

5  and he nodded with his head, but he was relatively aloof I would

6  say.  When Steve Boers, who was the Director of Operations -- I

7  don't know exactly what his title was -- left the lobby, Kanzi

8  checked his surroundings and seen that Steve Boers was no longer

9  there, he was on the other area of the glass, he waved his hands

10  at me.

11  BY MR. ZIFCHAK:

12  Q.  Kanzi waved his hand?

13  A.  Yes, Kanzi waved his hand to me so I would be closer to him

14  and so that I would be able to at least speak in English to him

15  through the glass.

16        What I can say, which was certainly the most

17  striking -- and observed also Maisha and Elykia, but I could not

18  have -- I could not see Elykia in the eyes.  I couldn't see her

19  face.  What I can say is that in none of the enclosures I saw,

20  which is most of the enclosures, a keyboard was there.  So there

21  was no longer any kind of paper keyboard.  The computer keyboard

22  was off.  Back in the time both in 2010 and 2011 all of the

23  volunteers and the caretakers were wearing all of the time

24  T-shirts with the lexigrams printed on the T-shirts which

25  helps -- which means if you don't have the keyboard on, the

DUBREUIL - DIRECT

1   computer keyboard on, or if you don't carry with you a keyboard,

2   then you still have the T-shirt and the apes are able to point

3   at the lexigrams on your own body, I guess.  Even though the

4   T-shirts with the lexigrams were on sale in the lobby, none of

5   the volunteers and the employees I saw were wearing those

6   T-shirts.

7        So language was no longer there.  The similar culture

8   was no longer there in none of the enclosures I could see,

9   except one where you had a paper keyboard with one panel

10  missing, and that enclosure in the 4 hours that I was there was

11  not used with the apes or by the apes.

12       I can also say that the volunteers had to go through

13  kind of a routine with the apes in case they would be examined

14  physically and that during this routine the volunteers and

15  employees had apparently been instructed to show -- to ask the

16  apes to show their body parts but not through the use of

17  language but just by pointing at a shoulder or pointing at the

18  arm.

19       And the last very sharp contrast was this very heavy

20  silence within the facility.  You have seen -- we have seen the

21  videos, but it's even more than that for real.  I mean, the apes

22  are screaming all the time, they are speaking or responding all

23  the time.  I stayed for 4 hours, maybe almost five, but

24  certainly 4 within the bonobo building, and there was just

25  silence.  The only moments when the bonobos expressed vocally

1  anything was when I was at the gate leaving the facility, at the

2  outdoor gate, and Steve Boers coming back in his car, and that's

3  when I heard them very clearly screaming, which tells you

4  something.  I'm not sure everybody is familiar with the

5  geography there, but the gate is relatively far away from the

6  facility, and if you can hear them screaming from the gate, it's

7  really that they scream very loud, which is one of the physical

8  difficulties when you stay for long with them.  But during my

9  stay with them, that was pure silence.  It is usually considered

10  that bonobos are silent in the wild, according to observations

11  that I have not done myself; that when bonobos are silent, it is

12  because they are -- they believe they are under threat.  That's

13  why they don't vocalize so that they would not be attacked.  So

14  I saw a sign of distress according to the literature.

15  Q.  Did you draw any conclusions during that 4- or five-hour

16  visit as to whether any research effort was being conducted?

17  A.  My insight would be twofold.  On the one hand, since this

18  whole research is based on the immersion within symbolic culture

19  and language, I can say that this side of the research was no

20  longer in place.  That I can say extremely clearly with no doubt

21  because you cannot, you cannot say, okay, let's use language

22  from 9:00 to 5:00 -- no; not from 9:00 to 5:00, but from 9:00 to

23  10:00 or 9:00 to 12:00, and then let's go back to something else.

24          So the fact that for 4 hours in a row language was not

25  used and could not be used in any way by the apes was a sign

1  that at least half, if not more than half, of the very

2  foundations of the research was being shut down.  Then I have

3  been told that Kanzi and Nyota were foraging from time to time

4  and that -- I believe that was Jared's graduate student who put

5  food into containers with the lexigram on the container, but I

6  saw the empty containers.  I didn't see the experiment, and I'm

7  not sure it's exactly the most relevant experiment I have.  So

8  that's what I could say.

9          So in my view the main impetus of the research was

10 already being at least diminished, possibly shut down.

11 Q.  In August of 2014, were you a member of the BHI Board of

12 Directors?

13 A.  Yes, I was.

14 Q.  And you have remained a board member until today, is that

15 correct?

16 A.  Yes, it is correct.

17 Q.  Since August of 2014, have you made any other efforts to

18 visit the bonobos in Des Moines?

19 A.  Yes.

20 Q.  Please describe them.

21 A.  So I sent messages to Jared asking him to allow me to see

22 the bonobos in the way that I had seen them in August; that is,

23 just for kind of a checkup, and also I asked to be at the

24 facility for a longer period of time.  So I had those

25 interactions back and forth, usually -- not recently, but I

1 would say until the last few weeks Jared was responding in a

2 polite way, telling me that I could come and, of course, each

3 time I was suggesting a date, the date didn't work.  So I tried

4 that several times.  The most striking example of that is that

5 on March 30th we agreed on a visit that would have taken place

6 yesterday.  So we agreed on that on March 30th.  I had suggested

7 any date from May 18th to the beginning of the trial, and Jared

8 said May 26th, but he informed me on Sunday or Monday, last

9 Sunday or last Monday that this visit would be cancelled.

10 Q.  Laurent, who was it that invited you to join the board of at

11 the time I believe it was called Bonobo Hope Great Ape Trust?

12 A.  My understanding was that it was the Great Ape Trust, IPLS

13 when I had been invited by Sue Savage-Rumbaugh.

14 Q.  And when was that?

15 A.  So that was in November 2012.

16 Q.  And do you recall any particular issues that the board was

17 confronting at that point in time?

18 A.  That was a critical moment because of the recent death of

19 Panbanisha.  And that's, by the way, how I wrote back to Sue

20 when I learned about the death of Panbanisha in the press.  We

21 had been in touch here and there but not constantly in touch.

22 The pressing issue beyond that -- but that was kind of a strong

23 issue.  The pressing issue beyond that was relocation because I

24 understood that there was -- from Savage-Rumbaugh and then I

25 understood more completely with the records that there was a

1   discussion about relocating the apes to facilities where the

2   research trajectory would not be maintained at all since we were

3   speaking about zoos.  And as a kind of counter project, Sue

4   Savage-Rumbaugh was suggesting that some of the ways of moving

5   forward would be to expand on the artistic side of things for

6   the bonobos, playing music, maybe doing some narration or at

7   least subjecting them to that, doing more art.  And since I

8   had -- I was familiar with the bonobos, I was very familiar with

9   the history of ape language research and I was one of those rare

10  people who with the training both in the humanities and

11  especially in literature and in the community of science, Sue

12  Savage-Rumbaugh approached me as someone who would present these

13  kind of expanded interests, and I accepted precisely because of

14  that idea.

15  Q.  Was Dr. Taglialatela a member of the board at that time as

16  well?

17  A.  He was.

18  Q.  As of November 2012, had you had occasion to read any of his

19  published works?

20  A.  Yes.  At that point in time, yes, mainly in the moment

21  after -- just after or before my first visit in 2010.  I knew he

22  was a former graduate student of Sue Savage-Rumbaugh.  I knew

23  that.  I had seen the paper where he was a co-author on

24  language, speech, tools and writing, I believe it was an early,

25  early paper, certainly 2001.  And I had read and I had copies of

1    those in my hard drive, my computer.  I had read his first --

2    what I believe to be the first article that he published as a

3    first author on verbalizations, of Kanzi's verbalizations, the

4    way that you will have kind of semantic connection between

5    verbalizations and words.

6    Q.  Based on whatever it is you had read to that point in time

7    of his published works, did you have any impression that his

8    approach to ape language research was in conflict with that of

9    Dr. Savage-Rumbaugh?

10   A.  No, certainly not.  He was building on the foundation of the

11   work because those organizations would never have appeared

12   without the method of Savage-Rumbaugh, and then those

13   organizations were present as one of the next frontiers that

14   when we had established that some language through the keyboard

15   could be used across humans and apes, then maybe Kanzi would

16   begin trying to speak.  So that was really the kind of next

17   step.  That's how I saw it at that point.

18   Q.  When academics publish papers, they sometimes publish works

19   with co-authors, correct?

20   A.  Yes, especially in the sciences.

21   Q.  And what is the protocol as far as the order of the names?

22   A.  So when you are the co-author, that means that you agree

23   with what is in the article, and that doesn't depend on if

24   you're the first author or second author or third author.  If

25   you disagree with the article, then you're not an author.

1   There's no way you could be in disagreement with the content of

2   an article and be a co-author.

3        Then the order of priority is usually -- you have

4   different situations, but usually the first author will do most

5   of the work in an article.  Sometimes in the sciences you have

6   notes of who wrote what.  When you don't have that, it is

7   usually assumed that the first author is the main author.  In

8   the case of Jared Taglialatela co-signing with Duane Rumbaugh

9   and Sue Savage-Rumbaugh who are -- I mean, Savage-Rumbaugh is

10  the committee chair, it is understood that this research is

11  being done because the graduate student had access to the lab

12  and to the experiment that the advisor had designed, but that

13  most of the article, if not all of the article, is being written

14  by the first author.  We don't have the same practice in the

15  humanities.

16  Q.  All right.  Well, we'll accept that.

17  A.  Yes.

18  Q.  Going back to November 2012, did there come a point in time

19  when the, I'll refer to it as the Great Ape Trust board voted on

20  a resolution concerning the division of the board into two

21  boards?

22  A.  Could you tell me the date again?

23  Q.  December 2012.

24  A.  Yes.  In December 2012 -- I need to say -- I'm answering

25  your question, but I need to say that one of the very first

DUBREUIL - DIRECT

1   communications I got when I was appointed to the board, I was

2   appointed to the board in the midst of a meeting in November of

3   2012.  One of the first communications was coming from Lyle

4   Simpson explaining many things, but explaining the legal issues

5   with the settlement agreement and documents of that kind, I was

6   not aware of that honestly before signing, and his strong desire

7   to create two boards.

8           So since the very beginning, I believe he sent first

9   message maybe November 26th or 27th, you had this person who was

10  presented to me as the counsel of the board who was arguing in

11  favor of splitting the current board into two boards, and then

12  what he was saying as well, which was -- it's a complicated

13  matter, but that Bonobo Hope existed independently at one point

14  and then had been merged and the board of Bonobo Hope had been

15  merged with the board of Great Ape Trust or IPLS, and he was

16  suggesting that we could in the operation consisting in

17  splitting the current board into two, a science board on one

18  hand and a business board on the other hand, we could say that

19  the business board was the IPLS board and the Bonobo Hope board

20  would absorb the scientists, who were the majority of the

21  people, if not all of the people, currently at that point on the

22  Great Ape Trust, IPLS board.

23  Q.  Was that board meeting conducted on the telephone or by

24  e-mail or by a combination of the two?

25  A.  By at least dozens, maybe more, maybe 100, 200 e-mails.

1  Q.  And thereafter as you served on the board, was that

2  typically the way the board would conduct its meetings?

3  A.  Yes.  We -- yes.  In the last year, I mean approximately,

4  the Bonobo Hope board decided to still retain this way of

5  communicating over e-mail while also having -- taking advantage

6  of Webinar or Skype facilities so that we would be live at the

7  same time for a period of time.  But for the -- that was the

8  common practice for IPLS, yes.

9         MR. ZIFCHAK:  Your Honor, I just want to confer with

10  Mr. Stambaugh for a split second.

11         THE COURT:  All right.

12         (Pause.)

13         MR. ZIFCHAK:  Your Honor, I would like to put on the

14  screen page 7 of Exhibit 27, which I'm advised is --

15         MR. STAMBAUGH:  It's already admitted.

16         MR. ZIFCHAK:  -- admitted into evidence.

17         MR. LANGEL:  Exhibit 23, Bill.

18         MR. ZIFCHAK:  Oh, it's 23?  No.  That's the one.

19         MR. LANGEL:  All right.  What's published is page 7 of

20  Exhibit 23.

21         MR. ZIFCHAK:  Okay.  All right.

22  BY MR. ZIFCHAK:

23  Q.  Laurent --

24  A.  Yes.

25  Q.  -- I'm showing you what --

1        MR. MELHUS:  Your Honor, before we get into this

2   exhibit, I just wanted to renew our objections based on the

3   pretrial order to hearsay on Exhibit 23.

4        THE COURT:  I thought somebody just indicated it's a

5   category A exhibit.  It's not?

6        MR. STAMBAUGH:  That's our mistake, Your Honor.  This

7   is Exhibit 23, which has not yet been admitted.

8                          (Defendants' Exhibit 23 was

9                           offered in evidence.)

10        THE COURT:  Well, I'll receive it, subject to the

11   objection, hearsay objection.  It's a little hard to tell

12   whether or not it's being offered for the truth of the matter

13   asserted or something that was simply to record something that

14   was said or communicated --

15        MR. ZIFCHAK:  It's a recording of a vote on a

16   resolution.

17        THE COURT:  Well, depending upon what the recording

18   is, it could be hearsay, it might not be hearsay; but I'll

19   receive it, subject to your objection.

20        MR. ZIFCHAK:  Thank you, Your Honor.

21        MR. STAMBAUGH:  Thank you, Your Honor.

22                          (Defendants' Exhibit 23 was

23                           received in evidence.)

24   BY MR. ZIFCHAK:

25   Q.  Laurent, have you seen that document before?  And you can --

1  we can show you that.  If you would scroll.

2  A.  I'm not completely sure I saw this in December, I'm not

3  completely sure, but we received messages by Lyle Simpson before

4  December explaining the content of those -- of the memorandum,

5  and then I saw the resolutions when we voted upon them later on.

6  Q.  When did you vote on the resolutions?

7  A.  I believe we voted in April of 2013, yes.

8  Q.  Do you recall a vote --

9  A.  Maybe May.  I know that the resolutions had been introduced

10  in late April, so I don't know when the vote took place exactly.

11  Q.  Do you recall a vote on any resolution on the date of

12  Exhibit 27 (sic), page 7?

13  A.  I don't -- I might be wrong.  I don't recall a formal vote

14  on the immediate transcription of this into action I would say.

15  Q.  Okay.  Fair enough.

16        But it is your recollection that at a point in time

17  the Great Ape Trust board voted to split in two?

18  A.  Oh, yes, yes.  And it is my recollection that we discussed

19  that resolution.  I don't really recall if we voted upon that at

20  that point, but --

21  Q.  Okay.  Fair enough.

22        Did Lyle Simpson circulate anything else to the board

23  at the time of the first meeting that you participated in?

24  A.  I know from the records that there was memorandum that he

25  drafted.

185

1  Q.  Right.  Anything else?

2  A.  We had -- at the same time, I mean, in this late November

3  message when he was explaining the need for the split of the two

4  boards, he also sent as attachments, but that was different, the

5  draft for the settlement agreements, the two -- the drafts for

6  the two side agreements if I'm --

7  Q.  Okay.  What is your understanding of what the settlements

8  that were executed in this matter, the two settlements were

9  intended to accomplish?

10  A.  So the idea was to, as far as I can tell, was to determine

11  ownership and all the -- ownership of the bonobos and all that

12  comes with ownership.  And in this description of ownership, you

13  have several items, and the point was to make clear that Sue

14  Savage-Rumbaugh was relinquishing her rights and that those

15  rights were being transferred to the science board, to what was

16  to become the science board; that is, Bonobo Hope.  The Bonobo

17  Hope board already existed.  The research trajectory was playing

18  a huge role in the definition of what was being owned since we

19  can only own apes, and so that was also put into the draft that

20  we saw in late November of 2012.

21  Q.  Did there come a point in time in the spring of 2013 when it

22  was brought to your attention that the Great Ape Trust was

23  seeking someone to succeed Dr. Savage-Rumbaugh?

24  A.  Yes.  We all received a message, possibly early June or late

25  May of that year, from Lyle Simpson, again, the counsel of the

1  two boards since at that point in time in May - June, we had the

2  split -- I mean, the split was complete between the two boards.

3  So in that message Lyle Simpson was mentioning that the trust

4  had met and had decided to grant to Sue Savage-Rumbaugh the

5  title of Director Emeritus of Science and that she could still

6  do research as she wishes, I believe that's the exact term, as

7  long as she would be able to do it, I believe was almost the

8  exact term.

9          In that very same message explaining that Sue

10  Savage-Rumbaugh will be here at the trust, even though he could

11  have said -- I mean, Lyle could have said since he wrote the

12  trust at that point, that the trust had acknowledged her

13  tremendous role in the facility and wanted to grant her

14  permanent access.  At the same time, there was also the mention

15  that Sue so far had been a one-person band -- that's another

16  quote, one-person band -- and that certainly we needed more, we

17  needed people to step forward and continue the research, with

18  her being granted those permanent rights to access and to do

19  research, but someone else, preferably younger.  There was a

20  discussion about those criteria.  The goal was for finding a

21  Director of Science.

22  Q.  Were you approached about becoming the Director of Science

23  at the Great Ape Trust?

24  A.  Yes, I was.

25  Q.  Who approached you?

1  A.  Bill Greaves and Jim Benson invited me to --

2  Q.  Thanks.

3      Would you identify them for the court, please?

4  A.  So Jim Benson and William Greaves or Bill Greaves were two

5  members of the Bonobo Hope board, and they were members of the

6  board I joined and they -- one passed away very recently.  They

7  have done tremendous work with their undergraduate students at

8  their home institutions, at their college, tremendous work of

9  indexing in depth the whole content of how -- I mean, hundreds

10  of hours of videotaping of interactions between humans and

11  bonobos and between bonobos.

12      And I had the ability to visit them in nearby Toronto

13  in April of that same year, and we had a very good conversation

14  there.  I met with the students.  I saw the research they had

15  done.  We were in touch before.  I was in touch with them even

16  before I came in 2010 to the lab or maybe the same week, but we

17  had not seen each other.  And so we had a chance, I knew some of

18  their work, I knew that they had co-written articles with Jared,

19  for instance and Sue, and so I knew some of their work on

20  language and in a linguistic framework that I'm not going to

21  explain.  And they told me, maybe you should say that you would

22  be okay with being the Director of Science.

23  Q.  Was that concept discussed with Lyle Simpson or Julie

24  Gilmore?

25  A.  Yes.  I sent a message to both Lyle Simpson and Julie

1    Gilmore -- I'm sure it was sent to Lyle Simpson; I'm almost sure

2    it was sent to Julie Gilmore as well -- telling them that I had

3    been approached by others, and I said -- we were in June, so I

4    was not teaching until August.  So I said, if you need someone

5    who would do interim work for the summer who could certainly

6    lend some credentials to the facility, help with getting grants,

7    I would be glad to intervene to do that; but the problem is I

8    cannot take the responsibility of becoming the Director of

9    Science because I have a full-time job and I cannot see how you

10   could be the Director of Science if I were just doing my regular

11   job, which is heavy job, plus this.  I could not see myself

12   going a few days a month to the facility.  I could not imagine

13   that.  So I said maybe another title if you want my credentials,

14   if you want me and the imprint of Cornell, maybe another title

15   would be more appropriate such as Director of Research.  And

16   Lyle wrote back to me that what he needed was a firm offer and

17   that they should pursue that.

18          That's where we were, and then in that very same

19   summer, the discussion shifted to questions of money, so the

20   discussion of about finding a new Director of Science was in a

21   sense suspended by the emergency situation about the money.

22   Q.  Did you receive later that fall, in about October of 2013,

23   an e-mail from Dr. Savage-Rumbaugh nominating Jared Taglialatela

24   and Bill Hopkins to positions at the Great Ape Trust?

25   A.  Yes, yes.

1  Q.  And what was your reaction?

2  A.  When we got the first message in June, I believe one of the

3  implications was that one of the members of the Bonobo Hope

4  board would volunteer.  At that point Itai would have been a

5  very strong candidate, Itai Roffman, whose name I mentioned in

6  my letter to Lyle Simpson; but he had to complete his Ph.D.

7  first, so he was not the ideal candidate for now or for that

8  time.  Jared Taglialatela had been discussed as well I know, and

9  there were discussions about other people from outside of the

10 Bonobo Hope board, but that didn't lead us very far because we

11 had been in some sense a bit sidetracked by the summer

12 discussion about keeping the lights on.  Lots of messages were

13 being exchanged on that topic.

14        When in October we got the message that Jared was

15 interested and then that Jared would come with William Hopkins,

16 I thought that finally we had identified people who would be

17 able to really do the work as I thought they would do it; that

18 is, by being there more than a few days a month, by really

19 conducting new research projects.  But I need to remember that

20 when we were being asked in June what kind of Director of

21 Research we could contemplate, we were also being asked at the

22 same time -- we are also being told at the same time that Sue

23 Savage-Rumbaugh had this new title of Director Emeritus of

24 Science with the ability to do research as she wishes and so

25 long as she wanted to.

1          That was precisely when we discussed -- in the summer

2    we discussed the possibility of having Jill "Prutz" or

3    "Prootz" -- I'm sorry about the pronunciation -- P-R-E-U-T-Z, as

4    the possible Director of Science because she works nearby.  Ken

5    Schweller nominated her.  It was clear that had she resigned

6    from the former board, so that wasn't obviously the main point

7    and she was not exactly in line with the idea of having Sue

8    Savage-Rumbaugh as -- I mean, she's more advanced than Jared is,

9    for instance, so having a new mentor at the stage of her life

10   was more difficult.

11   Q.  Did there come a point in time when the Bonobo Hope board

12   voted on a resolution to appoint Jared and Bill Hopkins to the

13   positions of Director of Research and Director of Science,

14   respectively?

15   A.  Yes.  We didn't go into that, but there is also the question

16   of determining if we were actually the Bonobo Hope board, but I

17   would say that the people who thought they were the Bonobo Hope

18   board --

19   Q.  I stand corrected.

20   A.  -- voted at that point, and I thought I was a member of the

21   Bonobo Hope board at that time, and they voted and supported the

22   nomination of Hopkins and Jared Taglialatela.

23   Q.  Was there any either telephonic or e-mail or -- well, was

24   there any exchange of ideas or comments about those resolutions,

25   whether in person, by e-mail or on the telephone that you

1  recall?

2  A.  At that point in time, no, not that I recall.

3  Q.  And did you vote on the resolution?

4  A.  I did.

5  Q.  At that time were you aware of the IPLS resolution in May of

6  2013 that granted Dr. Savage-Rumbaugh unfettered permanent

7  access to the bonobos?

8  A.  I had the quotes in Lyle Simpson's message from June saying

9  something relatively similar, but not speaking -- not giving us

10  the wording of that resolution.

11  Q.  All right.  And at the time of the vote on the resolution,

12  which was November 13, 2013, is that correct?

13  A.  I believe it was, yes.

14  Q.  Were you aware that Dr. Savage-Rumbaugh had been banned from

15  further access to the laboratory?

16  A.  Oh, no, certainly not.  I was operating within the previous

17  parameters telling me that she would have access as long as she

18  wishes.

19  Q.  And at the time that you voted on the resolution, did you

20  have any inkling that Yerkes, which I believe has been

21  previously identified today, had any hand in the banning of Sue

22  from the lab?

23  A.  Absolutely not.

24  Q.  And at the time that you voted, Laurent, did you have any

25  inkling that Dr. Savage-Rumbaugh had purportedly been dismissed

1  as a director on the board of IPLS?

2  A.  No, not at all.

3  Q.  When did you learn these things?

4  A.  I would say I learned some of those things, I mean, the

5  banishment in December of 2013 and generally 2014.  For the

6  actual resolution put forward by the trust granting her limited

7  access -- or unfettered access to Sue Savage-Rumbaugh, I believe

8  I saw the document very recently, certainly yesterday when we

9  were preparing together, and for the mention of Yerkes, that

10 became completely clear to me in the last few months.

11 Q.  Do you have any evidence that any of the other purported

12 Bonobo Hope members who voted on the resolution were aware of

13 any of these things when they voted?

14 A.  I guess that -- I guess none was aware.  Maybe there was an

15 exception for Jared.  Maybe he was aware of that, but certainly

16 we were not.

17 Q.  As of the time of the vote on the resolution appointing

18 Jared and Bill Hopkins, had anyone disclosed to you that IPLS

19 had been dissolved by the State of Iowa?

20 A.  Oh, no, no, no.  We didn't know that.

21 Q.  And, lastly, at the time that you voted, did you have any

22 reason to doubt that either Jared or Bill Hopkins did not

23 support Sue's research trajectory?

24 A.  No, I had no reason to -- I had absolutely no reason,

25 because when you -- in the arena of science or getting into

1   research in general, if you suddenly believe that what you were

2   stating or explaining before is not true, you have -- it is your

3   duty to retract or your duty to critique the work.  I had -- I

4   was aware of no critique, no such critique of Savage-Rumbaugh's

5   work that would have been done by Taglialatela or Hopkins.  I

6   was not aware of any e-mail communication that would be critical

7   about that, and so I had absolutely no reason to believe that

8   there would be a problem there or that there would be any kind

9   of critical comment about Sue Savage-Rumbaugh's research

10  trajectory, especially based on my knowledge at the time of the

11  work of vocalization, since Bill Hopkins did his dissertation,

12  his Ph.D. on vocalization before getting tenure as well, not

13  only on this, but -- so, I mean, the common point that they

14  had -- and I was not extremely familiar with Hopkins' work when

15  I voted I have to say.  The common point that they had was their

16  work with Savage-Rumbaugh, their work with Kanzi and their work

17  on verbalization, which could be seen as one of the next steps.

18  Q.  After the November 13, 2013 vote, when was the first time

19  that Bonobo Hope was given any substantive information regarding

20  the goings on at the Great Ape Trust?

21  A.  Depends on what you call substantive information.  I would

22  say that I never received any substantive information, but we

23  received some amount of substantive information in March of

24  2014.  I believe it's March.  In the spring, that's for sure.

25  Q.  Could you summarize what that communication was?

1   A.   That was kind of intent about the research that was very

2   vague.   I had a phone conversation before that with Jared who

3   spoke to me over the phone for maybe -- I believe it was in

4   February of that same year, 2014, who explained to me several

5   things that we could discuss if need be, and he was basically

6   saying that he was doing his best.

7          So in this message that we received in March, we had

8   some vague notions about research being done, but just vague.

9   Certainly no description that you could assess in any way, and

10   information about the fact that the bonobos were in good health,

11   which was only true when I saw them if we just take the physical

12   aspect of the notice, but we need to remember that Matata passed

13   away in between.   So we had a few information at that time about

14   the new scientific advisory board that they had constituted,

15   which was also a surprise to some of us, most of us, that there

16   would be a new science board the first thing.   But the second

17   thing was that the new science board would just have an advisory

18   role, which means a non-role at least from our academic criteria

19   or viewpoint.

20   Q.   Did Bonobo Hope respond to the communication from Jared that

21   you just described in March of 2014?

22   A.   Yes.   I mean, we were glad to finally have some

23   communication on a one-on-one basis, but we wanted to have more

24   information about the research being conducted there.

25   Q.   Did you have a hand in drafting a response?

1   A.  Yes.

2   Q.  And was that response ultimately sent to Dr. Taglialatela?

3   A.  Ah --

4   Q.  If you recall?

5   A.  We may have sent it.  I hope we sent it.  We certainly

6   conveyed through multiple messages, multiple messages we

7   conveyed our opinion in an individual way.  After Jared sends

8   the message, we had a kind of heated discussion over e-mail

9   about many subjects, but not a discussion over the content of

10  science, for instance.

11         MR. ZIFCHAK:  Your Honor, I would like to display one

12  of ACCI's exhibits, Exhibit 6 (sic).

13         THE COURT:  All right.

14  BY MR. ZIFCHAK:

15  Q.  Laurent, I'm showing you ACCI Exhibit 6.  Have you seen this

16  before?

17  A.  Yes.

18  Q.  When was the first time you saw it, approximately?

19  A.  Recently, recently, a few months ago.

20  Q.  Between the March 2014 communication from Dr. Taglialatela

21  and this document, did Bonobo Hope receive any written

22  information from ACCI?

23  A.  Pertaining to research, no, certainly not.

24  Q.  What was your reaction when you first saw this document?

25  A.  As you can see, it's a list with a few titles.  Most, not

1    all of them, but most of the titles are so vague that it would

2    be difficult -- I mean, that you could do everything with

3    bonobos.  Let's take the first one, for instance, "New Insights

4    into Human Origins through the Study of Linguistically Competent

5    Bonobos."  I mean, it's difficult to be more vague than that.  I

6    mean, I don't know what it means.

7           So basically we have a list of possible research

8    protocols that appear to be active, and though I don't know

9    exactly what it means, some of them very clearly will not do

10   many things with bonobos, such as "A Socio-Ecological Comparison

11   of Captive Pan troglodytes, Pan paniscus and Gorilla gorilla."

12   You will have some interaction with the bonobos but not much.

13   Others are just completely vague.  And we certainly -- I mean,

14   nobody could get away with it.  I mean, when I am, as I will be

15   in two days, when I am a member of the selection committee for

16   grants, which I am in two days, most of the grants being the

17   sciences, the other half English humanities, and me judging all

18   of those grants, for each grant I have up to 100 pages of

19   description.  So let's say that 100 pages might be a bit on the

20   long side here, but certainly more than one vague title would be

21   welcomed to have any kind of possible scientific and scholarly

22   judgment about what is going on.

23   Q.  Is it your understanding that at least since last June, June

24   2014, that ACCI has denied Dr. Savage-Rumbaugh access to the lab

25   and access to the bonobos?

1  A.  It is my understanding, yes.

2  Q.  And as a member of the board of Bonobo Hope and as an

3  academician, what is your view on that continued banishment?

4  A.  I believe it's wrong from almost all of the angles I can

5  envision.  It's certainly wrong for the welfare of the bonobos

6  because all animals, all mammals, let's say, have a strong

7  emotional bond with the other mammals that raised them, but

8  certainly in the case of primates, in the case of great apes,

9  especially in the case of bonobos, this emotional bond is

10  extremely, extremely powerful.

11          So you had experiments in the 1960s where you had

12  small monkeys, not apes, but small monkeys being raised in

13  isolation, and you had after that the psychotic mother and the

14  female monkeys that were isolated with no human contact would

15  then become like a mother cheating their offspring, and all of

16  this is very well regimented for lesser, if I may use the term

17  "lesser," for lesser animals than bonobos.

18          So it's wrong to prevent those bonobos from at least

19  seeing, being in contact with the people who raised them.

20  That's the ethical part of it.

21          Then it's completely wrong scientifically because the

22  whole point of the experiment was symbolic, constant symbolic

23  immersion on a systematic basis and this happening through

24  bondage, through emotional bonding, precisely.  So you are

25  basically dismantling the experiment, the whole decade long

1  experiment by preventing Sue Savage-Rumbaugh from having access.

2  It's wrong professionally.  I mean, I cannot say how much it is

3  wrong, I mean, how wrong it is, excuse my French, in the sense

4  that in science, in research in general, you have the phase of

5  preparation, so you prepare the experiment.  Then you will

6  collect data and then you will interpret them.  But the first

7  stage of preparation is the rearing in the case that we are

8  considering, and this is a phase that has been not only done by

9  Savage-Rumbaugh but designed by her in an extremely theoretical

10  and reflective way.  So it's almost close to stealing the

11  intellectual property, not the property research, but the

12  intellectual property of the work by abandoning animals,

13  experimental animals that haven't been prepared.

14         And then I would add the last point where it is wrong,

15  as I have said before, your own ethics as a scholar and a

16  scientist is to say in the public through publications, through

17  peer review publications why you disagree with someone, why you

18  disagree with something.  So you cannot appropriate the bonobos

19  and say, oh, I disagree, but I'm not going to say why, I'm not

20  going to publish why.  Because in one year and a half how many

21  articles did we see coming from Bill Hopkins and Jared

22  Taglialatela that was based on their supposed research, supposed

23  active research in the lab?  None.

24  Q.  Just one last question, Professor Dubreuil, and I'll put the

25  question as it's been put to Jeb Bush recently.  Knowing what

1  you know now, would you have voted to install Jared and Bill

2  Hopkins?

3  A.  No.

4        MR. ZIFCHAK:  Thank you.

5        I pass the witness.

6        THE COURT:  Cross-examination?

7        MR. MELHUS:  Just briefly, Your Honor.

8                    CROSS-EXAMINATION

9  BY MR. MELHUS:

10  Q.  Mr. Dubreuil, you testified earlier that in September of

11  2010, you had several extended interactions with the bonobos, is

12  that correct?

13  A.  I had several interactions with the bonobos, yes.

14  Q.  And at night you would go home and take very careful notes

15  about your interactions?

16  A.  Each night.  I'm not doing them back home because I was

17  living in Des Moines and Des Moines is not my home; but every

18  night, yes, I was and sometimes for lunch when I had a break I

19  would write down observations, yes.

20  Q.  Okay.  And then at some time later you had a second visit,

21  an extended visit?

22  A.  Yes.

23  Q.  And you also had interactions with the bonobos at that time?

24  A.  Yes.

25  Q.  And during those interactions in that second visit, I think

1 you described it in your testimony as ape language research, is

2 that right?

3 A.   Could you rephrase the question?

4 Q.   Sure.  You described your interactions the second -- during

5 the second visit as targeted towards ape language research.

6          Is that an accurate description?

7 A.   No, that's not.  I said that in between my two visits, I had

8 edited a special issue that was devoted to ape language research

9 and the theories of thought foundations of ape language

10 research.  So when I came for the second visit, I had a deeper

11 knowledge of the long-term history of ape language research.

12 Q.   Okay.  That's what I said.

13 A.   I believe.

14 Q.   And were you conducting any type of research during either

15 of those two visits?

16 A.   I conduct research almost every day of my life.  I'm writing

17 a lot.  So, yes, I conduct research.  I was involved in one of

18 my research projects, the one that led to the publication of the

19 2015 book I already referenced, "The Intellective Space."

20          So that was one of the research projects I was

21 involved in at that point when I visited for the second time in

22 2011.

23 Q.   Okay.  And during that second visit, you conducted some

24 observations and you included those in your publication, is that

25 right?

1   A.  I did -- I observed things.  I didn't set up a research

2   procedure with control -- you know, in a controlled setting if

3   you want.  I mean, you have different ways of conducting

4   research.  So I observed what I saw.  I simply reflected on this

5   and some of my personal observations, interlaced with my general

6   understanding of the problems that we discussed, appear, do

7   appear in my 2015 book.

8   Q.  Okay.  Did you collect any data during either of those

9   visits?

10  A.  It depends on what you call data.  I believe it's in the

11  discussion there, so we can discuss that if you want.

12  Q.  Sure.  What is your understanding of what the term "data"

13  is?

14  A.  I would say it's mainly a term that you have in the

15  experimental sciences.  So in nonexperimental sciences, such as

16  math or theoretical physics or theoretical chemistry, you don't

17  call it data because you just theorize about things.  So if you

18  seek -- chose the definition of data in the experimental

19  sciences, meaning that you set up a protocol with controlled

20  procedures and then you collect data, I didn't do that in none

21  of my stay.

22          Now, the term "data" is coming from Latin.  It's the

23  pure form of datum which means given, something that is given to

24  you.  So you consider that when you are a historian and you do a

25  type of work, for instance, you collect data because you collect

1   items that are a part relatively speaking with the experimental

2   sciences.  I am not a scholar doing experimental research, so I

3   don't collect data more than a theoretical person would, as a

4   scientist working in physics would collect data; but as someone

5   who theorizes on things, I'm extremely interested in the data

6   and the experiments that other scientists and scholars could

7   have.

8   Q.  Did you conduct any research with the bonobos during either

9   of those visits?

10  A.  My answer would be yes, because research is not collecting

11  data.  It's not reduced to collecting data.

12  Q.  Are you aware of the requirements to obtain IACUC -- that's

13  I-A-C-U-C -- approval before conducting research with primates?

14  A.  Before collecting data, yes, I'm aware of that.

15  Q.  Before conducting any research, are you aware of any

16  requirements about obtaining IACUC approval before conducting

17  research of primates?

18  A.  I was observing primates, so I didn't intervene in their

19  life space.  In that sense I believe the jury is out, if I may

20  use such an expression here.  Maybe that's not -- but according

21  to the rules of the IACUC, I was not asked by the Director of

22  Operations, who was Bill Fields at that point, I was not asked

23  by him to submit a research proposal that would go through an

24  IACUC.

25  Q.  So you did not obtain IACUC approval before conducting

1   research of the bonobos?

2   A.   I did not collect data.  I believe that my work was

3   observational and I was not being asked to go through the IACUC

4   procedure since I was with Jared Taglialatela.

5   Q.   Did you obtain IACUC approval before conducting research on

6   the bonobos?

7           MR. ZIFCHAK:  Objection; asked and answered.

8           MR. MELHUS:  Your Honor, I don't think he answered the

9   question that was posed, so I'll just restate it again.

10          THE COURT:  I'll let you restate it.

11          Go ahead and answer.

12  A.   I did not receive IACUC approval for any collection of data.

13  BY MR. MELHUS:

14  Q.   So that's a slightly different answer than the question that

15  I had asked about.  Did you obtain any IACUC approval before

16  conducting research with the bonobos?

17  A.   I believe we are here in a discussion about the identity of

18  terms which we use, so could you tell me what you call

19  conducting research?  And then I will be very glad to answer.

20  Q.   I'm using research in the same sense that you used it when

21  you testified that you conducted research of bonobos.

22          MR. ZIFCHAK:  I think that mischaracterizes the

23  testimony, but I'll allow the witness to answer.

24  A.   As I said, I did not -- I was not being asked to submit a

25  research protocol, so I did not receive a research protocol -- a

DUBREUIL - CROSS

1  research authorization.  I believe I have been clear about that.

2  BY MR. MELHUS:

3  Q.  All right.  Thank you.

4         Now, there was a third visit you testified about in

5  August of 2014, is that correct?

6  A.  That is correct.

7  Q.  And that visit lasted approximately 4 to five hours, is that

8  right?

9  A.  4 to five, yes.

10  Q.  And during that time, you made some observations about the

11  bonobos and how they behaved and the research that was being

12  conducted at the facility, is that correct?

13  A.  I made an observation about the behavior of the bonobos.  I

14  made observations about their enclosures.  I could not make

15  direct observation about research since there was no research

16  going on as far as I could tell.

17  Q.  So you didn't see any research going on during that August

18  2014 --

19  A.  No, not of any kind.  I had been told that the cannisters

20  that were somewhere on the floor with things around them were

21  being used for some kind of simple recognition cognition task.

22  That's what I have been told, but I had no direct experience of

23  that.  And I can say that the research defined as involving

24  preparation through the constant and systematic immersion within

25  the cultural symbolic used here, that this research was not

1  taking place since the lexigrams were nowhere to be found in the

2  enclosures with the apes.

3  Q.  So other than your observation in October -- or excuse me,

4  August 2014 for the 4 to five hours, you have no way of knowing

5  whether or not lexigrams are in use outside of that time period,

6  is that correct?

7  A.  If lexigrams are being used, I have no reason to believe

8  that the lexigrams would have been removed before my visit and

9  then reinjected after my visit.

10 Q.  But you have no way of knowing for sure whether or not there

11 is any lexigrams in use before or after your visit, is that

12 correct?

13 A.  I have ways of drawing conclusions, but I have no way of

14 being constantly checking where things are since I'm not being

15 allowed to visit the lab when I suggest different dates and

16 different years, so no.

17 Q.  And your observations during that August 2014 visit, they

18 weren't based on any formal research in primatology, were they?

19 A.  Could you rephrase the question?

20 Q.  You testified earlier to some observations that you made of

21 the bonobos during your August 2014 visit, correct?

22 A.  I testified, yeah.  I went there, yes; but I don't get the

23 second part of your question.

24 Q.  So the conclusions that you drew from those observations --

25 A.  Yes.

DUBREUIL - CROSS

1    Q.  -- during that August 2014 visit, they weren't based on any

2    formal training in primatology or ape behavior, were they?

3    A.  They were trained -- I'm a member of a cognitive science

4    project and communication program.  Cognition, which is the way

5    the mind works through feelings, emotions, cognition is at the

6    core of my training, at the core of what I do in cognitive

7    science.  Ape cognition is a part of that.

8           Behavior and behaviorism is one way of looking at

9    things that has been -- behaviorism as a paradigm has been

10   largely distributed in the past.  Cognition is another way.  So

11   I have extensive knowledge of the scientific literature, if we

12   can use that term, about ape cognition, yes, I have that.

13   Q.  You have training in ape cognition?

14   A.  I have an extensive knowledge of the recent and published

15   literature about ape cognition.

16   Q.  And that's just sort of based on your own understanding and

17   research in that area?

18   A.  Okay.  So when you study carefully, the question of

19   cognition, the very theory of cognition is that cognition

20   appears and happens independently from the site, that you can

21   have an understanding of cognition understood as a unit of the

22   way your mind works, that you can have that understanding and

23   that this understanding does not depend on the animal or the

24   organism that is using it.

25          So when you work in cognitive studies, you don't work

1  with apes, you don't work with grass.  You can, but you don't

2  have to.  When you work in cognitive studies or cognitive

3  science, you are interested in the way that the mind works.  In

4  order to understand how the mind works, you need to cross

5  boundaries.  You need to cross disciplinary boundaries.  You

6  need to go from biology to philosophy to computer science to

7  artificial intelligence to experimental psychology, and you need

8  to do that.  Some people are more on the experimental side of

9  things; some people are more on the theoretical side of things.

10 I am more on the theoretical side of things, so I have the

11 theoretical knowledge of cognition as it also pertains to apes.

12         That is why I have been elected by my peers as a

13 member of the Cognitive Science Program, and I am the only

14 humanist beyond three philosophers being a member of that

15 program.  All the other ones are in engineering science, in

16 biology, in neurobiology, experimental psychology.

17         So I might believe that I have been elected for good

18 reasons and precisely because I provide a theoretical light and

19 a theoretical angle specifically grounded and explained to me

20 that people working on experiments cannot competently bring.

21 Q.  So in that capacity that you just described at some length,

22 how many papers have you published, for example, on ape

23 cognition and behavior?

24 A.  On ape cognition and behavior?

25 Q.  Right.

1  A.  So I don't work so much on behavior, so I don't publish on

2  behavior.  Behavior is for me just a consequence of cognition,

3  emotional and intellectual cognition.  Then if you -- what I

4  need to explain is that if you narrow down things, then you are

5  missing the whole point of cognition.

6         So to go back to your question, I edited the journal

7  issue about ape cognition and language, the one I referred to

8  earlier on.  I was invited to respond to Sue Savage-Rumbaugh's

9  essay on the web site in 2011 or 2012 -- yeah, early 2011, I

10 believe.

11        I have published observations and reflective

12 observations in the article that was in the collection I have

13 already mentioned.

14        I have published some pages within "The Intellective

15 Space," maybe 10 percent of "The Intellective Space."  I

16 don't -- it's hard to quantify my 2015 book that pertains to ape

17 cognition.

18        And I am working right now on a book co-authored with

19 Sue Savage-Rumbaugh about -- that we entitled "Dialogues on the

20 Human Ape," which is a co-authored book that is certainly at

21 that stage it's at least 250 pages long, and it's a theoretical

22 book and based on the dialogue between people coming from

23 different disciplines and trying to understand the states and

24 the possibilities of becoming a human ape.

25        I also gave a key note lecture at a conference at

1   Cornell on post humanities where I mainly spoke about ape

2   cognition.

3            Are you -- do you want more?

4   Q.  No.  Let's move on.  But thank you for that response.

5   A.  Okay.

6   Q.  Let's just change topics for a second.

7   A.  Yes.

8   Q.  Since December 2013, has BHI obtained any grants to support

9   or care for the bonobos in Des Moines?

10  A.  Your question is, since December 2013, did we get any grants

11  to support the bonobos in Des Moines?  That's your question?

12  Q.  Correct, that's my question.

13  A.  I wanted to be sure about the time line since, as you know,

14  we have multiple time lines and multiple instances as well.

15           So since December of 2013, basically we as members of

16  the Bonobo Hope have been unable to conduct any research with

17  the bonobos.  So that's the first part of my answer.  So we did

18  not try to bring so much money to the facility for research that

19  we could not conduct.  But we decided that we would move forward

20  and that we would try to come up with a new facility, and we

21  have been in discussion with different facility directors and

22  especially Ryan Sheldon, who has very generously decided to go

23  ahead and build a new facility either for the bonobos if we are

24  able to have them, which we hope, or for chimpanzees who would

25  need rehabilitation.  So this is a place that is being built in

1    Missouri, and there is funding attached to that.

2    Q.  I appreciate that response, and I think we got a little bit

3    off topic again.  Let's focus specifically on how many grants

4    BHI has gained for the care and support of the bonobos in

5    Des Moines.

6    A.  Since December 2013?

7    Q.  Correct.

8    A.  And you're speaking about grants or you're speaking about

9    donations?

10   Q.  Let's start with grants.

11   A.  With grants, since -- how can I put that?  If I believe that

12   I am not allowed to have access to the bonobos, why would I try

13   to have the grant to work with the bonobos if I cannot work with

14   the bonobos?  I believe that question is certainly in my mind,

15   in the mind of several of us.  And so when you propose -- when

16   you do a research proposal for a grant, you -- there is an

17   engagement, a commitment from your part, so you're saying this

18   is a research that I would like to do and I know I will be able

19   to conduct that research if I get that grant.  Now, if you

20   believe, as I believe, that I would not be able to conduct that

21   research, that BHI would not be able to conduct that research,

22   et cetera, then I'm not going to write a paper and submit it to

23   a federal institution or to a private foundation asking for

24   money, asking for money for a project that I know or I believe I

25   cannot conduct in any way.

1          So the answer is we didn't try to have grants for

2    research that could not be conducted because we were de facto

3    excluded from that.

4    Q.  You didn't obtain any grants and you didn't try to obtain

5    any grants; is that what you're saying?

6    A.  You can only have grants for research that is likely.  If

7    you believe the research is not likely because you don't --

8    you're not allowed to enter the premises, then why would you ask

9    for any grant?  That would be lying to a federal agency.  So the

10   answer is no; but I qualified the answer.

11   Q.  All right.  Thank you.

12          And let's go a little bit simpler.  How much money has

13   BHI contributed to the care and support of the bonobos in

14   Des Moines since December 2013?

15   A.  We have contributed in different ways.  So there was money

16   especially coming from Bill Greaves who committed to several

17   thousand of dollars in the summer of -- oh, I'm sorry, I'm mixed

18   up with the time line.  So you are asking after December 2013

19   again, I think.  So after 2013, we have tried to come up with

20   solutions on the long term believing that the solution in

21   Des Moines was not a long-term solution for many reasons.  So we

22   did not try to have much donations at that level.

23   Q.  Can you qualify not much donations at that level?  Is it

24   zero or --

25   A.  I could, but I could not -- I mean, I don't know.  I don't

1    know the answer to that.  You are asking since December?  You

2    are asking since we have been unable to access the bonobos, so I

3    don't know exactly what the answer is.  Unless we include the

4    promise coming from Ryan Sheldon and the new facility in

5    Missouri, which is, of course, what we did.

6           So we were looking for donations, not for the

7    Des Moines facility, but we have been raising funds for another

8    facility where we hope to transfer the bonobos.  So we paid for

9    a few, for their veterinary care I believe, but I cannot be more

10   specific on this.  I'm not the treasurer of the board.

11   Q.  Fair enough.  And I'm not meaning to interrupt you, and if I

12   am, I'm sorry.

13          If I'm to understand your testimony, since December

14   2013, you haven't -- BHI has not contributed any money to the

15   care and support of the bonobos.  But has put forth effort to

16   relocate the bonobos somewhere else, is that correct?

17   A.  Yes.  You also need to take into consideration that the

18   whole system based on volunteers who would be trained to work

19   with the apes was coming from before December 2013.  So the main

20   reason, you also have to understand that when Jim Benson and

21   Bill Greaves sent their undergraduate students as interns for

22   the summer, they were members of Bonobo Hope or of the science

23   board, as far as we could tell.

24          So we have been helping through the formal training of

25   the volunteers, through the work of Liz and Heather who have

 1   been working in their own life with Dr. Savage-Rumbaugh, and

 2   through the unpaid work of interns that were coming from

 3   college, and they're graduate students of both Benson and

 4   Greaves, who were members of the science board.

 5   Q.  You mentioned Liz and Heather.  Could you identify those two

 6   individuals for the record?

 7   A.  So Liz -- I mean, we spoke of her.  I mean, she's here, and

 8   she has been -- she's Sue's sister, one of Sue's sisters, and

 9   she has been in charge of working with the bonobos for decades.

10   And I have to say that I didn't really know since Liz didn't

11   publish so much.  Before coming to the trust, I had no knowledge

12   of the tremendous experience that she had with the apes.  I

13   certainly spent more time with her during my two visits than I

14   spent with -- in 2010 and 2011, than the time I spent with

15   Savage-Rumbaugh, and she is really incredible in her own

16   connection with the apes, but also in her ability to precisely

17   inscribe this research trajectory into very concrete aspects of

18   daily life.

19           Heather is her daughter, and I don't know her

20   personally and I never observed her working with the bonobos.  I

21   have heard positive reports of what she has done, but I have no

22   personal knowledge of what she has done and what she does with

23   the bonobos.

24   Q.  Is Liz contributing her time and efforts as a member of BHI?

25   A.  As you know, the membership of BHI is a complicated matter,

1  so Liz is not right now a member of the BHI, even though I

2  believe that she has been or she may have been.  She is

3  certainly the embodiment of the research trajectory that BHI is

4  heading toward.

5  Q.  Was Heather contributing efforts to support and care for the

6  bonobo as a member of BHI or in some other capacity?

7  A.  She is not a member of BHI.  As I told you before, I never

8  met her, but I believe that her training came at least partially

9  from the time that she spent working with Sue Savage-Rumbaugh

10 and Liz and the time she spent as a member of the family group

11 as has been defined before.

12          MR. MELHUS:  Just one minute, Your Honor.

13          (Pause.)

14          MR. MELHUS:  That's all the questions I have for this

15 witness at this time, Your Honor.

16          THE COURT:  Redirect?

17          MR. ZIFCHAK:  Your Honor, because I can't get the

18 image of an hourglass out of my mind, I have no more questions.

19          THE COURT:  Thank you.

20          You may step down, sir.

21                              (Witness excused.)

22          MR. STAMBAUGH:  Your Honor, just a few housekeeping

23 matters.  I don't know if the court is prepared to let us call

24 our next witness.  I do want to move into evidence Exhibit 1006,

25 which while not a category A was proposed by ACCI, so I assume

1  there's no objection.

2                              (Plaintiffs' Exhibit 1006 was

3                              offered in evidence.)

4        MR. MILLER:  No objection.

5        THE COURT:  1006 is received.

6                              (Plaintiffs' Exhibit 1006 was

7                              received in evidence.)

8        MR. STAMBAUGH:  Thank you, Your Honor.

9        One moment.

10       (Pause.)

11       MR. STAMBAUGH:  Your Honor, the other issue is that

12 our next witness is one of two that have been called by

13 subpoena.  I don't know if the court has any concern that if we

14 don't call him this evening that he's not subject to the court's

15 jurisdiction, we may run into problems, or if you would like to

16 call this witness and have him subject to the court's

17 jurisdiction, we would be happy to do that and then we can

18 finish for this evening.

19       THE COURT:  Well, is he here?

20       MR. STAMBAUGH:  He is, Your Honor.  May I inquire?

21       THE COURT:  Why don't you talk to the witness and tell

22 the witness it looks like he's going to have to come back.  He?

23       MR. STAMBAUGH:  Yes.

24       THE COURT:  He would just have to come back tomorrow.

25       MR. LANGEL:  And I have just had that conversation

1    with the witness, Your Honor, and he has committed to being back

2    tomorrow.

3             THE COURT:  Okay.

4             MR. STAMBAUGH:  My witness is Mr. Lyle Simpson, Your

5    Honor.

6             THE COURT:  Oh, well, why don't we get a running start

7    on Mr. Simpson, and we'll adjourn at 5:00.

8             MR. STAMBAUGH:  May I inquire?

9             THE COURT:  Yes.  By the way, I have -- somebody has

10   given me a deposition of Mr. Simpson up here.

11            MR. NEIHAUS:  Yes, Your Honor.

12            THE COURT:  Is this going to be offered in evidence?

13            MR. NEIHAUS:  No.  It's just for the court to follow

14   if it's used for impeachment.

15            THE COURT:  All right.

16            MR. NEIHAUS:  I also have a copy for the witness which

17   I will now put up on the stand with the court's permission.

18            THE COURT:  Let's start with Mr. Simpson, and we'll

19   adjourn at 5:00.  Please tell him that.

20            (Pause.)

21            THE COURT:  Mr. Simpson, would you come forward,

22   please, right up here and face the clerk.

23            THE CLERK:  Please raise your right hand.

24            LYLE LEE SIMPSON, DEFENDANTS' WITNESS, SWORN

25            THE COURT:  Please be seated right there.

1          THE WITNESS:  Thank you.

2          THE COURT:  We're going to get a running start on your

3   testimony here this afternoon, Mr. Simpson; but I believe as

4   you've been told, you'll probably have to come back tomorrow.

5   Understood?

6          THE WITNESS:  That's fine, Your Honor.  I'm totally

7   deaf on this side (indicating).

8          THE COURT:  All right.

9          THE WITNESS:  So I need to watch you and make sure I

10  know what you're saying.

11         THE COURT:  All right.  Fair enough.

12         Counsel, you both identified Mr. Simpson as a witness.

13  I assume since we're in a bench trial, we can get his testimony

14  in the record and everybody can ask all the questions they want

15  to ask of him so that he only has to come to court once.  Would

16  that be all right?

17         MR. MILLER:  I appreciate that stipulation, Your

18  Honor, yes.

19         MR. STAMBAUGH:  Absolutely, Your Honor.

20         THE COURT:  So everybody will ask the questions they

21  have of Mr. Simpson, and then when he's done, we can excuse him.

22         You can proceed.

23         MR. NEIHAUS:  Thank you, Your Honor.

24

25

SIMPSON - DIRECT

218

1                        DIRECT EXAMINATION

2   BY MR. NEIHAUS:

3   Q.  Good afternoon, Mr. Simpson.

4   A.  Good afternoon.

5   Q.  Could you please state your full name for the record.

6   A.  Lyle Lee Simpson.

7   Q.  And you're an attorney here in Des Moines, is that right?

8   A.  Yes, sir.

9   Q.  You were counsel for IPLS; that is, plaintiff Iowa Primate

10  Learning Sanctuary in 2012 and 2013, is that right?

11  A.  Yes, sir.

12  Q.  And you have also been counsel for plaintiff Ape Cognitive

13  and Communication Institute or ACCI since its founding in

14  December of 2013, is that right?

15  A.  Yes, sir.

16  Q.  And you also formerly were counsel for defendant Bonobo Hope

17  Initiative, BHI, is that correct?

18  A.  Yes, sir.

19  Q.  You're appearing here today pursuant to a subpoena, is that

20  right?

21  A.  That's right.

22  Q.  And there's a document request attached to that subpoena, is

23  that correct?

24  A.  Yes, sir.

25  Q.  Did you bring any documents here with you today pursuant to

1  that subpoena?

2  A.  All documents that have been requested of me that I have

3  have already been provided.  I do not have the documents that

4  were on the -- listed on the subpoena today, to the best of my

5  knowledge.

6  Q.  Thank you.

7          Mr. Simpson, you believe that the bonobos that are at

8  issue in this case are treasures, don't you?

9  A.  Are what?

10 Q.  Are treasures.

11 A.  Well, yes.

12 Q.  And you believe that the bonobos would not have reached

13 their current level and Iowa would not have these treasures if

14 Dr. Sue Savage-Rumbaugh had not been involved, is that right?

15 A.  Both Sue and her former husband, Duane Rumbaugh.

16 Q.  Isn't it true that the bonobos are so unique because they've

17 grown up sharing a culture and sharing a language with humans?

18 A.  Yes.  In fact, this is the only place on earth where humans

19 can actually conduct an intelligent conversation in the English

20 language with another species of life.

21 Q.  Isn't it also true that the head of the human part of that

22 group was Dr. Savage-Rumbaugh?

23 A.  She spent a lot of time with the bonobos.

24 Q.  You believe that if the bonobos were denied the ability to

25 communicate, say if they were denied the ability to use their

1  keyboards, that that would be a travesty, isn't that right?

2  A.  I don't know that I'm qualified to answer that question, but

3  I do know that they use them.

4  Q.  But you believe if they were denied access, that that would

5  be a travesty, is that correct?

6  A.  My opinion is only a lay opinion.

7  Q.  I understand that.  And what is your lay opinion, sir?

8  A.  One of the unique features of these bonobos is the fact that

9  they do understand human language when it's spoken to them and,

10  you know, I suppose some people say that their horse or their

11  dog can understand also; but the level of understanding seems to

12  be superior among these bonobos.

13  Q.  Mr. Simpson, you gave a deposition in this case, isn't that

14  right?

15  A.  Tell me what you said.

16  Q.  You gave a deposition in this case?

17  A.  Yes.

18  Q.  And in that deposition you told the truth, is that right?

19  A.  I believe so.

20  Q.  Mr. Simpson, I've placed a copy of your deposition

21  transcript in the white binder just ahead of you.  If you could

22  please go ahead and open the deposition to page 57.

23          And starting at line 3, are you there, Mr. Simpson?

24  Have you found line 3, Mr. Simpson?

25          I'll withdraw the question.

1          Mr. Simpson, isn't it true that at your deposition you

2    were asked this question and gave the following answer:

3          "Q.  Let me ask the question another way.  If the

4       bonobos -- and this is a hypothetical question -- were

5       denied access to the keyboards with which they've become

6       accustomed, would that detract from the continued research

7       into their ability to communicate in English?"

8          At which point counsel objected.  And after the

9    objection you answered:

10         "A.  I think that would be a travesty."

11   A.   In my opinion --

12   Q.   My question is, did I read the transcript of your deposition

13   correctly?

14         MR. MILLER:  Your Honor, I object.  There's lack of

15   foundation and also reassert the objection stated in the

16   deposition with regard to the fact that this is calling for

17   expert testimony.

18         THE COURT:  I will receive it, subject to the

19   objection.

20   BY MR. NEIHAUS:

21   Q.   Did I read your deposition transcript accurately?

22   A.   From what I've observed, to me that would be -- a travesty

23   is probably a good word for it.

24   Q.   You at times have written letters of support on behalf of

25   Dr. Savage-Rumbaugh's research in order to raise funds, isn't

1  that correct?

2  A.  For many reasons.  If you're referring to the letters that

3  I've written the Governor and the Senators --

4  Q.  Are those some letters that you have written in support of

5  Dr. Savage-Rumbaugh's research in order to raise funds?

6  A.  The letters to the Governor were to influence the University

7  of Iowa and Iowa State University to take title to the facility

8  so that we had a stable economic base.  One problem in operating

9  the facility is that you can get grants to do research, but it

10  doesn't cover the base cost of electricity and staff.  And what

11  we were trying to do because we were in desperate economic

12  condition at that time was to get somebody to help us support

13  the facility, and that was the purpose for the letter to the

14  Governor.

15  Q.  And in your letter -- in your letters to the Governor, you

16  praised Dr. Savage-Rumbaugh's research, isn't that correct?

17  A.  Yes.

18  Q.  And you also wrote a letter to a state -- I'm sorry, to

19  Senator Grassley praising Dr. Savage-Rumbaugh's research, isn't

20  that correct?

21  A.  Yes.

22  Q.  If I could ask you to now turn in the other binder that is

23  in front of you, the largest one, to Exhibit 25.

24          THE COURT:  Counsel, when we're finished with this

25  exhibit, we'll take our evening recess at that time.

1              MR. NEIHAUS:  Thank you, Your Honor.

2   BY MR. NEIHAUS:

3   Q.  I would like to identify for the record Exhibit 25, which is

4   a letter from Lyle Simpson to Senator Charles Grassley written

5   on February 4, 2013.

6              Mr. Simpson, this is a letter that you wrote to

7   Senator Grassley in which you praise Dr. Savage-Rumbaugh's

8   research, isn't that correct?

9   A.  Yes.

10              MR. NEIHAUS:  At this time I would like to offer

11   Exhibit 25 into evidence.

12                             (Defendants' Exhibit 25 was

13                              offered in evidence.)

14              THE COURT:  Is there any objection?

15              MR. MILLER:  Well, Your Honor, we'll object to

16   relevance and hearsay; but we understand your prior order with

17   respect to accepting the evidence.

18              THE COURT:  Exhibit 25 is received, subject to the

19   objection.

20                             (Defendants' Exhibit 25 was

21                              received in evidence.)

22              THE COURT:  With that, why don't we take our evening

23   recess, shall we?  9 o'clock, 9 o'clock tomorrow morning.

24              9 o'clock in the morning, Mr. Simpson.

25              THE WITNESS:  All right.

1              THE COURT:  We'll see you all then.  Have a pleasant

2    evening.

3              MR. STAMBAUGH:  Thank you, Your Honor.

4              (Recess at 5:04 p.m., until 9:00 a.m., Thursday,

5    May 28, 2015.)

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - - -X
IOWA PRIMATE LEARNING SANCTUARY  :
d/b/a GREAT APE TRUST AND        :
APE COGNITION AND COMMUNICATION  :
INSTITUTE,                       :
                                 :
        Plaintiffs,              :    Case No. 4:10-cv-00052
                                 :
    vs.                          :
                                 :
ZOOLOGICAL FOUNDATION OF         :
GEORGIA, INC. d/b/a ZOO ATLANTA, :
DEMOCRATIC REPUBLIC OF CONGO,    :
JAPAN MONKEY CENTRE INSTITUTE    :
AND MUSEUM OF PRIMATOLOGY, and   :
SUE SAVAGE-RUMBAUGH, Ph.D.,      :
                                 :
        Defendants,              :    TRANSCRIPT OF HEARING
                                 :         VOLUME II
and                              :
                                 :
BONOBO HOPE INITIATIVE, INC.,    :
                                 :
        Intervenor-Defendant.    :
- - - - - - - - - - - - - - - - - -X


                        Fourth Floor, South Courtroom
                        United States Courthouse
                        123 East Walnut Street
                        Des Moines, Iowa  50309
                        Thursday, May 28, 2015
                        9:00 a.m.



BEFORE:  THE HONORABLE ROSS A. WALTERS, Magistrate Judge.



                    Terri L. Martin, CSR, RPR, CRR
                     United States Court Reporter
                     Room 189, U.S. Courthouse
                      123 East Walnut Street
                     Des Moines, Iowa  50309

```
APPEARANCES:

For the Plaintiffs:          WILLIAM J. MILLER, ESQ.
                             BRIAN A. MELHUS, ESQ.
                             Dorsey & Whitney
                             801 Grand Avenue, Suite 4100
                             Des Moines, Iowa  50309-2790

For the Defendants:          TODD P. LANGEL, ESQ.
                             Faegre Baker Daniels
                             801 Grand Avenue, 33rd Floor
                             Des Moines, Iowa  50309-8011

                             WILLIAM C. ZIFCHAK, ESQ.
                             Kaye Scholer
                             250 West 55th Street
                             New York,  New York  10019-9710

                             JOSHUA STAMBAUGH, ESQ.
                             Kaye Scholer
                             1999 Avenue of the Stars
                             Suite 1600
                             Los Angeles, California  90067

                             ROSS NEIHAUS, ESQ.
                             Kaye Scholer
                             Three First National Plaza
                             70 West Madison Street
                             Suite 4200
```

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **For the Defendants:** | | | | |
| Lyle Simpson (Resumed) | 230 | 292 | 299 | 302 |
| Derek Wildman | 303 | 333 | 350 | |
| Ryan Sheldon | 351 | 372 | | |
| **For the Plaintiffs:** | | | | |
| Julie Gilmore | 390 | 422 | 438 | 445 |
| Jared Taglialatela | 454 | | | |

E X H I B I T S

| PLAINTIFFS' EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 23 - Simpson 12/4/12 memorandum | 236 | 236 |
| 26 - 4/25/13 Mate e-mail | 238 | 239 |
| 30 - Simpson e-mail | 247 | 247 |
| 35 - 8/30/13 Caudill and Simpson e-mails | 242 | 242 |
| 36 - 9/24/13 Simpson e-mail to IPLS board | 249 | 250 |
| 37 - 9/27/13 Simpson e-mail | 254 | 254 |
| 38 - Yerkes request for guarantee | 286 | 287 |
| 51 - 12/12/13 Simpson e-mail | 289 | 298 |

| DEFENDANTS' EXHIBIT NUMBERS: | | |
|---|---|---|
| 94 - Sheldon letter of credit | 371 | 372 |

1                    P R O C E E D I N G S

2              (In open court, with defendant present.)

3              THE COURT:  Please be seated, everybody.

4         And you can continue your examination.

5              MR. NEIHAUS:  Yes, Your Honor.

6              MR. FISHER:  Your Honor --

7              THE COURT:  Yes.

8              MR. FISHER:  -- permission to address the court?

9              THE COURT:  Sure.

10             MR. FISHER:  My name is Gary Fisher.  I practice law

11   with Lyle Simpson, and he's asked me to be here with him and

12   represent him today for purposes for his testimony.  I don't

13   intend on saying much more than I have right now, but I would

14   ask permission that I be heard if I need to make an objection.

15             THE COURT:  Well, you can certainly be present.  I

16   think when we talk about objections, any objection to the

17   evidentiary admissibility really ought to be made by counsel for

18   the plaintiffs.  If you feel for some reason that it goes into

19   an area that may relate to badgering the witness or something

20   like that, which I imagine you might be concerned with --

21             MR. FISHER:  And matters potentially of privilege.

22             THE COURT:  And the matter of privilege, you can

23   assert an issue of privilege.  If there's a badgering issue, I

24   think you need to discuss that with counsel first and let him

25   make it.  So I'm not going to give you carte blanche to make

1   objections, but objections that involve the personal rights of

2   the witness, of course, I would hear those based on that.

3           MR. FISHER:  Thank you.

4           THE COURT:  And you may continue.

5           MR. NEIHAUS:  Thank you, Your Honor.

6                     LYLE LEE SIMPSON,

7   resumed his testimony as follows:

8                  DIRECT EXAMINATION (Continued)

9   BY MR. NEIHAUS:

10  Q.  Good morning, Mr. Simpson.

11  A.  Good morning.

12  Q.  Can you hear me okay?

13  A.  Yes, now.

14  Q.  Mr. Simpson, I would like to talk about the structural

15  changes of the BHI and IPLS boards in 2012 and 2013.  In your

16  role as counsel, you were responsible for merging the two boards

17  together, is that right?

18  A.  It was my recommendation to do that and the boards voted on

19  doing that.

20  Q.  And that merger happened in February 2012, is that right?

21  A.  I believe that's correct.

22  Q.  And once you merged the boards, BHI and IPLS in effect

23  became one entity, is that right?

24  A.  That's true.

25  Q.  And that entity went by different names, including BHI,

1  IPLS, Great Ape Trust or GAT, is that right?

2  A.  Yes.

3  Q.  In December 2012, however, you determined that the combined

4  board structure was not effectively working, right?

5          MR. MILLER:  Your Honor, I would like to object.

6  Counsel has called this witness as part of their direct case,

7  their case in chief.  He's called as a witness for them for

8  direct purposes, and he's being cross-examined.  I think the

9  testimony is -- you know, I wanted to give him some leeway

10  yesterday, we were just getting started, but I think we should

11  proceed in a question-and-answer fashion rather than a

12  cross-examination.

13          MR. STAMBAUGH:  Your Honor, may I be heard on that?

14          THE COURT:  Sure.

15          MR. STAMBAUGH:  Mr. Simpson has been called in our

16  case in chief.  Pursuant to Rule 611(c), when an adverse witness

17  is called, counsel is allowed to ask leading questions on direct

18  examination.  Mr. Neihaus has already established that

19  Mr. Simpson was counsel for IPLS and ACCI during the relevant

20  events, clearly making him an adverse witness under Rule 611

21  and, therefore, he should be allowed to ask leading questions.

22          THE COURT:  Anything further?

23          MR. MILLER:  Well, Your Honor, he's also -- there's

24  testimony that he's counsel for BHI, Dr. Rumbaugh as well.

25  Again, they've called him.

1          THE COURT:  Is he still counsel for BHI and

2   Dr. Rumbaugh?

3          MR. STAMBAUGH:  He is not, Your Honor.

4          THE COURT:  I'll let you lead, though do bear in mind

5   leading questions are oftentimes not the best way to get

6   information out of someone; but I'll let you lead if you think

7   you need to.

8          MR. NEIHAUS:  Thank you, Your Honor.

9   BY MR. NEIHAUS:

10  Q.  So my question, Mr. Simpson, in December 2012, you

11  determined that the combined board structure was not effectively

12  working, is that right?

13  A.  Not totally.

14  Q.  I'm sorry, can you explain your answer?  You determined that

15  the board structure was not totally working; is that what you're

16  saying?

17  A.  The reason for merging the two entities, Bonobo Hope really

18  was not a functioning board at the time of the merger, but it

19  had money in it that had been raised by the people who were

20  participating in the Bonobo Hope activity.

21          IPLS from January 1, 2012 on was operating on a --

22  without a source of income essentially, and it was operating

23  essentially because of contributions.  We were having trouble

24  paying the utility bills, let alone -- I say "we," the client

25  was having trouble paying the utility bills and paying salaries.

1        There was money in Bonobo Hope.  The easy way of --

2   and Bonobo Hope had been given this money without having tax

3   exempt status, so the people that had given the money would have

4   trouble taking income tax deductions for the money that they had

5   contributed.  In order to get it qualified with the Internal

6   Revenue Service so that they could get a tax deduction, the

7   easiest way to do that is to show that this is a supporting

8   organization for another 501(c)(3) tax exempt organization.

9   There's three different levels of foundations, and this is by

10  far the simplest and the least expensive.

11        By merging the two entities together, that made it

12  very easy to qualify so that the people that made contributions

13  could deduct them.  It also made it very easy then to transfer

14  the money from Bonobo Hope into IPLS so they could pay their

15  immediate bills, and that was the reason it was created.

16        Once that was done, there was really -- it wasn't

17  necessary to keep them together.  The problem with Bonobo Hope

18  is that it had people on the board all over the world, most of

19  whom I never met, even as of today.  It was very difficult to

20  get that organization to do anything.  In fact, they wouldn't do

21  anything unless Sue specifically told them to do it.  And the

22  net result was it was totally dysfunctional, and so --

23  Q.  You're talking about the combined board right now?

24  A.  No.  I'm talking about why we separated them.  In order to

25  manage the facility, you know, somebody in Barcelona or in

1   Israel, I don't even know that they had ever been to the

2   facility, let alone could make decisions for managing it.  It

3   was just totally ineffective.

4           My recommendation to them was that they get local

5   people on the IPLS board who had hands on ability to manage and

6   that people on the Bonobo Hope board, most of whom were

7   scientists and were there because they were interested in the

8   program itself, could continue to function; but they could do it

9   better as separate boards than to expect somebody in Barcelona

10  or Haifa, Israel to make local decisions.  So that's the reason

11  we separated.

12  Q.  So then you separated them into two different boards; a

13  board composed of scientists, which was BHI, and a board

14  composed of local business people, which was IPLS, is that

15  right?

16  A.  That's true.

17  Q.  And you recommended -- you were the one who made the

18  recommendation that the board be split in two in this way?

19  A.  That's true.  They were -- there wasn't any leadership

20  effectively and they weren't making decisions, and they needed

21  some guidance, and so I was -- I had to make recommendations

22  because nobody else was doing it.  In the meantime, they're

23  going broke.

24  Q.  And what you recommended was that going forward the purpose

25  of Bonobo Hope should be the management and protection of the

1  bonobo colony and the direction and development of the science

2  that can be produced through the proper utilization?

3  A.  That was my recommendation, yes.

4  Q.  You also recommended that control and maintenance of the

5  bonobos and the science be administered only by Bonobo Hope, is

6  that right?

7  A.  That was my recommendation.

8  Q.  And you described your recommendation in a memo to the

9  Bonobo Hope board, right?

10  A.  Yes.

11  Q.  I would like to show you what's been marked as Exhibit 23,

12  which is a memorandum authored by Mr. Simpson dated December 4,

13  2012, and which was distributed to the joint IPLS and BHI

14  boards.

15          Mr. Simpson, could you please turn to your --

16  A.  I have nothing on my desk.

17          MR. NEIHAUS:  I'm sorry.  It's by the side of the

18  witness stand.

19          Judge, may I approach?

20          THE COURT:  You may.

21  BY MR. NEIHAUS:

22  Q.  Mr. Simpson, are you looking at what's been marked as

23  Exhibit 23?

24  A.  Yes.

25  Q.  Is this the memorandum that you wrote?

1  A.  Yes.

2          MR. NEIHAUS:  At this time I would like to offer

3  Exhibit 23 into evidence.

4                              (Defendants' Exhibit 23 was

5                              offered in evidence.)

6          MR. MILLER:  No objection, Your Honor.

7          THE COURT:  23 is received.

8          MR. NEIHAUS:  Thank you.

9                              (Defendants' Exhibit 23 was

10                             received in evidence.)

11 BY MR. NEIHAUS:

12 Q.  Mr. Simpson, you called this memorandum your plan of action,

13 is that right?

14 A.  It was my recommendation for a plan of action.

15 Q.  And the combined BHI-IPLS board accepted your

16 recommendation, isn't that right?

17 A.  Yes.

18 Q.  And that happened through two sets of resolutions; one in

19 December 2012 and one in April 2013, is that right?

20 A.  I don't -- tell me again what you just said.

21 Q.  The board accepted your recommendation --

22 A.  Yes.

23 Q.  -- and implemented it through two sets of resolutions, is

24 that right?

25 A.  I don't know about the two sets of resolutions.  Are you --

1   Q.  If I could ask you to turn towards the back of Exhibit 23,

2   three pages from the back, there's a sheet that starts minutes

3   for December 12, 2012.

4              Are you there?

5   A.  Yes.

6   Q.  All right.  Mr. Simpson, do you recognize these minutes?

7   A.  Actually I don't, but it doesn't mean that I might not have

8   seen them before, but I -- I'm just amazed somebody created

9   minutes.

10  Q.  If you can move down about three-quarters of the way down

11  the page, you say -- you see there's a small letter a, and it

12  starts, "Resolved, that the board's current officers," and if

13  you can just read paragraph a to yourself, you authored that

14  paragraph, isn't that right?

15  A.  Well, it's language that I certainly would have used.

16  Q.  And if you could look at the following letters --

17  A.  Yes, I did write that.

18  Q.  And if you could look through the following letters b

19  through f, you also wrote those parts of the document, isn't

20  that right?

21  A.  Yes, that was my recommendation.

22             MR. NEIHAUS:  If I may have just one moment, Your

23  Honor.

24             (Pause.)

25  BY MR. NEIHAUS:

SIMPSON - DIRECT

238

1   Q.  At this time I would like to identify Exhibit 26 for the

2   record, which is an e-mail from Ursala Goodenough, but is

3   forwarding another e-mail from Carmen Mate on April 25, 2013.

4           MR. NEIHAUS:  Your Honor, permission to publish to the

5   court?

6           THE COURT:  Has 26 been received?

7           MR. NEIHAUS:  It has not, Your Honor.  At this time I

8   would like to -- I'm sorry.

9   BY MR. NEIHAUS:

10  Q.  Mr. Simpson, could you please turn to Exhibit 26.

11  A.  Yes.

12  Q.  And do you see the e-mail sent by Carmen Mate on the first

13  page?

14  A.  Yes.

15  Q.  Now, if you go to the line beginning "To:  Bonobo Hope

16  Initiative, Inc. Board Members," from that point on you actually

17  authored the text, isn't that right?

18  A.  Yes.

19  Q.  And you can confirm this by your signature block at the end

20  of the document, is that right?

21  A.  Yes.

22          MR. NEIHAUS:  At this point I would offer to move

23  Exhibit 26 into evidence.

24                          (Defendants' Exhibit 26 was

25                           offered in evidence.)

1          MR. MILLER:  Your Honor, we're going to object on the

2   basis of hearsay asserted in the pretrial listing.  Furthermore,

3   I think the subsequent testimony from Exhibit 23 establishes

4   that was hearsay, but I acknowledge I didn't state that

5   objection previously, that's the perceived admission of that

6   evidence.

7          THE COURT:  I'll receive Exhibit 26, subject to the

8   objection.

9                              (Defendants' Exhibit 26 was

10                             received in evidence.)

11         MR. NEIHAUS:  We would also ask permission to publish

12  to the court?

13         THE COURT:  Certainly.

14  BY MR. NEIHAUS:

15  Q.  Mr. Simpson, in this e-mail you asked -- you proposed

16  certain resolutions to the combined BHI-IPLS board, isn't that

17  right?  In the e-mail that you offered in Exhibit 26, you

18  proposed certain resolutions to the combined BHI-IPLS board?

19  A.  I did, yes.

20  Q.  Including the resolution that the members of the BHI board

21  resign from the joint board, isn't that right?

22  A.  Yes.

23  Q.  And that was how you effectuated the split; all the BHI

24  members who were on the joint board simply resigned from the

25  IPLS board?

1   A.   That's true.

2   Q.   I would like to ask you now about some resolutions that IPLS

3   passed a month after this e-mail, approximately a month, in May

4   of 2013.   IPLS approved a resolution to grant Dr. Sue

5   Savage-Rumbaugh unfettered access to the bonobo colony, is that

6   right?

7   A.   Yes.

8   Q.   And that resolution was never rescinded, correct?

9   A.   That I can't say.   IPLS made subsequent decisions that could

10  have had the effect of rescinding that.   My intent of putting

11  that in there was to be consistent with the original plan.   When

12  ACCI was formed, it was, in essence, parallel with IPLS.   I hope

13  you get into that a little later.   It made different decisions

14  at that point in time that could have had that effect; but my

15  intent at the time when all of this was created was that that be

16  established policy.

17  Q.   IPLS never passed a resolution rescinding this May 2013

18  resolution, did it?

19  A.   It wouldn't have to.   If it came up with another decision

20  that was conflicting with it, the later decision would apply.

21  Q.   I appreciate the answer, but, Mr. Simpson, my question is

22  simply, did ACCI ever pass another resolution rescinding this

23  May 2013 resolution?

24  A.   They passed another resolution that might have had the

25  effect of rescinding it.   It didn't specifically address that

1  resolution.

2  Q.  And what resolution are you referring to?

3  A.  In their December 18, 2013 minutes, ACCI made a lot of

4  decisions establishing the trajectory that it would be operating

5  under, and some of those decisions would modify prior decisions.

6  Q.  In fact, in one of their set of minutes, ACCI determined --

7  I would like to strike the question and start over.

8         In IPLS's minutes from December 18, 2013, they passed

9  a resolution acknowledging that Dr. Savage-Rumbaugh had been

10  dismissed from the board in July of 2013, isn't that right?

11  A.  Yes, I believe that's right.

12  Q.  Yet even after July of 2013 when, as you suggest or as the

13  IPLS board minutes reflect, Dr. Savage-Rumbaugh had allegedly --

14  supposedly been dismissed from the IPLS board, IPLS was still

15  telling Dr. Rumbaugh with certainty that she will always be able

16  to rejoin her bonobo family, isn't that right?

17         MR. MILLER:  Objection; hearsay.

18         THE COURT:  I'll receive it, subject to the objection.

19  A.  I don't know what you're referring to.

20  BY MR. NEIHAUS:

21  Q.  I would like to identify for the court Exhibit 35, which is

22  an e-mail authored by IPLS Chair George Caudill, sent to

23  Dr. Savage-Rumbaugh in which Mr. Simpson was cc'd.  Mr. Simpson,

24  if you could please turn to Exhibit 35.

25         Mr. Simpson, you received this e-mail, is that right?

1  A.  I believe so.

2          MR. NEIHAUS:  At this time I would like to offer

3  Exhibit 35 into evidence.

4                              (Defendants' Exhibit 35 was

5                              offered in evidence.)

6          MR. MILLER:  Well, with the same objection with

7  respect to hearsay, Your Honor; also lacks foundation, I

8  believe, but --

9          MR. NEIHAUS:  Your Honor, I'll point out that this was

10  an Exhibit B document on the final pretrial order, which meant

11  there was no objection to foundation and there was no objection

12  to hearsay on that document.  In addition, this document is not

13  being brought for the truth of the matter asserted but the

14  effect on the listener.  And we call it a party opponent

15  admission anyway because it's by the president of IPLS.

16          THE COURT:  I'll receive it, subject to the objection.

17                              (Defendants' Exhibit 35 was

18                              received in evidence.)

19  BY MR. NEIHAUS:

20  Q.  Mr. Simpson, if you could look at the third paragraph down,

21  the final line that's written in bold, do you see where

22  Mr. Caudill on August 30 of 2013 told Mr. Savage-Rumbaugh, "I

23  can say with certainty that you will always be able to rejoin

24  your bonobo family."

25          Do you see where that's written?

1  A.  Yes.

2  Q.  Was that your understanding as well?

3  A.  At that point in time, I certainly -- that was everybody's

4  hope.

5  Q.  And if you could please turn to the next page of the

6  document, at the very top of the page, the second line down

7  about halfway through, the sentence beginning, "You can do all,"

8  George Caudill also told Dr. Savage-Rumbaugh on August 30 of

9  2013, "You can do all of this with complete confidence that you

10  will always be welcome to rejoin the bonobos."

11       Was that also your understanding at the time?

12  A.  Yes.

13  Q.  Mr. Caudill continues that Dr. Savage-Rumbaugh will be able

14  to continue her research as she sees fit.

15       Was that your understanding at the time as well?

16  A.  Yes.  Everybody was concerned with the fact that nothing was

17  happening and they certainly wanted Sue back.

18  Q.  Sooner rather than later, is that right?

19  A.  Yes.

20  Q.  Mr. Simpson, after the settlement agreements in this case

21  were entered into, you recommended that IPLS undergo a

22  transitional period, is that right?

23  A.  After --

24  Q.  After February of 2013 when the settlement agreements in

25  this case were entered into, you recommended that IPLS undergo a

1  transitional period, is that right?

2  A.  You're talking about the position of the Director of

3  Science?

4  Q.  That's right.

5  A.  All right.  I don't want to get into Sue's personal health

6  issues, but it does affect this.  Late April, early May,

7  sometime in that point in time, in 2013 -- Sue has issues

8  dealing with depression -- I was called up and told that she was

9  having those problems, and it didn't surprise me because Sue had

10  contributed money to the Community Foundation of Greater

11  Des Moines in order to support the activity of IPLS during her

12  administration as the director, and we were running out of money

13  and there was no source of funding.

14      I found out sometime later that she also apparently

15  had fallen and hurt herself.  Anyway, she left the facility.

16  She was there one day and gone the next, and attempts to contact

17  her and attempts -- something is wrong -- and attempts to get

18  her direction because she was running the facility stopped.

19      MR. NEIHAUS:  Can I ask the court, I think the

20  microphones are out.

21      THE COURT:  The microphones are off.  Mr. Simpson, the

22  best we can do is just speak up.  The microphones aren't working

23  very well.

24  A.  Okay.  Anyway -- oh, there it comes -- she needed help.  She

25  was, in essence, a one-person band.  She was tending to the

1  care -- we had no money to pay people.  She was tending to the

2  care of the bonobos.  She was I assume attempting to continue

3  her science, and at the same time she was paying the bills and

4  running the facility, and it was pretty obvious to anybody

5  looking on that the science was waning because of all of the

6  other activity demanding her attention.

7          So what I was seeking then was an assistant for her.

8  I made that proposal to Bonobo Hope that they find a Director of

9  Science and that we elevate Sue to Director of Science Emeritus

10  was my recommendation, but nothing happened.  I didn't get a

11  response from anybody on the bonobo board and just literally

12  nothing happened.  So -- do you want me to continue?

13  Q.  I'll go ahead and ask another question.

14          And after that episode, that was when you agreed, as

15  we discussed previously, that IPLS wanted Sue back and that she

16  would always be welcome to rejoin the bonobos, is that right?

17  A.  Yes.

18  Q.  And that her science would continue, right?

19  A.  Yes.

20  Q.  You never intended for her to be put out to pasture, right?

21  A.  I had no thought of that.

22  Q.  You needed Sue because she needed to continue to have a

23  vital role in the success of IPLS, right?

24  A.  We had one of the most valuable science treasures in the

25  world right here in Des Moines and there was no activity.  We

1    had a third-generation bonobo, Teco, born who was I think at

2    that point in time, what, three.  I think that Teco is five now

3    or will be.  There was a tremendous amount of science being lost

4    because we didn't have a scientist.

5    Q.  And at this time you communicated to the IPLS board, the BHI

6    board, as well as to Dr. Jared Taglialatela, that you needed an

7    assistant for Sue, is that right?

8    A.  I'm not sure how Jared got involved in that description,

9    but -- I didn't even know Jared.  He was on the Bonobo Hope

10   board, but he was one of those people that I had never met.  We

11   asked -- in fact, I went through Dr. Duane Rumbaugh and asked

12   that he and Sue help us find a scientist to, in essence, assist

13   Sue.  That would have been I think in August because I couldn't

14   get any help out of anybody else on the Bonobo Hope board, and

15   then he and Sue did recommend Jared, and that was probably in

16   September.

17   Q.  At this point I would like to identify for the record

18   Exhibit 30, which is an e-mail authored by Lyle Simpson to the

19   BHI and IPLS boards, which includes Dr. Jared Taglialatela,

20   dated July 1, 2013.

21          Mr. Simpson, if you could please turn to Exhibit 30 in

22   your exhibit book.

23   A.  Yes.

24   Q.  You authored this e-mail, is that right?

25   A.  Yes.

1          MR. NEIHAUS:  I would like to offer Exhibit 30 into

2    evidence.

3                              (Defendants' Exhibit 30 was

4                              offered in evidence.)

5          MR. MILLER:  Well, we again object on the basis of

6    hearsay, Your Honor.

7          THE COURT:  I'll receive it, subject to the objection.

8                              (Defendants' Exhibit 30 was

9                              received in evidence.)

10          MR. NEIHAUS:  We also ask permission to publish?

11          THE COURT:  Yes.

12   BY MR. NEIHAUS:

13   Q.  Mr. Simpson, in this e-mail that you sent, one of the

14   recipients was Dr. Jared Taglialatela, is that right?

15   A.  He was a member of the Bonobo Hope board.

16   Q.  And in this e-mail you told the board that this transition

17   was not intended to have Sue just stop working and have another

18   person take over, right?

19   A.  That's right.

20   Q.  So you told Dr. Jared Taglialatela in July of 2013 that this

21   transition was not intended to have Dr. Savage-Rumbaugh just

22   stop working and have another person take over, is that right?

23   A.  That's true.

24   Q.  Isn't it true that when you envisioned the transition in

25   July of 2013, you believed that the trust needed for Sue to

1  continue to have a vital role?

2  A.  I had all expectation that she would.

3  Q.  And you told Dr. Taglialatela in July of 2013 that the trust

4  needed Dr. Savage-Rumbaugh to continue to have a vital role, is

5  that right?

6  A.  Yes.

7  Q.  I'm sorry?

8  A.  Yes.

9  Q.  You believed that neither the bonobos nor IPLS could afford

10  to have Dr. Savage-Rumbaugh simply step away, right?

11  A.  We had one of the most valuable research tools in the world

12  right here in Des Moines, and she had been involved in it from

13  day one.  I would have had no expectation of anything else.

14  Q.  And you told Dr. Taglialatela in July 2013 that neither the

15  bonobos or IPLS could afford to have Dr. Savage-Rumbaugh simply

16  step away, is that right?

17  A.  Yes.

18  Q.  This transition was not intended to occur quickly, but

19  during a period of overlap, perhaps many years, is that right?

20  A.  I don't know that I would have used those terms, but that

21  would have been my expectation.

22  Q.  I would like to identify for the court Exhibit 36, which

23  purports to be an e-mail from Mr. Simpson to Dr. Duane Rumbaugh

24  and other members of the IPLS board.

25          Mr. Simpson, are you on Exhibit 36?

1   A.   Yes.

2   Q.   Do you recognize this document?

3   A.   Yes.

4   Q.   What is it?

5   A.   It's an e-mail from me.

6   Q.   And it's sent to the IPLS board, is that right?

7   A.   Yes.

8   Q.   And in that e-mail you discuss this transition period?

9   A.   It was sent to a limited number of people, but it was sent

10  with the idea that Carmen would distribute it to the IPLS board.

11  Q.   And the date of this document is September 24, 2013, is that

12  right?

13  A.   Yes.

14          MR. NEIHAUS:  I would offer Exhibit 36 into evidence.

15                          (Defendants' Exhibit 36 was

16                          offered in evidence.)

17          MR. MILLER:  Your Honor, may I voir dire the witness

18  for purposes of an objection?

19          THE COURT:  You may.

20                      VOIR DIRE EXAMINATION

21  BY MR. MILLER:

22  Q.   Mr. Simpson, you're reviewing Exhibit 36 in front of you

23  right now, correct?

24  A.   Yes.

25  Q.   Do you see the second paragraph of the e-mail and then on

1  the second page two paragraphs are in what appear to be in bold

2  type?

3  A.  Yes.

4  Q.  Is that bold type you applied to this document?

5  A.  Yes.

6          MR. MILLER:  Thank you.

7          Your Honor, I object to hearsay, no other objection.

8          THE COURT:  I'll receive it, subject to the objection.

9          I would note that the probative value of documents of

10 this kind are not as to the truth of any matters contained

11 therein, but as to the intent and plan and reasons why the

12 witness did what he did, which in my judgment would not be

13 hearsay.  But that said, I will receive it, subject to your

14 objection.

15         MR. MILLER:  Thank you, Your Honor.

16                         (Defendants' Exhibit 36 was

17                          received in evidence.)

18         MR. NEIHAUS:  Also ask permission to publish?

19         THE COURT:  Yes.

20              DIRECT EXAMINATION (Continued)

21 BY MR. NEIHAUS:

22 Q.  Mr. Simpson, if you could look at the second paragraph you

23 bolded, you say, "This certainly is not intended to mean that we

24 are contemplating the transition to occur in the near future,

25 but we should have a period of overlap, perhaps many years,

1  where they might work together"...

2          And that was your expectation at the time, is that

3  right?

4  A.  Yes.

5  Q.  And the purpose of this transition was to make sure that

6  Dr. Savage-Rumbaugh's life work continues forever, right?

7  A.  The purpose for this documentation was we needed to get an

8  additional scientist involved because nothing was happening.

9  Nobody really wanted to push Sue out of the facility, but she

10 really wasn't there.  She was in New Jersey at this time.

11 Certainly no one wanted to dishonor the work she had done.  I

12 mean, she's world famous.  But we had to have somebody there.

13 We couldn't pay the utility bills at that point in time.  We had

14 no source of income.  What that would have meant is that once

15 IPLS went bankrupt, the Department of Agriculture would have

16 taken charge of those bonobos and they would have put them in a

17 sanctuary somewhere and they would no longer be available for

18 research because you can't do that kind of research in a

19 sanctuary.

20          We were scared to death that we were going to lose the

21 bonobo community for the citizens of Iowa.  We had to have

22 science in order to sustain the facility.  Nobody wanted to

23 offend or insult Sue in any way, still don't; but she wasn't

24 functioning.

25 Q.  So you wanted to bring in an assistant --

1   A.   We needed -- we had to bring in somebody.

2   Q.   To make sure that her life work continued forever, is that

3   right?

4   A.   That was my intent, yes.

5   Q.   And you told Dr. Jared Taglialatela that the purpose of this

6   transition was to make sure that Dr. Savage-Rumbaugh's life work

7   continues forever, is that right?

8   A.   I told Carmen that my recommendation was that we proceed on

9   this plan.  She circulated it to the board, I assume, and I'm

10  not directing the facility.  All I'm trying to do is advise

11  them.  I'm saying this is a plan that I think would work.

12  Q.   So you were counsel for IPLS at the time?

13  A.   Yes.

14  Q.   And you advised -- and this was your advice to them, right?

15  A.   Yes.

16  Q.   And if I could direct you back to Exhibit 30.  If you could

17  please turn to page 2, the last full paragraph in the e-mail

18  that you authored, starting at the second sentence, you said,

19  "We want a strong team to make sure that her" -- that is,

20  Dr. Savage-Rumbaugh -- "life work continues forever."

21           Is that right?

22  A.   Yes.

23  Q.   And that's what you told to Dr. Taglialatela who was a

24  recipient of that e-mail, right?

25  A.   Assuming he read it, yes.

1  Q.  And even later in September of 2013 when Dr. Taglialatela

2  was considering the nomination to be the Director of Science at

3  IPLS, you told him that you were trying to ensure that

4  Dr. Savage-Rumbaugh's world class work continues, right?

5  A.  I don't recall telling him that, but I certainly would have.

6  Q.  I would like to identify Exhibit 37 for the record, which is

7  an e-mail authored by Mr. Simpson on September 27, 2013 to

8  Dr. Taglialatela.

9         Mr. Simpson, are you at Exhibit 37?

10 A.  Yes.

11        MR. MILLER:  Your Honor --

12 BY MR. NEIHAUS:

13 Q.  And you wrote this e-mail, is that right?

14        MR. MILLER:  Excuse me, Counsel.  Point of order.  I

15 apologize.

16        I don't believe we received Exhibit 37 from you folks,

17 so if I could just see a copy, if we could take a moment.

18        THE COURT:  Certainly.

19        (Pause.)

20        MR. NEIHAUS:  And just to correct the record, we

21 believe that we did provide counsel with Exhibit 37.  And,

22 Counsel, after our discussion, I don't know if you want to

23 acknowledge that you did at some point receive that exhibit.

24        MR. MILLER:  Mr. Neihaus is saying we made some

25 objections to it in the pretrial order, so if we did, we

1   received it.  I don't have a copy of it here, but that's fine.

2   BY MR. NEIHAUS:

3   Q.  Mr. Simpson, you wrote this e-mail, is that right?

4   A.  Yes.

5          MR. NEIHAUS:  At this time I would like to offer

6   Exhibit 37 into evidence.

7                              (Defendants' Exhibit 37 was

8                               offered in evidence.)

9          MR. MILLER:  Your Honor, I'll reassert the objection

10  that's in the pretrial order.

11         THE COURT:  37 is received, subject to the objections

12  in the pretrial order.

13                             (Defendants' Exhibit 37 was

14                              received in evidence.)

15         MR. NEIHAUS:  Also ask permission to publish?

16         THE COURT:  You may.

17  BY MR. NEIHAUS:

18  Q.  Mr. Simpson, if you could please look in the first

19  paragraph, the fourth line from the bottom, halfway through

20  there's a sentence beginning "Sue and Duane."

21         Are you with me at that point?

22  A.  Are you talking about my message or are you talking about

23  page 2?

24  Q.  Page 1.

25  A.  Page 1.

1  Q.  The first paragraph in your e-mail, about halfway through

2  there's a sentence beginning "Sue and Duane."

3          Do you see that?

4  A.  Yes.

5  Q.  You told Dr. Taglialatela on September 27, 2013, that Sue

6  and Duane, together with many other scientists from around the

7  world, including yourself, have contributed so much to the

8  science of today, we want to make sure that this world class

9  work continues.

10          That's what you told Dr. Taglialatela, is that right?

11 A.  Yes.

12          THE COURT:  I do note that the exhibit has certain

13 comments about the content.  They're numbered 13, 14 and 15.  I

14 think in fairness to the witness we ought to indicate whether or

15 not those are his words or who wrote those things there.

16 BY MR. NEIHAUS:

17 Q.  Mr. Simpson, if you look on page 1 you see at the top in

18 bold, starts 13 and then says September 27, 2013 with a

19 description.

20          That's not your writing, is it?

21 A.  No.

22 Q.  And then if you look on the next page, the other numbered

23 paragraphs, those were not in your writing either?

24 A.  The bold language, no.

25          THE COURT:  I think so the record is clear where

1   somebody has editorialized, I think it's fair that I'm not going

2   to consider the numbered comments in the exhibit.

3           MR. NEIHAUS:  Thank you, Your Honor.

4   BY MR. NEIHAUS:

5   Q.  Mr. Simpson, I would like to ask you some questions about

6   being a registered agent in Iowa.  What is the purpose of a

7   registered agent in the state of Iowa?

8   A.  In the first place, it's a source of contact to the public.

9   So if you want to access that company, you serve the registered

10  agent.  The Iowa Secretary of State's office also maintains a

11  register for all corporations licensed to do business in the

12  state of Iowa, and they require a registered agent so that not

13  only they have a contact source, but so that they can look to

14  that contact source to keep the reports current so that the

15  corporation continues to exist.

16          In our office we go beyond that, we serve as

17  registered agent for 2,000 companies and many doing business in

18  Iowa from outside the state, and so our objective is to preserve

19  their existence.  For our own clients I probably have -- I've

20  created several thousand corporations, but we maintain the

21  minute books for about 400 corporations and 200 limited

22  liability companies that we go further than that and try and

23  maintain their minutes to the best that they'll allow us to do

24  it.

25  Q.  So you're very familiar with the Secretary of State's

1   requirements for filings of corporations, is that right?

2   A.  Yes.

3   Q.  At one point you asked Dr. Savage-Rumbaugh to be the

4   registered agent for --

5   A.  No.

6   Q.  -- IPLS, is that right?

7   A.  No.

8   Q.  You never --

9   A.  I wouldn't have done that.  I don't know how that decision

10  was made.  We have a lot of clients that we represent where

11  we're not the registered agent.  That's the client's choice.  We

12  offer the opportunity for our firm to do that.

13  Q.  You provided Dr. Savage-Rumbaugh with the form to become a

14  registered agent, is that right?

15  A.  No.

16  Q.  You frequently had Dr. Savage-Rumbaugh sign forms on behalf

17  of IPLS, right?

18  A.  Yes, because she was the director.

19  Q.  And so forms such as a registered agent form, if you would

20  have brought it to her, you would have expected her to sign?

21  A.  I wouldn't have done that because that's not our policy.  We

22  attempt to serve as registered agents for our clients if they'll

23  allow us to do it, and probably half of them do.

24  Q.  So you keep track of who the registered agents are for your

25  companies?

1   A.   No.

2   Q.   You do not keep track of who the registered agents are for

3   your companies?

4   A.   No.  That's a decision for the company to make.  I keep

5   track of the clients that we're the registered agent of.

6   Q.   You offer your clients to serve as their registered agents,

7   right?

8   A.   Given the opportunity I do that, yes.

9   Q.   You spoke with Dr. Savage-Rumbaugh many times in 2011 and

10  2012, is that right?

11  A.   Certainly, but not about that subject.

12  Q.   You never brought that up to her, did you?

13  A.   I probably wouldn't.  I mean, that's --

14  Q.   Even though IPLS was your client?

15  A.   That's true.  I represent a lot of clients.

16  Q.   As IPLS's counsel, didn't you have a responsibility to make

17  sure that IPLS filed its biennial reports?

18  A.   Only if I'm registered agent.

19  Q.   Well, Mr. Simpson, a few moments ago I asked you the

20  responsibilities of a registered agent, and you did not list

21  filing a biennial report among them?

22  A.   No; I did.  I talked in terms of the Secretary of State's

23  requirement that those documents be handled -- you know, filed

24  by the registered agent.  I didn't use those words, but that's

25  exactly what I meant.

1   Q.  Have you ever filed a biennial report?

2   A.  Have I ever filed an annual report for a corporation?

3   Q.  Yes.

4   A.  We file many of them every year.  There are a lot of clients

5   that don't want to pay us to do their annual reports.

6   Q.  Mr. Simpson, you agree that IPLS was administratively

7   dissolved in August of 2013, correct?

8   A.  Sorry, but I'm getting a beep in my ear.  I can't hear

9   anything.

10          THE COURT:  The microphone is off.

11          THE CLERK:  The battery should have been okay, but

12   here is another set.  You may need to adjust the volume.

13   BY MR. NEIHAUS:

14   Q.  Mr. Simpson, can you hear me now?

15   A.  Yes.

16   Q.  Do you agree that IPLS was administratively dissolved in

17   August 2013, right?

18   A.  I now know that to have happened, yes.

19   Q.  You did not tell Dr. Savage-Rumbaugh, however, that IPLS had

20   been administratively dissolved, is that right?

21   A.  I'm not -- this went off again.

22          I'm not too sure she didn't tell me.  The procedure is

23   this:  The registered -- do I have sound?

24          THE COURT:  You don't have sound either.  Sometimes if

25   you hold -- if you jostle it a little, the thing at the bottom,

1   it will work.

2            MR. STAMBAUGH:  I think we've lost all the mics.

3            THE CLERK:  The system is down.

4            THE WITNESS:  Can you hear me now?

5            THE CLERK:  I've let IT know.

6            THE COURT:  Okay.  We'll forge ahead.  We'll do it the

7   old fashion way.  Everybody speak up and go slow.

8            THE WITNESS:  Okay.

9   A.  (Continuing)  Sometime in January the Secretary of State

10  sends a postcard to the registered agent for all corporations

11  that has a code on it that allows them to access the Secretary

12  of State records so that they can file an annual report.  It's a

13  simple process.  It doesn't take long.  I think there's a small

14  filing fee.

15           If that isn't done by March 31st, at that point in

16  time, the Secretary of State starts preparing a report of all

17  those corporations that haven't filed, and they forward that to

18  the Iowa Attorney General's office.  The 1st of August of that

19  year the Attorney General then administratively dissolves

20  corporations that haven't filed because they assume they've gone

21  out of business.

22           The Secretary of State then sends a letter sometime in

23  mid August saying that this has happened to your corporation,

24  it's a second reminder, so that if you didn't intend for that to

25  happen or you missed the mailing -- it looks like bulk mail and

1  many clients simply throw it away, which is one of the reasons

2  we offer that service for clients because we know what we're

3  looking at and a client could easily miss it.

4         If that happens, when you get that letter from the

5  Secretary of State saying you've been administratively

6  dissolved, you then have a chance to do something about it.

7         My first notice that IPLS and Bonobo Hope had neither

8  one filed their annual report was when Sue showed me a copy of

9  those letters.  I think it was Sue.  Somebody did in the

10 organization; but I was pretty sure it was Sue.  At that time

11 our procedure is to go back, determine what wasn't filed,

12 prepare that document, prepare an application, send it with the

13 fees to the Secretary of State and have it reinstated, in which

14 case it's reinstated retroactively back to the time that it was

15 administratively dissolved as if nothing had gone wrong.

16        I had Sue sign those documents.  I think at that point

17 in time I also had her sign something changing the registered

18 agent to what we call Iowa Registered Agents, Inc., which is the

19 corporation that's owned by my law firm that handles all of

20 those registrations for at least 2,000 clients.

21        The problem then -- I prepared the documentation and I

22 filed it with the Secretary of State.  Bonobo Hope got

23 reestablished.  IPLS didn't because part of the process the

24 Secretary of State goes through before they'll reform a

25 corporation is they go to the Department of Revenue and

1    determine are there any liens against this corporation because

2    they require those payments to be made before they'll

3    reestablish the corporation.

4         Ted Townsend, when he was -- when his board was

5    running IPLS, there's a quirk in nonprofit corporation law that

6    allows them to opt out of paying unemployment taxes on the

7    payroll of their employees.  I think that was created by

8    churches.  I have no clue why on earth there should be an

9    exemption.  So no unemployment taxes were ever paid on the IPLS

10   employees up through December 31, 2011.  When Ted Townsend quit

11   paying for all of those employees, they were let go, and many

12   filed for unemployment.

13        What happens then is it made IPLS the self-insurer of

14   those unemployment payments, and so Work Force Development in

15   the State of Iowa, they paid them, but they filed a lien, and

16   that lien at that time I think was approximately $60,000.  Well,

17   at this point in time, we didn't have the money to pay the

18   utility bill, let alone to pay $60,000 to get the corporation

19   reestablished.  So we weren't able to do it.

20        The problem that that caused that I could see is that

21   we no longer had a corporate shield around the Board of

22   Directors and yet we've got a facility that we're trying to open

23   to the public, and that made them personally liable for the risk

24   of operating the Great Ape Trust.  And so my recommendation to

25   them at that time is that we need to create a new entity so you

1  have a corporate shield and we need to have the facility owned

2  by that entity so that you don't have a big liability, either

3  that or you've got to come up with the money to pay off this

4  lien so we can get your corporation reestablished.

5  BY MR. NEIHAUS:

6  Q.  Mr. Simpson, one question about the lien.  When did you

7  first learn about that tax lien?

8  A.  Tell me what?

9  Q.  When did you first learn about that tax lien?

10 A.  When I was shown the letter that came from the Secretary of

11 State in August that said the corporation had been dissolved.

12 Q.  Didn't you write a letter to Ted Townsend in March of 2012

13 asking for funds to pay the tax lien?

14 A.  I asked -- I knew what was going on because every time they

15 make a payment, they send a statement and it was going to the

16 corporation, and so I knew that the unemployment taxes for those

17 employees was an obligation of IPLS.  I was worried about the

18 liability of IPLS.  It had nothing to do with the annual report.

19 Q.  So you knew at least by March 2012 that IPLS had this

20 outstanding tax obligation, is that right?

21 A.  Yes.

22 Q.  And you said you knew that from the corporate statements

23 that you received, is that right?

24 A.  I knew it had a tax liability.  I didn't know for sure that

25 they had filed a lien, and once I tried to get IPLS

1   reestablished, I found out that the lien was there, and it

2   didn't surprise me; but it did say to me we either pay the lien

3   or we've got to create a new entity or you've got public

4   liability for everybody you allow on the premises, including the

5   people who are there maintaining the bonobos.

6   Q.  You said you knew about the tax liability again before you

7   knew about the lien.  You knew about the liability --

8   A.  I knew about the unemployment lien -- or not lien, but the

9   unemployment obligation to Work Force Development.

10  Q.  How did you know about that obligation?

11  A.  Because they send out a piece of paper every time they make

12  payments on a monthly basis to employees who have filed for

13  unemployment.

14  Q.  Who sends out a monthly statement?

15  A.  Work Force Development.

16  Q.  And that's an entity of the State of Iowa?

17  A.  It's the state agency that pays the unemployment.

18  Q.  How did you come to receive those statements?

19  A.  They would be mailed to -- they probably were mailed to the

20  trust.

21  Q.  How did you then receive those statements from the trust?

22  A.  Somebody would have asked me what's this about, I'm sure, at

23  least that would be my guess.  I have no memory of it.

24  Q.  I would like to ask you about an event that occurred in

25  October of 2013.  At that time the BHI board approved -- I'm

 1  sorry.

 2          In October of 2013, you're familiar that

 3  Dr. Savage-Rumbaugh recommended that the IPLS board appoint

 4  Drs. Jared Taglialatela and Bill Hopkins to positions with the

 5  facility?

 6  A.  They had recommended Jared.  When Jared came to visit, he

 7  brought Bill Hopkins with him, and they decided they would split

 8  up the responsibilities between the two of them if they were to

 9  accept.  And if my memory serves me, we went back either to Sue

10  or to Duane and indicated that this is what they wanted to do.

11  And they thought that was great, and so they, in essence,

12  nominated both of them.

13  Q.  And in November of 2013, the BHI board approved

14  Dr. Savage-Rumbaugh's recommendations to appoint

15  Drs. Taglialatela and Hopkins, is that right?

16  A.  Both boards approved it.

17  Q.  You never told the BHI board before that vote that

18  Dr. Savage-Rumbaugh had previously been kicked off the IPLS

19  board, is that right?

20  A.  I don't recall that; but I don't know why it would have been

21  my responsibility to do that.

22  Q.  And you never told the BHI board before November of 2013

23  that Dr. Savage-Rumbaugh had been banned from the IPLS facility

24  by George Caudill, is that right?

25  A.  I thought that was a very temporary situation.  Dr. Rumbaugh

1  had not been there since April.  All of a sudden she showed up

2  at the facility because young Teco apparently was ill, and she,

3  in essence, took charge.  And the result of that was I get a

4  call from George Caudill saying, the director of the facility

5  and the veterinarian are both quitting.  What do we do?

6          And I said, tell me what's going on.

7          And he said that Sue had come in there and was

8  undermining -- she took charge.  She was undermining their

9  authority, and both of them were upset.  I have a home down in

10  Lake of the Ozarks and I was down there.  There wasn't anything

11  that I could do.  But he was concerned, and he knows that at

12  least I can talk with Sue and hopefully she would listen, and

13  what he wanted was that she back off because the tidal wave that

14  was being created by her simply showing up and taking charge was

15  more than he could manage at that point.  I think this was over

16  a weekend.

17          I explained to Sue three different ways that her

18  behavior was causing problems and that we needed to modulate

19  what she was trying to do.  Nobody was trying to kick her out.

20  Q.  When did you explain this to Sue?

21  A.  Oh, heavens, I probably spent 20, 30 hours that weekend back

22  and forth in conversations with a lot of people.  I tried to --

23  the best analogy that I can give to the situation at that point,

24  we were operating with volunteers, and these are people that are

25  there because they loved the bonobos and they're willing to work

1  for them for nothing.  We -- my best analogy I used -- I have 30

2  years in the military, and I used the military context which

3  hopefully makes sense out of what I was trying to say.

4  Everybody there would have known who Sue Rumbaugh was.  She's a

5  world famous name.  I characterized her as if she were a general

6  and she's come down to a company level organization where we've

7  got a captain that's in charge and we've got all of these

8  workers, and she was doing things directly with the workers that

9  were in contradiction to the instructions that they had had from

10 their captain.

11 Q.  This captain that you're referring to is George Caudill, is

12 that right?

13 A.  No.  It was Julie Gilmore and Steve Boers.

14 Q.  Wasn't George the president of IPLS at the time?

15 A.  Yes, but he's not running the facility and --

16 Q.  Wasn't George the individual who made the decision to ban

17 Sue from the lab on November 9th?

18 A.  You're way ahead of me in the story.

19 Q.  Sir, I would just like you to answer this question.

20 A.  He's the one that acted.  With the corporation, you have the

21 member group that owns it.  With IPLS, the members and the board

22 are identical.  You have the board that makes the policy

23 decisions, and then you have the officers that carry out the

24 work of the company.  The work of the company would be by the

25 directors, and the directors in this case were -- Julie is the

1  veterinarian.  At that time she probably was director of the

2  facility -- no.  Steve Boers was still director of the facility,

3  but --

4  Q.  But, Mr. Simpson, my question is George Caudill, the chair

5  of IPLS at the time, is the one who made the decision to ban Sue

6  from the laboratory, isn't that right?

7  A.  That was the only solution that he could come up with that

8  solved the problem that he was dealing with that would keep

9  Julie Gilmore and Steve Boers working in the facility.

10  Q.  And you thought he was overreacting, right?

11  A.  I didn't know.  I knew that there was havoc going on.  I

12  wasted a whole weekend on the phone talking to people.

13  Q.  But you felt George Caudill was overacting by banning Sue

14  from the lab and you told him that, right?

15  A.  Probably.

16  Q.  Do you doubt whether you told him that?

17  A.  I can't remember, but I --

18  Q.  Mr. Simpson, please --

19  A.  That to me is kind of a final solution.  It was temporary.

20  All he was trying to do is not lose his people.

21  Q.  Mr. Simpson, if I could please direct your attention to the

22  transcript of your deposition, which I will get from the side

23  for you.

24         At this time I would like to direct your attention to

25  page 122, starting at line 21.

1         Mr. Simpson, isn't it true in your deposition you were

2    asked the following question and gave the following answer:

3         "Q.  Was it your understanding that as of the

4         afternoon of Sunday, November 10, that Sue had been

5         banned from the lab and had been dismissed from her

6         position as director of science by George?

7         "A.  I don't know when that occurred.  He told me that

8         he did it.  I think he felt that that was the only emergent

9         thing that he could do at that time to get order again and

10        not lose his key people.  But whether he overreacted, which

11        is kind of what I told him -- I says 'You've got to have a

12        better solution.'  But, you know, I wasn't there."

13        Did I read that transcript correctly?

14   A.  It would sound like something I would have said under those

15   circumstances.

16   Q.  Mr. Simpson, did I read -- could you please just answer --

17   A.  It is what I said, yes.

18   Q.  Mr. Caudill, who made the decision to ban Sue from the lab,

19   is the same one, is the same individual who previously told Sue

20   that with complete confidence she will always be welcome to

21   rejoin the bonobos and continue her research as she sees fit,

22   isn't that right?

23   A.  No one had ever seen this form of behavior from Sue before.

24   Q.  You testified that Sue returned to take care of the bonobos,

25   right, to take care of Teco because she felt he was sick?

1  A.  Nobody had seen Sue for six months.  When she showed up, she

2  acted like she was still in charge of the facility, and that was

3  more than the people that were in charge of the facility could

4  deal with.  That was never contemplated.  It's not saying that

5  from her perspective she was wrong.  I'm not sure what

6  information she had that she was acting on.

7  Q.  So Dr. Savage-Rumbaugh was kicked out of the lab on

8  November 9, 2013, and after that time, later in that same month,

9  the BHI board accepted Sue's recommendation to appoint

10  Drs. Jared Taglialatela and Bill Hopkins in a vote, isn't that

11  right?

12  A.  Yes.

13  Q.  And before that vote occurred, you never told the members of

14  the BHI board that Dr. Savage-Rumbaugh had been banned, isn't

15  that right?

16  A.  That wasn't my obligation to tattle on Sue.  My guess is --

17  Q.  And you didn't tell the BHI board members that she had been

18  banned?

19  A.  I had no responsibility to tell them that.

20  Q.  So you didn't do that?

21  A.  Of course not.  I'm not trying to air dirty laundry for Sue

22  publicly.

23  Q.  And you never told the BHI board --

24  A.  That wasn't a permanent ban, by the way.  It was to get her

25  out of the facility that weekend.

1  Q.  So you expected that she would be back?

2  A.  Of course.

3  Q.  And before that vote which appointed Drs. Jared Taglialatela

4  and Bill Hopkins, you never told the BHI members that

5  Dr. Savage-Rumbaugh had been kicked off of the IPLS board, isn't

6  that right?

7  A.  That I don't remember because, keep in mind, I don't attend

8  their meetings.  I heard from George at some point in time, and

9  I cannot now remember when, that -- we had a provision in the

10  bylaws that if you missed three meetings without an accepted

11  excuse, that you, in effect, had resigned.  We also had a

12  provision in the bylaws that the majority of the board could

13  remove another director if necessary.  For some reason or

14  another in the middle of the summer, they got tired of

15  attempting to keep Sue informed because she was never responding

16  to anything.  They sent Julie Gilmore over to her house, and she

17  wouldn't let her in even.  I talked to several people, Liz and

18  Shawn, I think, relatives of Sue.  I understood that Sue was

19  dealing with depression.  I've seen Sue before when she deals

20  with depression.  She gets catatonic.  And there was no way to

21  contact her, and so they got tired of trying, and they simply

22  agreed that, okay, we won't consider her a board member.

23  Q.  And that was in the summer?

24  A.  Somewhere in the summer, and I can't tell you when, but I --

25  Q.  So when the vote came in November of 2013 to appoint

1  Drs. Taglialatela and Bill Hopkins, before that you never told

2  the BHI board members that Dr. Savage-Rumbaugh had been kicked

3  off the IPLS board, right?

4  A.  I had no obligation to do that.

5  Q.  So you didn't do it?

6  A.  Of course not.  That's not -- I'm not trying to defame Sue

7  in any way.  She could tell anybody she wanted to.

8  Q.  Sue's being banned from the facility and kicked off the

9  board, that ruined your weekend, right?

10 A.  We didn't think she -- I wouldn't use the term she was

11 kicked off the board.  I think she simply ceased to participate.

12 Q.  When Sue was banned from the lab, that ruined your weekend,

13 right?

14 A.  Tell me again?

15 Q.  When Sue was banned from the lab on November 9, 2013, that

16 ruined your weekend, right?

17 A.  Yes.

18 Q.  You were on the phone with everybody you said?

19 A.  I would say that --

20 Q.  You were on the phone with people frequently discussing the

21 situation, right?

22 A.  I'm trying to figure out how we not lose all of the people

23 that were working there.

24 Q.  George you felt was overreacting?

25 A.  That would be my guess, yes.

1  Q.  And only a few days later when BHI held its vote to appoint

2  Drs. Taglialatela and Bill Hopkins, you did not think it was

3  important to tell the BHI board members what had happened?

4  A.  No.  I don't think that's my responsibility.  Sue was on the

5  BHI board.  She could tell them anything that she wanted to.

6  But why would I make her look bad to her own board?

7  Q.  Now, moving to December 18th of 2013, IPLS passed a

8  resolution acknowledging that Dr. Savage-Rumbaugh had been

9  kicked off the board in July of 2013, right?

10  A.  They claimed that that had happened.  I've never seen

11  anything documenting that.  To me that's an important issue.  So

12  I advised the board that that's something that they needed to

13  record if that, in fact, happened.

14  Q.  But you never told Dr. Savage-Rumbaugh in July of 2013 or in

15  December of 2013 -- strike that.

16          But you didn't tell Dr. Savage-Rumbaugh in December of

17  2013 that IPLS had passed that resolution, did you?

18  A.  I don't recall.

19  Q.  Mr. Simpson, I would now like to ask you some questions

20  about events that occurred on December 18, 2013 regarding the

21  establishment of Ape Cognition and Communication Institute,

22  ACCI.

23          On December 18, 2013, you sent an e-mail to

24  Mr. Zifchak, who was counsel for Dr. Savage-Rumbaugh at the

25  time, isn't that right?

1    A.   Yes.

2    Q.   You sent this e-mail at 6:23 p.m., on December 18th of 2013,

3    right?

4    A.   Right.

5    Q.   And in that e-mail you told Mr. Zifchak that you were

6    considering forming a new entity to assume ownership of the

7    bonobos, right?

8    A.   I'm not sure that I said -- I'm not sure what I said in it,

9    but I was informing him -- in the first place, I had been trying

10   to talk Bill Zifchak, as well as Julie Flattery, into becoming

11   counsel for Bonobo Hope.  I had been looking for somebody to

12   replace -- I would love to have somebody replace me with both

13   organizations.  I've got over $300,000 worth of my time invested

14   pro bono, and I can't afford to keep this up; but I've never

15   been able to find anybody who would accept the responsibility.

16   And the problem that you've got in what I do is you just can't

17   walk away, but --

18   Q.   But this e-mail that you wrote to Mr. Zifchak --

19   A.   So I think I told him -- I can't remember, but I had a

20   conversation with him on the telephone, and he was reluctant to

21   get involved.  And I don't think he felt he was involved at that

22   point in time.  In fact, I think he was thinking of retiring.

23   Q.   When was this conversation on the telephone?

24   A.   Earlier in December 2013.  I would have to go back to my

25   time record to determine that, but -- so I was simply putting

1  him on notice that we had filed -- in fact, I probably wrote

2  that message before they made the decision and we went ahead and

3  filed it because I didn't know what the name was going to be

4  until they were in the middle of this meeting, and I wanted to

5  put him on notice that because IPLS, we were not able to get it

6  reconstituted, we had to create a new organization, because I

7  didn't want him to be surprised about that, and what I really

8  needed to know was on the basis of the lawsuit, is that

9  something we needed court approval.

10 Q.  So let me make sure I'm understanding your testimony

11 correctly.  We have this e-mail here of December 18, 2013 that

12 you have acknowledged sending to Mr. Zifchak.  Your testimony is

13 earlier in the month you had actually called Mr. Zifchak --

14 A.  Yes.

15 Q.  -- and had a discussion about IPLS and BHI?

16 A.  Yes.

17 Q.  You sure of that?

18 A.  That's my memory.

19 Q.  Mr. Simpson, I would now like to direct your attention to

20 Exhibit 59, which pursuant to the pretrial order is a category A

21 and has been admitted into evidence.

22         Mr. Simpson, are you on Exhibit 59?

23 A.  Yes.

24 Q.  Is this the e-mail that you wrote to Mr. Zifchak on

25 December 18, 2013?

1  A.  Yes.

2  Q.  And you start the e-mail, "Bill, a voice out of your past"?

3  A.  Yes.  He and I had been --

4  Q.  You were contacting Mr. Zifchak after not having been in

5  contact for a long period of time?  That is why you are the

6  voice out of the past?

7  A.  Well, he and I have had a lot of conversations ever since I

8  first got involved.

9  Q.  But if you had spoken to him a week prior, you wouldn't have

10 written "a voice out of your past"?

11 A.  That's probably true.  I can't tell you when I talked to him

12 before.

13 Q.  I'm sorry?

14 A.  I can't tell you exactly when I talked to him before.  I was

15 more than frustrated when I found out we didn't have a

16 corporation.

17 Q.  So you did not actually speak to him on the phone in the

18 weeks before sending this e-mail?

19 A.  My memory tells me that at some point in time after I found

20 out I had a problem with IPLS and needed to form another

21 organization, that I needed to talk to Bill.

22 Q.  And then the second sentence of the e-mail says, "I have a

23 very novel question to ask you."

24 A.  Yes.

25 Q.  Do you see that?

1  A.  Yes.

2  Q.  So this is the first time you're bringing the issue to him?

3  A.  This is the first time I what?

4  Q.  This is the first time you're bringing the issues mentioned

5  in the e-mail to him?  That's why it's novel?

6  A.  That's probably right, yes.

7  Q.  And in this e-mail you told Mr. Zifchak that you were

8  considering forming a new entity, isn't that right?

9  A.  Yes.

10 Q.  And that new entity was to assume ownership of the bonobos,

11 isn't that right?

12 A.  Yes.

13 Q.  You said that IPLS at that time was subject to a $75,000 tax

14 lien from the State of Iowa that it could not pay, right?

15 A.  It had gone up with interest, yes.

16 Q.  And that the entity had been administratively dissolved and

17 you could not reinstate it, is that right?

18 A.  Yes.

19 Q.  You said that this new entity would assume IPLS's

20 responsibility for all of IPLS's assets, including the bonobos,

21 but not responsibility for the tax lien, right?

22 A.  There's other debts that Ted Townsend had left with IPLS.

23 And what I was trying to do was walk the line of fulfilling the

24 obligation to the bonobos without bringing all of the history of

25 Ted Townsend's organization with it.

1  Q.  So the new entity would assume all the assets of IPLS but

2  not the debts?

3  A.  That's the point.  Then it had a different board, and that

4  was protection from creditors.

5  Q.  Well, it had the same board, right?

6  A.  Well --

7  Q.  All of the members of the ACCI board were the members of the

8  IPLS board?

9  A.  Yes, most of them.

10 Q.  And in this e-mail you asked Mr. Zifchak if he thought that

11 you required federal court approval to do this transaction,

12 right?

13 A.  That was my question.  I wasn't part of the lawsuit, so I

14 really didn't know the content of what the issues were.

15 Q.  So you were asking Mr. Zifchak if this transaction required

16 the court's approval?

17 A.  Yes.

18 Q.  Mr. Simpson, you really did not want to know whether you

19 needed this court's approval, did you?

20 A.  That was my reason for the question.

21 Q.  Isn't it true that by the time you wrote this e-mail first

22 informing Mr. Zifchak that you were considering forming a new

23 entity, that new entity, ACCI, in fact, already had been formed?

24 A.  I had written this message before.  I didn't send it until

25 afterward.

1  Q.  Isn't it true that by the time you sent this e-mail, the new

2  entity discussed --

3  A.  It had been formed about three hours ahead of this message

4  going out.

5  Q.  So ACCI, in fact, already was formed by the time you sent

6  this e-mail?

7  A.  Yeah.  I didn't go back and correct that language.  That

8  wasn't -- to me that wasn't relevant.

9  Q.  More than that, by the time you sent this e-mail to

10 Mr. Zifchak, IPLS, in fact, already had transferred the bonobos

11 to ACCI, isn't that right?

12 A.  It had agreed to do it.

13 Q.  It had signed the bill of sale agreeing to transfer the

14 bonobos, right?

15 A.  The bill of sale memorialized the decision they made in that

16 board meeting.

17 Q.  The board meeting --

18 A.  On December 18th.

19 Q.  So you're telling me there was a board meeting --

20 A.  There was a physical board meeting in my office, I attended

21 probably 10 percent of it, in order to get the administrative

22 functions decided.  They met there all day.  December is not a

23 month that I would give up pro bono to anybody because we do

24 twice the volume in December as we do in any other month of the

25 year, and we have fewer days to do it in because of holidays.

1 And so I said if you need to have me present for part of your

2 meeting, then you're welcome to meet in our office if you would

3 like to do that.  I need to have some specific questions

4 answered, and that was one of them.

5 Q.  So that was 9:00 a.m., on December 18th of 2013, right?

6 A.  Where do you get the 9:00 a.m.?  Is that on the minutes?

7 Q.  I'm asking you from your memory.  The meeting occurred at

8 9:00 a.m.?

9 A.  It probably would have started at that point in time.  It

10 went all day.  I spent an hour of that time with them probably

11 at best.

12 Q.  And in that meeting ACCI accepted -- strike that.

13         And in that meeting ACCI passed a resolution agreeing

14 to receive the bonobos from IPLS, right?

15 A.  Yes.

16 Q.  And it memorialized that in a bill of sale, correct?

17 A.  Yes.

18 Q.  That all occurred before you sent your e-mail?

19 A.  Yeah, that's probably right.  Because I sent the e-mail only

20 after the meeting was over.  I didn't want to send the e-mail

21 until I knew the decisions had been made.  I wasn't trying to

22 make the decisions for them, but I --

23 Q.  You did not seek this court's approval before doing the

24 transaction, isn't that right?

25 A.  No.  But then I didn't look at myself as even being a part

1   of this court's action.  IPLS was represented by Paul Burns.  I

2   hadn't even talked to him.

3   Q.  So before this transaction occurred, you did not ask

4   Mr. Zifchak his opinion about whether court approval was

5   required?

6   A.  Well, I didn't know.  I didn't ask him that question until I

7   knew they made the decision to do it.  My concern, what I was

8   doing at that time was protecting the liability of these board

9   members from the public, and I had to have a corporate shield.

10  Now, in a business you make decisions collectively in board

11  meetings.  You document all of those things typically sometimes

12  quite a ways afterwards.  Sometimes you never document it until

13  all of a sudden you're forced to.

14  Q.  Clearly you had the idea in your head that this transaction

15  might require court approval, right?

16  A.  I didn't know.  It was a question that was raised in my mind

17  and I was worried about it.

18  Q.  And you were counsel to IPLS and ACCI when it was

19  established at the time?

20  A.  Yes.

21  Q.  What if the transaction did require court approval?

22  A.  Then I needed to get somebody who was going to submit it to

23  the court so it could get approved.

24  Q.  And you never looked into that before the transaction

25  occurred?

1  A.   No.  It was not on my mind until all of a sudden I'm trying

2  to put all the pieces together and I'm saying this is one that I

3  don't know the answer to.

4  Q.   Mr. Simpson, didn't you testify that you drafted the e-mail

5  to Mr. Zifchak several days before you actually sent it?

6  A.   I did this -- I'm not sure in terms of timing --

7  Q.   You said you drafted it at one point and then sent it in at

8  a later point?

9  A.   That's right.

10  Q.   Is it fair to say there was at least a day in between those

11  two then?

12  A.   That was --

13  Q.   You wrote the e-mail at least a day before you sent it?

14  A.   That was pro bono time.  I've got a whole bunch of clients

15  backed up wanting things done by December 31st for tax reasons.

16  I fit things in pro bono when I can.  I typically work 7:00 to

17  7:00, half days, but at that point in time I was working until

18  9 o'clock at night, and at my age it's getting hard to do.

19  Q.   And I would like to ask you some questions about the Yerkes

20  Regional Primate Research Center.  Are you familiar with that

21  entity?

22  A.   Other than the fact I've heard the name and I know that

23  Duane Rumbaugh had something to do with setting it up, and I

24  know it's in Georgia; but beyond that, I have very little

25  knowledge about it.

1  Q.  Isn't it true that in order for ACCI to acquire bonobos from

2  the Yerkes Regional Primate Center at this point or anytime

3  after it was formed, Dr. Savage-Rumbaugh and Dr. Duane Rumbaugh

4  cannot be associated with ACCI in any way?

5  A.  I was told -- and probably by one of the Rumbaughs -- that

6  they had had problems when they were exiting Georgia to bring

7  the bonobos to Iowa, and Yerkes was mentioned at that point, I

8  think probably by Duane because most of my conversation about

9  that was with him.  So I knew that there was some issues.

10       What was happening, because of the research that Sue

11  has done with these bonobos, she has shown that the difference

12  between the bonobo and the humans is very narrow.  Genetically

13  it's a percent-and-a-half.  She showed that these bonobos have

14  feelings and aspirations that are close to human.  That caused

15  people that were using apes to do medical research to have a

16  real hiccup because now all of a sudden you're doing bad things

17  to people -- you know, to animals that have the same kind of

18  feelings that we do.

19       And so as a result of that, the Director of the

20  National Institute of Health, being sympathetic to Sue's view,

21  determined that no longer can we do biomedical research with

22  apes.  The problem that that causes is that they owned, I don't

23  know, close to 500, I assume, chimpanzees around the world that

24  were being used for medical research that they no longer had a

25  need for.  Yerkes has quite a few chimpanzees.  There is a bill

1  that passed Congress that said that the NIH chimpanzees could be

2  furloughed, and there was a -- if my memory serves me, something

3  like $15,000 a year retirement fund for chimpanzees to cause

4  people to be willing to take them.  That's never really been

5  funded, but that was the first half of the legislation.

6          Yerkes owned a bunch of these chimpanzees.  They

7  simply wanted to get rid of them, and they were willing to pay

8  money up front instead of the $15,000 a year for somebody to

9  take them.  We've got a facility at the Great Ape Trust that's

10  not being used that was originally used for the gorillas, but

11  when Ted quit funding them, the gorillas were moved.  So it's an

12  empty building and it could house I've been told about 20

13  chimpanzees.  If we got the Yerkes money up front, we would have

14  money then that we could pay the utility bills out over the

15  course of the winter, which is what everybody was worried about,

16  and continue paying some of the salaries for key people.

17          Jared and Bill Hopkins have access and a relationship

18  with Yerkes and were a source of the potential of bringing these

19  bonobos to Des Moines and we were hoping right now.  Because of

20  Sue's prior history, my understanding at that point was that

21  they wanted assurance that this was not a facility Sue was still

22  running.  And so, consequently -- and I can't remember in terms

23  of exact timing, but I told Sue this was a pending problem.  And

24  she offered to go down there and clean up her relationship with

25  the folks in Georgia.  I suggested that she not do that at that

1  point in time because I didn't think anybody should get between

2  Jared and Bill if they were capable of bringing them here and,

3  you know, cause problems because I was -- my concern at that

4  point in time for the organization, looking at it from the

5  outside, was that if they don't have the source of funding to

6  pay the heating bill, this organization is not going to be here.

7  And so that was the imminent problem at that time, and Sue was a

8  component of it because I had understood that they at least

9  wanted assurance that she wasn't running the facility or they

10  weren't going to give the chimpanzees to them.  That was my

11  knowledge at that point.

12  Q.  If I could please, I would like to identify for the court

13  Exhibit 38.

14      Mr. Simpson, if you could please turn to Exhibit 38.

15  A.  Yes.

16  Q.  Do you recognize this document?

17  A.  Yes.

18  Q.  What is this document?

19  A.  This is -- once this lawsuit was going forward, I said to

20  George Caudill, tell me what it is that Yerkes actually said.

21  What's causing the problem?  Why are we dealing with this issue

22  with Sue?

23      And this was sent to me in an e-mail from George.  He

24  said the first question in the application that IPLS or now ACCI

25  would have to submit to Yerkes to get these chimpanzees, this

1  was the first question that they asked and --

2  Q.  And the question -- I'm sorry, continue.

3  A.  Tell me what?

4  Q.  I'm sorry, I didn't want to cut you off.

5  A.  No.  I was just saying that this was far more descriptive

6  than anything that I had understood before then and, frankly, I

7  didn't know that it was intended to include Duane; but,

8  obviously, he lives in New Jersey and so that's not really an

9  issue, but --

10  Q.  And these questions that were on the questionnaire, the

11  first one is, "Are either of the Rumbaughs associated with your

12  sanctuary in any way at this time," right?

13  A.  That's the first question.  And then the second part of that

14  question is, "Can you guarantee they will have no more

15  involvement?"  And that's what apparently Jared and Bill Hopkins

16  were faced with.

17          MR. NEIHAUS:  At this time I would offer Exhibit 38

18  into evidence.

19                          (Defendants' Exhibit 38 was

20                           offered in evidence.)

21          MR. MILLER:  Objection, Your Honor.  Keeping in mind

22  your prior statements with respect to hearsay, I do think this

23  has a different quality.  It is hearsay and I would reassert

24  that objection.

25          THE COURT:  I will receive it, subject to the

1    objection again.  I don't think it has any probative value for

2    the truth of the matter asserted, merely evidence of a question

3    that was asked; but it's received, subject to the objection.

4                              (Defendants' Exhibit 38 was

5                              received in evidence.)

6         THE COURT:  I think what we'll do since we're paused

7    here is we'll take our mid-morning recess.  We're in recess for

8    15 minutes.

9         (Recess at 10:35 a.m., until 10:55 a.m.)

10        THE COURT:  Please be seated.

11        Counsel.

12   BY MR. NEIHAUS:

13   Q.  Mr. Simpson, before the break we were discussing the Yerkes

14   Regional Primate Research Center and the restrictions it put on

15   Dr. Sue Savage-Rumbaugh having an association with ACCI or

16   formerly IPLS.  If it wants bonobos from Yerkes, then ACCI or

17   formally IPLS could not even say that Dr. Savage-Rumbaugh had

18   taken a leave of absence, right?  It had to say that she has

19   retired?

20   A.  I don't really know what they would have to say for Yerkes

21   to accept.  All I know is that this is the statement that was

22   shown to me in the last few months.  I've never seen the

23   application.

24   Q.  You are aware of the Yerkes restrictions prior to the last

25   few months, right?

1  A.  I was aware of the fact that they were concerned about Sue

2  for some period of time.

3  Q.  I would like to identify for the record Exhibit 51, which is

4  an e-mail from Lyle Simpson to Dr. Savage-Rumbaugh dated

5  December 12, 2013.

6         Mr. Simpson, are you looking at that exhibit?

7  A.  Yes.

8  Q.  This is the e-mail that you wrote?

9  A.  Yes, uh-huh.

10  Q.  And in the second paragraph of the e-mail you say, "The only

11  real problem that I have with what you have outlined is that we

12  must say that you have 'retired' from IPLS in order to be able

13  to answer the Yerkes questionnaire honestly."

14  A.  That was my understanding.  That's what was told to me.

15  Q.  You continue, "We cannot say that you have taken 'a leave of

16  absence' if we want to acquire Yerkes' chimpanzees which Jared

17  and Bill wish to bring to Des Moines."

18         That was your understanding at the time, right?

19  A.  That's what I was told.  I'd never seen the reason for it.

20  Q.  And then you continue, "That does provide immediate capital

21  so it is an avenue the IPLS board must pursue."

22         That was your understanding at the time, right?

23  A.  Yes.

24  Q.  IPLS's only option was to procure chimpanzees from Yerkes so

25  it could get funding, isn't that right?

1   A.   That was the immediate source of funding that was apparent

2   to the board at that time.  It's obviously not happened yet.

3   Q.   And you felt that was the only option IPLS had?

4   A.   We were moving into winter.  There's no money to pay the

5   utility bills.  We didn't see any other source of funding at

6   that time.

7   Q.   And IPLS did have another option, right?

8   A.   Which was move the bonobos?

9   Q.   Under the settlement agreements, if IPLS could not procure

10  the funding it needed to sustain itself, then Dr. Sue

11  Savage-Rumbaugh and BHI had the right to relocate the bonobos,

12  right?

13  A.   And then the people of Iowa lost one of the most valuable

14  research tools in the world today.

15  Q.   But that was an option that was available, right?

16  A.   It's an unacceptable option.

17  Q.   Dr. Sue Savage-Rumbaugh would be able to continue her life

18  work that way?

19  A.   I don't know that.

20          MR. NEIHAUS:  I would like to offer Exhibit 51 into

21  evidence.

22                              (Defendants' Exhibit 51 was

23                               offered in evidence.)

24          MR. MILLER:  I again object on the basis of hearsay,

25  Your Honor, noting I understand your prior ruling on that.

1          THE COURT:  51 is received, subject to the objection.

2                              (Defendants' Exhibit 51 was

3                               received in evidence.)

4          MR. NEIHAUS:  Excuse me for one moment, Your Honor.

5          (Pause.)

6  BY MR. NEIHAUS:

7  Q.  Mr. Simpson, what measures, if any, has ACCI taken to date

8  to deal with the threat of flooding at the lab?

9  A.  I can't answer that question.

10 Q.  Do you know of any measures that ACCI has taken to deal with

11 the threat of flooding at the lab?

12 A.  I know that this is an issue that they've addressed.  I do

13 not know what decisions have been made.

14 Q.  What measures, if any, has ACCI taken to test the toxicity

15 of the groundwater at the lab?

16 A.  I have no way of knowing that.

17 Q.  Has IPLS been reinstated to date?

18 A.  It's a de jure corporation today.  I mean, simply because

19 you lose your charter with the state so you're no longer a

20 de facto corporation, which means that a lot of the laws that

21 protect corporations apply, doesn't mean the organization itself

22 ceases to exist.  It just changes character, and it's running --

23 it's still -- there are aspects of IPLS that you would have to

24 say still are in existence today.

25 Q.  You agree --

1  A.  It's not an operating company.

2  Q.  IPLS today is not an operating company?

3  A.  Not in the sense that it's -- it's running parallel.  It has

4  the same board that ACCI has, and so when one board meets,

5  technically both boards are meeting; the same kind of issue we

6  had when Bonobo Hope and IPLS were joined together.  But IPLS

7  itself is a fictitious name now, as far as the state is

8  concerned, of ACCI, and so it's still a functional organization

9  under the guise of ACCI.

10  Q.  You agree that the Iowa Secretary of State administratively

11  dissolved IPLS in August of 2013, isn't that right?

12  A.  That's right.

13  Q.  And you --

14  A.  That the Attorney General dissolved, administratively

15  dissolved.

16  Q.  And you helped IPLS apply for reinstatement, right?

17  A.  Yes.

18  Q.  And that request was denied, right?

19  A.  Yes, until the lien has been paid.

20  Q.  Has the lien been paid?

21  A.  No.

22  Q.  Has IPLS been reinstated?

23  A.  Not in that sense, no.

24  Q.  Let's talk about that tax lien for a moment, Mr. Simpson.

25  What plans does IPLS currently have to lift the tax lien?

1  A.  I don't have any knowledge of that.

2  Q.  Do you know of any plans that IPLS has currently to lift the

3  tax lien?

4  A.  I know of none.

5  Q.  How does IPLS intend to pay that tax lien?

6  A.  I don't know.

7  Q.  What fund-raising effort has IPLS taken since it was

8  administratively dissolved to pay that tax lien?

9  A.  I don't have any knowledge of that.

10  Q.  Do you have knowledge of any fund-raising efforts that IPLS

11  has taken since it was administratively dissolved in order to

12  pay off the tax lien?

13  A.  I know that IPLS is continually seeking funding.  I have no

14  idea what their budget or plans would be related to that.

15  That's not my area of concern.

16  Q.  Who's seeking funding on behalf of IPLS?

17  A.  Jared and Bill Hopkins.

18  Q.  So is that funding distinct from their funding for ACCI?

19  A.  No.

20  Q.  Do you know of any efforts that have been made since IPLS

21  was administratively dissolved to raise funds specifically for

22  IPLS?

23  A.  No.

24          MR. NEIHAUS:  One more moment.

25          (Pause.)

1          MR. NEIHAUS:  At this time I have no more questions,

2     subject to redirect.

3          THE COURT:  Cross-examination, Mr. Miller.  As we

4     mentioned yesterday, you can combine your cross-examination with

5     your direct examination if you care to.

6          MR. MILLER:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8     BY MR. MILLER:

9     Q.  Good afternoon, Mr. Simpson.

10          Can you hear me okay?

11    A.  Yes, I can.

12    Q.  Actually good morning.  I'm sorry.

13          You've been a Des Moines, Iowa lawyer, based lawyer

14    for about 50 years, is that correct?

15    A.  Fifty-two January 15th -- June 15th I mean.

16    Q.  And do you have an area of specialty or expertise?

17    A.  I take people from a point of an idea through hopefully what

18    makes them successful, the transition planning to maximize the

19    value they've created in their lifetime and the estate planning

20    to make the best statement they can make about their life.  My

21    practice is limited to those areas.

22    Q.  Does that include a practice in corporate law?

23    A.  Yes, corporate law, limited liability company law.  I

24    chaired the limited liability company session for the Iowa Bar.

25    It's an area that I work in.

1    Q.  This may seem a silly question, but I want to make sure we

2    get it in the record.  Have you ever taken an action that has

3    not been authorized by a client of yours?

4    A.  Not to my knowledge.

5    Q.  Are you a member of the Board of Directors of IPLS?

6    A.  No.

7    Q.  Are you a member of the Board of Directors of ACCI?

8    A.  No.

9    Q.  Are you a member of the Board of Directors of BHI?

10   A.  No.

11   Q.  Have you ever been a member of any of those boards?

12   A.  No.

13   Q.  I think earlier you were starting to explain, and I want to

14   make sure I give you an opportunity to do so.  To your

15   knowledge, are the lexigram keyboards at the facility being

16   used?

17   A.  I have no knowledge of that.  I haven't been there since.

18   Q.  And you've known Dr. Rumbaugh for several years, is that

19   right?

20   A.  Yes.

21   Q.  Dr. Sue Rumbaugh, right?

22   A.  Uh-huh.

23   Q.  And you worked with her over the years for various purposes?

24   A.  Yes.

25   Q.  She at one point in time discussed a change in her name to

1  match that of the colonies, is that correct?

2  A.  Apparently she has given a surname of Wamba to the bonobo

3  community that we have here in Des Moines, and she did ask about

4  the possibility of changing her last name to that.

5  Q.  Have there been points in time when you've dealt with

6  Dr. Rumbaugh in which she was unavailable to you for a period of

7  time?

8  A.  Yes.

9  Q.  And was that due to illness or what caused it that you

10  understood?

11  A.  Essentially I guess I would have to say it's because of

12  illness.

13  Q.  And was this a matter of days or matter of weeks that you

14  would go without contact?

15  A.  Well, more like months.

16  Q.  Did you learn in April of 2012 that Dr. Sue was not able to

17  care for the bonobos and to assure the safety of people and the

18  bonobos?

19  A.  Yes.

20  Q.  And I'm going to refer you to an exhibit --

21          MR. MILLER:  Your Honor, may I approach to help?

22          THE COURT:  You may.

23          MR. MILLER:  And, Counsel, Your Honor, I'm going to

24  refer the witness to Exhibit 1000 of the plaintiffs' exhibits.

25  BY MR. MILLER:

1  Q.  Mr. Simpson, do you see Exhibit 1000 front of you there?

2  A.  Yes.

3  Q.  I refer you to the first page -- first off can you identify

4  for me what Exhibit 1000 is?  Is that an e-mail string that

5  you --

6  A.  Yes.

7  Q.  At least the most recent e-mail was to you.  You sent an

8  e-mail to Dr. Duane Rumbaugh on April 3rd of 2012?

9  A.  Yes, it is.

10  Q.  And if you follow through the rest of that exhibit, is that,

11  again, an e-mail string that begins at the very tail end with an

12  e-mail from Dr. Sue on April 1st of 2012?

13  A.  Yes.

14  Q.  Okay.  In that e-mail do you see there that Dr. Sue is

15  e-mailing Dr. Ken Schweller?  Do you see that?

16  A.  Yes.

17  Q.  And who is Ken Schweller -- or what was his role as of

18  April 1, 2012?

19  A.  He would have been -- I think he was still chairman of the

20  board of IPLS.

21  Q.  And she reports, "Ken, I have been not able to care for the

22  bonobos and to assure the safety of people or the bonobos,"

23  correct?

24  A.  Yes.

25  Q.  And that e-mail continues on.  Would you agree that there's

1  further discussion resulting from that e-mail from Dr. Sue?

2  A.  Yes.

3  Q.  Do you recall -- you learned about this e-mail on April 1,

4  2012?  You received it, correct, at least in a forward?

5  A.  I received it in a string of e-mails.

6  Q.  And what action did this e-mail prompt from you?

7  A.  I think it started a conversation between myself and Duane

8  Rumbaugh.

9  Q.  Was this e-mail concerning to you and Mr. Schweller?

10  A.  Oh, my, yes.

11  Q.  Why is that?

12  A.  Well, Sue was running the facility, and as I said earlier,

13  she was somewhat of a one-person band.  It would take three or

14  four people to fill her shoes.

15  Q.  And did Mr. Schweller talk with Sue and yourself about this

16  situation?

17  A.  Yes, he did.

18  Q.  If you would look at the bottom of page 5 of the exhibit,

19  bottom right corner --

20  A.  Uh-huh.

21  Q.  -- do you see there the subject matter "Attn:  LYLE Sue in

22  trouble"?

23  A.  That was really a shock.

24  Q.  And that's Dr. Schweller reporting to you what his

25  discussion with Dr. Rumbaugh entailed, is that right?

1    A.   Yes.

2    Q.   Was this issue with respect to Dr. Sue in April resolved

3    immediately?

4    A.   No.

5    Q.   What occurred subsequent to this e-mail?

6    A.   Well, I was seeking -- because I had the most direct

7    contact, Duane Rumbaugh has been a personal friend for a long

8    time.  We lived on the same floor in the Park Fleur, and I was

9    seeking help from him because whenever Sue has had this

10   problem in the past that I was aware of, he was her source of

11   support.

12   Q.   And is this e-mail reflective of similar circumstances as

13   those you described earlier where Dr. Sue would have some issue

14   with respect to the bonobos and the facility and would not be in

15   the picture?

16   A.   Yes, many years earlier.

17   Q.   And were the events discussed and described here in the

18   April e-mail, they precede the next year or maybe more

19   discussion and development that you've testified to with respect

20   to where the boards would head?

21   A.   I'm not quite following the question.

22   Q.   Right.  Sorry about that.  I'm going to move on,

23   Mr. Simpson.

24        Mr. Simpson, do you have any personal knowledge from

25   direct contact with somebody at Yerkes with respect to whatever

1  Yerkes may intend relating to Dr. Rumbaugh?

2  A.  No.

3  Q.  And I mean either Dr. Sue Rumbaugh or Dr. Duane Rumbaugh.

4  A.  No, other than what I've heard from them.

5  Q.  When you say other than what you've heard, you're referring

6  to from Mr. Caudill?

7  A.  From Dr. Rumbaugh or Sue.

8  Q.  Okay.  So you've never spoken to anybody at Yerkes who has

9  told you we're not going to do anything with ACCI unless Dr. Sue

10 is out of the picture?

11 A.  No.

12 Q.  And do you profess in any way to understand what chimpanzees

13 or what information or what location those chimpanzees at Yerkes

14 may come from?

15 A.  No.

16 Q.  You don't have any personal knowledge with respect to that?

17 A.  No.

18          MR. MILLER:  That's all my questions, Your Honor.

19          Thank you.

20          THE COURT:  Redirect?

21          MR. NEIHAUS:  One moment, Your Honor, please.

22          (Pause.)

23                    REDIRECT EXAMINATION

24 BY MR. NEIHAUS:

25 Q.  Just a few questions, Mr. Simpson.

1   You agree, though, that generally Sue was around,

2   right?

3   A.  Yes.

4   Q.  And she did take care of the bonobos?

5   A.  Yes.

6   Q.  And you mentioned that the few times that she was absent

7   were years apart, right?

8   A.  The two times where I've known that there was depression

9   issues, yes.

10  Q.  And as you saw in the exhibit that was placed before you,

11  when she's in a position where she does not feel she can assure

12  the safety of the people or the bonobos around her, she can

13  identify it, right?

14  A.  She did in this case, yes.

15  Q.  And that situation got resolved?

16  A.  Yes.

17  Q.  Assuming that Dr. Savage-Rumbaugh was unable for any reason

18  to reenter the lab, does that in any way negate BHI's rights

19  under the settlement agreement?

20  A.  Not that I can see.

21  Q.  And just one other topic, Mr. Simpson.

22      How many board meetings has ACCI had since July of

23  2012?

24  A.  I really have no way of knowing that.

25  Q.  Do you know if ACCI has had any board meetings since July of

1  2012?

2  A.  I know they have.  If they provide me minutes of their

3  meeting, then I record those in the minute book, and that's

4  really the only information that I would have.

5  Q.  Do you have any minutes of ACCI board meetings since July of

6  2012?

7  A.  Off the top of my head, I can't respond to that.  Whatever

8  we did have that I had in the minute book was provided to you.

9  Q.  I'm sorry, I believe I said 2012.  I meant since July of

10  2014.

11  A.  I honestly -- I'm typically not in the loop of their

12  meetings.  I know there's issues that they've had to deal with,

13  so I'm assuming they've had meetings.

14  Q.  You don't have records of any meetings?

15  A.  Since 20' --

16  Q.  Since July of 2014.

17  A.  I get an e-mail exchange from time to time.  I don't put

18  those in the minute book.  I don't recall that I've had physical

19  minutes of a meeting since then that has gone through the minute

20  book.

21          MR. NEIHAUS:  No further questions.

22          THE WITNESS:  Okay.

23          MR. MILLER:  Just a couple of follow-ups, Your Honor.

24

25

```
1                       RECROSS-EXAMINATION

2   BY MR. MILLER:

3   Q.  Mr. Simpson, have you ever at any point in time intended to

4   deceive Dr. Rumbaugh with respect to any of these events that

5   you've described?

6   A.  Heavens no, nor would I.

7   Q.  Have you intended to deceive BHI with respect to these

8   issues?

9   A.  No, not at all.

10  Q.  Same question for IPLS?

11  A.  No.

12  Q.  Or ACCI?

13  A.  No.  My duty is to be a conveyor of information to my client

14  and that's -- I do that daily.

15          MR. MILLER:  Nothing further.

16          Thank you.

17          THE COURT:  Anything further?

18          MR. NEIHAUS:  Nothing further, Your Honor.

19          THE COURT:  You may step down, sir.

20          Thank you.

21          This witness is under subpoena.  May he be excused?

22          MR. STAMBAUGH:  Yes, Your Honor, he may.

23          MR. MILLER:  Yes.

24          THE COURT:  You're excused.

25          Thank you.
```

1                              (Witness excused.)

2              MR. STAMBAUGH:  May we call our next witness?

3              THE COURT:  Please.

4              MR. STAMBAUGH:  Claimants call Derek Wildman.  May we

5    inquire?

6              THE COURT:  Would you come forward, sir.

7              THE CLERK:  Please stop right there and raise your

8    right hand.

9              DEREK WILDMAN, DEFENDANTS' WITNESS, SWORN

10             MR. STAMBAUGH:  Mr. Zifchak will be doing the

11   examination, Your Honor.

12             THE COURT:  All right.

13                         DIRECT EXAMINATION

14   BY MR. ZIFCHAK:

15   Q.  Good morning, Professor.

16   A.  Yes.

17   Q.  Could you please state your name and business address for

18   the record.

19   A.  Yes.  My name is Derek Wildman.  My business address is the

20   Institute for Genomic Biology at the University of Illinois at

21   Urbana-Champaign.

22   Q.  Who is your current employer, please?

23   A.  The University of Illinois.

24   Q.  And is it correct that you're currently a member of the

25   board of Bonobo Hope Initiative?

1  A.  Yes.

2  Q.  How long have you been a professor at the University of

3  Illinois?

4  A.  About ten months.

5  Q.  Prior to that where were you employed?

6  A.  Wayne State University in Detroit, Michigan.

7  Q.  For how long?

8  A.  Fourteen years.

9  Q.  At Illinois you are a professor of what subject or subjects?

10  A.  I am a professor of molecular and integrative physiology and

11  I am a faculty member at the Institute for Genomic Biology.

12  Q.  And same question with respect to Wayne State?

13  A.  At Wayne State I began as a post-doctoral associate in the

14  year 2000, and I was promoted to the faculty as an assistant

15  professor in 2005.  I received tenure and promotion to associate

16  professor in 2009 and was promoted to full professor in August

17  2014.  And I'm currently still an adjunct professor there at the

18  Center for Molecular Medicine and Genetics at the Wayne State

19  University School of Medicine.

20  Q.  Professor Wildman, what do you teach currently at the

21  University of Illinois, what subjects?

22  A.  The subjects I teach are human medical genomics.

23  Q.  Is it correct that you drove six hours from Champaign,

24  Illinois, last night to come here and give testimony?

25  A.  Yes, it is correct.

1   Q.  Will you tell the court, please, a little bit about your

2   educational background.

3   A.  Sure.  I became -- I received my undergraduate training at

4   the University of Colorado in Boulder, where I became interested

5   in human evolutionary studies, and my degree was in

6   anthropology, after which I enrolled in the Ph.D. program at the

7   University of Arizona in Tucson.  I obtained a master's degree

8   from that university, and I switched and went to New York

9   University, to the New York Consortium in Evolutionary

10  Primatology and obtained by Ph.D. from New York University in

11  the year 2000.

12  Q.  Who were the educational institutions that are members of

13  the consortium that you just identified?

14  A.  That's New York University, the City University of New York,

15  and Columbia University.

16  Q.  What did you get your doctorate in?

17  A.  My doctorate was on the genetics of baboons, specifically

18  baboons from the Arabian Peninsula, Saudi Arabia, and Yemen.  I

19  did field work in Ethiopia and in Yemen to obtain that degree

20  and collected samples and worked with baboons.

21  Q.  So your doctorate is in anthropology?

22  A.  It is in anthropology, uh-huh.

23  Q.  I know we have not had a chance to introduce your CV into

24  the record.  Could you comment just briefly on whether you have

25  published in these fields?

WILDMAN - DIRECT

306

1   A.   Sure.   I've published approximately 100 peer-reviewed

2   articles.   Additionally, I'm Editor in Chief of the Journal of

3   Molecular Phylogenetics and Evolution, which is a scholarly

4   journal devoted to understanding the evolutionary relationships

5   among species of organisms.

6   Q.   How did you get interested in that latter subject?

7   A.   Well, initially I became interested in phylogeny and

8   evolution as an early graduate student, and my Ph.D. was

9   involved in the baboons as I mentioned.   What was -- what I was

10  trying to find out was when did the baboons leave Africa

11  because, as we all know, humans as part of their migration left

12  Africa around a couple -- a hundred thousand years ago, and I

13  wanted to see if other species left at times coincident.

14       The way you can do that is by understanding genetic

15  relatedness and tabulating the number of DNA mutations that have

16  occurred over time as a molecular clock, and so that was my

17  initial interest.   I then became interested in more general

18  primate and mammalian phylogeny, and I've done quite extensive

19  work in that area.

20  Q.   Very briefly can you define phylogeny?

21  A.   Yes.   Phylogeny is the genealogy of species.

22  Q.   Could you also summarize what your principal interests are

23  at this time as a scholar?

24  A.   As a scholar I'm interested in what defines humans, what

25  makes us humans, how did we evolve, and I'm interested in that

1  from the perspective of genetics, genomics, and epigenetics.

2  Q.  Is it fair to say that you are a scientist?

3  A.  I would say so, yeah.

4  Q.  Okay.  Did there come a point in time when you learned of

5  the work of Dr. Sue Savage-Rumbaugh?

6  A.  So I had heard of Dr. Rumbaugh's work.  Since the 1990s I

7  was aware of it.  She's one of the luminaries in the field of

8  comparative ethology and the evolution of language.

9        So as part of any anthropological training, any

10  anthropology degree would -- degree granting institution would

11  likely expose their students to the work of Dr. Rumbaugh.

12  Q.  And were you exposed to the work?

13  A.  Yes, uh-huh.

14  Q.  And did that lead you at a point in time to make contact

15  with Dr. Savage-Rumbaugh?

16  A.  Well, so one of the things that I have done as part of my

17  career is understand the relations of humans to other apes from

18  a genetic perspective, and with my colleague and mentor, Morris

19  Goodman, who's now deceased, we published work about the genetic

20  evolution of humans, chimpanzees, gorillas, other apes, and we

21  came to the conclusion that humans and chimpanzees are more

22  closely related, including bonobos, are more closely related to

23  each other than either of those species is to gorillas or other

24  apes and that their similarities were so apparent they deserved

25  to be classified in the same genus of mammals, and that genus is

1   homo.  And so we proposed that humans and chimpanzees should be

2   classified this way, in a way similar to the way donkeys and

3   horses are classified in the same genus Equus.  And so that

4   perspective about shared similarities is something that made the

5   work of Dr. Rumbaugh attractive to both Morris and myself

6   because we're interested in the features that unite us, not the

7   features that separate us, and I think that Dr. Rumbaugh has in

8   some ways similar perspectives.

9   Q.  When did you first make contact with Dr. Savage-Rumbaugh?

10  A.  This would have been in 2008, late 2008, early 2009.

11  Q.  What was the nature of the contact?  What prompted it?

12  A.  So Sue had contacted Professor Goodman, and we came out here

13  and visited the facility in Des Moines and met with Sue for a

14  couple of days and discussed a project that we were interested

15  in on working on together, and that project initially was the

16  sequencing of the genome of Kanzi, and that was a large scale

17  project that is still ongoing.

18  Q.  Briefly, could you explain what you mean by, in lay terms,

19  sequencing the genome of Kanzi?

20  A.   Sure.  So our cells contain nuclei within which resides DNA.

21  This DNA genome is packaged in chromosomes of which we have 23

22  pairs.  Kanzi and bonobos have 24 pairs.  Total number of DNA

23  nucleotype bases or letters, if you want to think of it as an

24  analogy, stretch out to be about three billion letters of DNA

25  sequence in the genome of a human or a bonobo.

1              So we undertook a project to sequence every single one

2    of those three billion letters in Kanzi's genome, and we did

3    that ad nauseam I would say.  We sequenced each base about a

4    hundred times.

5    Q.  Okay.  You say that you spent a couple of days in Des Moines

6    with Dr. Rumbaugh.

7    A.  Uh-huh.

8    Q.  What did that entail?

9    A.  That entailed visiting the facility.  That entailed many

10   intense discussions about research and potential research in the

11   future, potential collaborations.  What was most interesting for

12   me was observing Sue with the bonobos.

13   Q.  And what did you observe?

14   A.  I observed a family.  I observed Sue interacting with

15   Panbanisha, with Kanzi, with Nyota, with the other bonobos, and

16   I saw relationships that were clearly long-term relationships

17   that were meaningful.

18   Q.  Did these observations have any particular relationship to

19   the purpose of your visit or were these just incidental to the

20   visit?

21   A.  Well, so what the purpose of our visit was was to begin to

22   explore a study from the genetic and epigenetic perspective on

23   the evolution of language.  Something that we in this room all

24   share is language.  It is very difficult to study the origins of

25   human language because it has already happened, possibly as long

1   ago as several hundred thousand years.  In the case of the

2   homo-pan culture that Sue has developed over the decades working

3   with Kanzi and the others, what we have is the possibility of

4   language emerging de novo in another species.  We don't have --

5   language doesn't fossilize.  We don't have fossil words, so

6   we -- if we want to study that, we can study that from the

7   perspective of genetics and from the perspective of epigenetics.

8   Q.  You mentioned that Dr. Rumbaugh contacted Professor Goodman.

9   A.  Uh-huh.

10  Q.  Do you know why it was that she contacted him?

11  A.  Well, Professor Goodman in the early 1960s made a profound

12  discovery.  This discovery was that using immunological data --

13  Professor Goodman was trained as an immunologist -- was that

14  humans, chimpanzees and gorillas were more similar to one

15  another immunologically than either of those three creatures

16  were to something like orangutans.  Professor Goodman was very

17  excited about this at that time, and actually he went to a

18  conference in Austria that had many of the top geneticists of

19  the field at the time.  And he was excited to present his

20  results, and he's written about this, so it's a matter of public

21  record.  But what he found was a lot of resistance to the idea

22  that humans were similar to apes and not distinct from all apes.

23  The sort of working hypothesis was that humans were profoundly

24  genetically distinct from everything else.

25          Dr. Goodman's finding has been supported by subsequent

1   studies from him and many other groups at the level of proteins

2   and amino acid sequences, DNA sequences, insertion of

3   transposable elements.  Many different types of data have

4   supported that hypothesis, and it's been refined to say that

5   humans and chimpanzees are, including bonobos are the sister

6   group to the human species and that we share a recent common

7   ancestor, a most recent common ancestor about six million years

8   ago.

9   Q.  Why then did Dr. Rumbaugh contact Dr. Goodman?

10  A.  Well, so because Dr. Goodman was able to see the

11  similarities that humans shared with other species, and

12  Dr. Goodman was able to look at human evolution from an unbiased

13  perspective.  That was his greatest genius, and his genius was

14  recognized.  He was elected to the National Academy of Sciences.

15  Dr. Goodman was able to look at the DNA sequence without any

16  packaging of human behaviors or human accomplishments and just

17  look at that and make what he considered to be rational

18  decisions that were based solely on the amount of genetic

19  similarity and genetic difference in a species-by-species

20  comparison.

21        And he and I worked very closely on a number of

22  grants, a number of research projects for a period of ten years,

23  and so when he told me that he had the opportunity to come talk

24  to Sue, I was, you know, gangbusters, we must do this, we must

25  go and talk to her.  It's a great opportunity.

1  Q.  In your travels as a scientist, have you visited primate

2  colonies other than the one here in Des Moines?

3  A.  Sure, sure.

4  Q.  Based on your observations in, I think you said 2008, how

5  would you contrast the Des Moines bonobo colony with the typical

6  primate colony you have visited elsewhere?

7  A.  The Des Moines colony was not a facility like any other

8  primate colony I've seen.  Most primate colonies are -- the

9  animals are in cages.  They are restricted in terms of what they

10  can do, and to be honest, they are not happy, those primates.

11  The bonobos in Des Moines and the interactions with humans is

12  unique in the world in terms of a captive primate situation.

13          I think we lost the mic.

14  Q.  Did we lose the mic?

15  A.  Yes.

16          THE CLERK:  There's nothing I can do.

17          MR. ZIFCHAK:  Derek, can you speak up?

18          THE COURT:  Can you speak up?

19          THE WITNESS:  Yes, I will do my best.  I can talk

20  loud.  I'm a professor.

21          THE COURT:  I thought so.

22  A.  (Continuing)  Okay.  So primates are typically kept in

23  facilities for biomedical research, and in that instance they

24  are treated as subjects no different than you would see, you

25  know, dogs in a kennel.  At the Iowa facility what you saw was

1  multi species family of humans and bonobos interacting with one

2  another.  So that's a totally different thing.

3  BY MR. ZIFCHAK:

4  Q.  Did you come to an understanding, either at the time of that

5  visit or before or after, as to the nature of

6  Dr. Savage-Rumbaugh's research trajectory; and, if so, what was

7  that understanding?

8  A.  Yeah.  So I had -- well, before meeting Dr. Rumbaugh, I knew

9  her work and I knew she was interested in studying language

10  acquisition in nonhuman primates, but I didn't really appreciate

11  the multigenerational trajectory that she was aiming towards,

12  and that I learned by getting to know her.  And what I learned

13  was that that she was interested in a long-term project, not a

14  project of a few years.  A typical grant cycle is four or five

15  years.  She was interested in a lifetime of work and work that

16  would go on after she was gone.

17  Q.  As a scientist, do you consider her body of work to date

18  incremental or original?

19  A.  The word I would use to describe Dr. Savage-Rumbaugh's work

20  is transformative, and by transformative I mean she's changed

21  the way many scientists and many people think about nonhuman

22  species, and she has demonstrated that nonhuman species have

23  abilities that we did not think they had.  And it's in the area

24  of language that this work has been most focused on by

25  Dr. Rumbaugh.  But I will point out that other workers have

1   exposed human biases in many other fields.  For example, Dr.

2   Jane Goodall discovered that chimpanzees made and used tools.

3   Before Dr. Goodall's works in Africa, it was considered that

4   humans were the only species that made and used tools, and now

5   we know that chimpanzees in Senegal, for example, use spears to

6   hunt bush babies, which are a small little primate.  So that's

7   one example.  And many of the so-called human specific traits it

8   has been determined were not human specific.

9          Another example is fossil tools older than the human

10  genus were discovered and published just last month, 3.3 million

11  year old tools.

12  Q.  This is, I guess, a naive question.  Are the bonobos in

13  Des Moines or any of them capable of making tools?

14  A.  Yes, yes, absolutely, absolutely.  Kanzi is an expert

15  flintknapper, much better than you or I would be, yeah.

16  Q.  What were your first principal interests as far as studying

17  the bonobos here in Des Moines?

18  A.  Well, so I'm interested in how new features emerge in

19  evolution, and one new feature that emerged in our evolution was

20  language, and what were the biological consequences of the

21  emergence of language.  We know that DNA sequences can mutate,

22  but it's unlikely that there was a DNA mutation that all of a

23  sudden gave some human long, long ago the ability to speak and

24  that human taught everybody else how to do that.  What we in the

25  field have come to appreciate in the past several decades is

1  that in addition to DNA mutation, sequence mutation, DNA can be

2  chemically modified in various ways, and that chemical

3  modification doesn't change the actual underlying DNA sequence,

4  but it changes the activity of genes.  So genes get turned on

5  and turned off based on these chemical modifications.  We are

6  interested in whether those chemical modifications can be passed

7  from generation to generation, and that can be -- we can

8  hypothesize that that could be a mechanism for how biologically

9  the requirements for language emerged.

10  Q.  Thank you.

11          Professor Wildman, when were you first elected to one

12  of the boards governing the Great Ape Trust?

13  A.  That would have been 2010, 2011.

14  Q.  And at whose invitation were you elected to the board?

15  A.  The invitation initially came from Dr. Rumbaugh and

16  Dr. Fields.

17  Q.  And you accepted the invitation?

18  A.  I did.

19  Q.  Why?

20  A.  Because I found the research that was being done at that

21  facility to be fascinating and important, and I wanted to help

22  support that in any way that I could.

23  Q.  Do you recall being on the board at the time that a

24  resolution was considered that would split the board in two?

25  A.  I do.

1    Q.  Do you recall that?

2    A.  Uh-huh.

3    Q.  What was the proposition at that point in time?

4    A.  Well, the idea was that the board would be better and more

5    efficient if it was divided in the following way:  That there

6    were people who had expertise in finance and fund-raising, and

7    those folks would be in charge of raising the money and that

8    type of thing for the facility, and then there would be a

9    separate board which we called in the vernacular the science

10   board, and the science board was involved in the management of

11   scientific activities that involved the bonobos.

12   Q.  Do you recall in conjunction with the proposition that the

13   board be split in two seeing either a memorandum from Lyle

14   Simpson or an actual resolution to be voted on by the board?

15   A.  Eventually there was, yeah.

16   Q.  Okay.  I'm going to ask you to identify that in just a

17   moment.

18           MR. ZIFCHAK:  It's I believe Exhibit 23.  It was

19   identified and moved into evidence in Mr. Simpson's testimony.

20   Is that correct?

21           MR. STAMBAUGH:  Yes.

22   BY MR. ZIFCHAK:

23   Q.  Derek, would you look at the exhibit?  I think it's on the

24   screen right to your left.

25   A.  Oh, this one, okay.

1  Q.  Yeah.  We can scroll it from here.

2  A.  Okay.  These words seem familiar to me.

3         Yeah, I remember this.

4  Q.  Was there a vote on those resolutions?

5  A.  There was.

6  Q.  And what was the result?

7  A.  The result was that the board was split in two.

8  Q.  Is it correct that the vote was unanimous?

9  A.  As far as recall, yeah.

10  Q.  And what was your vote?

11  A.  I voted that, yes, the board should be split.

12  Q.  At that time or around that time, were you made aware of

13  pending settlement agreements in this action?

14  A.  Not so much.  Yeah, I knew that -- I viewed my role in the

15  whole enterprise was to advise on the science side of things.

16  Q.  Uh-huh.

17  A.  And I focused my attention on those matters.

18  Q.  At a point in time, though, you were made aware of

19  settlement agreements, correct?

20  A.  Yes, absolutely.

21  Q.  And what was your understanding of the intention of those

22  agreements?

23  A.  The intention of the agreements was that the science board

24  would be in charge of the science and the bonobos' care and that

25  the other board was more of an administrative and fiduciary

1  body.

2  Q.  Can you identify George Caudill, please?

3  A.  I know who that person is, absolutely.  He was sold to the

4  board as someone who could fix whatever public relations

5  problems the facility was having at the time, and he was

6  presented to us as someone who had experience in scandal

7  management, and so he would be a very strong and powerful person

8  to help us get pointed in the right direction.

9  Q.  When did you first learn that the board was interested in

10  identifying a successor to Dr. Savage-Rumbaugh?

11  A.  Well, we had discussed that for some time.

12  Dr. Savage-Rumbaugh was interested in having a transition, a

13  slow transition that would enable eventually when she was no

14  longer capable of doing the work, that her research trajectory

15  could be continued, and so we were interested in identifying

16  folks that could possibly continue that trajectory.

17  Q.  Was Dr. Jared Taglialatela on the board at that point in

18  time?

19  A.  He may have been, yeah, uh-huh.

20  Q.  But you don't remember specifically?

21  A.  No, because you must understand that there were many votes

22  and many board members switching, and so, yeah, I can't recall,

23  but he was involved.  He became involved in, as far as I know,

24  in the last few years.

25  Q.  There came a point in time when Jared was identified as a

1  potential successor to Sue, correct?

2  A.  Yes, yes.

3  Q.  Did you participate in any discussions where the nature of

4  Sue's research trajectory was communicated to Jared?

5  A.  Well, I have discussed with Jared several times my feelings

6  about the research trajectory and that it should be continued.

7  Q.  What about back in 2013?

8  A.  In 2013, Jared was presented to us as somebody who would be

9  doing such a thing.

10  Q.  Presented to you by whom?

11  A.  By Dr. Rumbaugh and others.

12  Q.  Did Mr. Simpson express any views in that respect to the

13  board at that time?

14  A.  Yeah.  I mean, Mr. Simpson was supportive of Jared and later

15  Dr. Hopkins being involved and promoting the research trajectory

16  going forward.

17  Q.  Did there come a point in time when you voted to appoint

18  Jared and Bill Hopkins to positions at IPLS?

19  A.  Yes, there did.

20  Q.  At the time that you voted, did you have any knowledge that

21  Dr. Savage-Rumbaugh had been banned from the lab?

22  A.  I did not.

23  Q.  Or that she may have been banned at the insistence of

24  Yerkes?

25  A.  I did not.

1  Q.  Or that she had allegedly been dismissed from the IPLS board

2  without notice to her?

3  A.  I did not.

4  Q.  Did you vote with the understanding that Jared and Bill were

5  going to exclude Bonobo Hope, which you've described as the

6  science board, from any meaningful role in the science going

7  forward?

8  A.  No.  I thought that the Bonobo Hope board would be the

9  science board and, you know, serve the purpose that they were

10  created to serve.

11  Q.  Do you have any reason to believe that the other board

12  members who voted on the resolutions installing Jared and Bill

13  knew of any of these conditions that I just ticked off?

14  A.  Some of them must have, I would think, but not on the Bonobo

15  Hope side.

16  Q.  I see.  Well, had you known of these conditions at the time

17  that you voted, would you have voted the same way?

18  A.  No.

19  Q.  When did you first learn that Dr. Savage-Rumbaugh had been

20  banned from access to the bonobos?

21  A.  That would have been in 2013, late 2013, early 2014.

22  Q.  What was your reaction at the time?

23  A.  I was horrified.

24  Q.  Why?

25  A.  Because to me removal of Sue from those bonobos is akin to

1   removing a parent from a household by Social Services, and I

2   certainly didn't think that anyone outside of the science board

3   had the authority to do such a thing.

4   Q.   Did you communicate these views to Jared, Bill Hopkins, or

5   ACCI?

6   A.   I did.

7   Q.   How did you do that?

8   A.   I did it orally and via e-mails.

9   Q.   From your perspective as a scientist, what is the impact on

10  the science of removing Sue from access to the bonobo colony?

11  A.   So longitudinal studies are studies that take place over

12  time.  The two types -- the main division in experimental

13  science is cross-sectional study design versus longitudinal

14  study design.  A cross-sectional study design is simple as you

15  do an experiment, you write it up, and it's done.  A

16  longitudinal study design is a long-term study, like an

17  ecological study that goes on for decades.

18         What happened when Sue was removed was one of the main

19  variables in longitudinal study was shifted.  I can give an

20  example that might help with the lawyers and so on.  At the

21  University of Illinois, there is something called the Morrow

22  Plots, and this is an experimental agricultural field.  It

23  started in 1867.  It's a continuous experiment about soil

24  quality, fertilizer.  It's been going on for over a hundred --

25  about 150 years, and it's the longest continuous experiment in

1  the United States.

2          In 2007 the institute where my office is was built,

3  and it's right next to the Morrow Plots, and the architects made

4  their plans and everything, and it looked great, and they were

5  going to start building, and then somebody said, whoa, wait a

6  second, raised their hand, wait a second.  If we build this

7  building here, it's going to cast shade on this plot and that's

8  going to mess up the experiment that we've been working on for

9  150 years.  So the architects had to go back and reconfigure the

10  building so that it has no shade on that field and that the

11  integrity of the experiment is kept intact.

12          Removing Sue and stopping the human interaction with

13  the bonobos is the same as casting shade on the plot.

14  Q.  Did you make these views known to ACCI?

15  A.  I did.

16  Q.  From the time that the vote was taken in November of 2013

17  going forward, do you recall the first instance when you or the

18  board of Bonobo Hope received a substantive communication from

19  Jared regarding the goings on at the lab?

20  A.  So, to my recollection, we have received basically one

21  substantive thing from Jared, and that was in 2014, and that was

22  a list of what was going on at the facility in terms of

23  establishment of a new scientific advisory board and also, you

24  know, some of the titles of research grants, either submitted or

25  planned to be submitted, things like that.

1    Q.   What was your reaction to that document?

2    A.   Well, it wasn't a total surprise to me because I had been

3    asked by Jared to serve on the ACCI scientific advisory board,

4    and I thought that was a good thing because, you know, that's

5    what I'm all about and I wanted to advise the science.   What I

6    wasn't aware of was all of the things that you previously

7    mentioned and that Sue was not -- no longer involved in the

8    scientific activities at the place.

9    Q.   Do you recall the other professionals who were named to the

10   scientific advisory board?

11   A.   Yeah, I do.   Some of them were -- the majority of them were

12   working at primate facilities around the country.   There was

13   also a professor from the George Washington University, I

14   believe.

15   Q.   Did any of those folks have expertise in the area of Sue's

16   research trajectory?

17   A.   No.

18   Q.   Or did they have expertise in other areas?

19   A.   No.   They had expertise in animal husbandry and management

20   and health care of bonobos, things like that.

21   Q.   Did Bonobo Hope respond to Jared's March 2014 report?

22   A.   We did, and we ultimately held a joint meeting in June of

23   last year.

24   Q.   Were you satisfied with the outcome of the joint meeting?

25   A.   No.

1   Q.   Why not?

2   A.   Because Sue was not reinstated in the facility and the

3   research trajectory that had been going on for several decades

4   remains stopped.

5   Q.   After the March 2014 communication, have you seen any other

6   communication from ACCI regarding research at the lab?

7   A.   Well, I have been -- I've had one document shared with me,

8   which is the list of active research protocols, and I've also

9   spoken with Jared and I've met with him at the facility.

10  Q.   Have you seen any documentation, other than the list of

11  protocols that you just referred to?

12  A.   I have not.

13  Q.   Was the list of protocols particularly illuminating in your

14  judgment?

15  A.   It was not.

16  Q.   Why not?

17  A.   Because a protocol in the field is simply permission to do

18  particular research.  It doesn't mean the research is actually

19  being done.  It doesn't mean there's funding for the research.

20  It's just something that an IACUC board approves.  The titles of

21  those research protocols are sufficiently vague that I have no

22  idea whether they involve one bonobo at the facility, all of the

23  bonobos, whether they involve human interaction with the

24  bonobos, what experiments are proposed to be done.  None of that

25  is in the title.

1  Q.  Did you convey to Jared or Bill Hopkins these observations?

2  A.  Sure.  Yes, I did.  And -- yeah, I did.

3  Q.  And what was their response?

4  A.  Jared had said he would send me the abstracts of grant

5  proposals and the protocols.

6  Q.  Did he ever do that?

7  A.  He did not.

8          THE COURT:  I think we'll take our noon recess at this

9  time.  We'll be in recess until approximately 1 o'clock this

10  afternoon.

11          MR. ZIFCHAK:  Thank you, Your Honor.

12          (Recess at 12:03 p.m., until 1:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      AFTERNOON SESSION  1:08 p.m.

2          (In open court.)

3          THE COURT:  Take a seat.

4          Go ahead, Mr. Zifchak.

5                    DEREK WILDMAN,

6  resumed his testimony as follows:

7                    DIRECT EXAMINATION (Continued)

8  BY MR. ZIFCHAK:

9  Q.  Derek, have you had occasion to visit the bonobo lab since

10 November of 2013?

11 A.  Yes.  I've visited twice since then.

12 Q.  And please explain what you observed in the first visit and

13 approximately when that was.

14 A.  In June of 2014, there was a joint board meeting, after

15 which we went to the facility for a brief visit, and we remained

16 in the lobby and looked at the bonobos and had conversations

17 amongst ourselves.

18 Q.  Let's jump ahead to the second visit.  When was that?

19 A.  The second visit was about approximately one month ago, and

20 I was visiting the facility to talk with Jared and see how

21 things were going.

22 Q.  How did that visit come about?

23 A.  Well, there was a desire to get -- for the Bonobo Hope board

24 to get information about the status of the bonobos, and so a

25 call was sent to people on that board if we can go visit, when

1   they could go visit, and I volunteered to go, and then Jared and

2   I corresponded and worked out a mutually agreeable time.

3   Q.  Did you have any difficulty in doing that?

4   A.  Well, I think there -- like anything, it took some back and

5   forth; but I would point out that that didn't seem too strange

6   to me because I realized that Jared is not always in Iowa and

7   that when he is here, he's quite busy, and so there was some

8   back and forth.

9   Q.  Do you have an understanding as to how frequently or

10  infrequently Jared is in Iowa at the lab?

11  A.  What he's told me -- and I can't verify it -- is that he

12  tends to spend about five days per month at the lab.

13  Q.  What about Bill Hopkins, do you have any understanding with

14  respect to his visitation frequency?

15  A.  My sense is that his is a little bit less than Jared's.

16  Q.  In any case, can you please describe what you observed at

17  the lab in your April 2015 visit and in particular contrasted,

18  to the extent you can, with what you had observed while Sue had

19  access to the bonobos?

20  A.  Okay.  The facility when I visited it in April was clean.

21  The lights were on.  The bonobos were not in any obvious

22  distress or anything like that.  But in contrast to what I

23  observed in terms of the interactions between Sue and the

24  bonobos and others and the bonobos in the past, that wasn't so

25  much going on.  Staff were wearing masks, myself included, and

1  gloves, and some of the procedures had been updated in terms of

2  how the interactions occurred.

3  Q.  Did you observe any humans interacting with the bonobos

4  using the keyboards?

5  A.  I did not.

6  Q.  Was Jared Taglialatela present during your visit?

7  A.  Yes.

8  Q.  What did he show you in particular?

9  A.  Oh, he was very open and he showed me the facility.  He

10  showed me -- we went back beyond the glass to the mesh, and we

11  observed the bonobos.  We walked around outside and we went to

12  the kitchen.  We went to the other building.  It was a pretty

13  comprehensive walk around the facility.

14  Q.  Did he show you any space that he intended to dedicate to

15  medical procedures?

16  A.  Well, he showed me a room that is currently designed to be

17  an enclosure room, and he described that in the future they

18  would like to repurpose that so that veterinary work could be

19  done on the animals on site.

20  Q.  Did he give you access to any documents pertinent to the

21  operation of the lab or any research progress?

22  A.  We discussed that.  I felt that our time was best spent

23  talking with one another, and as I said before, I asked him to

24  send me some of those documents via e-mail.

25  Q.  Did he give you any information pertinent to what his plans

1  were for the facility going forward?

2  A.  Yeah, sure.  He described his plans for -- his goal of

3  having Pan troglodytes, chimpanzees, common chimpanzees brought

4  in, as well as additional bonobos.

5  Q.  Anything else?

6  A.  He talked about some of the research he planned to do with

7  his graduate student who was there.

8  Q.  Did he describe the research?

9  A.  Briefly.

10  Q.  And?

11  A.  And it was language acquisition tasks, experiments in which

12  objects were out of view of the bonobo, sort of standard

13  psychological experiments.

14  Q.  How does that contrast with Sue's research trajectory, in

15  your opinion?

16  A.  Those types of experiments are not my preferred type of

17  experiments, but they are standard psychological experiments

18  done with animals.

19  Q.  Is there anything notable about those experiments given the

20  talents of these particular bonobos?

21  A.  Well, the idea behind the design of those experiments is to

22  prevent what's called the Clever Hans Phenomenon in which

23  experiments were done on a horse and a horse figured out -- was

24  able to count basically, and it turned out that the handler of

25  that horse was giving signals to the horse.  And so in order to

1  prevent and control for the experiment, you know, Jared and his

2  student had, in my view, instituted those procedures to avoid

3  that.  I think that at this point that is not necessary given

4  the several decades of interaction that had already occurred

5  with, for example, Kanzi.

6  Q.  Did you discuss with Jared why Dr. Savage-Rumbaugh had been

7  banned from the lab and whether she could be reinstated?

8  A.  Yes.  I expressed concern and I requested that she be

9  brought back.  Jared did not seem to -- Jared told me that there

10 was no reason to do that scientifically, there was no scientific

11 basis for having Sue come back in the lab, that if Sue wanted to

12 come back to the facility, she was welcome, but she would have

13 to stay outside the glass.

14 Q.  Subsequent to your visit to the lab in April 2015, do you

15 recall describing the conditions you observed as, quote, a ghost

16 town?

17 A.  Yeah, yeah.

18 Q.  An ape farm?

19 A.  I did.

20 Q.  What did you mean by an ape farm?

21 A.  I meant that it was in -- my concern is that the facility is

22 becoming a breeding facility for chimpanzees and not a real

23 research facility.

24 Q.  Now, it's interesting that Jared said that Sue's research is

25 not necessary, I think that's what you testified to.

1  A.   Uh-huh.

2  Q.   Do you agree or disagree with that statement?

3  A.   I disagree.

4  Q.   Why?

5  A.   Well, because it's an ongoing study that we're actively

6  working on trying to understand over time how human, chimpanzee,

7  bonobo interactions change the biology of both species.

8  Q.   What research, in your judgment, remains to be done that's

9  consistent with Sue's research trajectory that has not yet been

10 done?

11 A.   Well, I would like to look at the epigenetics of all of the

12 members of the colony throughout the course of their lives, so

13 longitudinally sampling their DNA to test hypotheses about how

14 the environment can chemically alter that DNA and in the context

15 of human-chimpanzee interaction, so that's an essential part.

16 Q.   Do you have an understanding as to what research

17 Dr. Savage-Rumbaugh would like to undertake with the bonobos

18 should she be restored to the lab?

19 A.   Well, we've talked about the epigenetic work and we've

20 actively collaborated on that and would like to keep working on

21 that, and that would require -- what's cool is that the

22 sequencing and the experimental techniques are minimally

23 invasive and they are now relatively cost effective, and we're

24 interested in looking at the activity of genes in these

25 creatures.  So that's one aspect of future work.

1  Q.  Okay.  Are you prepared to work with Dr. Savage-Rumbaugh

2  in these various research endeavors if she is restored to the

3  lab?

4  A.  Yes, absolutely.

5  Q.  Just a couple more questions.  Is it correct that

6  Dr. Taglialatela has recently been promoted to associate

7  professor?

8  A.  That's what he told me, yes.

9  Q.  And where is he an associate professor?

10 A.  Kennesaw State College in Georgia.

11 Q.  Do you know whether this has anything to do with any of the

12 work he's been doing in Des Moines?

13 A.  I wouldn't think so because that's relatively new.  Tenured

14 decisions are based on past research accomplishments.

15 Q.  I see.  Were you or anyone on the Bonobo Hope board

16 contacted in connection with the decision to give him a

17 promotion?

18 A.  No.

19         MR. ZIFCHAK:  I have nothing further.

20         Thank you very much.

21         THE COURT:  Thank you.

22         Cross-examination.

23         MR. MILLER:  Thank you, Your Honor.

24

25

1                      CROSS-EXAMINATION

2   BY MR. MILLER:

3   Q.  Dr. Wildman, my name is Bill Miller.  I represent ACCI and

4   IPLS.  We've met before, correct?

5   A.  Correct.

6   Q.  Good to see you here today.

7   A.  Thank you.  Likewise.

8   Q.  You were just telling Mr. Zifchak about some epigenetic

9   research you want to perform?

10  A.  Uh-huh.

11  Q.  Is that correct?

12  A.  Yes.

13  Q.  Right.  And that would involve taking blood or tissue from

14  the bonobos here in Des Moines to do that research?

15  A.  Yeah.  Epigenetics can be done on any biological material,

16  including saliva, blood, hair, whatever you --

17  Q.  Right.  You just told me you would do invasive testing on

18  these bonobos?

19          MR. ZIFCHAK:  Objection to form.

20          THE COURT:  I think he did use the term "minimally

21  invasive."

22  BY MR. MILLER:

23  Q.  Okay, minimally invasive.  Minimally invasive testing,

24  correct?

25  A.  So the way that we've operated in the past in a lot of

1  nonhuman primate studies is when primates are examined by

2  veterinarians and typically blood draws occur at those

3  examinations, we take a little bit of blood.

4  Q.  Right.  And you use that blood to do your work?

5  A.  Absolutely.

6  Q.  And you're certainly not testifying today that if ACCI has

7  plans to adapt the facility to use it to give on site veterinary

8  care that there's anything wrong with that, is there?

9  A.  I think it's a great idea.  I think veterinary care is

10  important for chimpanzees and bonobos, yes, and you don't want

11  to transport them places if you don't have to, sure.

12  Q.  Right.  Now, have you prepared a proposal to the IACUC

13  committee at ACCI, IPLS, the Great Ape Trust, for the epigenetic

14  research that you've just described?

15  A.  No, sir.

16  Q.  Do you -- you don't consider yourself an expert in Great Ape

17  behavior, correct?

18  A.  No.

19  Q.  All right.  You're not an expert in Great Ape cognition?

20  A.  I have -- not only on Great Ape cognition, but human

21  cognition.  I've studied the genetics and the genomics of human

22  brain evolution.

23  Q.  And I appreciate that research.  My understanding is that

24  that would be done in your laboratory, correct?

25  A.  Sometimes.

1  Q.  Okay.

2  A.  For example, I've collaborated with Dr. Hopkins on

3  publications.  Some of the work was done in my laboratory, some

4  was done in his, some was done in Dr. Sherwood's laboratory,

5  yes, sir.

6  Q.  Right.  And that's cellular study with relation to the

7  genome or DNA?

8  A.  That is usually how I contribute, yeah.

9  Q.  And you don't consider yourself an expert in Great Ape

10  communication?

11  A.  No more than any other Ph.D. in anthropology whose trained

12  years of course work and observational studies has, yes.  My

13  research funding is not in that area.

14  Q.  And your research funding is not in the field of

15  experimental psychology?

16  A.  No, but I do have quite an extensive publication in

17  community-based psychiatric studies.

18  Q.  Right.  With bonobos?

19  A.  With humans.

20  Q.  All right.  With any great apes?

21  A.  With great apes, I've only worked on the genetics and

22  genomics of great apes.

23  Q.  And you don't consider yourself an expert in the field of

24  use of language and tools of great apes, correct?

25  A.  I consider myself a Ph.D. who's qualified to evaluate such

1 research, yeah.

2 Q.  All right.  You don't consider yourself an expert in that

3 field, though?

4 A.  No -- well, I would say I served on the National Science

5 Foundation grant panels and reviewed dozens and dozens of

6 research grants on these topics.

7 Q.  Okay.  How about the field of ape intelligence, are you an

8 expert in that area?

9 A.  I think that I would say yes in many ways.

10 Q.  Okay.  And what basis do you have for that conclusion?

11 A.  Because I've studied the molecular underpinnings of

12 intelligence for several decades.

13 Q.  In apes?

14 A.  In apes.

15 Q.  How about human cultural modes, are you an expert in human

16 cultural modes?

17 A.  What do you mean by mode?

18 Q.  I believe it's defined -- I'm looking at Exhibit 1.  It's in

19 the big binder in front of you.  I'm going to refer you to

20 paragraph 4, which is on the second page of that exhibit.

21      And do you see there there's a reference to ape

22 intelligence in human cultural modes, the fourth line down,

23 paragraph 4?

24 A.  Uh-huh.

25 Q.  And that's "yes," sir?

1   A.   Yes, I see that.

2   Q.   Right.  And Dr. Rumbaugh, I believe my understanding was her

3   testimony was human cultural modes include but are not limited

4   to art, music, tools, agriculture, fire, et cetera.

5          Do you see that there?  Is that your area of

6   expertise?

7   A.   My doctoral training covered that issue, yeah, sure.

8   Q.   Okay.  How did it cover that issue?

9   A.   Through course work.

10   Q.   What kind of course work?

11   A.   So anthropology as a discipline is divided into four

12   subfields.  These are biological anthropology, cultural

13   anthropology, linguistic anthropology, and archaeology.  I was

14   trained in the four-field tradition of anthropology, meaning I'm

15   competent in all of those areas.

16   Q.   That was your Ph.D. training?

17   A.   That was my Ph.D. training, that was my undergraduate

18   training, that was my master's training, yes.

19   Q.   And are you using that training in your current work?

20   A.   Absolutely.

21   Q.   Okay.  You testified --

22   A.   You know -- may I make an analogy?

23   Q.   Sure.

24   A.   So a cardiac surgeon knows about the anatomy of the pelvis

25   and received that as part of his medical training.  Even if the

1  doctor doesn't do pelvic surgery on a day-to-day basis, they

2  still know.

3  Q.  You testified that you visited some primate facilities?

4  A.  Uh-huh.

5  Q.  That's a "yes"?  I'm sorry, you have to answer.

6  A.  Yes.

7  Q.  I want to make sure we get it in the record.

8  A.  Sure.

9  Q.  Thanks.

10      What primate facilities have you visited with great

11 apes present?

12 A.  The Primate Foundation of Arizona and the National --

13 Southwest National Primate Research Facility in San Antonio.

14 Q.  And how much time have you spent at those facilities?

15 A.  I have spent several weeks.

16 Q.  All right.  You spent enough time to be able to compare and

17 contrast those facilities with the facility here in Des Moines,

18 correct?

19 A.  Sure.

20 Q.  Right.  You said that those facilities don't match up with

21 the Des Moines facility because they have the great apes in

22 cages, correct?

23 A.  Uh-huh.

24 Q.  Is that a "yes"?

25 A.  Yes.

1  Q.  Thank you.

2       And, furthermore, you told me they don't match up

3  because they don't have space for the great apes to roam,

4  correct?

5  A.  That is correct.

6  Q.  And what species of great apes would have been at those

7  facilities that you visited?

8  A.  Pan troglodytes.

9  Q.  Can you translate that for a lay lawyer?

10 A.  Chimpanzees.

11 Q.  Thank you.

12      So you visited a few weeks ago with Dr. Taglialatela,

13 is that correct?

14 A.  Uh-huh.

15 Q.  That's a "yes"?

16 A.  Yes.

17 Q.  Thank you.

18      And when you met with him --

19 A.  Uh-huh.

20 Q.  -- he had the binder of research protocol sitting on his

21 lap, right?

22 A.  Correct.

23      MR. ZIFCHAK:  Objection to the question; no

24 foundation.

25      THE WITNESS:  Okay.

1    THE COURT:  The answer is in.  I'll receive it.

2    BY MR. MILLER:

3    Q.  He offered to let you look at the research protocols while

4    you were visiting, correct?

5    A.  He may have.  I can't recall.

6    Q.  Well, I think you testified that you asked him -- or you

7    said, well, I don't want to spend time looking at those today,

8    you can e-mail them to me later?

9    A.  Yes, that is true.

10   Q.  Okay.  And you --

11   A.  I don't recall them being on his lap.

12   Q.  Okay.  They were in his office, they were offered to you,

13   correct?

14   A.  They were pointed at, yeah, or binders were pointed at, yes,

15   that's true.  I didn't see the contents of those binders.

16   Q.  You understood that they were the IACUC research protocols?

17   A.  No.

18   Q.  Okay.  All right.  You've spoken to Dr. Taglialatela on the

19   phone several times --

20   A.  Sure.

21   Q.  -- in the past couple of years, correct?

22   A.  Correct.

23   Q.  In the fall of 2012, you told him that you didn't think that

24   Dr. Rumbaugh had any scientific credibility, correct?

25   A.  I told him that many people in the community questioned

1   Dr. Rumbaugh's scientific credibility.

2   Q.  You told him during this meeting a few weeks ago that you

3   were going to do a paternity test on Teco because it was at

4   least questionable if Kanzi was the father, right?

5   A.  No.  What I told him was that I had the capability to do a

6   paternity test on Teco if that was something that he desired to

7   have done.

8   Q.  You didn't tell him you were going to go back to your

9   office, do it and e-mail the results?

10  A.  I said we could talk about it, but I certainly promised

11  nothing.

12  Q.  Did you discuss with him the use of lexigram keyboards while

13  you were there?

14  A.  Not so much.

15  Q.  Right.  Because when you were there, you saw that they were

16  being used, correct?

17  A.  No.  I wasn't paying -- I said I saw -- what I saw there was

18  the big screen in the main room and it was on, and mostly we

19  went in the back where the -- when we interacted with the

20  bonobos, we were not interacting with lexigrams, and then there

21  was a high school tour going on.

22  Q.  And you weren't paying attention to lexigrams during your

23  visit?

24  A.  That was not the purpose of my visit.

25  Q.  Earlier you told us an analogy about a tree and some

1  research and about how Dr. Rumbaugh had been removed from the

2  facility and removed from the situation, right?

3  A.  Uh-huh.

4  Q.  Is that correct?  Was that correct?  I mean, do you recall

5  that testimony?  I'm sorry.

6  A.  Yeah.  It was not a tree, but yeah, yeah.

7  Q.  I apologize.  Let's be clear, now, Dr. Rumbaugh removed

8  herself from the facility in the fall of 2013, isn't that right?

9  A.  I have no idea.

10  Q.  Okay.  Grab a binder up there if you would next to you with

11  the plaintiffs' exhibits.

12  A.  This one (indicating)?

13  Q.  Great.  If you would look at Exhibit 1005 for me.

14  A.  Yes.

15  Q.  I mean, you certainly knew in the fall of 2013, the plan was

16  for Dr. Rumbaugh to be leaving the facility?

17  A.  Yes, I did.

18  Q.  Right?

19  A.  I did.

20  Q.  And if you look at 1005, that's an e-mail that you received

21  from Dr. Sue, correct?

22  A.  Let me just confirm that I'm on this e-mail list.

23        I see my name on the cc, yeah.

24  Q.  Right.  If you go to the third page, top of that page, you

25  would have received this e-mail and read it, I assume?

1  A.  Yes.

2  Q.  She says, "I also hope that, as appropriate, and under

3  Jared's direction, I will continue to do some research with the

4  bonobos, once the needed structural changes and funding are

5  firmly in place.  I will do nothing to disrupt this critical and

6  necessary next step."

7          Do you see that?

8  A.  I do.

9  Q.  And on the page before, if you go to the second page, at the

10 very bottom, she tells you, "While Jared and Bill are familiar

11 with language work, their focus is on investigating the effects

12 of language acquisition as well as comparing and contrasting

13 bonobos and chimpanzees."

14         Do you see that there?

15 A.  I do.

16 Q.  In fact, she tells you and the rest of the board, "This is

17 appropriate and the direction that should now be taken," right?

18 A.  I see that, yes, uh-huh.

19         (Pause.)

20         THE WITNESS:  Is there a question?

21         THE COURT:  None pending.

22 BY MR. MILLER:

23 Q.  Again, I think you said you understood that she was leaving

24 at that point in time?

25 A.  I understood that she would not be working full time all the

1  time, yeah.  That's how I understood it.  As it says here, it is

2  my hope that I will continue to do some research with the

3  bonobos.  That's what I understood.

4  Q.  Right.  You also understood that that would be as

5  appropriate and under Jared's direction once the needed

6  structural changes and funding are in place; you understood

7  that, too, right?

8  A.  I understood Sue to be a principal investigator capable of

9  making her own scientific decisions and going through proper

10  channels to do research, yeah.

11  Q.  Right.  And principal investigator is a term of art that you

12  use for somebody that's submitted a research protocol that was

13  approved to do research at a facility, is that correct?

14  A.  Well, it doesn't have to be at a facility; just to do

15  research, yeah.

16  Q.  Okay.  And earlier you testified about all sorts of things

17  that you thought were not disclosed to you.  You didn't know

18  about Sue had been removed from the facility, right?

19  A.  Uh-huh.

20  Q.  You didn't -- that's a "yes," correct?

21  A.  Yes.

22  Q.  You didn't know that she was not apparently on the IPLS

23  board; is that what your testimony was?

24  A.  In the question that Mr. Zifchak asked me at that time, yes,

25  I stand by my testimony.

1  Q.  Sure.  You didn't know anything about Yerkes?

2  A.  No, I did not.

3  Q.  You still don't know anything about Yerkes today, right?

4  You don't have any personal knowledge about what Yerkes may or

5  may not be doing at that facility?

6  A.  You're absolutely correct.  All I know is what Jared has

7  told me about Yerkes.

8  Q.  Okay.  Did he tell you when you were visiting about chimps

9  coming that Yerkes had said Dr. Sue can't be here because Yerkes

10 is telling me they can't be here?

11 A.  No, he did not.

12 Q.  And, to your knowledge, nobody at Bonobo Hope knows anything

13 about Yerkes directly, correct?

14 A.  Well, many of us know about many things about Yerkes.

15 Q.  Let me be clear.  None of you know for a fact or have

16 personal knowledge, direct knowledge, that Yerkes has put some

17 sort of condition relating to Dr. Sue participating and whether

18 chimps can come to Des Moines?

19        MR. ZIFCHAK:  Could we have an understanding of who

20 "you" is in the question?

21        MR. MILLER:  Sure.

22 BY MR. MILLER:

23 Q.  My question is, does anybody on Bonobo Hope, has anybody

24 ever told you that, that they have that understanding or that

25 personal knowledge?

1   A.   Nobody on Bonobo Hope has told me, but Jared has told me

2   that he is -- would be unable to obtain research funds if

3   Dr. Rumbaugh was allowed access to the facility.

4   Q.   When did he tell you that?

5   A.   Most recently on my most recent visit and also on the

6   telephone.

7   Q.   Well, I just asked you if --

8   A.   No.  I'll clarify.

9   Q.   Okay.  Please do.

10  A.   I didn't say that Jared named names of individuals at

11  Yerkes.  I'm not in Jared's head.  I'm just telling you what

12  Jared said.

13  Q.   Tell me precisely what he told you.

14  A.   He said that for him to be able to get assurances from his

15  institutions, whatever that may mean, Sue should not be working

16  there.

17  Q.   And what kind of assurances?

18  A.   What do you mean?

19  Q.   Well, you --

20  A.   I'm just telling you that's what he told me.  That's the end

21  of it.

22  Q.   You don't know what he was talking about?

23  A.   I could speculate.  But why would I do that?

24  Q.   Fair.  And you don't have any knowledge about Yerkes putting

25  a condition -- you personally don't have any knowledge about

1  Yerkes putting a condition on chimpanzees coming to this

2  facility, correct?

3  A.  Correct.

4  Q.  Did you talk to Dr. Sue before the vote at the end of -- in

5  December of 2013, a vote that you say was tainted by this lack

6  of knowledge, did you ask her, Dr. Sue, are you still at the

7  facility?

8          MR. ZIFCHAK:  Objection.  How many questions is the

9  witness required to answer?

10          THE COURT:  I think it is a compound question.  Let's

11  take another shot at it.

12  BY MR. MILLER:

13  Q.  Okay.  Did you ask Dr. Sue before you voted in December of

14  2013 if she was still working at the facility?

15          MR. ZIFCHAK:  I think that question lacks foundation.

16  The vote was in November 2013.

17  BY MR. MILLER:

18  Q.  Same question with the clarification that it was November

19  2013, if I misspoke.

20  A.  I did not ask Liz, I did not ask Heather, I did not ask Sue,

21  I did not ask anyone if they had been removed access to the

22  facility because it hadn't occurred to me that that would have

23  happened.

24  Q.  And you didn't ask her, correct?

25  A.  No.  I had these kinds of e-mails from her that said things

WISDMAN   CROSS

1  like she will continue to do research.

2  Q.  Okay.  You didn't ask her about her status at IPLS at that

3  time, did you?

4  A.  No.

5  Q.  You didn't ask her anything about whether there's conditions

6  about Yerkes?

7  A.  Why would I do that?

8  Q.  Well, you're testifying -- are you testifying that these are

9  issues that were important to you when you took that vote?

10  A.  No.  I'm testifying that those issues were not raised when I

11  took that vote.

12  Q.  Okay.  They weren't raised.  Did they matter?

13  A.  You know, I also didn't ask if there was an astroid that hit

14  the facility.

15  Q.  No, I know, but if --

16  A.  It was unexpected.

17  Q.  You're here today testifying that these were issues that

18  were apparently material to you when you took that vote, is that

19  correct?

20  A.  Correct.

21  Q.  And you did not ask Dr. Rumbaugh about any of those issues,

22  correct?

23  A.  Correct.

24  Q.  Were you asleep at the switch?

25  A.  There's a switch?

```
 1            MR. ZIFCHAK:  Objection.

 2            THE COURT:  It's argumentative.

 3  BY MR. MILLER:

 4  Q.  Have you, Dr. Wildman, provided any fund-raising support or

 5  funding to the Great Ape Trust or to the ACCI -- sorry; to Great

 6  Ape Trust?

 7  A.  Have I -- I've donated a little bit of money to the Great

 8  Ape Trust, sure.

 9  Q.  When did you do that?

10  A.  A couple of years ago.

11  Q.  Okay.  You haven't donated to the current ACCI, correct?

12  A.  No, I have not, I don't think so.

13  Q.  To your knowledge, have any of your colleagues on the Bonobo

14  Hope board donated any money to the operation?

15  A.  I have no knowledge of what my colleagues have done.

16  Q.  But you've sought funding for a facility in Missouri, is

17  that correct?

18  A.  I personally have not, but I'm aware that that's going on.

19            MR. MILLER:  Thank you, Doctor.  I appreciate your

20  time.

21            I'll pass the witness.

22            THE COURT:  Redirect?

23            MR. ZIFCHAK:  Thank you.  Just a couple of quick

24  questions and then we'll let Mr. Professor Wildman get back on

25  the road to Champaign, Illinois.
```

```
 1                    REDIRECT EXAMINATION

 2   BY MR. ZIFCHAK:

 3   Q.  First of all, in addition to Kennesaw, do you know of any

 4   other institution with which Dr. Taglialatela is currently

 5   affiliated?

 6   A.  Yerkes.

 7   Q.  So that when he told you that his institutions required

 8   certain assurances before they would let chimps arrive at the

 9   Des Moines lab, he was referring to Kennesaw and Yerkes,

10   correct?

11   A.  That was my assumption.

12             MR. ZIFCHAK:  Nothing further.

13             Thank you.

14             THE COURT:  Anything further?

15             MR. MILLER:  No.

16             THE COURT:  You may step down, sir.

17             Thank you.

18             THE WITNESS:  Thank you.

19                               (Witness excused.)

20             MR. STAMBAUGH:  May we call our next witness, Your

21   Honor?

22             THE COURT:  Please.

23             MR. STAMBAUGH:  The claimants call Mr. Ryan Sheldon,

24   and Mr. Neihaus will be doing the examination.

25             May I inquire and get Mr. Sheldon?
```

1            THE COURT:  Yes.

2            Would you come forward, please.

3            THE CLERK:  Please raise your right hand.

4       RYAN DOUGLAS SHELDON, DEFENDANTS' WITNESS, SWORN

5            THE COURT:  Be seated right there, sir.

6                      DIRECT EXAMINATION

7   BY MR. NEIHAUS:

8   Q.  Good afternoon, Mr. Sheldon.

9   A.  Thank you.

10  Q.  Would you please state your full name for the record.

11  A.  Ryan Douglas Sheldon.

12  Q.  Why are you here today, Mr. Sheldon?

13  A.  Your Honor, my history with this bonobo colony spans 23

14  years, and the knowledge I have gained from this bonobo colony

15  has allowed my business to grow to sell millions of dollars

16  worth of product.  And I'm here today because I built a facility

17  in Missouri because I would like to relocate them on 200 acres

18  of land near my home.

19            I'm here today to provide a lifelong funding solution

20  for the bonobo colony, and it is my belief that it is my moral

21  and ethical obligation to these bonobos to support them for the

22  rest of their life, and I'm here to ask you if you will make it

23  my legal obligation.

24  Q.  Thank you, Mr. Sheldon.

25            If I could just ask you to speak a little bit louder

1 and into the microphone in front of you.

2 A.  Okay.

3       MR. NEIHAUS:  Your Honor, Mr. Sheldon has prepared a

4 PowerPoint presentation that we would like to use purely for

5 demonstrative purposes.  We have shared it with opposing

6 counsel, who has indicated they have no objections to our

7 publishing it to the court solely for demonstrative purposes,

8 and so with the court's permission, we would like to publish.

9       THE COURT:  That's fine.

10 BY MR. NEIHAUS:

11 Q.  Mr. Sheldon, what do you do for a living?

12 A.  I am CEO and founder of National Control Devices, which is

13 ControlAnything.com and ControlEverything.com.

14 Q.  And what kind of company is that?

15 A.  We're an electronics design and manufacturing firm, and we

16 do all our electronics design work in our facility in Osceola,

17 Missouri, and we also do our manufacturing at that facility.

18 Q.  When did you found the company?

19 A.  I believe it was October of 1995.

20 Q.  Where is your company located?

21 A.  We are located at 430 Market Street, Osceola, Missouri.

22 Q.  And what type of products does National Control Devices

23 make?

24 A.  We specialize in making computer-controlled switching

25 products.  We turn things on and off for a living.  We

1  specialize in iPad control, Android control.  We can control

2  pumps, valves, motors, solenoids, gates, all of those kinds of

3  things, from a computer anywhere in the world.

4  Q.  And if you can tell a little bit more about what the

5  technology that your company develops allows people to do.

6  A.  Yeah.  The technology that we work with, we work

7  specifically to customize our product for many customers.  We've

8  customized our product for computer-controlled switching

9  companies all over the United States and actually all over the

10  world.

11  Q.  Does the company have any plans for expansion in the coming

12  year?

13  A.  Yes, we do.  In 2016 we're introducing -- or we're retasking

14  ControlEverything.com to be a social networking web site that

15  introduces 600 new products to the market that also hits 12 new

16  targets.

17  Q.  Is the company profitable?

18  A.  It's very highly profitable.

19  Q.  Can you tell me a little bit about the company and its

20  statistics?

21  A.  Yes.  We have 14 full-time employees.  We have now 20 years

22  in the business.  We have shipped over 52,000 orders.  We have

23  over 4,000 products in our product line.  We're currently

24  shipping about 3.4 million dollars worth of product to our

25  customers each year, and we've seen a very steady increase of

1  about 27 percent per year.

2  Q.  And what's your percentage of repeat customers?

3  A.  We have a very high percentage of repeat customers.  It

4  is sometimes -- we believe the latest numbers might be as high

5  as 90 percent, so --

6  Q.  You mentioned your clients before.  Who are your clients?

7  A.  Our clients are companies like Google, Apple, Microsoft,

8  Intel, Lockheed Martin, McDonnell Douglas, Boeing and customers

9  like that.

10  Q.  Do you have any governmental clients?

11  A.  Yes.  We have a huge number of government clients.  We work

12  with NASA very frequently.  We work with the FBI.  We work with

13  the U.S. Army and the U.S. Navy, as well as many other

14  government organizations.

15  Q.  And any local clients here in Des Moines?

16  A.  In Des Moines, yes, we have many.  We've worked with Hach is

17  one of our clients.  Northern Iowa Shrimp is another one of our

18  clients.  We've worked with the University of Iowa, Iowa State

19  University, and I believe we've got Rockwell Collins is another

20  one of our big clients in Iowa.

21  Q.  I would like to ask you now, when did you first meet and

22  become involved with Dr. Sue Savage-Rumbaugh and the bonobo

23  colony?

24  A.  I was introduced to the work of Dr. Sue Savage-Rumbaugh on

25  my 20th birthday, which was December 24th of 1991, and it was

1   one of the greatest birthday gifts a person could ever have.

2   Q.   What happened on that day?

3   A.   I went to visit a man named Russ Rupert on a job interview,

4   and Russ and Pam wanted to hire me to write a video game

5   software for test applications for chimpanzees.

6   Q.   And did they hire you?

7   A.   Yes, they hired me, and I continued to work there for seven

8   months.

9   Q.   What was the name of that company?

10  A.   The name of the company was called Public Sphere.

11  Q.   And where did you go after Public Sphere?

12  A.   In July of that year of 1992 -- I worked with Russ for seven

13  months, and in July of 1992 I moved to Atlanta to work with Sue

14  directly.

15  Q.   And where did you work with her?

16  A.   At the Language Research Center at Georgia State University,

17  the Language Research Center in Decatur, Georgia.

18  Q.   Can you tell me a little bit about the Language Research

19  Center?

20  A.   Yeah.  The Language Research Center was a phenomenal place.

21  Basically it was a USDA type facility.  It had extra offices in

22  the front for administrative tasks and things of that nature.

23  It had a large acreage.  We had a really great interaction with

24  the bonobos.  We spent a lot of time walking with them outside.

25  We were encouraged to use the keyboard.  We were encouraged to

1   spend a lot of time with them, treat them as though they were

2   people, treat them as our friends because they became our

3   friends in that time.  It was a really, really incredible place.

4   It was very well isolated, and it was very focused on the

5   research and it was very focused on the well being of the

6   bonobos.

7   Q.  And how did you develop your technology to serve the

8   research needs of Dr. Savage-Rumbaugh and the bonobos?

9   A.  Dr. Sue Savage-Rumbaugh asked me to develop a keyboard -- or

10  a relay controller, which was basically used to dispense food to

11  chimpanzees whenever they got a task right.  And I developed

12  that relay controller for Dr. Sue Savage-Rumbaugh, and that was

13  the basis upon which I formed my company.

14  Q.  I see on the slide here --

15  A.  Yeah.

16  Q.  -- talking about the merging of the technology.  There's a

17  picture.

18  A.  Yeah.

19  Q.  Can you tell me a little bit about that picture?

20  A.  Yes.  Panbanisha was a great friend of mine.  I spent a

21  great deal of time with her in the woods.  Most of the time we

22  didn't have cameras near us.  Most of the time Panbanisha and I

23  just hung out a lot.  We played, we used the keyboard a lot.

24  And she really showed me that she is a person inside.

25  Q.  So is this you then in the picture?

1  A.  This is me and Panbanisha together.

2  Q.  And what are you doing in the picture?

3  A.  Well, right now we're sitting and we're about to use the

4  keyboard because Sue is ready to do some work for her research.

5  So we have to kind of calm her down a little bit and get her to

6  focus.

7  Q.  And that's the keyboard in front of you?

8  A.  Yeah.  The keyboard is to the right on the bottom corner.

9           At that time Sue really taught me the importance of

10  merging technology with research, and technology and research is

11  very symbiotic.  They rely on each other, and without one the

12  other is not as good.

13  Q.  How long were you at the Language Research Center?

14  A.  For seven years.  I left in September 15th of 1999.

15  Q.  And why did you leave?

16  A.  Sue was getting ready to go to Iowa, she was making plans

17  for that, and I was making plans to grow my company further.

18  Q.  Did you maintain a relationship with Dr. Savage-Rumbaugh

19  after leaving?

20  A.  Yes, I did.

21  Q.  Can you tell me about that relationship?

22  A.  Well, Sue and I have always been close.  Sue and I have --

23  she stopped by to visit my office many times throughout the

24  years.  She's kind of seen us grow, and she has -- she's always

25  kind of kept me up to date on how the bonobos are and those

1  kinds of things, and we just had a really great, really great

2  working relationship.

3  Q.  Mr. Sheldon, what is it that you have proposed to house the

4  bonobos going forward?

5  A.  What I'm proposing to do is to create a facility that is

6  based more like what we had at the Learning Research Center.  It

7  was more of a basic USDA facility.  It was designed for low cost

8  of operation.  It was designed for -- basically to have all of

9  the things that we had at the LRC, which were to have the

10  freedom, the ability to do what we did then that made the

11  research very successful.  And so that is the path that I am

12  really trying to follow now is to go back to the LRC standards.

13  Q.  And where is this facility located?

14  A.  This facility is located in Osceola, Missouri.  It is

15  located near my home.  I have a 200-acre farm, which is next to

16  the bluffs of where I live, in Osceola.  I also have a guest

17  house in town, and Sue has come to stay in the guest house

18  numerous times as we've made plans for this facility.

19  Q.  I see on the slide there's a picture with some arrows on it.

20  Can you please tell us what those are.

21  A.  Yes.  The red arrow is the farm.  It's the approximate

22  location of the facility.  The blue area is where my home is,

23  and the yellow area is where my guest house is.

24  Q.  Where is your office?

25  A.  My office is -- the town is bigger than that photo shows.

1  My office is a little bit -- it would be below the yellow arrow

2  so --

3  Q.  And what are we looking at in these pictures?

4  A.  In that photo -- and this kind of shows a reference point of

5  the area of where we're building.  It's about three-quarters of

6  a mile off the bluff, and it is divided -- the bluff area is

7  divided with a road.  It is very deep and very heavily forested,

8  but also in an open field area.  So we have a mix of forest and

9  open area, pasture areas.

10  Q.  So if I understand you correctly, the river that we see

11  there (indicating)?

12  A.  Uh-huh.

13  Q.  It's the river, and then the red arrow is pointing to a very

14  small structure far off?

15  A.  Right, that's right, exactly.  That arrow is very accurately

16  positioned.  At the bottom of that arrow is where the facility

17  would be located.

18  Q.  And about how far is that?

19  A.  It's about three-quarters of a mile from the edge of the

20  bluff.

21  Q.  What are the facilities that have been planned?

22  A.  The facilities are -- we have modeled them on the USDA

23  facilities.  We've planned a 40 x 80 building.  If I might read

24  through some of these, there's a lot of details, and I don't

25  want to leave these out.  We've planned for five 18 x 11 cages.

1  We've planned for a 25 x 17 utility room, a 15 x 15 infirmary.

2  We have tunnel access to the infirmary, as well as three tunnels

3  to cages 1, 3 and 5 -- my screen went blank.  The screen is out.

4  Q.  Sure.  You can look at the one right behind you if that's

5  all right.

6  A.  Yes.  Dr. Amory Lovins has consulted with me and he has

7  recommended the insulation --

8          MR. MELHUS:  Objection.  Excuse me.  Objection to the

9  extent that he's testifying to hearsay, anything that Dr. Lovins

10  has told him in the past, for the truth of the matter asserted

11  here.

12          THE COURT:  I'll receive it, subject to the objection

13  and only for the purpose of explaining the reason for the

14  design.

15          THE WITNESS:  I'm sorry?

16          THE COURT:  You may continue.

17          THE WITNESS:  Okay.  Thank you.

18  A.  (Continuing)  Dr. Amory Lovins has had numerous

19  conversations with me because he is an energy management

20  specialist.  He focuses -- he is world renowned at the Rocky

21  Mountain Institute as an energy management.  He flies all over

22  the world for this particular type of thing, and he has

23  consulted with me because we want to make this facility be very

24  low cost and self-sustaining as much as we possibly can.  So

25  that is the purpose why we have consulted with him about this.

1  BY MR. NEIHAUS:

2  Q.  Was there anything more you wanted to say about the

3  facility?

4  A.  We have -- again, we have really focused this in on being a

5  USDA type facility.  We have modeled it around the colony room

6  that we had at the Language Research Center.  It is kind of a

7  combination of the colony room and the P-Suke Building that we

8  had at the Language Research Center.

9  Q.  Can you tell me about the floor plan?

10  A.  Yeah.  The floor plan is -- Sue and I worked on drawing the

11  floor plan in coordination with our builder and our plumber.

12  It's got a very intricate plumbing system.  We've positioned all

13  of the utilities to the left side of the facility so that

14  maintenance can be done without any interaction into the ape

15  areas.  The right side of the facility serves as a storm shelter

16  with tunnel access, and also it would double, could be used for

17  double purpose as an infirmary.

18  Q.  What are the important utilities at the facility?

19  A.  I'm sorry, I have to read some of this.  I'm having trouble

20  keeping up with this.  We have a dual 120-gallon --

21         MR. NEIHAUS:  Mr. Sheldon, I'll just ask you to wait

22  one minute.

23         THE CLERK:  I believe the screen just got turned off.

24         MR. NEIHAUS:  Okay.

25         (Pause.)

1        MR. STAMBAUGH:  Your Honor, we have a paper copy.  May

2   I approach?  Would that help?

3        THE WITNESS:  Yes.  Okay.  Sorry for the interruption.

4   BY MR. NEIHAUS:

5   Q.  You were taking about the utilities?

6   A.  Yeah.  The utilities, we have a dual 120-gallon pressurized

7   water tank.  That was recommended by our plumber.  We have grid

8   power with five kilowatt of two-day reserve battery backup.  We

9   have a thousand gallon propane tank with propane generator,

10  which would allow us to run the facility off of the generator if

11  we need to.  We have a 50-foot propane radiant heater.  This is

12  a very special heater that is specific for this facility.  This

13  heater operates off of -- without grid power.  It will operate

14  as an emergency heat source in the event that we were to lose

15  utilities.  We have dual HVAC conventional air-conditioning.  We

16  have a high power humidification system that is being planned

17  right now.  We have radiant floor heating, metal encapsulated

18  electrical wiring throughout the entire facility with GFI

19  protection.  We have a high pressure water sprayer system to

20  keep the facilities sanitary.  We have a propane water heater

21  with a wood burner backup.  We also have interior low power LED

22  lighting with day/night dimming.  The apes actually can control

23  the brightness of the light inside the cages with the system.

24        All utilities are accessible from the west side as I

25  mentioned earlier before, and we have a fresh air exchange

1  system for air quality to make sure the air quality stays good

2  inside the building.

3          We have many more utilities planned, but that is --

4  that's where we're at at this time.  This is what we have as our

5  must have list of utilities.

6  Q.  When did construction of the facilities start?

7  A.  We started in September of 2014 building the facility, and I

8  have photos of the facility as we go through the construction.

9  Q.  So what are we looking at this first?

10  A.  The first photo is -- the red is the radiant floor heating

11  with the infrared reflective barrier.  It also serves as

12  moisture barrier for the facility.  And they're pouring concrete

13  in this photo.  This is a special concrete.  It's cement mix

14  with fiber backup.  The reason we do fiber is to prevent

15  cracking.  We don't want cracking in USDA facilities, not

16  advisable.

17  Q.  What are we looking at in this next photo?

18  A.  This next photo kind of shows the pillars starting to form

19  for the cages in the corners, each cage.

20          And also there's a worker there.  He is working

21  setting the next group of blocks, and below him -- or I guess

22  behind him, he's got a trough which serves as the main drain

23  behind the cages for cleanup.

24  Q.  And could you tell me about these photos?

25  A.  Yeah.  These photos show a much better picture of the drain

1   system that we have planned.  The wall in the back is the

2   opening where we'll put the tunnel for the storm shelter, which

3   would also serve as an emergency storm shelter and as an

4   infirmary, and that's where the blocks are knocked out in the

5   photo.

6          And Sue came to visit the facility.  This kind of

7   gives you a general reference of size.  It's a very -- we have

8   plenty of height, far beyond the USDA recommendations in size.

9   Q.  Are there any outdoor areas near the facility?

10  A.  Yes.  We have outdoor areas planned for the facility.  Many

11  of these outdoor areas are still in the planning phase.  We're

12  focusing on the building at this time.  And in future

13  conversations with Sue and the USDA, we will plan a caging

14  system that would be exactly what is -- what we need.

15  Q.  What kind of security measures do you have in place?  I'm

16  sorry, what -- can you tell me what's in this photo?

17  A.  Oh, this is an artist rendering of the overview of the

18  facility.  It kind of shows its basic structure and size.  It's

19  a very modest facility, and Sue and I wanted to name this

20  after -- this facility after Panbanisha who was our very, very

21  close friend.

22          And so it's designed to be sustainable.  It's designed

23  to be sustainable at low cost so that we can focus more funds on

24  doing everything that the apes would need to enrich their lives.

25  Q.  Now, can you tell me about the security measures you have in

1  place?

2  A.   Yes.   Our company has a special connection to the security

3  industry.   We work with a lot of security companies, and so we

4  have planned an 8-zone fire detection system, a 20 zone push

5  notification system.   This will allow us to have buttons

6  throughout the facility that would immediately send a text

7  message to everybody who's connected to the network.   No matter

8  where you happen to be, you will get a text message from the

9  facility.   We will have 10 zones of indoor/outdoor ultrasonic

10  motion detection system.   This system cannot be penetrated.   It

11  cannot be bypassed.   There is no known way to get around an

12  ultrasonic motion detection system.   We have 20 zones of low

13  power LED exterior flood lighting.   We have 8 zones of security

14  cameras system with remote access to all the cameras.   We have

15  an RFID card swipe system that will be in place hopefully later

16  this year that would give access/control to the cages so you

17  would have to swipe the card to get into the cages, and it would

18  not allow you to leave doors open that would allow for an escape.

19  Q.   When is the projected opening of the facility?

20  A.   We're hoping to open late August for a lot of the actual

21  facilities themselves.   We also hope to be getting the outdoor

22  play yards finished in September or October.   In 2016 I would

23  like to expand the play yard area to a much larger size, but the

24  original size that we planned is more to meet the USDA

25  requirements.   The second size is to give them a lot more free

1    space.

2    Q.   You mentioned the USDA requirements?

3    A.   Right.

4    Q.   What are those guidelines?

5    A.   We read a number of guidelines as we were designing the

6    facility, and Sue and I read those together, and we determined

7    that a lot of the guidelines were specific more to cage size and

8    transport and some of the basic requirements for ape care.  We

9    have made sure that we have followed all of these guidelines to

10   the best of our ability, but it's been awhile since I've read

11   it, so I don't have all of the guidelines in memory right now.

12            We've also been working with a company called Swmo

13   Safety.  They do OSHA safety certification for our company, and

14   we're going to employ them to do OSHA safety certification for

15   this facility as well.

16   Q.   Has your building been inspected?

17   A.   Yes.  The building has been inspected by Matt Bishop.  This

18   inspection was to guide us to any corrections, any minor issues

19   that we needed to address, and it's been very helpful.  We will

20   have a final inspection prior to a USDA inspection, so --

21   Q.   What is the purpose of relocating these bonobos to Missouri?

22   A.   My primary purpose for bringing them to Missouri is to give

23   them a safe, open place where they can go back to the kind of

24   work that we used to do at the LRC.  That is my first and

25   foremost concern is that we have the best kind of facility at

1   that time for the type of language research that Sue was doing.

2   I would like to return to that trajectory as much as we can so

3   that the research can continue.

4          I would like to provide never-ending improvements to

5   the bonobo environment.  The bonobo environment never stops

6   changing.  When you get into a facility like this, you realize

7   that you always need to make adjustments and improvements in the

8   bonobo environment, and this is one of my hugest commitments to

9   this project is to always be improving on and expanding their

10  environment so that they have an incredible place to play.

11         I would also like to develop hardware and software

12  technologies.  With Sue and I working together, we can propel

13  the research many, many years ahead.  Sue and I have the ability

14  to work very synergistically together, and we know exactly how

15  to plan the research with the technology.  We have learned that

16  many years ago, and we are not afraid of returning to that

17  model.

18         I would also like to provide Dr. Sue Savage-Rumbaugh

19  with lifetime access to the bonobo colony.  That is, in my

20  opinion, critical.  These bonobos form relationships with

21  people, and they hurt when people are missing from their life as

22  we would hurt when people are missing from our lives.  I have

23  experienced this, and I cannot explain it to anyone who has not

24  experienced it; but I can tell you these bonobos are like people

25  inside and they love us as much as we love them.

1  Q.  What -- I'm sorry.

2  A.  My other objectives that I really want to mention is that I

3  would -- Dr. Sue Savage-Rumbaugh, in my mind, has been a huge

4  role model in my career.  She has been a wonderful inspiration.

5  She has been a pillar.  She has been someone who I feel has been

6  sent to guide me through life, and I would like to honor her

7  with archiving all of her work on our web site.  All of the

8  history I can put together, I want to put it on our web site,

9  and I would like to enrich humanity by sharing all of the work

10  and all of the technology and make it available to anyone who

11  wants to do whatever they need to do, and we want to share it at

12  Apes.ControlEverything.com.

13  Q.  What are you and your company prepared to commit to this

14  bonobo colony and to Dr. Savage-Rumbaugh in terms of services?

15  A.  I consider this to be a lifetime commitment.  This is huge

16  for me, and I don't make many lifetime commitments in my life.

17  Q.  So what kind of services would you provide?

18  A.  The building and site maintenance is going to be provided by

19  my company.  We're also going to be covering the costs of

20  transport of the bonobo colony.

21       We will provide accounting and tax services with RMMC

22  in Springfield, which is a very large accounting firm that we

23  work with.  We will also be providing administrative services

24  for this facility.  We will be contributing technology to

25  perpetuate Sue's work, whatever that may be.

1        We will also work with Swmo Safety for bi-annual OSHA

2   safety certifications to make sure our facility stays OSHA

3   compliant and safe.

4        We will also be providing employee health screening,

5   TB testing, and all necessary vaccinations for everyone who has

6   contact with the bonobos.

7   Q.  And what kind of commitment are you and your company

8   prepared to make in terms of financial support?

9   A.  My company is ready to commit to a 40 x 80 pre-engineered

10  building.  That's not the end.  It's the beginning.  I'm willing

11  to commit 203 acres of land which this resides on, this property

12  resides on, an irrevocable $104,000 annual contribution from

13  National Control Devices, LLC.  I would also like to commit

14  $2,000 a week to be paid to ACCI.  I have a good friend,

15  Dr. Jared Taglialatela, and I would like to see ACCI have the

16  funds that they need to take care of the bonobos while they're

17  in Iowa.

18  Q.  And that commitment is until --

19  A.  That is until the relocation, until the USDA-approved and

20  court-approved relocation.

21       I would like to -- I'm also offering a renewable

22  five-year bank guarantee of $520,000.  This will be renewed

23  annually.  So if anything should happen to me or my business,

24  there would be at least five years of funding that would be

25  guaranteed to make sure that everything goes well.

1  Q.  And have you received any assurances or approvals from a

2  bank?

3  A.  Yes.  My very close friend, Scott Buerge from Metz Banking

4  Company, he is the president of Metz Banking Company, he has

5  also been the person who has helped me start my business from

6  the very beginning to where it is today, and we've had many long

7  conversations about this, and he has offered this $520,000 line

8  of credit to be used in the event that I cannot fund it with

9  cash, but I do intend to fund this with cash every single year,

10  so --

11  Q.  At this time I would like to identify for the record Exhibit

12  94.  Mr. Sheldon, in that big notebook to your left that's

13  sitting on the ledge, there's a book of exhibits.

14  A.  Okay.

15  Q.  It's even further to your left.

16  A.  Okay.

17  Q.  There you go.  If you could please turn to Exhibit 94.

18          MR. MELHUS:  Your Honor, I would like to assert an

19  objection to Exhibit 94 at this time.  We believe that this is

20  hearsay and lacks foundation.  This letter is being offered to

21  prove that this money is going to be available, so it's offered

22  for the truth of the matter asserted, and I don't think that BHI

23  or Dr. Sue Savage-Rumbaugh intend to offer the author of this

24  letter as a witness in this case.

25          THE COURT:  I don't know that it's been offered yet.

1  Has the exhibit been offered?

2          MR. NEIHAUS:  It has not been offered yet.  We do

3  intend to offer it.  Can I lay foundation first?

4  A.  Yes, that is the letter of credit.

5  BY MR. NEIHAUS:

6  Q.  Can you tell me, how did you receive this letter?

7  A.  Scott Buerge signed it for me on Sunday evening.  We were

8  both pressed for time, and we met and he signed this and brought

9  it to me.

10  Q.  Did you request this letter?

11  A.  Yes, I did.

12  Q.  For what purpose?

13  A.  For securing the future of these bonobos.

14  Q.  And, to your understanding, what does this letter give

15  assurance of?

16  A.  This letter gives assurance that if anything should happen

17  to me or my company that the bonobos will continue to be funded.

18          MR. NEIHAUS:  At this time we would offer Exhibit 94

19  into evidence.

20                              (Defendants' Exhibit 94 was

21                              offered in evidence.)

22          MR. MELHUS:  We assert the same objections as we did

23  earlier, Your Honor.

24          THE COURT:  Thank you.

25          94 will be received, subject to the objection.

1                    (Defendants' Exhibit 94 was

2                    received in evidence.)

3           THE WITNESS:  He's willing to accept a phone call if

4    anyone is interested.

5    BY MR. NEIHAUS:

6    Q.  And were there any other financial commitments?

7    A.  Yes.  I believe I have about a hundred thousand dollars left

8    to finish this building, and this figure is a little bit out of

9    date.  I've now committed a total of 1.25, one-and-a-quarter,

10   million dollars in resources to this project in land,

11   facilities, trust fund, and cash.

12   Q.  Have you received any support in your endeavors to build the

13   facility?

14   A.  Yes, I have.  I have received --

15   Q.  And to move this bonobo colony?

16   A.  Yes.  I received letters of support from Dr. Amory Lovins

17   and Dr. Jane Goodall.

18           MR. NEIHAUS:  Thank you, Mr. Sheldon.

19           I have no further questions, subject to rebuttal.

20           THE COURT:  Cross-examination?

21           MR. MELHUS:  Just briefly, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. MELHUS:

24   Q.  Mr. Sheldon, when did you begin construction of this

25   facility in Osage (sic), Missouri?

1   A.  I believe I had that marked in September, so I can look back

2   at the slides to see.  It has a better document.

3   Q.  Okay.  And in September of 2014 I think your earlier

4   testimony reflects, what was the purpose or purposes for that

5   facility?

6   A.  The purpose is for these bonobos.

7   Q.  Was there any other purpose?

8   A.  It's for these bonobos.

9   Q.  That's the sole purpose for this facility and there's no

10   other purpose?

11   A.  That is the purpose of this facility is for these bonobos.

12   We have discussed the potential that if we cannot get the

13   bonobos there that we may consider chimpanzees for other

14   applications; but the purpose and the reason why it was

15   constructed was for these bonobos.

16   Q.  So the primary purpose would then be for the bonobos, the

17   secondary backup purpose --

18   A.  A secondary backup purpose actually would be determined by

19   BHI.  BHI will then decide what happens to the facility if we do

20   not get the bonobos relocated.

21   Q.  And what purposes other than chimpanzees were contemplated?

22   A.  That was the only purposes that have been contemplated as of

23   now.

24   Q.  And these chimpanzees, where would they come from?

25   A.  That hasn't been decided.  That's well outside my area,

1  so --

2  Q.  Have you had any conversations about where these chimpanzees

3  might come from?

4  A.  No, not any that I can think of.

5  Q.  You've made what you've described as a lifetime

6  commitment --

7  A.  Yes.

8  Q.  -- to the bonobos for as long as they reside at the Missouri

9  facility, right?

10  A.  Yes.

11  Q.  And that lifetime commitment, I'm just trying to unbundle

12  that a little bit, that includes money.  How much money do you

13  expect it to cost to fund the facility each year?

14  A.  I expect it to cost around 80 to 90 thousand dollars to fund

15  the facility each year, but those are projected costs based on

16  our area and based on the information that we have been able to

17  gather.

18  Q.  Do you have any experience in running a facility that houses

19  great apes that would allow you to make such projection?

20  A.  Well, what I did was I looked into the NIH standards, and

21  NIH typically funds chimpanzees for 15 and as high as 17

22  thousand dollars I've seen references to.  So basically they've

23  decided that NIH is willing to fund 15 to 17 thousand dollars

24  from what I've been able to determine per chimpanzee.

25  Q.  Okay.  And what about administrative services?

1  A.  I'm providing that.  That's not part of the money that I'm

2  contributing.  My company is providing all of the administrative

3  services as I outlined in my PowerPoint presentation.

4  Q.  Do you have any idea of what those administrative services

5  might cost your company?

6  A.  I haven't -- I don't think that they're going to cost that

7  much because we have a really good administration in place for

8  my company, and we can -- they are all willing to volunteer

9  their time to work on this, so --

10  Q.  So the administrative services would be volunteered --

11  A.  Right.

12  Q.  -- by people from your company?

13  A.  Right.

14  Q.  What about the tax services that you discussed, how much

15  will that cost?

16  A.  That will cost -- typically tax services for my company cost

17  about seven or eight thousand dollars a year.

18  Q.  And so a similar amount could be expected here?

19  A.  I doubt that it would be that high given the nature of this.

20  Tami from RMMC has been very low cost so far.

21  Q.  What about staffing, how are you going to take care of these

22  bonobos on a day-to-day basis?

23  A.  I don't plan to take care of the bonobos on a day-to-day

24  basis.  What I would like to do is provide the funding and

25  provide the facilities.  I intend to have BHI make the

1  determination as to how staffing is handled.

2  Q.  How much would staffing cost in this type of facility?

3  A.  The general staffing for our facility could be -- I would

4  say in our area we're probably looking at about 20,000 a year as

5  a pretty average annual income for a lot of people.  There are

6  some people who make more obviously and then there are some

7  people who make less, but we're actually in a low to very low

8  income area in terms of Missouri is -- this area of Missouri is

9  a very low income area in Missouri.

10 Q.  So that would mean that labor costs less down there; is that

11 what you're trying to say?

12 A.  That's exactly right.  Labor typically costs less in our

13 area.

14 Q.  And against -- excuse me.  What about food costs, have you

15 determined how much food is going to cost?

16 A.  Yeah, I've discussed that with Sue.  I have discussed that

17 with Sue, and it is very typical of many of these types of

18 organizations to have food donated.  However, we have discussed

19 having a budget for food, and I am certainly willing to increase

20 my budget as necessary to cover those kinds of things.

21 Q.  So you intend to have staff on a volunteer basis?

22 A.  No, I wouldn't say on a volunteer.  We're looking at a paid

23 staff.

24 Q.  Okay.  Administrative staff would be on a volunteer basis?

25 A.  The administrative staff are actually paid at my company.

1   They have extra time at work, and they're willing to do it

2   voluntarily at work; but they will be paid through my company,

3   so --

4   Q.  And the food, you're hoping that that's going to be donated?

5   A.  From what I've been able to determine, food is typically

6   always donated to many of these kind of facilities.  It was

7   donated at the LRC.  Sue has indicated to me that it's been

8   donated at ACCI, and I have no reason to believe that we can't

9   get food donated to this facility as well.

10  Q.  What about the commitment to provide never-ending

11  improvements to technology?

12  A.  Right.

13  Q.  How much is that going to cost?

14  A.  That could cost tens of thousands of dollars to do that.

15  Q.  Okay.  Against whose lifetime is this commitment going to be

16  measured; against your lifetime?

17  A.  That's a good -- that's a very, very excellent question.  It

18  is my hopes that it would go against the lifetime of me and any

19  business that I own.  So as my business currently stands, if I

20  were to die, my business would continue on.  I have employees

21  who can carry it forward without me.  And however it serves the

22  interests of this court, I would like for it to always be a

23  lifetime commitment for me, for any business that I own.

24  Q.  Have you taken any steps to ensure that that commitment is

25  going to be carried forward?

1  A.  I'm sorry, I don't understand the question.

2  Q.  Other than offering your word of a lifetime commitment, have

3  you taken any steps to ensure that this money will be provided

4  for your lifetime?

5  A.  Well, I've provided a bank letter of credit.

6  Q.  Have you set up a trust, for example?

7  A.  We will set up a trust.  I believe Mr. Zifchak has been

8  working on setting up the trust.

9  Q.  But you haven't done that to date?

10  A.  No, it's not set up yet.  We don't want to set up the trust

11  until we get a decision.

12  Q.  Okay.  Are you aware that Mr. Ted Townsend -- do you know

13  Mr. Ted Townsend?

14  A.  Yes.  I have met Ted Townsend two, maybe three times.  I

15  have a very high regard for Mr. Ted Townsend.

16  Q.  Are you aware he made a similar lifetime commitment to care

17  for the bonobos?

18  A.  Right.

19  Q.  Are you aware that he invested approximately 20 million

20  dollars into the bonobos here --

21  A.  I'm not aware of really anything that he had done in terms

22  of how much or any of those kinds of things.

23  Q.  Would it surprise you to learn that he's invested 20 million

24  dollars?

25  A.  It wouldn't surprise me.  It's a beautiful facility, so --

1  Q.  And are you aware that the 20 million dollars that he's

2  invested -- and I'll represent that that's an approximate figure

3  to you.  Are you aware that that 20 million dollars,

4  approximately, was not enough to fund the facility here and to

5  care for the bonobos?

6  A.  I am aware that facilities such as Chimp Haven operate off

7  of budgets similar to mine.

8  Q.  But the bonobos that we're discussing here and the budget

9  that IPLS had --

10  A.  Yes.

11  Q.  -- with Ted Townsend --

12  A.  Yes.  I can't really speak to those kinds of things.  I'm

13  not aware of much of what has happened in terms of budgeting and

14  planning at ACCI or IPLS, so --

15  Q.  So when you're making your projections about how much it

16  would cost to run your facility in Missouri --

17  A.  Right.

18  Q.  -- you didn't compare the facility here in Des Moines?

19  A.  No, absolutely not.  The facility in Des Moines is not what

20  I would call a USDA sustainable type of facility.  The facility

21  we're building is a USDA sustainable facility.

22  Q.  I'll interrupt for just a second.

23           MR. NEIHAUS:  Objection, Your Honor.  The witness was

24  answering the question.

25           THE COURT:  Oh, I'll entertain another question.  I'm

1  not sure what he hadn't finished as far as the question.

2          Go ahead.

3  BY MR. MELHUS:

4  Q.  Did you make any comparisons between the facility you're

5  proposing in Osage (sic), Missouri, to the facility here in

6  Des Moines during your design process?

7  A.  No, I haven't made any comparisons between the two.  I don't

8  have any basis for the comparison.

9  Q.  Then you have no basis for your conclusion or your testimony

10  that a facility here in Des Moines was not a USDA sustainable

11  facility?

12  A.  I have no basis for comparison on the grounds that the

13  facility in Des Moines is very different than the LRC that we

14  had.  I'm making my basis of comparison for the LRC that we used

15  to work out of.

16  Q.  So what happens, Mr. Sheldon, when, heaven forbid, something

17  bad happens to your company, the economy goes down or some other

18  unforeseen circumstance prevents the profitable operating of

19  your company as it stands today?

20  A.  I've -- failure is a very long way from our company.  We

21  have started and we have built, and we have built slowly and

22  steadily for many, many years.  We are very deeply connected to

23  industries throughout the United States and throughout the

24  world.  Many companies that we work with depend on our parts,

25  which cannot be copied and have not been copied in 20 years.

1  Q.  To make an analogy, Mr. Townsend owned a very successful

2  company here in Des Moines.  Are you aware of that?

3  A.  Yes.

4  Q.  And he felt, based on the success of his company, that he

5  could sustain the bonobos in perpetuity for a lifetime --

6  A.  In --

7           MR. NEIHAUS:  Objection; assumes facts not in

8  evidence.

9           THE COURT:  Well, I get the point that you're making,

10  but I think we're getting rather far afield.

11          MR. MELHUS:  Sure.  I'll move on, Your Honor.

12          Thank you.

13  BY MR. MELHUS:

14  Q.  Okay.  Let's talk a minute about the proposed facility.

15          As it stands today, do you have any electricity in the

16  building?

17  A.  The building has temporary power running to it for the

18  purposes of running construction equipment.

19  Q.  So when you testified earlier that you had a long list of

20  utilities --

21  A.  Yes.  No, these are all utilities that are planned for this

22  facility.  These are -- let me correct that.

23  Q.  Sure.

24  A.  These were planned utilities for this facility.  Our

25  intention is to meet the USDA requirements and then work through

1    these.  These are requirements that we believe we need in order

2    to sustain it long term.  So our -- our objection -- or our

3    primary goal is to meet the USDA requirements first.

4    Q.  Okay.  Fair enough.

5         As it stands today, if we were to try to send bonobos

6    to the facility today --

7    A.  Right.

8    Q.  -- would there be any electricity?

9    A.  No.  It wouldn't be possible to send them today, which is

10   why I'm proposing to donate $2,000 a week to ACCI to sustain

11   them until we can get the facility inspected.

12   Q.  Okay.  And just to confirm, there's no plumbing at the

13   facility --

14   A.  We have --

15   Q.  -- that's operational?

16   A.  Actually we do have quite a bit of plumbing that is

17   operational right now.  That is one of the first parts that

18   we're doing.  It isn't all hooked up yet, but we do have the

19   complete septic system put in, all the drainage is nearly

20   complete.

21   Q.  Are there any windows?

22   A.  Not at this time.  We haven't planned the windows yet.

23   Q.  The HVAC system that you talked about earlier, is that in

24   place?

25   A.  It's not in place yet, but those will be in place before we

1  can get an inspection for USDA approval.

2  Q.  And the fire detection system that you talked about --

3  A.  Right.

4  Q.  -- is that in place yet?

5  A.  That is not in place yet either, no.

6  Q.  And what about the security system, is that --

7  A.  Those things are not in place yet, they are not in place.

8  Q.  I am interested -- and I think just because it's not

9  something I've seen in too many facilities before.  I'm

10  interested in the wood-burning furnace.  Could you tell me a

11  little bit more about how that would work?

12  A.  Right, right.  The wood-burning furnace is a furnace that

13  sits away from the facility, and it is used for emergencies

14  only.  It is used to generate heat in a jacket of water, and

15  it's usually a very small building.  It looks like kind of a

16  small utility garage shed, and you would load wood into that

17  wood burner, and it circulates water throughout the jacket, and

18  that's what runs the radiant floor heating system into the

19  building, which is all water circulation.

20  Q.  Okay.  I understand that process, but what I don't

21  understand is how logistically -- do you have to feed this

22  machine, this wood-burning furnace every day or --

23  A.  Yes.  It needs to be fed once every two days, so --

24  Q.  And how close would it be burning -- when it's burning, how

25  close would it be to the bonobos?

1  A.  It would not be anywhere near the bonobos.

2  Q.  I guess I -- and the exhibit or the demonstrative that you

3  showed earlier, it appeared that it was fairly close?

4  A.  Yeah.  That's a proposed location.

5  Q.  So that hasn't been constructed yet?

6  A.  No.  Again, we will meet USDA guidelines on that, on that

7  location, so -- wood burners are a very common heat source in

8  our area.

9  Q.  How common are they in facilities that house great apes?

10 A.  Like I said before, this is an emergency heat source.  This

11 isn't necessarily required.  Our primary is propane.  Propane is

12 the primary heat source that we will be using for the radiant

13 floor heating, and then we can deal with the wood burner as an

14 emergency.

15 Q.  Do you know if wood-burning furnaces are common in

16 facilities that house great apes?

17 A.  I don't know if that's common or not.

18 Q.  Did you consult with the USDA when making the decision to

19 install a wood-burning furnace?

20 A.  We haven't installed the wood-burning furnace.

21 Q.  Have you consulted with the USDA in any form in the

22 construction of this facility?

23 A.  Not at this time, no.  We have followed the USDA guidelines.

24 Q.  Do you have any USDA permits to transport the bonobos from

25 Des Moines to Missouri?

1  A.  We can't get permits for that until we have a relocation

2  agreement.

3  Q.  Have you contacted the USDA about transporting the bonobos

4  from Des Moines to Missouri and what that would entail?

5  A.  We wouldn't contact the USDA at this stage.

6  Q.  So you wouldn't consult to see if it was even possible or

7  how long that might take?

8  A.  USDA does animal transport very frequently.  It is in the

9  Blue Book, and there are guidelines for that.  What you do is

10  you hire an animal transport company that is USDA certified.

11  You get your permits, and then you do the transport.  We are not

12  in the process of getting our permits yet because we don't have

13  a relocation agreement in place.

14  Q.  Okay.  And you haven't consulted with any USDA transport

15  companies to see how much that will cost?

16  A.  Actually we did consult with one USDA transport company.  We

17  found that it would be about a thousand dollars per chimpanzee,

18  and that was going from Omaha, Nebraska, to Springfield,

19  Missouri, which is a comparable distance to Des Moines, Iowa, to

20  Osceola, Missouri.

21  Q.  And those are for chimpanzees?

22  A.  Those are for chimpanzees, yes.

23  Q.  And these aren't chimpanzees that are proposed to go to the

24  Missouri facility, are they?

25  A.  It is my understanding that they are a breed of chimpanzee,

1  yes.

2  Q.  I think I wasn't clear on the question, but I'll go ahead

3  and move on.

4       I suppose worst case scenario this will be my final

5  question.  I appreciate your patience with me as I kind of work

6  through this.  This is my first time I've had an opportunity to

7  question you about this facility.

8       Worst case scenario, the funding falls through for the

9  Missouri facility.  What is the backup plan?  Is there another

10  plan in place, for example, to move the bonobos again to another

11  facility in Iowa, Africa, or elsewhere?

12  A.  Well, that plan is not in place.  However, I will say that

13  relocating the bonobos is not obviously an easy task.  If

14  something were to happen to me or my business, there would still

15  be five years of funding that are guaranteed, no matter what,

16  and that funding could be used to relocate the bonobos.  The

17  bonobos could be relocated by BHI at their discretion at any

18  time.  I intend to do all that I can to make sure that they have

19  their funding and that they have a plan for five years in the

20  event of my death.  However, I do believe my company is a

21  strong, successful company, and I do believe my company can

22  sustain them.

23       MR. MELHUS:  All right.  I appreciate your time.  I

24  promised that would be my last question and, subject to any

25  recross, it will be.

1          Thank you.

2          THE COURT:  Redirect?

3          MR. NEIHAUS:  No further questions, Your Honor.

4          THE COURT:  Thank you.

5          You may step down, sir.  Thank you.

6          THE WITNESS:  Thank you.

7                                   (Witness excused.)

8          MR. STAMBAUGH:  Your Honor, if I may just be heard for

9    a few minutes, I would appreciate the court's indulgence.

10          THE COURT:  Sure.

11          MR. STAMBAUGH:  We have taken the court's advisements

12   regarding scheduling and timing to heart.

13          As you can see, we've had a very large showing of

14   support both here in Iowa and across the United States and

15   throughout the world.  We have a few witnesses who we had

16   planned to call who have come as far as Israel and Africa.

17   That's Itai Roffman, I-T-A-I R-O-F-F-M-A-N, and Sally Coxe,

18   C-O-X-E.  Because this is a bench trial, as an offer of proof, I

19   will represent to the court these are additional BHI board

20   members who would testify that when they voted Dr. Taglialatela

21   on to the IPLS board in November 2013, they were not aware that

22   Dr. Savage-Rumbaugh had been kicked off the IPLS board or banned

23   from the lab.

24          Again, taking the court's instructions to heart and in

25   an effort to avoid any cumulative or duplicative testimony, we

1  will forego those witnesses.

2           Now, there is one witness, Your Honor, Dr. Russ

3  Tuttle, who is a professor at the University of Chicago, who has

4  traveled here yesterday to testify.  We have already worked out

5  with the other side an availability for Dr. Tuttle which is

6  limited to tomorrow morning.

7           So with the exception of and subject to the testimony

8  of Dr. Tuttle, the claimants are prepared to rest their case,

9  Your Honor.

10          THE COURT:  All right.  Thank you.

11          Now, just so the record is clear, these two additional

12  persons, and we've heard what they would testify to if they were

13  called, is there any objection to the court simply considering

14  that that's what they would say if they were called?

15          MR. MILLER:  Your Honor, I think we would be entitled

16  to an opportunity to cross-examine them with respect to what

17  they would say.  Yes, we object to counsel's representation of

18  that.  I understand the circumstances we're under.  The sole

19  representation is that they would say we didn't know these --

20          MR. STAMBAUGH:  As consistent with the other BHI board

21  member testimony that they were unaware at the vote in November

22  of 2013 of Dr. Taglialatela and Hopkins on to the IPLS board,

23  that they were unaware that Dr. Sue Savage-Rumbaugh had been

24  banned from the lab and dismissed from the IPLS board.  We could

25  limit it to those two offers of proof.

1          THE COURT:  Do you have any serious doubt that that's

2  what they would testify to?

3          MR. MILLER:  Your Honor, if you would note my

4  objection, no, I think that that's -- I don't, I don't have --

5  that's fine.

6          THE COURT:  Well, I'll go ahead and accept that then.

7          MR. STAMBAUGH:  We appreciate that, Your Honor.  So,

8  again, Your Honor, subject to the testimony of Dr. Tuttle

9  tomorrow morning, claimants rest their case.

10          THE COURT:  Thank you.

11          Are you ready to go forward now?  We could take a

12  minute and recess a little early if you want.

13          MR. MILLER:  We'll go ahead and recess if you don't

14  mind, Your Honor.

15          THE COURT:  We'll take our mid afternoon recess and be

16  in recess for 15 minutes.

17          (Recess at 2:42 p.m., until 2:57 p.m.)

18          THE COURT:  Please be seated.

19          Plaintiffs, you can call your first witness.

20          MR. MELHUS:  Plaintiffs call Dr. Julie Gilmore to the

21  stand.

22          THE COURT:  Please come forward, please.

23          THE CLERK:  If you could wait right there and I'll

24  swear you in.

25          THE WITNESS:  Okay.

1          THE CLERK:  Raise your right hand.

2             JULIE GILMORE, PLAINTIFFS' WITNESS, SWORN

3          THE COURT:  Right there.

4                      DIRECT EXAMINATION

5    BY MR. MELHUS:

6    Q.  Good afternoon.

7          Could you please state and spell your name for the

8    record.

9    A.  Julie Gilmore, J-U-L-I-E G-I-L-M-O-R-E.

10   Q.  And could you please describe your educational background

11   for the court.

12   A.  I have an undergraduate degree in business management.  I

13   attended undergraduate work at Colorado State University.  I

14   also did some work at the University of Phoenix and Iowa State

15   University is where I did most of my vet school prerequisites,

16   and then I have a degree in veterinary medicine from Iowa State

17   University, College of Veterinary Medicine.

18   Q.  And are you currently a member of ACCI?

19   A.  Yes.

20   Q.  That's a member of the Board of Directors just to be clear?

21   A.  Yes.

22   Q.  Are you licensed to practice medicine, veterinary medicine

23   in Iowa?

24   A.  I am.

25   Q.  Is there a special license in Iowa to practice veterinary

1  medicine with great apes?

2  A.   There is not.

3  Q.   Is there a special license to practice veterinary medicine

4  with bonobos?

5  A.   No.   There's no primate specialty in veterinary medicine.

6  Q.   How do you gain experience or expertise in treating or

7  caring for bonobos or great apes as a veterinarian?

8  A.   There's a couple of different avenues that that occurs with.

9  There are some specialty routes that incorporate some training

10  in great ape species such as, you know, a specialty in zoo

11  animal medicine or in laboratory animal medicine.  Both of those

12  specialties obviously provide training in a wide variety of

13  species that are used in research or, you know, that you would

14  find in a typical zoo collection.

15        Lots of experience in veterinary medicine in general

16  comes from mentorship opportunities and things like that,

17  working with other individuals who gained experience in an

18  apprenticeship almost type of situation.  Lots of veterinarians

19  are -- well, in general, veterinarians are trained to treat

20  multiple species, and so that's just part of the education.  I

21  think early on we learn that there are a lot of similarities

22  between a lot of different types of mammals and reptiles and

23  things like that, and you learn what the pertinent questions are

24  to ask and what the important species differences are to know.

25        So it's very common for veterinarians to treat many

1  different species.

2  Q.  And as a veterinarian have you gained experience working

3  with bonobos in particular?

4  A.  I now have about three years of experience working with

5  these animals, yes.

6  Q.  Is that type of experience very common in Iowa?

7  A.  No.  There are actually no other great apes in Iowa, even

8  the Blank Park Zoo does not have a collection of great apes, and

9  there are -- there's really -- yeah, there are not veterinarians

10  licensed in Iowa who have a wealth of great ape experience.

11  Q.  Okay.  And have you served as the veterinarian for ACCI?

12  A.  Yes.

13  Q.  And in that capacity have you taken care of bonobos under

14  their control?

15  A.  Yeah.  Absolutely, yes.

16  Q.  How did that first come to be?  How did you first get

17  involved with what was then the Iowa Primate Learning Sanctuary?

18  A.  So, at the time I was working at a small animal practice,

19  urgent care hours, and I had a colleague -- well, actually there

20  was a couple of different routes.  I had a colleague who was

21  contacted by an affiliate of the organization at that time

22  asking if she or some of the other vets in our practice would be

23  willing to help out because their veterinarian was leaving at

24  the time, they didn't have anybody to treat the animals and, you

25  know, asked if we would come out and meet with them.

1          The facility that I worked at was very close in

2    proximity to what was then the Great Ape Trust, and so it was

3    literally less than five minutes up the road and so we were a

4    logical choice.  So that was one route.

5          I also happened to know the former veterinarian who

6    provided care for those animals, Dr. Robert King, you know, when

7    he was leaving and had a conversation with him, you know, about

8    potentially doing that and he thought it would be, you know, a

9    good opportunity and something that would be a good fit for me,

10   so --

11   Q.  Okay.  All right.  Did you have any conversations with

12   Dr. Sue Savage-Rumbaugh about your involvement at the Iowa

13   Primate Learning Sanctuary which I'll refer to as IPLS?

14   A.  Yes, in the very beginning.  Can you clarify exactly what

15   you're asking with that?

16   Q.  Did you discuss what your role would be at IPLS with

17   Dr. Savage-Rumbaugh?

18   A.  Yes.  I mean, they were definitely looking for a

19   veterinarian or veterinarians plural to help care for the

20   animals there.

21   Q.  And at the time did she know about your experience with

22   great apes?

23   A.  Yes.  I think we were very clear that the veterinarians --

24   none of the veterinarians at the practice had extensive

25   experience with species like great apes, and, again, you know,

1    that is -- all veterinarians in Iowa are pretty much in that

2    same boat.  We were very clear that, you know, we're willing to

3    learn and we're willing, you know, to engage other resources,

4    but we didn't have direct species with it -- or direct

5    experience with the species prior to that.

6    Q.  Did you finally agree to become formally involved with IPLS?

7    A.  I did, yes.

8    Q.  When was that?

9    A.  That was probably -- the first time we met and agreed to

10   move forward with them I believe was in March of 2012.  And at

11   the time there was another veterinarian in particular who was

12   going to help with that endeavor who later decided that she

13   didn't want to be involved, but there were two of us initially

14   that were involved in that from Avondale.

15   Q.  All right.  And how did your role at IPLS change, if at all,

16   from March of 2012 through September of 2012?

17   A.  So, I gradually became more and more involved.  One of the

18   things that I initially started out just in a veterinarian

19   capacity, would make pretty regular trips out there to see the

20   animals, get to know the animals, attend to, you know, requests

21   for veterinary care.  I did get involved in the capacity of

22   helping them through the process of applying for an exhibitor's

23   license from the USDA.  So that was something that is kind of a

24   long process that requires lots of inspections and, you know,

25   following a set of certain rules that makes the facility safe

1   for visitors to visit and things like that.  And so I was very

2   much involved in that capacity, as well as being a veterinarian.

3   Q.  Okay.  Did IPLS have an exhibitor's license before you got

4   involved?

5   A.  No.  They had a research license but not an exhibitor's

6   license, and the exhibitor's license was something that they

7   needed to have the public out at the facility.  The USDA agent

8   had told them that they need that to, you know, host

9   fund-raising events or have tours, educational type tours or

10  things like that.

11  Q.  Okay.  And in September 2012, did your role evolve at all at

12  IPLS?

13  A.  Yes.

14  Q.  And how did it change?

15  A.  Well, about that time there were some allegations that

16  surfaced against Dr. Savage-Rumbaugh by mostly a group of former

17  people who had worked there.  The board chair at the time, Ken

18  Schweller, when those surfaced called me kind of in a panic at

19  that time saying that they needed to, you know, pending an

20  investigation, definitely remove Dr. Savage-Rumbaugh from the

21  director type situation and basically told me that I -- you

22  know, he asked, you know, you're the only person in Iowa that's

23  there to do this, will you step in and basically in a

24  supervisory type role and, you know, monitor the animals and

25  also Dr. Savage-Rumbaugh while in the lab until she -- while we

1  can conduct an investigation.

2  Q.  Okay.  Do you have any idea what the investigation was

3  about?

4  A.  It was just general welfare concerns that they had about the

5  safety of the animals and the safety of -- well being of the

6  animals and safety of the staff.  There were numerous

7  allegations made in a letter that, you know, was distributed

8  widely around the -- not only to the Board of Directors but to

9  lots of media outlets and things like that.

10         There were claims that cages were, you know, not being

11  locked and, you know, that there was some mental instability as

12  well on her part.

13  Q.  Okay.  And I understand that Dr. Savage-Rumbaugh was

14  eventually cleared of those allegations as a result of that

15  investigation?

16  A.  That's correct.

17  Q.  And did they consult with you or did the investigators

18  consult with you during that process?

19  A.  Not in a formal -- I never had a formal interview as part of

20  that process, so no.

21  Q.  Okay.

22  A.  I did have conversations, you know, independently with some

23  of those investigators, you know, about my involvement there,

24  but I didn't -- you know, the other people that were

25  investigated as part of that -- or I mean who were interviewed

1  as part of that investigation had a filmed interview with all

2  three members of the investigation committee, and I did not.

3  Q.  Okay.  Did you agree with the results of that investigation?

4  A.  I -- you know, I -- yes and no.  I would say that I did not

5  actually -- I was not privy to the results of that investigation

6  for a long time because I wasn't a member of the board so I

7  didn't initially even have an opportunity to, you know, see the

8  investigation report.  I was -- I agreed with the fact that

9  there were definitely -- it's not fair to make accusations

10  against someone that are, you know, based on hearsay and not

11  direct knowledge of certain incidents or things like that.  And

12  so, yes, I agreed that anything like that should be -- you know,

13  should not be used against somebody when somebody doesn't have

14  firsthand knowledge of a specific incident.

15  Q.  All right.  Okay.  Let's move forward in time a bit.  Around

16  November of 2012, I understand that several of the bonobos and

17  Panbanisha in particular fell ill, is that correct?

18  A.  Yes.  All of the bonobos actually fell ill at that time,

19  starting with Teco.  I think it was about October 29th he

20  started showing signs of respiratory illness, 28th, 29th, around

21  there, and then on the 30th he got quite ill.

22  Q.  Could you explain kind of the circumstances leading up to

23  that illness?

24  A.  You mean the circumstances of the bonobos being sick at that

25  time or -- yeah.  So he was the first one to be ill.  He started

1    showing typical upper respiratory symptoms, you know, runny

2    nose, low grade fever, a little bit of coughing intermittently,

3    you know, loss of appetite, lethargy, things like that.  He --

4    yeah, so it started with him, and then it kind of spread.

5    Actually quickly all of the bonobos were affected by that.  We

6    did not have an effective quarantine protocol in place at that

7    time and they all were sick at different stages.  Some of them

8    were more affected than others.  Panbanisha was actually one of

9    the last ones to get -- to show symptoms through that round of

10   illness, and she -- you know, she started showing symptoms on or

11   around probably November 4th or 5th.

12   Q.  Could you describe your course of treatment for the bonobos

13   throughout that time?

14   A.  Okay.  Initially it started with, you know, obviously

15   treating the ones that, you know, were symptomatic, so it

16   started with Teco before others started showing symptoms.  He --

17   you know, we started out with putting him on antibiotics

18   initially because he had a low grade fever and even though

19   definitely there was a suspicion that there was a viral

20   pathogen, but that was to protect against secondary bacterial

21   invaders, which is kind of a common route of treatment with a

22   respiratory disease.  As he got more ill, we started adding in

23   other measures such as a nebulization with Albuterol to open

24   airways, oxygen therapy as needed as he was having trouble

25   breathing, obviously trying to encourage good supportive care

1   with nutritional support, you know, things like that, to keep

2   him healthy.  And he had a lot of those treatments around the

3   clock and did pull through and did make a complete recovery from

4   that.

5   Q.   And that's Teco that made the full --

6   A.   Yeah, Teco, the youngest bonobo.

7   Q.   I understand one of the bonobos, Panbanisha, did not make a

8   full recovery, is that right?

9   A.   That's correct.

10  Q.   What happened to Panbanisha?

11  A.   Panbanisha was, again, one of the last ones to show

12  symptoms, and, again, some of them were affected more than

13  others.  My recollection is that Elikya and Maisha were the

14  least affected of the group, and Kanzi, Nyota, Panbanisha and

15  Teco were all quite ill, and Matata actually had some very bad

16  days during that period as well.  So they were all affected to

17  one degree or another, but Elikya and Maisha were the least

18  affected.

19          Panbanisha was one of the last to show symptoms, but

20  her symptoms were very severe and acute in nature.  She

21  started -- you know, she started showing symptoms around the 4th

22  or the 5th; same runny nose with a little bit of yellow tinge,

23  you know, discharge from her nose, lethargy.  They were not able

24  to obtain a rectal temperature for me, so I'm not sure what

25  their rectal temperature was at the time.  But we, you know,

1   started the same type of treatment with her, and we used a broad

2   spectrum injectable antibiotic.  We used oxygen therapy

3   treatment with Albuterol nebulization to help her breathe,

4   things like that, and she progressed into something called acute

5   respiratory distress syndrome, which is not uncommon in cases of

6   respiratory illness.  I think that upper respiratory became more

7   of a pneumonia type situation, and once she progressed into this

8   acute upper respiratory distress syndrome, it was very difficult

9   to get her through that, and she did succumb to it, which is

10  quite common, unfortunately, with all species who are affected

11  by acute upper -- acute respiratory distress syndrome or ARDS is

12  the acronym for that.

13  Q.  Were other people helping in the care and treatment of

14  Panbanisha and the other bonobos throughout that time?

15  A.  Staff or veterinarians or what specifically?

16  Q.  Both.

17  A.  Yes.  Many of the staff members definitely were helping

18  provide treatments to all seven of those.  I was there pretty

19  much around the clock.  I was still working -- my entire

20  involvement out there I also worked full time as a veterinarian

21  in practice, and so there were hours that I was not able to be

22  there, but when I could be there I was actually spending the

23  night there for about a three-week period of time to provide

24  care for them around the clock.  Staff members were also

25  involved in administering medications, nebulization treatments,

1   oxygen therapy, things like that.

2           I did involve other veterinarians in the course of

3   treatment there, so I consulted with Dr. King who was their

4   former veterinarian, who was actually a cardiovascular and

5   respiratory specialist up at Iowa State University, so a good

6   person to ask about respiratory disease.

7           I had also previous to that reached out and made a

8   contact with Dr. Vickie Clyde, who's a veterinarian in Milwaukee

9   County and is responsible for overseeing the bonobo colony in

10  Milwaukee County, which is quite large.  She has extensive

11  experience with bonobos.  We talked about the treatment plan,

12  challenges of managing illnesses like respiratory disease in

13  captive apes, which, unfortunately, it's the second leading

14  cause of death in this species, so it's not uncommon at all to

15  lose them to respiratory disease, and the frustrations

16  associated with trying to treat a species like a bonobo that,

17  you know, you can't ventilate for three weeks under anesthesia

18  or things like that.  So she was involved in the treatment plan

19  as well.

20          I also consulted with another veterinarian that had

21  been, you know, involved with the IACUC and things like that out

22  at the facility, Dr. Doug Pernikoff, who has a lot of captive

23  great ape experience as well and some field experience as well.

24          And then, finally, I also discussed the findings

25  with -- or the treatment plan with our USDA veterinarian,

1  Dr. Heather Cole, who is not only now and continues to be our

2  USDA representative, but prior to becoming a USDA representative

3  had extensive -- or some great ape experience in captivity as

4  well.

5          And I had -- everybody agreed that the treatment plan

6  was appropriate.  There were no additional recommendations made

7  of other things that we could do.  I think it was agreed that we

8  were making a very valiant effort, and I think that if we had

9  not made those efforts, we probably would have lost more than

10 Panbanisha in my professional opinion.

11 Q.  Okay.  And after those valiant efforts to save the bonobos

12 in 2012, in November specifically, did your role at IPLS evolve

13 again?

14 A.  Yeah.  So Panbanisha died I believe on November 6th.

15 Towards the middle or end of November, you know,

16 Dr. Savage-Rumbaugh had been cleared from that investigation,

17 but the board was clear that they did not want her in an

18 administrative role any longer and they were looking for

19 somebody to fill the role as the director.  And I had numerous

20 conversations with Dr. Savage-Rumbaugh about that, also with Ken

21 Schweller, and I agreed to put my name forward for nomination to

22 that role, and the board voted me in as the executive director.

23 Q.  Okay.

24 A.  At that time.

25 Q.  That was in November of 2012?

1    A.   Uh-huh.

2    Q.   So shortly after that, in January of 2013, were you

3    approached by anyone with a settlement agreement to resolve some

4    underlying concerns about ownership of the bonobos?

5    A.   Yes.  I -- Lyle Simpson sent me an e-mail, so I didn't have

6    a direct conversation with anyone about that.  He forwarded an

7    e-mail from Paul Burns that said, please have Julie Gilmore sign

8    this and return it to me.  Lyle sent me an e-mail that said,

9    please sign this and return it to me.  You know, the parties

10   have agreed on this issue, and it's a done deal.  So it was a

11   legal directive that I followed when I signed that document.

12   Q.   Okay.  And that was -- to be clear, there was a settlement

13   agreement that you signed?

14   A.   Yes.

15   Q.   January of 2013?

16   A.   Yes.

17   Q.   If you would flip to Exhibit 1 of the large binder to your

18   left.

19   A.   Yes.  All the way to the beginning?

20   Q.   Yes, No. 1.

21        Okay.  And does that look like the settlement

22   agreement that you signed, referring to Exhibit 1?

23   A.   Yeah, yes.

24   Q.   Okay.  Could you turn to page 2 of that exhibit, referring

25   to paragraph 5.  Do you see where it says, "The Trust shall use

1    its best efforts to provide complete and competent care of

2    Matata and Maisha; and shall take all reasonable precautions to

3    ensure their complete safety."

4              Do you see that?

5    A.  Yes.

6    Q.  And you read that at the time that you signed the agreement?

7    A.  Yes.

8    Q.  And since then have you endeavored to comply with providing

9    complete and competent care to the bonobos?

10             MR. LANGEL:  Objection.

11             THE COURT:  I'll receive it, subject to the objection,

12   whatever it was.

13             MR. MELHUS:  Go ahead and answer, if you can.

14   A.  Yes, absolutely, I believe that we provide complete and

15   competent care, and our ability to do that continues to actually

16   expand over time.

17   BY MR. MELHUS:

18   Q.  Okay.  Can you talk about how you endeavored to provide care

19   for the bonobos and how that's changed over time?

20   A.  Since the formation of ACCI, we've put a lot of very helpful

21   protocols in place that were not in place previously.  Some of

22   the things that have been very helpful is actually adopting and

23   incorporating the use of personal protective equipment.  The

24   best way in my experience to treat animals is to keep them from

25   getting sick in the first place, and personal protective

1   equipment is designed to do that.

2            So what that entails is, you know, strict policies

3   about hand sanitization, wearing gloves and masks when

4   appropriate; wearing gloves and masks when preparing food and,

5   you know, definitely while cleaning, things like that; strict

6   isolation protocols about how to protect other animals in the

7   group if some get sick and others don't, and those are policies

8   that, you know, volunteers and staff alike are very compliant

9   with.  We've had a dramatic reduction in the number of

10  respiratory illnesses since we've adopted those protocols.

11           The first eight months I was there I think I treated

12  Teco for four separate incidences like this where he's had

13  respiratory illness.  And knock on wood, we have not had any

14  respiratory illness since we have adopted that protocol very

15  stringently in and around April of, I guess it would have been

16  2014.

17  Q.  So just to -- sorry.  I think my question was maybe unclear

18  as to time.

19  A.  Okay.

20  Q.  So you're testifying to actions that were taken after the

21  formation of ACCI in December of 2013, is that correct?

22  A.  Yes.

23  Q.  Okay.  And the standard operating procedure and the policy

24  that you discussed as being adopted in April 2014, that was an

25  ACCI policy?

1   A.   Yes.

2   Q.   Okay.

3   A.   Ah -- go ahead.

4   Q.   And I think we'll return to some of the standard operating

5   procedures or policies a bit later, but I kind of want to keep

6   on this time line here.

7   A.   Okay.  Do you want me to -- I mean, there were other things

8   that we had done to increase their care.  I don't know if you

9   want me to talk about that or not.

10  Q.   Sure.  Let's talk about that now.

11  A.   Okay.  So things like strict control of their diet is I

12  think hugely important.  Their diet was not well regulated

13  previously, and we have adopted not only, you know, making sure

14  that they're receiving healthy meals all the time with, you

15  know, acceptable foods for them to eat, but that we're logging

16  those calories.  We've had some significant weight loss in Kanzi

17  since that period of time, which I think is very important from

18  a veterinarian's perspective.  We've also started a lot of

19  husbandry protocols to make it easier to examine a species like

20  this.  So they all participate almost daily in body part exams,

21  presenting different body parts, presenting for different

22  procedures that we need to do.  They present for -- we're in the

23  process of training them to accept injections, which is a far

24  better, superior method of delivering injectable medications

25  than darting, for instance, things like that when that is

1  better.

2        So I would say we continue to grow our supply of

3  veterinary equipment and, you know, we've had, you know, funds

4  coming in to make cage modifications to allow us to collect

5  blood safely and, you know, with like a blood sleeve with them

6  awake, things like that.

7        So we have a lot of things in place and plans to

8  continue to grow that program down the road.

9  Q.  Okay.  And just to be clear again, those are policies and

10  changes that were implemented after the formation of ACCI?

11  A.  Yes.

12  Q.  And that didn't exist before the formation of -- well, it

13  didn't exist under the tenure as you saw it during 2012 when you

14  first got involved with IPLS?

15  A.  Correct.  Very early on I did, you know, talk a lot about

16  diet that first summer that I was involved out there, but I

17  would say that compliance with that was not consistent and that

18  neither was logging of that.  We did not have consistency.  So

19  the diet has been something that we tried to work on for quite

20  awhile, but I feel like we are leaps and bounds ahead of that

21  now since the formation of ACCI than we were when I first was

22  involved with the organization.

23  Q.  Okay.  Just changing topics a little bit and moving forward

24  in time to May 2013, I understand that there was an incident or

25  an accident at the facility in Des Moines and that

1  Dr. Savage-Rumbaugh was taken to the hospital as a result of

2  that incident, is that correct?

3  A.   Yes.

4  Q.   Could you describe the circumstances surrounding that

5  incident and what occurred immediately after?

6  A.   Yeah.  I wasn't there at the facility when the accident

7  actually occurred, but I was at another appointment.  I did get

8  a call from Steve Boers who said she had fallen at the facility

9  and was not feeling well and she was taken to the hospital by

10  ambulance.  I attended -- I went to the hospital as soon as I

11  finished that other appointment and met with her there, and she

12  had fallen and hit the back of her head.  You know, she was -- I

13  sat with her for a while and got some clothing and stuff like

14  that for her.  She was discharged from the hospital that same

15  day and, you know, her -- you know, she returned to not the

16  facility but to the house she rents right next to the facility,

17  and I didn't see her for quite awhile after that.

18  Q.   Okay.  Did you meet her at the hospital after that accident

19  or --

20  A.   Yeah.  I did go to the hospital, like a visitor in the

21  hospital right after that occurred.  She wasn't there overnight.

22  She was just there for treatment before she was discharged.  At

23  the time -- I don't know what followed that, but at the time I

24  was there when she was discharged by her doctor or the

25  caretaking staff at the hospital, and they said she could go

1  home and that they didn't think she would have long-standing

2  injury from the fall at the time.

3  Q.  Okay.  Did they give any other -- did the doctors or nurses

4  give any other indication as to her sort of medical diagnosis?

5  A.  No; just that she had fallen and hit her head.  I don't know

6  the details of, you know, her medical exam associated with that.

7  I was just there when she was discharged, and they said, oh,

8  you're going to be fine, just go take it easy today.

9  Q.  Okay.  And you mentioned that since that time you hadn't

10  heard much from her since the accident in May 2013.

11  A.  Uh-huh.

12  Q.  Could you describe your efforts to reach her?

13  A.  A couple of different times I sent text messages, you know,

14  to her asking if she's okay, you know, just checking in and did

15  not get a response to that.  I also visited her house a couple

16  of times and knocked on the door and didn't get an answer.

17  Q.  And how long did this unresponsiveness last?

18  A.  Well, with me, I guess the first response that I got from

19  Sue was in July.  We were filming a BBC -- or the BBC was coming

20  out and we had started those agreements with them before she was

21  gone, and they were expecting on having some time to interview

22  with her and things like that.  So we had let them know we don't

23  know what's going on with her, she's not available.  So because

24  of that I did try to reach out to her and said, hey, they're

25  here, they really want to interview with you.  You know, is that

1   something that you would be interested in coming down even for a

2   little bit of time or things like that, and she just responded

3   no.

4   Q.   In July of 2013, at the same time you tried to contact

5   Dr. Savage-Rumbaugh about the BBC interview, did IPLS hold a

6   Board of Directors meeting?

7   A.   Yeah, July or August.  I can't remember the exact date.

8   Q.   And did you invite Dr. Savage-Rumbaugh to that meeting?

9   A.   Yes.  It was at -- it was an e-mail invitation that went out

10  to all of the Board of Directors.  It was at Tom Watson's Hy-Vee

11  organization out at Westown Parkway, and there was a call-in

12  number provided for people who couldn't attend in person.

13  Q.   Do you recall specifically if that invite, that e-mail was

14  sent to Dr. Savage-Rumbaugh?

15  A.   Yes.  We made certain it was sent to Dr. Savage-Rumbaugh.

16  Q.   And did she attend that meeting?

17  A.   Not to my knowledge.  No, I don't know if she called in or

18  not, but we weren't aware that she called in if she did.

19  Q.   Around that same time or perhaps at that same meeting, did

20  your role as director of IPLS change?

21  A.   Yes.  I resigned as the director at that time.  As I said, I

22  had continued to work full time in practice.  When I initially

23  accepted that directorship, I saw myself in that position on an

24  interim basis until we could find someone ideally suited to be a

25  leader of a nonprofit such as ACCI, and I just felt like it was

1  something that I couldn't continue to be involved in at that

2  level, and so I did resign.

3  Q.  Okay.

4  A.  Not from the board or as the veterinarian, but just as the

5  director.

6  Q.  Okay.  Thank you.

7         So with Dr. Savage-Rumbaugh unresponsive to attempts

8  to reach her and with you stepping down as the director of IPLS,

9  was there any talk amongst the board about who might carry this

10  work forward?

11         MR. LANGEL:  Object to foundation based on -- I think

12  it mischaracterizes the prior testimony, and there's no

13  foundation as to the allegation that Sue was not responsive.

14         THE COURT:  Well, I'll receive it, subject to the

15  objection.  I think the question was simply whether or not there

16  was talk about the subject.

17         MR. MELHUS:  Answer if you can, please.

18  A.  Can you ask me again, please?  I'm sorry.

19  BY MR. MELHUS:

20  Q.  Sure.  Was there talk about who might carry IPLS's work

21  forward in July or August of 2012, at about that time?

22  A.  There was not a specific person, and I do know that there

23  had been some e-mails that had gone around.  I didn't have

24  direct communication with Sue.  George may or may not have.  I'm

25  not privy to that, to a lot of those e-mails; but I think that

1  the consensus was she had, if any involvement -- in any

2  involvement with the board, very limited involvement at that

3  point in time.  She -- there was a feeling that she was just not

4  going to return.  We didn't have -- things weren't very

5  responsive when we were attempting to communicate with her.  We

6  felt like we needed to make a plan for the facility.  You know,

7  we either -- do we move the animals, do we find a new

8  researcher?  We didn't name specific names, but the subject did

9  come up of what are we going to do next, you know, it doesn't

10  look like Sue is coming back, or it didn't feel like she was

11  coming back at that time anyway, and we just talked, you know,

12  about that in general.

13  Q.  Did you finally hear from Dr. Savage-Rumbaugh in October of

14  2013?

15  A.  I did, yes.  And, again, I mean, she I think had some

16  communication potentially with George or things like that before

17  that; but the first time I spoke with her after the text about

18  the BBC interview was in October about -- she reached out to me

19  with concerns about Teco.

20  Q.  Okay.  Do you recall receiving an e-mail from

21  Dr. Savage-Rumbaugh on or about or on October 26, 2013?

22  A.  Oh, about Teco, you mean, that same incident?  I'm trying

23  to --

24  Q.  Why don't you direct your attention, please, to Plaintiffs'

25  Exhibit -- the smaller binder in front of you, Plaintiffs'

1  Exhibit 1005.

2  A.  Oh, yes.  I didn't remember the date of this e-mail.  Yes, I

3  do remember the e-mail.

4  Q.  Could you describe the e-mail just generally for us.

5  A.  Yes.  So, yes, it's an e-mail from Sue where she is writing

6  to us saying that she is basically wanting to endorse Jared

7  Taglialatela and Bill Hopkins as basically the future leaders of

8  the facility.  She talks about feeling like they would be good

9  people to transition the program to and that she was planning on

10  stepping down and stepping back from, you know, her role there.

11  I know there was -- yeah, so, you know, she was -- definitely it

12  was a very wholehearted endorsement of them, as I read it, and

13  her plans to no longer be involved at the facility in the

14  capacity that she had been.

15  Q.  Just so we're clear here, when you're referring to Jared and

16  Bill, that's Jared Taglialatela?

17  A.  Yes.

18  Q.  And Dr. William Hopkins?

19  A.  Yes.

20  Q.  And was there any representation by Sue in that October 26th

21  e-mail about how much control that Jared and Bill would have

22  over the research conducted at IPLS?

23          MR. LANGEL:  Objection.  The exhibit speaks for

24  itself.  There isn't enough foundation as to contents other

25  than -- she doesn't have the separate knowledge about the

 1    document other than reading it.

 2            THE COURT:  Restate your question, please, and then

 3    I'll consider it.

 4    BY MR. MELHUS:

 5    Q.  Was there any representation by Sue in that October 26th

 6    e-mail about the amount of control Jared and Bill would have

 7    over the research being conducted at IPLS as you understood it?

 8    A.  I understood --

 9            MR. LANGEL:  Same objection.

10            THE COURT:  I'll receive it, subject to the objection.

11            Go ahead.

12    A.  I understood it that Bill and Jared would have complete

13    control over the science.

14    BY MR. MELHUS:

15    Q.  Okay.  In that same e-mail, did Dr. Savage-Rumbaugh make any

16    representation about whether or not she would be present in the

17    lab?

18            MR. LANGEL:  Same objection.

19            THE COURT:  Same ruling.

20            MR. MELHUS:  Go ahead and answer.

21    A.  No.  I mean, there is a statement in there that, you know,

22    under Jared's direction in the future, as appropriate she may

23    continue to do some research, but it sounded like it was

24    completely up to Jared when and where and what that would look

25    like.

1  BY MR. MELHUS:

2  Q.  Okay.  And after Dr. Savage-Rumbaugh sent you this e-mail,

3  did Dr. Hopkins and Dr. Taglialatela accept Sue's offer to come

4  to Des Moines?

5  A.  Yes, they did.

6  Q.  And about what time did that occur?

7  A.  I don't recall the exact date, but it was very close after

8  that we -- you know, George reached out to them and welcomed

9  them, and those proceedings got started very quickly after that.

10 Q.  Okay.  And I understand that there was an incident at the

11 lab that occurred about that time or very close in time to Sue,

12 Dr. Savage-Rumbaugh, sending that e-mail involving young Teco.

13 Could you describe that incident to the court?

14 A.  Right.  So after -- after this was sent, I guess, I don't

15 recall the exact date, but it was around the same time frame in

16 the fall, Teco had an injury and he was lame on one of his legs,

17 and so he had -- I believe it was his left, but I don't remember

18 that for sure.  He had basically a very tender ankle, and he

19 was -- we did x-ray him at that time.  We saw no fractures.  We

20 were treating it as a soft tissue injury, and he did fully

21 recover in not a long period of time at all.

22 Q.  Okay.  And did Dr. Savage-Rumbaugh return to the lab at any

23 point in time after that apparent injury to Teco?

24 A.  She did.  So we had a conversation I think on October 30th

25 or -- or on October 30th we had a conversation via the phone.

1   She called and I received -- or she had called me on that date

2   inquiring about Teco.  She also had sent an e-mail at that time.

3   I did talk to her on the phone and, you know, talked about Teco,

4   you know, how he was doing and things like that and just had,

5   not long conversation about that, but just kind of passed that

6   along and tried to answer questions that she had, and it was

7   mostly just about that.

8   Q.  Okay.  And after that conversation on October 30th, did

9   Dr. Savage-Rumbaugh actually physically return to the lab?

10  A.  She did, yep.

11  Q.  And can you describe the effect that that had on the lab and

12  its operations?

13  A.  She was planning on returning as part of a scheduled visit

14  later in the month, but made a decision to kind of drop

15  everything and fly out there, and she just kind of immersed

16  herself in the lab.  She took over care of Teco.  She just

17  without permission basically spent the night at the lab and

18  started just sort of picking up, in my opinion, as if she had

19  never left the lab to begin with, as far as their day-to-day

20  care and, you know, talking to staff about what should be done

21  when and where, and she started e-mailing lots of different

22  people about lots of different things, including, you know,

23  Teco.

24          I know at that time she started to send Jared and

25  Bill, who were just still in their very beginning stages of

1   involvement with us, lots and lots of e-mails, and the board was

2   very concerned about that behavior and also very concerned that

3   those actions may not -- or may drive Dr. Taglialatela and

4   Dr. Hopkins away.  They had been very clear that they wanted

5   autonomy over the science there and, you know, they were

6   accepting with the understanding that Sue was effectively

7   retiring from research there.

8   Q.  And did Dr. Savage-Rumbaugh's involvement in the lab at that

9   time, was that consistent with the e-mail that she sent on

10  October 26, 2013?

11  A.  No.

12  Q.  In what way, based on your understanding of the e-mail and

13  her role going forward, was her subsequent involvement

14  inconsistent?

15  A.  There was just no discussion about it.  It just happened.

16  She just came back and basically re-embedded herself in the

17  facility without appropriate discussions with people like George

18  or Steve Boers was the executive director at the time or things

19  like that about what her visit should look like, what role she

20  should play there, what contacts she should have with the

21  animals.  You know, she had -- that was the first time, in my

22  recollection, that she had seen them since she left in May, and

23  it was just kind of picking up like a day had not passed.

24  Q.  And did the board at that time, the IPLS board, take any

25  action to push back on her involvement consistent with her prior

1  representations in that October 26 e-mail?

2  A.  Yes, I know George and Lyle had phone conversations and

3  e-mail conversations with her asking her to, you know, please

4  take a step back, go back to New Jersey, you know, honor this

5  initial statement that she had sent out on October 26th and, you

6  know, at the time they were saying, you know, come back at

7  Thanksgiving, that's how it started out when you had initially

8  planned, and we can have kind of a formal discussion about

9  things like that.  And she essentially refused to leave, and the

10  communications between them -- I didn't have communication with

11  her about this at that time; but the communications between them

12  got more and more adversarial until the end as she continued to

13  e-mail.  In spite of Lyle saying, please don't e-mail anyone

14  else about the research, you know, you need to stop, please

15  don't call Bill and Jared, this is inappropriate, she continued

16  to send those e-mails.  And, finally, George just said she

17  needed to leave the facility immediately.

18  Q.  And did you or anybody else on the IPLS board then take

19  action to enforce her prior representations?

20  A.  George asked that I go out there.  He asked her to leave,

21  and he asked me to go out and make sure that -- to the facility

22  and make sure that she had left the premises.  What I arrived

23  there, she hadn't left.  And so I entered the building, we had a

24  conversation about her needing to leave and comply with George's

25  request and Lyle's request that she return, you know, return

1 back -- well, we didn't -- where she goes is not important, but

2 that she leaves the facility.

3 Q.  Okay.  And did she eventually leave the facility?

4 A.  She did.

5 Q.  Did you have any conversations with her as she was leaving

6 the facility about why she was being asked to leave?

7 A.  Yeah.  We did have a conversation where I said, the board --

8 I shared the board's concern that the e-mailing and kind of

9 excessive e-mailing to Bill and Jared was going to cause a

10 problem with them wanting to come out and be a part of the

11 program just because it was so contradictory to what she had

12 initially said, you know, she would do.  And so it was -- there

13 was definitely concern about that, and I shared that with her.

14 Q.  Okay.  Sometime later in November of 2013, did you become

15 aware of a lien against IPLS as an entity, a tax lien?

16 A.  When Lyle told us about it, yeah, we --

17 Q.  Okay.  Did Lyle explain what was going on at that time and

18 his plan to take the organization forward?

19 A.  Right.  So are you talking about the tax ID?  I don't know

20 what -- I don't understand exactly what you're asking.

21 Q.  Right.  Mr. Lyle Simpson was the attorney for IPLS at the

22 time, right?

23 A.  Uh-huh.

24 Q.  And did he have any conversations with you about the effect

25 of a tax lien or an unpaid debt to the state and how that would

1    affect the organization in general and the plan for moving

2    forward?

3    A.   Yes.   There were lots of different conversations about that.

4    There was definitely -- we had conversations.  Lyle many times,

5    you know, talked about, you know, the fact that under prior

6    administration this debt had accumulated, and he talked about

7    different strategies that we could use to try to carry on the

8    organization, you know.  And so one of those was, you know -- I

9    mean, down the line he talked about potentially -- not initially

10   but potentially considering bankruptcy for that organization

11   and, you know, effectively starting another one; but there

12   were -- yeah, he was aware of that and talked about it on a

13   number of different occasions.

14   Q.   Okay.  And at some point did IPLS form a new organization to

15   carry that name and continue the work forward?

16   A.   Yes.  And we were sort of forced to do that.  So Lyle

17   informed us that -- so he -- you know, he had talked about the

18   tax lien or the lien initially; but he at some point around that

19   same time frame, later on in the fall, early winter, became

20   aware that the registration for the Iowa Primary Learning

21   Sanctuary had expired, had not been renewed.  And so in order to

22   renew that, we needed to pay off that tax lien, which was quite

23   expensive.  We didn't have anything near the funds to do that.

24   It wasn't practical for us to be able to do that.

25           So he formed -- and that's the only reason why we

1  didn't renew that was because we had, you know, that outstanding

2  debt making it literally impossible to do that, and we -- at the

3  time anyway.  So he created ACCI so we would have, you know, a

4  working tax ID.

5  Q.  Okay.  And I suppose if ACCI generates enough income and

6  funding, would it be possible to reinstate IPLS as you

7  understand it?

8  A.  Yes.  That's how he described it to us.

9  Q.  Okay.

10  A.  But it was very clear that we needed to -- to operate we

11  needed to have something then, you know, a tax ID right at the

12  moment.  So he described it as this has expired, we need to fix

13  this immediately, and clearly we didn't have the funds to do

14  that.

15  Q.  So going forward with ACCI in December, or there about, in

16  2013, did you continue on in your role as a veterinarian for

17  ACCI?

18  A.  I did.

19  Q.  And you talked earlier, you testified earlier about some of

20  the protocols that were in place --

21  A.  Uh-huh.

22  Q.  -- to protect the health and safety of the bonobos, is that

23  correct?

24  A.  Yes.

25  Q.  As it stands today, is it your medical opinion that you're

1  providing complete and competent care for all of the bonobos at

2  ACCI's facility?

3  A.  Yes.  I think it's better than ever and that we want to

4  continue to make it even better than it is today.

5  Q.  And is ACCI doing everything -- or is it taking all

6  reasonable precautions to ensure the bonobos' complete safety?

7  A.  Yes.

8         MR. MELHUS:  I have no further questions for this

9  witness at this time, subject to redirect, Your Honor.

10         THE COURT:  Cross-examination.

11         MR. LANGEL:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13 BY MR. LANGEL:

14 Q.  Ms. Gilmore, my name is Todd Langel, and I'm one of the

15 attorneys for Dr. Savage-Rumbaugh.

16 A.  Okay.

17 Q.  I want to back up just a little bit to the 2012 time frame.

18 Do you recall -- you may recall back in 2012 you told Sue that

19 she had your support?

20 A.  Yes.

21 Q.  Do you remember that?  And that your support would be

22 wholehearted and unending?

23 A.  Yes.  At what point in 2012?  I don't --

24 Q.  In August of 2012.

25 A.  Okay.

1   Q.  Do you recall writing her an e-mail to that effect?

2   A.  I was very supportive of Sue when I was first involved with

3   the organization, yes.

4   Q.  Okay.  And do you recall writing her an e-mail to that

5   effect that she had your --

6   A.  I don't recall a specific e-mail, but we have sent thousands

7   of e-mails as you know.

8   Q.  So you don't recall a specific e-mail in which you indicated

9   you were supportive of Sue?

10  A.  I was supportive of Sue when I got started, but I don't -- I

11  mean, again, we literally have exchanged thousands of e-mails,

12  so it's hard to recall a specific one from three years ago.

13  Q.  If I showed you a copy of a document, might it refresh your

14  recollection about that conversation?

15  A.  Sure.

16          MR. LANGEL:  May I approach, Your Honor?

17          THE COURT:  Yes.

18  BY MR. LANGEL:

19  Q.  Ms. Gilmore, do you recognize the e-mail that I've handed

20  you?

21  A.  Yes.  I mean, I recognize it.  I wrote it, but I need to

22  re-read it to remember exactly what I said in it.

23  Q.  Take your time.

24          (Pause.)

25  A.  I believe that this is in response to the executive board

1   making a recommendation to move the bonobos to a facility in --

2   with Heidi Lyn in Mississippi, and so I think that was what I

3   was referencing there, saying I'm supportive of her because at

4   the time Sue was willing to, you know, make a contribution to

5   help cover the care.  And it seemed fair to me that the board

6   did not want to accept her donation, and it seemed fair that if

7   she wanted to do that that they should take those funds.

8   Q.  And the board did take those funds?

9   A.  They did.  I wasn't on the board at that time, but yes,

10  that's my understanding.

11  Q.  And it was $140,000?

12  A.  That's my understanding.

13  Q.  Did the board know that you sent this e-mail?

14  A.  I don't know, but I sent it to Sue.  I didn't send it to

15  anybody else.  But I don't think that was a surprise that I was

16  not saying anything contrary to other board members at the time.

17  Q.  I want to move forward a little bit to when -- there was a

18  discussion about Teco and when he got sick.  Isn't it true that

19  prior to when Teco became ill, you brought your daughter for a

20  visit to the facility?

21  A.  My daughter initially came many times with me to the

22  facility.  That's just how it was.  I was a single mother, and I

23  provided lots of care for those animals, you know, at odd hours

24  and things like that, so there were times that she would come

25  with me to the facility quite frequently.

GILMORE - CROSS

1  Q.  And at least in one of those instances, your daughter was

2  ill when she came to the facility with you?

3  A.  I don't recall intentionally ever bringing her ill to the

4  facility and exposing her to Teco, no.  I was trying to be very

5  careful about that.  If she was showing signs of illness, I

6  tried to keep her away from the facility.

7  Q.  Are you denying that you ever brought her to the facility

8  while she was ill?

9  A.  Intentionally, yeah, I didn't bring her to the facility ill.

10  Q.  Did you ever require your daughter to wear a mask when she

11  came to the facility?

12  A.  No.  That's been a protocol that we've adopted in 2014.

13  Q.  But you would agree with me that shortly before Teco became

14  ill you did indeed bring your daughter to the facility?

15  A.  Well, he was ill many times when I was coming out there and

16  had been, so yes, she was with me many times at the facility.

17  So I'm sure there were times she was there before he was ill.  I

18  think -- well, I'll let you continue.

19  Q.  When your daughter visited, is it true that you allowed your

20  daughter to share food with Teco?

21  A.  I would say that I was not in a position to set policy at

22  the time when I first started coming out there, and that was

23  very standard for Sue to encourage Teco to share food with

24  almost everybody who visited, and it was quite common for him

25  to -- you know, that's just how it was.  Teco was out.  He

1  greeted every visitor.  It wasn't a unique situation with my

2  daughter.  It was everybody who visited the facility met Teco.

3  Everybody who came there often shared food with Teco.

4  Q.  And that included the sharing of food with a potentially ill

5  child?

6  A.  Not intentionally, absolutely not.

7  Q.  But it may have occurred?

8  A.  It may have occurred.  And, again, it wasn't my decision to

9  have Teco out with my daughter.  It was Dr. Savage-Rumbaugh's.

10  Q.  There was a discussion about when Sue was asked to leave in

11  November of 2013, and you testified that you spoke with her as

12  she was gathering her belongings?

13  A.  Yes.

14  Q.  When she was leaving, you told her at that point that she

15  was being asked to leave the decision about her being asked to

16  leave was all about the money, isn't that true?

17  A.  No.  I described it as involvement of the future scientists,

18  so not the money, but the scientists, Bill and Jared's

19  involvement.

20  Q.  But you indicated to her that her involvement in the lab had

21  to cease because of the funding sources?

22  A.  I -- I wanted -- no; the scientific involvement, which

23  brings in funding.  I mean, we had -- so, you know, very

24  indirectly, I guess; but I was very concerned that that would

25  affect the transition to new leadership which she herself said

1    she had wanted.

2    Q.  But Jared and Bill, they needed money for their plan to

3    bring -- they needed to bring chimpanzees in in order to fund

4    their future plans at the facility, isn't that correct?

5    A.  Yeah.  They've been very successful bringing funds into the

6    facility.

7    Q.  But you understood that Sue could not have a material role

8    in the day-to-day operation of the lab were those efforts to

9    continue, isn't that correct?

10   A.  I had an understanding that she had said that she was

11   stepping down as, you know, playing an active role in the

12   science there and turning things over to Bill and Jared.  We had

13   moved forward on her own recommendation to bring them into the

14   fold, so to speak, and to try and put them in a leadership role,

15   and it was very frustrating to see that be seemingly sabotaged

16   by Sue herself even though it was her idea.

17   Q.  You mentioned that Jared and Bill have been successful in

18   bringing funds in.  What do you mean by that?  What funds?

19   A.  I mean that they have -- their respective universities have

20   been very supportive of their involvement here, and they, you

21   know, have continued to get small grants that have, you know,

22   put us in a not -- you know, in much better financial shape than

23   we were.

24   Q.  And what specifically have they reported to you or to the

25   board as to what they brought in?

1  A.  I mean, I don't recall the exact breakdown of grants, but

2  it's been a substantial amount of money, somewhere between two

3  and three hundred thousand dollars from what I recall in

4  different grants and different sources of funding; but that

5  would probably be a better question for Jared or Bill.

6  Q.  Has Jared or Bill reported on the fund-raising in writing to

7  the board or to you?

8  A.  Yeah.  I mean, we had that joint board meeting between BHI

9  and ACCI, you know, and there was a detailed explanation I think

10 at that time of funds that came in that they shared with both

11 boards.  And then, yeah, we continue to as we meet talk about

12 the funds that continue to come in, so they continue to bring

13 funds into the organization.

14 Q.  That joint meeting that you described took place in July

15 2014?

16 A.  Yeah.

17 Q.  June or July of 2014?

18 A.  Uh-huh.

19 Q.  Have there been any reports by Bill or Jared in writing to

20 you or to the board since that time about fund-raising?

21 A.  The ACCI board?

22 Q.  Right.

23 A.  I don't recall.  It's very possible.  I would have to look

24 at my e-mail.  We talk continuously and send many, many e-mails

25 back and forth, so I -- it's possible, but I don't recall that

1 specifically.

2 Q.  So nothing specific, but it's your testimony that they've

3 been successful?

4 A.  Yes.

5 Q.  But you don't have any specifics?

6 A.  I can get specifics; but right at the moment up here on the

7 witness stand, I don't have specific dates or funding, you know,

8 funding sources.

9 Q.  You can send those to Bonobo Hope.

10        How many meetings has the ACCI board had since July

11 2014?

12 A.  I don't recall specifically how many meetings that we have

13 had.  We are in frequent communication; but, again, we could get

14 that information for you.

15 Q.  Have you had any in-person meetings at all since July 2014?

16 A.  Probably, yes.  Yes, we have had some board meetings

17 specifically.  I'm trying to recall the exact dates of meetings

18 that we've had, so --

19 Q.  And when I ask questions, I expect that you not look at the

20 gallery or look at counsel table --

21 A.  Okay.

22 Q.  -- and you communicate with me.

23 A.  Okay.

24 Q.  So you have had in-person meetings?

25 A.  Yes, we have.  I don't recall exact dates, but --

1  Q.  How many?

2  A.  I don't recall the exact number of meetings.  I mean --

3  Q.  Do you know if minutes were indeed generated at those

4  meetings?

5  A.  I'm not the secretary, so I don't know.

6  Q.  How many of the bonobos have died while the colony has been

7  under your care?

8  A.  Two.

9  Q.  Panbanisha in November of 2012?

10 A.  Yes.

11 Q.  And then Matata?

12 A.  Yes.

13 Q.  Okay.  And when did Matata die?

14 A.  I believe June 22nd, or on or about there, in 2014.

15 Q.  In either of those cases, was Sue allowed in the lab or had

16 she been allowed in the lab?

17 A.  No.  You mean at the time of death or --

18 Q.  Yeah.

19 A.  No.

20 Q.  How did Matata die?

21 A.  Matata had -- so the day before she died, we were notified

22 by staff that she was having -- you know, seemed a little

23 shakier than normal, just seemed a little off, and it was hard

24 for them to pinpoint specific symptoms.  They said that she was

25 shakier than normal, she was still eating and drinking, she took

1 her food and climbed up into the tunnel and, you know, had made

2 a nest, and this is kind of afternoon that I was notified about

3 this.  But there definitely was a concern, you know, just with

4 that type of report.

5          And so I did reach out to June Olds, a Blank Park Zoo

6 veterinarian who I've formed a relationship with and has been

7 helpful at other times with these animals, and they have been

8 very helpful and willing to share their equipment and, you know,

9 facilities with us.  And so we talked about -- she indicated

10 that she would be willing to assist me with an anesthetized exam

11 on Matata if necessary.  It takes a little bit of timing.  They

12 need to -- you know, she would bring her portable anesthesia

13 machine and things like that out there, and so we were making

14 plans to do that, and she died in her nest overnight.

15 Q.  So who was in the lab at the time leading up to Matata's

16 death?

17 A.  There -- oh, I don't remember, but I believe possibly

18 Heather Housh was in the lab before that.  I think Tami Watson

19 also potentially was in the lab that day.  I can't remember who

20 was there or not.  We had one of Jared's graduate research

21 assistants, Scott Milne, I think that's how you say it, was

22 there that night as well.  And I can't -- there may have been

23 other people there, but I can't recall that detail.

24 Q.  Was there anybody from Yerkes there?

25 A.  No -- well, I don't think so.  There wasn't -- no, not that

1   I know of.  I mean, as far as working with Matata, it was

2   general care staff.

3   Q.  Is it correct that Liz Pugh had been banned from the lab --

4   A.  No.

5   Q.  -- for about 24 hours before Matata died?

6   A.  No.

7   Q.  Was she there?

8   A.  I don't think so, no.  She was there the following morning,

9   but I don't think she was there the night of.

10  Q.  And do you know why counsel for Dr. Rumbaugh or counsel for

11  the Congo was not advised that Matata had died?

12  A.  Well, we issued a press release.  It wasn't -- we didn't --

13  it was definitely not something that we tried to keep a secret.

14  Q.  Are you aware of any plans of Jared or anybody at ACCI to

15  loan any of the bonobos out for breeding?

16  A.  No.  Well, we do want to rejoin the SSP.  We think that's a

17  very important part of conservation, and the SSP is the Species

18  Survival Plan that is in affiliation with the zoos in North

19  America.  So the problem with SSP is that they don't have any

20  space for bonobos, and so in talks that we have had about

21  rejoining them, they have talked about bringing bonobos to us

22  for breeding.  So we would like to breed them in the future in

23  conjunction with the Species Survival Plan.

24  Q.  And what's the reason that hasn't happened yet?

25  A.  Well, we're in the process of applying for that.

1  Interestingly, I guess, one of the things that they're very

2  concerned with is this ownership issue.  The SSP has been quite

3  clear that they don't want any involvement with

4  Dr. Savage-Rumbaugh at all, so --

5  Q.  And who at SSP has conveyed that to you?

6  A.  Gay Reinartz and Vickie Clyde have said that at different

7  times.

8  Q.  Do you know why?

9  A.  I feel like they have a tenuous relationship and they don't

10  feel that the bonobos have received the best care under

11  Dr. Savage-Rumbaugh.

12  Q.  When was the last time you spoke with them about that topic?

13  A.  One of the conversations that I had with Vickie Clyde about

14  this topic was -- I mean, specifically about Sue was probably

15  when she came out when they were all sick with respiratory

16  illness actually in 2012, she agreed to come out, but only if I

17  could promise that she didn't have to have a conversation with

18  Dr. Savage-Rumbaugh or ideally ever be in the same room with

19  her.  And Dr. Savage-Rumbaugh was aware of that I do know.

20            THE COURT:  What does SSP stand for again?

21            THE WITNESS:  I'm sorry; Species Survival Plan.  It's

22  all endangered species that are captively housed in North

23  American zoos are part of a Species Survival Plan, and what that

24  does is try and create -- it's a breeding program basically that

25  involves the input of geneticists and veterinarians and things

1    like that to breed animals that would preserve as much genetic

2    diversity as possible out of the present captive population.  So

3    it's a -- and it also is a very good veterinary resource.

4    Incidentally, when you're part of the SSP, veterinarians who

5    have participating animals have regular meetings and share a lot

6    of data about health of different animals, about illnesses,

7    about injuries.  They have a report that comes out very

8    regularly, and so it can be a very helpful veterinary -- you

9    know veterinary tool.

10            THE COURT:  Thank you.

11   BY MR. LANGEL:

12   Q.  Does ACCI have plans to inform BHI of its proposed breeding

13   activities before breeding occurs?

14   A.  I'm sure that -- I think that we've discussed actually

15   wanting to join the SSP.  I don't recall exactly if we talked

16   about that back in that joint board meeting, but I think that we

17   did.

18   Q.  So you don't know right -- as you sit here today, you don't

19   know if there are plans for that?

20   A.  I mean, it's not a secret.  We would -- you know, the

21   members of the SSP are, you know, easily identifiable.

22   Q.  Are there any current plans to anesthetize any of the

23   bonobos?

24   A.  There are not current plans as far as like a set date.  We

25   do -- we think it's routine and responsible veterinary care to

1  provide, you know, periodic anesthetized exams that allow us to

2  collect, you know, full blood work and take chest x-rays and,

3  you know, do a lot of the things available.  That's a very

4  standard practice in captive management of exotic species like

5  apes or anything you would find in a zoo.

6  Q.  So do you have any currently planned?

7  A.  We don't have any currently planned, but we -- as far as

8  like a set date, but we are taking steps to ensure that that

9  does happen in the near future because we think it's part of

10 responsible veterinary care.

11 Q.  Do you have plans to inform BHI of those activities?

12 A.  We haven't discuss that yet, but I would see no reason why

13 we wouldn't.

14 Q.  So you haven't -- as of today, you haven't made any plans to

15 inform BHI of any --

16 A.  No, not concrete plans, but we definitely haven't made plans

17 to not inform them.

18 Q.  Have any of the bonobos been anesthetized in the last 18

19 months?

20 A.  No.

21 Q.  Who are the members of the ACCI IACUC?  And what does IACUC

22 stand for?

23 A.  IACUC is Institutional Animal Care and Use Committee.  I am

24 a member of the IACUC as a veterinarian.  I am also the current

25 IACUC chair.  Dr. Taglialatela is also on the IACUC as a

1  scientist.  Allyson Bennett is another scientist that is part of

2  that.  And then we have a facility representative, Tami Watson,

3  who's on the IACUC, and our layperson, nonaffiliated layperson

4  is Jack Price, and he's someone from the Des Moines community.

5  Q.  Have any chimps come to the lab yet?

6  A.  No.

7  Q.  If they do come there, who will be their veterinarian?

8  A.  I expect that I will be at this point in time.

9  Q.  Before Mr. Taglialatela took over as the leader of ACCI,

10 were you required to wear masks and gloves anywhere in the lab?

11 A.  No.

12 Q.  Has IPLS been reinstated as of today?

13 A.  What do you mean; from -- I think we just discussed that,

14 like there's a tax lien out that we still owe money.  Is that

15 what you mean, the tax --

16 Q.  You're not aware of IPLS being reinstated as we sit here

17 today?

18 A.  In -- as far as the tax ID goes, the IPLS tax ID has not

19 been reinstated.  We consider it to be the same organization

20 functionally.

21 Q.  Are you aware of any plans in the near future to resolve the

22 tax lien and reinstate IPLS?

23 A.  We would like to resolve the tax lien.  A lot of that is a

24 funding issue.  As funds become available, we would like to

25 address that issue.

1  Q.  But as you sit here today, there aren't immediate plans to

2  do that?

3  A.  There's not immediate funds to do that.

4  Q.  Have any representatives of Yerkes been to the lab while you

5  have been there?

6  A.  Yes.

7  Q.  Who?

8  A.  Veterinarians from Yerkes have visited the lab, Joyce Cohen

9  is the head veterinarian out there, and I can't recall the names

10  of the other two veterinarians, but I visited with them

11  recently.

12  Q.  How often have they been there?

13  A.  I was only there with them once.  I don't remember if

14  they've been there other times or not, but I was only there with

15  them once.  I think that's the only time they visited.

16  Q.  And when was that?

17  A.  I don't recall.  It wasn't horribly long ago, but I mean it

18  was within the last year.

19  Q.  Do you recall what time of year it was?

20  A.  It was warm out.  We were outside.  Yeah, I can look.  I am

21  guessing that would have been last fall then.

22          MR. LANGEL:  That's all the questions I have.

23          Thank you.

24          THE COURT:  Redirect?

25          MR. MELHUS:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. MELHUS:

Q.   Dr. Gilmore, let's talk a little bit about the course of care that you provided for Matata.  Could you briefly describe the care that you provided to Matata?

A.   Yes.  Well, Matata actually had been a remarkably healthy ape for her age.  She was very -- many apes her age -- as far as we know or to our knowledge, she was the second oldest ape in captivity -- or second oldest bonobo in captivity, I'm sorry.  She, compared to many others, was doing very well.  She was not horribly arthritic.  She was still very active.  Her hair coat looks good.  She did not have obvious terrible cataracts or anything like that impeding her vision.  So she actually had been fairly healthy.

          I had been concerned in the year prior to her death about potential renal disease, which is common in aging animals.  I noticed that she was polyuric, drinking more and urinating more than what I would consider to be normal.  We did not anesthetize her to get blood work to confirm that there was an elevation of renal values, but I did collect urine on her many times and saw what -- I saw protein in her urine, and I saw that she was isosthenuric, which means that her urine wasn't concentrated or diluted, and that is a sign that her kidneys aren't working well to concentrate urine, and that can be normal in a well hydrated animal; but it's a flag, especially

1  consistently, and the protein in the urine was concerning.  We

2  also -- animals -- I watched her urine pretty closely because

3  animals that do have potential kidney issues are more prone to

4  urinary tract infections and things like that, and we did treat

5  her for multiple urinary tract infections over the year before

6  she died.

7          So we really weren't given, you know, a lot of warning

8  that there was something awry with her.  She -- it was

9  literally -- it wasn't even a full 24 hours that she had

10 symptoms.  It was maybe even more like 12 hours that she had

11 symptoms and then passed away.

12 Q.  Were you consulting with any other individuals about the

13 care for Matata either before or right after?

14 A.  Yes.  I mean, as I mentioned, June Olds is the Blank Park

15 Zoo veterinarian.  I was in discussion with her about the

16 symptoms that were concerning that were described by the staff,

17 and she agreed, again, to come out and help with an anesthetized

18 exam if needed, bring the equipment from the zoo to help us and

19 things like that to get that done.  So we were going to meet the

20 following morning.  And she died in her sleep overnight, so we

21 didn't have very much time to respond to a health crisis with

22 her.  Again, she was eating, she made a nest, she climbed up to

23 her nest.  She died in her sleep in her nest.

24 Q.  Were you able to validate your course of care for Matata as

25 a result of those consultations?

1  A.  Can you say that one more time?  I didn't hear you.

2  Q.  Sure.  Were you able to validate your course of care for

3  Matata during the consultations you just discussed?

4  A.  Yes, absolutely.  I mean, nobody -- obviously, just as I

5  mentioned, as a general rule, veterinarians like Vickie Clyde or

6  USDA Agent Heather Cole, things like that, agree that it's a

7  good idea to periodically anesthetize animals and obtain survey

8  data on them, you know, check blood work, take x-rays, you know,

9  image them and things like that as appropriate, you know, to

10  make sure -- we, again, are not at the place where we could

11  routinely do that at that time, but it's something that we're

12  working towards.

13          But given the circumstances, no, nobody provided any

14  other insight or any other suggestions for what could be done

15  for her.  In fact, this is -- I know we did share the necropsy

16  report with Vickie Clyde and things like that.  Her thought was

17  that given the very sudden acute onset and kind of the -- you

18  know, there were definitely renal changes identified on that

19  necropsy report, but they weren't the obvious cause of death.  I

20  mean, you can't totally exclude that; but one thought was that

21  it was probably -- or Vickie's opinion, Dr. Clyde's opinion was

22  that it was very likely an arrythmia caused by some myocardial

23  fibrosis in her heart.  And that, incidentally, is the leading

24  cause of death in great apes, in bonobos.

25  Q.  Okay.  You mentioned a necropsy report.  As I understand it,

1   that's the primate equivalent to an autopsy in a human?

2   A.  Or the veterinary equivalent.  Yeah, we call it necropsy;

3   same as thing as an autopsy.

4   Q.  Okay.  And did anything during your course of care in that

5   necropsy report indicate that Matata had passed away as a result

6   of, for example, water from the flood of 2008?

7   A.  No.

8   Q.  Did she have access to water from that flood?

9   A.  No -- well, I don't know.  I wasn't there in 2008, so -- she

10   doesn't have access to lake water, though, now.

11   Q.  Okay.  Shortly after Matata's death, do you recall George

12   Caudill or any other member of the ACCI board sending an e-mail

13   to Carmen Mate, the chair of the ACCI board, about Matata's

14   death?

15   A.  I don't recall exactly who George shared an e-mail with, but

16   I know he prepared an e-mail and sent it and, yes, I don't -- I

17   think so.

18   Q.  Okay.  So, in any event, BHI was made aware of Matata's

19   death soon thereafter?

20   A.  Yes, to my knowledge.

21   Q.  Okay.  And counsel asked some questions about -- I'm

22   changing subjects just quickly.  Counsel asked some questions

23   about reasons why the SSP may not want to interact with

24   Dr. Savage-Rumbaugh.

25   A.  Uh-huh.

1  Q.  And you gave some reasons for that.  Are there any other

2  reasons that you can think of?  For example, has

3  Dr. Savage-Rumbaugh placed any bonobos or staff in physical harm

4  that you're aware of?

5  A.  I mean, yes, there are a history of various issues.  I mean,

6  it depends on exactly where you're wanting to go with that.  But

7  as a very general rule placing them in harm from a veterinarian

8  perspective is Kanzi and Panbanisha being morbidly obese by not

9  feeding them the healthiest of diets.  So that is definitely a

10  concern when they're breeding, you know, new animals, that they

11  have a claim and they want to make sure that they're going to be

12  treated well.

13        They also were not comfortable with the protocol of

14  removing young babies from their mothers and, you know, rearing

15  them because they felt like it was a welfare issue for both the

16  infants and, you know, the mother of that infant.

17        I mean, those are two main issues.  There was also,

18  you know, various concerns about the difficulty historically

19  that veterinarians have had working at this organization or

20  working with Sue Savage-Rumbaugh.  People have not had the best

21  experience from my understanding, other veterinarians have not

22  had the best experience getting cooperation with needed

23  procedures and compliance with, you know, veterinary

24  recommendations.

25  Q.  Okay.  Are you aware of any other specific incidences with

1  Dr. Savage-Rumbaugh placing the bonobos in physical harm?

2  A.  Yes.  I mean, I can think of a couple of examples of that.

3  Q.  Could you provide a couple of examples just briefly for the

4  court?

5  A.  Okay.  Well, Teco has had a few separate issues that I was

6  called to treat him on that were directly related to his care

7  while under Dr. Savage-Rumbaugh.  One time I was called out and

8  he had grabbed a bottle of Tylenol and was running around with

9  the Tylenol.  There was a concern about how much Tylenol he

10 potentially ingested.  He -- I was able to retrieve the bottle

11 from him, but he had that.  There were pills all over the floor.

12 He did ingest I think a small amount of those, but not enough

13 to, you know, cause any lasting damage; but that was a very

14 frightening incident.

15       There's another time that I was asked to x-ray him to

16 see if he potentially had eaten a battery because he was holding

17 batteries in his mouth and things like that, and then we

18 couldn't find a battery, so we were concerned about whether or

19 not he had swallowed a battery.  He hadn't swallowed a battery

20 at that time.

21       There was one incident, you know, that was an

22 accident, but I still think warrants some investigation into

23 protocol.  There was a time where Teco had a leash and collar on

24 in the anteroom, which is like the space right outside of the

25 enclosure -- outside of the ape enclosure, and one of the other

1   bonobos, Maisha, grabbed his leash through the wire and almost

2   strangled him, which obviously wouldn't happen in normal

3   circumstances if he wasn't wearing a leash and collar.

4          You know, obviously, we've changed a lot of protocols

5   over time, but I think in general, you know, exposing him to,

6   you know, the public or lots of visitors or things like that, or

7   any of them is not in their best interests.  We've changed

8   things dramatically there to try to keep them healthier by just

9   not exposing them to germs in the first place.

10  Q.  Were there any issues with transporting Teco or others --

11  excuse me.  Were there any issues with Dr. Savage-Rumbaugh

12  transporting Teco or other bonobos in a personal vehicle that

13  would have caused any safety concerns?

14  A.  The first --

15          THE COURT:  Mr. Melhus, if I may interject a moment.

16  Remember what I said about funnels and hourglasses?

17          MR. MELHUS:  Sure.

18          THE COURT:  We're getting to the hourglass area.

19          MR. MELHUS:  Okay.

20          THE COURT:  You started a little bit about the SSP and

21  why those people might have been reluctant to work with

22  Dr. Savage-Rumbaugh; but now we're going into a whole other area

23  of stuff that has happened, and I think we're opening new vistas

24  that probably we need not.

25          MR. MELHUS:  Fair enough, Your Honor.  I apologize and

1  I'll move on.

2  BY MR. MELHUS:

3  Q.  My final question for you would be, has ACCI adopted any

4  protocols to address some of the concerns that you just

5  testified to?

6  A.  Yes.  There are a lot of protocols in place to make our

7  environment as safe as possible.  You know, I directly attribute

8  that to Bill and -- to Dr. Taglialatela and Dr. Hopkins' efforts

9  at the lab.  We've taken considerable steps to provide, you

10 know, actual structured safety training for staff and teaching

11 staff members how to move apes, you know, safely and how to

12 interact with the apes safely.  We have strict diet protocols in

13 place, including a protocol for how they're rewarded for the

14 research that they participate in.  Again, husbandry is, you

15 know, exponentially better and, you know, more organized than it

16 ever has been.

17        MR. MELHUS:  Thank you, Dr. Gilmore.

18        And, Your Honor, that's all the questions I have for

19 this witness.

20        THE COURT:  Mr. Langel, recross.

21                RECROSS-EXAMINATION

22 BY MR. LANGEL:

23 Q.  Dr. Gilmore, I just have a few questions.

24        Did you at some point fill out a questionnaire that

25 was prepared by Nancy Howell during the investigation of Sue in

1   November of 2012?

2   A.  Yes, I think so.

3   Q.  Okay.  And do you recall what you said in that -- in your

4   responses to the questions in that questionnaire?

5   A.  I don't have that questionnaire in front of me, but I'm sure

6   you can give it to me.

7   Q.  Would it help if I put it in front of you?

8   A.  Yeah, sure.

9           MR. LANGEL:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. LANGEL:

12  Q.  Ms. Gilmore, is the document I've handed you a copy of the

13  questionnaire that you completed in response to questions from

14  Nancy Howell?

15  A.  Yes, it looks like it.

16  Q.  Okay.  With respect to your response as to diet and feeding

17  of the apes, can you summarize your response?

18  A.  Give me just a second to find it again.

19          (Pause.)

20          Yeah, and I would say that, as I mentioned earlier, in

21  June we had done some work trying to bring a nutritionist out to

22  start an active -- you know, an active nutrition plan for them,

23  and so this was, you know, we were --

24  Q.  You indicated that you were satisfied with the diet and

25  feeding program.  In fact, that's what you said verbatim, is

1  that correct?

2  A.  Yes.  I am satisfied that we had put that in place and I

3  think that we were making efforts to comply with that on some

4  level.  I think we're better at it now, but I think that there

5  were efforts to comply with those initial recommendations,

6  especially during this investigation period.

7  Q.  And you were also asked to evaluate the injuries to Kanzi

8  and Teco, isn't that correct?

9  A.  Uh-huh.

10  Q.  And you concluded in your remarks that you didn't have any

11  reason to believe that the injuries occurred as a result of

12  negligence or maltreatment, isn't that correct?

13  A.  Oh, no, I didn't think that.  Dr. Savage-Rumbaugh had

14  indicated that somebody had cut him with a weed whacker and I --

15  Q.  Let me move back.  As to the injury as to -- just describe

16  your summary and your testimony there as to --

17  A.  I did not think that that was maliciously inflicted on them,

18  no.

19  Q.  Okay.

20  A.  I think it was just an injury.

21  Q.  Okay.  It was your view that it was not maliciously

22  inflicted, but you --

23  A.  No, I don't think so.

24  Q.  -- understood that Dr. Rumbaugh --

25  A.  I did not think that Dr. Rumbaugh cut Kanzi, no.

1  Q.  The third category of the inquiry involved Dr. Rumbaugh's

2  interactions with the bonobos?

3  A.  Uh-huh.

4  Q.  And can you describe for me your response to the inquiry in

5  that regard?

6  A.  I think that she has a good relationship with the bonobos

7  and I think that she definitely has walked among them as I

8  indicated there.  So she -- I believe that she cares about them

9  and she definitely has spent many years with them.

10 Q.  You concluded -- with respect to some of the concerns that

11 were being raised about safety, is it fair to say that some of

12 the incidents that Sue was accused of occurred when Sue wasn't

13 even in the building; is that fair to say?

14 A.  Yes.  And I have always maintained, and I still will say

15 this, that a lot of those Bonobo 12 allegations as I mentioned

16 at the very beginning of my testimony, I had a problem with the

17 way that -- I didn't think that was fair to Sue, because a lot

18 of those were thirdhand and by people who hadn't spent very much

19 time there, and I did not like the way that that was presented

20 to the public.

21       MR. LANGEL:  Your Honor, this document is not marked

22 as an exhibit yet, but we would like to mark it and would like

23 to move it into evidence at this time as Exhibit 107.

24       MR. MELHUS:  Your Honor, could we see the exhibit

25 before it's --

1             THE COURT:  Certainly.  I didn't pick up the date.

2             What was the date of your responsive questionnaire?

3             THE WITNESS:  I don't know.  It's not on here.  I

4    can't remember.

5             MR. MELHUS:  May I approach the witness, Your Honor?

6             THE COURT:  Yes, please.

7             MR. LANGEL:  I have it in -- if I can publish my

8    screen, I could also share it with the court; but this is the

9    only paper copy that I have.

10            THE COURT:  I would be happy to take a look at it.

11            THE CLERK:  Do you want me to publish it then on the

12   screen?

13            THE COURT:  Oh, yes.  Go ahead and put it up.

14            (Pause.)

15            MR. MELHUS:  Your Honor, recognizing that this is the

16   first time that we've been provided with this particular

17   document, we do have concerns about when it was created and

18   whether or not this is a complete and accurate copy of

19   Dr. Gilmore's prior statements, and I would ask that the

20   court --

21            THE COURT:  You can voir dire the witness, if you care

22   to, for the purposes of an objection if that's your concern.

23            MR. MELHUS:  Sure.

24

25

1              VOIR DIRE EXAMINATION

2  BY MR. MELHUS:

3  Q.  Dr. Gilmore, do you recall answering this questionnaire?

4  A.  Yes.  It was three years ago, so it's hard to remember, you

5  know, the verbatim details of that that were made that long ago.

6  Q.  Would you be able to make -- or would you be able to testify

7  today about whether or not this is a complete and accurate copy

8  of your prior statements?

9  A.  I would probably have to review it.

10         MR. MELHUS:  Your Honor, we would object to foundation

11  at this time, and we recognize the court's earlier ruling taking

12  exhibits subject to those objections, so we have no further

13  objections about this exhibit.

14         THE COURT:  Mr. Langel, do you care to lay a little

15  more foundation about the exhibit?

16         MR. LANGEL:  Just a few questions, Your Honor.

17              RECROSS-EXAMINATION (Continued)

18  BY MR. LANGEL:

19  Q.  Ms. Gilmore -- and could I hand you the document again?

20         MR. STAMBAUGH:  May I approach, Your Honor?

21         THE COURT:  Please.

22  BY MR. LANGEL:

23  Q.  You testified that you indeed prepared a summary of

24  responses in response for Nancy Howell, correct?

25  A.  Yes.

1   Q.  And you've had a chance to review Exhibit 107 briefly.  And

2   take all the time that you need, but my question to you is, is

3   Exhibit 107 a true and correct copy of your responses to

4   Ms. Howell's questionnaire?

5   A.  Oh, this here (indicating)?  What's Exhibit 107; what I'm

6   holding?

7   Q.  Yes.

8   A.  Okay.  Yes.  I mean -- do you want me to read it right now?

9   Q.  I want you to become familiar with it and tell me if there's

10   any reason for you not to believe that it isn't -- or for you to

11   disagree with me that it is a true and correct copy of your

12   responses.

13          MR. MELHUS:  Your Honor, in the interests of not

14   having Dr. Gilmore have to review this entire document, if we

15   could possibly leave the record open with respect to this

16   particular exhibit and have Dr. Gilmore review it and would make

17   an offer tomorrow morning regarding its admissibility.

18          THE COURT:  That would be fine.  I only have a little

19   bit of it here on the screen.  Is it a lengthy document?

20          MR. MELHUS:  It's about seven pages.

21          MR. LANGEL:  Seven pages.

22          THE COURT:  I think that's a reasonable request.  Is

23   she going to be back tomorrow?  Is that what you're proposing,

24   or can she do it yet tonight?

25          MR. MELHUS:  If our objections still stand tomorrow

1  morning, we can make her available tomorrow.

2          THE COURT:  I would suggest an alternative, if you

3  have a few minutes when we're done here today, maybe you could

4  talk to her, both of you, both sides about it and satisfy

5  yourselves as to its authenticity and completeness.

6          MR. MELHUS:  I will do that, Your Honor.

7          THE WITNESS:  All right.

8          THE COURT:  Let me ask especially for context because

9  I'm a little bit outside of the bubble on it, but it's my

10  understanding that this questionnaire is in response to concerns

11  that were raised by the Bonobo 12?

12          THE WITNESS:  Yes.

13          THE COURT:  Some of the complaints that they made; is

14  that true?  Yes.

15          THE WITNESS:  Yes.

16          THE COURT:  And in about what time frame again?

17          THE WITNESS:  It would have been September of 2012

18  maybe, August or September.

19          THE COURT:  Thank you.

20          I had assumed that.  I just wanted to make sure I had

21  it right.

22          THE WITNESS:  All right.

23          THE COURT:  Why don't we -- who's questioning?

24  Mr. Langel, I think you've got the floor.  Do you have any more

25  questions for this witness?

```
 1              MR. LANGEL:  Just the famous last phrase, one final
 2  last question.
 3  BY MR. LANGEL:
 4  Q.  Did you have any conversations with Mr. Taglialatela about
 5  your testimony?
 6  A.  No.
 7  Q.  Or with anyone about what any prior witnesses have said in
 8  this case?
 9  A.  No.
10              MR. LANGEL:  Thank you.
11              No further questions.
12              THE COURT:  Anything further of this witness at this
13  time?
14              MR. MELHUS:  Nothing further, Your Honor.
15              Thank you.
16              THE COURT:  Ma'am, you may step down.  If you don't
17  mind, would you stay awhile, and we're going to do a little bit
18  more here, and then they would like to talk to you about that
19  today.
20              And then if you're able to stipulate that it's
21  complete -- you've made other objections, but that it's complete
22  and accurate and hers, maybe she won't have to come back
23  tomorrow.
24              MR. MELHUS:  That would be my hope, Your Honor.
25              MR. STAMBAUGH:  That would be our preferred approach,
```

1   Your Honor.

2          THE COURT:  Do you have another witness we could get

3   started on today?

4          MR. MILLER:  We do, Your Honor.  Plaintiffs call

5   Dr. Taglialatela, Jared Taglialatela.

6          THE COURT:  Sir, would you come forward, please, and

7   be sworn.

8          Cheryl?

9          THE CLERK:  Oh, I'm sorry.

10          Please raise your right hand.

11        JARED TAGLIALATELA, PLAINTIFFS' WITNESS, SWORN

12                        DIRECT EXAMINATION

13   BY MR. MILLER:

14   Q.  Would you state your name and spell your last name, please.

15   A.  Sure.  My name is Jared Taglialatela.  It's

16   T-A-G-L-I-A-L-A-T-E-L-A.

17   Q.  Are you, as has been alleged and discussed in this trial, a

18   research associate with Yerkes National Primate Research Center?

19   A.  Yes, I am.

20   Q.  What is a Yerkes research associate?

21   A.  That's a good question.  It's basically a blanket term for

22   any individual who would have already received a doctoral degree

23   but would still have privileges to enter the facility and

24   presumably collect data from any of the animals that are housed

25   there.

1  Q.  And you're Director of Science for ACCI, is that correct?

2  A.  No.  I'm the Director of Research.

3  Q.  Oh, excuse me, I'm sorry; Director of Research.  Thank you

4  for that correction.

5       You're also a board member of ACCI?

6  A.  That is correct.

7  Q.  Does Yerkes have any involvement with ACCI's operations?

8       MR. STAMBAUGH:  Objection; lacks foundation.

9       THE COURT:  I'll receive it, subject to the objection.

10 A.  The Yerkes National Primate Research Center has no

11 involvement with ACCI's operations.

12 BY MR. MILLER:

13 Q.  Have you met or discussed ACCI with Yerkes in the past?

14 A.  Yes, I have.

15 Q.  For what purpose?

16 A.  For the purpose of attempting to have the Yerkes National

17 Primate Research Center transfer a number of their chimpanzees

18 within their overall colony to ACCI here in Des Moines.

19 Q.  Has Yerkes transferred those chimpanzees?

20 A.  No, they have not.

21 Q.  Has Yerkes ever told you that a condition on their

22 involvement with ACCI to transfer these chimpanzees would be

23 that Dr. Sue or Dr. Duane Rumbaugh has no involvement with ACCI?

24 A.  No, they have not.

25 Q.  Have you provided an assurance or a statement to ACCI that

1  they would have no involvement?

2  A.  There was an initial questionnaire that was given to ACCI

3  when we first inquired with the Yerkes National Primate Research

4  Center about -- if they were interested in divesting their

5  chimpanzees.  I don't have it in front of me, so I don't really

6  know.  I believe one of their questions, I think this was

7  Lyle's, Mr. Simpson's earlier testimony, indicated this was at

8  least mentioned.  There was a question, I believe, in which that

9  came up.  I was not the person charged with writing the response.

10  I don't off the top of my head remember what that response was.

11  Q.  Has anyone from BHI ever asked you if Yerkes ever made this

12  condition relating to chimpanzees?

13            MR. STAMBAUGH:  Objection; lacks foundation.

14            THE COURT:  I'll receive it, subject to the objection.

15  A.  Not to my recollection.

16  BY MR. MILLER:

17  Q.  And you've never provided -- am I understanding you

18  correctly you, Dr. Taglialatela, you have never provided such

19  assurances to Yerkes?

20  A.  No, I have not.

21  Q.  And, to your knowledge, has anybody at ACCI provided that?

22            MR. STAMBAUGH:  Objection; lacks foundation.  The

23  witness just testified he didn't fill out the questionnaire.

24            THE COURT:  Overruled.  I'll receive it, subject to

25  the objection.

1  A.  I'm sorry, could you restate that one again?

2  BY MR. MILLER:

3  Q.  To your knowledge, has any assurance about their involvement

4  been provided to Yerkes?

5          MR. STAMBAUGH:  Same objection.

6          THE COURT:  Same ruling.

7  A.  Not specifically, based on my previous response.

8  BY MR. MILLER:

9  Q.  Where do you live, sir?

10  A.  I live in Atlanta, Georgia.

11  Q.  And how old are you?

12  A.  I'm 40.

13  Q.  You have in front of you in one of the notebooks an Exhibit

14  1007.  Could you take a look at that?

15  A.  Yeah.

16  Q.  Do you have that there?

17  A.  Yeah.

18  Q.  Can you identify that for the record, what that exhibit is?

19  A.  It looks like a copy of my CV, curriculum vitae.

20  Q.  Is that current?

21  A.  It looks like it's probably missing a couple of recent

22  peer-reviewed publications.

23  Q.  Do you know approximately when that CV would have been

24  prepared?

25  A.  The peer-reviewed publications stop in this CV in 2012.

1  There will be a few more in the intervening years.

2  Q.  Can you provide the court a brief description of your

3  educational background?

4  A.  Sure.  I'll use my CV to remind myself.  I received my

5  bachelor's degree in biology from the University of Virginia in

6  1997.  I received my Ph.D. in neurobiology and behavior from

7  Georgia State University in 2004.  I then did postdoctoral

8  training, which was partially funded by the National Institutes

9  of Health by individual postdoctoral fellowship, and I completed

10 that work in 2008.

11 Q.  And do you have a particular area of expertise?

12 A.  I would consider my area of expertise is in great ape

13 behavior, with a focus on great ape communication, as well as

14 neuroanatomy.

15 Q.  Where are you employed?

16 A.  I'm employed at Kennesaw State University in Kennesaw,

17 Georgia.

18 Q.  Do you have a job title there?

19 A.  I'm assistant professor of biology.

20 Q.  And what does that position entail?

21 A.  It entails teaching courses, mentoring both undergraduate

22 and master's level graduate students, and it involves conducting

23 research and publishing those findings, as well as seeking grant

24 funding for funding network.

25 Q.  What does your position as Director of Research at ACCI

1  entail?

2  A.  That's a pretty comprehensive position at this point given

3  the size of the organization.  Mainly sort of my job

4  description, if you will, is kind of overseeing the research

5  that gets conducted at the facility in sort of a most pragmatic

6  way.  So, in other words, what I mean by that is being able to

7  make sure that the apes are being cared for in such a way that

8  we can conduct the research that we need to conduct, by

9  interfacing with other researchers, whether those be PIs or

10  graduate students or postdoctoral fellows, either from within

11  the organization or from other institutions, making sure they

12  have time to work with the animals.  I also help other PIs

13  develop and we'll use protocols and talk about basically the

14  pragmatics of what we can and cannot do at the facility.

15  Q.  And I think we established earlier, PI is --

16  A.  I'm sorry; principal --

17  Q.  -- principal -- go ahead.  What it is?

18  A.  Principal investigator.

19  Q.  Can you define what that entails?

20  A.  That term is a little nebulous, depending on where you go;

21  but basically it refers to an individual who would be completing

22  animal use protocols and conducting their own line of research.

23  So, obviously, if there's individuals that don't do animal work,

24  it wouldn't necessarily involve animal work.

25  Q.  Are you paid for your position at ACCI?

1   A.   No, I am not.

2   Q.   Are you fulfilling that position alongside full-time work

3   that you're doing at Kennesaw?

4   A.   Um --

5   Q.   Your day job, as it were?

6   A.   Right.  This is -- yes, I have another day job.  That's what

7   pays the bills.

8   Q.   And that's the professorship you just described a moment

9   ago?

10  A.   Yes.

11  Q.   Okay.  Approximately how much time a month do you spend in

12  Des Moines for ACCI work?

13  A.   I've calculated that since the -- I believe it was since --

14  now my memory is gone; but I think it was since December of

15  2013, I would say on or about sometime in December of 2013, and

16  I have spent approximately six days in Des Moines, although this

17  May it turned out to be approximately 21 days, so I think I had

18  not calculated that.  It was anticipating how many days I would

19  be in Des Moines.

20  Q.   And those other months, you didn't have a lawyer asking you

21  about it.

22          So it's six days a month?

23  A.   Yes, I'm sorry, six days a month.

24  Q.   And outside those six days a month physically in Des Moines,

25  are you able to quantify or explain for the court other time you

1    spend on ACCI business?

2    A.  I would have to give my best guess estimate, and I have been

3    working on that for a number of reasons, and right now I'm

4    thinking somewhere in the area of 35 hours.

5    Q.  Thirty-five hours per --

6    A.  Per week; I'm sorry.

7            MR. MILLER:  Your Honor, I have a demonstrative

8    exhibit that I shared a copy with counsel.  I would just like to

9    show it to Dr. Taglialatela to assist in his testimony if that's

10   okay?

11           THE COURT:  That's fine.

12   BY MR. MILLER:

13   Q.  Actually, Doctor, before we have you start looking at the

14   document as it gets up there, there's been no testimony about

15   this facility in Des Moines.  Can you describe for the court

16   where in Des Moines it's located?

17   A.  Sure.  So it's on the southeast side of town on Evergreen

18   Avenue or what's known as Southeast 44th Street.  It's

19   approximately 200 -- approximately 230 acres is basically the

20   grounds of the facility.  The building, which is now depicted in

21   the picture here, is basically a large, what would probably be

22   best referred to as poured concrete building.  So it's

23   foam-filled concrete slabs that are basically poured on site and

24   then assembled together.

25           It's an expansive building and it's basically a mirror

1  image of each other, so you have sort of an east side and west

2  side that are basically identical.  In the images, you can see

3  there's a central area there that would be glass windows called

4  the greenhouse.

5          Next to that there are two towers, again an east tower

6  and a west tower, and then there's halls in the areas that go

7  out from the sides of that.  Those indoor -- those facilities

8  house ape -- the majority of that space is ape accessible space,

9  so that's where the bonobos spend their days.

10         In addition to that ape accessible space inside, there

11 are two play yards attached to those towers as well as to some

12 bedroom areas on the inside.  And then it's a little bit hard to

13 make out in this photograph -- and I don't have a pointer, but

14 you can basically see there's approximately three-and-a-half

15 acres of outdoor yards that are surrounded by electrical

16 fencing.

17         So these are open area yards open to the top, a total

18 of three-and-a-half areas, and the west one is about

19 one-and-a-half, maybe a little bit shy of that and the east one

20 is about two-and-a-half, and those are all bonobo accessible

21 weather permitting.

22 Q.  And are there additional buildings on the grounds?

23 A.  There is another building that used to house orangutans.

24 It's not nearly as aesthetically interesting as this one, but it

25 basically is a big three-story rectangle, and it has an outdoor

PROBLALATION - DIRECT

463

1  play yard that is a similar three-story rectangle with what we

2  call welded wire, which is sort of square metal mesh attached to

3  it.  It's also three stories.  That entire building is attached

4  by a chute, if you will, so a tunnel that's fully enclosed.

5  That tunnel leads out to a yard that is surrounded by a

6  triple-layered electrical fence.  The final layer has about 56

7  strands of electrical wiring on it, and it surrounds about

8  eight-and-a-half acres of hardwood forest.

9  Q.  And if you can help me put the court at the front door, the

10  front door to the facility on this demonstrative exhibit is

11  opposite the greenhouse, is that correct?

12  A.  That is correct, yes.

13  Q.  Okay.  And walk us through the door and tell the court what

14  you would see.

15  A.  Sure.  So we walk into the lobby building, and, again, like

16  I just initially described, the building has an east and west

17  side that are effectively mirror images.  There's some

18  exceptions.  The first thing you would see is a rounded glass

19  room -- I should say two rounded glass rooms that are each a

20  quarter of a pie piece if you could imagine.

21        So you walk straight in, there is a beautiful mural

22  that was painted of the surrounding grounds, and then on the

23  right side there's a quarter inch pie piece which is surrounded

24  in the area facing the lobby with glass.  The east side has a

25  very similar one.  Inside of that pie piece is what we call the

1  demo room.  It's outfitted with a touch screen computer so that

2  you can project the bonobos' lexigram keyboard.  Also you can

3  use that touch screen for cognitive testing and various things.

4       Those rooms open into an east and west component of

5  this greenhouse that you see here again, which is ape accessible

6  space, and those east and west greenhouses lead through a series

7  of what we basically call the ramps into those large towers that

8  you see.

9       Beyond those large towers are what we call bedrooms

10  and, they're sort of similar, more traditional, quote/unquote,

11  caging, although they're quite nicer than most of the caging you

12  would see other places.  All of the towers and those bedrooms

13  connect to both an enclosed play yard, which would have mesh of

14  some kind all around it, natural substrate on the ground,

15  surrounded by wall on one side, the rest of it is mesh, and then

16  there's also a tunnel that leads out to these large play yards

17  that I was describing that is surrounded by electrical fence.

18  Q.  When you describe the towers and the bedrooms, those are for

19  the bonobos?

20  A.  They are for the bonobos, yes.

21  Q.  Do you agree you became involved in ACCI in December of 2013

22  as has been described here in the proceedings?

23  A.  Yes.

24  Q.  After you became involved with ACCI, have you been involved

25  with the board making any improvements to this facility?

1   A.  Yes.  We've made a number of -- we haven't made any major

2   improvements -- well, I guess it depends on who you're asking.

3   We've made some improvements to the facility.  Most recently

4   we've installed different access mechanisms for the front gate,

5   which we think are more secure and more reliable performance

6   wise because there was at least in my time experiencing some

7   historical troubles with the gate following bad weather, for

8   example.  I've worked at a lot of primate facilities and know a

9   lot of people who have gates, and apparently gates are always an

10  issue.  We've installed some new access panels that allow the

11  gate to be accessed in a way to keep the facility more secure.

12          In addition to that, we've done general improvements

13  to the facility.  The radiant flooring system has been improved.

14  It still needs to be improved further, but we've improved the

15  radiant flooring, as well as some, what I would call badly

16  needed maintenance and cleanup that needed to be done when I

17  first -- from the time that I officially started at the end of

18  December of 2013.

19  Q.  And have you also made any changes to the play areas for the

20  bonobos?

21  A.  We have, yes.  We've built some of the large outdoor yards

22  I've described.  Approximately three-and-a-half to four total

23  acres were really lovely opening spaces, but were without any

24  climbing structures.  We've added climbing structures to that

25  space.  Incidentally, we've also added climbing structures to

1  the indoor spaces as well.  We've added climbing structures to

2  the outdoor spaces, and in point of fact I think in the next

3  week or so, we have an Eagle Scout coming out to build us more.

4  Q.  And during your tenure, has electricity stayed on, the heat

5  been on?

6  A.  Yes.

7  Q.  And how do you know that?  How do you -- do you monitor the

8  heat and electricity, for instance?

9  A.  Oh, well, I talk with staff at the facility daily.  In

10  addition, during the winter months we keep -- actually we keep

11  it all year long, but we check them regularly in the winter

12  months obviously when it gets cold.  We have sensors that sense

13  the temperature where the bonobos are sleeping, and they're

14  actually programmed to send out text messages to a number of us

15  in the event that the temperatures fall below a set point.

16          One of the advantages of the building itself is that

17  the entire building is heated with radiant floor heat and, as I

18  mentioned, poured foam-filled concrete, and so the building

19  retains its heat even in the really cold Iowa winters.  As an

20  example, we lost our radiant floor heating for a period of 24

21  hours while I was here in February, and nobody noticed until

22  noon the following day, and that was when we took our routine

23  floor heat readings and they were one degree off what they had

24  been, what we normally would expect to see.  And so as a matter

25  of precaution, we then started feeling the floor, and we have a

1  contract, which is sort of an informal kind of in kind contract,

2  with a local contractor servicing company.  We put a call into

3  them, and they indeed verified that it had gone out and we

4  hadn't even noticed it.  We had a less than one degree change in

5  temperature in 24 hours, and that was on a very critical winter

6  day.

7          THE COURT:  Mr. Miller, why don't we take our evening

8  recess at this time.

9          MR. MILLER:  Thank you, Your Honor.

10          THE COURT:  We'll be in recess until 9 o'clock,

11  9 o'clock tomorrow morning.

12          (Recess at 5:00 p.m., until 9:00 a.m., Friday,

13  May 29, 2015.)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

```
                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF IOWA
                           CENTRAL DIVISION

- - - - - - - - - - - - - - - - - -X
IOWA PRIMATE LEARNING SANCTUARY  :
d/b/a GREAT APE TRUST AND         :
APE COGNITION AND COMMUNICATION   :
INSTITUTE,                        :
                                  :
            Plaintiffs,           :   Case No. 4:10-cv-00052
                                  :
       vs.                        :
                                  :
ZOOLOGICAL FOUNDATION OF          :
GEORGIA, INC. d/b/a ZOO ATLANTA,  :
DEMOCRATIC REPUBLIC OF CONGO,     :
JAPAN MONKEY CENTRE INSTITUTE     :
AND MUSEUM OF PRIMATOLOGY, and    :
SUE SAVAGE-RUMBAUGH, Ph.D.,       :
                                  :
            Defendants,           :   TRANSCRIPT OF HEARING
                                  :        VOLUME III
and                               :
                                  :
BONOBO HOPE INITIATIVE, INC.,     :
                                  :
            Intervenor-Defendant. :
- - - - - - - - - - - - - - - - - -X
```

Fourth Floor, South Courtroom
United States Courthouse
123 East Walnut Street
Des Moines, Iowa  50309
Friday, May 29, 2015
8:57 a.m.

BEFORE:  THE HONORABLE ROSS A. WALTERS, Magistrate Judge.

Terri L. Martin, CSR, RPR, CRR
United States Court Reporter
Room 189, U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa  50309

```
APPEARANCES:

For the Plaintiffs:          WILLIAM J. MILLER, ESQ.
                             BRIAN A. MELHUS, ESQ.
                             Dorsey & Whitney
                             801 Grand Avenue, Suite 4100
                             Des Moines, Iowa  50309-2790

For the Defendants:          TODD P. LANGEL, ESQ.
                             Faegre Baker Daniels
                             801 Grand Avenue, 33rd Floor
                             Des Moines, Iowa  50309-8011

                             WILLIAM C. ZIFCHAK, ESQ.
                             Kaye Scholer
                             250 West 55th Street
                             New York,  New York  10019-9710

                             JOSHUA STAMBAUGH, ESQ.
                             Kaye Scholer
                             1999 Avenue of the Stars
                             Suite 1600
                             Los Angeles, California  90067

                             ROSS NEIHAUS, ESQ.
                             Kaye Scholer
                             Three First National Plaza
                             70 West Madison Street
                             Suite 4200
                             Chicago, Illinois  60602-4231
```

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiffs: | | | | |
| Jared Taglialatela (Resumed) | 473 | 528 | 597 | 601 |
| William Hopkins | 638 | 652 | 663 | |
| For the Defendants: | | | | |
| Russell Howard Tuttle | 602 | 629 | | |

471

E X H I B I T S

| PLAINTIFFS' EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1000 - Simpson & D. Rumbaugh e-mail string | 672 | 672 |
| 1007 - Taglialatela CV | 472 | 472 |
| 1008 - Hopkins CV | 640 | 640 |

| DEFENDANTS' EXHIBIT NUMBERS: | | |
|---|---|---|
| 43 - 11/9/13 e-mail from Caudill | 668 | 671 |
| 48 - 11/20/13 e-mail string from D. Rumbaugh | 668 | 671 |
| 69 - 3/18/14 e-mail string from Simpson | 668 | 671 |
| 71 - 3/18/14 e-mail string from Taglialatela | 668 | 671 |
| 74 - 4/22/14 Knoploh-Odole e-mail string | 668 | 671 |
| 76 - 4/28/14 Simpson e-mail string | 668 | 671 |
| 95 - Dubreuil CV | 668 | 670 |
| 97 - Tuttle CV | 555 | 555 |
| 98 - SSR video compilation of bonobos | 668 | 670 |
| 103 - 11/19/13 Caudill e-mail to Simpson | 668 | 671 |
| 105 - Taglialatela e-mail | 509 | 509 |

```
 1                    P R O C E E D I N G S

 2              (In open court.)

 3              THE COURT:  Please be seated.

 4              And good morning to you all.

 5              Let's see, were we going to make a record about that

 6    exhibit first?

 7              MR. STAMBAUGH:  We are, Your Honor.  We have conferred

 8    with opposing counsel, and I believe all of the objections have

 9    been withdrawn as to Exhibit 107 as testified to by Dr. Gilmore

10    yesterday.  So we would like to move Exhibit 107 into evidence.

11                                   (Defendants' Exhibit 107 was

12                                   offered in evidence.)

13              MR. MELHUS:  That is correct, Your Honor, on behalf of

14    plaintiffs.

15              THE COURT:  Thank you.

16              107 is received.

17              MR. STAMBAUGH:  Thank you, Your Honor.

18                                   (Defendants' Exhibit 107 was

19                                   received in evidence.)

20              THE COURT:  Now, are we going to continue with the

21    witness we had yesterday or do you have somebody here that was

22    presenting at some point today?

23              MR. STAMBAUGH:  I believe we're going to continue with

24    Dr. Taglialatela and then go to Dr. Tuttle.

25              THE COURT:  Okay.  Sir, would you come forward and
```

1  retake the stand, please.

2                          JARED TAGLIALATELA,

3  resumed his testimony as follows:

4          MR. MILLER:  I'm sorry, madam court attendant, it

5  looks like we're losing our screen.  Are we still on the other

6  screens?

7          THE CLERK:  Oh.

8          THE COURT:  Literally we're losing that one.

9          THE CLERK:  We're on the other screens.

10          MR. MILLER:  I will get it to come back up, I hope.

11          Hmmm.  Well, I'll try resetting it, let it go all the

12  way down.

13          MR. MILLER:  Okay.

14                    DIRECT EXAMINATION (Continued)

15  BY MR. MILLER:

16  Q.  Good morning, Doctor.  I will go ahead and ask you a little

17  bit about security at the facility at Des Moines.  We just lost

18  on the big screen the photo, but you have it in front of you.

19  That's a picture of the compound or the facility, correct?

20  A.  Yes.

21  Q.  Okay.  Can you explain, around the facility is there any

22  security procedures or devices in place?

23  A.  Sure.  Around the building itself or the general property,

24  or both?

25  Q.  Both -- well, let's start with the building itself.

1    A.   Okay.  So the building itself is actually secured with key

2    card access.  There are actually three entry points for --

3    actually I take that back.  There's four entry points to the

4    physical structure of the building itself, all of which are key

5    card access, and in order to gain access, once you gain access

6    to the public space of the building, you also need a second

7    level key card to get into the -- actually any of the places

8    where the ape enclosures are.  Of course, the ape enclosures

9    themselves are all locked with manual locks.

10   Q.   And then how about security within the grounds?

11   A.   So, as I mentioned yesterday, the property is 230 acres.

12   Out of that 230 acres, I think approximately 125 are fenced in

13   with barbed wire at the top.  There's two entry points for that,

14   the main gate and a back gate.  The back gate is locked and

15   chained and requires a manual key lock.  It's not really used,

16   except for I go through there and walk the property every once

17   in a while because it's a very nice area along the Des Moines

18   River; but the main gate is secured again with, as I mentioned

19   yesterday, a key pad access.

20   Q.   At some point in time, did you become a member of a

21   governing body for this facility?

22   A.   Yes.

23   Q.   Okay.  When did that first happen?

24   A.   So initially, to the best of my recollection, it was in the

25   fall of 2012.  I was approached by Dr. Savage-Rumbaugh by e-mail

1   and telephone, if I'm not mistaken, and was asked to join a

2   board that was my understanding was basically the organization

3   that was overseeing the operation at the, quote/unquote, Great

4   Ape Trust.  The name of that organization was not very clear to

5   me.  Some referred to it as the Great Ape Trust, some referred

6   to it as IPLS, and some referred to it as the Bonobo Hope

7   Initiative.  The idea was they were all basically the same

8   thing, at least that was my understanding.

9           I vaguely recall asking specific questions of Ken

10  Schweller, who was the chair of the board of that organization,

11  and I believe that's the way he explained that answer to me.

12  Q.  Do you know if you were ever a board member of the entity

13  called IPLS?

14  A.  My understanding now is that I was never a board member of

15  the entity called IPLS.

16  Q.  Do you recall discussing with Dr. Rumbaugh, Dr. Sue

17  Savage-Rumbaugh, her intention to transition away from the

18  operation at some point in time?

19  A.  I do, but that didn't happen until the fall of 2013.

20  Q.  And what do you recall about that discussion?

21  A.  Well, I was initially written an e-mail by Dr. Duane

22  Rumbaugh, and he had asked me if I would consider being involved

23  with the facility in Iowa.  I don't remember the specific

24  contents, but if I had it in front of me, I certainly could

25  relay them.  His -- he basically was requesting, for lack of a

1 better way, sort of what I assume oversight of the scientific

2 program there in his e-mail.  And I remember being a bit stunned

3 by that just because I hadn't heard from him in awhile, though

4 we are close and usually had been corresponding fairly

5 regularly, but it had been a little bit of time since we had

6 last spoke.

7 Q.  Had you previously discussed with Dr. Duane or Dr. Sue

8 involvement in any sort of leadership position at the facility?

9 A.  Again, just to sort of get the time line correct, joined

10 this Bonobo Hope Initiative board in the fall of 2012 upon

11 Dr. Savage-Rumbaugh's request.  Following -- basically the

12 reason or my understanding of the reason Dr. Savage-Rumbaugh

13 contacted me at that time was because there was some concern

14 that the bonobos were going to be relocated.  The board or the

15 executive committee, some subset of the board were concerned

16 that they wouldn't be able to provide support for the apes and

17 there was discussions about them being relocated.

18         Initially, having not visited the facility or not

19 really -- just sort of only participating by e-mail and by

20 phone, I was concerned that they were correct and was helping to

21 try and figure out a way to find a place for the bonobos where

22 they would be able to be cared for properly.

23         Through the course of those discussions, which were

24 basically e-mail discussions between board members, to be quite

25 frank, my position somewhat changed on that because it became

1  clear to me that no one would actually probably take the bonobos

2  and, in all likelihood, we would need involvement from another

3  organization to help support them in situ, if you will.

4  Q.  And when you say "in situ," what do you mean?

5  A.  I mean at the facility for Des Moines.  Dr. Savage-Rumbaugh

6  and I, for lack of a better word, argued quite publicly about

7  this or at least among the board members.  The minute after she

8  invited me and I started voicing my opinions, she pretty much

9  attacked me both to the board as a group and also in individual

10  e-mails that were written just to me.

11  Q.  Were these e-mails among the group, did that include members

12  of the entity known as BHI that we've heard from some members of

13  that group here in testimony?

14  A.  To the best of my recollection, it does.

15  Q.  And other than the ongoing discussion about relocation, what

16  other involvement did you have from that point in time in 2012

17  up to the point when Dr. Duane contacted you in 2013?

18  A.  Well, it appears that that discussion while quite heated for

19  three or four weeks, and probably hundreds of e-mails were

20  exchanged if not in the thousands, after that time there was

21  some influx of financial support, which I really don't know

22  where it came from, and it sort of put a temporary hiatus, if

23  you will, on the discussion.

24          It was a pretty ineffective board.  It wasn't very

25  communicative.  In fact, I was probably writing -- having just

478

1  joined, I was writing, you know, probably 75 percent of the

2  e-mails in this discussion.  It was basically

3  Dr. Savage-Rumbaugh and me and Dr. Schweller, with other people

4  chiming in very small bits there.

5           Once that financial -- immediate financial crisis was

6  resolved, communications basically stopped, and to the best of

7  my recollection, I didn't receive another communication about

8  that organization or related to that organization until

9  approximately May of 2013.

10 Q.  And when were you contacted by Dr. Duane?

11 A.  To the best of my recollection, that was in September of

12 2013.

13 Q.  Okay.  And after he contacted you, did you have any

14 discussions with Dr. Sue Savage-Rumbaugh?

15 A.  Yes.  Dr. Rumbaugh, Duane Rumbaugh, and I spoke, and the

16 first thing I told him was that I would absolutely need to visit

17 the facility and take a look at the apes.  I mean, my primary

18 concern, based on his e-mail, was for the apes' welfare and

19 continues to be so.  So I wrote to him.  He put me in contact --

20 I don't know exactly how this worked, but he put me in contact

21 with leadership at the organization.  We arranged a visit, and I

22 traveled there.  To the best of my recollection, shortly after

23 my return, Dr. Savage-Rumbaugh called me and we spoke on the

24 phone and then spoke numerous times after that.

25 Q.  What did Dr. Savage-Rumbaugh tell you during that first

1  conversation?

2           MR. STAMBAUGH:  Objection; calls for hearsay.  This is

3  a witness who testified in this proceeding.

4           THE COURT:  Well, yes, but it's also a party opponent.

5  I'll receive it, subject to the objection.

6  A.   To the best of my recollection, we talked a little bit about

7  the history.  She gave me her version, if you will, of the

8  history since about 2011 onward.  We spoke -- she, quite

9  frankly, told me that she was living in New Jersey, she felt she

10 couldn't be of assistance to the bonobos anymore, she felt that,

11 you know -- she, I guess, was being complimentary with regards

12 to what she thought was my -- what role I could offer or what

13 support I could offer for the bonobos, and she told me she was

14 doing some other academic activities, some things with Rutgers

15 University, just attending lectures and that sort of thing.  I

16 could go into more detail on it, but --

17 BY MR. MILLER:

18 Q.   Well, what did you tell her during that discussion?

19          MR. STAMBAUGH:  Same objection.

20          THE COURT:  Same ruling.

21 A.   Again, to the best of my recollection, it was after my

22 initial visit, shortly after my initial visit -- and, again,

23 just to the best of my recollection, that was the timing.  I

24 can't be absolutely certain.  But we -- I told her, you know,

25 that it was something that I would certainly consider, that I

1  visited the facility.  I also remember distinctly telling her

2  that I was working on a rather large grant application and the

3  due date was early December and so I was sort of postponing any

4  formal commitments until after that point since my time was

5  consumed with that application.  I don't remember a whole lot

6  more than that.

7  BY MR. MILLER:

8  Q.  Did you have any further discussions with her or was that

9  answer to describe all of your discussions?

10  A.  I think probably I'm -- I did have additional phone

11  conversations with her.  I think I'm blending -- I don't know if

12  all of those took place on the same -- on that initial

13  conversation.

14  Q.  What was the next step you took after this phone call?

15  A.  At that time I was seriously considering -- you know, as has

16  been testified by others, Bill Hopkins and I came to the

17  facility sometime in October, to the best of my recollection.

18  We spent a full day there.  We had breakfast meetings with the

19  board members, visited the facility, visited the grounds.  We

20  didn't -- I think we were there by 9:00 in the morning, and we

21  didn't leave until 4:00 or 5:00 in the afternoon.  It was a fall

22  day.  Looking at the facility, looking at the condition of the

23  apes, trying to understand as much as I could about how the

24  facility ran, that was one day.  I mean, this was barely

25  anything.

1          We spent time from that visit onward -- or I should

2     say I spent time from that visit onward thinking very seriously

3     about the position, if you will, of actually assuming some sort

4     of leadership role at that facility.  I spoke with many, many

5     colleagues.  I spoke with friends, to be quite frank.  I spoke

6     with people I used to work with that were not necessarily

7     colleagues but former technicians, people who knew

8     Dr. Savage-Rumbaugh, all of it just to sort of evaluate whether

9     or not it would be reasonable for me to even take on this

10    responsibility.

11    Q.  And did you ask questions about Dr. Savage-Rumbaugh's

12    ongoing involvement?

13    A.  I did.  I spoke with Dr. Savage-Rumbaugh specifically about

14    that, and, again, she had told me that she didn't -- initially,

15    I should qualify this, initially she told me she was in New

16    Jersey, didn't feel like she could do anything positive, that

17    the Bonobo 12 had, you know, sort of left a scar, if you will,

18    and was doing things in New Jersey with other folks there.  Her

19    involvement was, you know, in basically her words not an issue.

20          Actually can I add one thing?  Because I also spoke to

21    her specifically about how I felt my research interests had

22    diversified to some extent and that I had a research program

23    involving lots of different facets, some were aspects of

24    experimental ecology, some aspects in psychology, some of them

25    were aspects of maybe what you'd just call the origins of human

1    language, human intelligence and that those were diverse.  And

2    she assured me, you know, that, oh, yeah, I think there would be

3    lots of great opportunities for that type of work there.

4    Q.  Did she assure you that she was no longer planning to be

5    involved with the Des Moines facility?

6    A.  Yes, she did.

7    Q.  Did you then eventually decide to take on a leadership role

8    there?

9    A.  I did eventually.  Now, I want to be clear about this.  When

10   I arrived to visit the facility, in I think what is October, to

11   the best of my recollection, of 2013, I'll be quite frank, the

12   existing board members and counsel, Mr. Simpson, were fairly,

13   for lack of a better word, pushy about my involvement, to which

14   I asked them, of course, to hold on, but their -- I expressed

15   concerns on day one, if you will, that it would be something I

16   would need to have autonomy with and that I would not have

17   Dr. Savage-Rumbaugh in any oversight role or in any role in

18   which she would be basically overseeing any aspect of our

19   research program.  And by we, I mean Dr. Hopkins and myself.

20   Q.  From your discussions with Dr. Savage-Rumbaugh, did you

21   satisfy yourself that those conditions were going to be met?

22   A.  I satisfied myself at the time, but clearly I was not right.

23   Q.  And, similarly, from any other discussions that you had with

24   board members, did you also satisfy yourself that that was going

25   to be the case?

1   A.   I did.  I spoke with a number of them.  They indicated to

2   me -- I know it's been testified -- I believe I've heard it's

3   been testified since May, but according to the folks I spoke

4   with, it was since March of 2013, so we were going on six or

5   seven months that Dr. Savage-Rumbaugh had been absent from the

6   facility and was actually no longer living in Des Moines.  And

7   Lyle Simpson told me that -- he used the word that she was

8   cocooned, that she was not going to be involved moving forward.

9   And I was satisfied, I guess, that that was going to be the case

10  based on Dr. Rumbaugh, Dr. Savage-Rumbaugh, board members and

11  Mr. Simpson's, you know, words to me.

12  Q.   Would you have taken on the role of Director of Research for

13  ACCI if Dr. Sue had not told you she was no longer going to be

14  involved?

15  A.   Absolutely not.

16  Q.   Can you explain for the court -- well, first off, can you

17  identify Dr. Hopkins?

18  A.   Sure.  Dr. Bill Hopkins is a professor at Georgia State

19  University.  He's also the science director at the Ape Cognition

20  and Communication Institute.

21  Q.   And what's your understanding of how Dr. Hopkins got

22  involved?

23  A.   After receiving that initial e-mail from Dr. Duane Rumbaugh

24  in, again, the fall of 2013, I contacted Dr. Hopkins and invited

25  him to come visit with me.

1  Q.  And did he eventually agree to get involved as well with

2  ACCI?

3  A.  Yes, he did.  In fact, after our initial visit, I was much

4  more reticent I would say than he was.  He was excited about the

5  prospect of being able to -- we both wanted to do something

6  positive for the apes obviously.  He felt that we could make it

7  a reality, whereas I was perhaps a bit more cautious.

8  Q.  And what was his role that he took on when he first started?

9  A.  He took on the role of science director.

10  Q.  Did you eventually become a member of the Board of Directors

11  of ACCI?

12  A.  Yes.  When ACCI was formed on December 18, 2013, I became a

13  member of the Board of Directors.

14  Q.  At that time, who were the other members of the Board of

15  Directors?

16  A.  At that time George Caudill, Tom Watson, Meg Schneider-Fitz,

17  Steve Boers, Julie Gilmore, Dr. Bill Hopkins, and myself.

18  Q.  And has that membership of the board changed over time?

19  A.  Yes.

20  Q.  Are -- who are its current members?

21  A.  The official current members include the list I just gave,

22  with the exception of Mr. Steve Boers who resigned from the

23  board in September of 2014.

24  Q.  And are there new members to the board since that time?

25  A.  There are new members that have agreed we will officially

1    appoint them.  Although some of them are already acting in that

2    capacity, we'll officially appoint them at our next face-to-face

3    board meeting, but they include Al Setka, they include Jill

4    Pruetz, P-R-U-E-T-Z, and Steve Clark, Steven Clark.

5    Q.  Does ACCI have employees?

6    A.  Yes.

7    Q.  And can you give the judge a brief overview of who the

8    employees are?

9    A.  Sure.  With specific individual names or --

10   Q.  Sure.

11   A.  Okay.  So we currently employ basically two full-time and

12   one half-time, what we call animal care technicians; but there's

13   a bit of a transition in the works right now, so I'll just try

14   to describe that.  Heather Housh and -- oh, my, gosh, sorry,

15   blanking on their names -- and Elizabeth Cleveland are two

16   full-time animal care technicians.  We have a half-time animal

17   care technician, Gaila, G-A-I-L-A, Conklin.  Heather Housh

18   resigned two weeks ago.  She's going back to school.  And

19   basically we have just made an offer to another individual who

20   has provisionally accepted.

21          In addition to those animal care staff, we have a

22   research coordinator, and we also have two additional graduate

23   research assistants.  So that concludes the paid individuals --

24   I'm sorry, and Dr. Gilmore is paid a very small monthly sort of

25   retainer, if you will, as our attending veterinarian.

1  Q.  What are the job duties of the animal care employees?

2  A.  Basically their job entails taking care of animals.  A

3  typical day would involve preparing food, shifting the apes from

4  their sleeping -- where they slept to an outdoor yard if it's

5  nice weather or another yard.  We usually do foraging activities

6  for the apes so they will be dispersing food in different

7  locations.  They're also responsible for sort of setting up

8  enrichment devices or giving the apes other forms of enrichment.

9  They do a lot of husbandry training, and by that it's very

10 important to, obviously, be able to monitor the health and well

11 being of the apes.  And so the way we do that is we like to use

12 anesthesia as infrequently as possible, and you can very

13 readily, especially with our bonobos, train them or teach them,

14 if you will, to participate in presentation of their body parts.

15 And so they're able to -- the animal care staff help us with

16 that as well.  They also on occasion would be hopefully able to

17 help with research, but we haven't had that much yet.

18 Q.  What does the research coordinator do?

19 A.  The research coordinator is basically -- as I mentioned

20 yesterday, I'm there about six days a month.  The research

21 coordinator is basically my eyes and ears while I'm not there,

22 so she or he helps me to coordinate activities at the facility

23 on a daily basis.  We are in basically constant contact with one

24 another, and so it's a main sort of sounding board for me to

25 understand what's going on at the facility and to communicate

1  what I would like to see happen.

2  Q.  And is there a contingent of volunteers that works with ACCI

3  as well?

4  A.  There are a contingent of volunteers.  Volunteers are

5  absolutely vital to what we've got going on, and we are very

6  grateful to have the support.  They do lots of different things;

7  assist us with cleaning, food preparation, picking up our food

8  donations, doing other shopping types of things, basically, with

9  the exception of feeding the apes and shifting the apes, help us

10 with just about anything.  We've had volunteers help us with

11 taking care of the grounds and building climbing structures and

12 designing educational material for school groups that come

13 through, sometimes even leading those school groups, so --

14 Q.  Okay.  And how does ACCI fund its operation?

15 A.  So we have a number of different avenues for that.  We have

16 existing grants that fund those operations, and when I say

17 "grants," I'm referring to research grants that either come from

18 public or private foundations or agencies that fund scientific

19 research.

20         The second way we have that is that we've formed a

21 consortium, which I'm not an attorney, but as far as I

22 understand, it's just a legal entity agreement.  The members of

23 that consortium as of now are ACCI, Kennesaw State University,

24 Georgia State University and Drake University, and what --

25 effectively what happens with the consortium is that consortium

1  members pay an annual fee and in exchange for the annual fee

2  faculty and students would have access to the facility.

3  Q.  Has ACCI secured in kind or reduced cost support from the

4  community?

5  A.  Yes.  So -- I should have also finished with the funding

6  sources.  So, in addition to that -- so I would call that maybe

7  institutional support -- we also have received private

8  donations.  Individuals both on our board and in the community

9  donate cash.  So, I mean, for example, board member -- financial

10  donations from board members for 2015 my best guess right now is

11  somewhere in the order of $28,000 just from board members.

12  Going outside of that, I don't have the number for individuals.

13  We also recently lost a corporate sponsorship program, and we've

14  done actually -- I'm actually thrilled with how well we've done

15  with that.

16       In addition to that, yes, we receive in kind type

17  donations or reduced cost services from -- for example, three

18  Hy-Vee grocery stores in the Des Moines area donate food, as

19  does Anderson-Erickson Dairy.  So we do buy some of our food,

20  but they buy a large portion of it.  In addition to that, we

21  have a marketing group that works with us for free, we have

22  attorneys, and I think that's just about it.

23       I would like to mention, by the way, that the

24  donations that we receive, whether they be in kind or cash

25  donations, are used to fund the care and welfare of the apes.

1   They don't fund science.  We use scientific grants to fund

2   science.

3           The final source is collaborations with other PIs

4   basically at other institutions, so they'll come in, they want

5   to collect some data.  They submit an IACUC protocol.  It gets

6   reviewed by our IACUC.  Sometimes there's a little back and

7   forth where they have to revise and resubmit.  Once they do and

8   that protocol gets approved, they'll come to me and we'll work

9   out some way, schedule a visit.  They'll come and collect data

10  and basically, for lack of a better way of describing it, we

11  charge them for the opportunity to collect data at the facility.

12  Q.  Let's shift slightly to discuss one item that was discussed

13  with Dr. Gilmore briefly yesterday, but I want to give a little

14  context.  Are you familiar with the Species Survival Plan that

15  she mentioned in her testimony?

16  A.  Yes, I am.

17  Q.  Is that Species Survival Plan tied to an entity of any sort?

18  A.  I believe it is an organization that stands alone.  It is

19  housed or hosted by -- hosted I think is a better word by the

20  Milwaukee County Zoo, but it is an entity, and my understanding

21  is that it's a distinct entity of its own.

22  Q.  And do you recall if participation in the Species Survival

23  Plan was something that had been discussed during the joint

24  meeting that you had with Bonobo Hope and ACCI last year?

25  A.  It was most definitely discussed during that meeting.

1  Q.  Is ACCI regulated by any governmental or other entity?

2  A.  Yes.

3  Q.  What entity or entities?

4  A.  The USDA, United States Department of Agriculture.

5  Q.  Can you briefly describe for the court what that regulatory

6  relationship is?

7  A.  Sure.  So given the nature of our facility, we actually have

8  two licenses from the USDA, an exhibitor's license and a

9  research license.  We are primarily a research facility, so the

10  USDA inspects us regularly, and those are often -- or I should

11  say are most often surprise visits, if you will, unannounced,

12  and they will basically review protocols for animal care, animal

13  husbandry and research activities, but include also things like

14  security, disaster planning, all that kind of things.

15           So that is -- we have a USDA inspector.  I believe it

16  would be a regional -- an individual handler for the region.

17  Fortunately, ours has primate experience.  On a date that she

18  does an inspection -- I've been fortunate enough to be there for

19  one of them -- she'll come in, she will tour the facility,

20  inspect our food prep areas, inspect all of our logs to which

21  there are very many, as they say in this sort of business if you

22  don't write it down, you didn't do it, so we have logs for just

23  about everything.  She also meticulously looks through all of

24  our protocols and standard operating procedures.

25  Q.  If there's some concern by the USDA, do they write you up or

1  put a report in?

2  A.  Yeah.  There would be a way to issue, I guess it would be --

3  I'm looking for the term, I want to say citation, but that's not

4  correct; a violation.

5  Q.  Has ACCI had any violations within the time that you've been

6  involved?

7  A.  No, they have not.  No, we have not.

8  Q.  Yesterday we briefly discussed the Yerkes facility.

9        Do you recall that testimony?

10  A.  Yes.

11  Q.  Okay.  I don't know if I asked you, what is the Yerkes --

12  what is Yerkes?  Can you briefly describe that?

13  A.  The Yerkes, Y-E-R-K-E-S, National Primate Research Center.

14  Q.  And what does that national primate center do?

15  A.  There's a number of national primate research centers.  I

16  don't know the number off the top of my head.  There's one in

17  Wisconsin.  There's a couple -- basically they're part of a

18  national primate research center system which house primates,

19  but in the case of Yerkes also lots of other animals and

20  basically work for different aspects of really scientific

21  research.

22  Q.  Is ACCI regulated by Yerkes?

23  A.  No.

24  Q.  Does ACCI have any written agreements with Yerkes?

25  A.  Not at the moment.

1   Q.   Does ACCI have any oral agreements with Yerkes?

2   A.   No.

3   Q.   Has it made any promises or commitments to Yerkes?

4   A.   Commitments, no, or promises actually.

5   Q.   Has Yerkes made any promises or commitments to ACCI?

6   A.   Not at this point.

7   Q.   Does ACCI have procedures or protocols in place with respect

8   to its operations?  You heard Dr. Gilmore talk about a few of

9   those?

10  A.   Yes.

11  Q.   Is there a procedure or protocol in place for emergencies?

12  A.   Yes.

13  Q.   Or natural disasters?

14  A.   That is actually a relatively new USDA requirement that you

15  need to have a disaster plan.

16  Q.   And ACCI does have a disaster plan in place?

17  A.   ACCI does have a disaster plan.

18  Q.   And that disaster plan would have been reviewed presumably

19  by the USDA in one of these visits?

20  A.   Absolutely.

21  Q.   Does ACCI have committees that assist the board in operating

22  the facility?

23  A.   Yes.

24  Q.   And what are they?

25  A.   Well, we have a scientific advisory panel.  That body is

1   probably the main for providing, for lack of a better way of

2   saying it, external peer review of what we're doing.  And I mean

3   that with regards to both the health and welfare of the apes,

4   management policies, but also security issues, emergency

5   preparedness, things like that.

6   Q.   And who are -- who sits on that committee?

7   A.   So --

8   Q.   If you can describe generally for the court?

9   A.   Okay.  So not individual names?

10  Q.   Yes.

11  A.   They include individuals that have extensive experience in

12  great ape care, management and, you know, working with apes in

13  behavioral research contexts.

14  Q.   There's also an IACUC committee, is that correct?

15  A.   That is true.

16  Q.   You sit on the IACUC committee?

17  A.   I do.

18  Q.   Has the IACUC committee that you sit on received any

19  proposals for research from a member of Bonobo Hope?

20  A.   No.

21  Q.   And I mean the current BHI board.

22  A.   No, although I believe that Dr. -- not doctor, that Mr. Itai

23  Roffman is preparing one.  I could be wrong about that, but we

24  had e-mail exchanges and I sent him the application for the

25  protocol form.

1  Q.  I would like to talk to you a little bit about the bonobos

2  in residence.

3  A.  Uh-huh.

4  Q.  Who are the bonobos in residence at the colony currently?

5  A.  So we have Kanzi, Elikya -- I don't know if you want me to

6  say something about them or --

7  Q.  Just name them off.

8  A.  Kanzi, Elikya, Maisha, Teco, Nyota.

9  Q.  How long have you worked with the colony or members of the

10  colony?

11  A.  I first began working with Kanzi in 1998.  I was working

12  with him when he was at the Georgia State University Language

13  Research Center, and I worked with him from 1998, roughly May of

14  1998 until October of 2004 on a near daily basis; the same goes

15  for Elikya and the same goes for Nyota, and, I'm sorry, the same

16  goes for Maisha, but Maisha wasn't born in 1998, so I was there

17  actually when he was born.

18        I returned again, as I mentioned earlier, for an

19  initial visit in October.  I believe my next visit after that

20  was December, and I worked with them on a daily basis when I'm

21  in Des Moines, save the last two-and-a-half days.

22        MR. MILLER:  Your Honor, at this time I would like to

23  publish a photograph as a demonstrative exhibit that I've

24  previously shared with counsel.

25        THE COURT:  Please.

1  BY MR. MILLER:

2  Q.  Dr. Taglialatela, we've put a photograph -- it's actually

3  three photographs side by side.  Who is depicted in that

4  photograph?

5  A.  That's Kanzi.

6  Q.  And when you're here in Des Moines since your time with

7  ACCI, you've worked with the bonobos yourself directly?

8  A.  Yes, absolutely.  I work with the bonobos, you know,

9  depending on what the day -- as you can probably imagine, I'm

10  fairly busy on the days that I'm here; but as often as I can,

11  I'm working with the bonobos.  And to be quite frank, that has

12  included things such as collecting data for colleagues or for

13  graduate students or my own projects.  It's also included

14  cleaning the cages and moving the apes and training our new

15  staff because we have new animal care staff and research staff

16  that work with the apes.  So I've been doing a lot of that hands

17  on when I'm here as well.

18  Q.  Did you know a bonobo by the name of Matata?

19  A.  Yes.

20  Q.  And did Matata pass away since you began working with ACCI?

21  A.  Yes.  To the best of my recollection, Matata passed away in

22  June of 2014.

23  Q.  Were you surprised when that occurred?

24  A.  I was surprised when that occurred.  I was also sad when

25  that occurred.  Matata was the second oldest bonobo in captivity

1   when she passed away.  She was wild caught, so her age is a

2   little unknown, but we guesstimated 45.  As a colleague of mine

3   commented to me, she was old when I met her; but she also was by

4   all outward appearances healthy, and the main -- I've seen video

5   of her the day before, and she was foraging in her yards and

6   acting otherwise normal during the course of that day.  In fact,

7   the USDA inspected us I think a couple of days later and was

8   shown the same video that I was shown because I was not in town

9   when it occurred and came to the same conclusion that I came to.

10  Q.  You're not a veterinarian, correct?

11  A.  No.

12  Q.  And Matata was under the care of Dr. Gilmore at that time?

13  A.  Yes, she was.

14  Q.  Do you have any concerns about the care that was provided

15  Matata?

16  A.  No, no.  I mean, Dr. Gilmore was in close contact with me

17  about -- is always in close contact with me about their care.

18  So if I have a concern, I would voice it to her directly.

19  Q.  Is ACCI providing for the emotional health of the bonobos?

20  A.  Absolutely.

21  Q.  And how is it doing that?

22  A.  Well, I mean, we do that in a number of ways.  You know, I'm

23  not sure if it's appropriate, but I mean, I've heard a lot of

24  testimony from people that, I mean -- you know, I've worked with

25  apes for going on nearly 20 years now, and I see these apes or

1  apes at other facilities, which I think is probably one of the

2  important things to remember, a lot.  I've worked with bonobos

3  at Milwaukee County Zoo.  I've worked with bonobos at

4  Jacksonville Zoo.  I've worked with obviously the bonobos that

5  are now in residence at ACCI.  I've worked with chimpanzees,

6  literally hundreds of chimpanzees at research facilities, at

7  zoos and even in sanctuaries.

8          There's a number of ways that you can both provide and

9  then not only just provide and say we're doing something, but

10 assess whether or not you're effective at doing what you say

11 you're doing.  Apes are extremely intelligent.  The way apes got

12 to be extremely intelligent is because they live in very

13 complex, dynamic environment that is both socially rich and

14 geographically or what we would call ecologically rich; in other

15 words, it's a complex environment.

16         If you're a bonobo living in the wild or, for that

17 matter, a chimpanzee living in the wild, your biggest challenge,

18 right, is finding food.  It's hard to find food, and you need

19 help from other individuals.  So the way we provide for the

20 emotional well being of the apes in captivity is to provide them

21 under the rich environment in which they basically need to --

22 you know, are stimulated emotionally and socially and

23 intellectually, and we do that in very specific ways; by giving

24 them extractive or challenging foraging tasks that challenge

25 them.

1          So, for example, we're doing things where we would

2    maybe provide, you know, simulated termite fishing devices,

3    where you would put some food and whatnot in a tube and allow

4    the apes to use a stick to kind of extract food.  We do a lot of

5    different foraging activities outside, take advantage of those

6    human spaces, provide food.  They're foraging in the wild.  The

7    apes actually love that, right.  Kanzi likes to sit at a

8    computer and work all day, he does that in front of us, but he

9    also likes foraging, and he's out there doing that all day long.

10         The environment itself also provides some degree of

11   enrichment.  You know, we have wildlife that the bonobos enjoy

12   chasing off, geese mainly and the unfortunate bunny once in a

13   while, and so we do all of these things to provide.  And then

14   what we do is we assess that.  We assess, hey, are we doing a

15   good job at what we think we're doing a good job of.

16   Q.  Okay.  Since you're getting excited in the explanation, I

17   would just ask you to slow down a little bit for the benefit of

18   the court reporter.

19   A.  Oh, I'm sorry.

20   Q.  How do you assess the emotional state or what you've just

21   described?

22   A.  Well, so, for -- in a number of ways.  The people that take

23   care of the apes on a daily basis discuss how the -- you know,

24   discuss our impressions, subjective impressions of how the apes

25   are feeling that day, their activity level.  We record

1   meticulously how much food they're eating.  Now that it's summer

2   and we have a couple of interns starting, we're also initiating,

3   although it hasn't started yet, basically a study looking at the

4   social interactions of the apes, so where they're spending their

5   time and with who.  We also look at their physical appearance.

6   So if you look at the pictures up here, I mean, for example --

7   Q.  Hold on one second.

8   A.  Sure.

9        MR. MILLER:  Madam court reporter, did you -- excuse

10  me; madam court attendant, did you say there's a device that we

11  could have him point with?

12       THE CLERK:  Yes.

13       THE WITNESS:  Yeah, the screen is really dark.

14       MR. MILLER:  Let me approach here.

15       THE WITNESS:  I can use the screen.

16       MR. MILLER:  Well, I just want you to be able to

17  illustrate for the court --

18       THE CLERK:  May I?

19       MR. MILLER:  Hold on one second, Doctor.

20       (Clerk confering with witness.)

21  BY MR. MILLER:

22  Q.  Dr. Taglialatela, using the demonstrative exhibit and the

23  gesturing tool that the court attendant just showed you, could

24  you explain for the court what you're just about to describe

25  with respect to physical condition?

1    A.   Yeah.   So this is a picture of Kanzi.   Kanzi will be 35 in

2    October, and these are pictures basically from 2011, the one --

3    the picture from 2011 was taken as a still shot from some video.

4    There's a picture from 2013.   And, by the way, I think this is

5    May of 2011.   I don't know about 2013, and this is May of 2015.

6            Okay.   So just a couple of things that I want to

7    highlight with regard to how we assess physical condition of the

8    apes.   You can see Kanzi in this picture, and probably the most

9    obvious thing to anyone who looks at this would notice that

10   Kanzi's physical appearance is largest in the middle picture, in

11   2013.   In 2011 he does seem thinner, but it's not necessarily a

12   good thing.   He's missing hair you can see quite readily over

13   here (indicating), all along his arms, and in addition to

14   missing hair, he's quite ashy, which is an indication that the

15   skin is dry.   Now if this were February, I think it could have

16   been explained, well, maybe it was a particularly bad winter in

17   2011, dry skin.   In my opinion, that's a reflection of diet

18   that's led to that dry skin.   He does also appear to be

19   strangely enough -- this isn't visible in the other pictures, so

20   I can't say a whole lot of it, some redness on his genitals, so

21   I'm not really sure about any of that.

22           But one other thing to notice is that there's very

23   little muscle tone.   I mean, these are apes.   They're strong,

24   powerful animals, and there's very little muscle tone.

25           Now, if you look at the picture -- I'm going to clear

 1  this.  If you look at the picture of 2013, okay, Kanzi's skin, I

 2  mean, at least from the quality of this picture, seems better.

 3  It seems like his hair is coming in a bit more, but he's also,

 4  for lack of a better word, enormous.  I mean, an adult male

 5  bonobo should weigh approximately 145 pounds.  Kanzi in this

 6  picture I would guess is at least 210, morbidly obese by all

 7  definitions.  Okay.  The No. 1 cause is heart disease or what --

 8  I don't know the technical term for it in captive bonobos.

 9  Clearly, this condition is extremely dangerous for Kanzi.

10        Now, if you look at 2015 -- and, again, we just took

11  this picture the other day; I didn't take it, but someone else

12  took it the other day -- couple of things:  Hair and skin are in

13  great condition.  Also what you can see -- and I don't know if

14  it's very clear.  Yeah, I think it's actually clear.  You can

15  see actual muscle tone, and this comes from activity.  I

16  mentioned yesterday we enhanced the facility by building

17  climbing structures indoors and out, by having them do, in

18  addition to all their cognitive and behavioral testing,

19  extractive foraging tasks, tasks that get them moving around in

20  their environment, all right.  That's the kind of things that

21  contribute to the health.

22        And one final thing and, again, maybe this -- I'll

23  admit maybe it may not be a fair comparison given the picture

24  that's up there.  Look at Kanzi's eyes.  They're bright, right,

25  the skin across his face is looking taunt, is looking alive, if

1  you will, and that's one of the measures that you use.

2          MR. STAMBAUGH:  I'll object to the witness's testimony

3  to the extent it calls for a medical opinion.  He's already

4  testified he's not a veterinarian.

5          THE COURT:  Received, subject to the objection.  The

6  answer is in.

7  BY MR. MILLER:

8  Q.  Did you make any observations of the physical health of the

9  other bonobos when you made your return visit in the fall of

10 2013 to the Des Moines facility?

11         MR. STAMBAUGH:  Same objection.

12         THE COURT:  Same ruling.

13 A.  I will say that overall, including Kanzi -- you know, I have

14 the benefit of hindsight when I look at this picture now.  My

15 initial impression in the fall of 2013, especially considering

16 what I was expecting to see, was that the apes were -- you know,

17 they were still there, and that was pretty good, and none of

18 them were exhibiting any obvious signs of physical distress.

19 BY MR. MILLER:

20 Q.  Has their physical condition from your observations changed

21 over time?

22         MR. STAMBAUGH:  Same objection.

23         THE COURT:  Overruled.

24 A.  Yes.

25 BY MR. MILLER:

1 Q.  And how so?

2 A.  I think we can look at the photo of Kanzi, and there are

3 similar ones to be had for the other apes.  When I began,

4 Elikya's skin was not very good at all, and she basically had

5 literally not much hair except for the top of her head.  I don't

6 have it with me, but for those of you who follow us on Facebook

7 would have seen a picture of Elikya just a couple of days before

8 where she's basically unrecognizable from that earlier photo;

9 bright eyes, great looking skins, shiny coats.

10       I've had a number of colleagues visit the facility,

11 these are people that have worked with apes in captive settings

12 for years, decades, not just a visit five days here and only see

13 these bonobos.  I'm talking about individuals that have

14 dedicated their lives, and they have commented.  The one comment

15 we get most often is I cannot believe how good the apes look.

16 Q.  The court record of prior testimony will reflect what it

17 does; but if there's been any claim with respect to the apes not

18 doing well, do you agree with that?

19 A.  No.

20 Q.  Why is that?

21 A.  Well, I guess for the reasons I just gave you.  I mean --

22 Q.  You were in the courtroom yesterday when Mr. Sheldon

23 explained the plan for the Missouri facility, correct?

24 A.  Yes.

25 Q.  Based on your experience and training, what do you think

1    about that plan?

2    A.   I'm sorry, what did I think of the facility?

3    Q.   Yes, based on -- yes, based on your experience and training,

4    what do you think of that plan and facility?

5    A.   I mean, I think that -- before I say anything, I think that,

6    you know, Mr. Sheldon should be commended for the generosity to

7    say the least on what he is willing to put forth.  I think

8    that's really commendable.

9           To be quite frank -- and I also would like to say that

10   I appreciate the perspective of simplifying the building

11   structure as much as possible.  That lowers maintenance costs

12   and also increases probably reliability, right.  It's probably

13   easier to take care of a Toyota than it is a Lamborghini.

14          With that said, in this day and age, the facility is

15   primitive and is not really appropriate for apes.

16   Q.   And why do you say that?

17   A.   You know, I heard talk of large outdoor spaces and outdoor

18   play yards, but we didn't see any -- I haven't seen any pictures

19   of those, and to contain the apes in effectively cages inside of

20   what looks like, you know, a Morton building is, in my mind, not

21   what anyone should be moving towards.  You know, I've spent 11

22   years working at the Yerkes Primate Center, which includes the

23   main center in which the apes are in indoor/outdoor runs that

24   are concrete floors and metal caging, and it's not acceptable.

25   And as far as I can tell from that facility, they don't even

1  have the outdoor part built.

2  Q.  I would like to switch subjects with you --

3  A.  Sure.

4  Q.  -- and talk with you a little bit about research.

5           There's a binder next to you in the --

6           MR. MILLER:  May I approach, Your Honor?

7           THE COURT:  You may.

8           MR. MILLER:  Thank you.

9  BY MR. MILLER:

10  Q.  Dr. Taglialatela, I put in front of you what was previously

11  admitted as Exhibit 1006.

12           Do you see that there?

13  A.  Yes.  ACCI Active Research Protocols?

14  Q.  Correct.  And in preparing for this proceeding, did you

15  alert me that that document was actually out of date?

16  A.  Yes, it is.

17           MR. MILLER:  Your Honor, I have a demonstrative

18  exhibit that I would like to put up on the board that is an

19  update to that exhibit.  I've shown counsel.  Would that be

20  permissible?  I would like to publish that.

21           THE COURT:  You may.

22           MR. MILLER:  Thank you.

23  BY MR. MILLER:

24  Q.  So Exhibit 1006 is list of active research protocols, at

25  least through the date of when that document was produced, with

1 Bonobo Hope and Dr. Savage-Rumbaugh?

2 A.  Yes.

3 Q.  And then if you refer to the board, does the demonstrative

4 exhibit that's been placed on the board there reflect additional

5 research protocols that have been approved since that time?

6 A.  Yes.  It looks like it includes the addition of three

7 protocols, three additional protocols.

8 Q.  Is there additional information that supports each of these

9 proposals?

10 A.  Yes.  These are just a list of names of the PIs, principal

11 investigators, as well as the title of the proposal, I think

12 also, I guess, their animal use protocol number, which is what

13 AUP number stands for, their approval date and their end date.

14 Q.  Generally speaking briefly, what kind of information would

15 back or be behind these protocols?

16 A.  Okay.  The Institutional Animal Care and Use Committee is in

17 place to review research protocols.  So the protocol itself

18 contains everything an individual would need to evaluate both

19 what's going to be done and whether it's important for that

20 research to be done and any potential harm or discomfort to the

21 animals.  So it includes all of the details that a layperson

22 would need to evaluate them.

23 Q.  So that information would have been approved -- or reviewed

24 and approved by the IACUC committee?

25 A.  That is correct.

1   Q.  The IACUC?

2   A.  That's correct.

3   Q.  Did the ACCI agree to voluntarily produce the list in 1006

4   to Bonobo Hope previously?

5   A.  This exhibit?

6   Q.  Not that exhibit, but 1006 which is the one that we actually

7   marked Exhibit 1006.

8   A.  Oh, I'm sorry, I apologize.  I believe so, yes.

9         MR. STAMBAUGH:  I just want to note for the record

10  that counsel is talking about a document -- counsel is showing a

11  document that was not given to counsel for BHI until yesterday,

12  so I believe the witness's testimony that the previous document

13  that we're not looking at on the screen was given to us.  Is

14  that right?

15        MR. MILLER:  That was my understanding.

16  BY MR. MILLER:

17  Q.  Dr. Taglialatela --

18  A.  I'm not sure I followed all of that.

19  Q.  Yes.  Let me make sure it's clear for the court.

20        Exhibit 1006 had been previously produced to Bonobo

21  Hope, correct?

22  A.  That is my understanding, yes.

23        MR. STAMBAUGH:  Correct.  Which is not the document

24  being shown on the screen right now?

25        THE WITNESS:  Yes.

1          MR. MILLER:  So stipulated.

2    BY MR. MILLER:

3    Q.  Have any publications resulted from the research reflected

4    in 1006 or on the update that's on the screen?

5    A.  To my knowledge at this point, no publications.

6    Q.  Why not?

7    A.  Well, if you look at the dates of approval, we -- you know,

8    those are -- the earliest one is the end of April of last year.

9    I mean, research projects take time to collect data, analyze the

10   data, write up the data, submit the paper, and in most cases get

11   the paper back.  So, I mean, it's just that it takes time.  It's

12   too soon.

13   Q.  Are you able to predict when there may be publications?

14   A.  I think we're far enough along on -- and, again, you'll have

15   to bear with me without going into too much detail.  Depending

16   on the journal you submit the paper to, some of them will turn a

17   paper around to you in ten days, and some of them will take four

18   months, so that would be a thing.  But I think we may have

19   something in press, which means it's been accepted but hasn't

20   been released, by the end of the calendar year.

21   Q.  And those would be peer-reviewed publications?

22   A.  Of course.

23   Q.  I think you told the court briefly previously that with

24   respect to your CV that you publish research yourself,

25   Dr. Taglialatela?

1   A.   Yes.

2   Q.   Have you published with Dr. Savage-Rumbaugh in the past?

3   A.   I have.

4   Q.   Do you know when the last article you published with her

5   would have been?  And if you want to refer to your CV, it's

6   Exhibit 1007.  And, Doctor, it should be in the binder right in

7   front of you.

8   A.   The one that's in here?

9   Q.   Yes.

10          MR. MILLER:  Your Honor, while he's looking for that,

11   I would move Exhibit 1007 into evidence.

12                              (Plaintiffs' Exhibit 1007 was

13                               offered in evidence.)

14          THE COURT:  Is there objection to 1007?

15          MR. STAMBAUGH:  Only the objections listed on the

16   pretrial order.  I'll reassert those.

17          THE COURT:  Exhibit 1007 is received, subject to those

18   objections.

19                              (Plaintiffs' Exhibit 1007 was

20                               received in evidence.)

21   A.   Okay.  So I divide my CV because it's standard to do this.

22   Publications are divided into what we would call research

23   papers, which are mostly going to be reporting primary research

24   that I or colleagues have done.  That research would then be

25   peer-reviewed by colleagues, appointed by an editor of a

1    journal, and then published.  This would be what we would call

2    primary data.

3              So that section appears the last paper I coauthored

4    with Dr. Savage-Rumbaugh was published in 2004.

5              I also have a number of book chapters.  Some of those

6    are peer-reviewed, some of them are not.  They're usually more

7    review type -- not really theoretical, but review where you're

8    sort of considering a corpus of data or previously published --

9    actually I don't think this is a complete copy of my CV.  It

10   stops at page 8, and I think it should be like 17 pages.

11             So book chapterwise, it looks like it was 2004, but

12   they're chronological from start to finish, so it could be

13   later.  I don't have it in front of me.

14             MR. MILLER:  Your Honor, may I approach?

15             The copy I have in this notebook has additional pages.

16   I don't know if that was simply an administrative error that we

17   didn't get the full copy in the notebook.

18             THE COURT:  You can show that to him to refresh his

19   recollection.

20   BY MR. MILLER:

21   Q.  I mainly just want to make this available to you.

22   A.  It says 8 of 16.  There's no 9.

23   Q.  Dr. Taglialatela, why have you not published with Dr.

24   Rumbaugh since 2004?

25   A.  We stopped working together in 2004.

1   Q.  Yesterday there was some testimony regarding minimally

2   invasive or invasive research.  I think it's also been referred

3   to as biomedical research at some point in time.  Does that term

4   have meaning to you in your experience?

5   A.  I mean, those terms are very nebulous in my experience, and

6   I think biomedical and invasive should not be the same.

7   Q.  Okay.  Do you have an understanding of invasive research

8   based on your training and expertise?

9   A.  My definition of invasive research would be research that

10  does something to sort of alter the animal, if you will.  So

11  once upon a time -- this hasn't been done in a long time as far

12  as I understand now -- chimpanzees were used for hepatitis B

13  research.  I'm not talking about bonobos.  I'm talking about pan

14  troglodytes.  As part of those procedures, they would take

15  biopsies of their spleens, for example.  That would clearly be

16  defined as a surgery.  It's clearly defined as invasive.

17          I think an argument could be made that withdrawing

18  blood has some degree of invasivity, right, I mean the word

19  coming from invading the body at some level.  I restrict -- I

20  try to avoid the use of the term because it doesn't have a

21  clearly accepted definition; but I would say permanently

22  altering the animal is my definition of invasive.

23  Q.  Do you have -- similarly, do you have an understanding from

24  your experience of what biomedical research has -- or what

25  meaning that has?

1  A.  Yes.  And I will sort of give my definition acknowledging

2  that the common use of the term has a negative connotation that

3  I don't agree with.  In my mind, biomedical research is research

4  that can benefit human health.  That's the biomedical part,

5  okay.  That's not the way it's used conventionally.

6  Q.  And does ACCI have any protocol in place involving invasive

7  research?

8  A.  Invasive research the way I've described it, no.

9  Q.  Does ACCI have any plans to do invasive research?

10  A.  Absolutely not.  In point of fact -- oh, sorry.

11  Q.  Go ahead, please.

12  A.  I think it is -- I'm fairly certain it is illegal to do

13  invasive research on bonobos as dictated by the Endangered

14  Species Act.

15  Q.  Has ACCI taken the lexigram keyboards away from the bonobos?

16  A.  No.

17  Q.  Do you have any understanding where this notion arises?

18  A.  I have no understanding.  That is positively ridiculous.  In

19  fact, we're constantly thinking of new ways to invent, to keep

20  the lexigram keyboard used, you know, as we're thinking of new

21  ways to do it.  If I may, we last summer built a climbing

22  structure, I think I mentioned yesterday, beautiful outdoor play

23  yards.  Bonobos are arboreal, which means they spend time in

24  trees.  They like to be up high, they like to climb, and they

25  like to hang out up high.  There were no climbing structures in

1   these beautiful yards, so we built a climbing structure to see

2   if it would be used.  Well, Kanzi was very excited to see -- or

3   very interested, I should say, to see the Director of Science,

4   the Director of Research, one of our staff member's husbands and

5   a graduate student of mine, you know, with power tools building

6   a climbing structure in his yard.  And when he was inside

7   wanting to be let out, he said a number of things and then said

8   tree house.

9           Now, the tree house was a location that

10  Dr. Savage-Rumbaugh had built in the facility in Atlanta, and it

11  was a place that they would visit, because one of the things

12  that I think probably was consistent with what

13  Dr. Savage-Rumbaugh and I initially had talked about

14  researchwise back when I was in graduate school, you know, 15 or

15  so years ago, was that what I just said, moving around to

16  different spots, looking for food, thinking about whether that

17  food was there the day before or will it be there today or

18  tomorrow.  Dr. Savage-Rumbaugh built basically a mockup of that

19  in Atlanta.  Kanzi had a place called tree house.  Tree house

20  was associated with a food.  If my memory serves, it was

21  bananas.  That's what you find at the tree house.

22          So Kanzi saw us building this structure.  He used his

23  keyboard calling it tree house.  Staff were talking to me that

24  night because we were talking about it, and they told me that

25  story, and I was, like, that's awesome.  I was floored.  And not

1  to mention, we then decided, well, we need to call this thing

2  something, let's call it tree house, and the next morning we

3  painted the lexigram on it for tree house, and it's the tree

4  house and everyone calls it the tree house.

5  Q.  Has anybody from the Bonobo Hope, the BHI board ever asked

6  you if the keyboard had been taken away?

7  A.  No.

8  Q.  Have you banned any form of communication with the bonobos?

9  A.  No, absolutely not.

10  Q.  Do you require the use of face masks and gloves?

11  A.  Absolutely do.

12  Q.  Why?

13  A.  Because the apes are susceptible to respiratory diseases.

14  Dr. Gilmore testified yesterday that Panbanisha died of acute

15  respiratory distress.  I've seen her necropsy report, and I'm

16  not a veterinarian, but I've asked other veterinarians to look

17  at it, and the only thing of concern was her morbid obesity.

18  I'm concerned about the effect that a respiratory illness will

19  have on our colony.

20         Teco before we instituted this policy became gravely

21  ill last May with a respiratory infection.  If it weren't for

22  the heroic efforts of Dr. Gilmore, as well as a pediatric, human

23  pediatric pulmonary specialist, who not only brought his

24  equipment but medicine, quite frankly, I'm not sure Teco would

25  still be here.  Dr. Gilmore saved him based on her heroic

1   efforts, and I've worked with many veterinarians through the

2   course of my career, and what Dr. Gilmore has done was above and

3   beyond what you normally see because of her relationship with

4   the apes.  I don't ever want to repeat that.

5        All of the staff, you know, don't like wearing face

6   masks, but they all understand why we do it.  In fact, probably

7   the biggest person who doesn't like it the most is Dr. Hopkins,

8   but we all do it because it's what's in the best interests of

9   the apes.

10        Now, I will add, with that said, if it's necessary and

11  someone can justify it in their IACUC protocol, we have a

12  provision that allows that it's not be used for certain IACUC

13  protocols, but no one has tried to justify not using face masks,

14  but the IACUC would certainly review it and entertain it.

15  Q.  Have you been in any other forms of interaction with the

16  bonobos?

17  A.  Could you be more specific?  I don't know what --

18  Q.  Are you preventing them from interacting in any way with

19  humans that are working with them?

20  A.  No.

21  Q.  Has ACCI continued to bar Dr. Savage-Rumbaugh from access in

22  the facilities since you've become involved?

23  A.  Yes.

24  Q.  Why?

25  A.  I believe that Dr. Rumbaugh poses a safety risk to the

1  bonobos and to the people that she works with.

2  Q.  What's the basis for that conclusion?

3  A.  The basis for that is my past experiences working with her.

4  Q.  Can you describe briefly for the court what you mean by

5  that?

6  A.  I personally -- and, again, we're going back now to the time

7  that I was in graduate school, between the periods of 1998 and

8  2004 -- have witnessed unsafe practices.  By that I mean locks

9  off of cages, diets not being followed, allowing apes to get out

10  of her control and do, you know, things that either put them in

11  harm or put humans in harm.  I can be specific if you want.

12       And I probably should add that some of that is also

13  based on information that I've directly or indirectly gained

14  subsequent to me accepting this position in December of 2013,

15  and by that I mean documents that refer to protocols being

16  reversed or specific complaints that I've come upon as part of

17  my presence at the facility.

18  Q.  Is there any restriction on BHI members accessing the

19  facility?

20  A.  No.

21  Q.  You've been here in court and heard complaints about

22  accessibility by the board members, is that correct?

23  A.  I have heard that.

24  Q.  Have you ever purposely avoided Bonobo Hope members having

25  access?

1  A.  Absolutely not, and the only meeting, to my recollection,

2  that I postponed was Dr. Laurent Dubreuil's, and it was because

3  I was meeting with you to prepare for this hearing.

4  Q.  Did you meet with Dr. Wildman during his recent visit that

5  he testified about?

6  A.  I did for the entire length of his visit.  I invited him to

7  lunch, but he wanted to get on the road.

8  Q.  Did you put any restrictions on his access to the facility

9  or documents?

10  A.  I did not, and I believe he testified to that.

11  Q.  Did you tell him you would e-mail him something afterwards?

12  A.  Yes.

13  Q.  Did you do that?

14  A.  No, I did not.

15  Q.  Why not?

16  A.  Quite frankly, there were two issues.  One -- and, again,

17  this is not an excuse; it's an explanation.  I have 432 e-mails

18  in my inbox as of this morning.  I simply did not get to that

19  item on my to do list.  He wanted a list of abstracts for grants

20  we've submitted.  It would take some time to pull that all

21  together, and since the time I met with Dr. Wildman, my

22  academic semester ended, so I had to get grades in and grade

23  papers, I submitted a very large grant, and I had to get

24  research graduate students up here and set up for research

25  projects this summer.

1    So I've just -- quite frankly, it hasn't gotten -- I

2  haven't gotten to it yet, and I regret -- you know, I apologize

3  for that.  I said I would do it and I haven't.

4    The other thing he asked for was full IACUC protocols.

5  After reviewing that, it's come to my attention that there's

6  some gray area, but that actually IACUC protocols are

7  confidential and shouldn't be shared with members that are

8  outside of the IACUC.  It's a gray area.  I offered them to him,

9  but I wasn't comfortable at this point e-mailing them to him,

10  and I needed to e-mail him to clarify that, and I haven't had a

11  chance to e-mail him to clarify that.

12  Q.  Do you think Dr. Wildman's testimony accurately described

13  your discussion with him?

14  A.  I'm sorry.  Could you --

15  Q.  Sure.  Do you believe his testimony accurately described

16  your discussion with him?

17    MR. STAMBAUGH:  Objection; inadmissible character

18  evidence.  That's the province of the court to weigh a witness's

19  credibility.

20    THE COURT:  I'll receive it, subject to the objection.

21  A.  To be honest with you, I'm trying to recall.  Maybe if you

22  would ask me specifics.

23  BY MR. MILLER:

24  Q.  He testified that you provided some sort of statement with

25  respect to assurances that you were being required to give.

1          Do you recall that testimony?

2          MR. STAMBAUGH:  Objection, misstates the record.

3   BY MR. MILLER:

4   Q.  If you don't recall, we'll just move on.

5   A.  Assurances with regards to?

6   Q.  Your institutions.  I believe he said -- he made some point

7   with respect to institutions multiple.

8   A.  No, I don't recall that, and I think he was -- you know,

9   assuming that somehow Kennesaw or the Yerkes Primate Center --

10  so the Yerkes Primate Center is not funding ACCI at all at this

11  point in time.  They have literally given us absolutely not a

12  single dollar.  So Kennesaw State University, my university, has

13  given us money both in forms of pilot grants to me and bridging

14  funds and monies from this consortium agreement which I

15  described earlier.

16          So the suggestion that the Yerkes Primate Center is

17  now contributing financially to ACCI at this point in time is

18  absolutely false.

19  Q.  Are there plans for one or more BHI members to visit the

20  Des Moines facility tomorrow?

21  A.  Yes.  I had to postpone Laurent Dubreuil's visit which I

22  think was originally scheduled for the 26th.  I asked him to

23  come tomorrow.  Dr. Coxe contacted me about -- Dr. Sally Coxe

24  contacted me about visiting.  I asked her to come tomorrow when

25  the hearing was concluded.  She has agreed.  I don't know if

1  we've decided on a final time, but we can work that out, and she

2  will come and visit tomorrow.  I extended that same invitation

3  to Dr. Dubreuil.  He has not at this point in time responded to

4  me yet.  Dr. Roffman similarly, and I know he would have had to

5  extend his visit, but I have extended that invitation to him,

6  but I haven't heard confirmation that he will be here.

7  Q.  And did a Dr. Tuttle also make a visit to the facility?

8  A.  Yes, he did.  He's not a member of BHI, but he did make a

9  visit yesterday.

10  Q.  When the BHI members presumably visit, will they have an

11  opportunity to review the active research protocols during that

12  visit?

13  A.  Uh-huh.

14  Q.  Is that a "yes"?

15  A.  Yes, of course.  I'm sorry.

16  Q.  You've been in the courtroom when you've heard various

17  witnesses explain their concerns with respect to Dr. Rumbaugh's

18  research trajectory being respected, is that correct?

19  A.  Yes.

20  Q.  Do you agree with that?

21  A.  Do I agree with that?

22        MR. STAMBAUGH:  Objection; vague and ambiguous.  Agree

23  with what?

24  BY MR. MILLER:

25  Q.  Sure.  Do you agree that ACCI has jettisoned, rejected,

1  destroyed Dr. Savage-Rumbaugh's research trajectory?

2  A.  Absolutely not.

3  Q.  Do you disagree with Dr. Rumbaugh's past research?

4  A.  No.

5  Q.  Do you disagree with the aspects of her past relations with

6  the bonobos?

7  A.  Yes.

8  Q.  Why is that?

9  A.  You know, let's look at what I would consider to be the sort

10  of most recent peer-reviewed publications that

11  Dr. Savage-Rumbaugh has produced.  It probably takes us back to

12  1993, which was a monograph that was produced on Kanzi's English

13  comprehension.  There may be a couple of things after that, but

14  I'm just focusing possibly on the main largest corpus of her

15  work.  This is absolutely groundbreaking work, okay.  Through

16  meticulous data collection, controls, they -- Sue and

17  colleagues -- I'm sorry, excuse me; Dr. Savage-Rumbaugh and

18  colleagues discovered that a nonhuman animal, a nonhuman ape was

19  capable of comprehending spoken English.  Yes, Kanzi uses

20  lexigrams.  He probably uses lexigram to a greater extent than

21  previous apes that have been looked at, but he understands

22  spoken English and not just simple word identification but novel

23  sentences.

24          So if you ask Kanzi a question, can you put the keys

25  in the refrigerator, right, something theoretically Kanzi would

1  never hear before or never heard before, he can do that, right;

2  absolutely groundbreaking work.  It was published in a

3  peer-reviewed publication in 1993, I think the Monograph Society

4  for Child Development if I have that correct.

5        So I don't disagree with the profound findings.

6  Actually before that, in the mid 1980s, Dr. Savage-Rumbaugh

7  published a paper that I believe appeared in the Journal of

8  Science documenting the abilities of two chimpanzees, Sherman

9  and Austin, to exchange lexigrams, to identify items, perhaps --

10  you know, it's a subjective impression which one was the more

11  profound finding.  Both of them are quite amazing, okay.

12        What I -- there's a famous scientist by the name of

13  Harry Harlow.  Many of you have probably heard about him.  For

14  those of you who did, I'll be very brief.  Harry Harlow took

15  monkeys and separated infants separated from their moms, put

16  them on a wire rack with a nipple that gave milk and looked at

17  the effects that that had on the developing individual neonate

18  monkey, okay.  Now, everyone is probably thinking, well, that

19  sounds cruel.  At the time no one really knew what would happen

20  when you did that.  There was a debate ranging in this company

21  about whether nature or nurture was more important.  Well, Harry

22  Harlow did that, and we found out it is devastating to the

23  emotional and neurological development of an organism when you

24  do that type of thing.

25        Now, are we going to get -- I mean, that was his work,

1  and it was really important that we all learned that; but if a

2  person came to you and said, hey, could we do this again, you

3  would probably say no, right?

4        I disagree with the idea of taking a bonobo even for

5  part of the day, rearing it with humans, for any reason, because

6  I think that the detriment to the individual animal, all right,

7  is not justified by the benefit you get from the science to

8  either our understanding of our place in the universe or for

9  biomedical or public health relevance.

10  Q.  I'm going to ask you a few questions.  If you need to refer

11  to Exhibit 1006 or the demonstrative that's in front of you, I

12  ask that you do that.

13  A.  Okay.

14  Q.  Do the bonobos at the facility in Des Moines continue to be

15  involved in research in the field of experimental psychology?

16  A.  Yes.

17  Q.  What active research protocols involve experimental

18  psychology?

19  A.  Experimental psychology is a pretty broad stroke, but I

20  would say specifically these three that are on the bottom part

21  of this table here, so these three here would certainly fit into

22  that context.

23  Q.  Can you give us the title of those?

24  A.  Oh, I'm sorry.  "Using Virtual Reality to Investigate the

25  Spacial Cognitive Abilities of Bonobos" would certainly fall

1  into experimental psychology.

2  Q.  You need to slow down.

3  A.  I'm sorry, I forgot.

4  Q.  Go ahead.  And the second one?

5  A.  "Using Virtual Reality to Investigate the Spacial Cognitive

6  Abilities of Bonobos."

7  Q.  I'm sorry, I wanted to refer you to the second one.

8  A.  Okay.  "Do Bonobos Make Inductive Inferences About

9  Nonvisible Properties of Object Categories."

10 Q.  And the third is nonhuman primate SNARC effect?

11 A.  Yeah.  That would be SNARC effect.

12 Q.  What is the SNARC effect?

13 A.  I was afraid you would ask me this.

14 Q.  Well, I --

15 A.  For the record, I'm not an experimental psychologist.

16       It's basically the priming effect you would get.  If I

17 were to order numbers for you on a page and I had 1, 2, 3, 4,

18 you would have this expectancy given that we read English from

19 left to right that 1 would be on the left and 10 would be on the

20 right, for example.  So it's basically a computer-based testing

21 to sort of see if the apes have a sort of similar bias, if you

22 will.

23 Q.  Other than IACUC approval, is there anything barring

24 research in the area of experimental psychology at the facility?

25 A.  No.

1  Q.  Do the bonobos at the facility continue to be involved in

2  research in the field of use of language and tools?

3  A.  Absolutely.

4  Q.  What active research protocols involve those areas?

5  A.  You said language and tools?

6  Q.  Correct.

7  A.  So the first six in the actual exhibit.

8  Q.  On Exhibit 1006?

9  A.  Uh-huh.

10  Q.  And other than IACUC approval, is there anything barring

11  research in the field of use of language and tools at the

12  facility?

13  A.  No.  In fact, I've had a scientist recently contact me about

14  the recent discovery that Dr. Wildman mentioned that they found

15  stone tools that were three-and-a-half million years old.  We're

16  working to develop protocol for them because they want to come

17  and bring some of those exact core stones and see if we can do

18  some of that stone tool work here to see what the apes can

19  produce.

20  Q.  Do the bonobos at the facility continue to be involved in

21  research in the field of ape intelligence and human cultural

22  modes?

23  A.  Yes.

24  Q.  What active research protocols involve those areas?

25  A.  So human cultural modes is a really big topic.  I would say

1 without a doubt rhythmic entrainment in bonobo apes at ACCI

2 would certainly be a cultural move because rhythmic entrainment

3 is basically -- I mean, it's drumming.

4          What was the first part of that?  I'm sorry.

5 Q.  We're looking at --

6 A.  Something in cultural modes?

7 Q.  Use of language -- or excuse me, field of ape intelligence

8 and human cultural modes.

9 A.  The one entitled "Theory of Mind in Language Competent

10 Bonobos," for those of you that don't know, the theory of mind

11 is basically the idea that you have knowledge states that you

12 know are different from other individuals, and that's the theory

13 of mind, and so we're looking at that as well.

14          And "The Large-Scale Comparison of Cognition and

15 Communication in the Animal Kingdom" as well.  And I guess, to

16 some extent, "New Insights into Human Origins through the Study

17 of Linguistically Competent Bonobos."

18 Q.  You mentioned a moment ago moment rhythmic entrainment in

19 bonobo apes, et cetera?

20 A.  Yes.

21 Q.  Is that a continuation of a study that the PI, Patricia

22 Gray, had begun with Dr. Savage-Rumbaugh?

23 A.  It is my understanding it is.  She's also worked I think at

24 the Jacksonville Zoo with bonobos there.

25 Q.  Other than IACUC approval, is there anything barring

1  research in the field of ape intelligence and human cultural

2  modes at the ACCI facility?

3  A.  No.

4  Q.  Would you welcome a proposal to the IACUC for research in

5  these areas from a member of BHI?

6  A.  Yes.

7  Q.  And you've told this to the BHI board in the past?

8  A.  I believe that I wrote an e-mail that it may not have

9  included all members of BHI, but it at least included Carmen

10  Mate, the chair, and Itai Roffman that, to the best of my

11  recollection, indicated that -- that gave them the protocol form

12  and indicated what would be required.

13  Q.  And Dr. Roffman mentioned he may be preparing this

14  submission to the IACUC?

15  A.  My understanding, he is.  It's not a trivial form, so it

16  would take some time.  So the fact that I haven't heard back

17  from him after I sent it to him is not surprising at all.

18  Q.  Any other proposals to the IACUC committee been made by the

19  BHI board?

20  A.  No, they have not.

21          MR. MILLER:  That's all my questions.

22          I'll pass the witness.

23          THE COURT:  I think we'll take our mid-morning recess

24  at this time.  We'll be in recess for 15 minutes.

25          (Recess at 10:21 a.m., until 10:38 a.m.)

1          THE COURT:  Be seated, please.

2          Cross-examination.

3          MR. STAMBAUGH:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. STAMBAUGH:

6    Q.  If you'll indulge me, Dr. Taglialatela, I know your counsel

7    was sitting down; but from where I come from, we stand up when

8    we examine witnesses.

9    A.  That's fine; cultural differences.

10   Q.  I understand your students call you Dr. Tag?

11   A.  Yes.

12   Q.  Do you have any problem if I call you Dr. Tag?

13   A.  No; only if you consider yourself my student.  No, I'm just

14   kidding.  That's fine.

15   Q.  I would be happy to some day.  That would be my pleasure.

16          Dr. Tag, during your direct examination you gave the

17   court a nice visual depiction of the facility here in

18   Des Moines, is that right?

19   A.  Yes.

20   Q.  It is a big space?

21   A.  Yes.

22   Q.  It is a nice space?

23   A.  Yes.

24   Q.  You didn't build it?

25   A.  No, not at all.

1  Q.  You didn't design it?

2  A.  No, not at all.

3  Q.  In fact, you were just appointed as the Director of Science

4  of an organization that co-operates it, correct?

5  A.  Director of Research and I think we -- well, I wouldn't say

6  we co-operate it.  ACCI operates the facility, yes; but no, I

7  didn't build it.

8  Q.  The only reason you are the Director of Research at ACCI is

9  because Dr. Sue Savage-Rumbaugh recommended that you be

10 appointed to that position, correct?

11 A.  That is not correct.

12 Q.  Why isn't that correct?

13 A.  Well, for starters, I don't think that's the only reason.

14 That may be part of the initial introduction, and to be quite

15 frank, if Dr. Savage-Rumbaugh had written me an e-mail to come

16 visit the facility, I wouldn't have.  I visited because

17 Dr. Duane Rumbaugh asked me to come visit the facility, and

18 that's why I did.

19         There's about two-and-a-half months between me

20 visiting that facility and taking on an official role at that

21 organization.  So I guess that's why my answer is what it is.

22 Q.  And you understand Dr. Sue Savage-Rumbaugh wrote a letter

23 recommending you for that position, is that right?

24 A.  I do, yes.

25 Q.  Did you receive a copy of that letter?

1  A.  I did.

2  Q.  You don't want Dr. Rumbaugh in the lab anymore, though, do

3  you?

4  A.  Dr. Savage-Rumbaugh?

5  Q.  Dr. Sue Savage-Rumbaugh.

6  A.  No.

7  Q.  That would hurt your career, wouldn't it, Dr. Tag?

8  A.  Not at all.

9  Q.  It's your testimony here today that having

10  Dr. Savage-Rumbaugh in the lab would not hurt your career?

11  A.  Would hurt my career?

12  Q.  Correct.

13  A.  I don't know how to evaluate the statement of whether or not

14  it would hurt my career.

15  Q.  I thought a second ago you testified that it would not.  So

16  let's make sure the record is clear.

17  A.  Okay.  I'll stand by that.  I'm explaining myself.  It would

18  not --

19  Q.  Dr. Taglialatela --

20  A.  -- not hurt my career.  I don't know how it would hurt my

21  career.

22  Q.  Let's get this straight.  It would not hurt your career?

23  A.  No.

24  Q.  But you don't know how it would hurt your career?

25  A.  Let me restate --

1   Q.  Let me ask you a better question, Dr. Tag.

2   A.  Yes.

3   Q.  You have a professional financial investment in the outcome

4   of this case, isn't that correct?

5   A.  Can you restate that?

6   Q.  Sure.  And it's a simple question.  I'm just wondering if

7   you can explain to the court whether or not you have a direct

8   professional investment in the outcome of this case.  If these

9   bonobos are relocated, Dr. Tag, would that hurt your career?

10  A.  Quite frankly, if these bonobos are relocated, no, it

11  doesn't hurt my career.

12  Q.  So you would have no objection to them being relocated?

13  A.  No.  I would have an objection to them being relocated.  Do

14  you want me to explain why?

15          I have an objection to having these bonobos being

16  relocated because if these bonobos are relocated, in all

17  likelihood, I would fear for the grave outcomes it would have on

18  their welfare, okay.  I'm not paid, I haven't been paid, I don't

19  get money from summer support for grants to support this.  In

20  point of fact, I've spent about $2,500 of my discretionary

21  account which I get from the university as part of indirects

22  that are given back to me from the university to fly back and

23  forth.  I've spent, you know, 90-something days or more away

24  from my family.  I got involved in this endeavor for one reason,

25  with regards to those bonobos, which is for their welfare.  And

1  to be quite frank, no one else would do it, and the reason no

2  one else would do it is because of this situation we're in right

3  now.  Everyone I spoke to and sought counsel on advised me,

4  she's never going to stop, just give up.  You're crazy to do

5  this.  And I looked at the bonobos and thought I might have a

6  real chance because she told me she wasn't -- "she" being

7  Dr. Savage-Rumbaugh, told me she wasn't involved, told me she

8  was done.  Duane Rumbaugh corroborated that, and that's why I

9  agreed, perhaps foolishly, to get involved in the beginning.

10          So no, if the bonobos are relocated, it doesn't hurt

11  my career.

12  Q.  And we'll take a little bit of a closer look at what

13  Dr. Savage-Rumbaugh actually said to you regarding her

14  involvement.

15  A.  Okay.

16  Q.  I want to go back to my earlier question.  You mentioned

17  that Dr. Savage-Rumbaugh's involvement with these bonobos

18  currently wouldn't necessarily hurt your career, is that right?

19  A.  Yes.

20  Q.  So you have no objection to Dr. Savage-Rumbaugh being

21  involved in the research at ACCI's facility?

22  A.  I do have an objection to Dr. Savage-Rumbaugh being involved

23  in the research.

24  Q.  So, Dr. Tag, it's your testimony for the court here today

25  that despite you thinking it may have been a poor decision, you

1   were the only one on the planet who was capable and ready to

2   take care of these bonobos, is that right?

3   A.   I would not argue capable.  I would say that I was the only

4   one who was willing and ready to do it.

5   Q.   And as we sit here today on May 29, 2015, it's your

6   testimony for the court that you are the only one who is ready

7   and willing to take care of these bonobos, is that right?

8   A.   I have a co-director, Dr. Hopkins, so I would --

9   Q.   So there's two people in the country who are ready and

10   willing to take care of these bonobos.  Thankfully it's Dr. Tag

11   and Dr. Hopkins?

12   A.   Let me say it this way.  There are two people in the country

13   that have the expertise and the resources necessary to take care

14   of these bonobos that are also willing to do it.

15   Q.   And that's you and Dr. Hopkins?

16   A.   That's my testimony.

17   Q.   Nobody else at any other research institutions?

18   A.   I mean, I haven't polled everyone.  I would be welcome to

19   polling people, but -- sometimes I feel like I want to poll

20   people.

21   Q.   What about Dr. Savage-Rumbaugh, does she have the

22   qualifications?

23   A.   No.

24   Q.   She doesn't have the qualifications to care for these

25   bonobos; that's your testimony?

1   A.   That is my testimony.

2   Q.   Now, Dr. Tag, I'm sure the court is wondering and the

3   question in my mind is, you're the first and only witness who's

4   made that statement here during this proceeding, and you've been

5   sitting here listening to the testimony.

6          Does that surprise you that you are the only person

7   currently in control of these bonobos who has that opinion that

8   Dr. Sue Savage-Rumbaugh is unable to care for these bonobos?

9   A.   I don't recall you asking anyone else; but with that said,

10  you know, there's a reason -- the folks that were -- there

11  weren't anyone who would be qualified to make that statement

12  that you brought into the witness box -- I'm sorry, whatever

13  this place is called, except for Dr. Gilmore.

14  Q.   So you and Dr. Gilmore are the only ones qualified?

15  A.   To make a determination of whether or not

16  Dr. Savage-Rumbaugh is qualified to take care of the bonobos?

17  Q.   Correct.

18  A.   Out of all of the people that have been in this seat that I

19  am in right now, yes.

20  Q.   Okay.  Do you know who Dr. Russ Tuttle is?

21  A.   I do.

22  Q.   And you would agree with me that Dr. Russ Tuttle is one of

23  the foremost primatologists in the world, is that correct?

24  A.   He's certainly -- I don't know if one of the foremost, but

25  he's certainly a very well known primatologist.

1  Q.  You believe that Dr. Russ Tuttle's opinions with respect to

2  primatology should be respected?

3  A.  I do.

4  Q.  And that those opinions should be listened to?

5  A.  Yes.

6  Q.  Now, you testified about this facility and the beautiful

7  outdoor grounds, is that right?

8  A.  Uh-huh.

9  Q.  The play yard?

10  A.  Yes.

11  Q.  You told the court that it was important for these bonobos

12  to be in trees to forage and they are -- let me get it straight.

13  I'm not a scientist?

14  A.  I don't think I said that.  I don't think I said trees.

15  Q.  Arboreal?

16  A.  Yes.

17  Q.  Is that the word?

18  A.  I said they are arboreal.  They like to climb and be up

19  high, yes.

20  Q.  Okay.  Do they actually go into the forest, though, in the

21  facility?

22  A.  They do not.  They have their -- I guess depending upon your

23  definition of the forest, my definition of the forest does not

24  accurately describe those two bonobo yards.

25  Q.  Your definition of the forest doesn't include trees?

1   A.   No.  The bonobo yards are not forest.  A forest includes

2   trees.

3   Q.   You said it was important for them to go in the trees,

4   though?

5   A.   No, I didn't say that.  I said they are arboreal in the

6   wild.  It's important for them to climb and go up high.

7   Q.   Okay.  But not necessarily --

8   A.   I think the record will reflect that's what I said.

9   Q.   Not necessarily in trees?

10  A.   No, not necessarily in trees.

11  Q.   So you described this wonderful facility with lots of acres.

12  They don't go in the forest, is that right?

13  A.   They do not go in the forest.  I will add that the

14  chimpanzees that we hope to bring there have a yard that's

15  eight-and-a-half acres that could be described as a forest given

16  that it has hardwood trees on it.  In fact, I think we call it

17  the chimpanzee forested yard.

18  Q.   You mentioned an infirmary, is that right?

19  A.   I did not mention an infirmary.

20  Q.   During your testimony yesterday?

21  A.   I may have.

22  Q.   Okay.

23  A.   Yeah, it was one of the improvements that we're planning for

24  the building.  I don't actually remember me mentioning it, but --

25  Q.   It's not actually functional right now, is it?

1  A.  It is.  We are at the point now where we are trying to fund

2  its construction.  Given the space, we don't actually have a

3  whole lot to do.  It's a lot of outfitting it with equipment.

4  The modifications required to actually -- there's no major

5  structural modifications that need to be done.  We need to

6  acquire additional equipment and have it installed.

7  Q.  And, Dr. Tag, it will help us be more efficient here today

8  if you just answer the question that I'm asking.

9  A.  Okay.

10 Q.  And my specific question was, it's true that the infirmary

11 is not functional today, isn't that right?

12 A.  That is correct.

13 Q.  Okay.  It's true that one of the lexigram keyboards is not

14 fully functional today, isn't that right?

15 A.  I don't -- no, that's not correct.  One of the lexigram

16 keyboards?  The majority of the lexigram keyboards are pieces of

17 paper.  As far as I know, pieces of paper don't have any lack of

18 functionality, unless they're no longer available or destroyed,

19 so --

20 Q.  With respect to the electronic ones, is it your testimony

21 that they're all fully functional?

22 A.  There are two electronic ones, and to the best of my

23 knowledge, both are fully functional.

24 Q.  Dr. Tag, earlier in your direct testimony, you specifically

25 said that you didn't believe that you were voted on to the IPLS

1  board, is that correct?

2  A.  To the best of my knowledge, I've never been a member of

3  that board.

4  Q.  Okay.  I am going to go ahead and identify for you Exhibit

5  54 and take a look at that large notebook.

6  A.  I don't know if I can lift it.

7  Q.  Go ahead and turn to Exhibit 54.

8         Do you have Exhibit 54 in front of you?

9  A.  I'm not there yet.

10        Okay.  Yes, I'm there.

11  Q.  Exhibit 54 appears to be minutes of a board meeting for the

12  Iowa Primary Learning Sanctuary, and you understand that to be

13  IPLS, correct?

14  A.  Yes.

15  Q.  And on the first page of these minutes, it says, the

16  following officers were elected, and it includes Jared

17  Taglialatela as vice president.

18        Do you see that?

19  A.  I do see that.

20  Q.  Would you go ahead and flip to Exhibit 55.

21        Do you see Exhibit 55?

22  A.  Yes, I'm here.

23  Q.  And these are, again, minutes by unanimous consent of

24  December 18, 2013 reorganizational meeting of IPLS, correct?

25  A.  That's what is stated at the top.

1  Q.  And then on the second page, it says that you, Jared

2  Taglialatela, shall be appointed to scientific program manager,

3  is that right?

4  A.  That's what it says, yes.

5  Q.  And that's of IPLS, is that correct?

6  A.  It looks like it, yeah.

7  Q.  So that's something that you were mistaken about in your

8  direct?

9  A.  I said to the best of my knowledge.  I mean, the first

10  document is not signed; but, you know, I said to the best of my

11  knowledge, I was never elected to IPLS.

12  Q.  And, Dr. Tag, that testimony was mistaken, correct?

13  A.  To the best of my knowledge, I was never a member of IPLS.

14  Q.  Okay.  As we see here in these exhibits, that testimony was

15  mistaken, is that right?

16  A.  Well, to be quite honest, I don't know that that testimony

17  is not correct because still, to the best of my knowledge, I

18  would have to consult with someone who could verify -- I've

19  never -- to the best of my knowledge, I've never seen this

20  document before, and so --

21  Q.  Let's talk about some other documents that you may not have

22  seen.

23  A.  Okay.

24  Q.  Prior to being appointed to the Director of Research --

25  A.  Yes.

1  Q.  -- for ACCI --

2  A.  Yes.

3  Q.  -- had you ever seen the settlement agreements that were

4  approved by this court?

5  A.  I don't believe that I have -- that I had clearly seen them,

6  no.

7  Q.  And you hadn't read the research provisions that were

8  included in those settlement agreements prior to accepting your

9  position as Director of Research at ACCI, correct?

10  A.  To be quite frank, I don't recall when I first saw the

11  settlement agreements.  If I didn't see them before, I clearly

12  didn't read the research provision.

13  Q.  So you clearly didn't rely on them when you assumed this

14  role?

15  A.  Again, if I didn't see them before, I didn't -- I haven't

16  read them, I wouldn't have relied on them.

17  Q.  So if you didn't see them, you wouldn't have read them, and

18  if you hadn't read them, you wouldn't have relied on them?

19  A.  Yes.

20  Q.  Correct?

21  A.  Yes.

22  Q.  You wouldn't have incorporated any of the information in the

23  settlement agreements into your understanding of what your role

24  was, correct?

25  A.  My understanding at the time, to the best of my

1  recollection, of what my role is, what Dr. Savage-Rumbaugh and I

2  talked about over the phone, what was written in e-mails to me

3  and what my discussions with the then board was, were, and that

4  was to take the research in the directions that we saw fit.

5  Q.  I appreciate that.  That's interesting.

6          Dr. Tag, you had a chance to say that when you spoke

7  with Mr. Miller.  My question is, you didn't incorporate any of

8  the information from the settlement agreements approved by this

9  court into your understanding of your role as Director of

10  Research of ACCI, isn't that correct?

11  A.  Yes.

12  Q.  You don't know what the research agreements -- excuse me,

13  what the settlement agreements said about co-ownership, correct,

14  prior to assuming this position?

15  A.  Again, to the best of my recollection, it's possible I did

16  see the settlement agreements before December 18, 2013.  To the

17  best of my recollection, the answer is no.

18  Q.  And you've made that very clear and we understand.  All I

19  can ask for is the best of your recollection.

20  A.  Okay.

21  Q.  You didn't know what the settlement agreements said about

22  co-ownership prior to accepting that position, correct?

23  A.  That is to the best of my recollection, yes.

24  Q.  You didn't know what the settlement agreements said about

25  the emotional welfare, the physical welfare of these bonobos

1  prior to accepting your position, isn't that correct?

2  A.  Again, yes.

3  Q.  You don't know what the settlement agreement says about the

4  research trajectory -- no reason to roll your eyes.

5  A.  I'm sorry.

6  Q.  I want to make sure that we have a clear record here.

7  A.  I apologize.

8  Q.  You don't know what the settlement agreement said about

9  research trajectory before accepting your position?

10  A.  I didn't know what the settlement agreement said about

11  anything if I hadn't seen it before December 18, 2013.

12  Q.  Your counsel, Mr. Miller, talked about boundaries in his

13  opening statement.

14          Do you remember that?

15  A.  I do.

16  Q.  Dr. Tag, do you think that you're bound by these settlement

17  agreements in your current position at ACCI?

18  A.  I've been advised that I am.

19  Q.  That's your understanding?

20  A.  Yes.

21  Q.  And you can testify to the court you believe you're bound by

22  these settlement agreements?

23  A.  Again, that's what I've been advised, yes.

24  Q.  But you don't know what was in them prior to accepting this

25  role at ACCI?

1  A.  Right.

2  Q.  Now, Dr. Tag, we talked about -- Mr. Miller talked with you

3  about the Yerkes Research Center?

4  A.  Yerkes National Primate Research Center.

5  Q.  Yerkes National Primate Research Center?

6  A.  That's right.

7  Q.  Do they use an acronym or has it always just been Yerkes?

8  A.  Just Yerkes.

9  Q.  You told Mr. Miller yesterday, I believe, that you don't

10  believe there's been any assurances by ACCI that they have

11  promised Yerkes that the Rumbaughs wouldn't be involved, isn't

12  that right?

13  A.  I told them that there was a caveat to that because the

14  initial statement -- the initial questionnaire was distributed,

15  was asked to be completed.  I wasn't charged with that answer

16  because we divided it up, and I think the first question, if I'm

17  not mistaken, was do Dr. Sue Savage-Rumbaugh or Dr. Duane

18  Rumbaugh have any involvement, and then there was some second

19  clause which I thought was in Lyle Simpson's, Mr. Simpson's

20  testimony.  And, to be quite frank, I can't remember the

21  wording, but it said something to the effect of any future

22  involvement of those two individuals.

23          I don't recall the answer that was given, but given

24  that context of that document -- and I hope I'm still answering

25  your question -- Dr. Savage-Rumbaugh was not at the facility,

1   was not involved.  So we simply -- I'm guessing what we simply

2   would have answered or what I would have advised at the time was

3   that Dr. Savage-Rumbaugh is not involved.  So just say she's not

4   involved.  She's living in New Jersey.  That's what we all knew

5   to be the truth.

6   Q.  Okay.  And I don't think you answered my question, and I'll

7   ask respectfully again, because we're under time constraints, if

8   you could focus on the question I asked.

9   A.  I'm doing my best.

10  Q.  Yesterday you testified that you didn't fill out that

11  questionnaire, is that right?

12  A.  I didn't fill out that answer.

13  Q.  Today, just 30 seconds ago, we heard a little bit of

14  discussion about what you think they might have answered if you

15  advised at the time.  I want to be very clear.  Did you fill out

16  the questionnaire?

17  A.  I filled out part of the questionnaire.

18  Q.  Did you fill out that question regarding the Rumbaughs?

19  A.  To the best of my recollection, no.

20  Q.  Do you know what the answer was given then by ACCI?

21  A.  To the best of my recollection is the details I just gave

22  you, which I think you're now telling me not to give you.

23  Q.  Dr. Tag, do you know who responded to that question in the

24  questionnaire?

25  A.  I don't off the top of my head.  In all likelihood -- would

1  you like me to speculate?

2  Q.  I don't need you to speculate.  Can you tell us here today

3  who filled it out?

4  A.  I don't know.

5  Q.  Did you ever see the answer to that question after it was

6  completed?

7  A.  I probably did, and I don't know -- I don't recall it at the

8  time.

9  Q.  So you can't tell us here today what ACCI's response was to

10  that question by Yerkes regarding the Rumbaughs' involvement in

11  the research, correct?

12  A.  With certainty I cannot.

13  Q.  Well, you can't tell us with any reasonable indication of

14  what it might be; you don't know one way or the other?

15  A.  Well --

16  Q.  Correct?

17  A.  I'm not trying to be difficult.  No, that's not correct.  I

18  asked you earlier, you said the best thing you can ask me for is

19  my best recollection.  I have a vague recollection of some

20  discussion of that answer.  I wasn't the one who was responsible

21  for preparing it.

22          I'm just trying to answer your question as honestly as

23  I can.  I mean --

24  Q.  I appreciate that because we didn't hear that testimony

25  yesterday, okay.  So I want to be very clear.  Yesterday you

1 testified you didn't fill out the response to that question.

2 A.  Yes.

3 Q.  Okay.  That was your testimony again here today?

4 A.  Yes.

5 Q.  You didn't fill it out?

6 A.  Yes.

7 Q.  You don't know with certainty who did fill it out?

8 A.  Yes.

9 Q.  And you don't know if you ever saw it after it was filled

10 out?

11 A.  I'm sure I saw it after it was filled out because I'm sure

12 someone sent it to me saying, are we okay to send these?

13 Q.  So because the court didn't hear that testimony yesterday,

14 could you tell us what the response said?

15 A.  With certainty I cannot tell you what the response said.

16 Q.  Do you have any specific recollection of what this response

17 to this specific question said, Dr. Tag?

18 A.  I think I said that.  I think that it probably said that

19 Dr. Savage-Rumbaugh wasn't there, was no longer with -- or

20 wasn't with our organization and was living in New Jersey.

21 Q.  So ACCI did assure Yerkes that the Rumbaughs -- Dr.

22 Savage-Rumbaugh was not working at the Great Ape Trust?

23 A.  I don't see how that's an assurance.  That's a statement of

24 fact.

25 Q.  In fact, it's your impression that Dr. Sue Savage-Rumbaugh

1  being absent from the lab is a condition of Yerkes sending any

2  apes to the Great Ape Trust, isn't that correct?

3  A.  That is not correct.  But, if I may, I think that given that

4  we've told them that, it would be quite -- you know, it might be

5  an issue if we were to change, reverse our position on that.

6  Q.  But, Dr. Tag, it was your impression that it was necessary

7  for you to make that representation to them, isn't that correct?

8  A.  I don't believe that is correct.  It was a statement of

9  fact.

10  Q.  Dr. Tag, did you give a deposition in this case?

11  A.  Yes, I did.

12  Q.  Did you promise to tell the truth in that deposition?

13  A.  I did.

14  Q.  And you've had an opportunity to review your transcript

15  after it was finished?

16  A.  I have, yes.

17  Q.  There's a copy of your transcript on the ledge right there.

18  I'm going to draw your attention to page 119 in your deposition

19  transcript.

20  A.  Okay.

21  Q.  Are you at page 119?

22  A.  I am.

23  Q.  Now, on page 119 you were asked:

24          "Q.  Has Yerkes conditioned any proposals or contracts

25       or agreements with ACCI on Doctor Rumbaugh having no access

1      to the bonobos in Des Moines?

2         "A.  Not formally, but initial discussions --

3      initially there was a discussion between myself, Doctor

4      Hopkins, and members of Yerkes, say, executive staff or

5      whatever.  At that time Doctor Rumbaugh had no involvement.

6      We made it clear to them that that was the case.

7         "Q.  Was it necessary for you to make that clear to

8      them?

9         "A.  It was -- I was of the impression it was

10      necessary."

11      Did I read that accurately?

12 A.  You did.

13 Q.  So at the time of your deposition you had the impression

14 that it was --

15 A.  Apparently I did.

16 Q.  Well, apparently at the time of your deposition?

17 A.  That's what it says right here, it was, I was of the

18 impression it was necessary.

19 Q.  Is that true today?  Is it necessary --

20 A.  Didn't I just answer the question?

21 Q.  I'm sorry?

22 A.  I just answered that question.

23 Q.  I'm asking, is it true today that Doctor -- that it's

24 necessary that you made clear to Yerkes that Dr. Savage-Rumbaugh

25 be banned from the lab as a condition of them sending any

1  chimpanzees or working with the Great Ape Trust?

2  A.  Can you restate?

3  Q.  Sure.  Is it true that it's necessary for ACCI to explain to

4  Yerkes that Dr. Sue Savage-Rumbaugh has been banned from the lab

5  as a condition for Yerkes working with ACCI?

6  A.  I would say that if Dr. Savage-Rumbaugh were to be involved

7  at this point, I would need to explain something to Yerkes.

8  Conversations with Yerkes have evolved since this deposition was

9  taken, and so that may have changed my opinion of what my

10 impression is today, you know, sort of post hoc, if you will, I

11 guess.

12 Q.  Let's talk about that.  We didn't hear that during your

13 direct examination.  What conversations have you had with

14 Yerkes?

15 A.  So, to give some context if I may, I don't want to prolong

16 anything unnecessarily, we approached Yerkes at a time I can't

17 remember now to bring chimpanzees to the facility.  Quite

18 frankly, we did that because there's an empty building that is

19 far superior than any building Yerkes has to offer any ape, as

20 well as this large outdoor eight-and-a-half acre yard.  We

21 wanted -- these are chimpanzees I've worked with since 2004.  I

22 know them.  I know them as individuals.  I don't like where they

23 live.  I don't like a lot of other things about where Yerkes --

24 Q.  And, Dr. Tag, I apologize --

25 A.  That's okay.

1  Q.  -- I hate to interrupt.  For the purposes of moving forward,

2  my question was, you gave an answer during your deposition, you

3  just explained to the court that apparently that was your

4  impression then?

5  A.  Right.

6  Q.  You've just testified there's been conversations with Yerkes

7  between January of this year and as we sit here today.  This is

8  a very important issue.  What are those conversations that

9  you've had with Yerkes since then?

10  A.  What I was trying to get to is that we've had conversations

11  with Yerkes -- I don't know exactly how many, but there have

12  been more than two -- face-to-face meetings discussing the

13  possibility of bringing chimpanzees to our facility in

14  Des Moines and housing them in that building.

15  Q.  Is it still your impression that as a condition of them

16  doing that that it's necessary for Dr. Sue Savage-Rumbaugh to

17  not be in the lab?

18  A.  Yes.

19  Q.  Okay.  Now, let's talk about when you were voted onto the,

20  what we now know as the IPLS board.  Subsequently that became

21  the ACCI board, correct?

22  A.  I'm sorry, could you restate?  I didn't hear the first part

23  of the question.

24  Q.  Let's just talk about when you were voted onto the IPLS

25  board.  We've now seen that was the IPLS board and that

1    subsequently became the ACCI board, is that right?

2    A.   I don't know -- I didn't have any knowledge I was on that.

3    Q.   You don't even know what you were voted onto, is that

4    correct?

5    A.   I thought I was voted onto the ACCI board.

6    Q.   And that turned out to be incorrect?

7    A.   I'm not sure it turned out to be incorrect.

8    Q.   Okay.

9    A.   There may be a document just like this one that has ACCI on

10   it.

11   Q.   It is true that IPLS no longer exists, correct?

12   A.   It is true that IPLS was dissolved by the Attorney General

13   of the State of Iowa.

14   Q.   My question was slightly narrower, Dr. Tag.

15           It's correct that IPLS no longer exists, correct?

16   A.   Sure.  In a legal sense, I guess.  I don't know.  I'm not an

17   attorney.

18   Q.   Well, you've stated it.  You've said as much, IPLS no longer

19   exists, correct?

20   A.   When did I say -- I'm unsure when I may have said that.

21   Could you give me context of when I said that?

22   Q.   I would be happy to.  Let me ask you today, is it your

23   testimony that IPLS does exist?

24   A.   My understanding now, again, not being an attorney, is

25   that -- which IPLS can be retroactively restarted because once

TROGLIA/LATELLA - CROSS

552

1  this sort of lien is paid.  In fact, we've had now discussions

2  among the ACCI board and that subset of individuals as to how

3  that actually would happen when finances permitted.

4  Q.  But as we sit here today, IPLS no longer exists, correct?

5          MR. MILLER:  Your Honor, I'm going to object that he's

6  both asked and answered and calling for a legal conclusion.  The

7  witness has testified, and it's clear from the record, he's not

8  a lawyer.

9          THE COURT:  I will accept his lay opinion.

10  A.  It's been dissolved.  To me, if I no longer exist, I can't

11  be recreated.  My understanding now is that IPLS can be

12  reconstituted or whatever because -- so, I guess, that would be

13  my --

14  Q.  And I appreciate that, but neither the court nor I am

15  interested in metaphysics right now.

16          Is it correct that IPLS no longer exists?

17  A.  Yeah.  I thought I just said that.  I was using the analogy,

18  but yes.

19  Q.  Okay.  I'm going to go ahead and draw your attention to

20  Exhibit 105.

21  A.  Okay.

22  Q.  If you can look at your exhibit binder.

23  A.  The big one here?

24  Q.  Yes, it is.

25  A.  All right.  I apologize trying to get to these pages.

1          Okay.  I'm back.

2     Q.  Okay.  Exhibit 105 is an e-mail from you to the directors of

3     the board, correct?

4     A.  Yes, it is.

5     Q.  Dated March 14, 2014?

6     A.  Yes, it is.  I will note that it's an e-mail that was

7     forwarded apparently from Dr. Savage-Rumbaugh to Dr. Bill

8     Zifchak and a couple of other folks.  It's not my original

9     e-mail.

10    Q.  Correct.  And that's not something that we're interested in

11    today.

12    A.  Okay.

13    Q.  But the body of the e-mail on that first page is from you,

14    correct?

15    A.  It looks like it's from me, but since it's forwarded, I

16    can't verify the entire contents of it.

17    Q.  Let's take a look at your e-mail address --

18    A.  Yeah, that's --

19    Q.  jtaglialal@kennesaw.edu, is that your e-mail address?

20    A.  Yes, it is.

21    Q.  Do you have any reason to believe you did not write this

22    e-mail on March 14, 2014?

23    A.  To be frank, over the past year-and-a-half, there has been

24    some shady things that have occurred involving members of

25    Dr. Savage-Rumbaugh's counsel, and I'm concerned that perhaps

1  somewhere in this document something I wrote has been

2  misrepresented.  I mean, that would be my only concern.

3  Q.  You think the document has been altered?

4  A.  I'm not saying it has.  I'm just saying I would be concerned

5  it might have, if I can't verify that.  If it came from my

6  e-mail address and it was electronically out of my mailbox, I

7  would certainly be obvious to verify it.

8  Q.  Do you have any reason to believe as we sit here today that

9  it's been altered?

10  A.  I don't have any specific reason to believe that, no.

11  Q.  As you see in the top right-hand corner, this was a document

12  that was introduced during your deposition.

13          Do you remember that?

14  A.  I don't remember it specifically, but --

15  Q.  Do you see that exhibit stamp?

16  A.  Yeah.

17  Q.  In fact, it's Exhibit 1?

18  A.  Okay.

19  Q.  Do you recall raising any concerns about the document being

20  altered during your deposition?

21  A.  I mean, I would have to check my deposition testimony.  I

22  remember raising a concern about some document that was

23  forwarded as well.  I don't recall if it was this one or not,

24  for the same reason.  I'm just -- I'm not going to say anything

25  else.

1       MR. STAMBAUGH:  Your Honor, at this time I would move

2  to admit Exhibit 105 into evidence.

3                         (Defendants' Exhibit 105 was

4                          offered in evidence.)

5       MR. MILLER:  Your Honor, objection; lack of

6  foundation, also it includes hearsay.

7       THE COURT:  105 is received, subject to the objection.

8                         (Defendants' Exhibit 105 was

9                          received in evidence.)

10 BY MR. STAMBAUGH:

11 Q.  I'm going to go ahead and publish Exhibit 105, Dr. Tag.  We

12 started this discussion with the question of whether IPLS exists

13 any longer.

14 A.  Uh-huh.

15 Q.  I'm going to draw your attention to the second full

16 paragraph in your e-mail to the directors.

17 A.  Uh-huh.

18 Q.  In the second-to-the-last sentence or the last sentence of

19 that second paragraph you state, "Moving forward, IPLS will no

20 longer exist."

21       Do you see that?

22 A.  Yes.

23 Q.  And you wrote that as of March 14, 2014?

24 A.  Yes.

25 Q.  And you were truthful at the time?

1   A.  Yes.  And the reason I wrote that is because we were

2   talking -- this was not a legal document and I'm not an

3   attorney, and this was a matter of a branding issue.  Go do an

4   Internet search for Great Ape Trust or IPLS and you get all

5   sorts of things that are -- you know, we needed to move past

6   that in order to gain some scientific credibility.  That is, you

7   know, what I intended in writing this document.  I certainly had

8   no legal -- or never tried to do that.

9   Q.  Let's go ahead and talk about this document for a bit.

10  A.  Sure.

11  Q.  You wrote it to both the board members of both ACCI and BHI,

12  correct?

13  A.  That appears to be correct, yes.

14  Q.  The first sentence says, "It is with great pleasure that I

15  provide you with an update regarding the Iowa Bonobo family," is

16  that correct?

17  A.  Yes.

18  Q.  In fact, Dr. Tag, you hadn't communicated with any BHI board

19  members for approximately four months before that?

20  A.  I think that would be incorrect.  I had conversations over

21  the phone with Dr. Savage-Rumbaugh in January, if I'm not

22  mistaken.  I spoke with Mr. Zifchak over the phone I believe in

23  February or March, called me at my home.

24  Q.  Is Mr. Zifchak a member of the BHI board?

25  A.  No, but I'm -- okay.  Sorry.  Not to my knowledge, he is not

1    a member of the BHI board.

2    Q.   What are you referring to when you say "the Iowa Bonobo

3    family"?

4    A.   I'm referring to the bonobos that lived in residence at the

5    facility at the time.

6    Q.   You talk about making monthly trips to Des Moines.  What did

7    you mean by that?

8    A.   I travel to Des Moines on a monthly basis.

9    Q.   It was your testimony on direct examination that you spend

10   approximately six days a month, per month at the facility, is

11   that right?

12   A.   Since December of 2013, that's correct.

13   Q.   How many days did you spend in January of this year at the

14   facility?

15   A.   I would have to check that record.  I don't have that in

16   front of me.  Basically I use my credit card because I use

17   American Express for everything and I look at charges that are

18   in Des Moines.  I don't have specific recollection of my travel

19   dates for January of this year.

20   Q.   You don't keep a log of your research that you do at the

21   facility by date?

22   A.   I do.  That's what -- I would verify it in those ways, sure.

23   Q.   You just told me that you verify it by reference to your

24   credit card receipts?

25   A.   Well, unfortunately, there are days when I'm in Des Moines

1    that I'm not able to be at the facility, such as being in

2    federal court.

3    Q.  Well, this is the first time you've been in federal court

4    over these bonobos?

5    A.  It is the first time I've been in federal court at all, but

6    I also --

7    Q.  Now, you mentioned that you have 420 e-mails in your inbox,

8    that you spend 35 hours a week, I believe --

9    A.  That's correct.

10   Q.  -- working on these bonobos?

11   A.  Working on ACCI, yes.

12   Q.  But yet you've only had time to respond to BHI requests to

13   visit until you had to come here today and answer to the court

14   regarding the proceedings in this case?

15   A.  Can you restate the question?

16   Q.  Sure.  How many visits by BHI board members have there been

17   in the last 18 months?  I counted two.

18   A.  Yes, off the top of my head, I believe it's two as well.

19   Q.  Okay.  We heard Dr. Laurent Dubreuil's description, four to

20   five hours last fall, is that right?

21   A.  That was -- yes.

22   Q.  And Dr. Derek Wildman's visit in March of this year?

23   A.  I think he said April, I think he's right.

24   Q.  In April of this year?

25   A.  Yes.

1  Q.  Okay.  So during the 35 hours that you spend a week on these

2  animals, there wasn't time to allow any other BHI board members

3  to visit the facility, is that right?

4  A.  Well, I spend six days a month approximately, and given that

5  this is the subject of a, whatever we call this, lawsuit, I felt

6  it was important to be present when these visitations were

7  occurring.  As Dr. Wildman testified yesterday, we go back and

8  forth for scheduling per the normal discussions that any two

9  professionals would come about and settle upon a date.  Dr. Coxe

10  and I did the same thing with I think less than two e-mails.

11  Q.  That's right.  And you settled on a date with Dr. Dubreuil,

12  right?

13  A.  I did, and I changed that date.

14  Q.  And you cancelled it?

15  A.  I postponed it.

16  Q.  Right?

17  A.  I did, yes, I testified to that.

18  Q.  And now you've allowed, for instance, Mr. Roffman to visit

19  the facility after we're here in court for this proceeding, is

20  that correct?

21  A.  I've allowed him to -- no.  He hasn't requested to visit

22  before.

23  Q.  Has anyone else at BHI requested to visit before?

24  A.  Oh, and actually I want to correct something.  I just

25  remembered a third -- Dr. Sally Coxe visited last June after the

1  joint meeting.

2  Q.  And Dr. Sally Coxe has requested to visit again?

3  A.  And she will be there tomorrow.

4  Q.  Tomorrow?

5  A.  Yes.

6  Q.  After this proceeding is over?

7  A.  Yes.  In time, tomorrow is after today, so, yeah, it will be

8  after.

9  Q.  Those are the only times that were available to you given

10  your busy schedule?

11  A.  No, that's not correct.

12  Q.  Those are the only times you could agree upon given your

13  busy schedule, is that right?

14  A.  Me and Dr. Coxe?

15  Q.  She and any other BHI board member?

16  A.  No.  No, that's not true.  Dr. Wildman visited in April.

17  Q.  We've got one in April, Dr. Tag?

18  A.  Yeah.

19  Q.  We've got one last August, right?

20  A.  Yeah.

21  Q.  Pursuant to the settlement agreements, you may be aware BHI

22  co-owns these bonobos.  Do you understand that?

23  A.  I understand.

24  Q.  Do you believe that ownership means access to these bonobos?

25  A.  I believe that if ownership doesn't involve any inherent

1   risks associated with that access, then yes.

2   Q.  It's your testimony to the court that you are going to

3   determine whether there are inherent risks when BHI, the

4   co-owners of the bonobos, ask to see them whether or not they'll

5   be allowed access?

6   A.  I'm specifically referring to Dr. Savage-Rumbaugh.  Everyone

7   else is welcome to access them, is welcome to visit the facility

8   and they can -- as long as they're willing to abide by our

9   safety protocols, go wherever they want to go or as Derek

10  Wildman testified yesterday, I did not restrict his access in

11  any way.

12          But I'm telling you that I haven't had requests from

13  Dr. Roffman -- I'm sorry, from Mr. Roffman prior to whenever his

14  initial request came and we tried to settle on a date.  Dr. Coxe

15  asked me to visit last June, I guess it was, and we settled on a

16  date very quickly, and she asked to visit again most recently

17  and we settled on a date very quickly.  Dr. Wildman asked to

18  visit and we settled on a date relatively quickly.

19  Q.  There's been about three visits in about 18 months, correct?

20  A.  Correct.  And there's probably been four requests.

21  Q.  Okay.  Dr. Wildman visited in April?

22  A.  Yes.

23  Q.  He sent you a request or you talked about --

24  A.  We talked about it.

25  Q.  -- you sending him an e-mail in April.

1    A.   Yes.

2    Q.   It's been a month.  You didn't have time to respond?

3    A.   I haven't gotten back to him on it.

4    Q.   Let's go ahead and talk about your appointment to ACCI.

5    A.   Okay.

6    Q.   And I want to bring up Exhibit 1005, which I believe has

7    already been admitted.

8            You can refer to the screen as well since we're

9    publishing.

10           Do you recall testimony regarding Exhibit 1005?

11   A.   I do recall, yes.

12   Q.   This is the letter of recommendation, correct?

13   A.   Sure.

14   Q.   From Dr. Sue Savage-Rumbaugh?

15   A.   Yes, yes.

16   Q.   Okay.  And you relied on this letter?

17   A.   Relied on this letter --

18   Q.   In terms of your appointment to ACCI, you relied on the

19   statements in this letter?

20   A.   I mean, yeah, I considered the statements very carefully.

21   Q.   Okay.  Let's go to page 2, the top of the second page --

22   and perhaps it's page 3.

23           Thank you.

24           The top paragraph reads, "It is my hope that the

25   coming essential transition will proceed smoothly and rapidly.

1  I also hope that, as appropriate, and under Jared's direction, I

2  will continue to do some research with the bonobos, once the

3  needed structural changes and funding are firmly in place."

4          Did you rely on that statement, Dr. Tag?

5  A.  I did.  I relied on that statement and specifically it was

6  in conjunction with phone conversations that Dr. Savage-Rumbaugh

7  and I had.

8  Q.  Has there been any planned research that's appropriate under

9  your direction for Dr. Savage-Rumbaugh?

10 A.  Dr. Savage-Rumbaugh hasn't specifically submitted a research

11 proposal or even written me any sort of correspondence

12 requesting any research activity.

13 Q.  Did you not plan on Dr. Savage-Rumbaugh having any

14 involvement; you just didn't tell her in response to this

15 e-mail?

16 A.  I took that e-mail and what she stated in it and what she

17 told me on the phone as what she intended.

18 Q.  And do you expect today that Dr. Savage-Rumbaugh will have

19 any involvement in the research going forward?

20 A.  I think that, you know, we have grave concerns regarding

21 Dr. Savage-Rumbaugh's access to the apes because of specific

22 safety concerns.  If Dr. Savage-Rumbaugh wants to submit a

23 research protocol and we are able to have a conversation and

24 figure out what specifically she wants to do and we think we

25 could do it in a safe way and have some assurance of her safety,

1  I assume that the hurdle beyond that would be IACUC, I guess.  I

2  don't --

3  Q.  Let's go ahead and publish Exhibit 30.

4  A.  Are these in here, can I ask?  It's hard to turn.  Are

5  these --

6  Q.  They're in the large exhibit binder.

7  A.  30?

8  Q.  30, yes.  Please do refer to the hard copy if you want.

9         Go ahead and take a look at Exhibit 30 that's been

10  published.

11  A.  Okay.

12         (Discussion off the record.)

13  BY MR. STAMBAUGH:

14  Q.  Dr. Tag, do you have Exhibit 30 in front of you?

15  A.  Yes, I do.

16  Q.  This is an e-mail from Lyle Simpson copying you on July 1,

17  2013, correct?

18  A.  Yes, it appears that's correct.

19  Q.  This is during the so-called transition period in which you

20  testified Dr. Savage-Rumbaugh was cocooned, correct?

21  A.  Well, Dr. -- Mr. Simpson didn't mention that to me until

22  what would be October of 2013.

23  Q.  But this is the time period when she would have been, quote,

24  cocooned?

25  A.  I wouldn't be able to say.  What I took Mr. Simpson to be

1    saying was that, as of my arrival in approximately October of

2    2013, that she was, quote/unquote, cocooned.

3    Q.   And was this part of this transition plan on July 1, 2013?

4    A.   I don't know.  I did receive this e-mail, and to be quite

5    honest with you, I don't recall reading it very closely.

6    Q.   Well, Dr. Tag, did you read the e-mails from Mr. Simpson?

7    A.   You know, this is before -- I mean, I was a Bonobo Hope

8    board member.  If I read this e-mail, which I'm sure I may have

9    skimmed through if I got it, you know, that's a very busy

10   research time, and it's possible that I didn't read very closely

11   this e-mail, but I definitely received it.  I'm not denying

12   that.  That's my e-mail address.

13   Q.   We understand that you have been very busy.  I can

14   appreciate that.

15         How many peer-reviewed publications have been made by

16   ACCI since you took over as Director of Research?

17   A.   I believe Mr. Miller asked that.  It is zero.

18   Q.   That is none?

19   A.   That is none.

20   Q.   Okay.  Let's go back to this e-mail.

21   A.   Yeah.

22   Q.   You don't know if you read -- do you have any specific

23   recollection of reading this e-mail regarding the transition?

24   A.   To be honest, no.

25   Q.   Okay.  Let's take a look at it.

1          Mr. Simpson says in the first paragraph, "We need Sue

2   and she must continue to have a vital role in the success of the

3   Trust."

4          Did I read that correctly?

5   A.  I wasn't following along, but I'm sure you did.

6   Q.  Well, Dr. Tag, for purposes, again, of the court --

7   A.  Okay.

8   Q.  -- and people who are here today, let's go ahead and follow

9   along.

10  A.  Okay.

11  Q.  Take a look at the first paragraph.

12  A.  First paragraph.

13  Q.  Is it correct that Mr. Simpson wrote to others, including

14  you, in July of 2013 and said, "We need Sue and she must

15  continue to have a vital role in the success of the Trust."

16  A.  That is correct.

17  Q.  Okay.  Was that your understanding at the time that he wrote

18  this e-mail to you, that Sue needed to have a vital role in the

19  success --

20  A.  I don't recall anything about this e-mail.

21  Q.  So that's a no?

22  A.  So that's -- that was not my understanding, I guess.

23  Q.  Okay.  Mr. Simpson also wrote in the third paragraph, "We do

24  not want Sue simply to step away.  Neither the bonobos nor the

25  Trust can afford to have that happen."

```
 1              Did I read that correctly?
 2   A.   You did.
 3   Q.   Do you remember seeing that in his e-mail when he wrote it?
 4   A.   No.
 5   Q.   So that was not part of your understanding at the time that
 6   you assumed the role as Director of Research, correct?
 7   A.   Yes.
 8   Q.   Okay.  Dr. Tag, the question again that I have in my mind
 9   and that I would suspect that the court has is when you
10   testified on direct that Dr. Savage-Rumbaugh would be no longer
11   involved in the facility, why weren't you paying attention to
12   the settlement agreements, the e-mail from Dr. Savage-Rumbaugh
13   herself, and the e-mails we've seen from Mr. Simpson?
14   A.   I mean, I think I can answer that very clearly.  I was
15   paying attention to the e-mail that you just showed me -- I
16   forget the exhibit name right now, but I think it was written
17   roughly late in October, or whatever that endorsement letter, as
18   you put it, was, and you said the word "facility."  Being
19   involved in the research and being involved in the facility are
20   two very different things.  I have colleagues that are involved
21   in our research that come and collect data.  They don't have
22   anything to do with the day-to-day operations of the facility.
23              In that same e-mail you showed me from
24   Dr. Savage-Rumbaugh, she mentions things about having -- it may
25   have been another e-mail -- autonomy to run the program, take
```

1  care of the bonobos because you can't separate the bonobos from

2  the research.  That's what we were -- that's what my impression

3  was.  Between what Dr. Simpson -- excuse me, Mr. Simpson told me

4  and Dr. Savage-Rumbaugh told me, I was under the impression that

5  we would have that autonomy.  That was then in my mind affirmed

6  by resolution by both boards.

7  Q.  I want to get this straight.  There's a difference between

8  the research and the facility, is that right?

9  A.  There's a difference between running the facility and

10  operating the facility and doing the research, yes.

11  Q.  So is it your testimony to the court today that

12  Dr. Savage-Rumbaugh can play a role in the research as long as

13  it's not in the facility?

14  A.  I think I -- well, I'll just go back to the answer I just

15  previously gave, which was about Dr. Savage-Rumbaugh, again, if

16  we can be assured that it can be done safely, it's consistent

17  with the mission, that our IACUC approves it, then, yes, a

18  research project would not be impossible I presume.

19  Q.  But you told us this morning that you banned

20  Dr. Savage-Rumbaugh from the lab?

21  A.  I don't think I said I banned her.  I think you asked me --

22  or someone asked me if she continued to have no access, and I

23  said yes, she does not have access.

24  Q.  She doesn't have access today, but you believe that she can

25  be involved in the research at some point indeterminate in the

1  future; is that your testimony here today?

2  A.  That would be.

3  Q.  If she can comply with Dr. Tag's research requirements?

4  A.  If she can comply with the research requirements and safety

5  procedures and standard operating procedures of ACCI and get our

6  IACUC to approve a research proposal and cover the cost of doing

7  such research, then yes.

8  Q.  What if that is inconsistent with the settlement agreements?

9  A.  I'm sorry?

10 Q.  What if your requirements on the research are inconsistent

11 with the settlement agreements?

12 A.  I don't understand.  I don't understand how that would be

13 the case.

14 Q.  You don't understand how you could have requirements that

15 are separate and distinct from the settlement agreements?

16 A.  We have requirements that are mandated or dictated by the

17 United States Department of Agriculture and basically the Office

18 of Laboratory Animal Welfare.  So I don't think a settlement

19 agreement or supplemental agreement could force us to break the

20 law.

21 Q.  Do you believe that you need to operate consistent with both

22 the USDA requirements and the settlement agreements approved by

23 this court?

24 A.  I believe I have to operate -- I'm a scientist, and my

25 expertise --

1   Q.  So you're not bound by the court's settlement agreements?

2   A.  I imagine I would.  I am.

3   Q.  Okay.

4   A.  I --

5           THE COURT:  You're cross-talking.  Let each other

6   finish first.

7   BY MR. STAMBAUGH:

8   Q.  Go ahead.

9   A.  I don't know a situation that would arise with those two

10  things would be in conflict with one another.

11  Q.  That's because you haven't even read the settlement

12  agreement?

13  A.  No.  I've read the settlement agreement.

14  Q.  Dr. Tag, are there any plans to anesthetize the bonobos this

15  year?

16  A.  We have a plan to give them all health surveys, like those

17  described by Dr. Gilmore.

18  Q.  Does that include anesthetizing?

19  A.  Yes, it does include anesthesia.

20  Q.  Was Steve Boers dismissed as executive director of ACCI?

21  A.  Steve Boers, to the best of my recollection, resigned.  But

22  that's --

23  Q.  I'm sorry?

24  A.  Steve Boers, to the best of my recollection, resigned.

25  Q.  Do you know why he resigned?

1  A.  Well, I think I do.  He was --

2         MR. MILLER:  Your Honor, I'm going to -- excuse me,

3  Your Honor.  I'm going to object.  May we approach for a moment,

4  Your Honor, to discuss an issue with you?

5         THE COURT:  I'm sorry, I've lost you.  What was the

6  question again?

7         MR. MILLER:  We're getting into a line of questioning

8  regarding Steve Boers and his employment relationship with the

9  entity, and I would like to explain to you perhaps off the

10  record at a side-bar why I have concerns about that, and then if

11  you think it's appropriate, we would proceed obviously.

12         THE COURT:  Well, have we heard anything previously

13  that he was an employee?

14         MR. MILLER:  Yes, he was previously an employee.

15         THE COURT:  Okay.  What do we need to ask about other

16  than the fact that he was an employee?

17         MR. STAMBAUGH:  The reasons for his resignation, Your

18  Honor, to the extent Dr. Tag knows about it.

19         THE COURT:  Oh --

20         MR. STAMBAUGH:  Your Honor, I'll move on.

21         THE COURT:  All right.

22  BY MR. STAMBAUGH:

23  Q.  So, Dr. Tag, we saw a document today that was an amendment

24  to what was previously marked as Exhibit 1006, and I want to go

25  ahead and have you take a look at Exhibit 1006.

1           And let's bring that up.

2   A.   Is that in here as well (indicating)?

3   Q.   We're going to put it up on the screen.  I believe the

4   exhibit would have the old version of 1006.

5   A.   All right.

6   Q.   Dr. Tag, are you aware that the revised version was given to

7   us three days ago?

8   A.   I'm not aware.

9   Q.   Are you aware that it was given to us literally the night

10  before this proceeding?

11  A.   This document here, I'm not aware of that.

12  Q.   Okay.

13  A.   But you stated that earlier.

14  Q.   I'm actually going to have you take a look at Exhibit 1006

15  in the binder, which will be the last exhibit, the big binder --

16  A.   The last exhibit?

17  Q.   -- the one that we've been looking at, correct.

18  A.   I'm sorry.  The numbers go from 1 to 100 in here.  That's

19  why I ask.

20  Q.   Oh, I apologize.  It will be in the smaller binder, the 1000

21  exhibits?

22  A.   Okay.  I'm there.

23  Q.   Okay.  Go ahead and take a look at what was previously

24  provided to us as 1006 and compare it to this new document on

25  the screen.

1   A.   Okay.

2   Q.   Do you know what the differences is?

3   A.   Yeah.  There were three additional protocols listed on the

4   new document.

5   Q.   And those were added three days ago, correct?

6   A.   No.  They were added whatever the date of approval would be.

7   Q.   So that would be March 1, 2015 for two of them and then

8   April 23 of 2015?

9   A.   Apparently.

10  Q.   Why wasn't that provided to BHI prior to three days ago?

11           MR. MILLER:  Your Honor, objection.  I'm going to

12  object on the basis of relevance.  I'm going to further object

13  because this counsel is aware or should be aware this court

14  previously entered an order whereby the parties agreed there

15  would be no written discovery in this case, and we agreed

16  between us that we would share documents.  We have done so.  Now

17  he's cross-examining my witness based on an allegation that he

18  failed to fulfill a voluntary agreement to exchange documents.

19  I think that's highly inappropriate.

20           MR. STAMBAUGH:  Your Honor, may I be heard briefly?

21           THE COURT:  Certainly.

22           MR. STAMBAUGH:  As Your Honor knows, a main theme in

23  this case is the information that was given to BHI.  Dr. Tag

24  testified to that on direct examination, and I believe his

25  testimony was that he was willing to give any information at any

1   time to BHI board members.  My question goes directly to that

2   issue.

3            THE COURT:  I'm going to receive it, subject to the

4   objection.

5   BY MR. STAMBAUGH:

6   Q.  Dr. Tag, why didn't you give these three protocols to

7   anybody at BHI prior to three days ago?

8   A.  Well, I didn't give them to BHI three days ago.  I guess

9   you're asking me why, when this table was updated, wasn't an

10  update sent to BHI.  I guess to be quite honest, you know, that

11  would have come up in one of our periodic reviews of what we're

12  doing, who is doing what; but as I said, this has been a

13  particularly busy time and I guess we just didn't get around to

14  it.

15  Q.  Dr. Tag, to be fair --

16  A.  Yeah.

17  Q.  -- the court has now heard you mention on a number of

18  occasions, we understand that you're very busy at the lab, that

19  you're too busy to respond to Dr. Wildman's e-mail, you're too

20  busy to have actually gone through the scheduled appointment

21  with Dr. Dubreuil, and you're too busy to simply send another

22  piece of paper to BHI prior to your counsel providing it three

23  days ago?

24  A.  If I may, I am that busy because I have two full-time jobs,

25  one of them I don't get paid for, which is this job; but leave

1  that all aside, so, I mean, I'll put my schedule up against

2  anyone's in this room to be quite frank.  With that said --

3  Q.  You might get taken up on that offer.

4  A.  With that said, with that said, you're bringing up three

5  instances.  I postponed Dr. Dubreuil's appointment because I was

6  meeting with my attorney to prepare for this hearing.  I did not

7  respond to an e-mail from Dr. Wildman.  I didn't send him

8  something that we spoke about, and perhaps that was not a

9  reasonable amount of time, perhaps it was.  He told me he was

10  going to do a paternity test on Kanzi.  I didn't have that -- he

11  hasn't gotten back to me on that either.  So, you know, I didn't

12  send an update.  It's only been a couple -- it hasn't even been

13  three months.  If an update had been requested, I would have

14  sent one.

15  Q.  This is the research, though, Dr. Tag, correct?

16  A.  Yes.

17  Q.  This is what BHI is interested in, correct?

18  A.  I have no idea what BHI is interested in.

19  Q.  I agree with that statement.  And despite their requests,

20  this is the first time, literally the night before this hearing

21  began, that we saw these research proposals.  Can you explain

22  that to the court?

23  A.  That's a misrepresentation.  I'm sorry, Counsel.

24  Q.  The first time that anyone was aware of these three

25  protocols --

1  A.  They've only been approved since March.

2  Q.  Correct.

3  A.  And a document was provided with the other research

4  proposals.

5  Q.  Three days ago.

6  A.  No.  I'm sorry, I thought this document (indicating) --

7  Q.  Oh, the previous proposal.

8  A.  Yeah, yeah, yeah.

9  Q.  Correct, correct, that one page was given.

10       You can't explain why these weren't given to BHI?

11       MR. MILLER:  Your Honor, objection.  This has been

12  asked and answered.  He's badgering.

13       THE COURT:  We'll ask one more question on this

14  subject.

15  BY MR. STAMBAUGH:

16  Q.  Dr. Tag, can you explain why BHI board members were not

17  given any details on these three protocols until three days ago,

18  despite it starting in March?

19  A.  I guess we've been too busy to send an update.  If an update

20  had been requested, it would have been sent.

21  Q.  Okay.  Let me ask a few questions about this update version.

22  I'll make the representation that I have compared them, and it

23  appears that the only change, other than the addition of these

24  three protocols, is the addition of a particular research

25  assistant, is that right?

1  A.  I'm sorry, that's correct, yes, that's a change.

2  Q.  Is that Sara Skiba?

3  A.  Yes.

4  Q.  Who is Sara Skiba?

5  A.  She's our research coordinator.

6  Q.  For ACCI?

7  A.  Yes.

8  Q.  Does she work with you?

9  A.  She does.

10  Q.  Does she work with you in Georgia?

11  A.  She will actually.  She was recently, I think -- my

12  recollection now is February -- was hired as a research

13  coordinator.  I believed I described the details of that

14  position earlier.  She graduated from the University of

15  Wisconsin, Madison, did an internship at the Lincoln Park Zoo in

16  Chicago, moved here on or around mid to end of February of 2015,

17  began working as research coordinator for us and will begin

18  graduate school at Kennesaw State under my direction in -- I

19  guess in August.

20  Q.  So apparently she is an undergraduate student?

21  A.  No.  She's a postgraduate student would be the technical

22  term.

23  Q.  Is she a Ph.D. candidate?

24  A.  She is not a Ph.D. candidate.

25  Q.  She's not yet in graduate school?

1    A.   That's correct.

2    Q.   Dr. Tag, do you ever recall telling a reporter that you were

3    going to start from scratch at ACCI?

4    A.   I don't recall that; but that sounds like something I might

5    have said.

6    Q.   Why would you have said that you were going to start from

7    scratch?

8    A.   Well, from a branding perspective -- I've had a lot of

9    opportunity to talk to people in this community about the

10   facility, educators, people that could give us money,

11   philanthropists, and they are extremely sour, for lack of a

12   better word, on the organization, the facility, just the

13   prospect of all aspects of the bonobos being in Iowa.  And that

14   I guess is sort of my, although I'm not an expert in branding is

15   my sort of way of saying no, no, no, we're going to do things --

16   we're taking a fresh start maybe is a better way to say it.

17   Q.   Fresh start from Dr. Savage-Rumbaugh's research?

18   A.   No.  I don't remember the context that I told this reporter,

19   but it would not be that.  It would be more of an operational

20   standpoint.

21   Q.   Would it refresh your recollection if I showed you a copy?

22   A.   Sure.  That would be great.

23          MR. STAMBAUGH:  Your Honor, may I approach?

24          THE COURT:  You may.

25   BY MR. STAMBAUGH:

1  Q.  Is it true that you told a reporter in August 2014 that you

2  were going to start from scratch?

3  A.  Again, it looks like I did.

4  Q.  Dr. Tag, do you know what a Form 990 is, an IRS Form 990 is?

5  A.  Not off the top of my head, sorry.

6  Q.  Do you know if ACCI has filed a Form 990 for the years 2013

7  or 2014?

8  A.  I do not know.  That's beyond my pay grade.

9          MR. STAMBAUGH:  Your Honor, one moment, please.

10          (Pause.)

11  BY MR. STAMBAUGH:

12  Q.  Dr. Tag, have you ever read the December 2012 resolutions

13  regarding the role of BHI and the oversight of the science?

14  A.  I don't specifically recall them, but maybe looking at them

15  might --

16  Q.  You don't recall as you sit here today --

17  A.  No.

18  Q.  -- reading about the role of BHI when that board was

19  created?

20  A.  I don't.

21  Q.  What sort of data do you collect in the lab today?

22  A.  Are you referring specifically to ACCI or my research

23  program in general?

24  Q.  Correct, ACCI.  You mentioned you're there about six days a

25  month?

1  A.  Yes.

2  Q.  You said you collected data?

3  A.  On occasion.

4  Q.  I'm sorry?

5  A.  I said on occasion because I'm also doing other

6  administrative things, but yes.

7  Q.  All right.  You mentioned, in fact, that you were so busy as

8  we've heard to respond to e-mails, to schedule appointments,

9  that you clean the cages; that was your testimony?

10  A.  That I was so busy that I cleaned the cages?  I was cleaning

11  the cages because we needed help in that area.  So, yes, I do

12  that.

13  Q.  Despite having the busiest schedule of anyone in this room?

14  A.  Well, to be quite frank, you cannot answer an e-mail, but

15  you cannot clean a cage, so I'm triage.

16  Q.  How often do you clean the cages?

17  A.  It doesn't happen very often.

18  Q.  So let's go back to my original question.  What sort of data

19  have you been collecting the last 18 months?

20  A.  So the data that we've collected is we take two forms.  It's

21  all behavioral data.  It's either observational behavioral data

22  or experimental behavioral data, okay.  Observational behavioral

23  data usually involves setting up some sort of scenario, okay.

24  For example, we're doing a study looking at social grouping and

25  communication as it relates to sort of a feeding patch size.  So

1    we would distribute, let's say, some food and then we would let

2    the apes into the area, in their outdoor yards, for example, and

3    we videotape it and take real-time pen and paper data.  So I

4    would describe it as an observational study.

5         Experimental behavioral data is collected.  You

6    present the ape with a scenario and they have to make a

7    selection.  So, for example -- we don't do this, but just to

8    give you a very simple example, you have three, you know, cups

9    or something and one of them is labeled each with a lexigram,

10   and you would, say, hide a food under one and you ask the ape to

11   find it or something like that.  They're often videotaped, and

12   we often take real-time pen and paper data as well.

13        The final data we collect are computer-based data, so

14   the ape is usually given a computer game, for lack of a better

15   way to explain it, and they do that and actually the computer

16   logs the data of those times.

17   Q.  Where do you keep all of this data?

18   A.  So the behavioral data, the observational study data is

19   stored on videotape, obviously, and then it's scored back in my

20   lab in Kennesaw.  There's also pen and paper data, which is kept

21   in notebooks, and then it's transferred to digital -- some

22   individual cataloging.  Sometimes it's Excel.  Sometimes it's a

23   software program called Bentel.  It's like a -- I can't think of

24   the term -- a database program, and then the computer data logs

25   itself, and we, again, keep that on hard drives.

1   Q.  How many in-person meetings has ACCI had since July of last

2   year?

3   A.  In person?

4   Q.  Correct.

5   A.  One in October, we had one in December, and I can't

6   remember -- we have had at least two conference calls, but I

7   don't remember off the top of my head an in-person one, but

8   I'm -- so at least two in-person meetings.

9   Q.  I'm sorry, you said just a second ago at least two

10  conference calls.

11  A.  No, no.  I'm sorry.  At least two in-person meetings; one

12  in, to the best of my recollection, October and one in December,

13  and then at least two additional, sorry, conference calls.

14  Q.  So you think there's been two in-person meetings over the

15  last nine months of ACCI?

16  A.  That is my recollection as of this moment in time.

17  Q.  You mentioned earlier something about, was it a scientific

18  advisory board?

19  A.  Scientific advisory panel, yes.

20  Q.  Panel.  How many times have they met in the last year?

21  A.  We have not met as a group.  Individuals have come and

22  visited, but we haven't met as a group.

23  Q.  You have never met together?

24  A.  That is my recollection, we've never met as a group

25  together.

1   Q.   But you consider it a panel?

2   A.   I consider it a panel.

3   Q.   Do you have any minutes of any proposed meetings or --

4   A.   No, we do not.

5   Q.   -- or strategic plans?

6   A.   We have a strategic plan to bring, again, you know -- if you

7   will, 30 seconds of indulgence -- when we came on board, they

8   were literally, you know, tens of thousands of dollars in the

9   hole.  The lights were going to be shut off.  We've done

10  considerable efforts to reverse that course.  We have a plan, a

11  strategic plan hopefully as soon as the end of the summer to

12  bring those individuals here for a face-to-face sort of

13  conference.

14  Q.   Have you produced this written strategic plan?

15  A.   There may be a file on my computer somewhere with some

16  notes.  I've discussed it with members of the panel.  In

17  particular certain individuals have visited.

18  Q.   So there's not actually a formal written plan?

19  A.   No.  There is no formal written plan, that is correct.

20  Q.   And the scientific advisory panel has never actually met?

21  A.   The scientific advisory panel has never actually met in

22  person all as a group.

23  Q.   Let's talk about funding and trying to keep the lights on.

24  You spoke with Mr. Miller about numerous grants that you were

25  looking forward to?

1  A.  Yes, sure.

2  Q.  How much money has come into ACCI from those grants for the

3  last 12 months?

4  A.  I don't have that number off the top of my head.

5  Q.  You can just give an approximation.

6  A.  Considering we've been paying staff off of those grants

7  since last fall, I'm going to guess that portion would be

8  somewhere around 100, 150 thousand.  We've gotten at least --

9  I'm sorry, I wasn't prepared for this question -- perhaps

10 another 35 to 45 in collaborator per diems, which I described

11 earlier.  I, myself, have gotten some pilot grants and bridging

12 funds that are probably in the neighborhood of 30, and then

13 we've had private donations, which I've not had the opportunity

14 to add up; but I would still say it's probably under $30,000, in

15 the neighborhood, and then corporate sponsorships which are

16 probably in the neighborhood of around 10 to 20 thousand right

17 now.

18 Q.  Funding is important, correct, Dr. Tag?

19 A.  Funding is very important.

20 Q.  But you can't tell us exactly how much ACCI has received?

21 A.  No, I can't tell you that.

22 Q.  And the research is important, correct, Dr. Taglialatela?

23 A.  Yes.

24 Q.  But there haven't been any peer-reviewed publications since

25 you've been in charge?

1  A.  Well, there haven't been any peer-reviewed publications.

2  Q.  Correct.

3  A.  There have not.

4  Q.  The scientific advisory panel you believe is important,

5  correct?

6  A.  I think it's important.

7  Q.  But they've never met?

8  A.  No, but individuals have been in contact with us and

9  visited.  They haven't met as a group.

10  Q.  I want to talk a little bit about Matata's death.

11  A.  Yes.

12  Q.  Is it true that Liz Pugh was not permitted access to the lab

13  24 hours before Matata died?

14  A.  That is not my recollection, no.

15  Q.  You testified that -- did you testify that you were there

16  the day before Matata died?

17  A.  No, I was not there the day before Matata died.

18  Q.  Were you at the lab the day that she died?

19  A.  I was not.

20  Q.  Do you know if Matata was playing outside the day before she

21  died?

22  A.  My understanding she was and I saw a video to that effect.

23  Q.  Is it possible that Matata died because of something she ate

24  outdoors?

25  A.  I'm not a veterinarian.  I have no idea.

1   Q.   Do you know if it's possible?

2   A.   I do not know if it's possible.  I would imagine it's not

3   possible.

4   Q.   Even though you're not a veterinarian?

5   A.   Even though I'm not a veterinarian.  You asked me my

6   opinion.

7   Q.   You testified about the bonobos foraging all day?

8   A.   No, not all day, but they do forage during the course of the

9   day.

10   Q.   And that's important?

11   A.   I think that's very important.

12   Q.   Have you had the water toxicity evaluated since you were

13   appointed Director of Research?

14   A.   I don't understand what you mean by the water.  What water?

15   Q.   The water that's outside, the groundwater.

16   A.   The groundwater.  In the pond?

17   Q.   In the pond, in the area.  Have you seen it rain in

18   Des Moines?

19   A.   You mean when there's puddles, have I tested the water

20   that's in the puddles?

21   Q.   Have you tested the groundwater?

22   A.   I don't know what the term "groundwater" means, and I'm a

23   Ph.D. with no biology behavior.  I don't know what groundwater

24   is.

25   Q.   Do you understand that there's water under the ground?

1    A.   I understand that there is water under the ground.  I have

2    not tested the water under the ground.

3    Q.   Wonderful.  Have you tested the pond water?

4    A.   I have not tested the pond water.  The apes have no access

5    to the water under the ground nor the pond.  The apes drink

6    water as it comes out of the tap that I just drank a couple of

7    cupsful.

8    Q.   Dr. Tag, do you know who Heather Housh is?

9    A.   I do.

10   Q.   Is it correct that Heather has worked and cared for the

11   bonobos for a long time?

12   A.   It's my understanding she's been there for at least a year,

13   but I think more.

14   Q.   Are you aware that she resigned?

15   A.   Yes, of course, I'm aware she resigned.

16   Q.   Are you aware that she resigned because she was fed up with

17   you?

18   A.   I am not aware of that, and I have e-mails from her and

19   personal conversations that directly contradict that.

20   Q.   Dr. Tag, we've heard about these research protocols that you

21   have on the screen here.  Can you give us any further written

22   details about this underlying list of protocols?

23   A.   At this moment?

24   Q.   As we sit here today, trying to determine --

25   A.   Sure.

1   Q.   -- the appropriate location for these bonobos and the

2   research trajectory, correct.

3   A.   Do you want me to go through and explain what each one is?

4   Q.   That isn't my question.

5   A.   I'm sorry; I misunderstood.

6   Q.   My question is, can you provide us or the court with any

7   written details regarding these research protocols?

8   A.   Okay.  I just want to be clear.  Can I provide this court

9   with written details, meaning I would type it out, or provide

10   you with a document that details what's in the protocol?

11   Q.   Dr. Tag, this is not a complicated question.  We have a

12   page-and-a-half of written protocols.

13   A.   Yes.

14   Q.   And I'm not a scientist.  I know His Honor is not a

15   scientist.  Do you have any other written materials as we sit

16   here today?

17   A.   We have the full written protocols that these all refer to.

18   Q.   What does that mean; full written protocols?

19   A.   There's something called an animal use protocol.  It's

20   basically an application.  I think I described this earlier.  It

21   describes to a layperson so that they may evaluate the science,

22   evaluate the need to do the science, evaluate the value of what

23   is the data that are collected and their implications for

24   science, whether it be for human health or otherwise.  A

25   layperson needs to be able to understand those so that the IACUC

1   committee can evaluate that.

2   Q.   Why haven't those been provided to BHI?

3   A.   It's my impression, based on my reading of the rules, that

4   those are confidential documents.

5   Q.   Is BHI on the ACCI IACUC?

6   A.   No.   There's no member of the Bonobo Hope Initiative board

7   on the ACCI IACUC.

8   Q.   You testified that you're willing to give BHI any

9   information regarding the research, correct?

10  A.   Okay.   I would have to check more closely, but I don't think

11  that I could give them IACUC protocols because I believe them to

12  be -- again, not -- I believe them to be confidential.

13  Q.   Have you given any written description of these protocols

14  other than the IACUC protocol?

15  A.   I think I gave a presentation about some of them during that

16  joint meeting, which would only qualify to some of them because

17  it would have been ones that would have been by June, when we

18  met.

19  Q.   Dr. Tag, you've heard testimony that BHI has rescinded the

20  resolution appointing you to the board, correct?

21  A.   I didn't hear that testimony.

22  Q.   You didn't hear the testimony regarding rescinding of the

23  resolution appointing you to the board?

24  A.   I thought I heard --

25  Q.   By Dr. Savage-Rumbaugh?

1   A.   Appointing me to the BHI board?

2   Q.   There seems to be some confusion about which board you were

3   appointed to.  Did you hear any testimony that BHI appointed you

4   to the ACCI board?

5   A.   I don't see how BHI could have appointed me to the ACCI

6   board.

7   Q.   So it's your testimony here today that BHI votes were not

8   necessary to appoint you to the combined board which became,

9   according to you, ACCI?

10  A.   I'm -- no, I'm sorry.  I don't -- I think that there's facts

11  out of whack there.

12  Q.   Let me ask a better question.

13       Do you believe that BHI appointed you Director of

14  Research of ACCI, the BHI board members?

15  A.   No, I don't believe that.  I believe they passed a

16  resolution that gave me the autonomy to lead the research

17  program.

18  Q.   And was that part of your appointment as Director of

19  Research?

20  A.   I don't know.

21  Q.   And you know that that resolution has been rescinded?  Did

22  you hear testimony to that effect?

23  A.   You know, I heard --

24       MR. MILLER:  Objection.  It misstates the record.

25       THE COURT:  He asked if he's heard testimony to that

1 effect.

2 A.   To be quite frank, I didn't understand what the testimony

3 was.   You are now making it very clear to me what -- I

4 understand that now.   I didn't -- I heard Dr. Savage-Rumbaugh

5 say rescind to that effect.   I didn't understand what it meant.

6 I am now clear as to what it means.

7 Q.   Okay.   I'll make that representation to you --

8 A.   Okay.

9 Q.   -- that BHI has rescinded that resolution.   So do you have

10 any plans for vacating the lab?

11 A.   No.

12 Q.   Didn't Mr. George Caudill tell Dr. Savage-Rumbaugh when he

13 banned her that she no longer had any connection to IPLS?

14 A.   I have no knowledge of what George told -- George Caudill

15 told Dr. Savage-Rumbaugh.   In fact, I didn't know anything about

16 that entire ordeal, or whatever, until long after it had been

17 over.

18 Q.   Did you understand that the BHI board members have any role

19 in appointing you as Director of Research, putting the

20 resolution aside?

21 A.   Can you restate it one more time?

22 Q.   Absolutely.   Did you believe that BHI was required, that

23 their votes were required to appoint you as Director of Research

24 of this entity?

25 A.   Did I believe that BHI needed to vote on my appointment as

1  Director of Research?

2  Q.  Correct; taking over the lab.

3  A.  I -- it's a separate board, in my understanding, so it seems

4  like one board can't vote members onto another board.  That

5  would be my understanding.  It probably was my understanding at

6  the time.

7  Q.  Do you know what the settlements say about who owns the

8  bonobos?

9  A.  I know what's been advised to me by counsel of what the

10  settlement agreement says.

11  Q.  And you don't know what the resolutions say in December of

12  2012 regarding the role of BHI and the oversight of the science?

13  A.  In December of 2012, I'm fairly certain that those

14  resolutions -- there's this whole discussion that's gone on

15  about everyone on BHI resigning and then joining another board.

16  You'll note that I was never a part of those individuals because

17  the e-mails were sent to an e-mail address that I no longer use.

18  So I was never a part of that discussion, which is probably why

19  I didn't see those fall, December 2012 ones anyway.

20  Q.  Dr. Tag, I have to ask then, do you know what you're a part

21  of?  This is an important issue in the case.  You don't believe

22  that one board can vote a board member onto another board.

23            Who voted you as Director of Research?

24  A.  The ACCI board.

25  Q.  The ACCI board wasn't in existence, correct?

1  A.  My understanding -- and, again, this is -- you know,

2  Mr. Simpson is counsel and advised us that ACCI was created on

3  December 18, 2013, and when that was created, I was given the

4  position of whatever, Director of Research, or however it's

5  stated in our minutes.

6  Q.  So your understanding was not based upon the settlements,

7  correct?

8  A.  Yes, that's my understanding.

9  Q.  Your understanding was not based upon the May 2013

10 resolution giving Dr. Savage-Rumbaugh unfettered access,

11 correct?

12 A.  I didn't even know that.

13 Q.  Your understanding was not based upon the December 2012

14 resolutions describing the role of BHI, is that correct?

15 A.  Yes.

16 Q.  Dr. Tag, can you tell us what happened on November 9th,

17 November 10th when Dr. Savage-Rumbaugh was kicked out of the

18 lab?

19 A.  I have no idea.

20 Q.  It was her testimony that you heard it was based on an

21 e-mail sent to you?

22 A.  Again, that's all -- I have no idea.  Wasn't there, never

23 discussed.

24 Q.  You didn't read the e-mail?

25 A.  Wait.  Oh, no, I'm sorry.

1  Q.  Do you know what she's referring to?

2  A.  I'm sorry.  I thought you were saying -- she testified that

3  it was an e-mail that I sent?

4  Q.  She testified that after she sent that e-mail, she was asked

5  to leave by Mr. Caudill, sent an e-mail to you.

6  A.  I don't recall that.

7  Q.  Do you recall reading that e-mail?

8  A.  That she sent an e-mail to me?

9  Q.  Yes.

10 A.  No, I don't recall reading that.

11 Q.  You don't recall reading that e-mail?

12 A.  Well, I don't know what e-mail you're even talking about.

13 Q.  This is --

14 A.  At this minute I have 420 e-mails in my inbox.

15          THE COURT:  Just a minute.

16 BY MR. STAMBAUGH:

17 Q.  This was at the time that you were appointed to the board.

18 We've heard about your inbox.

19 A.  I wasn't appointed to the board until December 18, 2013.  So

20 November is not the time I was appointed to the board.  Show me

21 the e-mail.

22 Q.  Would you agree that it's around the time that you were

23 appointed to the board?

24 A.  Sure.  Can you show me the e-mail?

25 Q.  I want to make sure that we understand that the court

1  understands what actually happened in November 2013.  We've

2  heard a number of things that you didn't read or don't remember

3  reading.  And my question is, do you recall the e-mail that

4  Dr. Savage-Rumbaugh has testified about which led to her being

5  banned from the campus?

6  A.  I don't recall that specific e-mail.

7  Q.  Dr. Tag, you don't want Dr. Savage-Rumbaugh in the lab

8  screwing up your research, do you?

9  A.  I don't want Dr. -- I don't want Dr. Savage-Rumbaugh in the

10 lab because I think she poses a danger to the humans and the

11 apes that work with her or are around her.

12 Q.  It's fair to say you don't want her screwing up your

13 research?

14 A.  That is false -- that is a half truth.

15 Q.  And you don't want her to take away from your professional

16 development at this point, correct?

17 A.  I don't understand what you mean by take away from my

18 professional development.

19 Q.  Well, this is the way we started our discussion.  You have a

20 professional interest in this case.  We've established that,

21 correct?

22 A.  Is that what I testified, that I did?  I mean, I've been up

23 here for a long time, and I feel like at times I've been kind

24 of -- I just want to make sure.

25 Q.  I'm asking you, do you have a professional interest?

1   A.   I have an interest in this case or --

2   Q.   And you don't want Dr. Savage-Rumbaugh to screw that up,

3   isn't that right?

4   A.   I don't want Dr. Savage-Rumbaugh to pose a physical threat

5   to any of the people or the bonobos that work there.

6   Q.   Or a professional threat to your career?

7        MR. MILLER:  Your Honor, objection.  It's been asked

8   and answered repeatedly.

9        THE COURT:  It has, yes.

10  BY MR. STAMBAUGH:

11  Q.   Dr. Tag, I've been authorized by BHI to advise you that you

12  have been relieved of your duties and that they would forbid you

13  from research of any kind with the bonobos.  They intend to

14  report this to Kennesaw and Yerkes at the conclusion of this

15  hearing.

16       My final question would be, do you care to comment on

17  that?

18  A.   No.

19       MR. MILLER:  Your Honor -- hold on for a second.

20       MR. STAMBAUGH:  I have no further questions.

21       MR. MILLER:  -- objection.  Objection, Your Honor.

22       THE COURT:  That last question and answer, that last

23  exchange is stricken from the record.  You can give him official

24  notification in other more appropriate ways.

25       MR. STAMBAUGH:  Thank you, Your Honor.

1          No further questions at this time.

2          THE COURT:  Anything further?

3          MR. MILLER:  Yes, Your Honor.  Thank you.

4                    REDIRECT EXAMINATION

5    BY MR. MILLER:

6    Q.  Dr. Taglialatela, based on recent discussions with Yerkes,

7    have they sent chimpanzees to the facility?

8    A.  No.

9    Q.  Do they have immediate plans to send chimpanzees to the

10   facility?

11   A.  No, they don't.

12   Q.  Was your testimony that you received direct questions, four

13   requests for visits from BHI board members to the facility?

14   A.  I'm sorry, could you restate?

15   Q.  How many requests do you recall receiving from BHI board

16   members to visit the facility?

17   A.  Specific requests for individuals to visit the facility?

18   Q.  Yes.

19   A.  I -- the most fresh in my memory are the four that I

20   described earlier.

21   Q.  And other than requests that you received since January 1,

22   2015 with this hearing imminent, how many requests have you

23   received?

24   A.  Laurent Dubreuil had a request.  I think he visited in

25   August of 2014.  I don't remember any others off the top of my

1  head -- oh, and I'm sorry, Dr. Coxe visited in June of 2014

2  after our joint meeting.

3  Q.  And other than visits, you've had phone calls with at least

4  Dr. Wildman, is that correct?

5  A.  Yes.  I also had one early on with Dr. Dubreuil, but I can't

6  remember the exact date.

7  Q.  You were asked some questions about Exhibit 1006 and the

8  demonstrative we used earlier.  Were the backup information to

9  those protocols in the binder that you offered to Dr. Wildman

10  when he visited in April?

11  A.  Yes.  All the protocols are kept for regulations in binders

12  at the facility on site.  I offered them to Dr. Wildman.

13  Q.  Can you explain why Dr. Wildman didn't take time to look at

14  the details of those exhibits, other than he was too busy?

15  A.  I think he was --

16       MR. STAMBAUGH:  Objection; foundation, totally

17  irrelevant.

18       THE COURT:  You can ask him what Dr. Wildman said

19  about that.

20       MR. MILLER:  Okay.  Thank you.

21       THE COURT:  There's a lot of speculation in this

22  record about what other people are thinking and what they're

23  doing on both sides.  Focus.

24       MR. MILLER:  Thank you, Your Honor.

25  A.  Dr. Wildman drove down for the day.  He visited.  I invited

1   him to stay as long as he did.  He testified that he wanted

2   to -- he felt this time would be spent talking to me, so I

3   assumed I'm taking him on his word and that he didn't want to go

4   through the details at the time and waste the opportunity to

5   speak with me.  That would be what I would guess.

6   BY MR. MILLER:

7   Q.  Are you guilty of occasionally not responding to an e-mail

8   while you were working to keep the lights on at the facility?

9   A.  Yes.

10  Q.  Have you received financial contributions from the purported

11  co-owners of the bonobos?

12  A.  No -- oh, I'm sorry.  We did receive, I think -- to the best

13  of my recollection, it was a thousand dollars.  It may have been

14  1,500 or on or around a thousand dollars.  I believe the timing

15  was last summer, and it was for medical, to go towards some

16  medical expenses.

17          I wrote Dr. Savage-Rumbaugh explaining that we would

18  use that money for that purpose, but I also indicated that we

19  are planning for an anesthetic survey, a full comprehensive

20  survey like that described by Dr. Wildman.  She wrote me back

21  indicating that she had some -- I got the impression from that

22  message, her response that she wasn't completely happy with

23  that.  I offered to return the money to her, and I did not hear

24  another word on that subject.

25  Q.  And on cross-examination you were asked about a number of

1  events in December 2012, in May of 2013, July of 2013, and you

2  readily admitted you didn't rely on those events in your

3  decision to become part of the leadership at ACCI, is that

4  correct?

5  A.  Yes.  In fact, there was some e-mail I vaguely remember in

6  May of 2013 where Steve Boers wrote me an e-mail asking me to

7  take up the directorship then, and I told him it wasn't a

8  possibility.

9  Q.  What did you rely on when you decided to become that

10  director?

11        MR. STAMBAUGH:  Objection; asked and answered and

12  extremely cumulative at this point.

13        THE COURT:  Well, I agree, but I'm going to allow it

14  one more time as to what he relied on in taking his position.

15        THE WITNESS:  I may answer?

16        THE COURT:  You may, briefly.

17  A.  Okay.  I relied on the phone conversations I had with

18  Dr. Duane Rumbaugh, I relied on e-mails written by

19  Dr. Savage-Rumbaugh, as well as phone conversations, and I

20  relied on the advice of board members, as well as board counsel

21  at that time, Lyle Simpson.

22        MR. MILLER:  That's all I have, Your Honor.

23        Thank you.

24        THE COURT:  Anything further?

25        MR. STAMBAUGH:  Your Honor, I have two questions that

1   I inadvertently left out, very specific questions, during my

2   cross-examination.

3                         RECROSS-EXAMINATION

4   BY MR. STAMBAUGH:

5   Q.  Dr. Tag, is it your opinion -- or is it correct that when a

6   bonobo spits water, it is an indication of its stress level or

7   displeasure with something?

8   A.  I think there are probably very limited contexts where that

9   would not be the case.

10  Q.  And my final question is, do you have a professional opinion

11  as to whether Kanzi is any worse off for not having interacted

12  with Dr. Sue Savage-Rumbaugh?

13  A.  I do have a professional opinion about that.

14  Q.  What is that opinion?

15  A.  My professional opinion is that Kanzi is not worse off.

16          MR. STAMBAUGH:  Thank you.

17          Nothing further, Your Honor.

18          THE COURT:  Anything further?

19          MR. MILLER:  No, Your Honor.

20          THE COURT:  You may step down, sir.

21          Thank you.

22                                  (Witness excused.)

23          THE COURT:  We'll take our noon recess at this time.

24  We'll be in recess until 1 o'clock.

25          (Recess at 12:02 p.m., until 1:00 p.m.)

1        AFTERNOON SESSION  1:04 p.m.

2            (In open court.)

3            THE COURT:  Please be seated.

4            We're going to hear from Dr. Tuttle now?

5            MR. STAMBAUGH:  Yes, Your Honor.  We call Dr. Russ

6    Tuttle to the stand.

7            THE COURT:  Please come forward.

8            THE CLERK:  Raise your right hand.

9        RUSSELL HOWARD TUTTLE, DEFENDANTS' WITNESS, SWORN

10                DIRECT EXAMINATION

11   BY MR. STAMBAUGH:

12   Q.  Good afternoon, Dr. Tuttle.

13   A.  Hello.

14   Q.  Can you please tell the court who you are and why you're

15   here.

16   A.  I'm Russell Howard Tuttle.  I'm Professor of Anthropology,

17   Evolutionary Biology, the Morris Fishbein Center for the study

18   of the history and biology of medicine, social sciences, and

19   biological sciences, Collegiate Division of the University of

20   Chicago, the director of the anthropology program, the

21   undergraduate program, and director of the Paris Center.  We

22   have a Paris Center, the University of Chicago program on

23   primates and human evolution, and I'm the innovator of that.

24   Q.  Thank you, Dr. Tuttle.

25            Because we have a court reporter taking down

1  everything you say, if you could just try to slow down a little

2  bit, we'd appreciate it.  Thank you so much.

3          How long have you been a professor at the University

4  of Chicago?

5  A.  Fifty-one years.

6  Q.  Doctor, what is primatology?

7  A.  It's the study of primates.  It's living humans, nonhuman

8  and human, from lemurs, lorises, bushbabies, monkeys of various

9  sorts, apes, and us.

10 Q.  How long have you been studying primatology?

11 A.  Fifty-one years.

12 Q.  How long have you been studying apes?

13 A.  Fifty-one years.

14 Q.  How many publications have you had, peer-reviewed

15 publications regarding apes and/or primatology?

16 A.  I don't know.

17 Q.  Is it --

18 A.  I haven't counted them.  I have a 60-page CV, and a lot of

19 that is publications, government appearances, whatever, you

20 know.

21 Q.  Has it been hundreds of articles?

22 A.  No, I don't think so.  More than a hundred, yeah.

23 Q.  Let's go ahead and identify your CV, which is Exhibit No.

24 97.  There is a notebook, a large notebook right in front of you

25 that has the exhibit numbers.

1  A.   Uh-huh.

2  Q.   If you could turn to Exhibit 97.  I think it may be the

3  larger one underneath there.

4  A.   I've got it, I think.  Well, I can't really open this.

5          MR. STAMBAUGH:  May I approach, Your Honor, to assist

6  the witness?

7          THE COURT:  Sure.

8          THE WITNESS:  I'm sorry, I had surgery on this

9  shoulder.

10         MR. STAMBAUGH:  That's okay.  We've run into this

11 problem before.

12 BY MR. STAMBAUGH:

13 Q.   Dr. Tuttle, referring to what's been marked as Exhibit 97, I

14 would like you to take a look at it.  My question would be, does

15 that appear to be a true and correct copy of your CV?

16 A.   It's dated May 6, yes, that's close enough.

17 Q.   Does it appear to be accurate in terms of reflecting your

18 qualifications and credentials?

19 A.   I think so, yes.

20         MR. STAMBAUGH:  At this time I move 97 into evidence.

21                       (Defendants' Exhibit 97 was

22                        offered in evidence.)

23         MR. MILLER:  No objection.

24         THE COURT:  97 is received.

25

1                          (Defendants' Exhibit 97 was

2                          received in evidence.)

3    BY MR. STAMBAUGH:

4    Q.   Dr. Tuttle, are you being paid for your time here today?

5    A.   No.

6    Q.   What awards have you received in the field of primatology?

7    A.   Okay.  I was recently given the Charles R. Darwin Lifetime

8    Achievement Award by the American Association of Physical

9    Anthropologists, and I was Distinguished Anthropologist of the

10   Midwest Primate Interest Group a couple of years back.  I would

11   have to look for the date here.  And I've received a national

12   teaching award in anthropology from the American Anthropological

13   Association of Students, and also there's an award on campus

14   that is also a highest teaching honor you can get for teaching

15   on my campus.

16   Q.   Who awards the Darwin Award?

17   A.   The American Association of Physical Anthropologists.

18   Q.   Is that awarded every year?

19   A.   No, no.

20   Q.   How often is it awarded?

21   A.   I have no idea.  But I was the first -- it's been a couple

22   of years before I got it, and then last year a former teacher of

23   mine got it, so it's hit and miss.  It's when somebody feels,

24   takes the time -- and it takes quite a bit of time to nominate

25   these things, the supporting documents and whatever.

1  Q.  Any other awards or accolades you haven't mentioned already?

2  A.  I'm a Fellow of the American Association for the Advancement

3  of Science.  I guess that's considered an honor.  That will be

4  enough, I think.

5  Q.  Dr. Tuttle, have you authored any books regarding the

6  subject of great apes and/or primatology?

7  A.  Yes.

8  Q.  How many?

9  A.  Well, I've authored two, truly authored and written them

10 entire cover to cover two, and I have edited many, many books,

11 some under my name, but then as the editor of a book series on

12 all of primatology, and also I edited the International Journal

13 of Primatology for 20 years, which --

14 Q.  What was the most recent book that you wrote?

15 A.  "Apes and Human Evolution," 2014, Harvard University Press.

16 Q.  I'm holding a copy of Apes and Human Evolution.  By the size

17 of it, does that appear this publication?

18 A.  Yes.

19 Q.  Dr. Tuttle, what courses are you currently teaching?

20 A.  I'm teaching the course Apes and Human Evolution.  I teach

21 it in Paris in the autumn and also on campus at the University

22 of Chicago in the spring.  I should be there doing that right

23 now.  Also in the winter I taught a course on hominoid

24 evolution.  That is the evolution of apes to humans.  We have a

25 huge cap collection of tracing 35 million years of evolution

1  through fossils, fossil primates and whatever, and it's a hands

2  on course where students can really dig in.

3  Q.  Do you utilize your publication "Apes and Human Evolution"

4  in your --

5  A.  Of course, it's an outgrowth of that course.

6  Q.  And that's a text that's actually used in the curriculum?

7  A.  Yes.

8  Q.  Dr. Tuttle, now I want to talk about your relationship with

9  Dr. Sue Savage-Rumbaugh and Dr. Duane Rumbaugh.  When did you

10  first meet Dr. Savage-Rumbaugh?

11  A.  In 1976, perhaps.

12  Q.  Have you worked with her during the time from 1976, did you

13  say?

14  A.  Yeah, I've interacted with her.  I haven't actually worked

15  on a project with her.  I knew Duane before, incidentally.

16  Q.  Let me ask you this first, Dr. Tuttle.  What experience do

17  you have with bonobos?

18  A.  Well, I've watched the project involving the bonobos from

19  the time Kanzi was a tiny kid.  I was bitten by him once in the

20  love handle.  He ran back behind me.  We lived in the woods

21  where they had the bonobos where they could be walked, and he

22  was allowed to run freely in the woods, and he would come and

23  peek in the window of the trailer where my family and I were

24  staying.  And then as he grew up, I've also visited and seen

25  him; but I haven't actually worked directly with him.

1  Q.  Tell the court what you do know about Dr. Sue

2  Savage-Rumbaugh's work with these bonobos.

3  A.  It's more than groundbreaking.  It's -- well, it's

4  incredible.  She has shown that -- there's a field called

5  symbiotics, which is the study of symbols and science, and so

6  forth, and she has managed to create an environment in which

7  Kanzi spontaneously learned about this and also to understand

8  spoken English to a pretty good level.  And it was almost by not

9  manipulating him, but letting him experience what was being done

10  with Matata, his foster mother, that he was just running around

11  the room and somehow he absorbed a lot.  We learn this from

12  children.  Children learn a lot about language before they can

13  barely babble and whatever.  So he picked that up, and it's been

14  carried forward then to others who are fortunately not deceased.

15  Q.  How long have you followed this groundbreaking work of

16  Dr. Savage-Rumbaugh?

17  A.  From the outset.  I go way back to Atlanta, which is where

18  Yerkes was invented by Duane Rumbaugh, to see about whether they

19  could command symbols, and that lexigram was made up of Yerkes

20  symbols and many more, Atlanta manipulated.  It went through the

21  study of Sherman Austin.  I was on the site visit as to whether

22  the Sherman Austin study should be continued, and it was.  And

23  then I was on the grant review committee three times, three

24  reviews more recently of Sue's project.  Unfortunately, it

25  didn't do so well with the committee because it had been -- the

1   principal investigator was not a qualified academic.  He was

2   uncredentialed entirely, and it's very difficult to support that

3   when you have Sue doing the work, when it's her study.

4   Q.  Are you aware if Dr. Savage-Rumbaugh received an honorary

5   degree from the University of Chicago?

6   A.  I think so.  I promoted it and nominated her.  It was the --

7   we were inaugurating a new president, Hugo Sonnenschein, and

8   there was a call for the college to have some representative.

9   It's tricky for the college because they have four collegiate --

10  five collegiate divisions in our college.  So it would have to

11  pass muster with physical sciences, biological sciences, social

12  sciences -- well, I won't mention the fifth one, and the

13  humanities, and it got high marks from all of those when I first

14  presented it.  There was a linguist on the nominating committee

15  with me and someone else I can't remember, historian or

16  something.  And this goes through many, many filters.  It then

17  goes to the council of the senate.  The senate by university is

18  of the entire faculty, but then it comes to the council who are

19  representatives of the faculty, and then it goes to the

20  committee of the council and the honorary degree committee, and

21  on and on.  And it came through with flying colors I must say.

22  Q.  Can you -- I'm sorry, were you finished?

23  A.  Yes.

24  Q.  Can you explain to the court the significance of receiving

25  an honorary degree from the University of Chicago?

1  A.  Yes, we're one of the few -- first of all, the stature of

2  the university, you know, that should be clear, the University

3  of Chicago, we're on a par internationally with Oxford and

4  Cambridge and Harvard and many other universities.  The

5  differences with us is that we do not give honorary degrees to

6  anyone other than people of scientific, high level scientific

7  accomplishments, innovative and high level scientific

8  accomplishments.

9       Bill Clinton nibbled around, didn't get it.  Elizabeth

10  the II, her minions tried.  We just do not give it to

11  celebrities and just anyone.  It has to be based on one's

12  research programming success.

13  Q.  Dr. Tuttle, explain to the court what you know about the

14  history of Dr. Savage-Rumbaugh's work with the bonobos here in

15  Des Moines, starting with the Ted Townsend era as it's been

16  called.

17  A.  Well, I was -- I saw the plans in Atlanta, Georgia, when

18  Duane was retiring.  There was a faction organized by David

19  Washburn, I believe, and after one of the dinners, we were

20  presented by a representative of Ted's to present this plan and

21  talk about it.  It sounded wonderful, and I remember looking at

22  the plans, and I asked two questions because it looked like it

23  was near a river.  I asked, does the river flood?  I was told

24  no.  And I asked if they had tested the soil because it had been

25  some sort of Army or Navy place where they exercised, and so

1  forth, and you can imagine there might be elements, heavy

2  elements in the water, and that I don't think has ever been

3  done.

4          Well, Sue came, and then within a year, 2007, I

5  received an invitation to come to be on a scientific advisory

6  board, and I was surprised to find orangutans there, that there

7  was another project.  The building was much smaller than I

8  remembered from the plans.  I mean, they cut back quite a bit, I

9  think to accommodate building the orangutan building, and Sue

10 was nowhere to be seen initially.

11         So we had a meeting the first day, and one wondered

12 why the people, the scientists weren't called in for us to talk

13 to.  The second day Ted came in and sat down and opened with he

14 hadn't fired many people in his career, but he wanted to fire

15 Sue.  And I must say tears started.

16 Q.  Whose tears?

17 A.  Mine.

18 Q.  What was your reaction?

19 A.  That's never happened ever, in court or in a meeting.

20 Q.  What hasn't happened?

21 A.  That I would become just instantly -- it was horrible.  I

22 mean, you could just see everything going poof (indicating).

23 Q.  Dr. Tuttle, you mentioned the river that's next to the

24 facility.  Are you aware of the possibility for flooding in this

25 facility?

1  A.  Well, it's happened twice, once in 1993, which I didn't know

2  about in 2007, and then more disastrously I think in 2008 or '9.

3  I can't remember.

4  Q.  Have you had a concern about the flooding of this facility?

5  A.  Yes.  Today, in fact, you know, what's going on in Houston

6  and elsewhere, the climate is changing.

7  Q.  Have you recently read any reports regarding the possibility

8  for flooding in this facility?

9  A.  I was sent one, yeah.

10  Q.  What report was that?

11  A.  As I remember, it was about various cycles of predictability

12  of damage to the area where the center is, you know, 11 -- or

13  predicting if it happened in 11 years, the 10 years, that kind

14  of stuff.  And, of course, that's all --

15       MR. MILLER:  Your Honor, I'm sorry, I don't mean to

16  interrupt the witness, but I think the question was if he had

17  reviewed a report.  He's now describing what the report was.

18  It's hearsay.

19       THE WITNESS:  Well, I wasn't asked as an expert to

20  review it, no.

21       THE COURT:  Dr. Tuttle, he'll ask another question.

22       THE WITNESS:  Okay.

23       MR. STAMBAUGH:  And, Your Honor, I will say that

24  Dr. Tuttle has the stature of an expert in this proceeding, and

25  I would ask that he be allowed to rely on hearsay documents.

1    THE COURT:  Well, my ruling has consistently been I'll

2  receive it, subject to the objection, and it is in.

3    MR. STAMBAUGH:  Thank you, Your Honor.

4  BY MR. STAMBAUGH:

5  Q.  Dr. Tuttle, you were describing this flood report you had

6  read.

7  A.  Uh-huh.

8  Q.  Please continue.

9  A.  Well, I think I have said what I have to say about it.  I

10  don't know what basis they premise this on.  It must be

11  meteorological long-term satellite stuff; but supposedly you

12  should be able to predict -- we don't have the technology I

13  think to do it yet -- when a flood is likely to occur or not in

14  a particular area.  And, of course, you can miss, and if you

15  miss, then you lose.  You lose your home, you lose valuable

16  research.

17  Q.  In your opinion after reading this flood report, do you

18  think that this facility is a safe place for the bonobos?

19  A.  No.

20  Q.  Why not?

21  A.  Well, it can flood.  The last time I understand the water

22  was way up, you couldn't even get to the bonobos for a while.

23  They had to wade through high water just to get there finally,

24  and, fortunately, they were up near the top of the exhibit or

25  page.

1  Q.  Dr. Tuttle, as someone with your standing in the field and

2  knowledge of Dr. Savage-Rumbaugh's work, in your opinion, what

3  is the significance of Dr. Savage-Rumbaugh's work both for the

4  field and humanity?

5  A.  Well, as an anthropologist, I will say that, first of all,

6  she broke one barrier, the language thing.  Language is thought

7  to underpin human culture, and the linguists at my university --

8  anthropological linguists teach courses called Language in

9  Culture.  What is the role of language in mediating culture?  I

10  do not want to get into what culture is, but we know -- social

11  sciences across the board will agree that symbols and symbolic

12  mediation of beliefs and ideals and behavior and social codes

13  and morality codes and all are symbolically mediated.  That's

14  what culture is.  It's the output of this symbolic mediation.

15          Language is one of those, but Sue has crossed one

16  barrier.  She has the bonobos and -- actually the chimpanzees

17  first, Sherman Austin, let's stay with that; but she has that

18  capacity, they have that capacity.  It's like having a computer

19  with a new capacity.  Now, can we go forward and get them to

20  use -- can that be used and cap this cognitive aspect of their

21  machinery, if you will, to start having using that and becoming,

22  I hate to say it, moral social beings.  I mean, socially

23  mediated and social beings with the sense of feelings where you

24  can tell us whether their altruistic behavior is based on

25  feelings or whether it's just a mechanism, you know, to get by.

1  Q.  Do you have an opinion as to whether that research should

2  continue?

3  A.  Of course, it should.

4  Q.  Dr. Tuttle, have you recently visited the Great Ape Trust?

5  A.  Yes.  I was out there yesterday for about 45 minutes.

6  Q.  Please tell us about that visit.

7  A.  Well, it's showing the wear and tear.  That's my opener.  Of

8  course, what can you tell in 45 minutes?  I did see all five of

9  the bonobos.  Some were more active than others.  Kanzi was not

10  terribly interactive until he was asked if he wanted a surprise,

11  and then he became very animated; but before that he was just

12  sitting with his back -- he knew we were there.  We were in

13  masks and gloves.  I don't know if that had any effect --

14  fiddling through some vegetation.  And it was like, I don't know

15  just -- I'm not in -- I don't know about stereotypings and

16  stuff, but it didn't look like -- but it could have been the

17  rain.  I don't know.

18         The others, most of the others -- initially two were

19  covered by blankets.  They wanted to be outside it seemed rather

20  than inside, which was interesting, and I got spit on.

21  Q.  Who spit on you?

22  A.  Nyota.

23  Q.  I'm sorry?

24  A.  Nyota.

25  Q.  How did Nyota look?

1  A.  He was more animated, but he was displaying for my benefit I

2  think.

3  Q.  Did that have any significance to you that Nyota spit on

4  you?

5  A.  I didn't like it, obviously.  Yeah, well, he was sick, too.

6  He was hacking, you know, very wet hacking cough and stuff, so

7  I'm trying to get over the flu.  I think I might have a new

8  kind, but it wasn't too helpful.  I don't know what the mask was

9  doing, whether that -- I think it's just something that he's

10 taken up.

11 Q.  Were the bonobos active in communicating and running around?

12 A.  When surprise was said, then -- when Kanzi started to

13 vocalize, then Nyota who was standing above him started to

14 vocalize, and the ones across the way also joined in in also

15 vocalizing.

16 Q.  Was the communication that you saw yesterday consistent with

17 the research trajectory of Dr. Savage-Rumbaugh as you understand

18 it?

19 A.  It was bonobo communication.  It wasn't through symbols or

20 whatever.

21 Q.  Did you see lexigram keyboards?

22 A.  I saw it a short distance away, yeah, the one outside where

23 the surprise was asked and --

24 Q.  To your knowledge, were all of the lexigram keyboards

25 functioning?

1  A.  I saw nothing lit on that keyboard.  It could have been

2  scratched up.  I don't know.  Inside there's another keyboard

3  that seemed to be working with -- I think it was on a big yellow

4  dot.  It looked to me like what had been used on the orangutan

5  project, but I don't know.  I didn't ask.

6  Q.  Who was with you on this visit?

7  A.  Shane, Sue's son.  I think his last name is Rumbaugh.  I

8  can't remember.  He grew up, and he was communicating with

9  Kanzi.

10  Q.  Who visited you and welcomed you to the center?

11  A.  Bill Hopkins.

12  Q.  Do you know Bill Hopkins?

13  A.  Yes.  I've known him his entire career.

14  Q.  And how do you know him professionally?  What do you know

15  about him professionally?

16  A.  I just have him in high regard as a professional.  He's an

17  expert on laterality.  We have two hemispheres of our brains and

18  other mammals do, going way back to fish for certain.  Certain

19  behaviors are lodged in one or the other.  The theory is that

20  the neural activity -- if you had to have both engage, it would

21  slow down the neural activity, your ability to respond, and so

22  forth.

23  Q.  Did Kanzi recognize Shane when you went in?

24  A.  I'm not sure, I'm not sure, because we were masked, and

25  there was certainly no immediate response.  As I say, he had his

1  back to us and sort of, you know, looked around and back and

2  finally he came and got in the tunnel near the keyboard.

3  Q.  You mentioned you had to wear masks and gloves.  Did the

4  bonobos, were they able to go into the forest?

5  A.  There is a woods there, but I did ask about that.  No, they

6  can be in the grassy area before that I think.  I don't know how

7  far out, but --

8  Q.  Were you taking -- I'm sorry.  Were you taken to an

9  infirmary?

10  A.  I asked if there was an infirmary.  There's one that is

11  going to be developed, but the room was empty.

12  Q.  Was there an infirmary there yesterday?

13  A.  No.

14  Q.  What was it?

15  A.  It was an empty room.

16  Q.  Dr. Tuttle, in your opinion, did it appear to be a

17  functional research center?

18  A.  There were two people there.  Bill was there and another

19  person, Sara, and I don't know what they were doing before, but

20  there was no other activity going that I could see; but we could

21  have distracted them from whatever they were doing research

22  wise.

23  Q.  Dr. Tuttle, are you familiar with the settlement agreements

24  entered into in this case?

25  A.  I've seen them, yes.

1  Q.  Have you read the research trajectory provisions in those

2  settlement agreements?

3  A.  Yes.

4  Q.  Do you know what that research trajectory is?

5  A.  Well, I know what it is to Sue, and as I read it, that is

6  what it is to Sue.

7  Q.  Do you have a personal opinion as to what that research

8  trajectory looks like?

9  A.  Yes.  I think it carries forward from the linguistic

10 capabilities to instantiated in culture to test out now whether

11 we can move ahead and see if you have symbolically deviated

12 culture, if that can be achieved in bonobos, and even further

13 than that if you can, can you start really finding out what

14 they're thinking.  We know they think, but can we really get at

15 thinking, and do they have any kind of goals, do they have

16 belief systems, do they have ideals even.

17 Q.  You mentioned that you are familiar with Dr. Bill Hopkins,

18 is that right?

19 A.  Yes.

20 Q.  Do you know who Dr. Jared Taglialatela is?

21 A.  Yes, of course.

22 Q.  Are you familiar with his work?

23 A.  Yes.  I've even helped it I think at times as an editor of a

24 journal and whatever throughout his career.

25          MR. STAMBAUGH:  Your Honor, at this time I would like

1  to publish the amended version of Exhibit 1006 that has already

2  been admitted in evidence.

3          THE COURT:  Okay.

4          THE WITNESS:  I have it.  No, I have --

5  BY MR. STAMBAUGH:

6  Q.  And, Dr. Tuttle, you can also look at the screen right in

7  front of you if that would help.

8  A.  Oh, thanks.

9  Q.  And there's a screen to your left behind you.

10  A.  Okay.  I'm looking.

11  Q.  I'm going to ask you to go ahead and take a look at what's

12  been marked as Exhibit 1006.

13          If you want to go ahead and scroll down.

14  A.  It says out of range.

15  Q.  Oh, your screen is not working.  It's not the first time.

16  It's nothing against you personally, Dr. Tuttle.

17          Have you seen this document before?

18  A.  What is it?  I have a paper copy here of something called

19  ACCI Active Research Protocols.  Is that what we're talking

20  about?

21  Q.  Correct.  Why don't you go ahead and take a look at that

22  paper copy first.  And why don't we take just a second to see if

23  we can fix your screen.

24  A.  This is old, I think.  It has eight.  I've seen one that has

25  11.

1          Now, you'll have to -- how do I scroll?

2          THE CLERK:  You don't.  They do.

3          MR. STAMBAUGH:  Your Honor, may I approach?

4          THE COURT:  You may.

5  BY MR. STAMBAUGH:

6  Q.  Dr. Tuttle, I've handed you what is the amended version of

7  Exhibit 1006.

8  A.  Thank you.

9  Q.  So you can refer to that.  Have you seen this document

10  before?

11  A.  Yes.

12  Q.  Have you reviewed it?

13  A.  Well, as best I can.  I would like to see the substance -- I

14  see titles and dates, but I would like to see the substance of

15  what is being planned, over what time period, how many subjects,

16  you know.

17  Q.  But you've read these protocols, the titles of the

18  protocols?

19  A.  Yes, yes.

20  Q.  Dr. Tuttle, in your opinion, do you think that these

21  research protocols can accomplish the research trajectory that's

22  set forth in the settlement agreements?

23  A.  No.

24          MR. MILLER:  I'm sorry, Your Honor.  Objection; lack

25  of foundation.  Objection; relevance.

1          THE COURT:  I'll receive it, subject to the objection.

2          MR. STAMBAUGH:  You can answer.

3  A.  Oh, okay.  Well, I have been, as I said, on site -- not

4  exactly a site -- well, one site, not others.  I do know how to

5  read a title and tell perhaps what they might want to do.  What

6  I can't do here is to tell exactly how they're going to

7  accomplish all of this.  In fact, you have five subjects, five

8  bonobos to work with, and 11 projects.  It just doesn't seem

9  feasible to me that you're going to be able to do this in a

10 reasonable amount of time.  It should be pruned down to a couple

11 of really central things to look at and justify that.

12 BY MR. STAMBAUGH:

13 Q.  You mentioned the amount of time it might take.  Is someone

14 who is present at the lab approximately six days a month able to

15 accomplish the research necessary to continue

16 Dr. Savage-Rumbaugh's research trajectory?

17          MR. MILLER:  Objection; lack of foundation.

18 Objection; relevance.

19          Thank you.

20          THE COURT:  I'll receive it, subject to the objection.

21 A.  They couldn't do it themselves certainly if you have

22 obligations elsewhere, and so forth, and that means you would

23 have to get assistants and students and whatever to be doing the

24 actual work, and that can have its pitfalls.

25 BY MR. STAMBAUGH:

1  Q.  You mentioned that you know Dr. Bill Hopkins, correct?

2  A.  Yes.

3  Q.  And you know of Dr. Jared Taglialatela?

4  A.  Yes.

5  Q.  In your professional opinion, Dr. Tuttle, do you think that

6  Dr. Hopkins and Dr. Taglialatela are well situated to continue

7  the research trajectory of Dr. Savage-Rumbaugh?

8  A.  I think, in fact, it's quite the opposite.

9  Q.  Why is that?

10 A.  Because we have the language thing, now we want to move it

11 forward into areas that aren't really represented here.  It's

12 more comparative psychology than it's something that would be --

13 I'm sure my colleagues in social anthropology wouldn't accept

14 this.  It's more anthropological.  You're really getting at what

15 it is to be a human being, a culture, a culture bearing

16 symbolically deviated being.  And she's the only one who has the

17 faith in this to carry it forward, and she had started it even,

18 but because of that grant -- the grant had all of that in it;

19 but when you have an unqualified person to be the project

20 director, as long as she's willing to do it herself, I think we

21 can make some progress.

22 Q.  Dr. Tuttle, have you seen any recent videos in addition to

23 your site visit yesterday showing what's going on at the Great

24 Ape Trust today?

25 A.  Well, I saw Jared talking to some news people about biking

1   for bonobos and stuff, but I don't recall there being any

2   footage in there about bonobos.  The preceding one from March, I

3   think, done by Cedar Rapids was -- again, it was more, you know,

4   an entertainment piece almost.  I mean, it was trying to make

5   the point that they're all happy and everything is going fine.

6   There was one statement about the research that's going on, but

7   actually what Sara said was that she's there to get things

8   started so that they can get -- have some data, in essence.  I'm

9   paraphrasing.

10  Q.  And just for the record, you're talking about an earlier

11  video?

12  A.  March, I think, March.

13  Q.  Of the bonobos at the Great Ape Trust?

14  A.  Yeah, yeah.

15  Q.  What did that indicate?

16  A.  It had Teco in it and Nyota, and there was one very silly

17  thing.  Nyota was sitting with his mouth pressed to the glass

18  and a girl runs by and kisses him, kisses the glass and runs on,

19  and he wiped his mouth off on his arm, which was humorous; but I

20  don't know why that's going on.  It's not good health for people

21  to be kissing the glass, I wouldn't think.

22  Q.  What do the videos indicate to you, in your opinion,

23  regarding the actual research that was happening at the lab?

24  A.  There was no research apparent.  There was a promise of

25  things to come, but there was no research apparent.  And one of

1   the chimpanzees had a slash on his back, too, a deep open wound,

2   which was not there when we saw it, so apparently it had been

3   treated.

4   Q.  Dr. Tuttle, you mentioned Sara few minutes ago.  Who is

5   Sara?

6   A.  Her name is Sara Skiba.  She said on the phone that she's

7   the coordinator of the research.

8   Q.  I'm going to ask you to take a look at Exhibit 1006 to see

9   if you recognize the Sara you're talking about?

10  A.  Yes.  She's on the first one, the second one, the third one,

11  the fourth one, the fifth one, the sixth one, the seventh,

12  eighth and ninth.  She's not on one or two of them, as a

13  research assistant.

14  Q.  Sara Skiba is listed as a research assistant on the majority

15  of these protocols?

16  A.  Yes.

17  Q.  Do you know who Sara Skiba is?

18  A.  I met her.

19  Q.  When did you meet her?

20  A.  Yesterday, apart from seeing her on the video, but yes, I

21  met her yesterday.  She seemed to be very bright, eager.  I

22  think she's a master's student at Jared's school.

23  Q.  Dr. Tuttle, just a few final questions for you.  I'll

24  represent to you that Dr. Taglialatela testified here in court

25  that, in his opinion, Kanzi is not any worse off for not having

1  interacted with Dr. Sue Savage-Rumbaugh.  What is your

2  professional opinion of that statement having just seen Kanzi

3  yesterday?

4           MR. MILLER:  Objection; lack of foundation.

5  Objection; relevance.

6           THE COURT:  I'll receive it, subject to the objection.

7           THE WITNESS:  And can I answer or not?

8           MR. STAMBAUGH:  You can answer it.

9  A.   Yeah.  Let me sort of answer this in a somewhat different

10 way.  We talk about enrichment of captive animals.  There are

11 two zoos in Chicago that I take our students to, and I won't

12 tell you the project, but it's on this kind of thing.  They have

13 done everything you can imagine almost to enrich the environment

14 of the gorillas, chimpanzees, et cetera, in their zoos; but it

15 can't compare with what Sue was doing.  Sue was the enrichment

16 for Kanzi.  He grew up with her, et cetera.  She was his

17 enrichment.  I mean, the things she brought to him, not just her

18 presence, but the way she interacted, the things she introduced

19 him to, the things she exposed him to that he learned on his

20 own, you know, by just being around, et cetera.  That was the

21 enrichment.

22           None of that was going on when I went Thursday.  He's

23 sitting out in the grass, fiddling with the grass, but that's 45

24 minutes.  But I don't think you can match that.  I don't think

25 you can take someone, some being that's had that kind of thing

1   and then just stop it.

2   BY MR. STAMBAUGH:

3   Q.  Dr. Taglialatela also testified for us that in his 20 years

4   experience he thought that the emotional health of these bonobos

5   was good.  In your professional opinion, what do you think the

6   emotional health of these bonobos will be going forward without

7   Dr. Sue Savage-Rumbaugh?

8            MR. MILLER:  Objection; lack of foundation.

9   Objection; relevance.  Objection; also calls for speculation.

10           THE COURT:  I'll receive it, subject to the question.

11  A.  Would you --

12  BY MR. STAMBAUGH:

13  Q.  With your fifty years of experience?

14  A.  Rephrase it.  I mean without the 50 years.  Tell me what

15  you're asking again.

16  Q.  Yes, absolutely.  Dr. Tuttle, in your opinion, what do you

17  think will happen to the emotional health of these bonobos if

18  Dr. Sue Savage-Rumbaugh is absent from their lives forever?

19  A.  I can't -- it's too broad a question in a sense.  I mean,

20  they're going to continue to live on.  I mean, people live on

21  after all kinds of awful things happen to them, and they can be

22  re -- what is it; reconstituted, if you will, to some extent,

23  but it doesn't -- the question would have to be, if you want me

24  to speculate, would he be a happier, more productive for

25  humankind bonobo if he had stayed with Sue, yes, absolutely, and

1   the others as well.  We would be well along in knowing yes or no

2   about, again, what I've spoke of of the cultural part of

3   language and culture.

4   Q.  And, finally, Dr. Tuttle, you've seen Mr. Ryan Sheldon's

5   PowerPoint presentation?

6   A.  Yes.

7   Q.  Have you?

8   A.  Yes.

9   Q.  And what was your opinion of his PowerPoint presentation in

10  terms of a viable alternative location for these bonobos?

11  A.  I would move them immediately if it were ready or as soon as

12  they are and without -- we've talked about many things.  I think

13  the flooding threat is the big thing and the toxicity of the

14  soil.  I just don't understand why the soil isn't tested and

15  whatever.  They shouldn't be there until the place is ready to

16  serve them well.  And this is not faulting Jared and Bill, Bill

17  Hopkins and Jared Taglialatela; but the place I think has

18  become -- it can't help but become more toxic.  They have been

19  dying.  I mean, what kind of -- what more do you want?  I don't

20  know if it's directly related, but something is going on there

21  that they die.  If they're subject to respiratory stuff and it's

22  going through the colony and the fourth one dies, Panbanisha,

23  then why aren't remedial things taken, why don't you look at the

24  whole context of things.  Is that an enriched environment?

25  Q.  In your professional opinion, it's not an enriched

1  environment?

2  A.   No.   It isn't for people and it wouldn't be for apes.

3          MR. STAMBAUGH:   Your Honor, I have no further

4  questions at this time and pass the witness.

5          THE COURT:   Cross-examination.

6                      CROSS-EXAMINATION

7  BY MR. MILLER:

8  Q.   Good afternoon, Dr. Tuttle.   My name is Bill Miller.   We met

9  in the hall briefly.

10          You were just discussing you're aware that four

11  bonobos died through Panbanisha, is that right?

12  A.   No.   I said there were four ill.   The report that I read,

13  the obituary -- not obituary; the autopsy Panbanisha stated that

14  four had been ill.

15  Q.   Okay.   At the time that Panbanisha died four were ill?

16  A.   They had been.

17  Q.   Okay.

18  A.   It was as if the virus was going from A to B to C to D,

19  which is common with people.   It takes them awhile for a virus,

20  if you get it, to start showing symptoms.

21  Q.   Okay.   And you're concerned there was no followup on that

22  issue at that time?

23  A.   From when the first one got sick, obviously.

24  Q.   Right.   And you understand at that time Dr. Taglialatela and

25  Dr. Hopkins were not on the scene?

1   A.  I just said that, that I didn't hold them responsible for

2   that.

3   Q.  Right.  Dr. Rumbaugh was the scientist in residence,

4   correct?

5   A.  I have no idea.  I just don't remember any mention of Bill

6   or -- I don't know if they were in charge of the center at the

7   time.  I don't know who was in charge of the center at the time.

8   Q.  You have very impressive credentials, and I will establish

9   that; but you have no credentials with respect to flooding or

10  expertise with regard to flooding, correct?

11  A.  No.

12  Q.  And same thing with toxicity of water or soil; is that

13  accurate?

14  A.  I know if it's there, it should be eradicated.  My point is

15  it should be tested and, to my knowledge, it has not been.  Even

16  today I don't know.

17  Q.  Right.  And you came to that conclusion when you first

18  visited the center in 2008 or before?

19  A.  No.  I had asked the question when I saw the plans, has it

20  been tested?  I was told -- I wasn't really answered, but it

21  wasn't my business to start asking them to test the soil.

22  People heard it.  I assumed it would proceed.

23  Q.  Okay.  And that was made in --

24  A.  A year later I was invited to be on the scientific advisory

25  board, and I'm sure if I would have stayed on it without Ted

1  saying he would fire Sue, I would have demanded it.

2  Q.  Did you tell either Dr. Duane Rumbaugh or

3  Dr. Savage-Rumbaugh, you can't leave Georgia until somebody

4  shows you a test or a report about flooding?

5  A.  No.  I hadn't seen the plans yet.

6  Q.  The same thing, you didn't say to them, you cannot leave

7  Georgia until you are satisfied that there's no toxic soil here?

8  A.  No.

9  Q.  And Dr. Duane and Dr. Sue are close friends of yours for

10  decades; fair?

11  A.  Yes, I would say that.  You would have to ask them.

12  Q.  Sure.

13  A.  But I know where my heart is.

14  Q.  Now their son drove you around yesterday for your visit here

15  in town?

16  A.  Yes.  It was nice to see him again.  And I told him he

17  probably would have to wait outside.

18  Q.  Right.  But he was welcomed into the center?

19  A.  He grew up with Bill.

20  Q.  Why did Dr. -- or excuse me, why did Mr. Townsend want to

21  fire Dr. Savage-Rumbaugh?

22  A.  You don't ask Ted why.  He just does what he wants.

23  Q.  Well, did he tell you why?

24  A.  No.  And, in fact, if you -- if I can talk at length, I

25  did -- I wrote to him when I got home and told him, you can take

1  me off the board, too.  In fact, while I was there, he asked me

2  if I would chair the board -- this is the first day -- and also

3  would I be willing to come and be the director of the center,

4  this new center.

5  Q.  Ted was asking you to replace Dr. Savage-Rumbaugh?

6  A.  No.  I don't know that Sue was meant to be the director.

7  She was the researcher, lead researcher.

8  Q.  During your visit yesterday, did you ask Dr. Hopkins to

9  review the IACUC protocols or any and all documents backing

10 Exhibit 1006 that you looked at?

11 A.  No.  You mean the actual texts of them?

12 Q.  Right.

13 A.  No.  No, I did not.

14 Q.  But you told the court those are important, you wanted to

15 see them?

16 A.  No.  I would like to see them I said before I would judge

17 it, but it looks too busy to me -- regardless what's in them, it

18 looks like a very busy agenda, especially if you're not set up.

19 Q.  Okay.  But you testified you wanted to review them and you

20 didn't ask to review them while you were there?

21 A.  No.  I wasn't there for that.  I was to see the condition of

22 the animals and the facility, et cetera.

23 Q.  Did you ask to review any documents while you're visiting?

24 A.  No.

25 Q.  Is another common reaction for an ape in captive environment

1  to spit on a person they don't know?

2  A.  Well, he knew -- no, he wouldn't know Shane either.  I don't

3  know.  How would he know me, if he did know me, with a mask on?

4  Q.  Okay.  But that reaction, spitting on you, may have been a

5  reaction to the fact that he did not know you, correct?

6  A.  That's speculation.

7  Q.  It's one possibility, correct?

8  A.  If you want to make it so, yes.  I don't know.

9  Q.  And you were wearing a mask because you had just recovered

10  from the flu and you had been asked to --

11  A.  No, no.  It's the rule, you have to.  If you go in certain

12  areas of the ape places, you're supposed to wear a mask and

13  rubber gloves.

14  Q.  You had a question about Dr. Savage-Rumbaugh's research

15  trajectory.  Have you reviewed Bonobo Hope's research

16  trajectory?

17  A.  Yes, not in this, but I've seen it.

18  Q.  Okay.  What did you review?

19  A.  I think I was asked to be on that board, too, at some point.

20  I don't remember.  It would have been sometime when it was

21  forming, but I don't remember.

22  Q.  What is the research trajectory?

23  A.  The research trajectory is -- it's in a paragraph in a

24  couple of things where you go from things that have already been

25  done into art and agriculture, and I forget what all.  I would

1  have to have it in front of me.

2  Q.  I appreciate that.  I think you're referring to the research

3  trajectory you read and you testified to about the settlement

4  agreements.  I'm saying, what did you review that Bonobo Hope

5  gave you with the research trajectory?

6  A.  I don't know that Bonobo Hope gave me anything.

7  Q.  And you haven't reviewed their research trajectory?

8  A.  No, no.

9  Q.  Do they have a research trajectory that they've shared with

10  you?

11  A.  I assume it's the same as was in those documents, the

12  settlement agreements.

13  Q.  And you would not move the bonobos to Missouri until -- you

14  said at least until the facility is finished, is that right?

15  A.  Well, of course.

16  Q.  You were okay with the proposal with respect to caging of

17  the bonobos?

18  A.  I don't understand.

19  Q.  You had an opportunity to review Mr. Sheldon's proposal,

20  correct?

21  A.  Yes.  I've seen the presentation of it.  It looks wonderful,

22  but I would certainly not start moving them immediately.  It's

23  too bad we can't do that.  It's not finished.

24  Q.  And you're comfortable with that proposal, even though there

25  are cages for the bonobos?

1   A.   There will have to be.

2   Q.   And you're comfortable moving them, even though it will

3   require anesthetizing them before you move them down to

4   Missouri?

5   A.   I'm not sure it would require anesthetization before moving

6   them.   In fact, I think you could probably get around that,

7   unless there's a law about it or something, you know.

8   Q.   So if it's a USDA requirement, you would agree that that

9   would be necessary?

10  A.   It wouldn't be my place to agree or disagree.   I would have

11  nothing, no reason to be commenting on it really.

12              MR. MILLER:   Dr. Tuttle, thank you for your time.

13              Have a safe trip back.

14              THE COURT:   Doctor, I do have a question for you.   I

15  didn't pick it up.   You might have mentioned it.   When was it

16  that Mr. Townsend told you that he wanted to fire

17  Dr. Savage-Rumbaugh?

18              THE WITNESS:   It was at the first meeting of the

19  scientific advisory -- what was it -- council anyway -- well, an

20  advisory council, the first meeting.   It was in 2007.   There's a

21  copy of the invitation somewhere in the records.   I have -- no,

22  it's not.   But I have the invitation to do it, yeah.

23              THE COURT:   Thank you, Doctor.

24              THE WITNESS:   Thank you.

25              THE COURT:   Anything further?

1          MR. STAMBAUGH:  Nothing further, Your Honor.

2     Thank you.

3          THE COURT:  You may step down, sir.  Thank you.

4     May this witness be excused?

5          MR. MILLER:  Yes.

6          MR. STAMBAUGH:  Yes.

7          THE COURT:  You're excused.

8          THE WITNESS:  What's the short way out?

9          THE COURT:  Directly to the door.

10                                    (Witness excused.)

11          MR. STAMBAUGH:  Your Honor, with the conclusion of

12     Dr. Tuttle's testimony, again, Your Honor, defendants do rest

13     their case.  There's one very small housekeeping issue with

14     documents that I've spoken to opposing counsel about.  I think

15     we can deal with that at the end if necessary so we can move

16     along.

17          So for present purposes, reserving those rights,

18     defendants rest.

19          THE COURT:  Ready to call your next witness,

20     Mr. Miller?

21          MR. MILLER:  We are, Your Honor.  And just to

22     confirm -- and I apologize -- my understanding, I believe

23     counsels' understanding as well, is the court intends to defer

24     any motion, oral motion that we might make to the briefing that

25     we're contemplating for after the hearing?

1           THE COURT:  You can join such a motion if you want

2    with your briefing, yes.  I will accept that.  Nobody needs to

3    make -- you're talking about a motion for judgment as a matter

4    of law?

5           MR. MILLER:  For instance, Your Honor, I was not

6    intending to do that.  I just didn't know if you were expecting

7    we could do that.  I think both of our understanding was we were

8    going to be briefing these issues, but we didn't want to

9    surprise the court if we didn't address that I guess.

10          THE COURT:  It wouldn't surprise me.  I always hope

11   people tell me.

12          So we're clear, can it be stipulated and agreed that

13   all rule 50 type motions which might be made at the conclusion

14   of one party's record or the other party's record, all of those

15   things may be reserved until the posttrial briefing and may be

16   included therein as a part of the briefing?  Is that

17   satisfactory?

18          MR. STAMBAUGH:  So stipulated, Your Honor.

19          MR. MILLER:  Same, Your Honor.

20          Thank you.

21          MR. MELHUS:  Plaintiffs call Dr. William Hopkins to

22   the stand.

23          THE COURT:  Dr. Hopkins, if you would come forward,

24   please, and face the clerk, she'll administer the oath to you.

25          THE CLERK:  If you would stop right there.  Raise your

1  right hand.

2          WILLIAM HOPKINS, PLAINTIFF'S WITNESS, SWORN

3                  DIRECT EXAMINATION

4  BY MR. MELHUS:

5  Q.  Good afternoon, Dr. Hopkins.

6          Could you please state your name and spell your last

7  name for the record, please.

8  A.  William Hopkins, H-O-P-K-I-N-S.

9  Q.  And could you please describe your educational background

10 for the court?

11 A.  I have a bachelor's degree in psychology from the University

12 of Wisconsin, a master's and Ph.D. from Georgia State

13 University.  That's my academic background.

14         I have held three faculty appointments.  I worked from

15 1994 to 2005 at Berry College in Rome, Georgia.  In 2005 I moved

16 to Agnes Scott College, an all women's liberal arts college in

17 Atlanta, from 2006 to 2011.  And then in 2012 I went to the

18 Neuroscience Institute at George State University, which is

19 where I am now.  I've also held an appointment as research

20 associate scientist of Yerkes National Primate Research Center

21 since 1990, and I continue with that appointment today.

22 Q.  And you're currently a member of the ACCI Board of

23 Directors, is that correct?

24 A.  That's correct -- I'm sorry, I'm president of ACCI.

25 Q.  Okay.  And could you please direct your attention to what's

1   been marked as Plaintiffs' Exhibit 1008.  It's in the small

2   binder in front of you.

3   A.  Okay.

4   Q.  And could you just describe that document generally for the

5   court?

6   A.  I just want to make sure -- could you say the document

7   again; I'm sorry?

8   Q.  I'm sorry.  It's Plaintiffs' Exhibit 1008.

9           THE COURT:  It should be in the small notebook.

10          THE WITNESS:  Right there?

11          THE COURT:  No, not that.

12          MR. MELHUS:  May I approach, Your Honor?

13          THE COURT:  You may.

14          THE WITNESS:  Sorry.  I want to make sure I'm looking

15  at the -- oh, 1008.  I'm sorry.  Oh, I'm sorry, it's my CV.

16  Okay.  It's an exhibit now.

17  BY MR. MELHUS:

18  Q.  I think I may have missed it, but you said that was your CV?

19  A.  That's correct.

20  Q.  Okay.  And just in the general sense, are CVs created in the

21  normal course of business as a Professor of Neuroscience at

22  Georgia State University?

23  A.  A CV would be an academic's, essentially their resume, and

24  they're continually updated with changes in appointments or

25  publications, grants, any other academic responsibilities you

1  might have such as serving to the college or community.

2  Q.  And did you prepare that CV?

3  A.  I did.

4  Q.  And did you prepare it in the normal course of business as

5  you just described?

6  A.  That's correct.

7  Q.  Is it a complete and accurate representation of your

8  accomplishments to date?

9  A.  Pretty close.

10  Q.  Okay.  Did you make each of the entries on the CV or update

11  them at or about the time that the accomplishments occurred?

12  A.  Yes.

13          MR. MELHUS:  Plaintiffs offer Exhibit 1008 into

14  evidence at this time.

15                          (Plaintiffs' Exhibit 1008 was

16                          offered in evidence.)

17          MR. STAMBAUGH:  No objection, Your Honor.

18          THE COURT:  1008 is received.

19                          (Plaintiffs' Exhibit 1008 was

20                          received in evidence.)

21  BY MR. MELHUS:

22  Q.  Could you please describe for the court how you became

23  involved with the bonobos at ACCI?

24  A.  Okay.  In the fall of 2013, Dr. Taglialatela was approached

25  by Bonobo Hope and Sue and Duane Rumbaugh to assume leadership

1  of the organization, and Jared approached me and asked me if I

2  would be willing to help.  So I said yes, I'm certainly willing

3  to consider that, given the history that I had also had with

4  those particular bonobos, and we came to visit in the fall of

5  2013 and decided -- I decided at that point that I would work

6  with Jared toward, you know, resurrecting the facility and the

7  organization.

8  Q.  Okay.  Prior to making that decision, did you have any

9  conversations with Dr. Sue Savage-Rumbaugh?

10 A.  We did.  We talked by phone, and we had a number of e-mail

11 exchanges that I was copied on, including the correspondence

12 with Jared, and we were assured that we would have autonomy to

13 move the research in the direction that we thought would be most

14 beneficial for garnering private or public sector support for

15 the work and to try and, you know, essentially, you know,

16 reactivate, you know, start the program of research again and

17 try to improve the visibility of the institution both nationally

18 and internationally, which I think it was suffering at that

19 time.

20 Q.  Okay.  And I think you mentioned some e-mail communications

21 with Dr. Savage-Rumbaugh, is that correct?

22 A.  That's correct.

23 Q.  Could you please direct your attention to what's been marked

24 as Plaintiffs' Exhibit 1005.

25 A.  I'm sorry, I don't -- 1005?  There doesn't seem to be

1  anything in the 1005, unless I'm missing something.

2           THE COURT:  Why don't you help him out.

3           MR. MELHUS:  May I approach the witness, Your Honor?

4           THE COURT:  You may.

5           THE WITNESS:  I'm sorry, I can't read a folder.

6           MR. MELHUS:  That's okay.

7           THE WITNESS:  1005?

8           MR. MELHUS:  One moment, Your Honor.

9           (Pause.)

10          THE COURT:  I have my copy here if that would help

11  speed things up.

12          MR. MELHUS:  Well, I think we have another copy here.

13          May I approach, Your Honor?

14          THE COURT:  You may.

15          THE WITNESS:  Okay.

16  BY MR. MELHUS:

17  Q.  Could you please briefly describe that document for the

18  court?

19  A.  This document is a series of correspondence principally

20  between Sue and the board members of IPLS encouraging them to

21  endorse and support Jared and my control over essentially IPLS.

22  And, you know, the rest of the document just describes her

23  support for us, our credentials to manage the facility and to

24  take care of the apes.  And the rest of the document is the

25  support that we received from the Bonobo Hope board endorsing

1  our appointments to the IPLS and to the management of the

2  operation.

3  Q.  And based on that e-mail and some of the conversations you

4  described earlier, what was your understanding of your role at

5  the Iowa Primate Learning Sanctuary and the research it was

6  conducting moving forward?

7  A.  My understanding was that essentially the organization was

8  being handed to Jared and I and that we were being asked, and I

9  would even go so far to say as we were being, you know, begged

10  to take over the management and the care of the animals, and

11  that's what was my understanding.  It was my understanding we

12  had complete authority to do that, to take the research in the

13  direction it needed to go, and we had the complete authority to

14  make decisions about the welfare of the animals, and that was my

15  understanding of the agreement.  And, quite frankly, I would not

16  have got involved without that stipulation.

17  Q.  Okay.  And you understand that prior to those conversations

18  and that e-mail that's marked as an exhibit, Plaintiffs' Exhibit

19  1005, that Dr. Savage-Rumbaugh had a more active role in IPLS?

20  A.  No.

21  Q.  Excuse me.  Prior to the conversations and e-mail

22  communications prior to you joining IPLS, did

23  Dr. Savage-Rumbaugh have a more active role at any point

24  historically?

25  A.  At IPLS, yes, she did.  Prior to our involvement, yes.  The

1  plan was not for her to be involved going forward.

2  Q.  Okay.  I would like to talk about some of the research

3  that's being conducted at ACCI currently.  Could you please

4  direct your attention and I'm going to ask you to flip to the

5  exhibit book in front of you again.  It's Plaintiffs Exhibit

6  1006.

7  A.  Okay.

8  Q.  And could you describe that document just briefly?

9  A.  It looks like a brief description of the active IACUC or

10  research protocols that have been approved at ACCI.

11  Q.  Okay.  And would you be able to describe some of those --

12  some of that research that's reflected in this document for the

13  benefit of the court, starting with, for example, what's

14  described as AUP No. 140423-01?  It's the very first protocol on

15  the list.

16  A.  Well, the first project is Dr. Taglialatela's proposal.  In

17  that particular IACUC, the goal is to go back and to

18  characterize the speech comprehension abilities of all of the

19  bonobos at ACCI.  We know that Kanzi's abilities are well

20  documented, but the rest we know much less about, although

21  clearly we interact with them, we have a sense they understand

22  many, many words, but we don't really have a sense of that.

23        For me, I guess, this complements the work from the

24  past in important ways in that we're establishing, you know,

25  what other individuals are capable of doing this.  And then the

1  larger goal of that project is to incorporate experimental

2  psychological methods into assessing what are the underlying

3  mechanisms that allow for these bonobos to comprehend spoken

4  English.  It's really a remarkable ability that they have, but

5  we really, really don't understand beyond their capacity to do

6  that much about how they're capable of doing that.  And if you

7  look in the literature and you look for theories for an

8  explanation of that, there's very few of them, and it's really

9  difficult to reconcile what they're capable of doing with what's

10 out there theoretically.

11        So to me this is a very important project and

12 certainly one that complements the work from the past.

13 Q.  When you describe the work from the past, could you kind of

14 explain what you mean?

15 A.  Well, I'm talking about the work that's been started at the

16 Language Research Center in the early 1970s, and that is the use

17 of symbols, the ability -- there's documentation of the

18 linguistic capacities of chimpanzees and bonobos.  So that's

19 essentially what I mean by the past.

20 Q.  Okay.  And would it be fair to characterize that type of

21 research as experimental psychology?

22 A.  Absolutely.

23 Q.  Would it be fair to characterize that type of research as

24 the use of language?

25 A.  Yes.

1  Q.  Would it be fair to characterize that type of research as

2  involving ape intelligence?

3  A.  Absolutely, sure.  I mean, again, as, you know, their

4  capacity to acquiring and use the symbols and their capacity to

5  particularly comprehend the speech certainly reflects something

6  about their intelligence.  So it certainly captures, you know,

7  that theme as a research theme as a whole, sure.

8  Q.  Okay.  And I think the court may be curious, and there's

9  certainly some questions about some of the other research that's

10  going on at ACCI, so I'll ask you just to describe one more

11  research protocol.

12         Let's move to the third on the list, which is marked

13  as AUP No. 140611-02.  Could you describe that protocol and the

14  research that's being conducted under it?

15  A.  So this is Dr. Lyn's protocol, so she's really interested in

16  examining the role that social linguistic experiences have on

17  the developmental cognition.  And so in this particular set of

18  studies, she's developed or is employing something called a

19  primate cognition test battery.  So it's sort of a standardized

20  intelligence test, for lack of a better term, that's used to

21  measure sort of social and physical intelligence in apes

22  specifically.

23         So her goal in that project is to explore, you know,

24  whether acquiring the use of a symbol system, you know, in some

25  way alters or it selectively picks certain forms of intelligence

1  over others, so that's a pretty significant part of that

2  project.

3         The other part of that project is trying to get at an

4  old question that's been around a long time in the literature,

5  and that is, what is the motivation behind ape communication.

6  So starting back in the seventies, it was sort of argued that

7  apes only sign or use chips or use symbols for instrumental

8  things, so they only produce keyboard utterances for the

9  purposes of asking for something, I want this, I want that, I

10  want that.  They never engage in communication just for the

11  purposes of communication.  So, you know, look, there's an

12  airplane up in the sky, which is -- you know, so this has been

13  an argument that's been around starting with Paris, but more

14  recently it was argued in the literature, not just in the

15  context of simple use, but also in the context of just normal

16  forms of gestural and vocal communication in apes.

17         So there's an element of that proposal as well that

18  aims to look at, you know, whether or not particularly apes that

19  have been raised in these sort of rich sociolinguistic

20  environments are more prone to engage in more declarative form

21  of communication, which are these forms where you talk about

22  something other than asking for something.

23  Q.  Okay.  Thank you for that description.

24         I think we talked earlier about how you would

25  characterize that type of research.  Are you familiar with

1    Dr. Savage-Rumbaugh's research historically?

2    A.  Yes, I am.

3    Q.  Would you characterize that type of research as continuing

4    on the same type of research trajectory?

5    A.  I would.  In fact, I would argue that this work is all, you

6    know, being framed in a way that complements that work very

7    well.

8    Q.  Since you've been involved at ACCI, have there been any

9    changes to policies or protocols that are designed to benefit

10   the bonobos' care and well being?

11   A.  Yes.  So we have done a number of things in terms of

12   sanitation.  So we've removed some -- at least early on, some of

13   the greenhouse areas had a bark in them instead of the natural

14   floors, and so we removed some of those substrates just because

15   we had some mold building in there and that was we thought a

16   health problem, so we removed some of that.

17           We've instituted some policies around how the care

18   staff and also the volunteers interact with the animals in terms

19   of, you know, certain levels of sophistication and what they're

20   allowed in terms of contact policy with the animals.  So we have

21   instituted some of those policies as well, and we've also

22   adopted the policies of having both the volunteers and the care

23   staff to wear masks and gloves when working with the apes.

24   Q.  And what would be the benefit of having the volunteers and

25   caretakers wear masks and gloves when interacting with the

1  bonobos?

2  A.   So it's principally for the health of the apes, so we worry

3  about human pathogen transmission to the apes, all right.   The

4  apes are in the facility.   They're confined.   We're not worried

5  so about the contact, what they encounter with each other.   What

6  we worry about is the volunteers and the staff go home every day

7  and socialize with other people and other people, and so each

8  time they do that, you know, they're putting themselves at risk,

9  you know, of picking up some type of pathogen that could then be

10  brought back and transmitted to the chimps and the bonobos.   So

11  we just were worried about that.   And what prompted that was the

12  fact that Teco had been ill when we first came on board, and we

13  were -- it was a respiratory infection.   They only get them from

14  us, no other way.   This was on the heels of Panbanisha passing

15  away from a respiratory infection essentially.   So we just

16  didn't want to put the apes at any more risk, so we instituted

17  this policy, and it's a policy that's used in many institutions

18  that house great apes.

19  Q.   Are there exceptions to the policy to allow for research

20  interaction with the bonobos?

21  A.   Certainly.

22  Q.   Could you describe that?

23  A.   Yeah.   If there's a research justification for not wearing

24  the masks or the gloves, that can be placed in the IACUC, it can

25  be presented and evaluated, and a decision can be made.   So it's

1  a cost benefit or it's a risk benefit analysis.  Does the

2  benefit of doing whatever research you want to do with them

3  without wearing a mask or gloves, is that greater than the risk

4  that it presents to the apes, right.  So if it's deemed to be

5  the case, then that can move forward, and we're not opposed to

6  that as long as it's scientifically justified.

7  Q.  Okay.  So it's not the case that you're trying to block

8  interaction with the apes by requiring people to wear masks and

9  gloves?

10  A.  No, absolutely not.  That is not the motive whatsoever.

11  Q.  Are you trying to erase Dr. Savage-Rumbaugh's research

12  trajectory by requiring the use of masks and gloves?

13  A.  Absolutely not.  We're simply trying to keep the animals

14  healthy.

15  Q.  Are you trying to eliminate Dr. Savage-Rumbaugh's research

16  trajectory in any way at ACCI?

17  A.  No, absolutely not.

18  Q.  Do you have a secret agreement or any other type of

19  agreement with Yerkes to block Dr. Savage-Rumbaugh's access to

20  the laboratory?

21  A.  No, absolutely not.

22  Q.  Is there any type of invasive biomedical research going on

23  at the facility?

24  A.  No.

25  Q.  Going forward, what would you like to see happen with these

1  bonobos in Des Moines?

2  A.   I would -- going forward, I would like the original

3  agreement that we thought we had signed on to to be enforced,

4  and that is we would like to be given the autonomy and control

5  over both the scientific direction and the health and management

6  of the five bonobos here and the research program forward.

7  Q.   Why is that so important?

8  A.   Because I think the program has suffered in the past and it

9  hasn't been terribly productive, and it's been muddled in

10  controversies with the Bonobo 12 and other kinds of groups

11  constantly -- there's just been constant, sort of a circus

12  atmosphere around its management and operation.  You know, these

13  apes deserve more than that.  They're an incredibly valuable

14  research population, and we have an opportunity and we have an

15  obligation I think to continue investigating what they're

16  capable of doing.  And I think if they were to leave and go

17  anywhere else, that wouldn't be possible.

18          When we first came on board, I mean there was some

19  discussion about moving some of the bonobos to zoos, and I

20  remember thinking that would just be a tragedy.  This is the

21  worst thing that could happen, because we wouldn't be able to

22  continue to work with them, and they probably wouldn't be in as

23  good of an environment than they are now.

24          So that's why I really feel like they should stay here

25  and they should stay and continue to be under our control.

1          MR. MELHUS:  No further questions for this witness,

2  subject to any redirect, Your Honor.

3          Thank you, Dr. Hopkins.

4          THE COURT:  Cross-examination?

5          MR. STAMBAUGH:  Very briefly, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. STAMBAUGH:

8  Q.  Good afternoon, Dr. Hopkins.

9  A.  Hello.

10 Q.  Do you know who Dr. Russ Tuttle is?

11 A.  I do.

12 Q.  Is Dr. Russ Tuttle one of the most widely acclaimed and

13 respected primatologists in the world?

14 A.  He's well known.

15 Q.  Do you respect his opinion?

16 A.  I think it would depend on the topic.

17 Q.  Do you respect his opinion with respect to the topic of

18 primatology?

19 A.  Primatology globally, maybe, yeah.

20 Q.  And you would agree with me that Dr. Tuttle is more familiar

21 with the research trajectory of Dr. Sue Savage-Rumbaugh than you

22 are, correct, sir?

23 A.  No.

24 Q.  How long have you worked with Dr. Sue Savage-Rumbaugh?

25 A.  I've known Dr. Savage-Rumbaugh for 30 years now.

1  Q.  And it's your opinion that you know the nature of her

2  research trajectory better than Dr. Russ Tuttle at the

3  University of Chicago?

4  A.  I do.

5  Q.  But you believe his opinions should be respected?

6  A.  I do.

7  Q.  Dr. Hopkins, you mentioned on direct examination that

8  there's no secret agreement between ACCI and Yerkes?

9  A.  That's correct.

10 Q.  But is it your understanding that it's a necessary condition

11 of any funding from Yerkes that Dr. Sue be absent from the lab?

12 A.  Yes, but that's not secret.  That's not a secret.

13 Q.  Dr. Hopkins, you attended a board meeting of ACCI on

14 July 29, 2014, is that correct?

15 A.  I'm sorry, what was the date?

16 Q.  July 29, 2014.

17 A.  Yes.

18 Q.  Do you recall a discussion about individuals from Yerkes

19 being sent to ACCI during that board meeting?

20 A.  I don't recall that, but that might have come up.

21 Q.  Would it refresh your recollection if I showed you a copy of

22 the board minutes?

23 A.  Sure.

24         MR. STAMBAUGH:  May I approach, Your Honor?

25         THE COURT:  You may.

1          THE WITNESS:  Okay.

2    BY MR. STAMBAUGH:

3    Q.  So do you recall the discussion of people from Yerkes coming

4    to ACCI during that board meeting?

5    A.  Yes.

6    Q.  And what I've just showed you mentions sending a vet, is

7    that correct?

8    A.  That's correct.

9    Q.  A PR person?

10   A.  That's correct.

11   Q.  That means public relations?

12   A.  Yes.

13   Q.  And their colony manager?

14   A.  That's correct.

15   Q.  Why was a vet being sent from Yerkes?

16   A.  Because if we were ever going to bring chimpanzees to the

17   facility, they would want to see the layout of the structures to

18   see whether it would allow for isolation of apes if they were

19   sick or ill, or things like that.

20   Q.  Did the Yerkes' vet actually come?

21   A.  Sure.  Two of them came.

22   Q.  Two vets?

23   A.  Two came.

24   Q.  On what date?

25   A.  On those dates in this --

1   Q.   July 30th and July 31st, 2014?

2   A.   That's correct.

3   Q.   Did they stay for those two days?

4   A.   I would say it was a day-and-a-half.

5   Q.   Did you speak with them?

6   A.   Sure.

7   Q.   Did Dr. Taglialatela speak with them?

8   A.   Yes.

9   Q.   Did a PR person come from Yerkes on those dates as well?

10  A.   She did.

11  Q.   Did you talk with her?

12  A.   Yes.

13  Q.   Did Dr. Taglialatela talk with her?

14  A.   Yes.

15  Q.   What did you talk about?

16  A.   In terms of public relations or --

17  Q.   Yes.

18  A.   -- what did we talk about on the whole?  We talked about the

19  prospects here.

20  Q.   Why was she there from Yerkes?

21  A.   Why was the public relations individual there?  I think from

22  the standpoint of the Yerkes Primate Center, they would want to

23  know something about where they were sending their apes in the

24  event that they did produce a press release to announce that.

25  Q.   Did you talk about Sue Savage-Rumbaugh with the vet?

1  A.  On that occasion, I don't recall talking about Sue during

2  that time.

3  Q.  Did you talk about Sue Savage-Rumbaugh with a vet from

4  Yerkes on any other occasion?

5  A.  We have had conversations about Dr. Savage-Rumbaugh with,

6  yes, veterinarians from the Yerkes Primate Learning Center, not

7  necessarily on the date of that meeting, but perhaps another

8  meeting.

9  Q.  Subsequent to July 2014?

10  A.  I don't think subsequent to that, no.

11  Q.  Did you talk about Sue Savage-Rumbaugh with the PR person

12  from Yerkes?

13  A.  Yes.

14  Q.  What did you talk about?

15  A.  I don't remember really everything about that conversation.

16  I think principally it centered around Sue and Duane's

17  involvement in ACCI and the institution itself going forward.

18  Q.  Was that conversation the basis for your understanding that

19  it was a necessary condition of funding from Yerkes that Sue and

20  Duane be banned from the lab?

21  A.  Well, not essentially with the PR person.  That was from

22  e-mail exchanges that we had with the then director and also

23  some of the other folks from the Yerkes center that would be

24  involved in any decision to bring chimps here.  The person who

25  was given the task of spearheading, you know, that discussion

1  was the PR person.

2  Q.  Did you speak with the colony manager?

3  A.  He was here, and we did talk, yes.

4  Q.  Did you talk about Dr. Sue Savage-Rumbaugh?

5  A.  Honestly, I don't remember talking with him about Sue

6  Savage-Rumbaugh.

7  Q.  So there was no secret agreement, Dr. Hopkins, but as a

8  result of your conversations and e-mails with these individuals

9  from Yerkes, you knew that it was a condition that Sue and Duane

10  be banned from the lab if they brought chimpanzees there,

11  correct?

12  A.  I'm not exactly sure I understand the question.

13  Q.  You testified on direct that there was no secret agreement?

14  A.  Right.

15  Q.  But there had been conversations about Dr. Savage-Rumbaugh?

16  A.  Uh-huh.

17  Q.  There had been e-mails about --

18  A.  Yes, Sue and Duane knew that.

19  Q.  Let me finish my question.

20  A.  Okay.

21  Q.  There had been e-mails about Dr. Sue Savage-Rumbaugh, okay,

22  and you now have an understanding, based upon conversations and

23  e-mails, that if Yerkes brings chimpanzees, Sue and Duane will

24  be banned, correct?

25  A.  No.  We don't have an agreement with Yerkes at this point.

1    Q.  That wasn't my question.

2    A.  Okay.

3    Q.  My question was, you now have an understanding, based upon

4    the e-mails, the conversations with individuals from Yerkes,

5    that Sue and Duane will be banned, correct?

6    A.  No.  I disagree with that.  I would not say that's a fair

7    statement.

8    Q.  Your impression is --

9    A.  I would say that, you know, I think that if we want to

10   pursue the opportunity to bring chimpanzees from the Yerkes

11   Center to ACCI, all right, I believe that the Yerkes Center

12   would put the kibosh on that if Sue and Duane were involved, and

13   I think Sue and Duane also would agree with that statement.

14   Q.  Does ACCI have immediate plans to bring chimpanzees from

15   Yerkes?

16   A.  We would -- not necessarily Yerkes.  We have a vacant

17   building.  We would very much like to put some chimpanzees in

18   it.  If Yerkes isn't interested or doesn't want to or chooses,

19   for whatever reason it decides, not to work with us toward that

20   endeavor, then we will look for another organization to work

21   with.

22   Q.  I appreciate that, Dr. Hopkins, and I don't want to mince

23   words; but can you tell the court, have there been any immediate

24   plans with Yerkes, whether or not they come to fruition?

25   A.  We have had discussions with Yerkes about bringing

1  chimpanzees to ACCI, yes.

2  Q.  And it's a true statement that as a condition of doing that,

3  Sue and Duane will be banned from the lab, correct, sir?

4  A.  No, that's not correct.

5  Q.  It's your understanding that Yerkes would ban Sue and Duane

6  from the lab should they bring chimpanzees, correct?

7  A.  My thoughts on that are that Yerkes will never agree to send

8  the apes here, all right, if Sue and Duane are involved.  I'm

9  not sure --

10  Q.  Okay.  So let's go at it from that angle.  If Sue and Duane

11  are involved, you understand from your conversations and e-mails

12  with Yerkes that they will never send chimpanzees here, correct?

13  A.  That's correct, yeah.

14  Q.  Okay.  Would you consider that a condition of Yerkes sending

15  chimpanzees here?

16  A.  Yeah, I would.

17  Q.  Okay.  Dr. Hopkins, you have enormous respect for Dr. Sue

18  and Dr. Duane Rumbaugh's contributions to science, correct?

19  A.  I do.

20  Q.  Why was it necessary to ban Sue from the lab, in fact, to

21  deny her access in order for you and Dr. Taglialatela to pursue

22  a scientific course for ACCI?

23  A.  I didn't ban Sue from the lab.

24  Q.  So you would have no objection to Dr. Savage-Rumbaugh

25  becoming part of the research at the lab today, is that correct?

1   A.   No.  I would oppose that.

2   Q.   And why is that?

3   A.   Because I don't think it would be successful.

4   Q.   If Dr. Tuttle opined that it would be successful if Dr. Sue

5   Savage-Rumbaugh was involved, would you disagree with him?

6   A.   I would.

7            MR. STAMBAUGH:   One moment, Your Honor.

8            (Pause.)

9   BY MR. STAMBAUGH:

10  Q.   Dr. Hopkins, a couple of final questions.

11           You mentioned in your direct testimony that you needed

12  autonomy in your research; is that accurate?

13  A.   Yes.

14  Q.   Why does that necessitate banning Sue to have autonomy?

15  A.   I think that's the definition of autonomy is working alone

16  and independently.

17  Q.   You have other individuals assisting you and

18  Dr. Taglialatela, correct?

19  A.   We do, yeah.

20  Q.   So why is it so important that you completely deny access to

21  the woman who has reared these bonobos over the last four

22  decades?

23  A.   Again, I think it's because if Sue is involved in the

24  organization, I believe we will not be successful, and I think

25  if you look at the last ten years and the opportunity that's

1  been squandered to this point, I would say that's the basis for

2  that argument.

3  Q.  Well, ACCI hasn't produced any peer-reviewed research since

4  you've been in charge, correct?

5  A.  That's not correct.

6  Q.  Have there been publications from ACCI, peer-reviewed

7  publications --

8  A.  Yes.

9  Q.  -- since you were in charge?

10 A.  Even before now, we've had papers that I've published with

11 Sue in the past.

12 Q.  I've talking about research done at ACCI since you became --

13 and forgive me, I've forgotten your title; Director of Science?

14 A.  Yes.

15 Q.  Okay.  There's been no peer-reviewed publications from ACCI

16 regarding the bonobos?

17 A.  I'm not exactly sure about that, so I would have to look

18 exactly to determine if any of the papers that we published say,

19 for example, in 2015 have an ACCI affiliation.  I would say -- I

20 think the answer to that is no.  So if the definition of

21 productivity is, does it have an ACCI title or recognition of

22 the institution, at this point I would say no; but that doesn't

23 mean that isn't the case.  At professional conferences certainly

24 work that's been done at ACCI has been presented at professional

25 meetings.

1    Q.  You would agree with Dr. Taglialatela's opinion as to

2    whether there have been peer-reviewed publications from ACCI

3    since you've been in charge?

4    A.  I'm sorry?

5    Q.  You would agree with Dr. Taglialatela's opinion on the issue

6    as to whether there has been peer-reviewed publications from

7    ACCI since you've been in charge?

8              MR. MELHUS:  Objection.

9    A.  I don't know what his opinion is.

10             MR. MELHUS:  Before you answer, objection to lack of

11   foundation.  I don't think that the basis for that question has

12   been established with this witness, Your Honor.

13             THE COURT:  Well, he's answered it, and I'll receive

14   it, subject to the objection.  He said he didn't know what Dr.

15   Taglialatela's opinion was.

16   BY MR. STAMBAUGH:

17   Q.  In other words, would you defer to Dr. Taglialatela's

18   opinion as to whether there have been peer-reviewed publications

19   from ACCI?

20   A.  Sure.

21             MR. STAMBAUGH:  Okay.  No further questions, Your

22   Honor.

23             THE COURT:  Redirect?

24             MR. MELHUS:  Just briefly, Your Honor.

25

1              REDIRECT EXAMINATION

2   BY MR. MELHUS:

3   Q.  Dr. Hopkins, you've testified that Yerkes does not want

4   Dr. Savage-Rumbaugh to be involved with any chimpanzees that may

5   be transported to the facility at ACCI.  Do you have any idea

6   why that might be?

7   A.  Yes.

8             MR. STAMBAUGH:  Objection; lacks foundation.

9             THE COURT:  You may answer --

10  A.  Yes.

11            THE COURT:  -- subject to the objection.  Go ahead.

12  I'm sorry.

13  A.  I mean, again, I think -- there was a PR person who came to

14  visit, and I think there's a reason because I think if you type

15  into any Internet search engine, you can find a lot of negative

16  publicity, negative press, negative things that took place at

17  GAT and IPLS, and I think the Yerkes Center and anyone

18  interested in bringing chimps, probably not just Yerkes, would

19  be quite concerned about what might happen if Sue were involved

20  with the organization and they brought chimpanzees there, would

21  people be put at risk.  I think, you know, given what's been put

22  out there for public discussion, the answer to that is they

23  would have -- the answer is yes, they would have a concern about

24  that.

25            Honestly, the Language Research Center started at the

1  Yerkes Primate Center in the 1970s, and for many, many years the

2  Language Research Center, where Sue and Duane did a lot of their

3  important work, was part of the Yerkes Primate Center, and they

4  had a long history with Sue and Duane, and that relationship

5  ended, and I don't think that relationship ended on the best of

6  terms, and I think there were some concerns by the center at the

7  time about some safety issues and things like that, with the

8  operation, even when it was at George State, even before it came

9  to Iowa.

10        So it's not as if that anyone from the Yerkes Primate

11  Center had never heard of Sue or Duane or had no background or

12  experience working with them.  Many people did.  I think the

13  players in the discussions have changed over the years, all

14  right; but, you know, there's still some legacy there, if you

15  will, in terms of, you know, the actions or some of the

16  unfortunate events that happened at the language center when the

17  Yerkes Center was still involved in it.

18  BY MR. MELHUS:

19  Q.  And are there other organizations that share or validate

20  Yerkes' concern about working with Dr. Sue Savage-Rumbaugh

21  moving forward?

22        MR. STAMBAUGH:  Objection; lacks foundation.

23        THE COURT:  I'll receive it, subject to the objection;

24  but I must say, although the witness has some ideas as to why

25  and impressions about Yerkes' reasons that they may or may not

1  have for the position that they may or may not have taken with

2  regard to Dr. Savage-Rumbaugh and her husband being involved,

3  but I think -- well, I want you to know that this is of little

4  probative value to me because the witness has opinions and --

5  but I think they're far enough removed that they're not

6  particularly helpful on that subject.

7           MR. MELHUS:  Okay.  I apologize if I'm getting too far

8  off course.  I just wanted to establish the record with respect

9  to dispelling any conspiracy theory that might be out there as

10 far as ACCI and Yerkes is concerned.  And with that

11 understanding, Your Honor, I'll move along.

12          THE COURT:  I know this is difficult for you to sit in

13 the stands, but move along and ask another question.

14 BY MR. MELHUS:

15 Q.  Are there any other reasons, sitting Yerkes aside, that you

16 would not want to work with Dr. Savage-Rumbaugh moving forward

17 that would explain why she has been denied access to the

18 laboratory?

19          MR. STAMBAUGH:  Objection; lacks foundation,

20 cumulative, improper credibility testimony -- character

21 testimony, excuse me.

22          THE COURT:  I'll receive it, subject to the

23 objections.

24          MR. MELHUS:  Answer if you can.

25 A.  Okay.  Can you -- I'm sorry.  Can you ask it again?

1   BY MR. MELHUS:

2   Q.   Sure.   Sitting aside the concerns that Yerkes may or may not

3   have with Dr. Savage-Rumbaugh, are there any reasons that would

4   justify or explain why she has been not allowed access to the

5   lab up until this point?

6          MR. STAMBAUGH:   Same objections.

7          THE COURT:   Same ruling.

8   A.   Okay.   I think on the whole the belief is that the animals

9   are at risk, to some extent, as are the people that work with

10  the animals.   I think this is a concern that would be a concern

11  for me going forward, and that's largely a big motivating factor

12  for why it is I feel like we must work independent from

13  Dr. Savage-Rumbaugh in order to be successful.

14         MR. MELHUS:   Dr. Hopkins, thank you for your time.   I

15  have no further questions, subject to any recross -- or

16  redirect.

17         MR. STAMBAUGH:   No further questions, Your Honor.

18         THE COURT:   You may step down, sir.

19         Thank you.

20                              (Witness excused.)

21         MR. MILLER:   Your Honor, at this point in time, I know

22  counsel have a couple of issues with respect to some documents

23  or exhibits we want to discuss.   I believe we are done with the

24  presentation of our evidence, although I would like to briefly

25  huddle with my co-counsel and our representative, and I

1  respectfully ask if we could perhaps take an early break to

2  address these items, and we may be done.

3          THE COURT:  That is perfectly fine.  Will you need --

4  is 15 minutes going to be enough time?

5          MR. MILLER:  Yeah.  I was going to say, I think we

6  need to review some exhibits, so we may need a little bit

7  longer.

8          THE COURT:  Okay.  We'll play it by ear.  We'll be in

9  recess for 15 minutes, maybe a little longer.

10         MR. STAMBAUGH:  Thank you, Your Honor.

11         (Recess at 2:34 p.m., until 3:13 p.m.)

12         THE COURT:  Be seated, please.

13         There was some record you wanted to make about some

14  exhibits I think?

15         MR. STAMBAUGH:  Yes.  Thank you, Your Honor.

16         Counsel has conferred and worked out some agreements.

17  For claimant's purposes, we would like to enter the following

18  exhibits into evidence:  No. 95, which was the CV of Dr. Laurent

19  Dubreuil that was discussed by Dr. Dubreuil but not moved into

20  evidence, and also Exhibit No. 98, Your Honor, which is a

21  collection of videos.  Your Honor has it on a disk in the

22  exhibit binder.  These are videos that show the relationship and

23  interplay between Dr. Savage-Rumbaugh and the bonobos and would

24  be used essentially in lieu of any rebuttal testimony regarding

25  her relationship with these bonobos, whether or not that was a

1   safe relationship.

2           With respect to -- and, again, I confess that I'm not

3   as familiar with the local procedure.  We have a number of

4   exhibits, Your Honor, they were e-mails authored by George

5   Caudill.  That was an individual that was on the guaranteed to

6   appear witness list by the plaintiffs in this case in the

7   pretrial order.  I can represent to the court that we would have

8   introduced these exhibits through Mr. Caudill because they were

9   authored by him.  We believe that they are party opponent

10  admissions in any event; but the reason that we did not use them

11  during the proceeding is because Mr. Caudill was not here, even

12  though his presence was guaranteed.

13          Those exhibit numbers, the e-mails offered by

14  Mr. George Caudill, are Nos. 43, 48, 69, 71, 74, 76 and 103.  So

15  we would -- claimants would move all of those exhibit numbers

16  into evidence as well.

17                              (Defendants' Exhibits 43, 48, 69,

18                              71, 74, 76, 95, 98 and 103 were

19                              offered in evidence.)

20          THE COURT:  Any objection, Mr. Miller, to those

21  exhibits?

22          MR. MILLER:  Your Honor, I would restate the

23  objections in the pretrial order.  Further, we do think the

24  offer here of these exhibits is inappropriate.  We did note

25  Mr. Caudill as a witness, guaranteed presence here.  We notified

1  counsel beforehand he had personal issues that arose that

2  prevented him from being here.  We think this is somewhat

3  punitive, but, Your Honor, we understand the circumstances.  So

4  we would restate -- or we would state that objection and restate

5  our objections in the pretrial order.

6          Then I would also ask with respect to the videos, are

7  we able to stipulate to a time frame of those videos?  I don't

8  think that that's identified in that.

9          MR. ZIFCHAK:  I believe the videos predate Iowa.

10         MR. MILLER:  Okay.  And can we so stipulate?

11         MR. ZIFCHAK:  We can so stipulate to that.

12         MR. STAMBAUGH:  So the videos would reflect the

13  interplay between Dr. Savage-Rumbaugh and the bonobos before

14  coming to Iowa.

15         MR. MILLER:  Right, as I understand it.

16         And the only other thing, we would restate the

17  objection asserted to Dr. Dubreuil's CV in the pretrial order.

18         Thank you.

19         THE COURT:  Mr. Stambaugh, did you want to make a

20  record that it was a business record like Mr. Melhus did with

21  one of the CVs?

22         MR. STAMBAUGH:  I was impressed, Your Honor.  Well

23  done.

24         THE COURT:  95 and 98 are received, subject to

25  objection.

1          (Defendants' Exhibits 95 and 98

2          were received in evidence.)

3          THE COURT:  Now, with regard to what I'll call the

4   Caudill e-mails, is there any issue about the authenticity of

5   these e-mails and were they written by Mr. Caudill or at the

6   time he was -- was he -- I'm not quite sure, chair of the board

7   of the IPLS?

8          MR. ZIFCHAK:  Yes, Your Honor.

9          THE COURT:  Is all of that true?

10          MR. MILLER:  He was chair.  He wrote e-mails, Your

11   Honor.

12          THE COURT:  Did he write these?

13          MR. MILLER:  What's that?

14          THE COURT:  Did he write these?

15          MR. MILLER:  Well, to be honest, I mean, I have looked

16   through the stack.  You know, if I didn't say it before, I think

17   several of these could have been admitted through others.  That

18   being said, for instance, 43, you know, we've had this, not a

19   pattern but occasional e-mail, where it seems like something was

20   copied and pasted over another document.  That's what it appears

21   to be with 43 as well as 103, Your Honor.

22          So I don't have a reason to believe these aren't what

23   are being represented by counsel, but, you know, I don't know

24   either.  So I guess -- I think from the appearance of the

25   document, you can draw whatever weight or conclusion you may

1  from that.  I don't have any reason to object beyond that.  I

2  have no knowledge.

3          THE COURT:  All right.  I'll receive the Caudill

4  e-mails, 43, 48, 69, 71, 74 and 76 and 103, subject to the

5  objections made.  Are they hearsay objections?

6          MR. MILLER:  Hearsay.  Also there would be relevance

7  objections.  We've stated objections in the pretrial order, and

8  I would rely on those; but hearsay, I'm certain there would be

9  some hearsay objections.  I can go through document objections

10 if you prefer.

11         THE COURT:  You don't need to.  My main concern was

12 that these are statements by Dr. Caudill, who's chair of IPLS,

13 and I assume is writing these things in his capacity as such.

14         MR. MILLER:  That appears to be the case, Your Honor,

15 and I think you'll see they're e-mail trails or strings with

16 other people involved as well.

17         THE COURT:  Well, I'll receive them subject to those

18 objections then.

19                          (Defendants' Exhibits 43, 48, 69,

20                          71, 74, 76 and 103 were received

21                          in evidence.)

22         THE COURT:  Is there anything else evidentiary wise

23 before we close the record?

24         MR. MILLER:  Yes.  Thank you, Your Honor.

25         We had one exhibit that we discussed with Mr. Simpson,

1   No. 1000, which had I been on top of things would have moved to

2   admit and would do so now.

3                           (Plaintiffs' Exhibit 1000 was

4                           offered in evidence.)

5           MR. STAMBAUGH:  Your Honor, we have no objections.

6           THE COURT:  1000 is received.

7                           (Plaintiffs' Exhibit 1000 was

8                           received in evidence.)

9           MR. MILLER:  Oh, and one other matter of housekeeping.

10  We do have this exhibit that has the certification for Secretary

11  of State that we would like to three-hole punch and switch out.

12          THE COURT:  You can do that and put it in the official

13  court record, which the official court record exhibits are the

14  ones up here.

15          THE CLERK:  And they will be taking those, Judge.

16          Do you need a copy with that stamp on it for your own

17  records?

18          THE COURT:  No, I don't.

19          THE CLERK:  Do you want the official to be used to

20  consider or do you want to use the ones they provided to you?

21          THE COURT:  We'll keep the official ones they provide.

22          THE CLERK:  Then I won't prepare the receipts because

23  the practice is to give counsel the official exhibits back now,

24  so I will.

25          THE COURT:  I will keep the official.

1          THE CLERK:  That's fine, but that's what I was

2    preparing, so I won't do that.

3          THE COURT:  Anything else on the exhibits?  Any

4    other --

5          MR. STAMBAUGH:  That's it for evidentiary issues, Your

6    Honor.

7          MR. MILLER:  I agree, Your Honor.

8          THE COURT:  Now, we've talked about written argument,

9    and in my last order I proposed maybe 21 days, but I'm flexible

10   as your schedules may dictate.  I think the efficient way to do

11   it would be to have you both file them simultaneously and you

12   can both reply to the other's.  So I'll give you a brief period

13   of time for that.  Now, when do you think you can have that

14   done?

15         MR. STAMBAUGH:  I'm going to defer to Mr. Zifchak.

16         MR. ZIFCHAK:  Your Honor, would you expect us to have

17   the transcripts before we prepare the briefs?

18         THE COURT:  Are you going to be ordering transcripts?

19         MR. ZIFCHAK:  Yes.

20         THE COURT:  All right.  Well, yes, though I don't --

21   why don't we move it out by another week, and if for some reason

22   the transcript is not ready -- should we make it 28 days?  I

23   really don't know how long the transcripts will take.  I'm

24   resisting the temptation to fluff up the court reporter after

25   all I know about her high skills and prompt service, but she has

1  other things to do as well.

2          MR. ZIFCHAK:  Friday, June 26th?

3          THE COURT:  Let's make it June the 26th.  Now, they're

4  due at the same time, so if somebody can't get it done, talk,

5  and if I need to grant an extension, I want to do it mutually so

6  that you both have them at the same time.

7          And shall we allow, oh, say, ten days after that for

8  reply, which would be -- is that sufficient?

9          MR. MILLER:  Your Honor, normally ten days would be

10 sufficient.  I note the July 4th holiday would be in there.

11 Maybe we could go with 14 just to avoid that holiday.

12         THE COURT:  All right.  What day would that be?

13         MR. MILLER:  I'm showing July 10th then.

14         THE COURT:  Okay.  Replies due by the 10th, and it

15 will be submitted at that time.

16         Now, as you work on these, one thing that will really

17 help the court, you know, different witnesses remembered things

18 happening at slightly different times and sometimes the record

19 was a little boggy as to what was going on when.  So if you

20 could include a time line of significant events with your

21 arguments, that would be helpful to me in keeping that straight,

22 the chronology.  So if you would do that for me, I would

23 appreciate that.  You don't have to -- just a description of

24 what happened, but your argument by the dates.  I just want to

25 be able to track the chronology as accurately as I can.  I know

1  the exhibits will help with that, but if you would do that for

2  me, I would appreciate that.

3          Anything else we need to talk about?

4          MR. STAMBAUGH:  Your Honor, as a personal matter, and

5  I know that I speak for all of us out-of-towners, we very much

6  appreciate the court's patience and courtesy in this proceeding.

7  I just wanted to say that.

8          THE COURT:  Well, you're quite welcome.  It's a

9  pleasure to have you all here.  You know, as pro bono

10  presentations go, this has been ranked very high in the pantheon

11  of such presentations I've seen.  You've all done an excellent

12  job, and it's apparent to me that all of you share the passion

13  of your respective clients for the subjects as to the inquiry of

14  the animals concerned, and I think that reflects the quality of

15  the presentation.

16          I'll look forward to your posttrial submissions and,

17  of course, I'll rule as quickly as I am able to.

18          Good day to you all.  Safe travels.

19          (Proceedings concluded at 3:25 p.m.)

20

21

22

23

24

25

676

1                    C E R T I F I C A T E

2          I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6          That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to computer transcription under my direction and

9    supervision, and that the foregoing computer transcription pages

10   are a full and complete transcript of the shorthand notes so

11   taken.

12         Dated at Des Moines, Iowa, this 15th day of June,

13   2015.

14

15

16

17                        /s/ Terri L. Martin
                          CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25