IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION AND COMMUNICATION INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA, DEMOCRATIC REPUBLIC OF CONGO, JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY, SUE SAVAGE-RUMBAUGH, Ph. D., and BONOBO HOPE INITIATIVE, INC.,<br><br>Defendants. | Case No. 4:10-cv-00052-RAW<br><br>**PLAINTIFFS' POST-HEARING REPLY BRIEF IN RESISTANCE TO DEFENDANT SUE SAVAGE-RUMBAUGH'S MOTION FOR SPECIFIC PERFORMANCE AND RELATED RELIEF** |

COME NOW Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust ("IPLS") and Ape Cognition and Communication Institute ("ACCI"), and for their Post-Hearing Reply Brief in Resistance to Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief ("Motion"), argue as follows:

**Table of Contents**

A. IPLS Continues to Exist as a Matter of Law ........................................................................... 2

B. ACCI Has Complied with the Research Provisions of the Settlement Agreements ............... 4

    1. Dr. Rumbaugh and BHI Cannot Rewrite the Settlement Agreements to Conform to a Never-Before Articulated Research Trajectory ............................................................. 4

    2. To the Extent Dr. Rumbaugh's and BHI's Interpretation of the Research Provisions Allows or Requires Research to be Conducted Without Prior IACUC Approval, it Violates Federal Law ...................................................................................................... 6

    3. Just Because Yerkes—Like Other Institutions—is Unwilling to Work with Dr. Rumbaugh it Does Not Follow and is Simply Untrue that Yerkes has Imposed or has

1

    the Power to Impose Restrictions on Dr. Rumbaugh's Access to the Facility ................ 8

C.    ACCI Has Complied with the Joint Ownership Provisions of the Settlement Agreements.... 9

D.    ACCI has Complied with its Obligations to Adequately Care for the Bonobos ................... 10

E.    BHI Should Not be Allowed to Relocate the Bonobos to Missouri ..................................... 12

\* \* \*

Dr. Rumbaugh and BHI have taken extreme and unsupportable positions. First, Dr. Rumbaugh and BHI ask this court to ignore Iowa law under which IPLS continues to exist. Then, Dr. Rumbaugh and BHI appear to ask the Court to rewrite the Settlement Agreements to incorporate certain more favorable terms and then request that the Court find ACCI in violation of those rewritten provisions. Such a request is contrary to Iowa law and in direct conflict with the clear language of the Settlement Agreements. The Settlement Agreements specifically provide that they are complete and do not incorporate any other oral or written agreements. The sought-after remedy for the alleged breaches is equally extreme—relocation of all the bonobos to a state in which Dr. Rumbaugh could personally own them, or an order directing that BHI be allowed to make <u>all</u> decisions regarding research in which the Bonobo 4 are involved.

Notwithstanding the extreme positions taken by Dr. Rumbaugh and BHI, ACCI has demonstrated a willingness to work with BHI in the future. The Court should find that IPLS continues to exist as a matter of law and that ACCI has not violated the terms of the Settlement Agreements.

**A. IPLS Continues to Exist as a Matter of Law**

To determine whether IPLS "ceases to exist" under the Settlement Agreements, this Court should decline Dr. Rumbaugh's and BHI's invitation to rely on a quote from a century old case. (Dkt. No. 134 at 18) (citing *Smith v. Vill. Enters.*, 208 N.W.2d 35 (Iowa 1973) (quoting appellant's quote of *Luedecke v. Des Moines Cabinet Co.*, 118 N.W.2 456, 487 (1908))). While

the opinion in *Smith*, a case involving equitable liens of co-creditors, contains the language "ceases to exist," it hardly governs the issues before this Court. A lot has happened under Iowa law over the past century, not the least of which is the enactment of Iowa Business Corporation Act. As such, Dr. Rumbaugh's and BHI's reliance on *Smith* is entirely misplaced.

Pursuant to Iowa Code section 490.1421, "[a] corporation administratively dissolved continues its corporate existence . . . ." A corporation's reinstatement following administrative dissolution is effective retroactively from the date of dissolution. Iowa Code § 490.1422(3) ("When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution as if the administrative dissolution had never occurred.").

