IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA PRIMATE LEARNING SANCTUARY d/b/a GREAT APE TRUST and APE COGNITION & COMMUNICATION INSTITUTE,<br><br>Plaintiff(s),<br><br>vs.<br><br>ZOOLOGICAL FOUNDATION OF GEORGIA, INC. d/b/a ZOO ATLANTA; DEMOCRATIC REPUBLIC OF CONGO; JAPAN MONKEY CENTRE INSTITUTE AND MUSEUM OF PRIMATOLOGY and SUE SAVAGE-RUMBAUGH, Ph.D.,<br><br>Defendant(s).<br><br>And BONOBO HOPE INITIATIVE, INC.,<br><br>Intervenor Defendant. | 4:10-cv-00052-RAW<br><br><br><br><br><br>RULING ON MOTION OF DEFENDANT DR. SUE SAVAGE-RUMBAUGH FOR SPECIFIC PERFORMANCE AND RELATED RELIEF |

The above motion [69] joined by Intervenor Defendant Bonobo Hope Initiative, Inc. (BHI) is before the Court. Plaintiffs Iowa Primate Learning Sanctuary (IPLS) d/b/a Great Ape Trust and Ape Cognition and Communication Institute (ACCI) resist. The Court conducted a three-day evidentiary hearing, which began on May 27, 2015, and was completed on May 29, 2015. Following post-hearing briefing the matter is now fully submitted. It is before the undersigned pursuant to 28 U.S.C. § 636(c).

# I.    THE INTERPLEADER AND SETTLEMENT

IPLS filed this interpleader action pursuant to 28 U.S.C. § 1335 against Zoological Foundation of Georgia d/b/a Zoo Atlanta (Zoo Atlanta); Democratic Republic of the Congo (DRC); Japan Monkey Centre Institute and Museum of Primatology (JMC); and Dr. Sue Savage-Rumbaugh requesting the Court determine the ownership rights of two bonobos (a great ape species, *see infra* at 18), a then 40-year old female named Matata, and her then 9-year old son named Maisha. The bonobos resided at the IPLS sanctuary in Des Moines.

The convoluted transactions going back to 1974 upon which the competing ownership interests were based and which brought the bonobos to Des Moines do not need to be recited here. Count I of the Complaint sought resolution of the competing ownership claims to Matata and Maisha and Count II requested an injunction restraining the Defendants from instituting or prosecuting any proceeding affecting Matata or Maisha.

On June 25, 2010, Zoo Atlanta filed a motion to appoint a receiver. On January 20, 2011, prior to the hearing, the parties notified the Court they had resolved the issue and the motion was withdrawn. Almost one year passed without any contact with the Court. Then, on December 6, 2011, Dr. Savage-Rumbaugh filed a motion in the form of a letter, requesting expedited relief, an emergency status conference, and a scheduling conference. The other parties filed various responses to Dr. Savage-Rumbaugh's request and the Court set the matter for a status conference, which was held on December 20, 2011, before U.S. District Judge James E. Gritzner. On the same date, the undersigned held a scheduling conference with the parties. A settlement conference was set for January 24, 2012, however, the parties repeatedly requested continuance of the settlement

conference indicating settlement negotiations were underway. Settlement was ultimately finalized on January 31, 2013.

On February 21, 2013, IPLS filed a stipulation pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and LR 41.1.a.2, stating that it "stipulat[ed] to the dismissal of this interpleader action, pursuant to the terms of a settlement agreement, as to all defendants except JMC . . . ." [59]. The Stipulation also stated that "[t]he parties agree and consent to the continued jurisdiction of the court to oversee compliance with the settlement agreement, for a period of twelve (12) months from signature." (*Id.*) The parties did not attach a copy of the settlement agreement to the stipulation nor was a copy otherwise provided to the Court. The Court did not enter a dismissal order incorporating the settlement.

On IPLS's motion, the Clerk of Court entered default against JMC, and on June 14, 2013, default judgment was entered against JMC which eliminated its ownership interest [63].

On February 14, 2014, Dr. Savage-Rumbaugh filed an unresisted motion requesting "that this Court retain jurisdiction over the settlement agreement previously entered into by the parties for an additional 120 days (until on or around June 17, 2014)." (Unopp. Mot. to Continue Juris., [65]). The Court entered a text order granting the motion to retain jurisdiction over the settlement agreement until June 17, 2014. A copy of the settlement agreement was not attached to the motion to continue jurisdiction.

On June 13, 2014, Dr. Savage-Rumbaugh filed the present motion. She sought to enforce both the settlement agreement and a separate supplemental agreement against ACCI as alleged

successor to IPLS[1] in particulars which will be gone into later. Attached to the motion were several exhibits including documents titled "Agreement for Settlement and Acknowledgment of Ownership" (the "Settlement Agreement") and a document titled "Supplemental Agreement for Settlement and Acknowledgment of Ownership" (the "Supplemental Agreement"). (Exs. A and B to Motion [69-2] and [69-3], respectively). Dr. Savage-Rumbaugh's motion represented the first time the Court was informed of the Supplemental Agreement entered into between IPLS, Dr. Savage-Rumbaugh, and non-party BHI. The Settlement Agreement and the Supplemental Agreement were presented to the Court for the first time when the motion to enforce was filed.

The Settlement Agreement, entered into between IPLS, Zoo Atlanta, the DRC, and Dr. Savage-Rumbaugh,[2] settled the ownership interests in bonobos Matata and Maisha, and contained provisions relating to research involving the bonobos, their care and residence. It stated:

AGREEMENT FOR SETTLEMENT AND ACKNOWLEDGMENT OF OWNERSHIP

This Agreement for Settlement and Acknowledgment of Ownership ("Agreement") is entered into on the dates set forth below, by and between the Iowa Primate Learning Sanctuary d/b/a Great Ape Trust of Iowa ("Trust"); Zoological Foundation of Georgia d/b/a Zoo Atlanta ("Zoo"); Democratic Republic of the Congo ("DRC"); and Emily Sue Savage-Rumbaugh ("Savage-Rumbaugh") according to the terms set forth below:

WHEREAS, there has been a dispute concerning the ownership of two bonobos (*Pan paniscus*) who reside at the Trust, including specifically: Matata, a

_____

[1] IPLS was administratively dissolved on August 9, 2013, for failure to deliver the 2013 biennial report as required under Iowa law. On December 18, 2013, ACCI was formed to succeed to IPLS. *See infra* at 28-29.

[2] At the time the Settlement Agreement was signed, BHI was not a party to this action. Nonetheless, BHI Director Julie Gilmore signed the Settlement Agreement on behalf of BHI as to paragraphs 3, 6, and 8. Those paragraphs contain contingency provisions giving BHI, in unison with Dr. Savage-Rumbaugh, sole discretion regarding placement of Maisha in the event IPLS ceased to exist or otherwise became unable to provide care for Maisha.

forty (40) year old female born in the Democratic Republic of the Congo, and Maisha born May 28, 2000 at the Language Research Center at Georgia State University;

WHEREAS, each of the parties to this Agreement asserts a potential ownership interest in one or more of the bonobos;

WHEREAS, on or about February 9, 2010, the Trust filed a Complaint for Interpleader in the United States District Court for the Southern District of Iowa, captioned Iowa Primate Learning Sanctuary d/b/a Great Ape Trust v. Zoological Foundation of Georgia, Inc. d/b/a Zoo Atlanta, Democratic Republic of Congo, Japan Monkey Centre Institute and Museum of Primatology ("JMC"), and Sue Savage Rumbaugh, Ph.D., Case No. 10-52, for the purpose of resolving the competing ownership claims to Matata and Maisha ("Interpleader.") A copy of the Interpleader is attached as Exhibit A;

WHEREAS, JMC has not appeared in the Interpleader and is in default; and WHEREAS, the parties wish to resolve their respective claims to ownership of Matata and Maisha, and dismiss the Interpleader;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, and other good and valuable consideration as set forth herein, the parties do now agree as follows:

1. All parties stipulate and agree that DRC is the sole owner of Matata.
2. Subject to DRC's absolute rights to at any time take possession and/or control of Matata or to otherwise unilaterally change the arrangements respecting possession, custody and/or care of Matata, which rights are hereby acknowledged by all parties, Matata shall continue to reside at the Trust for at least so long as she and/or the other members of the colony for which she is the Matriarch continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Matata's residence.
3. All parties stipulate and agree that the Trust is the owner of Maisha.
4. Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits,

sociological role construction, normative child rearing practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Maisha's residence.

5.     The Trust shall use its best efforts to provide complete and competent care of Matata and Maisha; and shall take all reasonable precautions to ensure their complete safety.

6.     Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for Matata and/or Maisha, the Trust shall provide the DRC, in the case of Matata, and Bonobo Hope Initiative, Inc., an Iowa nonprofit corporation ("Bonobo Hope"), in the case of Maisha, sixty days written notice prior to the date upon which the Trust will no longer be available as a residence for Matata or Maisha. The Trust in either case shall also provide sixty (60) days written notice to the court in the Interpleader Action. The notice will include any information in the Trust's possession concerning the status of the research in which the bonobos are participating, and any options, of which the Trust is aware, for new residences for the bonobos. DRC shall have sole discretion regarding placement of Matata under such circumstances. Bonobo Hope in unison with Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such circumstances. Should either DRC or Bonobo Hope fail to exercise its discretion regarding placement of Matata or Maisha, as the case may be, including making appropriate arrangements to transport the bonobo to a new residence, the Trust will use its best efforts to place the bonobo in a new location, preferably a private sanctuary, with preference given to placement together with other members of the bonobo colony with whom the bonobo resided at the Trust.