BHI's own example of how it was retroactively reinstated after being administratively dissolved for failing to file its biennial report demonstrates how IPLS continues to exist as a matter of law. (Dkt. No. 134 at 18). Reinstatement after administrative dissolution is effective "<u>nunc pro tunc</u>" as of the date of dissolution. *Id.* (emphasis in original). Under Iowa law, corporations are perpetual in their existence. *See* Iowa Code § 490.302 (2015) (providing for perpetual duration of a corporation by default). IPLS has not taken action necessary to wind up the corporation because it plans to seek reinstatement as funds become available to pay off the lien against it. (Dkt. No. 134-1, App. at 50). As those funds become available, IPLS will be able to seek reinstatement upon which it will be "as if the administrative dissolution had never occurred." Iowa Code § 490.1422(3). There's nothing inequitable or illegal about allowing IPLS to do what BHI has done—seek reinstatement pursuant to Iowa law.

BHI and Dr. Rumbaugh attempt to ascribe some legal significance to an email written by Dr. Taglialatela containing the line that IPLS "no longer exist[s]" as if those were magic words capable of changing the legal characteristics of IPLS. As Dr. Taglialatela explained, IPLS needs

3

to move past its namesake "in order to gain some scientific credibility." (Tr. At 555:15-556:8). That remains true today. It does not, however, change the state of Iowa law under which IPLS continues to exist.

As explained in ACCI's and IPLS's post-hearing brief, to the extent the Court is even willing to entertain the argument that IPLS has ceased to exist, the Court should not allow Dr. Rumbaugh to benefit from her own wrongful acts by precipitating such a condition through her failure to file IPLS's biennial report. *Kaltoff v. Nielsen*, 106 N.W.2d 597, 602 (Iowa 1960); 17A Am. Jur. *Contracts* § 686 (2004).

### B. ACCI Has Complied with the Research Provisions of the Settlement Agreements

#### 1. Dr. Rumbaugh and BHI Cannot Rewrite the Settlement Agreements to Conform to a Never-Before Articulated Research Trajectory

After voluntarily removing herself from IPLS and the bonobos in May 2013 and passing over control of the research to Dr. Taglialatela and Dr. Hopkins in October 2013, Dr. Rumbaugh and BHI essentially ask the Court to rewrite the research provisions of the Settlement Agreements and then find ACCI in violation of those provisions. Specifically, in arguing that ACCI has violated the research provisions of the Settlement Agreements, Dr. Rumbaugh and BHI ask the Court to find that ACCI has violated the Agreements by failing to do the following:

- require "immers[ion] in the culture of language (Dkt. No. 134 at 28);
- provide Dr. Rumbaugh access to the bonobos as "one of the principal variables in the experiment" (*Id.* at 29);
- conduct human "rearing techniques" (*Id.* at 32);
- require volunteers to "wear[] t-shirts with lexigrams on them" (*Id.*);
- require "constant and systematic immersion of the bonobos in the culture of language" (*Id.* at 33); and
- require the "creation of a familial environment" that involves "sharing between members of the family to develop an immunological profile." (*Id*).

4

Dr. Rumbaugh's and BHI's arguments fail because they ignore the plain language of the Settlement Agreements.

The plain language of the Settlement Agreements does not require immersion in the culture of language, Dr. Rumbaugh's access to the bonobos, human "rearing techniques," wearing of certain t-shirts, "constant and systematic immersion of the bonobos in the culture of language," or the "creation of a familial environment" that involves "sharing between members of the family to develop an immunological profile." As one of the principal authors of the research provisions, Dr. Rumbaugh could have provided for any one of those requirements. She did not. And she cannot now ask the Court to rewrite the Settlement Agreements to require the parties to follow a purported "research trajectory" that had not even been articulated at the time the Settlement Agreements were signed. *Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651, 669 (Iowa 2008) (Appel, J., concurring) ("[W]e have repeatedly and in strong terms refused to supply terms that the parties for whatever reason chose not to include."). Indeed, to the extent the alleged research trajectory means something other than the language contained in the Settlement Agreements, the description of the research trajectory changed depending on which BHI witness testified at the hearing.