7.     Savage-Rumbaugh's willingness to execute this Agreement is contingent upon her entering simultaneously into a side agreement with the Trust.

8.     Zoo, Savage-Rumbaugh and, respecting Matata only, the Trust, in consideration of the terms and promises set forth herein, including but not limited to the stipulation of all parties to the dismissal of the Interpleader and the mutual releases of claims by all parties, hereby agree to relinquish all claims of ownership that they may have or claim to have, based on contract, statute or regulation, common law, or on any other basis, to Matata or Maisha; and in the case of Zoo only, any claims of ownership to Panbanisha, Nyota, Elikya, Kanzi and Teco.

    Zoo, and Savage-Rumbaugh acknowledge and agree that relinquishing their claim to ownership of Matata and Maisha includes, but is not limited to relinquishing any and all rights to determine the residence, breeding, activities, or use of Matata and Maisha, subject to the contingent rights of Bonobo Hope in paragraph 6 above.

9.     The Trust shall indemnify and hold Zoo and Savage-Rumbaugh harmless against and from any and all claims or demands of every kind or character

that may be asserted against the Trust as a result of or related to any actions by any of the bonobos now residing at the Trust.

10. The parties agree that they have executed this Agreement of their own free will, and with full understanding of its content and the impact of this Agreement on their legal rights, and that it they have had an opportunity to discuss and evaluate the terms of this Agreement with their attorneys as they deem appropriate.

11. Each party agrees that it will stipulate to the dismissal of the Interpleader pursuant to the form attached hereto as Exhibit B, which stipulation provides for continued supervision by the court for twelve (12) months.

12. Each party agrees to release each other party of the Action, including the other parties' respective corporate affiliates, current and former officers, directors, employees, agents, representatives, and attorneys, from any and all actions, causes of action, suits, claims, expenses, costs (including court costs), claims for attorneys fees, or demands of any kind whatsoever arising prior to the date of the dismissal with prejudice of the Interpleader and relating in any way to: the ownership of Matata and Maisha, assertion of any claim to ownership of Matata and Maisha, the Interpleader, the agreements attached as Exhibits to the Interpleader, only insofar as they relate or may relate to the ownership of Matata and Maisha, and any other action taken by any other party as it relates to the ownership, care, custody, or possession of Matata and Maisha.

13. The parties each represent and warrant that the signatories below are authorized to enter into this Agreement and bind the parties with respect to the matters addressed herein.

14. Any notices required by this Agreement shall be forwarded both by email and by the regular mail service of the country from which they originate to the parties. . . [omitted].

15. Administrative Provisions

   a. The Agreement shall be governed by the laws of the state of Iowa; and any action to enforce it must be brought in the State or Federal Courts located in Des Moines, Iowa, provided that the Trust remains a going concern in Polk County, Iowa and those courts can acquire personal jurisdiction over the Trust or its representatives.

   b. The language of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

   c. *The foregoing constitutes the entire agreement among the parties, and there exists no other Agreement, oral or written, among the parties to this Agreement related to the matters covered by this Agreement. This Agreement may be executed by facsimile signature and in counterparts, and each signed counterpart shall be treated as an original for all purposes.*

   d. This Agreement shall not be modified except by an express written understanding between parties.

(Ex. 1 (emphasis added)).

The Supplemental Agreement entered into between IPLS, Dr. Savage-Rumbaugh, and

BHI, related to the ownership of four other bonobos at the sanctuary, Kanzi, Nyota, Elikya and

Teco ("the Bonobo 4") and like the Settlement Agreement contained provisions relating to the

research involving, care and residence of the bonobos. It stated:

SUPPLEMENTAL AGREEMENT FOR SETTLEMENT
AND ACKNOWLEDGMENT OF OWNERSHIP

This Agreement for Settlement and Acknowledgment of Ownership
("Agreement") is entered into on the dates set forth below, by and between the Iowa
Primate Learning Sanctuary d/b/a Great Ape Trust of Iowa ("Trust"); Emily Sue
Savage-Rumbaugh ("Savage-Rumbaugh"); and Bonobo Hope Initiative, Inc.
("Bonobo Hope") an Iowa non-profit corporation according to the terms set forth
below:

WHEREAS, all parties to that certain Interpleader Action filed in the Iowa
District Court for the Southern District of Iowa on or about February 9, 2010, with
the exception of the Japanese Monkey Centre Institute and Museum of Primatology
("JMC") which is in default, have resolved their respective claims to ownership of
certain of the bonobos (*pan paniscus*), Matata and Maisha who reside at the Trust;

WHEREAS, the Trust and Savage-Rumbaugh *wish to resolve their
respective remaining claims to ownership of the remaining bonobos at the Trust*
and to provide for their care and safety going forward;

NOW, THEREFORE, in consideration of the foregoing and the mutual
promises, and other good and valuable consideration as set forth herein, the parties
do now agree as follows:

1.    All parties stipulate and agree that the Trust and Bonobo Hope jointly are
      the owners of the bonobos Kanzi, Nyota, Elikya and Teco, now residing at
      the Trust (the "Bonobo 4").
2.    The Bonobo 4 shall continue to reside at the Trust for at least so long as
      they continue to be involved in research in the fields of experimental
      psychology; use of language and tools; and ape intelligence and human
      cultural modes (including but not limited to art, music, tools, agriculture,
      fire, animal domestication, habitat construction, use of water, hunting,
      mimits, sociological role construction, normative child rearing practices,
      play, or normative religious/mythological practices.)

3.  The Trust shall use its best efforts to provide complete and competent care of the Bonobo 4; and shall take all reasonable precautions to ensure their complete safety.

4.  Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for the Bonobo 4, the Trust shall provide Savage-Rumbaugh (or her legal representative) and Bonobo Hope (or its legal representative or successor, if any) sixty (60) days written notice prior to the date upon which the Trust will no longer be available as a residence for the Bonobo 4 or the date as of which the Trust proposes to place the Bonobo 4 in a new residence, whichever date is earlier. The notice will include any information in the Trust's possession concerning the status of the research in which the Bonobo 4 are participating, and any options, of which the Trust is aware, for new residences for the Bonobo 4. Savage- Rumbaugh or her legal representative and Bonobo Hope acting in unison shall have sole discretion regarding placement of the Bonobo 4 under such circumstances and the Trust or its legal representative shall cooperate fully in that endeavor, at no cost to Savage-Rumbaugh or Bonobo Hope. Should Savage Rumbaugh or Bonobo Hope fail to exercise such discretion regarding placement of the Bonobo 4, including making appropriate arrangements to transport the Bonobo 4 to a new residence, the Trust (or its legal successor, if any) will use its best efforts to place the Bonobo 4 in a new residence, preferably a private sanctuary, with preference given to placement in a new residence together with the bonobos Matata and Maisha, at no cost to Savage-Rumbaugh or Bonobo Hope.

5.  Savage-Rumbaugh, in consideration of the terms and premises set forth herein, hereby agrees to relinquish all claims of ownership that she may have or claim to have, based on contract, statute or regulation, common law, or on any other basis, to the Bonobo 4 or any of them. Savage-Rumbaugh acknowledges and agrees that relinquishing her claim to ownership includes, but is not limited to relinquishing any and all rights to determine the residence, breeding, activities, or use of the Bonobo 4, subject to her contingent rights and those of Bonobo Hope in paragraph 4 above, which contingent rights are absolute and unqualified; and without prejudice to her rights, responsibilities or professional judgments, as a member of the boards of the Trust and Bonobo Hope and as Director of Science of Bonobo Hope or any other officer position of either entity to which she may be appointed, elected or hired.

6.  The Trust shall indemnify and hold Savage-Rumbaugh and Bonobo Hope harmless against and from any and all claims or demands of every kind or character that may be asserted against the Trust, Savage-Rumbaugh or Bonobo Hope as a result of or related to any actions by any of the bonobos now residing at the Trust. This indemnity shall extend to all costs, expenses and attorney's fees which may be incurred by Savage Rumbaugh or Bonobo Hope in connection with any such claim or demand.

7.    The parties agree that they have executed this Agreement of their own free will, and with full understanding of its content and the impact of this Agreement on their legal rights, and that they have had an opportunity to discuss and evaluate the terms of this Agreement with their attorneys as they deem appropriate.

8.    Each party to this Agreement agrees to release each other party to the Agreement, including the other parties' respective corporate affiliates, current and former officers, directors, employees, agents, representatives, and attorneys (collectively "Released Parties"), from any and all actions, causes of action, suits, claims, expenses, costs (including court costs), claims for attorneys fees, or demands of any kind whatsoever arising prior to the date hereof and relating in any way to: the ownership of the Bonobo 4 (or the deceased bonobo, Panbanisha), assertion of any claim to ownership of the Bonobo 4 (or Panbanisha ["Panbanisha"]), and any other action taken by any other of the Released Parties as it relates to the ownership, care, custody, or possession of the Bonobo 4 (or Panbanisha), provided that this release shall not preclude Savage Rumbaugh from asserting counter-claims or cross-claims, as the case may be, against any of the Released Parties, who makes a claim against Savage-Rumbaugh relating to the ownership, care, custody or possession of the Bonobo 4 (or Panbanisha) or any of them.

9.    The parties each represent and warrant that the signatories below are authorized to enter into this Agreement and bind the parties with respect to the matters addressed herein.

10.   Any notices required by this Agreement shall be forwarded both by email and by the regular mail service of the country from which they originate to the parties . . . [omitted].