Moreover, the Settlement Agreements are fully integrated. *Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996). "An agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement." *Id.* Where an agreement is fully integrated, the parties cannot rely on "extrinsic evidence to contradict (or even supplement) the terms of the written agreement." *Id.* (citing Restatement (Second) of Contracts § 213 (1981)). Here, the handcrafted Settlement Agreements include "Administrative Provisions" that expressly provide as follows: "[t]he foregoing [Settlement Agreement]

5

constitutes the entire agreement among the parties, and there exists no other Agreement, oral or written, among the parties to this Agreement related to the matters covered by this Agreement." (Ex. 1 ¶ 15(c); Ex. 2 ¶ 11(c)). Thus, any argument that the Settlement Agreements incorporated any other oral or written agreements is contrary to the plain language of the Settlement Agreements.

As made clear in their post-hearing briefing, IPLS and ACCI have complied with the research provisions contained in the Settlement Agreements. As a result, the Court should decline to find a violation of these provisions.

> **2. To the Extent Dr. Rumbaugh's and BHI's Interpretation of the Research Provisions Allows or Requires Research to be Conducted Without Prior IACUC Approval, it Violates Federal Law**

Following the research trajectory urged by BHI and Dr. Rumbaugh would violate federal law. The Animal Welfare Act ("AWA") governs animal research and experimentation in the United States. Jeff Leslie, *Lay Persons and Community Values in Reviewing Animal Experimentation*, 2006 U. CHI. LEGAL F. 113, 116 (2006). According to the United States Department of Agriculture, the AWA "is the only Federal law in the United States that regulates the treatment of animals in research . . . . Other laws, policies, and guidelines may include additional . . . specifications for animal care and use, but all refer to the Animal Welfare Act as the minimum acceptable standard." *Animal Welfare Act*, USDA.GOV, http://goo.gl/DS82b (last visited July 16, 2015).

The AWA provides that "[t]he Chief Executive Officer of the research facility shall appoint an Institutional Animal Care and Use Committee (IACUC), qualified through the experience and expertise of its members to assess the research facility's animal program, facilities, and procedures." 9 C.F.R. § 2.31(a) (2015). Through this mandate, "[t]he mechanism for reviewing the proposed activities of animal facilities for compliance with the federally

6

established requirements begins with the IACUC." *Miss. State Univ. v. People for the Ethical Treatment of Animals, Inc.*, 992. So. 2d 595, 598 (Miss. 2008); s*ee also S.E.T.A. UNC-CH, Inc. v. Huffines*, 399 S.E.2d 340 (N.C. Ct. App. 1991) ("The IACUC is a committee created under the Federal Animal Welfare Act, 7 U.S.C. §§ 2131-2157 (1985), to inspect animal study areas and animal facilities, and to review all potential research experiments to ensure that all experiments minimize pain and distress in animals used in experiments.").

To facilitate IACUC review, "each member of the Committee shall be provided with a list of proposed activities to be reviewed. Written descriptions of all proposed activities that involve the care and use of animals shall be available to all IACUC members . . . ." 9 C.F.R. § 2.31(d)(2) (emphasis added).

Contrary to the requirement that IACUC review all proposed activities, Dr. Dubreuil testified that he had on at least two prior occasions conducted research with the bonobos without prior IACUC review or approval. (Tr. at 203:5–204:1). Dr. Dubreuil's testimony is consistent with Dr. Rumbaugh conducting research without IACUC oversight. Indeed, when Dr. Gilmore took over as the executive director of IPLS she had to help reinstate the IACUC altogether.

IPLS and ACCI have made clear that they are willing to allow any member of BHI, including Dr. Rumbaugh, to play a role in research to the extent it can be done safely, is consistent with the organization's mission, and is approved by the Institutional Animal Care and Use Committee (IACUC). (Dkt. No. 133 at 17); (Dkt. No. 133-1 at 64). Rather than submit research for IACUC approval, Dr. Rumbaugh and BHI urge the Court to construe the Settlement Agreements in a manner that would violate federal law by allowing or requiring research to be conducted without prior IACUC review and approval. This is is clearly inappropriate, and a concept the Court must reject.

### 3. Just Because Yerkes—Like Other Institutions—is Unwilling to Work with Dr. Rumbaugh it Does Not Follow and is Simply Untrue that Yerkes has Imposed or has the Power to Impose Restrictions on Dr. Rumbaugh's Access to the Facility

Although it is unclear how it could be a violation of the Settlement Agreements with respect to the research provisions, or even the joint ownership provisions, ACCI is compelled to respond to the persistent and patently false allegations that ACCI is merely a puppet organization for Yerkes which has required ACCI to restrict Dr. Rumbaugh's access to the lab.