11.   Administrative Provisions

      a.    The Agreement shall be governed by the laws of the state of Iowa; and any action to enforce it must be brought in the State or Federal Courts located in Des Moines, Iowa, provided that the Trust remains a going concern in Polk County, Iowa and those courts can acquire personal jurisdiction over the Trust or its representatives.

      b.    The language of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

      c.    *The foregoing constitutes the entire agreement among the parties concerning the subject matter of this Agreement, and there exists no other Agreement, oral or written, among or between the parties related to the matters covered by this Agreement, with the exception of the "Agreement for Settlement and Acknowledgment of Ownership" dated January 31, 2013. This Agreement may be executed by facsimile signature and in counterparts, and each signed counterpart shall be treated as an original.*

      d.    This Agreement shall not be modified except by an express written understanding between parties.

(Ex. 2 (emphasis added)).

On June 21, 2014, shortly after Dr. Savage-Rumbaugh filed the present motion for specific performance, Matata passed away.

The Court subsequently allowed ACCI, an Iowa non-profit corporation with its principal place of business in Iowa, [69-7], to be added as a plaintiff, and BHI, also an Iowa non-profit corporation with its principal place of business in Iowa, [69-15], to be added as an intervenor defendant. A status conference was held on December 18, 2014. Among other things discussed at the status conference was the issue of whether the Court had subject matter jurisdiction to enforce the Supplemental Agreement. Following the status conference, the Court entered an order [93] directing the parties to file briefs by February 16, 2015, addressing the issue of the Court's subject matter jurisdiction over the Supplemental Agreement. Briefs were filed as directed.

## II.    JURISDICTION

### A.    Original Jurisdiction

At this point no one questions the Court's original jurisdiction of the interpleader action involving Matata and Maisha, but any discussion of jurisdiction to enforce the Settlement Agreement and Supplemental Agreement starts with the original jurisdiction. IPLS filed this interpleader action pursuant to the interpleader statute, 28 U.S.C. § 1335.

Section 1335 states:

(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more, or having issued a note, bond, certificate, policy of insurance, or other instrument of value or amount of $500 or more, or providing for the delivery or payment or the loan of money or property of such amount or value, or being under any obligation written or unwritten to the amount of $500 or more, if

(1) Two or more adverse claimants, of diverse citizenship as defined in subsection (a) or (d) of section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court with respect to the subject matter of the controversy.

(b) Such an action may be entertained although the titles or claims of the conflicting claimants do not have a common origin, or are not identical, but are adverse to and independent of one another.[3]

In *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523 (1967), the U.S. Supreme Court defined the diversity requirement of § 1335 as "requir[ing] only 'minimal diversity,' that is, diversity of citizenship between two or more claimants, without regard to the circumstance that other rival claimants may be co-citizens." *Id.* at 530. The minimal diversity requirement of § 1335 must exist at the time the interpleader complaint is filed. *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570 (2004) ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'").

At the time this action was filed, IPLS was an Iowa non-profit corporation organized under the laws of Iowa with its principal place of business in Iowa; Zoo Atlanta was a Georgia non-profit corporation with its principal place of business in Atlanta, Georgia; the DRC was a foreign sovereign nation; JMC was an entity organized under the laws of the foreign sovereign nation of Japan; and Dr. Savage-Rumbaugh was a citizen of Iowa. Parties asserting claims of ownership

---

[3] On September 15, 2015 ACCI posted the interpleader bond set by the Court [139].

over Matata and Maisha were citizens of the states of Iowa and Georgia, and the foreign sovereigns of Japan and the DRC. There were thus two or more adverse claimants of diverse citizenship. The bonobos have a value of $500 or more. The Court had original jurisdiction of the interpleader.

**B.** **Jurisdiction to Enforce the Settlement Agreement and the Supplemental Agreement**

The Settlement Agreement was entered into between IPLS, the DRC, Zoo Atlanta, Dr. Savage-Rumbaugh, and to a limited extent, non-party BHI. The Supplemental Agreement was entered into between non-diverse parties IPLS and Dr. Savage-Rumbaugh, and non-diverse, non-party BHI. The Supplemental Agreement concerned the Bonobo 4, none of which were the subject of the interpleader action.

The Stipulation of Dismissal filed on February 20, 2013, stated, in relevant part, that the "*parties* agree[d] and consent[ed] to the *continued* jurisdiction of the court to oversee compliance with the *settlement agreement*, for a period of twelve (12) months from signature. All *parties* who have appeared are signatories to this stipulation." (Stip. Dismiss. [59] (emphasis added)). The Stipulation did not mention the Supplemental Agreement entered into between IPLS, Dr. Savage-Rumbaugh, and non-party BHI, involving the Bonobo 4.

Although the Court granted Dr. Savage-Rumbaugh's unresisted motion for extension of the Court's enforcement jurisdiction until June 17, 2014, the order indicated only that the Court would retain jurisdiction "over the *settlement agreement entered into by the parties*." (Text Order of Feb. 14, 2014 [66] (emphasis added)). The Motion for Specific Performance, seeking enforcement of both the Settlement Agreement and the Supplemental Agreement was the first time the Court learned of the Supplemental Agreement.

13

Both sides in substance argue the Court has ancillary enforcement jurisdiction to enforce the Supplemental Agreement. Dr. Savage-Rumbaugh and BHI argue the Court also has statutory supplemental jurisdiction under 28 U.S.C. § 1367.

An action to enforce a settlement agreement is a claim for breach of contract to which the parties must look to state court for enforcement unless the federal court has "its own basis for jurisdiction." *Myers v. Richland County*, 429 F.3d 740, 745 (8th Cir. 2005) (citing and quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). There is no independent basis for jurisdiction. The citizenship of the party opponents would not be diverse with respect to a contract action to enforce either the Settlement Agreement or the Supplemental Agreement.

Ancillary enforcement jurisdiction may exist if the breach of a settlement agreement would violate a court's order or decree. In that circumstance the breach of the agreement is a violation of the court's judgment. *See Kokkonen*, 511 U.S. at 380-81; *Myers*, 429 F.3d at 747 & n. 5 (discussing the difference between ancillary enforcement jurisdiction and supplemental jurisdiction under 28 U.S.C. § 1367); *Miener v. Missouri Dept. of Mental Health*, 62 F.3d 1126, 1127 (8th Cir. 1995). In *Kokkonen* the Supreme Court said: "If the parties *wish* to provide for the court's enforcement of a dismissal-producing settlement agreement they can seek to do so." 511 U.S. at 381 (emphasis original). Where, as here, the dismissal is by a Federal Rule of Civil Procedure 41(a)(1)(A)(ii) stipulation "the court is authorized to embody the settlement contract in its dismissal order" or it may retain jurisdiction. *Id.* at 381-82. "Absent such action, however, enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Id.* at 382; *see, e.g., 4:20 Communications, Inc. v. Paradigm Co.*, 336 F.3d 775, 778 (8th Cir. 2003) (no ancillary jurisdiction where dismissal order did not incorporate settlement terms and court expressly retained jurisdiction only for brief period of time); *Hayden & Assoc., Inc. v. ATY*

*Building Systems, Inc.*, 289 F.3d 530, 532 (8th Cir. 2002) (enforcement of settlement agreement appropriate only where dismissal order incorporates the settlement agreement or court expressly retains jurisdiction over it); *see also Roberts v. Ocwen Loan Servicing, L.L.C.*, ___ Fed. Appx. ___, ___, 2015 WL 4095368, at *1 (8th Cir. July 8, 2015).

As noted, the Court did not enter a dismissal order in this case. Dismissal was by stipulation of the parties appearing. Fed. R. Civ. P. 41 (a)(1)(A)(ii). Nor when the stipulation of dismissal was filed did the Court expressly retain jurisdiction over the Settlement Agreement. Later, in granting Dr. Savage-Rumbaugh's motion asking the Court to retain jurisdiction over the Settlement Agreement for an additional 120 days, the Court said it would "retain jurisdiction as requested." (Text Order [66]). Though the extension order was entered nearly a year after the stipulation of dismissal, and the Court had not been informed of the terms of the Settlement Agreement, the Court has considered that implicit in the extension order was recognition the Court had intended to retain jurisdiction of the agreement from the filing of the stipulation. Accordingly, the Court has previously indicated it will decide the motion for specific performance of the Settlement Agreement with respect to the remaining bonobo governed by it, Maisha, while noting its concern about jurisdiction to enforce the Supplemental Agreement involving the Bonobo 4. Because of the similarity between the two agreements, the Court reserved decision of the jurisdictional issue until the final ruling. (Order [120] at 1-2).

The Settlement Agreement recites that "Savage-Rumbaugh's willingness to execute this Agreement is contingent upon her entering simultaneously into a side agreement with the Trust." It does not identify the "side agreement", its subject or terms. The Court was unaware there was such an agreement when it retained jurisdiction. The parties agree the side agreement referred to the Supplemental Agreement and contend that as a matter of Iowa law the reference was "clear

and specific" enough to incorporate the Supplemental Agreement in the Settlement Agreement. *Hofmeyer v. Iowa District Court*, 640 N.W.2d 225, 228 (Iowa 2001).

The parties are free to agree as they wish about the interpretation of their contract, but they cannot extend the Court's jurisdiction by contract. *4:20 Communications*, 336 F.3d at 778. The fact is the Court never expressly retained jurisdiction to enforce the Supplemental Agreement and could not have done so because it did not know about it.[4] If a court is being asked to retain jurisdiction to enforce a collateral agreement which is part of the consideration for settlement, that request must be made clear to the court at the time of dismissal. The Court cannot expressly retain jurisdiction to enforce a contract of which it has no knowledge.