As was made abundantly clear during the hearing, ACCI does not have any agreement—express, implied, secret, or otherwise—with Yerkes. It is unfortunate that Yerkes, like the Species Survival Plan, zoos, veterinary institutions, and other organizations with resources to help ACCI's operations are not willing to work with Dr. Rumbaugh because of her past interactions with them, her reputation in the scientific community, and the significant safety risks she poses to the bonobos and staff. (*see, e.g.*, Tr. 663:3-24; 666:2-13); (*see also* Dkt. No. 133 at 18-19) (setting forth safety concerns). However, it does not follow that Yerkes or any other institution has imposed Dr. Rumbaugh's ban from the facility; nor could they.

To the contrary, Dr. Rumbaugh voluntarily removed herself from the bonobos in May 2013. For several months, she continued to fail to assist the bonobos or IPLS in any way, including failing to file its biennial report. When Dr. Rumbaugh resurfaced in October 2013, she voluntarily passed complete control of the research over to Dr. Taglialatela and Dr. Hopkins. She agreed to absent herself from the lab and to be involved only after IPLS had stabilized and only as appropriate under Dr. Taglialatela's direction. Both IPLS and BHI voted to approve the new roles of Dr. Taglialatela and Dr. Hopkins.

Dr. Rumbaugh and BHI now attempt to assign fault to ACCI for holding Dr. Rumbaugh to her word as clearly set forth in her October 26, 2013 email. Whether Dr. Rumbaugh thought

circumstances had changed after she sent that email, it was incumbent on her to raise that issue with BHI. For their part, Dr. Taglialatela and Dr. Hopkins simply relied on Dr. Rumbaugh's word and followed through with the significant undertaking of caring for the bonobos against what has evolved into increasing resistance from BHI and Dr. Rumbaugh.

### C. ACCI Has Complied with the Joint Ownership Provisions of the Settlement Agreements

As an initial matter, ACCI agrees that it and BHI jointly own Kanzi, Nyota, Elikya, and Teco. (Ex. 2 ¶ 1) ("All parties stipulate and agree that the Trust and Bonobo Hope jointly are the owners of Kanzi, Nyota, Elikya, and Teco"). ACCI alone owns Maisha. (Ex. 1 ¶ 3) ("All parties stipulate and agree that the Trust is the owner of Maisha."). Those two elements seem to be the extent of the parties' agreement relative to the ownership provisions. IPLS and ACCI will briefly address BHI's contentions with respect to its rights under the ownership provisions.

BHI does not have the right to direct the research with the bonobos under the Settlement Agreements. BHI argues that because it was purportedly tasked with directing the research with the bonobos at one time before the signing of the Settlement Agreements that the Settlement Agreements somehow incorporate BHI's alleged exclusive, perpetual power to direct that research. Here again, BHI and Dr. Rumbaugh ignore the plain language of the Settlement Agreements. The Settlement Agreements are simply silent as to how the joint ownership provision operates and what rights it confers.

The better interpretation of the joint ownership provision of the Side Agreement is that it requires the parties to work together to conduct research with Kanzi, Nyota, Elikya, and Teco. The parties have done just that. In November 2013, on Dr. Rumbaugh's express recommendation, IPLS and BHI voted to provide Dr. Taglialatela and Dr. Hopkins with complete control over the research to be conducted with the bonobos. That decision is consistent

with exercising joint ownership. At the time, no one from BHI objected that this was somehow inconsistent with the Settlement Agreements. Nor did BHI object that it was inconsistent with the rights they now claim—exclusive, perpetual control over the research to be conducted with the bonobos. In sum, the Agreements do not provide BHI with the exclusive, perpetual right to direct the research to be conducted with Kanzi, Nyota, Elikya, and Teco; and certainly not with respect to Maisha.