Dr. Savage-Rumbaugh and BHI next argue 28 U.S.C. § 1367 gives the Court supplemental jurisdiction to enforce the Supplemental Agreement. Supplemental jurisdiction under § 1367 incorporates that branch of ancillary jurisdiction identified in *Kokkonen* as "permit[ing] disposition by a single court of claims that are, in varying degrees and respects, factually interdependent." 511 U.S. at 379-80. Under the statute, supplemental jurisdiction extends to "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367 (a). In most relevant respects the Settlement Agreement and Supplemental Agreement are identical, but that is not the pertinent claims relationship. Assuming § 1367 could apply, under the plain language of the statute the focus would not be on the similarity of the disputes under the two agreements, but on the relationship between the dispute

---

[4] Subparagraph 15(c) of the Settlement Agreement recites that the Settlement Agreement is entire "and there exists no other Agreement, oral or written . . . related to the matters covered by this Agreement." The "side agreement" is not expressly incorporated in the Settlement Agreement by reference. The Settlement Agreement would have clearly indicated to the Court that the requested retained jurisdiction was limited to the four corners of the Settlement Agreement.

under the Supplemental Agreement to the original interpleader claims. The interpleader claims involved only the ownership of Matata and Maisha stemming from a series of transactions specifically pertaining to those bonobos. No claims were made involving the status of the Bonobo 4. To paraphrase *Kokkonen*, the facts underlying the interpleader claims and those underlying the claim for breach of the Supplemental Agreement "have nothing to do with each other." 511 U.S. at 380.[5]

The Court understands that the parties would very much like to resolve the issues under both agreements. It would be desirable to do so. Federal courts are, however, courts of limited jurisdiction. Subject matter jurisdiction either exists, or it does not. There is no middle ground. A federal court must satisfy itself that it has subject matter jurisdiction, and here Dr. Savage-Rumbaugh and BHI have the burden to establish jurisdiction. *United States v. Afremov*, 611 F.3d 970, 975 (8th Cir. 2010). The Court concludes it has neither ancillary enforcement jurisdiction nor statutory supplemental jurisdiction to enforce the Supplemental Agreement. The Court will proceed to consider the motion with respect to the Settlement Agreement involving Maisha. The Settlement Agreement and the Supplemental Agreement are the same in relevant respects. The research provision in paragraph 4 of the Settlement Agreement requires the Court to take into account research involving the entire bonobo colony. Consequently, the factual background and analysis are not affected by lack of jurisdiction to consider specific performance of the Supplemental Agreement.

_____

[6] In fact the Supplemental Agreement acknowledges this. It recites that the parties to the interpleader action having resolved their claims to ownership of Matata and Maisha, IPLS and Dr. Savage-Rumbaugh "wish to resolve their respective claims to ownership of certain of the remaining bonobos . . . and to provide for their care and safety going forward." (Ex. B to Motion [69-3]).

### III.   FACTUAL BACKGROUND

To understand the present dispute it is important to review the history which has brought the parties back to court. The Des Moines sanctuary now operated by ACCI houses five bonobos (*pan paniscus*); Maisha, Kanzi, Nyota, Elikya and Teco. Bonobos are a species of great ape with a remarkable ability to understand human language and communicate. Kanzi, the most linguistically advanced of the colony, can comprehend human language -- not just a trained response as a dog might understand "sit" -- but relatively complex sentences. According to Dr. Sue Savage-Rumbaugh, Kanzi was "the first nonhuman ever to . . . acquire language without being trained to understand spoken sentences, even novel sentences that he had never heard before." (Tr. at 26).   Kanzi does not have the physiological equipment to audibly speak language, but by using "lexigram" keyboards with some 450 symbols is able to express himself. When Kanzi's abilities were discovered and developed it became possible for the first time to conduct a conversation in English with another species. Kanzi has other talents. He is a capable "stone tool napper" and he can create representational art.

Dr. Savage-Rumbaugh was chiefly responsible for discovering and developing the language abilities of bonobos. After obtaining her doctorate at the University of Oklahoma, Dr. Savage-Rumbaugh went to work as a research assistant at the Yerkes National Primate Research Center in Atlanta, Georgia ("Yerkes") under the direction of Dr. Duane Rumbaugh who she would later marry. Yerkes is one of a number of primate research facilities funded by the federal government. (Tr. at 23). It keeps primates for the purpose of biomedical and behavioral research. Dr. Savage-Rumbaugh left Yerkes after about five years for the Language Research Center at Georgia State University where she began working with Kanzi, then about six months old. The focus of her work was to attempt to discover whether an ape could learn language as a human child

18

would through free contact between bonobos and humans in a "familial like situation" in which an attachment was formed. That is how she interacted with Kanzi. Her research demonstrated it could be done. Dr. Savage-Rumbaugh's work was described in the record as "transformative," (*id.* at 313) and "more than groundbreaking." (*Id.* at 608). Dr. Savage-Rumbaugh's chief opponent in the present dispute, Dr. Jared Taglialatela, said Dr. Savage-Rumbaugh's 1993 monograph on Kanzi's English capabilities as "absolutely groundbreaking work." (*Id.* at 541).

With the success of Dr. Savage-Rumbaugh's research came recognition and awards of which *Time Magazine*'s listing of Dr. Savage-Rumbaugh as one of the 100 most influential people in the world and her honorary doctorate from the University of Chicago are chief examples. Dr. Savage-Rumbaugh's work came to the attention of Des Moines businessman Ted Townsend. Mr. Townsend traveled to Dr. Savage-Rumbaugh's lab in Georgia to speak with her and learn more. Ultimately Mr. Townsend invested $20 million in constructing a large state-of-the-art facility in which bonobo and other primate research would take place. The sanctuary was built near the Des Moines River on land given by the City of Des Moines. IPLS had been incorporated to run it. Dr. Savage-Rumbaugh and Dr. Rumbaugh agreed to relocate the bonobo colony to the new facility. They and the bonobos came to Iowa in 2005. Dr. Savage-Rumbaugh became IPLS's Director of Science.

The sanctuary is comprised of two large mirror-image buildings on about 230 acres. The bonobos are located in one of the buildings. There are two "towers" with fenced play yards adjacent, and another three and one-half acre fenced outdoor yard for the bonobos to use. A tunnel leads to the yard. Climbing structures have been built for the bonobos. (*See* Tr. at 461-66).

The record is not very clear on the point, but apparently there was some disruption in the relationship between Mr. Townsend and Dr. Savage-Rumbaugh. In late 2007 Mr. Townsend

announced he wanted to fire her. The record is silent about his reasons, but Dr. Savage-Rumbaugh was removed as Director of Science. She would, however, continue her research activities at the sanctuary.

In 2008 the Des Moines River flooded badly. The water reached the sanctuary. Food had to be brought in by boat. There was no electricity. The bonobos retreated to safety "high in the tunnels." (Tr. at 41). Dr. Savage-Rumbaugh and her sister, Liz Pugh, stayed with the bonobos until the water receded.

Mr. Townsend funded the operations of the sanctuary for a period of time after construction. Some months after the 2008 flood he announced he was going to incrementally reduce his funding. It ceased entirely at the end of 2011. In November 2011 Dr. Savage-Rumbaugh formed BHI as a nonprofit corporation to assist in raising money. In 2012 IPLS entered a period of financial crisis and transition.

Des Moines attorney Lyle Simpson represented both IPLS and BHI. In February 2012 he recommended that the boards of the two entities merge. IPLS was operating without a reliable source of income and was having difficulty paying its bills. BHI held donated money, but it had not been organized as an entity which could receive tax exempt contributions. Mr. Simpson thought combining the two would allow money to pass from BHI to IPLS while at the same time gaining IRS tax exempt status for BHI as a supporting organization for another tax exempt organization, IPLS. (*See* Tr. at 233). Mr. Simpson's recommendation was accepted by both boards.

The merger served its purpose, but the combined board did not function well. Many of the scientists Dr. Savage-Rumbaugh had recruited to serve on the BHI board were located in other areas of the country, some in other countries, and it was difficult to get all of the members of both boards to work in harness. On December 4, 2012 Mr. Simpson circulated a "Plan of Action" which

envisioned splitting the two boards again. (*See* Ex. 23). IPLS, with a board made up of local Des Moines area business persons, would manage the sanctuary physical facility, raise funds for that purpose, and promote the bonobos in the Des Moines community. BHI, with a board dominated by scientists, would manage the bonobo colony and direct the science. The proposal was approved and the two entities separated within a few months. George Caudill was named chair of IPLS.

In January 2013 the interpleader action was settled and the parties entered into the Settlement Agreement which the present motion seeks to enforce.

From early 2012, with the cessation of Mr. Townsend's funding and the reduced staffing which followed, Dr. Savage-Rumbaugh took over the daily running of the facility. Her effort, she said, was to "pull the trust out of chaos." (Tr. at 47). She became, as Mr. Simpson put it, "a one person band." (*Id.* at 244). This took its toll on Dr. Savage-Rumbaugh.

Adding to the stress were the activities of the "Bonobo 12." The time frame is a little unclear, but in 2012 allegations were made by a group of former sanctuary workers that Dr. Savage-Rumbaugh had endangered the welfare and safety of the bonobos through carelessness or neglect; lost keys, unlocked cages, improper diet, injuries and the like. (*See* Ex. 107). For a time the sanctuary's veterinarian, Dr. Julie Gilmore, was asked to monitor Dr. Savage-Rumbaugh's activities in the lab. An investigation cleared Dr. Savage-Rumbaugh of any wrongdoing, but the affair was hurtful to her. In an August 29, 2013 email to IPLS chair Caudill Dr. Savage-Rumbaugh wrote she had been working "under severe stress as there were constant attempts to berate me and misrepresent my efforts." (Ex. 35 at 2).