Dr. Rumbaugh and BHI set forth a number of other actions which they allege violate the joint ownership provision of the Settlement Agreement. Other than being displeased with ACCI's actions and decisions, Dr. Rumbaugh and BHI point to no language in the Settlement Agreement which substantiates these actions as being violations of the Settlement Agreements. Dr. Rumbaugh's and BHI's argument that the Settlement Agreements incorporate unwritten and unexpressed expectations is contrary to the language in the Settlement Agreements that expressly provide that the Agreements contain no other written or oral agreements. (Ex. 1 ¶ 15(c); Ex. 2 ¶ 11(c)); *Kern*, 757 N.W.2d at 669 ("[W]e have repeatedly and in strong terms refused to supply terms that the parties for whatever reason chose not to include.").

**D. ACCI has Complied with its Obligations to Adequately Care for the Bonobos**

Incredibly, Dr. Rumbaugh and BHI double down on the theory that Des Moines flood waters cause cancer in humans and bonobos. This wildly speculative and completely unsupported claim further undermines the credibility of Dr. Rumbaugh and BHI to take responsible, well-reasoned positions. Moreover, it is undisputed that Dr. Rumbaugh served as the executive director of IPLS after the 2008 flooding. As IPLS's executive director, Dr. Rumbaugh was in a direct position of authority to test the toxicity of the ground water had she—or anyone—thought the water posed a risk to the bonobos or to human life, including the life of her sister. It is clear that the idea that flood waters in Des Moines cause cancer was invented to

10

support Dr. Rumbaugh's and BHI's requested relief.

In addition, with no citation to authority, Dr. Rumbaugh and BHI request that the Court re-open the record and take judicial notice of certain water levels at the end of June 2015. Simply put, this position cannot hold water. To the extent the Court is willing to entertain new evidence as to water levels, it should also take notice of the fact that no water reached ACCI facility nor did it pose any risk to the bonobos.[1]

As clearly explained in its post-hearing brief, ACCI has used its best efforts to provide complete and competent care of the bonobos and have taken all reasonable precautions to ensure their complete safety. (Tr. 404:8-405:10, 421:19-422:7). Indeed, ACCI has enacted protocols improving the health and diet of the bonobos, requiring hand sanitation, and requiring volunteers to wear gloves and masks when appropriate that have resulted "in a dramatic reduction in the number of respiratory illnesses." (Tr. 405:2-10).

Notwithstanding the clear evidence that ACCI has used its best efforts to provide complete and competent care of the bonobos and have taken all reasonable precautions to ensure their complete safety, Dr. Rumbaugh and BHI offer speculation that the bonobos' psychological health has suffered in Dr. Rumbaugh's absence. Professor Dubreuil is not qualified to opine on "signs of depression" or interpret the meaning of purported "heavy silence" in the facility. (Dkt. No. 134 at 47). Moreover, this speculation is contrary to Dr. Rumbaugh's and BHI's October 2013 agreement that it was in everyone's best interest that Dr. Rumbaugh "absent herself" from the lab following several months of her voluntarily having no contact with the bonobos at all. (Ex. 1005).

---

[1] If inclined, the Court could also consider the new evidence that Dr. Rumbaugh and BHI's general counsel, Sheila Knoploh-Odole, had opportunity to personally confirm the absence of any flooding concern on June 26, 2015, when both entered the fenced grounds of the ACCI facility unannounced and uninvited and confronted Dr. Taglialatela based on purported police reports about the bonobos being moved from the facility.

Dr. Rumbaugh and BHI also offer unsupported speculation that the bonobos' psychological health has suffered in alleged absence of the lexigram keyboards. Dr. Rumbaugh and BHI appear to jump to the conclusion that the lexigram keyboards are <u>never</u> in use at the facility because a BHI board member purportedly did not see the bonobos actively engaging with the keyboards during a brief visit to the facility. Such a logical leap is completely unwarranted. Indeed, Dr. Taglialatela testified that the notion that ACCI has taken the lexigram keyboards away from the bonobos is "positively ridiculous." (Tr. 512:15-18). ACCI is "constantly thinking of new ways" to use the lexigram keyboards with the bonobos. (Tr. 512:15-514:9). This allegation again appears to have been invented for purposes of supporting Dr. Rumbaugh's and BHI's sought-after relief.

**E. BHI Should Not be Allowed to Relocate the Bonobos to Missouri**

Notwithstanding its own failure to provide any support for the care of the bonobos, BHI has apparently undertaken efforts to relocate the bonobos to Missouri—a state in that, unlike Iowa, would apparently allow Dr. Rumbaugh to personally own the bonobos as pets. To facilitate this relocation, Dr. Rumbaugh and BHI intend to lean heavily and almost exclusively on the resources of Ryan Sheldon.