Another stressor in 2012 was the death of a bonobo named Panbanisha. Panbanisha also had advanced language skills, and was one of the colony members of whom Dr. Savage-Rumbaugh was particularly fond. (*See* Ex. 35 at 3). Bonobos are susceptible to respiratory illness. In

November 2012 all of the bonobos fell ill with respiratory illness, starting with the youngest, Teco. Panbanisha was one of the last to be afflicted, but when she did become ill her symptoms rapidly became acute. A rigorous course of antibiotics was unsuccessful. On November 6, 2012 Panbanisha died of respiratory distress syndrome.

In May 2013 Dr. Savage-Rumbaugh fell and suffered a concussion. The injury was not serious but was the culmination of events which appear to have affected her mental health. She seemed depressed. (*See* Tr. at 244). Dr. Savage-Rumbaugh left the facility in May and would not return until November 2013. She stayed in Des Moines for a while and then traveled to New Jersey to be with her husband, Duane. Dr. Savage-Rumbaugh testified she felt she was unable to come back and continue working. (*Id.* at 68).

Research had languished with the end of Mr. Townsend's support. Dr. Savage-Rumbaugh's time was taken up with administrative tasks. With her now gone essentially no research activity was taking place. All realized, including Dr. Savage-Rumbaugh, that there was a need for someone to take over the science at the facility.

On May 22, 2013 the IPLS board, apparently on Mr. Simpson's recommendation, passed a resolution that Dr. Savage-Rumbaugh be elected "Director Emeritus of Scientific Research of [IPLS] with unfettered permanent access to the bonobo colony." (Ex. 27 at 1). The resolution continued with a request that the BHI board select a permanent science director for the sanctuary. (*Id.*) Mr. Simpson later clarified that the resolution was not meant to put Dr. Savage-Rumbaugh "out to pasture," that IPLS did not want Dr. Savage-Rumbaugh to "simply step away," but a transition plan looking to an eventual successor was necessary. (Ex. 30 at 1). Mr. Simpson wrote that the Trust needed Dr. Savage-Rumbaugh and that she must "continue to have a vital role." (*Id.*)

When Dr. Savage-Rumbaugh left in May 2013 she also stopped participating in IPLS board meetings. At some point during the summer of 2013 the board ceased its attempts to involve Dr. Savage-Rumbaugh. She was effectively dismissed from the IPLS board in July 2013. Neither BHI (on which Dr. Savage-Rumbaugh continued as a board member), nor it seems Dr. Savage-Rumbaugh, was informed of this.

Though she may have ceased formal involvement in IPLS, Dr. Savage-Rumbaugh remained interested in the wellbeing of the bonobos and continuation of her "research trajectory." In the summer of 2013 Mr. Simpson asked Dr. Savage-Rumbaugh for help in looking for someone to succeed her. She agreed. In fact, she testified that one of the reasons she returned to New Jersey in the summer of 2013 was to discuss a possible successor with her husband who she had not seen in several years. (Tr. at 106). Ultimately Dr. Savage-Rumbaugh and her husband recommended Dr. Jared Taglialatela. He had been one of Dr. Savage-Rumbaugh's students and they had co-authored research papers. (*See* Ex. 1007 at 6). Dr. Taglialatela had interacted with the sanctuary's bonobos. Dr. Savage-Rumbaugh believed he supported her research. She testified the transition she envisioned was one in which she would co-direct the facility for three or four years during which she would have unfettered access to the bonobos. (Tr. at 72).

Dr. Taglialatela is an assistant professor of biology at Kennesaw State University in Georgia, and a Yerkes research associate. He became a member of the BHI board in the fall of 2012. He joined the board at Dr. Savage-Rumbaugh's request.

In September 2013 Dr. Duane Rumbaugh solicited Dr. Taglialatela's interest as a successor to his wife. Dr. Taglialatela was receptive but wanted to visit the facility. He testified that after the visit Dr. Savage-Rumbaugh called him, talked about the history of the facility, and said she could not give assistance to the bonobos anymore. (Tr. at 479). Dr. Taglialatela as a viable candidate,

and the recommendation of Dr. Savage-Rumbaugh and Dr. Rumbaugh that he succeed Dr. Savage-Rumbaugh, was communicated by Mr. Simpson to the IPLS board. In doing so Mr. Simpson wrote that the transition should involve a period of overlap in which Dr. Taglialatela and Dr. Savage-Rumbaugh could work together to assure the continuity of Dr. Savage-Rumbaugh's research. (Ex. 36).

Mr. Simpson and the IPLS board were encouraged by the prospect of Dr. Taglialatela's involvement and anxious for him to agree. Dr. Taglialatela described Mr. Simpson and the board as "pushy" for him to take the job. (Tr. at 482). Dr. William Hopkins, who would join Dr. Taglialatela, testified the pair were "begged to take over the management." (*Id.* at 643). Dr. Taglialatela told the IPLS board he would need autonomy in managing the facility and would not have Dr. Savage-Rumbaugh in any oversight role. He believed he had obtained that assurance.

Dr. Taglialatela asked Dr. Hopkins to work with him. Dr. Hopkins is a professor of neuroscience at Georgia State University and also a research associate at Yerkes. He is currently president of ACCI. Like Dr. Taglialatela, Dr. Hopkins was familiar with the bonobos at the sanctuary. He testified that he talked with Dr. Savage-Rumbaugh before making a commitment and was assured he and Dr. Taglialatela would have autonomy in directing the research. (Tr. at 641).

On October 26, 2013 Dr. Savage-Rumbaugh emailed IPLS and BHI board members "enthusiastically endors[ing] Drs. Taglialatela and Hopkins" as "without doubt, the professionals best able to move IPLS forward, at this time." (Ex. 1005 at 1). She said she had supervised both as graduate students and was highly complementary of their research and grant writing abilities. Dr. Savage-Rumbaugh explained her recent absence from the sanctuary. The activities of the Bonobo 12, she said, made it "increasingly clear that the best thing I could do to improve the chances for

IPLS funding and to decrease the level of objections to the [U.S. Department of Agriculture ("USDA")] about IPLS -- would be to absent myself from the lab." (*Id.* at 1-2). She concluded:

> It is my hope that the coming essential transition will proceed smoothly and rapidly. I also hope that, as appropriate, and under Jared's direction, I will continue to do some research with the bonobos, once the needed structural changes and funding are firmly in place. I will to [sic] do nothing to disrupt this critical and necessary next step. The leadership role must transition to and remain within, the hands of others. IPLS is most fortunate that Jared and Bill are visiting and willing to consider what they might do.

(*Id.* at 3).

Dr. Savage-Rumbaugh's endorsement of Dr. Taglialatela and Dr. Hopkins was favorably received by both the IPLS and BHI boards. On November 12, 2013 BHI approved a resolution drafted by Mr. Simpson appointing Dr. Taglialatela as "Scientific Program Manager of [IPLS]" with responsibility for overseeing "the day to day science program," and Dr. Hopkins as the "Science Director" with responsibility for "overseeing all science done at IPLS." (Ex. 46 at 2). IPLS did the same.

At the end of October 2013 Dr. Savage-Rumbaugh, Dr. Taglialatela and Dr. Hopkins, as well as the BHI and IPLS boards, and Mr. Simpson were, if not completely congruent in understanding, in general alignment on the plan ahead for the management of the sanctuary and the research. Research would restart under the direction of Dr. Taglialatela and Dr. Hopkins with Dr. Savage-Rumbaugh at some point resuming her research with the bonobos under their leadership.

Things came apart almost immediately.

Teco, the youngest bonobo, had sustained a soft tissue leg injury in October 2013. Dr. Gilmore treated the injury and on October 30 spoke to Dr. Savage-Rumbaugh on the phone about it. Dr. Savage-Rumbaugh had planned to come to Des Moines later in November, but concerned

about Teco, accelerated her plans, arriving on November 4 or 5. Though Dr. Savage-Rumbaugh testified she told Dr. Gilmore and another employee about her intentions, her appearance at the sanctuary was sudden and unsettling. Dr. Savage-Rumbaugh took charge and gave directions to staff members as if she had never left. She sent emails about Teco and the lab, including to Dr. Taglialatela and Dr. Hopkins. IPLS chair Caudill was alarmed. He contacted Mr. Simpson concerned that Dr. Gilmore and the then facility director, Steve Boers, might leave, and Dr. Taglialatela and Dr. Hopkins have second thoughts. (*See* Ex. 41). On November 9 Mr. Caudill emailed Mr. Simpson: "I fear word of [Dr. Savage-Rumbaugh's] presence will get to Jared and Bill, and the entire house of cards will come tumbling down." (*Id.*)

Events moved swiftly. Mr. Caudill, with the IPLS board's approval, decided to ask Dr. Savage-Rumbaugh to leave the facility. Dr. Savage-Rumbaugh was told not to communicate with anyone about the situation without clearance from Mr. Caudill or Mr. Simpson, specifically with the IPLS and BHI board members, Dr. Taglialatela and Dr. Hopkins. (*Id.*; *see* Ex. 103). Dr. Savage-Rumbaugh did not understand the problem and was, from her perspective, blindsided by IPLS's reaction to her return. Nonetheless, she complied and left the facility on November 10, 2013, though she was allowed to return spend Thanksgiving with the bonobos. BHI board members knew nothing of this at the time they voted to approve the appointments of Dr. Taglialatela and Dr. Hopkins a few days later. On November 21, 2013 Mr. Caudill announced to the staff and volunteers at the sanctuary that Dr. Savage-Rumbaugh would no longer be affiliated with IPLS. (Ex. 48 at 3).