As an initial matter, the request to relocate the bonobos should be denied because, as previously explained, IPLS continues to exist and it has not, in its sole discretion, determined that it is unable to provide a home and proper care and support for the bonobos. (*See* Ex. 1 ¶ 4; Ex. 2 ¶ 4).

If IPLS had ceased to exist—which it has not—only then would Dr. Rumbaugh and BHI have the opportunity to relocate the bonobos. (*See* Ex. 1 ¶ 4; Ex. 2 ¶ 4). However, should Dr. Rumbaugh and BHI "fail to exercise [their] discretion regarding placement [of the bonobos], including making appropriate arrangements to transport the bonobos to a new residence, the

Trust will use its best efforts to place the bonobo[s] in a new location." (*See* Ex. 1 ¶ 4; Ex. 2 ¶ 4).

Here, even if IPLS had ceased to exist, Dr. Rumbaugh and BHI have not made appropriate arrangement to transport the bonobos to a new residence. Mr. Sheldon should be commended for his generosity. His good-intentions, however, put the bonobos at serious risk. Indeed, Mr. Sheldon testified that as the facility stands today it has no utilities, only rudimentary plumbing, no windows, no HVAC system, no fire detection system, and no security system. (Tr. 382:5-383:7). He also testified that, without even knowing whether it was common or acceptable in a facility that houses great apes, he intended to provide backup power through the use of a wood burning furnace in a location close to the bonobos. (Tr. 383:8-384:23). Moreover, Dr. Rumbaugh and BHI have not obtained nor have they attempted to obtain permits to transport the bonobos. (Tr. 384:24-385:22). As such, Dr. Rumbaugh and BHI have failed to make appropriate arrangement for the transport of the bonobos to a new residence. Thus, even if IPLS had ceased to exist (which it has not), IPLS and ACCI should be afforded the opportunity to continue to care for the bonobos in the existing twenty-million dollar great ape facility right here in Des Moines.

In sum, the Court should find that IPLS continues to exist as a matter of law and that ACCI has not violated the terms of the Settlement Agreements.

WHEREFORE Plaintiffs Iowa Primary Learning Sanctuary d/b/a Great Ape Trust and Ape Cognition and Communication Institute respectfully request that this Court deny Defendant Sue Savage-Rumbaugh's Motion for Specific Performance and Related Relief in its entirety and grant such further or additional relief the Court deems just and proper under the circumstances.

Date: July 24, 2015

/s/ William J. Miller
William J. Miller (AT0005414)
Brian A. Melhus (AT0011421)
Dorsey & Whitney LLP
801 Grand Avenue, Suite 4100
Des Moines, Iowa 50309-2790
Tel: (515) 283-1000
Fax: (515) 283-1060
E-mail: miller.william@dorsey.com
 melhus.brian@dorsey.com
**ATTORNEYS FOR PLAINTIFFS**

Original filed. Copy to:

Todd P. Langel
Faegre Baker Daniels LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309

William C. Zifchak
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Ross Neihaus
Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
ATTORNEYS FOR DEFENDANTS
DR. SUE SAVAGE-RUMBAUGH,
PH.D. and BONOBO HOPE
INITIATIVE, INC.

Gregory M. Lederer
Kimberly K. Hardeman
Lederer Weston Craig, PLC
118 Third A venue Se, Suite 700
P.O. Box 1927
Cedar Rapids, IA 52406-1927
ATTORNEYS FOR DEFENDANT
ZOOLOGICAL FOUNDATION OF
GEORGIA, INC. d/b/a ZOO
ATLANTA

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 24, 2015, the foregoing instrument was served upon all parties to the above case and/or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings:

**By:** Electronic Filing and/or
\_\_\_\_ U.S. Mail          \_\_\_\_ FAX
\_\_\_\_ Hand Delivered     \_\_\_\_ Overnight Courier
_X_ E-mail                 \_\_\_\_ Other _____

/s/ Brian A. Melhus

William W. Graham
Graham Ervanian & Cacciatore, LLP
317 Sixth Avenue
Suite 900
Des Moines, IA 50309
ATTORNEYS FOR DEFENDANT
DEMOCRATIC REPUBLIC OF
CONGO