Dr. Savage-Rumbaugh's ban from the sanctuary was intended to be temporary,[6] but as a practical matter it has become permanent. Dr. Taglialatela testified he does not want Dr. Savage-Rumbaugh in the lab because she is a danger to humans and the bonobos.[7] (Tr. at 595). He bases this on having witnessed unsafe practices in the past and what he learned about practices at the sanctuary after accepting his position. (*Id.* at 515-16). In view of Dr. Savage-Rumbaugh's career-long history with the bonobos, that she would be a threat to their safety is difficult to credit, certainly not intentionally. Probably closer to the truth is Dr. Hopkins' perception that as events have developed, having Dr. Savage-Rumbaugh in the lab would simply not be successful. (*Id.* at 660). He testified he and Dr. Taglialatela would like to have "autonomy and control over both the scientific direction and health and management" of the bonobos because in the past the program was not productive and "muddled in controversies." (*Id.* at 651). The fact Yerkes has signaled it would not send chimpanzees to the sanctuary (which the sanctuary is actively pursuing) if Dr. Savage-Rumbaugh is involved undoubtedly is also a factor.[8]

---

[6] At the time Mr. Simpson thought the removal of Dr. Savage-Rumbaugh was an overreaction.

[7] Dr. Taglialatela also testified Dr. Savage-Rumbaugh could conduct research with the bonobos if she obtained approval and complied with the safety procedures he had put in place. Unless attitudes change, the Court has doubts Dr. Savage-Rumbaugh would ever be welcome to return to the sanctuary.

[8] Dr. Savage-Rumbaugh and her husband Duane appear not to have ended their association with Yerkes on the best of terms. Quite a few chimpanzees are at Yerkes. Their role in biomedical research has been curtailed by the National Institutes of Health. Yerkes wants to transfer the chimpanzees and there is money to pay facilities who will take them, a potential source of income for the sanctuary as well as additional research. Though Yerkes has inspected the sanctuary (there is a vacant building available to house the chimpanzees), there is no transfer agreement at this point. A questionnaire Yerkes sent to IPLS/ACCI in connection with the sanctuary's application asked if either Rumbaugh was associated with the sanctuary "in any way" concluding with the question: "Can you guarantee they will have no more involvement?" (Ex. 38).

For their part, it is evident Dr. Savage-Rumbaugh and her supporters on the BHI board would like to move the bonobos from Des Moines and end Dr. Taglialatela's involvement with them. BHI has rescinded its resolution appointing Dr. Taglialatela to his position.

Since December 2013 Dr. Taglialatela has spent about six days a month at the sanctuary. (Tr. at 460). He has kept his academic responsibilities. He testified that when away he talks to staff at the sanctuary daily. (*Id.* at 466). The record does not indicate how often Dr. Hopkins is at the facility but it is evident from his testimony that he is fully involved in its activities.

Missouri businessman Ryan Sheldon is in the process of building a habitat for the bonobos on a farm near Osceola, Missouri. Mr. Sheldon was introduced to Dr. Savage-Rumbaugh on his 20th birthday in 1991, an event he describes as "one of the greatest birthday gifts a person could ever have." (Tr. at 355). Mr. Sheldon worked with Dr. Savage-Rumbaugh at the Language Research Center at Georgia State University between 1992 and 1999. Dr. Savage-Rumbaugh remains a close friend and role model.

The facility Mr. Sheldon is building is on a 200-acre farm. It is, in his words, a "modest facility" (Tr. at 364) consisting of a 40' x 80' building which will contain five cages and an infirmary. There will be an outdoor play area. The facility is designed to be low-cost and self-sustaining. Mr. Sheldon's purpose is "to give [the bonobos] a safe, open place where they can go back to the kind of work we used to do at LRC" (*id.* at 366) with Dr. Savage-Rumbaugh having lifetime access. (*Id.* at 367). The construction is nearing completion. Mr. Sheldon promises a lifetime financial commitment to maintain the facility.

Dr. Savage-Rumbaugh was the registered agent for both IPLS and BHI. Both are Iowa nonprofit corporations subject to the requirements of Iowa Code Ch. 504. As registered agent, Dr. Savage-Rumbaugh would have received notice from the Iowa Secretary of State in January 2013

that the corporations' biennial reports required by Iowa Code § 504.1613 were due. She took no action to see that the reports were filed and as a consequence both corporations were administratively dissolved in August 2013. *Id.* §§ 1421, 1422. Dr. Savage-Rumbaugh's inaction was unintentional, the product of unawareness of her responsibilities as agent, or oversight.

Upon learning of the dissolutions, Mr. Simpson prepared applications for reinstatement which Dr. Savage-Rumbaugh signed. BHI was reinstated, but not IPLS. As a nonprofit, Iowa law allowed IPLS to opt out of paying unemployment taxes for its employees. When Mr. Townsend ended his support a number of employees were let go and applied for unemployment compensation. The compensation was paid by the State of Iowa resulting in a lien against IPLS for the payments, now aggregating some $90,000. The lien had to be paid to reinstate IPLS. IPLS could not afford to do so.

To provide a corporate shield Mr. Simpson recommended the creation of a new entity, ACCI. ACCI was created on December 18, 2013 with the same board of directors and officers as IPLS. (*See* Exs. 54, 55, 57, 58). Also on December 18, and unknown to BHI, IPLS by bill of sale conveyed its interest in the bonobos and all of its assets to ACCI.

Formal research under the stewardship of Dr. Taglialatela and Dr. Hopkins began in 2014. Since April of that year nine research "protocols" have been approved by the sanctuary's Institutional Animal Care and Use Committee (IACUC) (six of which are listed on Ex. 1006).[9] All are ongoing and slated to end in 2017. The titles of the protocols are somewhat vague. Dr. Taglialatela has been reluctant to disclose the full protocols themselves in the belief they are

---

[9] As the Court understands it, USDA regulations require a facility like the sanctuary to have to have an IACUC to review research proposals. The current members of the Des Moines IACUC are Dr. Gilmore (chair), Dr. Taglialatela, Allyson Bennett (scientist), Tami Watson (facility representative) and Jack Price (layperson).

confidential, though there is evidence he offered to let BHI board member, Dr. Derek Wildman, look at them during a site visit by Dr. Wildman. (Tr. at 340-41, 517-18). The research described in the protocols includes all of the subjects listed in paragraph 4 of the Settlement Agreement. (Ex. 1 at 2; *see* Tr. at 523-26, 644-48). Noted primatologist Dr. Russell Tuttle testified the research in the protocols looked "too busy" to him and should be pruned down. (Tr. at 622, 632).

BHI board members have received limited information about the research being conducted at the sanctuary. From their visits to the facility, it is evident the BHI board members who testified, Dr. Laurent Dubreuil and Dr. Wildman, have questions about what research is actually being conducted. Neither believes it is following Dr. Savage-Rumbaugh's research trajectory.

On the limited record before the Court it is difficult to gauge the nature and extent of the research being conducted at the sanctuary, though Dr. Hopkins discussed some of the protocols in more detail. (Tr. at 644-48). Though there is clear disagreement between Dr. Savage-Rumbaugh and BHI on the one hand, and Dr. Taglialatela and Dr. Hopkins on the other, about the appropriate focus and methods for the current research, Dr. Taglialatela and Dr. Hopkins are well regarded primatologists who have committed themselves to superintending research at the sanctuary. The purpose of bringing them to the facility was to reignite the research efforts which had languished. The Court has no basis to conclude that the research described in the protocols is not in fact occurring as Dr. Taglialatela and Dr. Hopkins testified.

In about April 2014 the sanctuary adopted policies intended to protect the wellbeing of the bonobos. These included strict procedures on hand sanitation, wearing gloves and masks, isolation protocols for bonobos who get ill, and strict control of diet. The result, Dr. Gilmore said, has been a dramatic reduction in respiratory illness. (Tr. at 405-06). Dr. Savage-Rumbaugh believes these

policies, particularly the gloves and masks requirement, are an impediment to the interaction with the bonobos important in furthering her research trajectory.[10]

Additional factual background is included in the discussion which follows.

## IV.  DISCUSSION

### A.  Specific Performance and Principles of Contract Interpretation

Dr. Savage-Rumbaugh and BHI request specific relief in two particulars, the second alternative to the first:

> Dr. Savage-Rumbaugh and BHI respectfully request that this Court remedy IPLS and ACCI's breaches by: (i) granting Dr. Savage-Rumbaugh and BHI their right to relocate Maisha and the Bonobo 4; or, alternatively (ii) ordering that BHI be allowed to make all decisions regarding the research in which the Bonobo 4 are involved and that Dr. Savage-Rumbaugh be allowed to participate in this research, including having regular access to the bonobos and having at least an equal say in other decisions affecting the bonobos; and (iii) granting any other relief this Court deems just and equitable.

(Savage-Rumbaugh & BHI Pre-Hearing Brief [113] at 18-19; Savage-Rumbaugh & BHI Joint Post-Hearing Brief [134] at 48). The residence and research control of the Bonobo 4 could be addressed only if the Court had jurisdiction to enforce the Supplemental Agreement, which it does not. The internecine dispute over BHI's control of science at the sanctuary, and whether and the extent to which Dr. Savage-Rumbaugh should be involved, are beyond the scope of the issues properly before the Court. The Court has jurisdiction to enforce the Settlement Agreement, but apart from its terms does not have jurisdiction over the general welfare of the bonobos or to determine who should be in charge of the research in which the bonobos are involved.

---

[10]  The free contact interaction with the bonobos favored by Dr. Savage-Rumbaugh, and use of the lexigram keyboards, can be seen among the video clips in Exhibit 98.

Under Iowa law (the choice of law adopted by the Settlement Agreement) a litigation settlement agreement is "contractual in nature." *Peak v. Adams*, 799 N.W.2d 535, 543-44 (Iowa 2011). Dr. Savage-Rumbaugh and BHI seek specific performance of the Settlement Agreement. They have the burden to establish they are entitled to the performance sought. *See Quint-Cities Petroleum Co. v. Maas*, 259 Iowa 122, 128, 143 N.W.2d 345, 348 (1966). Specific performance is a form of equitable relief which rests in the court's sound discretion. *Lange v. Lange*, 520 N.W.2d 113, 117 (Iowa 1994); *see Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006). "The object of specific performance is to best effectuate the purpose for which the contract was made." *Lange*, 520 N.W.2d at 118. Ordinarily specific performance should not be decreed "unless contractual terms are so express that the court can reasonably determine the duty of each party and the conditions under which the performance is due." *Id.* at 117 (citing *Tri-States Inv. Co. v. Henryson*, 179 N.W.2d 362, 363 (Iowa 1970)).

Determining the intent of the parties at the time they entered into the contract is the "cardinal rule" of contract interpretation.[11] *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). Extrinsic evidence of context often may help in aiding interpretation of a contract, but the language of the contract remains most important. *Id.* at 436 (citing *Restatement (Second) of Contracts* ("*Restatement*") § 212 cmt. b (1979)). "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Id.* (quoting *Fausel v. JRJ Enters. Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (in turn quoting *Restatement* § 202(1)); *see Nevadacare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010).

---

[11] "Interpretation of a contract involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect." *Peak*, 799 N.W.2d at 543.

## B.  Analysis and Ultimate Findings

Three Settlement Agreement provisions are in issue and will be discussed in the following order: the research provision in paragraph 4, the relocation provision in paragraph 6, and the care and safety provision in paragraph 5.

### 1.  The Research Provision

The research provision states:

> Maisha shall continue to reside at the Trust for at least so long as he and/or the other members of the colony of which he is a part, continue to be involved in research in the fields of experimental psychology; use of language and tools; and ape intelligence and human cultural modes (including but not limited to art, music, tools, agriculture, fire, animal domestication, habitat construction, use of water, hunting, mimits, sociological role construction, normative child rearing practices, play, or normative religious/mythological practices); provided that, if a member of the colony dies of natural causes it shall not be grounds for transferring Maisha's residence.

(Ex. 1 at 2). Dr. Savage-Rumbaugh and BHI argue the research provision was intended to require the continuation of Dr. Savage-Rumbaugh's "research trajectory." ACCI is alleged to have failed to maintain that trajectory by banning Dr. Savage-Rumbaugh from the facility. ACCI responds it has not jettisoned the research trajectory described in the provision and is currently conducting research within the listed fields.

Dr. Savage-Rumbaugh testified that the purpose of the provision was to see that her research trajectory continued long after her involvement ended. (Tr. at 62). She had a hand in drafting it. She said the language prior to the parenthetical describes her trajectory. (*Id.* at 60). She proposed the language in the parenthetical. She testified it lists activities usually considered uniquely human which she thought apes might be able to accomplish beyond their demonstrated language skills if her research trajectory continued. (*Id.*)

Dr. Savage-Rumbaugh also testified the pursuit of her research trajectory not only requires research in the listed fields of study, but also the research must be conducted according to her method; free contact with the bonobos in a caring, familial, "bi-species rearing" environment, as if raising a child. (Tr. at 26, 30, 78, 102). She expected her protégés, Drs. Taglialatela and Hopkins, would follow her path. The primatologists Dr. Savage-Rumbaugh called as witnesses, Drs. Dubreuil, Wildman and Tuttle, generally echoed the importance of conducting research as Dr. Savage-Rumbaugh had. Indeed, Dr. Tuttle testified Dr. Savage-Rumbaugh is the "only one who has the faith" to carry the research beyond language to the more anthropological research epitomized (as the Court understands his testimony) by the activities listed in the parenthetical.

Under the direction of Drs. Taglialatela and Hopkins the bonobos are treated more as subjects for study than family members. Dr. Taglialatela disagrees with the idea of rearing bonobos with humans. He believes that approach to be detrimental to the bonobos and not justified by the benefit to science. (Tr. at 523). While research in the fields listed in the research provision is being conducted, it is done with more limited direct contact with the bonobos than Dr. Savage-Rumbaugh employed. That masks and gloves are now routinely worn by staff to minimize the risk of illness to the bonobos is a departure from Dr. Savage-Rumbaugh's practice. She believes masks and gloves, while sometimes necessary, interfere with the kind of human contact necessary to advance her research trajectory. (*Id.* at 77-78).

The terms of the research provision are not so express as to impose a duty on ACCI to conduct future research by Dr. Savage-Rumbaugh's direct contact, familial method. The provision describes fields of research. It does not say how the research is to be conducted. It does not say who should be in charge of the research. Indeed, in paragraph 8 of the Settlement Agreement Dr. Savage-Rumbaugh specifically relinquished "any and all rights to determine the residence,

breeding, activities or use of . . . Maisha" subject to the contingent rights of BHI under the relocation provision in paragraph 6. (Ex. 1 at 3). In the Court's judgment, no duty to follow Dr. Savage-Rumbaugh's research method can be implied from the contractual language employed, particularly when the situation of the parties at the time of contracting is considered.

The provision is forward-looking to a time after the end of Dr. Savage-Rumbaugh's involvement with the sanctuary, for, as she said, "generations beyond me." (Tr. at 62). Dr. Savage-Rumbaugh was under great stress at the time the Settlement Agreement was finally agreed to, and would soon leave for a lengthy period of time. Turnover of the research to other scientists was within the contemplation of the parties, indeed was hoped for. It is unlikely the parties would have agreed to restrict Dr. Savage-Rumbaugh's successors to conducting research only by her method. That Drs. Taglialatela and Hopkins were not asked to make this commitment at the time they were hired with Dr. Savage-Rumbaugh's support and were promised autonomy is inconsistent with any interpretation of the research provision restricting how research would be conducted in the future.

Were the Court to agree research at the sanctuary was being conducted in breach of the research provision, the remedy in the first instance would not be Maisha's relocation by Dr. Savage-Rumbaugh and BHI. The provision mandates that Maisha shall reside at the sanctuary "at least so long as he and/or other members of the colony" are involved in the listed research fields. It does not say "only so long as." Subject to paragraphs 5 and 6, the research provision is clearly intended to ensure Maisha resides at the sanctuary so long as the described research is ongoing. Specific performance of the research provision would involve a decree requiring the sanctuary to conduct research in accord with the Court's interpretation of the provision. Only if the sanctuary failed to comply with the decree would relocation be in order.

2. The Relocation Provision

The relocation provision states in relevant part:

Should the Trust cease to exist or otherwise, in its sole discretion, determine that it is unable to provide a home and proper care and support for Matata and/or Maisha, the Trust shall provide the DRC, in the case of Matata, and Bonobo Hope Initiative, Inc., an Iowa nonprofit corporation ("Bonobo Hope"), in the case of Maisha, sixty days written notice prior to the date upon which the Trust will no longer be available as a residence for Matata or Maisha. The Trust in either case shall also provide sixty (60) days written notice to the court in the Interpleader Action . . . . Bonobo Hope in unison with Savage-Rumbaugh or her legal representative, shall have sole discretion regarding placement of Maisha under such circumstances.

(Ex. 1 at 2). Dr. Savage-Rumbaugh and BHI argue that with IPLS's administrative dissolution[12] it has ceased to exist as a practical matter triggering the relocation rights of Dr. Savage-Rumbaugh and BHI. They contend the fact that under Iowa law a dissolved nonprofit corporation "continues its existence" only for the purpose of winding up and liquidating its affairs, *see* Iowa Code §§ 504.1405(1); 504.1422 (3),[13] cannot mean its existence continues for the purposes of the relocation provision because so viewed the cease-to-exist clause would have no meaning. ACCI counters that as a matter of law IPLS does continue to exist even though its corporate activities are restricted, and Dr. Savage-Rumbaugh should not benefit from the dissolution because her inaction as registered agent brought it about.

The Court agrees with Dr. Savage-Rumbaugh and BHI that the fact IPLS legally exists as a dissolved corporation to wind up its affairs does not necessarily mean it continues to exist for purposes of the cease-to-exist clause. If that were the case the clause would be meaningless because

---

[12] The Settlement Agreement's preamble states the "Trust" refers to "IPLS d/b/a Great Ape Trust of Iowa." As indicated in the discussion which follows, the word is used interchangeably to describe the corporate entity and the place where Maisha resides.

[13] An Iowa nonprofit corporation continues in existence under the statutory sections cited in the text if the dissolution is voluntary or administrative.

IPLS could potentially never go out of legal existence. *See First Nat'l Bank of Creston vs. Creston Implement Co.*, 340 N.W.2d 777, 781-82 (Iowa 1983)(interpretation of contract which leaves a part meaningless should be avoided).

The Court does not agree, however, that the clause is concerned with IPLS's legal status as a corporate entity. When the Settlement Agreement was signed the future of the sanctuary was very much in doubt. It had struggled without Mr. Townsend's financial backing. There was a real chance the sanctuary would fold or lack the resources to care for Maisha and the other bonobos. It is clear to the Court the purpose of the relocation provision was to address these eventualities. The operative language must be taken together. "Should the Trust cease to exist *or otherwise* . . . is unable to provide a home and proper care . . . " it must give notice of the date "*the Trust* will no longer be available as a residence for . . . Maisha." (emphasis added). Seen in context the word "Trust" here describes the place where Maisha resides, the sanctuary. The relocation provision is triggered if the sanctuary stops functioning or otherwise is not able to take care of Maisha. This view is consistent with the directive in the research provision that Maisha "continue to reside *at* the Trust." (emphasis added). It is also in accord with the interpretive clause in paragraph 15(b) of the Settlement Agreement: "The language of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties." (Ex. 1 at 4).

The sanctuary still functions as it did before the dissolution of IPLS and incorporation of ACCI. It continues to provide a home and proper care for Maisha. ACCI has succeeded to IPLS's obligations under the Settlement Agreement. When incorporated ACCI had the same board of directors as IPLS. The sanctuary continued to operate under the same management and staff. ACCI was created solely to carry on the same work as IPLS because the unemployment benefits lien frustrated IPLS's ability to reinstate itself. Nothing changed except the corporate entity under

which the sanctuary operated. As a practical matter, ACCI was little more than a name change. Had the operations of the sanctuary continued as contemplated in the Fall of 2013, under the leadership of Drs. Taglialatela and Hopkins with Dr. Savage-Rumbaugh continuing to have access to the bonobos and involved in research, no one would have thought the bonobos must be relocated simply because ACCI now operated the sanctuary.[14] The Trust has not ceased to exist within the meaning of the relocation provision.

Apart from the interpretation of the relocation provision, if the Court were to weigh whether the equities favored a decree permitting Dr. Savage-Rumbaugh and BHI to relocate Maisha, the Court would have to include in the balance the fact that Dr. Savage-Rumbaugh's own conduct contributed to the dissolution of IPLS and the need to create a new corporate entity to operate the sanctuary. Dr. Savage-Rumbaugh may not have understood what it meant to be a registered agent for IPLS, and was distracted by the many demands on her time, but the fact remains Dr. Savage-Rumbaugh's failure to perform her responsibility to see that IPLS's biennial report was filed contributed to the situation of which she now seeks to take advantage.

3.      The Care and Safety Provision

The care and safety provision states:

The Trust shall use its best efforts to provide complete and competent care of Matata and Maisha; and shall take all reasonable precautions to ensure their complete safety.

(Ex. 1 at 2).

---

[14] In a lengthy March 14, 2014 email to ACCI and BHI board members providing an update on the bonobo colony, Dr. Taglialatela wrote that ACCI had assumed the responsibilities of IPLS and that "[m]oving forward, IPLS will no longer exist and we will be known as THE APE COGNITION AND COMMUNICATION INSTITUTE." (Ex. 105). In his testimony Dr. Taglialatela explained the change as a "branding issue . . . in order to gain some scientific credibility" going forward. (Tr. at 556).

Dr. Savage-Rumbaugh and BHI maintain the bonobos are not safe at the sanctuary for two reasons; (1) the risk of flooding; and (2) the soil, pond and groundwater in the area may be toxic. They also believe the care and safety provision includes taking care of the bonobos' emotional well-being, which they allege has been harmed by the restrictions on direct contact with the bonobos, in particular with Dr. Savage-Rumbaugh. ACCI argues the concerns about flooding and toxicity are speculative and the evidence does not support a finding the bonobos' psychological health has suffered.

In 2008 the Des Moines River flooded to the point where it reached the sanctuary. The river has flooded a couple of times since without threatening the sanctuary. It is foreseeable another flood like that in 2008 will occur sometime in the future.[15]

When the parties finalized the Settlement Agreement in 2013 they knew flood waters from the river could reach the sanctuary. It had happened in 2008, yet they agreed the bonobos would continue to reside at the sanctuary. The record is silent on what measures are in place to protect the bonobos should flood water again reach the sanctuary. As a USDA exhibitor and research licensee, the sanctuary is regulated and inspected regularly by the USDA. It is required to and does have a disaster plan which is reviewed by USDA inspectors when they visit. No regulatory violations have been found to date. (*See* Tr. at 490-91). The disaster plan is not in the record and there is no testimony about its content other than it covers emergencies, of which flooding should

---

[15] Subject to a hearsay objection the Court received movants' Exhibit 91. The exhibit includes a written report apparently by a California engineering firm which opines that the sanctuary is in a delineated 10-year flood plain. While some of the government documents in the exhibit may be admissible under the hearsay exceptions for business or public records, Fed. R. Evid. 803(6)(8), the report itself is hearsay. Dr. Tuttle referred to the report briefly in his testimony, but he is not a flood expert nor otherwise was a foundation laid for admissibility under Fed. R. Evid. 703. That said, the history of flooding near the sanctuary site and its proximity to the Des Moines River are probative of a risk of flooding in the future.

be one. The Court is therefore unable to evaluate whether the plan adequately protects the safety of Maisha if the river rises again as it did in 2008 and, it follows, if all reasonable precautions have been taken to ensure Maisha's safety. In the face of a known risk the Court will grant the motion to require ACCI to submit for review all disaster or other plans in place to protect the bonobos in the event the sanctuary is flooded.

The soil, groundwater, and water in a nearby pond have never been tested for toxicity. Like the flood risk, toxicity does not appear to have been a concern when the parties agreed the bonobos would continue to reside at the sanctuary. There is simply no probative evidence in the record that the soil, pond or groundwater in or around the sanctuary are toxic to the point of endangering bonobo safety. The testimony on the point is entirely speculative. In the absence of any evidence of a serious risk, the care and safety provision does not warrant a decree requiring the sanctuary to conduct toxicity testing.

The Court will assume the care and safety provision embraces care for the bonobos' emotional health, though it is doubtful the language of the provision is express enough for the Court to determine what ACCI's duty would be in this regard. Drs. Dubreuil, Wildman and Tuttle all gave some testimony on the subject from their brief visits to the sanctuary, though not specifically with respect to Maisha. Drs. Dubreuil and Wildman noted the silence of the sanctuary, as if it were a ghost town, and the reserved demeanor of the bonobos. (Tr. at 174-75, 330).[16] When asked specifically about the emotional health of the bonobos if Dr. Savage-Rumbaugh is not in their lives, Dr. Tuttle responded the question was "too broad in a sense" but he speculated the

---

[16] Dr. Dubreuil also testified he did not see keyboards (lexigrams) except a computer version which was off. (Tr. at 173). Dr. Wildman did not observe staff interacting with the bonobos using the keyboards. (*Id.* at 328). Dr. Taglialatela testified the lexigram keyboards remain in use and that the sanctuary is continually thinking of new ways to use them. (*Id.* at 512-13).

bonobos would be "happier, more productive for humankind" if they stayed with Dr. Savage-Rumbaugh. (*Id.* at 627).

Perhaps the bonobos would be happier and their behavior productively different with Dr. Savage-Rumbaugh and her direct contact, familial association with them than they are in the current environment in which staff and researchers do not assume a quasi-parental role. The Court is not in a position to decide what kind of relationship with humans is best for the bonobos or to advance the research on their human-like abilities. Experts disagree. The record does not demonstrate, however, that the current environment in which the bonobos live, and specifically Maisha, so imperils their emotional health that they are deprived of competent care or are unsafe.

For the reasons stated above the Court finds movants Dr. Savage-Rumbaugh and BHI have not established that ACCI is in violation of the terms of the Settlement Agreement in any relevant particular warranting specific performance of the agreement by a decree granting movants the right to relocate Maisha. They have shown that there is a known risk to Maisha's safety from periodic flooding of the nearby Des Moines River which merits further inquiry into what provisions have been made to protect Maisha and the other bonobos from that eventuality.

## V. CONCLUSION AND ORDER

The Motion of Defendant Dr. Savage-Rumbaugh, joined by Intervenor BHI, for Specific Performance and Related Relief [69] is **granted in part and denied in part** as to the Settlement Agreement. It is **granted** to the extent that ACCI shall within thirty (30) days produce for the Court's review all disaster or other plans in place to protect the bonobo colony from a flood disaster. Copies of the plan(s) shall at the same time be provided to counsel for Dr. Savage-Rumbaugh and BHI. Beyond this, the motion is denied. The motion as to the Supplemental Agreement is **denied** for lack of subject matter jurisdiction.

41

Two observations are in order before concluding, the first a feature of this case which underscores the unique value to science of the bonobos, and the other the regrettable present circumstances in which the parties find themselves.

The Court understands that many of the attorneys who have worked on this case, including Mr. Simpson, have given their services pro bono. Witnesses travelled from diverse locations at their own expense. At his own considerable expense Mr. Sheldon is constructing a facility for the bonobos in Missouri. Drs. Savage-Rumbaugh, Taglialatela and Hopkins, the BHI and ACCI boards, the staff and volunteers at the sanctuary, all are motivated by a sincere desire to protect the bonobos, advance the research so successfully begun by Dr. Savage-Rumbaugh, and promote greater public awareness of the bonobos' close relationship to humankind. There is disagreement about how to do these things, but that those involved have invested so much of themselves in itself confirms how remarkable and important are these apes.

It is all the more regrettable then that the transition envisioned for the future of the sanctuary in October 2013 fell apart. As a result, Dr. Savage-Rumbaugh, whose groundbreaking research discovered and developed the human language abilities of the bonobos and who raised at least two of them, is now barred from contact with them (at least of the kind and to the extent she enjoyed before). BHI is supposed to direct the science at the sanctuary yet has been kept at arm's length by ACCI. Now there is an open split between Dr. Taglialatela and BHI. It is indeed unfortunate that those who share an appreciation of the bonobos and their research potential are unable to cooperate in what should be a common endeavor. The Court is limited to enforcement of a contract entered into before the upset in the parties' relationship, a contract the terms of which do not permit resolution of many of the issues created by that upset. These remain to be resolved,

but in the process one can only hope the parties reach an accommodation for the benefit of the bonobos and the science all those involved profess to support.

IT IS SO ORDERED.

Dated this 2d day of November, 2015.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE